
SEALED

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 18-10364-DPW |
| v. | Violations: |
| JASIEL F. CORREIA, II, | Counts One – Nine: Wire Fraud (18 U.S.C. § 1343) |
| Defendant | Counts Ten – Thirteen: False Tax Returns (26 U.S.C. § 7206 (1)) |
| | Counts Fourteen, Sixteen, Eighteen, Twenty, and Twenty-Two: Extortion Conspiracy (18 U.S.C. § 1951) |
| | Counts Fifteen, Seventeen, Nineteen, Twenty-One, and Twenty-Three: Extortion; Aiding and Abetting (18 U.S.C. §§ 1951 and 2) |
| | Count Twenty-Four: Bribery (18 U.S.C. § 666(a)(1)(B)) |
| | Forfeiture Allegation: (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c)) |

## FIRST SUPERSEDING INDICTMENT

### Part I:  General Allegations Re: SnoOwl & Tax Fraud

At all times relevant to <u>Counts One through Thirteen</u> of this First Superseding Indictment:

1.     SnoOwl was a company conceived and founded by JASIEL F. CORREIA, II ("CORREIA") in late 2012 to develop an "app" designed to connect local businesses with their target consumer market.  SnoOwl was incorporated in Delaware in December 2014.

2.     CORREIA, 27, is the mayor of Fall River, Massachusetts.  CORREIA was first elected in November 2015, and was re-elected by a wide margin to a second two-year term in

November 2017. Prior to his election as mayor, CORREIA was a one-term Fall River City Councilor between 2014 and 2016.

3.      In or about January 2013, CORREIA began seeking investors who were willing to provide investment money for SnoOwl in return for equity in the company. To induce their investments, CORREIA represented to the SnoOwl investors that: (i) he was a successful tech entrepreneur who previously sold another app, FindIt Networks, for a large profit; (ii) their investment funds would be used for expenses related to the development of the app; (iii) he would not take a salary or otherwise draw compensation from SnoOwl; and (iv) he would use his best efforts to ensure the success of SnoOwl. As a result, seven individuals invested in SnoOwl.

<u>Overview of the Scheme to Defraud and False Tax Returns</u>

4.      Starting in approximately January 2013, and continuing until at least in or about May 2017, CORREIA perpetrated a scheme to defraud the SnoOwl investors by making false representations and diverting a significant portion of the investors' funds to himself, while neglecting the development of the company to focus on his political career. Of the approximately $363,690 CORREIA received from the seven individual SnoOwl investors, CORREIA used at least $231,447, approximately 64% of all money invested, to fund his own lavish lifestyle, burgeoning political career, and the needs of his other business ventures.

5.      In February 2015, CORREIA filed false 2013 and 2014 tax returns by failing to report the diverted SnoOwl investor funds, as well as other income he received in those years. In fact, CORREIA omitted any mention of SnoOwl in his 2013 and 2014 personal tax returns.

6.      Then, in May 2017, after learning that he and SnoOwl were the targets of a federal investigation, CORREIA filed false 2013 and 2014 amended tax returns in which he substantially understated his actual income, and claimed false Schedule C business losses.

## Scheme to Defraud

7.      From in or about January 2013, to in or about May 2017, CORREIA devised and intended to devise a scheme to defraud the SnoOwl investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

It was part of the scheme that:

## Founding of SnoOwl and Opening of Citizen's Account

8.      In or about November 2012, CORREIA applied for and received an Employer Identification Number ("EIN") from the Internal Revenue Service ("IRS") for SnoOwl. When the IRS provided the EIN, it notified CORREIA that SnoOwl was required to file a Form 1065 Partnership Return by April 15, 2013.

9.      In or about December 2012, CORREIA and two other individuals, Associate #1 and Associate #2, agreed to formally start SnoOwl. Shortly thereafter, in January 2013, CORREIA, Associate #1, and Associate #2, opened a SnoOwl bank account at Citizen's Bank in Rhode Island ("Citizen's Account").

10.     Associate #1's primary role for SnoOwl was to provide business and strategic advice.    In conversations about SnoOwl in early 2013, CORREIA told Associate #1 that compensation for either CORREIA or Associate #1 was "off the table," and that SnoOwl would not be providing salaries or hourly pay for employees.    Associate #1 never received any compensation from SnoOwl, nor did CORREIA ever tell Associate #1 that CORREIA intended to take investor money for himself.

11.     Associate #2 had a background in software development.  In or about November 2012, while discussing his vision for SnoOwl, CORREIA falsely told Associate #2 that he had previously created and sold an app for several hundred thousand dollars.  Shortly thereafter,

3

Associate #2 agreed to work on SnoOwl in return for equity in the company, which he understood he would split with CORREIA and Associate #1. Associate #2 never received a salary or compensation from SnoOwl, nor did CORREIA ever tell Associate #2 that CORREIA intended to take investor money for himself.

12.     In approximately Spring 2014, CORREIA initiated conversations with Associate #3, a lawyer by training, about joining SnoOwl. Associate #3 told CORREIA that he would not join the company unless and until it had incorporated. In approximately December 2014, SnoOwl was incorporated in Delaware, and Associate #3 joined the company in return for what CORREIA told him was 15% of founder stock. At the time Associate #3 joined SnoOwl, CORREIA told Associate #3 that CORREIA was not taking any salary or compensation from SnoOwl, and also confirmed that Associate #3 would not receive a salary.

13.     CORREIA never gave Associate #1, Associate #2, and Associate #3 access to bank statements or online banking for the Citizen's Account, nor did CORREIA ever give them check-signing authority or a debit card for the Citizen's Account.

SnoOwl Investors

14.     Investor #1 was an orthodontist in Massachusetts who had known CORREIA (through Investor #1's son) since CORREIA was in high school. Between 2013 and 2015, Investor #1 invested $145,000 in what Investor #1 believed was the development and promotion of SnoOwl.

15.     In a January 2013 meeting, CORREIA asked Investor #1 to invest $50,000 in SnoOwl. To induce Investor #1, CORREIA falsely told him that CORREIA had founded and sold a previous internet technology company. CORREIA also falsely told Investor #1 that the $50,000 investment would be used for business purposes. At no point prior to Investor #1's investment in

4

SnoOwl, did CORREIA tell Investor #1 that CORREIA intended to use investor money for himself. Investor #1 relied on CORREIA's representations, and would not have invested in SnoOwl had CORREIA disclosed that he intended to use investor money for himself.

16.     On or about January 16, 2013, Investor #1 gave CORREIA a $50,000 check in return for 5.00% equity in SnoOwl, which was memorialized in a January 16, 2013 Investment Agreement ("1/16/2013 Agreement"). According to the 1/16/2013 Agreement, SnoOwl agreed: (i) not to "sell, [or] transfer … a business asset… without the Investor's consent;" and (ii) to "take reasonable action to protect the integrity of the company and the investment."

17.     Also on or about January 16, 2013, CORREIA deposited Investor #1's $50,000 check into the Citizen's Account. Just over a month later, on or about February 22, 2013, CORREIA bought himself a 2011 Mercedes C300 AWD Sport Sedan. As part of the purchase, he used $10,000 of Investor #1's money, which he withdrew directly from the Citizen's Account.

18.     In April 2013, CORREIA told Investor #1 that he was having trouble with his software developers and needed an additional $15,000. CORREIA did not tell Investor #1 that he had used $10,000 of Investor #1's money to buy himself a Mercedes, nor did CORREIA tell Investor #1 that CORREIA intended to use Investor #1's additional investment money for himself. Based on CORREIA's representations, in April 2013, Investor #1 gave CORREIA another $15,000 check, which CORREIA deposited into the Citizen's Account.

19.     Between April 2013 and April 2014, Investor #1 and CORREIA communicated regularly about the progress of the app. During this time, CORREIA repeatedly told Investor #1 that the app was doing well. At no point did CORREIA seek Investor #1's permission to use Investor #1's investment money for himself. At all times during this period, Investor #1 believed that the $65,000 that he had invested was used for legitimate business purposes.

5

20.     In or about May 2014, CORREIA told Investor #1 that SnoOwl was "in a lot of trouble," as one of the other potential investors had not come through, and that CORREIA immediately needed additional funds to complete the app.  CORREIA did not tell Investor #1 that he had taken a large portion of Investor #1's money for himself.  Based on CORREIA's representations, on or about May 2, 2014, Investor #1 gave CORREIA a third check, payable to SnoOwl for $6,000, which CORREIA deposited into the Citizen's Account at a branch in Massachusetts.  The processing of this check involved interstate wire communications.

21.     On or about May 30, 2014, as Investor #1 was preparing to provide CORREIA with an additional $4,500 investment in SnoOwl (for what Investor #1 believed were software development costs), CORREIA asked Investor #1 to include two payees on the investment check, "SnoOwl" and "Jasiel Correia."  When Investor #1 asked CORREIA why, CORREIA falsely stated that the office had two business accounts and that he needed to put the money in one account or the other.  Investor #1 believed CORREIA, and agreed to include two payees on this and future investment checks.

22.     Between on or about May 30, 2014, and on or about August 17, 2015, Investor #1 wrote 16 additional checks, totaling approximately $74,000, 15 of which were payable to CORREIA or SnoOwl.  In many of these instances, CORREIA wrote his own name in as a payee on the checks after Investor #1 had written "SnoOwl."  CORREIA repeatedly, and falsely, told Investor #1 that CORREIA needed his own name as a payee because CORREIA had several business accounts.  Investor #1 relied on CORREIA's representations.

23.     With respect to the 16 additional checks (totaling $74,000) from Investor #1, payable to both SnoOwl and CORREIA, instead of depositing these checks, CORREIA cashed most of the checks (12 of the 16) and only deposited a portion of this cash into the Citizen's

Account, keeping approximately $30,000 of the remaining cash for himself. CORREIA never told Investor #1 that he took large sums of cash from Investor #1's investment checks. On or about May 5, 2015, CORREIA deposited two of the four checks that he did not cash from Investor #1, both of which were payable to SnoOwl and CORREIA (totaling $9,500), into the Citizen's Account at a branch in Massachusetts. The processing of these checks involved interstate wire communications.

24.     Investor #2 was a small business owner in Rhode Island who met CORREIA in the Summer of 2013 after a Fall River Chamber of Commerce event while CORREIA was running for City Council. When they met, CORREIA falsely told Investor #2 that CORREIA and a roommate developed an app that they later sold for several hundred thousand dollars. This subsequently led to a conversation about SnoOwl and the fact that CORREIA was looking for additional investors.

25.     Approximately one or two weeks later, CORREIA went to Investor #2's office to discuss a potential investment by Investor #2. At this meeting, CORREIA explicitly told Investor #2 that he was not taking, and would not take, any salary or compensation in connection with his work for SnoOwl. In addition, to induce this investment, CORREIA showed Investor #2 SnoOwl's August 2013 business plan, which made no mention of any compensation for CORREIA, and referred to SnoOwl's operations and costs as "inexpensive" and "negligible."

26.     Investor #2 eventually agreed to invest $50,000 in SnoOwl in return for 5.00% equity in the company. CORREIA memorialized that equity in an Investment Agreement comparable to the 1/16/2013 Agreement referred to above in paragraph 16. Shortly after accepting Investor #2's $50,000 check, CORREIA used approximately half of the money, $23,000, to pay

off personal loans, make payments to his personal credit cards, pay for personal travel with his then girlfriend, and make a personal charitable donation.

27.     After making his initial $50,000 investment, Investor #2 contacted CORREIA approximately every four to six weeks for updates on SnoOwl. CORREIA routinely told Investor #2 that the development of the app was going well. In approximately January 2015, CORREIA asked Investor #2 if he wanted to invest additional money in SnoOwl "before the valuation of the company increased." Investor #2 agreed, and gave CORREIA a $20,000 check, dated January 14, 2015. CORREIA deposited this check into the Citizen's Account at a branch in Massachusetts. The processing of the check involved interstate wire communications.

28.     In return for Investor #2's additional January 2015 investment, CORREIA gave Investor #2 a "Convertible Promissory Note." According to the note, Investor #2 was entitled to interest at a rate of six percent per year, and the principal and interest were due and payable on demand by the investor at any time after January 1, 2016. Directly above CORREIA's signature on the Note, SnoOwl represented that it "intend[ed] to use the principal of [the Note] primarily for the operations of its business, and not for any personal, family or household purpose."

29.     Subsequent to his January 2015 investment, Investor #2 continued to contact CORREIA periodically regarding the progress of the app. During those calls throughout 2015, CORREIA gave Investor #2 uniformly positive status reports on the app and assured Investor #2 that CORREIA was working diligently to ensure the success of the app.

30.     Investor #3 was a small business owner living in Florida and Massachusetts; Investor #4 was a small business owner living in southeastern Massachusetts. At a meeting in approximately November 2014, CORREIA falsely told Investors #3 and #4 that, when he was in

college, he had developed, packaged, and sold an app to a venture capital group in Cambridge, who eventually sold it to Facebook.

31.     At this meeting, CORREIA also informed Investors #3 and #4 that he was seeking additional investors to complete the SnoOwl app, and that he was selling 5.00% equity stakes for $50,000. CORREIA never told Investors #3 and #4 that he planned to take a salary or otherwise use a significant portion of their investment money for himself. Investors #3 and #4 relied on CORREIA's representations, and would not have invested in SnoOwl had they known CORREIA was not telling the truth about selling a prior company and the fact that he planned to use their investment money for himself.

32.     On or about November 5, 2014, CORREIA emailed Investors #3 and #4 a November 2014 version of SnoOwl's business plan. This email involved interstate wire communications. Like the August 2013 business plan, the November 2014 business plan did not list any compensation for CORREIA, and referred to the costs of running SnoOwl as "negligible."

33.     Investors #3 and #4 each agreed to invest $25,000 in return for 3.50% equity in SnoOwl. On or about November 8, 2014, CORREIA emailed Investors #3 and #4 confirming their joint 7.00% equity stake in SnoOwl and requesting a timetable for receipt of their investment money. This email involved interstate wire communications.

34.     On or about November 9, 2014, Investors #3 and #4 each wrote a $25,000 check to SnoOwl, both of which CORREIA deposited into the Citizen's Account. The processing of these checks involved interstate wire communications.

35.     On or about November 18, 2014, CORREIA emailed Investors #3 and #4 with signed copies of their Investment Agreements, which were substantially similar to the above-described 1/16/2013 Agreement. This email involved interstate wire communications.

36.     Subsequent to their November 2014 investments in SnoOwl, Investors #3 and #4 contacted CORREIA regularly throughout 2015 seeking updates on the app. Through in or about June 2015, based on representations made by CORREIA, Investors #3 and #4 believed that CORREIA was working diligently to ensure SnoOwl's success and that the app was progressing.

### CORREIA's Theft of Investor Money

37.     As described above, within weeks of receiving his first investor money in January 2013, CORREIA bought himself a Mercedes. Then, between February 2013 and July 2015, CORREIA systemically looted the Citizen's Account of investor funds, most often by using the account's debit card as his own personal credit card. Indeed, between 2013 and 2015, CORREIA stole at least $231,447 of investor money, approximately 64% of all money invested.

38.     CORREIA used SnoOwl investor money as follows:

   a.   CORREIA purchased tens of thousands of dollars of luxury items, including the Mercedes, jewelry, and designer men's and women's clothing and shoes;

   b.   CORREIA spent lavishly on extensive personal travel and entertainment, including tens of thousands of dollars on airfare, luxury hotels, restaurants, casinos, and adult entertainment;

   c.   CORREIA used approximately $10,000 of investor money to pay down his personal student loan and to fund his own political campaigns; and

   d.   CORREIA used investor money to make charitable donations in his own name, having nothing to do with SnoOwl, and to fund his other business ventures.

39.     The Citizen's Account records do not contain any regular salary payments to CORREIA, nor do they contain any regular "draws" by, or distributions to CORREIA. Instead, the records show that CORREIA took investor money directly out of the Citizen's Account whenever he needed it, racking up thousands of charges while the account was active. CORREIA also set up recurring payment schedules for, among other things, his student loan, car payments, and dating services, so that investor money was automatically debited for those personal purposes.

In approximately October 2016, the Citizen's Account, which incurred thousands of dollars of overdraft fees, was closed with a negative balance. To date, no SnoOwl investor has received any return or interest on his investment, and the business of SnoOwl is essentially worthless.

### CORREIA's Concealment of the Fraud

40.     CORREIA concealed his theft of investor money in several ways. He concealed it from Associates #1, #2, and #3 by denying them access to the Citizen's Account and other financial records, and by not telling them that he was using investor funds for himself. CORREIA concealed his theft of investor money from his then-girlfriend, on whom he spent tens of thousands of dollars, by falsely stating that the money CORREIA was spending on her came from his sale of FindIt Networks for "several hundred thousand dollars." CORREIA concealed his theft of investor funds from the SnoOwl Investors, including Investors #1, #2, #3, and #4, by providing falsely positive updates on SnoOwl's status, and, as described more fully below, refusing to provide the company's financial records, which would have revealed his extensive personal use of investor funds.

41.     CORREIA also concealed his ill-gotten gains from the IRS. In February 2015, when CORREIA filed his 2013 and 2014 individual income tax returns, CORREIA completely concealed the existence of SnoOwl (and his other businesses) from the IRS. Moreover, CORREIA intentionally failed to provide the tax preparation service that prepared his 2013 and 2014 returns with *any* SnoOwl records, including the Citizen's Account records, and affirmatively represented to the tax preparation service that he had no business or partnership income in 2013 or 2014. As a result, CORREIA's 2013 and 2014 individual income tax returns substantially understated his income for those years.

### CORREIA Decides to Run for Mayor and Neglects SnoOwl

42.     Despite repeatedly assuring his investors that he would use his best efforts to ensure SnoOwl's success, CORREIA was not only diverting investor funds to himself, he was actively neglecting SnoOwl (and concealing that fact from investors), by failing to do even the most basic tasks to keep the company viable.  For example, CORREIA stopped paying the Company's software developer, stopped paying the company that hosted SnoOwl's server, and failed to pay the nominal legal fees necessary to protect SnoOwl's intellectual property, despite repeated warnings from others that he needed to do so.

43.     In or about the Spring/Summer of 2015, as SnoOwl foundered, CORREIA announced his decision to run for mayor of Fall River.  Notwithstanding the fact that he had fraudulently taken hundreds of thousands of dollars of investor money, CORREIA touted his stewardship of SnoOwl to Fall River voters as one of his primary qualifications for mayor.

### As Investors Begin To Ask Questions, CORREIA Continues to Deceive

44.     After he was elected mayor in November 2015, CORREIA became increasingly unresponsive to inquiries from the investors and software developers.  As a result, in or about April 2016, Investor #1 asked his nephew, who had a Ph.D. in chemistry and experience with technology start-ups ("Advisor #1"), if Advisor #1 was willing to help try to revive SnoOwl now that CORREIA had been elected mayor.  Advisor #1 agreed.

45.     After meeting, Advisor #1 and CORREIA agreed that Advisor #1 would become a formal advisor to SnoOwl.  In that role, Advisor #1 would attempt to strengthen SnoOwl's business, raise funding, acquire more users, and help make SnoOwl an attractive candidate for acquisition.  In return, CORREIA agreed to provide Advisor #1 with SnoOwl's financial records,

including financial statements, balance sheets, income statements, cash flow statements, accounting ledgers, and any salary or loan-related information for SnoOwl employees.

46.     Despite several requests for accounting ledgers, debt notes, and other important records, however, CORREIA only provided Advisor #1 with a handful of documents. Concerned about CORREIA's failure to provide these documents, Advisor #1 met with Associate #3 and later emailed CORREIA (who was mayor at the time), on or about April 29, 2016:

> I met with [Associate #3] today to go over company financial information, and found that there are some very alarming financial issues that need to be fixed before we can move forward with SnoOwl. [Associate #3] and I need access to records for all investor money that's been put into the company, and how it has been spent ... If you don't have those records available, then, we have to get together, find what we can and rectify these issues...
>
> Right now, neither [Associate #3] nor I know where a substantial amount of investor money collected by SnoOwl has gone. Furthermore, as I understand it, early on, in the company, you used a personal account to conduct company business ... after raising investment money. This is, at best, a horrible mistake, and, at worst, can be regarded as criminal if the funding gaps are not solved.

47.     CORREIA never responded to the above email. In or about May 2016, however, CORREIA hired an accountant based in southeastern Massachusetts ("Accountant #1") to verify and categorize three years (2013, 2014 and 2015) of SnoOwl deposit and disbursement activity as either business or nonbusiness transactions.

48.     To perform this task, Accountant #1 requested all of SnoOwl's financial and accounting records. In response to this request, however, CORREIA provided only limited SnoOwl financial documents, including the Citizen's Account records. There were broad categories of documents that Accountant #1 never received, including, but not limited to, the investor agreements, accounting records, business plans, records reflecting SnoOwl's joint ownership, convertible debt notes, and receipts or invoices.

49.     Over the next several months, Accountant #1 met with CORREIA on multiple occasions to attempt to determine which disbursements from the Citizen's Account were business, and which were personal.   Despite repeated requests, CORREIA never provided Accountant #1 with any supporting documentation for any of the disbursements from the Citizen's Account that CORREIA claimed were business expenses.   Coupled with CORREIA's failure to provide other critical categories of documents, CORREIA's repeated failure to provide supporting documentation to Accountant #1 prevented Accountant #1 from ever completing the verification and categorization of SnoOwl deposit and disbursement activity.

50.     Moreover, during the course of the engagement, CORREIA falsely told Accountant #1 that CORREIA was the sole owner of SnoOwl, and that there were no other SnoOwl owners or partners in either 2013 or 2014.   This, coupled with CORREIA's failure to provide any documentation showing that there were other equity partners in SnoOwl, later caused Accountant #1, when he filed CORREIA's amended 2013 and 2014 personal tax returns in May 2017, to characterize SnoOwl as a sole proprietorship, instead of a partnership, a critical distinction for tax purposes, as described in paragraphs 54-55 below.

51.     On several occasions during the course of his engagement with Accountant #1, CORREIA admitted to Accountant #1 that CORREIA had used a substantial amount of investor money for personal expenses (approximately $100,000); CORREIA, however, did not come to close to admitting the full amount of investor money he had taken for himself.   CORREIA also admitted to Accountant #1 that CORREIA had not disclosed the existence of SnoOwl on either CORREIA's 2013 or 2014 personal tax returns; this caused Accountant #1 to inform CORREIA that CORREIA was required to file amended returns.

14

52.     In or about November 2016, Investor #1 asked CORREIA to see the results of Accountant #1's analysis. At a meeting, CORREIA showed Investor #1 (but did not let him keep) several sheets and graphs purporting to be that analysis, and told Investor #1, in sum and substance, that, "the books were all squared away." CORREIA also attempted to convince Investor #1 to agree that some of Investor #1's SnoOwl investment money was actually a "loan" to CORREIA. Investor #1, however, did not agree.

### CORREIA Learns of Federal Investigation, Files False Amended Returns

53.     By in or about late-March 2017, CORREIA was aware that SnoOwl had become the subject of a federal investigation. Local media subsequently reported the existence of a federal investigation in April 2017.

54.     In or about early-May 2017, aware that he was under federal investigation, CORREIA instructed Accountant #1 to file amended 2013 and 2014 personal tax returns. Accountant #1 filed those returns on or about May 28, 2017, both of which noted that, "tax return is being amended to include the Schedule C for SnoOwl which was erroneously omitted on the original filing." Because Accountant #1 relied on the information CORREIA had provided to him, the amended returns classified SnoOwl as a sole proprietorship, and included Schedules C purportedly listing all of SnoOwl's income and expenses.

55.     In a sole proprietorship, money taken out of the business is non-taxable draw, whereas in a partnership, money taken out of the business is taxable income. Accordingly, Accountant #1 did not treat any of the investor money that CORREIA took out of SnoOwl as taxable income on the amended returns. As a result, after filing the amended returns, CORREIA was not assessed any tax liability for all of the investor money that he took for himself, and CORREIA actually received a refund from the IRS in June 2017.

15

56.     CORREIA knew that the amended 2013 and 2014 personal tax returns that he caused to be filed with the IRS were materially false in the following ways: (i) SnoOwl was improperly classified as a sole proprietorship in 2013 and 2014, saving CORREIA tens of thousands of dollars in tax liability; (ii) the returns failed to report income CORREIA received from a different business of his; and (iii) the returns falsely claimed personal expenditures as business expenses on the attached Schedules C.

Part II:  General Allegations Re: Corruption under CORREIA

At all times relevant to Counts Fourteen through Twenty-Four of this First Superseding Indictment:

57.     The city of Fall River, Massachusetts ("Fall River") was a local government that received in excess of $1 million in federal assistance from the U.S. Department of Housing and Urban Development in the one-year period between July 1, 2017 and June 30, 2018, and in excess of $1 million in the one-year period between July 1, 2018 and June 30, 2019.

58.     According to Chapter C, Section 3.2 of Fall River's charter, the executive powers of the city were vested solely in the mayor, who exercised general supervision and direction over all city agencies, and was responsible for the administration of all city activities and functions.

59.     Medical marijuana was legalized in Massachusetts in 2012; recreational marijuana was legalized in December 2016.  Under Massachusetts law, the process for obtaining a license to operate a marijuana business (whether medical or recreational) required a letter of non-opposition from the head of the municipality or local government where the applicant sought to operate the marijuana business.   The non-opposition letter typically stated that the head of the local government had verified with the appropriate local officials that the proposed marijuana facility was located in a permissible zoning district that allowed such use.

60.     Because non-opposition letters were essential to marijuana vendors, the competition for them amongst applicants seeking to operate marijuana businesses was substantial.

61.     In addition to a non-opposition letter, applicants seeking a license were required to enter into a host community agreement. A host community agreement is an agreement between a marijuana company and the local government in which the marijuana company agrees to give the local government up to three percent of its gross sales and up to $50,000 annually.  In Fall River,

the host community agreement was typically negotiated and issued in conjunction with the issuance of the non-opposition letter.

62.     As mayor, CORREIA was solely responsible for approving all non-opposition letters in Fall River. Without a non-opposition letter from CORREIA, an application to operate a marijuana dispensary in Fall River would not be approved.

63.     To date, CORREIA has issued at least 14 non-opposition letters for marijuana businesses in Fall River, including two for his current girlfriend's brother. In so doing, CORREIA publicly stated that, "nobody's getting a special deal, a special anything." On August 12, 2019, the Fall River City Council passed an ordinance to limit the number of marijuana licenses in Fall River. In a letter dated August 19, 2019, CORREIA vetoed the order, claiming that it could expose the city to future litigation, would eliminate competition, artificially inflate the value of licenses already issued, and that a proponent of the ordinance had a conflict of interest.

### Overview of CORREIA's Corruption

64.     Within months of becoming mayor in January 2016, CORREIA began monetizing his official position to fund his lavish lifestyle and mounting legal bills. As set forth below, CORREIA used his office to: (i) extort at least four marijuana vendors for hundreds of thousands of dollars in bribe payments; (ii) extort a building owner for cash and a Rolex watch in exchange for, among other things, the approval of, and payment for, permits and excavating work to activate the water supply to a commercial building; and (iii) corruptly demand that his chief of staff give him half of her salary and almost all of a $10,000 "snow stipend," in return for appointing her and allowing her to keep her city job.

### Relevant Parties

65.     CORREIA was the mayor of Fall River.

66.     Genoveva Andrade was CORREIA's Chief of Staff from November 2017 through December 2018 at a salary of $78,780 per year.  Prior to that, she was his campaign manager.  In January 2019, Andrade stepped down to run CORREIA's March 2019 recall campaign.

67.     "Mayoral Aide #1" was a long-time friend of CORREIA and investor in SnoOwl whom CORREIA appointed to a position in his administration at a salary of approximately $84,000 per year.

68.     "MJ Vendor #1," "MJ Vendor #2," "MJ Vendor #3," "MJ Vendor #4," and "MJ Vendor #5" were the owners or part owners of marijuana companies that did business in and affecting interstate commerce, and that were seeking to operate in Fall River.

69.     "Middleman #1" was the owner of several properties in Fall River, a friend of CORREIA and Mayoral Aide #1, a SnoOwl investor, and an illegal marijuana dealer prior to its legalization in Massachusetts.  Middleman #1 regularly did business with Fall River, but did not hold any official position in Fall River government.

70.     "Middleman #2" was the owner of several commercial and residential real estate properties in Fall River, and a friend of both CORREIA and MJ Vendor #3.  Middleman #2 regularly did business with Fall River, but did not hold any official position in Fall River government.

71.     "Jeweler #1" was the owner of a jewelry business in Fall River.

72.     "Current Girlfriend" was CORREIA's girlfriend.

73.     "Excavator #1" was a laborer at a Fall River excavation company that did business in and affecting interstate commerce.

19

### Conspiracy to Commit Extortion #1 – July 14, 2016 Non-Opposition Letter

### Object and Purpose

74.     The object and purpose of the conspiracy was for CORREIA and co-conspirators to extort $250,000 and a percentage of sales from MJ Vendor #1 in exchange for providing MJ Vendor #1 a non-opposition letter, effectively allowing MJ Vendor #1 to operate a marijuana business in Fall River.

### Manner and Means

75.     Among the manner and means by which CORREIA and co-conspirators carried out the conspiracy were:

   a. Entering into an agreement to issue MJ Vendor #1 a non-opposition letter in exchange for $250,000 to be paid to CORREIA, and a percentage of MJ Vendor #1's future marijuana sales to be paid to Middleman #1;

   b. Obtaining payment of the bribe incrementally, through Middleman #1, in order to conceal CORREIA's involvement; and

   c. Providing a non-opposition letter to MJ Vendor #1.

### Acts in Furtherance of the Conspiracy

76.     CORREIA and co-conspirators committed the following acts, among others, in furtherance of the conspiracy:

   a. Beginning in or about June 2016, Middleman #1 introduced MJ Vendor #1 to Mayoral Aide #1 to discuss the process for obtaining non-opposition letters.

   b. Shortly thereafter, Mayoral Aide #1 and MJ Vendor #1 met at a Dunkin Donuts in Fall River to discuss how Mayoral Aide #1 could be helpful to MJ Vendor #1.

   c. Eventually, CORREIA told Middleman #1 to tell MJ Vendor #1 that, in sum and substance, CORREIA wanted $250,000 for the letter, what "other groups had paid."

   d. MJ Vendor #1 agreed that, to obtain the letter, he would pay CORREIA $100,000 up front, and another $150,000 after his business was cash-flow positive.  MJ Vendor #1 also agreed to give Middleman #1 two percent of his sales.

20

e.  On or about July 14, 2016, to conceal CORREIA's involvement, MJ Vendor #1 gave Middleman #1 a check for $100,000. The memo line of the check falsely indicated that the check was for "Property Management Fees/Retainer."

f.  The same day, Middleman #1 informed CORREIA that he had received the $100,000 check, and CORREIA issued a non-opposition letter to MJ Vendor #1.

g.  In the ensuing weeks, CORREIA drove to Middleman #1's residence approximately four or five times, typically in his official Fall River vehicle, and picked up approximately $10,000 - $20,000 in cash each time as his cut of the bribe.

h.  In total, Middleman #1 paid CORREIA approximately $70,000 in cash and kept $30,000 for himself. CORREIA was to receive all of the remaining $150,000.

Conspiracy to Commit Extortion #2 – July 2, 2018 Non-Opposition Letter

Object and Purpose

77.     The object and purpose of the conspiracy was for CORREIA and conspirators to extort up to $250,000 from MJ Vendor #2 in exchange for providing MJ Vendor #2 a non-opposition letter, effectively allowing MJ Vendor #2 to operate a marijuana business in Fall River.

Manner and Means

78.     Among the manner and means by which CORREIA and co-conspirators carried out the conspiracy were:

   a.   Entering into an agreement to offer a non-opposition letter to MJ Vendor #2 in exchange for $150,000 to be paid to CORREIA;

   b.   Falsely claiming to MJ Vendor #2 – in order to artificially inflate the value of the non-opposition letter/bribe – that CORREIA was only going to approve five or six marijuana dispensaries in Fall River;

   c.   Issuing a non-opposition letter to MJ Vendor #2;

   d.   Accepting several bribe payments, in cash and marijuana, from MJ Vendor #2; and

   e.   Pressuring MJ Vendor #2 to make the remainder of the bribe payments.

Acts in Furtherance of the Conspiracy to Commit Extortion #2

79.     CORREIA and co-conspirators committed the following acts, among others, in furtherance of the conspiracy:

   a.   When MJ Vendor #2 first approached Fall River, his calls were unreturned. In approximately May 2018, Middleman #1 told MJ Vendor #2 that he was close with CORREIA and would speak to him on MJ Vendor #2's behalf.

   b.   In or about June 2018, CORREIA and Mayoral Aide #1 directed Middleman #1 to tell MJ Vendor #2 that the cost for a letter was $250,000.

   c.   Middleman #1 and MJ Vendor #2 negotiated the bribe payment down to $150,000.

22

d.  At a June 20, 2018 dinner at Ocean Prime (and later at a cigar bar in the North End), CORREIA told MJ Vendor #2 that he would only approve five or six dispensaries in Fall River and confirmed that MJ Vendor #2 was willing to pay a bribe.

e.  On or about July 2, 2018, CORREIA issued MJ Vendor #2 a non-opposition letter.

f.  In early-July 2018, MJ Vendor #2 gave Middleman #1 an envelope with approximately $25,000 in cash, as the first payment on the bribe.  The cash had been recently withdrawn from the bank, and was comprised entirely of $100 bills.

g.  Mayoral Aide #1 told Middleman #1 to put the envelope in a shed behind Mayoral Aide #1's home in Fall River, which Middleman #1 did on or about July 7, 2018.

h.  After retrieving the envelope in CORREIA's presence, Mayoral Aide #1 later returned it to Middleman #1, telling him, in sum and substance, that CORREIA thought the cash in the envelope was "Fed money."

i.  Mayoral Aide #1 and Middleman #1 agreed that Middleman #1 would sell marijuana to generate cash to pay CORREIA for the non-opposition letter.

j.  In July and August 2018, MJ Vendor #2 made additional payments on the $150,000 bribe to Middleman #1, including cash and about 12-15 pounds of marijuana.

k.  By late-July 2018, MJ Vendor #2 had, including cash and marijuana, paid Middleman #1 approximately $50,000 – $67,550 on the $150,000 bribe.

l.  CORREIA and Mayoral Aide #1 pressured Middleman #1 for the outstanding bribe money owed to CORREIA.

m.  On or about September 7, 2018, at a cigar bar in Providence, Rhode Island, CORREIA was frustrated, and asked MJ Vendor #2 why it was taking so long to get CORREIA his money.

n.  On or about October 13, 2018, at the direction of Mayoral Aide #1, Middleman #1 texted MJ Vendor #2, "just don't screw the kid he did what he had to do for you" (referring CORREIA's issuance of the July 2, 2018 non-opposition letter).

o.  In or about March 2019, MJ Vendor #2 gave Middleman #1 an additional $10,000 cash bribe payment at a Cumberland Farms in Fall River.

### Conspiracy to Commit Extortion #3 – August 17, 2018 Non-Opposition Letter

#### Object and Purpose

80. The object and purpose of the conspiracy was for CORREIA and co-conspirators to extort approximately $100,000 from MJ Vendor #3, in campaign contributions, cash, and a mortgage discharge, in exchange for providing MJ Vendor #3 with two non-opposition letters (one for each of his marijuana businesses), effectively allowing MJ Vendor #3 to operate a marijuana business in Fall River.

#### Manner and Means

81. Among the manner and means by which CORREIA and co-conspirators carried out the conspiracy were:

    a. Entering into an agreement to issue MJ Vendor #3 two non-opposition letters for bribes to be paid to CORREIA, including an initial payment of $25,000;

    b. Falsely claiming – in order to artificially inflate the value of the non-opposition letter/bribe – that CORREIA was going to approve only five or six marijuana dispensaries in Fall River;

    c. Meeting with MJ Vendor #3 to confirm the agreement;

    d. Concealing the bribe payments by instructing MJ Vendor #3 that MJ Vendor #3 should pay the money to CORREIA's campaign through several family members;

    e. Requiring, in addition to the $25,000, among other things, $5,000 – $6,000 in cash and that MJ Vendor #3 forgive a mortgage held by MJ Vendor #3's brother; and

    f. Providing MJ Vendor #3 with a non-opposition letter.

#### Acts in Furtherance of the Conspiracy to Commit Extortion #3

82. CORREIA and co-conspirators committed the following acts, among others, in furtherance of the conspiracy:

    a. On or about July 11, 2018, Middleman #2 offered to speak with CORREIA to help MJ Vendor #3 obtain a non-opposition letter.

b.  On or about July 25, 2018, Middleman #2 arranged a meeting with CORREIA, but said that MJ Vendor #3 was, in sum and substance, "going to have to start helping [CORREIA] out, because he is going to help you."

c.  MJ Vendor #3 agreed with Middleman #2 to give a $25,000 bribe to CORREIA for a non-opposition letter.

d.  At the end of a July 26, 2018 meeting at City Hall, CORREIA confirmed with MJ Vendor #3 that MJ Vendor #3 was willing to pay CORREIA a bribe for a non-opposition letter.

e.  At a cigar shop in Fall River, Middleman #2 and MJ Vendor #3 agreed that MJ Vendor #3 would make two $12,500 bribe payments to CORREIA's campaign fund, to be concealed as small donations by MJ Vendor #3's friends and family.

f.  Middleman #2 later told MJ Vendor #3 that non-opposition letters were "going for at least $100,000," and thus MJ Vendor #3 would have to pay more than $25,000.

g.  Middleman #2 had an approximately $61,000 mortgage held by MJ Vendor #3's brother.  As additional payment toward the bribe, MJ Vendor #3 (through his brother), agreed to forgive that mortgage.

h.  Middleman #2 gave CORREIA an additional $5,000 to $6,000 in cash as payment for a non-opposition letter for MJ Vendor #3.

i.  On or about August 21, 2018, Middleman #2 hand-delivered MJ Vendor #3's non-opposition letters to MJ Vendor #3 in a cigar shop in Fall River.

j.  On or about August 29, 2018, at MJ Vendor #3's direction, several of MJ Vendor #3's friends and family gave $12,500 to CORREIA's campaign.  Middleman #2's mortgage was also officially discharged.

k.  In May 2019, MJ Vendor #3's wife was fined $5,000 for illegal donations to CORREIA.  During a chance encounter with MJ Vendor #3's wife in July 2019, CORREIA apologized "for all the stuff that went down with the campaign finance."

<u>Conspiracy to Commit Extortion #4 – July 5, 2018 Non-Opposition Letter</u>

<u>Object and Purpose</u>

83.     The object and purpose of the conspiracy was for CORREIA and co-conspirators to extort $150,000 from MJ Vendor #4 in exchange for a non-opposition letter, effectively allowing MJ Vendor #4 to operate a marijuana business in Fall River.

<u>Manner and Means</u>

84.     Among the manner and means by which CORREIA and co-conspirators carried out the conspiracy were:

a.   Entering into an agreement to issue MJ Vendor #4 a non-opposition letter in exchange for $250,000 to be paid to CORREIA, but later negotiating the bribe down to $150,000;

b.   Falsely claiming – in order to artificially inflate the value of the non-opposition letter/bribe – that CORREIA was going to approve only five or six marijuana dispensaries in Fall River;

c.   Agreeing to accept the bribe in two installments – $75,000 cash up front and the remainder after MJ Vendor #4 received his provisional marijuana license from the state; and

d.   Issuing MJ Vendor #4 a non-opposition letter.

<u>Acts in Furtherance of the Conspiracy to Commit Extortion #4</u>

85.     CORREIA and co-conspirators committed the following acts, among others, in furtherance of the conspiracy:

a.   In approximately June 2018, at a meeting with Andrade and MJ Vendor #4 in City Hall, CORREIA said that no additional non-opposition letters would be issued.

b.   Several days later, CORREIA and Andrade showed up unannounced at MJ Vendor #4's business in Fall River.  When told MJ Vendor #4 was not there, CORREIA and Andrade agreed to return later that day.

c.   Later that day, when CORREIA and Andrade returned to the store, they went to an upstairs office with MJ Vendor #4.  There, CORREIA told MJ Vendor #4 that he would give him a non-opposition letter in return for $250,000.

26

d. MJ Vendor #4 reacted to CORREIA's demand for $250,000 with visible nervousness, which Andrade observed, and asked if she could use the restroom. MJ Vendor #4 escorted Andrade to the restroom, and returned to the office.

e. Upon returning, MJ Vendor #4 asked CORREIA why the number (referring to the $250,000) was so high. CORREIA said it was for his legal fees. CORREIA also said that this would be the sixth and final non-opposition letter issued in Fall River.

f. CORREIA and MJ Vendor #4 agreed on a $125,000 bribe (later modified to $150,000).

g. As they walked out, Andrade asked MJ Vendor #4 if everything was alright. MJ Vendor #4 said yes. Then, Andrade said to MJ Vendor #4, "you're family now."

h. At a subsequent meeting with MJ Vendor #4 and Andrade, CORREIA said he would reduce the annual $50,000 payment MJ Vendor #4 was required to make to Fall River under the host community agreement (to $25,000) if MJ Vendor #4 gave CORREIA an additional $25,000.

i. MJ Vendor #4 agreed to the additional $25,000 bribe, bringing the total amount to $150,000. MJ Vendor #4 also agreed he would pay $75,000 cash up front for the letter, followed by another $75,000 after he received his provisional marijuana license from Massachusetts.

j. Several days later, on or about July 5, 2018, CORREIA came to MJ Vendor #4's business in his official vehicle and instructed MJ Vendor #4 to get inside. Once inside, MJ Vendor #4 gave CORREIA $75,000 in cash in a contractor's clipboard. Upon receiving the cash, CORREIA handed MJ Vendor #4 a non-opposition letter.

### Conspiracy to Commit Extortion #5 – Cash and "Batman" Rolex

### Object and Purpose

86.     The object and purpose of the conspiracy was to obtain property, in the form of a stream of benefits, which included cash and a Rolex watch valued at approximately $7,500 – $12,000, in exchange for obtaining official action and assistance from CORREIA that was favorable to Middleman #1 and his business(es) in Fall River, including directing Fall River public employees to approve and pay for permits and excavating work to activate the water line for the sprinkler system at Middleman #1's commercial property in Fall River.

### Manner and Means and Acts in Furtherance of the Conspiracy to Commit Extortion #5

87.     In or about June 2016, Middleman #1 purchased the commercial property at 379 Kilburn Street in Fall River (hereinafter, "379 Kilburn").   379 Kilburn is part of several commercial and mill-type buildings that use and operate the same city water lines, including, among others, 367 Kilburn and 386 Kilburn.   Thereafter, Middleman #1 learned that the water supply from Fall River to feed 379 Kilburn's sprinkler system was inoperable.

88.     Middleman #1 contacted Fall River and learned that it would cost several thousand dollars to get the necessary permits and work done to enable the building's sprinkler system.

89.     Middleman #1 contacted CORREIA for assistance.   At the time, Middleman #1 regularly did business with Fall River and knew that CORREIA expected to get paid for official action.

90.     In late-January 2017, a friend and business associate of Middleman #1, Jeweler #1, gave Middleman #1 a GMT-Master II 116710 Rolex watch, valued between $7,500 – $12,000, as payment on a debt owed.   The GMT-Master II 116710 is manufactured in Switzerland and is known by Rolex enthusiasts as a "Batman" because of its blue and black ceramic bezel.

91.     In or about January/February 2017, Middleman #1 agreed to give (and in fact did give) CORREIA the "Batman" Rolex in exchange official action and assistance, including, but not limited to, official action related to the water issue at 379 Kilburn. When Middleman #1 obtained the "Batman" Rolex from Jeweler #1, he told him, in sum and substance, that the watch was for CORREIA "for Kilburn."[1]

92.     On or before March 9, 2017, Excavator #1 received a trench permit from Fall River to dig a trench to provide water service for a sprinkler system at 379 Kilburn. Excavator #1 invoiced Fall River for this work, which cost approximately $7,950, instead of Middleman #1. It was a departure from Excavator #1's typical practice to invoice the city instead of the building owner for this type of work. In fact, when Excavator #1 performed the trench-related work, he commented to Middleman #1, in sum and substance, "you must know someone at City Hall" (referring to the fact that he was invoicing the city instead of Middleman #1).

93.     In or about July 2017, CORREIA's campaign issued a $3,900 check to Middleman #1 as rent payment for space CORREIA's campaign was renting from Middleman #1 at 257 South Main Street in Fall River. CORREIA and Andrade came to 257 South Main Street to deliver the check to Middleman #1. When they did, CORREIA told Middleman #1, in the presence of Andrade, that Middleman #1 had to give CORREIA $3,900 cash back – the full amount of the check. Middleman #1 gave CORREIA approximately $3,900 in cash. Middleman #1 understood that this cash payment to CORREIA was a part of the stream of benefits that he agreed to pay to CORREIA in exchange for favorable official action and assistance from the Mayor.

---

[1] In or about November 2016, Jeweler #1 sold CORREIA two other Rolexes – a Milgauss and a Yacht Master – for approximately $10,000 in cash. Mayoral Aide #1 helped CORREIA purchase these watches by pretending to buy the Rolexes for himself (to prevent suspicion as to how CORREIA could afford the watches), and delivering the cash from CORREIA to Jeweler #1.

94.     When Middleman #1 gave CORREIA the $3,900, they were standing near the front window of the building.  Andrade, who signed the check, told CORREIA and Middleman #1, in sum and substance, "do not be giving cash out in front of the windows" (referring to the need to avoid detection).

95.     Fall River paid Excavator #1 $7,950 for the work at 379 Kilburn in or about September 2017.

96.     CORREIA thanked Middleman #1 for the "Batman" Rolex.  Current Girlfriend purchased a "Batman" Rolex wall clock from Jeweler #1 for CORREIA to match the "Batman" Rolex watch that Middleman #1 gave CORREIA for assistance with the water at 379 Kilburn.

97.     CORREIA has never disclosed the $3,900 cash payment or the "Batman" Rolex that he obtained from Middleman #1 on any conflict of interest or related ethics disclosures.

## Chief of Staff Bribery Scheme

98.     In or before November 2017, Andrade and CORREIA agreed that, in return for CORREIA appointing Andrade and keeping her as CORREIA's Chief of Staff, she would kick back approximately half of her city salary to CORREIA.  At or about the same time, Andrade and CORREIA agreed that Andrade would kick back a $10,000 city-funded "snow stipend" that CORREIA intended to give her.

99.     On or about November 27, 2017, CORREIA appointed Andrade Chief of Staff at a salary of approximately $78,780 per year.  The term of the agreement was from November 27, 2017 through December 31, 2018.  As part of a M.G.L. c. 268A, §23(b)(3) conflict of interest disclosure, Andrade stated that, "I have taken an oath to perform to the best of my abilities with integrity and honesty."   Andrade also received orientation and training on reporting ethics violations.

100.    On or about December 14, 2017, CORREIA personally approved a $10,000 city-funded "snow stipend" to Andrade, to be paid in two $5,000 installments in December 2017 and January 2018.

101.    Andrade received her first Chief of Staff paycheck from Fall River for $2,046 on or about December 11, 2017.  Days later, Andrade gave CORREIA $1,200.

102.    Andrade received approximately $5,354 from Fall River on December 22, 2017, including the first installment of the "snow stipend." Days later, Andrade gave CORREIA $4,300.

103.    Andrade received approximately $5,354 from Fall River on January 19, 2018, including the next installment of the "snow stipend." Days later, Andrade gave CORREIA $4,300.

104. This pattern, in which Andrade promptly gave approximately half of her paycheck (and almost all of the "snow stipend") to CORREIA, continued for at least eight months, until in or about July 2018.

105. In total, between December 2017 and July 2018, including salary and the snow stipend, Andrade gave approximately $22,800 dollars to CORREIA.[2]

106. The funds CORREIA obtained from Andrade assisted him, on or about March 29, 2018, when he paid a $10,000 down payment for Current Girlfriend's 2015 Mercedes G550.

107. On or about August 1, 2018, Andrade had lunch with MJ Vendor #5 to follow-up on MJ Vendor #5's concern that CORREIA had issued a non-opposition letter to MJ Vendor #4, whose business was located close to MJ Vendor #5's.

108. At this lunch, MJ Vendor #5 told Andrade that CORREIA was blaming her for the issuance of the non-opposition letter to MJ Vendor #4. Andrade replied, in sum and substance, "that's bul***it, there are lots of sleazy things the mayor has going on."

109. Andrade continued, in sum and substance, "you want to hear something even more f***ed up ... I have to give [CORREIA] half of my salary." When asked why she would do that, Andrade replied that that was the deal she had to make to get (and keep) her job.

110. Separate and apart from the above lunch, on several occasions, Andrade has told Middleman #2 that in order to get (and keep) her job, she had agreed to give half of her salary to CORREIA. Andrade has also told Middleman #2 that CORREIA has a safe with "hundreds of thousands" of dollars that he has received from bribes.

---

[2] As noted above in paragraphs 83-85, in or about July 2018, Andrade conspired with CORREIA to extort approximately $150,000 from MJ Vendor #4.

COUNTS ONE – NINE
18 U.S.C. § 1343
(Wire Fraud)

The Grand Jury charges:

111.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 56 of this First Superseding Indictment.

112.  On or about each of the dates set forth below, in Fall River, in the District of Massachusetts, and elsewhere, the defendant,

JASIEL F. CORREIA, II,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Date | Description of Wire Communication |
|-------|------|-----------------------------------|
| 1 | 5/5/2014 | Processing of $6,000 Check #112 from Investor #1 to SnoOwl |
| 2 | 11/5/2014 | Email from CORREIA to Investors #3, #4 attaching SnoOwl business plan |
| 3 | 11/8/2014 | Email from CORREIA to Investors #3, #4 re equity stake, inv. agreement |
| 4 | 11/18/2014 | Processing of $25,000 Check #130 from Investor #3 to SnoOwl |
| 5 | 11/18/2014 | Processing of $25,000 Check #3808 from Investor #4 to SnoOwl |
| 6 | 11/18/2014 | Email from CORREIA Investors #3, #4 re: signed investor agreement |
| 7 | 1/14/2015 | Processing of $20,000 Check #131 from Investor #2 to SnoOwl |
| 8 | 5/5/2015 | Processing of $5,000 Check #2412 from Investor #1 to SnoOwl/CORREIA |
| 9 | 5/5/2015 | Processing of $4,500 Check #2413 from Investor #1 to SnoOwl/CORREIA |

All in violation of Title 18, United States Code, Section 1343.

33

## COUNTS TEN and ELEVEN
26 U.S.C. § 7206(1)
Filing False Tax Returns

The Grand Jury further charges:

113.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 56 of this First Superseding Indictment.

114.     On or about the dates set forth below, in the District of Massachusetts, the defendant,

### JASIEL F. CORREIA, II,

did willfully make and subscribe U.S. Individual income tax returns, Forms 1040, for the tax years identified below, which were verified by written declarations that each return was made under the penalties of perjury, and which were filed with the Director, Internal Revenue Service, which returns CORREIA did not believe to be true and correct as to every material matter in that CORREIA then and there well knew and believed said Individual Returns substantially understated his actual income.

| Count | Form | On or About | Tax Year |
|-------|------|-------------|----------|
| 10 | 1040 | 02/18/2015 | 2013 |
| 11 | 1040 | 02/18/2015 | 2014 |

All in violation of Title 26, United States Code, Section 7206(1).

34

COUNTS TWELVE and THIRTEEN
26 U.S.C. § 7206(1)
Filing False Tax Returns

The Grand Jury further charges:

115.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 56 of this First Superseding Indictment.

116.    On or about the dates set forth below, in the District of Massachusetts, the defendant,

JASIEL F. CORREIA, II,

did willfully make and subscribe Amended U.S. Individual income tax returns, Forms 1040X, for the tax years identified below, which were verified by a written declaration that each return was made under the penalties of perjury, and which were filed with the Director, Internal Revenue Service, which returns CORREIA did not believe to be true and correct as to every material matter in that CORREIA then and there well knew and believed said Individual Returns substantially understated his actual income, and claimed false Schedule C business losses.

| Count | Form | On or About | Tax Year |
|-------|------|-------------|----------|
| 12 | 1040X | 05/30/2017 | 2013 |
| 13 | 1040X | 05/30/2017 | 2014 |

All in violation of Title 26, United States Code, Section 7206(1).

## COUNTS FOURTEEN, SIXTEEN, EIGHTEEN, TWENTY, and TWENTY-TWO
### 18 U.S.C. § 1951
### (Extortion Conspiracy)

The Grand Jury further charges:

117.    The Grand Jury re-alleges and incorporates by reference paragraphs 57 through 97 of this First Superseding Indictment.

118.    On or about the dates set forth below, in Fall River and Boston, in the District of Massachusetts, and elsewhere, the defendant,

### JASIEL F. CORREIA, II,

and others known and unknown to the Grand Jury, did conspire to knowingly obstruct, delay, and affect, in any way and degree, commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to CORREIA and his co-conspirators, from the victims, with the victims' consent, under color of official right, as set forth below:

| Count | Appx. Dates | Victim | Official Act(s) |
|-------|-------------|--------|-----------------|
| 14 | Jun. 2016 – Sept. 2016 | MJ Vendor #1 | Issuance of Non-Opposition Letter; Issuance of Host Community Agreement |
| 16 | May 2018 – March 2019 | MJ Vendor #2 | Issuance of Non-Opposition Letter; Issuance of Host Community Agreement |
| 18 | July 2018 – Sept. 2018 | MJ Vendor #3 | Issuance of Non-Opposition Letter; Issuance of Host Community Agreement |
| 20 | June 2018 – July 2018 | MJ Vendor #4 | Issuance of Non-Opposition Letter; Issuance of Host Community Agreement |
| 22 | Jan. 2017 – Sept. 2017 | Middleman #1 | Activation of Water to 379 Kilburn; Issuance of Trench Permit; Payment of Invoice for Work Done |

All in violation of Title 18, United States Code, Section 1951.

## COUNTS FIFTEEN, SEVENTEEN, NINETEEN, TWENTY-ONE, and TWENTY-THREE
### (18 U.S.C. §§ 1951 and 2)
### Extortion; Aiding and Abetting

The Grand Jury further charges:

119.    The Grand Jury re-alleges and incorporates by reference paragraphs 57 through 97 of this First Superseding Indictment.

120.    On or about the dates set forth below, in Fall River and Boston, in the District of Massachusetts, and elsewhere, the defendant,

### JASIEL F. CORREIA, II,

did knowingly obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree, commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to CORREIA and his co-conspirators, from the victims, with the victims' consent, under color of official right, as set forth below:

| Count | Appx. Dates | Victim | Official Act(s) |
|-------|-------------|--------|-----------------|
| 15 | Jun. 2016 – Sept. 2016 | MJ Vendor #1 | Issuance of Non-Opposition Letter; Issuance of Host Community Agreement |
| 17 | May 2018 – March 2019 | MJ Vendor #2 | Issuance of Non-Opposition Letter; Issuance of Host Community Agreement |
| 19 | July 2018 – Sept. 2018 | MJ Vendor #3 | Issuance of Non-Opposition Letter; Issuance of Host Community Agreement |
| 21 | June 2018 – July 2018 | MJ Vendor #4 | Issuance of Non-Opposition Letter; Issuance of Host Community Agreement |
| 23 | Jan. 2017 – Sept. 2017 | Middleman #1 | Activation of Water to 379 Kilburn; Issuance of Trench Permit; Payment of Invoice for Work Done |

All in violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT TWENTY-FOUR
### 18 U.S.C. § 666(a)(1)(B) (Bribery)

The Grand Jury further charges:

121.    The Grand Jury re-alleges and incorporates by reference paragraphs 98 through 110 of this First Superseding Indictment.

122.    Between at least in or about November 2017 and July 2018, in Fall River, in the District of Massachusetts, and elsewhere, the defendant,

### JASIEL F. CORREIA, II,

being an agent of a local government, namely, the mayor of the town of Fall River, did corruptly solicit, demand, accept, and agree to accept a thing of value from a person, intending to be influenced and rewarded in connection with a transaction and series of transactions, involving $5,000 or more, of the town of Fall River, a town that receives in excess of $10,000 in federal program benefits in any one year period; that is, CORREIA solicited, demanded, and accepted approximately $22,800 from his chief of staff, Genoveva Andrade, in return for agreeing to appoint Andrade, and allowing her to remain in her position.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

123.   Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1343, 1951, and 666(a)(1)(B), set forth in Counts One through Nine and Fourteen through Twenty-Four of this First Superseding Indictment, the defendant,

JASIEL F. CORREIA, II,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

124.   If any of the property described in Paragraph 123, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant –

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 119 above.


All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

39

A TRUE BILL

FOREPERSON

ZACHARY R. HAFER
DAVID G. TOBIN
ASSISTANT U.S. ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: SEPTEMBER ___5___, 2019
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

@ 4:01 PM
9/5/19