```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                   )
UNITED STATES OF AMERICA,          )
                                   )          Criminal Action
           Plaintiff,              )          No. 18-10364-DPW
                                   )
v.                                 )
                                   )
JASIEL F. CORREIA, II,             )
GENOVEVA ANDRADE,                  )
                                   )
           Defendants.             )
                                   )


              BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                   UNITED STATES DISTRICT JUDGE


                          RULE 11
                       VIDEOCONFERENCE

                      December 14, 2020


          John J. Moakley United States Courthouse
                    One Courthouse Way
               Boston, Massachusetts  02210




                              Kelly Mortellite, RMR, CRR
                              Official Court Reporter
                              One Courthouse Way, Room 3200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com
```

APPEARANCES:

On Behalf of the Government:
Zachary R. Hafer
David G. Tobin
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3106
zachary.hafer@usdoj.gov
david.tobin@usdoj.gov

On Behalf of the Defendant Genoveva Andrade:
Charles W. Rankin
Rankin & Sultan
151 Merrimac Street
Second Floor
Boston, MA 02114-4717
617-720-0011
crankin@rankin-sultan.com

P R O C E E D I N G S

1

2          COURTROOM CLERK:  Criminal Action 18-10364, *United*

3   *States v. Jasiel Correia and Genoveva Andrade*.

4          THE COURT:  I have received a copy of the plea, a

5   signed plea agreement directed to Mr. Rankin dated December 7th

6   and signed by the defendant and Mr. Rankin on the 8th, so I

7   assume that we're prepared to go forward with a change of plea

8   here.  I note that it's a so-called C plea.  That is a plea in

9   which the parties have agreed upon the proper disposition, and

10  they're asking me to accept it; or, if I reject it, then the

11  plea agreement is void.

12         The way in which I generally proceed with C pleas is

13  that I will receive the defendant's plea if I find it to be

14  knowing and voluntary.  And I'll defer deciding on whether or

15  not I'm going to accept it until after I've had an opportunity

16  to review the Presentence Report and have a better

17  understanding of whether or not I can sign off on the

18  arrangement that the parties have here.

19         So with that general understanding, I'm going to ask

20  Ms. Beatty to swear the defendant, and I'm going to ask her

21  some questions.

22         (Defendant duly sworn.)

23         COURTROOM CLERK:  Please state your full name.

24         THE DEFENDANT:  I'm sorry?

25         COURTROOM CLERK:  Please state your full name.

1          THE DEFENDANT:  Genoveva Andrade.

2          THE COURT:  Ms. Andrade, if you could remove your mask

3    so that I can observe you, because I have to make a

4    determination about your credibility in connection with the

5    question of voluntariness and whether or not you know what

6    you're doing.

7          I know, Ms. Andrade, that you've been on a number of

8    these Zoom calls that we've had during the course of

9    proceedings, but I want to emphasize something because I have

10   to make a finding quite apart from whether or not I'm going to

11   receive your plea.  And the finding I have to make is whether

12   or not this very serious choice that you're making, the choice

13   to offer a plea of guilty to very serious federal felonies, is

14   something that we can do on Zoom.

15         As you know, we're in the middle of a pandemic.

16   You've demonstrated it by wearing your mask.  But this is a

17   time in which we've had to balance questions of public health

18   and the way in which we ordinarily administer justice.

19         For purposes of public health, it's pretty clear

20   what's going on right now.  We've been under a state of

21   emergency declared both by the President and by the governor

22   for, it's been about eight months now, and we're going through

23   a period, if the reports are to be believed, and I do, of a

24   spike in the number of people who are suffering from or exposed

25   to the virus.  And so the courts have a special obligation not

1    to put people in harm's way, and we're trying to discourage
2    people from coming into court except under the most controlled
3    of circumstances.
4          At the same time we recognize that serious matters
5    have to be dealt with in a serious way.  And ordinarily, the
6    way in which a plea would take place is it would be in open
7    court.  You would be present.  You'd be right next to your
8    attorney in court itself.  You'd get an opportunity to see how
9    I was responding to what was being said here.  You'd get to see
10   what the prosecution is saying.  You could have friends of
11   yours present to support you.  You could see if there are
12   people there who didn't support you and what they were saying
13   and how they were responding.  In short, you would get to see
14   the whole thing in realtime, and now you have to watch it on
15   TV.  That's what the Zoom technology is about.
16         We've tried to provide a balance for these kinds of
17   things, but I have to be sure first that this is in the public
18   interest and, second, that you're prepared to go forward
19   knowing that you have the right to require that this take place
20   in open court.
21         For purposes of the first part, I'm satisfied that
22   there is a public interest in proceeding by Zoom.  It makes it
23   possible for us to do virtually everything that we need to do
24   in these circumstances.  It provides an opportunity for the
25   public to observe, again, by television but not in person.  On

1    the other hand, it provides a better perhaps way to see what's

2    going on.

3         It also means that we can move these cases along a

4    bit, and that's of value for the public generally, that is, a

5    prompt resolution of cases.  So I find that there is a public

6    interest in proceeding by Zoom.

7         But now on to you.  You have had a chance to see how

8    this functions.  I assume that you've discussed this fully with

9    your attorney.  Do you have any questions of me about

10   proceeding by Zoom under these circumstances?

11        THE DEFENDANT:  No, sir.

12        THE COURT:  Do you think you know enough about what's

13   available to you to make the choice to do that?

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  Okay.  I'm satisfied in light of the

16   larger experience that we've had in this case, that it's gone

17   on for a period of time in which there have been various

18   hearings, that the decision of the defendant to proceed by Zoom

19   is a knowing and voluntary act on her part, so for those

20   reasons we will proceed by Zoom.

21        Now let me turn to the question of your plea.  I

22   started this proceeding by saying that I have been provided

23   with a copy of a plea agreement, a letter to Mr. Rankin here.

24   But I want to be sure that there is a plea agreement and that

25   this letter embodies that plea agreement.

1          So let me ask you, Ms. Andrade, is this the plea

2   agreement between you and the government?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  The entire plea agreement?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Did anybody threaten you in any way to get

7   you to plead guilty?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  Did anybody promise you something that

10   isn't in this plea agreement to get you to plead guilty?

11          THE DEFENDANT:  No, sir.  I'm sorry.  No, sir.

12          THE COURT:  So let me go back to ask some more

13   fundamental questions.  Can you tell me how old of a woman you

14   are.

15          THE DEFENDANT:  I'm 49.

16          THE COURT:  How far did you get in school?

17          THE DEFENDANT:  I believe the 11th grade.  I don't

18   remember.  It's been a while.

19          THE COURT:  Okay.  Did you get a GED or graduate at

20   all?

21          THE DEFENDANT:  I'm working on the GED.

22          THE COURT:  Okay.  And for the past, say, 15 years,

23   what have you been doing for a living?  Jobs you've had, that

24   sort of thing.

25          THE DEFENDANT:  I worked for the Bristol County

1    Sheriff's Office as a case worker, and then I had my two

2    children.  I stayed home until they went to school.  And then

3    that's when I went to the Sheriff's Department.  And then I was

4    out of work.  I was a stay-at-home mom, which is a tough job.

5              THE COURT:  Right.

6              THE DEFENDANT:  And then I worked for the City of Fall

7    River.

8              THE COURT:  Okay.  Do you have any difficulty

9    understanding what this case is about?

10             THE DEFENDANT:  No, sir.

11             THE COURT:  Have you had an adequate opportunity to

12   discuss this case fully with your attorney, Mr. Rankin, and his

13   colleagues?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  And are you satisfied that you know enough

16   about this case and have received the kind of legal advice that

17   you need to assess this case so that you're comfortable making

18   a decision, a very important decision like this of pleading

19   guilty?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  You understand this is your own choice.

22   You can't say, "My lawyer told me to do it."  You have to make

23   that decision.

24             THE DEFENDANT:  No.  It's my decision, Your Honor.

25             THE COURT:  Okay.  And you think you know enough and

1    have received the kind of legal advice that you need to make

2    that decision?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Okay.  Now, can you tell me if you've ever

5    had any problem with substance abuse, either drugs or alcohol?

6              THE DEFENDANT:  Never, never.

7              THE COURT:  Okay.  I appreciate the forcefulness with

8    which you answered that question.  I want you to understand

9    that I'm going to be asking you questions that are somewhat

10   personal in nature.  You'll understand I'm not trying to delve

11   into your personal life, except as it helps me to decide

12   whether or not you know what you're doing and what you're doing

13   is voluntary.  Do you understand?

14             THE DEFENDANT:  Absolutely, sir.

15             THE COURT:  Are you taking any prescription drugs at

16   this point?

17             THE DEFENDANT:  Nothing right now, Your Honor.

18             THE COURT:  Okay.  Are you in the care of a physician

19   for any kind of physical problems?

20             THE DEFENDANT:  I have bursitis in my arm, and now my

21   -- I have high cholesterol, so I was just put on high

22   cholesterol medication.

23             THE COURT:  Is that a statin of some sort?

24             THE DEFENDANT:  That I couldn't answer.  It's to help

25   me lower my cholesterol.

1            THE COURT:  Sure.

2            THE DEFENDANT:  I do have a prescription for

3    Lorazepam.  I very, very rarely use it.  I don't like -- I'm

4    not a good person to take medication.  I'm having a tough time

5    with the cholesterol meds as it is.  And I have arthritis in my

6    ankles because I fractured both of my ankles a few years back,

7    but I very rarely ever take that.  I'll take some Advil for the

8    pain.

9            THE COURT:  Okay.  The reason I ask the question is to

10   see whether or not there's a physical condition that's

11   influencing you or interfering with your ability to make a

12   clear-eyed judgment in this case.  And I've heard what you have

13   to say about the kinds of meds that you have been prescribed

14   anyway and your response to them, but I want to ask the

15   fundamental question.  Do you think anything about your

16   physical condition or medications that you from time to time

17   are using is going to interfere with your ability to make a

18   clear-eyed judgment in this case?

19            THE DEFENDANT:  No, sir.

20            THE COURT:  Okay.  Let me ask whether or not you've

21   ever had the occasion to consult a mental health professional.

22   I mean by that --

23            THE DEFENDANT:  Never.

24            THE COURT:  -- a psychiatrist, a psychologist, a

25   psychiatric social worker or anyone like that.

1          THE DEFENDANT:  Never.

2          THE COURT:  Now, I ask all of these questions because

3     I want to be sure that you know what's involved here.  But

4     let's turn to the plea agreement itself.  The plea agreement

5     tells me that you're going to be pleading to various counts of

6     the second superseding indictment.  And the counts that you are

7     going to be pleading guilty to, as I understand it, are Counts

8     20 to 23 and Counts 25 and 26 of the superseding indictment.

9          For Counts 20 to 23, you're facing a maximum penalty

10    of incarceration for 20 years, supervised release for four

11    years -- for three years, excuse me, a fine of $250,000 or

12    twice the gain or loss that's involved in the conduct, a

13    mandatory special assessment, that's $100, potential for

14    restitution and forfeiture, which is alleged in the indictment.

15    Those are the potential penalties, maximum penalties that could

16    be imposed here by law on Counts 20 through 23.

17         On Count 25, the maximum penalty is ten years,

18    supervised release for three years, a fine of $250,000 or twice

19    the gross gain or loss, again, whichever is greater, a

20    mandatory special assessment of $100, restitution and

21    forfeiture, again as alleged in the indictment.

22         And Count 26 provides for incarceration for five

23    years, supervised release for three years, a fine of $250,000,

24    or again twice the gross gain or loss, whichever is greater, a

25    mandatory special assessment of $100 there and restitution.

1          Those are the maximum penalties that could be imposed

2     in this case.  You understand that that's what you're facing

3     here?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  And you understand that it's not merely

6     the maximum penalties that can be a matter of concern.  This is

7     a serious enough set of penalties that, if you have a

8     vulnerable immigration status -- I have no knowledge of your

9     immigration status, but I must tell you, as I tell everybody,

10    that if you're in a vulnerable immigration status, this is the

11    kind of thing that gets you deported or removed from the United

12    States.  That's how serious it is.  You understand?

13         THE DEFENDANT:  Yes.  I was born in the United States,

14    Your Honor.

15         THE COURT:  Okay.  Then you'll obviously be advised

16    about what that means, except that I want you to understand

17    this is serious stuff.

18         Second, it may interfere with other aspects of your

19    life if you're convicted.  It may mean you can't hold a

20    firearm.  It may mean that you can't hold a public office.  It

21    may mean that you can't vote for a period of time.  It may

22    interfere with your ability to get a job more generally, not to

23    mention the problems in the community of being labeled as

24    someone who has been convicted of a serious federal felony.

25         All of those things can follow from a conviction.  Do

1    you understand that?

2         THE DEFENDANT:  Yes, sir.

3         THE COURT:  Now, I started by saying that this was a C

4    plea.  That's a reference to the rule of criminal procedure

5    that permits the kind of plea that the parties have negotiated

6    here.  It's one in which the parties have agreed upon a

7    disposition.  My role here is to decide whether or not I'll

8    accept it or not.  And I will make that determination only

9    after I know more about the case than I know now and know more

10   about you than I know now.

11        The way in which I'm going to do that is have a

12   Presentence Report prepared.  The Presentence Report will spend

13   a good deal of time talking about your background, but it will

14   also focus on what are called the sentencing guidelines.  Those

15   are a series of directives to me that tell me what the range of

16   sentence might be for someone with your background who has

17   committed this kind of crime or these kinds of crimes.

18        I'll look at those guidelines very carefully, and you

19   can see in the plea agreement that the parties have made their

20   own calculation about those guidelines.  But I want to make

21   something clear.  I'm not bound by those calculations.  I'll

22   make my own determination about those guidelines.  Do you

23   understand that?

24        THE DEFENDANT:  Yes, sir.

25        THE COURT:  And moreover, I'm not going to stop with

just the guidelines.  I'm going to look at the larger purposes

of sentencing before I decide whether or not to accept any plea

here.  Those are larger purposes of sentencing like deterrence

and reflecting the seriousness of the offense and making sure

that there's not unwarranted disparity with other sentences in

similar kinds of cases.  Those are the kinds of things that

I'll take into consideration before I finally decide what I'm

going to do or whether or not I'm going accept this plea.

Now, have you fully discussed with Mr. Rankin the way

in which the sentencing guidelines work and the way in which

sentencing generally works and how I'm going to approach

sentencing?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you think you know enough about how

that's going to happen to make the decision to enter a plea?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, as I said, there is a plea agreement

in this case in which the parties have indicated what they

believe the proper sentence would be under these circumstances.

It's the agreed disposition that's referenced in section 5.

And what the parties are going to be asking me for and agree is

reasonable and appropriate is incarceration for a period of

what's called time served.  You appeared in court as a result

of an arrest warrant, but you voluntarily surrendered, as I

understand it.  And that is to be followed by 12 months of

1    supervised release.  It will involve a fine of $10,000.

2    There's a mandatory special assessment including all of those

3    counts that you're supposed to be pleading guilty to that will

4    be $600.  In addition, there is the question of forfeiture and

5    restitution.

6         I don't know, Mr. Hafer, what does that amount to in

7    this matter?  It's not covered specifically by the agreed

8    disposition.

9         MR. HAFER:  Yes, Your Honor.  Mr. Rankin and I have

10   talked about this.  There wouldn't be restitution here.  We've

11   consulted with our victim witness folks, and given the sort of,

12   when you have a victim in an extortion who is also paid a

13   bribe, they don't qualify, so there's not an issue of

14   restitution.  We're not seeking any forfeiture from Ms. Andrade

15   here, as Mr. Rankin and I have agreed.

16        THE COURT:  Okay.  So that's what the parties have

17   said and agreed upon here, and that's part of what I would be

18   considering or evaluating in this case.  Do you understand

19   that?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  So what this means is that I'm going to

22   listen to your plea in the case.  I'm going to make an

23   evaluation, and we'll decide this when it comes time for

24   sentencing when I have all of the information.  But I can't

25   tell you now how I'm going to decide that because I don't know

1    enough about it.  That means you're pleading guilty in the face

2    of uncertainty about what I'm going to do.  You understand

3    that?

4            THE DEFENDANT:  Yes, sir.

5            THE COURT:  Okay.  So let's go back to the larger

6    principle here.  You don't have to plead guilty at all.  Under

7    our system of justice, a person who is accused of a crime is

8    presumed innocent unless and until the government can prove

9    beyond a reasonable doubt every essential element of that crime

10   or those crimes.

11           What that means is that the government bears the

12   burden throughout.  They bear the burden in a context in which

13   you're presumed innocent unless they meet that burden.  And the

14   burden is the highest one the law knows:  proof beyond a

15   reasonable doubt.

16           What that also means is you don't have to do anything

17   at all.  You can sit back, look the government straight in the

18   eye and say, "Prove it."  And unless and until they do

19   according to that very high burden, you can't be found guilty,

20   unless of course you plead guilty.

21           So by pleading guilty you're giving up those profound

22   constitutional rights.  Do you understand that?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  Okay.  And you're exposing yourself to the

25   question of penalty that we've talked about here.  Now, I want

1   you to understand that I'm receiving information from you.  The

2   information cannot be used against you unless you engage in

3   conduct that suggests that you're not speaking -- you have not

4   spoken truthfully in response to various things that are said.

5   But we're taking this information to understand fully what your

6   position is with respect to this.

7          You have the right also to challenge the government's

8   case.  That is to say, you can have Mr. Rankin cross-examine

9   the government's witnesses.  He could bring in witnesses on

10  your behalf.  If they wouldn't come in here voluntarily, I

11  would give him court process to force them to come in here.

12         You could decide to take the witness stand yourself,

13  or you could choose not to.  If you chose not to, I would tell

14  the jury, and of course I've observed this principle myself,

15  that I can't hold that against you, none of us can.  That is a

16  very valuable Constitutional right that you have as well, the

17  right to remain silent in the face of criminal accusation.  We

18  can't burden that in any way.  It just drops out of the case.

19  It's another way of underscoring that the burden always rests

20  with the government.

21         Now, by pleading guilty in this case you're giving up

22  those valuable constitutional rights as well.  Do you

23  understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  And you're also giving up the right to

1  challenge various or mount various kinds of defenses or

2  initiatives.

3          In the course of this case we've had hearings with

4  respect to matters having to do with what's called immunity and

5  *Kastigar* kinds of settings.  Those are the terms of art, but

6  you've been sitting in on those.  And I assume that you've been

7  discussing with Mr. Rankin the various things that you're going

8  to be giving up, the defenses that you might have, the

9  initiatives that you won't get to pursue.  I've already ruled

10  preliminarily, but I've also indicated that it's subject to

11  revisiting, that I would deny the *Kastigar* motion.  On the

12  other hand, by pleading guilty, you don't get to test that on

13  appeal.  Do you understand that?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Okay.  So do you have any questions of me

16  about the kinds of initiatives that you could pursue in this

17  case without pleading guilty?

18          THE DEFENDANT:  No, sir.

19          THE COURT:  Okay.  One of the things I have to do is

20  satisfy myself that there's sufficient evidence from which a

21  finder of fact could find you guilty of the offenses charged.

22  I want to go briefly through the elements of the offenses here

23  so that I've at least outlined them, and I'm doing it really to

24  make sure that you don't have any questions of me.  But I

25  assume that you've discussed fully to your satisfaction with

1   Mr. Rankin what the government has to prove and how you might

2   respond to it.  But let me talk about it more specifically.

3          First, talking about Counts 20 through -- excuse me --

4   20 and 22.  Those are the counts that allege a conspiracy to

5   interfere with Congress by threats of violence or extortion.

6   They're paralleled by actual counts of interference with

7   commerce by threats of violence or extortion, and they're also

8   accompanied in that connection by what's called aiding and

9   abetting.  But they have a common element.

10         The common element is they center around what we call

11  the Hobbs Act.  And what they essentially look to is whether or

12  not you knowingly and willfully obtained property, in this case

13  it's alleged to be either a marijuana vendor or middleman; that

14  you did so by means of what is broadly called extortion and

15  that the extortion affected interstate commerce.  That's the

16  core of those four counts.

17         The conspiracy count is alleged as an agreement with

18  one or more other persons in which you entered into willfully

19  and knowingly.  That is, it wasn't a mistake.  You didn't

20  misunderstand what was going on.  You entered into an agreement

21  to engage in this Hobbs Act extortion.

22         And the aiding and abetting means that you took some

23  step, felony step, to advance the charge of Hobbs Act extortion

24  and that that step, the crime was actually committed by someone

25  else and you intended to help or cause the commission of the

1    charged crime.

2          Now, those are a complex collection of ways in which

3    the government has charged the events in this case, but they've

4    got to prove all of that beyond a reasonable doubt and

5    particularly that you did this knowingly, you knew what was

6    going on, and intentionally, that it was intentional on your

7    part.  Do you understand that?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Do you have any questions of me of what

10   the government has to prove in regards to those counts, the

11   Hobbs Act extortion?

12         THE DEFENDANT:  No, sir.

13         THE COURT:  So then we turn to the question of

14   bribery, which is alleged in Count 25 of the superseding

15   indictment, to which I gather you're going to offer a plea.

16         "Bribery" is defined here as involving -- has an

17   element of a kind of quid pro quo.  But what the government

18   must prove is that you corruptly gave or offered or agreed to

19   give something of value to another person, that you did so with

20   the intent to influence or reward an agent of a state of

21   municipal government, this requires an intent, that is the

22   intent, specific intent to give or receive something in value

23   in exchange for an official act, and the government entity or

24   organization or agent of the entity that receives the thing of

25   value as a threshold matter must be an agency or government

1    entity that receives benefits in excess of $10,000 under a

2    federal program involving grants or contracts or subsidies,

3    that sort of thing; and in connection with the actions of

4    bribery, this was in connection with a business of that

5    government entity, and that the thing of value that was offered

6    by you must be $5,000 or more.  That refers to the value of the

7    transaction or series of transactions, not specifically the

8    value of the bribe itself.

9            Now, again, that's somewhat complex.  I want to be

10   sure that you've discussed it fully with Mr. Rankin, and I want

11   to be sure that there isn't some additional question that you

12   have of me.  Is there anything that you'd ask me?

13           THE DEFENDANT:  No, sir.

14           THE COURT:  Okay.  And you've had an adequate

15   opportunity to discuss it fully with Mr. Rankin I take it?

16           THE DEFENDANT:  Absolutely, yes.

17           THE COURT:  Finally, there's an allegation quite apart

18   from the forfeiture allegations that we've talked about

19   earlier.  There's the allegation that you made false

20   statements.  And that's Count 26, I believe, yes.

21           And in Count 26 the government has to show that you

22   knowingly and willfully, again not by mistake or

23   misunderstanding, made a material false statement.  A material

24   false statement is something that has a natural tendency to

25   influence a decisionmaker, that you made it voluntarily,

1    intentionally as I said, and that you made that statement in

2    the jurisdiction of a government agency here, that is, that it

3    was designed to influence some action by some federal

4    government agency in this connection.

5              Now, again, do you have any questions of me about it?

6              THE DEFENDANT:  No, sir.

7              THE COURT:  And have you discussed fully with Mr.

8    Rankin what the government has to prove?

9              THE DEFENDANT:  Absolutely, Your Honor, yes.

10             THE COURT:  Okay.  So what I'm going to do is I'm

11   going to ask Mr. Hafer to tell us briefly what the evidence

12   would be if this case went to trial.  I'm going to ask you to

13   listen carefully, because when he's through, I'm going to ask

14   you, "Is that what happened?"  I'm going to ask you whether or

15   not you disagree with anything that he says.  Okay?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Mr. Hafer.

18             THE DEFENDANT:  Should I mute my -- while he speaks?

19             THE COURT:  You probably can.  I think that's probably

20   best because we get feedback if you don't.

21             THE DEFENDANT:  Absolutely.

22             THE COURT:  So Mr. Hafer, you can go ahead.

23             MR. HAFER:  Thank you, Your Honor.  I'll try to be

24   both brief and also satisfy Your Honor that there's a

25   sufficient factual basis.

1          Judge, I'll take the evidence of what the government

2     would prove sort of in groups here starting with Counts 20 and

3     21 which relate to the extortion of the individual identified

4     in the second superseding indictment as Marijuana Vendor 4.

5     For ease of reference, I will call him by his name going

6     forward.  That's Charles Saliby.  The government would prove

7     the circumstances of the extortion of Marijuana Vendor 4,

8     Charles Saliby, as follows.

9          THE COURT:  Again, Mr. Hafer, if you can slow down

10    just a bit so the court reporter --

11         MR. HAFER:  I'm sorry.

12         THE COURT:  -- well, more accurately so I can pick it

13    up and the court reporter can do so as well.

14         MR. HAFER:  Yes, Your Honor.  And I'm sorry to Kelly

15    as well.

16         The government would prove that Genoveva Andrade

17    conspired with Jasiel Correia to extort Charles Saliby, whose

18    marijuana business was in and affecting interstate commerce, by

19    agreeing to obtain $150,000 in return for then Mayor Correia's

20    issuance of a Non-Opposition Letter and Host Community

21    Agreement to Marijuana Vendor 4.

22         I know Your Honor is familiar with this from other

23    Rule 11s in this matter, but very briefly for this record.

24    Under Massachusetts Law, from 2016 through 2018, the relevant

25    time periods in this case, any individual seeking a license to

1  operate a marijuana business required a Letter of

2  Non-Opposition from the head of the municipality in which the

3  business was located, and that letter just typically stated

4  that the head of the local government had verified with

5  appropriate local officials that the facility was properly

6  zoned.

7      Because these Letters of Non-Opposition were essential

8  to marijuana vendors, the competition amongst applicants for

9  them was substantial.  In addition to the Non-Opposition

10 Letter, Your Honor, applicants seeking a license were required

11 to enter into what is called a Host Community Agreement, or

12 HCA, in which the marijuana company would agree to give the

13 local government up to three percent of its gross sales and

14 $50,000 annually.

15     Were this case to go to trial, the government would

16 prove that in Fall River, the Host Community Agreement and

17 Letters of Non-Opposition were typically negotiated

18 contemporaneously.

19     The principal evidence against Ms. Andrade on these

20 counts, Your Honor, would come from the testimony of Charles

21 Saliby, Marijuana Vendor 4, his sister, whose name is Nicole

22 Custadio, and his father, whose name is Sami Saliby.  The

23 evidence would essentially be as follows:

24     In approximately June of 2018, at a meeting with

25 Ms. Andrade and Mr. Correia in City Hall, Mr. Correia told

1    Charles Saliby that there would be no additional Non-Opposition
2    Letters issued in Fall River.  Several days later, Ms. Andrade
3    showed up unannounced at Mr. Saliby's business in Fall River
4    and encountered his sister Nicole Custadio.  When told
5    Mr. Saliby wasn't there, Ms. Andrade agreed to return later in
6    the day.

7           Later that day, both Ms. Andrade and Mr. Correia
8    returned to the store, which, just for Your Honor's benefit, is
9    a convenience store in Fall River, and went upstairs with
10   Mr. Saliby and Mr. Correia.  In an upstairs office in the
11   store, Mr. Correia told Mr. Saliby he would give him a
12   Non-Opposition Letter in return for $250,000.  Mr. Saliby
13   reacted with nervousness to this demand, which Ms. Andrade
14   observed, and asked to leave the room and was escorted to the
15   restroom nearby.

16          Upon returning to the room, Mr. Saliby asked
17   Mr. Correia why the number for the letter was so high.
18   Mr. Correia said it was in part to cover his legal fees in
19   connection with the federal investigation involving Sno app.
20   He also falsely told Mr. Saliby this would be the final
21   Non-Opposition Letter that he was going to issue.

22          Mr. Saliby and Mr. Correia subsequently agreed on a
23   bribe payment of approximately $125,000 in return for the
24   Non-Opposition Letter, although that was later modified to
25   $150,000.

1        As they walked out of the convenience store that day,

2   Ms. Andrade asked Mr. Saliby if everything was okay, to which

3   he said yes.  And then Ms. Andrade made a comment in sum and

4   substance that, "You're family now," to Mr. Saliby.

5        At a subsequent meeting with both Mr. Saliby and

6   Ms. Andrade at City Hall, Mr. Correia said he would reduce the

7   annual $50,000 payment as part of the Host Community Agreement

8   I mentioned earlier if Mr. Saliby would give Mr. Correia an

9   additional $25,000 in cash.  Mr. Saliby agreed to that, and

10  thus the final negotiated bribe amount was $150,000.

11  Mr. Saliby further agreed he would pay $75,000 cash up front in

12  return for the letter and an additional $75,000 after receiving

13  his provisional marijuana license from the Commonwealth.

14       Several days later, Your Honor, on or about July 5 of

15  2018, Mr. Correia came to Mr. Saliby's business in his official

16  Fall River vehicle and instructed Mr. Saliby to get inside.

17  Once inside, Mr. Saliby gave then Mayor Correia $75,000 cash in

18  a contractor's clipboard.  Upon receiving the cash, then Mayor

19  Correia handed Mr. Saliby his Non-Opposition Letter.

20       And Sami Saliby, Your Honor, who I mentioned earlier,

21  the father of Mr. Saliby, would also testify at trial and would

22  generally corroborate the timeline of events that I've just

23  outlined and additionally would testify that his son Charles

24  asked him for permission to access the family safe to remove

25  cash as required for this payment.  Obviously a convenience

1    store is a large cash business.

2          That's the essence of what the government's evidence

3    would be on those counts, Your Honor.

4          With respect to Counts 22 and 23, which are referred

5    to as the extortion of Middleman 1 -- Middleman 1, the

6    government, just for ease of reference, will now refer to as

7    Antonio Costa, an individual who has pled guilty already in

8    this matter before Your Honor.

9          With respect to these counts, the government would

10   prove that Ms. Andrade conspired with Mr. Correia to extort

11   Mr. Costa whose business was in and affecting commerce.

12   Mr. Costa, Your Honor, owns several commercial and other real

13   estate properties in and around the City of Fall River.

14         The object and purpose of this conspiracy was to

15   obtain property in the form of a stream of benefits which

16   included cash and a Rolex watch in exchange for Mr. Costa

17   receiving favorable official action and assistance on

18   commercial real estate and other real estate interests he had

19   in the City of Fall River.

20         By way of background, in approximately June of 2016,

21   Mr. Costa purchased a commercial property at 379 Kilburn

22   Street, Fall River, and thereafter learned that the water

23   supply to feed the building's required sprinkler system was

24   inoperable.  After contacting the city and learning it would

25   cost several thousand dollars to get the necessary permits to

1    restore the water supply to the sprinkler system, Mr. Costa

2    contacted then Mayor Correia.

3         At the time he contacted Mayor Correia, Mr. Costa

4    regularly did business in Fall River and he knew that

5    Mr. Correia expected to get paid for certain official actions.

6    Here specifically, this particular extortion postdates the

7    first charged marijuana extortion in the second superseding

8    indictment, the extortion of Marijuana Vendor 1, which

9    Mr. Costa middled, for lack of a better term, Your Honor.

10        In January of 2017, Mr. Costa received a Rolex

11   watch -- this particular watch is known as a Batman Rolex

12   valued at between $7,500 and $12,000 -- from an acquaintance of

13   his as payment on a debt.  Mr. Costa subsequently agreed to

14   give that watch to Mr. Correia in exchange for official action

15   and assistance, including the activation of the necessary water

16   supply to the building at 379 Kilburn Street.

17        Shortly thereafter receiving the watch, on March 9,

18   2017, the individual identified in a second superseding

19   indictment as Excavator 1 dug the necessary trench to provide

20   the water to 379 Kilburn.

21        If this case were to go to trial, Excavator 1 would

22   testify that he invoiced the City of Fall River for that work,

23   which was not his typical practice, which was to invoice the

24   building owner, not the city.

25        In July of 2017, as part of Mr. Correia's reelection

1     campaign, the campaign issued a $3,900 check to Mr. Costa for

2     office space the campaign was renting at a building at 257

3     South Main Street in Fall River.  Ms. Andrade came to that 257

4     South Main to deliver that check to Mr. Costa, along with

5     Mr. Correia.

6             Upon giving Mr. Costa the check for $3,900 for office

7     rental space, Mr. Correia demanded $3,900 cash back in return

8     from Mr. Costa.  Mr. Costa gave Mr. Correia that cash in the

9     presence of Ms. Andrade.  When he did, he understood again the

10    cash was part of the stream of benefits for the official action

11    and assistance with respect to his commercial real estate

12    interests in and around the City of Fall River.

13            Mr. Costa would testify, if this case against

14    Ms. Andrade were to go to trial, that they were standing near

15    the front window of a building at the time of this cash

16    exchange, and Ms. Andrade made a comment that was in sum and

17    substance, "You shouldn't be handing out cash in front of the

18    windows," in other words, implying that they should be more

19    discreet.

20            Finally, on these two counts, Your Honor, the

21    government's evidence would be that neither Mr. Correia nor

22    Ms. Andrade ever disclosed the watch or $3,900 cash payment on

23    any ethics forms, campaign finance forms or related

24    disclosures.

25            I'll go quicker now with the final two counts, Your

1    Honor.  Count 25, which Your Honor described as the bribery

2    count, here, the principal evidence against Ms. Andrade would

3    be bank records which show that almost immediately upon her

4    hire as Mr. Correia's chief of staff in November of 2017, she

5    began kicking back approximately half of her salary to

6    Mr. Correia.

7            In addition, on or about December 14 of 2017, Mr.

8    Correia approved a $10,000 city-funded snow stipend to

9    Ms. Andrade, and that was to be paid to her and was in fact

10   paid to Ms. Andrade in two separate $5,000 installments, one in

11   December of '17, one in January of '18.

12           In essence, Your Honor, this count would show -- the

13   evidence on this count would show that within one or two days

14   of receiving her city paychecks and that snow stipend,

15   Ms. Andrade gave almost exactly half in the case of her salary

16   and almost all in the case of the snow stipend of the funds

17   directly back to Mr. Correia.

18           This was a pattern that continued on a biweekly basis

19   between December of 2017 and July of 2018.  And on the rare

20   occasions when a payment was missed, Ms. Andrade would pay

21   double the following cycle.  Neither she nor Mr. Correia ever

22   reported this arrangement on ethics forms, campaign finance

23   forms or anywhere else.  In total between December of '17 and

24   July of 2018, Ms. Andrade gave approximately $22,800 to

25   Mr. Correia.

1         This count again would be proved with bank records and

2    also the testimony of two individuals identified in the second

3    superseding indictment to whom Ms. Andrade made admissions

4    regarding this scheme that she was required as part of getting

5    and keeping her job to give Jasiel half of her salary.

6         Finally, Your Honor, the government would prove that

7    both Ms. Andrade and Mr. Correia were agents under 18 U.S.C.

8    666 of the City of Fall River and that the City of Fall River

9    received millions of dollars in HUD funding in the 12-month

10   period relative to these charges.

11        The final count, Judge, Count 26, the government would

12   prove on or about December 10 of 2018, at a proffer here in the

13   United States Attorney's Office in Boston, which was attended

14   by, among others, a special agent from the Department of

15   Housing and Urban Development Office of Inspector General,

16   Ms. Andrade falsely stated the three statements identified in

17   the second superseding indictment.  Essentially that the only

18   time -- number one, statement one, the only time she was

19   involved in a marijuana issue with chief of staff was when a

20   group of marijuana investors wanted to meet with Mr. Correia;

21   statement two, which in essence was that Mr. Correia would

22   never have given a Non-Opposition Letter in return for money;

23   and statement three, that she had loaned Mr. Correia

24   approximately $10,000.

25        If the case were to go to trial, in addition to

1   proving those statements occurred in Boston in the presence of

2   federal law enforcement agents and that they were false, the

3   government would prove they were knowingly and willfully made

4   by Ms. Andrade.  That's it, Your Honor.

5            THE COURT:  So you've heard what Mr. Hafer tells me

6   the evidence would be.  Do you disagree with any of that?

7            THE DEFENDANT:  No, sir.

8            THE COURT:  To the degree that -- matters within your

9   own personal knowledge, do you deny that any of that took

10  place?

11           THE DEFENDANT:  I'm sorry.  Could you repeat that Your

12  Honor?  I'm sorry.

13           THE COURT:  To the degree -- there has been some

14  references to things that took place out of your presence.

15           THE DEFENDANT:  Yes.

16           THE COURT:  But with respect to the things that took

17  place in your presence and the actions that you undertook, is

18  that what happened?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  Okay.  Mr. Hafer, do you know of any

21  reason I shouldn't accept the plea?

22           MR. HAFER:  I do not, Your Honor.

23           THE COURT:  Mr. Rankin, do you know of any reason I

24  should not "receive" the plea, is I guess the phraseology I'm

25  using here, for the C plea?

```
 1              MR. RANKIN:  I do not, Your Honor.

 2              THE COURT:  Okay.  So I'm going to ask Ms. Beatty to

 3     inquire of the defendant.

 4              COURTROOM CLERK:  Genoveva Andrade, on Criminal Action

 5     18-10364 on Counts 20 through 23 and Counts 25 and 26 of a

 6     26-count second superseding indictment, you have previously

 7     pled not guilty.  Do you now wish to change your pleas?

 8              THE DEFENDANT:  Yes.

 9              COURTROOM CLERK:  What say you now as to Counts 20 and

10     22, guilty or not guilty?

11              THE DEFENDANT:  Guilty.

12              COURTROOM CLERK:  As to Counts 21 and 23, guilty or

13     not guilty?

14              THE DEFENDANT:  Guilty.

15              COURTROOM CLERK:  As to Count 25, guilty or not

16     guilty?

17              THE DEFENDANT:  Guilty.

18              COURTROOM CLERK:  And as to Count 26, guilty or not

19     guilty?

20              THE DEFENDANT:  Guilty.

21              THE COURT:  Based on the discussion we've had this

22     morning, I'm satisfied that your decision to enter those pleas

23     of guilty is knowing and voluntary and it's supported by

24     substantial evidence by which a finder of fact could find you

25     guilty to the offenses charged.
```

1      As I indicated, I'm receiving that plea, but I'm not

2  accepting it at this point because I want to evaluate a variety

3  of materials that will be focused through what's called a

4  Presentence Report.  It's a document I rely on very heavily in

5  making my own judgment in the case.

6      You and Mr. Rankin will have an opportunity to work

7  with the probation office to answer their questions.  It's very

8  much in your best interest but also an obligation that you

9  have.  But you can also bring to their attention things you

10  think you I should know in making my determination.

11      You'll get a chance to see their Presentence Report in

12  its draft form.  If you're not satisfied with it, you can ask

13  the probation office to make changes or corrections.  And if

14  they don't make those changes and corrections to your

15  satisfaction, you can bring the matter up to me at the time of

16  what we're calling sentencing in this case.  I'll listen to

17  what you have to say and what Mr. Rankin has to say and what

18  the government has to say, and I'll indicate whether or not I'm

19  prepared to accept the plea agreement that the parties have

20  entered into.  Do you understand?

21      THE DEFENDANT:  Yes, sir.

22      THE COURT:  Ms. Beatty, can you give us a date for the

23  sentencing in the matter.

24      COURTROOM CLERK:  Tuesday, April 27 at 2:00.

25      THE COURT:  Okay.  Anything further that we need to

1  take up?  The defendant's terms and conditions seem to be

2  appropriate for continued release pending that proceeding.

3            MR. HAFER:  Agreed, Your Honor.

4            THE COURT:  Okay.  Anything else that we need to take

5  up with respect to Ms. Andrade's circumstances?

6            MR. RANKIN:  No, Your Honor.

7            THE COURT:  Okay.  Then we will be in recess in this

8  matter, although we have a follow-on to try to develop a

9  scheduling understanding with respect to the case involving

10 Mr. Correia.  We'll be in recess then on this matter.

11           THE DEFENDANT:  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           (Adjourned, 11:53 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 15th day of January, 2021.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25