UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                    )
UNITED STATES OF AMERICA,           )
                                    )            Criminal Action
            Plaintiff,              )            No. 18-10364-DPW
                                    )
v.                                  )
                                    )
JASIEL F. CORREIA, II,              )
                                    )
            Defendant.              )
                                    )
```

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


JURY TRIAL DAY 6


April 28, 2021


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Debra M. Joyce, RMR, CRR, FCRR
Official Court Reporters
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Zachary R. Hafer
3    David G. Tobin
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3106
6    zachary.hafer@usdoj.gov
     david.tobin@usdoj.gov

7

8    On Behalf of the Defendant Jasiel Correia, II:
     Kevin J. Reddington
9    Law Offices of Kevin J. Reddington
     1342 Belmont Street
10   Suite 203
     Brockton, MA 02301
11   508-583-4280
     kevinreddington@msn.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Douglas P. Woodlock, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on
 7    April 28, 2021.)
 8    (Case called to order.)
 9              THE COURT:  So I've received the updates that I
10    requested, and that's helpful.  I think we'll be moving along
11    fairly efficiently now.  I don't think there's anything else
12    that we need to take up at this point.
13              MR. HAFER:  Not from us, Your Honor.
14              THE COURT:  Mr. Reddington, nothing?
15              MR. REDDINGTON:  No, thank you.
16              THE COURT:  Okay.  So we're going to bring the jury
17    in.
18              MR. HAFER:  Would you like us to get the witness in
19    the box, on the stand?
20              THE COURT:  Please, if you could.
21              (Jury enters the courtroom.)
22              THE COURT:  Good morning, ladies and gentlemen.  I'll
23    give my morning question.  Have any of you been exposed in any
24    way to any information or communication of any kind dealing
25    with this case outside of the courtroom itself?
```

1          And I see no response to that, so I can move on to
2     something else, which is kind of a preliminary.
3          I gather from the folks who are helping you to help
4     you negotiate the way around the back of the house and the
5     secured section of the courthouse, that some of you have raised
6     questions -- not raised questions but asked about the
7     architecture, which you'll find I'm prepared to talk to at
8     great length.  I won't talk about it at great length.  But it
9     does provide an occasion to talk again about what we're up to,
10    together, all of us in this courtroom and more generally.
11         I guess one of the questions or some of the questions
12    had to do with the structure, that is that big picture window
13    outside.  It's three and a quarter acres of glass.  And some
14    questions have been asked about how it's constructed.  I won't
15    go into great detail because I don't know the full details, but
16    I'll tell you this:  It's made up of basically 35 ladders,
17    that's what those structures are, that go from the second floor
18    up to the ninth floor.  Those are the only places that they're
19    tied together, on top.  That gives you a pretty clear view
20    outside.  And then they're welded together.  They are called
21    ladders because they were just laid up like ladders and the
22    glass was put in.
23         The second aspect of it that you asked, I guess, is
24    what are those tension elements within the ladders, what's
25    holding them together?  Well, you should know that this court,

1     up until after the Civil War, was known as the admiralty court.

2     Its principal responsibilities were to deal with shipping

3     matters, interstate or international commerce by shipping.

4          Things have changed since after the Civil War, and

5     obviously they're a much broader jurisdiction, but we were

6     called the admiralty court for that reason and one of the

7     principal admiralty courts in the country.  So the desires

8     thought about that and said, "Well, maybe what we should do is

9     provide the support for that structure by using the kind of

10    tension bars and tension elements that you have on yachts."

11    And that's what that is.

12         As a matter of fact, people who actually designed

13    those tension bars are the people in Rhode Island who did the

14    same thing for the America's Cup, for all the yachts in the

15    America's Cup.

16         Now, that's a fun fact, I suppose, but it's something

17    more fundamental, I think.

18         It is very much the case that in conceiving this

19    building the architects and the people who were engaged with it

20    thought about what architecture is supposed to be.  It's a

21    marriage of memory and invention.  The memories, of course, are

22    the memories of the creation of this court and how it got to

23    where it is as the admiralty court.  But that big picture

24    window is meant to indicate that there's transparency.  People

25    looking out can look out at the full range of the demographics

1    from which we draw cases, principally in olden times from the

2    water, but from the disputes in rich people's housing just

3    across the way or in working class communities like Everett and

4    Revere or East Boston.  The point of it is you can look out and

5    see where it is that we draw the kinds of disputes that bring

6    people into the courthouse and bring you into the courthouse.

7         Similarly, the people who are out there can look back

8    and see each of the entrances to each of the courthouses --

9    courtrooms, like this courtroom.  So the design was meant to

10   tell everybody that this is open; that this is a place where

11   you can see where the controversies come from and where the

12   controversies are resolved.

13        That brings me to a final point at this point.  I hope

14   at the end of the case that when the proceedings are completed

15   and you're discharged from any further jury duties in this

16   matter, I'll have a chance to come in and thank you and answer

17   any questions you have.  Not questions about the case or the

18   law or anything like that.  That's something that you

19   yourselves will decide.  I'm not going to be asking about that.

20   But we are interested in how things worked out, whether we can

21   do it better, that kind of thing.  And I'll sure be happy to

22   answer questions about the architecture of the building if

23   you're still interested at that point.

24        But one of the things that people don't notice when

25   they come into the courthouse, it's really at the foundation of

1    this building.  As a matter of fact, I suspect most of you

2    didn't even go by it, it's the elevator bank right at the first

3    floor here.  You probably walk out differently.  But directly

4    across from the elevator bank there's a big display of names,

5    about a thousand names up there.  And it's, from my

6    perspective, the most important symbol of this courthouse.  And

7    there's a quotation at the top of it that introduces those

8    names.  The quotation is from a speech that was given by Daniel

9    Webster before the Civil War as a eulogy for one of the great

10   Supreme Court justices from Massachusetts, Joseph Story.  And

11   what Webster did -- he's a great advocate -- is he used a

12   metaphor of building or architecture to describe Justice

13   Story's life as the concept of kind of building a sustaining

14   structure, the rule of law.  And so maybe I'll quote from it

15   and then I want to say something more.

16        The part that you see when you go across from the

17   elevator bank is one in which Webster says that those involved

18   in building a structure -- and he was -- the metaphor was Story

19   creating the rule of law -- connect with, and now I quote him,

20   "With that which is and must be as durable as the frame of

21   human history."

22        So who are those names?  The names are of every person

23   who worked on this building, the laborers, the architects, the

24   designers, the consultants, everybody.  There are even three

25   judges there.  And they're all in alphabetical order.  The name

1    of one of the current Supreme Court justices is up there.  He's

2    between a fellow who was a member of the laborers' union and

3    used to, you know, work hard to make sure that the site was

4    clean.  And just below him was a fellow who was an electrician,

5    a member of the electrician's union.

6         So why do I go into that?  Well, I suspect you already

7    know.  We're all in this together.  We all have different job

8    descriptions, but we're all working to make something that is

9    as durable as the frame of history.  That is, to provide legal

10   proceedings that are dealt with transparently as well as we can

11   with Zoom and that sort of thing.  And fairly, exercising the

12   respective responsibilities that we have together.

13        So I'm glad you asked about the architecture because

14   the architecture tells a great deal about what we're all about

15   here, and now we're going to get back to what we're about.

16        So the government has called its first witness.

17   Ms. Beatty will swear the witness in.

18        <u>JOSHUA SCOTT HARDING Sworn</u>

19        COURTROOM CLERK:  Please state your full name and

20   please spell your last name.

21        THE WITNESS:  Joshua Scott Harding, H-a-r-d-i-n-g.

22        THE COURT:  Mr. Harding, you can take your mask off

23   and try to keep the microphone between you and Mr. Hafer, who I

24   guess is going to be examining you.

25        THE WITNESS:  Okay.

```
1              THE COURT:  Mr. Hafer.
2              MR. HAFER:  Thank you, Your Honor.
3    DIRECT EXAMINATION BY MR. HAFER:
4    Q.   Mr. Harding, how old are you?
5    A.   37 years old.
6    Q.   Where did you grow up?
7    A.   The Greater New Bedford area.
8    Q.   How far did you go in school?
9    A.   I dropped out of college my junior year.
10   Q.   Are you currently working?
11   A.   Yes.
12   Q.   Where are you working?
13   A.   I work at this company, Cognizant.
14   Q.   What kind of company is Cognizant?
15   A.   They're a software company.
16   Q.   What do you do for Cognizant?
17   A.   It's all software related.  I solve problems.  I do
18   consulting, that type of thing.
19   Q.   How long have you been working for Cognizant?
20   A.   For about five months now.
21   Q.   Prior to the five months that you've been with Cognizant,
22   where were you working?
23   A.   I was working at a handbag retailer also doing software.
24   Q.   And prior to working at that handbag retailer?
25   A.   I was at a software company in Providence.
```

1    Q.    About how long in total, Mr. Harding, have you been in

2    software development?

3    A.    About 25 years.

4    Q.    In the course of that 25 years, have you worked with

5    startups doing software development?

6    A.    Yes.

7    Q.    Are you familiar with a company called Statewide Software?

8    A.    Yes.

9    Q.    What is Statewide Software?

10   A.    It's a software company I founded in 2003.  I ran it for

11   about 12 years.

12   Q.    What type of work did Statewide Software do?

13   A.    Pretty much anything related to computers.  Like I liked

14   being a problem-solver.  So if someone called me with a

15   problem, a small business, they couldn't get their computers

16   online, they needed it fixed, they wanted a website.  Whatever

17   it was, I did my best to help out.  But it was all generally

18   related technology.

19   Q.    You said that was about 12 years starting in approximately

20   '03 or '04?

21   A.    That's correct, yes.

22   Q.    Mr. Harding, do you know the defendant Jasiel Correia?

23   A.    Yes.

24   Q.    How did you first learn about Jasiel Correia?

25   A.    I was in a business networking group.  We passed

```
 1    referrals.  It was one of the ways I marketed my company.  We
 2    would trade jobs and prospects back and forth.  There was a
 3    fellow in the group, Dave Wilder, and he came up to me one day
 4    and said, "Hey, I know this fellow Jasiel.  He's working on an
 5    app.  He's having some trouble with his developers that are
 6    offshore.  It's not going too well.  Would you want to talk to
 7    him?"  And he told me that Jasiel had done a company before.
 8    This was his second one.  And he thought it would be a good
 9    referral.  So Dave put me in touch with him.
10    Q.   At some point -- well, let me ask you this:  Was it
11    significant to you that Mr. Correia had been involved in
12    another company?
13    A.   Very significant.  Because that's proof of success.  Like,
14    in the course of running my company, sometimes I had some
15    really questionable ideas come in.  People would come in and
16    say, Hey, I got an idea for a website.  It's like EBay but only
17    sells dog food, all kinds of just whacky stuff.
18         So knowing that someone came in and they had started up a
19    business and faced all the challenges that entails and operate
20    and run it successfully, to me that was kind of like social
21    proof that he knew what was going on, and that made it a more
22    exciting conversation for me to have.
23    Q.   Directing your attention, Mr. Harding, to approximately
24    the spring of 2014, did you subsequently meet the defendant?
25    A.   Yes, I did.
```

1    Q.    Where did you meet him?

2    A.    It would have been in my office on River Road.

3    Q.    And was anyone else there, if you recall?

4    A.    I'm not sure.  Nick Lizotte, who was my partner, he may

5    have been in the room at the time.  I don't remember, though.

6    Q.    What was the purpose of this meeting between you and the

7    defendant?

8    A.    Basically to hear about the idea.  Because Dave told me

9    that he had some challenges and he was working on the app, but

10   I didn't know the details of it.  I'm not sure Dave knew the

11   details either.

12   Q.    What happened at this meeting?

13   A.    I believe Jasiel had me sign an NDA, which is not

14   uncommon.

15   Q.    What's an NDA?

16   A.    A nondisclosure agreement.  When someone has an idea and

17   they go to find someone to implement it, sometimes they're

18   worried because it's pretty typical that someone with an idea

19   doesn't have the ability to do it themselves.  They have to

20   talk to somebody in software.  They don't want you to say, "Oh,

21   I'm not interested," and then you do the idea yourself.  So

22   it's very common there'd be some kind of like non-disclosure

23   agreement.  So basically I'm not allowed to just take his idea,

24   do it myself and say, "Oh, it was my idea."  Very standard.  I

25   did this quite a bit.

```
 1    Q.   What happened after the nondisclosure agreement?
 2    A.   Either -- I think he told me the pitch right then.
 3    Sometimes people take the agreement and they go back and they
 4    file it and you see it again.  I think he pitched me right
 5    there.  I think he made the elevator pitch of what he wanted to
 6    do and so forth.
 7    Q.   When you say he pitched you, was that in connection with
 8    this app SnoOwl?
 9    A.   Yes.  One of the things I always like to hear -- there's a
10    nickname for it, like, the elevator pitch, and it's basically
11    like a quick explanation of what the business is.  It gets that
12    name because, like, when you get stuck in a elevator with
13    someone, you have a very short amount of time to explain it.
14         Typically, this is important for a startup because when
15    you go to investors and so forth, you have to be able to
16    explain your idea in a really concise manner.  It's really
17    important to have that explanation.  And he did.  The plan was
18    great.  It was awesome.  I was very excited.
19    Q.   What were your initial impressions of --
20              THE COURT:  Mr. Harding, I'm going to permit the
21    examination, but one of the things that you should keep in mind
22    is the elevator pitch, which is the very concise response to
23    the circumstances.  And so just respond to what Mr. Hafer asks
24    you.
25              THE WITNESS:  I'm sorry.
```

1          THE COURT:  Then we'll move along.

2          THE WITNESS:  I understand.  Very good.

3          THE COURT:  Mr. Hafer, you can continue.

4          MR. HAFER:  Thank you, Your Honor.

5     Q.   Mr. Harding, what were your initial impressions of Jasiel

6     Correia?

7     A.   Very well-dressed, seemed to know what was going on, had a

8     great plan, seemed very competent.

9     Q.   What was your general understanding of what the app SnoOwl

10    was going to do?

11    A.   Jasiel told me that small businesses were an underserved

12    segment of the market.  So he wanted to give them some way to

13    reach audiences and promote themselves.  I thought it was a

14    great idea.

15    Q.   After meeting with the defendant in the spring of 2014 at

16    your offices, did Statewide Software eventually agree to do

17    work for SnoOwl?

18    A.   Yes.  Yes, we did.

19    Q.   Mr. Harding, there should be a binder in front of you with

20    several tabs.  Could I ask you at this time to please turn to

21    tab 41.  And take a moment and just let me know if you

22    recognize that document.

23    A.   Yes.

24    Q.   What is it?

25    A.   This is a proposal that I wrote for the project to make

1   the app.

2            MR. HAFER:  I offer Exhibit 41, Your Honor.

3            THE COURT:  It's received.

4            (Exhibit 41 admitted into evidence.)

5   Q.   Just starting with the first page here, Mr. Harding, this

6   is the -- it says "SnoOwl 1.0."  What does that mean?

7   A.   1.0 is typically the first release of an application.  So

8   it's like the first ever version of it.

9            MR. HAFER:  Could I have the next page.  Could you

10  just highlight the project description, please.

11  Q.   Under the project description here, Mr. Harding, what was

12  -- it talks in some detail here about the objective.  But what

13  was the essence of what Statewide was going to do for SnoOwl

14  under this version 1.0 proposal?

15  A.   Jasiel had the idea, but he didn't have the ability

16  himself to write the program.  So we were going to take his

17  idea, figure out how to make it happen, program it, and then

18  eventually launch it on the app store.

19  Q.   What does that mean, launch it at the app store?

20  A.   An app is considered launched when someone can open up

21  their iPhone, they can visit the App Store.  They can search

22  for the app, and they can click install and they can get it,

23  it's considered launch.

24            MR. HAFER:  Ms. DiPaolo, can I have the last page of

25  the exhibit, page 6, please.  The project costs and estimates

1    paragraph.

2    Q.   Mr. Harding, this is the final page of the exhibit, but is

3    it fair to say here at the end of the proposal for version 1.0,

4    Statewide is laying out what the software development costs

5    will be for this part of the project?

6    A.   Yes.  Yes, it is.

7    Q.   And in the last paragraph there it essentially says an

8    initial down payment of $4,500 will cover the first monthly

9    block, and then you're saying an additional 1,500 is required

10   to get this thing started; is that right?

11   A.   Yes.

12   Q.   Before we get into the specifics of the software

13   development work that you did, Mr. Harding, after this proposal

14   was presented to SnoOwl, did Statewide, in fact, begin working

15   on version 1.0?

16   A.   Yes, we did.

17   Q.   And this version 1.0 part of the project, Mr. Harding, was

18   that approximately six months in or about May of 2014 to in or

19   about November of 2014?

20   A.   Yeah, that sounds about right.

21   Q.   Could I ask you to turn to tab 42 of your binder and just

22   take a moment and let me know if you recognize that.

23   A.   Yes.

24   Q.   What is it?

25   A.   It's a list of payments from SnoOwl to my company,

 1    Statewide Software, and also to the employees.  One is

 2    Edmilson, one is Nick Lizotte and myself.

 3              MR. HAFER:  I offer Exhibit 42, Your Honor.

 4              THE COURT:  That's received.

 5              (Exhibit 42 admitted into evidence.)

 6    Q.   Mr. Harding, we're going to get into the specifics, but in

 7    general terms, this is a spreadsheet documenting all the

 8    payments from SnoOwl to Statewide Software or you and

 9    Statewide's other employees individually; is that correct?

10    A.   Yes, that is correct.

11              MR. HAFER:  Ms. DiPaolo, could I have the second page.

12    Could you just highlight that bottom half of the spreadsheet.

13    Q.   Do you see the heading here, Mr. Harding, Total Paid by

14    SnoOwl Correia to Statewide Software and Employees?

15    A.   Yes.

16    Q.   And it indicates a total of $76,885?

17    A.   Yes, I see this.

18    Q.   Was that the total amount over the time period that

19    Statewide and you and others individually were involved that

20    you were paid for software development work?

21    A.   Yeah, that feels about right.

22    Q.   And just to be clear, this was real development work that

23    was being done that you were being paid for, correct?

24    A.   Oh, for sure.  I mean, this was weeks and weeks and weeks

25    of development.  Not just by myself but two other guys as well.

1    Yes, it was a lot of work.

2    Q.   With respect to those two other guys, just staying on

3    what's on the screen in front of you, and you already mentioned

4    this, but Nicholas Lizotte and Edmilson Dos Santos, who were

5    they?

6    A.   Well, Nick was my partner at Statewide and Edmilson was an

7    employee.

8    Q.   So when you and -- Edmilson, do you call him Edmilson, or

9    does he have a nickname?

10   A.   He has a nickname.  The first time I met him, he said to

11   call him Junior.  So if I call him "Junior," Junior and

12   Edmilson are the same person.

13   Q.   When you began working on version 1.0 in May of 2014, did

14   you rely on any of the prior development work that had been

15   done by other software developers?

16   A.   No, I did not.

17   Q.   Why not?

18   A.   It didn't seem very significant.  In one of our very first

19   meetings Jasiel showed me the worked that had been done.  He

20   showed me his phone, and there was a login screen where one

21   could log into the app.  But when you typed your name into it

22   and hit okay, it just crashed.  It didn't look very useful to

23   me, so we didn't utilize it.

24   Q.   Mr. Harding, I want to now kind of walk through the

25   software development work that you did.

1  A.   Sure.

2  Q.   And also try to do it in a way that makes sense to people

3  that don't have the level of expertise that you have.  When you

4  began working on SnoOwl in 2014, did you create in the first

5  instance things called wireframes?

6  A.   Yes.

7  Q.   Okay.  Can you explain what those are.

8  A.   Wireframes are essentially a blueprint of what the user is

9  going to see on their phone.  It shows like where all the

10  buttons are, some little rough notes on what they do.  It kind

11  of shows not necessarily what the app will look like but kind

12  of what's going to be in it and how it's arranged, that type of

13  thing, visually.  If you've seen a blueprint, it's the same

14  idea but for a mobile phone application instead of a building.

15  Q.   So after you develop these wireframes, what's the next

16  step in the development process?

17  A.   The wireframes don't convey any kind of look and feel.

18  They don't have the colors for the app.  They don't have the

19  logos.

20       The next step is to hand it off to a graphic designer.

21  They take the blueprints and they make them look really

22  attractive with the final fonts and colors and other things.

23  Basically a mock-up of how it will actually look.

24  Q.   Did that, in fact, happen here after the wireframes, the

25  blueprints you developed, went to the graphic designers?

1   A.   Yes.

2   Q.   Was Mr. Correia involved in that process?

3   A.   Yes.  He would have not only approved and provided input

4   on the wireframes but also on the graphic design.

5   Q.   Okay.  So then what happens after the graphic designers do

6   their thing?

7   A.   After they're done with that, then we begin programming it

8   with not only the wireframes as our guidance but also the

9   markups the graphic designers create.

10   Q.   Okay.  And, again, staying roughly at 30,000 feet, what

11   happens -- you say you begin programming.  What does that mean?

12   What are you doing?  What's being created?

13   A.   Well, someone has to implement all the logic that makes

14   the app come to life and makes it do what it's supposed to do.

15   So it involves sitting down at the computer, writing code,

16   solving bugs, figuring out challenges with data type of thing.

17   Computer programming is the easiest way to put it.

18   Q.   So with respect to SnoOwl here, did you, in fact, do that

19   programming with the app after the wireframes, after the

20   graphic design process?

21   A.   Myself and the two others, yes, we were the programmers.

22   Q.   Then what happens as that programming work continues?

23   What happens next?

24   A.   When it gets to a point where -- when you first start out,

25   the app doesn't do anything.  When it gets to a point where you

1    can kind of test-drive it, we'll do -- we call it a closed

2    beta.  So people in the office or the customer themselves, they

3    can test out the app and kind of test drive it before the

4    public can see it.

5         Once everything kind of looks okay, then we proceed to

6    launch, which involves submitting to Apple, getting it out

7    there, so anyone in the public can see it.

8    Q.   Did you, in fact, submit SnoOwl to Apple at some point in

9    2014?

10   A.   We did, yes.

11   Q.   What happened when you submitted it to Apple?

12   A.   We waited about two weeks.  There's a line for the review.

13   And we were rejected based on a bug of -- I don't recall.  Then

14   we solved the bug and we resubmitted it, and a few days later

15   we were accepted and it was on the App Store.

16   Q.   So version 1.0 of SnoOwl officially launched on the App

17   Store?

18   A.   That's correct.

19   Q.   During this first six months working on version 1.0,

20   Mr. Harding, were you and Nick and Junior being paid promptly

21   for your development work?

22   A.   Technically Junior was not paid directly by SnoOwl.  My

23   company Statewide Software was paid, and then we took the money

24   from there.

25   Q.   I see.  But were the payments prompt?

1    A.    Yes.

2    Q.    Were they being paid?

3    A.    The payments were prompt.  My development process is

4    staged where the customer has to give money at each stage of

5    the process.  The payments were very prompt.

6    Q.    During this time period in 2014, where were you physically

7    working and doing the development work?  In other words, where

8    were you sitting doing this development work?

9    A.    My office at River Road.

10   Q.    Did you ever in 2014 physically sit at a building 104

11   Anawam Street?

12   A.    I don't believe so.

13   Q.    Let me turn, Mr. Harding, now as we move into early 2015.

14   Did you continue to work on SnoOwl, do additional software

15   development work on SnoOwl moving into 2015?

16   A.    Do you mean did I work on the app after 1.0 was launched?

17   Q.    Correct.

18   A.    Yes.  We worked on subsequent versions that had various

19   improvements and bug fixes.

20   Q.    Did you work in 2015 on version 1.1?

21   A.    Yes.

22   Q.    What generally was the goal of version 1.1?  What were you

23   trying to do?

24   A.    We got some feedback from some of the users asking for

25   more things.  We found a couple of bugs with the app.  We

1    wanted to make it a little faster, that type of thing.  Just a

2    version of the same.

3    Q.   As you're transitioning to 1.1, Mr. Harding, in 2015, was

4    there a change in your employment status vis-a-vis SnoOwl?

5    A.   Yes.

6    Q.   What was that?

7    A.   At a point -- I don't remember if this was just prior to

8    launch or post launch, but Jasiel mentioned the possibility of

9    getting equity in the company, getting shares.  I asked if

10   these shares could be given to Statewide Software and Statewide

11   Software could hold them.  Jasiel said it was hard to assign

12   shares to a company.  He said it would be easier if we were

13   employees.

14        Additionally, he said it would be better for the company

15   if the company had employees as well.  It makes it look more

16   vibrant.

17   Q.   So did you, in fact, become an employee of SnoOwl in 2015?

18   A.   Yes.

19   Q.   Did Nick Lizotte become an employee of SnoOwl in 2015?

20   A.   Yes.

21   Q.   And did Junior become an employee of SnoOwl in 2015?

22   A.   Yes.

23   Q.   Whereas prior to that, you were essentially independent

24   contractors; is that right?

25   A.   That's right, yes.

1    Q.    In the process of becoming an employee of SnoOwl,

2    Mr. Harding, did you become familiar with someone named Nick

3    Bernier?

4    A.    Yes.

5    Q.    And what role, if any, did he play in the process of you

6    and your partners becoming employees?

7    A.    One of the key things was when the conversation about

8    stock or equity came up, we were asked if, when we were getting

9    paid, what percentage we wanted in stock and what in equity.

10   One of the things Nick Bernier did very early on was he made a

11   spreadsheet that you could plug in how much equity you wanted

12   versus how much cash, and we could all select kind of split in

13   stock and cash.

14   Q.    At this point in time who was in charge of SnoOwl, Nick

15   Bernier or Jasiel Correia?

16   A.    Jasiel.

17   Q.    When you transitioned to being an employee, Mr. Harding,

18   how were you paid?  Were you salaried, was it hourly?

19   A.    I believe we were paid hourly.

20   Q.    And did you and Nick Lizotte and Junior actually get

21   equity or just compensated hourly?

22   A.    We were all allowed to pick different percentages.  I

23   recall taking a very small percentage of stock and mostly cash.

24   Q.    That small percentage of stock you took, was that ever

25   something you cashed in or got anything for?

```
 1   A.   No.  Yeah, no.  I did not cash it in.  I believe I was
 2   issued a letter saying how much I had, but I don't have it.  I
 3   don't know where it is.  And I never did anything with it
 4   either.
 5   Q.   So now we're in 2015.  You're employees and you're working
 6   on version 1.1.  Is that accurate?
 7   A.   Yes.
 8   Q.   And as you're moving into this next phase of the project,
 9   Mr. Harding, in or about March of 2015, did you start to
10   physically work out of that 104 Anawam building?
11   A.   Yes.
12   Q.   Could you turn your attention in your binder to tab 43.1.
13   I believe it's two pages.  Yours might be double-sided.  But do
14   you recognize 43.1?
15   A.   Yes.
16   Q.   What is it?
17   A.   This is a receipt for a new router.
18              MR. HAFER:  Your Honor, I offer Exhibit 43.1.
19              THE COURT:  It's received.
20              (Exhibit 43.1 admitted into evidence.)
21              MR. HAFER:  Ms. DiPaolo, can you just enlarge that.
22   Thank you.
23   Q.   Mr. Harding, this is an email from you to Jasiel Correia;
24   is that correct?
25   A.   Yes.
```

1    Q.    March 31, 2015 is the date; is that correct?

2    A.    Yes.

3    Q.    And the subject is "Receipt for Router"?

4    A.    Yes.

5          MR. HAFER:  Ms. DiPaolo, can I have the second page.

6    Q.    And is this, in fact, here just the receipt for a router

7    that you attached to that email?

8    A.    Yes.

9    Q.    Approximately $80, correct?

10   A.    Yes.

11   Q.    Okay.  So what was the significance of this?  Why did you

12   send this email to Jasiel Correia and why did you buy a new

13   router?

14   A.    As part of our work, we needed a reliable and fast

15   connection to the internet to get software or to do research.

16   When we first went down to Anawam Street, the connection was

17   very slow and I was very frustrated and it was inefficient.  So

18   I told Jasiel I could fix it by getting a new router and

19   installing it, which I did.

20   Q.    When you started to do work in 104 Anawam, what was the

21   setup in there?  Was it all SnoOwl space?

22   A.    No, it was not.

23   Q.    What was it?

24   A.    When you first entered, there was a large area, and it had

25   a piano in it and some other furnishings.  There was a small,

1    like, front desk.  SnoOwl, we worked in a room behind that, and

2    it was semi closed-off.  And crucially, for us it had a lot of

3    white boards, which is important because we do a lot of doodles

4    and take notes and so forth.  We had some tables in there.  I

5    believe we were bringing in our own computers in the beginning.

6    I think later on maybe there was some already down there.  But

7    there was not much in that room.  Tables, white boards, a few

8    computers, ping-pong table, that's about all.

9    Q.   And were there other businesses in there that you observed

10   that were not SnoOwl?

11   A.   Not directly in that room, but there was a room off to

12   side with like little cubbies.  Some people would come in.  I

13   remember there was a woman there doing like textile-related

14   things.  She brought in yarn and all kinds of things, and she

15   would knit and make stockings and so forth.  There were some

16   other people who did that type of thing, small business

17   artisans, that type of thing.

18   Q.   At some point in the spring of 2015, as you're working on

19   version 1.1, Mr. Harding, did you learn of issues that SnoOwl

20   was having with Rackspace?

21   A.   Yes.

22   Q.   What is Rackspace?

23   A.   For an app like SnoOwl, there's actually two programs that

24   get written.  So that's the so-called mobile app that runs on

25   someone's phone.  When that program goes to do something, it

1    needs to talk to a server somewhere, and that handles the

2    searches, it handles when you log in, if you forget your

3    password.  We used this company called Rackspace.  So that had

4    the other half of SnoOwl that didn't live on your phone.

5    Q.    Is something like Rackspace significant for a new app?

6    A.    I don't understand the question.

7    Q.    Is it -- what is the importance of Rackspace?

8    A.    Oh, oh, I see.  Without the server side component, if you

9    would open up the app, it would just show an error screen.  It

10   doesn't do anything without the server.  It's very important.

11   Q.    About how much does it cost a company like SnoOwl to be on

12   Rackspace?

13   A.    From what I recall, when we started, we only had a small

14   server.  It was probably like maybe a hundred dollars a month.

15   And then I recall by the end it grew to be a few hundred

16   dollars a month.

17   Q.    And what happens to an app like SnoOwl if Rackspace shuts

18   it down?

19   A.    Any app where the server is responsible for the functions

20   like this, if the server is down, the app doesn't do anything.

21   If you open it up, you just get an error page.

22   Q.    What was the issue that you learned about in the spring of

23   2015 with SnoOwl and Rackspace?

24   A.    The bill was not being paid and Rackspace sends a warning

25   advising you that they'll shut you down if you don't pay

1   promptly.

2   Q.   And what was your reaction when you learned that was

3   happening?

4   A.   The first time it happened I didn't think much of it.

5   Occasionally people's credit cards will expire and this will

6   happen.  It didn't trouble me very much.

7   Q.   Did it happen more than once?

8   A.   It did.  It happened a couple of times.

9   Q.   And how did you react to that?

10  A.   Made me think that he wasn't paying the bill.

11  Q.   Regarding the bills, Mr. Harding, at any point during the

12  time Statewide or you were working for SnoOwl, did you ever see

13  the company's books and records or accounting ledgers?

14  A.   No.  My focus was technology.

15  Q.   So you don't know how the company -- beyond what you were

16  paid, you don't know how the company was spending money?

17  A.   No.

18  Q.   As you're moving into this next phase into the spring of

19  2015 and summer of 2015, were the payments that you were due

20  for the work you were doing, were they still coming in

21  promptly?

22  A.   Do you mean were the payments prompt when I was an

23  employee?

24  Q.   Yes.

25  A.   At first, yes, and then there started to be some troubles.

1    Q.   What were the troubles?

2    A.   I can't recall what day we got paid.  It may have been

3    Friday.  But sometimes it was late.

4    Q.   Is that something that continued throughout the spring and

5    into the summer of 2015, your payments were late?

6    A.   Yeah, there was a general trend of lateness.

7    Q.   Once that general trend was established, did you have any

8    conversations with the defendant about the fact that you

9    weren't being paid on time?

10   A.   Yes, he said the bank was giving him troubles.

11   Q.   What else did you say to him or what else did he say to

12   you about your compensation?

13   A.   One time I complained that we weren't getting paid on time

14   and Jasiel said he doesn't get paid at all.

15   Q.   Mr. Correia told you he wasn't getting paid at all?

16   A.   Yes.

17   Q.   When he told you that, did you believe him?

18   A.   Yeah, I did.

19   Q.   Why?

20   A.   Because when he came to me, David told me that he had an

21   app before that he sold and he was very wealthy.  So I didn't

22   think he needed the money.  It didn't surprise me.

23        Also, if you're going out and seeking investment for an

24   app, it's very difficult to ask for someone's money and then

25   you'll also be taking some for yourself.  It makes it very hard

1    to seek investment.  So the fact that he wasn't taking money

2    from the company, that didn't surprise me at all.

3    Q.   Let me direct your attention now to later in the spring

4    and early in the summer of 2015.  Did you have a conversation

5    with the defendant about his career plans?

6    A.   Yes.

7    Q.   What did he tell you?

8    A.   He told me he was running for mayor.

9    Q.   What did you say when he told you he was running for

10   mayor?

11   A.   I said whether he wins or loses, that he can kiss the app

12   goodbye.

13   Q.   Why did you say you can kiss the app goodbye?

14   A.   For two reasons.  One is, being mayor is very

15   time-consuming.  You wouldn't have time to do -- run an app

16   company properly and also be mayor.

17        Secondly, I believe that being mayor is more important

18   than running a mobile application.  So I felt it would become a

19   secondary priority.

20   Q.   Do you remember, did the defendant say anything in

21   response to you when you said that?

22   A.   I don't remember exactly what he said, but Jasiel is not

23   the type to back down, so I would imagine he would have been

24   like no, no, I'll keep it running or we'll do something like

25   this.  He would never admit defeat, nothing like that.

1    Q.   After he told you he was going to run for mayor and after

2    the mayoral campaign started in earnest, what observations, if

3    any, did you have about the promptness of your payments for

4    development work?

5    A.   I mean, they were already kind of spotty to begin with,

6    and they didn't get better.

7              MR. HAFER:  Ms. DiPaolo, could you go back to tab 42,

8    please, the first page, and could you just enlarge just

9    Mr. Harding's payments.

10   Q.   Mr. Harding, looking at Exhibit 42, which is already in

11   evidence, this reflects a $1,000 payment to you on July 27,

12   2015; is that correct?

13   A.   Yes.

14   Q.   And in general terms, in the several months before that,

15   you're getting semi regular payments in April, May, June, for

16   your development work, correct?

17   A.   Yes.

18   Q.   And then after July 27 of 2015, there's not another

19   payment until December 6 of 2015; is that right?

20   A.   Yes.

21   Q.   Is that consistent with your memory that you were having

22   trouble getting paid at this time?

23   A.   Yes.

24             MR. HAFER:  Ms. DiPaolo, can you just enlarge the

25   bottom section of the second page.

 1   Q.   There's a notation here I just want to close the loop on,

 2   Mr. Harding.

 3        Do you see payment from Correia's campaign account to

 4   Statewide Software?

 5   A.   Yes.

 6   Q.   What is that?

 7   A.   Jasiel had asked us to help him make votejasiel.com, which

 8   is a website about his campaign for mayor.

 9   Q.   And he paid Statewide $750 for that development work?

10   A.   That's correct.

11   Q.   I want to move forward a little bit now until November of

12   2015.  Did you learn the outcome of the mayoral election?

13   A.   Yes.

14   Q.   What was your reaction to that with respect to SnoOwl and

15   how it would affect SnoOwl?

16   A.   I mean, not much.  To me the second he told me that he was

17   running for mayor, that's when the blow landed.  Him winning, I

18   didn't have much reaction.

19   Q.   Could you turn to tab 44, Mr. Harding.  Do you recognize

20   that?

21   A.   Yes, this is an email thread of which I was part of.

22             MR. HAFER:  I offer Exhibit 44, Your Honor.

23             THE COURT:  That's received.

24             (Exhibit 44 admitted into evidence.)

25             MR. HAFER:  Ms. DiPaolo, could I have the first page

1    first enlarged.

2    Q.   I'm actually going to start backwards here, Mr. Harding,

3    at the top.  Is that an email from you to Mark Eisenberg on

4    November 16 of 2015?

5    A.   Yes, it is.

6    Q.   Okay.  Who is -- how do you know Mark Eisenberg?

7    A.   Mark Eisenberg, he owned a food distribution business.  It

8    was called Cisco.  It was very big in my area.  So he was very

9    involved with the restaurant industry.  Because restaurants

10   often need websites, I was kind of involved in the restaurant

11   industry as well.  So we ended up meeting on a job for this

12   place PieZoni's Pizza.  We worked together.

13   Q.   Did you know at this time, in November of 2015,

14   Mr. Eisenberg to be involved in SnoOwl?

15   A.   Yes, yes, he was involved.

16   Q.   And on this particular one, you essentially forward what

17   appears to be a longer email below to Mr. Eisenberg indicating

18   you haven't received a reply from the defendant, you're pretty

19   sure you're fired, but since you're not being paid, there's not

20   much difference; is that correct?

21   A.   Yes.

22   Q.   Before we go to the second page, that email to

23   Mr. Eisenberg was forwarding a November 12, 2015 email; is that

24   correct?

25   A.   Yes.

1   Q.   And the November 12, 2015 email was from you to Jasiel

2   Correia, Nick Bernier, and then it looks like Junior; is that

3   right?

4   A.   Yes.

5          MR. HAFER:  Ms. DiPaolo, could I have page 2.  Could

6   you enlarge the whole page.

7   Q.   Mr. Harding, it's somewhat lengthy, but I'd like to ask

8   you, please, to read that email, if you would, aloud.

9   A.   "Greetings fellows.  We are feeling increasingly

10  despondent over" --

11         (Court reporter interrupts.)

12         THE COURT:  Yes.  If you could go -- When people read

13  things, their pace --

14         THE WITNESS:  I'll speak slowly and deliberately.

15         THE COURT:  It's hard for the court reporter to pick

16  it up.

17         THE WITNESS:  No problem.  I'll begin again.

18         THE COURT:  Yes.

19  A.   "Greetings Fellows.  We are feeling increasingly

20  despondent over here.  What's going on with SnoOwl?  Is the

21  project still alive?  Will we ever be paid?  I'm feeling sad

22  and irritated.  I can only imagine the amount of tasks that are

23  on Jasiel's plate to take over the city operations but that

24  doesn't erase promises made in the past.  We have been waiting

25  many months to be paid for SnoOwl.com, and also the last bit of

1    our pay from SnoOwl Inc.  From where I sit, I feel we built an

2    excellent platform and really built something to be proud of.

3    SnoOwl feels waterless right now, and I'm not sure what I can

4    say about an operation that will leave three employees without

5    pay.  I cannot speak for Nick, nor Junior, but I'm not

6    extremely wealthy, nor is Statewide, and that few thousand

7    dollars that we are owed will make a difference in our lives.

8         I watched every second of Jasiel's debates with Sam

9    Sutter, and he said he would support small businesses and

10   wanted to build this type of technology business operation for

11   Fall River.  Yet you have a small business right under your

12   nose which is suffering.  SnoOwl was trumpeted as a successful

13   app/company, yet it is indebted to the very people which helped

14   it become a reality.  If you want to cease operations with the

15   company and move on and focus on being mayor, that's not right

16   or wrong, but I want to know where I stand and if Nick, Junior

17   and I will ever be paid or if we will just be left in limbo and

18   crossing our fingers that SnoOwl gets some attention and

19   funding.  Call me at your convenience.  Josh."

20   Q.   Mr. Harding, did you receive a reply from the defendant to

21   this email?

22   A.   No.

23   Q.   Did you hear from Nick Bernier after you sent this email?

24   A.   Yes.

25   Q.   What did you learn from Nick Bernier?

1    A.   He said I shouldn't have sent the email and that Jasiel

2    was angry.

3    Q.   Could you turn to tab 45, please.  Do you recognize the

4    document at tab 45?

5    A.   Yes.

6              MR. HAFER:  Your Honor, I offer Exhibit 45.

7              THE COURT:  It's received.

8              (Exhibit 45 admitted into evidence.)

9              MR. HAFER:  Can we start on page 2 and just enlarge

10   the caption and the first paragraph.

11   Q.   Just starting here, just to make it understandable,

12   Mr. Harding, is it correct that on November 16 of 2015, Mark

13   Eisenberg forwarded you an email and says, "Did you get this?"

14   To which you replied, "No, I didn't.  Sadly, I'm the inventor

15   of the patent."

16   A.   Yes.

17             MR. HAFER:  Okay.  Ms. DiPaolo, can we just have the

18   below email that was forwarded.

19   Q.   We're not going to read this one, Mr. Harding, but is it

20   accurate to say this is a November 16, 2015 email from Nick

21   Bernier providing an update on what's going on with SnoOwl?

22   A.   Yes.

23   Q.   It refers to a patent application related to geospatial

24   aware queuing; is that right?

25   A.   Yes, it is.

 1   Q.   And then a private table at Jerry Remy's for SnoOwl

 2   investors and advisers; is that correct?

 3   A.   Yes.

 4   Q.   That's an email Mr. Eisenberg received and forwarded to

 5   you, correct?  Based on the chain we looked at before.

 6   A.   Yeah, reviewing it, it looks like Mark received it and

 7   then he forwarded it to me.

 8        MR. HAFER:  Could we have the first page of the

 9   exhibit, please.  Could you highlight the Subject/From/To line

10   first.

11   Q.   Looking now at page 1, Mr. Harding, is this a November 17,

12   2015 email that you sent to Mr. Eisenberg?

13   A.   Yes, it is.

14   Q.   I'm not going to ask you to read the entire one, but I am

15   going to ask you to read pieces of this one.

16        MR. HAFER:  Could I have paragraph 2, Ms. DiPaolo.

17   Q.   Could you read paragraph 2 aloud slowly again for the

18   benefit of everyone, Mr. Harding.

19   A.   "If he was upset with the quality of the work and didn't

20   want to pay, that's one thing.  But as far as I know, Jasiel is

21   quite satisfied with what we did.  Last week I reached out to

22   him simply wanting to know what the plan for us is to be paid,

23   and he still has not gotten back to me.  I don't think it's too

24   much to ask when we will be paid, especially since we have been

25   waiting for multiple months with no answer. "

1           MR. HAFER:  Ms. DiPaolo, could I have the fourth

2    paragraph, please.

3    Q.    Could you please read paragraph 4, Mr. Harding.

4    A.    "One really bad scenario that could occur is Apple or

5    Facebook could release an update which breaks the app.  If

6    there aren't any active programmers on the project, the whole

7    app will be instantly crashed and all the users will be lost.

8    This is an extremely poor situation for an app company to be

9    in.  He could pay a few thousand dollars he owes the employees

10   that built the product and keep us, or flush everything down

11   the drain by ignoring our simple request to be paid what we are

12   owed, or, at the very least, tell us when the money is

13   forthcoming."

14   Q.    What did you mean about Apple or Facebook releasing an

15   update which breaks the app?

16   A.    Our app was dependent on both the Apple ecosystem and the

17   Facebook ecosystem.  If the behavior of either one of these

18   platform changes, our app may become nonfunctional.

19           MR. HAFER:  Ms. DiPaolo, can I have paragraph 6, the

20   final paragraph, please.

21   Q.    Last one, Mr. Harding.  If you wouldn't mind reading

22   paragraph 6.

23   A.    "Good luck at the investor meeting.  Maybe Jasiel has a

24   really good explanation for the way he is running the show.

25   I'm on the sidelines scratching my head and trying to figure

1    out what he's thinking."

2    Q.   Mr. Harding, at some point after this email in November of

3    2015 and into early of 2016, did you come to meet a Dr. David

4    Cabeceiras?

5    A.   Yes.

6    Q.   How did you come to meet him?

7    A.   I knew that he was an early investor in the app.  The name

8    Dr. Cab was around the SnoOwl office quite a bit.  I don't

9    recall if he contacted me for a meeting or if I contacted him.

10   But we wanted to talk about the app, what was going on.  So we

11   were on the phone, and then he said, "Come meet me at my

12   office."  I did, in fact, meet him at his office and we went

13   out for lunch at Friendly's.

14   Q.   Fair to say that you and Dr. Cabeceiras at the time had a

15   joint interest in the success of the app?

16   A.   Yes.

17   Q.   When you met Dr. Cabeceiras at Friendly's, what happened?

18   A.   He was very upset with the current state of the app.  He

19   wanted to know what was going on.  He wanted to know if we

20   could salvage it.  He wanted to know if there's any value left.

21   He wanted to know what was going on.

22   Q.   What did you say?

23   A.   I said that the app has been neglected.  I wanted to do

24   what I could to bring it back, but I wasn't sure.  Jasiel

25   wasn't around.

1  Q.   At some point did you and Dr. Cabeceiras discuss, or did

2  you later learn about a man named Staff Sheehan?

3  A.   I did.  So in this meeting, Dr. Cab asked me what I could

4  do.  I wasn't too sure.  And he said that he had a nephew that

5  was rather brilliant.  I was very dismissive when I heard this.

6  And Staff I believe was out of the country at the time.

7       In a few weeks, when he returned and I was able to talk to

8  him, I was 100 percent wrong.  He was really brilliant, and we

9  spoke for quite a bit on how to rejuvenate the project.

10 Q.   You spoke with Mr. Sheehan about how to rejuvenate it?

11 A.   We spoke on the phone a few times and we even met up a few

12 times.

13 Q.   Did Staff Sheehan become the CEO of SnoOwl?

14 A.   He was trying to.  He made a very generous offer to come

15 in and take over operations and do it at no cost.  One of the

16 difficulties he faced was that in order to take over the

17 company, he wanted to make sure that the books were in order,

18 and he had tremendous difficulties looking and reviewing the

19 financials.  Due to this, I don't believe he ever really took

20 over.

21       MR. HAFER:  Ms. DiPaolo, could you please go back to

22 Exhibit 42 for a moment.  And could you go to page 2 and

23 enlarge the heading Payments from Correia in 2017.

24 Q.   There have been references in your testimony, Mr. Harding,

25 and in these emails to you, Junior, Nick not being paid,

1  correct?

2  A.  Yes.

3  Q.  At some point were you finally paid what you were owed for

4  software work for SnoOwl?

5  A.  Yes.

6  Q.  As we sit here today, does anyone from SnoOwl or Jasiel

7  Correia owe you any money for software development work?

8  A.  No.  He said we would be fully paid and he made good to

9  his word.  He did pay us off fully.

10  Q.  According to this chart, that happened in August of 2017,

11  the final payments?

12  A.  Yes.

13  Q.  In August of 2017, by the way, was there any development

14  work still being done on the app?

15  A.  No.  I didn't want to do any work without getting paid,

16  and I wasn't sure there was any more money.

17  Q.  You testified earlier about writing code and your work on

18  version 1.0 and version 1.1.  Did you write an actual algorithm

19  for SnoOwl of some sort?

20  A.  Yes.

21  Q.  Were you the inventor of the algorithm?

22  A.  Yes.

23  Q.  Did you get a patent on the SnoOwl algorithm?

24  A.  We submitted an application for it, but the patent was

25  never awarded.

1    Q.   Did you personally have any conversations with the

2    defendant about getting a patent for SnoOwl?

3    A.   Yes.

4    Q.   What were those?

5    A.   One of the things that's important for a company is

6    intellectual property.  For a software company, you don't have

7    trucks or there's not much assets.  So one of the things you

8    can do is you can figure out what you have that's worth money.

9         So one day Jasiel said, "Hey, take your best three ideas

10   from the app.  I have a law firm in Boston that's going to

11   review them and see if there's any patentable assets here."  So

12   I took what I believed was my best three ideas, and we met

13   with -- it was a phone conversation, actually, with a law firm

14   to see if the ideas had any merit.

15   Q.   Did they?

16   A.   Two of them did not.  One of them did.

17   Q.   Could you turn to the final tab in your binder,

18   Mr. Harding, tab 46.  Just let me know if you recognize that.

19   A.   Yes.

20   Q.   What is it?

21   A.   This is an email from an attorney saying that he hasn't

22   been paid, and if he doesn't receive payment, the patent

23   application will go abandoned.

24        MR. HAFER:  I offer Exhibit 46, Your Honor.

25        THE COURT:  It's received.

 1              (Exhibit 46 admitted into evidence.)

 2              MR. HAFER:  Ms. DiPaolo, could I have the Sunday, July

 3    30, email enlarged in the middle of the page.

 4    Q.   You mentioned an attorney.  Is that this individual named

 5    Robert Blasi, Mr. Harding?

 6    A.   Yes.

 7    Q.   And this is an email from July 30 of 2017; is that

 8    correct?  If you look at the top of the screen it may be easier

 9    to see, at the very top there.

10    A.   Yes, July 30, 2017, yes, I see this.

11    Q.   And in the re line, it refers to geospatial aware queuing

12    by Harding.  Do you see that?

13    A.   Yes.

14    Q.   That's you?

15    A.   Yes, that is me.

16    Q.   What is geospatial aware queuing?

17    A.   It's the name given to this algorithm.

18    Q.   And would you just read, if you wouldn't mind, the first

19    paragraph of this email.

20    A.   "Gentlemen, as you are no doubt aware, despite my repeated

21    requests, my bill from last November remains unpaid.  Given

22    your history of nonpayment, I have decided that it would be

23    best for you to find another attorney to work with going

24    forward."

25              MR. HAFER:  Ms. DiPaolo, could I have the email at the

1    top of this page enlarged, please.

2    Q.    I'm enlarging now, Mr. Harding, an email from Robert Blasi

3    on September 5 of 2017; is that correct?

4    A.    Yes.

5    Q.    And this is an email to Staff Sheehan, who you mentioned,

6    Jasiel Correia and yourself; is that correct?

7    A.    Yes.

8    Q.    And could you just read in the first paragraph the text in

9    the second sentence that's both bolded and underlined.

10   A.    "If you do not file a response by December 30, 2017, then

11   your application will go abandoned."

12   Q.    To your knowledge, was a response ever filed?

13   A.    I don't believe so.

14   Q.    At this point in time in 2017, Mr. Harding, would a patent

15   for geospatial aware queuing have had value?

16   A.    I'm not sure.

17   Q.    Is there currently -- as we sit here today, is there

18   currently a patent -- do you have a patent on geospatial

19   queuing?

20   A.    No, I do not.

21   Q.    As you sit here today, Mr. Harding, is the SnoOwl app

22   operational?

23   A.    No.

24   Q.    Given that there's no patent and the app isn't

25   operational, is the company worth anything?

```
 1   A.   Not without additional work to kind of rejuvenate it.
 2             MR. HAFER:  Thank you, Mr. Harding.
 3             Your Honor, I have no further questions at this time.
 4             THE COURT:  All right.  Mr. Reddington.
 5   CROSS-EXAMINATION BY MR. REDDINGTON:
 6   Q.   Good morning, sir.  You knew that obviously Jasiel was
 7   elected and sworn in as mayor --
 8   A.   Yes.
 9   Q.   -- in January of '16, right?
10   A.   Yes.
11   Q.   And you dealt on a regular basis, pretty much to say, with
12   a fellow by the name of Nick Bernier?
13   A.   Yes.
14   Q.   You also dealt on a fairly regular basis, spring moving
15   into the summer, with a fellow by the name of Staff Sheehan?
16   A.   Yes.
17   Q.   And, in fact, you had been dealing with Nick Bernier going
18   back to 2015, isn't that right?
19   A.   Yes.
20             MR. REDDINGTON:  And in fact, could you please call
21   up, Alyssa, Exhibit 66.
22             MR. HAFER:  Kevin, I don't --
23             May I ask Mr. Reddington a question?  I think it's
24   innocuous.
25             THE COURT:  Yes.
```

```
 1            MR. HAFER:  Did you say 66?

 2            MR. REDDINGTON:  Yes, I'm sorry.

 3            MR. HAFER:  I don't believe that's in yet.

 4            MR. REDDINGTON:  Well, then -- is it in his binder?

 5            MR. HAFER:  No.  It's coming in, Mr. Reddington, I

 6    believe through Mr. Bernier, the next witness.

 7            MR. REDDINGTON:  I'm sure it would be.  But I'd like

 8    to ask him a few questions about it.

 9            I'll do it this way, Judge --

10            MR. HAFER:  I'm okay --

11            THE COURT:  Just a moment.  If it is not objected to,

12    I'll permit it to come in what we call de bene.  It means

13    sooner or later it's likely to come in.  So we'll permit it to

14    be shown to the jury at this point.

15            MR. REDDINGTON:  Thank you, Your Honor.

16            MR. HAFER:  No objection, Your Honor.

17    Q.   So Exhibit 66 would be the SnoOwl bank account, is that

18    correct, at BayCoast Bank?

19            MR. HAFER:  Objection.

20    A.   I don't know.  I wasn't his banker.

21            MR. HAFER:  Objection, Your Honor.

22            MR. REDDINGTON:  I'll withdraw it.

23            Can you pull up, please, Alyssa, the checks that are

24    attached to Exhibit 66.  Great.  Thank you.

25    Q.   You see on the first check, sir, Joshua Harding, for
```

1    example?

2    A.    Yes.

3    Q.    That would be you, right?

4    A.    That's me, yes.

5    Q.    And that was a check that was given to you and signed by

6    Nick Bernier in January of '16, correct?

7    A.    Yes.

8         MR. REDDINGTON:  Alyssa, can you just list all the

9    checks.

10   Q.    And if we go down, all the checks, December of '15,

11   December of '15, for example, all Josh Harding, Josh Harding,

12   Josh Harding, Edmilson Dos Santos, all signed by Nick Bernier;

13   isn't that right?

14   A.    That appears to be his signature, yes.

15   Q.    Yes.

16        MR. REDDINGTON:  Next one, Alyssa, please.

17        Thank you.

18   Q.    Likewise, Nick Lizotte, that would be your partner, right?

19   A.    Yes.

20   Q.    That's the first one, April 14 of '15, signed by Nick for

21   6,000 -- or $1,600, right?

22   A.    Yes.

23        THE COURT:  Mr. Reddington, if you could get the

24   microphone in front of your mouth so that we can pick up what

25   you have to say.

1          MR. REDDINGTON:  Sorry, Judge.  Thank you.

2     Q.    And Edmilson Dos Santos, do you know who that is?

3     A.    Yes.

4     Q.    Who is that?

5     A.    He was my employee at Statewide.

6     Q.    All right.

7          MR. REDDINGTON:  And, again, all the way down the next

8     page, Alyssa, please.

9     Q.    Did Jasiel Correia sign any checks at all for your

10    invoices, other than the three that he paid out of his personal

11    account?  As you said, a man of his word, he made payment back

12    in '17 to bring you guys up to date.

13    A.    None of the checks you showed me appear to have his

14    signature, but as to whether he gave me any previous ones, I'm

15    not sure.

16    Q.    Okay.  Well, these were checks you received for your

17    services.

18          MR. REDDINGTON:  Thank you, Alyssa.

19    Q.    It would be a total, as I understand it, of 70-some-odd

20    thousand dollars was paid, correct?

21    A.    That sum agrees with the spreadsheet displayed earlier.

22    Q.    And what you guys were owed that these emails were

23    referring to basically would be those three checks that we saw,

24    700 bucks and change, three checks that you guys were owed,

25    right?

1   A.   I don't remember the exact count, but we were owed some

2   money.

3   Q.   Right.  And do you remember when the prosecutor put up on

4   the screen the payments that were made from the campaign

5   account for Jasiel Correia?  It was his account that was giving

6   money to you, three guys that you owed -- you were owed money,

7   three checks?

8   A.   If you're speaking of the money for the votejasiel, I

9   believe there was one payment made from Jasiel to Statewide.

10  Q.   All right.  Do you remember in the late summer of 2017,

11  Mr. Hafer had you look at the checks.  There were three

12  amounts.  You, your partner, and an employee, all were paid in

13  the end of 2017.  Do you remember that?

14  A.   There was a number of checks.

15  Q.   Right.  And the bottom line is you guys were owed about

16  $2,000 altogether, correct?

17  A.   Sounds about right, yes.

18  Q.   And that's the amount of money, after the payments of

19  70,000-some-odd dollars, that you were owed $2,000, and that's

20  what -- you were not going to work any more on the app, you

21  were not going to refresh it, you were not going to monitor it

22  because of the 2,000 bucks, right?

23  A.   It's not so much the amount as --

24  Q.   I understand it's the principle.  But my question is that

25  the $2,000 is the amount of money we're talking about, right?

```
 1   A.   I believe so.  I referenced a few thousand dollars in my
 2   email.
 3   Q.   Yes.  And all that period of time, after he was elected
 4   and sworn in as mayor in January of 2016, running that spring
 5   of '16, through the summer of '16, through the fall of '16,
 6   into 2017, the spring, into the summer, you were dealing with
 7   Mr. Bernier and Mr. Sheehan, correct?
 8   A.   Yes.
 9   Q.   Okay.  Did you ever ask Bernier and Sheehan to pay the
10   bill?
11   A.   I asked everyone to pay the bill.
12   Q.   Did you ever ask Bernier or Sheehan to pay the bill?
13   A.   Yes.  I wanted to be paid.
14   Q.   Okay.  And the email -- by the way, did you know that
15   after he was mayor that he had resigned from SnoOwl in
16   accordance with a memorandum of understanding or an agreement
17   with Staff Sheehan and Mr. Bernier?  Did you know that?
18   A.   I know that Staff was trying to take over to rejuvenate
19   things, but I wasn't privy to all the paperwork flying back and
20   forth.
21   Q.   And did you know he didn't have jasiel@email.com, he no
22   longer had that account that you were sending emails to?
23   A.   I believe I also tried to reach him via phone.
24   Q.   So were you aware, sir, that he didn't have that email
25   anymore after he was mayor?
```

```
 1   A.   Actually, I don't think that's true because if he didn't
 2   have the email when I sent it, it would have bounced back to
 3   me.  I would have got an error message.
 4   Q.   How about Mr. Bernier, did he ever at any time make
 5   payment on the 2,000 bucks you were owed?
 6   A.   To me personally?
 7   Q.   Personally or on behalf of the corporation, in any
 8   fashion.
 9   A.   I mean, we received checks to be paid off, but I don't --
10   I didn't really know where they came from.
11   Q.   They didn't pay you the $2,000 for a long period of time,
12   isn't that right?
13   A.   Yes.
14   Q.   And then he ended up paying it in the end of summer of '17
15   on his own account, right?
16   A.   I don't know whose account it was.
17   Q.   He ended up paying you, right?
18   A.   Yeah, absolutely.
19   Q.   You were paid off?
20   A.   Yes, I'm not owed a single cent.  He said he would pay me
21   off, and he did.
22   Q.   So Dave Wilder introduced you to -- well, who is Dave
23   Wilder?
24   A.   He was a member of the business networking group I was in.
25   Q.   And back in -- when was it that you first started working
```

1    with SnoOwl?

2    A.    I don't recall the exact date.

3    Q.    You actually met Jasiel because of Mr. Wilder, correct?

4    A.    Yes.

5    Q.    Basically Mr. Wilder told you that there's this young guy

6    who's got quite an idea and it seems to be a really interesting

7    or intriguing potential app?

8    A.    And crucially it was his second idea.  That was very

9    exciting to me.

10   Q.    So basically Mr. Wilder had no idea about any second app

11   or prior app, did he?

12   A.    I don't understand the question.

13   Q.    Mr. Wilder introduced you to Jasiel, correct?

14   A.    Yes.

15   Q.    Mr. Wilder told you that this was a very exciting,

16   interesting concept that he had, correct?

17   A.    Yes.

18   Q.    Mr. Wilder did not know him personally, did he?

19   A.    I don't know the detail of which they knew each other.

20   Q.    Mr. Wilder at no time indicated he had any knowledge about

21   this first business that he wanted to reference.  He didn't

22   know anything about that, did he?

23   A.    I believe he told me this was Jasiel's second business.

24   So for him to tell me that, he must have had some knowledge of

25   it.

1    Q.   When he introduced you, where did you meet the first time
2    you met?
3    A.   Sorry.  Where did I meet Jasiel?
4    Q.   Yes.
5    A.   It would have been in my office at River Road.
6    Q.   And Mr. Wilder is also a consultant, correct?  He's
7    involved with sun, solar panels and things like that?
8    A.   That's correct.
9    Q.   You spoke with Mr. Wilder.  Wilder told you about
10   Mr. Correia and the app that he was developing and that he had
11   outsourced -- what does that mean? -- the development to
12   another company.
13   A.   That means Jasiel doesn't write the program himself.  So
14   he hired fellows to do it, and these fellows were overseas.
15   Q.   They would be from Nepal?
16   A.   Yes.
17   Q.   And this particular group that was, I guess, writing code
18   and trying to get the app up and running really didn't do a
19   very good job, did they?
20   A.   No, they did not.
21   Q.   And basically, you couldn't even build on that.  You had
22   to basically start from scratch yourself, correct?
23   A.   It's not that we couldn't have.  I judged that it wasn't a
24   good use of time.
25   Q.   So when you had that meeting, you had occasion to speak to

 1   him about the concepts and you thought it was a great idea,

 2   right?

 3   A.   Sorry.  I had an occasion to speak to Jasiel --

 4   Q.   You spoke to Jasiel Correia about the concept of SnoOwl,

 5   and you thought it was a great idea?

 6   A.   Yes, yes.  I thought it was a great idea.

 7   Q.   You also met with Mr. Correia a number of times after

 8   that, true, before you actually entered into a contract with

 9   SnoOwl?

10   A.   Is that a question?

11   Q.   Did you meet with him?

12   A.   Yes, yes, we met a few times.

13   Q.   Thank you.  Where did you meet with him?

14   A.   Most likely at my office.

15   Q.   And at some point there was a contract that was entered

16   into between Statewide Software, that would be your business,

17   and SnoOwl, correct?

18   A.   Yes.

19   Q.   And is it fair to say that when you -- you remember

20   looking at the bill showing a total of payments that were made,

21   and we saw the checks and the dates of the payments were made,

22   that they were paid in a timely fashion?

23   A.   From what I recall, when it was Statewide Software,

24   everything was quite timely.

25   Q.   Right.  And that would be the lion's share, if you will,

1    being the $70,000, in increments of those bills that were paid,

2    correct?

3    A.   I'm not sure of the exact split.  We'd have to refer back

4    to the spreadsheet.

5    Q.   Well, in reference to the spreadsheet and in reference to

6    the amount of money, your total billing was over $70,000?

7    A.   If you combined the period of which we were SnoOwl

8    employees and in which Statewide was doing the work, yes, that

9    figure altogether accounts for that 70-some-odd thousand

10   dollars.

11   Q.   And the payments were timely, were they not?

12   A.   Sorry.  Which payments?

13   Q.   The payments to your company, sir.

14   A.   Yes.  When we were the company --

15   Q.   The answer is yes?

16   A.   -- working with Jasiel?  Yes, the payments were timely.

17   Q.   And the problem was in the summer, if you will, spring

18   into the summer of 2017, you were still owed like 2,000 bucks,

19   the three of you, correct?

20   A.   Yes.

21   Q.   All right.  When you referenced the -- was it an NDA,

22   nondisclosure agreement?

23   A.   Yes.

24   Q.   Do you remember when you signed that?

25   A.   It would have been my probably first or second encounter

1    with Jasiel because, before signing the NDA, he couldn't tell
2    me much about the idea.  So it would have been an obstruction
3    to us working together if I had not signed it quickly.
4    Q.    Would that be in the early summer of 2014 that things got
5    real with you guys and you signed the NDA?
6    A.    Prior to beginning any work, yes, we would have had to
7    sign the NDA.
8    Q.    And you did take a look at the Nepal company.  Basically
9    you required a one-third deposit at the time of the signing of
10   the agreement.  That would be $10,000 you wanted on the first
11   contract installment of 30, correct?
12   A.    You asked about if I took a look at the Nepal company.
13   Q.    I'm asking you about the one-third deposit, sir.  The
14   initial contract of the initial agreement was $30,000.  You
15   wanted to receive $10,000 up front, correct?
16   A.    Yes, to begin work we wanted a down payment.
17   Q.    And, in fact, that check was given to you, right?
18   A.    Yes.
19   Q.    And then you and Jasiel set milestones for when the second
20   and third payment would be made, correct?
21   A.    Correct.
22   Q.    And the check was always issued to Statewide, true?
23   A.    Yes.
24   Q.    He never provided you any cash or anything like that?
25   A.    No.  Everything was via check.

1    Q.   Who was it that came up with the concept of uploading to

2    Rackspace?

3    A.   It was just a common architecture.  Any app where there's

4    a client and server, you need a server who acts as --

5    Q.   That makes sense.  Was that on your advice, though, to use

6    Rackspace?

7    A.   Yeah.  I mean, we dealt with them.  It might have been

8    Nick or something, but this isn't -- if you look at the other

9    apps we were doing at the time, quite a few of them were on

10   Rackspace.  We worked with them pretty frequently.

11   Q.   So you've worked with Rackspace before?

12   A.   Yeah, yeah, this was not the first time, SnoOwl.

13   Q.   After you were able to ultimately develop the app

14   successfully, and did a pretty good job of it, that would be

15   the first stage, and then it was -- I may be using the wrong

16   terminology -- accepted by Apple and placed in the App Store,

17   correct?

18   A.   Yes, that's accurate.

19   Q.   And the second stage would be any improvements to the app

20   in attempting to create a revenue-generating module.  Is that

21   fair to say?

22   A.   Yes, this is fair.

23   Q.   So that would be phase two as if it were.  But phase one

24   was a success.  The app was up, it was running, and it was

25   working, correct?

1   A.   Yeah, yeah, it was operational.

2   Q.   And did you ever, or were you ever able to establish the

3   revenue-generating module within the app itself?

4   A.   It was never actually launched, no.

5   Q.   Okay.  What does a revenue-generating module mean?

6   A.   There was an idea -- this explanation could go long.

7   Q.   Just give me a quickie.

8   A.   Basically, it was a service called Quill that would let

9   businesses quickly promote themselves.  They could put their

10  own videos on the platform and so on.  That's the short

11  version.

12  Q.   So in the fall of 2015, sir, when you were involved with

13  stage two, that's when there was no longer any contract with

14  Statewide but you, Mr. Dos Santos and Mr. Lizotte were

15  basically independent contractors, correct?

16  A.   We transitioned from Jasiel or SnoOwl working with

17  Statewide Software to working with us as individuals.

18  Q.   Right.  And you basically would be paid an hourly rate,

19  and then you would be given a percentage in SnoOwl, correct?

20  A.   Yes.

21  Q.   Then you would bill your invoices basically by the hour;

22  is that correct?

23  A.   Yes, that is correct.

24  Q.   And you received a check from SnoOwl every two weeks

25  pretty much like clockwork, right?

1    A.    I don't recall the exact payment periods.

2    Q.    Well, there were no complaints that you weren't being paid

3    in the fall of 2015?

4    A.    I don't recall when the trouble started.

5    Q.    So would you agree, sir, that you were paid around $40,000

6    in total for stage one and about $30,000 for stage two?

7    A.    Well, not myself personally.

8    Q.    Of course not.  Total payments for the development of the

9    app.

10   A.    Correct.

11   Q.    Now, in the fall of 2015, that's when Jasiel asked if you

12   would be able to help him out and create a website for

13   votejasiel.com?

14   A.    He -- Nick Lizotte was mainly the fellow doing it.  I

15   didn't actually touch votejasiel that much.

16   Q.    I'm just asking because you remember talking to the FBI in

17   March of 2017.  Does it refresh your memory that around the

18   time that Correia was running for mayor in the fall of 2015,

19   he, Jasiel, asked Harding if Statewide could create a website

20   for his campaign, "votejasiel.com"?

21   A.    Yeah.  I think I was too busy on another project.  So Nick

22   Lizotte did the work.  So yeah, we were hired to do this.

23   Q.    Thank you.  And he was charged $1,500, and he paid it,

24   right?

25   A.    He did pay.  I think there was some minor difficulties in

 1    collecting it, but yes, he did pay.

 2    Q.    Lizotte completed the website work in about a week and a

 3    half, right?

 4    A.    Yeah, it was a pretty basic project.

 5    Q.    And you also -- when I say "you," I mean Statewide --

 6    created a website for SnoOwl, snoowl.com, right?

 7    A.    Yes.

 8    Q.    And that was created for about a thousand dollars?

 9    A.    Yes.

10    Q.    And that bill was paid, correct?

11    A.    I think there were also some difficulties as referred to

12    in my earlier email, too.

13    Q.    So you know that Mr. Bernier joined SnoOwl and was working

14    as an attorney and possibly bookkeeper of SnoOwl, correct?

15    A.    Yes.

16    Q.    And Mr. Bernier was the one that was providing the

17    information for the filing of trademark, filing of patent

18    paperwork, SnoOwl app technology, that was Mr. Bernier, right?

19    A.    Yes.  Although, I seem to recall that Jasiel was also

20    present when we were discussing patents and so forth.

21    Q.    Okay.  But the information, all the technical stuff, the

22    legal stuff, was all coming from Mr. Bernier, right?

23    A.    As a general trend, if it was paperwork or legal related,

24    it was Nick Bernier.

25    Q.    Thank you.  So actually, the payments to Statewide started

1    to get kind of sporadic.  That was when he was campaigning for

2    mayor, that's when they started to get sporadic.  Would you

3    agree with that?

4    A.    There's a general trend of things being very orderly in

5    the beginning and less orderly as time went on.

6    Q.    And this is when you were dealing with Mr. Bernier, right?

7    In the fall, winter of '15?

8    A.    In the absence of Jasiel, I could only deal with Nick

9    Bernier.

10   Q.    And during that period of time, you dealt mainly with

11   Bernier.  You didn't deal with him when he was running for

12   mayor.  You didn't deal with him when he was mayor.  You dealt

13   with Bernier, didn't you?

14   A.    True.  But you could say more he's an agent of the

15   company.

16   Q.    So when you spoke to the FBI, they asked you, and you

17   indicated Harding was dealing mainly with Bernier during this

18   time period, meaning when he was running for mayor, when he

19   became mayor.  That's what you told the FBI.

20   A.    Yes, but, I mean, "dealing with" is communication.  If I

21   need help from SnoOwl and Nick Bernier replies and Jasiel does

22   not reply, that's me dealing with Nick Bernier.

23   Q.    And you dealt with Mr. Bernier about the payments, and he

24   indicated that there would be records that he had to pull

25   together and that you obviously would be paid?  "You" meaning

1    Statewide.

2    A.    Yeah.

3    Q.    Now, when was it that you actually noted the SnoOwl office

4    located at 104 Anawam Street?  Would that be in phase two of

5    the work, or would that be in phase one?

6    A.    I think when we were working at Statewide, all the work

7    happened in our office.  I recall sitting in the back at River

8    Road working on it, Jasiel coming in and asking to see progress

9    and so on.  I don't think I stepped foot in Anawam for quite a

10   while.  It was much later on before I entered that building.

11   Q.    That's where the office of SnoOwl was located right?

12   A.    Yeah, Anawam Street, SnoOwl headquarters.

13   Q.    He brought you over there and showed you the office was,

14   showed you the space, the mill space, right?

15   A.    Yes.

16   Q.    And it was kind of eclectic.  I mean, it was an old

17   refurbished mill, but it looked good, right, the paint on the

18   walls, the floors?

19   A.    Yeah, it was cool.

20   Q.    And you actually kind of set up in there, if you could, to

21   use your computers that you brought in and actually worked at

22   the Anawam Street location.

23   A.    We did.  We spent many hours there working.

24   Q.    Okay.  And as you told us, you noted also that there were

25   other offices in the space.  There were other people, other

1    businesses, if you will, that were working in that area as

2    well, correct?  It was a pretty large space?

3    A.   Very large space and, yes, other people not directly

4    related to SnoOwl would come in.

5    Q.   Would you agree, sir, that you, Mr. Lizotte, Dos Santos

6    and you stopped working on stage two of SnoOwl, and that would

7    be around December of '15 into January of '16?

8    A.   That we stopped working on it?  Yeah.  When we weren't

9    getting paid in a timely way, we stopped working on it.

10   Q.   And once he was elected mayor, you then were dealing

11   pretty much directly with Mr. Bernier, but you were not getting

12   paid.  Is that fair to say?

13   A.   That's right, yeah.

14   Q.   Now, you're friendly with or you were friendly with or

15   still are, perhaps, with Mr. Eisenberg, right, Mark?

16   A.   Yes.

17   Q.   And, in fact, you went to Mr. Eisenberg when you were

18   working on SnoOwl and basically pitched it to him.  You thought

19   it was a pretty good idea, right?

20   A.   Yeah, when Jasiel was --

21   Q.   The answer is yes?

22   A.   Yes.

23   Q.   Okay.  So basically, Jasiel never reached out to

24   Mr. Eisenberg or through you or -- you basically introduced

25   Mr. Eisenberg and brought him to him, correct?

1    A.   I called Mark Eisenberg, and I said that I was working

2    with a company.  I thought it was a great idea.  I thought he

3    should talk to Jasiel, and they subsequently did meet.

4         MR. REDDINGTON:  Okay.  That's all I have, Your Honor.

5    Thank you.

6         THE COURT:  All right.  Mr. Hafer.

7         MR. HAFER:  Very brief, Your Honor.  Thank you.

8    REDIRECT EXAMINATION BY MR. HAFER:

9         MR. HAFER:  Ms. DiPaolo, could I have 42, please, page

10   2, and the two sections right in the middle of the page there.

11   Yes.  And the one below it.

12   Q.   Mr. Harding, Mr. Reddington asked you several questions

13   about the money that you were owed by Jasiel Correia.  Do you

14   remember those questions?

15   A.   Yes.

16   Q.   And he said several times he just owed you a couple of

17   thousand dollars.  Do you remember those questions?

18   A.   Yes.

19   Q.   Looking at Exhibit 42 in front of you, do you see a

20   notation there from November 26 of 2016 for a payment of

21   $2,675?

22   A.   Yes.

23   Q.   And that was long after you had done any development work

24   for SnoOwl, correct?

25   A.   Yes.

1  Q.   And then below that, the payments in August of '17, are an

2  additional $2,382; is that correct?

3  A.   Yes.

4  Q.   So, in fact, sir, you were owed over $5,000 up until you

5  were paid in November of 2016, isn't that true?

6  A.   The employees and my company.

7  Q.   You and your employees.

8  A.   Yes.

9  Q.   Mr. Reddington asked you some questions about your

10 interview with the FBI in March of 2017.  Do you remember those

11 questions?

12 A.   Yes, yes.

13 Q.   So you were aware in March of 2017 there was a federal

14 investigation involving SnoOwl?

15 A.   Yes.

16 Q.   The payments that you finally received in August of 2017,

17 those would have been after there was public awareness that

18 there was a federal criminal investigation, correct?

19 A.   Yes.

20         MR. HAFER:  Nothing further, Your Honor.

21         THE COURT:  Mr. Reddington.

22         MR. REDDINGTON:  Nothing, Your Honor.  Thank you.

23         THE COURT:  All right.  You may step down.  Thank you.

24 You can take the cover off the microphone it's on.

25         And we'll take the next witness, at least start the

1    next witness.

2              THE WITNESS:  Do I have to --

3              THE COURT:  Yeah, if you could, just lightly.  It

4    would be helpful.

5              MR. HAFER:  Your Honor, what time would you like me to

6    stop?

7              THE COURT:  I'll find a break, but maybe 11:10, 11:15.

8    But we'll get an introduction, we'll get a sense of who the

9    witness is.

10             MR. HAFER:  Okay.

11             NICHOLAS BERNIER Sworn

12             COURTROOM CLERK:  Please be seated and state your full

13   name and please spell your last name.

14             THE WITNESS:  My name is Nicholas Dennis Bernier,

15   B-e-r-n-i-e-r.

16             THE COURT:  So Mr. Bernier, if you could put the --

17   make sure the microphone is between you and Mr. Hafer who is

18   going to be asking you questions so we can pick up your voice.

19   And you can take your mask off at this point.

20             THE WITNESS:  Thank you, sir.

21   DIRECT EXAMINATION BY MR. HAFER:

22   Q.    Mr. Bernier, how old are you?

23   A.    I'm 35 years old.

24   Q.    Where did you grow up?

25   A.    I grew up in Swansea and went to high school in Taunton.

```
 1    Q.   How far did you ultimately go in school?
 2    A.   I obtained a law degree and a tax degree from Washington,
 3    St. Louis.
 4    Q.   I'm sorry, where was your law degree from?
 5    A.   Washington University in St. Louis.
 6    Q.   And where did you do your undergrad?
 7    A.   Boston College.
 8    Q.   Are you currently working?
 9    A.   Yes, sir.
10    Q.   What do you do?
11    A.   I'm a tax and energy attorney.
12    Q.   Approximately how long have you been practicing law?
13    A.   Approximately ten years.
14    Q.   And during those ten years, have you held several
15    different legal jobs?
16    A.   Yes.
17    Q.   Where are you practicing currently?
18    A.   At my own law firm, the Rampart Law Group, with a
19    colleague and friend of mine.
20    Q.   What's your specialty area of the law?
21    A.   Tax and energy.  Specifically --
22            THE COURT:  You're going to have to speak up.  And try
23    to speak a little bit slower as well.
24            THE WITNESS:  Yes, sir.
25    A.   Specifically property tax law, appealing property taxes.
```

1   Q.   Mr. Bernier, do you know the defendant Jasiel Correia?

2   A.   Yes, I do.

3   Q.   How did you first meet him?

4   A.   I met him at a -- my own fundraiser in 2013 in the summer.

5   Q.   Sorry.  What was the fundraiser?

6   A.   I was running for city council at the time in Fall River.

7   Q.   And how did you meet him while you were running for city

8   councillor?

9   A.   I was introduced to him by the district attorney at the

10  time, Sam Sutter.

11  Q.   Was he also -- was Mr. Correia also a candidate for office

12  at the time that you met him?

13  A.   Yes.  And when I was running, it was kind of a -- you

14  allow other candidates to attend your events.  It's kind of

15  just a collegial thing.

16  Q.   What were your initial impressions of Mr. Correia?

17  A.   Extremely impressed.  He seemed very articulate, educated.

18  He had a business or marketing degree or something from PC.

19  Just a very nice person.  I liked him immediately.  Kind of

20  commandeered the room.

21  Q.   Ultimately, were you a candidate for office for city

22  council in Fall River in 2013?

23  A.   No.  It was a family decision.  I withdrew my candidacy,

24  and my daughter was born within a year.

25  Q.   When you withdrew your candidacy, did you do anything to

1    support Mr. Correia's candidacy?

2    A.   I did.  I gave him a digital copy of a file of my voter

3    data.  I had voter data which lists likely voters, and I gave

4    it to him in hopes that it would help him.

5    Q.   I want to direct your attention now, Mr. Bernier, to the

6    spring of 2014.  Did you begin having conversations with the

7    defendant about joining a company called SnoOwl?

8    A.   I did.  He contacted me.  He said he was -- he had a new

9    venture.  He had previously done another company and sold it

10   and was using that to kind of fund this.  And he asked me if I

11   would represent the company or him.  I said I didn't know the

12   type of law he needed.  I knew enough to know that I didn't

13   know that law.  Then we just continued talking from there.

14   Q.   So did you initially agree to join SnoOwl in a legal

15   capacity?

16   A.   No.

17   Q.   You indicated you continued talking to Mr. Correia?

18   A.   Yes, we did.

19   Q.   You mentioned he told you he had sold another company?

20   A.   Yes.

21   Q.   When he told you that, did you believe him?

22   A.   Yes.

23   Q.   During these initial conversations, Mr. Bernier, did you

24   come to learn the name of the company that he was currently

25   involved with?

1   A.    Yeah.  It was SnoOwl.

2   Q.    What did -- just very briefly, what did you understand

3   SnoOwl to be?

4   A.    I think he got the name from Harry Potter he said, and --

5   like the bird there.  But basically it was a business-to-

6   business marketing company, and the idea was to kind of be a

7   Yelp that worked better, kind of.

8   Q.    As the year -- as 2014 progressed, did you and the

9   defendant stay in touch about the prospect of you joining

10  SnoOwl?

11  A.    Yes.  We would have breakfast at the luncheonette,

12  Highland, down the street from my house.

13  Q.    And did you eventually agree to join SnoOwl formally?

14  A.    I did.  I had some conditions, though.

15  Q.    Let me ask you about those.  Backing up, did you

16  eventually join SnoOwl formally?

17  A.    Yes, I did.

18  Q.    Prior to agreeing to join, you indicated you had

19  conditions?

20  A.    Yes.  I had some friends who were involved in startups.

21  One of them was a startup lawyer and, you know, I knew that you

22  had to do things the right way.  So I inquired how things were

23  kind of organized, and he wasn't incorporated.  For me that was

24  a big deal.

25  Q.    Let me break that down.  Slow up just a second, if you

```
 1    wouldn't mind.  You indicated you inquired.  Who did you
 2    inquire of?
 3    A.   With Jasiel at one of our breakfast meetings or other
 4    meetings.
 5    Q.   And you said he indicated the company was not
 6    incorporated?
 7    A.   No.  He indicated that he had raised some money but was --
 8    just had the money.
 9    Q.   And what did you say, with respect to your conditions,
10    your position was on incorporation?
11    A.   It was absolutely essential because I think it protects
12    you and the investors, and it also allows you to grow and
13    possibly get acquired.
14    Q.   And these conversations between you and Mr. Correia, these
15    were in the fall of 2014; is that right, Mr. Bernier?
16    A.   Yeah, summer into fall.
17    Q.   And did he, based on your position on incorporation, did
18    he ultimately agree to meet with some attorneys to discuss
19    these issues?
20    A.   We did.  We went up together.
21    Q.   Where did you and the defendant go together to meet with
22    attorneys?
23    A.   Near here.  Actually, Gunderson Dettmer has an office near
24    here in Seaport.
25         MR. REDDINGTON:  I'm sorry, I can't understand.
```

1          THE COURT:  If you could speak up and maybe move the
2     microphone closer to you.
3     A.   Near here.  So we actually went to Gunderson Dettmer,
4     which is a startup attorney law firm based in Palo Alto but
5     they have a Boston Seaport office.
6     Q.   When you and the defendant went together to Gunderson
7     Dettmer in 2014, what was the purpose of the meeting from your
8     perspective?
9     A.   Convince my friend's boss to defer legal fees and
10    represent us and incorporate us.
11    Q.   So there was a threshold thing on legal fees that you had
12    to work out?
13    A.   Yeah.  Not a lot of firms want to do that type of work pro
14    bono.  There is a niche for it in the city and you just have to
15    make sure you sell yourselves and the company to the startup
16    lawyer -- law firm.
17    Q.   Getting past the issue of payment, substantively what did
18    you and the defendant want to talk to the firm about?
19    A.   Basically incorporating the company.
20    Q.   Yeah.
21    A.   And then we talked about how the money was raised because
22    that's the most important thing when you're raising money to
23    develop an app.
24    Q.   When you say "how the money was raised," are you talking
25    about the SnoOwl investment money?

1   A.   Yes.

2   Q.   And what did you and the defendant tell Gunderson about

3   how the money was raised?

4   A.   He had drawn up or found these kind of like two-page

5   investment docs and was giving away percentages of the company.

6   I think one of them was like 5 percent.  But as, you know, we

7   discussed, like, you just can't do that indefinitely, and

8   there's a reason why they use something called a convertible

9   debt note for a lot of these transactions.

10  Q.   What is your understanding of what a convertible debt note

11  is, Mr. Bernier?

12  A.   It's an agreement -- you're still getting equity but the

13  equity can change depending on the valuation of the company.

14  So if -- and you're also protected, once you have the equity if

15  you're the investor, to, you know -- I believe you can even get

16  a board seat.  There was a lot to it.  But basically it's the

17  same similar agreement.  It takes some more pages.  You have

18  equity, but if the company needs to raise more money, then your

19  number of shares just go up or the ability to buy shares goes

20  up.

21  Q.   And did you and Jasiel Correia discuss with Gunderson

22  taking the existing investment agreements and turning them into

23  convertible debt notes?

24  A.   Yeah, in depth.  Because the issue was we had to explain

25  it to the investors, why they're giving up -- my paper says I

1    have 5 percent of the company.  Why am I going to give up 5

2    percent for a debt note?  What's a debt note?  And we had to be

3    pretty thorough and understand what a convertible debt note

4    was.

5    Q.   And that conversation about understanding what a

6    convertible debt note was, who was present for that

7    conversation besides yourself?

8    A.   Myself and Jasiel.

9         MR. HAFER:  Ms. DiPaolo, can I have Exhibit 13 already

10   in evidence, please.

11   Q.   Mr. Bernier, on the screen in front of you, Exhibit 13, do

12   you recognize the cover sheet of that document?

13   A.   Yes, sir.

14   Q.   What is that?  It's a large document, but do you recognize

15   it from the cover page?

16   A.   Yes, I do.  It's a note purchase agreement which goes

17   along with the convertible debt note.  So there's two parts to

18   a convertible debt note.  You have the note itself, which is

19   just a two-page thing saying you get X, Y, and here are some of

20   the conditions.  Then you have the promissory agreement or note

21   purchase agreement which kind of tells you the conditions.

22   Q.   This particular one that was used by SnoOwl, who was the

23   principal drafter of that agreement?

24   A.   The law firm, Gunderson Dettmer.

25   Q.   And did you yourself also review this at some point?

1  A.   Yeah, we went through it together because we wanted to
2  know what we were assigning.
3  Q.   Who is "we"?
4  A.   Jasiel, myself and the law firm.
5  Q.   I'll get back to this shortly.  Let me ask you, after this
6  meeting with Gunderson and discussion regarding the debt notes,
7  did you eventually agree to join the company?
8  A.   Yes, I did.
9  Q.   And approximately when was that, Mr. Bernier?
10  A.   December of 2014.
11  Q.   What were the terms of your joining SnoOwl?  What were you
12  getting; what were you going to be providing?
13  A.   Well, I was going to be receiving 15 percent of the
14  founders' stock, with Jasiel receiving the remaining 85
15  percent.  I'd be what was called the junior founder, and he
16  would be the senior founder since he had done most of the work.
17  He already found the software developer and raised the money.
18  And then my duties were basically organizational, manage the
19  law firm and manage the developers and kind of work with them
20  on contracts and things like that.  Our goal was to manage
21  costs.
22  Q.   Were you going to be getting a salary?
23  A.   No, sir.
24  Q.   Did you have conversations with the defendant in 2014 at
25  the time you joined the company about the issue of salary?

1    A.    Yes.

2    Q.    What were those conversations?

3    A.    Well, my wife wanted me to have a salary.  I had a seven-,

4    eight-month-year-old at that time.  So I had -- I was a working

5    lawyer, so that was okay.  I just wanted to make sure that when

6    salaries were given out, I would have one, when I started

7    dedicating more time to the company.

8         So I kind of at this juncture I treated it as a part-time

9    thing, but I asked Jasiel if he was receiving a salary, if he

10   was receiving payment, and he said, "No, of course not."  He

11   was partially funding this with his prior venture.

12   Q.   And that was in December 2014 he said, "Of course not" to

13   you on the issue of salary?

14   A.    Yes.

15   Q.   Before we get into more specifics of your time with

16   SnoOwl, Mr. Bernier, just to orient the jury, December 2014,

17   you joined SnoOwl, correct?

18   A.    Yes, sir.

19   Q.   And then when did you leave SnoOwl?

20   A.    I gave my notice in June of 2016.

21   Q.   So in total, about one and a half years between December

22   of 2014 and June of 2016?

23   A.    Yes, sir.

24   Q.   What was your title during that time period?

25   A.    I was the corporate secretary, but then on business plans

1    and other things we would put that I was the junior founder and

2    I was the chief operating officer.

3    Q.    Were you ever the CEO of SnoOwl?

4    A.    No, never.

5    Q.    Were you ever in charge of Jasiel Correia?

6    A.    No, never.

7    Q.    And you mentioned when you were involved with SnoOwl, you

8    had another job, Mr. Bernier?

9    A.    Yes, I was a practicing attorney.

10   Q.    I think you alluded to this already, but in joining this

11   company, Mr. Bernier, what was your big picture goal, what were

12   you hoping to achieve?

13   A.    The company either receive venture capital funding, which

14   would allow me and Jasiel to work full time on developing the

15   product, and/or eventual acquisition by a larger company like a

16   Twitter or something like that.

17           THE COURT:  Is this a good point to break, Mr. Hafer?

18           MR. HAFER:  Yes.  Yes, Your Honor, it is.

19           THE COURT:  All right.  So ladies and gentlemen, we'll

20   take our morning break at this time.  We'll be back here

21   probably around 11:25.

22           (Jury exits the courtroom.)

23           THE COURT:  Is there anything we need to take up

24   before the break?

25           MR. HAFER:  Not from us, Your Honor.

```
 1            MR. REDDINGTON:  No, Your Honor.

 2            THE COURT:  Okay.  So we'll see you back here a little

 3     before 11:25.

 4            MR. HAFER:  Your Honor, are we still planning on a

 5     12:30 lunch, just for my timing purposes?

 6            THE COURT:  Yes.  We may go a little beyond that, with

 7     proper breaks and that sort of thing.

 8            MR. HAFER:  Understood.

 9            (Recess, 11:09 a.m. - 11:32 a.m.)

10            THE COURT:  Ready for the jury?

11            MR. HAFER:  We are, Your Honor.

12            (Jury enters the courtroom.)

13            THE COURT:  Same question, ladies and gentlemen:  Was

14     there any discussion of any kind about this case during the

15     break?

16            I see no response to that, so I assume there was not

17     or find that there was not.

18            You may continue, Mr. Hafer.

19            MR. HAFER:  Thank you, Your Honor.

20     Q.   Mr. Bernier, when we broke I believe I asked you about

21     your main objective or goal when you joined SnoOwl.

22     A.   Yes, sir.

23     Q.   And you indicated -- well, what did you say, let's just

24     transition, what was your main goal or objective?

25     A.   My main goal was to have the company either funded by
```

1    venture capital, so I could work full time in the company with

2    Jasiel, or for the -- and/or for the company to be acquired by

3    a larger company, like Twitter, and then obviously be

4    compensated for the shares I would hope to earn.

5    Q.    Shortly after you joined the company, did you have any

6    conversations with the defendant about meeting a

7    Dr. Cabeceiras?

8    A.    Yes.

9    Q.    What were those conversations?

10   A.    He asked me to meet with one of his key investors.  He was

11   a dentist in Fall River, and he asked that -- Dr. Cabeceiras

12   wanted to meet with me.  He was nervous about someone new

13   joining the company.  So I went and met with Dr. Cabeceiras at

14   his office in -- it's in Fall River.

15   Q.    I think you indicated at the beginning of that answer

16   "when he asked me to meet Dr. Cabeceiras," who was "he"?

17   A.    Jasiel.  Jasiel asked me to meet with Dr. Cabeceiras.

18   Q.    And did you eventually meet with Dr. Cabeceiras?

19   A.    I met after hours like when his office was closing, I

20   think his secretary was leaving or something, and then met with

21   him in his office.

22   Q.    When you went to meet with Dr. Cabeceiras, what was the

23   purpose of the meeting?

24   A.    We needed all the investors to sign convertible debt notes

25   for their equity investment, and people who had previously

1   signed notes with Jasiel prior to us incorporating, I wanted a

2   waiver letter, or I was told to have a waiver letter executed

3   by them.  That was a conversation Jasiel and I had with our

4   attorneys the best way to handle this transition from

5   pre-incorporation to post-incorporation.

6   Q.   By "waiver letter" you mean they sort of waive any rights

7   the previous agreement gave them, and they're putting their

8   rights into this new convertible debt note?

9   A.   Exactly.

10  Q.   I think I forgot to ask you this earlier.  At some point

11  did SnoOwl, in fact, incorporate?

12  A.   Yes.  We were incorporated, I believe it was December of

13  2014, and we were incorporated in Delaware because that's just

14  where you go -- if your plan is to be acquired or to obtain

15  venture capital funding, investors and acquirers want you to be

16  based in Delaware because the law is very standardized and

17  formal.

18  Q.   Going back to your meeting with Dr. Cabeceiras, you

19  indicated the principal purpose was to get him to agree to sign

20  a convertible debt note; is that right?

21  A.   Yes.

22  Q.   So what happened when you had that meeting with him,

23  Mr. Bernier?

24  A.   He was very nice, but he wanted to know my background, why

25  I was interested in SnoOwl, how I met Jasiel.  So we had some

1   pleasantries.  Then he kind of drilled down.  He basically

2   asked me point blank, "Are you making any money from this?"

3   Like, "Are you receiving a salary?  Are you getting money from

4   the company?"  And I said, "No."  And he asked me, "Is Jasiel?"

5   And I said, "No.  Jasiel told me he is not receiving money from

6   this.  He's not receiving a salary.  Our goal will be to

7   receive a salary, but it will only be after we raise enough

8   money and then you, as a convertible debt note holder, would

9   have a say in that."

10  Q.   At some point either that day or shortly thereafter did

11  Dr. Cabeceiras agree to sign the convertible debt note?

12  A.   He did.

13  Q.   Did you ever tell him that that agreement was effectively

14  a loan?

15  A.   We took a long time explaining it, but I did -- because it

16  says convertible debt note, he wanted to know what that meant.

17  I told him to have a lawyer look at it, have his personal

18  lawyer look at it.  But basically you're getting interest rate

19  after -- unfortunately, the way it was drafted we had a

20  one-year call.  So we had one year to get the funding to

21  basically do what they call a preferred stock round or a big

22  stock round.

23       And the reason why you do convertible debt notes and not

24  do a full stock offering is because there's a lot of regulatory

25  stuff with the SEC and it's basically very expensive.  And what

1    was explained to me was that it was going to cost us a lot of

2    money to do a round of shares the right way, the legal way.

3    Q.   Mr. Bernier, shortly after joining the company, did you

4    have any conversations with the defendant about the amount of

5    money that had been invested in SnoOwl?

6    A.   Yes.  So he basically told me he had raised some money.  I

7    believe it was $50,000 from Dr. Cabeceiras.  $50,000 initially

8    from a Steve Miller.  And then another 20 from Miller.  And

9    then two -- then $50,000 in total from two guys that owned

10   PieZoni's, that pizza shop thing.  Mark and Victor.

11   Q.   Did you have a general understanding about generally how

12   much had been raised or how much had been invested in total?

13   A.   About $270,000 I was aware of at the time.

14   Q.   Actually, Mr. Bernier, shortly after joining SnoOwl, did

15   you have occasion to go to Newport with the defendant?

16   A.   I did.  In February I went with my wife, and Chris Parayno

17   was there as well.

18   Q.   Did he have an apartment there of some sort?

19   A.   Yeah, he had a condo in Newport.  It was a really nice

20   condo.  It was snowing out when we went, I remember, because I

21   was driving a Toyota Corolla, and I was having trouble

22   sticking.

23   Q.   Did you have any conversations with him about the price of

24   the condo in Newport while you were there?

25   A.   Yeah, because my wife was saying, "Why can't we get one,"

1    and I said, "We can't afford it."

2    Q.   What did you say to the defendant?

3    A.   I said, "How did you afford this?"  And he said, "You

4    know, my last venture, the FindIt Network."

5    Q.   Getting back to the amount of money invested in SnoOwl, at

6    some point after you joined, Mr. Bernier, did you ask the

7    defendant to provide you with copies of the checks that had

8    been given by the investors?

9    A.   Yes.  I started looking for records.  Again, this is a

10   part-time job for me.  My full-time job was, you know, making

11   money, to pay my rent and raise my family.  So that was my

12   full-time job.  Part time I was asking -- I was trying to clean

13   up the books for him, fix the business plan.  He had given me a

14   business plan that he told me he had written.  So I fixed some

15   of the stuff on that.  I think my name was misspelled on the

16   first one, so I wanted to fix that.

17        And --

18   Q.   You mentioned cleaning up the books, you said?

19   A.   Yeah.

20   Q.   Did you have any conversations with him at or about the

21   time you joined about the status of the books or what was going

22   on with the books?

23   A.   Yeah.  I basically asked him, and he said, you know, he

24   was a business guy.  He ran on like a business thing when he

25   ran for city council and then again for mayor.  But he says,

1    "You know, I'm not an accountant.  I don't go into details on

2    that."  I'm like, "Okay.  We just need to clean it up.  I

3    advised we either hire an accountant, you hire an accountant.

4    It's worth us to do that because in order to raise any serious

5    money, they're going to want to look at every dime you've

6    raised and how you've spent every dime."  So that's what I

7    inquired about.

8    Q.   Did he say anything to you specifically about the funds in

9    the account that existed before you joined SnoOwl?

10   A.   Yeah.  I did press him on that.  The goal, when we met

11   with the attorneys and when we had follow-up conversations, we

12   were incorporating, it's a new chapter in SnoOwl.  We had to

13   set up a new bank.  He could be at any bank he wanted.  He was

14   a public official, so he could pick his favorite local bank,

15   and we needed to transfer all of those funds over.

16   Q.   From the account that existed before you got to SnoOwl to

17   this new one you were going to open?

18   A.   Exactly.

19   Q.   So did you, in fact, open a new SnoOwl account at BayCoast

20   Bank?

21   A.   We did.  It took us a couple of months.  Some of our

22   schedules just didn't line up.  Eventually we were supposed to

23   meet, but I think he got called away to something in Newport.

24   So I just went to the bank.  I believe I called him on the

25   phone, and we did it like semi remotely, and then he later came

1    in and signed it, but it was opened in March of 2015.

2    Q.   Mr. Bernier, there's a binder in front of you.  Could you

3    actually turn for the time being to tab 66, sir.  It's a

4    thicker document.  Would you just take a moment and review the

5    document and tell me if you recognize it.

6    A.   These are the BayCoast records, it looks like.  Hold on

7    one second.  Yeah, these are the BayCoast records from when it

8    was opened in March of 2015, until March of 2016, I believe.

9    Hold on.

10         MR. HAFER:  Your Honor, I'm going to offer Exhibit 66,

11   please.

12         THE COURT:  All right.  It's received.  This was the

13   exhibit that we looked at earlier.

14         MR. HAFER:  Yes, sir.

15         (Exhibit 66 admitted into evidence.)

16   Q.   Mr. Bernier, the date in the top right-hand corner of the

17   first page of Exhibit 66 indicates the statement start date.

18   Do you see that?

19   A.   Yes, sir.

20   Q.   And what date is that?

21   A.   March 13, 2015.

22   Q.   And a little bit down further on the page it indicates the

23   starting balance and then an initial deposit a little bit

24   further down.  There it is.  What was the starting balance on

25   this account?

1  A.    $100.  I put $100 in to start while we waited for the

2  transfer.

3  Q.    Okay.  Now, what was the agreement that you had with the

4  defendant about other money that was going to go into this

5  account?

6  A.    Well, to transfer all the funds currently in his account,

7  and obviously any new funds raised would go in this account.

8  This was the business account.

9  Q.    And at some point over the next several months were funds

10  transferred from the other account into this BayCoast account?

11  A.    In dribs and drabs.  I don't remember the exact timeline

12  but my goal -- we started working, spending more and more time

13  with our software team because I was asking him about the

14  background, and he had said that a previous software developer

15  had kind of ripped him off.

16      So initially I was suspicious of our software team, but as

17  I spent more time around them, I realized they were just really

18  good.  He had found this amazing software team and had been

19  directing them well.

20  Q.    Okay.  Just to be clear, your conversation with Jasiel

21  Correia was the funds in the other account that existed before

22  you joining SnoOwl would be transferred into this account?

23  A.    Yes, sir.

24  Q.    You said it happened in dribs and drabs?

25  A.    Basically whenever I or someone else pressed him to put

 1   money in the account, because that's how we were going to be

 2   paying all of -- well, all of our independent contractors.

 3   Q.   Software developers?

 4   A.   Software developers.

 5   Q.   Mr. Bernier, you indicated that the defendant told you

 6   approximately $270,000 had been invested in SnoOwl; is that

 7   correct?

 8   A.   Yes, around that.  Actually, it was about 170, and then we

 9   had two other people invest.  So then it went to 270, yes.

10   Q.   In total -- and we'll look at the record in more detail,

11   but in total how much money was deposited into the BayCoast

12   account during the time that you were at SnoOwl, approximately?

13   A.   Approximately $36,000 the entire time.

14   Q.   Did you have a reaction to the fact that $36,000 was

15   deposited in the account notwithstanding that over 200 -- or

16   approximately 270,000 had been raised?

17   A.   Yeah.  My -- it happened slowly, so I just thought he was

18   slow or lazy at first and I thought he was busy with what he

19   was doing, and I was working, too.  So I'd check in.  And the

20   only time I would really -- it had become an issue is when I

21   had to make a payroll, I had to pay our people.

22   Q.   Did you say anything to Jasiel Correia about the balance

23   being less than you expected it to be coming from the other

24   account?

25   A.   Yes.

1    Q.   What did you say?

2    A.   I asked him, "What are you doing?"  And he basically said

3    it was more complicated because he had a -- he had like direct

4    debits done, and he had the software -- he had what was our

5    hosting space -- it was called Rackspace -- was being taken out

6    of his account.  I said, "I'll help you with that.  We'll

7    switch it over to this account first, and then we can, like,

8    slow down that account."

9    Q.   Why not just move the money yourself from the other

10   account into the BayCoast account?

11   A.   He told me he didn't do online banking, and I was

12   suggesting we just do a transfer.  Eat the wire transfer fee

13   and just get it all and get this going.

14   Q.   Did you have access or authority to the other account to

15   initiate that transfer yourself?

16   A.   No, I did not.

17   Q.   You mentioned that Statewide -- you had to pay Statewide

18   developers out of that BayCoast account; is that correct?

19   A.   Yes, sir.

20   Q.   And ultimately over the next several months, were

21   Statewide developers paid from the BayCoast account for

22   development work they did on SnoOwl?

23   A.   Yes, sir.

24   Q.   Anyone else while you were there as corporate secretary

25   who was paid any type of salary or wage out of the BayCoast

1    account?

2    A.   No, sir.

3    Q.   At any point did you authorize salary or wage or draw

4    payments from the BayCoast account to Jasiel Correia?

5    A.   No, sir.

6    Q.   Mr. Bernier, would you turn to tab 49, please.  Again, a

7    longer document.  So just take a moment to familiarize yourself

8    with it.

9    A.   This is one of the business plans he was involved in

10   helping to create.

11            MR. HAFER:  I offer Exhibit 49, Your Honor.

12            THE COURT:  It's received.

13            (Exhibit 49 admitted into evidence.)

14            MR. HAFER:  Ms. DiPaolo, may I have the first page.

15   Q.   What is the date of this business plan for SnoOwl,

16   Mr. Bernier?

17   A.   April 2015.

18   Q.   You were involved in putting this business plan together?

19   A.   Yes.  I received an original business plan, I believe,

20   from Jasiel at some point in time, I think, in December and

21   then I kind of used his template and just tried to make it

22   better.

23   Q.   What was the purpose of this business plan in April of

24   2015?

25   A.   Sorry, could you repeat the question.

 1   Q.   Why were you doing a business plan in April of 2015?  Just
 2   generally what was the purpose of this?
 3   A.   We were trying to -- usually business plans is to organize
 4   the company and make sure you're proceeding in an organized
 5   fashion, but really it was to attract investors, attract
 6   investors so we could continue to develop the application.
 7        MR. HAFER:  Ms. DiPaolo, may I have page 4 of the
 8   business plan, specifically the language under "Leadership" at
 9   the bottom.
10   Q.   Mr. Bernier, under "Leadership" of the business plan on
11   page 4, the second sentence indicates, "While still a student
12   at Providence College, Jasiel launched and sold his first web-
13   based advertising project, the FindIt Networks."  Do you see
14   that?
15   A.   Yes, sir.
16   Q.   Why is that language in the business plan?
17   A.   It's my belief he put it there.  That was in the draft I
18   received and, you know, that's what I knew to be true at the
19   time.
20   Q.   Prior to finalizing this business plan, had you ever seen
21   an earlier version of a SnoOwl business plan which indicated
22   that FindIt was fatally flawed and never came to fruition?
23   A.   No, sir.
24   Q.   Could you turn to tab 50 of your binder.  Do you
25   recognize -- take the time if you need to review it, I'm sorry,

```
 1    and let me know if you recognize it.
 2    A.   It's another version of the business plan, approximately a
 3    month later.  I don't know if the dates were exact because, you
 4    know, we changed the front of it, but it wasn't like time
 5    tracked or anything.
 6              MR. HAFER:  Your Honor, I offer Exhibit 50.
 7              THE COURT:  It's received.
 8              (Exhibit 50 admitted into evidence.)
 9    Q.   Business plan, same business plan here just a month later
10    on the cover page, Mr. Bernier?
11    A.   Yes, sir.
12    Q.   Very generally, your understanding as to why a new
13    business plan only about a month later than the previous one?
14    A.   Well, this is -- I was actually very proud of this at the
15    time.  Jasiel and I both were trying to reduce our burn rate.
16    Q.   What's burn rate?
17    A.   It's the amount of money a company spends at any given
18    point in time.  The goal is to keep your development costs as
19    low as possible, and our plan was to develop and then market.
20    So you need a product before you can market the product.  So in
21    this plan the financials are different, I believe.  I have to
22    check, but in this one we changed them.  At some point we
23    changed the financials because we negotiated with Statewide
24    Software, and Statewide Software was no longer going to receive
25    their previously hourly rates.  I think they ranged from like
```

1 $70 to $90 an hour, and we dropped them all the way down, it

2 says here, I think to $50 and $35 an hour respectively.

3 Q. Let me stop you for a second.

4   MR. HAFER:  Ms. DiPaolo, could I have page 13 of the

5 business plan, please.  Under "Location."

6 Q. Let me ask you some questions before we get to that burn

7 rate thing.  Do you see this language on your screen that's

8 enlarged, Mr. Bernier?

9 A. Yes, sir.

10 Q. That indicates that SnoOwl pays $150 a month to occupy

11 space at the historic mill.  Do you see that?

12 A. Yes, sir.

13 Q. Was that consistent with what your understanding was in

14 terms of a SnoOwl expense, $150 a month to rent space at 104?

15 A. Yes, sir.

16 Q. Personally, were you familiar with that space at 104?

17 A. Yeah, and I believe by this time I was spending two days a

18 week there with the software team.  I think it was Tuesdays and

19 Thursdays.

20 Q. Were you also familiar with a business that was called

21 104, a business incubator or something?

22 A. That was the landlord and the entity that SnoOwl was

23 supposed to be paying its rent to.

24 Q. The owner of the 104 was who SnoOwl was supposed to pay

25 its rent to, correct?

1    A.    Yeah, SnoOwl was supposed to be paying 104.

2    Q.    Mr. Correia, to your knowledge, had a separate business

3    called -- a business incubator 104?

4    A.    Yeah.  I believe it was a nonprofit, though, because he

5    was applying for grants.  I was aware that he was, you know,

6    doing that as well with Chris Parayno.

7    Q.    Regarding this space at 104, did the software developers

8    work in that space in 2014?

9    A.    No, sir.

10   Q.    When did the software developers start working in that

11   space?

12   A.    Right after we negotiated their contract.  They originally

13   were just a contract with Statewide Software, and then we

14   brought them on as independent contractors.  Part of that deal

15   was we wanted them working close to us at least two days a

16   week.

17   Q.    You mentioned you were in there two days a week yourself

18   sometime starting in 2015?

19   A.    Yes.

20   Q.    And when I say "in there," was there a SnoOwl office

21   within this space and then the business incubator, or what was

22   it?

23   A.    It was a nice setup actually.  I thought he did a good

24   job.  It was space you can rent.  It was like a long room, and

25   there were tables and you could rent a table.  And I believe

1   there was a prior version or a prior discussion where we

2   started at $100 a month to just have the table, and we were all

3   sharing a table.  I think there's a video online or something

4   that shows us.  That's when we were just using that table.

5       Eventually the software guys were saying, "Hey, we're

6   limited in what we can do from this table because we don't have

7   a server."  So Nick Lizotte, I believe, came in after hours and

8   brought his server to 104, and we were given an exchange for

9   increased rent a room, a small little room where they could put

10  the server and another desk and we'd have more privacy.

11  Q.   So there was a lot of space there that had nothing to do

12  with SnoOwl?

13  A.   Yeah, there were many tables.  I think the goal was to

14  have every table rented or something like that, and then you'd

15  have like -- it was like an office sharing space.  I think

16  Cambridge Innovations has one.  WeWork Space.  It was like a

17  WeWork space, if you're familiar with it.

18  Q.   Did you ever see a lease agreement between SnoOwl and the

19  owner of the 104 indicating that SnoOwl was paying $14,000 a

20  year to the owner of 104?

21  A.   No, sir, I did not.

22  Q.   If you had seen a document like that, Mr. Bernier, would

23  you have put $150 a month as the rent SnoOwl was paying in the

24  business plan?

25  A.   No, I would not.  I don't know how many times we actually

1  paid this.  It may have only been a few times, but I definitely

2  would not have done that.

3  　　　MR. HAFER:  Ms. DiPaolo, could I have a little lower

4  down on page 15 just the box -- the burn rate there.  Could you

5  just enlarge those boxes.

6  Q.  Mr. Bernier, you were talking about the burn rate.  Is

7  that what this is here?

8  A.  Yes, sir.

9  　　　MR. HAFER:  All right.  Could I have page 16, Ms.

10  DiPaolo, specifically the language under "Salary Projection."

11  Q.  Mr. Bernier, could you read the first sentence under

12  "Salary Projection," please.

13  A.  "SnoOwl shall begin paying CEO Jasiel Correia, II and COO

14  Nicholas D. Bernier annual salaries of $50,000 per year in June

15  2015."

16  Q.  That's fine.  Just that first sentence is fine.  We'll

17  leave the rest on the screen.

18  　　　It indicates in this business plan here, May of 2015

19  Jasiel Correia is the CEO; is that correct?

20  A.  Yes, sir.

21  Q.  You're the COO?

22  A.  Yes, sir.  It stands for chief operating officer.

23  Q.  Did you ever become the CEO of SnoOwl?

24  A.  No, sir.

25  Q.  It indicates that SnoOwl will begin paying you and Jasiel

1    Correia salaries of $50,000 per year in June of 2015; is that

2    correct?

3    A.   Yes, sir.

4    Q.   Prior to June of 2015, to your knowledge, had SnoOwl paid

5    any salary to yourself or Jasiel Correia?

6    A.   No, sir.

7    Q.   Did, starting in June of 2015, SnoOwl pay you and Jasiel

8    Correia a salary?

9    A.   No, sir.  We didn't reach the threshold.

10   Q.   What was the threshold?

11   A.   I believe it was either 600,000 or a million dollars in

12   new money, I believe.

13   Q.   In the entire time you were at SnoOwl, Mr. Bernier, from

14   December of 2014 to June of 2016, did you see any documents

15   reflecting legitimate salary payments to the defendant?

16   A.   No, sir.

17   Q.   Did he ever tell you at any point he was taking a salary?

18   A.   No, sir.

19   Q.   Did he ever tell you he was using SnoOwl investor money

20   for personal expenses?

21   A.   He told me that he was mixing his personal and business

22   funds in the prior account.  After I kept inquiring, I was

23   asking, you know -- it was part time for me, but especially as

24   I started spending more time with the developers, it was

25   becoming more of an issue for me because, you know, you work

1    with people, you want to make sure they get paid for the work

2    they're doing.  You're seeing how much they're putting into it.

3    And the fact that the money wasn't there, I just asked him,

4    "What's going on?  What's taking so long?"  The online banking

5    excuse wasn't working for me anymore.  He eventually said,

6    "Yeah, I was commingling," and sometimes on some of these

7    things he would spend business money.

8    Q.    Regarding the commingling in that prior account, now we're

9    several months into your tenure at SnoOwl, have you seen any

10   records from that account that predated your arrival reflecting

11   investor money going in or expenditures going out?

12   A.    No, sir.  This is, I think, when I started requesting

13   copies of that bank account and records around this time.

14   Q.    Did you receive those -- who did you ask them from?

15   A.    I asked -- I requested them from Jasiel Correia.

16   Q.    Did he provide them to you?

17   A.    He offered them to me in August of 2015.

18   Q.    August of 2015.  About eight or nine months after you

19   joined the company?

20   A.    Yes.

21   Q.    When he offered them to you -- actually, prior to August

22   15, did you see any accounting ledgers for the company

23   reflecting balances, debits, assets, anything like that?

24   A.    No, sir.

25   Q.    But you were the corporate secretary, right?

1  A.    Yes, sir.

2  Q.    Regarding August of 2015, what you just mentioned, you

3  said the defendant tried to provide you or attempted to provide

4  you with the prior bank account records?

5  A.    Well, I had been asking for them for months.  We had -- he

6  had found someone who might be interested in investing or

7  setting up an acquisition, but that person -- his name was

8  Spiro something or other -- wanted to see what we spent our

9  money on.  He wanted to see the financials.  That was

10 important.

11     I think after that he finally gave them to me, but at that

12 point in time I was just suspicious and I was aware of certain

13 ethical conflicts I could have.

14 Q.    So did you look at them in 2015 when he gave them to you?

15 A.    I did not.  I declined at that point.

16 Q.    You mentioned ethical conflicts.  Why wouldn't you have

17 looked at them, Mr. Bernier?

18 A.    After talking with some friends, I was growing -- at first

19 I thought he was just, you know, bad with numbers or maybe a

20 little lazy.  And then eventually, you know, time dragged on

21 and he still wasn't producing it, and there had to be a reason

22 why.

23     Then I thought, okay, maybe it was just a benign error, he

24 used a couple hundred dollars that he shouldn't have.  We can

25 fix that.  And then eventually I'm just like, you know, maybe

1    there's something bigger here that I don't know.

2         And I told him, when he offered them to me, "Jasiel, if

3    there's something really bad here and I see it, I have to tell

4    the investors.  I have a fiduciary duty to do that, and I also

5    don't want to -- I have a fiduciary duty to you as my business

6    partner not to throw you under the bus if you haven't done

7    anything wrong."

8         I told him at that point in time I thought personally he

9    should go and find an accountant and/or a lawyer to talk to and

10   get this fixed, get it squared away, and then come to the

11   investors with a plan.  If there is a shortfall, you can fix

12   it.  I don't know how much it is, but you're going to have to

13   pay it back.  We'll figure out some way to do it.

14   Q.   So you didn't look at them?

15   A.   I did not, sir.

16   Q.   Mr. Bernier, during the entire time you were with SnoOwl

17   as corporate secretary and COO, did you ever authorize any

18   official travel?

19   A.   No, sir.  After the fact I think Jasiel told me once or

20   twice that when he was in D.C. he might have used some SnoOwl

21   funds because he was visiting his girlfriend Natalie, but he

22   was doing business things, too, and I told him to cut that out.

23   Q.   By August of 2015, when you opted not to look at those

24   records, had the defendant announced that he was running for

25   mayor?

1   A.    Yes, sir.

2   Q.    What impact did that announcement have on SnoOwl?

3   A.    I thought a very good impact initially.  I thought -- I

4   was a big Jasiel supporter.  I was one of his first

5   contributors, I think in 2015, of my own personal funds.  And,

6   you know, I thought it was great because I thought we were

7   going to kind of grow the company.

8         We had an app at that point.  We had a working app.  It

9   was a working -- we had Apple IOS.  The problem was IOS devices

10  were only about like 40 percent of the city, I think.  We were

11  looking it up.  So we needed more money to do the Android.  We

12  had developers that could do it.  We just needed more money to

13  get the Android version out.  So I did think having Jasiel run

14  was good because it would tell everyone about SnoOwl and we

15  might pick up more user activity, and we did.  We picked up

16  initial user activity.

17  Q.    Would you say that Jasiel Correia became more or less

18  involved or focused on SnoOwl once he started running for

19  mayor?

20  A.    Less and less focused.  More avoiding of it.

21  Q.    Were you involved in his mayoral campaign in 2015?

22  A.    Yes.

23  Q.    What was your role?

24  A.    No official role.  I actually introduced him to Gen

25  Andrade, who ended up becoming his campaign manager, and I

1    tried to raise money.  I introduced him to contacts.  I did

2    everything I could.  I helped create his first and only mailer

3    in the preliminary.  I helped him do robocalls.  Anything he

4    needed that I could do while not neglecting my daughter, I did.

5    Q.   What was -- you mentioned a mailer.  What was the campaign

6    slogan?

7    A.   "Honest Answers for Fall River."

8    Q.   Was he eventually elected?

9    A.   Yes, sir.  He won the preliminary and then he won the

10   general.

11   Q.   When he was elected, Mr. Bernier, were you personally made

12   aware of the reactions of some of the investors and software

13   developers in the company through that election?

14   A.   Yes.  And thinking through it, and we spoke about it, I

15   thought it was in our best interest to just get everyone

16   together, get everyone together in one room.  We agreed on it,

17   and we set up a meeting at Jerry Remy's with the investors, and

18   it was maybe a week or so after he was elected mayor.

19        MR. HAFER:  Ms. DiPaolo, could I have Exhibit 4

20   already in evidence, please, starting -- just so Mr. Bernier

21   can see the heading at the bottom of the page.

22   Q.   Mr. Bernier, 44 in evidence, November 12, 2015 email from

23   Josh Harding to Jasiel Correia, yourself and another individual

24   at Statewide Software.

25        MR. HAFER:  Ms. DiPaolo, could I have the second page.

1  Q.   Mr. Bernier, in or about November of 2015, do you remember

2  receiving this email from Josh Harding?

3  A.   Yes.

4  Q.   What did you do after receiving it?

5  A.   I spoke with Jasiel about it.  He was upset.  He thought

6  people weren't being patient enough with him.  He had just won

7  a major elected office and was handling transition.  And I

8  think at this point in time I think I reached out to Josh and,

9  you know, and told him that Jasiel was pissed that you should

10  be, you know, a little more patient.  We're going to have a

11  meeting.  We're going to talk with the investors, and we're

12  going to have a transition plan because clearly he can't be

13  mayor and CEO.

14  Q.   Do you know -- Mr. Harding refers in this email to not

15  getting paid.  Do you have any personal knowledge as to why he

16  wasn't being paid?

17  A.   There was no money in the BayCoast account, and that was

18  the only other account he was paid for, to my knowledge, once

19  he became an independent contractor.

20  Q.   By the way, Mr. Bernier, when the defendant was elected

21  mayor, did you want a job in his administration?

22  A.   Yes.

23  Q.   What job did you want?

24  A.   Corporation counsel.

25  Q.   Did you get it?

A.    No, sir.

Q.    At some point after Jasiel Correia is elected mayor of Fall River, did you learn about an individual named Staff Sheehan becoming involved with the company?

A.    Yes.   Jasiel told me that -- prior to that we had tried something else, and then when that didn't work, he told me that he had a contact named Stafford Sheehan.   So I looked him up.

       At first I was a little scared because he has the same name as his father, who is a disbarred attorney.   So I looked more into it and it was the son, and he was a Ph.D. from Yale and just a very impressive individual.   And part of me thought, wow, I can't believe this guy is interested in joining SnoOwl. And so I think I wrote him a pretty good update.

       I checked with Jasiel, "What do you want me to do?"   And Staff wanted to meet with me.   So I put together kind of an intro letter, and I sent it to him kind of explaining what I believed to be true at the time.

Q.    You sent that to Staff Sheehan?

A.    I did.

Q.    At some point did SnoOwl enter into what's called an MOU with Staff Sheehan?

A.    Yes.

Q.    Did Staff Sheehan ever become the CEO of SnoOwl?

A.    No.

Q.    Why?

1   A.   It was conditioned.  When I met with Staff, he was

2   concerned about the company's financials.  Specifically with

3   the money that wasn't placed in the BayCoast bank account.

4   Basically where it went.

5   Q.   Mr. Bernier, in 2015 and 2016, as part of your roles at

6   SnoOwl, were you involved in providing updates on the company,

7   the patent, possible VC funding to the investors?

8   A.   Yes, sir.

9   Q.   Very broadly, were those updates that you were providing

10  positive or negative?

11  A.   Positive.  You want to put a good spin on things but they

12  were true.  They were what we were doing.

13        MR. HAFER:  Ms. DiPaolo, can I have Exhibit 15 already

14  in evidence, please.  Can you just enlarge the lower email

15  that's from Mr. Bernier.  Thank you.

16  Q.   Mr. Bernier, this email is already in evidence, but is

17  this an email that you sent to Dr. Cabeceiras and other

18  investors on or about November 16, 2015?

19  A.   Yes, sir.

20  Q.   Indicating that progress is being made with the patent

21  essentially, a serial number has been assigned, right?

22  A.   Mm-hmm.

23  Q.   You're going to do this event at Jerry Remy's, correct?

24  A.   Yeah.

25        THE COURT:  You have to answer verbally.

```
 1    A.    Yes, sir.

 2    Q.    Could you just read the first sentence?  Actually, I'll

 3    read it.  I think it will go quicker.  The last paragraph

 4    indicates, the second-to-last paragraph, "Jasiel has always

 5    said that our investors are our partners" --

 6               THE COURT:  Mr. Hafer, a little slower.

 7               MR. HAFER:  Sorry, Your Honor.

 8    Q.    Reading the third paragraph, "Jasiel has always said that

 9    our investors are our partners.  Our successes are your

10    successes.  And we wanted to take a moment to share the recent

11    good news while planning SnoOwl's next chapter."  Have I read

12    that correctly?

13    A.    Yes, sir.

14    Q.    Could you turn to tab 37 in your binder, please,

15    Mr. Bernier, which is not yet in evidence, and let me know if

16    you recognize that document.

17    A.    One second.  It's an email chain.  I'm sorry.

18    Q.    That you sent.

19    A.    Yes, sir.  So I sent --

20    Q.    That's fine.  Let me --

21               MR. HAFER:  I offer Exhibit 37, Your Honor.

22               THE COURT:  It's received.

23               (Exhibit 37 admitted into evidence.)

24               MR. HAFER:  Ms. DiPaolo, can I have the first page,

25    just the...
```

1   Q.   Mr. Bernier, starting at the top of this particular

2   document, this is an April 2016 email from you to the investors

3   and advisers of SnoOwl?

4   A.   Yes, sir.

5   Q.   I'm not going to read this, but is it fair to say this is

6   essentially you announcing the MOU entered into between SnoOwl

7   and Staff Sheehan?

8   A.   Yes, sir.

9   Q.   And providing some detail and actually attaching

10  Mr. Sheehan's resume; is that correct?

11  A.   Yes, sir.

12  Q.   Noting that you're excited about his energy and innovative

13  ideas for SnoOwl in paragraph 3, correct?

14  A.   Yes, sir.

15  Q.   And then you indicate at the last sentence of that

16  paragraph that Dr. Sheehan will immediately take action as

17  SnoOwl's new CEO while Jasiel will stay involved as SnoOwl's

18  chief innovation officer.  Have I read that correctly?

19  A.   Where is that line?  I'm sorry.

20  Q.   It's the last sentence of the third paragraph starting

21  "Dr. Sheehan."  It should be highlighted on your screen.

22  A.   Yeah, it was -- he wasn't the CEO -- because the MOU

23  qualifies it.  He didn't want to become the CEO without the

24  financials.

25  Q.   To your knowledge, did Mr. Sheehan, Dr. Sheehan ever

1   receive the financials that he wanted?

2   A.   No, he did not, to my knowledge.

3   Q.   At any point in time in late 2015 and into 2016 --

4   A.   Actually, no.  Let me say I do think he eventually did

5   receive some documents from the accountant, but it was after

6   the MOU had elapsed.  Because there was an MOU, and then there

7   was an extension.

8        Part of it was Staff and I wanted to keep Jasiel on

9   timelines because he just wasn't responding.  So we put a

10  deadline.  He said he almost had it done, and then we gave

11  another deadline, and he missed that, and that's when I

12  resigned.

13  Q.   Mr. Bernier, at any point during this time period, 2015

14  into 2016, when you're communicating with the broader

15  investor/adviser community of SnoOwl, did you provide a

16  negative update saying things were really bad at the company?

17  A.   No.  I mean, it's -- you're truthful.  You didn't hide

18  anything, but at the same time you don't want to make your CEO

19  being elected mayor sound like a bad thing because it wasn't,

20  and I didn't know -- I had missing information, and I was just

21  doing my best to get that missing information.

22  Q.   But you never wrote an email to the investors and advisers

23  saying, you know, I have identified very serious accounting

24  issues at SnoOwl?

25  A.   No.  I had conversations whether or not I should do that

1    with other friends and colleagues, and they said, "Well, how

2    much do you actually know, Nick?"  And, "If you do that email

3    and it turns out you're wrong, did you just breach your own

4    fiduciary duties for everyone and you tank a company that

5    really shouldn't have tanked."

6              MR. HAFER:  Ms. DiPaolo, can you go back, please, to

7    Exhibit 66, the BayCoast records.

8    Q.   I want to ask you several questions from these records.

9    We'll try to enlarge it.  It may be easier to follow along on

10   your screen.

11             MR. HAFER:  Ms. DiPaolo, could you actually start with

12   the end of the exhibit, I think it's page 56, and just enlarge

13   the bottom right there with the signatures.

14   Q.   Mr. Bernier, who are the signatures on the BayCoast SnoOwl

15   account?

16   A.   Myself and Jasiel Correia.  I'm familiar with both

17   signatures.

18             MR. HAFER:  Ms. DiPaolo, could I please have, I think

19   it's page 14 of the exhibit, the Bates number ends 495.  Could

20   you just enlarge that.  Actually, would you back up for a

21   second, Ms. DiPaolo, and get the statement date in the top

22   right-hand corner.

23   Q.   Mr. Bernier, this is a statement date for what month and

24   year?

25   A.   The entirety of December 2015, from December 1st until

1    December 31 of 2015.

2            MR. HAFER:  And Ms. DiPaolo, if you could now go back

3    to where you started.

4    Q.   According to the BayCoast records, what was the starting

5    balance on the SnoOwl BayCoast account on December 1st of 2015?

6    A.   Negative $653.57.

7    Q.   And what was the ending balance?

8    A.   Negative $194.22.

9            MR. HAFER:  Ms. DiPaolo, could I have page 17, please.

10   And, again, if you would just go up to the statement date

11   first.

12   Q.   What is the statement date of this document, Mr. Bernier?

13   A.   January 29 of 2016.

14           MR. HAFER:  And if you could now enlarge the body of

15   the email or statement.

16   Q.   What does this reflect here from January of 2016,

17   Mr. Bernier?

18   A.   It means we had zero money in the account and we were

19   being charged overdraft fees, which is a standard of most

20   banks.

21           MR. HAFER:  Ms. DiPaolo, could I please have 19.  Top

22   right corner first, if you wouldn't mind.

23   Q.   I'm showing you another page from the SnoOwl BayCoast

24   records.  What is the statement start and end date for this

25   page, Mr. Bernier?

1    A.    March 1, 2016 to March 31 of 2016.

2          MR. HAFER:  If I could have the balance information.

3    Thank you.

4    Q.    What was the starting balance in the SnoOwl bank account

5    in March of 2016?

6    A.    Negative $780.52.

7    Q.    And the ending balance, Mr. Bernier?

8    A.    Zero.

9    Q.    Mr. Bernier, you have testified about the convertible debt

10   notes that the company issued to its investors in December of

11   2014 and thereafter; is that correct?

12   A.    Yes, sir.

13   Q.    If Mark Eisenberg had called his convertible debt note in

14   2015 or 2016, would you have been able to pay him?

15   A.    No, sir.

16   Q.    If Dr. Cabeceiras had called his convertible debt note in

17   2015 or 2016, would you have been able to pay him?

18   A.    No, sir.

19   Q.    If Stephen Miller had called his convertible debt note in

20   2015 or 2016, would you have been able to pay him?

21   A.    No, sir.

22   Q.    Why not?

23   A.    There was no money.  These bank records show there's

24   nothing.  The only thing we had of value, in my opinion, at the

25   time, was intellectual property.  We had the preliminary

1    patent, but we didn't know how marketable it was.  All we had

2    going for us, I thought, was that we had a major law firm front

3    the money.  I think we paid the filing fee, but they did all

4    the legal work to file that preliminary patent.  It was Goodwin

5    Procter.

6    Q.   So whatever value the intellectual property may have had,

7    were you aware of any other assets of SnoOwl at this time?

8    A.   No, we had none, to my knowledge.

9         MR. HAFER:  Ms. DiPaolo, finally, may I have page 28

10   of the exhibit.  And could you just enlarge actually the bottom

11   two tickets.

12   Q.   Showing you page 28, Mr. Bernier, these savings deposit

13   amounts.  Do you see those?

14   A.   Yes, sir.

15   Q.   Okay.  Who is indicated as the person who made these

16   deposits into the BayCoast account in April of 2015?

17   A.   Jasiel.  It says "J. Correia."  I would imply -- I believe

18   that means Jasiel Correia, given the amounts and the timing of

19   it, when I was getting dribs and drabs of money into the

20   account to pay our workers.

21   Q.   And the top page indicates a deposit of $2,000.  Do you

22   see that?

23   A.   Yes.  Yes, sir.

24   Q.   How was that $2,000 put into the account?  What was that?

25   A.   It says "cash," which --

1    Q.   Well, were you aware of cash deposits being made by Jasiel

2    Correia into the account?

3    A.   No.  I thought it was just going to transfer it or write a

4    check.

5    Q.   The bottom ticket here also indicates a cash deposit of

6    $1,200; is that correct?

7    A.   Yeah, yeah.  I wouldn't have cared at the time.  If he

8    said -- I don't think he would have told me, but all I cared

9    about was the money hit the account so I can pay our people.

10        MR. HAFER:  Ms. DiPaolo, may I have the next page,

11   below the check, if you wouldn't mind, the bottom third.

12   Q.   From the BayCoast SnoOwl records, Mr. Bernier, this

13   indicates a savings deposit from May of 2015; is that right?

14   A.   Yes, sir.

15   Q.   And how does it indicate this $5,000 deposit was made?

16   A.   Cash.

17        MR. HAFER:  May I have just the next page,

18   Ms. DiPaolo.

19   Q.   Again, from May and in this case June of 2015,

20   Mr. Bernier; is that right?

21   A.   Yeah, two cash payments, $2,000 in cash May 20, 2015,

22   $3,000 in cash on June 5, 2015.

23   Q.   Mr. Bernier, at some point after the defendant had become

24   the mayor in 2016, was there a meeting regarding SnoOwl at the

25   mayor's office in Fall River?

```
 1    A.    Yes, there was.

 2    Q.    Who was there?

 3    A.    I believe it was initially myself, Attorney Chris

 4    Carreiro, Chris Parayno, who was then serving, I believe, as

 5    the chief of staff, and Jasiel Correia, and Stafford Sheehan,

 6    sorry.

 7    Q.    And Staff Sheehan?

 8    A.    Yeah.

 9    Q.    Who was Chris Carreiro?

10    A.    He was actually an attorney that I introduced Jasiel to.

11    He was a friend of mine.  I thought -- basically I had been

12    asking Jasiel for so long -- we had that conversation about the

13    bank records in August.  Then he got elected mayor.  And I was

14    nervous because I said, you know, if what you did was wrong,

15    you know, from a guy who had a failed company to a mayor who

16    had a failed company is different.  They may look at it more

17    closely.

18          And I wanted to make sure -- you know, he was my friend.

19    I wanted to make sure he was covered.  So I introduced him to

20    one of my friends hoping that they could work out an

21    arrangement, and at that point in time it was my belief Chris

22    Carreiro was serving as Jasiel Correia's personal attorney.

23    Q.    What happened at the meeting?

24    A.    Chris -- Attorney Carreiro asked everyone to sign

25    nondisclosure agreements.
```

1    Q.   Did you sign -- I'm sorry.  What was the purpose of the

2    nondisclosure agreement?

3    A.   It was so -- it was by Attorney Carreiro that we were

4    going to sign the nondisclosure agreements so no one would go

5    blabbing to the newspaper.

6    Q.   About whatever was going to happen at the meeting?

7    A.   Exactly.

8    Q.   Did you sign it?

9    A.   I would not sign it.

10   Q.   So what happened after you didn't sign it?

11   A.   I left the room.

12   Q.   Did there come a time in June of 2016, Mr. Bernier, when

13   you resigned from SnoOwl?

14   A.   Yes.  I sent a letter to our registered agent and to

15   Jasiel Correia, and I believe I might have emailed it as well.

16   I can't remember.  I sent it certified and on advice of my law

17   firm I was working at.

18   Q.   Did you subsequently also, you mentioned SnoOwl was

19   incorporated in Delaware, and you were the corporate secretary;

20   is that right?

21   A.   Yes, sir.

22   Q.   Did you at some point resign as corporate secretary of

23   SnoOwl?

24   A.   No.  I think I did it all in one letter and my thought

25   process was the company would just take me off the books.

1    Either staff or Jasiel should just take me off the records.

2    Q.    Did you later actually contact the Massachusetts Secretary

3    of State or Delaware Secretary of State?

4    A.    Yeah.  A year later I believe a reporter from the Herald

5    news reached out to me and said that I was still -- I think it

6    was like May or June of 2017 -- reached out to me and said,

7    "Are you still corporate secretary of SnoOwl?"  And I said,

8    "No, I'm not.  I resigned a year ago," and I think I sent a

9    copy of my resignation.  And she said, "You're still on the

10   Secretary of State's website."  And then I just called the

11   Secretary of State's website and said, "How do I do this?"

12   because I wasn't an authorized officer to take my name off, and

13   there was like a form I filled out, and I just paid a fee and I

14   got off.

15   Q.    Why did you resign from SnoOwl, Mr. Bernier?

16   A.    I was becoming concerned.  I still liked Jasiel.  I was

17   still supporting him.  But as mayor, I just thought the company

18   was problematic and he wasn't doing anything to fix it.  Well,

19   not anything, but he wasn't doing enough, in my opinion.

20            MR. HAFER:  Your Honor, I have no further questions.

21            THE COURT:  All right.  Mr. Reddington.

22            MR. REDDINGTON:  Thank you.

23   CROSS-EXAMINATION BY MR. REDDINGTON:

24            MR. REDDINGTON:  Would you call up Exhibit 51, please.

25   Q.    Now, sir, you recognize this document, correct?

1    A.   Yes, sir.

2         THE COURT:  Just so the record is clear, I don't

3    believe it's been introduced, but it's not objected to.

4         MR. REDDINGTON:  May I introduce it?

5         THE COURT:  Yes, but it's on the screen right now.

6         MR. REDDINGTON:  Sorry.  Should I take it down?

7         MR. HAFER:  No, no.  It's okay, Mr. Reddington.  I

8    don't object, Your Honor.

9         (Exhibit 51 admitted into evidence.)

10        THE COURT:  So in any event, when we get to a document

11   that hasn't been formally introduced, just lay a short

12   foundation.

13        MR. REDDINGTON:  I thought it was already introduced,

14   Judge.

15        THE COURT:  No, that's fine.

16   Q.   So you recognize Exhibit Number 51 that has now been

17   introduced into evidence, sir, correct?

18   A.   Yes, sir.

19   Q.   And the date of that would be April 22nd of 2016, correct?

20   A.   Yes, sir.

21   Q.   And Jasiel was sworn in as mayor in January of 2016,

22   correct?

23   A.   Yes, Jasiel was sworn in in January of 2016.

24   Q.   And it was understood that he would basically resign from

25   SnoOwl and that you and ultimately Mr. Sheehan would take over

1    the reins of SnoOwl, correct?

2    A.   No, sir.  And actually, that's not what this says.

3    Q.   So the answer is no?

4    A.   No, sir.

5    Q.   Okay.

6            MR. REDDINGTON:  So if you could, please, Alyssa, what

7    you do for Zach, will you make it bigger for me.  Thank you.

8    Q.   So the memorandum of understanding, proposed management.

9    What is a memorandum of understand?

10           THE COURT:  Mr. Reddington, if you could get close to

11   the mic there so we can pick it up.

12           MR. REDDINGTON:  Thank you.

13   A.   Kind of like almost like a letter of intent or kind of an

14   agreement to agree.  Our plan was to, you know, work through

15   any -- you know, basically -- the goal was to get Staff to come

16   on and take over, and in here Jasiel would stay on as chief

17   innovation officer.

18   Q.   Chief innovation officer.  What does a chief innovation --

19   I've heard CEO, I've heard chef executive officer.  What's an

20   innovation officer?

21   A.   I mean, he was good with the big ideas, and I think he

22   came up with the title himself.

23   Q.   He was a pretty lousy businessman, but he had great ideas;

24   fair to say?

25   A.   As I learned, yes, sir.

1    Q.   Memorandum of Understanding Proposed Management in April

2    of 2016 is addressed to Dr. Stafford Sheehan.  This would be

3    Staff Sheehan, the guy that you checked out on the internet,

4    right?

5    A.   Yes.

6    Q.   He's Dr. Cabeceiras's nephew, correct?

7    A.   I found that out when I met Staff.

8    Q.   It indicates that "the letter shall detail the agreement

9    between SnoOwl, Dr. Sheehan, Jasiel Correia, regarding

10   Dr. Sheehan's proposed employment as SnoOwl's new CEO.  Mayor

11   Correia's resignation as SnoOwl's CEO and proposed employment

12   as new chief innovation officer and the restructuring of

13   founders' stock."  I read that correctly, right?

14   A.   Yes, sir.

15   Q.   What is founders' stock?  Is that initial stock that's

16   issued by a corporation?

17   A.   Yeah.  When you're creating one of these companies -- I

18   can explain if you want -- Delaware, it was explained to us,

19   they were going to have a pool of money --

20   Q.   Who explained it to you?

21   A.   Gunderson Dettmer, myself.

22   Q.   Okay.

23   A.   They were going to -- basically like pools of shares.  And

24   you have a pool for the founders.  Then you have a pool for the

25   employees.  And then obviously you have a lot of room for

1  potential investors.

2  Q.  And just because the stenographer is trying to take a

3  record that's accurate, could you just spell Gunderson, the law

4  firm?

5  A.  G-u-n-d-e-r-s-o-n, and then second name is D-e-t-t-m-e-r.

6  It's a longer name, but that's like what they're known by.  One

7  of those big firms with lots of names.

8  Q.  Sure.

9       MR. REDDINGTON:  In reference to the next paragraph

10  Alyssa, please.  Thank you.

11  Q.  "The details of this letter will be incorporated into an

12  action by consent of shareholders on a certain date and it is

13  agreed that SnoOwl will appoint Dr. Sheehan and he will then be

14  granted 1,700,000 shares of stock with a six-month cliff date

15  for one million of those shares and the remaining 700,000

16  subject to a vesting schedule."  I read that correct, right?

17  A.  Yes, sir.

18  Q.  And again, Jasiel shall resign as CEO and will forego

19  1,700,000 shares of stock of the original 4 million shares that

20  were granted to him back in December of '14, correct?

21  A.  Yes, sir.

22  Q.  And that SnoOwl will then appoint him as CIO, innovation

23  officer, and shall vest whatever shares he has remaining in

24  accordance with that schedule.  Correct?

25  A.  Yes, sir.

1    Q.   And that agreement -- thank you.

2         That agreement, sir, was extended, I believe -- it was

3    extended, you're aware of that, right?

4    A.   Yeah, there's another document very similar.  It's

5    shorter.  And it basically says we extend, I think, for another

6    month or so.

7    Q.   Okay.  I think it's Exhibit 55.

8              MR. REDDINGTON:  Your Honor, I don't know if Exhibit

9    55 has been introduced.

10             THE COURT:  Not yet, but if you're offering it, it's

11   received.

12             MR. REDDINGTON:  Thank you.

13             (Exhibit 55 admitted into evidence.)

14   Q.   This would be the extension document dated May 6, 2016,

15   correct?

16   A.   Yes, sir.

17   Q.   All right.  Thank you.

18        Now, did you know Jasiel before you started getting

19   involved with SnoOwl?

20   A.   I met him in the summer of 2013, sir.

21   Q.   And where did you meet him?

22   A.   Campaign fundraiser for myself for city council of Fall

23   River.

24   Q.   And he donated some money to your account or something?

25   A.   No.  I believe he -- the standard practice was to allow

1    other candidates to come to the event for free.

2    Q.   Okay.  And he was running for city council as well?

3    A.   Yes, he was.  Sorry.

4    Q.   And is it fair to say you became friends?

5    A.   Yes, sir.

6    Q.   And how often would you socialize prior to getting

7    involved with SnoOwl?

8    A.   Our main meeting points were at breakfasts.  We did a lot

9    of breakfasts.  We both liked to have breakfast at a certain

10   diner down the street from our houses.

11        MR. REDDINGTON:  Your Honor, I don't know if you want

12   me to keep going.

13        THE COURT:  12:45 is how I'd like to do this.

14        MR. REDDINGTON:  12:45, Okay.

15   Q.   When did you actually get involved with SnoOwl?

16   A.   A lot of it were just discussions over the summer of 2014.

17   And then things got more serious, I believe, in August or the

18   fall because then I --

19   Q.   Of '14?

20   A.   Of '14.

21   Q.   Okay.  And just, there's a lot of names here to try to

22   keep everybody straight.  You're Nick Bernier, correct?

23   A.   Yes, sir.

24   Q.   You're an attorney?

25   A.   Yes, sir.

1   Q.   And who is Chris Carreiro?  He's an attorney as well?

2   A.   Yes, sir.

3   Q.   Now, Chris Carreiro, I believe you indicated is one of

4   your friends?

5   A.   Yes, sir.

6   Q.   And that you hooked him up, if you will, with Jasiel

7   Correia?

8   A.   Yes, sir.

9   Q.   And the purpose of that would be what, to represent him

10  personally?

11  A.   Yes, I believe.

12  Q.   Did you have any business relationships professionally

13  with Mr. Carreiro?

14  A.   Yeah, at that point in time I was working out of his

15  office.

16  Q.   You were working in his office?

17  A.   Yeah.

18  Q.   And would that be the law firm of Carreiro, and that's

19  C-a-r-r-e-i-r-o & Phillis, P-h-i-l-l-i-s?

20  A.   Yes, sir.

21  Q.   So Carreiro -- who is Phillis?

22  A.   Keith Phillis, another attorney.

23  Q.   All right.  Did you ever refer him as well to Jasiel to

24  talk to him or do anything for him?

25  A.   I believe it was both of them, but mainly Chris because

1    Chris was more of the kind of wheeler-dealer person.

2    Q.   Wheeler-dealer.  Okay.  So he would be a better match for

3    Jasiel?

4    A.   Yeah, basically.

5    Q.   So when you introduced him to Chris Carreiro as an

6    attorney, you introduced him to Mr. Phillis as an attorney, and

7    you yourself were kind of involved at the same time with

8    SnoOwl, right?

9    A.   Well, no.  I introduced him in 2016 after he had been

10   elected mayor.

11   Q.   After he was mayor.  That's when you introduced him to

12   Chris Carreiro?

13   A.   I believe so.  I believe that was when I introduced him in

14   that capacity.  I may have tried to get Chris to donate to

15   Jasiel's campaign when he was running.

16   Q.   How many times, sir, in the past, let's say, well, since

17   2017, I guess, have you been either interviewed by, talked to

18   or met with the Federal Bureau of Investigation, Housing and

19   Urban Development, Office of the Inspector General; how many

20   times have you talked with these people?

21   A.   I believe there were two times in 2017 where I met.  Then

22   I had -- there was a grand jury, I believe, later that year.

23   And then since then it's been very sporadic.  We had a couple

24   meetings prior to today.

25   Q.   And you had meetings to prepare for your testimony,

1   correct?

2   A.   Yes, sir.

3   Q.   And you reviewed a number of documents, that you had made

4   statements earlier, correct?

5   A.   Yes, sir.

6   Q.   And where did you review those documents?

7   A.   In this building, Your Honor.  I mean, sir.

8            MR. REDDINGTON:  I'm not Your Honor.

9            THE COURT:  The job is filled.

10           MR. REDDINGTON:  And I certainly would never run

11  against you, Judge.

12  Q.   So where did you review the documents?  I know you were in

13  the building, but where?

14  A.   The ninth floor.

15  Q.   Come on.

16  A.   In the, I believe it's the U.S. Attorney's Office.

17  Q.   Okay.  When was that?

18  A.   Last night, this morning.

19  Q.   And there's nothing wrong with that.  That's normal trial

20  prep, right?  You know that as an attorney, I would imagine,

21  right?

22  A.   Yes, sir.  I'm a tax attorney, though.  So it's different.

23  Q.   Okay.  So do you recall that -- you also practice in Rhode

24  Island as well as Massachusetts?

25  A.   Yes, sir.

1    Q.   And back in 2017, you left Carreiro & Phillis and you were

2    working now for a firm called DarrowEverett; is that correct?

3    A.   Yes, sir.

4    Q.   So DarrowEverett is a law firm that you were working for

5    that's down in Providence, Rhode Island, right?

6    A.   Yes, sir.

7    Q.   And that's where you met Detective Benton from the Federal

8    Bureau of Investigation, along with other representatives, if

9    you will, of the Inspector General's Office, et cetera,

10   correct?

11   A.   Yeah.  I think it was -- it was Benton and someone from

12   HUD.

13   Q.   And that interview would be the first one you had with

14   them, and that was in that law firm's office that you were then

15   working for, correct?

16   A.   Yes.  They had previously knocked on my door, but I wasn't

17   home.  I was actually at a town meeting for a planning board.

18   Q.   It doesn't matter.  You did meet with them in the law

19   firm, correct?

20   A.   Yes, sir.

21   Q.   Now, you also, apparently, in 2015 had a job working for

22   McLaughlinQuinn LLC, right?

23   A.   Yeah.  Yes, sir.

24   Q.   Okay.  So you had the one, two, three jobs.  But when you

25   were interviewed, you were working for the firm down in Rhode

1  Island doing tax work, correct?

2  A.  Yes, sir.

3  Q.  When you left McLaughlinQuinn, you then worked for solar

4  developers apparently, correct?

5  A.  Huh?  I'm sorry.

6  Q.  Well, you would be Bernier, correct?

7  A.  Yes, sir.

8  Q.  And when Bernier left McLaughlinQuinn LLC, he had booked

9  business solar developers.  Did you ever work for solar --

10  A.  It's a book of business, Your Honor -- I mean, sir.

11        THE COURT:  I'm sorry, Mr. --

12        MR. HAFER:  I have no objection.  Can I just ask for a

13  page, a Bates page.

14        MR. REDDINGTON:  I'm sorry.  Page 1 of 13.

15        MR. HAFER:  Say again.

16        MR. REDDINGTON:  Page 1 of 13 on the March 3, 2017

17  interview.

18        MR. HAFER:  Thank you.

19        MR. REDDINGTON:  No problem.

20  Q.  So did you work with the solar industry?

21  A.  Yes, sir.  I'd won a big tax case that benefited the solar

22  industry in 2015.

23  Q.  So when you left McLaughlinQuinn, you then were involved

24  with the solar developers, and it was at that point that you

25  then worked with Carreiro & Phillis to work with them at their

1  firm after the solar industry, correct?

2  A.   Yes, sir.  The clients followed me.

3  Q.   You worked there for about five or six months, and then

4  you left because there were not enough clients for you, right?

5  A.   I don't remember saying that.  But the reason why I left,

6  actually there was a conflict.  The case I had won was --

7  Q.   I'm just asking you a question, sir, about what you

8  indicated to the FBI.  "Bernier worked there for five to six

9  months and left because there were not enough clients for him."

10  A.   No, I don't believe that to be -- I believe that to be a

11  typo or a misstatement.

12  Q.   A typo, okay.  Did you review this document, sir, last

13  night and the night before?

14  A.   I believe I saw that last night, yes.  I indicated that

15  there were some typos.

16  Q.   Now, another character, if you will, will be a fellow by

17  the name of Chris Parayno, correct?  You know Chris, correct?

18  A.   Yes, I do.

19  Q.   That's P-a-r-a-y-n-o, right?

20  A.   Yes, sir.

21  Q.   How do you know Chris Parayno?

22  A.   Through Jasiel.

23  Q.   And he, indeed, at the time Jasiel was mayor, he was his

24  chief of staff; is that correct?

25  A.   Yes, sir.

 1   Q.   And did you ultimately receive a position, now working in

 2   a different job, for the Fall River Housing Authority, correct?

 3   A.   Yes, sir.  Well, I applied for it, and I won it on an

 4   interview.

 5   Q.   But you were pretty upset at Jasiel because you thought

 6   you would get the job of city solicitor, the head lawyer for

 7   the city, right?

 8   A.   In the city it's called corporation counsel, yes, sir.  I

 9   was upset, because I was told it, and then I resigned from

10   McLaughlinQuinn with that knowledge.

11   Q.   So before you got that job, you resigned from that firm

12   you were working for, expecting that you were going to get a

13   job as corporation counsel?

14   A.   It was not my brightest moment, sir.

15   Q.   I'm sorry?

16   A.   Yes, sir.  It was not my brightest moment.

17   Q.   And you actually introduced Gen Andrade to Jasiel,

18   correct?

19   A.   I did, sir.

20   Q.   And you knew ultimately that Gen Andrade became very

21   active in his campaign, as far as being his campaign manager,

22   things of that nature, correct?

23   A.   Yes, sir.

24   Q.   She also received, I believe, what was called a snow

25   stipend.  You know about that.  $10,000, she was in charge of

1    snow removal?

2    A.    Just what I read in the papers, sir.  I don't know

3    personally.

4    Q.    So in 2013 timeline, that is when you first met Jasiel,

5    and that's where he attended your campaign kickoff party,

6    correct?

7    A.    Yes, sir.

8    Q.    Politically enough, Sam Sutter actually introduced Jasiel

9    to you, right?

10   A.    Yes, sir.

11   Q.    And Sam Sutter was the former D.A., right?

12   A.    Yes, sir.

13   Q.    You used to work for Sam Sutter, right?

14   A.    I did, sir.

15   Q.    And then after Sam introduced you to Jasiel -- this is

16   when Jasiel was running for city council and then became city

17   council -- he ultimately ended up running against the very same

18   Sam Sutter, correct?

19   A.    Yes, sir.

20   Q.    And then he ultimately won, obviously, and became mayor,

21   right?

22   A.    Yes, sir.

23   Q.    So during the campaign, you guys would get together.

24   You'd march in the same processions and things of that nature,

25   and you got quite friendly, right?

1    A.    Yes, sir.

2    Q.    And before the election, you basically dropped out.  You

3    decided not to run for councilman at that point, right?

4    A.    Yes, sir.

5    Q.    The night of the city council election Jasiel finished in

6    10th place, and Cathy Ann Viveiros -- who's Cathy Ann Viveiros,

7    V-i-v-e-i-r-o-s?

8    A.    She was a former city councillor, and she had run for

9    mayor a few times and lost, and I believe she topped the ballot

10   that year.

11   Q.    She what?

12   A.    I'm sorry, finished first out of the ten -- out of the

13   nine.

14   Q.    And she ultimately took a position in the City of Fall

15   River under Will Flanagan, who was then the mayor, correct?

16   A.    Yes, sir.

17   Q.    And Will Flanagan basically provides Cathy Ann Viveiros a

18   job working in the city administrator's office, the city

19   administrator position.  And that left an opening in the city

20   council.  Jasiel Correia then moved up.  He was now on the city

21   council.  Right?

22   A.    Yes, sir.

23   Q.    And this, again, would be sometime in 2013, right?

24   A.    Yes, sir.

25   Q.    All right.

1    A.    I think he took office in 2014.

2    Q.    2014.  And you mentioned about having breakfast together

3    at the luncheonette at Highland Street.  That would be in 2014,

4    correct?

5    A.    Yes, sir.

6    Q.    And he would ask you for advice about his company, SnoOwl,

7    right?

8    A.    Yes, sir.

9    Q.    He talked about SnoOwl all the time, didn't he?

10   A.    And other ventures I think we talked about.

11   Q.    He talked about SnoOwl all the time, didn't he?

12   A.    I'd say partially true.  I would say -- no, I would say a

13   lot of the time, but -- a good chunk of the time.

14   Q.    You knew that this was a very innovative plan or concept,

15   right?

16   A.    I thought it was a great idea.  That's why I was involved.

17   Q.    Yeah.  You knew that he was pretty much, you know, running

18   the show, as it were, himself at that point, right?

19   A.    Yes, sir.

20   Q.    And he was asking you questions, for legal advice, and you

21   knew it was a startup company and he wanted legal advice,

22   right?

23   A.    Well, at that point in time, once he started asking me

24   legal advice, I said, "Well, I can't really do that."  And I

25   think I asked him.  He said he could pay me, he had money to

1    pay me, and I said, "I just don't know enough about that area

2    of law."  And that's when I basically started trying to pivot

3    to maybe just become a cofounder with him or an adviser,

4    eventually became a junior cofounder.

5    Q.   So you began to pivot, meaning you wanted a position in

6    SnoOwl?

7    A.   I thought -- yeah, I was -- you know, I learned -- it's

8    tough to be a business partner and a lawyer, and you kind of

9    have to pick one role, and I tried to pick that one role.

10   Q.   And at this stage in your life you were not working for

11   any of the law firms, you were a solo practitioner on your own,

12   right?

13   A.   Yes, sir.

14   Q.   And it was at that time that you transitioned in, if you

15   will, because you wanted a bigger role in the company.

16   Initially you were listed as secretary, right?

17   A.   Well, that was all done at once, sir.  So for the Delaware

18   corporation, you have a secretary, like a corporate formality,

19   and then you have different roles when you're -- like d/b/a

20   roles.

21   Q.   All right.  So do you recall indicating to the --

22         MR. REDDINGTON:  This is on the same page, Zach.  I'm

23   sorry, page 2.

24   Q.   Do you recall indicating to the FBI agent that you became

25   a part of SnoOwl in November or December of '14 but not as an

```
 1   attorney.  You were initially listed as the secretary, but you
 2   wanted a bigger role.  Do you remember telling them that?
 3   A.   I don't think so.  I'm pretty sure I said it was all at
 4   once.
 5   Q.   Typo?
 6   A.   It was all at once.  I was secretary, chief operating
 7   officer and junior founder all at once.
 8   Q.   What I'm asking, sir, is if it refreshes your memory that
 9   when you were talking with the gentleman from the FBI that you
10   indicated that you wanted a bigger role in the company.  So
11   Correia made you a cofounder is what you told the FBI.
12   A.   I believe so.  I think it all happened at once.  I was --
13            THE COURT:  Let me just set the ground rules for this.
14   You were shown this document before?
15            THE WITNESS:  Yes, sir.  Yes, Your Honor.
16            THE COURT:  And now Mr. Reddington is asking you
17   whether or not you said that, in substance, to the FBI agents,
18   not -- maybe somebody else will ask you about further
19   explanation or not, I don't know.  But Mr. Reddington is
20   entitled to an answer whether or not you said that, in
21   substance, to the FBI agents.
22   A.   I did not say it that way, I did not.
23   Q.   Well, were you made ultimately a cofounder of SnoOwl?
24   A.   Yes, sir.
25   Q.   Were you also appointed, as it were, to the position of
```

1    chief financial officer?

2    A.   No, sir.

3    Q.   Did you indicate, sir, to the FBI agent that you also

4    became chief financial officer?

5    A.   No, sir.

6    Q.   You did negotiate compensation for your work, that it

7    would be 15 percent of the company, correct?

8    A.   No, sir.  But I could correct the misstatement if I'm

9    allowed.

10   Q.   Sure.

11   A.   15 percent of the founders' stock.

12   Q.   15 percent of the founders' stock.  And that you then went

13   to work, if you will, for SnoOwl.  You worked a lot of times

14   remotely from your house, right?

15   A.   Yes, sir.

16   Q.   But you also pretty much had dedicated Tuesdays and

17   Thursdays to do SnoOwl on-site work, right?

18   A.   Yes, sir.  Once we had the developers in-house, once we

19   had them as contractors.

20   Q.   And where was the SnoOwl office located?

21   A.   In an old mill building in 104 Anawan Street, sir.

22   Q.   And the old mill building, you know SnoOwl negotiated

23   ultimately space there, and Jasiel and his mother and his

24   family basically rehabbed that whole place as far as their

25   area?

1   A.   I don't know that, sir.

2   Q.   So when you went in there, you were working.  Would you

3   agree, sir, by the way, that there were desks, that there were

4   chairs, phones, things of that nature in that office space?

5   A.   Yes, there was.  It was very well done.

6   Q.   Then at the time, sir, one of the questions you were asked

7   is whether there were any assets owned by SnoOwl, and you said

8   no, there was nothing other than the intelligence, if you will,

9   or the intellectual property.  They still had all of that

10  office equipment and things of that nature, right?

11  A.   I do not believe that, sir.  I believe that was owned by a

12  different entity.

13  Q.   So when you started working for SnoOwl --

14          THE COURT:  Is this -- Mr. Reddington, I don't want to

15  interrupt, but is this a break point now?

16          MR. REDDINGTON:  Perfect.

17          THE COURT:  Okay.  So ladies and gentlemen, we'll take

18  our lunch break, or more accurately you'll take your lunch

19  break, and we'll be back here probably a little bit before 1:30

20  to continue with the examination of Mr. Bernier.

21          Bear in mind my instructions not to talk about the

22  case outside of the courtroom at all.  Everything you need is

23  going to be -- the nourishment you need for this case is going

24  to take place in the courtroom.  Now you get different kinds of

25  nourishment.

1              (Jury exits the courtroom.)

2              THE COURT:  One issue.  I assume that we'll go right

3    into Ms. Cleveland after -- I'm sorry, we have Mr. Sheehan, but

4    that we will get to Ms. Cleveland today.  In any event, we

5    better be ready to.

6              MR. HAFER:  She'll be here and ready obviously.

7              THE COURT:  Or here by --

8              MR. HAFER:  By Zoom.

9              THE COURT:  Okay.  So that's what I think is the

10   likely timing, but I don't want anybody excused.

11             MR. HAFER:  We have way beyond --

12             THE COURT:  All right.  We'll be back a little bit

13   before 1:30.

14             (Recess, 12:46 p.m.)

15             (Resumed at 1:34 p.m.)

16             THE CLERK:  All rise.

17             THE COURT:  Ready for the jury?

18             MR. REDDINGTON:  We are, Your Honor, just one thing.

19             I did speak with counsel.  I've got a few e-mails, not

20   a lot, and maybe two texts that I would like to introduce.

21             THE COURT:  Okay.

22             MR. REDDINGTON:  We have an agreement on them, so my

23   question is, would I be permitted to, for example, have the

24   ELMO on and then say, Sir, do you recognize this document?  Put

25   it down.

1          The government's already reviewed it.

2          THE COURT:  That seems fine.

3          MR. REDDINGTON:  Thank you.

4          (Discussion off the record.)

5          THE COURT:  What numbers are we going to start using

6     for that?

7          MR. REDDINGTON:  300 I believe, is that what you said?

8          MR. HAFER:  We have premarked Mr. Reddington's around

9     300, but we want to just make sure -- Alyssa has a system.

10          MS. DiPAOLA:  Do you want to replace the ones we

11     already have starting at 300?  You want to start at 300.

12          MR. REDDINGTON:  That's fine.

13          THE COURT:  I'm sorry, what's fine?

14          MR. HAFER:  That would be 300 and 301.

15          MR. REDDINGTON:  Yes.

16          THE COURT:  You've got them premarked at 300?

17          Look it --

18          MR. HAFER:  It might be easiest -- Mr. DiPaolo, can

19     you explain?

20          THE COURT:  What's easiest for you because you're the

21     custodian of all this stuff.

22          Why don't we start at 336, which is the last number,

23     so when you identify it, use 336.

24          MR. REDDINGTON:  That's fine.

25          MR. HAFER:  Your Honor, I want to put this on the

 1   record that Mr. DiPaolo has so far been right on this all

 2   stuff.

 3            THE COURT:  Absolutely.  Maybe I'll leave and she can

 4   take over the courtroom.

 5            (Laughter.)

 6            THE COURT:  But maybe I won't.  Anyway, continue to

 7   praise her and recognize the wisdom of those other people who

 8   praise her.

 9            THE CLERK:  All rise.

10            (Jury entered the courtroom.)

11            THE CLERK:  Please be seated.

12            THE COURT:  Again, ladies and gentlemen, in the

13   absence of a hand raised, I will assume you've had no

14   conversations or were exposed to nothing having to do with this

15   case outside of this courtroom during the lunch break.

16            Seeing no hands, we'll move on to continued the

17   examination of Mr. Bernier.

18            MR. REDDINGTON:  Thank you, Your Honor.

19            Mr. DiPaolo, could you please call up Exhibit 26.2?

20   Thank you.

21   BY MR. REDDINGTON:

22   Q.   Mr. Bernier, this is the business plan that you put

23   together, correct?

24   A.   No, sir.

25   Q.   Okay.  Who put that together?

1  A.   It was given to me by Jasiel Correia and/or Christopher

2  Parayno.

3  Q.   Okay.  What business plan did you put together, 2015?

4  A.   I would say I took this one and worked with several people

5  to create 2015 -- sorry, April 2015.

6  Q.   So you don't know who actually put together the 2014

7  business plan; it was given to you, you don't know by who?

8  A.   I believe it was Jasiel Correia or Christopher Parayno.

9  Q.   Jasiel or Chris Parayno?

10 A.   Yes, sir.

11        MR. REDDINGTON:  If you could pull up on the business

12 plan page -- under "Executive Summary Leadership."

13 Q.   Now, that's where information is provided to people that

14 are interested as to the background of the individuals, for

15 example, you provided the information pertinent to you, general

16 counsel of SnoOwl, right?

17 A.   I did not provide information.  My name is spelled

18 incorrectly.

19 Q.   Okay.  So do you recall reviewing this, sir, and noting

20 that you were general counsel to SnoOwl?

21 A.   No, I was never general counsel to SnoOwl, that's why I

22 also know it's incorrect.

23 Q.   So you knew that Jasiel, when he was flying solo, as it

24 were, prepared a business plan for SnoOwl in August of 2013.

25        You knew that, right?

1    A.    I did not know that, sir.

2          MR. REDDINGTON:  Can you pull up Exhibit 8, please.

3          Thank you.

4    Q.    Have you ever seen this, sir?

5    A.    No, sir.

6          MR. REDDINGTON:  Can you pull up page 6, please.

7          Can we blow up 2.2 "Company History."

8    Q.    Sir, this is a reference to SnoOwl growing out of a

9    project called FindIt Network, correct?

10   A.    That's what it says, sir.

11   Q.    FindIt Networks were formed on the rise of social networks

12   creating applications on social platforms, correct?

13   A.    That's what it says, sir, yes.

14   Q.    Progress was successfully implemented in Providence,

15   Pittsburgh, Albany, and Fall River, correct?

16   A.    That's what it says, sir, yes.

17   Q.    The focus of the network, next paragraph down, is getting

18   business to advertise on social media, social networks then

19   shifted their focus to mobile applications.

20   A.    That's what it says.

21   Q.    The mobile networks were not able to transfer their

22   business model to a business platform, do you know what that

23   means?  Would that be like going online or an app?

24   A.    It sounds like they had a web browser thing and they were

25   not able to put it onto an iPhone or Android.

1   Q.   And it did not provide -- this is the 2013 business

2   plan -- did not provide business owners with the opportunity to

3   communicate in real time.  These limitations proved to be a

4   fatal flaw identified in the business and ownership decided to

5   remove the service and reevaluate it completely to find a more

6   sustainable and effective social platform.

7   A.   Yes, that's what it says, sir.

8   Q.   Now, that language is not in the 2014 business plan, is

9   it, sir?

10  A.   No, sir.

11  Q.   That language is not in the 2015 business plan, is it,

12  sir?

13  A.   No, sir.

14  Q.   Now, one of the first things that you did when you started

15  working for SnoOwl is that you reviewed the records that Jasiel

16  had presented to you for the business, correct?

17  A.   I reviewed what he gave me.

18  Q.   So the answer is yes?

19  A.   Yes, sir.

20  Q.   Okay.  And they were a mess?

21  A.   Yes, sir.

22  Q.   You indicated, I believe, in your interview to the FBI the

23  records were horrible and almost non-existent?

24  A.   Yes, sir.

25  Q.   He did not keep good records.  We can agree on that,

1   right?

2   A.   Yes, sir.

3   Q.   At which point you then determined that changes had to be

4   made as to how the records were kept and what information was

5   recorded for purposes of taxes and income and things of that

6   nature, right?

7   A.   I wouldn't say all of that, so, no, sir.

8   Q.   Jasiel indicated that he was busy talking with investors,

9   trying to manage the software developers on his own, and that's

10  why he was happy you were coming onboard, correct?

11  A.   Correct, sir.

12  Q.   You were the person that hired the law firm of Gunderson

13  Dettmer, right?

14  A.   I believe Jasiel -- no, he signed the engagement letter.

15  Q.   I don't care who signed the engagement letter, I want to

16  know who introduced him to Gunderson Dettmer, the law firm?

17  A.   I did.

18  Q.   Thank you.

19        In fact, law firm of Gunderson Dettmer started out and

20  they ended up preparing SnoOwl filings for the states of

21  Massachusetts.

22  A.   I believe so.

23  Q.   That's pretty much corporation 101, you know you have to

24  file with the Secretary of State, every year you have to file

25  updates?

1    A.    Yes, sir.

2    Q.    He didn't file anything, did he, when he was running it?

3    A.    I don't believe so, no.

4    Q.    In fact, he didn't even have a corporation, did he?

5    A.    He did not, sir.

6    Q.    He thought he did because he had an EIN.  Do you remember

7    him saying that to you, he was all proud he had a corporation

8    because he had an EIN?

9    A.    I don't remember that specifically, sir.

10   Q.    You know what an EIN is, right?

11   A.    Yes, sir.

12   Q.    That's an Employee Identification Number, isn't it?

13   A.    It's also called a tax ID.

14   Q.    Tax ID.  He had a tax ID at least for SnoOwl, right?

15   A.    I don't believe -- I did see it at some point, sir.

16   Q.    So the answer is yes.

17   A.    Yes.

18   Q.    So after you -- and why is it that you turned him onto

19   Gunderson Dettmer?  Do you have a particular specialty that

20   they were involved with?

21   A.    Startup law.

22   Q.    Startup law?

23   A.    They were known for taking startup companies and deferring

24   their legal fees until a larger capital event.

25   Q.    So they specialize, basically, in representing startup

1  companies like SnoOwl?

2  A.   Yes, sir.

3  Q.   So SnoOwl basically was not incorporated, there had been

4  no filings, the records were a mess, and you then tried to pull

5  together something that made sense from a business standpoint

6  that you were able to provide to Gunderson Dettmer, right?

7  A.   Yes, sir.

8  Q.   And you gave all those documents to the attorney at

9  Gunderson Dettmer, correct?

10  A.   Yes, sir.

11  Q.   And Gunderson Dettmer at this point -- and this would be,

12  what, 2015?

13  A.   December of 2014, yeah.

14  Q.   All right.  And Gunderson Dettmer -- and who was the

15  lawyer that you were dealing with them?

16  A.   Attorney Steve Wheeler.

17  Q.   Steve Wheeler.  And Attorney Wheeler at some point

18  indicated that he believed it was important to basically

19  eradicate the mess that he had created earlier and start off

20  with these convertible debt notes, correct?

21  A.   Yes, sir.

22  Q.   And you know that the form, the Investor Agreement, so to

23  speak that he had used initially way back in '14 and '13, he

24  basically got it off the internet, you know that, right?

25  A.   It seemed like it, sir.

1    Q.    Right.  It was a lousy document, right?

2    A.    It seemed like it, sir.

3    Q.    And Gunderson Dettmer put together a very, very, very

4    comprehensive document numbering, what, 15, 16 pages?

5    A.    It's a two-part document.  It was like a note which was

6    two pages and then the accompanying note, kind of like a

7    mortgage, the mortgage is longer.

8    Q.    And it's very confusing, isn't it, even for an attorney?

9    It's very technical and complex.

10   A.    It had to be explained to us.

11   Q.    It had to be explained to even you with your expertise in

12   taxes and stuff?

13   A.    Yes, sir.

14   Q.    He had no clue --

15   A.    I can't speak to his knowledge.

16   Q.    Pardon me?

17   A.    I can't speak to his knowledge.

18   Q.    Well, you're assisting him at that time, true?

19   A.    Yes, sir.

20   Q.    Did you sit down and show him this is a convertible debt

21   note and this is what these people have to sign now?

22   A.    Together with the attorneys, yes.

23   Q.    With the attorney, okay.  Did he appear to grasp it?  Did

24   he understand what this language meant in the convertible debt

25   note and the promissory note?

1   A.    Yeah, because he was making some of the decisions.

2   Q.    What?

3   A.    Like whether there was going to be a $1 million cap versus

4   a $5 million cap on certain people, certain rounds.  Basically

5   what he had previously signed with them had to not exact match

6   but more or less match what they were getting in the new

7   company.

8   Q.    So that's pretty standard stuff, though, I'm talking about

9   the language in the convertible debt note that Gunderson

10  Dettmer put together.  Did he ask you any questions about that?

11  A.    We went through it together but, you know --

12  Q.    So after Gunderson Dettmer provided the convertible debt

13  notes, you guys then made sure that the investors reviewed them

14  and signed them; is that right?

15  A.    Yes, sir, give them the opportunity to go through it and

16  have their attorneys check it out.

17  Q.    When you became the chief financial officer of SnoOwl, you

18  started documenting how investors' funds were going to be

19  utilized, correct?

20  A.    No, sir.  I was never the chief financial officer, I think

21  that's a typo as well.

22  Q.    You think that's a typo from the FBI?

23  A.    I think they put CFO instead of COO.

24  Q.    So your position, let's see if we can agree, would be

25  what?

1    A.    Chief operating officer.

2    Q.    COO?

3    A.    Yes, sir.

4    Q.    Not chief financial officer as is written in the FBI

5    statement.

6    A.    Yes, sir.

7    Q.    And you would agree that you did have to document how the

8    investor funds were being utilized, right?

9    A.    I was trying to going forward, we were trying to clean up

10   what had previously been done.

11   Q.    So, at this point, sir, you knew that you were concerned

12   that SnoOwl would not be taken advantage of by people, I

13   believe some of the people you initially thought, maybe even

14   Statewide Software.  In fact, Jasiel indicated that he thought

15   Statewide Software was doing a really good job putting

16   everything together?

17   A.    Yes, sir.

18   Q.    And ultimately, you agreed to that as well, right?

19   A.    Yes, sir, they were great.

20   Q.    Did an excellent job.

21         Now, Chris Parayno, he was the marketing person, would you

22   agree with that?

23   A.    Yes, sir.

24   Q.    He was the one that came up with the ideas on how to

25   market the app, right?

1   A.   Yes, sir.

2   Q.   And much like yourself, he was going to get paid for his

3   work by receiving equity in the business, SnoOwl?

4   A.   Yes, sir, that was the plan.

5   Q.   Now, did Mr. Parayno also work for the City of Fall River?

6   A.   I believe so.  I believe he worked for the housing thing

7   under Mike Dion, whatever that --

8   Q.   Mike Dion?

9   A.   Yes, under him.

10  Q.   He was the director of the City of Fall River CDA,

11  correct?

12  A.   Yes, sir.

13  Q.   And what's the CDA?

14  A.   Community Development Agency.

15  Q.   So once Jasiel was elected to the mayor, Mr. Parayno

16  stopped that particular job and then became his chief of staff

17  for a period of time, correct?

18  A.   Yes, sir.

19  Q.   Now, in late fall of 2014, when you were starting to speak

20  to Jasiel about SnoOwl, he basically presented information to

21  you as best he could as to how much money had been raised, what

22  expenses there were and things of that nature, right?

23  A.   Yes, we had multiple conversations about it because I was

24  trying to drill down and it was vague at first and I tried to

25  get more pinpoint.

1    Q.    So, at this point, sir, in late 2014, you had a chance to

2    review, for example, you knew that there was a debit card that

3    he had access to for SnoOwl, correct?

4    A.    No, I actually didn't know about the debit card.  I knew

5    that there was an account that he had raised money --

6    Q.    Well you knew that -- you knew that he had made a number

7    of purchase -- I think your terminology was that he was

8    "commingling funds," personal funds, investor funds, right?

9    A.    Yes, sir.

10   Q.    And you knew that a lot of these things, whether they

11   would be dinners, strip clubs, whatever the case may be, you

12   knew that they were paid for by the SnoOwl debit card, right?

13   A.    Well, I didn't know that.  And that wasn't SnoOwl the way

14   I viewed it.  That was SnoOwl pre-Delaware incorporation.

15   Q.    Okay.  So now the Delaware corporation is the first time

16   SnoOwl is actually incorporated, true?

17   A.    Yes, sir.

18   Q.    And who incorporated it in Delaware?

19   A.    Gunderson Dettmer, their agents thereof.

20   Q.    Did you ever talk to him, did he have any grasp why this

21   is a corporation now that's going to be incorporated in

22   Delaware?

23   A.    Yeah, we had a long conversation about what they had

24   wasn't -- it was -- depending on what it was, I think we called

25   it a partnership once or whatever it was, because he had

1    partners.  I was kind of confused with the origin of SnoOwl.

2    All I know is he had success previously, then he started SnoOwl

3    and, you know, it seemed like he had great ideas, he knew what

4    he was doing, but at the same time, he clearly had someone else

5    helping him prior to this that did the bookkeeping, at least

6    that's what I thought.

7    Q.   So you didn't know whether or not it was a sole

8    proprietorship or whether or not it was a partnership or

9    whether or not it was a trust agreement, you didn't know what

10   it was, right?

11   A.   I didn't and I was concerned for him and obviously for

12   myself --

13   Q.   I'm not asking if you were concerned.  I'm talking about

14   the business entities, sir.

15        Were you able to discern or know whether or not his

16   business, when he was involved in it, solo, was a partnership,

17   whether or not it was a trust, whether or not it was a solo

18   enterprise?

19   A.   I was not.

20   Q.   And that would be, sir, because after you reviewed the

21   records, you determined that he was sloppy, correct?

22   A.   Yes, sir.  It was -- yes, sir.

23   Q.   And as time progressed that you would ask him questions

24   about the various investments and investors, and then you

25   started to put together a budget, correct?

1    A.    Yes, sir.  I believe the time we would now be in 2015 we

2    started doing the budgeting, I think.

3    Q.    Okay.

4            MR. REDDINGTON:  I spilled coffee on my papers, they

5    got all wrinkly, I apologize for the delay, Your Honor.

6    Q.    So as you continue on with your interviews with the FBI,

7    do you recall indicating that in July of 2015, that Jasiel gave

8    you bank account statements and other documents for SnoOwl,

9    right?

10   A.    July or August he offered them to me.

11   Q.    Yeah, and this is where he offered it to you to review

12   because he was basically responding to your request and trying

13   to get you whatever documentation, sloppy or not, that he had,

14   right?

15   A.    Yes.

16   Q.    And he presented this to you, and this is when you decided

17   that you were not going to review the documents.

18   A.    Yes, sir.

19   Q.    So you're not suggesting that working as the COO in SnoOwl

20   where you've requested that he provide you with documentation

21   that he been providing you, sloppy or not, that you determined

22   that you were going to turn a blind eye, you were going to

23   cover your eyes, you weren't going to look at them?

24   A.    Yes, sir.  I explained that earlier, but yes, sir.

25   Q.    The answer is yes, right?

1          And that you told him to get an accountant and provide
2     the bank statements to the accountant, correct?
3     A.   Yes, sir.
4     Q.   And when you were SnoOwl's CFO, again, CFO, not COO, but
5     that's wrong, it's a typo, you were never chief financial
6     officer, you were the COO, right?
7     A.   Yes, sir.
8     Q.   You then opened a bank account at BayCoast Bank, right?
9     A.   Yes, with Jasiel's consent.  Over the phone, he was --
10    Q.   With his consent?
11    A.   He did it with me over the phone, actually.
12    Q.   He did it with you over the phone.  That would be the
13    BayCoast Bank account that we've all been talking about,
14    correct?
15    A.   Yes, sir.
16         MR. REDDINGTON:  Alyssa, would you call up Exhibit 66,
17    please, and go towards the very end where we have the signature
18    pages, it says "Corporate Authorization Resolution."
19         No, next one, I think it's the next page.
20    Q.   So while we're looking at that, you signed as well as
21    Jasiel, correct?
22    A.   Yes, sir, both of us.
23         MR. REDDINGTON:  And it's not numbered -- yes, it
24    would be 517 on the Bates stamp.
25    Q.   Now, on this here, it makes reference to -- that

1    certification of the corporation being organized under the laws

2    of Massachusetts and that was signed by you, correct?

3    A.   Yes, sir.

4    Q.   And that would be for the Bay -- Bay account, correct?

5    A.   Yes, sir.

6         MR. REDDINGTON:  Thank you, Alyssa.

7    Q.   And that was the time that Jasiel transferred funds to the

8    account, correct?

9    A.   Some funds.  I started the account with $100, sir.

10   Q.   So my question, sir, is that he transferred funds to the

11   account, though, right?

12   A.   Yes, sir.

13   Q.   Okay.

14   A.   Starting at that point.

15   Q.   You then determined what your burn rate was as you've

16   explained, which would be expenses on a monthly basis, right?

17   A.   Yes, sir.

18   Q.   Do you recall that you were involved in paying for a

19   marketing party for SnoOwl in May of 2015?

20   A.   Yes, we did, sir.

21   Q.   And when you say "yes, we did," who's "we"?

22   A.   The company.

23   Q.   But, in fact, when you talked to the FBI, you stated that

24   you paid for it yourself, but it was the company, wasn't it?

25   A.   Yeah, it was definitely the company, sir.

1   Q.   Also paid investor dinner after Jasiel won the mayoral

2   election, and this was at Jerry Remy's, right?

3   A.   Yes, sir, in November.

4   Q.   Now, you knew that in the course of working with and

5   trying to promote SnoOwl that he would travel, you knew that,

6   right?

7   A.   No, sir.

8   Q.   Well, you knew that he had a girlfriend at the time,

9   Natalie, right?

10   A.   Yes, sir.

11   Q.   You knew that she was involved in some fashion in

12   Washington, D.C., right?

13   A.   Yeah, I believe she was going to school there, sir, yes.

14   Q.   And you knew that she had met Jasiel initially when they

15   were both interns working for Senator John Kerry, I believe?

16   A.   Yes, sir.

17   Q.   And you knew that when he was going to school, that he

18   would on occasion go down to visit with her in Washington,

19   D.C., right?

20   A.   Yes, sir.

21   Q.   You knew that, in fact, he was quite excited about the

22   contact that he had made at the Intercontinental Hotel with

23   this fellow by the name of Abdulla.  He talked to you about

24   that, right?

25   A.   I don't know, sir.  I remember the Intercontinental and

1  telling me now great it was.

2  Q.   And do you remember him telling you that Abdulla was going

3  to agree that SnoOwl coupons, little folding cards would be

4  placed on all the dining room tables in the dining room at the

5  Intercon?

6  A.   No, sir.

7  Q.   He never told you about that?  This is the first time

8  you're hearing about this?

9  A.   Yes, sir.

10  Q.   And whose idea was it to utilize Rackspace as -- to manage

11  the server?

12  A.   I believe that was our developers, either Josh or Nick.

13  Nick Lizotte.  Josh Harding, sorry.

14  Q.   You asked -- you determined -- he was asked whether he

15  received a salary while working for SnoOwl.  He said he did not

16  receive a salary, correct?

17  A.   Yes, sir.

18  Q.   Did you ask him or was there any explanation as to the

19  expenditures that were made on the debit card, however?

20  A.   I didn't know what the expenditures on the debit card,

21  sir.

22  Q.   Did you know there was a debit card?

23  A.   Eventually I learned there was a debit card.

24  Q.   Did you go out to dinners with him, talk about SnoOwl,

25  whether it's a business dinner or entertainment?

1   A.    No, we did --

2   Q.    You went to a strip club with him, didn't you?

3   A.    One time, yes, sir.

4   Q.    And where was that, sir?

5   A.    In Providence somewhere.

6   Q.    Somewhere in Providence.  Did you have a good time?

7   A.    No -- yeah, it was okay.

8   Q.    And he paid for it with the SnoOwl debit card, didn't he?

9   A.    I didn't know how he paid for it.

10  Q.    Well, you didn't pay for it, he did, right?

11  A.    He paid for it, yes, sir.

12  Q.    Can you tell me who Spiros C. is?

13  A.    He was a potential investor that Jasiel had made contact

14  with somehow, we began talking to him in the summer of 2015 and

15  it was right over the Fourth of July weekend that things kind

16  of heated up and we were talking with him a lot and exchanging

17  e-mails.

18  Q.    Is this a gentleman that Jasiel came up with or did you

19  came up with?

20  A.    No, Jasiel's contacts.

21  Q.    And did he seem legit to you?

22  A.    I had my concerns and I voiced them I think in

23  correspondence.  Like I called him "the wolf," because I saw --

24  I looked him up and he seemed to have some different history.

25  You know, we spoke with him anyway because I figured we needed

1    an investment, so to see what he has to offer.

2    Q.   And how many times did you meet with him, if you recall,

3    approximately?

4    A.   I think I only met him in person once.  That summer was

5    all remote.  I believe we did a couple of calls.  I don't know,

6    it was a lot.  It was probably, over a short period of time,

7    maybe six to ten times.

8    Q.   And he did not pan out ultimately, correct?

9    A.   He did not pan out, no, sir.

10   Q.   Going into the summer of 2015, things were pretty much

11   moving along for SnoOwl, the developers were doing a good job,

12   correct?

13   A.   Sorry, what time, sir?

14   Q.   Summer of '15, June, July.

15   A.   Yeah, the issue then was we just didn't have money, we

16   didn't have money to pay the developers.

17   Q.   All right.  You knew, sir, that there was an issue

18   involving commingling of funds, his personal accounts, again,

19   with the SnoOwl accounts, right?

20   A.   Yes, sir.

21   Q.   And the use of the word "commingle" is your term, not his,

22   right?

23   A.   Yeah, he just said he mixed them together.

24   Q.   Okay.  And that sometimes on occasion he would use the

25   SnoOwl bank account or the d/b/a bank account for personal

1    expenses and that you indicated that he should have opened a

2    separate SnoOwl account and that's what led to the Bay State --

3    the BayCoast, correct?

4    A.    Yes, sir.

5    Q.    Now, you knew, because you've said it a number of times

6    this morning, that when Jasiel was at Providence College, he

7    worked on a startup company called FindIt Network, right?

8    A.    Yes, sir.

9    Q.    Did you know what FindIt Network was?

10   A.    No, sir.

11   Q.    Did you know what it consisted of?

12   A.    No, sir.

13   Q.    Did you know how it worked on Facebook?

14   A.    No, sir.

15   Q.    Did you ask any questions about it?

16   A.    I would ask and he would just say some of it is

17   proprietary because it got sold.

18   Q.    So he didn't get much money for it, though, did he?

19   A.    I don't know that, sir.

20   Q.    Well, you knew it when you were talking to the FBI because

21   you indicated, sir, that when Correia left the company, FindIt,

22   he received some money but Bernier does not think it was a lot

23   of money.

24   A.    So that -- I learned that in conversations with --

25   Q.    No, I'm asking what you said to the FBI.

```
 1    A.    Yes, sir.

 2    Q.    You told them that he made some money but not a lot,

 3    right?

 4    A.    Yes, sir.

 5    Q.    When was it that Staff Sheehan was brought onboard?

 6    A.    The winter of 2016, so after Jasiel had taken office.

 7    Q.    Now the 1 Zero 4 Business Academy, that business,

 8    incubator business, you were familiar with that as well,

 9    correct?

10    A.    Yes, sir.

11    Q.    Was that a corporation or was it sole proprietorship or

12    what?

13    A.    I believe it to be a nonprofit corporation.

14    Q.    And do you know who set that up?

15    A.    I do not know, sir.  But I knew Jasiel and Chris Parayno

16    were involved in it.

17    Q.    Was it ever filed with the Secretary of State?

18    A.    I do not know, sir.

19    Q.    So as the COO of SnoOwl, you would agree, sir, that SnoOwl

20    and 1 Zero 4 were pretty much joined at the hip, right?

21    A.    No, sir.

22    Q.    Well, 1 Zero 4 was a nonprofit, correct?

23    A.    Yes, sir.

24    Q.    And it had to be a nonprofit because it was in an area

25    where funding would be available for the city to bring
```

```
 1    entrepreneurs, if you will, into the city, so he had to --
 2    corporation had to be a nonprofit corporation, right?
 3    A.    That sounds correct, sir.
 4    Q.    All right.  And you know documents had to be filed and
 5    records had to be kept and you never looked at any of them?
 6    A.    No, sir.  I was involved in SnoOwl, not 1 Zero 4.
 7    Q.    You'd agree that 1 Zero 4 was the location of the SnoOwl's
 8    office, right?
 9    A.    Once we had an office, yes, sir.
10    Q.    So the answer is yes, right?
11    A.    Yes, sir.
12    Q.    Thank you.
13          And SnoOwl had to pay rent to Patricia Todd I believe is
14    the landlady or the person that owned the building?
15    A.    No, sir.
16    Q.    Did SnoOwl pay rent?
17    A.    SnoOwl paid rent to 1 Zero 4.
18    Q.    SnoOwl paid rent to 1 Zero 4.  Did you ever see the lease
19    for that property?
20    A.    No, sir.
21    Q.    Did you know that SnoOwl was on the lease as the lessee?
22    A.    I later learned that from the U.S. Attorney's Office.
23    Q.    All right.  Okay.  And by the way, as recently as Friday,
24    April 2nd, you were communicating with the U.S. Attorney's
25    Office and sent an e-mail saying, Enclosed find group text
```

1    messages I was able to export from iCloud.  I was able to do

2    them as whole PDFs for you.  Nick L. is one of the software

3    developers, Wassem is a former attorney we were communicating

4    with.  Wassem, he's the same person held on a $1 million bail

5    on this story.

6         Did you recently send that to the U.S. Attorney's Office?

7    A.   Yes.

8    Q.   And did you attach group text messages to them?

9    A.   I did, sir.

10   Q.   And who is Mr. Wassem?

11   A.   Wassem Amin is an attorney that we were going to hire.

12   Q.   Who knew Wassem?  Did he know Wassem?

13   A.   Yes, I was introduced to him through Jasiel Correia.

14   Q.   So did Mr. Wassem ultimately end up getting hired or

15   working for SnoOwl?

16   A.   No, his story didn't really pan out for us.  We met with

17   him a few times and had conversations and he just wasn't really

18   delivering on anything.

19   Q.   So, ultimately, he did not get involved, right?

20   A.   No, sir.

21   Q.   So who could you agree was the attorney for SnoOwl?

22   A.   Gunderson Dettmer or Steve Wheeler at Gunderson Dettmer

23   and his, you know, colleagues, and then we switched to Bill

24   Schnoor of Goodwin Procter.

25   Q.   All right.  So whose idea was it to switch from Gunderson

1    Dettmer to Goodwin and Procter?  That's a huge law firm in

2    Boston, right?

3    A.   Yes, sir.

4    Q.   Very well-known, very established, very respected, right?

5    A.   Yes, sir.

6    Q.   Whose idea was it to retain Goodwin Procter?

7    A.   It was a mutual decision.  We were trying to brainstorm

8    ways to raise money.

9    Q.   Who is "we"?

10   A.   Jasiel and I.

11   Q.   Did he know anybody from Goodwin and Procter, the big firm

12   in Boston?

13   A.   No, I didn't either, sir; so I contacted an advisor Jasiel

14   and I had both met, a Phil Beauregard, the son, not the -- not

15   the attorney/father, and he had had some success with startups

16   and he gave us three names, I believe he sent the e-mail to

17   both of us.

18   Q.   Did Jasiel contact Phil Beauregard or did you contact Phil

19   Beauregard?

20   A.   I contacted Phil Beauregard.

21   Q.   You did, right?

22        And Phil Beauregard told you that Goodwin Procter is a

23   pretty good firm for startups, correct?

24   A.   Yes, sir.

25   Q.   So as a result of that, you then reached out to Goodwin

```
 1   Procter and got hooked up with a guy by the name of Bill
 2   Schnoor, right?
 3   A.   I believe Jasiel did the first call, but I set it up, I
 4   set up the call.
 5   Q.   All right.  And you ultimately went into Boston and met
 6   with Bill Schnoor, correct?
 7   A.   Yes.
 8   Q.   Why did you get rid of Gunderson Dettmer?
 9   A.   We were a little dissatisfied with the service.  I believe
10   there were a couple of typos that we took exception to.  I
11   believe they misspelled Jasiel's name a few times on some
12   documents and correspondences, so that, and then the goal was
13   also to find a firm that was willing to introduce us to
14   possible investors as well.  Some firms do that because it's
15   kind of an in-house baseball where they just put people
16   together, and Gunderson wasn't doing that, and we were hoping
17   another law firm would.
18   Q.   All right.  So Gunderson Dettmer does the promissory
19   notes, the convertible debt notes, Gunderson Dettmer
20   incorporates the corporation in Delaware, and then you leave
21   Gunderson Dettmer and go to Goodwin Procter, correct?
22   A.   Yes, sir.
23   Q.   How long did Goodwin Procter represent SnoOwl, if you
24   know?
25   A.   From August of 2015, I believe, until -- until I think my
```

1   exit.  I'm not sure when they terminated the relationship.

2   Q.   All right.  And when was it that Jasiel stopped working

3   for SnoOwl?

4   A.   I don't know, sir.  To my knowledge, he's still in charge

5   of it.

6   Q.   He's still in charge of it?

7   A.   Yeah.

8   Q.   Okay.  Well, you knew he was elected mayor, obviously,

9   right?

10  A.   Yes, sir.

11  Q.   You saw the Memorandum of Understanding with Staff Sheehan

12  indicating that he would resign, correct?

13  A.   Yes, subject to the conditions in it.

14  Q.   And you met Staff Sheehan and ultimately the two of you

15  were working together with SnoOwl for quite a period of time,

16  right?

17  A.   We were trying to satisfy his conditions which was getting

18  the financials.

19  Q.   Right.  So you were working with Staff Sheehan?

20  A.   Yes, sir.

21  Q.   On behalf of SnoOwl?

22  A.   While he was thinking about joining per the MOU, sir.

23  Q.   Okay.  So do you remember sending an e-mail introducing

24  Staff Sheehan as being -- you were very proud and excited

25  because "introducing our new CEO"?

1    A.    Potential new CEO, and I think I copied the MOU.

2    Q.    Memorandum of Understanding that we just went through?

3    A.    Yes.

4    Q.    And you held yourself out, obviously, and were quite

5    active by way of e-mails and whatnot with all sorts of people

6    in the industry, investors, startup companies, professionals,

7    you were sending e-mails all over the place, weren't you?

8    A.    Yes, sir.

9    Q.    And in fact, sir, you probably sent hundreds of e-mails to

10   any number of people in your capacity as COO for SnoOwl, right?

11   A.    Yes, sir.

12   Q.    This is long after he's gone; he's already the mayor now,

13   right?

14   A.    Well, he had to sign off on it, he still had the bulk of

15   the shares.

16   Q.    He had what?

17   A.    Sign off and direct it.  He was always in charge.

18   Q.    Okay.  He had to sign off on what?

19   A.    He had control of the company.

20   Q.    So you're the one that's sending out all these e-mails to

21   people holding yourself out as the COO of SnoOwl, and you're

22   saying he had to read all your e-mails and sign off on them?

23   A.    On certain decisions, yes.

24   Q.    So the e-mails that you were sending out to people, for

25   example -- when did you say that you left SnoOwl?

1   A.   June of 2016.

2   Q.   And do you realize that as of December of 2016 that you

3   were still sending e-mails to Jasiel about SnoOwl?

4   A.   Yes, I was.

5   Q.   Yeah.  And do you recall that he also sent e-mails to you,

6   for example, saying, Look, I need all the tax records, I need

7   all the business records because I got to deal with the

8   accountant to pull this stuff together?

9   A.   He sent me one e-mail to that effect, and I believe I

10  delivered it to his house.

11  Q.   Right, because you kept all the records at your house.

12  A.   Well, they were -- I had --

13  Q.   What?

14  A.   I took them after I guess I found out we were evicted from

15  1 Zero 4, and I had to rescue the records.

16  Q.   You had to rescue the records?

17  A.   Yes.

18  Q.   So the rescued records now resided at your home?

19  A.   Yes, sir.

20  Q.   All right.  And ultimately, when he's trying to pull stuff

21  together for the accountant, he had e-mailed you and requested

22  that you obtain the records and give them back to him, right?

23  A.   Yes, sir.

24  Q.   And you did ultimately, right?

25  A.   Yes, sir.

1    Q.    Now, the accountant was a fellow by the name of Terrence

2    Charest, correct?

3    A.    Yes, sir.

4    Q.    C-h-a-r-e-s-t, I believe.   Did you know him?

5    A.    I knew of him.

6    Q.    How did you know of him?

7    A.    I believe he was the accountant for Attorney Chris

8    Carreiro.

9    Q.    So Chris Carreiro, the same guy that was either your

10   partner or you worked in his office or whatever, right?

11   A.    Correct.

12   Q.    Chris Carreiro is the guy that you hooked Jasiel up with

13   to represent him, correct?

14   A.    Yes.

15   Q.    Chris Carreiro is the guy who knew Terrence Charest,

16   right?

17   A.    Yes, sir.

18   Q.    So Jasiel was then told to talk to Mr. Charest, true?

19   A.    I believe so.   I wasn't part of the discussion, sir.

20   Q.    Well, in May of 2016, sir, you were still involved with

21   SnoOwl actively, correct?

22   A.    Yes, sir.

23   Q.    And you would agree with me, sir, that Carreiro Phillis

24   forwarded documentation to Terrence Charest confirming the

25   arrangement, and this is on Carreiro Phillis letterhead.

 1    Whereby you will assist us with respect to the tax affairs of

 2    Jasiel Correia.  You knew that, right?

 3    A.   If you show me the document, I can see if I saw it before.

 4    Q.   It's embarrassing, I spilled coffee on it, but I will.

 5              MR. REDDINGTON:  Can I have the ELMO?

 6              MR. HAFER:  Your Honor, if that's what I think it is,

 7    I have no objection to it.

 8              THE COURT:  All right.

 9              MR. REDDINGTON:  Thank you.

10              THE COURT:  So are we going to mark this as an

11    exhibit?

12              MR. REDDINGTON:  Yes.

13              THE COURT:  And this will be 336.

14              MR. REDDINGTON:  Thank you, Judge.

15              (Exhibit 336 received into evidence.)

16    BY MR. REDDINGTON:

17    Q.   So, May 6, 2016, Carreiro Phillis to Terrence Charest,

18    CPA, confirming the arrangements agreed to by and between us on

19    May 6, where he's going assist with respect to the tax affairs

20    of Jasiel Correia, right?

21    A.   Yes.  I have not seen this before today.  I was kind of

22    screened out of this, because of my relationship with Jasiel,

23    by Carreiro Phillis.

24    Q.   By what?

25    A.   Because of my relationship with Jasiel, I couldn't be

1   involved in any of this, so this is the first time I'm seeing
2   this.
3   Q.   Why couldn't you be involved with it?
4   A.   Potential conflicts.
5   Q.   What kind of conflicts?
6   A.   Again, like, if I saw how -- if the money was being
7   grossly misused, I would have a duty to tell the investors.
8   Q.   So you just figured, again, if you didn't look at it,
9   didn't know about it, you didn't have to say anything?
10  A.   Well, I was hoping it was not a lot of money; it was
11  repairable.
12  Q.   So, again, sir, the question is pretty simple.  You didn't
13  look at it, and if you didn't look at it, you didn't know about
14  it, if you didn't know about, you didn't have to tell anybody?
15  A.   Yes, sir.
16  Q.   So you would agree, sir, that you knew Jasiel ended up on
17  that advice going to Terence Charest?
18  A.   Yes, sir.
19  Q.   And you knew that Terrence Charest was working with him on
20  the taxes.
21  A.   Yes, sir, I guess.
22  Q.   And you knew, ultimately, that he filed the taxes and then
23  filed an amended tax return, correct?
24  A.   I didn't know that, sir.
25  Q.   You didn't know that.

1    A.    I was not involved in that at all.  Again, I was screened

2    out.

3    Q.    So, now, when he's the mayor, one of your main concerns

4    was what his role would be, if any, for SnoOwl in January of

5    '16 once he gets appointed, right?

6    A.    Yes, sir.

7    Q.    And who is Bill Sr., do you know?

8    A.    Oh, that might have been a typo, it might be Bill Schnoor

9    if it's Goodwin Procter.

10   Q.    And in fact, interviews were conducted ultimately

11   resulting in Staff Sheehan to be the CEO, right?

12   A.    Yes, sir.

13         Well, to sign the MOU, I should say.  We wanted him as

14   the CEO -- I wanted him as the CEO.

15   Q.    Now, do you remember that you and Staff on behalf of

16   SnoOwl went to Phil Beauregard, the father, who's the lawyer,

17   not the son?

18   A.    We went to Phil Beauregard, the lawyer's office, but we

19   met with the son.

20   Q.    Okay.  But you indicated to the FBI that Phil Beauregard

21   was SnoOwl's attorney?

22   A.    No, I did not.

23   Q.    So does that refresh your memory, that Staff and Bernier

24   then went to Phil Beauregard SnoOwl's attorney to discuss

25   Correia and related issues?

1   A.   No, I believe that's a misstatement --

2   Q.   Another typo?

3   A.   -- or typo.

4   Q.   In any event, sir, do you recall consulting with,

5   ultimately, Attorney Schnoor and Attorney Schnoor indicating

6   that commingling of funds is a common mistake in startups?

7   A.   Yes, sir.

8   Q.   And you talked about possible recapitalization of the

9   company, right?

10  A.   Yes, sir.

11  Q.   And after the meeting at Goodwin Procter, you then called

12  Correia.  He didn't even go to that meeting, did he?

13  A.   No, no, it was --

14  Q.   You and Staff Sheehan?

15  A.   Yes, sir.

16  Q.   And when was that, if you recall?

17  A.   In the spring of 2016, so maybe April.

18  Q.   April of '16?

19  A.   Early May.

20  Q.   Now, back in February of '16, you worked for Chris

21  Carreiro's law firm, right?

22  A.   Yeah, I went and worked with him.

23  Q.   That's yes?

24  A.   Yes, sir.

25  Q.   You then set up a meeting with the assistance of Parayno,

1    correct?

2    A.    A meeting for what, sir?

3    Q.    Because Correia was basically dragging his butt, and he

4    wasn't, you know --

5    A.    Oh.

6    Q.    -- responding to requests --

7    A.    Yes, sir.

8    Q.    -- to be organized?

9    A.    Yes, sir.

10   Q.    And in fact, you did have a meeting with Correia, and it

11   appeared to you that he was not grasping what you wanted, is

12   what you told the FBI, right?

13   A.    Yes, sir.

14   Q.    Would you agree with me that when you told him to do

15   something, that he would try to do it; when you asked him for

16   records, he would get you the records, granted they might not

17   have been great, but, nevertheless, he'd get you the records,

18   right?

19   A.    No, I would not say that.  It took a long time.

20   Q.    But he, ultimately, got you the records.

21   A.    Yes.

22   Q.    Okay.  And when he's told that he's got to speak to

23   Terrence Charest, the accountant, in fact, he did that, right?

24   A.    Well -- yes, he did.

25   Q.    And on May 6th, sir, of '16, when the Carreiro Phillis

1    retention letter to Terrence Charest was signed, that's also

2    the same date that the Memorandum of Understanding and

3    extension was signed by SnoOwl and Staff Sheehan, same date?

4    A.   I would have to check the dates, sir.  Which one, the MOU

5    or the extension thereof?

6    Q.   Extension, May 6, 2016.

7    A.   Okay.

8    Q.   Who wrote up the Memorandum of Understanding?

9    A.   I believe I did, and I e-mailed it to, I think Staff,

10   added some stuff.  It was a group document, but I think I did

11   the first draft.

12   Q.   So, after the accounting was completed, you, Carreiro, and

13   Staff then met with Correia and talked about the details of the

14   accounting during the meeting.

15        Do you remember that meeting at city hall?

16   A.   I believe that was the one I did not participate in.  That

17   was the one, I think, Parayno was there, too, and then I

18   wouldn't sign the NDA so I went in the next room.

19   Q.   So when you spoke to the FBI, sir, you indicated that

20   after the accounting was completed, Bernier, that would be you,

21   Carreiro, and Staff me with Correia.  Parayno was not part of

22   the meeting.

23   A.   He might have been there at the beginning and then went

24   into his office because he was the chief of staff --

25   Q.   In any event, you do recall that meeting, correct?

1    A.    Yes, sir.

2    Q.    You talked about the details of SnoOwl accounting, right?

3    A.    I believe I recused myself.

4    Q.    You recused yourself?

5    A.    I wouldn't sign the NDA, so I left the room.  I do not

6    believe I heard the details of SnoOwl accounting.

7    Q.    After what?

8    A.    I do not believe I heard the details then.

9    Q.    Okay.  Do you remember that after this discussion of the

10   details of SnoOwl accounting during the meeting there was a

11   discussion of the way to get you out of the situation?

12   A.    No, sir, I don't recall that.

13   Q.    You never said that to the FBI?

14   A.    No.

15   Q.    So then Bernier, Carreiro, and Staff terminate their

16   meeting or finish the meeting and Staff then indicated that he

17   reached an agreement with the investors, right?

18   A.    Yes, I was aware of that.

19   Q.    And the investors and Staff decided that Correia's shares

20   of SnoOwl would be diluted, right?

21   A.    I believe that's what resulted in the MOU, maybe.

22   Q.    Yeah, Memorandum of Understanding.

23   A.    Yeah.

24   Q.    And most of all -- most, if not all of his percentage of

25   SnoOwl would be diluted.  That's what you told the FBI?

1    A.   Yeah, and I think it was in the MOU.

2    Q.   Sir, it was around this time that the investors received

3    the convertible debt notes and everybody signed off on the

4    documents that had been prepared, right?

5    A.   At what time, sir?

6    Q.   When were the convertible debt notes given to the

7    investors that they signed?

8    A.   I believe starting in December of 2014.

9    Q.   What is SnowKemo?

10   A.   I think it was a weird name that Nicholas Lizotte came up

11   with, I don't really remember that.

12   Q.   Was it ever a business of SnoOwl?  Was it ever

13   incorporated or a subsidiary or anything?

14   A.   I don't think so, no.

15   Q.   There were some businesses that were paying for whatever

16   it is that they paid for with SnoOwl, for example, I think one

17   pretty good account would be Jerry Remy's, well-known, right?

18   A.   Yes, sir.

19   Q.   The Pink Bean --

20   A.   Yes, sir.

21   Q.   -- coffee shop?

22   A.   I think we also partially funded their operation at the

23   beginning, too.

24   Q.   By buying a lot of coffee?

25   A.   Yeah, we liked going there.

1   Q.   Now, at some point you indicate to the FBI that you had a
2   falling out with Mr. Correia, right?
3   A.   Yes, sir.
4   Q.   And then you proceeded to tell the FBI that he had bad
5   habits, including drinking, smoking cigars, and womanizing.
6   That's what you told the FBI, right?
7   A.   Well, they asked me, I believe they asked me those actual
8   things, and I said yes or no, similar to this.
9   Q.   Yeah, and you indicate that he does not gamble, he does
10  not do drugs, right?
11  A.   Yes, sir.
12  Q.   But he liked a lot of cigars, he liked to smoke cigars.
13  A.   Yes, sir.
14  Q.   You met with the FBI in June of 2017.  Do you recall where
15  that meeting was?
16        You met up with special agent Jessica Thompson, met up
17  with Special Agent Kenneth Benton --
18  A.   I believe it was the same two agents.
19  Q.   I'm sorry?
20  A.   I believe it's the same two agents.
21  Q.   No, it's a woman and a guy, Kenneth Benton and Jessica
22  Thompson.
23  A.   Yes.
24  Q.   Okay.  And where did you meet them?
25  A.   I believe DarrowEverett again, I'm guessing.

1    Q.    What's DarrowEverett?

2    A.    The law firm I was working at in Providence.

3    Q.    Okay.  And also Dave Sullivan was present, right?

4    A.    Yes, sir.

5    Q.    And who's Dave Sullivan?

6    A.    My colleague and attorney, and he was representing me at

7    the time.

8    Q.    Right, he was representing you in your dealings with the

9    FBI, right?

10   A.    Yes, sir.

11   Q.    So did they give you Miranda warnings or anything like

12   that, right to remain silent, right to an attorney, anything

13   like that?

14   A.    No, sir.

15   Q.    And they basically asked you a number of questions again

16   regarding SnoOwl, all the stuff that we just went through,

17   right?

18   A.    Yes, sir.

19   Q.    And again, you indicated that you negotiated 15 percent of

20   founders' stock?

21   A.    Yes, sir.

22   Q.    You talked about all the agreements that you had prepared

23   for SnoOwl or through Gunderson Dettmer or Goodwin Procter.

24   A.    Yes, sir.

25   Q.    You indicated that in 2015, Chris Parayno wanted legal

 1    advice regarding a grant and you said, no, and you referred him

 2    to Attorney Mark Levin.

 3         Now, do you know Attorney Mark Levin?

 4    A.   Yes, sir.

 5    Q.   He's a fairly well-known attorney in Fall River for real

 6    estate and corporations and business things, right?

 7    A.   Yes, sir.

 8    Q.   And you indicated that it was in 2015 that you asked Phil

 9    Beauregard -- probably the son maybe, was he an attorney?

10    A.   No, no, sir.

11    Q.   So if you were talking to Attorney Phil Beauregard, would

12    that be the father?

13    A.   No, I think -- again, typos, you know, it's -- they're

14    writing down, I think, shorthand.

15    Q.   So you asked for assistance to locate a new attorney, and

16    that's when you got bounced over to Goodwin Procter, right?

17    A.   Yes, I reached out -- Jasiel and I spoke -- we wanted to

18    reach out to Phil because we had approached Phil earlier, the

19    son, because he had had success with two startups and we were

20    trying to ask for help basically and say, Hey, what's a good

21    way of meeting potential investors that would be interested at

22    this stage?

23    Q.   Now, you indicated to the FBI that when -- when Jasiel

24    took office as the mayor of Fall River in January of 2016, that

25    you moved all of the file cabinets containing SnoOwl paperwork,

1   that you organized it and you took it, right?

2   A.   No, that was -- I believe what I said was the -- we

3   basically were kind of evicted.  I went back --

4   Q.   I know you said you were evicted already.  But I'm asking

5   you about talking to the FBI.  You didn't tell the FBI you were

6   evicted, did you?

7   A.   I think I said the stuff was in storage.  I only read this

8   one time last night, so --

9   Q.   Okay.  Well, when Correia took office as mayor of Fall

10  River in January of '16, they moved all the file cabinets

11  containing SnoOwl paperwork that you organized and you,

12  ultimately, stored at your house, right?

13  A.   Well, I'd say the -- the files were actually moved from

14  where -- their original location to, like, a storage locker in

15  the -- elsewhere in the building.

16        I called Jasiel and then Chris to basically ask him

17  what happened with the documents, then I got a key -- I went to

18  city hall, got the key, then I tried to find the documents.  I

19  took the documents I could find, and then I stored them.

20  Q.   Now, in January of '17 -- I'll go through the whole year

21  of '16 -- now we're in January of '17, Correia called you, and

22  he had called you a number of times asking for SnoOwl records,

23  right?

24  A.   Yes, sir.

25  Q.   He indicated that he was trying to pull stuff together and

1    get things done and he needed the records and he reached out to

2    you a couple of times asking for the records, right?

3    A.    All I remember is he reached out and then I provided the

4    records.

5    Q.    So you provided the records at the Pink Bean coffee shop,

6    right?

7    A.    Yes, sir.

8    Q.    And he was living in a -- in a, like, a loft up above the

9    Pink Bean coffee shop?

10   A.    Yes, it was a nice loft, a big loft.

11   Q.    But you then gave him the records that you recovered from

12   Anawan storage space.

13   A.    Yes, sir.

14   Q.    Now, when he was the mayor, one of the things that you

15   were really interested in was getting a job, as we talked

16   about, for the city, right?

17   A.    Yes, sir.

18   Q.    And Jasiel indicated, no, he was not going to be able to

19   appoint you as the corporation counsel, that that was a fellow

20   by the name of Joe Macy who was a retired District Court judge,

21   correct, state?

22   A.    Eventually, yes, sir.

23   Q.    You were pretty upset about that, weren't you?

24   A.    I was upset that I had given up one job without the other

25   job.

1   Q.   So before you had even been offered the job in the city,

2   you quit your job anticipating that you were going to have

3   corporation counsel position, right?

4   A.   Well, he told me I was going to be his corporation

5   counsel.

6   Q.   And you did not get that job ultimately, right?

7   A.   I did not, sir.

8   Q.   You then kind of angled for a couple of other jobs in the

9   city, which would were denied by Jasiel.  That upset you,

10  right?

11  A.   Yes, sir.

12  Q.   And ultimately, he reached out and said that he could get

13  you appointed on behalf of the Fall River Housing Authority.

14  A.   I believe it was an interview, yes, sir.

15  Q.   Did you have the interview?

16  A.   Yes, sir.

17  Q.   Did you get the job?

18  A.   Yes, sir.

19  Q.   All right.  And how long did you work for the Fall River

20  Housing Authority?

21  A.   Until, I believe, I gave my notice in December 2016, I was

22  simultaneously working at the law firm, DarrowEverett.

23  Q.   And you were asked and you indicated that Correia talked

24  to you about the director of revenue for the City of Fall

25  River, correct?

```
 1    A.    I might have.  I believe so, maybe.
 2    Q.    Okay.  So, you'd agree with me, sir, that you were upset
 3    because you had no job in the administration and then,
 4    ultimately, you ended up in the FRHA, the Fall River Housing
 5    Association, right?
 6    A.    Yes, sir.
 7    Q.    And then, ultimately, you quit that job and you went back
 8    to the law firm.
 9    A.    Yes, sir.
10          Well, it was the same law firm, it was just a
11    conversation I had with the law firm about spending more time
12    doing law and my practice was growing and, you know, focusing
13    on that more.
14          MR. REDDINGTON:  Now, if I could have the ELMO,
15    please.
16          Your Honor, these are the documents that we had
17    already addressed with you that we have an agreement.
18          THE COURT:  Okay.  So we'll mark them in due course
19    when they're introduced.
20    BY MR. REDDINGTON:
21    Q.    Now -- okay.
22          So, Nick Bernier, Esq., that's you, right?
23    A.    Yes, sir.
24    Q.    And that's forwarding an e-mail from Steven Argentieri --
25    A.    Yes.
```

```
 1   Q.   -- to Nick Bernier, that would be you, right?

 2   A.   Yes, sir.

 3   Q.   With a cc to Josh Harding; Jared Fine, Goodwin Procter;

 4   Kenneth Radcliffe, right?

 5   A.   Yes.

 6   Q.   Is Jasiel copied on that?

 7   A.   No, he is not, sir.

 8   Q.   So, in any event, this gentleman stated, "Hi, Nick, thanks

 9   for checking in."

10        THE COURT:  Just so the record is clear, this is now

11   Exhibit Number 337.

12        MR. REDDINGTON:  Yes, Your Honor, 337.

13        (Exhibit 337 received into evidence.)

14   BY MR. REDDINGTON:

15   Q.   And they provided to you draft provisional application,

16   right?

17   A.   Yes, sir.

18   Q.   Now, what is that all about?  What does that mean, "draft

19   provisional application"?

20   A.   I'm not a patent lawyer, but after discussing it with

21   them, it was you do a provisional application and then after

22   the provisional you do a more detailed application, I guess.

23   Q.   Okay.  Now, this gentleman is from Goodwin Procter, right?

24   A.   Yes, sir.

25   Q.   On November 17th of 2016, you were still involved with
```

1    Sarah Harding on behalf of Statewide Software, correct?

2    A.   Yeah, I believe there was an -- she was the -- I forget

3    her title, she kind of like ran Statewide Software's books.

4    Q.   So you know that Sarah Harding worked for Statewide

5    Software?

6    A.   Yes, sir.

7    Q.   Simple.  All right.

8         And this is in November of 2016, right, after you had

9    indicated that you left SnoOwl --

10   A.   Yes, as an officer, I was still a shareholder.

11   Q.   And you were still communicating regarding outstanding

12   bills, balances, the business of SnoOwl, right?

13   A.   Yes, sir.

14          MR. REDDINGTON:  So and this would be 338, Your Honor.

15          THE COURT:  Yes.

16          (Exhibit 338 received into evidence.)

17   BY MR. REDDINGTON:

18   Q.   November 15 of 2016, Nick Bernier receives from Sarah

19   Harding and then you forward it, attaching invoices that Jasiel

20   received indicating one is not paid, 3/22, attaching the hours

21   and the spreadsheets, right?  That was sent to you, right?

22   A.   Yes, sir.

23   Q.   And then he responded, "How much is Statewide owed,"

24   asking you how much they're owed, right?

25   A.   Yes, sir.

1    Q.    Were you able to determine how much they were owed?

2    A.    I'm not sure if there's another e-mail, I might have.

3    Q.    You then -- that would be earlier, February of '15, when

4    you were still actively involved with SnoOwl asking to have --

5    her send invoices and hour sheets for SnoOwl, so you were

6    pretty much in contact with Statewide, right?

7    A.    Yes, I was the one doing the payroll.

8              MR. REDDINGTON:  And 339.

9              (Exhibit 339 received into evidence.)

10   BY MR. REDDINGTON:

11   Q.    In reference to the Delaware Domestic Corporation Annual

12   Franchise Tax Reports, do you know what that means?

13   A.    Yes, it's a tax due to the State of Delaware.

14   Q.    I mean, it's small potatoes.  I mean, it's only a couple

15   hundred bucks, right?

16   A.    Yes, sir.

17   Q.    And that aggravated you because he had never filed

18   anything and didn't even pay the filing fee on an annual basis

19   for the Delaware corporation, right?

20   A.    Yes, sir.

21   Q.    So you -- who's Jared?

22   A.    He was the associate we were working with at Goodwin

23   Procter, he was at the time under Bill Schnoor.

24   Q.    All right.  And then, of course, you write to him in

25   February of '16 asking, "Is there something we should be

```
 1   filing, annual franchise tax," right?
 2   A.   Yes, sir.
 3   Q.   Now, who is Ben Levitan?
 4   A.   He was one of the three names we got from Bill Schnoor,
 5   and we -- I believe he was the one who came down to Fall River
 6   to meet with Jasiel.  And he -- we were hopefully going to have
 7   him come in as the CEO, and that was, I want to say, in
 8   December or January, it was either right before he was sworn in
 9   or right after.
10   Q.   Do you recall on December 23rd of 2015 --
11           MR. REDDINGTON:  This will be 340 I think, Your Honor.
12           THE COURT:  It is.
13           (Exhibit 340 received into evidence.)
14   BY MR. REDDINGTON:
15   Q.   -- sending an e-mail, looking down below -- strike that,
16   January 27, 2016, and this would be an e-mail to -- from David
17   Cabeceiras, "Hi, Nick, I hope all is well.  Any updates?"
18        And that was Dave Cabeceiras, correct?
19   A.   Yes, sir.
20   Q.   And then earlier, about a month prior to that, December
21   23, 2015 -- and this is after he had won the election, before
22   he was sworn in, right?
23   A.   Yes, sir.
24   Q.   In December 23rd of 2015, you then send out a blast to all
25   the investors and advisors, correct?
```

1    A.   Yes, sir.

2    Q.   You tell them, "In the week since we last met, on Monday,

3    November 23rd, we've pursued a number of different

4    opportunities for SnoOwl," right?

5    A.   Yes, sir.

6    Q.   And you then proceed to bring them up-to-date, so to

7    speak, as to contacts that you made and how exciting things

8    were as far as developing the business, right?

9    A.   Yes, sir.

10   Q.   Oh, "Now, in addition to the contacts, Jasiel and I have

11   been exploring other avenues for acquisition."

12        What did that mean?

13   A.   Yeah, we didn't know because I think our conversation with

14   Levitan was, he didn't know if he wanted to come in as a CEO

15   or, like, find us a buyer.  If there was something patentable,

16   just sell the patent.  At that point in time, we were broke, so

17   I thought the only asset we had was the patent.

18   Q.   But -- you've already told us that, but when you were

19   writing to the investors, sir, you didn't say, Hey, I'm calling

20   on behalf of SnoOwl, we're broke.  You didn't say that, did

21   you?

22   A.   No, I crafted the e-mail with Jasiel so we kind --

23   Q.   What?

24   A.   I crafted the e-mail with Jasiel.

25   Q.   Jasiel, did he tell you what to say?  Did he have your

1    hand with the pen?

2    A.    We did it together.

3    Q.    Yeah.

4        So when this says, "Nick, Merry Christmas, Nick," and

5    you're suggesting that in addition to the contacts, Jasiel and

6    I have been exploring other avenues for acquisition, you're

7    telling us that that's basically saying that you were broke or

8    you were acting like you had other funding on the horizon?

9    A.    What I said, we're exploring opportunities.

10   Q.    What?

11   A.    We were exploring every opportunity.  We had three names,

12   two other names besides Ben Levitan.

13   Q.    Those are the context though.  We already talked about the

14   context --

15   A.    Yes, sir.

16   Q.    -- in addition to the context, "Jasiel and I have been

17   exploring other avenues for acquisition."

18       What other avenues for acquisition were you exploring?

19   A.    I don't recall.  I believe Jasiel had some ideas as well.

20   Q.    Jasiel had ideas.  Did you have any independent ideas

21   yourself or did he tell you what to do every step of the way?

22   A.    This was his company.  It always was.

23   Q.    So he certainly didn't force you to sit down in January of

24   2016, after he had been sworn in as mayor and resigned from

25   SnoOwl, leaving it to you and Staff Sheehan, and he didn't tell

1    you what to write in this e-mail, did he?

2    A.   He was involved.

3    Q.   How?  Did you go to city hall and say, Jasiel, I think

4    what we ought to do is tell people, fake, that we're dealing

5    with people for acquisitions?

6    A.   I know we were meeting -- it was hard to get a meeting,

7    when we did -- basically the only time --

8    Q.   It was hard to get a meeting, what, with him?

9    A.   Hmm?

10   Q.   It was hard to get a meeting with Jasiel?

11   A.   Yes.

12   Q.   So you could pick up the phone, right?

13   A.   Yes, sir.

14   Q.   And you did text back and forth, didn't you?

15   A.   Yes, sir.

16   Q.   And when this e-mail was prepared and sent out to

17   investors and advisors and you're making reference to the fact

18   that, "we have been exploring other avenues for acquisition,"

19   "acquisition" means buying the business, right?

20   A.   Yes.

21   Q.   "Acquisition" means that there's someone out there,

22   whether it's Barnes & Noble or some big corporation, and they

23   want to buy for millions of dollars that business, right?

24   A.   Yes, sir.

25   Q.   So who are you dealing with, sir --

1    A.    So that was based --

2    Q.    -- in January of 2016 regarding an acquisition of SnoOwl?

3    A.    So it was based on our -- a joint meeting Jasiel and I had

4    with -- I forget, it was either a call or I think we actually

5    saw him in person, Bill Schnoor at Goodwin Procter, and that

6    was the one who gave us those three names.  We were talking

7    about potential outcomes for SnoOwl now that he's mayor.  They

8    were obviously very happy that a client -- the CEO of a client

9    was now the mayor of a significant city in Massachusetts, and

10   they were excited to work with us, and that's how we got those

11   initial three names and the opportunities --

12   Q.    Let me ask you, sir, because the jurors will be able to

13   look at this as an exhibit.

14         Your e-mail, your name, Merry Christmas, Nick, the

15   three names, Ben suggested us making three more contacts, Glenn

16   Engler, Chris Comparator, and Nancy Lieberman.  Those are the

17   three names you're referring to, right?

18   A.    There are other names as well.

19   Q.    Well, you just told the jury it was three names, and I'm

20   referring to your e-mail with the three contacts.  Those are

21   the three names, right?

22   A.    So those are the three names we got from Ben or so --

23   yeah, so Ben Levitan is Levitan, and then there's Bill Schnoor.

24   So Bill Schnoor gave us three names, and I guess Ben gave us

25   three more.

1    Q.   Okay.  So Ben suggested we make three more contacts, you

2    told the jury he had three other names and these people were

3    not talking about acquisition of SnoOwl, these people were

4    talking about raising funds for SnoOwl and building the company

5    towards an acquisition, correct?

6    A.   Yes, sir.

7    Q.   And then you said, In addition to these contacts, Jasiel

8    and I have been exploring other avenues for acquisition.

9    A.   And I believe we were having conversations, we were trying

10   to figure out what to do.

11   Q.   What were the other avenues that you were exploring?  You

12   sent this out to all the investors.

13   A.   He made a contact with Twitter when we did a startup thing

14   that we got in for Phil Beauregard, the son, called Unpitch, so

15   he had Wayne from Twitter --

16   Q.   Excuse me, who is "he"?

17   A.   A contact Jasiel made.  We got into Unpitch, like a

18   startup kind of competition a year earlier --

19   Q.   What does that have to do with SnoOwl?

20   A.   Well, those were the contacts.  So you're asking me what

21   other avenues for acquisition.

22   Q.   Right, those are your words in the letter.

23   A.   Yeah, Jasiel's the idea guy.  So when we were discussing

24   the language of this e-mail because we want to tone it the

25   right way, he said -- he's the idea guy, he was giving the

 1    ideas, you know.

 2    Q.   You told the people that in addition to those contacts

 3    that you and Jasiel were exploring other avenues for

 4    acquisition, takeover, purchase, whatever the case will be.

 5    A.   Yes.

 6    Q.   All I'm asking you, that was a lie, wasn't it?

 7    A.   No, sir.

 8    Q.   So what were the other avenues of acquisition?

 9    A.   I just explained.

10    Q.   Well, Twitter talking about Unpitch has nothing to do with

11    acquiring SnoOwl, right?

12    A.   I guess it would.  Now that he's mayor, he had Wayne from

13    Twitter's contact information and he told me he was

14    corresponding and they had had contact.

15    Q.   So what do you think that Twitter, just because he's the

16    mayor of the Auguste City of Fall River, is going to all of a

17    sudden throw millions of dollars at you guys to purchase

18    SnoOwl?

19    A.   We had previously made contact, he previously explained

20    the geospace algorithm, the patentable asset, and I believe

21    that was one of the plans.  There were a lot of -- we were

22    looking for anything at this point.

23    Q.   Now, on February 19th of 2016, you received an e-mail from

24    Dave Cabeceiras.

25              MR. REDDINGTON:  This would be 341 I think, Your

1   Honor.

2            (Exhibit 341 received into evidence.)

3   BY MR. REDDINGTON:

4   Q.   And this would be from Nick Bernier to Dave Cabeceiras cc

5   to Jasiel, correct?  You recognize that?

6   A.   Yes, sir.

7            THE COURT:  It's received as 341.

8            MR. REDDINGTON:  Thank you.

9   BY MR. REDDINGTON:

10  Q.   And your indication was, "Yes, we'd love to catch up over

11  breakfast.  What does your schedule look like?"  Right?  And

12  that was to Dave Cabeceiras?

13  A.   Yes, sir.

14  Q.   And that was in response to Dave's e-mail to you saying,

15  Hey, Nick -- in February of 2016 -- any progress on SnoOwl,

16  also would you and Jasiel like to meet for supper soon,

17  correct?  I read that right, right?

18  A.   Yes, sir.

19  Q.   And then January 27th of 2016, you sent a letter to Dave

20  Cabeceiras indicating that you will be meeting Jasiel today at

21  5:00 with an attorney introducing us to another potential

22  investor/acquirer.

23       Who was the other potential acquirer of SnoOwl?

24  A.   That was investor/acquirer.  Mmm.

25  Q.   Mmm.

1    A.    Jasiel and I are meeting -- it must have been Bill

2    Schnoor.  That must have been the meeting with Bill Schnoor.

3    Yeah, that's when we went up to Boston and we went to Goodwin

4    Procter to meet with Bill Schnoor.

5    Q.    Well who was the other investor/acquirer, not the

6    attorney?

7    A.    Well, no, it was his contacts, and I think that's when we

8    got more information.

9    Q.    Uh-huh.

10         So you indicate that you're meeting at 5:00, introducing

11   us to another potential investor/acquirer.

12         So who were you introduced to by Bill Schnoor?

13   A.    At that point in time, Ben Levitan, we had already done --

14   honestly, I don't recall that.  If you have another document to

15   refresh my memory.

16   Q.    It's your documents, it's your e-mail that you sent out to

17   investors.

18   A.    I know, sir, but as you noted, there are a lot of

19   documents.

20   Q.    A lot of what?

21   A.    Documents, sir.

22   Q.    Now, have in mind that you've alleged to have left SnoOwl,

23   had a spat with Jasiel, had nothing to do with the business in

24   June of '16 or thereabouts.

25              In November of '16, you're still dealing -- talking to

1    him and sending him texts, probably 20 or 30 texts a day about

2    SnoOwl and different issues with the business, true?

3    A.    I might have been.  I was upset --

4    Q.    I'm not asking if you were upset.  Did you send him 20 or

5    30 more texts a day?

6    A.    I might have been.

7    Q.    This is after the whole summer after you had your spat and

8    into the fall and almost up to the holidays.  For example,

9    November 21 of 2016 --

10              MR. REDDINGTON:  This would be 342.

11              THE COURT:  342.

12              (Exhibit 342 received into evidence.)

13              MR. REDDINGTON:  Thank you, Judge.

14   BY MR. REDDINGTON:

15   Q.    So FYI, Union is stepping in per AFSCME, signing Scott --

16   what is this, city business?

17   A.    Yeah, I think it's a city thing.

18   Q.    And that's you texting him, right?

19   A.    Yes, sir.

20   Q.    And then November 23, 2016 at 11:18, FYI, your CPA,

21   Terry -- got to be Terrence Charest, right?

22   A.    Yes, sir.

23   Q.    -- called me -- meaning you?

24   A.    Yes, sir.

25   Q.    -- this morning.  It sounds like he just wants basic

1   SnoOwl corporate information, I'm returning the call after 12.

2          That was in November of 2016, right?

3   A.   Yes, sir, I was still concerned with --

4   Q.   Because you were friends and you wanted to protect him?

5   A.   At this point in time I had just resigned, it wasn't over

6   a spat with him.  I was upset that he wasn't providing basic

7   information.

8   Q.   And his response was, "Okay, sounds good, thank you."

9   Right?

10  A.   Yeah.

11  Q.   You also -- I mean, you sent him hundreds of texts, but

12  they would continue on, for example, even as late --

13          MR. REDDINGTON:  343, I believe, Judge.

14          THE COURT:  All right.

15          (Exhibit 343 received into evidence.)

16  BY MR. REDDINGTON:

17  Q.   -- December 2 of 2016.  You then say, "Should I reach out

18  to Ken later today for details on the police station?  The

19  group is interested."

20          Is that something to do with building a new police

21  station or something?

22  A.   Yeah, he had asked me -- well, I was working at

23  DarrowEverett and I was trying to connect -- yeah, yeah, it

24  was -- it was a refurbish, it was a pet project of his he

25  wanted, yeah.

1    Q.   So December 5 of 2016, he sends you a text:  "Nick, I need

2    the amount and documentation of all the back fees and taxes

3    that I paid, please, asap."

4         Do you remember receiving that, sir?

5    A.   I believe I immediately replied and sent everything I

6    could digitally.

7         THE COURT:  That's still 343?

8         MR. REDDINGTON:  Thank you, Judge.

9         THE COURT:  I assume that that's still --

10        MR. REDDINGTON:  Yes, thank you.

11        THE COURT:  Okay.

12        MR. REDDINGTON:  That's all I have, Your Honor.

13        THE COURT:  All right, Mr. Hafer?

14        MR. HAFER:  Your Honor, I have no redirect.

15        THE COURT:  All right.  You may step down,

16   Mr. Bernier.  You can take the shroud off the microphone, that

17   sort of thing.

18        (Pause.)

19        MR. TOBIN:  Your Honor, I'm prepared to call the next

20   witness, but will there be an afternoon break?

21        THE COURT:  There will be.  We'll probably go until

22   3:00 before the break.

23        MR. TOBIN:  Of course.

24        THE COURT:  So you'll introduce the witness and get

25   him started.

 1              MR. TOBIN:  Thank you, Your Honor.

 2              The United States calls Stafford Sheehan.

 3              STAFFORD WHEELER SHEEHAN, having been duly sworn by

 4    the Clerk, was examined and testified as follows:

 5              THE CLERK:  Please be seated and state your name and

 6    please spell your last name.

 7              THE WITNESS:  Stafford Sheehan, Stafford Wheeler

 8    Sheehan.

 9              THE COURT:  If you could take one of those covers to

10    put on the microphone, Mr. Sheehan, that would be helpful.

11              THE WITNESS:  Yes, sir.

12              THE COURT:  And you could take your own mask off at

13    this point.

14              THE WITNESS:  Stafford Wheeler Sheehan, last name

15    S-h-e-e-h-a-n.

16              THE COURT:  You may inquire, Mr. Tobin.

17              MR. TOBIN:  Thank you, Your Honor.

18                          DIRECT EXAMINATION

19    BY MR. TOBIN:

20    Q.   Good afternoon, sir.

21              How old are you?

22    A.   Thirty-two years old.

23    Q.   Where did you grow up?

24    A.   Tiverton, Rhode Island.

25    Q.   Where did you go to high school?

1    A.    Tabor Academy.

2    Q.    Where did you go to college?

3    A.    Boston College.

4    Q.    What year did you graduated from Boston College?

5    A.    2011.

6    Q.    What degree did you receive?

7    A.    Bachelor in chemistry with a minor in mathematics.

8    Q.    Did you attend graduate school?

9    A.    Yes.

10   Q.    Where?

11   A.    Yale University.

12   Q.    What degrees did you receive from Yale University?

13   A.    A master's and a PhD in chemistry.

14   Q.    When did you receive your PhD in chemistry from Yale

15   University?

16   A.    2016.

17   Q.    What is the title of someone with a PhD?

18   A.    Doctor.

19   Q.    Where are you currently employed?

20   A.    Air Company.

21   Q.    What does the company do?

22   A.    We develop technology that converts carbon dioxide into

23   high purity alcohols for consumer products.

24   Q.    What position do you hold with Air Company?

25   A.    Chief technology officer.

1   Q.   What are your primary responsibilities and duties in that

2   position?

3   A.   I guide and direct the optimization and scale up of the

4   new technology that we develop.

5   Q.   Sir, what is a startup company?

6   A.   A startup company is an early-stage business that is in

7   many cases prerevenue that is still working on solidifying a

8   scalable and revenue generating business plan and executing on

9   that.

10  Q.   Dr. Sheehan, what experience, if any, do you have working

11  with startup companies?

12  A.   Lots of experience.  Between software, waste-to-value,

13  chemistry, carbon tech.

14  Q.   Sir, who is Dr. Cabeceiras?

15  A.   Dr. David Cabeceiras is my uncle, my mother's brother.

16  Q.   Dr. Sheehan, I would like to ask you some questions about

17  April 2016.

18       In April 2016, did you have a conversation with your uncle

19  about his investment in a startup company called SnoOwl?

20  A.   Yes, sir.

21  Q.   Who initiated the conversation?

22  A.   To the best of my knowledge, my uncle did.

23  Q.   What did your uncle, Dr. Cabeceiras, tell you during the

24  conversation?

25  A.   He had told me that he had invested in SnoOwl, the

```
 1   business that Jasiel Correia was the founder and -- is the --
 2   had been the founder and CEO at the time, and he needed
 3   assistance with transitioning the business and scaling the
 4   business and growing the business.
 5   Q.   What did you know about Jasiel Correia prior to this
 6   conversation with your uncle?
 7   A.   That he had recently been elected the mayor of Fall River,
 8   Massachusetts.
 9   Q.   And what specifically did you understand your uncle, David
10   Cabeceiras, wanted you to do with regard to SnoOwl?
11   A.   He wanted me to help transition it to a new chief
12   executive officer and new management team, help to raise
13   additional funding, help to acquire new users, and just
14   generally help him with the business.
15   Q.   What was your response to your uncle?
16   A.   I told him I would.
17   Q.   Why were you willing to do this?
18   A.   Because he's my family and I would do that for my family
19   member.
20   Q.   Did you also see this as a potential opportunity to make
21   money?
22   A.   Yes.
23   Q.   Did you meet with anyone associated with SnoOwl after you
24   were told your uncle would be willing to help?
25   A.   Yes.
```

1    Q.    And who did you meet with?

2    A.    Nick Bernier and Jasiel Correia.

3    Q.    Jasiel Correia, the defendant in this case?

4    A.    Yes, sir.

5    Q.    At that time was he the mayor of Fall River?

6    A.    To the best of my memory, yes.

7    Q.    You mentioned you also met with Nick Bernier; is that

8    true?

9    A.    Yes, sir.

10   Q.    Who did you understand Nick Bernier to be at that time?

11   A.    The chief operating officer of SnoOwl.

12   Q.    Had you ever met Jasiel Correia prior to the meeting?

13   A.    I don't believe I met him in person prior to the meeting.

14   I believe I may have spoken to him on the phone, but not in

15   person.

16   Q.    About setting up the meeting?

17   A.    I believe so.

18   Q.    Had you ever met Nick Bernier or talked with him on the

19   phone prior to the meeting where the three of you sat down?

20   A.    Not to the best of my knowledge.

21   Q.    Where was the meeting, if you recall?

22   A.    I think -- I think we had a meeting in a coffee shop.  We

23   had a meeting also at -- we had meetings at the coffee shop, my

24   uncle's office, but I believe the one that we're referring to

25   is the one at the coffee shop.

1   Q.   And I'm referring to the first meeting.  What was the

2   purpose of that meeting, sir?

3   A.   To understand what was required to transition SnoOwl to

4   a -- to raise more -- additional funding for SnoOwl and to

5   transition SnoOwl to a new management team.

6   Q.   Did the three of you, Jasiel Correia, Nick Bernier, and

7   yourself, discuss something that was referred to or was called

8   a Memorandum of Understanding?

9   A.   Yes, sir.

10  Q.   What is a Memorandum of Understanding?

11  A.   A Memorandum of Understanding is a non-binding letter that

12  parties sign to have somewhere down in writing, you know, a

13  proposal of what you plan to do from -- from a meeting so that

14  there's some sort of written history of what you talked about.

15  Q.   You indicated there was some discussion among the three of

16  you about a Memorandum of Understanding.  What was discussed?

17  What was said about such a memorandum?

18  A.   We discussed what it would be, what would be reasonable

19  terms, you know, what I would require to help to do work in the

20  business, you know, help the business and, you know, work

21  toward transitioning it to a new management team in terms of

22  compensation and in terms of, you know, what other -- what

23  information I would require from the business.

24  Q.   Sir, during that meeting when you discussed a Memorandum

25  of Understanding, did you also discuss a due diligence

1   checklist?

2   A.   Yes, sir, that's the second part that I just mentioned,

3   things that I would require from the business.

4   Q.   And why did you request or why did you discuss or

5   "require," to use your word, a due diligence checklist from the

6   business?

7   A.   Because before I would take any ownership in any sort of

8   business that I don't know the history of, because I wasn't

9   personally there, I want to have some sort of understanding of

10  how the business conducted, you know, executed on their

11  business plan, conducted their business, where they got money

12  from and how they spent money.

13  Q.   Dr. Sheehan, ultimately, was a Memorandum of Understanding

14  executed or signed?

15  A.   Yes, sir.

16  Q.   I would ask you to please -- actually, open up your

17  binder, there's a binder in front of you, it holds some

18  exhibits that I'll be asking you to look at today, and if you

19  open up to tab 51, I believe this is already into evidence so

20  you can go right to it.

21       Do you recognize what Exhibit 51 is?

22  A.   Yes, sir.

23  Q.   What is it?

24  A.   The Memorandum of Understanding from that meeting.

25  Q.   And this was produced after the meeting?

1    A.    To the best of my knowledge, yes.

2    Q.    And who wrote it?

3    A.    I believe Nicholas Bernier wrote it.

4    Q.    To incorporate what you, Nicholas Bernier, and Jasiel

5    Correia had agreed to at the meeting or meetings?

6    A.    Yes, sir.

7    Q.    So did you make any revisions or editorial changes to it

8    before you signed it, if you recall?

9    A.    I don't recall.

10   Q.    So I would ask you to look at that Exhibit 51 and tell us

11   the date of that.

12   A.    The date, which is on the top left -- there you go -- is

13   April 22, 2016.

14   Q.    And the title or the "RE" designation says what?

15   A.    "RE:  Memorandum of Understanding - Proposed Management."

16   Q.    "Proposed management"?

17   A.    Yes, sir.

18   Q.    Was this a contract?

19   A.    Not a binding contract.

20   Q.    Did this change the management structure of SnoOwl, this

21   document?

22   A.    No.

23   Q.    So I'd ask you to please read the first full paragraph

24   after the salutation of dear -- or, "Dr. Sheehan."

25   A.    "This letter shall detail the agreement between SnoOwl

1    Inc., a Delaware corporation (SnoOwl) Dr. Stafford Sheehan

2    (Dr. Sheehan) and the Honorable Jasiel F. Correia, II, (Mayor

3    Correia) regarding Dr. Sheehan proposed employment as SnoOwl's

4    new chief executive officer (CEO) Mayor Correia's resignation

5    as SnoOwl's CEO, Mayor Correia's proposed employment as

6    SnoOwl's new chief innovation officer (CIO) and the

7    corresponding restructuring of founders stock."

8    Q.   So this deals with a proposed -- something that may happen

9    in the future?

10   A.   Yes, sir.

11   Q.   And in the future, you may become the new chief executive

12   officer; is that true?

13   A.   Proposed, if -- it's continued in the following paragraph.

14   Q.   Yeah, we'll get to that in just a moment.  But,

15   ultimately, this document didn't make you the CEO?

16   A.   That's correct.

17   Q.   It didn't take Jasiel Correia away from being the CEO?

18   A.   It did not take him away from being the CEO to the best of

19   my knowledge and as it's written.

20   Q.   So please read the second paragraph.

21   A.   "The details of this letter shall be incorporated into an

22   action by written consent of shareholders on or before Friday,

23   May 6, 2016.  SnoOwl, Dr. Sheehan, and Mayor Correia agree to

24   the following terms:"

25   Q.   Before we get to the terms, explain what that paragraph

1  means to us.

2  A.   So that paragraph means that if the proposed employment

3  were to go forward, it would be incorporated into an action by

4  written consent of shareholders, that document would have been

5  the document that would have actually transferred ownership,

6  CEOship of the business from Jasiel to myself, had it been

7  drafted and executed.

8  Q.   And the action by written consent of shareholders, would

9  that be an agreement, an offer, a contract from the

10  shareholders?

11  A.   Yes.

12        THE COURT:  Mr. Tobin, is this a point that we can

13  break before we get into --

14        MR. TOBIN:  Wonderful opportunity.

15        THE COURT:  Okay.  So, ladies and gentlemen, we'll

16  take our afternoon break.  Be back about 3:15.

17        THE CLERK:  All rise.

18        (Jury left the courtroom.)

19        THE COURT:  Anything we need to discuss before the

20  break?

21        MR. HAFER:  No, your Honor.

22        THE COURT:  Okay, we'll see you a little before 3:15.

23        MR. TOBIN:  Your Honor, the witness may step down

24  during the break?

25        THE COURT:  You may step down.

```
 1              (Recess taken.)

 2              THE CLERK:  All rise.

 3              (Court entered the courtroom.)

 4              THE COURT:  Ready for the jury?

 5              MR. TOBIN:  We are, Your Honor.

 6              THE COURT:  Okay.

 7              (Pause.)

 8              (Jury entered the courtroom.)

 9              THE CLERK:  Please be seated.

10              THE COURT:  Assuming, as I do, ladies and gentlemen,

11     that nobody has been exposed to any information about this case

12     since you left the courtroom, unless somebody raises their

13     hand, we'll proceed.

14              Mr. Tobin?

15              MR. TOBIN:  Thank you, Your Honor.

16     BY MR. TOBIN:

17     Q.   Dr. Sheehan, I believe before the break you were examining

18     the second paragraph of the April 22, 2016, Memorandum of

19     Understanding; is that correct?

20     A.   Yes, sir.

21     Q.   And there was a deadline of Friday, May 6, 2016.

22     A.   Yes, sir.

23     Q.   And in order for the proposed changes outlined in

24     paragraph 1, an action by written consent of shareholders had

25     to be voted on or ratified or approved by the shareholders
```

1    before May 6, 2016.

2    A.    Yes, sir.

3    Q.    You, however, had also informed Jasiel Correia that there

4    was a condition that you needed to have met before you would

5    agree to become CEO; is that true?

6    A.    Yes, sir.

7    Q.    And that condition was the checklist you had given.

8    A.    Yes.

9    Q.    I would ask you now, please, then to focus again on

10   Exhibit 51 and the following terms, that subparagraph 1, if you

11   will.

12       Would you be kind enough to read that?

13   A.    Yes, sir.

14       "SnoOwl shall appoint Dr. Sheehan as SnoOwl's CEO and

15   shall grant --"

16       THE COURT:  Dr. Sheehan, if you could speak just a

17   little bit slower, we have this problem whenever anybody reads

18   something, it's faster than normal, it's hard to pick up and

19   have it transcribed, okay?

20       THE WITNESS:  Yes, sir.

21   A.    "SnoOwl shall appoint Dr. Sheehan as SnoOwl's CEO and

22   shall grant him 1,700,000 shares of stock with a six-month

23   cliff date for 1 million of those shares with the remaining

24   700,000 subject to the vesting schedule specified in the

25   December 2014 founders stock purchase agreement."

1    Q.   Sir, did you ever receive 1,700,000 shares of stock in

2    SnoOwl?

3    A.   No, sir.

4    Q.   Sir, did you ever receive any shares of stock in SnoOwl?

5    A.   Not to the best of my knowledge.

6    Q.   And, sir, did the shareholders ever execute an action by

7    written consent of shareholders enacting the changes listed in

8    paragraph 1?

9    A.   Not to the best of my knowledge.

10   Q.   If you would be kind enough to read subparagraph 2.

11   A.   So paragraph 2:

12       "Mayor Correia shall resign as SnoOwl's CEO and shall

13   forego 1,700,000 shares of SnoOwl stock of the original

14   4,250,000 shares granted to him in December of 2014.  SnoOwl

15   shall appoint Mayor Correia as SnoOwl's CIO and shall vest

16   Mayor Correia's remaining shares in accordance with the vesting

17   schedule specified in the December 2014 founders stock purchase

18   agreement."

19   Q.   And again, to the best of your knowledge, did any of that

20   take place?

21   A.   No.

22          MR. TOBIN:  If we could go to the bottom of that page,

23   please.

24   Q.   This document, this Memorandum of Understanding of

25   proposed management, was signed by four individuals -- strike

1    that.

2          It contains four signatures; is that accurate?

3    A.   Yes, sir.

4    Q.   Whose signatures appear on this page?

5    A.   Jasiel Correia's, Nicholas Bernier's, and mine.

6    Q.   Does Jasiel Correia's signature appear twice?

7    A.   Yes, sir.

8    Q.   The first one identifies him individually?

9    A.   Yes, sir.

10   Q.   And Jasiel Correia's second signature, his block, he's

11   identified as what?

12   A.   CEO and corporate president for SnoOwl, Inc.

13   Q.   To the best of your knowledge, did he ever cease to be CEO

14   of SnoOwl?

15   A.   Not to the best of my knowledge.

16   Q.   Sir, I'm going to ask you to please look at tab 52 in the

17   book in front of you.  It will be -- yes, in the book in front

18   of you.

19          Do you recognize Exhibit 52?

20   A.   Yes, sir.

21   Q.   What is it?

22   A.   It's the due diligence checklist that I gave to Nick and

23   Jasiel.

24          MR. TOBIN:  Your Honor, may we introduce Exhibit 52?

25          THE COURT:  You may, it's received.

```
 1              MR. TOBIN:  Thank you.
 2                  (Exhibit 52 received into evidence.)
 3      BY MR. TOBIN:
 4      Q.   Sir, if you'd be kind enough to read the heading of that
 5      where it says, "SnoOwl Company"?
 6      A.   "SnoOwl company data checklist (SWS-critical docs)"
 7      bolded.
 8      Q.   This document, this checklist, who drafted it?
 9      A.   I did.
10      Q.   Who did you give it to?
11      A.   Jasiel and Nick.
12      Q.   And what does "SWS" stand for?
13      A.   Those are my initials.
14      Q.   And that says "Critical docs" bolded?
15      A.   Yes, sir.
16              MR. TOBIN:  If we can zoom out again and see the whole
17      document.
18      Q.   And this has items A through P; is that accurate?
19      A.   Yes, sir.
20      Q.   Some of the documents are, in fact, bolded.
21      A.   Yes.
22      Q.   A is a bolded -- is bolded; is that true?
23      A.   Yes.
24              MR. TOBIN:  If we can zoom back out.
25      Q.   The next one that's bolded is D, Organizational documents
```

```
 1    (articles of organization, charter, et cetera.)

 2         Is that accurate?

 3    A.   Yes, sir.

 4              MR. TOBIN:  Zoom out.

 5    Q.   F is bolded?

 6    A.   Yes.

 7    Q.   What does F ask for?

 8    A.   List of officers and other key personnel, salaries,

 9    including all outside consultants, indicating the percentages

10    of their time estimated to be devoted to SnoOwl's business if

11    less than full-time employees.

12    Q.   Now, sir, this is one of the bolded entries, you wanted

13    all of this information; is that true?

14    A.   Yes, sir.

15    Q.   But you put particular emphasis on the ones that you put

16    in bold?

17    A.   Yes, sir.

18    Q.   Why was it important for you to know the salaries of

19    people working for or with or in SnoOwl?

20    A.   Because if I were to raise additional funds for the

21    company, I would need to demonstrate to those investors that I

22    knew where all the money coming into the company came from and

23    where all of the money going out of the company went to.

24              MR. TOBIN:  If we can zoom out on the document again.

25    Q.   And L is bolded.  What is that?
```

```
 1    A.    A list of SnoOwl intellectual property, that includes
 2    patents, trademarks, licensing or collaborations.
 3    Q.    And, sir, what is the importance of a patent, particularly
 4    when we're dealing with a startup that deals with the internet?
 5    A.    For a tech startup that's using new technology, such as
 6    SnoOwl was, patents are, in my opinion, critical for the
 7    business to protect what they're doing so that if a larger
 8    business sees what they're doing and is -- that it could
 9    potentially be successful, they don't just steal it.
10    Q.    Much of the value of a company may well be in its patents
11    and its intellectual property?
12    A.    Yes, sir.
13          MR. TOBIN:  If we can zoom out again, please.
14    Q.    I'm going to ask you to focus, if you would, please, on N,
15    which is also bolded.
16          Can you read that aloud for the jury, please.
17    A.    Yes, sir.
18          "Financial statements including balance sheet, income
19    statement and statement of cash flows for the prior fiscal year
20    and any interim quarterly unaudited financial statements for
21    SnoOwl for the current fiscal year."
22    Q.    Were you looking for financial records for the company?
23    A.    Yes, sir.
24    Q.    Did you want financial records from the beginning or the
25    inception of the company?
```

1  A.   Yes, sir.

2  Q.   Why was it important to have financial records?

3  A.   Again, because if I were to go to investors to raise

4  additional capital for the business, they would want to know

5  how the initial capital for the business had come in, how it

6  was invested into the business, and how it was spent so how it

7  went out.

8  Q.   And would that be for investors to determine if this was a

9  good risk?

10  A.   Absolutely for them to make an accurate risk assessment.

11  Q.   So it's important to know the money that came in and the

12  money that went out?

13  A.   Yes.

14  Q.   So you sent this to Jasiel Correia as CEO and to Nick

15  Bernier after the meeting; is that true?

16  A.   I believe so, yes.

17  Q.   Okay.

18  A.   I believe at the meeting I handed them a copy as well, if

19  I remember correctly.

20  Q.   And again, I'm saying the drop-dead date, which is

21  probably an unartful way to say it, but you gave them until May

22  6, 2016 to provide you with this information; is that true?

23  A.   Yes, sir.

24  Q.   Did you ever receive a list of salaries paid by SnoOwl, as

25  you had requested?

1   A.    I don't believe I did.

2   Q.    Did you -- did Jasiel Correia, the CEO, ever tell you he

3   was taking a salary from SnoOwl investor money?

4   A.    Not in the beginning.  I think this was something that

5   materialized later on in the course of our discovery of company

6   financials.

7   Q.    Did you receive some of the items you requested on your

8   checklist?

9   A.    I did receive some of the items I requested.

10  Q.    Did you receive all of the items you requested?

11  A.    I did not receive all of the items I requested.

12  Q.    Did you expect that you would be provided with the bank

13  records in their entirety for SnoOwl, the company?

14  A.    I did expect to be -- yes, for SnoOwl the company.

15  Q.    What bank records were you provided, either from Jasiel

16  Correia or Nick Bernier?

17  A.    I was provided with bank records for a BayCoast, I believe

18  it was, bank account, that was under, I believe, SnoOwl Inc.

19  Q.    Did you ever receive bank records for a SnoOwl account at

20  Citizens Bank?

21  A.    Not to the best of my knowledge.

22  Q.    Until much, much, much later when you were completely out

23  of this, did you ever know there was a SnoOwl company account

24  at Citizens Bank?

25  A.    I did not.

1    Q.   With regard to the BayCoast account, were you aware that

2    that account was closed on March 8 -- on March 8, 2016, even

3    before you signed the Memorandum of Understanding?

4    A.   I remember there was -- if I recall correctly, there

5    wasn't much money in the account, if any, so that may have been

6    possible, yeah.

7    Q.   So you came into or were willing to come into, attempting

8    to come into a company that had no money, was that your

9    understanding?

10   A.   That was my understanding, yup.

11   Q.   Did you know where Jasiel Correia had put your uncle,

12   David Cabeceiras' investment checks and the other checks he

13   received from investors?

14   A.   At the time, no.

15   Q.   What did you think or believe based on information you

16   received from Jasiel Correia and others?

17   A.   Based on the information I received from Nick Bernier and

18   from Jasiel Correia, I had believed that Jasiel had deposited

19   some of the investment checks from my uncle and other investors

20   into a personal bank account.

21   Q.   A personal account in the name of whom?

22   A.   Jasiel Correia.

23   Q.   Again, did anyone ever tell you about a Citizens account

24   in the name SnoOwl?

25   A.   I did not know.

1   Q.   What steps, sir, Doctor, did you take to get a complete

2   set of SnoOwl's bank records?

3   A.   I met with Nick Bernier and messaged Jasiel Correia,

4   e-mailed asking for additional records, and I also discussed

5   with my uncle separately what he could provide, what he would

6   be able to find based on paper trail of money he put into the

7   business, where, you know, that money went.

8   Q.   At some point were you given the BayCoast bank records?

9   A.   I believe I was given the BayCoast bank records, yes.

10  Q.   Were you given any other bank records?

11  A.   To the best of my knowledge, no.

12  Q.   Were you given any bank records that reflected where your

13  uncle, David Cabeceiras' money had been put by Jasiel Correia?

14  A.   Not from Jasiel Correia or Nicholas Bernier.

15  Q.   The records that you were seeking, the records, the bank

16  records of where the investment money went, who possessed them,

17  as you understood?

18  A.   I had at the time believed that Jasiel had those bank

19  records being a personal account of his.

20  Q.   Sir, I'm going to ask you to look at tab 53, Exhibit 53

21  and tell me, if you can, what this is.

22  A.   It is a business plan for SnoOwl that was provided to me.

23       MR. TOBIN:  Your Honor, may that come in as Exhibit

24  53.

25       THE COURT:  Yes, it will.

```
1              (Exhibit 53 received into evidence.)
2    BY MR. TOBIN:
3    Q.   I believe you just indicated that was provided to you as
4    one of the documents that was provided to you on the checklist?
5    A.   Yes.
6    Q.   Sir, may I direct your attention to page 5 of the business
7    plan dated 2015.
8    A.   Yup.
9    Q.   And specifically, if I may direct your attention to the
10   paragraph entitled "Leadership."
11   A.   Yes.
12   Q.   Would you be kind enough to please read the third sentence
13   in that paragraph which begins, "While still a student."
14   A.   "While still a student at Providence College, Jasiel
15   launched and sold his first web-based advertising project, the
16   FindIt Networks."
17   Q.   Did you believe that?
18   A.   Yeah.
19   Q.   You believed he actually sold the FindIt Network?
20   A.   Yes.
21   Q.   Because you were told that; is that accurate?
22   A.   I had no reason not to believe it.
23   Q.   Sir, please direct your attention to page 17 of this
24   exhibit.
25        What is the heading on that page?
```

1   A.   "VII Financials."

2   Q.   And we'll get into it with a little more specificity but

3   essentially this section of the business plan, Section VII

4   Financials, what does this outline for you or anybody else

5   reading this?

6   A.   This outlines some invoices for the development of SnoOwl

7   and some predicted future payments.

8   Q.   Now, you've worked in startups, why is it important to put

9   on a piece of paper the financials of a company, what the

10  expected expenses are?  Why is that important?

11  A.   Because investors that are going to put in money want to

12  know how you plan to spend their money.

13  Q.   And if we look briefly at some of the expenses, it talks

14  about Statewide billing at $75 an hour.

15       Do you see that on the second line of the first paragraph?

16  A.   Yes.

17  Q.   And it says, "Now that the members of the development team

18  will bill at $50 and $35 per hour, respectively."

19  A.   Yes.

20  Q.   In addition there's some discussion about a total of

21  $27,000 development labor costs for SnoOwl, 1.5.

22       Is that projected as well?

23  A.   Yes.

24  Q.   And then, of course, in the chart below we talk more about

25  development costs for engineers; is that accurate?

1    A.    Yes.

2    Q.    So if we flip the page and we go to fixed operating

3    expenses, can you read us that paragraph, please?

4    A.    "Server space costs, $179 per month, however, SnoOwl

5    management is planning to upgrade the server beginning in June

6    2015 to increase capacity in preparation for Version 1.5 and

7    the SnoOwl business dashboard.  The new server, also provided

8    by Rackspace, will cost $680 per month."

9    Q.    And the rent in the next paragraph.

10   A.    "Rent costs $150 per month."

11   Q.    This spells out the expenses for SnoOwl, the reoccurring

12   expenses?

13   A.    I believe so.

14   Q.    Is there anything there that talks about salary for

15   anyone?

16   A.    I do not see anything there about salary for anyone.

17   Q.    Sir, I am going to ask you to direct your attention to

18   Exhibit 54.

19         Do you recognize what makes up Exhibit 54?

20   A.    Yes, sir.

21   Q.    What is it, sir?

22   A.    It's an e-mail that I sent to Jasiel with Nick cc'd.

23   Q.    Thank you.

24         MR. TOBIN:  Your Honor, may 54 come into evidence?

25         THE COURT:  It may, it's received.

```
 1                 (Exhibit 54 received into evidence.)
 2    BY MR. TOBIN:
 3    Q.   Sir, I will ask you, this is an e-mail dated what?
 4    A.   I was going to say it's dated Friday, April 29, 2016.
 5    Q.   2016, April 29th.  And it's written by whom?
 6    A.   By myself.
 7    Q.   And it's sent to whom?
 8    A.   To Jasiel.
 9    Q.   And to whom else, who else?
10    A.   With Nicholas Bernier cc'd.
11    Q.   If you'd be kind enough -- or the salutation is addressed
12    to whom?
13    A.   Jasiel.
14    Q.   Jasiel, the chief executive officer?
15    A.   Yes.
16    Q.   Would you be kind enough, again, slowly so that everyone
17    can follow along, can you read the first paragraph of your
18    April 29, 2016 e-mail?
19    A.   Yes.
20         "I need to apologize if this message comes across as
21    harsh.  I met with Nick today to go over company financial
22    information and found that there are some very alarming
23    financial issues that need to be fixed before we can move
24    forward with SnoOwl.  Nick and I need access to records for all
25    investor money that's been put into the company and how it has
```

1  been spent, going back to the first penny of Angel A.  If you

2  don't have those records available, then we have to get

3  together, find what we can, and rectify these issues.  What can

4  you provide as far as bank records and accurate numbers for

5  dollar amounts invested?"

6  Q.   Now, sir, you had signed the Memorandum of Understanding

7  only approximately a week before; is that true?

8  A.   Yes, sir.

9  Q.   On April 22, 2016?

10  A.   Yes, sir.

11  Q.   Now, perhaps you can explain, at this point, you were not

12  the CEO, correct?

13  A.   Correct.

14  Q.   You haven't received everything you've asked for; is that

15  accurate?

16  A.   Mm-hmm, that is accurate.

17  Q.   And the action by the shareholders has not taken place?

18  A.   That is accurate.

19  Q.   You are trying to get everything so you can make a

20  decision, is that true, about if you will join the company?

21  A.   That's accurate.

22  Q.   So -- but do you start actually doing SnoOwl work as

23  you're trying to gather these materials and ultimately decide?

24  A.   Yes, sir.  I had trusted that Jasiel did have this

25  material and he would be able to provide it, and so I had begun

1    to reach out to my network and reach out to people that I knew

2    that had experience with these sorts of apps to see who I could

3    tap to potentially invest in the business and potentially work

4    for the business.

5    Q.   So you started working for the company, for SnoOwl, even

6    though the relationship hadn't been formalized?

7    A.   Yes.

8    Q.   Now, in this first paragraph, you write in part,

9    "financial issues that need to be fixed before we can move

10   forward with SnoOwl."

11        What do you mean by "financial issues that need to be

12   fixed before we can move forward with SnoOwl"?  What were the

13   financial issues you saw in the first week?

14   A.   The financial issue was that, I mean, specifically, my

15   uncle had put in more money than the company had recorded he

16   put in.

17   Q.   And moving forward with SnoOwl, what do you mean by

18   "moving forward"?

19   A.   Before I could, you know, assume ownership, you know, sign

20   an employment agreement, and use my resources to try to build a

21   business as best as possible.

22   Q.   You write, then, sir, Nick and I need access to records

23   for all, bolded, investor money that's been put into the

24   company and how it has been spent.

25        Who is the Nick you're referring to?

1    A.    Nicholas Bernier.

2    Q.    Why did you believe that Nicholas Bernier did not have

3    access to all of those records?

4    A.    Because in the second sentence of that paragraph, it

5    states, "I met with Nick today to go over company financial

6    information," and in that meeting I believe that he had said

7    that he did not have that particular financial information.

8    Q.    And that financial information was who gave what and where

9    did it go?

10   A.    A complete picture of that, yes.

11   Q.    You also write, "If you don't have those records

12   available, then we have to get together, find what we can, and

13   rectify these issues."

14            And you ask Jasiel Correia what records can you give

15   me; is that correct?

16   A.    Yes, sir.

17   Q.    And does he ever give you all of the bank records, and by

18   saying that, I include the SnoOwl account at Citizens Bank?

19   A.    I did not receive, yeah.

20   Q.    Could you be kind enough to read the second paragraph of

21   this e-mail to Jasiel Correia?

22   A.    "Right now, neither Nick nor I know where a substantial

23   amount of investor money collected by SnoOwl has gone.

24   Furthermore, as I understand it, early on in the company, you

25   used a personal account to conduct company business (e.g.

1    Jasiel Correia d/b/a SnoOwl) after raising investor money.

2    This is, at best, a horrible mistake, and at worst, can be

3    regarded as criminal if the funding gaps are not solved."

4    Q.   Again, the Nick there is Nick Bernier?

5    A.   Yes, sir.

6    Q.   And you say that you and Nick do not know where a

7    substantial amount of investor collected by SnoOwl has gone.

8         How did you know Nick didn't know that?  Did that come up

9    in the conversation you had had with him previously?

10   A.   I believe so.

11   Q.   Now, you do mention here -- you, at this point, you

12   mention or you write that you understood, you understood that

13   early in the company you used a personal account to conduct

14   company business.

15        That was and remains your belief throughout your tenure

16   with SnoOwl?

17   A.   That was and remained my belief throughout -- until very

18   recently.

19   Q.   And did Jasiel Correia ever give you access to this

20   account you imagined was his personal account that had SnoOwl

21   business in it?

22   A.   No.

23   Q.   "A horrible mistake, and at worst, can be regarded as

24   criminal if the funding gaps are not solved."

25             You were very concerned, were you not?

1    A.   I was very concerned, yes.

2    Q.   Now, what about -- what effect did the fact that you were

3    concerned there may be some criminality have on your thinking

4    about joining SnoOwl as the CEO?

5    A.   I was more hesitant.  I did not believe at the time that

6    it was criminal, I stated, "at worst can be regarded as

7    criminal."  I didn't believe it was worst case at the time.  So

8    I -- I was -- I would say more hesitant to assume equity

9    ownership of SnoOwl after this, but I was still in

10   communication with my uncle very regularly and he was still

11   very hopeful that he would be able to recoup some of his --

12   some of the money he had put into the business.

13   Q.   Dr. Sheehan, would you be kind enough to read the third

14   paragraph of your e-mail.

15   A.   The third paragraph:

16        "I don't mean for this message to be overly harsh, but I

17   have personally seen these issues completely ruin both early

18   and well-established careers before, even after moving on from

19   the case/company.  I do not want that to happen to you -- we

20   need to take action now to correct everything in SnoOwl's

21   books, and while I know that you're very busy with your mayoral

22   duties, this is more urgent."

23   Q.   And "this is more urgent" you put in bold; is that

24   correct?

25   A.   Yes.

1   Q.   And your -- the last paragraph of the e-mail, please, if
2   you'd be kind enough to read that.
3   A.   "Your current investors could hold you as liable for
4   unaccounted spending, especially with the use of a personal
5   account.  I know that you haven't done anything malicious and
6   your actions in the past were all with the best intent to grow
7   SnoOwl, but that thought won't be shared by certain investors
8   when there are missing funds in a commingled bank account.
9   It's bad, but not the end of the world if we take action to fix
10  it now."
11  Q.   You wrote, "I know that you haven't done anything
12  malicious and your actions in the past were all with the best
13  of intent."
14       Did you really know that?
15  A.   I did not really know that; I believed it.
16  Q.   Did you hope that at the time?
17  A.   I hoped it, yes.
18  Q.   Did Jasiel Correia ever respond by e-mail or text to this
19  April 29, 2016 e-mail that you sent?
20  A.   To the best of my knowledge, he did not respond by e-mail,
21  no.
22  Q.   Did you discuss your concerns, the ones voiced in this
23  e-mail, with Jasiel Correia at a meeting in his mayoral office?
24  A.   I believe so.
25  Q.   And who was present for this meeting?

1    A.    Nicholas Bernier, Chris Carreiro, Jasiel and myself, I

2    believe.

3    Q.    And who is Chris Carreiro?

4    A.    Chris Carreiro is -- or at the time was a partner with

5    Nick Bernier in a law firm that Nick Bernier was working at.

6    Q.    What happened at the meeting?

7    A.    We discussed what Jasiel could potentially do to go

8    through his -- what I believed at the time to be a personal

9    account at Citizens Bank to determine which transactions were

10   personal and which transactions were business in nature.  I

11   believe that's what we discussed at that meeting.  We had other

12   meetings later on, and so my memory may not be perfect from

13   five years ago.

14   Q.    At that meeting did you discuss a Non-Disclosure

15   Agreement?

16   A.    I believe so.

17   Q.    And what is a Non-Disclosure Agreement?

18   A.    It's an agreement that states that parties won't disclose

19   what the other party discloses without their permission in a

20   specific field of -- in a specific narrow field of subject

21   field.

22   Q.    How did the -- who brought up the issue of a

23   Non-Disclosure Agreement?

24   A.    It was I believe Chris Carreiro or Jasiel, but I'm not a

25   hundred percent certain which party did.

1   Q.   And in this instance dealing with these records, what was

2   the purpose -- I understand you've given us an explanation as

3   to what a Non-Disclosure Agreement is, by why was one needed in

4   this circumstance as you understood?

5   A.   Well, because we all believed that Jasiel had used a

6   personal account for SnoOwl business as mentioned in this

7   e-mail, and there was a potential for myself and other people

8   to be potentially exposed to Jasiel's personal financial

9   information, of which we did not want to -- you know, we did

10  not want to be exposed to and we did not want -- we did not

11  want him to have concern that we would then share that

12  personal -- any personal financial information that we were

13  exposed to.

14  Q.   And you're okay with the Non-Disclosure Agreement?

15  A.   Yeah, I would say that would be typical for a situation

16  like this.

17  Q.   And you believed you were going to get records on an

18  account with just Jasiel Correia's name on it.

19  A.   I believed that that -- I would either get records or, you

20  know, receipts of specific transactions or things like that.

21  Q.   And you mentioned a moment ago "commingling," the belief

22  was that Jasiel Correia had commingled personal funds with

23  investor funds?

24  A.   That was the belief at the time, yes.

25  Q.   And that this had been done in his own account?

1    A.    Yes.

2    Q.    Did anyone ever disabuse you of that notion?  Did anyone

3    tell about this other account that you apparently didn't know

4    about?

5    A.    Not until very recently, about less than a month ago, I

6    believe.

7    Q.    So you sign the Non-Disclosure Agreement.  At that point

8    did you expect to get these records that might show where all

9    this money went, where other investor money went?

10   A.    I would expect to get the records to show where my

11   uncle's -- I mean, I was mostly concerned about my uncle's

12   money.  And I would say, yeah, I was looking for the records of

13   where my uncle's money had gone.

14   Q.    Well, did you need these records also if you wanted to get

15   outside investors?

16   A.    Yes, that also is true, as well.

17   Q.    And of course, after signing the Non-Disclosure Agreement

18   agreement, did Jasiel Correia show up or send you these

19   records?

20   A.    We never received the exact records themselves.  I would

21   say several months later summaries may have been provided.

22   Q.    But, again, never did you get or even know about a SnoOwl

23   account that may have been opened for years before BayCoast?

24   A.    Correct.

25   Q.    You never saw an entry in a bank record of your uncle's

```
 1    investment money?
 2    A.    I never saw an entry for the vast majority of his
 3    investment money.  I don't believe he had any in the
 4    BayCoast --
 5    Q.    Similarly, did you ever see records or receipts for how
 6    Jasiel had spent this money?
 7    A.    My uncle's money or --
 8    Q.    Well, you're right.  That's a bad question.  Let me strike
 9    it.
10           Did you ever learn that Jasiel Correia had spent
11    significant, thousands, thousands and tens of thousands of
12    dollars of investor money on personal items?  Did you ever
13    learn that?
14    A.    I learned that much later that he could have spent large
15    amounts of money on personal items, but not at the time, I did
16    not learn that at the time.
17    Q.    You did not know.  He never came to you and said, you
18    know, I spent all this money, investor money, on things that
19    were for myself and my girlfriend.  You never learned that?
20    A.    At the time I didn't.  I mean, I learned it much later.
21    Q.    You're talking about fairly recently?
22    A.    Fairly recently.
23    Q.    But not during your involvement ever with SnoOwl.
24    A.    During my involvement with SnoOwl, later on, I was told
25    that he had spent significant amounts of money on, you know, on
```

1    potentially personal things, but not the nature of those

2    personal things specifically.

3    Q.    Thank you.

4          Sir, I want to ask you to turn to Exhibit 55.  Do you

5    recognize that?

6          Actually, you know what, I think this is already in

7    evidence, so let me direct your attention to Exhibit 55.

8          Do you recognize that document?

9    A.    Yes, sir.

10   Q.    What is it?

11   A.    It's an extension to the Memorandum of Understanding.

12   Q.    And can you read it -- "Memorandum of Understanding

13   extension Dr. Sheehan," can you read the body of the text of

14   that?

15   A.    "This letter shall extend the April 22, 2016 Memorandum of

16   Understanding (MOU) between SnoOwl Inc., a Delaware corporation

17   (SnoOwl) Dr. Stafford Sheehan (Dr. Sheehan) and the Honorable

18   Jasiel F. Correia, II (Mayor Correia) collectively the parties.

19   The parties agree that additional ministerial work needs to be

20   completed before any action by written consent of the

21   shareholders can be completed.

22         "The parties agree to the details of MOU shall be

23   incorporated into an action by written consent of shareholders

24   on or about Thursday, June 9, 2016."

25   Q.    That's fine.

1           Why was there a need to extend the deadline to June

2    9th of 2016?

3    A.    To give Jasiel and Chris and his team adequate time to

4    review the -- what we had believed to be a personal account and

5    determine which transactions were business related, which

6    deposits were investor money, and other, you know -- and other

7    things to --

8    Q.    You were still waiting for all of the requested

9    information on the checklist you had given; is that true?

10   A.    Yes, that information is one of the things, financial

11   information I requested on the checklist.

12   Q.    And again, if we can go to the full page of that document.

13           And again, this May 6, 2016 extension is signed by

14   whom?

15   A.    Three individuals: myself, Jasiel, Nick, and signed by

16   Jasiel twice.

17   Q.    And Jasiel signs individually and as CEO and corporate

18   president for SnoOwl, Inc.; is that true?

19   A.    Yes, sir.

20   Q.    At this point you still have not committed to becoming the

21   CEO of SnoOwl; is that true?

22   A.    That's true.

23   Q.    The date was extended to June 9, 2016.  By that date, had

24   Jasiel Correia provided you with all of the company financial

25   records you had been seeking?

1    A.    No.

2    Q.    He missed the deadline of June 9, 2016?

3    A.    I believe so.

4    Q.    Without the requested records, were you able to verify or

5    determine how much money the company raised from investors?

6    A.    I was not able to accurately determine.

7    Q.    Without the financial records you requested, were you ever

8    able to determine how Jasiel Correia had spent the money he

9    raised from investors?

10   A.    Not specifically.

11   Q.    Directing your attention now to about May 11, 2016, did

12   you attend a meeting at a Boston law firm?

13   A.    Yes, sir.

14   Q.    Who attended the meeting?

15   A.    Myself; Nicholas Bernier, Bill Schnoor, who is a partner

16   at the law firm Goodwin Procter; and two of his attorneys that

17   were associates, I believe.

18   Q.    What was the purpose of the meeting at Goodwin Procter?

19   A.    It was to understand the legal status of SnoOwl, how best

20   to move forward with the business, and also how best to

21   understand -- how best to move forward with the business

22   understanding that there was investor money that was

23   unaccounted for, specifically checks that my uncle had written

24   to Jasiel.

25   Q.    What solution was proposed by the attorneys at the

1  meeting?

2  A.   The attorneys at the meeting proposed that the checks that

3  were -- that my uncle put into the business, that Jasiel had

4  spent -- Jasiel had spent on personal things be classified as a

5  loan between Jasiel and my uncle.

6  Q.   Now, are you referring, as you understood it, perhaps was

7  the attorney referring, to your uncle's original $50,000

8  investment or the remaining checks constituting his additional

9  $95,000 investment?  What was going to be classified as a loan?

10  A.   The remaining checks.

11  Q.   There were no records in the business of ever receiving

12  those checks; is that accurate?

13  A.   That is accurate, to the best of my knowledge.

14  Q.   Now, did you make a telephone call when you left Goodwin

15  Procter?

16  A.   Yes, I almost immediately called my uncle.

17  Q.   David Cabeceiras, one of -- the seed investor, if you

18  will?

19  A.   Yes.

20  Q.   What did you tell your uncle, investor David Cabeceiras?

21  A.   I relayed to him the message that -- or I relayed to him

22  the recommendation from Bill Schnoor at Goodwin Procter on how

23  to proceed forward.

24  Q.   Did you say anything to your uncle during that

25  conversation about any peril that Jasiel Correia might be in?

1    A.   Yes, I believe I said that it could negatively affect his

2    status as mayor.  I don't recall whether or not that was by

3    either a legal means or by word getting out to the public, but

4    either way, it was a negative thing.

5    Q.   This could be very difficult for the mayor of the city?

6    A.   Yes.

7    Q.   And what was your uncle's reaction?

8    A.   I would say he was very concerned.

9    Q.   Sir, after the meeting at the lawyer's office, Goodwin

10   Procter's office, did you and your uncle, David Cabeceiras, go

11   to his bank to make inquiry about the checks he had written to

12   Jasiel Correia?

13   A.   I believe so.

14   Q.   Did you learn that a number of those checks written by

15   your uncle to SnoOwl had been cashed for cash by Jasiel

16   Correia?

17   A.   Yes.

18   Q.   That they didn't make it into any account, is that what

19   you understood?

20   A.   That is what I understood.

21   Q.   And that was after looking at documents and talking to

22   bank personnel?

23   A.   I believe so.

24   Q.   And as a prospective CEO in this company, and as the

25   nephew of your uncle, what was your reaction to that?

1    A.    My first reaction was as the nephew of my uncle, because

2    that was the reason why I was there in the first place, and

3    really my first reaction was, we need to find a way to either

4    get my uncle paid back or follow up with what Bill Schnoor had

5    recommended, because myself, I am not a lawyer, so I didn't

6    understand what, you know, the overall ramifications of it

7    were.

8    Q.    Sir, the deadline, the second deadline of Thursday, June

9    9, 2016, came and went, and you still did not have the

10   necessary records; is that true?

11   A.    Yes, sir.

12   Q.    Sir, directing your attention to November 16th of 2016,

13   did you attended a meeting at your uncle's orthodontic office

14   in Fall River?

15   A.    I believe so, so.

16   Q.    To the best of your recollection, who attended the

17   meeting?

18   A.    To the best of my recollection, Jasiel Correia; my uncle;

19   myself; Chris Carreiro as Jasiel Correia's attorney; and my

20   cousin, my uncle's son.

21   Q.    Did your cousin, your uncle's son, leave the meeting early

22   on?

23   A.    I don't recall.  It was -- that particular detail I

24   haven't discussed, I was never asked that before so I don't

25   recall.

1   Q.   Okay.  You just don't know; you don't recall?

2   A.   I don't recall.

3   Q.   You do recall that he was present at least for part of the

4   meeting?

5   A.   Yes, sir.

6   Q.   What was the purpose of this meeting at your uncle's

7   dental office?

8   A.   It was to try to execute on Attorney Schnoor's

9   recommendation to have some sort of loan between my uncle and

10  Jasiel.

11  Q.   So is that what was discussed at the office, turning these

12  $95,000 in investment checks into a loan?

13  A.   I believe it was.

14  Q.   And what was your uncle's position or what did your uncle

15  do at this meeting?

16  A.   I remember at the end of the meeting he wanted to consult

17  his attorney, which is, you know, I think absolutely what he

18  should do.

19  Q.   So to the best of your knowledge or recollection, did he

20  ever at that meeting sign off on any paperwork classifying this

21  $95,000 as a loan?

22  A.   To the best of my knowledge, I don't think he did.

23  Q.   Was there a discussion at that meeting about your uncle

24  signing a Hold Harmless Agreement?

25  A.   I believe there was.

```
 1    Q.   And what is -- in this context, who would he be holding
 2    harmless?
 3    A.   Jasiel, I believe.
 4    Q.   Again, he wanted to see his lawyer and that was the end of
 5    the meeting?
 6    A.   If I recall, yeah, if I recall correctly.
 7    Q.   To the best of your belief and recollection, your uncle,
 8    did he ever sign any document saying that that was a loan?
 9    A.   I do not believe he did.
10    Q.   Sir, if I could direct your attention, if I might, or if
11    you might, to Exhibit 56.  This is not in evidence -- well, I
12    don't remember if it's in evidence.
13              Can you look at Exhibit 56?
14              THE COURT:  It's not.
15              MR. TOBIN:  It's not, thank you, Your Honor.
16    BY MR. TOBIN:
17    Q.   What is Exhibit 56?
18    A.   It's a letter that I wrote to SnoOwl, Inc.
19    Q.   And that letter is on January 26, 2017?
20    A.   Yes.
21              MR. TOBIN:  Your Honor, may 56, excuse me, Your Honor,
22    may that come into evidence as Exhibit 56?
23              THE COURT:  Yes, it's received.
24         (Exhibit 56 received into evidence.)
25    BY MR. TOBIN:
```

1    Q.    All right.  So this is a letter written by whom?

2    A.    By myself.

3    Q.    And what date is this?

4    A.    January 26, 2017.

5    Q.    And who do you write this to?

6    A.    SnoOwl Inc., the business.

7    Q.    And you write, "To whom it may concern"; is that true?

8    A.    Yes, sir.

9    Q.    Would you be kind of to read the body of the letter, and

10   of course going slowly so that the court reporter can get it

11   and we can all follow.

12   A.    "This letter is to reiterate that the terms set forth in

13   the Memorandum of Understanding dated April 22, 2016 and the

14   extension dated May 6, 2016 were not fulfilled by SnoOwl, Inc.

15   by the deadline of June 9, 2016; namely:

16        "The due diligence checklist that I sent to Nicholas

17   Bernier and Jasiel Correia on April 22, 2016 was not completed;

18        "Financial records were never produced, despite me

19   giving repeated extensions to the management team throughout

20   2016;

21        "As a result of these, no further extension was

22   granted beyond June 9, 2016 and my consideration to be CEO of

23   SnoOwl, Inc. was withdrawn.  The action by written consent of

24   shareholders was never completed and I no longer have interest

25   in this position."

1    Q.   So you make reference -- this is, essentially, I'm leaving

2    the company, any work I've done is going to stop?

3    A.   I would say I'm just reiterating that the Memorandums of

4    Understanding were never converted to binding contracts.

5    Q.   Did you cease to want or be willing to be CEO?

6    A.   I ceased to be willing to take over the CEO position at

7    this time.

8    Q.   And, sir, you mentioned that the extension, further

9    extension was granted beyond June 9, 2016.

10          That is the extension that was memorialized in the second

11   agreement that we've seen; is that true?

12   A.   Yes, sir.

13   Q.   And between June 9, 2016 and the date of this letter,

14   January 26, 2017, had you ever received the financial records

15   you had asked for?

16   A.   Not completely.

17   Q.   So just -- well, strike that.

18          Why is it, specifically on January 26, 2017, you

19   notified SnoOwl that you no longer were willing to become CEO,

20   a position you had never held, but you were no longer willing?

21   Why did you want out, if you will?

22   A.   I don't recall exactly why the specific timing of the

23   letter was there.  To be a hundred percent honest, I don't

24   remember exactly the timing, the reasoning for the timing.

25   Q.   Well, the timing -- okay.  But at some point you decided

1  that you didn't want to spend your time and your effort at

2  SnoOwl; is that true?

3  A.    Yes.

4  Q.    Thus, the letter; is that accurate?

5  A.    Yes.

6  Q.    Why didn't you?  Were you concerned?

7  A.    I think I was concerned that I wasn't going to get all the

8  materials that I would need to, you know, to raise additional

9  funds in the business, to revitalize it, and to execute on the

10  plan that we had discussed to continue SnoOwl forward.

11  Q.    Sir, again, the original Memorandum of Understanding was

12  dated April 22, 2016, correct?

13  A.    Yes, sir.

14  Q.    And your letter saying you were no longer interested is

15  dated January 26, 2017; is that accurate?

16  A.    Yes, sir.

17  Q.    So how long were you -- how many months or weeks or how --

18  what's the -- between April 22, 2016 and January 26, 2017, how

19  long were you in this position where you were assisting the

20  company and still doing due diligence to see if you could

21  become the CEO?  How long were you in that status?

22  A.    I would say, and as you -- as you phrase it specifically,

23  nine months.  I did continue to after -- even after I had sent

24  this, you know, at partially at the behest of my uncle, I did

25  continue to try to help the business, and help Jasiel even

1    after I sent this letter but --

2    Q.   Let me ask you about that.

3          You said even though you sent this letter dated

4    January 26, 2017, you tried to assist the business and help

5    Jasiel, and I think you mentioned your uncle?

6    A.   Yes.

7    Q.   In a moment I'll ask you what efforts transpired or you

8    took after January 26, 2017.  We'll get to that.  But right now

9    I'd like to talk --

10          THE COURT:  Mr. Tobin, does that mean we're not going

11   to be able to complete this witness' direct examination?

12          MR. TOBIN:  No, Judge, I don't think we will.

13          THE COURT:  Okay.  So I think we're going to take a

14   break for the day at this point.

15          So, ladies and gentlemen, this is the break for the

16   day.  You won't discuss this case with anyone or expose

17   yourself to any information about it.  You'll come back

18   tomorrow morning around 9:15 and assemble here.  And we'll try

19   to get started promptly at 9:30 with completing Dr. Sheehan and

20   taking on some additional witnesses at that point.

21          Bear in mind my instruction that you're not going to

22   be sitting on Friday afternoon, here, just to remind you this

23   week, so you can plan accordingly as a result of that.  And

24   we'll continue to trudge ahead tomorrow.

25          Have a good afternoon.

```
1            THE CLERK:  All rise.
2            (Jury left the courtroom.)
3            THE COURT:  Dr. Sheehan, you can leave at this point.
4            I want to be certain we have the schedule in place for
5    tomorrow.
6            The one thing that I did notice is that Mr. Charest
7    was put below or after Ms. -- Special Agent Lemanski, and I
8    want to be sure that that's -- that's the order you want to get
9    through.
10           I expect that we will be through SnoOwl this week.
11           MR. HAFER:  I mean, I don't know about the
12   cross-examination, but it's certainly our intention, yes, Your
13   Honor.
14           THE COURT:  Okay.  And so is Mr. Charest going to
15   precede Agent Lemanski?
16           MR. HAFER:  Yes, Your Honor, that's the plan.
17           THE COURT:  Okay.  Because I understood him to be
18   available tomorrow.
19           MR. HAFER:  He is available tomorrow, and if it's
20   okay, we'll send you that update tonight.
21           THE COURT:  Yes.
22           MR. HAFER:  We have a few moving parts.  I know,
23   actually, Mr. Charest has a vaccination on Friday, so -- but
24   we're going to get it done, I'll just send you an update this
25   evening.
```

1          THE COURT:  Well, I think just in terms of clarity for

2     the jury, as I understand it, Special Agent Lemanski is kind of

3     a summary witness?

4          MR. HAFER:  Yes, Your Honor.

5          THE COURT:  -- in this, so somebody who generally

6     comes at the end rather than in the middle of it.

7          MR. HAFER:  Yes, Your Honor.

8          THE COURT:  So that's the order that I would expect it

9     to be.

10          Anything else we need that we need to take up at this

11     point?

12          All right.  So we'll see you tomorrow morning.  Thank

13     you.

14          THE CLERK:  All rise.

15          (Court adjourned at 4:11 p.m.)

16                         CERTIFICATION

17          We certify that the foregoing is a correct transcript

18     of the record of proceedings in the above-entitled matter to

19     the best of our skill and ability.

20     /s/Debra M. Joyce_____      April 28, 2021_____
       Debra M. Joyce, RMR, CRR, FCRR   Date
21     Official Court Reporter

22

23

24     /s/Kelly Mortellite_____      April 28, 2021_____
       Kelly Mortellite, RMR, CRR      Date
25     Official Court Reporter

1                                    <u>INDEX</u>

2

3    <u>WITNESS</u>                                              <u>PAGE</u>

4
     JOSHUA SCOTT HARDING
5
         Direct Examination by Mr. Hafer                       9
6        Cross-Examination by Mr. Reddington                  46
         Redirect Examination by Mr. Hafer                    65
7
     NICHOLAS BERNIER
8
         Direct Examination by Mr. Hafer                      67
9        Cross-Examination by Mr. Reddington                 116

10   STAFFORD WHEELER SHEEHAN

11       Direct Examination                                  199
         By Mr. Tobin
12

13

14                          E X H I B I T S

15
     <u>Exhibit No</u>.                                      <u>Received</u>
16

17      41                                                   15

18      42                                                   17

19      43.1                                                 25

20      44                                                   33

21      45                                                   37

22      46                                                   44

23      66                                                   86

24      49                                                   90

25      50
                                                      92

| | | |
|---|---|---|
| 1 | 37 | 106 |
| 2 | 51 | 117 |
| 3 | 55 | 121 |
| 4 | 336 | 169 |
| 5 | 337 | 184 |
| 6 | 338 | 185 |
| 7 | 339 | 186 |
| 8 | 340 | 187 |
| 9 | 341 | 194 |
| 10 | 342 | 196 |
| 11 | 343 | 197 |
| 12 | 52 | 213 |
| 13 | 53 | 220 |
| 14 | 54 | 223 |
| 15 | 56 | 241 |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |