UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                               )
UNITED STATES OF AMERICA,      )
                               )            Criminal Action
          Plaintiff,           )            No. 18-10364-DPW
                               )
v.                             )
                               )
JASIEL F. CORREIA, II,         )
                               )
          Defendant.           )
                               )
```

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

JURY TRIAL DAY 7

April 29, 2021

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Debra M. Joyce, RMR, CRR, FCRR
Official Court Reporters
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

On Behalf of the Government:
Zachary R. Hafer
David G. Tobin
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3106
zachary.hafer@usdoj.gov
david.tobin@usdoj.gov


On Behalf of the Defendant Jasiel Correia, II:
Kevin J. Reddington
Law Offices of Kevin J. Reddington
1342 Belmont Street
Suite 203
Brockton, MA 02301
508-583-4280
kevinreddington@msn.com

```
1                     P R O C E E D I N G S
2              (The following proceedings were held in open court
3    before the Honorable Douglas P. Woodlock, United States
4    District Judge, United States District Court, District of
5    Massachusetts, at the John J. Moakley United States Courthouse,
6    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on
7    April 29, 2021.)
8              THE COURT:  Ms. Beatty tells me that there are no
9    matters that you want to take up ahead of time.  There is,
10   however, a scheduling issue that I wanted to take up with you,
11   or at least have you thinking about it.
12             As we get close to finishing the government's
13   presentation with respect to SnoOwl, I, of course, have been
14   thinking about instructions to the jury, and I think it would
15   be useful for us to talk about that at some convenient time.
16             The issue that I want to have you thinking about is
17   intent, and when intent attaches in connection with the charges
18   that are laid here.  My preliminary view is that the defendant
19   has to have the specific intent to defraud at the time that the
20   misrepresentations are made and that the wire facilitation
21   takes place, both of them.  I'm sorting through this.  I'm
22   outlining it for you so you've got an idea of what we might be
23   talking about and what you should be prepared to think about
24   and help me work my way through.
25             The second issue -- I'm sorry, this is a closed
```

1    hearing at this point.  We'll open it up shortly.

2         So you ought to be thinking about that.  The issue of

3    intent is not generally so well developed or the two competing

4    arguments with respect to it are not always so well developed

5    in wire cases, wire mail fraud cases as it has been here.  So I

6    want the parties to know what it is that I'm likely to be

7    charging on ahead of time and be able to address that.

8         Now, easy enough for me to say we'll find the time.

9    The question is when we find the time.  As far as I'm

10   concerned, the best time is after the government has completed

11   its case with respect to this issue.  They haven't completed

12   the case because, of course, there's -- the government hasn't

13   rested, won't rest until after, at least as I understand it,

14   won't rest until after the Fall River government aspect of the

15   case is completed.  But I don't want anybody being surprised or

16   anything like that.  If there's some remedial effort that has

17   to be done by the government, maybe they'll do the remedial

18   effort; maybe they won't.  I don't know.  But in any event, you

19   should have the best information that you can have on where I'm

20   going to be on this and be able to respond to it.

21        So that suggests some time next week.  I believe, I've

22   been reading and rereading the various submissions and so on

23   and going through the transcript.  I believe that the

24   government will rest next week and probably before Friday.  But

25   I don't know.

1            In any event, you think about it, and I know

2     Mr. Reddington obviously has demands on his time as well, and

3     this may be an opportunity as well to take up the lingering

4     motion to dismiss issue -- I shouldn't say motion to dismiss --

5     motion in limine issue.  So Mr. Reddington.

6            MR. REDDINGTON:  Yes, Your Honor.  Thank you.  I

7     indicated, Your Honor, to counsel I will not be calling Monica

8     Sousa.

9            THE COURT:  I'm sorry?

10           MR. REDDINGTON:  I will not be calling Monica Sousa.

11           MR. HAFER:  I think it moots the motion in limine

12     because Mr. Reddington's not going to call that witness.

13           THE COURT:  Okay.  I see.  I'm sorry.  It's fortunate

14     that I have hearing problems because then I can anticipate the

15     worst for everybody else and ask for clarity.  That's part of

16     my role here.

17           Okay.  So I've got what I've got, and we'll put that

18     over here.  So think about when there's a time to carve this

19     out here.  We can -- I want to discuss with the court reporters

20     as well, who are just under incredible pressures.  That's just

21     the case.  So I don't want to impose on them, and that's not to

22     mention Ms. Beatty.  I just show up whenever people tell me to

23     show up, so I'll show up sometime that fits for you guys.

24           MR. HAFER:  On that I just want to say, we, on behalf

25     of the government, recognize the work that your staff is doing,

1    Your Honor, and we really appreciate it.  We know the pressure

2    that they're under.

3         One, big picture, I agree with you that we will rest

4    no later than hopefully Friday of next week.  I think, given

5    that, it's possible, and what you had indicated to the jurors

6    initially, we could pick, if Your Honor has other business, it

7    may make sense Monday or Tuesday to do a half day and then do

8    an argument in the afternoon or a discussion, whatever you want

9    to call it, on the charge.  I think even if you did that, I'm

10   comfortable.

11        As you know, the second part of our case is not as

12   long as the first part of our case.  So while they sort of

13   break logically along those two lines, we have more witnesses,

14   more time, more evidence, more exhibits in the first part.  So

15   I think even if you were inclined to pick a day next week as a

16   morning day only, we'd comfortably be able to rest by the end

17   of the week.

18        THE COURT:  Well, let me -- so that you think about it

19   further, I really do mean it that I'm not trying to play a game

20   of gotcha and treat the government as having rested its SnoOwl

21   case when we move on to what I call the Fall River government

22   case.

23        If there are remediable things after the discussion,

24   the government thinks that they can remedy it, then obviously

25   you should have that opportunity, I think obviously you should

1    have that opportunity after a discussion.  All of which says

2    the discussion should take place before there is a completion

3    of all the evidence in the case.  And so I think that it

4    probably makes sense late in the afternoon of next week

5    sometime.  But that's a --

6            MR. HAFER:  We could do it Monday.  That would be

7    fine, Your Honor.

8            THE COURT:  I don't know about Monday.  But maybe --

9    whatever.  You think about it.  We'll talk about it tomorrow

10   and, of course, Mr. Reddington has his own set of scheduling

11   concerns I'm sure with respect to this.  But you guys are

12   entitled to know where I'm going.

13           MR. HAFER:  Thank you for the heads-up.  Obviously we

14   want to look closely at your comments and the cases and that

15   sort of thing and have an informed view when we're due to

16   discuss it.

17           THE COURT:  Right.  And I would welcome whatever case

18   law that you'd like me to look at.  I'm not looking for

19   arguments about it, you know, extended arguments but just

20   something like, what is it, a 28(j) filing in the Court of

21   Appeals.

22           MR. HAFER:  Yes, Your Honor.

23           THE COURT:  Additional case law, without argument, but

24   although I'll let you highlight the cases so that you get me to

25   the juicy parts of it.  That's really what I'm looking at.

1    I've been doing some obviously myself on this.

2            So that's my preliminary matter, but I think we're

3    ready to go now.

4            MR. HAFER:  We are.  Yes, Your Honor.

5            THE COURT:  If you could get the witness in and put

6    him on the stand, and we'll bring the jury in.  We'll become

7    public as soon as the jury is in.  If they can ask the pool

8    reporter to come in as well.

9            (Jury enters the courtroom.)

10           THE COURT:  So ladies and gentlemen, my customary

11   morning greeting.  Have any of you been exposed since last we

12   talked to anything touching on this case, other than what's

13   transpired here in the courtroom?

14           We do that by a show of hands or lack of show of

15   hands.  And I see no affirmative response to that, so I find

16   that there has been no such exposure.

17           We'll continue with the examination of the witness.

18   Mr. Tobin, you may inquire.

19           MR. TOBIN:  Thank you, Your Honor.

20   DIRECT EXAMINATION BY MR. TOBIN (Continued)

21   Q.   Dr. Sheehan, good morning.

22   A.   Good morning.

23   Q.   I believe when we finished yesterday for the day, you had

24   gone over the January 26, 2017 letter that you sent to SnoOwl

25   indicating you no longer had interest in the position of CEO.

1    A.    Yes, sir.

2    Q.    While you were associated with SnoOwl, did you become

3    aware of issues with Josh Harding and the other programmers not

4    being paid?

5    A.    I believe so.

6    Q.    At that time did you have any access to company funds?

7    A.    Not personally.

8    Q.    Do you even know were there any company funds at that

9    point?

10   A.    I did not know whether there were company funds.

11   Q.    Were you concerned that your computer people or computer

12   people weren't getting paid and were unhappy?

13   A.    Yes.

14   Q.    Did you bring that to the CEO's attention?

15   A.    I believe so.

16   Q.    That would be Jasiel Correia?

17   A.    Yes.

18   Q.    Did you ask him to pay them?

19   A.    I believe I did.

20   Q.    That checklist that you had originally given to Jasiel

21   Correia and Nick Bernier, it talked about patents.  You wanted

22   to know about the status of any patents that were pending or

23   that were possessed by SnoOwl.  Is that true?

24   A.    Yes, sir.

25   Q.    And during your association while you were trying to

1    determine if you could become the CEO, what was the status?

2    Did the company have a patent?  Did it have a provisional

3    patent?  What did you understand about the situation with the

4    intellectual property?

5    A.   The company had applied for a patent and had a favorable

6    priority date for a provisional patent.

7    Q.   But it did not yet have a patent?

8    A.   It did not yet have a fully-granted patent.

9    Q.   While most of us probably have some idea of what a patent

10   is, perhaps you could just explain briefly.  What is a patent

11   and why is it important for a company to have one on

12   intellectual property?

13   A.   Yes, sir.  So a patent is a description of a technology

14   filed with the United States Patent and Trademark Office that

15   is first applied for.  You apply for a patent by filing your

16   descriptions, specification and claims of what -- claiming what

17   invention you are making.

18        Then a patent examiner will examine the patent

19   application, and they will typically litigate with either

20   yourself or a patent attorney.  And I don't know if "litigate"

21   is the correct word.  Please correct me if I'm wrong.  But

22   ultimately, if you have a good patent attorney, many patents,

23   patent applications that are drafted are granted.

24        Once the patent is granted, your company has some level of

25   protection so that if someone else were to try to practice that

1    technology as described in your patent, you could sue them for

2    infringing upon your patent, and it is a good way for a small

3    business or a startup company to protect valuable technology so

4    that a big company can't just steal it, put more resources into

5    it and run over the small business.

6    Q.   And so when --

7                THE COURT:  Mr. Tobin, if I could just interrupt at

8    this point to make an explanation to the jury.

9                If we were in a patent case, I'd be the one

10   instructing you on the law of patents, but we're not in a

11   patent case.  We're in a case in which the concerns are the

12   perceptions of investors, and those generally, as to what the

13   value, if any, would be of a patent.  So I've permitted

14   Dr. Sheehan to speak about this as to his perception of what a

15   patent means here.

16               If it becomes necessary to provide a legal description

17   on the law of patents, then of course, I'll do that.  But for

18   present purposes, it does not yet appear necessary to do that.

19   So now you have the perception of someone who is involved in

20   the company about what the value, if any, was of a patent and

21   why there would be such value.

22               You may proceed, Mr. Tobin.

23               MR. TOBIN:  Thank you, Your Honor.

24   Q.   Your belief and perception was that protecting the

25   intellectual property of SnoOwl was important?

1  A.    Yes, sir.

2         THE WITNESS:  And thank you, Your Honor.

3  Q.    And the patent that was pending had not been fully secured

4  while you were there; is that true?

5  A.    That's correct.

6  Q.    What steps did you take in those months you were

7  associated with SnoOwl to help protect or finalize the patent

8  approval?

9  A.    So the first step that I took was discussing it with

10  Goodwin Procter, the attorney, the law firm, that had, I

11  believe had filed the patent application.  To the best of my

12  recollection, they believed that there was significant value in

13  the patent application as well.  And they also informed, I

14  believe they informed Nicholas and myself of the potential cost

15  to get the patent fully litigated to be granted, to be

16  converted from a patent application to a fully-granted patent.

17  Q.    It's a very expensive process?

18  A.    Yes, sir.  The cost was very high, and so I negotiated

19  with a different lawyer who was also very skilled with this

20  particular intellectual property type for a much lower rate for

21  the company.

22  Q.    Thank you.  Did you bring this, what you had done,

23  negotiated with another patent lawyer --

24         It would be less expensive.  Is that what you're telling

25  us?

1   A.   Yes.

2   Q.   Did you bring that to the attention of the CEO, Jasiel

3   Correia?

4   A.   I believe I did.

5   Q.   And what happened?  Did Jasiel Correia hire this

6   individual?

7   A.   I do not recall exactly because it was around five years

8   ago, but I believe Jasiel did engage with the lawyer, but I do

9   not know if -- I do not know if he fully signed all the

10   documents necessary, et cetera, et cetera.

11   Q.   Did the patent, was it ever fully secured, to the best of

12   your knowledge?

13   A.   To the best of my knowledge, it was not.

14   Q.   Now, you indicated or you talked -- we talked about the

15   January 26, 2017 letter you sent saying essentially you no

16   longer were interested in assuming the position of CEO,

17   correct?

18   A.   Yes, sir.

19   Q.   My question now is, after you sent that letter, did you

20   continue to do anything or have any involvement at all with

21   SnoOwl?

22   A.   Yes, sir.

23   Q.   And why did you continue to have any involvement with

24   SnoOwl after you had walked away?

25   A.   Because it was important to my uncle that I still try

1    to -- at least try to recoup some of the money he had invested.

2    Q.   So Dr. Sheehan, what at that point did you do?  How did

3    you try to recoup some of your uncle's money?

4    A.   I had been having -- prior to my sending this letter, I

5    had been having discussions with a potential acquirer of

6    SnoOwl's intellectual property.  A man by the name of Spyros

7    Contogouris, who had been a potential investor that Jasiel had

8    previously spoken to as well.  And I continued the

9    conversations up to the point where myself and Nicholas Bernier

10   negotiated a license agreement for SnoOwl's intellectual

11   property.

12   Q.   Would you be kind enough to explain to the ladies and

13   gentlemen of the jury, when you say you negotiated a license

14   agreement for intellectual property, what is a license

15   agreement?

16        THE WITNESS:  Your Honor, may I explain?

17        THE COURT:  Just give the jury your understanding of

18   what that is.

19        THE WITNESS:  Yes, sir.

20   A.   My understanding of what a license agreement is is it

21   allows a separate entity to use the intellectual property of a

22   business.  So this license agreement would have allowed Spyro's

23   -- the company that Spyro had planned to begin to use SnoOwl's

24   intellectual property in response and in exchange for a fee

25   that that company would pay to SnoOwl.  And I saw this as a

1    means to monetize and make money out of SnoOwl's intellectual

2    property for SnoOwl, the business.

3    Q.   And prior to this there had been no monetizing of SnoOwl;

4    is that true?

5    A.   To the best of my knowledge, there had not been.

6    Q.   No money had been brought in or made by the company?

7    A.   To the best of my knowledge.

8    Q.   So I'm going to ask you, if you would, sir, to turn to

9    Exhibit 57 in the binder in front of you.  It's made up

10   primarily of two things.  If you could look at those and then

11   let me know when you've had an opportunity to scan them.

12   A.   Yes, sir.  Yes, sir, I recognize these.

13   Q.   So what documents or what makes up Exhibit 57?

14   A.   First, it is an email chain between myself, Spyro

15   Contogouris, the potential acquirer or licensee of the

16   technology, Joe Martin, who was a business partner of Spyro

17   Contogouris, and Jasiel Correia.

18        Following that is a license agreement that Nicholas

19   Bernier drafted between SnoOwl -- I believe Nicholas Bernier

20   drafted it -- between SnoOwl and Spyro Contogouris.  And then

21   because there were emails on two different chains, I also

22   provided the individual emails between myself and Spyro well.

23        MR. TOBIN:  Thank you.  Your Honor, may Exhibit 57

24   come into evidence.

25        THE COURT:  Yes, it's received.

```
 1              (Exhibit 57 admitted into evidence.)
 2              MR. TOBIN:  Thank you.
 3   Q.   And Dr. Sheehan, I'll ask you to look at the first page of
 4   Exhibit 57.  Now, the first email in this chain is actually the
 5   last email on the page; is that true?
 6   A.   Yes, sir.
 7   Q.   So let's focus on the email at the bottom of the page,
 8   Tuesday, February 7, 2017 at 9:06 a.m.  Do you see that?
 9   A.   Yes, sir.
10   Q.   That email is from whom?
11   A.   It's from Spyros Contogouris.
12   Q.   And who was it sent to?
13   A.   I believe it is sent to everyone that was on the email
14   chain, but I'm not 100 percent sure of that.  I know it was at
15   least sent to me.
16   Q.   The salutation is "Staff"?
17   A.   Yes, sir.
18   Q.   Can you please read, slowly, that email to the ladies and
19   gentlemen of the jury.
20   A.   Yes, sir.  "Here's what I think I can do:  I can pay
21   $1,000 nominal consideration for the rights to use any and all
22   technology, plus a 7 percent gross annual fee off the top of
23   Hawkeye System's sales.  You know the customer, so I anticipate
24   about $300,000 annually in service revenue, including
25   relicensing annual fee.  I would obviously use Josh to work
```

1    through making the adjustments to the app I think I need and

2    offer to hire him and his team to perform the installation.

3    Let me know if this works and maybe Nick can draft something up

4    or modify my old agreement."

5    Q.   Who did you understand the "Josh" referenced in Spyros'

6    email to be?

7    A.   Josh Harding.

8    Q.   And who do you believe or recognize the Nick in the email

9    to be?

10   A.   Nicholas Bernier.

11   Q.   And essentially what is Spyros offering to do in this

12   email?

13   A.   He is offering to non-exclusively, which is important --

14   that means that SnoOwl can still license the technology to

15   others as well if they so desire -- license the technology that

16   SnoOwl had patent pending, and potentially provide a

17   potentially promising revenue stream to SnoOwl.

18   Q.   And still have the ability -- SnoOwl would have the

19   ability to maybe license to other companies and get other

20   revenue streams?

21   A.   Exactly.  It was a non-exclusive license.

22   Q.   Now, I'd like you to look at the second email in this

23   string, the one that appears on the page immediately above

24   Spyros's email.  Do you see where it says on Friday, February

25   10, 2017.  Do you see that email?

```
1    A.    Yes, sir.

2    Q.    Who sent that email?

3    A.    Myself.

4    Q.    And to whom did you send it?

5    A.    I believe it was to all the people that are on this email

6    chain.

7    Q.    And you started with Spyros, correct?

8    A.    Yes, sir.

9    Q.    And, again, if you'd be kind enough to read your email to

10   the ladies and gentlemen.

11   A.    I will say I believe it was to all the people on this

12   email chain, but again, my memory from five years ago may not

13   be 100 percent.

14   Q.    All right.  And what did you write in the email?

15   A.    "Spyros, Attached is a licensing agreement draft using

16   mostly template language.  It was written nonexclusive and

17   fairly broad.  Please let us know what changes you'd like to

18   see in it.

19        "Jasiel, please have anyone you would like on the SnoOwl

20   side review, once Spyros is happy with it, and then it should

21   be executable.  Jasiel's signature should suffice for all

22   company business, and if you would like to see additional

23   signatories, as we discussed, either he or I can get them in a

24   timely manner."

25        I believe the additional signatories that was considered
```

1    was potentially my uncle.

2         "I have been in touch with Josh, and he should be able to

3    get to work fairly quickly if need be.

4         "My power just came back on after a day on and off due to

5    the snow.  Now that I have electricity, I can keep an eye on

6    things more easily."

7    Q.    In this letter the salutation is "Spryos," correct?

8    A.    Spyros, yes.

9    Q.    But in the middle of the letter you also address a

10   specific comment or request to Jasiel.

11   A.    Yes, sir.

12   Q.    And you believe Jasiel actually was on this email chain?

13   A.    I believe so.

14   Q.    "Jasiel, please have anyone you would like on the SnoOwl

15   side review, once Spyros is happy with it, and then it should

16   be executable."  What does "executable" mean?

17   A.    That means they could sign it.

18   Q.    Now, if we go to the actual licensing agreement, which

19   begins on page 2.

20   A.    Yes, sir.

21   Q.    This is the licensing agreement that was, to the best of

22   your recollection, created by Nick Bernier after you and he

23   spoke and after Spyros made an offer?

24   A.    I believe so.

25   Q.    If you go to the last page of the licensing agreement

1  where it talks about license fee.

2  A.   Yes, sir.

3  Q.   Can you read that for us?

4  A.   13.1.

5  Q.   Item 9 on the very end of the --I'm sorry, if we can keep

6  going on the screen.

7  A.   Ah, yes.

8  Q.   No, the next page, actually.

9  A.   Next page.

10 Q.   Next page.

11 A.   That's it.

12 Q.   License fee, item 9.  Thank you.

13 A.   "The license fee shall be 7 percent of licensee revenue.

14 The licensee will pay the licensor quarterly and provide sales

15 data annually at the end of each fiscal year.  A $1,000

16 consideration fee is due to the licensor at the commencement

17 date."

18 Q.   Did you believe this was a good deal for SnoOwl and its

19 investors?

20 A.   I did believe this was a good deal because it is 7 percent

21 of licensee revenue.  Revenue is hard to fudge.  Whereas profit

22 people can change more easily.  But this is a license fee on

23 the revenue generated.

24 Q.   If we can go back to the first page of this exhibit, the

25 email chain.  We've gone through Spyros' email, your email, and

1    there's an email above that, second from the top.  Wednesday

2    February 15, 2017.

3    A.   Yes, sir.

4    Q.   And what do you write in that email?

5    A.   "Guys, please see the attached revised agreement.  Jasiel,

6    how does it look to you?"

7    Q.   And again, you're specifically asking the CEO how does

8    this look?

9    A.   Yes, sir.

10   Q.   You're keeping him up to speed on what's happening with

11   Spyros?

12   A.   Yes, sir.

13   Q.   And the final email, at least on this page, is at the

14   beginning of the page dated March 11, 2017; is that correct?

15   A.   Yes, sir.

16   Q.   So if we can look -- so we just read February 15.  Now we

17   go all the way to March 11, 2017.  You write an email to whom?

18   A.   To Spyros, Joe Martin and Jasiel Correia.

19   Q.   And, again, who is Joe Martin?

20   A.   He's a business partner of Spyros Contogouris, to the best

21   of my knowledge.

22   Q.   And Jasiel Correia, of course, is the CEO of SnoOwl?

23   A.   Yes, sir.

24   Q.   So can you tell us what you wrote on that date.

25   A.   "Jasiel, last time we talked it sounded like your/SnoOwl's

1  lawyer was happy with the license agreement.  Have you been

2  able to get a signed copy back to Spyros?"

3  Q.   Did you hear back from Jasiel at that point?

4  A.   I did not hear back -- well, I don't remember if I heard

5  back in other than email form but I did not hear back from

6  Jasiel in email form.

7  Q.   Okay.  And were you getting frustrated at him not signing

8  it?

9  A.   I would say it was -- yes, it was a bit frustrating

10  because I believed this to be a favorable license agreement.

11  Q.   Sir, I would ask you on the same exhibit there's a second

12  email chain, or actually a continuation of that email chain, or

13  whatever, which appears after the licensing agreement.  Do you

14  see that?

15  A.   Yes, sir.

16  Q.   And on the first page of these two pages, there is an

17  email March 12, 2017.  Do you see that?  There's actually two

18  of them.  So forgive me.

19  A.   Yes.

20  Q.   There's one March 12, 2017 at 1:54 p.m.  Do you see that?

21  A.   Yes, sir.

22  Q.   And who is that from?

23  A.   From Spyros Contogouris.

24  Q.   And who does the salutation say?

25  A.   "Staff," myself.

1    Q.   And what is Spyros saying in this -- read the email for

2    us, please.

3    A.   He asked, "Could you arrange to come to the office again

4    Thursday morning, March 23, to meet Roger, who will be partner

5    with Joe and I and responsible to champion the product."  The

6    "Roger" he's referring to is Roger Clinton, brother of Bill

7    Clinton.

8    Q.   Bill Clinton's brother.  Okay.

9         What's the next sentence?

10   A.   "I'd like to invite the Statewide guys as well so that we

11   can holistically wrap up a plan of action.  Can you guys swing

12   it?"

13   Q.   He's inviting you and the folks from SnoOwl to come to his

14   office so you can get this thing done and start producing

15   revenue for SnoOwl?

16   A.   Yes, sir.

17   Q.   You respond to Spyros' March 12 email later that same day,

18   don't you?

19   A.   Yes, sir.

20   Q.   And that's the email directly above, March 12, 2017 10:11

21   p.m.?

22   A.   I believe my response was 12:58.

23   Q.   I'm sorry.  12:58 p.m.  I apologize.

24        And what do you write in response?

25   A.   "Sounds good.  I will be there and will get in touch with

```
 1    Josh at Statewide today to make sure he can attend."
 2    Q.   Spyros then responds to that and says?
 3    A.   "Great."
 4    Q.   That's March 12, 2017.
 5         What email is next on this chain?
 6    A.   It's an email from me to Spyros.
 7    Q.   You to Spyros.  And what date is that?
 8    A.   The next day.
 9    Q.   March 13, 2017?
10    A.   Yes, sir.
11    Q.   11:26 p.m.?
12    A.   Yeah.
13    Q.   What do you write to Spyros?
14    A.   "I have gotten in touch with everyone.  Lucas, Josh's
15    employee on the project, will certainly be there.  Josh is 99
16    percent sure he can make it as well.  Spoke with Jasiel as
17    well.  He said he will have the signed license agreement to you
18    this week.  I really apologize again that I wasn't available by
19    phone today, have been on three flights in one day and I bet
20    you caught me while in the air," and just discussing that,
21    "Please feel free to give me a call tomorrow.  I should be free
22    10:00 to 12:00 and 1:00 p.m. onward eastern time."
23    Q.   Had you discussed the agreement again with Jasiel and had
24    he told you he was going to sign the license agreement and get
25    it back to Spyros this week?
```

1    A.    I believe I did.

2    Q.    And that's what you wrote in the email, is that true?

3    A.    I believe I did.  Again, my recollection of spoken words

4    from five years ago, but I believe I did.

5    Q.    Again, you wrote "spoke with Jasiel as well."

6    A.    Yes.

7    Q.    "He said he will have the signed license agreement to you

8    this week."  That was in your email, correct?

9    A.    Yes, sir.

10   Q.    And then is there an email above that?  There's one final

11   email above that, is there not?

12   A.    Yes, sir.

13   Q.    That is from Spyros to you and possibly others?

14   A.    Just to me.

15   Q.    And what does it say?

16   A.    "Gotcha.  Just call when you can...S."

17   Q.    Did the meeting in Spyros' office ever happen, to the best

18   of your knowledge?

19   A.    To the best of my knowledge, it did not.

20   Q.    To the best of your knowledge, did the CEO, Jasiel

21   Correia, ever send the signed agreement to Spyros?

22   A.    To the best of my knowledge, no.

23   Q.    To the best of your knowledge, did SnoOwl investors, your

24   uncle and others, ever get a penny from Spyros' licensing of

25   the intellectual property?

1    A.    To the best of my knowledge, no.

2    Q.    And is the intellectual property, is the patent still in

3    place?

4    A.    To the best of my knowledge, I do not -- well, I do not

5    know the exact status of the patent right now.

6          MR. TOBIN:  I have no further questions, but, sir,

7    please remain seated.

8          THE COURT:  Mr. Reddington.

9    CROSS-EXAMINATION BY MR. REDDINGTON:

10   Q.    Good morning, sir.

11   A.    Good morning.

12   Q.    In March of 2017, which would be the time of Exhibit 57,

13   the email chain that you were just going through --

14   A.    Yes, sir.

15   Q.    -- would you agree, sir, that the federal government had

16   already begun investigating SnoOwl and Jasiel Correia?

17   A.    Yes, sir.

18   Q.    And it was in the newspaper, correct?

19   A.    I don't recall exactly if it was, but if you say so, I

20   will believe that.

21   Q.    Okay.  Did you ever have occasion to read the Fall River

22   Herald, for example, and a person by the name of Jo Goode, who

23   is a reporter?

24   A.    That does sound familiar to me, yes, sir.

25   Q.    Right.  And pretty much on a daily basis, or at least on a

```
 1    biweekly basis, there were huge front-page articles about the
 2    mayor under investigation, the criminal, the FBI, and all this
 3    stuff, correct?
 4    A.    That sounds correct.
 5    Q.    So when you asked Jasiel to sign the license agreement,
 6    you knew from a conversation with him that he was represented
 7    by an attorney by the name of Mark Berthiaume.  Did you know
 8    that?
 9    A.    I don't recall that specific name, but he may have told me
10    that he was represented by an attorney.  Like I said, my memory
11    of conversations of spoken word from --
12    Q.    Of course.
13    A.    -- five years ago is not perfect.
14    Q.    That's okay.  So do you have any recollection, sir -- and
15    I know it's been five years.  Do you have any recollection of
16    Jasiel telling you, apologetically or however, that his
17    attorney, who was representing him on this FBI U.S. Attorney
18    criminal investigation, advised him not to sign any documents
19    such as licensing agreements or anything?
20    A.    I honestly don't remember.
21    Q.    Okay.  But in any event, you would agree with me that in
22    your dealings with Jasiel, he was always kind of excited,
23    exuberant, passionate about SnoOwl?
24    A.    I would agree with that.
25    Q.    And you know that, for example, one of the things that
```

1    Nick Bernier, Chris Carreiro had done was refer him to a fellow

2    by the name of Terrance Charest, who is a CPA, right?

3    A.   Yes, sir.

4    Q.   And that was to go through all of the records and try to

5    reconstruct the sloppy records and put together a decent

6    recognized accounting ledger, if you will, of what was

7    expenditures, what the income was?

8    A.   I believe that was why that CPA was hired, yes, sir.

9    Q.   Okay.  And in reference to the timeframe when the

10   Memorandum of Understanding was executed and extended -- who

11   wrote that up, by the way?

12   A.   I believe it was Nicholas Bernier.

13   Q.   Nick Bernier.  When the -- you thought that would be a

14   good thing to sign?

15   A.   I did at the time.

16   Q.   Okay.  And you were working pretty closely with Nick

17   Bernier with the SnoOwl business, right?

18   A.   I was -- I would say I was communicating with both Nick

19   Bernier and Jasiel.  I would say that for trying to understand

20   what had happened with --

21   Q.   I know you were trying to understand what happened.

22        My question is simple, sir.  You worked hand in glove, as

23   they say, with Nick Bernier in the business of SnoOwl, correct?

24   A.   I did work with Nick Bernier in the business of SnoOwl.

25   Q.   Okay.  And he, meaning Jasiel Correia, was a year into a

1    position of mayor by this time, right?

2    A.    I believe so.

3    Q.    And you did not talk to him on a regular basis while he

4    was working as mayor, did you?

5    A.    I would say I did communicate with Jasiel on a somewhat

6    regular basis.

7    Q.    Was he responsive it to your inquiries or questions?

8    A.    For the most part I believe he was.

9    Q.    All right.  Did you, when you finished looking at all the

10   documents and records -- for example, this note that was

11   written by, I believe, I might be wrong, I think Gunderson

12   Dettmer, the law firm Nick Bernier had reached out to, the

13   convertible debt note?

14   A.    Yes, sir.

15   Q.    You saw that, right?

16   A.    I believe so.

17   Q.    And at that point the people that were, as you referred to

18   as investors were referred to now as lenders on this

19   convertible debt note, right?

20   A.    I believe so.

21   Q.    Did you know at any time, sir, about maybe a year ago, or

22   a little bit longer, that Jasiel and his family were able to

23   raise funds sufficient to make payment with no quid pro quo for

24   the investor money, with interest, and the U.S. Attorney's

25   Office obviously had to have an approval of that?

```
1          MR. TOBIN:  Objection.
2          THE COURT:  Well, again, ladies and gentlemen, this is
3   one of those questions that we'll have to see whether there's
4   any evidence of it.  And if there isn't and this witness has no
5   knowledge of it, of course, you'll disregard it.  But the
6   witness may answer that question.
7   A.    I did not know.
8   Q.    No one told you that there was money available in return
9   for which there would be a document that would be signed by,
10  for example, your uncle waiving any interest that he would have
11  in SnoOwl?
12          MR. TOBIN:  Objection.
13          THE COURT:  Well, I think the jury understands the
14  limitations of the question and the issue of whether or not
15  there will be evidence of such a matter.
16  A.    Can I ask, are you referring --
17          THE COURT:  There's no need for you to answer that
18  question.  I'm sustaining the objection.
19          THE WITNESS:  Okay.
20  Q.    Now, as I understand it, when you have an app on the App
21  Store with Apple, it has to be kind of nurtured.  Whether it's
22  on a monthly basis or every couple of months, there would be
23  improvements to the platform, and you have to constantly
24  monitor it and make sure that your app is comparable to Apple's
25  platform.  If you don't monitor it every month or every couple
```

1    of months and do updates, it basically would just die?

2    A.   I do not know the specific timeframe for the Apple Store

3    off the top of my head.

4    Q.   Okay.

5    A.   But I do realize the need to update apps both for

6    compliance and for consumers.

7    Q.   Now, Josh Harding from Statewide Software, in response to

8    Mr. Tobin's question, you were concerned they had not been paid

9    and things of that nature, right?

10   A.   Yes, sir.

11   Q.   And did you know, sir, or did Mr. Harding do due diligence

12   on however the timeframe would be, monthly or bimonthly or

13   every couple of months, to make sure that the app was still

14   viable?

15   A.   I had believed -- I believe he was doing diligence to keep

16   an eye on the app and insure that it was still viable.

17   Q.   Well, you knew from looking at the records that Jasiel had

18   made payments to Statewide on behalf of SnoOwl, over $70,000,

19   and they were owed around 2,000 bucks.  That's all they were

20   owed.

21   A.   I didn't realize they were only owed around $2,000.

22            MR. TOBIN:  Objection.

23            THE COURT:  Yes.  The jury will recall the evidence in

24   the case, and you'll evaluate the question that's asked in the

25   context of whatever other evidence there is in the case to

1    decide about how compelling the question is.  But that's up to

2    you.  The point is that, and again, you're the final finders of

3    fact, but there is evidence in the case about the amount of

4    money that was involved that was outstanding.

5              MR. REDDINGTON:  Thank you.

6    Q.   Did you know that they were ultimately paid?

7    A.   I don't recall them telling me that.  I don't recall

8    anything about them being paid ultimately.

9    Q.   And in your opportunity to review the records from

10   BayCoast, for example --

11             You had the records from BayCoast, correct?

12   A.   Yes, sir.

13   Q.   Did you make any observation of these checks that were

14   cashed being deposited in the BayCoast account and making

15   payments for business expenses for SnoOwl?

16   A.   May I ask which checks you're referring to?

17   Q.   I'm just asking in a generic sense, if you will, when you

18   looked at the records were you aware -- I don't have the actual

19   check number in my head right now.  Did you make any

20   observation that a check would be received, for example, from

21   Dr. Cabeceiras, cashed, and a deposit then made in the BayCoast

22   account?

23   A.   I would have to look at the BayCoast records to be able to

24   remember that.  I don't remember off the top of my head.

25   Q.   So you were aware that Gunderson Dettmer were basically

1    discharged by Nick Bernier, and then Nick Bernier reached out
2    to Goodwin Procter, and then you guys went in and had a meeting
3    at Goodwin Procter, correct?
4    A.   Yes, sir.
5    Q.   That would be you and Nicholas, as you refer to him,
6    right?
7    A.   Yes, sir.
8    Q.   And you met with a guy by the name of Bill Schnoor?
9    A.   Yes, sir.
10   Q.   And he also had two associates with him for this meeting?
11   A.   To the best of my knowledge, yes.
12   Q.   And in the course of this meeting, this is when the idea
13   came about to have your uncle's funds classified as a loan and
14   it would be money that was loaned to Jasiel rather than the
15   corporation SnoOwl?
16   A.   I believe that was the recommendation of the legal
17   counsel, yes, sir.
18   Q.   Okay.  And that's the first time, really, that you had
19   heard of that, that would be on Mr. Schnoor's advice at that
20   meeting?
21   A.   That was the first time I had heard of that particular
22   strategy for the checks, yes, sir.
23   Q.   So it seemed like possibly a pretty good idea to do this
24   and get some money back to your uncle, correct?
25   A.   Correct.

1    Q.   And you spoke at some point with Jasiel about it, right?

2    A.   Correct.

3    Q.   And he was agreeable or cooperative to do pretty much

4    whatever you guys wanted to resolve that issue with your uncle,

5    right?

6    A.   He was agreeable, yes.

7    Q.   Okay.  And a meeting was scheduled, I believe, maybe at

8    your uncle's office.  I'm not sure where.  Do you recall there

9    was a meeting scheduled?

10   A.   Yes, sir.  I believe Attorney Tobin asked about the

11   meeting, this meeting, as well yesterday.

12   Q.   And where was this meeting?

13   A.   I believe it was at my uncle's office.

14   Q.   And there was an email chain, if you will, between

15   yourself and Jasiel Correia, for example, saying we're going to

16   have this meeting.  It's going to be you, me, meaning you, my

17   uncle, and then also Jeff Cabeceiras, your cousin, wanted to

18   attend the meeting, correct?

19   A.   I believe so, yeah.

20   Q.   And Jasiel sent you a response saying I'm not good with

21   that because at that point you were well aware that Jeff

22   Cabeceiras, the cousin, was posting incessantly on Facebook

23   about him being a thief and him being indicted and him going to

24   jail and all of that.  You recall that, right?

25   A.   I -- at the time I did not keep track of my cousin's

1    Facebook activities very well, to be honest.

2    Q.   Well, do you recall sending an email or a text to Jasiel

3    apologizing for your cousin's conduct and basically saying that

4    he's a spoiled child?

5    A.   I may have, you know, told Jasiel that my cousin was a bit

6    unhinged and I think he probably lacked decorum.  So I would

7    say I certainly had said that at that time.

8    Q.   As opposed to your uncle, who is a very classy guy?

9    A.   Yes.

10   Q.   So Jasiel did go to your uncle's office, right?

11   A.   I believe so.

12   Q.   And you were there, right?

13   A.   Yes, sir.

14   Q.   And your uncle was there?

15   A.   Yes, sir.

16   Q.   An Jeff was there, the cousin?

17   A.   Yes, sir.  And Christopher Carreiro, I believe.

18   Q.   Christopher Carreiro, the lawyer?

19   A.   Yes, sir.

20   Q.   Now, at that meeting, it's fair to say that based on his

21   conduct, shall we say, Jeffrey was pretty much asked to leave

22   or ejected from the meeting by yourself and your uncle?

23   A.   To be 100 percent honest, I don't recall that particular

24   detail.  I will say, you know, it fits.  But, you know, I don't

25   recall that -- to be 100 percent honest, sir, I don't recall

1    every single piece of every meeting we had in late 2016.

2    Q.   Right.  But you'd certainly recall the unhinged cousin

3    becoming unhinged at that meeting and being asked to leave.  Do

4    you remember that?

5              MR. TOBIN:  Objection.  Asked.

6              THE COURT:  No.  He may answer that question.

7    A.   To be 100 percent honest, I don't remember, you know, I

8    don't remember specifics.

9    Q.   In April of 2016, back it up a year --

10   A.   Yes, sir.

11   Q.   -- from the timeframe of March and April of '17.  In April

12   2016, Jasiel had already been mayor since January, correct?

13   A.   I believe so.

14   Q.   And you were familiar with, and as we established, working

15   with Mr. Bernier, correct?

16   A.   Yes, sir.

17   Q.   And in April of '16 did you know or did you see that Nick

18   Bernier sent out an email blast to investors, advisors, and

19   friends stating that he was introducing Staff Sheehan as a new

20   CFO.  Did you see that?

21   A.   I don't believe -- that doesn't make any sense to me.

22   Q.   It doesn't make any sense to you.  You didn't know that

23   Nick Bernier advised everybody that you were the CEO?

24   A.   Oh, you said CFO.

25   Q.   I'm sorry.  I get them confused.

1          Do you recall him sending out an email saying, "I am

2    excited to introduce to you our new CEO, Staff Sheehan," and

3    went through a whole thing about your background, your

4    education, which is very impressive.  Do you recall that?

5    A.   It sounds -- it sounds consistent.  I believe he may have

6    gotten ahead of himself a little bit by calling me the new CEO,

7    if that's the way he phrased it specifically.

8    Q.   Okay.  Well, you would agree with me, sir, that, for

9    example, the Memorandum of Understanding that was signed

10   indicating that you were going to be the CEO and that there was

11   going to be stock and all the rest of that, you held yourself

12   out to people as being the CEO, just so it could look to your

13   people or others that you had some control over this business,

14   right?

15   A.   I did not hold myself out to people as the new CEO, I

16   would say.  I would say that I did hold myself out to people as

17   having some level of -- having a very, you know -- because I

18   trusted Jasiel, that he would get all of the required documents

19   and everything.

20   Q.   I'm not asking did you hold yourself out -- I know you trusted

21   Jasiel.  I know you want to talk about Jasiel.

22          My question is simple, sir.  Did you hold yourself out to

23   people to show that you had some control over this business as

24   the CEO?

25   A.   There's two parts to that question.  Can I answer them

1    separately, please?

2    Q.   Sure.

3    A.   Did I hold myself out to people that I had some control

4    over the business?

5    Q.   Yes.

6    A.   Yes.   Did I hold myself out to people that I was the

7    permanent CEO of the business?   No.

8    Q.   Do you recall testifying in the grand jury, sir?

9    A.   Yes, sir.

10         MR. REDDINGTON:   And Zach, that would be pages 69 and

11   70.

12   Q.   You were asked a question by Mr. Hafer in the grand jury,

13   "Can you describe to the grand jury the time period in which

14   you considered yourself to be the interim CEO of the company

15   versus when you were more of a formal adviser?"   Do you recall

16   being asked that question?

17   A.   Yes, sir.

18   Q.   And then you were asked, "Were you interim CEO, in your

19   view, from the day you signed the first MOU, Memorandum of

20   Understanding, until June 9 when the second one came and went?

21   Were you interim CEO the whole time?"   Do you remember that

22   question?

23   A.   I believe I remember him asking that question.   I remember

24   reading it, yeah.

25   Q.   And your response, sir, was that, "Well, technically, my

1   understanding was not that I was officially interim CEO because

2   if I were interim CEO, I would have had an employment agreement

3   and option agreement.  So I never actually, you know, formally,

4   interim CEO, I kind of just like put that down there, you know,

5   so people in my network would see that I had power in the

6   company."

7   A.   Yes, sir.

8   Q.   You were holding yourself out as being a CEO so you could

9   show people you had power in the company, right?

10       MR. TOBIN:  Objection.

11       THE COURT:  Overruled.  You may answer the question.

12   A.   In the context specifically given -- by the way, I said I

13   did not hold myself out as a permanent CEO of the business.  In

14   the context of that specific situation, I had expectation

15   that -- reasonable expectation that Jasiel was going to return

16   the requested documents to me.

17   Q.   Nick Bernier thought that you were the CEO, didn't he?

18       MR. TOBIN:  Objection.

19       THE COURT:  If he knows, if he observed or has a

20   perception of that, he may answer the question.  If he doesn't,

21   he doesn't.

22   A.   I didn't have the perception that Nick Bernier viewed me

23   as the permanent CEO of the business.  I also believe Nick

24   thought that I was a transitory figure.

25   Q.   When you were talking about the issue of the patent with

1  the Boston lawyers and whatnot in the meetings, yet again
2  Jasiel had already been mayor for about a year, correct?
3  A.    Yes, sir.
4  Q.    Who was the other patent lawyer that you were talking
5  about?  Not Goodwin Procter, not Bill Schnoor, not Gunderson
6  Dettmer.  But you said there was a guy that would do the work
7  cheaper?
8  A.    Yes, sir.  Jasiel had been on an email chain with him.
9  I'm happy to provide that if you require it.
10  Q.    I'm not requiring anything.  I'm just asking, can you tell
11  me who was the attorney?
12  A.    I do not recall her name off the top of my head.
13  Q.    Okay.  This fellow Spyros, actually Jasiel was the one
14  that made the initial contact with Spyros, and Jasiel was the
15  one that brought Spyros to you that you were able to cultivate,
16  correct?
17  A.    Nicholas Bernier introduced me to Spyros, I believe.  But
18  yes, Jasiel I think was the original person, though I was not a
19  part of the business at that particular time.
20  Q.    Do you remember meeting Jasiel at the Pink Bean, I think
21  is the coffee shop?
22  A.    I believe so.
23  Q.    This is back when you were getting involved with SnoOwl,
24  correct?
25  A.    Yes, sir.  I believe that was when -- I believe that was

1    also in my -- in a prior document or testimony.

2    Q.   Okay.  Well, the jurors will recall what you testified to.

3    I'm just asking if you remember the meeting.

4    A.   I believe so.

5    Q.   Okay.  And you met Jasiel there, right?

6    A.   I believe so.

7    Q.   And he was very enthusiastic and excited about you working

8    with SnoOwl, isn't that right?

9    A.   Yes, sir.

10   Q.   And he was receptive to your advice and your involvement

11   in this business, right?

12   A.   Yes, sir.

13   Q.   And when you talked -- if you talked -- did you talk to

14   Terry Charest, the accountant, at all?

15   A.   May I have a moment to think about that?

16   Q.   Sure.

17   A.   I believe in a meeting, I believe I met him, but Jasiel

18   was also there.  So yeah, I believe I did have a chance to

19   speak with Terry Charest.

20   Q.   And Mr. Charest basically told you that the records and

21   the books were very sloppy and the accounting was not good, is

22   basically what his expression or terms were, right?

23            MR. TOBIN:  Objection.

24            THE COURT:  Overruled.  You may answer.

25   A.   I believe so.

```
 1              MR. REDDINGTON:  That's all I have.  Thank you.
 2              MR. TOBIN:  Your Honor, I have no further questions at
 3      this time.
 4              THE COURT:  All right.  You may step down,
 5      Mr. Sheehan.  Thank you.  If you'd take the shroud off the
 6      microphone and do the various cleanup activities.
 7              SERGIO ARIAS, Sworn
 8              COURTROOM CLERK:  Please be seated and state your full
 9      name and please spell your last name.
10              THE WITNESS:  My name is Sergio Arias.  My last name
11      is spelled A-r-i-a-s.
12              THE COURT:  You may proceed, Mr. Tobin.
13              MR. TOBIN:  Thank you, Your Honor.
14              Sir, you may remove your mask.  Good morning, sir.
15              THE COURT:  Just a moment.  Mr. Arias, if you could
16      put on the top of the microphone, if you could put the shroud
17      on top of it.  Or Ms. Beatty will do that for you.
18              Thank you.
19              MR. TOBIN:  Thank you, sir.
20      DIRECT EXAMINATION BY MR. TOBIN:
21      Q.   How old are you?
22      A.   50.
23      Q.   Where were you born?
24      A.   Boston, Massachusetts.
25      Q.   Where were you raised?
```

1    A.    Jamaica Plain and Roslindale.

2    Q.    Where do you live now, sir?

3    A.    North Attleboro, Massachusetts.

4    Q.    Do you own a business?

5    A.    Yes.

6    Q.    What business do you own?

7    A.    Arias Jewelers.

8    Q.    Where is it located?

9    A.    In North Attleboro, Massachusetts.

10   Q.    How long have you been the owner of Arias Jewelers?

11   A.    Since 2001.

12   Q.    Do you know, or have you met the defendant in this case,

13   Jasiel Correia?

14   A.    Yes.

15   Q.    How did you come to meet Jasiel Correia, sir?

16   A.    I was looking to have a website designed for my business,

17   and I was looking in craigslist, and that's where I found him.

18   Q.    And did you find him, or did you find specifically a

19   company name?  What did you find?

20   A.    It wasn't necessarily a company name.  It was just like an

21   ad on craigslist, and I didn't know what the name of the

22   company was because I didn't know it was like a company.  I

23   thought it was just a person that I was hiring to design a

24   website.

25   Q.    And did you make a telephone -- was there a phone number?

1  A.   Phone call first, yes.

2  Q.   And did you speak with somebody when you called?

3  A.   Yes.

4  Q.   And do you know with whom you spoke?

5  A.   It wasn't with Jasiel.  It was with someone else the first

6  time.

7  Q.   At some point after making that call, did you meet

8  actually with Jasiel?

9  A.   Yes.

10  Q.   And where did that meeting take place?

11  A.   At my store in North Attleboro.

12  Q.   And was Jasiel, did he come to your store alone or did he

13  bring another individual with him?

14  A.   He brought another -- well, the person I was talking to on

15  the phone, I thought he was the owner, or I still don't know

16  who was the owner, to be honest with you.

17  Q.   But my question is when Jasiel Correia came to your

18  store --

19  A.   Yes, he came with --

20  Q.   -- was there somebody with him?

21  A.   Yes.

22  Q.   And tell us what happened during that meeting at Arias

23  Jewelers.  What did Jasiel say?  What could he do for you?

24  A.   They were going to build a website for me for my business.

25  Q.   And there was going to be a cost associated with that; is

1    that true?

2    A.    Yes.

3    Q.    And ultimately did you provide money to Jasiel Correia for

4    the website?

5    A.    Yes.

6    Q.    Sir, I'm going to ask you, there is a book, a binder,

7    black binder, in front of you and it has exhibits in it.

8    A.    Should I open it?

9    Q.    Yes, please do.  And please open it to Tab 60.  6-0.

10   Exhibit 60.

11   A.    Mm-hmm.

12   Q.    And if you would be kind enough, just without really

13   saying anything, just look at what is in those pages beyond tab

14   60.

15   A.    Yes.

16   Q.    And do you recognize those as checks --

17   A.    Yes.

18   Q.    -- you wrote out for Jasiel to build your website?

19   A.    Yes.

20         MR. TOBIN:  Your Honor, may they come in as Exhibit

21   60.

22         THE COURT:  They may.  Received.

23         (Exhibit 60 admitted into evidence.)

24   Q.    And sir, I'm going to ask you now to turn to the next tab

25   which I believe is 60.1.  Do you see that?

1    A.    Yes.

2    Q.    And is that essentially a chart of all of the checks that

3    you wrote out for this website?

4    A.    Yes.

5          MR. TOBIN:  Your Honor, may 60.1 come into evidence?

6          THE JUROR:  It may as well.  It's received.

7          (Exhibit 60.1 admitted into evidence.)

8    Q.    Sir, let's look at the chart for a moment.  The first

9    check you wrote out was for how much money?  Do you see at the

10   top of the chart?

11   A.    Yes.

12   Q.    You can look either at your book or on the screen,

13   whatever is easier for you.  So strike that question.

14         What was the date of the first check you wrote?

15   A.    3/13/2013.

16   Q.    How much was the check for?

17   A.    $1,000.

18   Q.    And who was it written out to, who was the payee?

19   A.    SnoOwl.

20   Q.    Okay.  And we won't go through all of them, but there is a

21   number of checks in succession; is that true?

22   A.    Yes.

23   Q.    Why so many checks?  What was the arrangement, if any, you

24   had with Jasiel Correia to pay for the services of getting a

25   website?

1  A.   I couldn't -- I didn't have all the money at once, so I

2  would pay weekly or monthly, and I'd tell him to just cash the

3  check weekly or monthly, whenever I had them postdated.

4  Q.   Let me ask you a few questions about that.  When you say,

5  "I would have them postdated," would you give Jasiel or would

6  you give a number of checks at one time?

7  A.   Yes.

8  Q.   But you would postdate some of them?

9  A.   Yes.

10 Q.   So that he would have a number of checks but they would

11 only in your mind become good at a certain date?

12 A.   Yes.

13 Q.   And why did you do that?

14 A.   Because I didn't have all the money at once.

15 Q.   Sir, the total amount of all of your -- the first check

16 was on March 13, 2013; is that true?

17 A.   Yes.

18 Q.   The last check, according to this chart, is December 9,

19 2013; is that true?

20 A.   Yes.

21 Q.   And what is the total amount that you gave to -- you gave

22 for this website?

23 A.   4,500.

24 Q.   Sir, let me ask you a question.  The first number of

25 checks you made the check out to SnoOwl Company or Corporation,

 1    SnoOwl Co.?

 2    A.    Yes.

 3    Q.    The last number of checks you made out to Snokimo?

 4    A.    Yes.

 5    Q.    Why the change, and how did that come about?

 6    A.    Well, when he came in to pick up those checks, he told me

 7    to make them out to Snokimo.

 8    Q.    And you did as requested?

 9    A.    Yes.

10    Q.    So what about the product you had paid for?  Tell us about

11    the website.  Was it ever up and running?  Were you satisfied

12    with the work done?

13    A.    No.

14    Q.    Tell us why you were not satisfied with the work done.

15    A.    You'd go in and you'd try to make it work and it just

16    wouldn't work.

17    Q.    Did you bring your concerns to the attention of Jasiel

18    Correia?

19    A.    Yes.

20    Q.    What was his response or reaction?

21    A.    He said he would take care of it.

22    Q.    Well, did he ever take care of it?

23    A.    Not really.

24    Q.    Do you have -- did that website ever function properly for

25    you?

1    A.    No.

2    Q.    Did you ever get your $4,500 back?

3    A.    No.

4    Q.    So let me ask you, after you had provided the money, the

5    4,500 over the installment, and after you were dissatisfied

6    because it wasn't working, did you run into, by happenstance,

7    by chance, Jasiel Correia?

8    A.    Yes.

9    Q.    Where did you run into Jasiel Correia?

10   A.    In a bar/restaurant/lounge in Rhode Island in Providence.

11   Q.    Circe, if I'm getting that right?

12   A.    Yes, Circe.

13   Q.    Were you with a friend or were you by yourself?

14   A.    I was with a friend.

15   Q.    Were you expecting to see Jasiel Correia?

16   A.    No.

17   Q.    And when you saw him, what happened?

18   A.    I told my friend, and I pointed out to him and I said,

19   "That guy ripped me off."

20   Q.    And what was your friend's reaction?

21   A.    He was like, "Do you want me to go talk to him?"

22   Q.    What did you say?

23   A.    I said, "No."

24   Q.    At some point, what happened -- or what happened next I

25   suppose is --

1    A.    He just went over and talked to him.

2    Q.    Did you accompany your friend going over there?  Were you

3    there when --

4    A.    It wasn't -- we didn't have to walk.  It was, like, he was

5    right in front of us.

6    Q.    Jasiel Correia was?

7    A.    Yes.

8    Q.    What did your friend say to Jasiel Correia?

9    A.    I think he said, "Give him back" -- "Give him his money.

10   You ripped him off."

11   Q.    And what was Mr. Correia's response?

12   A.    He was like, "Do you know who I am?  I'm a governmental

13   official."  Something like that, yes.

14   Q.    And did he have anybody with him?  When I say "he," I mean

15   Mr. Correia.

16   A.    Yes.

17   Q.    Another guy?

18   A.    Yes.

19   Q.    After he said, as you recall Mr. Correia said, "Do you

20   know who I am?  I'm a government official," what happened

21   thereafter?

22   A.    I think we just -- it was really noisy, so you couldn't

23   really hear anything because they usually have music there.

24   It's like a restaurant lounge and it's loud.

25   Q.    Sure.  Did Mr. Correia tell you he'd call you and settle

1    this?

2    A.   Yeah, we had some conversation, "Call him on Monday."

3    Q.   Did he call you on Monday?

4    A.   No.

5    Q.   Did he call you on Tuesday?

6    A.   No.

7    Q.   I won't go through the rest of the week or the rest of the

8    years, but did he ever call you?

9    A.   No.

10   Q.   Did he ever settle it?

11   A.   No.

12   Q.   Did he tell your friend that he could have him arrested?

13   A.   Yes.

14        MR. TOBIN:  No further questions.

15        THE COURT:  All right.

16   CROSS-EXAMINATION BY MR. REDDINGTON:

17   Q.   Well, that was pretty contentious between your friend and

18   Jasiel in the restaurant.  Your friend was yelling and

19   threatening him, wasn't he?

20   A.   No, not really.

21   Q.   Maybe a little bit?

22   A.   No.  He was just, you know, "You ripped him off.  You

23   should give him back his" --

24   Q.   I'm not asking about him ripping him off.  I'm asking

25   about your friend that you sent over to talk to Jasiel.

1    A.    I didn't send him over.

2    Q.    When you were talking initially to SnoOwl, when you found

3    this developer, website developer, you were talking to a fellow

4    by the name of Dinesh?

5    A.    Mm-hmm.

6    Q.    Last name Siwotketi, S-i-w-o-t-k-e-t-i?

7    A.    Yes.

8    Q.    Now, Dinesh was the website developer, correct?

9    A.    I don't know.

10   Q.    Well, you didn't work with him.  He wasn't a website

11   developer, was he?

12   A.    No.

13   Q.    So you spoke to Dinesh, I imagine, about what product you

14   were looking for, right?

15   A.    Yes, but --

16   Q.    The answer is yes, you were given a quote for what the fee

17   would be to set up your website, right?

18   A.    He never really talked.  It was mostly Jasiel.

19   Q.    Okay.  Were you able to understand Dinesh when he would

20   talk?

21   A.    Yes.

22   Q.    Okay.  And were you given an initial quote or an estimate

23   as to what it would cost to set up your website?

24   A.    Yes.

25   Q.    And what was that estimate?

```
 1    A.    From the checks now that I see it, it must have been
 2    4,500.
 3    Q.    But you didn't have the money.  You wanted to pay, as
 4    you've already indicated --
 5    A.    Yes.
 6    Q.    -- kind of sporadically --
 7    A.    Yes.
 8    Q.    -- 125, 125 --
 9    A.    Yes.
10    Q.    -- spreading them out?
11    A.    Yes.
12    Q.    And you signed the checks perhaps and postdated them and
13    gave them to him?
14    A.    Yes.
15    Q.    And did you ever collaborate or work with Dinesh or have
16    any suggestions or input that you recall regarding the website?
17    A.    It just seemed like Jasiel was in charge of the thing, and
18    he was just kind of there.
19    Q.    Okay.  Did you have any input about what you were looking
20    for with the website?
21    A.    Say that again.
22    Q.    Did you have any input with either Dinesh or Jasiel as to
23    what you were looking for in the website?
24    A.    Yes.
25    Q.    And what indicated -- what were you looking for?
```

1   A.   A website for my business.

2   Q.   And, in fact, there was a website that was put up for your

3   business, correct?

4   A.   No.

5   Q.   Well, was it online?

6   A.   Excuse me?

7   Q.   Was it online?

8   A.   No.

9   Q.   Did it ever get online?

10   A.   No.

11   Q.   Do you remember having an argument with Dinesh because you

12   wanted to have people be able to buy jewelry online on your

13   website?

14   A.   I never talked to Dinesh.

15   Q.   Did you ever indicate to Jasiel that you wanted a website

16   that would allow people to have realtime interaction --

17   A.   Yes.

18   Q.   -- scroll --

19       And he indicated to you that that is a very costly

20   project.  That's a big difference from a regular website to

21   being able to have realtime purchases, correct?

22   A.   I'm pretty sure that we talked about that at the

23   beginning.

24   Q.   And he told you that they couldn't do that for the price

25   and sporadic payments you were going to be making, correct?

```
 1    A.    No.

 2    Q.    Well, you indicated you wanted a website?

 3    A.    Yes.

 4          MR. REDDINGTON:  Nothing further.

 5          THE COURT:  Mr. Tobin.

 6    REDIRECT EXAMINATION BY MR. TOBIN:

 7    Q.    Did you ever get a functioning website from Jasiel

 8    Correia?

 9    A.    It never worked.  You couldn't put it -- we had trouble

10    loading things into the website.

11          MR. TOBIN:  Okay.  Thank you.  No further questions.

12          MR. REDDINGTON:  One other question, if I may, Judge.

13          THE COURT:  Yes.

14    RECROSS-EXAMINATION BY MR. REDDINGTON:

15    Q.    This -- is it Circe?

16    A.    Yes.

17    Q.    That's in Providence, Rhode Island, correct?

18    A.    Yes.

19          MR. TOBIN:  Objection, beyond.

20          THE COURT:  Grounds?

21          MR. TOBIN:  I'm sorry.  I asked one question.

22          THE COURT:  Okay.  Beyond the scope.

23          MR. TOBIN:  Beyond the scope.

24          THE COURT:  Overruled.

25          MR. TOBIN:  Thank you.
```

1          THE COURT:  You may step down.  Thank you.  And take

2     the --

3          MR. HAFER:  I'll do whatever you want, Your Honor.

4     The next witness is by Zoom.  So I don't know if it makes sense

5     to break with the technology or start.

6          THE COURT:  I think we can move right into that

7     witness at this point.

8          So ladies and gentlemen, this will be another witness

9     who I've determined to be unavailable to be present in the

10    courtroom itself, and we're going to use the Zoom technology.

11         I will mention what I mentioned before, which is that

12    I've told the IT people who are handling this that they're free

13    to choose to decline to permit people to come into the Zoom

14    hearing at this time.  It's more or less the same as if

15    somebody during the middle of some process like having a video

16    shown wanted to come into the courtroom, it would be very

17    disruptive for that to happen.

18         What happens with the Zoom technology, we've

19    determined, is that it becomes very volatile when we're doing

20    this kind of presentation of a witness.  And so the best way of

21    insuring that you, who are the critically important people

22    here, get to see this in a fashion that's not disruptive and

23    that other people get to see it in a fashion that's not

24    disruptive, that is those people who are already on the Zoom

25    aren't interfered with with someone who is coming in or going

 1    out, my instructions stand with the IT people that we're not

 2    going to have or allow people to come in for the first time

 3    during the course of the testimony of this witness.

 4              So you may proceed, Mr. Hafer.

 5              MR. HAFER:  Should I defer to Ms. Beatty to swear the

 6    witness, Your Honor.

 7              THE COURT:  I'm sorry, yes.  We should.  So Ms. Beatty

 8    will swear the witness, and then you can proceed.

 9              NATALIE CLEVELAND, Sworn

10              COURTROOM CLERK:  Can you please state your full name

11    and spell your last name.

12              THE WITNESS:  My name is Natalie Cleveland.  Last name

13    is C-l-e-v-e-l-a-n-d.

14              THE COURT:  Now you can proceed, Mr. Hafer.

15              MR. HAFER:  Thank you, Your Honor.

16    DIRECT EXAMINATION BY MR. HAFER:

17    Q.   Good morning, Ms. Cleveland.

18    A.   Good morning.

19    Q.   How old are you?

20    A.   25.

21    Q.   Where do you currently live?

22    A.   Washington State.

23    Q.   Where did you grow up?

24    A.   Also in Washington.

25    Q.   How far did you go in school?

```
 1    A.   All the way through graduate school.  I have my masters
 2    degree.
 3    Q.   Where did you do your undergrad work?
 4    A.   The George Washington University.
 5    Q.   And what about your masters?
 6    A.   The London School of Economics and Political Science.
 7    Q.   What do you currently do for work, Ms. Cleveland?
 8    A.   I'm currently a global policy analyst with an
 9    international organization.
10    Q.   Do you know the defendant Jasiel Correia?
11    A.   I do.
12    Q.   How did you meet Jasiel Correia?
13    A.   Jasiel and I met as interns on Capitol Hill in 2012.  We
14    were interning for the same U.S. senate office.
15    Q.   When you first met Jasiel Correia, was it just a casual
16    relationship?
17    A.   It was, yeah, colleagues and friends.
18    Q.   At some point, Ms. Cleveland, in or about September of
19    2013, did you and Mr. Correia start dating?
20    A.   We did.
21    Q.   And approximately how long did you date Mr. Correia?
22    A.   We dated for about three and a half years, through January
23    of 2017.
24    Q.   And in September of 2013, Ms. Cleveland, when you first
25    began dating Mr. Correia, how old were you?
```

1    A.    I was 18 years old.

2    Q.    Between 2013 and 2015, did you and the defendant travel

3    together?

4    A.    We did.

5    Q.    Did you stay in hotels together?

6    A.    We did.

7    Q.    Have meals together?

8    A.    Yes.

9    Q.    Did he buy you jewelry and clothing and other items?

10   A.    He did.

11   Q.    When you stayed in hotels and had meals, who paid?

12   A.    Ninety percent of the time he did.

13   Q.    Now, during the years between 2013 and 2015, did

14   Mr. Correia hold elective office at that time?

15   A.    He did, yes.

16   Q.    What position did he hold between '13 and '15, if you

17   recall?

18   A.    I believe it was city council at that time.  He would have

19   been sworn in in January of 2014.

20   Q.    Are you aware of the approximate annual salary of a Fall

21   River city councilman at the time?

22   A.    Mm-hmm.  I was under the impression at the time that it

23   was about $17,000 a year.

24   Q.    As a general matter then, given that salary,

25   Ms. Cleveland, with respect to the purchases that Mr. Correia

1    made for himself and you when you were together, how did you

2    think he was affording these things?

3    A.    So my assumption was that he was affording everything

4    through the previous sale of an app that he had developed about

5    a decade ago now when he was still an undergrad.  The app was

6    called the FindIt Networks.  I was never told how much the app

7    sold for, but my assumption was several hundred thousand

8    dollars.

9              MR. REDDINGTON:  Excuse me, Your Honor.

10             THE COURT:  Just a moment.

11             MR. REDDINGTON:  I object to that, her assumption.

12             THE COURT:  Just a moment.  Before I strike that

13   testimony, if you have a foundation for her understanding, I

14   want you to develop it, Mr. Hafer.  If you don't, then I will

15   strike the testimony.

16             MR. HAFER:  Yes, sir.

17   Q.    Ms. Cleveland, did you ever have conversations with the

18   defendant about the FindIt Network?

19   A.    Yes.

20   Q.    During those conversations, did he tell you his role in

21   the FindIt Network and what he said the fate of the company

22   was?

23   A.    Yes.

24   Q.    What did he tell you?

25   A.    He told me that he had developed the app in partnership

```
 1  with a few other partners, and that he had sold it to an
 2  investment company in Boston.
 3  Q.   Ms. Cleveland, do you have a binder in front of you?
 4        THE COURT:  If I could just pause here.  There was a
 5  statement about her perception of the amount of money for which
 6  he sold it.  Is there a foundation for that question or her
 7  knowledge?
 8        MR. HAFER:  I think it's going to develop throughout
 9  the examination.
10        THE COURT:  Then I'm striking that portion of the
11  earlier answer until there is a foundation for that.  So the
12  objection Mr. Reddington had is sustained to that limited
13  degree.
14  Q.   Did Mr. Correia ever say anything specifically to you
15  about how much it had sold for, Ms. Cleveland?
16  A.   I can recall a conversation in which he had said a few
17  million, but an exact amount was never given.
18  Q.   Could you turn to the binder --
19        THE COURT:  Just a moment.  I think Mr. Reddington is
20  concerned about disparity, and you can examine on
21  cross-examination with respect to that.
22  Q.   Ms. Cleveland, do you have a binder in front of you?
23  A.   I do.
24  Q.   Could you start by turning to tab 73 of the binder,
25  please, and just take a moment and let me know if you recognize
```

1    it.

2    A.    Sure.  Yes, I do.

3    Q.    Just generally, what is the exhibit at tab 73?

4    A.    Tab 73, the first page is an affidavit from Neiman Marcus.

5    Q.    And what's the rest of the exhibit?

6    A.    Receipts from Neiman Marcus.

7          MR. HAFER:  I offer Exhibit 73, Your Honor.

8          THE COURT:  It's received.

9          (Exhibit 73 admitted into evidence.)

10   Q.    Ms. Cleveland, I'm going to -- just bear with me here.

11   Sometimes with the technology, if the exhibit is on the screen,

12   the jury can't also see you.  So I'm going to do a little

13   reading from the exhibit first, and then ask you a question, I

14   think, which will make it the least disruptive.

15         MR. TOBIN:  Ms. Beatty, could I have -- or

16   Ms. DiPaolo, could I please have page 2.  Ms. Beatty, would it

17   be possible to have the exhibit on the screen.

18   Q.    Ms. Cleveland, this appears to be a January 24, 2015

19   invoice from Neiman Marcus for a purchase of something referred

20   to as Original Santal 1 for $290, $308 with tax.

21   Ms. Cleveland, what is, to your knowledge, this original Santal

22   purchase from Neiman Marcus in 2015?

23   A.    To my knowledge, Original Santal is a scent of Creed

24   cologne, which is a personal cologne that Jasiel liked to wear

25   at the time.

1          MR. TOBIN:  Could I have the next page, please.

2     Q.   On the next page of the exhibit, Ms. Cleveland, there is

3     an enlargement, the second Neiman Marcus receipt.

4          MR. TOBIN:  Ms. Beatty, if I could possibly have the

5     receipt back just for the jurors.  Thank you.

6     Q.   This indicates a January 28, 2015 purchase of an item C,

7     Louboutin for $675, $31 in tax.  At the bottom of the page it

8     indicates they were purchased by a J. Correia,

9     jasiel@snoowl.com email address.  What is this, Ms. Cleveland?

10    A.   Those are a pair of Christian Louboutin high-heeled shoes.

11    Q.   Were they given to you?

12    A.   They were.  They were given to me by Jasiel as a gift.

13    Q.   I'm going to ask you if you could, Ms. Cleveland, to

14    please turn to tab 75 in your binder.  It's actually 75.1, I

15    believe.  And take a moment and review the documents at 75.1.

16    Do you recognize those?

17    A.   I do.

18    Q.   In general terms, what are they?

19    A.   These are jewelry items that Jasiel had bought me.

20         MR. HAFER:  I offer 75.1, Your Honor.

21         THE COURT:  It's received.

22         (Exhibit 75.1 admitted into evidence.)

23         MR. HAFER:  Ms. DiPaolo, could I have the first page

24    of 75.1.  And Ms. Beatty, if we could have the exhibits the way

25    we did before, that was perfect.  Thank you.

1    Q.    Looking at the first page of 75.1, Ms. Cleveland, this

2    appears to be an October 2013 receipt from Tiffany & Company.

3    I'm going to put several pieces to the question with respect to

4    the technology.  Do you recognize the items in this receipt and

5    who bought them for you?

6    A.    I do recognize the items in this receipt.  This was a

7    necklace.  Jasiel purchased this for me as a gift.

8    Q.    An do you recognize the signature at the bottom of that

9    receipt?

10   A.    I do.

11   Q.    Whose signature is that?

12   A.    Jasiel's.

13          MR. HAFER:  Could I have the next page, Ms. DiPaolo.

14   Q.    The next page indicates a receipt from December of 2013

15   for two items from Tiffany, Ms. Cleveland.  Do you recognize

16   those?

17   A.    I do.

18   Q.    What are they?  Or do you --

19   A.    So one is a bracelet, which I received as a gift.  The

20   other is a pair of earrings, which I did not receive.  So that

21   item I don't recognize.

22   Q.    And who is the signature at the bottom of this receipt?

23   A.    Jasiel's as well.

24          MR. HAFER:  Could I have the next page, Ms. DiPaolo.

25   Q.    Showing you the next receipt, Ms. Cleveland, it indicates

1    a purchase of and 18 pendant chain and mini atlas key.  The

2    total purchase amount with tax is $1,070.  What is that?

3    A.   That is a necklace that I received from Jasiel as a gift.

4    Q.   This would have been in about November of 2015?

5    A.   Mm-hmm.  I would have received it as a gift in December

6    for Christmas.

7    Q.   Do you see on this receipt under the total amount for

8    $1,070, it says cash $1,070?

9    A.   I do.

10   Q.   During the course of over three years that you were with

11   Jasiel Correia, what, if anything, did you observe about his

12   use of cash for purchases?

13   A.   I noticed that he used to split purchases between cash and

14   card, typically large purchases.

15   Q.   Could you please turn to tab 76.  Just one -- it's two

16   pages, actually, Ms. Cleveland.  Do you recognize the exhibit

17   at tab 76?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   This is a receipt from the Pearl Factory for a pearl

21   necklace.

22           MR. HAFER:  I offer 76, Your Honor.

23           THE COURT:  It's received.

24           (Exhibit 76 admitted into evidence.)

25           MR. HAFER:  If I could have it again, Ms. Beatty.

1    Thank you.

2    Q.    You mentioned the Pearl Factory, Ms. Cleveland.  That's in

3    Honolulu, Hawaii; is that correct?

4    A.    I believe it's headquartered in Honolulu.  This particular

5    purchase would have been in Lahaina, Hawaii.

6    Q.    Were you with the defendant when he made this purchase in

7    June of 2014?

8    A.    I was.

9    Q.    And what was -- it indicates a 14-carat diamond,

10   two-millimeter drop pendant, and a Singapore chain.  Were those

11   for you?

12   A.    No.  These were a gift for his sister for her birthday.

13          MR. HAFER:  May I have the next page of the exhibit.

14   Q.    And, again, the receipt with this exhibit, do you

15   recognize the signature on that receipt?

16   A.    I do.

17   Q.    Whose signature is that?

18   A.    Jasiel's.

19   Q.    Could you please turn to tab 77.  And same drill.  If you

20   would take a look at 77 and let me know if you recognize it.

21   A.    Sure.  I do.

22   Q.    What is 77?

23   A.    So this is an affidavit, and then a series of receipts at

24   the Chatham Bars Inn.

25          MR. HAFER:  I offer Exhibit 77, Your Honor.

```
1              THE COURT:  That's received.

2              (Exhibit 77 admitted into evidence.)

3              MR. HAFER:  May I have page 2, please, Ms. DiPaolo,

4    and Ms. Beatty.

5    Q.   Ms. Cleveland, did you stay with Jasiel Correia at the

6    Chatham Bars Inn in August of 2014?

7    A.   I did.

8    Q.   Who paid for it?

9    A.   He did.

10   Q.   And that was approximately $495 per night?

11   A.   Yes, so it appears.

12             MR. HAFER:  Could I have the next page of the exhibit,

13   please.  Actually page 5, Ms. DiPaolo, if you wouldn't mind,

14   I'm sorry, page 5.

15   Q.   Putting on the screen in front of you now, Ms. Cleveland,

16   a receipt from the Stars restaurant at the Chatham Bars Inn, do

17   you see that?

18   A.   I do.

19   Q.   By the way, are you a vegan?

20   A.   I am.

21   Q.   So was this receipt here for a meal at the Chatham Bars

22   Inn in October 19 of 2014, was that a meal with you and Jasiel

23   Correia?

24   A.   It was.

25   Q.   And the entry for the vegetarian entree, that would have
```

1    been yours?

2    A.    It would have, yes.

3    Q.    And the $54 tenderloin, who was that?

4    A.    That would have been Jasiel.

5          MR. HAFER:  Could I have page 8, please.

6    Q.    Showing you another receipt from a meal at the Beach House

7    Grill at this Chatham Bars Inn on August 20, 2014, was that you

8    and the defendant Jasiel Correia?

9    A.    It was, yes.

10   Q.    And who had the $55 clambake?

11   A.    Let's see.  Sorry, I think I would have been on the wrong

12   page here.

13   Q.    I'm sorry.

14   A.    No worries.

15   Q.    August 20, 2014.

16   A.    At 6:39 p.m.?

17   Q.    Yes.

18   A.    Great.  Yeah, the clambake would have been Jasiel.

19   Q.    Could you please turn to tab 77.1, Ms. Cleveland.  Do you

20   recognize the documents at tab 77.1?

21   A.    I do.

22   Q.    What are they?

23   A.    These are a series of receipts from the Willard

24   Intercontinental Hotel in Washington, D.C.

25         MR. HAFER:  I offer 77.1, Your Honor.

1          THE COURT:  That's received.

2          (Exhibit 77.1 admitted into evidence.)

3          MR. HAFER:  Ms. DiPaolo, may I have page 1.

4   Q.   Ms. Cleveland, did you and Jasiel Correia stay at the

5   Willard Intercontinental in Washington, D.C. in September 2013?

6   A.   We did.

7   Q.   Was that a business or a personal stay?

8   A.   This was a personal stay.

9   Q.   And with tax, the room charge appears to be approximately

10  $949 per night?

11  A.   Mm-hmm.  That's correct.

12  Q.   In September of 2013, Ms. Cleveland, does the defendant

13  Jasiel Correia have a job at that point in time, in September

14  of 2013?

15  A.   At that point he was doing a couple of different

16  entrepreneurial ventures.  So not a salaried job per se.  He

17  was running his campaign for city council at that time.  He was

18  running a business called 104, which was his business

19  incubator.  Then he was also was working on SnoOwl, his app.

20          MR. HAFER:  Ms. DiPaolo, could I have the second page

21  of Exhibit 77.1.

22  Q.   Ms. Cleveland, did you and Jasiel Correia stay at the

23  Willard Intercontinental in Washington, D.C. between December

24  14 and December 16, 2013?

25  A.   Yes.

1    Q.    Was that business or personal?

2    A.    That was a personal trip.

3    Q.    To save asking the question over and over again,

4    Ms. Cleveland, are any of the receipts I'm going to show you

5    today, do any of them relate to business related expenditures?

6    A.    No.

7    Q.    At the bottom of this page for December of 2013, do you

8    see a notation for the ambassador membership enrollment fee?

9    A.    I do.

10   Q.    Did you and Jasiel Correia have a conversation about the

11   ambassador membership at the Willard Intercontinental?

12   A.    Mm-hmm.  Yes, we did.

13   Q.    What did he say about that?

14   A.    So he said he was enrolling as an ambassador.  The

15   ambassador membership is a program through the Intercontinental

16   Hotel chain that allows you to, you know, have room upgrades,

17   et cetera.  It's essentially a loyalty program.

18   Q.    And who paid for this stay at the Intercontinental in

19   December of 2013?

20   A.    Jasiel paid.

21          MR. HAFER:  Could I have the next page, Ms. DiPaolo.

22   Q.    Showing you now an invoice from February 14, Valentine's

23   Day, 2014, to February 17, 2014, do you see that?

24   A.    I do.

25   Q.    Did you stay with Jasiel Correia at the Willard

1    Intercontinental on those dates?

2    A.   Yes, I did.

3         MR. HAFER:  Could I have the next page, please.

4    Q.   Showing you now an invoice from April 27 to 28, 2014,

5    Ms. Cleveland, did you stay with Mr. Correia at the

6    Intercontinental that night?

7    A.   Yes, I did.

8    Q.   Did he pay for it?

9    A.   He did, yes.

10   Q.   With respect to the -- same thing, so I don't have to keep

11   asking you -- with respect to all of the exhibits I'll show you

12   this morning, did Mr. Correia pay for all of that stuff?

13   A.   He did, yes.

14        MR. HAFER:  Ms. DiPaolo, could I have the next page.

15   Q.   Showing you now from September 5 to September 7, 2014, did

16   you and the defendant Jasiel Correia stay in the Willard

17   Intercontinental?

18   A.   Yes, we did.

19        MR. HAFER:  May I have the next page, please.

20   Q.   Now, showing you December 13 to December 15 of 2014, did

21   you and the defendant stay in the Willard Intercontinental?

22   A.   Yes, we did.

23        MR. HAFER:  Could I have the next page, please.

24   Q.   Showing you now February 13 to 15 of 2015, did you and the

25   defendant stay in the Willard Intercontinental?

1    A.    Yes, we did.

2    Q.    And it appears, with tax, over $800 a night for that stay?

3    A.    It does, yes.

4    Q.    All these times you were at the Intercontinental,

5    Ms. Cleveland, did you ever personally observe the defendant

6    conducting SnoOwl related business?

7    A.    No, I did not.

8    Q.    Did he ever tell you he was there doing SnoOwl related

9    business?

10   A.    No.

11   Q.    Did you ever observe him putting fliers related to SnoOwl

12   down in various parts of the hotel?

13   A.    No.

14   Q.    Could you turn, please, to tab 79.  Do you recognize the

15   documents at tab 79?

16   A.    I do, yes.

17   Q.    What are they?

18   A.    This appears to be an invoice for a Valentine's Day dinner

19   cruise that we took in February of 2015.

20         MR. HAFER:  I offer Exhibit 79, Your Honor.

21         THE COURT:  It's received.

22         (Exhibit 79 admitted into evidence.)

23         MR. HAFER:  Could I have page 2, Ms. DiPaolo, and just

24   enlarge the top if you wouldn't mind.

25   Q.    This indicates, consistent with what you just said,

1    Ms. Cleveland, that it appears sometime in late January of '15,

2    Jasiel Correia, II purchased a Valentine's Day dinner cruise

3    for $457; is that correct?

4    A.    Yes.

5    Q.    And did you, in fact, in February of 2015 go on a

6    Valentine's dinner cruise with Jasiel Correia?

7    A.    Yes, I did.

8    Q.    And where was that?

9    A.    That was in Washington, D.C. on the Potomac River.

10           MR. HAFER:   Could I have page 2 of the exhibit.

11   Q.    The second page here, Ms. Cleveland, is a little hard to

12   make out.   Does it essentially list all the items that were

13   included with this dinner cruise?

14   A.    Yes, it does.

15   Q.    Champagne, single rose, correct?

16   A.    Mm-hmm.   That's correct.

17           MR. HAFER:   And could I have the final page, please.

18   Q.    And here, do you see at the bottom of the third page of

19   Exhibit 79 there's an indication "Guest of honor."   Do you see

20   that?

21   A.    I do.

22   Q.    And whose names are listed there?

23   A.    Jasiel Correia, II and mine, Natalie Cleveland.

24   Q.    Could you please turn to tab 80.   Do you recognize that

25   document?

```
 1    A.    I do, yes.

 2    Q.    What is it?

 3    A.    This is an invoice for a Jeep rental on Martha's Vineyard.

 4          MR. HAFER:  I offer Exhibit 80, Your Honor.

 5          THE COURT:  It's received.

 6          (Exhibit 80 admitted into evidence.)

 7    Q.    Ms. Cleveland, in 2015, did you and the defendant rent a

 8    Jeep together in Martha's Vineyard?

 9    A.    Yes, we did.

10    Q.    Just to sort of sightsee around?

11    A.    Exactly.  Just for a day trip.

12          MR. HAFER:  Could I have just the bottom of that,

13    Ms. DiPaolo.  Just little higher than that for the cost.

14    Q.    As per this document in evidence, that was a little bit

15    over $200?

16    A.    Yes.

17    Q.    And who paid for that?

18    A.    Jasiel paid.

19    Q.    Could you please turn to tab 81.  Do you recognize that

20    document?

21    A.    I do, yes.

22    Q.    What is that?

23    A.    It's an affidavit and a series of receipts from the

24    Chanler, which is a hotel in Newport.

25          MR. HAFER:  I offer Exhibit 81, Your Honor.
```

```
 1              THE COURT:  That's received.
 2              MR. HAFER:  Could I have the first page, please.
 3              (Exhibit 81 admitted into evidence.)
 4              MR. HAFER:  I'm sorry, page 2.
 5   Q.   You indicated that Chanler at Cliff Walk is a hotel in
 6   Newport, Ms. Cleveland?
 7   A.   Yes.
 8   Q.   And in March of 2014, did you and Jasiel Correia spend two
 9   nights, March 6 and March 7, at the Chanler?
10   A.   Yes, we did.
11   Q.   And that was personal?
12   A.   It was.
13              MR. HAFER:  Could I have the next page.
14   Q.   Did you have meals while you were there?
15   A.   Yes, we did.
16   Q.   And on the next page, the receipt that's enlarged, there's
17   a notation for kale and spinach for $14.  Do you see that?
18   A.   I do.
19   Q.   Would that have been what you ordered?
20   A.   Very likely.  I also see a vegan tofu entree, which I
21   believe is what I would have ordered for the main.
22   Q.   And what about the sirloin for $40?
23   A.   That would have been Jasiel.
24              MR. HAFER:  Could I have the next page of that
25   exhibit.  One more page, please.  Sorry.
```

1    Q.    Showing you the guest folio from May of 2015,

2    Ms. Cleveland, did you and Jasiel Correia stay at the Chanler

3    Cliff Walk in May of 2015?

4    A.    Yes, we did.

5    Q.    And as per this receipt, that was $529 for that night?

6    A.    Mm-hmm.  Yes, that looks correct.

7    Q.    Mr. Correia paid for that?

8    A.    He did, yes.

9    Q.    Could you turn to tab 97, please.  Just one page.  Do you

10   recognize tab 97?

11   A.    Yes, I do.

12   Q.    What is that?

13   A.    This is a PayPal receipt for an eBay charge for a Kate

14   Spade clutch purse.

15           MR. HAFER:  I offer Exhibit 97, Your Honor.

16           THE COURT:  It's received.

17           (Exhibit 97 admitted into evidence.)

18           MR. HAFER:  If I could have it, please, Ms. DiPaolo.

19   It's just one page, and Ms. Beatty.

20   Q.    Ms. Cleveland, the shipping address indicated here for

21   this item is in Vancouver, Washington to your name.  Was that

22   your address at the time?

23   A.    It was, yes.

24   Q.    And this was, as you indicated, a Kate Spade clutch bag;

25   is that correct?

1   A.    Yes, that's correct.

2   Q.    And who gave you that bag?

3   A.    That was a gift from Jasiel.

4   Q.    Could you turn to tab 98, please.  Do you recognize that

5   document?

6   A.    I do, yes.

7   Q.    What is that?  Or what are those two pages?

8   A.    These two pages are a couple of invoices from Suitsupply,

9   which is a boutique men's suit store in Washington, D.C.

10            MR. HAFER:  I offer Exhibit 98, Your Honor.

11            THE COURT:  It's received.

12            (Exhibit 98 admitted into evidence.)

13  Q.    Ms. Cleveland, you mentioned it was a boutique men's

14  clothing store in Washington, D.C.  Did you know the defendant

15  to shop there?

16  A.    Yes, I did.

17            MR. HAFER:  Could I have page 1 of that.

18  Q.    January of the 2014, appears to be a $632 charge from a

19  Suitsupply in Washington, D.C. to Jasiel Correia; is that

20  correct?

21  A.    Yes, that's correct.

22            MR. HAFER:  And could I have the next page, please.

23  Q.    The second page is April of 2015, Ms. Cleveland.  Also for

24  Jasiel Correia.  Do you see the total amount is $1,223?

25  A.    I do, yes.

1    Q.   And then below that it indicates 300 was paid in cash and

2    923 on a Visa card; is that correct?

3    A.   Yes, that's correct.

4    Q.   And is that generally consistent with what you testified

5    to earlier about, for large purchases, the defendant would

6    sometimes split it between his credit card and cash?

7    A.   Yes, that's consistent.

8         MR. HAFER:  Your Honor, I have one exhibit left.  It's

9    probably 15 minutes.  If you would like me to keep going, I'm

10   happy to.

11        THE COURT:  Yes.  I think, ladies and gentlemen, what

12   I'm going to do, because I've been told that your lunches have

13   arrived, and I'm going to try to protect you from the desire to

14   have lunch at the morning break, that we'll complete this

15   witness before we break for lunch.  If there's a problem with

16   that, tell me, but I want to get through this witness so we

17   don't detain her any longer.

18        MR. HAFER:  That's fine, Your Honor.  Thank you.

19        THE COURT:  Well, that's good for you.  But is there

20   any problem with any of the jurors that you'd like to take a

21   break earlier?  Okay.

22   Q.   Ms. Cleveland, could you turn to the final tab, tab 99,

23   please.  It's several pages, but when you've had a chance to

24   review it, would you let me know if you recognize it.

25   A.   Mm-hmm.  Yes.

1   Q.   What is it?

2   A.   This is a chart of different personal travel purchases

3   that Jasiel would have made during travel to see me and with

4   me.

5   Q.   Did you personally prepare this chart?

6   A.   No, I did not.

7   Q.   Have you reviewed it, however, and compared it to your

8   memory of these events?

9   A.   Yes, I have.

10  Q.   And, to the best of your knowledge, does this chart

11  accurately depict events that you and Jasiel Correia did

12  together?

13  A.   It does, yes, to the best of my knowledge.

14          MR. HAFER:  Your Honor, I offer Exhibit 99.

15          THE COURT:  That's received.

16          (Exhibit 99 admitted into evidence.)

17          MR. HAFER:  Ms. DiPaolo, if you could just enlarge the

18  first page.

19  Q.   Ms. Cleveland, between September 5 and 7, 2013, you and

20  Jasiel Correia were together in Washington, D.C.; is that

21  correct?

22  A.   Yes, that's correct.

23  Q.   And this particular trip included airfare, Ubers, the

24  Intercontinental invoice we looked at, and a dinner at the

25  Founding Farmers in Washington, D.C.?

1          THE COURT:  Just -- I'm sorry.  Go ahead.  I'm sorry.

2   Q.   Is that correct?

3   A.   Yes, that's correct.

4   Q.   Is that restaurant, the Founding Farmers, a place that you

5   regularly went with Mr. Correia?

6   A.   Mm-hmm.  Yes, it is.

7   Q.   And we'll go through each page of the chart,

8   Ms. Cleveland, but the totals on the bottom of this page, 2013,

9   2014, and 2015, is that an accurate summary for the information

10  that's depicted in this exhibit of about $32,000 in travel and

11  other items, related expenses between -- that Mr. Correia

12  purchased for the two of you?

13  A.   Yes, it is.

14          MR. HAFER:  Could I have the next page, please.

15  Q.   Were you and Mr. Correia together as per page 2 of Exhibit

16  99 in Newport, Rhode Island in October of 2013?

17  A.   Yes.

18  Q.   And did you stay at the Omni Providence Hotel?

19  A.   Yes, to the best of my memory.

20  Q.   Do you see a notation for October 8, 2013, Bird's Eye

21  View, Middleton, Rhode Island, Newport Helicopter Tour, $210?

22  A.   I do, yes.

23  Q.   What's that?

24  A.   That was a helicopter tour that we took.  This would have

25  been my first time seeing Massachusetts and Rhode Island, his

1    hometown.  So he hired a helicopter to tour us over Newport.

2    Q.   Below the October 2013 trip is a second October 2013 trip

3    reflecting a stay at the Providence Biltmore, and then it

4    appears NYLO or NYLO Providence.  Do you see that?

5    A.   I do.

6    Q.   And there's also an entry there for Tiffany.  Is that one

7    of the receipts you've already testified about?

8    A.   It is, yes.

9    Q.   And you, in fact, stayed with Jasiel Correia in Providence

10   that October 25 to 28 weekend in 2013?

11   A.   Yes, I did.  I did, yes.

12        MR. HAFER:  Could I have the bottom of that exhibit.

13   Q.   The next enlargement is the next one on your chart,

14   Ms. Cleveland, from November 15 to 17 of 2013.  Were you and

15   Jasiel Correia together in Washington, D.C. on those dates?

16   A.   Yes, we were.

17   Q.   And did you stay at the Hyatt Regency on Capitol Hill?

18   A.   To the best of my memory.

19   Q.   Who paid for that?

20   A.   Jasiel would have.

21   Q.   There appears to be an entry here for going to the movies

22   at the Regal Gallery; is that correct?

23   A.   Mm-hmm.  That's correct.

24   Q.   And Founding Farmers, that's a restaurant in Washington,

25   D.C.?

1   A.   It is, yes.

2   Q.   There's also an entry on November 19 for Filomena.   Is

3   that a restaurant you went to with the defendant?

4   A.   Yes, it is.

5        MR. HAFER:   Could I have the next page, please.

6   Q.   Ms. Cleveland, were you and Jasiel Correia together in

7   Washington, D.C. between December 12 and December 16 of 2013?

8   A.   Yes, we were together.

9   Q.   And is this, in fact, one of the Intercontinental stays

10  that you've already testified about?

11  A.   It is, yes.

12  Q.   There's an entry towards the top of this one under the

13  "Details" column.   It says Kimpton Hotel.   Do you see that?

14  A.   I do, yes.

15  Q.   What is that?

16  A.   That's another hotel.   So on occasion during these trips

17  we would do the Intercontinental for one or two nights and a

18  different less expensive hotel for another night.   So that's

19  what that entry would be.

20  Q.   There's a purchase at Nordstrom for $378.   Do you see

21  that?

22  A.   I do, yes.

23  Q.   And Hamilton in Washington, D.C. on December 16.   Do you

24  see that?

25  A.   I do, yes.

1   Q.   What's the Hamilton?

2   A.   It's a restaurant.

3   Q.   Right below the Hamilton is Tiffany & Company.  Is that

4   one of the Tiffany receipts you've already testified about?

5   A.   Yes, it is.

6   Q.   And there's a Zaytinya Mediterranean on December 17.  What

7   is that?

8   A.   That's a restaurant.

9            MR. HAFER:  Could I have the next entry.

10   Q.   The next entry indicates dates of December 16 to 21 in

11   Portland, Oregon and Washington State.  Do you see that,

12   Ms. Cleveland?

13   A.   I do, yes.

14   Q.   Were you and the defendant together in those places on

15   those dates?

16   A.   Yes, we were.

17   Q.   Did he fly out there?

18   A.   He did, yes.

19   Q.   There appears to be an entry on December 18 at Little

20   Italy's in Vancouver, Washington; is that correct?

21   A.   Yes, that's correct.

22   Q.   Regal Cinemas in Portland?

23   A.   Yes.

24            MR. HAFER:  Could I have the next one, please.

25   Q.   The next entry on the chart, Ms. Cleveland, pertains to a

1    January 17 to 20, 2014 visit in Washington, D.C.; is that

2    correct?

3    A.   Yes, that's correct.

4    Q.   There's an entry of Filomena's at the top again.  Is that

5    a restaurant you went to with Mr. Correia?

6    A.   It is, yes.

7    Q.   Did Mr. Correia fly to see you this weekend, if you

8    recall?

9    A.   He did, yes.

10   Q.   Did you stay at the Hotel Helix in Washington?

11   A.   Yes, to the best of my memory.

12   Q.   And on January 2 there's actually an entry for Suitsupply,

13   the boutique men's clothing store.  Is that one of the invoices

14   you've already testified about?

15   A.   It is, yes.

16        MR. HAFER:  Can I have the next one, please,

17   Ms. DiPaolo.

18   Q.   January 31, February 2014, were you and Jasiel Correia

19   together in Providence or Warwick?

20   A.   Yes.

21   Q.   And did he buy your plane ticket to come see him in

22   Providence that weekend?

23   A.   He did, yes.

24   Q.   And did you stay at the NYLO Warwick Loft Hotel?

25   A.   Yes.

1          MR. HAFER:  Can I have the next one, please.

2    Q.   In February of 2014, Ms. Cleveland, were you and Jasiel

3    Correia together in Washington, D.C.?

4    A.   Yes.

5    Q.   And is this the one that you've already testified about,

6    if you look at the last two entries on this portion of the

7    exhibit, where you stayed at both the Intercontinental and the

8    Kimpton?

9    A.   Yes.  This reflects the Intercontinental receipts I've

10   already testified about.

11   Q.   And then below, that's that Kimpton Rouge Hotel, correct?

12   A.   Yes, that's correct.

13   Q.   It appears there's an entry for both a plane ticket and an

14   Amtrak purchase.  Do you know why that is?

15   A.   It would appear that he took the train back to -- no.

16   Maybe he took the train down and flew back up to Providence.

17   Q.   And when you were together with Mr. Correia in Washington

18   and in Providence, would you guys use Ubers to get around

19   locally?

20   A.   Yes.

21          MR. HAFER:  Could I have the next, please.  You can

22   put the first two together, Ms. DiPaolo, if you wouldn't mind.

23   Q.   Ms. Cleveland, were you and Jasiel Correia together March

24   6 to 8 in Newport, Rhode Island?

25   A.   Yes, we were.

1   Q.   That's the Chanler Cliff Walk that you've already

2   testified about?

3   A.   It is, yes.

4   Q.   And later, in March of 2014, did you fly from D.C. to

5   Providence to visit Jasiel Correia?

6   A.   I did, yes.

7   Q.   And he bought your plane ticket?

8   A.   He did.

9        MR. HAFER:  Could I have the next one.

10  Q.   In April of 2014, were you together in Washington, D.C.?

11  A.   Yes, we were.

12  Q.   And he flew down to see you that weekend?

13  A.   He did, yes.

14       MR. HAFER:  Can I have the next one, please.

15  Q.   April 25 to 28 of 2014, were you and Jasiel Correia

16  together in Washington, D.C.?

17  A.   Yes, we were.

18  Q.   You stayed at the Intercontinental?

19  A.   Yes.

20  Q.   And he flew down to see you?

21  A.   He did.

22       MR. HAFER:  Could I have the next page, please.

23  Q.   In June of 2014, I believe you've already testified a

24  little bit about this, were you and the defendant together in

25  Washington State and Hawaii?

1    A.    Yes, we were.

2    Q.    And did he fly out there for that trip?

3    A.    He did, yes.

4    Q.    Did you guys have meals together in Lahaina while you were

5    there?

6    A.    We did.

7    Q.    This is where he purchased those items at the Pearl

8    Factory on June 18 of 2014?

9    A.    Yes, that's correct.

10   Q.    There's an entry there, PayPal Ginaveleka, that's the Kate

11   Spade handbag you've already testified about on June 26 of

12   2014?

13   A.    Yes.

14   Q.    And you went to the movies at Regal Cinemas in Vancouver

15   while you were together?

16   A.    Yes, to the best of my memory.

17        MR. TOBIN:  Could I have the next one, Ms. DiPaolo.

18   Q.    Were you and the defendant together in Washington State

19   around July 4 of 2014?

20   A.    Yes, we were.

21   Q.    And did he fly out there to see you?

22   A.    He did, for a single-day trip.

23        MR. HAFER:  Could I have the next one.

24   Q.    You've testified about the Chatham Bars Inn already,

25   Ms. Cleveland.  Were you and the defendant together at the

1    Chatham Bars Inn in August of 2014?

2    A.   Yes, we were.

3    Q.   Did you also, as part of that visit, stay at the

4    Intercontinental in Boston?

5    A.   To the best of my memory, yes.

6    Q.   That was about $1,912 for those nights, according to this?

7    A.   Yes, according to the document.

8         MR. TOBIN:  Could I have the next one, please.

9    Q.   Ms. Cleveland, were you and the defendant together in

10   Washington, D.C. in September of 2014?

11   A.   Yes.

12   Q.   And this is one you've already testified about.  You

13   stayed at the Intercontinental?

14   A.   Yes.

15   Q.   Went to Filomena's Restaurant?

16   A.   Yes.

17   Q.   There's also an entry at the bottom of this one for the

18   Graham, Washington, D.C., $459.  What's the Graham?

19   A.   The Graham is another hotel in Washington, D.C.

20   Q.   Do you recall, how many nights did you stay at the Graham?

21   A.   I think it was just a single night.

22        MR. HAFER:  Could I have the next one, please.

23   Q.   Were you and the defendant together in Providence October

24   10 to 13 of 2014?

25   A.   Yes.

1    Q.   And did he buy your plane ticket to come see him those

2    days?

3    A.   He did, yes.

4    Q.   By the way, speaking of Rhode Island, were you aware that

5    the defendant had an apartment in Newport?

6    A.   I wasn't aware that he had an apartment.  I was aware of a

7    condo that he stayed at on occasion.

8    Q.   Had you ever been to that condo with him?

9    A.   Yes.

10   Q.   Did you ever ask him about the cost of the condo or how he

11   paid for it?

12   A.   It was always presented to me as the condo was owned by a

13   friend, Patricia Tod, and she was letting us stay there as a

14   favor.

15   Q.   And when you said it was presented to you, who told you

16   that Patricia Tod was letting him stay in the condo for free?

17   A.   Jasiel.

18         MR. HAFER:  Could I have the next entry, please,

19   Ms. DiPaolo.

20   Q.   Ms. Cleveland, were you -- moving back to the chart now,

21   if you're following along, were you and Jasiel Correia together

22   in New York and Providence in November of 2014?

23   A.   Yes.

24   Q.   There's an entry there for Amtrak.  Did you take the

25   train?

1    A.    We did, yes, back to Providence.

2    Q.    And you stayed at the Intercontinental in New York City?

3    A.    Yes.

4    Q.    You would have taken Ubers while you were there?

5    A.    Yes.

6          MR. HAFER:  Could I have the next one, please.

7    Q.    Were you and Jasiel Correia together in December 13 to 15

8    in Washington, D.C. in 2014?

9    A.    Yes.

10   Q.    And this is at one of the Intercontinentals that you've

11   already testified about?

12   A.    Yes.

13         MR. HAFER:  Could I have the next one, please.

14   Q.    Were you and the defendant together in December of 2014 in

15   Washington State?

16   A.    Yes.

17   Q.    Did he fly out to see you?

18   A.    He did, yes.

19   Q.    Going below that, were you together with Jasiel Correia in

20   February of 2015 in Washington, D.C.?

21   A.    Yes.

22   Q.    This is the entry here for the Odyssey Cruise.  Is that

23   when you did the Valentine's Day dinner cruise on the Potomac?

24   A.    Yes, that's correct.

25   Q.    There's two entries for Neiman Marcus.  This is the Santal

```
 1   cologne and Christian Louboutin shoes you've already testified
 2   about?
 3   A.   Yes.
 4   Q.   And then an $1,800 charge from the Intercontinental; is
 5   that correct?
 6   A.   Yes, that's correct.
 7   Q.   Ms. Cleveland, during the course of the time you were with
 8   the defendant, did he ever buy you anything from Burberry?
 9   A.   He did, yes.
10   Q.   What did he buy you from Burberry?
11   A.   He bought me two different coats from Burberry.
12        MR. HAFER:  Could I have the next one.
13   Q.   Going to the next entry, were you and the defendant
14   together in February and March of 2015 in Washington, D.C.?
15   A.   Yes.
16   Q.   Did he fly down to see you?
17   A.   Yes.
18   Q.   Did you stay at the Kimpton Rouge Hotel during that visit?
19   A.   Yes, to the best of my memory.
20   Q.   And the Renaissance, do you see that's another hotel?
21   A.   I do, yeah.
22   Q.   You guys would have used Uber to move around locally that
23   weekend?
24   A.   Absolutely, yes.
25        MR. HAFER:  Could I have the next one, please,
```

1  Ms. DiPaolo.

2  Q.   Ms. Cleveland, did you fly to Providence, Rhode Island in

3  March of 2015 to visit the defendant?

4  A.   I did, yes.

5  Q.   Did he pay for your plane ticket?

6  A.   He did.

7  Q.   Were you and the defendant together in Washington, D.C. in

8  April of 2015?

9  A.   Yes.

10 Q.   Did he fly down to see you?

11 A.   He did, yes.

12 Q.   There's a charge there from Suitsupply for $923.  Do you

13 see that?

14 A.   I do.

15 Q.   That's the portion of the $1,223 receipt that you've

16 already testified about that also included the $300 in cash?

17 A.   Yes, that's correct.

18        MR. HAFER:   Could I have the next one.

19 Q.   I think we're on the last page, Ms. Cleveland.  Were you

20 and the defendant together in May of 2015 in Newport at the

21 Chanler?  You've already testified about that, correct?

22 A.   Yes, that's correct.

23 Q.   And in July of 2015, were you together on Martha's

24 Vineyard with Jasiel Correia?

25 A.   Yes.  Although to the best of my memory, it was June 29 of

1    2015.

2    Q.   June 29.  I see, that's where you guys rented the Jeep and

3    went sightseeing?

4    A.   That's correct.

5         MR. HAFER:  Thank you, Ms. Cleveland.  I have no

6    further questions at this time.

7         THE COURT:  Mr. Reddington?

8         MR. REDDINGTON:  Thank you, Your Honor.

9    CROSS-EXAMINATION BY MR. REDDINGTON:

10   Q.   So Ms. Cleveland, fair to say that you had a rather

11   intense, shall we say, relationship with Jasiel Correia?

12   A.   I'm sorry.  Could you repeat the question.

13   Q.   Yeah.  You had an intense relationship -- you're the

14   ex-girlfriend of Jasiel Correia, correct?

15        THE COURT:  Mr. Reddington, I think it would be

16   helpful if you got closer to the microphone so that the witness

17   can pick it up and the rest of us can, too.

18        MR. REDDINGTON:  Thank you, Judge.

19   Q.   You're the ex-girlfriend of Jasiel Correia?

20   A.   Yes, that's correct.

21   Q.   You had a fairly intense relationship for about three

22   years with Jasiel Correia, correct?

23   A.   We had a long relationship.

24   Q.   Well, you basically were -- quite frankly, you believed

25   that you were in love with each other?

1    A.    Mm-hmm.  That's correct.

2    Q.    Okay.  And that relationship broke up when?

3    A.    January of 2017.

4    Q.    And during this period of time, 2013, 2014, you knew that

5    he was working selling shoes at Nordstrom's, right?

6    A.    No, I did not.  I knew that he worked at Nordstrom during

7    the summer of 2012 in Washington, D.C. and that he worked at

8    Nordstrom in Providence during his college career.

9    Q.    Right.  And you were not aware that 2013 into 2014 he was

10   still working at Nordstrom's?

11   A.    No.

12   Q.    So you knew when he was elected to the city council,

13   right?

14   A.    Yes.

15   Q.    I mean, he would tell you his hopes, his dreams, his

16   aspirations.  He'd talk and be an open book with you many

17   times, correct?

18   A.    Fair enough, fair to say, yes.

19   Q.    And he indicated to you on a number of occasions, if not

20   all the time, about his baby, so to speak, SnoOwl?

21   A.    Yes, he spoke about SnoOwl.

22   Q.    He spoke about SnoOwl a lot, didn't he?

23   A.    Yes, especially during those early years.

24   Q.    And you knew what SnoOwl was, correct?

25   A.    Yes.

1  Q.   You knew that he had been working with SnoOwl during the
2  period of 2013, 2014, 2015, you knew that he was working for
3  SnoOwl, correct?  It was his business?
4  A.   Yes.
5  Q.   And he would tell you how exciting it was that it appeared
6  as though they were going to be able to possibly bring the app
7  to the Apple App Store?
8  A.   Yes, he would.
9  Q.   And quite frankly, he felt that at some point the business
10 would be acquired, an acquisition, and a lot of money would be
11 made?
12 A.   That was his desire.
13 Q.   And you knew that there were a number of people that had
14 made investments in the business, correct?
15 A.   Yes.
16 Q.   And during this period of time that he would either go to
17 Washington State to see you or he would go down to Washington,
18 D.C. and have occasion to see you, many times these were kind
19 of sporadic.  It wasn't like a preplanned trip or visit.  It
20 was spur of the moment.  Right?
21 A.   No.  I would say nine times out of ten they were
22 preplanned.
23 Q.   Okay.  Well, for example, when you would go, say December
24 14 for Christmas, you would expect, with your relationship,
25 that you were going to get together for Christmas, right?

1    A.    Mm-hmm.   That's correct.

2    Q.    You would expect that if you're in D.C., that he would fly

3    down to D.C. and that he would see you, correct?

4    A.    Correct.

5    Q.    You expected that he would buy you a gift for Christmas,

6    correct?

7    A.    That's also correct.

8    Q.    And certainly the gift, for example, was not preplanned.

9    You didn't say, "Listen, I want whatever those bags are" or "I

10   want this type of jewelry."   He would buy you a gift and give

11   it to you, correct?

12   A.    Not always.   There were times when I asked for specific

13   items as a gift.

14   Q.    I bet.   What did you ask for?

15   A.    The Kate Spade clutch, the necklace in 2015 from Tiffany

16   come to mind.

17   Q.    So those were at your request?

18   A.    Correct.

19   Q.    The Intercontinental, I mean, obviously it's a hotel

20   chain.   They're all over the place.   Like, there's one in

21   Boston, correct?

22   A.    That's correct.

23   Q.    And you've stayed there with Jasiel, right?

24   A.    Yes.

25   Q.    The Intercontinental in Washington, D.C., you stayed there

1    a couple of times or a number of times with Jasiel, didn't you?

2    A.    A number of times, yes.

3    Q.    And you knew a fellow down there by the name of Abdulla,

4    didn't you?

5    A.    I knew someone named Abdulla, yes.

6    Q.    And who was Abdulla?

7    A.    Abdulla was, to the best of my memory, the guest relations

8    manager or the hospitality manager, I don't remember the exact

9    title, for the Intercontinental, for the Willard.

10   Q.    Right.  And you would see Jasiel go off with him on a

11   number of occasions and either go up to an office or discuss

12   matters such as SnoOwl, you would actually witness that,

13   wouldn't you?

14   A.    No, sir.

15   Q.    Did you ever see Abdulla speaking with Jasiel about

16   folding cards that would be made that he was going to be --

17   "he" meaning Abdulla -- placing on the tables in the dining

18   room for purposes of people accessing or utilizing SnoOwl?

19   A.    No, sir, not to my memory.

20   Q.    When you went out to dinner to the Zaytinya Mediterranean

21   Restaurant, actually, that was with Abdulla, wasn't it?

22   A.    It was Abdulla and his girlfriend.  So it was a couples

23   dinner.

24   Q.    So the answer being yes, that it was Abdulla there with

25   you guys at that restaurant, the Zaytinya Mediterranean, and he

1    and Jasiel talked about SnoOwl in front of you.

2    A.   It's very likely, although I don't remember the exact

3    conversation.

4    Q.   Do you have any memory -- now you say it's very likely.

5    Do you have any memory at all of Jasiel speaking to Abdulla,

6    who was the director, if you will, of guest relations for the

7    Intercontinental Hotel in Washington, D.C., talking about

8    SnoOwl advertising?

9    A.   I don't know that you could call it advertising per se.

10   He definitely would have mentioned SnoOwl as his, you know,

11   business, source of income.

12   Q.   You knew when he purchased the Mercedes, right?

13   A.   I believe he purchased the Mercedes before we started

14   dating, but yes, it was my understanding he owned that.

15   Q.   Right.  And, quite frankly, in your grand jury testimony

16   you described that as a bottom-of-the-line Mercedes, correct?

17   A.   Yes, in the grand jury testimony, that's correct.

18   Q.   You knew that the FBI was investigating Jasiel for any

19   number of things dealing with SnoOwl and investors' money,

20   correct?

21   A.   I did, after they had contacted --

22   Q.   And you were fairly attuned to investigations that were

23   involving him while he was either city councillor or mayor?

24   A.   It would have been after the relationship, so not at the

25   time.

1   Q.   That was January 17 that the relationship broke up, right?

2   A.   Correct.

3   Q.   Okay.  And he advised you at one point that he had

4   retained an attorney, fellow by the name of Mark Berthiaume.

5   You knew that, right?

6   A.   The name didn't ring a bell, but yes.

7   Q.   He explained to you what was going on in Fall River as far

8   as the news media talking about this investigation, many people

9   hoping that he would be indicted for any number of political or

10  other reasons, correct?

11  A.   Yes, that's correct.

12  Q.   The condo in Rhode Island was owned by -- did you ever

13  meet Patricia Tod?  Very nice woman.

14  A.   Just once.  It would have been in November of 2013 at his

15  first election night party for city council.

16  Q.   How many times, if more than once, did you stay at the

17  condo in Rhode Island that was owned by Patricia Tod?

18  A.   I'm guessing twice.

19  Q.   Okay.  And he made no bones about it.  He didn't say he

20  owned the condo.  He said this is something that a nice woman

21  was letting him use when he wanted to, right?

22  A.   Yes, that's correct.

23          MR. REDDINGTON:  That's all I have, Your Honor.  Thank

24  you.

25          THE COURT:  All right.  Mr. Hafer?

1            MR. HAFER:  Your Honor, I have no redirect.

2            THE COURT:  All right.

3            So we'll close this witness off.  Thank you very much

4    for testifying by Zoom here.

5            What we're going to do now, ladies and gentlemen, is

6    take an early luncheon break.  So we'll be back here at, let's

7    say, 12:30, and we'll continue with the testimony.  We'll take

8    breaks in the afternoon, at least one break in the afternoon as

9    well.

10           (Jury exits the courtroom.)

11           THE COURT:  So do I understand the next witness will

12   be Mr. Charest?

13           MR. HAFER:  Correct, Your Honor.

14           THE COURT:  Okay.  All right.  So anything else before

15   the break?

16           MR. HAFER:  Not from us.

17           MR. REDDINGTON:  No.

18           THE COURT:  Okay.  We'll be in recess.  As I said, a

19   little bit before 12:30, if you're back here, say, 12:25.

20           (Recess, 11:43 a.m.)

21           (Resume at 12:36 p.m.)

22           THE CLERK:  All rise.

23           (Court entered the courtroom.)

24           THE COURT:  Are we ready for the jury?

25           MR. HAFER:  Yes, Your Honor, we were just waiting for

1    you and now we can put the witness up.

2              THE COURT:  Absolutely.

3              (Pause.)

4              THE COURT:  If you can remain standing until the jury

5    comes in, then we'll swear you as the witness.

6              THE CLERK:  All rise.

7              (Jury entered the courtroom.)

8              THE CLERK:  Please be seated.

9              THE COURT:  So, ladies and gentlemen, before I swear

10   the next witness, I'll ask my customary question:  Were any of

11   you exposed in any way to any material or conversations or any

12   information regarding this case other than what has been

13   presented in the courtroom here?

14             And I see no response to that, so I find that the jury

15   was not exposed.

16             Ms. Beatty, you can swear the witness.

17             TERENCE ALAN CHAREST, having been duly sworn by the

18   Clerk, was examined and testified as follows:

19             THE CLERK:  Can you please state your full name and

20   spell your last name.

21             THE WITNESS:  My name is Terence Alan Charest,

22   C-h-a-r-e-s-t.

23             THE COURT:  And, Mr. Charest, at this point you can

24   take your mask off.

25             You can take your mask off at this point.

```
 1              THE WITNESS:  Okay.
 2              THE COURT:  You may proceed, Mr. Hafer.
 3              MR. HAFER:  Thank you, Your Honor.
 4              Mr. Charest, you may want to move that microphone a
 5    little so it's in between the two of us.
 6                           DIRECT EXAMINATION
 7    BY MR. HAFER:
 8    Q.    How old are you?
 9    A.    I am 74 years old.
10    Q.    Where did you grow up?
11    A.    I grew up in Seekonk, Mass.  Actually started in
12    Plainville and grew up in Seekonk.
13    Q.    How far did you go in school, Mr. Charest?
14    A.    I have two bachelor's degrees, one in business
15    administration, the other one in accounting.
16    Q.    Are you currently employed?
17    A.    Yes.
18    Q.    What do you do for work?
19    A.    I'm a Certified Public Accountant.
20    Q.    How long have you been a Certified Public Accountant?
21    A.    Since 1988.
22    Q.    Do you have your own practice?
23    A.    Yes.
24    Q.    Does your practice have a particular focus or specialty?
25    A.    Small business bookkeeping and preparation of personal and
```

1    business tax returns.

2    Q.   Mr. Charest, there's a fairly substantial binder in front

3    of you with several tabs in it.

4         Do you see the binder in front of you?

5    A.   Yes.

6    Q.   Would you start, sir, by turning to tab 100 in the binder.

7              And let me know if you recognize the document at tab

8    100.

9    A.   I do.

10   Q.   What is it?

11   A.   It is an agreement between me and the U.S. Department of

12   Justice Massachusetts.

13             MR. HAFER:  I'm going to offer Exhibit 1 --

14             Sorry, I thought the witness had completed his answer.

15   Q.   I'm sorry, Mr. Charest, you said it was an agreement

16   between you and the Department of Justice?

17   A.   Yes.

18             MR. HAFER:  I offer Exhibit 100.

19             THE COURT:  It's received.

20             (Exhibit 100 received into evidence.)

21             MR. HAFER:  Could you just highlight the date and --

22   through the first paragraph -- that's perfect.

23   BY MR. HAFER:

24   Q.   Mr. Charest, is this what's called an Immunity Agreement

25   between you and the government?

1    A.    Yes.

2    Q.    All right.  In your own words, sir, what do you understand

3    this agreement to mean?  What do you have to do, what is the

4    government promising to do?

5    A.    I promise to give complete and trust -- truthful

6    testimony, and in return for that, the government has agreed

7    not to prosecute me for my testimony, anything in my testimony.

8    Q.    What happens, in your understanding, sir, if you don't

9    tell the truth?  What happens to this agreement?

10   A.    It's voided.

11   Q.    Did you have a lawyer represent you in connection with

12   negotiating this agreement with the government?

13   A.    Yes.

14   Q.    Mr. Charest, do you know the defendant, Jasiel Correia?

15   A.    Yes.

16   Q.    How did you come to meet him?

17   A.    I actually met him while I was well into my engagement

18   with SnoOwl.  I really never had met him before that.  I had

19   been in touch with his attorneys.

20   Q.    Okay.  So let's start there.

21        Can you explain for the jury how it was that you

22   became to be in touch with attorneys for Jasiel Correia?

23   A.    Yeah, I was contacted by Keith Phillis of Phillis and

24   Carreiro law firm about doing an audit on a company.  He didn't

25   tell me what the company was at that stage.

```
 1          I told him that I don't do audits, but I asked him
 2   more about what the purpose of the audit was.  He indicated to
 3   me that they were trying to get some bookkeeping done and to
 4   try to verify what the transactions were business purpose
 5   transactions.
 6   Q.   And just to orient the jury, did this later become the
 7   bookkeeping and tax work that you did for Jasiel Correia and
 8   SnoOwl?
 9   A.   Yes.
10   Q.   Could you turn to tab 101, please.  And tell me if you
11   recognize the document at tab 101.
12   A.   I do.
13   Q.   What is that, Mr. Charest?
14   A.   That's an engagement letter from Carreiro and Phillis
15   asking me to do an agreed-upon procedures engagement.
16          MR. HAFER:  Your Honor, I offer Exhibit 101.
17          THE COURT:  It's received.
18          MR. HAFER:  Ms. DiPaolo, could I have the top half of
19   the document, including the date.
20   BY MR. HAFER:
21   Q.   This letter is dated May 6, 2016, Mr. Charest; is that
22   correct?
23   A.   That's right.
24   Q.   And is that approximately when you received this
25   engagement letter from the law firm of Carreiro Phillis?
```

```
1    A.    Yes.
2    Q.    And the first paragraph indicates that it's confirming the
3    arrangement that you had agreed to with respect to the tax
4    affairs of Jasiel Correia, II.
5          Do you see that?
6    A.    Yes.
7    Q.    And the second paragraph, then, indicates that this
8    particular firm has authority to retain an accountant who will
9    work under the direction of the law firm and report to the law
10   firm.
11         Do you see that?
12   A.    Yes.
13   Q.    You just mentioned "agreed-upon procedures."
14   A.    Yes.
15   Q.    And earlier you mentioned an "audit."
16   A.    Yes.
17   Q.    Could you explain the difference between an audit and
18   agreed-upon procedures?
19   A.    Agreed-upon procedures is an engagement where both
20   parties, that would be that firm and the client, would agree to
21   various procedures in order to accomplish the -- to accomplish
22   what the client was ultimately looking to prove.
23   Q.    And --
24   A.    An audit requires an additional -- a lot of additional
25   procedures, third-party confirmations, that kind of thing, that
```

1    extends the amount of work and time.  And I don't do audits as

2    a rule, so I just -- I stay away from that kind of work.

3    Q.   And to be clear, this particular arrangement that we're

4    going to talk about in detail, this was agreed-upon procedures,

5    not an audit.

6    A.   Yes.

7    Q.   Meaning, among other things, there was no third-party

8    verification?

9    A.   No.

10        MR. HAFER:  Ms. DiPaolo, can I have the next three

11   paragraphs on the same page of that letter.

12   Q.   Mr. Charest, I think the most efficient way to do this

13   will be for me to just read a couple of portions of this to you

14   and ask you a question or two about it, if that's okay.

15   A.   That's fine.

16   Q.   The top paragraph that's now enlarged indicates that all

17   communications between Mr. Correia, the firm, and yourself will

18   be confidential; is that correct?

19   A.   That's right.

20   Q.   The second paragraph says you will not disclose to anyone

21   without written permission the nature or content of any

22   communications or information you learn in connection with

23   performing the agreed upon procedures; is that correct?

24   A.   Yes.

25   Q.   And actually, the last sentence of the second paragraph

1   says, Nor will you permit inspection of any papers or documents

2   without prior written permission; is that correct?

3   A.   That's correct.

4   Q.   The third paragraph indicates that you'll open a file and

5   place all of your work papers and documents into that file

6   and --

7         MR. HAFER:  Can we go to the next page now,

8   Ms. DiPaolo.

9   Q.   -- and you will immediately return the file to the law

10   firm at the conclusion of the engagement; is that right?

11   A.   That's right.

12   Q.   Now, before we get into the substance, you testified you

13   had your own practice since 1988.

14      Is this type of confidentiality and secrecy typical in

15   these types of engagements?

16   A.   No.

17         MR. HAFER:  Could I have the next paragraph, please.

18   Q.   The next paragraph, Mr. Charest, indicates that you will

19   immediately notify the law firm if you have to surrender any

20   documents or reports in a way that wasn't authorized, right?

21   A.   That's correct.

22   Q.   And then subparagraph 2 indicates if anyone asks to see

23   anything you're going to look at, you need to notify the firm,

24   correct?

25   A.   That's right.

```
 1    Q.   And the third one actually indicates if any -- any court
 2    order or subpoena or anybody summons the documents, you're
 3    going to immediately notify the firm; is that right?
 4    A.   That's correct.
 5    Q.   And then right below that you're confirming that you have
 6    no proprietary interest in any of your own work papers in
 7    connection with this engagement; is that correct?
 8    A.   That's correct.
 9    Q.   Could you turn, Mr. Charest, to the next tab in your
10    binder which would be 102.
11              Do you recognize that?
12    A.   I do.
13    Q.   What is Exhibit 102?
14    A.   It's an engagement letter to Keith Phillis.
15    Q.   From you?
16    A.   From me, from my firm, yes.
17              MR. HAFER:  Your Honor, I offer 102.
18              THE COURT:  It's received.
19              (Exhibit 102 received into evidence.)
20              MR. HAFER:  Just the top of it, if you wouldn't mind,
21    Ms. DiPaolo.
22    BY MR. HAFER:
23    Q.   You indicated this is an engagement letter from you to
24    Keith Phillis of the law firm of Carreiro Phillis; is that
25    correct?
```

1    A.    That's correct.

2    Q.    And this is dated May 14, 2016, Mr. Charest?

3    A.    It is.

4    Q.    So about two-and-a-half weeks after that letter we just

5    looked at from May 6th of 2016.  Is that about right?

6    A.    Yes.

7          MR. HAFER:  Ms. DiPaolo, could I have the first couple

8    of paragraphs of the letter.

9    Q.    In this letter generally, Mr. Charest, you set out what

10   you're going to do, right?

11   A.    That's correct.

12   Q.    What the agreed-upon procedures are; is that correct?

13   A.    Yes.

14   Q.    And we'll look at some of the specific language, but is it

15   fair to say the essence of this engagement was you were going

16   to segregate business expenses from personal expenses?

17   A.    That's correct.

18   Q.    And looking at paragraph 2, it's highlighted on the screen

19   in front of you, you're going to verify and segregate 2013,

20   2014, and 2015 deposit and disbursement activity as either

21   business or nonbusiness transactions, right?

22   A.    That's correct.

23   Q.    And then prepare schedules of those transactions

24   accordingly?

25   A.    Yes.

1    Q.   The last sentence of that paragraph reads:  Also, my

2    ability to complete the engagement on a timely basis will

3    depend on your cooperation to respond to requests for

4    additional information and inquiries; is that right?

5    A.   That's correct.

6              MR. HAFER:  Ms. DiPaolo, could I have the next several

7    paragraphs.

8    Q.   And then, again, Mr. Charest, in the interest of time, you

9    outline the procedures you're going to perform, but you

10   essentially indicate the information comes from the client.

11   A.   That's correct.

12   Q.   And is that typical in your line of work, that the

13   information comes from the client?

14   A.   Absolutely.

15   Q.   And this was not an audit.

16   A.   This was not an audit.

17   Q.   Now, again, let's start high and then move into more

18   detail.

19              How did you broadly intend to accomplish this

20   undertaking?  What were you going to do to start to perform the

21   agreed-upon procedures for '13, '14, and '15?

22   A.   The first thing we needed was the bank statements.

23   Q.   And once you had bank statements, would you use QuickBooks

24   or something like that?

25   A.   Yes, we use QuickBooks almost exclusively for our

1    bookkeeping engagements.

2    Q.   And I'm sure the jury knows, but just for the record, what

3    is QuickBooks?

4    A.   QuickBooks is a software package, very user-friendly,

5    which is why we use it, because the client -- many of our

6    clients use it, so it's easy to understand.  When you look at a

7    check, it looks just like a check that you would handwrite, so

8    it's a very user-friendly program.

9    Q.   Sir, at some point after you sent this return, May 24,

10   2016 engagement letter, did you, in fact, begin using

11   QuickBooks to perform the agreed-upon procedures?

12   A.   As soon as I received the bank statements I started that

13   process.

14   Q.   I see.

15        The bank statements, who did you receive those from?

16   A.   I received those from Chris Carreiro.

17   Q.   And Chris Carreiro, how does he fit into all of this, who

18   was he?

19   A.   Chris was the partner of Keith.  I believe Keith and Chris

20   separated soon after I got the letter from Keith.  So Chris

21   took over the engagement from there.

22   Q.   And you eventually -- in beginning, to do this work, you

23   received bank statements from Chris Carreiro from SnoOwl?

24   A.   Yes.

25   Q.   Did you also receive some other documents from the IRS and

1    other things from the outset of the agreed-upon procedures?

2    A.    Yes.  I did a little research to find out what kind of an

3    entity SnoOwl was.  I couldn't find it online, but I did find

4    an EIN number -- I did get an EIN number from Chris Carreiro.

5    Q.    Could you turn to tab 103, please.

6            Do you recognize that, Mr. Charest?

7    A.    Yes, I do.

8    Q.    Is that the EIN number you were talking about?

9    A.    That's the EIN number assignment from the Internal Revenue

10   Service.

11           MR. HAFER:  I offer 103, Your Honor.

12           THE COURT:  It's received.

13             (Exhibit 103 received into evidence.)

14           MR. HAFER:  Could you just highlight the top half of

15   the page down through the form, a little further.  Right

16   through -- a little further.

17           Thank you.

18   BY MR. HAFER:

19   Q.    Mr. Charest, this -- well, what is an EIN?

20   A.    It's an employer identification number that most employers

21   will want if they want to produce payroll.

22   Q.    And this one in particular here is for SnoOwl, Jasiel F.

23   Correia, general partner, right?

24   A.    Yes.

25   Q.    And do you see right where the enlargement ends at the

1    bottom of this, it says a Form 1065.  The IRS says:  Based on

2    the information received from you or your representative, you

3    must file the following forms by the dates shown, and it

4    indicates a Form 1065?

5    A.    Correct.

6    Q.    Do you know what a Form 1065 is?

7    A.    It's a partnership return, federal partnership return.

8    Q.    Okay.  So getting back to the bank statements, you

9    eventually -- you received bank statements from Chris Carreiro

10   for SnoOwl?

11   A.    Yes.

12   Q.    And when you received those statements, what did you do

13   with them?

14   A.    Well, we started inputting the information starting in

15   2013, January of '13 and continued on until we got through the

16   December of '15.

17   Q.    In general, what did the statements show?  Lots of

18   activity, minimal activity?  What did they show?

19   A.    There was a lot of debit card activity, not a lot of check

20   activity.  The transactions were many times restaurants and --

21   you know, we saw some transactions that we could perceive may

22   have been business, but we needed verification.

23   Q.    Was your initial reaction to the Citizens Bank statements

24   that there was more business activity or more personal

25   activity?

1    A.    It would look like there was an awful lot of restaurant

2    activity.  So, yes, we were inclined to believe that much of

3    that might be nonbusiness or personal activity.

4    Q.    As you began to segregate this, did you set up internally

5    different accounts to sort of park the various expenditures as

6    you were trying to classify them?

7    A.    Yes.

8    Q.    What were they?

9    A.    Initially started out using what we call an Exchange

10   account, which is an account that ends up on the balance sheet

11   and kind of stands out as something that we need to look at

12   before we finalize the numbers.  So we ended up putting a lot

13   of the -- the transactions that we were unaware of where to put

14   it, we put it in there, but then I had somebody else, later,

15   doing some of the work and they decided -- we decided then that

16   maybe we should put -- create an account called Due From Jasiel

17   Correia and put all the activity in there to capture most of

18   the activity there.

19   Q.    So, the Exchange account is, fair to say, stuff you need

20   to follow up on and get more information?

21   A.    Yes, absolutely.

22   Q.    And figure out where it has to go?

23   A.    Yes.

24   Q.    The Due From Jasiel account is -- well, why did you call

25   it "Due From Jasiel"?

1    A.    Same thing, that's the same thing.  We just decided to

2    switch from Exchange over to "Due From --"

3    Q.    Because it was --

4    A.    -- "Jasiel."

5    Q.    -- it was personal?

6    A.    Yes.  We're thinking that much of it is going to be

7    personal and it might be easier for us to make the entries that

8    are business and just leave the rest of it in that account.

9    Q.    And one of the things you have to do is if you see a

10   charge, for example, from Southwest Airlines, you don't know by

11   looking at that whether it's business or personal without

12   additional information; is that correct?

13   A.    Agreed.

14   Q.    If it's a business trip, it's business; if it's a personal

15   trip, it's personal?

16   A.    That's correct.

17   Q.    So you have to follow up and get additional information

18   but not from a third party because it's not an audit.

19   A.    No.

20   Q.    Do I have that right?

21   A.    Yeah.

22   Q.    So at some point in the process you're inputting these

23   initial disbursements into QuickBooks, you've created the Due

24   From Jasiel and the Exchange.

25         Have you met Mr. Correia yet at this point in the process?

```
1    A.    No.

2    Q.    Did you have any records, Mr. Charest, at this point in

3    the process other than the Citizens Bank statements and perhaps

4    that IRS document that we looked at?

5    A.    No.

6    Q.    Did you have any receipts?

7    A.    No.

8    Q.    Did you have any investor agreements?

9    A.    No.

10   Q.    Did you have any convertible debt notes?

11   A.    No.

12   Q.    Did you have any business plans?

13   A.    No.

14   Q.    Did you have any loan documents showing some type of a

15   loan?

16   A.    No.

17   Q.    At any point during the course of the agreed-upon

18   procedures, did you receive any of those categories of

19   documents?

20   A.    No.

21   Q.    At some point after you completed this, we'll call first

22   cut at inputting the information into the Exchange and Due From

23   Jasiel account, did you send a status report to Mr. Carreiro at

24   Carreiro Phillis?

25   A.    Yes.
```

```
1    Q.   Could you turn to tab 104, please.

2         Do you recognize that document, Mr. Charest?

3    A.   Yes.

4    Q.   What is it?

5    A.   It's a status report, as it says at the top, on the

6    agreed-upon procedures that we were originally engaged to

7    perform and that we hadn't received the necessary information

8    in order to initiate that engagement.

9         MR. HAFER:  Your Honor, I offer Exhibit 104.

10        THE COURT:  It's received.

11         (Exhibit 104 received into evidence.)

12   BY MR. HAFER:

13   Q.   Mr. Charest, this is the status report you sent to Chris

14   Carreiro; is that correct?

15   A.   Yes.

16   Q.   And again, just in the interest of time, I'm going to read

17   it in part, obviously the whole document is in evidence, and

18   ask you a couple of questions, if that's okay.

19        This indicates that you were retained to perform the

20   agreed-upon procedures, and then I'm going to read the second

21   full sentence.

22        The only information provided to us at this time has

23   been the bank statements for all three years and copies of some

24   checks made payable to the company which were deposited into

25   the checking account and checks payable to SnoOwl/Jasiel
```

1    Correia, II, that were deposited into another account assumed

2    to be the personal account of Jasiel Correia, II.  Very few

3    checks were used for the disbursement of funds with most

4    disbursements being debit transactions.

5            Have I read that correctly?

6    A.    That's correct.

7    Q.    What did you mean "most disbursements were debit

8    transactions"?  Was that your characterization of the citizen

9    transactions?

10   A.    Yes, the checks stand out in that there's a check number

11   on the bank statement.  The debit account doesn't have check

12   numbers, so they stand out also.

13   Q.    And the Citizens records were mostly debits; is that fair

14   to say?

15   A.    Right.

16   Q.    Thousands of debit charges?

17   A.    What's that again?

18   Q.    Were there thousands of debit charges over the several

19   years?

20   A.    Oh, yes.

21           MR. HAFER:  Ms. DiPaolo, could I have the next couple

22   paragraphs.

23   Q.    This next paragraph, Mr. Charest, I'm going to summarize,

24   but do you essentially set forth what you need to complete the

25   engagement?

```
 1    A.    Yes.
 2    Q.    And the first item is receipts or invoices or
 3    documentation of business purpose, correct?
 4    A.    Correct.
 5    Q.    You asked for credit card statements to document credit
 6    card activity?
 7    A.    Correct.
 8    Q.    You asked for information from PayPal?
 9    A.    Correct.
10    Q.    Number 4 I'm going to read.
11          Does the company have an Investment Agreement for the
12    investors' payments?  If so, we need copies of the various
13    signed agreements so we can determine capital investments
14    versus possible loans or loan agreements.
15          Have I read that correctly?
16    A.    Yes.
17    Q.    At any point during the course of your engagement to
18    perform these agreed-upon procedures, did you receive
19    investment agreements?
20    A.    No.
21    Q.    And then in number 5 here, you indicate that -- I'm going
22    to read it.
23          In the event that information necessary to disseminate
24    transactions into business categories is not received, we will
25    default to the undocumented transactions as being nonbusiness.
```

1        Is that correct?

2  A.   Correct.

3  Q.   And is that, in essence, what you did with the Due From

4  Jasiel account, if you didn't get documentation of a business

5  purpose, you made it personal?

6  A.   We never really got to that stage because what I ended up

7  doing was presenting to Chris Carreiro account analysis of the

8  Exchange account and the Due From Jasiel Correia account for

9  each of the years so that he could identify for us the personal

10 and the business activity, and it was easier to identify the

11 business activity.

12       So that was our instructions to Jasiel, was just

13 identify the business activity and then we'll reclassify it

14 into the proper account.  He would identify what it was for for

15 us.

16 Q.   And it was easier to identify the business activity

17 because there was a lot less of it; is that right?

18 A.   Yes.

19 Q.   Now, at the point that you sent this memo, this status

20 report, to Mr. Carreiro, the attorney, you still haven't met

21 Jasiel Correia, correct?

22 A.   No.

23 Q.   At some point after you sent this memo, what -- to Chris

24 Carreiro, what happened?

25 A.   I got a call from Chris, he wanted to know when I was

1    available to meet with Jasiel, and I said I'm available when

2    Jasiel's available.

3    Q.   Was he the mayor of Fall River at this time?

4    A.   Yes.

5    Q.   Did you eventually meet with Jasiel Correia and Chris

6    Carreiro?

7    A.   Yes.

8    Q.   Where was that?

9    A.   That was at Chris Carreiro's office.

10   Q.   What happened at that meeting, Mr. Charest?

11   A.   Well, we discussed the memo, and I tried to get some

12   insight as to what kind of -- what kind of entity we had.  I

13   asked him questions like, Did you have any partners?  And --

14   Q.   What did he say when you asked if he had any partners?

15   A.   He said, No.

16   Q.   I'm sorry, no, keep going.

17   A.   I'm all set.

18   Q.   Why did you care what kind of entity it was?

19   A.   Well, I'm trying to determine whether or not we have a

20   partnership or we have a sole proprietorship.

21   Q.   We're going to get to the tax returns a little bit later,

22   Mr. Charest, but could you explain the difference, again, up

23   here, between a partnership and a sole proprietorship for tax

24   purposes.

25   A.   Sure.  A sole proprietorship is -- it ends up on the

1    personal return, it's called a Form 1040 Schedule C for any

2    business activity that may have occurred in the proprietorship.

3    And a partnership return is a separate return entirely.  The

4    information goes on a Form 1065 for federal purposes, and what

5    ends up happening is from -- the information is gathered on the

6    1065 but then there's a Form K-1 that flows the information

7    through to the individual partner.

8    Q.   Is there a distinction for accounting purposes between

9    money taken out of a sole proprietorship and money taken out of

10   a partnership?

11   A.   Yes.

12   Q.   What is that distinction?

13   A.   The distinction is in a proprietorship, the proprietor is

14   allowed to take a draw, and they're only taxed on the income of

15   the proprietorship.  Wherein a partnership, if they were to

16   take money out, it would be conceived as a guaranteed payment

17   subject to income tax and the self-employment tax.

18   Q.   In essence, a sole proprietorship has one owner?

19   A.   Right.

20   Q.   To the extent money is taking out, you're taking out your

21   own money --

22   A.   Yes.

23   Q.   -- essentially; is that right?

24   A.   Yes.

25   Q.   Or if they're partners, there's several people with

1    ownership interest so it's taxable draw or income in some

2    respect; is that right?

3    A.    Correct.

4    Q.    At that first meeting, in addition to telling you he had

5    no partners, what did Mr. Correia say about your requests for

6    other documentation so you could move forward with the

7    agreed-upon procedures?

8    A.    He told me he had a gentleman that was in charge of all

9    that and he didn't know where it was.  And he said that he

10   didn't think that there was anything that he could find that

11   would be helpful to me.

12   Q.    Could you turn to Exhibit 105.

13           Actually, before I offer that, Mr. Charest, at some

14   point did you begin essentially printing up QuickBooks

15   worksheets and going over those worksheets with Jasiel Correia,

16   either in person or back and forth by email and fax?

17   A.    What we did was, we -- I indicated to him I needed his

18   assistance in identifying the business activity from the

19   personal, so I told him that I would print out the activity

20   from each of the accounts that we were capturing, the activity

21   in, and that he -- I kind of gave him instructions that we

22   would probably focus on the business -- the business activity,

23   if he could identify the business activity by maybe

24   highlighting it and indicating what it was for so it would help

25   us put it into the proper account on the profit and loss

1    statement.

2    Q.   Could you now tell me if you recognize Exhibit 105?

3    A.   I do.

4    Q.   What is it?

5         I'm sorry, what is Exhibit 105?

6    A.   Oh, what is it?  It's an account analysis of the Due From

7    Jasiel Correia account.

8    Q.   105, Mr. Charest, is it Due From Jasiel or Exchange?

9    A.   What's that again?

10   Q.   Is the -- is Exhibit 105 Due From Jasiel or is it Exchange

11   in the top corner?

12   A.   Oh, I'm sorry, I'm in the wrong place.

13        That's the Exchange account, yes.  That was the first

14   account we started using.

15        MR. HAFER:  Your Honor, I offer 105.

16        THE COURT:  It's received.

17   A.   I mean I ended up giving this to Chris Carreiro.

18        (Exhibit 105 received into evidence.)

19   BY MR. HAFER:

20   Q.   Okay.

21   A.   And he ended up, I'm assuming, passing it on to Jasiel for

22   his input on what the business expenses were.  And so much of

23   that writing, handwriting is -- some of that handwriting,

24   actually, is Jasiel.  When I got it back, there were a lot of

25   highlighted transactions but no description next to them.

```
 1          So I ended up having to go back -- we ended up having a
 2   meeting with Jasiel and trying to fill in the blanks on what
 3   had been -- what had been overlooked as far as descriptions
 4   were concerned.
 5          MR. HAFER:  Ms. DiPaolo, can you just highlight the
 6   top of the document a little higher than that so it includes
 7   the date as well.
 8   Q.   So this is the Exchange account you testified the account
 9   where you have to put stuff until you get more information as
10   to whether to classify it as business or personal, right?
11   A.   That's correct.
12   Q.   And the initial thing you did is you sent it to Chris
13   Carreiro seeking additional information from the defendant
14   about what was business and what was personal; is that right?
15   A.   That's correct.
16   Q.   And the highlighting was what?  What was the highlighting
17   supposed to indicate?
18   A.   That it was business.
19   Q.   And this part that's under the column that's titled
20   "Credit," there's handwriting.  What did you say -- whose
21   handwriting did you say that is on this exhibit?
22   A.   As I look at the analysis, the first two -- the first two
23   notes are "travel" and "website," that would be Jasiel's
24   writing.  And then below that, you can see where it's a little
25   different, that's my writing, which was -- there was no
```

1    description next to that when I received it back, so that's why
2    we ended up having a second meeting so I could fill in the
3    blanks.
4    Q.   Now, throughout the course of this engagement, did you
5    meet on several occasions with Jasiel Correia to determine from
6    him whether expenses were business or personal?
7    A.   I don't know that I would say it was several, but at least
8    on two other occasions, we kind of reviewed the activity on
9    both the asset accounts and the profit and loss accounts just
10   to make sure that we had properly recorded the activity in the
11   right place.
12   Q.   And all -- as we go through some of these worksheets,
13   Mr. Charest, so I don't have to keep asking you, all of the
14   information that you received during the engagement about
15   whether an expenditure was business or personal, who did the
16   information come from?
17   A.   It came from Jasiel Correia.
18           MR. HAFER:  Could you go to page 2 of this
19   Ms. DiPaolo, and maybe just the bottom half of the page, if you
20   would.
21   Q.   So, for example, on July 22, 2013, there's a $403 -- it's
22   a little tricky to see under the highlighting -- but a $403
23   Home Depot debit.  Do you see that?
24   A.   I do.
25   Q.   And next to that it says "R and M."  Do you see that?

1    A.    I do.

2    Q.    Okay.  What is R and M?

3    A.    Repairs and maintenance.

4    Q.    So Mr. Correia told you that charge was for SnoOwl repairs

5    and maintenance?

6    A.    Correct.

7    Q.    At any point when you were doing the agreed-upon

8    procedures, did Mr. Correia tell that you he had a separate

9    business, 1 Zero 4 Business Academy, and that he was building

10   out and rehabilitating that space?

11   A.    No.

12          MR. HAFER:  Ms. DiPaolo, could you go to page 3,

13   please, and down towards the very bottom -- right there.

14   Q.    Mr. Charest, do you see an entry on September the 4th of

15   2013, actually it has a 1022, it says "Flint Merchants

16   Association," and it's $4,000?

17   A.    I do.

18   Q.    And next to it, is that your handwriting or Mr. Correia's

19   handwriting?

20   A.    That's Jasiel handwriting.

21   Q.    And does that say, "sponsorship"?

22   A.    Yes.

23   Q.    What was the significance -- and we'll get to the tax

24   stuff -- but for tax purposes, what is the significance of that

25   $4,000 being classified as a sponsorship?

1    A.   It would be a business expense deductible on the return.

2    Q.   If you had known that $4,000 was to rebuild a neighborhood

3    school, didn't have anything to do with SnoOwl, would you have

4    classified it as a marketing business expense?

5    A.   I probably would have pursued it further.

6    Q.   Meaning asked more questions?

7    A.   Yes.

8         MR. HAFER:  Could you go to the next page,

9    Ms. DiPaolo.  And make sure you capture everything on September

10   10th and 11th, if you would.

11        Can you go a little lower than that?

12        Perfect.

13   Q.   Do you see a charge here on September the 11, 2013,

14   Intercontinental?  Do you see that for $3,081?

15   A.   I do.

16   Q.   Next to it, there's handwriting, what does that say?

17   A.   "Conference."

18   Q.   Whose handwriting is that?

19   A.   Jasiel.

20   Q.   What was the significance of -- for tax purposes, when we

21   get there, what was the significance of that expenditure being

22   classified as a conference?

23   A.   If the conference was related to his business and his

24   business purpose, it would be deductible.

25   Q.   If you had known that was a personal visit to his

```
1    girlfriend at the time, would you have included it as a
2    deductible business expense?
3    A.   No.
4    Q.   Right below the conference there's a charge $2,400 for
5    Ikea.  Do you see that?
6    A.   I do.
7    Q.   Whose handwriting is that next to it?
8    A.   That would be Jasiel's.
9    Q.   And that says "furniture"?
10   A.   Correct.
11   Q.   For tax purposes, what was the significance of that $2,400
12   expenditure being labeled furniture?
13   A.   Well, we capitalize it and then we probably for tax
14   purposes deduct it under the Sections 179 deduction, which
15   allows us to deduct it in full up to $200,000 back then.
16   Q.   If in fact the expenditure at Ikea didn't have anything to
17   do with SnoOwl, it wouldn't be a deductible or capitalized
18   SnoOwl expense --
19   A.   No.
20   Q.   -- correct?
21   A.   That's correct.
22            MR. HAFER:  Ms. DiPaolo, can you just zoom just so the
23   whole page is showing.
24   Q.   I'm not going to go through every line, Mr. Charest, but,
25   broadly, expenditures that are not marked with a highlight of
```

1    some sort in the 2013 Exchange account here, what is the

2    significance of all the entries that are not highlighted?

3    A.   They're classified as personal.

4    Q.   And essentially, the defendant has been given this print

5    up and been given an opportunity to go through and mark

6    business or personal; is that right?

7    A.   Correct.

8    Q.   And the highlights are what he has marked as personal?

9    A.   Correct -- no --

10   Q.   The highlights are what he has marked as business, excuse

11   me, I misspoke.

12         So the expenses that stay in here as personal, do you

13   move them out of the Exchange account?

14   A.   Yes.

15   Q.   And where do they go?

16   A.   They go to Due From Jasiel Correia.

17         MR. HAFER:  And could you just go back to the first

18   page, Ms. DiPaolo.

19         Could you highlight the header of the first page, the

20   very top.  Just to orient -- it's cut off on that version.

21   Q.   Mr. Charest, the -- this is occurring, this initial

22   screening, sometime in -- after May 24th of 2016, likely in

23   June and July of 2016; is that right?

24   A.   Yes.

25   Q.   Did Mr. Correia do any of this highlighting and writing in

1   your presence?

2   A.   No.

3   Q.   Could you turn to Exhibit 106, please.

4        Do you recognize that?

5   A.   I do.

6   Q.   What is 106?

7   A.   106 is an account analysis of 2013 of the Due From Jasiel

8   account.

9        MR. HAFER:  Your Honor, I offer 106.

10       THE COURT:  It's received.

11       (Exhibit 106 received into evidence.)

12       MR. HAFER:  Ms. DiPaolo, could you just highlight the

13  top half.

14  BY MR. HAFER:

15  Q.   This is, you said, the Due From Jasiel account for 2013;

16  is that correct?

17  A.   Correct.

18  Q.   So again, just so it's clear, there's an exchange where

19  you need to follow up and there's Due From Jasiel; is that

20  right?

21  A.   That's correct.

22       MR. HAFER:  Could you zoom out, please, Ms. DiPaolo,

23  and actually now -- now just take maybe down halfway through

24  the page or so -- the top half -- no, just take the top half if

25  you wouldn't mind.

1   Q.   Now, even though this is in the Due From Jasiel account,

2   Mr. Charest, did you go back and forth with the defendant about

3   whether everything was properly in that account?

4   A.   Yes.  What I did was, as I initially expressed, I printed

5   out these accounts, gave them to Chris Carreiro, who then was

6   to forward them to Jasiel for his analysis and to identify the

7   accounts that he believed were business and to identify for us

8   what the business purpose was.

9   Q.   The handwriting that we see on this document, 106, whose

10  handwriting is that?

11  A.   That's my handwriting.

12  Q.   They're both your handwriting, and perhaps further down on

13  the page some handwriting --

14  A.   Yes, Jasiel, too, down, I see "tech conference."

15  Q.   So Jasiel Correia wrote "tech conference"?

16  A.   Yup.  Yes.

17  Q.   So since we're on that, that is related to, it looks like,

18  the purchase of four Southwest plane tickets and Florida condo

19  for $744 and Enterprise rental for about $488 or so; is that

20  right?

21  A.   Yes.

22  Q.   And he told you that was a tech conference?

23  A.   Yes.

24  Q.   And if you had known that was a personal visit with

25  Mr. Correia and three of his friends, would you have included

1    that as a business expense for tax purposes?

2    A.    I would have pursued it.

3    Q.    And what do you mean by that?

4    A.    Well, I would have found out if it was truly a business

5    conference or if it was personal.

6    Q.    At the very top, February 22nd of 2013, do you see the

7    withdrawal for $10,000?

8    A.    Yes.

9    Q.    And you said that's your handwriting next to that?

10   A.    Correct.

11   Q.    What does that say?

12   A.    "Software technician."

13   Q.    Who told you that that $10,000 was for software

14   technology?

15   A.    Jasiel.

16   Q.    If you had known it was a down payment on a car, would you

17   have included it as software technology in your spreadsheets

18   and tax return?

19   A.    No.

20   Q.    Do you see the entry on April 23, 2013, a $2,410 check to

21   Shane Realty?

22   A.    Yes.

23   Q.    And there's handwriting next to that, it says "rent"?

24   A.    Correct.

25   Q.    Who told you that $2,410 was rent for SnoOwl?

```
 1    A.    That's his writing.

 2    Q.    So he classified that as a SnoOwl business expense?

 3    A.    Yes.

 4    Q.    And just to be clear, Mr. Charest, anything that's not

 5    highlighted in this account is personal?

 6    A.    Correct.

 7    Q.    Can you turn to tab -- actually, I should ask that

 8    question in a better way.

 9          Mr. Correia is indicating to you that it's personal

10    because he's not marking it as a business expense?

11    A.    Correct.

12    Q.    Could you turn to tab 107, please.

13          Do you recognize that document?

14    A.    I do.

15    Q.    What is it?

16    A.    It's an account analysis for 2014 of the Due From Jasiel

17    Correia account.

18               MR. HAFER:  I offer 107, Your Honor.

19               THE COURT:  It's received.

20             (Exhibit 107 received into evidence.)

21    BY MR. HAFER:

22    Q.    Mr. Charest, the first two documents we looked at exchange

23    and Due From Jasiel for 2013; is that right?

24    A.    Correct.

25    Q.    And now we're in Due From Jasiel for 2014?
```

1  A.   That's right.

2         MR. HAFER:  And actually, Ms. DiPaolo, could I have

3  the header of this document just for time purposes.

4  Q.   You printed this on or about July 7 of 2016, Mr. Charest?

5  A.   That's correct.

6  Q.   So sometime in the days or weeks after that is when you're

7  actually going through and identifying these expenses?

8  A.   Yes.

9         MR. HAFER:  Could you zoom out again.

10 Q.   And this is the Due From Jasiel account for 2014?

11 A.   Yes.

12 Q.   So anything that is not highlighted on this exhibit is

13 because the defendant is not -- is telling you that it's a

14 personal expense?

15 A.   That's right.  I don't know if this really represents

16 his -- oh, yeah, it does.  Yeah, so I don't see anything on

17 page 1, but on page 2, I see some activity that was identified

18 as business.

19 Q.   So, on page 2, now, it looks like there was about three

20 activities identified?

21 A.   Mm-hmm, yes.

22         MR. HAFER:  Ms. DiPaolo, could you go to page 4.

23 Q.   About three or four on the next page identified is --

24 perhaps five or six with the highlighting identified as

25 business?

1    A.    Correct.

2          MR. HAFER:   The next page.

3    Q.    Nothing there?

4    A.    No.

5          MR. HAFER:   Next page.

6    Q.    Nothing there?

7    A.    No.

8          MR. HAFER:   Next page.

9          Could you enlarge that?

10   Q.    You see September of 2014; is that right?

11   A.    That's correct.

12   Q.    It looks like there's a dinner at the Founding Farmer, the

13   Graham, can't tell if the Graham is cut off, but this is marked

14   as a conference; is that right?

15   A.    Correct.

16   Q.    And there's an Intercontinental charge -- again, a little

17   hard to make out -- but is there an Intercontinental charge

18   right there at the top on September 8, 2014?

19   A.    Yes.

20   Q.    And whose handwriting is that telling you it's a tech

21   conference?

22   A.    That's Jasiel Correia.

23         MR. HAFER:   Could you go to the last page of this

24   exhibit, Ms. DiPaolo?

25         Could you enlarge the very bottom of the page just to

1    capture the total.

2    Q.   What is the significance of this number, total Due From

3    Jasiel Correia, Mr. Charest?

4    A.   Well, the left-hand column represents that year, the

5    right-hand column represents '13 and '14.

6    Q.   So at this point in the engagement, based on the

7    information you have from Jasiel Correia, he's indicated to you

8    he's used about $88,874 of the SnoOwl Citizens Bank money for

9    personal purposes?

10   A.   Correct.

11   Q.   As the summer progressed, Mr. Charest, were you able to

12   complete the agreed-upon procedures?

13   A.   No.

14   Q.   Why not?

15   A.   We didn't receive the necessary backup documentation,

16   expense, invoices, things that we requested that we needed in

17   the first memo that I sent to them.

18   Q.   Could you look at Exhibit 108, please, sir.

19           Do you recognize that?

20   A.   I do.

21   Q.   What is it?

22   A.   It's another status report on the -- in the procedures,

23   agreed-upon procedures engagement.

24           MR. HAFER:  I offer 108, Your Honor.

25           THE COURT:  It's received.

```
 1              (Exhibit 108 received into evidence.)
 2              MR. HAFER:  Could you highlight down through the first
 3    paragraph but not the second, Ms. DiPaolo.  Thank you.
 4    BY MR. HAFER:
 5    Q.   This is a letter from you to Chris Carreiro in September
 6    of 2016; is that correct?
 7    A.   Yes.
 8    Q.   And the last sentence of the first paragraph reads:  The
 9    proper classification of the activity is not complete since we
10    have not been provided documentation that would assist in that
11    part of the process.
12         Is that right?
13    A.   That's correct.
14              MR. HAFER:  And could I have the next paragraph in the
15    letter, please.
16    Q.   I'm going to read the last sentence of this paragraph,
17    Mr. Charest.
18              We were unable to classify this activity because no
19    documentation has been provided, therefore, further assistance
20    from management is required to assign this activity to the
21    proper account classifications.
22              Have I read that correctly?
23    A.   Yes.
24    Q.   Who did you understand management to be?
25    A.   Management would have been Jasiel Correia.
```

```
 1   Q.   Did you ever deal with Nick Bernier?
 2   A.   No.
 3   Q.   No?  With respect to classifying what was business and
 4   what was personal?
 5   A.   No.
 6   Q.   Could you turn to tab 109?
 7        What is that?
 8   A.   That's what we call a "PBC" list, provided by client list,
 9   of information we require in order to complete any engagement.
10        MR. HAFER:  I offer 109, Your Honor.
11        THE COURT:  It's received.
12        (Exhibit 109 received into evidence.)
13   BY MR. HAFER:
14   Q.   These are five things that you indicate you need to
15   complete the agreed-upon procedures, Mr. Charest?
16   A.   Yes.
17   Q.   And this was attached to that last letter that was sent in
18   September of 2016?
19   A.   Yes.
20   Q.   Just reading it, you indicate you need PayPal summary
21   statements, number one; is that right?
22   A.   Yes.
23   Q.   And then number two, again, you say copies of signed
24   investor agreements, right?
25   A.   Yes.
```

1   Q.   Again, why did you want the signed investor agreements?

2   A.   We wanted to know how they actually classified the

3   investor funds that had been deposited into the SnoOwl account,

4   so it would have been helpful to have that information.

5   Q.   At any point during this engagement did you receive those

6   agreements?

7   A.   No.

8   Q.   Now, you have a checkmark next to the next one, the copies

9   of the articles of organization in Delaware.

10      Were you able to get those?

11  A.   Yes.

12  Q.   How did you get those?

13  A.   Went online in Delaware and was able to obtain the

14  articles from that website.

15  Q.   Number 5 says that Jasiel indicated in the information

16  provided to us identifying the business transactions that the

17  deposits received from Carl's Collision were for rent to 1 Zero

18  4, explain.

19      Have I read that correctly?

20  A.   Yes.

21  Q.   Did you get additional information about Carl's Collision

22  and deposits, checks to 1 Zero 4?

23  A.   No.

24  Q.   Could you turn to 110, please.

25      Do you recognize that?

1    A.    I do.

2    Q.    What is it?

3    A.    It's a statement about I have -- when we do an agreed-upon

4    procedures engagement, we have a report that we would provide

5    on our findings, and because we never did complete the

6    engagement, or actually stopped the engagement, we were unable

7    to do that.  So that was my indication to them that we had no

8    findings because we were unable to complete the engagement.

9              MR. HAFER:  I offer 110, Your Honor.

10             THE COURT:  It's received.

11             (Exhibit 110 received into evidence.)

12   BY MR. HAFER:

13   Q.    Again, in the interest of time, Mr. Charest, this

14   essentially says you're unable to make any findings because you

15   haven't been given the documents you need?

16   A.    Correct.

17   Q.    Now, at some point, notwithstanding your inability to

18   complete the agreed-upon procedures, in or about October of

19   2016, did you continue to work with Jasiel Correia and Chris

20   Carreiro on SnoOwl-related matters?

21   A.    The only thing that I think that I encouraged them to do

22   was potentially file -- since we were a proprietorship, or at

23   least I was led to believe we were a proprietorship, that we

24   should pursue filing amended returns for the years '13 and '14.

25   Q.    You advised Jasiel Correia and Chris Carreiro that they

1    should file amended returns?

2    A.   Yes.

3    Q.   I said "they," but who would have to file amended returns,

4    Chris Carreiro or Jasiel Correia?

5    A.   No, no, it would be for Jasiel Correia.

6    Q.   Why did you advise him to file amended returns?

7    A.   Well, he had the -- in both years they had losses, so, you

8    know, they should be filed, they should update their returns

9    with the correct information.

10   Q.   Did he tell you anything about whether he had included

11   SnoOwl on his original 2013 and 2014 returns?

12   A.   I don't recall that conversation, although I wouldn't have

13   recommended an amendment had I been told that.

14   Q.   In connection with the possibility of providing -- so at

15   some point -- we're going to start and then back up.

16       At some point did you prepare amended returns for 2013 and

17   2014 for Jasiel Correia?

18   A.   Yes, I did.

19   Q.   Okay.  And was that in approximately May of 2017?

20   A.   Yes.

21   Q.   Okay.  In October or November of 2016, did you give

22   Mr. Correia sort of a final pass or opportunity to review the

23   Due From Jasiel account?

24   A.   Yes, we just -- I just wanted to make sure that we had

25   everything properly accounted for, so, yes.

1    Q.   Can you turn to Exhibit 111.

2         Do you recognize that?

3    A.   I do.

4    Q.   And what is that?

5    A.   It's an account analysis of 2013, it looks like.

6    Q.   Of the Due From Jasiel account?

7    A.   Of the Due From Jasiel Correia account, yes.

8         MR. HAFER:   Your Honor, I offer 111.

9         THE COURT:   It's received.

10        (Exhibit 111 received into evidence.)

11        MR. HAFER:   And just for date purposes, if I could

12   have the very top, Ms. DiPaolo.

13   BY MR. HAFER:

14   Q.   You printed this on or about October 13 of 2016?

15   A.   That's correct.

16   Q.   And so at some point on or after October 13, 2016, you

17   provided this to Mr. Correia one last opportunity to review the

18   Due From Jasiel account; is that right?

19   A.   Correct.

20        MR. HAFER:   And could we just go back to the document,

21   Ms. DiPaolo.

22   Q.   The first page, it looks like there's one, one indication

23   there of an Albertos debit that's highlighted.

24        What is the significance of the highlighting?

25   A.   Highlighting indicates it's a business expense.

```
 1              MR. HAFER:  Could you go to page 2, Ms. DiPaolo.  No
 2    need to zoom in.
 3    Q.   It looks like three or so entries on page 2?
 4    A.   Yes.
 5              MR. HAFER:  Would you go to page 3.  Could you
 6    highlight in the very middle?  A little lower than that.  Lower
 7    please.  Right there.
 8    Q.   And again, the significance here is the highlighting,
 9    Mr. Correia indicating it's a business expense; is that right?
10    A.   Correct.
11    Q.   Do you see the entry on September 23, 2013, Gullivers
12    Tavern?
13    A.   I do.
14    Q.   And indicating this was a business expense, what did that
15    cause you to do for tax purposes?
16    A.   I would have deducted it probably as meals and
17    entertainment.
18    Q.   Had you known that Gullivers Tavern was the doing business
19    account for the Foxy Lady adult entertainment establishment in
20    Providence, would you have included this as a SnoOwl business
21    dinner?
22    A.   Not likely.
23    Q.   Could you turn to tab 111.1, please.
24              Do you recognize that?
25    A.   I do.
```

```
1    Q.    What is that?

2    A.    That's an account analysis of the Due From Jasiel Correia

3    account from 2014.

4              MR. HAFER:  Your Honor, I offer 111.1.

5              THE COURT:  It's received.

6              (Exhibit 111.1 received into evidence.)

7              MR. HAFER:  Ms. DiPaolo, could you go to page 11.

8    BY MR. HAFER:

9    Q.    Mr. Charest, I'm on the last page of this exhibit.  It

10   indicates at the bottom, Total Due From Jasiel Correia debit

11   $50,449.

12        Do you see that?

13   A.    I do.

14   Q.    What is the significance of that amount?

15   A.    That would be the total amount of activity in that account

16   for the year 2014.

17   Q.    Mr. Charest, at any point during your interactions with

18   Jasiel Correia during the agreed-upon procedures, did he seem

19   confused to you at all about what the difference was between a

20   business or a personal expense?

21   A.    No.

22   Q.    Were any special math skills required to provide you with

23   documentation of business and personal expenses?

24   A.    Math has nothing to do with it.

25   Q.    Could you turn to Exhibit 112, please.
```

```
 1              Do you recognize Exhibit 112?
 2    A.   Yes.
 3    Q.   What is that?
 4    A.   That is a proposal for services which we historically do
 5    with 99 percent of our business clients.
 6              MR. HAFER:  I'll offer Exhibit 112, Your Honor.
 7              THE COURT:  It's received.
 8              (Exhibit 112 received into evidence.)
 9    BY MR. HAFER:
10    Q.   Mr. Charest, the first page of this exhibit is actually an
11    email from yourself to Christopher Carreiro titled "Proposals."
12         Is that right?
13    A.   Correct.
14    Q.   And you're attaching proposals for tax preparation work or
15    services that your firm may provide in the future; is that
16    right?
17    A.   That's correct.
18    Q.   All right.  The last sentence of that email in November of
19    2016 says, "Also attached is the amount owed to
20    Dr. Cabeceiras."
21         Do you see that?
22    A.   Yes.
23              MR. HAFER:  Ms. DiPaolo, could I have the final page
24    of this exhibit, which I think is page 6.
25    Q.   This document here says, "Due to Dr. Cabeceiras,"
```

1    Mr. Charest.

2          Who prepared this document?

3    A.    I did.

4    Q.    What is it?

5    A.    It's at the request of Chris Carreiro.  We wanted to -- he

6    wanted me to put together an analysis of the money that was

7    still owed to Dr. Cabeceiras for the amounts that were -- had a

8    double payee, the sum of the checks were made out to

9    SnoOwl/Jasiel Correia.  So we -- and we never found those to be

10   deposited in any of the business accounts, so it was assumed,

11   as indicated earlier, that those checks should be treated as

12   loans to Jasiel.  So we created a separate account for Due to

13   Dr. Cabeceiras.

14         So the $74,000 represents the amounts of the dual payee

15   checks that we were given, and then deposits in BayCoast

16   were -- the amounts that we were told were deposited by Jasiel

17   Correia, so that totalled 34-8.

18   Q.    Who told you -- you said we were told that those were the

19   amounts deposited.  Who told you that?

20   A.    Jasiel told us, because we had no other way of knowing.

21               And then he had made a payment to Statewide, which was

22   a business expense, and recorded as due from Dr. Cabeceiras, so

23   we ended up with a total due to Dr. Cabeceiras of $36,525.

24   Q.    You indicated something about treating it as a loan.  Did

25   I hear you correctly there?

1   A.   Yes.

2   Q.   At any point during your engagement of the agreed-upon

3   procedures, did you see any documentation of a loan from

4   Dr. Cabeceiras to Jasiel Correia?

5   A.   No.

6   Q.   Did you see any documentation of level monthly principal

7   and interest payments by Jasiel Correia to Dr. Cabeceiras?

8   A.   No.

9   Q.   I don't think we need to publish it, but did the rest of

10  email in November of '16 attach proposals by you for tax

11  preparation service for Jasiel Correia?

12  A.   I didn't --

13  Q.   I'm sorry, bad question.

14       MR. HAFER:   Could I have page 2 of the exhibit.

15  Q.   This was attached to that email.  Is this just a proposal

16  from you, Mr. Charest, in November of 2016 to provide tax

17  preparation services?

18  A.   Yes.

19  Q.   And again, your understanding was the 2013 and 2014

20  returns had to be amended, correct?

21  A.   Correct.

22  Q.   Were you, in fact, hired by Chris Carreiro and Jasiel

23  Correia in November of 2016 to amend tax returns?

24  A.   No.

25  Q.   Could you turn to Exhibit 113, please.

1              Do you recognize Exhibit 113?

2    A.    I do.

3    Q.    What is it?

4    A.    It's our engagement letter.

5              MR. HAFER:  I'd offer 113, Your Honor.

6              THE COURT:  It's received.

7              (Exhibit 113 received into evidence.)

8    BY MR. HAFER:

9    Q.    Mr. Charest, this is a letter from you to Jasiel, May 6,

10   2017; is that right?

11   A.    That's correct.

12   Q.    Now, from November of 2016 when you first sent that

13   proposal until May of 2017 when you sent this engagement

14   letter, did anything happen with respect to the tax engagement?

15   A.    No.

16   Q.    Do you have any memory as to why in May of 2017, after

17   several months of nothing happening, you were engaged to amend

18   the tax returns?

19   A.    No.

20             MR. HAFER:  Could I have paragraph 2 of that letter,

21   Ms. DiPaolo.

22             Actually, the next paragraph.

23   Q.    Reading from paragraph 3 of your tax preparation

24   engagement letter:

25             We are not required to and will not verify the accuracy or

1    completeness of the information you will provide to us for the

2    engagement or otherwise gather evidence for the purpose of

3    expressing an opinion or a conclusion, accordingly, we will not

4    express an opinion or conclusion or provide any assurance on

5    the financial statements.

6              Have I read that correctly?

7    A.   Yes.

8    Q.   Was that standard language?

9    A.   Yes.

10   Q.   And you testified you eventually prepared and filed

11   amended returns, correct?

12   A.   Yes.

13   Q.   And all of the information in the amended returns, the

14   factual information, who gave you that information?

15   A.   It was Jasiel Correia.

16   Q.   When you filed the amended returns in May of 2017, what

17   state did you file them from?

18   A.   Massachusetts.

19   Q.   How did you actually file the amended returns?  Did you

20   e-file or did you mail them in?

21   A.   No, they were mailed in.  Back then we couldn't

22   electronically file amended returns.

23   Q.   Before actually filing amended returns, do you have

24   internal procedures for documenting and maintaining records in

25   connection with each return that you file?

1    A.    Yes.

2    Q.    Would you look at Exhibit 114, please.  It's a lengthy

3    exhibit, but do you recognize it?

4    A.    I do.

5    Q.    What is 114?

6    A.    114 is a copy of our work papers, which we prepare for

7    each business engagement.  A proprietorship was considered a

8    business engagement.

9          MR. HAFER:  All right.  I offer Exhibit 114, Your

10   Honor.

11         THE COURT:  It's received.

12           (Exhibit 114 received into evidence.)

13   BY MR. HAFER:

14   Q.    On top of Exhibit 114, it says, "Client SnoOwl

15   Proprietorship," do you see that?

16   A.    Yes.

17   Q.    Why does it say "proprietorship"?

18   A.    Because that's what it was.

19   Q.    Who told you that's what it was?

20   A.    Jasiel Correia.

21           (Pause.)

22         MR. HAFER:  Ms. DiPaolo, could I have page 9 of that

23   exhibit.  Could you just enlarge the whole thing.

24   Q.    What are we looking at here, Mr. Charest?

25   A.    It's called a balance sheet.

1    Q.    Lists assets and liabilities and equity for a particular

2    tax year?

3    A.    That's correct.

4    Q.    And again, this is listed as -- it says "Proprietor's

5    Equity," correct?

6    A.    Correct.

7    Q.    Do you see just about four or five lines up from the

8    bottom under "Equity" there's a notation:  "Draw JC average

9    salary 33,706."

10        Do you see that?

11   A.    I do.

12   Q.    What's that?

13   A.    That represents a request from Jasiel to take an average

14   of the years and include it in the financial statement.

15   Q.    Did he tell you he was taking a salary?

16   A.    No.

17   Q.    So why did you include that language there?

18   A.    Because he requested it.

19        MR. HAFER:  Could you turn to page 23 of that exhibit,

20   Ms. DiPaolo.

21        I need the bottom quarter.  Right there is good.

22   Q.    Again, this total Due From Jasiel Correia 2013, what is

23   this, Mr. Charest?

24   A.    That represents the -- $55,731.77 represents a total

25   activity in that account, and then the reclassified, the

```
 1    balance at that time of $44,569 -- I'm sorry, 669.25 to the Due

 2    to Draw.

 3    Q.   Meaning personal income to Jasiel Correia, or a draw?

 4    A.   Yes, yes.

 5    Q.   So, in essence, as you prepare to file the tax return, did

 6    you review this document with Mr. Correia before you filed it?

 7    A.   Yes.

 8    Q.   And did he have any objection to the classification of

 9    $55,731 from this tax year as being personal?

10    A.   Earlier we had gone through an account analysis of both

11    the balance sheet and the statement of operations accounts, and

12    when that was presented to him, he had no changes to be made.

13    He made one last pass back in October of 2016.

14    Q.   Could you go to 115, 115, please.

15         Do you recognize that?

16    A.   I do.

17    Q.   What is it?

18    A.   It's a profit and loss -- actually, statements of revenue

19    as an expense cash basis for years '14 and '13.

20    Q.   And then --

21         MR. HAFER:  I offer 115, Your Honor.

22         THE COURT:  It's received.

23         (Exhibit 115 received into evidence.)

24    BY MR. HAFER:

25    Q.   And then behind 115 there are several pages, perhaps 15 to
```

1    20 pages, in which you essentially categorize into different

2    classifications account activity; is that fair to say?

3    A.    Yes.

4    Q.    So --

5          MR. HAFER:  Ms. DiPaolo, could you go to page 12

6    under, I believe, "Marketing."

7    Q.    So under "Marketing," you include this $4,000 check from

8    the Flints Merchants Association; is that right?

9    A.    Correct.

10   Q.    And you included that there because Jasiel Correia told

11   you that was a marketing expense for SnoOwl; is that right?

12   A.    I think he initially identified it as sponsorship, so

13   we -- we felt that probably qualified for marketing.

14         MR. HAFER:  Can I have the next page, Ms. DiPaolo.

15   Q.    And again, here, you've summarized all the meal and

16   entertainment activity for 2013, correct?

17   A.    Correct.

18   Q.    And these are going to be deductions or expenses for the

19   company that come off any income or could count towards some

20   sort of loss?

21   A.    Fifty percent of it does.

22   Q.    And in the middle of this page for 9/23/13, there's that

23   entry from Gullivers Tavern for $500, correct?

24   A.    That's correct.

25   Q.    Could you go to 116, Mr. Charest.

```
 1              Do you recognize 116?

 2   A.   I do.

 3   Q.   Is that essentially for 2014 the same backup paperwork we

 4   just looked at for 2013?

 5   A.   That's correct.

 6   Q.   Tax papers --

 7   A.   Work papers, yes.

 8   Q.   Your work papers --

 9        MR. HAFER:  Your Honor, I offer 116.

10        THE COURT:  Let me be clear.  Is 116 meant to be the

11   2014 tax work papers file or is it the summary document?

12        MR. HAFER:  No, 116 is the work papers file, Your

13   Honor.

14        THE WITNESS:  They're the work papers for 2014.

15        THE COURT:  The label that we've been using for the

16   designation of the exhibits has that for 217 as the work

17   papers, but I'll -- if you want to characterize 116 being that,

18   we'll admit it.

19        MR. HAFER:  All right.  Can I do that for now, Your

20   Honor --

21        THE COURT:  Yes.

22        MR. HAFER:  -- and I'll clean it up later?

23        THE COURT:  Yes.

24        MR. HAFER:  I offer 116.

25          (Exhibit 116 received into evidence.)
```

1   BY MR. HAFER:

2   Q.   Mr. Charest, this is the work papers for 2014 comparable

3   to what we just looked at for 2013; is that right?

4   A.   Correct.

5        MR. HAFER:  Could you go to page 29 of this document,

6   Ms. DiPaolo.

7   Q.   This is the end of the document here.  What is the

8   significance total Due From Jasiel Correia 2014?  $49,324 and

9   some change, what is that number?

10  A.   That's the total number of transactions that went through

11  his account for 2014.

12  Q.   That would be in addition to the $55,000 from 2013?

13  A.   Correct.

14  Q.   What's that "Credit" column mean?

15  A.   The credit means that we're reclassifying the balance of

16  23,741.51 from the Due From Jasiel Correia account to Draw.

17  Q.   Could you turn to 117, please.

18       Do you recognize 117?

19  A.   I do.

20  Q.   What is it?

21  A.   It is the statement of revenue and expenses, cash balance,

22  cash basis as of '14 and '13, comparative.

23  Q.   Mr. Charest, at any point during the tax preparation

24  portion of your engagement, did Jasiel Correia tell you about a

25  business Snow Kemo?

1    A.    No.

2    Q.    Did you see any records related to income from a business

3    Snow Kemo?

4    A.    No.

5    Q.    Had you seen records of business income from a business

6    called Snow Kemo, would you have included those in the tax

7    returns?

8    A.    No.

9    Q.    Why not?

10   A.    Because they're two separate entities.  I'm assuming Snow

11   Kemo is some kind of an entity and it doesn't relate to

12   SnoOwl's business activity.

13   Q.    If you knew there was a separate business with separate

14   income, would you have filed another Schedule C if that was,

15   for example, another sole proprietorship?

16   A.    Yes.

17         MR. HAFER:  Last couple here, Your Honor.

18   Q.    Could you turn to 118, Mr. Charest.

19         THE COURT:  Is 117 being offered?

20         MR. HAFER:  Thank you.  I offer 117.

21         THE COURT:  All right, it's received.

22         (Exhibit 117 received into evidence.)

23   BY MR. HAFER:

24   Q.    Could you turn to 118 in the your binder, Mr. Charest?

25   A.    Okay.

1    Q.    Do you recognize 118?

2    A.    Yes.

3    Q.    What is it?

4    A.    It's a certification from the Department of Treasury

5    relative to the return for the tax year 2013.

6    Q.    And behind that initial certification is the amended 2013

7    tax return you prepared for Jasiel Correia?

8    A.    Correct.

9              MR. HAFER:  Your Honor, I offer 118.

10             THE COURT:  That's received.

11             (Exhibit 118 received into evidence.)

12             MR. HAFER:  Ms. DiPaolo, could I have page 4, and

13   could you highlight the middle of the page.  Right there.

14   BY MR. HAFER:

15   Q.    Mr. Charest, we're looking at the amended return you filed

16   in May of 2017.

17        Without reading the whole thing, is it fair to say that

18   you're amending the return because SnoOwl was erroneously

19   omitted on the original filing?

20   A.    Yes.

21             MR. HAFER:  And could you just go to the bottom of

22   that page, Ms. DiPaolo, and highlight the signature block.

23   Q.    And this is your signature, May 23, 2017?

24   A.    Yes.

25   Q.    And above that is whose signature?

```
 1    A.   Jasiel Correia.

 2         MR. HAFER:  Could you go to page 10, please.

 3    Q.   What is this form here?  This is what you called a

 4    Schedule C?

 5    A.   Yes.

 6    Q.   And what are you listing here on the Schedule C?

 7    A.   Well, I'm identifying it as amended.

 8    Q.   Any profit and loss from the business?

 9    A.   Correct.

10         MR. HAFER:  And finally, could you go back to page 2.

11    Q.   So, in preparing the amended return for 2013 for Jasiel

12    Correia, you included all these expenses based on the

13    information he provided you regarding the expenditures,

14    correct?

15    A.   Correct.

16    Q.   And you ultimately --

17         MR. HAFER:  If you could highlight the middle of that

18    page, Ms. DiPaolo.

19    Q.   You ultimately list here on the Schedule C, income and

20    deductions, taxable income, any profits and loss of the

21    business, and then that leads you to calculate a total amount,

22    of either due or refund amount; is that right?

23    A.   Correct.

24         MR. HAFER:  And, Ms. DiPaolo, could you just identify

25    the refund, box 22, I think it is.  Maybe it's 20.
```

7-161

1   Q.   Box 22 indicates -- box 21 and 20 indicate a $54 amount;

2   is that right?

3   A.   Yes.

4   Q.   So just to be clear, filing this, the defendant is

5   requesting a $54 refund; is that right?

6   A.   Yes.

7   Q.   Notwithstanding all the income that he admitted was

8   personal?

9   A.   Correct.

10   Q.   Could you turn to Exhibit 119, our second-to-last exhibit.

11        Do you recognize 119?

12   A.   I do.

13   Q.   What is that?

14   A.   Again, it's a certificate of official record from the

15   Department of Treasury for the year 2014.

16   Q.   And behind that, Mr. Charest, is it the amended 2014

17   return that you prepared on behalf of Mr. Correia?

18   A.   2014, yes.  Yes.

19        MR. HAFER:  Your Honor, I offer 119.

20        THE COURT:  It's received.

21        (Exhibit 119 received into evidence.)

22        MR. HAFER:  Could I have page 4, Ms. DiPaolo, that

23   middle of the page again.

24   BY MR. HAFER:

25   Q.   Again, like 2013, Mr. Charest, this is being amended

1   because SnoOwl was entirely omitted from the original filing,

2   right?

3   A.   Correct.

4        MR. HAFER:  Could you go to page 10, please.

5   Q.   And like 2013, here in 2014, you prepare a Schedule C for

6   SnoOwl?

7   A.   Yes.

8   Q.   And all the information in there about profit, loss,

9   expenses, deductions, that all came from who?

10  A.   It came from Jasiel Correia.

11       MR. HAFER:  Could you go back to page 2, please, box

12  20 and 21.

13  Q.   And in light of the information he provided you for 2014's

14  amended return, how much did he owe the IRS, according to this?

15  A.   He didn't -- he actually had a refund coming.

16  Q.   Oh, a refund of $588?

17  A.   That's correct.

18  Q.   Mr. Charest, these amended returns you said were filed in

19  May of 2017?

20  A.   Yes.

21  Q.   Sometime prior to May of 2017, had you been contacted by

22  the FBI regarding a federal criminal investigation into SnoOwl?

23  A.   Yes.

24  Q.   Last Exhibit, sir, 119.1 in your binder.

25       Do you recognize 119.1?

```
 1    A.    I do.

 2    Q.    What is it?

 3    A.    It's an account analysis from the Due From Jasiel Correia

 4    account for 2015.

 5             MR. HAFER:  Your Honor, I offer 119.1.

 6             THE COURT:  It's received.

 7             (Exhibit 119.1 received into evidence.)

 8    BY MR. HAFER:

 9    Q.   Mr. Charest, even though -- you only amended returns for

10    '13 and '14, correct?

11    A.    Correct.

12    Q.    But did you also do agreed upon procedures and bookkeeping

13    in connection with SnoOwl activity for 2015?

14    A.    Yes.

15    Q.    And does this document, 119.1, reflect that bookkeeping

16    work you did for 2015?

17    A.    Yes.

18    Q.    Did you file any tax return for SnoOwl or Jasiel Correia

19    in 2015?

20    A.    No.

21             MR. HAFER:  Ms. DiPaolo, could you go to page 8 of

22    that exhibit.  Just get the very bottom of the page if you

23    wouldn't mind.

24    Q.    With respect to 2015, you said this is the Due From Jasiel

25    account?
```

1    A.    Yes.

2    Q.    What is the amount Due From Jasiel in the 2015 account?

3    A.    To the far right the total says 132,298.55.

4    Q.    And that total actually, is that 2013, plus 2014, plus

5    2015, the 132,000?

6    A.    Yes.

7    Q.    So for 2015, it's just $42,837; is that right?

8    A.    Correct.

9    Q.    But for the three-year period in total, Mr. Correia told

10   you he had taken $132,298.55 for personal use.

11   A.    Correct.

12         MR. HAFER:  Your Honor, I don't have any further

13   questions.

14         THE COURT:  All right, Mr. Reddington?

15         MR. REDDINGTON:  Thank you, your Honor.

16                      CROSS-EXAMINATION

17   BY MR. REDDINGTON:

18   Q.    Mr. Charest, let me ask you, because I may have misheard

19   you, did I hear you indicate to the jury that --

20   A.    I'm sorry, I can't hear you.

21   Q.    Did I hear you indicate to the jury that before you filed

22   the tax returns, the FBI contacted you regarding the criminal

23   investigation?

24   A.    Yes.

25   Q.    When did the FBI contact you regarding a criminal

1   investigation?

2   A.   I was interviewed by an FBI agent that came to my office

3   for about five minutes, and then I decided that it was in my

4   best interest not to pursue any further discussion with him

5   until I had talked to an attorney.

6   Q.   That makes sense.  And ultimately, you did speak to an

7   attorney?

8   A.   Yes.

9   Q.   And would that attorney be attorney -- who was your

10  attorney?

11       Who's representing you?

12  A.   Who's representing me now?

13  Q.   Is that Nick Theodore?

14  A.   Nicholas Theodore.

15  Q.   Okay.

16  A.   But he's not the attorney that I first spoke to.

17  Q.   Okay.

18       Did the FBI agent ask you any particular questions?

19  A.   Yeah, he was asking questions that I felt uncomfortable

20  answering until I had advice --

21  Q.   Understood.

22       But what questions was he asking you?

23  A.   I can't recall.

24  Q.   Was it about --

25  A.   I really can't recall other than I wasn't comfortable

1   discussing anything until I had seen an attorney.

2   Q.   And was he somewhat intimidating to you?

3   A.   A little bit, yeah.  As it turns out, yes.

4   Q.   So did he indicate the nature and scope of his

5   investigation?

6   A.   No, no.

7   Q.   Did he say it was regarding Jasiel Correia, then mayor of

8   Fall River?

9   A.   No.  He just said SnoOwl.

10  Q.   SnoOwl.

11       Did you provide any information to him about SnoOwl?

12  A.   No.

13  Q.   Did you confirm that had you met with Jasiel to prepare

14  his taxes?

15  A.   No.

16  Q.   After you spoke with your attorney to get the advice of

17  counsel -- we have a thing called attorney-client privilege so

18  I'm not going to ask you any questions about what the lawyer

19  said to you and vice versa.

20  A.   Thank you.

21  Q.   After you received the advice of the attorney, did you

22  speak with the FBI after that?

23  A.   Well, the first attorney are you talking about?

24  Q.   Yeah.

25  A.   No.

1    Q.    Did you ever notify Chris Carreiro --

2    A.    Yes.

3    Q.    And Chris Carreiro, again, for reference, was the attorney

4    who was partners with Mr. Phillis and then they broke up,

5    correct?

6    A.    Correct.

7    Q.    So, Chris Carreiro, you worked with him before in other

8    cases, have you not?

9    A.    No, he's a personal client of mine, but no.

10   Q.    How about Mr. Phillis, had you worked with him before?

11   A.    No.

12   Q.    So, Mr. Carreiro or Mr. Phillis were the ones that

13   recommended that Jasiel Correia should speak to you, correct?

14   A.    Yes.

15   Q.    So part of your duty, your obligation, your task, if you

16   will, is that you were advised by Attorney Carreiro that they

17   wanted you to look at the books, the records, the documents of

18   SnoOwl --

19   A.    Yes.

20   Q.    -- and it was not an audit because you don't do audits,

21   but it was basically to verify or at least to determine,

22   income, expenses, business expenses, things of that nature?

23   A.    Correct.

24   Q.    And the type of entity that's filing the tax return really

25   kind of determines the tax rate and the way things would be

1    deducted, and that's where you get into telling us about sole

2    proprietorship, partnership, trusts, things of that nature,

3    right?

4    A.    Yes.

5    Q.    So after you sat with Mr. Carreiro, I imagine you must

6    have been debriefed by him as to the status of SnoOwl and what

7    was going on in the business?

8    A.    I don't know that I actually sat with Chris ever alone,

9    and I never sat with Jasiel ever alone.  They were both in the

10   room at the time.

11   Q.    Okay.

12   A.    I met Jasiel well after I had completed the bookkeeping

13   portion of the engagement, and that was because we were trying

14   to review the first memo that I wrote relative to the missing

15   information and what I required in the form of documentation so

16   I could complete the agreed-upon procedures engagement.  So I

17   really never consulted with Chris other than to request the

18   information I needed, and he started with the bank statements.

19   Q.    So Chris gave you the bank statements?

20   A.    Yes.

21   Q.    Did Chris tell you what kind of entity SnoOwl was?

22   A.    No, at that point we didn't know.

23   Q.    Nobody knew, did they?

24   A.    What's that again?

25   Q.    Nobody knew.  He didn't know what it was, sole

1   proprietorship versus a partnership --

2   A.   Mm-hmm.

3   Q.   -- Chris didn't know, did he?

4   A.   We never had that discussion.  I never had that discussion

5   with Chris.

6   Q.   It was pretty sloppy, wasn't it?

7   A.   Yeah, it was.

8   Q.   And when -- at some point you must have had some input

9   from Jasiel as to whether or not SnoOwl was a corporation or

10  did he have partners, because you mentioned that he said he had

11  partners, right?

12  A.   Well, I was pretty comfortable he wasn't a corporation.

13  The question was, was he a partnership?  He said he wasn't an

14  LLC --

15  Q.   Let's just do it like this.

16  A.   Go ahead.

17  Q.   You asked him whether or not he had partners, correct?

18  A.   Yes.

19  Q.   And he said that he did, right?

20  A.   He said he didn't.

21  Q.   In the beginning of your testimony, on direct, you had

22  indicated that he said he had a partner or partners?

23  A.   No, no.

24  Q.   Well, who is Chris Parayno?  Did you ever hear that name,

25  Chris Parayno?

```
 1    A.    No.

 2    Q.    Did you ever hear the name Nick Bernier?

 3    A.    Yes.

 4    Q.    Okay.  And who is Nick Bernier?

 5    A.    I was told by Jasiel that he kind of did the bookkeeping

 6    and all the legal stuff.

 7    Q.    All the legal stuff?

 8    A.    Yes.

 9    Q.    So he relied on Chris Bernier (sic), according to what he

10    told you, to take care of all the legal stuff, right?

11    A.    Correct.

12    Q.    So when you talked to Chris Bernier -- strike that.

13          When you talked to Nick Bernier verify the legal stuff,

14    what did he provide to you and what did --

15    A.    I asked him if I could meet with Nick and whether or not

16    he might have access to the records I was looking for.

17    Q.    Sure.

18    A.    That's pretty much what I was interested in.

19    Q.    Of course.

20    A.    And then, of course, maybe knowing further if there are

21    Investment Agreements and that kind of thing.

22    Q.    Sure.

23          So when you net with Nick, did he provide you with

24    Investment Agreements?

25    A.    I never met with Nick.
```

1    Q.   Did you ever try to meet with Nick?

2    A.   Yes, I asked Jasiel if I could -- he thought that it would

3    be helpful for me to check in with Nick --

4    Q.   Sure.

5    A.   -- and he said, No.

6    Q.   He said, No, you couldn't talk to Nick?

7    A.   Yeah.

8    Q.   Well, you just indicated that he said that Nick takes care

9    of all the legal stuff and has all the information.

10   A.   Yes.  I guess Nick wasn't with him at that stage anymore.

11   Q.   Is this after Nick left the business then?

12   A.   Might have been, yes.

13   Q.   Okay, okay.  June of 17, if I suggest --

14   A.   That's correct.

15   Q.   -- is when Nick left.

16        Did you know that when Nick left the SnoOwl business, that

17   he still, in fact, had all of the documentation and records

18   from SnoOwl and that he had been requesting it from Nick?

19             MR. HAFER:  Objection, Your Honor.

20             THE COURT:  Well, the jury is going to have to recall

21   the evidence in this case with respect to who had what when.

22             I'll permit the question to be asked and it probes

23   this witness' knowledge of circumstances.

24   BY MR. REDDINGTON:

25   Q.   Did he indicate to you that Nick had the stuff and he was

```
 1    trying to get it?

 2    A.    No.

 3    Q.    Okay.  How long, if you estimate, were you involved in

 4    gathering records and bank accounts and income expenses, things

 5    of that nature before you had your first meeting with Jasiel?

 6    A.    I would guess it was two months.

 7    Q.    And you had ready access, obviously, to Chris Carreiro for

 8    any questions you had --

 9    A.    Yes.

10    Q.    -- or information you wanted?

11    A.    Yes.

12    Q.    Would you say, sir, that when you did finally reach out to

13    Jasiel to meet with him, that he was accessible, came to talk

14    to you any time you wanted pretty much?

15    A.    Yeah.

16    Q.    Did you obtain the bank statements from Chris Carreiro?

17    A.    Yes, early on.  Early on.

18    Q.    You indicated, and I think on the records that were on the

19    screen, an awful lot of these expenditures would indicate debit

20    and then of course there would be a check check and then debit,

21    a whole bunch of them, correct?

22    A.    I'm not understanding.

23    Q.    You know what a debit is, right?

24    A.    Oh, yeah.  Yes.

25    Q.    Of course.
```

```
 1   A.    Absolutely.
 2   Q.    And then on your form there that you put up on the screen,
 3   you had down a number of -- on your ledger, it would say,
 4   debit, debit, debit, you know, a cup of coffee, debit, debit,
 5   restaurant bill, debit.  That's not a debit like a deduction,
 6   that's basically saying the use of a debit card, correct?
 7   A.    Well, a debit meaning in accounting there's two entries
 8   you can make, a debit and a credit.  Debits on the balance
 9   sheet indicate it's kind of either an asset or it could be
10   money that's owed by someone.
11   Q.    On the forms that the United States Attorney went through
12   with you, sir, with all of those lines, remember --
13   A.    Yes.
14   Q.    -- when Jasiel indicated what were business expenses --
15   A.    The only ones that would not be a debit would be if there
16   was an account number, a check number -- I'm sorry, a check
17   number.
18   Q.    Of course.
19   A.    There weren't many of those transactions.
20   Q.    And the debits were basically card activity, correct?
21   A.    They were what?
22   Q.    Card, like debit card, credit card, debit card activity?
23   A.    Yeah, debit card mostly.
24   Q.    That's what I'm getting at.
25         So the records for the debit card, for example, were
```

1    pretty accurate, weren't they, right down to the time, the

2    place, the location and the amount of money, right?

3    A.    I'm not understanding the question.

4    Q.    It's a pretty good paper trail, isn't it?

5    A.    Oh, yes.  No, it's a paper trail that we created.

6    Q.    As far as the records were concerned from the, for

7    example, the credit card company or whether it's a debit card

8    company, those records are pretty accurate, right?

9    A.    We would believe so because we reconcile cash every month.

10    Q.    And you're able to pretty much reconstruct his financial

11    movements, if you will, on a --

12    A.    Yes.

13    Q.    -- daily basis?

14    A.    Yes.

15    Q.    Right.

16    And there was no effort to try to hide or not disclose all

17    of these thousands of expenses on the debit card, they were

18    provided to you, correct?

19    A.    Correct.

20    Q.    And at some point did you advise or ask Jasiel what his

21    understanding was of the business?  He told you it was a sole

22    proprietorship.

23    A.    Well, we discussed it in our first meeting because I asked

24    him if there were any partners.  And he indicated to me, he

25    said there weren't any.

1              So I said to him, that being the case, you're not a

2      corporation, you're not a partnership because you don't have

3      any partners, so we're left with a proprietorship.

4      Q.    Okay.  And didn't he think that he was incorporated

5      because -- did he mention anything about the EIN to you?

6      A.    He mentioned that at -- in 2015, they had filed paperwork

7      to become incorporated.

8      Q.    And "they" would be who, would that be attorneys from

9      Boston?

10     A.    Whoever he relied on to do the incorporation.  He didn't

11     indicate to me who it was.

12     Q.    Okay.  Did you ask or did you try to determine, you know,

13     where the corporation, for example, was organized or where the

14     papers were filed or who filed the papers?

15     A.    I gave him a proposal on the business part of 2015, and I

16     never heard back from them on it, on a response to prepare for

17     that year.

18     Q.    Is "them" Chris Carreiro?

19     A.    Chris or Jasiel, but usually it was Chris.

20     Q.    So that would be in reference to the agreed-upon

21     procedures engagement where you were requesting PayPal summary

22     statements for the years ending 2013, '14, and '15, for

23     example?

24     A.    Correct.

25     Q.    Did you receive those?

1  A.   I received all bank statements for those three years, yes.

2  Q.   How about the request for PayPal statements, did you

3  receive that?

4  A.   No.

5  Q.   Did you ask Chris where the records were for the PayPal

6  statement?

7  A.   Yes.

8  Q.   Did he indicate where they were?

9  A.   He didn't know.  He was going to have to pursue it.

10  Q.   Did he ever get back to you and say he pursued it?

11  A.   No.

12  Q.   Copies of article of organization for incorporation.  Did

13  you ever receive that?

14  A.   No.

15  Q.   And you said you did a search, I guess, in Massachusetts

16  for a corporation.

17       Did you know at some point as the accountant here working

18  for Mr. Carreiro and working for the law firm ultimately

19  meeting up with Jasiel Correia, did you know it was organized

20  in Delaware?

21  A.   Yes.

22  Q.   And how did you determine that, sir?

23  A.   I was told that.

24  Q.   By who?

25  A.   By Chris Carreiro.

1    Q.    And did Chris tell you that it was Gunderson Dettmer, a

2    law firm in Boston, or that it was Goodwin Procter, a law firm

3    in Boston, that incorporated the corporation in Delaware?

4    A.    He didn't give me any details.

5    Q.    Did you ever check it out to see if, indeed, it was a

6    corporation that was incorporated in 2015?

7    A.    No, I took his word for it.

8    Q.    How about --

9    A.    I would have requested from him articles before I started

10   the engagement.

11   Q.    You did determine that there were no annual reports filed

12   in Massachusetts and that there was a potential revocation of

13   corporate status for not filing the annual reports, right?

14   A.    Yes.

15   Q.    And an annual report is like a three-line thing where you

16   say you're still active and you pay them a $100 or something,

17   right?

18   A.    Yeah, but if you go three years without filing, they

19   can --

20   Q.    Right, okay.

21         You had indicated to the jury, I think, that you were

22   unaware of 1 Zero 4, but, in fact, sir, you did note in number

23   5 that Jasiel indicated in the information provided pertinent

24   to Carl's Collision was for rent to 1 Zero 4.  So he did tell

25   you about 1 Zero 4?

1    A.    Mm-hmm.

2    Q.    And you know that Carl was in reference to Carl Garcia?

3    A.    Yes.

4    Q.    And you knew that Mr. Jasiel Correia told you that Carl

5    Garcia's daughter rented space there; she just graduate from

6    high school and she rented space there, right?

7              (Pause.)

8    A.    I didn't hear you, I'm sorry.

9    Q.    I'm sorry.

10             Did you know that Carl Garcia's daughter was renting

11   space from 1 Zero 4, in that location?

12   A.    No.

13   Q.    Okay.  So the EIN number was obtained in November 27th of

14   2012.  But that doesn't make you a corporation by any means,

15   right?

16   A.    No.

17   Q.    And you did obtain a copy of the EIN number, yes?

18   A.    Yes.

19   Q.    How about the convertible debt note documentation, were

20   you aware of that?

21   A.    No.

22   Q.    Were you aware that there was a rewrite of the alleged

23   investments into the corporation by investors that now became

24   lenders because of revisions that had been made by Goodwin

25   Procter or Gunderson Dettmer to turn them into lenders signing

1    a convertible debt note?  Did you know that?

2    A.    No, knew nothing about that.

3    Q.    Did Chris Correia ever tell you anything about that?

4    A.    No.

5    Q.    You made reference to a BayCoast account.  Do you recall

6    that, sir?

7    A.    Yes.

8    Q.    And you indicated, and I quote as best I recall, that you

9    assumed that to be Jasiel Correia's personal account, right?

10   A.    No, I didn't assume anything.  I just had activity I

11   needed to identify.

12   Q.    Okay.

13   A.    So we went through the same process.

14   Q.    All right.  Did you get the records?  Did you get the

15   records for the BayCoast account?

16   A.    Yes, I did get the records.

17   Q.    And who gave you those?

18   A.    Chris Carreiro.

19   Q.    And that was based upon information that he received from

20   Jasiel, correct?

21   A.    Yes.

22   Q.    The thing about Gullivers Tavern, now that's d/b/a, if you

23   will, I guess, the Foxy Lady in Providence, right?

24   A.    Yes.

25   Q.    Okay.  Now, I guess they refer these establishments as

1    like a gentleman's club, so to speak.

2         You're familiar with that term, right?

3    A.    Yes.

4    Q.    And many times people refer to it as a strip club, right?

5    A.    Yes.

6    Q.    And many times people will be entertained by going to

7    these particular establishments, right, on occasion?

8    A.    That's correct.

9    Q.    And you may very well have an occasion where you've got

10   employees, that you take employees or people that are working

11   with you or for you or helping you and you take them to the

12   gentleman's club, right?

13   A.    It happens.

14   Q.    Sure.

15        Now, you were pretty quick to discount Gullivers Tavern

16   because it was a gentleman's club when Zach asked you about

17   would you have deducted that as a business expense, and you

18   said, No.

19             Now, if a person were to take their employees or

20   people that work with them or partners or whatever the case may

21   be to this type of an establishment to eat, to drink, to do

22   whatever else, you would have written that off, right?

23   A.    Yes.  Fifty percent of it --

24   Q.    That's right.  I always forget the 50 percent, thank you.

25             Do you remember having conversation with Jasiel

1    basically where you were advising him that if he, for example,

2    were to take the debit card and purchase a diamond earring or

3    purchase clothing or purchase dinners or entertainment or a

4    hotel that's not related to business, that that's income to

5    him?

6    A.    It doesn't become a deductible item, so then it reflects

7    as income to him, correct.

8    Q.    Right.  And you told him that, right, he had to declare

9    that as income?

10   A.    I don't know that I ever had that conversation with him.

11   Q.    So when you finished looking through the various books and

12   records and documents, it's my understanding that -- and I

13   think it was in Exhibit 112 -- yes, Exhibit 112, where on

14   November 23rd of 2016, you wrote to Chris Carreiro and provided

15   him with a bill for services for what you had accomplished up

16   to that point, correct?

17   A.    Yes.

18   Q.    And on the same date you sent a letter regarding the

19   expenditure of a bill that you would expect to charge for

20   preparation of federal, state, corporate tax returns and things

21   of that nature, right?

22   A.    That was a proposal, yes.

23   Q.    And at some point you ended up, if I heard you correctly,

24   advising Jasiel Correia that it was your advice that he file

25   amended tax returns, right?

1    A.    Correct.

2    Q.    And he basically took your advice and filed the amended

3    tax returns, right?

4    A.    Yes.

5    Q.    And you actually sent them in the mail, you filed them on

6    his behalf?

7    A.    Yes.

8    Q.    Okay.  And he didn't come to you and say, Hey, wink, wink,

9    I want you to help me avoid tax liabilities, I'd like you to

10   file false returns for me -- not to mention the fact that you'd

11   never do that anyway -- but he didn't ask anything like that,

12   did he?

13   A.    No.

14   Q.    Did he strike you as being somewhat of a bit of a neophyte

15   as far as business expenses and financial records and legal

16   documents and things of that nature?

17   A.    No.

18   Q.    When you were preparing tax returns, did he have to sign

19   them?  You asked him to sign them, how does that work?  Did you

20   mail them to him and he mailed them back?

21   A.    I'm not understanding the question.

22   Q.    We're talking personal tax returns.

23   A.    Okay.

24   Q.    All right.  And you advised him that he should file

25   amended tax returns.

1    A.    Yes.

2    Q.    He didn't ask you to prepare amended the tax returns, that

3    was your advice, right?

4    A.    Correct.

5    Q.    He followed your advice and then had to sign the tax

6    returns, I imagine.

7    A.    That's right.

8    Q.    And then, what, did he return them to you so that you

9    could file them?

10   A.    Yes.  I think Chris probably returned them to me.

11   Q.    Okay.

12         Now you had mentioned the fact that he was asking, I

13   think Mr. Hafer might have said it, that he was asking for $54

14   refund on one of those tax returns.

15         In fact, that was based on your calculation on the tax

16   return that he was due $54, right?

17   A.    That's how it worked out.

18   Q.    Right.  He didn't say, "I want a refund this year from the

19   IRS," did he?

20   A.    No.

21   Q.    Did you get any information from a fellow by the name of

22   William Schnoor, an attorney from Goodwin Procter in Boston?

23   A.    Could you just --

24   Q.    I'm sorry.

25         Did you get any information at all from William Schnoor

```
 1   who was an attorney in Boston who worked with Goodwin Procter?
 2   A.   I have no remembrance of anybody by that name.
 3   Q.   Okay.  So the bottom line is that there was no contact
 4   with Gunderson Dettmer, no contact with Goodwin Procter, no
 5   contact with William Schnoor, little or no contact with Nick
 6   Bernier, no contact with Chris Parayno, but contact with Chris
 7   Carreiro, the lawyer, right?
 8   A.   That's who I spoke to most of the time.
 9   Q.   Okay.  I think counsel started asking you questions on
10   this case, sir, regarding your letter of immunity.
11        You didn't do anything wrong here.  You didn't do
12   anything wrong, right?
13   A.   Correct.
14   Q.   But they scared you so much that you were afraid to even
15   testify and you wanted to assert your rights under the Fifth
16   Amendment, right?
17   A.   I was on the advice from my counsel.
18   Q.   Which is a good thing to listen to on occasion, right?
19   A.   Yes.
20        MR. REDDINGTON:  Thank you, sir.
21        That's all I have, Your Honor.
22        THE COURT:  Mr. Hafer?
23        MR. HAFER:  Very briefly, Your Honor.
24                    REDIRECT EXAMINATION
25   BY MR. HAFER:
```

1   Q.   Mr. Charest, the amended 2014, 2013 returns, those were
2   signed by Jasiel Correia under penalty of perjury; is that
3   correct?
4   A.   Correct.
5   Q.   And is that part of that certification process you go
6   through when you're preparing amended returns?
7   A.   Yes.
8   Q.   You have to get like a jurat or whatever it's called --
9   A.   Yes.
10  Q.   -- from the -- from a person with an original signature
11  under penalties of perjury?
12  A.   That's right.
13  Q.   Mr. Reddington asked you just here at the end about the
14  $54 refund and he said Jasiel Correia didn't ask for that
15  refund, you filed the return asking for the refund, right?
16  A.   Yes.
17  Q.   Who gave you all the factual information you relied on in
18  filing the amended return?
19  A.   It came from Jasiel.
20       MR. HAFER:  Nothing further, Your Honor.
21       MR. REDDINGTON:  I have nothing, Judge, thank you.
22       THE COURT:  All right.  You may step down,
23  Mr. Charest, thank you.
24       THE WITNESS:  I need to clean up?
25       THE COURT:  Why don't you just take that cap off.

 1   We'll take care of the rest.

 2           So, ladies and gentlemen, I think we'll take our --

 3   this will be the afternoon break, be back maybe a little bit

 4   past 2:45 and we'll continue with the witnesses then.

 5           THE CLERK:  All rise.

 6           (Jury left the courtroom.)

 7           THE COURT:  Anything else before the break?

 8           MR. HAFER:  No, your Honor.

 9           THE COURT:  Okay.  So we'll be back at 2:45.

10            (Recess taken.)

11           THE CLERK:  All rise.

12           (The Court entered the courtroom.)

13           THE COURT:  Ready for the jury?

14           MR. HAFER:  Yes, Your Honor.

15           THE COURT:  Let's get the witness on the stand.

16           (Pause.)

17           THE CLERK:  All rise.

18           (Jury entered the courtroom.)

19           THE CLERK:  Please be seated.

20           PATRICIA TOD, having been duly sworn by the Clerk, was

21   examined and testified as follows:

22           THE CLERK:  State your full name and please spell your

23   last name.

24           THE WITNESS:  My name is Patricia Tod, T, as in

25   Thomas, o, d as in David.

```
 1              THE COURT:  You may inquire, Mr. Tobin.

 2              MR. TOBIN:  Thank you, Your Honor.

 3              THE COURT:  Ms. Tod, you take your mask off.

 4                         DIRECT EXAMINATION

 5    BY MR. TOBIN:

 6    Q.    Good afternoon, Ms. Tod.

 7    A.    Good afternoon.

 8    Q.    Could you tell us where you live?

 9    A.    I live in Somerset, Massachusetts.

10    Q.    And what is your job?  What do you do?

11    A.    I manage properties.

12    Q.    What kind of properties do you manage?

13    A.    I manage mill buildings.

14    Q.    And how long have you been in the occupation or business

15    of managing mill buildings?

16    A.    Approximately 15 years.

17    Q.    Do you know the defendant in this case, Jasiel Correia?

18    A.    Yes, I do.

19    Q.    Would you please tell us where and how you first met

20    Jasiel Correia?

21    A.    Jasiel was invited to my condo in Newport where we had a

22    gathering of mill owners and architects who had heard about

23    Jasiel, and we thought we should listen to his philosophies on

24    mills and helping Fall River.

25    Q.    And was he an elected official at that time, if you
```

1   recall?

2   A.   No, he was not.

3   Q.   Did he actually come to the condo and address this group

4   of mill owners and architects?

5   A.   Yes.

6   Q.   Was that the first time you had the chance to meet him?

7   A.   Yes.

8   Q.   Were you impressed by his presentation?

9   A.   Yes.

10   Q.   And did he specifically talk to the group about his

11   company SnoOwl?

12   A.   Yes.

13   Q.   In the presentation he made to you, the mill owners and

14   the architects, did he talk about a company that he had had

15   while still in college, a company before SnoOwl?

16   A.   Yes.

17   Q.   And do you recall the name of that company?

18   A.   FindIt.

19   Q.   And what did Jasiel Correia tell the assembled group about

20   FindIt and what happened to FindIt?

21   A.   I don't recall what he said about FindIt other than he

22   developed it and then sold it.

23   Q.   And did he indicate whether or not he could tell you more

24   about the sale of FindIt or was he limited as to what he could

25   say?

```
 1   A.   He told us that he could not give us details as to who he
 2   sold it to.
 3   Q.   Did he indicate why he couldn't give those details?
 4   A.   No.
 5   Q.   Okay.  You mentioned a condo in Newport.  Is that a
 6   vacation home?
 7   A.   I use it as a rental property.
 8   Q.   Thank you.
 9        And in fact -- let me ask you, Jasiel Correia, did he ever
10   rent the Newport condo from you?
11   A.   Yes, he did.
12   Q.   And was that, essentially, in the winter of 2014?
13   A.   Yes.
14   Q.   And for approximately how many months did Jasiel Correia
15   rent your Newport condo?
16   A.   I believe it was for two months.
17   Q.   And what was the monthly rent for that condo?
18   A.   It was $2,000 a month.
19   Q.   Did Jasiel Correia pay by check, credit card, cash?  Do
20   you recall?
21   A.   I do not recall.  It definitely was not credit card.
22   Q.   Okay.  Have you previously testified that it was by cash,
23   maybe when it was better in your memory?
24   A.   That's what I previously said.
25   Q.   Okay.  And you believed you were telling the truth when
```

1    you said that?

2    A.    Yes.

3    Q.    More time has gone by now, of course, right?

4    A.    Yes.

5    Q.    Now, you indicated that one of your -- your job is to

6    essentially run a number of mills; is that accurate?

7    A.    Yes.

8    Q.    Those mills are in the City of Fall River.

9    A.    Yes.

10   Q.    At any point did you speak with Jasiel Correia, did he

11   speak with you, about renting space in one of your mills?

12   A.    Yes.

13   Q.    And what did he need the space for, if you can recall him

14   saying?

15   A.    It was to develop the SnoOwl app and later to create an

16   incubator company.

17   Q.    Let me ask you about the incubator company.  Do you know

18   the name of the incubator company?

19   A.    1 Zero 4.

20   Q.    And 1 Zero 4, do you know where that -- you know the

21   incubator company was called 1 Zero 4, correct?

22   A.    Correct.

23   Q.    And where does that name come from?  What is the

24   significance of 1 Zero 4?

25   A.    That's the address of that mill.

1    Q.   And in fact, did Jasiel Correia's business incubator, 1
2    Zero 4, ever move into the space in your mill?
3    A.   Yes.
4    Q.   Did you ever visit 1 Zero 4's space in your mill?
5    A.   Yes.
6    Q.   And what did you observe when you went into the area
7    leased by Jasiel Correia for -- where 1 Zero 4 was held?  What
8    was in there?  What did it look like?
9    A.   It was set up with lots of, like, conference tables,
10   whiteboards, printers, televisions, ping-pong table.
11   Q.   I'm sorry, I apologize.
12   A.   That's okay.
13   Q.   Were there a number of small businesses doing work out of
14   1 Zero 4 Business Academy or incubator?
15   A.   Yes.
16   Q.   Did you recognize or know any of the individuals doing
17   work out of there?
18   A.   I knew one.
19   Q.   And who did you know?
20   A.   I knew David Wilder.
21   Q.   And what business was David running out of the incubator?
22   A.   He was a management consultant.
23   Q.   Did you see other businesses working in the incubator?
24   A.   Yes.
25   Q.   What kind of businesses did you observe?

1    A.   I saw and met a gentleman who was selling solar, and I saw

2    the accouterments of a sewing person.  There was a mannequin

3    where evidently she was making dresses or something.

4    Q.   Okay.  In front of you is a binder, Ms. Tod.  And if you

5    open that up, you should see some tabs, and the first tab

6    should be number 33.

7         Do you see that?

8    A.   Yes, sir.

9    Q.   Would you be kind enough to open up tab 33 and just review

10   enough to see if you understand or recognize what the document

11   is there.

12   A.   This is my standard lease for customers.

13   Q.   And is this the lease that was signed by Jasiel Correia

14   for space that ultimately became the business academy?

15        (Pause.)

16   A.   Sorry, I'm shaking.

17   Q.   Please, please relax, take your time.

18        Let me suggest you look at the last page.  There

19   should be some signatures there.

20   A.   Yes.

21        MR. TOBIN:  Your Honor, may 33 come into evidence,

22   please?

23        THE COURT:  Yes, it's received.

24        (Exhibit 33 received into evidence.)

25   BY MR. TOBIN:

1   Q.   All right.  So this, I believe, you've identified as,

2   essentially, your standard lease; is that true?

3   A.   Yes.

4   Q.   And the first line talks about a lease being entered into

5   on the first day of June 2013; is that true?

6   A.   Yes.

7   Q.   And this lease was between Shane Realty, and what is or

8   was Shane Realty?

9   A.   Shane Realty was the name of that particular mill, at the

10  time it was a partnership.

11  Q.   Okay.  And it says that, a Massachusetts general

12  partnership, having its place of Boston at 104 Anawan Street.

13  104, of course, we've already discussed that; is that accurate?

14  A.   Yes.

15  Q.   And hereinafter later -- and hereinafter called the

16  lessor, and SnoOwl hereinafter called the lessee.

17       So this is the lease between Shane Realty, the owner or

18  manager of the mill, and according to this, SnoOwl; is that

19  true?

20  A.   Yes.

21  Q.   And if we go down, Ms. Tod, to paragraph 3 on that first

22  page, where it says "rental lessee," and I won't ask you to

23  read all of that, but essentially is the rent here specified as

24  $1,205?

25  A.   Yes.

```
 1    Q.   And is that per month?

 2    A.   Yes.

 3    Q.   The rest of the document, as I'm leafing through it,

 4    essentially is boilerplate lease language; is that accurate?

 5    A.   Yes.

 6    Q.   And if we go to the last page of the document, the

 7    signature page, two signatures appear here; is that accurate?

 8    A.   Yes.

 9    Q.   And someone signs for you, someone has your power of

10    attorney; is that true?

11    A.   No.

12    Q.   It's not.  It doesn't say Lawrence Soloff, POA Patricia

13    Tod?

14    A.   I am the power of attorney for Lawrence.

15    Q.   Thank you for the correction.  So -- I understand.

16         So that penmanship is actually your writing?

17    A.   Yes.

18    Q.   Very clear and very nice.

19         And the other signature is whose signature?

20    A.   Jasiel Correia, II.

21    Q.   And below that there is a title, "CEO SnoOwl"; is that

22    true?

23    A.   Yes.

24    Q.   Now, I would ask you to go to Exhibit 35.  So skip 34 for

25    just a moment, and go to Exhibit 35.
```

1          Do you see Exhibit 35?

2     A.   Yes.

3     Q.   Are those the checks you received for the space rented by

4     Jasiel Correia?

5     A.   Yes.

6     Q.   So if we go --

7               MR. HAFER:  Judge, may 35 come into evidence?

8               THE COURT:  Yes, it's received.

9            (Exhibit 35 received into evidence.)

10    BY MR. TOBIN:

11    Q.   And if we go to 34, do you recognize that as a chart of

12    the checks received for that space?

13    A.   Yes.

14              MR. TOBIN:  Judge, may that come in?

15              THE COURT:  Yes, it's received as well.

16           (Exhibit 34 received into evidence.)

17    BY MR. TOBIN:

18    Q.   Looking at this, the first set of checks, Ms. Tod, says

19    SnoOwl checks payable to Shane Landing.

20         Do you see that first grouping of checks, I believe it's

21    the first 12?

22    A.   Yes.

23    Q.   And the first check drawn from SnoOwl, first SnoOwl check,

24    was dated what?  Do you see that on line 1 --

25    A.   April 24, 2013.

1    Q.    And that check was for?

2    A.    $2,410.

3    Q.    That essentially would be two months rent?

4    A.    First and last.

5    Q.    First and last, thank you.

6          And we don't have to go through them, but the other

7    checks all came on the dates or the other checks were at least

8    dated with the dates that are on the chart; is that correct?

9    A.    Correct.

10   Q.    And the last check that you got from a SnoOwl account was

11   check number 12, what date was on that check?

12   A.    June 17, 2015.

13   Q.    And the total amount that you received from SnoOwl funds

14   or SnoOwl checks was how much?

15   A.    $20,825.30.

16   Q.    Let me ask you a question:  The lease indicated the rent

17   amount of $1,205, but some of these checks are a little more

18   than that, can you tell us why that's the case?

19   A.    Yes.  When Jasiel and I first met, he was hoping that his

20   business would expand and there was additional space next to

21   his original space that he could expand into.

22   Q.    And at some time did he expand into the additional space?

23   A.    Yes.

24   Q.    I'm sorry?

25   A.    Yes.

1  Q.   Thank you.

2       And that, of course, increased the rent by ever so much?

3  A.   Right.

4       MR. TOBIN:  If we can zoom back out to that full page,

5  please.

6  Q.   And we look at the second group of checks, do you see the

7  heading FRMCU (Jasiel Correia, II account) checks payable to

8  Shane Landing.

9       Do you see those entries?

10 A.   Yes, I do.

11 Q.   And those are two checks that you received for rental

12 payments from an actual personal account maintained by Jasiel

13 Correia; is that accurate?

14 A.   True.

15 Q.   And it's your belief and understanding that those checks

16 are actually part of Exhibit 35?

17 A.   Yes.

18 Q.   And if we can go to the third group of checks, if you

19 will.  That group is -- says, at least, Carl Garcia checks

20 payable to Shane Landing.

21      Do you see that?

22 A.   Yes.

23 Q.   And did you, in fact, receive checks from Carl Garcia --

24 when I say "receive checks from Carl Garcia," checks with Carl

25 Garcia's name on it for the space leased by Jasiel Correia?

1   A.   Yes.

2   Q.   Did you know who Carl Garcia was?

3   A.   Yes.

4   Q.   Who is he?

5   A.   He's a local business owner.  He owns a car collision

6   repair place.

7   Q.   Thank you.

8        And did Carl Garcia also, separate and apart from

9   Jasiel Correia, did Carl Garcia rent space in your mill?

10  A.   Yes.

11  Q.   Do you know what Carl Garcia stored in the space he rented

12  in your mill?

13  A.   It was random car parts.

14  Q.   And the checks here, just so it's clear, the checks here,

15  Carl Garcia checks payable to Shane Landing, these checks were

16  not for his own space where he put car parts; is that true?

17  A.   True.

18  Q.   He gave you separate checks or separate payment for that;

19  is that true?

20  A.   True.

21  Q.   These checks from Carl Garcia was for the space that

22  Jasiel Correia had rented.

23  A.   True.

24       (Discussion off the record.)

25  Q.   Now, -- so another question, if I might, I don't mean to

1    skip around, I apologize.

2         We had talked about your rental condo in Newport,

3    correct?

4    A.   Correct.

5    Q.   You've indicated that Mr. Correia rented it in that winter

6    for two months, $2,000 a month cash.  Did he ever use the condo

7    any other times?

8    A.   I don't recall.

9    Q.   Did you ever let him use the condo for an occasional

10   weekend not including that period, if you remember?

11   A.   I don't remember.

12   Q.   Okay.

13        With regard to the warehouse space where you went in

14   and you saw these businesses, you've shown and we've looked at

15   the checks that you received from Carl Garcia, from the

16   defendant's personal account, and from the SnoOwl account.

17        Did Jasiel Correia ever pay rent for that warehouse

18   space in cash?

19   A.   Yes.

20   Q.   And who did he give the cash to?

21   A.   I know I personally received some cash, but also he may

22   have paid my bookkeeper.

23   Q.   You had a bookkeeper on site?

24   A.   Yes.

25   Q.   Do you have any recollection now so many years later, any

1    recollection as to how many times Jasiel Correia provided cash

2    or the amount of cash he provided?

3    A.   I don't recall.

4          MR. TOBIN:  Thank you so much, but please remain

5    seated.

6          THE WITNESS:  Can I make one change?

7          MR. TOBIN:  One change?  Sure.

8          THE WITNESS:  Clarification?

9          MR. TOBIN:  Of course.

10         THE WITNESS:  You said "bookkeeper on-site."

11   BY MR. TOBIN:

12   Q.   Yes.

13   A.   My office was not in that mill.

14   Q.   Okay.  Was your office in a different mill?

15   A.   I was in West Street Mill.

16   Q.   Okay.  And the bookkeeper was in your office in the other

17   mill?

18   A.   Yes.

19   Q.   Then perhaps I misspoke.  Thank you so much.

20         THE COURT:  Mr. Reddington?

21         MR. REDDINGTON:  Thank you.

22                      CROSS-EXAMINATION

23   BY MR. REDDINGTON:

24   Q.   Good afternoon, ma'am.

25         So, back in 2013, I guess, Jasiel was 20, 21 years of

1    age; he was in college, I think in Providence College; and

2    that's when you first met him?

3    A.   Yes.

4    Q.   And you organized what I think you referred to as a

5    soiree, is that what your expression was?

6    A.   Yes.

7    Q.   What does that mean?

8    A.   To me a soiree is an afternoon gathering of intellectual

9    people sharing ideas with food, appetizers; it's an

10   intellectual gathering.

11   Q.   Now, in 2013, this is before he was ever even an elected

12   official, city councillor, mayor, anything like that, right?

13   A.   True.

14   Q.   And he came down and, I guess, mingled with the people and

15   expressed some of his ideas, his thoughts, his plans, things of

16   that nature, right?

17   A.   Yes.

18   Q.   And in that time of exposure and any other occasions that

19   you had the opportunity to speak with Jasiel, is it fair to say

20   that he was a person that was passionate about the City of Fall

21   River?

22   A.   Yes.

23   Q.   And did he have ideas he wanted to try to improve the

24   life, if you will, in Fall River?

25   A.   Yes.

```
 1   Q.   And what did he say he wanted to do?  His goals, his
 2   aspirations?
 3   A.   Well, he was talking to us.  He gave us his background on
 4   when he was in high school and the work he did in college that
 5   had to do with improving Fall River.  He talked to us about his
 6   passion about the mills and how he wanted to try and preserve
 7   them and work with us to improve Fall River.
 8   Q.   And do you recall when he ran for office and was elected
 9   or ultimately appointed to the city council?
10   A.   Yes.
11   Q.   Do you have an idea as to what year that was,
12   approximately, if you know?  '14 or '15?
13   A.   I'm going to say '14 or '15.
14   Q.   Okay.  And did you have occasion to see him on other
15   occasions during that period of time?
16   A.   Yes.
17   Q.   And where would you see him?
18   A.   I would see him at work, I would see him at fund-raisers,
19   I would see him in Government Center.
20   Q.   And at some point -- by the way, did he talk frequently
21   about SnoOwl?
22   A.   Yes.
23   Q.   What would he say about SnoOwl?
24   A.   Well, he explained to us how it compared to Twitter and
25   hoots instead of tweets.
```

```
 1    Q.    Hoots?

 2    A.    Hoots instead of tweets.  And explained how he was

 3    developing it.

 4    Q.    And at some point did you, yourself, actually, once the

 5    app went up on the Apple store, did you get the app?

 6    A.    Yes.

 7    Q.    Did you use it?

 8    A.    Yes.

 9    Q.    Did you like it?

10    A.    I didn't not like it.  But it worked.

11    Q.    And where would you use it?  Like, would you use it local

12    or when you traveled?

13    A.    I used it in Miami.

14    Q.    And at some point he came and spoke with you about renting

15    space for SnoOwl, not for 1 Zero 4, it was SnoOwl that was on

16    the lease, right?

17    A.    Right.

18    Q.    And he did, indeed, sign the lease with you, not you

19    personally, but Shane Realty, and on behalf of SnoOwl, he

20    signed that lease, correct?

21    A.    Correct.

22    Q.    Now at some point -- who is Ken Fiola?

23    A.    Kenny is, was economic development.

24    Q.    And you knew Mr. Fiola, correct?

25    A.    Yes.
```

1    Q.   Now, was there something that was good for the City of

2    Fall River that they were trying to do to bring businesses into

3    the area where the mill was located, Fall River Office of

4    Economic Development?  In other words, you had to have a

5    corporation that was a nonprofit corporation, were you aware of

6    that?

7    A.   I'm not following you.

8    Q.   Okay.  You knew 1 Zero 4 was a business that Jasiel had

9    that was named after the location of the mill, right, 104

10   Anawan Street?

11   A.   Right.

12   Q.   At some point you knew that 1 Zero 4 was this incubator

13   business that was also located in the mill under the lease of

14   SnoOwl, correct?

15   A.   Yes.

16   Q.   And you saw that that was an active venture, if you will,

17   there were people that, indeed, were coming in and were

18   utilizing the space and utilizing the area for purposes of

19   their own businesses as little startups and incubator, correct?

20   A.   Correct.

21   Q.   Now, when Jasiel first signed the lease on behalf of

22   SnoOwl, do you recall if he had your permission to do

23   renovations?

24   A.   Yes.

25   Q.   And what type of renovations ultimately did he do?

```
 1   A.   The one that really comes to mind is he brought a team in
 2   over a weekend and totally sanded down all the floors, stained
 3   the floors, moved some walls around, built offices.
 4   Q.   And did a pretty good job?
 5   A.   Yes.
 6   Q.   Did you know at any point that the team actually consisted
 7   of his mother and some of his other relatives that worked with
 8   him over the weekend?
 9   A.   I didn't see his mother doing that.  He brought in a crew
10   of men.
11   Q.   So you were there while they were doing it?
12   A.   I saw it.
13   Q.   Okay.  And how long did it take to do the renovations, if
14   you recall?
15   A.   I don't recall, but it was fast.
16   Q.   Now, in addition to 1 Zero 4, in addition to SnoOwl, you
17   also -- and you told us you saw the mannequin person that did
18   work on clothing perhaps.  You knew Carl Garcia rented space to
19   store his auto parts and things like that, right?
20   A.   Yes.
21   Q.   And Carl Garcia also made payments on behalf of SnoOwl to
22   the Shane Realty trust, correct?
23   A.   Yes.
24   Q.   And did you know that Carl Garcia's daughter was actually
25   one of the tenants, if you will, in the space as a
```

1  photographer?

2  A.   Yes.

3        MR. REDDINGTON:  That's all I have.  Thank you, ma'am.

4        MR. TOBIN:  Very briefly, Your Honor.

5        THE COURT:  Yes.

6                    REDIRECT EXAMINATION

7  BY MR. TOBIN:

8  Q.   With the new floors, the 401 (sic) business incubator

9  looked great, didn't?

10 A.   Yes.

11 Q.   Were you at the 401 business incubator grand opening with

12 the cutting of the ribbon and the mayor and the videos?

13 A.   No.

14 Q.   You missed that.

15       Did you ever see software people, developers, in the

16 business academy?

17 A.   No.

18       MR. TOBIN:  No further questions.

19       THE COURT:  All right.  Mr. Reddington, anything?

20       MR. REDDINGTON:  No, your Honor, thank you.

21       THE COURT:  All right.  You may step down, Ms. Tod.

22 Thank you very much.

23       And if you can take that little top off the

24 microphone.

25       THE WITNESS:  Do I take the book?

 1          THE COURT:  Just leave that there.

 2          MR. TOBIN:  Thank you.

 3          Your Honor, the United States would next call Melissa

 4     Ahaesy.

 5          MELISSA AHAESY, having been duly sworn by the Clerk,

 6     was examined and testified as follows:

 7          THE CLERK:  Please be seated and state your full name

 8     and please spell your last name.

 9          THE COURT:  Take your mask off, yes.

10          THE WITNESS:  Melissa Ahaesy, last name is

11     A-h-a-e-s-y.

12          THE COURT:  Ms. Ahaesy, can you put this little cover

13     right over your microphone?  It's right to your left.

14          (Pause.)

15          THE COURT:  Thank you.

16          Mr. Tobin?

17          MR. TOBIN:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19     BY MR. TOBIN:

20     Q.   Good afternoon.

21     A.   Hello.

22     Q.   Would you please tell us in which city or town you live.

23     A.   North Dighton, Massachusetts.

24     Q.   I'm going to ask you to speak up.  My hearing is not good,

25     but it's more important for everyone else to hear you.

1    A.    North Dighton, Massachusetts.

2    Q.    Thank you.

3          How far did you go in school?

4    A.    I have my master's degree.

5    Q.    In which discipline?

6    A.    In mental health with a license to practice.

7    Q.    And how are you employed or what is your profession at

8    this time?

9    A.    I'm a self-employed master's level therapist,

10   psychotherapist.

11   Q.    You have clients, individuals that meet with you for

12   mental health issues?

13   A.    Yes, they do.

14   Q.    And how long have you been in this field, please?

15   A.    About maybe 17 years.

16   Q.    Was there a time when you decided that the City of Fall

17   River needed to have more activities for its children?

18   A.    Yes.  Around 2014, I was living in Fall River.  My

19   daughter was a few years old and we were going to a lot of

20   different places and I started to realize there was a deficit

21   in the city of types of places where children could have some

22   hands-on learning.

23   Q.    And at that point, did you formulate a plan to do

24   something about that?

25   A.    Yes, I did.

1    Q.    And what was that plan, please?

2    A.    I created -- I raised money with many other people, and

3    created the Children's Aquarium of Greater Fall River.

4    Q.    And were your efforts successful?  Were you able to

5    actually launch and open a children's aquarium in Fall River?

6    A.    Yes.

7    Q.    Now, for an undertaking such as that, did you need to

8    raise capital, money?

9    A.    Yes.

10   Q.    And how long did you -- how long was the process of

11   raising money before you could open the aquarium's doors?

12   A.    It was around three years.

13   Q.    At some point, did you run into or meet Jasiel Correia in

14   the City of Fall River?

15   A.    Yes, I did.

16   Q.    Can you tell us where that took place?

17   A.    I believe it was after a fund-raiser, the general public,

18   they were coming into the restaurant at Dunny's Saloon in Fall

19   River, and I bumped into him there.

20   Q.    Did you speak -- by the way, excuse me.  Was that the

21   first time you had actually met Jasiel Correia at the time?

22   A.    No, we had met before.

23   Q.    In what sort of circumstances?

24   A.    I'm not sure; I had just seen him around before.

25   Q.    This meeting at Dunny's, at that time, did Jasiel Correia

1    hold an elected position in the City of Fall River?

2    A.   He was a councilman then.

3    Q.   And did you and Jasiel Correia have a conversation at

4    Dunny's?

5    A.   We did.

6    Q.   What was discussed?

7    A.   He had asked me how far we were away from being able to

8    open.  He said something like -- he asked me how much money are

9    we talking, and I think I said something about $5,000.

10   Q.   Did he have a response when you threw out the number

11   $5,000?

12   A.   He did, it was something like -- again, it was years

13   ago -- but it was something like, Well, that's all, you know, I

14   could -- I could donate that, you know, around that amount.

15   Q.   And your response was, Are you serious?

16   A.   Yeah, I said, Are you serious?  You really mean this, this

17   is amazing.

18   Q.   And then did councilman, Jasiel Correia, reaffirm that,

19   yes, he could make a donation?

20   A.   He did.

21   Q.   Now, did you try to collect on that pledge of a donation

22   to the aquarium?

23   A.   I did.

24   Q.   What steps did you take in order to get that donation that

25   had been pledged?

1    A.    There were phone calls and texts.

2    Q.    And was Jasiel Correia responsive to the phone calls and

3    texts, at least initially?

4    A.    There were -- I remember struggling to reach him, and I do

5    believe there was a time where I was supposed to meet him and

6    he didn't show up.

7    Q.    Eventually, did you receive a check from Jasiel Correia

8    for the children's museum?

9    A.    We did.

10   Q.    And was there a conversation between you and Jasiel

11   Correia at the time you accepted the check?

12   A.    Yes.  Actually, he had told me that this was a donation

13   from him and his family.

14   Q.    From him and his family?

15   A.    Mmm.

16   Q.    And how much was the check for?

17   A.    It was $3,000.

18   Q.    Ma'am, there's a book in front of you, a black binder, I

19   believe, and if you open that, you'll see a few tabs.  One of

20   the tabs is marked 58.1.  Do you see that?

21   A.    Okay, yup.

22   Q.    I'm sorry, can you see that?

23   A.    Yes, I can.

24   Q.    Do you recognize that as the check that Jasiel Correia

25   provided you for the children's aquarium?

1    A.   Yes, I do.

2         MR. TOBIN:  Your Honor, may Exhibit 58.1 be admitted

3    into evidence?

4         THE COURT:  Yes, it will.

5         (Exhibit 58.1 received into evidence.)

6    BY MR. TOBIN:

7    Q.   Could you please tell us the date on the check?

8    A.   December 10, 2014.

9    Q.   And the check is made payable to whom or what?

10   A.   Children's Aquarium of Greater Fall River.

11   Q.   And the amount of the check is?

12   A.   $3,000.

13   Q.   And does that appear to be Jasiel Correia's signature?

14   A.   Yes.

15   Q.   The actual check is drawn on a check from what company,

16   what entity, what -- I know it's a little blurry, but can you

17   make that out?

18   A.   Yes, SnoOwl.

19   Q.   When you got this check, is that when he said this is from

20   me and my family?

21   A.   Yes.  I remember it specifically because we typically

22   would -- if somebody made a donation of that size, we'd make a

23   plaque, and I wanted to make sure it had the correct, you know,

24   name or label.

25   Q.   At the time you received the check from Jasiel Correia,

1   did he say anything about this being a corporate donation from

2   SnoOwl, a company check, anything like that?

3   A.    No.

4   Q.    At the time you received the check and put it into the

5   bank, did you even realize that it had a SnoOwl name on it?

6   A.    I don't remember if I realized that.  I do remember during

7   that time just hearing about how he was a young entrepreneur,

8   very successful and had some type of app, had invented

9   something.  So that was sort of his reputation.  So if I had

10  noticed, I'm sure that's what I would have just said, Well,

11  this is his personal business.

12  Q.    Years later, did federal agents ask you to try to find the

13  check or track it down?

14  A.    Yes.

15  Q.    Did you, in fact, do it?

16  A.    I didn't; I gave them access.  I tried to go to the bank,

17  but I just --

18  Q.    I suppose my question is:  When you saw the check years

19  later, again, were you surprised that SnoOwl was even on it?

20  A.    Yeah, I was, yup.

21  Q.    Now, I think you indicated just a moment ago that if

22  someone's going to give a significant check -- and for a small

23  entity like this aquarium, a $3,000 check was a significant

24  contribution, is that not true?

25  A.    It was.

```
 1   Q.   You wanted to recognize the contributor in some public
 2   way; is that true?
 3   A.   Yes.
 4   Q.   So what did you do to recognize Jasiel Correia and his
 5   family for their generosity of giving $3,000?
 6   A.   We had a plaque made from a sign shop that -- that said
 7   his name and family, and we put it up in a room in the aquarium
 8   to honor his donation.
 9   Q.   Let me ask you if you would be kind enough to open up to
10   tab 58.2 and tell me if you recognize the photograph there.
11   A.   Yes.
12   Q.   What's that a photograph of?
13   A.   This is the -- one of the aquarium rooms with Mayor Jasiel
14   Correia and the plaque that we had made and some volunteers who
15   were --
16                MR. TOBIN:  Your Honor, May 58.2 come into evidence.
17                THE COURT:  Yes, it will be received.
18            (Exhibit 58.2 received into evidence.)
19   BY MR. TOBIN:
20   Q.   Now, there's a young woman there holding -- is that a
21   turtle or a tortoise?
22   A.   It's a tortoise.
23   Q.   I thought so.
24            And above her head on the wall in that room in the
25   aquarium.  What does the honor plaque say?
```

1    A.    "Mayor Jasiel Correia, II and Family."

2    Q.    Is there a plaque anywhere in the aquarium that says

3    SnoOwl?

4    A.    No.

5    Q.    And the mayor is there, is he not?

6    A.    Yes, he is.

7    Q.    And there are these three women volunteers or patrons

8    or --

9    A.    Yes, volunteers.

10   Q.    The bird in the middle, that's your bird?

11   A.    He is now.

12   Q.    And what's the bird's name?

13   A.    Trouble.

14   Q.    Trouble.

15         So this was at the beginning when the aquarium opened

16   or at some point Jasiel came down, Jasiel Correia came down,

17   you showed him the room and you showed him his name?

18   A.    Yes.

19   Q.    At that point did he say, Goodness, it should say SnoOwl,

20   not Jasiel Correia and family?

21   A.    No.

22         MR. TOBIN:  Thank you.  No further questions.  But

23   please remain seated, ma'am, thank you.

24         THE COURT:  Mr. Reddington?

25                          CROSS-EXAMINATION

```
 1    BY MR. REDDINGTON:
 2    Q.    So when was it that you first met Jasiel?
 3    A.    I really don't remember.  He was just somebody --
 4    Q.    Where was it when you first met him?
 5    A.    I don't remember.
 6    Q.    Do you recall when it was that you had that initial
 7    conversation about the donation to the aquarium?
 8    A.    Where it was?
 9    Q.    Sure.  Where was it?
10    A.    It was at Dunny's in Fall River.
11    Q.    And this is the pub, right?
12    A.    It was after a fund-raiser that we were having with the
13    volunteers.
14    Q.    At that time he was a city councilman, right?  He was not
15    mayor, correct?
16    A.    From what I remember, yes.
17    Q.    What?
18    A.    From what I remember, yes.
19    Q.    Okay.  And you had a conversation because you had met him
20    before perhaps?
21    A.    Yeah.
22    Q.    You don't remember where, though?
23    A.    Well, I had been to different fund-raisers throughout the
24    city, so he was definitely a familiar face, and he was very
25    friendly.
```

1    Q.    So you were somewhat politically active or at least

2    supporter in Fall River?

3    A.    I wasn't politically active, but I did come to meet more

4    people as I was trying to raise money and spark interest.

5    Q.    So it was at that time that you had the conversation with

6    Jasiel he asked how you were doing; is that right?

7    A.    Okay.

8    Q.    He asked how you were doing and you told him that you were

9    trying to open the aquarium in Fall River, right?

10   A.    Yes.

11   Q.    Children's aquarium.

12          Did he have a conversation with you and ask you what's

13   holding up the process or the progress and you stated that you

14   needed to raise money?

15   A.    Yes.

16   Q.    And in reference to the plaque picture, shall we say, let

17   me ask you, when was that picture taken?

18   A.    I believe it was a soft opening.

19   Q.    I'm not asking about openings, I'm asking when was the

20   picture taken.

21   A.    The date, I don't know.

22   Q.    Do you have a idea of the month?

23   A.    No.

24   Q.    It was after he was elected mayor; isn't that right?

25   A.    Yes.

1   Q.   And you then reached out -- this is a significant period

2   of time from the initial conversation at the pub to when the

3   actual photograph was taken with the plaque, right?

4   A.   Yes.

5   Q.   Do you have any idea how much time had gone by from the

6   initial conversation and the check for $3,000 drawn on

7   SnoOwl --

8   A.   Well, I believe --

9   Q.   -- and the time --

10  A.   -- I believe it was around 2014 when I started

11  fund-raising.  It might have been 2015 when we had the

12  conversation, and --

13  Q.   So in this conversation that counsel had asked you about,

14  you indicated you were trying to open the children's aquarium.

15  He asked about the holdup, and then he asked you how much money

16  that you needed to raise, and you threw out the figure of

17  $5,000, right?

18  A.   Yeah.

19  Q.   You then stated that you really needed more than $5,000

20  but you threw that figure out, is what you told the FBI, right?

21  A.   Mmm.

22  Q.   Pardon me?

23  A.   Yes.

24  Q.   And then he said that he would make that donation, and you

25  were surprised, you said, "Are you serious?"  And he responded,

1    "Yes, it's a good cause," right?

2    A.   Yes.

3    Q.   Now, after that particular interaction, you felt that he

4    was avoiding you; isn't that right?

5    A.   I was a little confused.  It felt like that, but at the

6    same time he was very genuine when he was speaking with you.

7    So there was always that disconnect where nice person versus

8    not getting back to us at all, he must be busy.

9    Q.   So when you determined that it appeared as though he was

10   avoiding you, you thought that he was trying to avoid giving

11   you the $5,000; is that right?

12   A.   When I looked back at it later on, that's what it seemed

13   like.  I think at the time I was just --

14   Q.   Eventually he gave you a check for $3,000, right?

15   A.   Yes.

16   Q.   Where did he give you the check for $3,000?

17   A.   It was in a mill, somewhere where he had worked.

18   Q.   You went over there, right?

19   A.   I did.

20   Q.   Right.  You were chasing him for the money, right?

21   A.   Well, he said meet me here.

22   Q.   So did he say that he'd have the money for you?

23   A.   Yeah, three months later, maybe.

24   Q.   Right.  And you had sent a number of texts to him as well;

25   isn't that right?

```
 1    A.    Yes.
 2    Q.    You basically indicated that -- to him in texts that you
 3    wanted to know if you were going to get another $2,000
 4    consistent with the $5,000 that you had discussed.
 5          Do you recall that text?
 6    A.    Vaguely.
 7    Q.    Do you recall his response:  "What do you mean?  What do
 8    you need?  Where did this $2,000 figure come from?"
 9          Do you recall him responding to your text?
10    A.    You know what happened was --
11    Q.    I'm asking:  Do you remember him responding to your text?
12    A.    No.
13    Q.    You don't.
14          Have you looked at your texts to prepare for this
15    trial?
16    A.    I did.
17    Q.    Where?
18    A.    I'm sorry?
19    Q.    Where?
20    A.    At home.
21    Q.    And when?
22    A.    A couple of weeks ago.
23    Q.    Were you asked to review these texts?  Did somebody
24    provide these texts to you?
25    A.    I was trying to refresh your memory.
```

1    Q.   Did somebody provide these texts to you?

2    A.   No.

3    Q.   Are they an exhibit?

4         MR. TOBIN:  Objection.

5    A.   I don't know what we're talking about.

6         THE COURT:  She's answered, she doesn't know whether

7    it's an exhibit, so --

8    BY MR. REDDINGTON:

9    Q.   Do you recall indicating that the $2,000 would honor the

10   total that you offered to donate?  Do you recall saying that in

11   a text to him?

12   A.   When I read the texts, I did -- I was actually surprised

13   when I read texts recently that that was all in there because I

14   just didn't remember.  I think it's from eight years ago.

15   Q.   You continued to text him for, probably, I would say,

16   let's say from the beginning of November of 2014, requesting

17   money up through December of 2014, right?

18   A.    If that's what's on the paper, yes.

19   Q.   Did he ever give you a check for another $2,000 or cash or

20   anything so it would make that $5,000 that you were after him

21   for?

22   A.    To be honest with you, I've said this to Attorney Tobin, I

23   don't remember how it went from $5,000 to $3,000, somewhere

24   along the way, I asked for $5,000 and it ended up becoming

25   $3,000.

1  Q.   Right.  So you felt that you were owed another $2,000 and
2  you were quite vocal about it, right?
3  A.   No.
4  Q.   You texted him on a regular basis for about two months,
5  right?
6  A.   You're mistaken.
7  Q.   You felt that he was avoiding you, right?
8  A.   That was regarding an error on my part which is also in
9  the paper.
10  Q.   Do you remember talking to the FBI?
11  A.   Yes.
12  Q.   Do you remember indicating to the FBI that you thought he
13  was avoiding you?
14  A.   Yes.
15  Q.   So at some point you went to 104 Anawan Street, correct?
16  A.   Yes.
17  Q.   And what was the purpose of going to Anawan Street?
18  A.   To collect a check.
19  Q.   How much?
20  A.   It ended up being $3,000.
21  Q.   You deposited the check, right?
22  A.   Yeah.
23  Q.   Did you know what SnoOwl was?
24  A.   I knew it had to do with the internet or an app that was
25  his own.

```
 1    Q.    Did have you a conversation with him about SnoOwl?
 2    A.    Never, no.
 3    Q.    Now, once he was elected mayor, that's when you had this
 4    plaque prepared, correct?
 5    A.    Yes.
 6    Q.    And how was it -- do you have any texts or emails from
 7    yourself to him inviting him to a soft opening or anything of
 8    that nature?
 9    A.    I don't know if it was a text or a phone call that was
10    inviting him, but he was invited.
11    Q.    And he showed up at that point, right?
12    A.    Yes.
13    Q.    That's what a lot of mayors do, they show up at soft
14    openings and ribbon cuttings and things like that?
15    A.    It was for people who had donated as well.
16    Q.    And that's where the photograph was taken of you and the
17    two volunteers, correct?
18    A.    Yes.
19    Q.    And did you say that you went to the bank to look
20    something up on the check after that?
21    A.    After speaking with the FBI agent, she had asked me for a
22    copy.  I didn't have one, so I went to the bank to obtain one,
23    but it just felt very awkward and I just -- I didn't end up
24    obtaining it.  I gave them permission to obtain a copy.
25                MR. REDDINGTON:  That's all I have, Your Honor, thank
```

1    you.

2              THE COURT:  All right.

3              MR. TOBIN:  No further questions, Your Honor.

4              THE COURT:  All right, you may step down.

5              You may step down.

6              (Witness left the courtroom.)

7              MR. TOBIN:  Your Honor, the United States would next

8    call Carlos Cesar.

9              CARLOS CESAR, having been duly sworn by the Clerk, was

10   examined and testified as follows:

11             THE CLERK:  Please be seated and state your full name

12   and please spell your last name.

13             THE WITNESS:  My name is Carlos, C-a-r-l-o-s, Cesar,

14   C-e-s-a-r.

15             THE COURT:  Mr. Cesar, you can take your mask off at

16   this point.

17             Mr. Tobin, you can inquire.

18             MR. TOBIN:  Thank you, Your Honor.

19                          DIRECT EXAMINATION

20   BY MR. TOBIN:

21   Q.   Good afternoon, Mr. Cesar.

22             Can you please tell us your age?

23   A.   My age, 55.

24   Q.   Where were you born and raised?

25   A.   I was born in Ponta Delgada, Azores, and I came to this

```
 1   country in 1988.
 2   Q.   Sir, how are you employed presently?
 3   A.   I have a couple of jobs.  I'm a bus driver for public
 4   schools, and I work for Wal-Mart.
 5   Q.   And in which city or town do you currently live?
 6   A.   Fall River, Mass.
 7   Q.   Thank you.
 8        Sir, are you active in the Flint Neighborhood
 9   Association?
10   A.   I'm the president since 19 -- since 2010.
11   Q.   For almost 11 years you've been the president of the Flint
12   Neighborhood Association?
13   A.   Correct.
14   Q.   What is the Flint Neighborhood Association, sir?
15   A.   The Flint Neighborhood Association, it's one of 14
16   neighborhood associations that exists in Fall River, and we do
17   all kinds of -- we help the community in all different ways,
18   and --
19   Q.   And host various events and things of that nature for the
20   community?
21   A.   Exactly.  For events we try to fund-raise a lot of
22   different events for the community, from -- to put movie
23   nights, free movie nights at the parks to food pantries, we do
24   all kinds of events.  In 2019, was about -- we put about 50
25   events in 2019.
```

1    Q.    Before COVID, of course.

2    A.    Before COVID.

3    Q.    And the name of the organization, Flint Neighborhood

4    Association, is Flint the name of a neighborhood in Fall River?

5    A.    Correct.

6    Q.    And you live in the Flint neighborhood?

7    A.    Right now, no.  When I became the president, yes.

8    Q.    Very good.  You mentioned that the neighborhood

9    association does many different things for the community.

10         Was there a time when the association was attempting to

11   buy a school building that was surplus, that the city was no

12   longer using as a school?

13   A.    Mm-hmm.  Our idea was when the city put the old schools

14   for sale, I believe five or six old schools for sale, we tried

15   to purchase one of the schools to put -- to turn it back into

16   the community.  We need headquarters for nonprofit

17   organizations.

18         I came to find out that a lot of nonprofit

19   organizations, they meet -- they don't have pretty much place

20   to meet, they meet at the volunteers' homes, basements.  So we

21   start talking about the idea of purchase one of these

22   buildings, number one, saving the building because it's an

23   historic building.  The school was 121 year old when we

24   purchased, and in the meantime, turn around, turn it into a

25   community center where we were going to put and -- on the

 1    project is the -- one of the groups moving in, is going to be

 2    the post office that they are closing in our neighborhoods and

 3    because we have a lot of elderly people living in the

 4    neighborhood, we thought it was very important to have them --

 5    the building so we moved for it.

 6    Q.   The organization, the neighborhood association of which

 7    you were president, wanted to raise funds to buy -- is the name

 8    of this school -- am I getting this right -- is it the Davol

 9    school?

10    A.   Davol school.

11    Q.   Did the association ultimately, finally, were they able to

12    raise the money to buy the Davol school?

13    A.   Yes.

14    Q.   And let me ask you this:  Approximately when did the Flint

15    Neighborhood Association purchase the school?

16    A.   We start -- as soon as the schools came for sale, I

17    started approaching the city councils at the city and putting

18    just the idea and if it was a good idea or not.  And we put a

19    campaign out for funds for the school.

20    Q.   And ultimately, what did the city sell you the Davol

21    school for?  How much was the purchase price?

22    A.   The purchase price was $5,121.  So the -- our offer was

23    $5,000 and 121 dollars is to symbolize the age of the school at

24    the time that we purchased.

25    Q.   It was 121 years old?

1    A.    It was 121 years old.

2    Q.    And in order to come up with the $5,121 to buy the

3    school -- let me finish the question -- where did you get the

4    money?  Did you fund-raise?

5    A.    We did fund-raise, and just like happens with most of our

6    fund-raisers, we sent letters to our community business and 80

7    percent of our events funds come from the merchants on the

8    neighborhood, and some out of the neighborhood, but in the city

9    that loved the project and they sent their donations, that's

10   what happened when we put the intent to buy the Davol school.

11   Q.    In or about September of 2013, September of 2013, did a

12   young man by the name of Jasiel Correia, our defendant, come to

13   the Flint Neighborhood Association regular meeting?

14   A.    Um, pretty much when I got approached back in August of

15   2017, that's when went back and tried to look at the paperwork

16   we had filed, and I came to find out and I provide you the

17   minutes of the meeting.  In July -- our meeting in July,

18   Mr. Correia attended a neighborhood meeting, and he was very

19   happy that we were trying to save the school, loved the project

20   and we wanted to do with the school and offered himself to

21   donate some funds for the purchase of the school.

22   Q.    And you mentioned a moment ago that after you started

23   talking with the government or the agents you went back and you

24   looked at documents.  Are you referring to the minutes from the

25   various meetings that the neighborhood association had?

1    A.    The minutes and the copy of the donation, the check of the

2    donation that we got.

3    Q.    Sir, in front of you there is a black binder, and if you

4    open that up you'll see a few tabs.  Do you see that, if you

5    open the book up, there's some tabs?  One of the tabs should

6    say 59.2.

7          Do you see that?

8    A.    59 --

9    Q.    Point 2.

10   A.    Point 2.

11   Q.    If you open that up, do you recognize the documents there

12   as some of the minutes from your organization's regularly

13   scheduled meetings?

14   A.    Correct.

15          MR. TOBIN:  Your Honor, May Exhibit 59.2 be moved into

16   evidence?

17          THE COURT:  Yes, it's received.

18          (Exhibit 59.2 received into evidence.)

19   BY MR. TOBIN:

20   Q.    Sir, directing your attention, now that the ladies and

21   gentlemen of the jury can see it, these are minutes in your

22   organization; is that correct?

23   A.    Correct.

24   Q.    And this is a minute from a meeting dated what?  Do you

25   see it on the top?

1    A.    This one is July 31st.

2    Q.    Of 2013?

3    A.    Correct.

4    Q.    And of course, given all of the good work the association

5    does, the minutes talk about the Flint Pride Day Festival, the

6    Christmas party and things of that nature, giving an update or

7    a recap of what took place at the meeting; is that true?

8    A.    Correct.

9    Q.    If you look down at perhaps the last entry of entries, it

10   says "Davol school."

11         Do you see that?

12   A.    Yes.

13   Q.    I'm going to read this, and I'm going to ask you if I've

14   read it correctly.

15         So the minute says:  The school is still up for sale

16   and the neighborhood association needs help with the funds.

17   Present here today is Mr. Correia who is a business person with

18   a successful business in Fall River.  He mentioned that he

19   would like to help with funds and will also help the

20   neighborhood purchase the historic building.

21         That is the meeting you talked with just a few minutes

22   ago about him coming to a meeting and talking about wanting to

23   help financially with the meeting; is that true?

24   A.    Correct.

25   Q.    Now, let me ask you:  Are you aware that at the time of

1    that meeting in July of 2013, Jasiel Correia was running for

2    the city council of Fall River?

3    A.   At that time I don't believe that he was running or

4    probably was thinking of running, but that actually was never

5    mentioned to us or anything.

6    Q.   Because -- is that -- your neighborhood association does

7    not allow politicians to come and campaign at the meetings; is

8    that true?

9    A.   Correct.

10   Q.   You want to be a non-partisan force?

11   A.   Exactly.  So what happens, because we are a nonprofit

12   organization established with the Commonwealth of

13   Massachusetts, we cannot support or endorse any candidates for

14   seeking seats.  We endorse all kinds of, like, new business

15   coming to the neighborhood, we endorse new developers coming to

16   the neighborhood.  We endorse projects that the city approaches

17   that want to benefit the neighborhood, fixes streets or fixing

18   a building or even fixing a park.

19   Q.   So does that mean you don't actually welcome politicians

20   to come in and say, Hey, I'm running for mayor, I'm running for

21   city council, and let me tell you what I think is great.

22        So there's no political speeches?

23   A.   There is no political speeches.  What we do have on our

24   agenda every month is a citizen input which anybody can come

25   that has an issue, even if you're running for office, you can

1    come, introduce yourself and talk about the issues and all of

2    that.  But we don't accept its political speech, or campaigning

3    speech, and we always -- when we are notified that the person

4    that introduced himself is going to be running for office, we

5    right away mention that we don't endorse no candidates seeking

6    seats.

7    Q.   Thank you, sir, for that explanation.

8            On July 31st of 2013, Jasiel Correia came to the

9    meeting; is that correct?

10   A.   Correct.

11   Q.   He talked about his business and he gave a presentation to

12   the people at the meeting; is that true?

13   A.   It's one of the -- it's one thing that I keep trying to

14   remember is and on this, I'm going to just rely on the minutes

15   of the meeting because it's no business have been mentioned on

16   the minutes, we -- and I, pretty sure, I got the impression

17   that it was Mr. Correia that was going to donate the funds.

18   Q.   Your belief --

19   A.   From himself.

20   Q.   He, himself, was donating money for the school?

21   A.   Exactly.

22   Q.   Okay.  And in fact, there was a check presented to the

23   neighborhood association by Mr. Correia for the school; isn't

24   that true?

25   A.   Yes.

```
 1    Q.   And let me ask you to please open -- I think it's the
 2    first tab, perhaps, sir, in -- it's not -- yeah, it is, it's
 3    the first tab, 59.1.
 4         Do you see that?
 5    A.   Yes.
 6    Q.   Is that the actual check you received?
 7    A.   Yes.
 8    Q.   And --
 9              MR. TOBIN:   Judge, may 59.1 come into evidence.
10              THE COURT:   Yes, it's received.
11              (Exhibit 59.1 received into evidence.)
12    BY MR. TOBIN:
13    Q.   Sir, again, this the check that Jasiel Correia provided to
14    the neighborhood association?
15    A.   Yes.
16    Q.   Here it says Flint Merchants Association, but it's
17    essentially the same thing?
18    A.   Same thing, yes.
19    Q.   And this is for $4,000?
20    A.   Correct.
21    Q.   And who received that check from -- who actually took the
22    check from Jasiel Correia?
23    A.   I did.
24    Q.   Because you were the president?
25    A.   Correct.
```

Case 1:18-cr-10364-DPW   Document 236   Filed 05/17/21   Page 234 of 250

7-234


1    Q.   Did that happen at a meeting or did it happen at some
2    place or some time other than one of your formal meetings?
3    A.   As you can see, I didn't get the check until September.
4    Mr. Correia came to the meeting in July.  After that, I'm
5    pretty sure we had a couple of conversations, but then I got a
6    call to meet, I think we meet at a bakery, if I'm not mistaken,
7    in a bakery, and he gave me the donation.
8    Q.   Did he say anything to you when you gave you this check,
9    this generous check of $4,000?
10   A.   I don't recall but probably, you know -- I mean, he was
11   very happy that we were going to be able to purchase this
12   building.  And to tell you the truth, if it was not for this
13   donation, we probably hadn't made enough to buy the building.
14   Q.   And you were very grateful to Jasiel Correia?
15   A.   Correct.
16   Q.   And you believed the check was from Jasiel Correia?
17   A.   Yes.
18   Q.   When he gave you the check, did he say anything about it
19   being a corporate donation from SnoOwl or anything --
20   A.   I don't remember anything of that nature.
21   Q.   Today you can look at the check and you can see that it
22   says "SnoOwl" on it; is that correct?
23   A.   Correct.  And I was surprised when, back in 2017, that I
24   went back to the files and I really noticed, paid attention to
25   the check and who the check came from.

1    Q.   And you were surprised when you saw, what, on the check in

2    2017?

3    A.   Exactly, I was surprised.  I mean, I was surprised

4    because, again, and even when we accept -- or the neighborhood

5    accept, board accept the donation, once again, in September, it

6    was never mentioned -- the company was always mentioned

7    Mr. Correia because that's where we really thought that we were

8    getting the money from.

9    Q.   And back when you got the check and put it in the bank,

10   happily one must assume, did you even notice SnoOwl on it?

11   A.   No, I mean -- like I said, 80 percent of our donations for

12   our events comes from business.  I provide you with all the

13   donations that came for the Davol school, and they're all 99

14   percent, I believe, came from business.  So it's normal for us

15   to get business donations.  But on this particular case,

16   another thing that I'm surprised after all this time is looking

17   at the minutes and seeing that SnoOwl was never mentioned in

18   the meeting.

19   Q.   And, sir, when you typically -- strike that.

20             Sir, so got the $4,000 check, you believe it was from

21   Jasiel Correia personally?

22   A.   Mm-hmm.

23   Q.   And there was never any discussion when he gave it to you

24   about it being from SnoOwl; is that accurate?

25   A.   No.

7-236

1    Q.    Did SnoOwl ever get any public recognition, any publicity,

2    any signs, anything in a book?  Was SnoOwl ever recognized as

3    being a donator to this school?

4    A.    No, and it was never requested to, Mr. Correia never ask

5    anything in return.

6                MR. TOBIN:  Thank you so much.

7                THE WITNESS:  You're welcome.

8                MR. TOBIN:  No further questions, but please remain

9    seated.

10                              CROSS-EXAMINATION

11   BY MR. REDDINGTON:

12   Q.    Sir, the question I have is:  Are you telling me that the

13   Flint Merchant Association and the Flint Neighborhood

14   Association is one in the same?

15   A.    Yes, we combined both organizations because --

16   Q.    No, no, the answer is, yes, thank you, I appreciate it.

17   A.    Yes, yes.

18   Q.    And is it incorporated?  Is it a trust?

19   A.    We are nonprofit organization.

20   Q.    Okay.  So have you to really have, like, one name.  Is it

21   Flint Merchants Association?

22   A.    Flint -- no, Flint Neighborhood Association.

23   Q.    Okay.  And the check was made payable to the Flint

24   Merchants Association, right?

25   A.    Correct.

1  Q.   Now, when -- this is back in 2013, when Jasiel was
2  thinking about running for city council, right?
3  A.   Like I said, I don't remember at this time ever talking
4  about him running for office.
5  Q.   So -- in looking at the minutes of July 31, 2013, was
6  this -- these minutes, did people make speeches at your
7  meetings and then they're reduced to minutes?
8  A.   No, no, usually what we do, like I said, we have sometime
9  on the agenda for public input, so citizens can talk about the
10 issues on their streets, with their neighbors --
11 Q.   Okay.  Do you recall speaking to Jasiel regarding his
12 business?
13 A.   No.
14 Q.   Did he ever talk to you about SnoOwl?
15 A.   Probably later on, but not at that time.
16 Q.   But you felt impressed enough, apparently, on July 31st of
17 2013 to put in that the Davol school is up for sale,
18 neighborhood association needs help with funds, present here
19 today is it Mr. Correia who is a business person with a
20 successful business in Fall River?
21 A.   That's what's being announced, but, personally, I never
22 talked to him about the business.
23 Q.   How many times have you talked to FBI agents on this
24 investigation, sir?
25 A.   Just once.

```
1    Q.   And where was that?

2    A.   That's back in August 2017 when I got served.

3    Q.   You got served?

4    A.   Exactly.

5    Q.   Were you interviewed?

6    A.   Yes.

7    Q.   In the course of the investigation, were you told that

8    it's important to basically put SnoOwl to the side and

9    everything's got to be Jasiel Correia, individually, himself,

10   no other business interest at all in donations?

11            MR. TOBIN:  Objection.

12   BY MR. REDDINGTON:

13   Q.   Anybody talk to you about that?

14            THE COURT:  Overruled the objection.

15            The jury, of course, will maintain my instruction that

16   if the witness doesn't adopt this question, then there's no

17   evidence of it.

18   BY MR. REDDINGTON:

19   Q.   Anybody ever tell you that, sir?

20   A.   No.

21   Q.   No.

22            In 2017 -- well, let me ask you:  When was it that you

23   actually received the check that was dated September 4th, two

24   months later, of 2013, from SnoOwl, the company?

25   A.   The check --
```

1   Q.   This check, the one for $4,000?

2   A.   I probably got it probably on the 4th.  I don't recall.

3   Q.   Do you remember where you got it?

4   A.   I got it from Mr. Correia.

5   Q.   Where you got it?

6   A.   Where?

7   Q.   Yeah, where?

8   A.   I believe in a coffee shop.  He called me, then he said I

9   have the check for --

10  Q.   Would that be the White Rose?

11  A.   -- for the donation and we meet up and --

12  Q.   Would that be the White Rose?

13  A.   -- I got the check.

14       Excuse me?

15  Q.   Would that be the White Rose coffee shop?

16  A.   The White Rose, yes.

17  Q.   And did he call you and say, Hey, meet me, I've got a

18  check to help you out with the purchase of the school for the

19  association?

20  A.   He said, Yes, I got the donation for you.

21  Q.   Okay.  The answer is yes.

22  A.   Let's have coffee and we met there and he gave me the

23  donation.

24  Q.   So you met, and you must have been really excited because,

25  apparently, this $4,000 donation put you over the top to buy

1    the school?

2    A.    Exactly.  I just mentioned that probably we would not

3    have -- make the purchase --

4    Q.    Right.

5    A.    -- if it was not --

6    Q.    So that was a quite a -- go ahead.

7    A.    If it's not this -- his good heart, I guess, to donate to

8    the neighborhood.  We thankful until today.

9    Q.    So when you met with him and he addressed a check to the

10   Flint Merchants Association for $4,000, it doesn't indicate

11   what it's for, obviously it's a donation, though, clearly

12   unequivocally and in bold writing it says "SnoOwl" on the

13   check, right?

14   A.    Exactly.

15   Q.    Now you knew that SnoOwl was his business, true?

16   A.    Now I know, yes.

17   Q.    Did you know then that SnoOwl was his business?

18   A.    At the -- at the time back then, no, everybody was -- knew

19   Jasiel for -- Mr. Correia, for a new business person, very

20   involved in the community and -- I really didn't pay attention

21   who the check came from.  I never pay attention.

22   Q.    So it was in 2017, apparently, that you were asked to go

23   back to your files, and that's when you were surprised to see

24   SnoOwl on the check?

25   A.    Yes.  I was surprised.

1    Q.    Were there any public accolades or, you know, pamphlets or

2    ads taking out thanking people for their donations?

3    A.    No, we never do that.

4    Q.    So you received a check for the $4,000 donation which was

5    for a young man who tried to help out in the community and you

6    bought the school, correct?

7    A.    Correct.

8    Q.    And when he gave you the check, there was little or no

9    conversation.  He didn't say, This check is coming from me,

10   Jasiel Correia, not SnoOwl, where he just gave you the check,

11   right?

12   A.    Yes.

13   Q.    Okay.

14         Now, the Flint neighborhood or merchant association,

15   just give me a thumbnail, what is it?  Is it residential or is

16   it business or what type of neighborhood is it.

17   A.    It's a neighborhood.  So we are 154 streets.  We represent

18   a neighborhood, we represent 156 streets, 14,000 families, and

19   over 700 small business.

20   Q.    Excellent.  And do you recall at one point that you

21   basically gave Jasiel a tour of that area showing him the

22   businesses, showing him the buildings, the locations?

23   A.    I give tours a lot to a lot of people, yes.

24   Q.    My question is, this guy sitting right here in the chair,

25   do you remember giving him a tour?

```
 1   A.   Yes.

 2   Q.   Okay.

 3   A.   Yes.

 4   Q.   And do you remember, as he was walking down the street

 5   getting the tour from you, that you both were putting little

 6   stickers on the windows of these businesses saying SnoOwl?

 7   A.   No.

 8   Q.   You don't --

 9   A.   That's a lie.

10   Q.   That's a lie?

11   A.   It's a lie.

12   Q.   You don't recall that at all?

13   A.   It's a lie.

14   Q.   Have you ever in the course of walking the streets, if you

15   will, of this neighborhood with Jasiel Correia, ever seen him

16   put anything on a window of a building?

17   A.   I never saw.

18   Q.   And when was the last time that you spoke to Mr. Jasiel

19   Correia?

20   A.   Our last conversation was over the phone that he was upset

21   at me because I had mentioned a meeting that supposedly he was

22   supposed to be not public.

23   Q.   Supposed to what?

24   A.   It was an ambush pretty much.

25   Q.   An ambush?
```

```
 1   A.   Yes.
 2   Q.   Right, because you kept going on the radio because you
 3   were running for mayor and contemplating running for mayor
 4   yourself against him, right?
 5   A.   Me?  I never said that I was running for mayor, never.
 6   Q.   Never?  Is that a lie too?
 7   A.   Never.  I never said that.  Somebody put on a paper my
 8   pictures being probably run potential candidates, but I will
 9   never run.  I never run.
10   Q.   Who is Linda Pereira?
11   A.   Linda Pereira?  She's in the city council right now.  She
12   did run for -- against --
13   Q.   And she ran against Jasiel Correia, right?
14   A.   Against Mr. Correia, correct.
15   Q.   And you're a strong supporter of Linda Pereira, weren't
16   you?
17   A.   Maybe.  I mean, I support a lot of people.
18            MR. REDDINGTON:  That's all I have, Your Honor.  Thank
19   you.
20   A.   I support a lot of candidates, but, you know,
21   individually, me.
22            THE COURT:  Mr. Tobin?
23            MR. TOBIN:  Your Honor, I have no further questions.
24            THE COURT:  You may step down.
25            You may step down, Mr. Cesar.  Thank you very much.
```

```
 1              MR. TOBIN:  Sir, before you leave, there's a little
 2      rag there, there's a canister like this, would you mind
 3      terribly just wiping down the table?  We've been asking all the
 4      witnesses to do that because of COVID.  Thank you.
 5              THE WITNESS:  You're welcome.
 6              MR. TOBIN:  Your Honor, I have my next witness ready
 7      to go if you'd like to call that witness.
 8              THE COURT:  I think maybe this is the point to break
 9      for the day.
10              MR. TOBIN:  Very good.  That's fine.
11              THE COURT:  We'll start with that witness tomorrow
12      morning.
13              So, ladies and gentlemen, we'll break for the day.
14      We'll start tomorrow morning at 9:30.  You'll be here a little
15      bit early so that we can get started promptly, and I think
16      we'll make some more significant progress tomorrow.
17              But you'll bear in mind that we're breaking at -- the
18      testimony, we're taking at lunch time, you're welcome, as I
19      said, to stay for the lunch that we're providing for you
20      because we're bringing in that day, and then we'll be back on
21      for Monday morning as we continue with the case.
22              Again, don't talk to anybody, don't expose yourself in
23      any way to any other outside information about the case so that
24      we can continue effectively tomorrow morning.
25              Have a good afternoon.
```

```
 1              THE CLERK:  All rise.

 2              (Jury left the courtroom.)

 3              THE COURT:  So, I think he should be ready to go on.

 4   I guess it would be probably be Mr. Brayton after Special Agent

 5   Lemanski, but you should have witnesses even though we will

 6   have completed, as I understand it, the principal evidence in

 7   the SnoOwl matter.

 8              MR. REDDINGTON:  Your Honor, could I just ask, I'm

 9   just looking for advice from the Court, perhaps your thoughts,

10   perhaps your thoughts.  I have spoken with the government.

11   This has been a long and I know you're used to this stuff, but,

12   boy, I'll tell you, there's a lot of exhibits, a lot of

13   documents, a lot of paper, been a long week for the jury, and

14   we have a half day tomorrow, as it were, which I appreciate.

15   If we get through the rest of the SnoOwl witnesses and wrap it

16   up with Sandra Lemanski, who we expect will take some

17   significant period of time, is it possible for us to break the

18   SnoOwl case at that time?  It's kind of like a good time to

19   break before we segue into --

20              THE COURT:  If the parties are agreeable to that, I'll

21   let that happen.  It looks to me like we might have some excess

22   time tomorrow, but if you want a clean break on presentation of

23   that aspect of the case, I'm agreeable to that.

24              MR. REDDINGTON:  Thank you.

25              THE COURT:  Let the jury go at -- when we're
```

```
 1   completed.

 2             MR. HAFER:  I think that makes sense, too, Your Honor,

 3   on behalf of us.  I think we'll end up filling the bulk of the

 4   time, and I think it's a logical place.

 5             THE COURT:  All right.  So that's what we'll do

 6   tomorrow.

 7             MR. REDDINGTON:  Thank you, Judge.

 8             THE COURT:  And then you'll be talking about a good

 9   time to discuss the legal instructions with respect to that and

10   when we can do that.

11             MR. HAFER:  Yes.  Your Honor, on that, would it be

12   helpful for me to submit something in writing short or

13   before -- before we discuss it.  I don't want to --

14             THE COURT:  Whatever you want will be fine.  I don't

15   want to impose extra responsibilities, and I've always felt

16   that just submitting the cases, I can read cases, too, I tend

17   to not read them quite the same way that advocates do, but if

18   you submitted cases and highlighted those parts that you think

19   I should look at, of course I'll look at those parts more

20   generally, but I don't see cranking up a major memorandum or

21   even a minor memorandum --

22             MR. HAFER:  Thank you for that.

23             THE COURT:  Okay.

24             MR. HAFER:  Thank you, that's helpful.

25             THE COURT:  Okay.  So we'll be in recess and we'll see
```

1    you tomorrow morning.

2           MR. REDDINGTON:  Very good, Your Honor.

3           THE CLERK:  All rise.

4             (Court adjourned at 4:11 p.m.)

5                     CERTIFICATION

6           We certify that the foregoing is a correct transcript

7    of the record of proceedings in the above-entitled matter to

8    the best of our skill and ability.

9    /s/Debra M. Joyce              April 29, 2021
     Debra M. Joyce, RMR, CRR, FCRR   Date
10   Official Court Reporter

11

12

13   /s/Kelly Mortellite            April 29, 2021
     Kelly Mortellite, RMR, CRR       Date
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3    WITNESS                                              PAGE

4

     STAFFORD WHEELER SHEEHAN
5
        Direct Examination by Mr. Tobin (Continued)        8
6       Cross-Examination by Mr. Reddington               26

7    SERGIO ARIAS

8       Direct Examination by Mr. Tobin                   42
        Cross-Examination by Mr. Reddington               51
9       Redirect Examination by Mr. Tobin                 55
        Recross-Examination by Mr. Reddington             55
10
     NATALIE CLEVELAND
11
        Direct Examination by Mr. Hafer                   57
12      Cross-Examination by Mr. Reddington               93

13   TERENCE ALAN CHAREST

14      Direct Examination                               102
        By Mr. Hafer
15      Cross-Examination                                164
        By Mr. Reddington
16      Redirect Examination                             184
        By Mr. Hafer
17
     PATRICIA TOD
18
        Direct Examination                               187
19      By Mr. Tobin
        Cross-Examination                                200
20      By Mr. Reddington
        Redirect Examination                             206
21      By Mr. Tobin

22   MELISSA AHAESY

23      Direct Examination                               207
        By Mr. Tobin
24      Cross-Examination                                215
        By Mr. Reddington
25

```
 1   CARLOS CESAR

 2       Direct Examination                                    224
         By Mr. Tobin
 3       Cross-Examination                                     236
         By Mr. Reddington
 4

 5

 6                           E X H I B I T S

 7
         Exhibit No.                                      Received
 8

 9       57                                                     16

10       60                                                     45

11       60.1                                                   46

12       73                                                     62

13       75.1                                                   63

14       76                                                     65

15       77                                                     67

16       77.1                                                   69

17       79                                                     72

18       80                                                     74

19       81                                                     75

20       97                                                     76

21       98                                                     77

22       99                                                     79

23       100                                                   103

24       102                                                   109

25       103                                                   113
```

| 1  | 104   | 118 |
| 2  | 105   | 125 |
| 3  | 106   | 132 |
| 4  | 107   | 135 |
| 5  | 108   | 139 |
| 6  | 109   | 140 |
| 7  | 110   | 142 |
| 8  | 111   | 144 |
| 9  | 111.1 | 146 |
| 10 | 112   | 147 |
| 11 | 113   | 150 |
| 12 | 114   | 152 |
| 13 | 115   | 154 |
| 14 | 116   | 156 |
| 15 | 117   | 158 |
| 16 | 118   | 159 |
| 17 | 119   | 161 |
| 18 | 119.1 | 163 |
| 19 | 33    | 192 |
| 20 | 35    | 195 |
| 21 | 34    | 195 |
| 22 | 58.1  | 212 |
| 23 | 58.2  | 214 |
| 24 | 59.2  | 229 |
| 25 | 59.1  | 233 |