UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )         Criminal Action
          Plaintiff,          )         No. 18-10364-DPW
                              )
v.                            )
                              )
JASIEL F. CORREIA, II,        )
                              )
          Defendant.          )
                              )
```

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

JURY TRIAL DAY 8

April 30, 2021

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Zachary R. Hafer
3    David G. Tobin
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3106
6    zachary.hafer@usdoj.gov
     david.tobin@usdoj.gov
7

8    On Behalf of the Defendant Jasiel Correia, II:
     Kevin J. Reddington
9    Law Offices of Kevin J. Reddington
     1342 Belmont Street
10   Suite 203
     Brockton, MA 02301
11   508-583-4280
     kevinreddington@msn.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3     before the Honorable Douglas P. Woodlock, United States
 4     District Judge, United States District Court, District of
 5     Massachusetts, at the John J. Moakley United States Courthouse,
 6     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on
 7     April 30, 2021.)
 8     (Case called to order.)
 9              THE COURT:  So I don't think we have anything to talk
10     about before the jury is brought in.
11              MR. HAFER:  I don't think so either, Your Honor.
12              MR. REDDINGTON:  No, Your Honor.
13              THE COURT:  So I'll ask Ms. Beatty to bring the jury
14     in.
15              MR. HAFER:  We'll get the witness now.
16              (Jury enters the courtroom.)
17              THE COURT:  Good morning, ladies and gentlemen.
18     Again, my customary morning greeting.  Were any of you exposed
19     in any way to any matters touching on this case outside of
20     what's occurred here in the courtroom?
21              And I see no positive response to that.  So I find
22     that the jury has not been so exposed, and I'll ask Ms. Beatty
23     to swear the next witness.
24              STACIA VIERIA, Sworn
25              COURTROOM CLERK:  Please state your full name and
```

1    please spell your last name.

2              THE WITNESS:  Stacia Vieria.  The last name is spelled

3    V-i-e-r-i-a.

4              THE COURT:  You may inquire, Mr. Tobin.

5              MR. TOBIN:  Thank you, Your Honor.

6    DIRECT EXAMINATION BY MR. TOBIN:

7    Q.   Good morning.

8    A.   Good morning.

9    Q.   It might make some sense to spell your first name as well

10   for our court reporter.

11   A.   Sure.  S-t-a-c-i-a.

12   Q.   Where do you live?

13   A.   I live in Dartmouth.

14   Q.   Where do you work?

15   A.   I work for Tamarack Technologies.

16   Q.   How long have you worked for that company?

17   A.   I've worked there for three years.

18   Q.   What position do you hold at the company?

19   A.   I'm an accounting clerk.

20   Q.   And what are your primary duties and responsibilities in

21   that position?

22   A.   I basically handle customer orders and I also process the

23   payments and post them.

24   Q.   Did you ever work as a tax preparer?

25   A.   Yes.

1   Q.   Where did you work?

2   A.   I worked for Liberty Tax Service.

3   Q.   Where was the office?

4   A.   The office was located in Fall River, Massachusetts.

5   Q.   And for what period of time did you work for Liberty Tax?

6   A.   I worked from 2006 until 2017.

7   Q.   What position did you hold at Liberty Tax?

8   A.   General manager.

9   Q.   And what were your primary duties and responsibilities as

10  general manager at Liberty Tax?

11  A.   That would be for filing tax returns, whether I prepped

12  them or not.  I oversee some staff, and I just did a lot of the

13  day-to-day deposits and things like that.

14  Q.   When you worked for Liberty Tax, were the federal tax

15  returns that were done by Liberty filed electronically or by

16  the U.S. mail or by both?

17  A.   It could be either/or.  Primarily they were e-filed,

18  electronically filed.

19  Q.   I'd like to ask you if a customer, a taxpayer came in and

20  wanted to hire Liberty Tax to do their federal income tax

21  return, walk us through, briefly, the process that would be

22  followed.

23  A.   The customer would come in, and they would fill out a

24  Client Data Sheet.  They would also bring in all of the

25  required documentation in order to file their tax returns.

1    Q.    What was on the Client Data Sheet that a client would be

2    asked to file?

3    A.    The Client Data Sheet would have all of their pertinent

4    information, their name, Social Security number, date of birth,

5    address, any dependents, if they had any, if they had a spouse,

6    any of that information, and all income and expenses that they

7    would have.

8    Q.    Ms. Vieria, once you or another member of Liberty Tax had

9    the data sheet and had the documents -- W-2s and such, is that

10   what you're referring to?

11   A.    Correct.

12   Q.    Once a member of your staff had the data sheet and had the

13   supporting documents, what happened next?

14   A.    At this point there would be a client interview if they

15   decided to stay, and we would sit down and complete the tax

16   return in-house with the client present.

17   Q.    And would you -- when you say, "We would complete the tax

18   returns," would you actually input data into a computer and

19   into a software program managed by Liberty Tax?

20   A.    Correct.

21   Q.    And once that data was completed, was it reviewed in any

22   way with the client?

23   A.    Yes.

24   Q.    Explain that process to us, please.

25   A.    So once all the data entry is completed, I would actually

1    turn the screen over to the customer and run through where all

2    of the income would go, what their refund would look like, any

3    tax liabilities just as a quick summary.

4    Q.    Now, with regard to that information, the information

5    you've inputted into the Liberty Tax computer that you go over

6    with the client, are they asked to initial or sign anything

7    that contains the data?

8    A.    Correct, yes.  It's --

9    Q.    Explain that to us.

10   A.    There is an electronic data capture pad that we utilize in

11   order to secure the signatures through the program.

12   Q.    And do you actually go over line by line with the client

13   the various information you've gleaned or gotten from them?

14   A.    Yes.

15   Q.    Do you ask them about the various kinds of income they

16   might have or expenses?

17   A.    Yes.

18   Q.    And again, at the end of these pages are they initialling

19   after you've gone over them?

20   A.    Yes.

21   Q.    You mentioned if the client stays.  Are there sometimes

22   times when an individual comes in, drops off their things,

23   fills out the form and leaves?

24   A.    Yes.

25   Q.    And you or somebody will do the taxes in their absence?

1    A.    Correct.

2    Q.    If that happens, do you talk to the client again before

3    they're filed?

4    A.    Yes.

5    Q.    Explain that process to us.

6    A.    They would have to come back into the office.  So we would

7    schedule an appointment or they can come in when it's good for

8    the customer to come in and we would complete the rest of the

9    signature process in order to complete the return.

10   Q.    And when you say "complete the signature process," are you

11   referring to, would you also go through that checklist and have

12   them sign -- go through that data and have them initial at the

13   bottom of the page?

14   A.    Correct.

15   Q.    And the information that Liberty Tax files with the IRS,

16   electronically or occasionally through the mail, where do you

17   get that information?

18   A.    That information is supplied by the customer.

19   Q.    You rely on the customer to provide you with truthful

20   answers to the questions that are asked?

21   A.    Correct.

22   Q.    And to provide you with the necessary documentation?

23   A.    Correct.

24   Q.    And if you could explain, perhaps nowadays most people

25   recognize this or understand this, but nonetheless, so if

1    you're going to file a customer's federal taxes electronically,

2    how does one sign an electronic tax form?

3    A.    This is done through a special form through the Internal

4    Revenue Service called a Form 8879.  What this form does is it

5    assigns a five-digit number that serves as a signature to the

6    IRS, and then you sign that document stating that you're

7    signing the tax return.

8    Q.    Did you ever prepare taxes for the defendant in this case,

9    Jasiel Correia?

10   A.    Yes.

11   Q.    Did you ever file electronically taxes for the defendant

12   in this case, Jasiel Correia?

13   A.    Yes.

14   Q.    You have a binder in front of you, and inside of that,

15   there are a number of tabs.  If you could open that up and see

16   if you recognize that.

17   A.    Yes.

18   Q.    I'm going to ask you to open up to 62.1.  Do you recognize

19   the exhibit at 62.1?  I think there's three pages.  You may

20   want to look at all of them.  It's two different things, I

21   would suggest.

22   A.    I don't see a 62 --

23   Q.    You don't see a 62.1?

24   A.    No.

25   Q.    Do you see a 62?

1    A.    Yes.

2    Q.    And if you open up 62, what's there?

3    A.    This is the return information verification form.

4    Q.    Do you have a Liberty Tax Client Data Sheet for Jasiel

5    Correia, II, that says "free dependent" on the top?

6    A.    I don't believe so.  Not in this section.

7    Q.    Okay.  Well, let me --

8            MR. TOBIN:  Your Honor, may I use the document camera?

9            THE COURT:  Yes, you may.

10           MR. TOBIN:  Your Honor, this is not yet introduced

11   into evidence, so I would ask that it be shown only to the

12   attorneys and to the witness, please.

13           THE COURT:  Sorry.  We're not able to do that

14   according to Ms. Beatty on the technology that we now have.

15   Hold on just a second.

16           MR. HAFER:  Your Honor, if we can have just a moment I

17   think we have a backup.

18           THE COURT:  Ms. DiPaolo is to the rescue.

19           MR. HAFER:  May Ms. DiPaolo approach the witness box,

20   Your Honor?

21           THE COURT:  Yes.

22   Q.    Ms. Vieria, I apologize for that kerfunkle.  Do you now

23   have before you 62.1?

24   A.    I do.

25   Q.    Would you be kind enough to look at it?  I believe it's

1    three pages.

2    A.    Yes.

3    Q.    Do you recognize what makes up 62.1?

4    A.    I do.

5    Q.    What is it?

6    A.    This is the Liberty Tax Client Data Sheet.

7    Q.    A specific one with information on it?

8    A.    Yes, this is --

9    Q.    That is two pages; is that correct?

10   A.    That is correct.

11   Q.    And there is a W-2 behind that.  Is that accurate?

12   A.    Yes.

13          MR. TOBIN:  Your Honor, I would ask that 62.1 be

14   introduced into evidence.

15          THE COURT:  It's received.

16          (Exhibit 62.1 admitted into evidence.)

17   Q.    So this is the Liberty Tax Client Data Sheet.  Is that

18   accurate?

19   A.    Yes.

20   Q.    Is this the form that you referred to previously as the

21   form that would be given to clients when they came in?

22   A.    Correct.

23   Q.    And information as to biographical information as to the

24   client would be placed on this.  Is that true?

25   A.    Yes.

1    Q.   And this has the information for whom?

2    A.   This would be for Jasiel Correia, II.

3    Q.   And we can see Jasiel Correia, II, occupation, city

4    council, Social Security number, address, phone number, that

5    sort of thing.  Is that true?

6    A.   Yes.

7    Q.   And on the top it says "Free Dependent."  Why does it say

8    that?

9    A.   Based on the information that I had he was a dependent of

10   his father that year.

11   Q.   I'm sorry.  And if you did the parents, you would do the

12   dependent children?

13   A.   Correct.

14   Q.   Even if they were city council members?

15   A.   Correct.

16   Q.   Okay.  Now, if we go to the second page of this document,

17   thank you.  There is a place for a signature at the bottom, is

18   there not?  Do you see, "I certify I would like my taxes

19   prepared" -- can we go a little below that, actually.  There is

20   a box there that says, "I certify that I would like my taxes

21   prepared according to the information I supplied above,"

22   correct?

23   A.   Correct.

24   Q.   This one, however, is not signed, is it?

25   A.   No.

1              MR. TOBIN:  In fact, if we can make the sheet larger,
2    the second page larger.
3    Q.   There's no information on this sheet, is there?  No
4    information provided by Jasiel Correia, II, or anyone else?
5    A.   No.
6              MR. TOBIN:  And if we go to the first page again.
7    Q.   Similarly, although there's the biographical information,
8    there is no information provided.  Is that true?
9    A.   Correct.
10   Q.   But with this form in your records there was something
11   else?
12             MR. TOBIN:  Can we go to the third page of this
13   exhibit, please.
14   Q.   What is that?
15   A.   That is a Form W-2 for Jasiel Correia.
16   Q.   A wage statement for the year.  Is that true?
17   A.   Correct.
18   Q.   And what year is that for?
19   A.   2013.
20   Q.   And it's for Jasiel F. Correia, II, from Fall River.  Is
21   that true?
22   A.   Correct.
23   Q.   And this is issued by -- who created this document?
24   A.   Providence College.
25   Q.   And the income for tax year 2013 was what?

1   A.   $6,630.

2   Q.   These records come from Liberty Tax, correct?

3   A.   Correct.

4   Q.   So you had this form with his name, you had his W-2.  He

5   didn't sign it and there was no other information.  Is that

6   true?

7   A.   Correct.

8   Q.   Okay.

9        MR. TOBIN:  If we could look now at, if we could go to

10  Exhibit 62.

11  Q.   Exhibit 62 on the tab.

12  A.   Yes.

13  Q.   And I think you've already identified Exhibit 62 as the

14  return income verification.  Is that accurate?

15  A.   Yes.

16       MR. TOBIN:  Your Honor, may this come into evidence as

17  Exhibit 62?

18       THE COURT:  Yes.  I'm sorry, just a second.  Yes, it's

19  received.

20       MR. TOBIN:  Thank you, Judge.

21       (Exhibit 62 admitted into evidence.)

22  Q.   So again, this is the return information verification

23  form.  Is that true?

24  A.   Yes.

25  Q.   And this has information on it?

1    A.    Yes.

2    Q.    And this is for whom?

3    A.    This is for Jasiel Correia, II.

4    Q.    And what does this tell us -- this gives other

5    biographical or identifying information, Social Security

6    number, date of birth, address and things of that nature.  Is

7    that true?

8    A.    Yes.

9          MR. TOBIN:  And if we go to the bottom part of that

10   page.  Yes, thank you.

11   Q.    This actually has some tax information on it, doesn't it?

12   A.    Yes.

13   Q.    And it has "Liberty preparer 11136" and the name "Joyce

14   Carreira."  Who is Joyce Carreira?

15   A.    Joyce Carreira was one of my employees.

16   Q.    And what's the significance or why is her name on this

17   form?

18   A.    She was the one who performed the data entry on this

19   return.

20   Q.    And the data entry, the information that is seen on this

21   form under "tax" and under "invoice," who would have put that

22   into your Liberty Tax computer?

23   A.    Joyce.

24   Q.    And for "federal AGI," what does that stand for?

25   A.    Adjusted gross income.

1   Q.   And for this form for Jasiel Correia, II, it was how much?

2   A.   $6,630.

3   Q.   And that is the exact same amount that we saw and that you

4   pointed out on the 2013 W-2, the $6,630 that we saw on the

5   Providence College W-2.  Is that correct?

6   A.   Correct.

7   Q.   And we have the number for taxable income.  Where does

8   that that number come from?

9   A.   That is calculated by the software.

10  Q.   Based on deductions, status and things of that nature?

11  A.   Correct.

12  Q.   And tax total tax was?

13  A.   $54.

14  Q.   And the total that was withheld was?

15  A.   $637.

16  Q.   And when we say or when you say the form says "total

17  withheld," what does that mean?

18  A.   That is the amount of monies that are withheld through

19  wages.

20  Q.   So there was obviously Providence College paying Jasiel

21  Correia, II, money.  Every paycheck they kept something out for

22  federal taxes?

23  A.   Correct.

24  Q.   That amount totaled $637?

25  A.   Correct.

1   Q.   But when the computer or Liberty Tax actually calculated

2   his taxes, the total tax was only --

3   A.   $54.

4   Q.   Which means there was too much money taken out during the

5   year.  Is that how it works?

6   A.   Correct.

7   Q.   So what's the total payment here again -- the right-hand

8   column is total withheld 637.  Total payment, what does it say?

9   A.   583.

10  Q.   So the refund was?

11  A.   583.

12  Q.   And what's the prep -- so 583, that would be the tax

13  return -- that would be what the return would be for that year,

14  2013 tax year?

15  A.   Correct.

16  Q.   And what's this "prep fee subtotal 137"?

17  A.   That was the fee that was determined by the software, and

18  then it was discounted because it was a free return.

19  Q.   And that's why it says "promo discount" with "137"

20  actually in brackets?

21  A.   Correct.

22       MR. TOBIN:  Now, can we go to the second page of this

23  form, please.

24  Q.   Now, what is the second page of this form, this return

25  information verification?

1   A.   This is a summary of the Form 1040 federal tax return.

2   Q.   Now, whose initial appears at the bottom of this page

3   where it says "taxpayer initial."  Do you see that?  JC II?

4   A.   Yes, that is Jasiel's initials.

5   Q.   Now, did you play any role in -- were you present when JC

6   II, put the initials on this?

7   A.   Yes.

8   Q.   Now, why is that?  I thought this other employee inputted

9   the data.

10  A.   Yeah.  She inputted the data, but I had finished the

11  return.  So whoever starts the return in the software has all

12  of their information attached to the return.

13  Q.   So when you say you finished the return, after the

14  information is put into the computer, this form is created.  Is

15  that true?

16  A.   Correct.

17  Q.   At that point in this instance, do you sit down with

18  Jasiel Correia, II, to go over and verify the information?

19  A.   Yes.

20  Q.   So let's go to the top of this page again if we might.  So

21  we can see there are many different categories, many different

22  issues.  This page has topics "filing status, number of

23  exemptions, income, Schedule C, adjustments, total adjustments,

24  deductions, tax computation," correct?

25  A.   Correct.

1    Q.    Perhaps we can't see all of them on the screen, but

2    nonetheless this is a very comprehensive list of information

3    needed for taxes?

4    A.    Yes.

5    Q.    And when you sat down with Jasiel Correia, II, do you

6    actually go through these?

7    A.    Yes.

8    Q.    Even the ones where there are no entries?

9    A.    Yes.

10   Q.    Okay.  So for instance, when we have income, wages,

11   salaries, tips, et cetera, what's the amount there?

12   A.    $6,630.

13   Q.    What questions, if any, would you have asked Jasiel

14   Correia to determine if there was any additional income beyond

15   Providence College?

16   A.    I would generally ask, did you have any other types of

17   income such as.

18   Q.    With regard to that, if we can go down seven or eight,

19   there is a line there that says "business income or loss,"

20   isn't there?

21   A.    Yes.

22   Q.    And what is the amount that is listed for business income

23   or loss for 2013?

24   A.    Zero.

25   Q.    And would you have specifically asked him, is there any

```
 1  business income or loss?
 2  A.   Specifically, no.  I usually just give a general, do you
 3  have anything else?
 4  Q.   Anything else.  When you say "anything else," do you
 5  explain you're asking about income?
 6  A.   Correct.
 7  Q.   Okay.  And again, "rents, royalties and partnerships," was
 8  any money reported by Jasiel Correia during this meeting with
 9  you?
10  A.   Yes.
11  Q.   Was any documentation about partnerships or money, other
12  monies made presented to Liberty Tax?
13  A.   No.
14  Q.   If they had been, would they have been factored into the
15  tax income and the tax equation?
16  A.   Yes.
17  Q.   And again, there's also another question, isn't there,
18  about potential income right there at the bottom above "total
19  income" it's "other income"?
20  A.   Correct.
21  Q.   No responses from Jasiel Correia, no information about any
22  other income?
23  A.   No.
24  Q.   Did he mention SnoOwl to you when you were doing his
25  taxes?
```

1    A.    No.

2    Q.    Did he mention Snowkimo to you when you were doing his

3    taxes?

4    A.    No.

5    Q.    And, again, if we go to the very bottom of the page, those

6    initials at the bottom are JC II, correct?

7    A.    Correct.

8    Q.    Now, can we go to the next page of this document that you

9    went over with Jasiel Correia.  So at the top of this, under

10   "Schedule A details," there's only one positive answer, isn't

11   there?

12   A.    Yes.

13   Q.    That's "taxes you paid."  How much was that?

14   A.    $549.

15   Q.    And if we go down the page, make the page larger, there's

16   the total tax determined to be 54, correct?

17   A.    Correct.

18   Q.    And then, of course, as you discussed before, the federal

19   income tax withheld was 637?

20   A.    Correct.

21   Q.    And then the payments were, again, 637 and the return

22   amount was how much?

23   A.    583.

24   Q.    Now, at the very bottom of this page, there is a

25   signature, is there not?

1    A.    Yes.

2    Q.    And whose signature is that?

3    A.    That's Jasiel Correia's signature.

4    Q.    And what date did he sign that?

5    A.    February 18, 2015.

6    Q.    And you know that because of what?

7    A.    The software at the time.  So it automatically dates

8    everything for when we sit down.

9    Q.    Now, immediately above Jasiel Correia, II's signature,

10   there is -- there are words.  Isn't that true?

11   A.    Yes.

12   Q.    Can you read those slowly -- people sometimes tend to go

13   fast when they're reading, but if you could just read those

14   slowly to the ladies and gentlemen of the jury, that would be

15   excellent.  Thank you.

16   A.    "By signing below, you, including each of you if there is

17   more than one taxpayer, certify that you have read and

18   understand the information contained in this three-page

19   document, and you authorize us to prepare your 2013 tax return

20   based on the information supplied by you and noted above.  You

21   certify that Liberty Tax Service is not responsible if the

22   information contained in this return is or becomes incomplete

23   or inaccurate."

24   Q.    Thank you.  If you could now turn to the next page of this

25   exhibit.  What do you recognize that document to be?

1    A.    This is the federal Form 8879.

2    Q.    And what's the title of this form?

3    A.    IRS e-file signature authorization.

4    Q.    And what does this form do or accomplish?

5    A.    This form serves as the signature when the return is filed

6    electronically.

7    Q.    Instead of signing the form, you signed this in lieu of

8    the form?

9    A.    Correct.

10   Q.    And is there a signature on this form?

11   A.    Yes.

12   Q.    And whose signature is that?

13   A.    Jasiel Correia's.

14   Q.    And what date did he sign it?

15   A.    February 18, 2015.

16   Q.    Now, if we can go back up to the larger form, where it

17   says, "Part 2, taxpayer declaration and signature

18   authorization.  Be sure to get and keep a copy for your return.

19   I'm going to read -- this is long.  I'm not going read all of

20   it.  I'm going to read just the beginning of it.  Please read

21   along with me silently and tell me if I've read it correctly.

22   Okay?

23   A.    Mm-hmm.

24   Q.    "Under penalties of perjury, I declare that I have

25   examined a copy of my electronic individual income tax return

1    and accompanying schedules and statements of the tax year

2    ending December 31, 2013.  And to the best of my knowledge and

3    belief, it is true, correct, and complete.  I further declare

4    that the amounts in part 1 above are the amounts from my

5    electronic income tax return."  Do you see that?

6    A.    Yes.

7    Q.    And then ultimately Jasiel Correia signs that?

8    A.    Correct.

9    Q.    After Jasiel Correia signs that, how does it get filed?

10   Or does it get filed?

11   A.    Yes.

12   Q.    And it's filed by you?

13   A.    Yes.

14   Q.    Because you -- in your job you file the tax returns for

15   everyone, even if sometimes they are or parts of them are done

16   by colleagues?

17   A.    Correct.

18   Q.    So we just handled the 2013 tax return for Jasiel Correia,

19   correct?

20   A.    Yes.

21   Q.    That was filed when, did we say, not until 2015?

22   A.    Correct.

23   Q.    I'd like you now to turn to --

24             THE COURT:  So the record is clear, have you

25   introduced 61?

1          MR. TOBIN:  I'm sorry, Your Honor.  If I haven't, yes,

2     if 61 could please be moved into evidence.

3               (Exhibit 61 admitted into evidence.)

4          THE COURT:  Okay.  And you'll identify what that is

5     for the jury.

6          MR. TOBIN:  Yes, of course.  Give me just a moment,

7     Your Honor.

8     Q.   And can you please tell us what Exhibit 61 is.  Do you see

9     it in your tab?

10    A.   Yeah.  This is the official certificate of record.

11    Q.   And the pages after that?

12    A.   Okay.  This is the 2013 Form 1040.

13    Q.   What year?

14    A.   2013.

15    Q.   For whom?

16    A.   Jasiel Correia.

17    Q.   So everything we've talked about thus far has been about

18    Jasiel Correia's 2013 tax return, correct?

19    A.   Correct.

20    Q.   And we've looked at the worksheet, we've looked at the

21    form that the data was inputted into with his signature.  We've

22    looked at the e-signature form that he signed.  Is that true?

23    A.   Yes.

24    Q.   This document now that is found at Exhibit 61, this is the

25    actual tax form?

```
 1    A.   Correct.

 2    Q.   And again, we know it's for Jasiel Correia --

 3         MR. TOBIN:  Your Honor, again, I think we've done

 4    this, but 61 is in evidence, correct?

 5         THE COURT:  Yes, it is.

 6         MR. TOBIN:  Thank you.  If we look at the first page

 7    of 61, now the second page.

 8    Q.   This is the 1040 tax form for 2013.  And if you could look

 9    at the top of it just to confirm the identity of the taxpayer,

10    Jasiel F. Correia.  And if we can go to the income section

11    about halfway down on the page.  What is the income?

12    A.   $6,630.

13    Q.   And if we can look at line 12, what does that call for?

14    A.   Line 12 calls for business income or loss.

15    Q.   And what's listed here?

16    A.   Zero.

17    Q.   And if we go to line 17, what does that call for?

18    A.   Rental real estate, royalties, partnerships,

19    S corporations, trusts, et cetera.

20    Q.   And what is listed?

21    A.   Zero.

22    Q.   And if there had been any partnership information, income

23    or loss, that would have been included by you on the form?

24    A.   Correct.

25    Q.   And that's all that we need for that.  Thank you.
```

1          If you'd be kind enough now to open up to Exhibit 64,

2     please.  64.1, excuse me.  64.1.  Do you have a 64.1?

3     A.   Yes.

4     Q.   Very good.  Could you be kind enough to open to 64.1 and

5     tell us what it is?

6     A.   This is a Liberty Tax Client Data Sheet.

7     Q.   For?

8     A.   Jasiel Correia, II.

9     Q.   This is a second Liberty Tax Client Data Sheet.  This is

10    different than the last one we looked at, 62.1, correct?

11    A.   Correct.

12    Q.   This is for another year; is that correct?

13    A.   Correct.

14              MR. TOBIN:  Your Honor, may 64.1 be included?

15              THE COURT:  Yes.  It's received.

16              MR. TOBIN:  Thank you.

17              (Exhibit 64.1 admitted into evidence.)

18    Q.   So the top of the sheet has what information?

19    A.   His biographical information.

20    Q.   Name, occupation, email address, things of that nature?

21    A.   Yes.

22    Q.   Let's go to the bottom part of that sheet or at least the

23    rest of that sheet.  And unlike the last time we saw the

24    Liberty Tax Client Data Sheet, there is some additional

25    information filled out on this sheet.  Is that true?

1    A.    Yes.

2    Q.    For instance, what is the first box that is checked?

3    A.    It says, "You and, if applicable, all of your qualifying

4    dependents have medical insurance."

5    Q.    And Jasiel Correia, II, would have been the individual

6    filling this out?

7    A.    Yes.

8    Q.    And what is the answer for that?

9    A.    United Health.

10   Q.    If you go down to the next -- I suppose it's the next

11   section.  The question is, "Are you self-employed?"  Do you see

12   that?

13   A.    Yes.

14   Q.    And what was the box checked by Jasiel Correia, II?

15   A.    No.

16   Q.    And, "Would you like your refund deposited into your bank

17   account?"  Yes or no was selected.  Which one?

18   A.    "No."

19   Q.    And if we go to the second page of this form, the only

20   real information on the top has to do with charitable

21   donations.  Is that true?

22   A.    Yes.

23   Q.    And what did Jasiel Correia write on the form?

24   A.    500.

25   Q.    Under which category?

```
 1   A.    College.
 2   Q.    And if we go down to "miscellaneous items."
 3         MR. TOBIN:   There seems to be further down,
 4   "miscellaneous items."  Very good.
 5   Q.    And there does seem to be an answer there.  This is for
 6   rent, correct?
 7   A.    Correct.
 8   Q.    And what did Jasiel Correia put?
 9   A.    Zero.
10   Q.    Okay.  Very good.  Then if we go to the bottom box, what
11   does that say?
12   A.    "I certify that I would like my taxes prepared according
13   to the information I supplied above."
14   Q.    And who signed that?
15   A.    Jasiel Correia.
16   Q.    And what date was it signed?
17   A.    February 18, 2015.
18   Q.    Now, that is the same date, is it not, for the -- what we
19   just discussed, the 2013 taxes?
20   A.    Yes.
21   Q.    Turn the page, please, on this exhibit.  And what do we
22   have?
23   A.    Form W-2 for 2014.
24   Q.    For what individual or for whom?
25   A.    For Jasiel Correia.
```

1    Q.   And who is the paying entity?

2    A.   City of Fall River.

3    Q.   And what is the amount of wages for that year, tax year

4    2014?

5    A.   $16,091.04.

6    Q.   Was that the only W-2 that was brought in by Jasiel

7    Correia for tax year 2014?

8    A.   Yes.

9    Q.   Was any other documentation involving income or loss

10   brought in by Jasiel Correia for 2014?

11   A.   No.

12        MR. TOBIN:  If we please go to, would you be kind

13   enough to turn to Exhibit 64.

14   Q.   Do you recognize the exhibit at tab 64?

15   A.   Yes.

16   Q.   And what is that?

17   A.   That is the return information verification.

18   Q.   For the tax year 2014?

19   A.   Correct.

20   Q.   Very good.

21        MR. TOBIN:  Your Honor, could Exhibit 64 be admitted,

22   please.

23        THE COURT:  It is, it's received.

24        (Exhibit 64 admitted into evidence.)

25   Q.   Again, just so we can confirm, we have the name of the

1    client at the top.  Who is that?

2    A.    Jasiel F. Correia.

3    Q.    We have the file date at the top right-hand side?

4    A.    2-18-2015.

5    Q.    Same as the earlier year's tax return.  They were filed

6    together.  Is that true?

7    A.    Correct.

8    Q.    And we have the biographical information that you've seen

9    and pointed out before, the name, date of birth and things of

10   that nature.  Is that true?

11   A.    Yes.

12   Q.    And if we can go down to the Liberty preparer block.  This

13   one is actually -- this data is put into the computer by whom?

14   A.    By myself.

15   Q.    And again, if we go to the next block, which talks about

16   tax.  "Federal AGI."  And again, refresh my memory, what does

17   "AGI" stand for?

18   A.    Adjusted gross income.

19   Q.    And how much is it here?

20   A.    $16,016.

21   Q.    Does that match what was on the W-2 from the City of Fall

22   River?

23   A.    Yes.

24   Q.    Taxable income, total tax, tax withheld, all of that

25   essentially or most of it from the W-2?

1   A.   Yes.

2   Q.   Okay.  The total tax, of course, determined by the

3   computer?

4   A.   Correct.

5   Q.   And if we can go to the very bottom of this page, are

6   there taxpayer initials there?

7   A.   Yes.

8   Q.   And whose initials are those?

9   A.   Jasiel Correia.

10  Q.   And were you present when he signed that?

11  A.   Yes.

12  Q.   And did you go over this form and this page with Jasiel

13  Correia?

14  A.   Yes.

15  Q.   Did he ask to make any corrections to anything?

16  A.   No.

17  Q.   Let's go to the second page of this document.  Again,

18  we've seen this before for the preceding year, but what

19  information is contained on this page?

20  A.   This is the summary of the Form 1040 and this has his

21  income.

22  Q.   And, again, were you present when -- did you review this

23  with Jasiel Correia?

24  A.   Yes.

25  Q.   Did he sign it acknowledging the accuracy -- strike that.

1    I said "sign."  Did he initial this, acknowledging that you had

2    gone over it with him?

3    A.    Yes.

4    Q.    His signature is at the -- his initials, excuse me, are

5    there at the bottom of the page?

6    A.    Yes.

7    Q.    So if we can go back to the top or the top section where

8    it says "income."  Did Jasiel Correia report any business

9    income or loss for 2014?

10   A.    No.

11   Q.    If he had, would it be placed on this form by you?

12   A.    Yes.

13   Q.    Go down a little bit further on that list.  Did Jasiel

14   Correia report any rents, royalties, partnerships, profit or

15   loss for 2014?

16   A.    No.

17   Q.    If he had, would you have included it in the form?

18   A.    Yes.

19   Q.    If we can go to the third page of this form.  Whose

20   signature appears on the form?

21   A.    Jasiel Correia.

22   Q.    That's at the bottom?

23   A.    Correct.

24   Q.    And the same date as we've seen before.  Is that accurate?

25   A.    Yes.

1    Q.   What date is that?

2    A.   2-18-2015.

3    Q.   And, again, on this form, like the form for the preceding

4    year, before he signs, there's something that he has to read.

5    Is that true?

6    A.   Yes.

7    Q.   We won't take up time by reading it again, but it's the

8    same language that was in the 2013 form?

9    A.   Correct.

10   Q.   He's acknowledging that the information provided by him is

11   accurate?

12   A.   Correct.

13   Q.   And that if there are any mistakes or deletions, it's not

14   on Liberty Tax?

15   A.   Correct.

16   Q.   And, again, if you could turn the page on this exhibit one

17   more time.  What is this form?

18   A.   This is federal Form 8879.

19   Q.   And is it signed by the client?

20   A.   Yes.

21   Q.   And in this instance it's signed by whom?

22   A.   Jasiel Correia.

23   Q.   And it's signed on what date?

24   A.   February 18, 2015.

25   Q.   And if we can go further out on this form again.  We won't

1    read it again to save time, but on part 2, "taxpayer
2    declaration and signature authorization," is that same language
3    there about declaring the taxpayer, Jasiel Correia essentially
4    is vouching for the accuracy of the information?
5    A.    Yes.
6    Q.    If we can go to the next page of this exhibit, please.
7    And, again, what is that, please, Ms. Vieria?
8    A.    This is the state version of the electronic filing
9    declaration.
10   Q.    Because, of course, in addition to federal taxes, were
11   state taxes filed by Jasiel Correia through you for that year?
12   A.    Yes.
13   Q.    By the way, the state information, the actual income and
14   loss, that information would have been the same as provided for
15   the federal?
16   A.    Yes.
17   Q.    And perhaps we could go to one final exhibit.  Do you
18   have, or please open to 63.  Review what is on 63.  Do you see
19   that?  There's the first page and then there's an actual tax
20   return.  Is that true?
21   A.    Yes.
22   Q.    And it's a tax return for whom?
23   A.    Jasiel Correia.
24   Q.    The one essentially completed by you with information from
25   him?

1    A.    Correct.

2           MR. TOBIN:  Your Honor, may 63 be introduced into

3    evidence.

4           THE COURT:  Yes, it's received.

5           MR. TOBIN:  Thank you.

6           (Exhibit 63 admitted into evidence.)

7    Q.    If we could look at the second page of this exhibit.  If

8    we could show the top of it just to confirm the identity of the

9    taxpayer that this fits to.  Who is that?

10   A.    Jasiel Correia.

11   Q.    If we can go down to the "income" section.  The income

12   that was reported was?

13   A.    $16,091.

14   Q.    If we look at line 12, "business income or loss."  Any

15   income or loss for business listed?

16   A.    Zero.

17   Q.    And line 17, "rental real estate, royalties,

18   partnerships."  Any partnership income or loss listed?

19   A.    No.  It's zero.

20   Q.    And for 21, where it says "other income," is there any

21   information?

22   A.    No, it's zero.

23   Q.    Do you actually remember on that date, when you filed both

24   of these or when you went over them with Jasiel Correia, do you

25   actually remember him coming into the office?

1    A.   Yes.

2    Q.   You do.  And do you recall going over all of this with

3    him?

4    A.   Yes.

5    Q.   And if a taxpayer has a question, do you endeavor to

6    answer it correctly?

7    A.   Yes.

8    Q.   If somebody asks if something is income, you try to give

9    them an answer?

10   A.   Yes.

11   Q.   Do you recall any conversation with Jasiel Correia on that

12   date when you were trying to get the information, did he have

13   any questions that you can recall about income or anything like

14   that?

15   A.   No.

16   Q.   This was a very basic -- these were basic returns.  Is

17   that true?

18   A.   Correct.

19   Q.   He brought in only one W-2 for each of the two years?

20   A.   Correct.

21   Q.   And again, we talked about 2013 taxes, but with regard to

22   2014 taxes, did he ever tell you, "Well, I have this company

23   called SnoOwl"?

24   A.   No.

25   Q.   Did he ever tell you, "I have this company called

1    Snowkimo"?

2    A.    No.

3    Q.    Did he ever tell you anything about sums of money that he

4    had received or that his company had received as a sole

5    proprietorship?

6    A.    No.

7    Q.    Or did he ask for any assistance to do a partnership

8    return, anything like that?

9    A.    No.

10    Q.    He just came in with the W-2s, correct?

11    A.    Correct.

12    Q.    Did you know if there were other W-2s from other sources

13    of income?

14    A.    No.

15    Q.    Would you have asked, "Are there other W's"?

16    A.    Yes.

17    Q.    Would you have asked, "Are there other sources of income"?

18    A.    Yes.

19         MR. TOBIN:   Thank you very much.  I don't have any

20    further questions, but please remain seated.

21         THE COURT:   Mr. Reddington.

22         MR. REDDINGTON:   Thank you, Your Honor.

23    CROSS-EXAMINATION BY MR. REDDINGTON:

24    Q.    Good morning.

25    A.    Good morning.

1    Q.    So Liberty Tax, that's the company that has the ad where

2    they sing "Liberty, Liberty, Liberty" that type of thing,

3    right?

4    A.    Yes.

5    Q.    And it has the people sometimes wear the outfit that shows

6    the Statue of Liberty, and they wave on the sidewalk to people

7    as they drive by, right?

8    A.    Yes.

9    Q.    Kind of like trying to get people to come in off the

10   street, if you will?

11   A.    Mm-hmm.

12   Q.    And you do obviously take people who come in off the

13   street?

14   A.    Correct.

15   Q.    Where was your office located back then?

16   A.    This was located on South Main Street.  I don't remember

17   the exact address.

18   Q.    That's all right.  And it was in February, or it was in

19   2015 that Jasiel Correia came in and provided the W-2s and

20   asked to have his 2013 and 2014 taxes prepared and filed,

21   right?

22   A.    Yes.

23   Q.    And in the 2013, I believe there was a notation "free

24   dependent."  And what does that mean?

25   A.    It basically means that he was a dependent of his father

1    that year based on the qualifications.  So his return was free
2    because I did his father's return.
3    Q.   I see.  Okay.  So you knew his dad?
4    A.   Mm-hmm.
5    Q.   You had done his paperwork?
6    A.   Yeah.
7    Q.   And you knew that his father told him that he had to go
8    over and see you and get his taxes filed because they were
9    overdue, obviously?
10   A.   Right.
11   Q.   And that's what he did, right?
12   A.   Yes.
13   Q.   And when you first met with him -- I guess 2013, he would
14   have been what, 21 years old, and he got the Providence College
15   stipend, right?
16   A.   Correct.
17   Q.   And what was that for, like being a resident assistant and
18   doing things like that for the school?
19   A.   Yes.
20   Q.   And then 2014, he had been elected to the city council and
21   he provided you with the form for purposes of the 2014 return
22   as well, right?
23   A.   Correct.
24           MR. REDDINGTON:  That's all I have.  Thank you.
25           MR. TOBIN:  Just one question.

1  DIRECT EXAMINATION BY MR. TOBIN:

2  Q.  I just want to make sure.  I think there was some talk

3  about 2016.  The day that he came in and the day these were

4  both filed, was that actually February 18, 2015?

5       MR. REDDINGTON:  I said that.

6       MR. TOBIN:  Did you say '15?  I apologize.  I thought

7  I heard '16.  I withdraw the question.  Thank you, Your Honor.

8       THE COURT:  Okay.  You may step down.  Thank you.  If

9  you could take the cap off the microphone and so on.

10      You may call your next witness.

11      MR. HAFER:  Yes, Your Honor.  The government calls

12  Special Agent Sandy Lemanski.

13      SANDRA LEMANSKI, Sworn

14      COURTROOM CLERK:  Please be seated and state your full

15  name and please spell your last name.

16      THE WITNESS:  May I remove my mask?

17      THE COURT:  You may take your mask off.  If you could

18  put also a cap on top of the microphone there.  I think it's on

19  the right-hand side.

20      You may inquire, Mr. Hafer.

21      MR. HAFER:  Thank you, Your Honor.

22  DIRECT EXAMINATION BY MR. HAFER:

23  Q.  Good morning.

24  A.  Good morning.

25  Q.  How are you currently employed?

1  A.   I'm a special agent with IRS criminal investigation.

2  Q.   How long have you been a special agent with IRS criminal

3  investigation?

4  A.   I've been a special agent for 26 years.

5  Q.   How long have you been employed with the IRS in total?

6  A.   In June it will be 33 years.

7  Q.   When you first joined the IRS 33 years ago, in what

8  capacity was that?

9  A.   A coop.

10  Q.   What is a coop?

11  A.   I was hired in between my junior and senior year to work

12  as a temporary position prior to graduating from college.

13  Q.   Did you subsequently become what's called a revenue agent?

14  A.   Yes.  Upon graduation, I was a revenue agent for about six

15  and a half years with the civil division of IRS.

16  Q.   Briefly, what does a revenue agent do?

17  A.   It's generally what most people know of the IRS.  You

18  conduct audits of individual partnership and corporate returns,

19  compliance audits.

20  Q.   At some point did you transfer to the IRS criminal

21  division?

22  A.   Yes, in 1994.

23  Q.   Once you transferred to the IRS criminal division, where

24  were you assigned?

25  A.   After graduating from the Federal Law Enforcement Academy

1    in February of '95, I was assigned to the Boston field office.

2    Q.   And is the Boston field office where you've been assigned

3    the last 26 years?

4    A.   Yes.

5    Q.   Since being assigned to the Boston field office, have you

6    been assigned a certain subspecialty within IRS criminal

7    investigation types of cases that you concentrate on?

8    A.   Yes.  I was first assigned to the strike force unit in the

9    U.S. Attorney's Office where I conducted financial

10   investigations relative to organized crime organizations and

11   the members of those organizations.  I did that for about the

12   first 16 years.  And for the last ten years, I've been assigned

13   to the public corruption unit where I have investigated -- done

14   financial investigations related to elected officials or people

15   that hold positions of public trust.

16   Q.   At some point did you become involved in the federal

17   criminal investigation of Jasiel Correia?

18   A.   Yes.

19   Q.   Approximately when was that?

20   A.   The fall of 2017, I believe.

21   Q.   Since becoming involved in that investigation, Special

22   Agent Lemanski, what types of investigative steps have you

23   taken, what have you done generally?

24   A.   Generally when I came on the investigation, it had been

25   ongoing for a while.  So when I first came on, I reviewed, you

1    know, prior statements of witnesses, prior financial records

2    that have been obtained by the grand jury, both financial and

3    other records.  And then upon coming aboard, I would

4    participate in witness interviews.

5    Q.   In addition to participating in witness interviews and

6    reviewing grand jury transcripts, have you reviewed extensive

7    bank and financial records?

8    A.   Yes.

9    Q.   And are those records both of business entities and

10   personal accounts and statements of Mr. Correia's?

11   A.   Yes.

12   Q.   Have you conducted a financial analysis of the -- well,

13   withdrawn.

14        Have the records you reviewed in this case been

15   voluminous?

16   A.   Yes.

17   Q.   Have you conducted a financial analysis of those

18   voluminous records?

19   A.   Yes, I have.

20   Q.   Before we turn to SnoOwl, Special Agent Lemanski, I want

21   to ask you some questions about what's called the FindIt

22   Networks.  Are you familiar with the FindIt Networks?

23   A.   Yes.

24   Q.   Are you familiar with its corporate entity's name if it's

25   different than the FindIt Networks?

1    A.   Well, its business name is Common Solutions.  It was a

2    partnership.

3    Q.   What research, since joining this investigation, have you

4    done with respect to FindIt Networks?

5    A.   I reviewed any filings for that entity with the IRS and I

6    reviewed financial bank records for the defendant, Mr. Correia.

7    Q.   Okay.  With respect to any IRS filings, what, if anything,

8    did your research reveal with respect to any IRS filings by

9    Mr. Correia related to the FindIt Networks?

10   A.   There was no -- there was only filings for the first two

11   years that Mr. Mendes was involved.  I think that was in 2010

12   and 2011.  But the partnership didn't file any returns after

13   that point.

14   Q.   With respect to Mr. Correia, I think you said you reviewed

15   personal bank accounts of Mr. Correia's?

16   A.   That's correct.

17   Q.   Going back approximately how far?

18   A.   I think the earliest records we have is July of 2010.

19   Q.   Going back all the way to July of 2010 until the present,

20   is there anything in Mr. Correia's personal bank records

21   reflecting sale of the FindIt Networks?

22   A.   No, nothing in his personal bank records or his personal

23   tax filings.

24   Q.   Is there anything in those -- the tax filings, how far

25   back did you go looking at his tax filings?

1    A.    2010.

2    Q.    And anything going back to 2010 in the tax filings related

3    to the sale of the FindIt Networks?

4    A.    Not related to the sale, no.

5    Q.    Were there any proceeds in any bank accounts of the

6    defendant's that you reviewed reflecting the sale of any

7    business?

8    A.    Not that I found, no.

9    Q.    I want to turn now to SnoOwl.  Did the grand jury subpoena

10   records from the corporation of SnoOwl, Special Agent Lemanski,

11   in 2017?

12   A.    Yes, it did.

13   Q.    And were records received from SnoOwl in response to that

14   subpoena?

15   A.    Yes, they were.

16   Q.    Are you familiar, based on your 26 years in criminal

17   investigations, with what's called a custodian of records for a

18   corporation?

19   A.    Yes, I am.

20   Q.    What is that?

21   A.    They're the person who has control over the records, the

22   one responsible to do a diligent search of the records when

23   asked and to produce records in this case.  With the grand jury

24   subpoena, it would be their requirement to produce the records

25   to the grand jury.

```
 1    Q.   When the corporation -- just to be clear, SnoOwl became a
 2    corporation in December of 2014; is that correct?
 3    A.   Yes.
 4    Q.   When the corporation of SnoOwl produced records to the
 5    grand jury in this case, did an official custodian of the
 6    records testify in providing those records to the grand jury?
 7    A.   Yes.
 8    Q.   Who was that?
 9    A.   Jasiel Correia.
10    Q.   To your knowledge, was Nick Bernier ever the official
11    custodian of the records for SnoOwl?
12    A.   No.
13    Q.   To your knowledge, was Stafford Sheehan ever the official
14    custodian of the records for SnoOwl?
15    A.   No.
16    Q.   Special Agent Lemanski, there are voluminous binders in
17    front of you.  Could I ask you first to turn to what's
18    identified as tab 83.
19         MR. HAFER:  Your Honor, we're obviously not going to
20    publish and read all of these.
21         THE COURT:  Right.  The idea, ladies and gentlemen, is
22    that these documents are available for you to review during the
23    deliberations.  I gather that there will be summaries of those
24    documents.  So you can delve back into the documents themselves
25    to the degree that you think it's necessary.
```

1          MR. HAFER:  Thank you, Your Honor.

2     Q.   Special Agent Lemanski, do you recognize the pages

3     contained at tab 83?

4     A.   I do.

5     Q.   What are those?

6     A.   These are the records that were produced to the grand jury

7     by Jasiel Correia for SnoOwl as the custodian of record.

8     Q.   In 2017?

9     A.   Yes.

10         MR. HAFER:  I offer Exhibit 83, Your Honor.

11         THE COURT:  It's received.

12         (Exhibit 83 admitted into evidence.)

13    Q.   I'd like to turn now, Special Agent Lemanski, to --

14    there's been a lot of testimony about Citizens Bank account

15    records.  Are you generally familiar with the Citizens Bank

16    account records in connection with this case?

17    A.   Yes, I am.

18    Q.   And did the grand jury in this case subpoena Citizens Bank

19    account records for a SnoOwl account and a Snowkimo account?

20    A.   Yes.

21    Q.   Would you please turn to tab 65.  Do you recognize all the

22    documents contained at tab 65?

23    A.   I do.

24    Q.   What are they?

25    A.   These are the bank records for Snowkimo and SnoOwl

1    produced by Citizens Bank pursuant to a grand jury subpoena.

2              MR. HAFER:  Your Honor, I offer Exhibit 65.

3              THE COURT:  It's received.

4              (Exhibit 65 admitted into evidence.)

5    Q.   Before we get into more documents, Special Agent Lemanski,

6    are you familiar, in your 26 years as a criminal investigation

7    agent, with the difference between a sole proprietorship and a

8    partnership?

9    A.   Yes, I am.

10   Q.   What is the difference?

11   A.   A sole proprietorship is an unincorporated business with a

12   single owner.  For tax purposes, the income and expenses are

13   reported to the IRS on a Schedule C, which is attached to the

14   business owner's personal return.

15   Q.   And what about a partnership?

16   A.   A partnership is an unincorporated business with more than

17   one owner, and their income and expenses are reported on a

18   partnership return Form 1065.

19             MR. HAFER:  Ms. DiPaolo, may I have Exhibit 6, which

20   is already in evidence, please.

21   Q.   Special Agent Lemanski, have you reviewed what's marked

22   Exhibit 6?

23   A.   Yes, I have.

24   Q.   And generally are these Citizens Bank records regarding

25   the opening of the SnoOwl Citizens Bank account?

1    A.   Yes, they are.

2         MR. HAFER:  Could I actually have the last page of the

3    exhibit first, Ms. DiPaolo.

4    Q.   Do you recognize this form, Special Agent Lemanski?

5    A.   Yes.

6    Q.   What is this?

7    A.   It's the response letter issued to SnoOwl, Jasiel Correia

8    as the general partner of SnoOwl, in response to his request

9    for an EIN number for the partnership SnoOwl.

10   Q.   And you see down there it says there's a Form 1065?

11   A.   Yes.

12   Q.   What's a Form 1065?

13   A.   It's a U.S. individual -- I mean, a U.S. partnership

14   return.

15   Q.   When the IRS issues this type of letter, is that in

16   response to something they've received first?

17   A.   Yes.  It's in response to a request for an EIN number.  So

18   based on the information provided by Mr. Correia, he requested

19   an EIN number for a partnership, SnoOwl.

20        MR. HAFER:  Ms. DiPaolo, can you go back to the first

21   page of this exhibit.

22   Q.   According to this particular page here, do you see the

23   notation at the top, "Partnership Agreement"?

24   A.   I do.

25   Q.   What is the significance of that?

1    A.    This bank account was opened as a partnership.

2    Q.    And how would Citizens Bank know to open it as a

3    partnership?

4    A.    From the information provided by the people opening the

5    account.  So the partners of SnoOwl requested a partnership

6    account in the name of SnoOwl.

7          MR. HAFER:  Could I have page 3.  Just highlight the

8    signature part at the bottom.

9    Q.    And you indicated the partners would have requested a

10   partnership account.  Are these the three individuals who made

11   such a request?

12   A.    Yes.

13   Q.    In addition to these records, Special Agent Lemanski, in

14   connection with your involvement in this case, have you seen

15   records reflecting the fact that the defendant sold equity

16   interests in SnoOwl to investors in 2013 and 2014?

17   A.    Yes.

18   Q.    Specifically have you seen investment agreements

19   reflecting the sale of equity in SnoOwl?

20   A.    Yes, I have.

21   Q.    And have you seen convertible debt notes reflecting equity

22   interest in SnoOwl?

23   A.    After, yes.  At a -- in later dates, yes.

24   Q.    Based on that information and this information in the

25   Citizens account opening documents, what type of entity was

1    SnoOwl in 2013 and 2014?

2    A.    A partnership.

3    Q.    Is the mischaracterization of a partnership as a sole

4    proprietorship for tax purposes something that is material to

5    the IRS?

6    A.    Yes, it is.

7    Q.    And what is the difference between a partnership and a

8    sole proprietorship in terms of how income is treated?

9    A.    For a partnership, the income and expenses or, you know,

10   incomes are shared equally between all the partners, and

11   distributions are potentially taxable to the partners if the

12   partners have not themselves invested any money into the

13   partnership.

14         As in this case, Mr. Correia made no personal

15   contributions, financial contributions, to the partnership.

16   Therefore, when he received distributions, those distributions

17   in '13 and '14 should have been taxed as a capital gain.

18   Q.    You just said that Mr. Correia made no contributions

19   himself in 2013 or 2014 to SnoOwl?

20   A.    Sorry, 2013 and 2014.

21   Q.    Is that based on your review of all the records you've

22   reviewed in this case?

23   A.    Yes.

24   Q.    There's nothing indicating any personal contributions?

25   A.    Personal financial contributions, yes.

1    Q.    Personal financial, thank you.

2          Are you generally familiar with -- we've talked a little

3    bit about FindIt Networks -- Common Solutions?  Are you

4    generally familiar with the -- I think you referred to them as

5    the tax filings for 2010 and 2011 for Common Solutions doing

6    business as FindIt Networks?

7    A.    Yes.

8          MR. HAFER:  Ms. DiPaolo, may I have Exhibit 3 already

9    in evidence.  Can I have the second page.  Could you just

10   highlight the top half.  I mean enlarge, not highlight.  Thank

11   you.

12   Q.    What is this, Special Agent Lemanski?

13   A.    It's the 2010 U.S. partnership return filed for Common

14   Solutions, also known as FindIt Network.

15         MR. HAFER:  Could I have page 7, please.  Just, if you

16   could highlight the bottom portion.

17   Q.    What does this enlarged portion reflect?

18   A.    It shows who owns -- who are the two partners.  And in

19   this instance they're 50 percent -- each of the 50 percent

20   partners in the Common Solutions were Alec Mendes and Jasiel

21   Correia, II.

22         MR. HAFER:  And could I have page 11, please.

23   Q.    What is this page, Special Agent Lemanski?

24   A.    It's called a Schedule K-1, and this is where the income

25   and expenses relative to the partnership is allocated between

1    the partners based on their ownership percentage.

2    Q.   Moving for a few moments to Snokimo.  Based on your

3    involvement in this investigation, are you familiar with an

4    entity known as Snokimo?

5    A.   I am.

6    Q.   What is Snokimo?

7    A.   My understanding, it was one of -- a related business of

8    Mr. Correia that was providing website design services.

9    Q.   In the records you reviewed from Citizens Bank for the

10   Snokimo business, were there deposits into the Snokimo Citizens

11   account for -- income-based deposits into the Snokimo Citizens

12   account?

13   A.   Yes, there were.

14   Q.   Could you look at tab 65.1 in your binder, please.  Do you

15   recognize that?

16   A.   I do.

17   Q.   What is it?

18   A.   It's a summary chart I prepared detailing the website, the

19   deposits into the account relative to the website design income

20   for Snokimo.

21           MR. HAFER:  I offer Exhibit 65.1, Your Honor.

22           THE COURT:  It's received.

23           (Exhibit 65.1 admitted into evidence.)

24           MR. HAFER:  Ms. DiPaolo, will you publish it.

25   Q.   Could you just -- I think the easiest thing here, Special

1    Agent Lemanski, could you just summarize in a little bit more

2    detail what this reflects?

3    A.    Yes.  So this is -- for the 2013 and 2014 year, there were

4    deposits into the Snokimo account for Arias Jewelers and

5    Aesthetic Laser Exchange for website design, which totaled

6    $6,000.  And for 2014, there was a deposit from Community

7    Foundations of Southeast for $2,137.50.  So these two -- this

8    is income to Snokimo for '13 and '14.

9    Q.    And who is the owner of Snokimo?

10   A.    According to the bank records, Mr. Correia.

11   Q.    You've reviewed the defendant's 2013 and 2014 original

12   returns in connection with your work on this case?

13   A.    I have.

14   Q.    You've reviewed the 2013 and 2014 amended returns in

15   connection with your work on this case?

16   A.    Yes.

17   Q.    Was there any mention of the income from Snokimo here on

18   either the original or amended returns?

19   A.    There was not.

20   Q.    Have you reviewed any other records the IRS might have

21   related to -- have you searched in the places where the IRS

22   might have any other records related to Snokimo?

23   A.    I have.

24   Q.    And what was the result of that search?

25   A.    The search was negative.  There was no records relative to

1  Snokimo.

2  Q.   Is the failure to include income received in a given year

3  on a tax return something that the IRS deems material?

4  A.   Yes.

5  Q.   In connection with your work on this case, Special Agent

6  Lemanski, has the grand jury subpoenaed Santander Bank for

7  records related to one of the defendant's personal bank

8  accounts?

9  A.   Yes, it has.

10  Q.   Could you turn to Exhibit 67, please.  Do you recognize

11  the documents attached at tab 67?

12  A.   I do.

13  Q.   What are those?

14  A.   Those are the records produced by Sovereign Bank pursuant

15  to a grand jury subpoena for the personal bank account of

16  Jasiel Correia.

17  Q.   Just to be clear, since they've been produced to today,

18  Sovereign became Santander; is that correct?

19  A.   Yes.

20         MR. HAFER:  I offer Exhibit 67, Your Honor.

21         THE COURT:  Received.

22         (Exhibit 67 admitted into evidence.)

23  Q.   Special Agent Lemanski, has the grand jury also subpoenaed

24  Fall River Municipal Credit Union for bank records related to

25  another personal account of the defendant Jasiel Correia?

1   A.    Yes.

2   Q.    Could you please turn and review tab 206.  Do you

3   recognize those documents?

4   A.    Yes.

5   Q.    What are they?

6   A.    These are the records produced by Fall River Municipal

7   Credit Union pursuant to a grand jury subpoena related to the

8   personal account of Jasiel Correia.

9         MR. HAFER:  Your Honor, I offer Exhibit 206.

10        THE COURT:  That's received as well.

11        (Exhibit 206 admitted into evidence.)

12  Q.    Special Agent Lemanski, did the grand jury subpoena

13  Citibank for records related to the defendant's personal credit

14  cards?

15  A.    Yes.

16  Q.    Would you turn to tab 68, please.

17        Do you recognize the documents contained at tab 68?

18  A.    I do.

19  Q.    What are those?

20  A.    These are the records produced by Citigroup pursuant to a

21  grand jury subpoena relative to the personal credit cards of

22  Jasiel Correia.

23        MR. HAFER:  I offer Exhibit 68, Your Honor.

24        THE COURT:  It's received.

25        (Exhibit 68 admitted into evidence.)

1   Q.   Special Agent Lemanski, before we get into some new

2   exhibits --

3           MR. HAFER:  I'm going to ask actually, Ms. DiPaolo, if

4   I could have Exhibit 99 already in evidence on the screen,

5   please.

6   Q.   Special Agent Lemanski, do you recognize Exhibit 99?

7   A.   I do.

8   Q.   What is that?

9   A.   It's a summary chart I prepared detailing the personal

10  travel of Jasiel Correia and Natalie Cleveland that was

11  purchased with funds from the SnoOwl Citizens bank account.

12  Q.   So just to be clear, the expenditures -- and this is a 13-

13  or 14-page exhibit -- the expenditures here that have already

14  been testified about, you were the one that confirmed those all

15  came out of the SnoOwl Citizens Bank account?

16  A.   That's correct.

17  Q.   Regarding some of the purchases contained on Exhibit 99,

18  Special Agent Lemanski, are you familiar generally with a

19  charge of over $3,000 at the Intercontinental Hotel in

20  September of 2013?

21  A.   Yes, I am.

22  Q.   And are you familiar generally, based on your work on this

23  case, with how that charge at the Intercontinental Hotel in

24  September of 2013 was classified for tax purposes?

25  A.   It was classified as a business travel expense for SnoOwl.

1          MR. HAFER:  Ms. DiPaolo, can I have Exhibit 115,

2     please, already in evidence.  And could I have the second-to-

3     last page of that exhibit.  If you could just expand that.

4     Q.   Looking at the second-to-last page of Exhibit 115, what is

5     this showing, Special Agent Lemanski?

6     A.   That the charge of Intercontinental Hotel in September of

7     2013 for $3,081.16 was classified as a travel expense on the

8     tax return for the Schedule C tax return for SnoOwl for 2013.

9     Q.   Above that Intercontinental charge, there's several

10    charges from June 10 of 2013, Florida condos for rent,

11    Southwest Airlines, Enterprise Rent-a-Car.  Are you familiar

12    with those charges?

13    A.   I am.

14    Q.   How were they classified for tax purposes for tax year

15    2013?

16    A.   They were also classified as a business expense for travel

17    for SnoOwl for the 2013 tax year.

18    Q.   And I should say for the 2013 amended return we're talking

19    about?

20    A.   On the amended returns, yes.

21    Q.   Is the mischaracterization of personal travel as business

22    travel on a tax return something that the IRS considers

23    material?

24    A.   Yes.

25          MR. HAFER:  Ms. DiPaolo, may I have Exhibit 97.

1    Q.   Do you recognize --

2              MR. HAFER:  Can you just highlight the middle block of

3    the document, please.

4    Q.   This is already in evidence, Special Agent Lemanski.  Do

5    you recognize this?

6    A.   I do.

7    Q.   What is this?

8    A.   It's a receipt from PayPal.

9    Q.   For a Kate Spade bag purchased in June of 2014?

10   A.   Yes.

11             MR. HAFER:  May I now have Exhibit 117 in evidence,

12   starting on the first page.  Could you just enlarge the page

13   just to reorient everyone.

14   Q.   What is this here from 117, Special Agent Lemanski?

15   A.   This is from Mr. Charest's work paper files showing how he

16   classified the expenses for tax purposes of the amended return

17   for the '13 and '14 tax year.

18             MR. HAFER:  May I now have page 12.  Can you a

19   highlight the whole thing.  In fact, could you just Zoom in on

20   anything from June of 2014 so it's enlarged.

21   Q.   Do you see a charge for June 26, 2014 PayPal $258.85?

22   A.   Yes.

23   Q.   What is that?

24   A.   That was the charge for the Kate Spade bag.

25   Q.   How was that charge treated for tax purposes for 2014?

1    A.    As a business expense.

2    Q.    So to be clear, that Kate Spade bag was purchased with

3    funds from what account?

4    A.    The SnoOwl Citizens account.

5    Q.    And then it was treated as a business deduction for

6    purposes of the defendant's 2014 amended return?

7    A.    Yes.

8    Q.    Is treating a personal purchase of a handbag as a business

9    expense something the IRS considers material for tax purposes?

10   A.    Yes.

11   Q.    I'd like to turn now to several additional subpoenas,

12   Special Agent Lemanski.  Did the grand jury in this case

13   subpoena Sallie Mae for records related to the defendant's

14   student loan?

15   A.    Yes.

16   Q.    Can you please review Exhibit 70.  Do you recognize that

17   document?

18   A.    I do.

19   Q.    What is it?

20   A.    These are documents produced by Sallie Mae pursuant to the

21   grand jury subpoena served on them relative to records of

22   Jasiel Correia.

23          MR. HAFER:  I offer Exhibit 70, Your Honor.

24          THE COURT:  It's received.  I realize it's difficult

25   with all the piles that you have in front of you, but if you

1    try to put the microphone between you and Mr. Hafer so we can

2    pick up your voice.

3                    THE WITNESS:  I apologize, Your Honor.

4                    THE COURT:  70 is received.

5                    (Exhibit 70 admitted into evidence.)

6    Q.   Special Agent Lemanski, did the grand jury subpoena

7    records from Autobahn and Rockland Federal for records related

8    to the purchase of a 2011 Mercedes?

9    A.   Yes.

10   Q.   Could you please review Exhibits 71.1 and 71.2.

11        Do you recognize those?

12   A.   I do.

13   Q.   What are they?

14   A.   71.1 is the records produced by Autobahn USA for a

15   purchase of a 2011 Mercedes by Jasiel and Maria Correia.

16        And 71.2 are the loan records for the finance of that

17   vehicle from Rockland Federal Credit Union.

18                    MR. HAFER:  I offer 71.1 and 71.2, Your Honor.

19                    THE COURT:  They are received.

20                    (Exhibit 71.1 admitted into evidence.)

21                    (Exhibit 71.2 admitted into evidence.)

22   Q.   Special Agent Lemanski, could you turn to tab 27, please.

23   Did the grand jury subpoena Amazon for records related to

24   purchases by Jasiel Correia from Amazon?

25   A.   Yes.

1    Q.   And what is contained at Exhibit 72?

2    A.   The records produced by Amazon pursuant to that subpoena.

3              MR. HAFER:  I offer Exhibit 72, Your Honor.

4              THE COURT:  That's received.

5              (Exhibit 72 admitted into evidence.)

6    Q.   Could you turn to tab 74.  Did the grand jury subpoena

7    records from Lululemon related to purchases made by the

8    defendant from the SnoOwl Citizens Bank account?

9    A.   Yes.

10   Q.   What is contained at tab 74?

11   A.   The records produced by Lululemon pursuant to that grand

12   jury subpoena.

13             MR. HAFER:  I offer Exhibit 74, Your Honor.

14             THE COURT:  It's received.

15             (Exhibit 74 admitted into evidence.)

16             MR. HAFER:  Ms. DiPaolo, could I have page 3 of that

17   exhibit, and could you enlarge the receipt.

18   Q.   Special Agent Lemanski, this is a receipt from Lululemon

19   for a purchase by Jasiel Correia using the Visa card from the

20   SnoOwl Citizens account?

21   A.   Yes.

22   Q.   In part?

23   A.   In part, yes.

24   Q.   Why in part?  What needs to be clarified?

25   A.   The Visa -- the card that was the total purchase --

1    Q.    Hold on one second.

2          MR. HAFER:  Could you highlight that.

3    A.    So the total purchase is $602.  The Visa -- the SnoOwl

4    debit card was paid for $342, and then cash of $260 was also --

5    made up the difference.

6    Q.    What observations, if any, based on your involvement in

7    this case do you have with respect to the defendant's use of

8    cash generally for these types of purchases?

9    A.    I've seen several receipts relative to his purchases in

10   which he uses a credit card and then uses cash as well to pay

11   the balance.

12   Q.    Could you turn to Exhibit 78, please.  Did the grand jury

13   subpoena Bird's Eye View for records related to a helicopter

14   trip in Newport, Rhode Island?

15   A.    Yes.

16   Q.    What is contained at tab 78?

17   A.    These are the records produced by that helicopter company

18   pursuant to a grand jury subpoena served on them.

19         MR. HAFER:  I offer Exhibit 78, Your Honor.

20         THE COURT:  It's received.

21         (Exhibit 78 admitted into evidence.)

22   Q.    And are those records in part that you reviewed, Special

23   Agent Lemanski, prior to including a charge of a little over

24   $200 for a helicopter trip on Exhibit 99, the chart Natalie

25   Cleveland has testified about?

1    A.    That's correct.

2    Q.    Did the grand jury subpoena -- could you turn to 82, 8-2,

3    please.  Did the grand jury subpoena a place called Reynolds

4    Dewalt for records related to campaign signage Jasiel Correia

5    purchased with funds from the Citizens account?

6    A.    Yes.

7    Q.    What is Exhibit 82?

8    A.    The records produced from that company pursuant to the

9    grand jury subpoena.

10           MR. HAFER:  I offer Exhibit 82, Your Honor.

11           THE COURT:  That's received.

12           (Exhibit 82 admitted into evidence.)

13           MR. HAFER:  Ms. DiPaolo, may I have page 2 of the

14   exhibit.

15   Q.    What does that reflect on the screen in front of you from

16   page 2 of that exhibit?

17   A.    The check issued to Reynolds Dewalt from the SnoOwl

18   Citizens account in the amount of $422.88 to Reynolds Dewalt.

19   Q.    What is the date on that check?

20   A.    October 3, 2013.

21   Q.    When was the defendant first running -- when was he first

22   elected to City Council, November of 2013?

23   A.    I believe so, yes.

24   Q.    And in addition to this check, did Reynolds Dewalt provide

25   any other materials they had in connection with services they

1    performed for this $422?

2    A.   Yes.

3         MR. HAFER:   Could I have page 4 of the exhibit.

4    Q.   And what is that?

5    A.   It's signs that the company produced for Mr. Correia, and

6    that was the payment for the check.

7         MR. HAFER:   May I have page 6, please.

8    Q.   Same question.   What is that?

9    A.   A copy of the signs that were produced for Mr. Correia by

10   Reynolds Dewalt.

11   Q.   In response to the check that was paid out of funds from

12   the SnoOwl Citizens account?

13   A.   Correct.

14   Q.   Did the grand jury -- could you turn to tab 87 of your

15   binder, please, or one of your binders.

16        Did the grand jury subpoena Professional Fitness for

17   records related to personal training services purchased by

18   Jasiel Correia with the SnoOwl debit card?

19   A.   Yes.

20   Q.   What is contained at tab 87?

21   A.   The records produced by personal training program services

22   pursuant to the grand jury subpoena.

23        MR. HAFER:   Your Honor, I offer Exhibit 87.

24        THE COURT:   That's received.

25        (Exhibit 87 admitted into evidence.)

```
 1              MR. HAFER:  Ms. DiPaolo, can I have page 1, and can
 2    you highlight the top third or so of the page.
 3    Q.   Special Agent Lemanski, this is the top of the first page
 4    of Exhibit 87; is that correct?
 5    A.   That's correct.
 6    Q.   That indicates the defendant is purchasing a total of 48
 7    personal training sessions; is that right?
 8    A.   Correct.
 9    Q.   And that's going to be, two lines below that, for eight
10    personal training sessions per month, correct?
11    A.   Yes.
12    Q.   And the monthly dues are going to be $216?
13    A.   That's correct.
14              MR. HAFER:  Ms. DiPaolo, can I have page 3.  Could you
15    highlight the top.
16    Q.   What is that in the top left-hand corner of page 3,
17    Special Agent Lemanski?  It's a little hard to make out.
18    A.   It's a copy of the SnoOwl Citizens debit card held by
19    Jasiel Correia for the Citizens SnoOwl account.
20    Q.   How did Jasiel Correia pay for the $216 a month in
21    personal training that he purchased?
22    A.   With automatic debit from the SnoOwl Citizens account.
23    Q.   In connection with your work on this case, Special Agent
24    Lemanski, did you create summary charts from all of the
25    voluminous records that you and other agents have reviewed?
```

1   A.    Yes.

2   Q.    Could you briefly describe, before we look at the charts,

3   in general what your methodology was in determining whether

4   something was business or something was personal?

5   A.    Well, Mr. Charest and Mr. Correia did most of that work in

6   preparation of the amended returns.  Most of -- he -- a lot of,

7   when he prepared the amended returns identified, most of the

8   debits from that account were personal.  And then from that

9   point, I looked at the items that were actually claimed as

10  business expenses, and based on, like, witness testimony and

11  records, if this was any items that I saw based on, you know,

12  either testimony or records that were classified as a business

13  expense that were, in fact, a personal expense, I reclassified

14  it as a personal expense.

15        There's a lot of expenses in there.  I mean, we didn't get

16  receipts -- even though it looks like we got receipts from

17  everywhere, it's hard to get all the records.  So if anything

18  that was classified as a business expense that I didn't have a

19  witness statement or some type of documentation, it was left as

20  a business expense.

21  Q.    So fair to say you were essentially conservative and

22  erring on the side of leaving something as a business expense

23  in the absence of evidence otherwise?

24  A.    Correct.

25  Q.    Can you review Exhibit 86, please.  Do you recognize

1    Exhibit 86?

2    A.    I do.

3    Q.    What is that?

4    A.    It's a summary chart I prepared detailing the SnoOwl

5    partners' investment into SnoOwl.

6         MR. HAFER:  I offer Exhibit 86, Your Honor, please.

7         THE COURT:  It's received.

8         (Exhibit 86 admitted into evidence.)

9         MR. HAFER:  Ms. DiPaolo, can I have the exhibit.  Can

10   you just enlarge the top half of that first page, including the

11   title.

12   Q.    You said this is a chart summarizing all the funds that

13   were provided by investors to Jasiel Correia, is that fair to

14   say, Special Agent Lemanski?

15   A.    Yes, it is.

16   Q.    And it's a chart you prepared after reviewing the

17   voluminous records condensed down to this two-page chart?

18   A.    Yes.

19        MR. HAFER:  May I have page 2, please.  And can you

20   just highlight the bottom all the way across.

21   Q.    Based on your review, what were the total amount of

22   investor funds for which there were records that you reviewed

23   that Jasiel Correia received for SnoOwl?

24   A.    $258 --

25   Q.    I think you said 200.

```
 1   A.   I'm sorry.  358,190.

 2   Q.   To the extent there was cash that was invested beyond

 3   that, do you have any records reflecting that?

 4   A.   I do not.

 5   Q.   Could you please turn to tab 88 of your binder.  And while

 6   you're looking for that, Special Agent Lemanski, I will ask if

 7   you prepared a -- you or other agents working on this case

 8   prepared a summary chart of funds the defendant spent paying

 9   Sallie Mae for a student loan or student loans?

10   A.   Yes.

11   Q.   And do you see Exhibit 88?

12   A.   I do.

13   Q.   What is that?

14   A.   It's the summary chart of the student loan payments paid

15   from the SnoOwl Citizens account.

16        MR. HAFER:  Your Honor, I offer Exhibit 88.

17        THE COURT:  It's received.

18        (Exhibit 88 admitted into evidence.)

19        MR. HAFER:  Could you just highlight the top half

20   including all the columns, Ms. DiPaolo.

21   Q.   Is it fair to say this is a spreadsheet reflecting student

22   loan payments to Sallie Mae from the SnoOwl account at Citizens

23   Bank; is that correct?

24   A.   That's correct.

25   Q.   Whose student loan did these payments go towards paying?
```

1    A.   Jasiel Correia's.

2         MR. HAFER:  And could I have the second page,

3    Ms. DiPaolo.  Could you highlight the bottom third.

4    Q.   How much in total was paid out of the Citizens Bank SnoOwl

5    account to pay down Jasiel Correia's student loan?

6    A.   $7,940.24.

7    Q.   I'm going to ask you to take a moment, I think it will go

8    quicker if we do it this way, and review tabs 89, 90 and all

9    the way through to 95, tabs 89 through 95, and let me know if

10   you recognize those seven.

11   A.   Just give me a moment.

12        THE COURT:  In that connection, going to what I gather

13   will be charts regarding personal purchases, do you intend to

14   include the records from Exhibit 75; and, if so, I don't

15   believe they're now in evidence.

16        MR. HAFER:  Thank you very much, Your Honor.  I

17   appreciate that clarification.

18   Q.   Special Agent Lemanski, would you pause on what you were

19   just doing and find tab 75 of your binder.  Do you recognize

20   the documents contained at tab 75?

21   A.   Yes.

22   Q.   What are those?

23   A.   These are records produced by Tiffany & Company of

24   purchases of Jasiel Correia pursuant to a grand jury subpoena

25   served on them.

1    Q.   You're aware that Natalie Cleveland testified to some

2    Tiffany records; is that correct?

3    A.   Yes.

4    Q.   And these are essentially more comprehensive records from

5    Tiffany beyond the subject?

6    A.   That's correct.

7    Q.   All right.

8            MR. HAFER:   Your Honor, I offer Exhibit 75.

9            THE COURT:   All right.   It's received.

10           (Exhibit 75 admitted into evidence.)

11   Q.   Special Agent Lemanski, could you now go back, if you

12   wouldn't mind, to 89 and 95 and review 89 to 95.   We're not

13   going to publish 75 at this time.

14   A.   Which number?   I'm sorry.

15   Q.   89 to 95.   Do you recognize those?

16   A.   I do.

17   Q.   And in general what are the documents contained at tab 89

18   through 95?

19   A.   They're summary pie charts categorizing the different

20   categories of expenses paid for using the -- out of the SnoOwl

21   Citizens Bank account.

22   Q.   And to the best of your knowledge, 89 through 95 are

23   accurate summaries of disbursements from the SnoOwl Citizens

24   account?

25   A.   That's correct.

1  Q.   There are essentially pie charts arranged by categories of

2  expense.  Is that fair to say?

3  A.   Yes.

4       MR. HAFER:  Your Honor, I offer Exhibits 89 through

5  95.

6       THE COURT:  They're received.

7       (Exhibits 89 - 95 admitted into evidence.)

8       MR. HAFER:  Could I have 89, first.

9  Q.   Special Agent Lemanski, what is this chart?

10 A.   It's a pie chart summarizing the personal purchases by

11 Jasiel Correia from the SnoOwl account.

12 Q.   This particular chart reflects a total for purchases of a

13 little over $18,600?

14 A.   Yes.  For these particular categories, yes.

15 Q.   And the categories on this chart are what?

16 A.   Clothing, health care products, jewelry, personal grooming

17 and personal trainers.

18       MR. HAFER:  Could I have Exhibit 89, please.  Pardon

19 me.  Can I have Exhibit 90.

20 Q.   What is Exhibit 90, Special Agent Lemanski?

21 A.   A pie chart summarizing donations and campaign expenses

22 paid for from the SnoOwl Citizens account.

23 Q.   And this one reflects that $422 signage for the check that

24 we just reviewed; is that correct?

25 A.   Yes.

1    Q.   Other campaign related charges total a little over $1,400?

2    A.   Correct.

3    Q.   And then donations would be things like Fall River

4    Children's Aquarium and Flint Merchants Association?

5    A.   That's correct.

6         MR. HAFER:  Could I please have Exhibit 91.

7    Q.   Special Agent Lemanski, what is Exhibit 91?

8    A.   A pie chart summarizing the hotel expenses paid for with

9    the SnoOwl debit card.

10        MR. HAFER:  Ms. DiPaolo, could you highlight just the

11   middle top portion.  It will have the total amount.  That right

12   there, yes, please.

13   Q.   And what was the total amount of hotel expenses paid out

14   of the Citizens account for Jasiel Correia?

15   A.   $27,023.10.

16        MR. HAFER:  Could I have Exhibit 92, please.

17   Q.   What does Exhibit 92 reflect, Special Agent Lemanski?

18   A.   A pie chart detailing the dining out expenses over $300,

19   paid for out of the SnoOwl Citizens account.

20   Q.   And in the middle top there's an indication there for

21   dining expenses over 300 and under 300.  Do you see that?

22   A.   Yes.

23   Q.   And what is the total amount of dining expenses paid out

24   of the SnoOwl Citizens account?

25   A.   The total is $25,121.18.

1          MR. HAFER:  Could I please have Exhibit 93.  Could you

2     highlight just the top half, Ms. DiPaolo.

3     Q.   What does Exhibit 93 reflect, Special Agent Lemanski?

4     A.   The pie chart of the transportation expenses paid out of

5     the SnoOwl Citizens account.

6     Q.   What is the total amount of transportation related

7     expenses that were paid out of the SnoOwl Citizens account?

8     A.   31,780.02.

9          MR. HAFER:  Could I please have Exhibit 94.

10    Q.   What does Exhibit 94 reflecting?

11    A.   A pie chart of loans and credit card payments on personal

12    credit cards, student loans and a vehicle totaling $37,282.02.

13         MR. HAFER:  Could I have Exhibit 95, please.

14    Q.   What is Exhibit 95?

15    A.   A pie chart of entertainment expenses paid out of the

16    SnoOwl Citizens account.

17    Q.   Things like movies, sightseeing, Six Flags; is that

18    correct?

19    A.   Yes.

20    Q.   Golf?

21    A.   Yes.

22    Q.   Special Agent Lemanski, in addition to these charts, do

23    the records you've reviewed from the SnoOwl Citizens account

24    reflect thousands of dollars in expenditures at adult

25    entertainment establishments?

1    A.    Yes.

2    Q.    Do the records reflect thousands of dollars of

3    expenditures at Foxwoods and Twin Rivers Casino?

4    A.    Yes.

5    Q.    Do the records reflect tens of thousands of dollars in

6    cash withdrawals?

7    A.    Yes.

8    Q.    Could you please turn and review tab 85.

9          Do you recognize tab 85?

10   A.    Yes.

11   Q.    What is that?

12   A.    It's a summary chart that I prepared summarizing the

13   expenditures from the SnoOwl Citizens account.

14            MR. HAFER:  Your Honor, I offer Exhibit 85.

15            THE COURT:  It's received.

16            (Exhibit 85 admitted into evidence.)

17            MR. HAFER:  Ms. DiPaolo, can I have page 1.

18   Q.    Before we look in detail at page 1, Special Agent

19   Lemanski --

20            MR. HAFER:  Could you actually go to the second page.

21   And could you highlight just the top quarter of the page so the

22   jury can see the columns.  Could you go down a little bit

23   further.

24   Q.    Special Agent Lemanski, other than that first summary page

25   at the front, which we'll get back to, are there approximately

1    63 pages that look like this in this exhibit that follow?

2    A.    Yes.

3    Q.    All right.  Could you explain generally what these columns

4    are and what methodologies of yours they reflect.

5    A.    First, the left side of the chart is basically a

6    summarization of the Citizens SnoOwl account, the debits and

7    the deposits, either investor deposits or non-investor deposits

8    that were deposited into the SnoOwl account, and then the

9    corresponding debits out of that account.

10        The next column labeled "Expenses Posted to the Tax

11   Return," those would be the business expenses that were

12   classified as SnoOwl business expenses on the tax return for

13   the amended tax returns for 2013 and 2014.

14        The Category 104 expenses would be the payments that were

15   classified as SnoOwl business expenses that were reclassified

16   as being expenses not of SnoOwl but of Mr. Correia's related

17   business, 104 Business Academy.

18        The next column, "Personal Expenses," were the actual

19   debits out of the account that Mr. Correia himself identified

20   as being personal expenditures he made out of Citizens SnoOwl

21   account.

22        And the next column is the reclassification of expenses

23   initially classified as business expenses in which we had

24   documentation or a witness statement identifying that they

25   were, in fact, a personal expense and not a business expense.

1        The last column is just showing which personal expenses

2   that were claimed as business expenses were actually claimed as

3   an expense on the amended tax returns for 2013 and 2014.

4   Q.   When you talk about expenses that were reclassified as

5   personal, who -- as it relates to this exhibit, who

6   reclassified those expenses?

7   A.   Myself and the other agents, case agents.

8   Q.   And you said that was based on if you had witness

9   statements or other bank or financial statements?

10  A.   Correct.

11  Q.   Looking at the second line down, a $50,000 deposit on

12  January 16 of 2013, do you see that?

13  A.   Yes.

14  Q.   And that's Dr. Cabeceiras' initial investment check?

15  A.   Yes, it is.

16  Q.   Do you see on February 22 of 2013 a withdrawal of $10,000?

17  A.   I do.

18  Q.   Do you know what that is?

19  A.   Yes.

20  Q.   What is that?

21  A.   It was a cash withdrawal made from this account, the cash

22  was deposited into Mr. Correia's personal bank account,

23  personal checking account, at what is now Santander Bank.

24  Q.   What happened after that 10,000 was deposited in his

25  personal account at what is now Santander Bank?

1    A.    A few days later the $10,000 was withdrawn from the

2    personal account and a bank check in the amount of $12,000, so

3    it was the $10,000 cash withdrawal plus an additional 2,000 in

4    cash was used to purchase a $12,000 bank check made payable to

5    Autobahn.

6    Q.    And what is Autobahn?

7    A.    The car dealership where the 2011 Mercedes was purchased

8    from.

9    Q.    Does this chart reflect how that $10,000 was classified

10   for tax purposes?

11   A.    Yes.

12   Q.    What does it reflect with respect to that?

13   A.    It was classified as a software development cost.

14        MR. HAFER:  Ms. DiPaolo, could you just briefly Zoom

15   out and go to the next page.

16   Q.    Special Agent Lemanski, we're not going to look at 66

17   pages, but, in essence, is the rest of this exhibit

18   chronological listing of all this information you've talked

19   about, debits from the account, investor deposits in, how it

20   was classified, how it may have been reclassified, is that

21   essentially what this is?

22   A.    Yes.

23   Q.    From 2013 through 2015?

24   A.    Yes.

25        MR. HAFER:  Ms. DiPaolo, could you go back to page 1

1    of this exhibit, please.  Could you enlarge 2013 summary.

2    Q.   Special Agent Lemanski, could you explain this, please?

3    A.   Yeah.  So this is by year.  So for this, it's the 2013

4    year, a summary.  The first line is the personal expenses that

5    Mr. Correia classified as being personal to his account in

6    preparation of the 2013 amended tax return.

7         The second line is the business expenses that were

8    claimed.  The third line is the 104 expenses that were paid for

9    by SnoOwl.  So it was an expense of 104 but it was paid using

10   SnoOwl investor funds.  So if you total -- I'm sorry, the

11   second line is a reclassification of business expenses that

12   were actually personal.

13   Q.   Let me ask you, just go to the second line up from the

14   bottom, what amount of funds were given to Jasiel Correia for

15   SnoOwl by SnoOwl investors in 2013?

16   A.   $132,800.

17   Q.   And what amount of that 132,000, based on your analysis,

18   was spent on personal things?

19   A.   $105,032.

20   Q.   As a percentage, what percentage of the funds that came in

21   in 2013, based on your analysis, were used for personal use?

22   A.   79 percent.

23            MR. HAFER:  Could we go to 2014, please.

24   Q.   Essentially, Special Agent Lemanski, you did the same

25   thing for 2014?

1    A.    Yes.

2    Q.    You listed what was admitted to Mr. Charest as personal,

3    added what you reclassified, subtracted any credits, and made

4    the same calculation for tax year 2014?

5    A.    Correct.

6    Q.    And what was the total amount of investor funds that were

7    given to Jasiel Correia by investors in 2014?

8    A.    $112,890.

9    Q.    And what percentage of those funds, based on your

10   analysis, were used for personal purposes?

11   A.    $55,916.

12   Q.    And approximately what percentage of that?

13   A.    50 percent.

14   Q.    And did you do the same thing for 2015?

15   A.    I did.

16   Q.    What amount of funds were given to Jasiel Correia by

17   SnoOwl investors in 2015?

18   A.    $112,500.

19   Q.    And what did you calculate to be the amount that was used

20   for personal purposes?

21   A.    $67,706.

22   Q.    What percentage of funds were used, based on your

23   analysis, for personal purchases in 2015?

24   A.    60 percent.

25   Q.    Did you aggregate 2013, 2014 and 2015 calculating the

```
 1   total amount of funds that were received by Jasiel Correia from
 2   SnoOwl investors and the total amount that were used for
 3   personal purchases based on your analysis?
 4   A.   Yes.
 5   Q.   And what was the result of that aggregated analysis?
 6   A.   That 64 percent of the investor funds were used for
 7   personal purposes of Jasiel Correia's.
 8   Q.   And again, that was a conservative methodology in your
 9   view?
10   A.   Yes.
11   Q.   I may have asked this, and I apologize if I did.  With
12   respect to the $10,000 that was characterized as software
13   development in 2013, is the mischaracterization of a personal
14   expense as a software development expense something that is
15   material to the IRS for tax purposes?
16   A.   Yes, it is.
17        MR. HAFER:  Your Honor, I think I have 20 to 25
18   minutes left.  I'm more than happy to keep going.
19        THE COURT:  Maybe we'll take our break at this point,
20   ladies and gentlemen.  So we'll take our morning break now, 15
21   minutes or so, and then we'll continue with the examination of
22   Special Agent Lemanski.
23        (Jury exits the courtroom.)
24        THE COURT:  You may step down, Agent Lemanski.
25        I've been trying to follow along, of course, with my
```

1   notes of discussions that we've had about various exhibits

2   here, and I want to be sure that I haven't missed something or

3   that there isn't something that the parties want to introduce.

4           But with respect to Government Exhibit 99.1, which is

5   the chart of other personal travel, are you planning on

6   introducing that?

7           MR. HAFER:  I don't think so.  I think I'm just going

8   to ask a question related to it, but I don't think I'm going to

9   introduce it.

10          THE COURT:  Okay.  And then with respect to 84, which

11  is the corporation filing for 104 Business Academy, are you

12  planning on introducing that?

13          MR. HAFER:  Same thing, Your Honor.  I'm just going to

14  ask a question, but I'm not going to introduce it.  I really

15  appreciate it, honestly I do, I really appreciate the oversight

16  that you have --

17          THE COURT:  It's just, you know, I want to be sure

18  that everybody's got in what they want, lots of pressures going

19  on, so that's why I make the inquiry because we have been

20  discussing the case for quite some time, trying to get a handle

21  on what it is that the jury is actually going to have, which is

22  piles and piles of paper when they go in.

23          If there's nothing further, then we'll be back here at

24  a little before 11:30.

25          MR. HAFER:  Yes, Your Honor.

```
 1                    (Recess 11:20 a.m. - 11:35 a.m.)
 2              THE COURT:  Are we ready to bring the jury back in?
 3              MR. HAFER:  Can I make brief request, Your Honor,
 4    before you do?
 5              THE COURT:  Sure.
 6              MR. HAFER:  To the extent we hopefully finish or get
 7    very close to finishing and Your Honor would be inclined to say
 8    something to the jury along the lines of sort of the part two
 9    coming next week --
10              THE COURT:  Right.
11              MR. HAFER:  -- I would just ask, because there are --
12    unquestionably the focus is the Fall River government stuff,
13    but in light of the fact that Mr. Costa and Mr. Camara already
14    invested in SnoOwl, they'll be testifying.  I just wanted to
15    make sure that there was room left there.  There's still some
16    SnoOwl evidence, but unquestionably the focus has obviously
17    shifted.
18              THE COURT:  I will say something.  I'm not going to be
19    that specific, but I'm just going to say the focus is now
20    likely to shift to allegations with respect to Fall River
21    government.
22              I'm also going to say, based on what I understand,
23    that the jury can anticipate receiving the case after charge
24    and argument the week after next.
25              MR. HAFER:  Sure.
```

1          THE COURT:  Just so they've got an idea of that,

2    without getting specific about it because it's not clear when

3    we'd have a formal charging conference, but I do want to have

4    some discussion even before that about the questions having to

5    do with intent here.

6          MR. HAFER:  Sure.

7          THE COURT:  So I'll do something like that, but my

8    assumption is we'll get through Agent Lemanski today.

9          MR. HAFER:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. HAFER:  We'll get the witness.

12          (Jury enters the courtroom.)

13          THE COURT:  So ladies and gentlemen, I assume that

14    there has been no discussions or any exposure to any

15    information concerning this case, outside of what you heard in

16    court, since last we saw you.  And looking always for a show of

17    hands, I see none, and that means that I find that there has

18    been no exposure.

19          So we'll continue with Agent Lemanski.

20          MR. HAFER:  Thank you, Your Honor.  Ms. DiPaolo, can I

21    have page 1 of Exhibit 85 again.  And could you highlight the

22    very bottom of the page.

23    Q.   Special Agent Lemanski, the total amount of personal

24    expenditures under your analysis -- the amount, not the

25    percentage -- for 2013, 2014 and 2015 was how much?

1    A.    $228,654.

2    Q.    With respect to the summary charts, the pie charts that we

3    just reviewed, there were indications for personal travel on

4    those; is that right?

5    A.    Correct.

6    Q.    And the Exhibit 99 reflecting Natalie Cleveland related

7    travel, did that Exhibit 99 include all of the travel that you

8    ultimately classified as personal?

9    A.    Yes.

10   Q.    Not just with Natalie Cleveland, but was there travel that

11   you classified as personal that did not include Natalie

12   Cleveland, it was not on Exhibit 99, additional trips?

13   A.    There may have been two Florida trips.

14   Q.    Did you review any Secretary of State records or corporate

15   filings in connection with your work on this case?

16   A.    Yes.

17   Q.    And very briefly, what did those show?

18   A.    That there was no, as there wouldn't need to be, there was

19   no filing for SnoOwl and the partnership in 2013 and 2014, and

20   that SnoOwl, the corporation, filed for incorporation I believe

21   in December of 2014, but it is currently inactive.  It hasn't

22   filed the annual reports in three years.

23   Q.    And with respect to Snokimo, did you review records from

24   the Secretary of State?

25   A.    There is no records for Snokimo with the Secretary of

1    State.

2    Q.   Are you familiar with the term commingling, commingling of

3    business and personal funds, if you will?

4    A.   Yes.

5    Q.   What does that mean?

6    A.   It means when you deposit business receipts and your

7    personal income into the same account.

8    Q.   Based on your review of the SnoOwl Citizens bank account,

9    was there commingling of Mr. Correia's personal funds and

10   SnoOwl investor funds in that account with respect to the

11   deposits?

12   A.   Not commingling of personal funds.  There was commingling,

13   I believe, of other related businesses.

14   Q.   If you know, where were Mr. Correia's Fall River City

15   Council paychecks deposited into?

16   A.   His personal accounts.

17   Q.   Not the SnoOwl Citizens account?

18   A.   No.

19          MR. HAFER:  Ms. DiPaolo, could I have page 8 of

20   Exhibit 85, and specifically could you highlight the bottom

21   seven or eight entries, including -- right there would be good.

22   Q.   Looking at page 8 of Exhibit 85, Special Agent Lemanski,

23   does that reflect a deposit -- it actually says "David" but it

24   should be "Stephen Miller," an investment check on August 22 of

25   2013?

1    A.    Yes.

2          MR. HAFER:    Could I go to page 9 of this exhibit,

3    please, Alyssa.   Could you highlight the top 15 or so entries.

4    Q.    After that August 22, 2013 deposit of Stephen Miller's

5    investment check into the SnoOwl Citizens account, do you see

6    several charges at Home Depot on August 26?

7          MR. HAFER:    Above those even higher.

8    A.    Yes.

9    Q.    And do you see a $2,000 cash withdrawal on August 26?

10   A.    Yes.

11   Q.    There are two payments on a Citi Card online payment

12   $2,351 and then $97?

13   A.    Yes.

14   Q.    Is that Mr. Correia's personal credit card?

15   A.    Yes.

16   Q.    And then there's a Sovereign Bank line of credit for about

17   $500.   Do you see that?

18   A.    Yes.

19   Q.    There's a Fall River Municipal Credit Union $6,900

20   payment.   Do you see that?

21   A.    I do.

22   Q.    What's that?

23   A.    The repayment of a personal loan of Mr. Correia.

24   Q.    So within six days of receiving Mr. Miller's check,

25   Mr. Correia paid almost $7,000 off a personal loan from Fall

1   River Municipal Credit Union; is that right?

2   A.   Yes.

3   Q.   And then paid over $2,400 off a personal credit card; is

4   that right?

5   A.   Yes.

6           MR. HAFER:   Could you go down a little bit lower,

7   please, little more, little more.   Thank you.

8   Q.   There's an entry August 30 of 2013 for $2,410 payment to

9   Shane Realty.   Do you see that?

10  A.   Yes.

11  Q.   What is that?

12  A.   The rent for 1Zero4 at 104 Anawan Street.

13          MR. HAFER:   Could you go to the next page, please,

14  Ms. DiPaolo.   And could you go down a little over a third of

15  the way, from the other side, top down, please.

16  Q.   Do you see a Citi Card online payment for just under

17  $4,000 on September 6?

18  A.   Yes.

19  Q.   So about two weeks after receiving Mr. Miller's investment

20  check, Jasiel Correia paid about $4,000 here off a personal

21  credit card?

22  A.   Yes.

23  Q.   And then that same day he gave the Flint Merchants

24  Association $4,000?

25  A.   That's correct.

1          MR. HAFER:  Could you capture now the bottom third of
2     the page, Ms. DiPaolo.
3     Q.   You see an entry at the very bottom of this page for $500
4     for Gulliver's Tavern?
5     A.   I do.
6          MR. HAFER:  Thank you.  Would you get the middle of
7     the page now, please.
8     Q.   There's a $2,400 charge of Ikea on September 11 about
9     three weeks after receiving Mr. Miller's check.
10    A.   Yes.
11    Q.   There's that $3,000 Intercontinental charge; is that
12    correct?
13    A.   Yes.
14    Q.   And a $1,000 charge at Best Buy; is that correct?
15    A.   Yes.
16    Q.   $350 payment on the student loan, correct?
17    A.   Correct.
18         MR. HAFER:  Ms. DiPaolo, could you go to page 38 of
19    this document, specifically November 18 of 2014.
20    Q.   Does this reflect a check of investors Eisenberg and
21    Martinez deposited November 18, 2014?
22    A.   Yes.
23         MR. HAFER:  And could you zoom out and get the bottom
24    couple entries on the page.
25    Q.   Then about ten days later, a $2,400 payment to Shane

1   Landing LLC?

2   A.   Yes.

3   Q.   A $725 payment to Rockland Federal.  What's that?

4   A.   That's the car payment for the Mercedes.

5            MR. HAFER:  Would you go to the next page, please, and

6   take the top half of it.  Could you go down a little further,

7   please.

8   Q.   This reflects a charge at the Intercontinental Hotel for

9   $469 about two weeks after receiving Mr. Eisenberg's and

10  Martinez's checks?

11  A.   Yes.

12  Q.   An Amtrak charge as well for over $250?

13  A.   Yes.

14           MR. HAFER:  Finally, the next page, please.  Could you

15  just highlight the top half of the page, please.

16  Q.   This reflect a U.S. Airways charge of $413?

17  A.   Yes.

18  Q.   And several meals; is that correct?

19  A.   Yes.

20           MR. HAFER:  Finally, could you turn to page 44.

21  Actually, could you go -- yeah, that's perfect.  Thank you.

22  Q.   On January 14 of 2015, do you see indications for deposits

23  from Mr. Miller and an individual identified as Camara?

24  A.   Yes.

25           MR. HAFER:  After those deposits, Alyssa, could you

1    please highlight the bottom ten or 12 entries.

2    Q.   Do you see a purchase of U.S. Airways on January 22, 2015?

3    A.   Yes.

4    Q.   A purchase from Henry's Tire in Fall River for $609 on

5    January 22?

6    A.   Yes.

7    Q.   Do you know what that is, from your review of the records

8    in this case?

9    A.   The purchase of tires for the personal vehicle of

10   Mr. Correia.

11           MR. HAFER:  Could you go to the next page, please,

12   page 45.  Could you highlight the top half of the page.

13   Q.   Cash withdrawal at Twin Rivers Casino.

14   A.   Yes.

15   Q.   That's about four days after receiving these checks?

16   A.   Yes.

17   Q.   $300 charge at Neiman Marcus.  Do you see that?

18   A.   I do.

19   Q.   Is that the cologne?

20   A.   Yes.

21   Q.   A $457 charge for the Odyssey Cruise.  Do you see that?

22   A.   I do.

23   Q.   Special Agent Lemanski, could you do me a favor and look

24   at Exhibit 69 in your binder, please.

25           MR. HAFER:  Your Honor, as a preview, I'd like to

1    offer this one de bene subject to some additional evidence

2    coming in later.

3              THE COURT:  All right.  It's received -- it will be

4    shown to the jury on that basis.  "De bene" simply means,

5    ladies and gentlemen, that we expect at some future date there

6    will be additional evidence to support the admission of the

7    exhibit, but in order to make the case move along effectively,

8    I'll let it be disclosed to you.  If the evidence doesn't show

9    up, of course I'm going to strike it, but, in any event, you

10   get to see it now to advance the case that Mr. Hafer is trying

11   to put on here.

12             MR. HAFER:  Thank you, Your Honor.

13   Q.   Do you recognize Exhibit 69?

14   A.   I do.

15   Q.   And what is that?

16   A.   It's a chart summarizing the investors of SnoOwl and the

17   amount of their investment and the portion of that investment

18   summarized in the charts we just reviewed that were classified

19   as personal expenditures for Mr. Correia.

20             MR. HAFER:  Ms. DiPaolo, could we please go back to

21   Exhibit 70 already in evidence.

22   Q.   Special Agent Lemanski, is this page 1 of the records that

23   you received from Sallie Mae?

24   A.   Yes.

25             MR. HAFER:  Could I have page 7, please,

1    Ms. DiPaolo.  Under the entry for June 3, 2014, which is the

2    one right in the middle of the page, could you expand that.

3    Q.   Are these records you reviewed from Sallie Mae related to

4    Jasiel Correia's student loans?

5    A.   Yes.

6    Q.   On June 13, 2014, starting with the third line, "STTD,"

7    can you read that, please?

8    A.   "Stated he is full time student in grad school and only

9    works part time and makes about $1,200 a month and does not

10   have funds for payment or delinquent," and then I'm not sure

11   what that "MMP" is, but basically it's the call notes from a

12   conversation with Mr. Correia relative to his delinquent

13   student loans.

14   Q.   And he indicated, as per this document to Sallie Mae, in

15   June of 2014 he was a full-time graduate student?

16   A.   That's what this says, yes.

17   Q.   Have you seen any records in this case reflecting at any

18   point that he was a full-time graduate student?

19   A.   No.

20   Q.   Is there any mention in this call note from June of 2014

21   about any SnoOwl salary?

22   A.   No.

23          MR. HAFER:  Could you go to the next page, please.

24   Could you expand that, please.

25   Q.   July 1, 2014, could you read this call note, Special Agent

1    Lemanski.

2    A.    "Stated doesn't have a job right now.  Stated is unable to

3    make payment as well, stated he is paying on other loans.

4    Stated he is living home with parents and helping them get by

5    right now.  Stated he's elected official and his salary is

6    about 17,000 per year.  Stated hard time finding job since the

7    elected official is taking up a lot of time."

8    Q.    You can stop there.  Any indication here of a salary from

9    SnoOwl?

10   A.    No.

11   Q.    Any indication here of working 24/7 for SnoOwl?

12   A.    No.

13            MR. HAFER:  Could you go back, if you would, to

14   Exhibit 85, please, and highlight like around July 12 to the

15   14.  I'm sorry, Ms. DiPaolo.  2014.

16   Q.    While Ms. DiPaolo is pulling that up, fair to say when

17   you're negotiating a payment schedule on a student loan, better

18   to have less money than more?

19   A.    Yes.

20   Q.    On the screen in front of you now, July 14 of 2014, do you

21   see a purchase at the Chatham Bars Inn for $1,134?

22   A.    I do.

23   Q.    So to be clear, about 13 days after the call notes reflect

24   the defendant telling Sallie Mae he didn't have money to make a

25   loan payment, he purchased a stay at the Chatham Bars Inn on

1    the Cape for $1,134?

2    A.    Yes.  This is a down payment on the August stay, yes.

3              MR. HAFER:  May I have Exhibit 71.2, page 1.

4    Q.    What are these, Special Agent Lemanski?  I'm sorry.  What

5    is this is on your screen, 71.2 from Rockland Federal Credit

6    Union?

7    A.    Yes.

8    Q.    These are --

9    A.    These are the loan records for the purchase of the

10   Mercedes.

11             MR. HAFER:  Could I have page 4 of that document.

12   Could you highlight that.

13   Q.    In general, what is this right here?

14   A.    It's the loan application filled out requesting finance

15   for the 2011 Mercedes.

16   Q.    Okay.  Was that financed by Jasiel Correia and someone

17   else?

18   A.    Yes.

19   Q.    On the right-hand side under "Employer's Name," it

20   indicates "Nordstrom" and "self-employed."  Do you see that?

21   A.    Yes.

22   Q.    And at the very bottom for source of other income, what

23   does it indicate?

24   A.    He indicates that he's self-employed and earns $1,000 each

25   month.

1    Q.    Okay.  Again, when you're trying to get a loan, it's

2    helpful to have income, right?

3    A.    Yes.

4    Q.    When you're filing tax returns, the more income you have,

5    the more you owe in tax liability; is that right?

6    A.    In general, yes.

7    Q.    And on the 2013 original or amended return, did

8    Mr. Correia -- or on the original return did he report any

9    self-employment income?

10   A.    No.

11   Q.    Did Jasiel Correia also receive income from Nordstrom's in

12   2013?

13   A.    There was a W-2 submitted to the IRS from Nordstrom's for

14   Jasiel Correia in the amount of approximately $6,000 that year.

15   Q.    Was that reported by Jasiel Correia on his original or

16   amended 2013 returns?

17   A.    No.

18   Q.    Special Agent Lemanski, in the course of this

19   investigation, have you become familiar with the SnoOwl

20   investment agreements, convertible debt notes given to the

21   investors?

22   A.    Yes.

23   Q.    Are you familiar with testimony at the trial that those

24   agreements constituted equity interests in SnoOwl?

25   A.    Yes.

1    Q.   Have you reviewed, in connection with your work on this

2    case, public statements that the defendant has made related to

3    the SnoOwl investors?

4    A.   Yes.

5    Q.   Have you reviewed statements the defendant made at a

6    mayoral debate related to the SnoOwl investors in October 21,

7    2015 in a debate with Sam Sutter?

8    A.   Yes.

9    Q.   Have you reviewed a video excerpt of statements the

10   defendant made on October 21, 2015 at a mayoral debate with Sam

11   Sutter?

12   A.   Yes.

13   Q.   Is the video excerpt you've reviewed and marked as Exhibit

14   157 an accurate excerpt, to the best of your knowledge, of

15   public statements the defendant made regarding the SnoOwl

16   investors?

17   A.   Yes.

18          MR. HAFER:  Your Honor, at this time I offer Exhibit

19   157.  I request permission to publish.  It's just about a

20   minute and 15 seconds.

21          THE COURT:  Yes.  I assume that Ms. DiPaolo can do

22   that from the link there in the absence of Ms. Beatty.  So

23   we'll receive it and we can play it.

24          (Exhibit 157 admitted into evidence.)

25          (Video played.)

1   Q.   Just a few questions, Special Agent Lemanski.  Mr. Correia

2   began his remarks by highlighting his experience in the

3   business community; is that correct?

4   A.   Yes.

5   Q.   He indicated he had spent the SnoOwl investor money

6   wisely?

7   A.   Yes.

8   Q.   At the time these statements were made in October of 2015,

9   what was the approximate balance in the SnoOwl Citizens

10  account?

11  A.   $69.

12  Q.   At the time these statements were made about spending the

13  investors' money wisely in October of 2015, what was the

14  approximate balance in the BayCoast account, positive or

15  negative?

16  A.   It was a negative.

17  Q.   Mr. Correia indicated his investors were uniformly happy

18  with their investment at this time in October of 2015?

19  A.   Yes.

20  Q.   He indicated he didn't have any lenders; is that correct?

21  A.   That's correct.

22  Q.   He said there were no loans?

23  A.   Correct.

24  Q.   The investors were his partners?

25  A.   Correct.

1   Q.   He actually said that several times about the investors

2   being his partners; is that correct?

3   A.   Yes, he did.

4   Q.   And just to close, any evidence in any of the documents

5   you've reviewed from the IRS of any partnership return ever

6   filed by SnoOwl?

7   A.   No.

8        MR. HAFER:  Your Honor, I have no further questions.

9        THE COURT:  All right.

10  CROSS-EXAMINATION BY MR. REDDINGTON:

11  Q.   Good morning.

12  A.   Good afternoon, Mr. Reddington.

13  Q.   Good afternoon.  You obviously have been working

14  intensively on this investigation, correct, for a number of

15  years?

16  A.   Yes.

17  Q.   And how many other agents from the IRS, for example, have

18  been working with you, either agents or staff assisting in this

19  investigation with these documents?

20  A.   From the IRS?

21  Q.   Yeah.

22  A.   I have a trainee assigned to me so he's helped, but that

23  would probably be it.

24  Q.   And then you've worked with agents from the HUD, Housing

25  and Urban Development, right?

1    A.   Correct.

2    Q.   You've worked with agents from the FBI, correct?

3    A.   Correct.

4    Q.   And you used the grand jury to subpoena a number of

5    financial records, not a number, a lot of financial records,

6    and pretty much -- in addition, for example, his family's

7    records, his mother's bank account, his father's bank account,

8    his grandmother's bank account.  They've all been subpoenaed to

9    grand jury, correct?

10   A.   Correct.

11   Q.   And you've had a chance to review all of those?

12   A.   Yes.

13   Q.   Not to mention his own documents that -- bank records that

14   you've had a chance to review, right?

15   A.   Correct.

16   Q.   Now, in your investigation -- can you tell me, what is a

17   non-investor deposit, if you know?

18   A.   So it would be -- on my schedule, is that what you're

19   referring to?

20   Q.   Yes.

21   A.   That would be a deposit into the account that wasn't from

22   one of the identified investors.  So it would either be

23   deposited from a related business or an unidentified cash

24   deposit.

25   Q.   And in your investigation, in looking at all of these

1    records and documents, for example, what you did is you would

2    take the records from the bank and then take the records that

3    were prepared by Mr. Charest, the CPA, take the records from

4    all of these other accounts, checks, deposits, and then you

5    would categorize them as to whether or not they were a business

6    expense or they were income or whether or not it was a personal

7    expense, right?

8    A.    Yes.

9    Q.    Then you put it into the pie charts that we've all seen,

10   correct?

11   A.    Correct.

12   Q.    As far as business expenses, for example, if a person has

13   a business and they purchase or lease a car, that's a pretty

14   common deduction for a business expense, right?

15   A.    The -- depends.  A lease and a purchase are two -- it's

16   treated differently.

17   Q.    Okay.  How about a purchase then?

18   A.    So a purchase of a vehicle has to be actually considered a

19   business asset and depreciated.

20   Q.    Okay.  And if the person has the business and purchased

21   the vehicle and uses the vehicle to go about the business of

22   the business, that would be subject to, as we say, a write-off,

23   business write-off, right?

24   A.    The business -- if it was purchased -- if the vehicle is a

25   business -- it has to be purchased in the name of the company.

1  Otherwise, there's an allocation that you use, you have to

2  determine between personal and business expense.  But if a

3  portion of the vehicle is used for business, it is to be

4  categorized as a business expense, you're correct.

5  Q.   And what if there was no corporation, if it was a person

6  that had been classified, as it were, as a sole proprietor, for

7  example?

8  A.   Sole proprietor, like you said, you can't take the

9  deduction for the payment itself.

10  Q.   And can you write off anything like gas or any

11  maintenance, tires things of that nature?

12  A.   The percentage that is of the business use, yes.

13  Q.   That would be a business expense or deduction, right?

14  A.   The portion of the use that is for business, yes.

15  Q.   Well, for example, if there are debit -- there are a lot

16  of debit transactions.  You had a chance to look at all of

17  those records.  They were pretty thorough and comprehensive.

18  Were they not?

19  A.   Yes.

20  Q.   And were you aware that Chris Parayno had access to the

21  Citizens account by way of a debit card, a credit card, debit

22  card?

23  A.   No.

24  Q.   Did you talk to Mr. Parayno and ask him that?

25  A.   I believe he testified that he did not.

1   Q.    So if, for example, Jasiel was at a SnoOwl related event

2   and transactions were posted either by way of debit or

3   expenditures, would that be a write-off, a business expense?

4   A.    What type of SnoOwl event?

5   Q.    Well, how about entertainment, for example, taking out

6   customers or taking out employees to a restaurant or to a strip

7   club or to any other place where people go and gather and have

8   food or drink and whatnot?

9   A.    If -- I mean, are we talking -- as long as he maintained

10  the receipts, documented who was being entertained and took the

11  portion of it that was ordinary and a necessary business

12  expense, yes.

13  Q.    Now, you knew that he had -- in the business we have Chris

14  Parayno, and Chris Parayno you know has testified in this case,

15  correct?

16  A.    Correct.

17  Q.    Chris Mello, remember Mr. Mello?  He was the guy that

18  initially was developing the program or the platform initially.

19  A.    Yes.

20  Q.    And then he was unable to get that done so he basically

21  was discharged, and then there's a fellow, Alex Vlahos, that

22  came on board, right?

23  A.    Correct.

24  Q.    And he tried to work on the app, as it were, correct?

25  A.    I don't think Mr. Vlahos worked on the app.

1  Q.   So you know at some point Statewide was hired, correct?

2  A.   Correct.

3  Q.   And that would be Josh Harding, fellow with the beard,

4  right?

5  A.   Correct.

6  Q.   But prior to Josh Harding, there was another person that

7  worked for SnoOwl for quite a while by the name of Dinesh,

8  correct?

9  A.   I don't think he worked for SnoOwl.

10  Q.   Well, what was his job?

11  A.   I think -- my understanding is that he was intermediary

12  between -- I know it keeps on being referred to as Nepal, but

13  there was people working on the website design business and I

14  believe some SnoOwl, and was the intermediary between the

15  people doing the work and Mr. Correia.

16  Q.   And there was a lot of work done by the people over in

17  Nepal on the SnoOwl app, correct?

18  A.   I have seen no evidence of that, no.

19  Q.   Did you know that Dinesh would actually send MoneyGrams

20  over to the people in Nepal that were working on the app?

21  A.   Mr. Dinesh testified in the grand jury that he did make

22  payments to Nepal, yes.

23  Q.   Right.  And how much money did Mr. Dinesh send over in

24  cash by way of conversion of MoneyGrams to Nepal?

25  A.   I think his testimony -- there's two checks.  Then he said

1    in addition to that, he believed there was approximately $2,000

2    in cash, but that's it.

3    Q.   And what was the total payment that Dinesh had made to the

4    people in Nepal?

5    A.   That was the total payment.  He was just the intermediary.

6    Q.   So in your records, for example, one of them indicates

7    payment to Dinesh for 1,690.  Do you remember that?

8    A.   Yes.

9    Q.   What was that for?

10   A.   One of the checks I'm referring to.

11   Q.   And how much cash did he receive?

12   A.   When?

13   Q.   In your investigation, did Dinesh --

14   A.   His testimony is in addition to any check he received, the

15   only additional payments that he received that were sent over

16   was no more than $2,000 in cash.

17   Q.   And yet again, the Nepal people were unable to actually

18   produce the app, correct?

19   A.   That's my understanding, yes.

20   Q.   So at that point, Jasiel gets Mr. Harding on board from

21   Statewide, correct?

22   A.   Correct.

23   Q.   And Statewide bills out about 70 plus thousand dollars for

24   the work that they did on developing the app, correct?

25   A.   Correct.

1   Q.   And then ultimately they were owed I think a balance or

2   somewhere in the vicinity of about $2,000 that they were

3   requesting payment on towards the end, right?

4   A.   They were requesting payment.  I'm not so sure the amount

5   is correct.

6   Q.   But ultimately the amount that they were owed, the three

7   gentleman, because they were independent contractors at that

8   point, was paid, right?

9   A.   Correct.

10  Q.   And it was paid by Jasiel, correct?

11  A.   Correct.

12  Q.   Do you know what an Unpitch event is, for example, have

13  you ever heard of that?

14  A.   I have not.

15  Q.   Pitch event.  Are you aware that when you have, for

16  example, a startup or an application with a company, that in

17  these types of businesses, they will have kind of like a trade

18  fair or a job fair and people will pitch their interests, their

19  ideas and their business to other people similarly situated?

20  A.   I'm not familiar with that, but it sounds reasonable.

21  Q.   Okay.  Did you make any determinations that expenditures

22  were made for any pitch events on behalf of SnoOwl by Jasiel

23  Correia?

24  A.   I saw no records relative to that, no.

25  Q.   You knew that the app, due to the good work of Mr. Harding

1    and his crew, ultimately produced, it was placed on the App

2    Store by Apple, correct?

3    A.    Yes.

4    Q.    And it was about that time that Jasiel then was running

5    for mayor in the City of Fall River, correct?

6    A.    Yes.

7    Q.    Ultimately, obviously he won the election against Sam

8    Sutter, right?

9    A.    Correct.

10   Q.    You knew that fellow by the name of Nick Bernier was

11   working on the SnoOwl business end of things, right?

12   A.    Yes, with Mr. Correia, yes.

13   Q.    And you knew that Staff Sheehan was also involved with

14   SnoOwl, correct?

15   A.    Yes.

16   Q.    You knew that Nick Bernier and Staff Sheehan ultimately

17   referred SnoOwl to a law firm of Gunderson Dettmer in Boston,

18   right?

19   A.    I'm not sure if they're the ones that did the referral.

20   Q.    You're not sure what?

21   A.    That those two individuals were the ones that made the

22   referral.

23   Q.    Was it Chris Carreiro that made the referral?

24   A.    I don't know who made the referral.  I can't testify to

25   that.  I'm not sure who did that.

 1    Q.   Well, you know Chris Carreiro was his attorney, personal

 2    attorney apparently, right?

 3    A.   At one point, yes.

 4    Q.   And you know that Chris Carreiro had a business

 5    relationship with Nick Bernier, right?

 6    A.   Yes.

 7    Q.   You knew that Chris Carreiro and Nick Bernier had a

 8    business relationship with Terry Charest, the accountant,

 9    right?

10    A.   Yes.

11    Q.   And you knew that Terry Charest was the accountant that

12    was referred to Jasiel by these gentlemen to try to figure out

13    what money came in and what money went out, right?

14    A.   Correct.

15    Q.   You knew that Mr. Bernier, Mr. Carreiro and Mr. Charest

16    met on a number of occasions before Mr. Charest even met him?

17    A.   I'm not sure that is accurate.

18    Q.   Okay.  If I suggest to you that Mr. Bernier, Mr. Charest

19    and Mr. Carreiro would review records, documents, well prior to

20    Mr. Charest actually sitting with Jasiel, you're not aware of

21    that?

22    A.   I don't -- that's not the testimony, I don't believe, of

23    Mr. Charest.

24    Q.   Well, you don't know what the testimony was in this case,

25    do you?

1    A.    I know his testimony in the grand jury and I know his

2    testimony from interviews that I've sat with him, during

3    interviewing him.

4    Q.    There's a difference between testimony like in front of a

5    judge and a jury or a trial and testimony or a statement that

6    somebody makes to an investigator, right, there's a difference?

7    A.    The information I have is that statement you made about

8    Mr. Bernier participating in those meetings is not accurate.

9    Q.    Okay.  How about Mr. Carreiro sitting with Mr. Charest and

10   reviewing all the records and documents?

11   A.    Yes.  That's to my knowledge, yes.

12   Q.    And ultimately Mr. Charest then reached out to Jasiel to

13   sit down face to face, person to person, right?

14   A.    Yes.

15   Q.    Mr. Charest had access to records and documents and he

16   created his own list of items that were expenditures that the

17   records indicated to him were spent by SnoOwl or by Jasiel

18   Correia, right?

19   A.    He -- yes, he input the bank record information into the

20   QuickBooks spreadsheets.

21   Q.    And then Mr. Charest requested that Jasiel go through

22   these records and somehow highlight what he believed was

23   personal as opposed to what was business related, correct?

24   A.    Correct.

25   Q.    And he then provided that information to Mr. Charest?

1    A.    Correct.

2    Q.    And then Mr. Charest, at some point, pulled together the

3    documents or the records, or at least was able to have his

4    opinion as to the expenditures by Jasiel on behalf of business

5    expense as opposed to personal expense, correct?

6    A.    Correct.

7    Q.    And at some point Mr. Charest reached out to Jasiel and

8    tax returns were prepared and documents were prepared to be

9    filed on behalf of the now corporation, SnoOwl, right?

10   A.    Correct.

11   Q.    Because you know that SnoOwl was ultimately incorporated

12   from whatever it was before, whether it was a sole

13   proprietorship, partnership, trust, whatever it may have been.

14   A law firm in the end of 2014, I believe December of 2014,

15   filed paperwork in Delaware to incorporate SnoOwl, right?

16   A.    That's correct.

17   Q.    And which law firm was that, do you know?

18   A.    I do not know.

19   Q.    Have you heard of Goodwin Procter?

20   A.    I've heard that name, yes.

21   Q.    Have you heard of Bill Schnoor, the attorney?

22   A.    I've heard that name, yes.

23   Q.    Did you know that Chris Carreiro and -- I'm sorry.

24   Mr. Bernier or -- did you know that Mr. Carreiro went into

25   Boston and actually sat with this attorney at Goodwin Procter?

1    A.   I don't know that, no.

2    Q.   How about Staff Sheehan; you knew who Staff Sheehan was,

3    right?

4    A.   I do.

5    Q.   And you knew that Staff Sheehan had signed a Memorandum of

6    Understanding indicating that he was going to take over or was

7    contemplating taking over as CEO of SnoOwl, correct?

8    A.   Contemplating, yes.

9    Q.   And you knew that he had signed a document to that effect,

10   right?

11   A.   Correct.

12   Q.   You knew Nick Bernier sent out a blast notice to all

13   investors and all people involved with the business welcoming

14   Staff Sheehan as our new CEO.  You saw that, right?

15   A.   Yes.

16   Q.   And the meeting with Bill Schnoor at Goodwin Procter took

17   place, you knew that actually it was Staff Sheehan and Nick

18   Bernier that met with Goodwin Procter on a number of occasions?

19   A.   I don't know that.

20   Q.   Okay.  So in any event, some law firm now incorporates

21   SnoOwl in Delaware.  It is now a viable corporation.  They file

22   documents with the Secretary of State.  You were able to locate

23   those, right?

24   A.   Correct.

25   Q.   And the Secretary of State documents were filed by the

1    attorneys, or were they filed by Jasiel or by staff or who, if

2    you know?

3    A.   I don't know who filed them.

4    Q.   All right.  In the course of your investigation, you

5    determined that Chris Mello, for example, Chris Parayno, they

6    didn't get salaries, right?

7    A.   None that I saw, no.

8    Q.   So is a salary different from somebody spending money on a

9    business and using a debit card?  I mean, that's not a salary,

10   right?

11   A.   No.

12   Q.   I mean, a salary would be like you're going to get X

13   number of dollars a week, you're going to get maybe medical

14   insurance, things of that nature, and that's your income for

15   working for that employer, right?

16   A.   That's traditionally what a salary is, yes.

17   Q.   Right.  And you know that at no time did Jasiel ever tell

18   anyone that he was getting a salary from SnoOwl, right?

19   A.   I think he did tell people he was getting a salary from

20   SnoOwl at some point.

21   Q.   Who?

22   A.   I believe he told Mr. Garcia and Mr. Camara.

23   Q.   That he was getting a salary?

24   A.   That he had taken a salary from SnoOwl.

25   Q.   Well, it's pretty apparent that he was spending money on

```
1    personal effects --

2    A.    I agree.

3    Q.    -- on those debit cards, right?

4    A.    I agree.

5    Q.    And that he had a number of accounts, one being what's

6    called the BayCoast account, right?

7    A.    Yes.

8    Q.    And, by the way, with Mr. Charest, you knew that

9    Mr. Charest at some point requested or suggested that he should

10   file amended tax returns for tax years 2013 and 2014, correct?

11   A.    Correct.

12   Q.    And you knew, I would imagine, that the FBI had already

13   sent an agent out to speak to Mr. Charest before he even

14   recommended that he file?

15   A.    I'm not sure of the timing of that.

16   Q.    Well, you know that the FBI -- was it Ed Benton?  Was it

17   Mr. Benton who went out and spoke to Mr. Charest?

18   A.    Without seeing the report, I apologize, I'm not sure who

19   actually made the initial contact with Mr. Charest.

20   Q.    All right.  But you do know that Mr. Charest was visited,

21   shall we say, by an agent from the Federal Bureau of

22   Investigation regarding Jasiel and SnoOwl, right?

23   A.    I believe so, yes.

24   Q.    And this is before Mr. Charest met with Jasiel and

25   suggested that he file his 2013 and 2014 amended tax returns,
```

1    correct?

2    A.   I'm not sure.  I think in March of 2017 I believe is when

3    Mr. Charest was visited by a federal agent, and I believe that

4    Mr. Charest was already working with Mr. Correia, so I'm not

5    sure when the topic of amended returns came up.

6    Q.   All right.  But you do know, nevertheless, that he took

7    Mr. Charest's advice obviously and he did file amended tax

8    returns for 2013 and 2014, right?

9    A.   Correct.

10   Q.   You knew that initially, the 2013 and 2014 tax returns, he

11   was living with his parents, he had just, I guess, graduated

12   from college, and was a dependent on his parents and went to

13   Liberty Tax to file that return, correct?

14   A.   Yes, in February of 2015.

15   Q.   And you knew that Liberty Tax basically had done work for

16   his dad, as far as filing his tax returns, right?

17   A.   Correct.

18   Q.   So in reference to your investigation, you knew that back

19   in 2010, in 2011, when you were referencing your direct

20   examination about the FindIt business down in Florida with Alec

21   Mendes, that it was Mr. Mendes who prepared and filed and took

22   care of all the business filings for that business, right?

23   A.   Yes.

24   Q.   Okay.  Now, Snokimo was not a corporation, was it?

25   A.   It was not.

1    Q.    1Zero4 was, indeed, a corporation, right?

2    A.    I believe so, yes.

3    Q.    And in either your direct exam or perhaps Mr. Hafer's

4    question to you, I think -- it's the jury's memory, not mine,

5    but I believe that there was a reference to 1Zero4 being on the

6    lease and making payments to Shane Realty, right?

7    A.    Not being on the lease, but yes, making payments.

8    Q.    So the lease for 1Zero4, which would have been the mill,

9    was between Shane Realty and SnoOwl Incorporated, correct?

10   A.    It was in the name of SnoOwl, yes.  Not Incorporated, just

11   SnoOwl.

12   Q.    Right, because it hadn't been incorporated at that point?

13   A.    Right.

14   Q.    So SnoOwl at that point, not being a real incorporated or

15   organized business, it was basically just Jasiel signing the

16   agreement to have 1Zero -- strike that -- SnoOwl on the lease

17   with Shane Realty, right?

18   A.    When he signed the lease, the company wasn't just Jasiel.

19   It was -- it had already -- Mr. Cabeceiras had already invested

20   in the company, and he already had three other partners, so.

21   Q.    Okay.  So who signed the lease?

22   A.    Mr. Correia signed the lease.

23   Q.    Correct.  And that would be on behalf of SnoOwl, right?

24   A.    Correct.

25   Q.    One of the references in the exhibits that you had with

1    Mr. Hafer with the Sallie Mae applications, a request, you

2    know, to have it held off or reduced because of a COS injury.

3    Do you remember the COS on that form, where they talked about a

4    workmen's comp. claim and things of that nature?

5    A.    Yes.  Oh, I'm sorry.

6    Q.    Sorry.  So "COS" basically means cosigner, right?

7    A.    Correct.

8    Q.    So in these conversations on that occasion, it would be

9    the cosigner, his father, had an injury and was on workmen's

10   comp. in addition to the fact that he didn't have the capital

11   or the ability to make the monthly payments at that point,

12   right?

13   A.    That's what it states.

14   Q.    And Henry's Tires were tires for what you referred to as a

15   personal vehicle in your direct examination, right?

16   A.    Correct.

17   Q.    Now, did you know what percentage or what amount of time

18   that vehicle was utilized by Jasiel to do SnoOwl business?

19   A.    No.  There was no vehicle log as required.

20   Q.    A vehicle log.  So he didn't write down the miles and

21   expenses for gas in a vehicle log, right?

22   A.    That's what's required by the IRS to take a deduction for

23   a vehicle.

24   Q.    Okay.  The reference that has been made to, for example,

25   the Odyssey Cruise, the gym, the helicopter, Gulliver's Tavern,

1    the Pink Bean, Jerry Remy's, you -- when I say "you," I mean

2    the investigation team, if you will -- basically categorized

3    those expenses as personal, right?

4    A.   No.  Mr. Charest and Mr. Correia -- anything that's in

5    that personal account on that nature was already classified by

6    Mr. Correia or Mr. Charest.

7    Q.   So it's fair to say that when Jasiel took that long list

8    and drew lines through it or highlighted it, fair to say that

9    he pretty much erred on the side of caution because there were

10   a heck of a lot more personal expenses than there were business

11   expenses, right?

12   A.   I don't think he erred on the side of caution.  I assume

13   he would submit the correct amount of personal expenses versus

14   business expenses.

15   Q.   That's a big assumption, though, isn't it?  You're

16   assuming he basically has a handle on all of these expenses and

17   is able to keep business records and car logs and things like

18   that, right?

19   A.   That's what's required.

20   Q.   I understand that.  I agree with that.  It is required.

21        But would you agree with me, for example, that if I had a

22   business and I was kind of schmoozing a business company that

23   sold letterhead, for example, and I went and I bought a whole

24   lot of letterhead, but my intent was to try and get them to

25   sign on with my SnoOwl app so that I could have income and

1    revenue coming in, that would be a legitimate business expense,

2    would it not, if you're developing or seeking to develop the

3    business?

4    A.    I'm sorry.  I missed your first -- if you purchased what?

5    Q.    Letterhead, like lawyers have letterhead.

6    A.    Yes, okay.  So you purchased -- can you just -- I'm sorry.

7    Q.    Sure.  Bad question.

8    A.    I apologize.

9    Q.    That's okay.  If a person has a business and, for example,

10   you go to a restaurant because your app allows people to pull

11   information regarding restaurants, hamburgers, sushi, whatever

12   the case may be, and that person does become ultimately a

13   customer of yours, I mean, that's a legitimate effort on a

14   business expense, would it not?

15   A.    What expense -- what are you purchasing?  That's what

16   I'm -- I'm sorry I'm missing your point.  I'm missing what's

17   being purchased.

18   Q.    If somebody goes to a restaurant and they have a meal and

19   they cultivate a relationship or a rapport with a person who

20   works for the restaurant or works for the hotel with the intent

21   of having the hotel promote SnoOwl, that would be a legitimate

22   expense, would it not?

23   A.    If you had a meal with a potential business customer and

24   you discussed them becoming a customer, yes, that would be a

25   deductible expense.

```
 1   Q.   And a lot of the places we're talking about, for example,
 2   would be potential customers or leads, or whatever word you
 3   want to use, for an app like SnoOwl, such as Odyssey Cruise,
 4   for example, right?  Odyssey Cruise, hopefully or possibly,
 5   could find the SnoOwl app to be very useful for them to be
 6   brought into it, right?
 7   A.   The Odyssey cruise receipt said it was a Valentine's
 8   dinner cruise.  I don't think that --
 9   Q.   Okay.  I get you on that.  But you know, when you have the
10   Valentine dinner cruise and you're again talking up the people
11   trying to get them to sign on with you as a customer, that
12   would be a legitimate expense, would it not?
13   A.   You can't just, because you think or you mention your
14   business name when you're out doing a personal thing, take it
15   as a business deduction.
16   Q.   So, for example, the gym membership, that's another
17   business that might be interested in utilizing an app like
18   SnoOwl, right?
19   A.   The gym itself?
20   Q.   Yeah.
21   A.   Yeah.
22   Q.   And the helicopter ride, correct?
23   A.   But the expense he deducted was for his personal trainer,
24   not for -- it's his personal trainer.
25   Q.   Okay.  And if, in fact, going to the gym and talking up
```

1    the app, the gym ended up becoming a customer, for example,

2    that would be a legitimate effort on the behalf of the

3    business, wouldn't it?

4    A.    No.

5    Q.    No?

6    A.    No.

7    Q.    Well, did the gym become a member of SnoOwl?

8    A.    I have no idea.

9    Q.    Well, you've got all these records.  For example, in the

10   exhibits, the big Exhibit 85.

11           MR. REDDINGTON:  Can you call up Exhibit 85 for me.

12   And maybe just jump down to, let's say, February 14, for

13   example.

14   Q.    Now, on this exhibit that you've been testifying

15   extensively from, who put this together in all of these

16   columns?

17   A.    It was a combination of -- originally it originated from

18   Special Agent Ken Benton, and then I made some changes to it

19   and made it my own, reviewed all the items on it, but the

20   initial input was done by Ken Benton.

21   Q.    Okay.  So, for example, when the jury is looking at these

22   particular records, the way it's set up is the left-hand side

23   are the dates, right?

24   A.    Correct.

25   Q.    The next column would be -- what's POS debit?  Point of

1    service or something?

2    A.    Yes.

3    Q.    And then, of course, debit purchase, that would be the

4    card, correct?

5    A.    Correct.

6    Q.    The next column would be the recipient of the payments,

7    whatever, if it's a restaurant, gas station, whatever the case

8    may be, right?

9    A.    Correct.

10   Q.    And then you have in the next column the amount of money,

11   correct?

12   A.    Correct.

13   Q.    Now, for example --

14          MR. REDDINGTON:  Can you pull up June 19, 2015.  And I

15   know there's an awful lot of paperwork that you guys went

16   through here.  And could you highlight June 19 of 2015.

17   Q.    This is just kind of like random focus on your work here,

18   that's all.

19   A.    Okay.

20   Q.    All right.  Now, for example --

21          MR. REDDINGTON:  That's May.  Can I have June?  That's

22   okay.  June 19.

23   Q.    All right.  Now, you'll notice here, for example, on June

24   19, debit purchase ABC Disposal Service, right?

25   A.    Yes.

1    Q.   And how much was that purchase for?

2    A.   $8.01.

3    Q.   And that was carried over to the next column, correct?

4    A.   Yes.

5    Q.   And then it was carried over as a total of how much?

6    A.   $801.

7    Q.   So that was a mistake then, right; it was really just

8    $8.01?

9    A.   No, I believe it's the opposite.

10   Q.   It was an $801 expenditure, right?

11   A.   Yeah.  It was an $800 expenditure, yes.

12   Q.   So when you are preparing your documents and your charts

13   and you're using records from the business -- do you remember,

14   what's Bird's Eye View?

15   A.   That is the helicopter tour.

16   Q.   All right.

17        MR. REDDINGTON:  And can you pull up October 8 of

18   2013.

19   Q.   Now, that shows the Bird's Eye View for Middletown, Rhode

20   Island, correct?

21   A.   Correct.

22   Q.   That would be the helicopter ride for $210, right?

23   A.   Correct.

24   Q.   And that was on October 8 of 2013, right?

25   A.   Correct.

```
 1              MR. REDDINGTON:  Now, would you go to the very next
 2    day, further down the next page, way down towards the bottom.
 3    Q.   Now, the Bird's Eye View -- okay.
 4              MR. REDDINGTON:  Excuse me for one minute, Your Honor.
 5              THE COURT:  Yes.
 6              (Discussion among counsel.)
 7              MR. REDDINGTON:  Your Honor, we have an agreement.  If
 8    I could have the Elmo, please.
 9              THE COURT:  Yes.
10              MR. REDDINGTON:  Thank you.
11    Q.   So this, again, would be your records that you compiled,
12    right?
13    A.   Is that the exhibit?
14    Q.   Yes.  If you would look farther down, do you see where it
15    indicates, "Business Bird's Eye View sales, helicopter."  Do
16    you see that?
17    A.   I see that document, but that's not the document I
18    prepared.
19    Q.   Okay.  So did you determine or were you able to determine
20    that basically within a day or so the helicopter ride became a
21    SnoOwl customer?
22    A.   I don't think that means that, no.
23    Q.   What do you think it means?
24    A.   It means that's how it showed up on the bank statement.
25    That would have been how it was identified on the bank
```

1  statement.

2  Q.   So how about the gym, the gym membership.  In your

3  investigation, did you determine that the day after Mr. Correia

4  signed up with the gym, that the gym became a customer of

5  SnoOwl?

6  A.   I don't know that.

7  Q.   You had a chance to look at all of the deposits referenced

8  on a number of occasions as cash, checks were cashed, correct?

9  A.   Correct.

10  Q.   For example, one of the checks would be on October 15 of

11  2014, a check payable to SnoOwl or Jasiel Correia for the

12  amount of $6,750, right?

13  A.   You'd have to -- I don't have that in front of me.

14  Q.   Okay.  Number 9.

15  A.   What's this -- I don't know what this document is, sorry.

16  Q.   So are you aware that one of the checks that was received

17  was for $6,750?

18  A.   If -- I don't know off the top of my head.  I would have

19  to refer to the summary chart.

20  Q.   Well, you know that --

21  A.   I know that there was checks that were cashed, if that's

22  what you're asking me.

23  Q.   Cashed, yes.  And did you notice when you looked at the

24  records from BayCoast that on the same day or the day after,

25  that amount of money or more would be deposited to the BayCoast

```
 1   account?
 2   A.   There were some -- when some of Mr. Cabeceiras' checks
 3   were cashed, we were able to give -- show that there was a cash
 4   deposit into the BayCoast account or another account.
 5   Actually, it's not the BayCoast at that time.  And we would
 6   give them credit for that.  So that would reduce the amount
 7   of -- the title of cash kept by Jasiel Correia by the amount
 8   that was deposited in cash into the bank account.
 9   Q.   My point is that, for example, the records would show he
10   received a check for $6,750, and he would cash it at the
11   initial account.  He would take the cash, right?
12   A.   He would cash the check at the bank, yes.
13   Q.   Right.  And did you in your investigation determine that
14   he would then deposit that cash into the BayCoast account?
15   A.   On some instances, yes.
16   Q.   And, for example, one of the things that your documents
17   would indicate would be on November 21, 2014, a Statewide
18   Software invoice for $13,500 was paid, right?
19   A.   I apologize.  I don't have that information memorized, but
20   if you want to --
21   Q.   I wouldn't expect you to.
22        So check for a -- strike that.  $50,000 check, that would
23   be from -- Deposit, Eisenberg, November 18, 2014, right?  Do
24   you see that?
25   A.   Yes, yes.
```

1    Q.    Then you see Statewide Software, $13,500, right?

2    A.    Correct.

3    Q.    That would be on November 21 of 2014, right?

4    A.    Right.

5    Q.    And that would be the invoices.  There were two invoices,

6    13268, 6,750, the other one 3380 for 6,750.  They were paid on

7    November 21, 2014, right?

8    A.    That's what those say, yes.

9    Q.    That was the same day he made the deposit to the BayCoast

10   bank in the amount of $14,000, right?  He cashed the check at

11   one bank, took the cash, went and deposited it into the other

12   bank, and then a day or two later the invoices were paid?

13   A.    Yeah.

14   Q.    Okay.  And there were a number of other deposits or

15   cashing of checks that were made August 27, 2014, for example,

16   May 1 of 2015, where the checks were cashed, and then they were

17   deposited into the BayCoast Bank and invoices were paid about a

18   week or so later to Statewide Software.  You saw that in your

19   investigation, right?

20   A.    I saw --

21   Q.    Okay.  So, for example, on July 27, 2015, there was a

22   check payable to SnoOwl or Jasiel Correia in the amount of

23   $2,500, and the investigation would show that that was cashed.

24   He took that money for cash, correct?  I know it's tough to try

25   to get the dates, but --

1    A.    I think if I have a different chart I can help better.

2    Q.    Do you see on the same day in the BayCoast account is a

3    deposit for $3,000?

4    A.    Yes.

5    Q.    Okay.  And an invoice for the software company was paid

6    shortly thereafter?  I mean, you have all those records, right?

7    A.    We have records of the payments to the software company,

8    yes.

9    Q.    And it's fair to say that there were a number of times

10   that checks were cashed and they were transferred or deposited

11   over to the BayCoast account, correct?

12   A.    Based on, if you look at chart Exhibit 86, you'll see that

13   we accounted for that in that chart.  It would be investor

14   funds deposited into the BayCoast account.

15   Q.    Would, for example -- by the way, did 1Zero4 have a bank

16   account?

17   A.    It did not, that I found.

18   Q.    And there were a number of checks that Carl Garcia wrote

19   to 1Zero4 for rent, correct?

20   A.    No.

21   Q.    Well, did Carl Garcia write a number of checks to --

22   strike that -- to Shane Realty?  Sorry.

23   A.    Yes.

24   Q.    Okay.  Would an Apple computer, for example, be a business

25   expense or write-off to a percentage?

1   A.   Would a what?  I'm sorry.

2   Q.   Can you write off like an Apple computer in the course of

3   your business if you use it for business?

4   A.   Yes.

5   Q.   And was that placed on the personal side or the business

6   side, if you know?

7   A.   I don't know.

8   Q.   Do you know what Stripe is?  I mean, you saw a number of

9   things in the bank accounts that would say "Stripe" and it

10  would show income, for example?  Are you familiar with Stripe,

11  the concept of Stripe?

12  A.   I am not.

13  Q.   Did you know that if somebody signed up with SnoOwl and

14  they made a payment and they used this particular -- another

15  app to make the payment, it would show up as a direct deposit,

16  almost like when you're dealing with a credit card.  It would

17  just automatically hit the bank account.  Stripe is the same

18  thing.  You've never heard of that?

19  A.   I haven't.

20  Q.   Okay.  So when you looked through the bank records and you

21  determined that there were a number Stripes, whatever, money

22  coming in from Stripe, you didn't know that meant?

23  A.   I just classified it's a non-investor deposit if it was

24  deposited into the account.

25  Q.   And you spoke to a gentleman from Arias Jewelers, right?

1   A.   I did.

2   Q.   He was a dissatisfied customer apparently, correct?

3   A.   Correct.

4   Q.   Did you speak with a number of other customers of SnoOwl?

5   A.   You mean --

6   Q.   There were a --

7   A.   -- me personally?

8   Q.   Anybody.  There were a lot of people that had this app, a

9   lot of people that were more than satisfied with it, right?

10  A.   I wouldn't know.  We have -- there was no business records

11  produced to us from SnoOwl showing who their customers were.

12  Q.   So how about, for example, the business of setting up

13  websites.  You knew that SnoOwl was involved in that through

14  Snokimo, right?

15  A.   That's my understanding, yes.

16  Q.   And that generated income, correct?

17  A.   Yes.

18  Q.   Did you determine or did you know how much space SnoOwl

19  used at 104 Anawam?

20  A.   The space itself?

21  Q.   Yes.

22  A.   My understanding, it was a small percentage of the space.

23  Q.   Well, you knew that it was a pretty large space, honestly,

24  and that it had been refurbished by Jasiel and his crew, as it

25  were; you knew that, right?

1    A.    Yes, with SnoOwl investor funds.

2    Q.    Okay.  What with?

3    A.    SnoOwl investor funds.

4    Q.    Okay.  Anything else you want to add?

5    A.    No.

6    Q.    Well, you certainly would agree that after dealing with

7    all of these attorneys and law firms and accountants and

8    looking at the records that Mr. Correia had from the origin or

9    the beginning stages of SnoOwl, you'd agree with me that his

10   records were pretty incomplete and sloppy?

11   A.    They were incomplete, yes.

12   Q.    And they were sloppy?

13   A.    If they're incomplete, I don't know if that's sloppy

14   because there's no record to be sloppy.

15   Q.    Well, you know that Terry Charest, you know that the

16   attorneys, you know that the law firms pulled records together

17   and, quite frankly, found that his business acumen, if you

18   will, was lacking significantly?

19   A.    That's not my understanding, no.

20   Q.    And have you continued to work with agents of the FBI on

21   this investigation?

22   A.    I have.

23             MR. REDDINGTON:  That's all I have, Your Honor.

24             THE COURT:  Mr. Hafer.

25             MR. HAFER:  Very briefly, Your Honor.

```
 1              THE COURT:  All right.
 2    DIRECT EXAMINATION BY MR. HAFER:
 3    Q.   Special Agent Lemanski, Mr. Reddington asked you several
 4    questions about when an automobile can be a legitimate business
 5    expense.  Do you recall those questions?
 6    A.   Yes.
 7    Q.   Regarding the $10,000 that was used to purchase the
 8    Mercedes, did Jasiel Correia tell Mr. Charest that was for an
 9    automobile?
10    A.   He did not.
11    Q.   What did he tell him it was?
12    A.   A software expense.
13              MR. HAFER:  Thank you, Your Honor.  I have nothing
14    further.
15              MR. REDDINGTON:  Excuse me, another thing.
16    CROSS-EXAMINATION BY MR. REDDINGTON:
17    Q.   On that reference, as we already talked about an
18    automobile being able to in many respects be a business
19    write-off, what was the categorization of that $10,000 on the
20    records?
21    A.   It was a computer -- it was the software development
22    expense.
23    Q.   Okay.  And whose handwriting noted "software development
24    expense" on that record?
25    A.   Mr. Charest.
```

1    Q.   Right.

2              MR. REDDINGTON:   Thank you.   That's all I have.

3              THE COURT:   All right.   You may step down.   Thank you.

4         So ladies and gentlemen, as we discussed, we're going

5    to break for the weekend at this point, or you're going to

6    break for the weekend, and we'll come back on Monday to

7    continue the case.

8         I should tell you that at this point the case focus is

9    going to shift from, as I understand it, is going to shift from

10   the SnoOwl allegations, charges that the government has made

11   and shift over to the allegations with respect to the conduct

12   of the Fall River government.   There's some overlap, as you can

13   see, and there may be some additional testimony that deals with

14   SnoOwl specifically.   But that's where we are.

15        I should tell you as well that everybody's been

16   cooperating very well in moving the case along, and so I'm

17   relatively certain that this case is going to be given to you

18   for purposes of the arguments of counsel and the charge the

19   week after next.   That is, we're bringing it in faster than I

20   had outlined earlier.   I talked about myself carving out four

21   weeks for this case.   We'll probably get it to you in the third

22   week now.   But next week will be devoted to testimony in the

23   case and, again, the focus now shifts, at least from the

24   government's perspective, shifts to the Fall River government

25   allegations.

1          All of that is another way of saying what I always

2     say:  Don't talk to anybody about this case.  Don't be exposed

3     in any way about this case.  Put the case out of your mind.

4     Enjoy the weekend, secure that nobody's going to be bothering

5     you about this case because you've got a lot of work to do next

6     week when you come back and the evidence is continued on

7     another aspect of the charges that the government has

8     undertaken to prove.

9          I'll give you better information as we go along.  I'll

10    give you the best information I can.  I try to be as candid as

11    I can, but one of the things that I've learned after a long

12    time working with trials in various capacities is that there's

13    only one thing certain about trials:  that they're uncertain.

14         So we'll keep our hand on the pulse of it, try to

15    report the best information we can, and I think the best

16    information that I've just given you, that is, that we'll

17    continue the evidence next week, but the case itself will be

18    put to you the week after, is the best information that we can

19    have.  And at that point then you start deliberations.  Then

20    you get to talk to somebody.  You talk to yourselves, among

21    yourselves about this case.  But not until then because you

22    don't have all of the information you need to begin that

23    conversation.

24         So a long way of saying something short, which is,

25    enjoy the weekend.  I think it's supposed to be nice one.  We

 1    will be in recess as to the jury.

 2              (Jury exits the courtroom.)

 3              THE COURT:  So anything we need to talk about?  Before

 4    next week starts, you'll get together and figure out timing and

 5    that sort of thing.

 6              MR. HAFER:  We'll send Ms. Beatty before the close of

 7    business today and Mr. Reddington the schedule for Monday, as

 8    we've been doing.

 9              THE COURT:  Okay.  Then, as I've said -- I don't want

10    to keep pushing on this too much, but I want to push a little,

11    that is preliminary discussions about intent, particularly with

12    respect to wire fraud.

13              MR. HAFER:  Yes, Your Honor.  I intend to look at that

14    and get something to you this weekend just in the way of a case

15    or some like that.

16              THE COURT:  Okay.  So if the two of you can talk about

17    or the three of you can talk about when would be a good time to

18    discuss it and have a preliminary discussion about it, that

19    would be helpful to me.

20              MR. HAFER:  Okay.

21              THE COURT:  All right.  So we will be in recess.

22    Enjoy the weekend.

23              MR. HAFER:  You too, Your Honor.

24              (Adjourned 12:45 p.m.)

25

1                        CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                        Dated this 30th day of April, 2021.

10

11                  /s/ Kelly Mortellite

12                  _____

13                  Kelly Mortellite, RMR, CRR

14                  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

<u>INDEX</u>

<u>WITNESS</u>                                                    <u>PAGE</u>

STACIA VIERIA

    Direct Examination By Mr. Tobin                          4
    Cross-Examination By Mr. Reddington                     38
    Direct Examination By Mr. Tobin                         41

SANDRA LEMANSKI

    Direct Examination By Mr. Hafer                         41
    Cross-Examination By Mr. Reddington                    100
    Direct Examination By Mr. Hafer                        132
    Cross-Examination By Mr. Reddington                    132

<u>E X H I B I T S</u>

<u>Exhibit No</u>.                         _____  Received

    62.1                                   11

    62                                     14

    61                                     25

    64.1                                   27

    64                                     30

    63                                     36

    83                                     48

    65                                     49

    65.1                                   54

    67                                     56

    206                                    57

    68                                     57

| | | |
|---|---|---|
| 1 | 70 | 62 |
| 2 | 71.1 | 62 |
| 3 | 71.2 | 62 |
| 4 | 72 | 63 |
| 5 | 74 | 63 |
| 6 | 78 | 64 |
| 7 | 82 | 65 |
| 8 | 87 | 66 |
| 9 | 86 | 69 |
| 10 | 88 | 70 |
| 11 | 75 | 72 |
| 12 | 89 - 95 | 73 |
| 13 | 85 | 76 |
| 14 | 157 | 98 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

