```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                    )
UNITED STATES OF AMERICA,           )
                                    )          Criminal Action
          Plaintiff,                )          No. 18-10364-DPW
                                    )
v.                                  )
                                    )
JASIEL F. CORREIA, II,              )
                                    )
          Defendant.                )
                                    )



             BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                  UNITED STATES DISTRICT JUDGE


                       JURY TRIAL DAY 10


                         May 4, 2021


           John J. Moakley United States Courthouse
                       Courtroom No. 1
                      One Courthouse Way
                 Boston, Massachusetts  02210




                           Kelly Mortellite, RMR, CRR
                           Debra Joyce, RMR, CRR, FCRR
                           Official Court Reporters
                           One Courthouse Way, Room 3200
                           Boston, Massachusetts  02210
                           mortellite@gmail.com
```

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Zachary R. Hafer
 3    David G. Tobin
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3106
 6    zachary.hafer@usdoj.gov
      david.tobin@usdoj.gov
 7

 8    On Behalf of the Defendant Jasiel Correia, II:
      Kevin J. Reddington
 9    Law Offices of Kevin J. Reddington
      1342 Belmont Street
10    Suite 203
      Brockton, MA 02301
11    508-583-4280
      kevinreddington@msn.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2               (The following proceedings were held in open court
 3      before the Honorable Douglas P. Woodlock, United States
 4      District Judge, United States District Court, District of
 5      Massachusetts, at the John J. Moakley United States Courthouse,
 6      One Courthouse Way, Courtroom 1, Boston, Massachusetts, on May
 7      4, 2021.)
 8      (Case called to order.)
 9               THE COURT:  Just briefly before the jury is brought in
10      here.  Thank you for sending me the update on likely witnesses
11      today.
12               I want to perhaps shape your approach to the
13      discussion about instructions in this way:  I want you to think
14      about the redacted indictment, and more particularly about the
15      identification of the persons whose mailings are involved or
16      who are the subjects of the alleged extortion, because part of
17      what I will be doing, I think, is engaging you in a discussion
18      about timing of events in relation to communications by those
19      who might be viewed as conspirators here.  That's at least a
20      way of thinking this through.  And it's the way I've been
21      thinking about it.
22               The issue, of course, for me is not whether or not the
23      jury believes or disbelieves anything but whether or not there
24      is evidence in the record from which the jury could find a
25      mailing on such and such a date involving such and such a
```

1    person that was kept out of the indictments when they were

2    returned and, you know, things were identified as middleman X

3    and that sort of thing.

4         Now we've had evidence about various of these things

5    and will have by this afternoon, I think, and so we can fill in

6    the blanks on those names.  You'll recall that in the redacted

7    version I put it as red-lined and said actual names in

8    brackets.  Now is the time, I think, that we can start doing

9    that, and that will be helpful to me in talking through the

10   question of intent.

11        All I can say is the more research I do, it almost

12   appears that the question of intent has been my life's work on

13   this court.  The most recent one I spent a little time with is

14   *United States v. Dray*, 901 F.2nd 1132 at page 1140, which

15   affirmed my instructions on a case 30 years ago.

16        MR. HAFER:  Would you repeat the citation.

17        THE COURT:  *United States v. Dray*, 901 F.2nd 1132.

18   The instruction is referenced at 1140, and by just general

19   statement this was a case involving honest services fraud

20   before McNally.  McNally changed the landscape after the

21   decision was entered and so the case was remanded.  It was

22   retried by Judge Mazzone at the time.  But it gives an outline

23   of some of the concerns that arise in these kinds of cases as

24   the court -- Supreme Court has been working its way through,

25   let's say starting in McNally, to deal with what is the kind of

1    activity that can be regulated by federal criminal law and what

2    isn't.  But that was my light reading yesterday evening.  So I

3    read these cases and say, you know, that's familiar.  And, of

4    course, it's familiar, I tried the case 30 years ago.  So

5    that's where we are.

6            So we'll take this up at the break this afternoon to

7    talk through the instructions.

8            Anything else that we need to talk about before then?

9    And if we can get the witness in.

10           MR. HAFER:  Yes, Your Honor.  No, we don't have

11   anything else, and, yes, we'll get the witness in.

12           THE COURT:  Okay.  Good.

13           (Jury enters the courtroom.)

14           THE COURT:  Good morning, ladies and gentlemen.

15           Let me ask my morning greeting question.  Have any of

16   you been exposed in any way to any information about this case,

17   communications from someone, any exposure to media accounts,

18   anything like that, other than what's occurred here in the

19   courtroom?

20           And I see no affirmative response to that.  So I find

21   that the jury has not been affected in that fashion.

22           Ms. Beatty, if you'd swear the next witness.

23           MICHAEL KHOURY, Sworn

24           COURTROOM CLERK:  Please state your full name and

25   please spell your last name, and you can remove your mask.

```
 1              THE WITNESS:  It's Michael, M-i-c-h-a-e-l.  Last name
 2      is Khoury, K-h-o-u-r-y.
 3              THE COURT:  Mr. Khoury, you're going to be examined by
 4      Mr. Tobin over there, and if you can keep the microphone
 5      between you and Mr. Tobin so we can pick up your voice.  Okay?
 6              THE WITNESS:  Okay.
 7              THE COURT:  Mr. Tobin, you can inquire.
 8              MR. TOBIN:  Thank you, Your Honor.
 9      DIRECT EXAMINATION BY MR. TOBIN:
10      Q.   Good morning, Mr. Khoury.
11      A.   Good morning.
12      Q.   How old are you?
13      A.   58.
14      Q.   Where do you live?
15      A.   Rehoboth.
16      Q.   Do you own a business?
17      A.   Yes.
18      Q.   What business do you own?
19      A.   Excavating contractor.
20      Q.   What's the name of the excavating business?
21      A.   Same as the last name, Khoury Excavating.
22      Q.   And how long have you owned or been in the excavating
23      business?
24      A.   Since 2005.
25      Q.   What sort of work does your company do?
```

1   A.   We do mostly excavation for new foundations, sewer, water

2   connections.

3   Q.   Do you work for individual homeowners?

4   A.   Yes, for private people.

5   Q.   Do you also work for municipalities and cities?

6   A.   Correct.

7   Q.   Do you ever work for the City of Fall River?

8   A.   We still do.  We do and we still do.

9   Q.   And in addition to the excavating work, in the winter do

10  you add additional services that are made available?

11  A.   Yes, we're on the list of snow-plowing.

12  Q.   And you snow-plow for the City of Fall River as well?

13  A.   Pretty much every year, yes.

14  Q.   Sir, I'm going to ask you some questions about early 2017.

15  At that time did you and your company do certain work at 367

16  Kilburn Street in the City of Fall River?

17  A.   Yes, we did.

18  Q.   What work did your company perform there?

19  A.   We had to connect a fire line for the sprinkler system.

20  Q.   Connect it from where to where?

21  A.   From the middle of the road to the edge of the property.

22  Q.   And how did you get that contract?  In other words, who

23  contacted you?

24  A.   Mr. John Perry contacted me.

25  Q.   Who was Mr. John Perry, for whom did he work?

1   A.   He worked for the city.  I believe he was the head of CDA

2   maybe at that point.

3   Q.   Was it unusual for you to be contacted by the City of Fall

4   River and contracted for that type of work?

5   A.   No.  It happens all the time.  They call us to do some

6   certain work.

7   Q.   And do homeowners call you periodically to do that sort of

8   work?

9   A.   Correct, they do, yes.

10  Q.   And in most instances when a fire line has to be replaced,

11  who hires you?

12  A.   Mostly it's for the private owner side.

13  Q.   And what work -- how long did the work take you, the work

14  you did at 367 Kilburn Street?

15  A.   A little over a day, a day and a half complete.

16  Q.   Now, sir, in order to excavate a street in order to lay

17  pipe -- and that's what you were doing essentially; is that

18  accurate?

19  A.   Right, yes.

20  Q.   Do you need certain permits?

21  A.   If it's for the city, we do it -- we pull a permit but we

22  don't have to pay the fee for it.

23  Q.   And on this instance at 367 Kilburn Street, what came

24  first, the work at the site or pulling the permit?

25  A.   The work.

1   Q.   Was that somewhat unusual?

2   A.   Not really because it has to be done.  It was like some

3   kind of an emergency because they don't have a water feed to

4   the building.

5   Q.   Sir, there's a book in front of you, a binder actually,

6   and if you open that up, you'll see a number of tabs.  And the

7   first tab is 146.  Do you see that?

8   A.   Yes.

9   Q.   And what is tab 146?  Do you recognize that document?

10  A.   That's a water service permit.

11  Q.   And is this the water service permit you pulled for the

12  Kilburn Street work?

13  A.   I believe so, yes.

14          MR. TOBIN:  Your Honor, may 146 come into evidence?

15          THE COURT:  Yes.  It's received.

16          (Exhibit 146 admitted into evidence.)

17  Q.   And sir, directing your attention to the top of it, where

18  it says, "Location to be opened, street," what does it say

19  there?

20  A.   Kilburn Street.

21  Q.   And the name of your company, does it appear under the

22  applicant box also at the top of the screen?

23  A.   Correct.

24  Q.   And the contact person on the right is listed as you,

25  Michael Khoury; is that true?

```
 1    A.    That's correct.

 2    Q.    And if we go down to "excavating information" where it

 3    says "purpose, size pipe, pipe material," that information, who

 4    placed that information on this?

 5    A.    Pretty much we do.

 6    Q.    Okay.

 7    A.    Knowing the type of the job it is.

 8    Q.    And again, the title of this document, if you look at the

 9    very top of the form, is what?

10    A.    "Street Opening Application and Permit."

11    Q.    And there's a date.  Was that date written in by you when

12    you filed it?

13    A.    Could be.

14    Q.    And the date on this form is what?

15    A.    3-9-17.

16    Q.    Again, that, of course, would be March 9 of 2017; is that

17    accurate?

18    A.    Correct.

19    Q.    But, again, the work had already been done by this point;

20    is that true?

21    A.    That's true.

22    Q.    And sir, is there a start date box on this form?

23          MR. TOBIN:  If we can make the form a little larger.

24    A.    March 2, 2017.

25    Q.    Was that actually accurate, March 2, 2017?
```

1    A.   I do not exactly remember.  Maybe when we did the job was

2    March 2.

3    Q.   Well, sir, this is dated March 9, 2017.  You did the work

4    before then, didn't you?

5    A.   Yes.

6    Q.   And do you recall when you did the work?

7    A.   I'm thinking March 2.

8    Q.   Do you know when you did the work?

9    A.   I can't remember, to be honest with you.

10   Q.   Okay.  But sometimes these forms are filed after the work?

11   A.   Mm-hmm.  Rarely.

12   Q.   In this instance, who asked you to file the form?

13   A.   I believe the city engineer back then, just for formality.

14   Q.   Sir, and if you turn the page to 147.

15        MR. TOBIN:  I don't have anything on my screen.  Do we

16   have 147?  Can he see it?

17        Excuse me, Your Honor.

18   Q.   Sir, I'd ask you to look at your tab on tab 147.

19   A.   Mm-hmm.

20   Q.   And do you recognize what that document is?

21   A.   Yes.

22   Q.   What is that?

23   A.   It's called a trench permit.

24   Q.   Is it the one you pulled for this job?

25   A.   Yes, it's part of the same permit.  When you do it, you do

1    both.

2    Q.   Very good.

3         MR. TOBIN:  Your Honor, if we could please move 147

4    into evidence.

5         THE COURT:  Yes, it's received.

6         (Exhibit 147 admitted into evidence.)

7    Q.   And, again, that's another document that you received or

8    that you applied for after the work.  Is that true?

9    A.   Correct.

10   Q.   And sir, how much did this job cost?  What did you bill

11   the city for this?

12   A.   I believe before we even started we discussed it at 11,000

13   for the total.

14   Q.   And is it your recollection that the bill after the work

15   was done was for approximately 11,000?

16   A.   Exactly.

17   Q.   Now, how were you paid by the city for this job?

18   A.   So as the job was done, I got approached by Mr. Perry, and

19   he said, "We'll be paying you as we plow."  It was plowing

20   season.  And whatever hours we put in for every storm, they

21   pretty much doubled the money up to a certain amount.  And when

22   the season was over, whatever was left over, we sent a separate

23   bill for the balance.

24   Q.   Now, sir, if we may focus for a moment.  You did plowing

25   work and you were paid the going rate for plowing work?

1    A.   Correct.

2    Q.   You would submit bills for the plowing work?

3    A.   Usually they track the hours.  I don't submit bills.

4    Q.   Okay.  And then you would get paid for the plowing work?

5    A.   Yes.

6    Q.   But at the same time, you were paid additional money.  Is

7    that accurate?

8    A.   Same exact amount of whatever storm it was, you know.

9    Q.   And that extra money, that same exact amount that wasn't

10   for plowing, what was that for?

11   A.   To cover the bill for the fire line.

12   Q.   Was that an unusual circumstance?

13   A.   It was a little bit unusual, yes.

14   Q.   When the season ended and the snow stopped falling, were

15   you still owed a balance on that $11,000?

16   A.   Correct.

17   Q.   And did you bill the city?  Did you send them an invoice

18   for the balance of what you were owed?

19   A.   Well, it took almost three months for them to respond or

20   so.  So finally she said -- the secretary sent us the balance

21   on our bill in a way, and we pay it.

22   Q.   And sir, I'd ask you to open your binder to the next

23   exhibit, 148.  Do you recognize what that is?

24   A.   Yes.

25   Q.   What is it?

1  A.   It's our invoice.

2       MR. TOBIN:  Your Honor, may this be introduced as

3  Exhibit 148?

4       THE COURT:  It may.  It's received.

5       (Exhibit 148 admitted into evidence.)

6  Q.   Sir, this is the invoice from Khoury Excavating?

7  A.   This is for the balance.

8  Q.   For the balance, yes, sir.

9  A.   Not the original invoice.

10 Q.   And the date that this was drafted and sent to the city,

11 is there a date on this document?

12 A.   7-3-2017.

13 Q.   And is there an address, the work address where the work

14 had been done?

15 A.   367 Kilburn.

16 Q.   And the amount of money you are asking for in this final

17 payment?

18 A.   The balance was 7,950.

19 Q.   So it started at 11, and it went down to 7,950?

20 A.   Correct.

21 Q.   Because of the payments you got, interim payments you got

22 during snow season?

23 A.   That's correct.

24 Q.   And sir, I'd ask you now to turn to the next tab in your

25 binder, which is 149.  Do you recognize that document as the

1   purchase order from the city?

2   A.   This is, I believe, a copy of the check.

3   Q.   Okay.  And it's for the work that was done on Kilburn

4   Street?

5   A.   Correct.

6        MR. TOBIN:  May 149, Your Honor, be introduced into

7   evidence?

8        THE COURT:  Yes, it's received.

9        (Exhibit 149 admitted into evidence.)

10  Q.   And this reflects the payment by the city to you of

11  $7,950; is that accurate?

12  A.   Correct.

13       MR. TOBIN:  No further questions.

14       THE COURT:  All right.  Mr. Reddington.

15  CROSS-EXAMINATION BY MR. REDDINGTON:

16  Q.   Good morning, sir.

17  A.   Good morning.

18  Q.   Just a couple of questions, sir.  The reference to the

19  property at 367 Kilburn that we're talking about, were you,

20  yourself, aware of the history, in other words, what happened

21  to that fire line and why it had to be replaced?  Did you have

22  any knowledge of that at all?

23  A.   We learned about it after the fact.

24  Q.   You knew that the history would be that the city in June

25  of 2014 took possession of the King Philip Mill buildings on

1    386 Kilburn Street.  Did you know where the King Philip Mill

2    buildings were?

3    A.    Yes.

4    Q.    And the buildings, the King Philip Mill buildings, had

5    been part of a larger complex which originally included

6    buildings at 379 Kilburn, formerly known as the Korber Hat Mill

7    at 394 Kilburn.  Do you know where that is located?

8    A.    Yes.

9    Q.    And those buildings were subdivided from 386 Kilburn prior

10   to a tax taking.  When the fire service water line was

11   originally installed, it was designed as a single loop

12   providing fire service to all of those buildings.  Do you know

13   what that means, a single loop?

14   A.    Exactly, that's correct.

15   Q.    So what does that mean, "a single loop"?

16   A.    Meaning one line that fed all -- pretty much the whole

17   complex and other properties.

18   Q.    And 379 Kilburn had four buildings with two connections to

19   the fire service loop.  And then in 2014, the owner upgraded

20   one of the fire service lines by connecting the city's water

21   line in Kilburn Street.  Did you know that?

22   A.    Yes.

23   Q.    And in March of '17, current owner, Tony Costa, who had

24   purchased that property in June of 2016, discovered that the

25   separate fire service line had been cut when the fire service

1    loop at 386 Kilburn was disconnected.  Right?

2    A.   I don't know any of that information, to be honest with

3    you.

4    Q.   Okay.  Did you know that the city actually had

5    disconnected and ripped up that one line that was feeding all

6    of those buildings?  Did you know that?

7    A.   I knew that after the fact.

8    Q.   Okay.  And in March of '17, there was a request to restore

9    the fire service lines to 379 Kilburn, mailing address would be

10   367, which is Mr. Costa's building, that the city had

11   disconnected in 2015.  So it was about two years prior that

12   they had disconnected the fire line, right?

13   A.   If you say so.  Like I said, I only learned all of this

14   after the installation.

15            THE COURT:  Just a moment.

16            MR. TOBIN:  I'm sorry.

17            THE COURT:  The jury understands that the witness has

18   indicated he doesn't have any knowledge of that, and so unless

19   there's other evidence of this, you'll assume that there's no

20   evidence.

21   Q.   And Khoury Excavating, that would be you, was hired to

22   reinstall this fire line by tapping into the existing city fire

23   line, correct?

24   A.   Correct.

25   Q.   Water line, I should say.

1          And you knew that the city had done an investigation into

2     what happened in the history, and the city was responsible to

3     reconnect the fire service?

4          MR. TOBIN:  Objection.

5     Q.   If you know.

6     A.   That would be their --

7          THE COURT:  Just a moment.  I'm sorry, Mr. Khoury,

8     just a second.

9          I'm going to overrule the objection.  The witness can

10    answer to the best of his knowledge, and the jury is instructed

11    on how they use a question and answer as to which they find

12    there's no underlying information.

13         So you can answer the question, Mr. Khoury.

14    A.   I mean, if the city wants to reconnect and feel

15    responsible for it, I'm sure they would go ahead and do that.

16    Q.   Right.  Ultimately that's what happened.  A determination

17    was made that the city was responsible to reconnect that fire

18    service, right?

19    A.   Could be.

20         MR. REDDINGTON:  That's all I have.  Thank you.

21         MR. TOBIN:  Very briefly, Your Honor.

22         THE COURT:  Yes.

23    REDIRECT EXAMINATION BY MR. TOBIN:

24    Q.   Sir, are you aware that in the City of Fall River, if a

25    homeowner pays for excavation like this, there's an entire

 1   process that they can go through with the city to be

 2   reimbursed.  Are you aware of that procedure?

 3   A.   Only if it's the city's fault, yes.

 4   Q.   And that determination is made by an organization or a

 5   part of the city after a hearing or after an investigation; is

 6   that correct?

 7   A.   Part of the city, correct.

 8   Q.   That didn't have to be done here because the work was done

 9   by the city from the get-go; is that right?

10   A.   Yes.

11        MR. TOBIN:  Thank you.  No further questions.

12   RECROSS-EXAMINATION BY MR. REDDINGTON:

13   Q.   Did you know that the city, in fact, did an investigation

14   into the responsibility and assumed responsibility for the

15   project?

16   A.   No, no knowledge of any of that.

17        MR. REDDINGTON:  Okay.  Thank you.

18        THE COURT:  All right.  You may step down, Mr. Khoury.

19   Thank you.  If you could take that sleeve off the top of the

20   microphone.

21        MR. TOBIN:  Your Honor, the United States next calls

22   John Perry.

23        THE COURT:  All right.

24        JOHN PERRY, JR., Sworn

25        COURTROOM CLERK:  Please be seated and state your full

 1    name, and please spell your last name.

 2              THE WITNESS:  John Perry, Jr., P-e-r-r-y.

 3              MR. TOBIN:  Your Honor, may the witness remove his

 4    mask?

 5              THE COURT:  Yes.

 6              MR. TOBIN:  May I inquire?

 7              THE COURT:  Yes.

 8              MR. TOBIN:  Thank you, Your Honor.

 9    DIRECT EXAMINATION BY MR. TOBIN:

10    Q.   Good morning, sir.

11    A.   Good morning.

12              THE COURT:  Just a moment.  One further activity.  If

13    you could put a shield on top of that microphone there.  To

14    your left is that kind of shield.

15              Now you can proceed, Mr. Tobin.

16              MR. TOBIN:  Thank you, Your Honor.

17    Q.   Sir, how old are you?

18    A.   45.

19    Q.   Where do you live?

20    A.   Westport, Massachusetts.

21    Q.   Where do you work?

22    A.   City of Fall River.

23    Q.   What position do you hold?

24    A.   I'm the director of community maintenance.

25    Q.   What are your primary duties and responsibilities as the

```
1   director of community maintenance?
2   A.   I oversee several departments, which include DPW, parks,
3   cemeteries, trees, traffic and engineering.
4   Q.   How long have you held that position?
5   A.   Between interim and official director position, a little
6   over three years.
7   Q.   How long have you worked for the City of Fall River?
8   A.   For 21 years.
9   Q.   Prior to the current position you have, what did you do;
10  what was your history with the city?
11  A.   I was the director of operations for DPW.  Prior to that,
12  I worked in DPW from the start and I worked my way up.
13  Q.   Sir, you mentioned that at one point you were the interim
14  director and you now are the director; is that true?
15  A.   That is correct.
16  Q.   At some point when you were interim director, was the
17  mayor Jasiel Correia?
18  A.   Yes.
19  Q.   In fact, did he ultimately and finally appoint you as the
20  permanent director?
21  A.   That is correct.
22  Q.   Now, in your current position and the position that you
23  had under Mayor Jasiel Correia, was the excavation of streets
24  and sidewalks within the City of Fall River under your domain?
25  A.   Yes, through the engineering department.  Each department
```

1    I run has a manager that is also involved.

2    Q.    What about the water pipes or the fire line pipes, does

3    that -- did that fall under your jurisdiction?

4    A.    It does not.  That falls under public utilities.

5    Q.    But in order to get to subterranean pipes, they have to go

6    through the street or the sidewalk; is that correct?

7    A.    That's correct.

8    Q.    And your department ultimately issues the permits and

9    things of that nature; is that accurate?

10   A.    Correct.

11   Q.    Sir, I want to ask you some questions about early 2017.

12   At that time did you get a call from Mayor Correia about a

13   certain address on Kilburn Street and work that needed to be

14   done?

15   A.    I did.

16   Q.    And were you at work at that time?

17   A.    I'm sorry?

18   Q.    Were you at work when you got the call?

19   A.    Yes.

20   Q.    And was it a call or a visit?

21   A.    It was a call.

22   Q.    And you've indicated it was from Mayor Jasiel Correia?

23   A.    That is correct.

24   Q.    What did he ask you or what did he say to you during that

25   call?

1    A.    He stated that Mr. Costa was having an issue with the

2    water line at his Kilburn Street property and he wanted me to

3    get it taken care of.

4    Q.    Did he indicate why -- when he said -- what did he say

5    again?  What was the words he used?

6    A.    He indicated -- he said that Mr. Costa was having an issue

7    with his water line, and he wanted me to get it taken care of.

8    Q.    Wanted you to get it taken care of.  What did you

9    understand that to mean?

10   A.    Well, I asked him that question.  And he stated that he

11   wanted us to figure out what the problem was, and I asked him

12   if we were taking care of it or if Mr. Costa was as far as

13   paying for it, and he stated that we would be doing that.

14   Q.    Was that somewhat unusual, that the mayor would call about

15   a specific water line?

16   A.    About a water line, to me, yes.

17   Q.    Was it unusual that the mayor was suggesting or asking or

18   telling you that the city would take care of it; they would pay

19   for it?

20   A.    For a water line, yes.

21   Q.    Now, sir, if excavation of this nature is -- when it's

22   done, who is it typically paid for -- who pays for it?

23   A.    If it's a city issue, the city would pay for it.  If it's

24   a property owner's issue, the property owner would pay for it.

25   Q.    Now, are you aware or can you describe the process that a

1    property owner goes through to be reimbursed by the city for

2    work that is done by them or paid for by them?

3    A.   So if there's a dispute as to who is responsible for the

4    repair, whether it would be the city or the property owner, the

5    property owner is responsible for taking care of the repair,

6    paying for it, and then they can file a claim with the law

7    department for reimbursement after the fact.

8    Q.   And who adjudicates that claim, who decides if the city is

9    actually going to pay for it?

10   A.   That would be the law department.

11   Q.   The law department?

12   A.   Yes, sir.

13   Q.   And do you know, do they hold hearings, do they review

14   evidence?  What is it that they do?

15   A.   A claim form is filled out.  Whatever estimates, bills,

16   invoices would be submitted as a file to the law department and

17   they would review that.

18   Q.   And how long does this process take from the time that a

19   homeowner looking to be reimbursed, a homeowner claiming that

20   the city caused this problem, how long does it typically take

21   from the application to the city finally deciding whether or

22   not they'll pay for it?

23   A.   It all depends on how convoluted the issue is.  I'm not

24   sure.  It would depend on the issue.

25   Q.   Did you previously indicate six months to one year?

1    A.    It could be six months to a year or even longer.

2    Q.    In this instance, with regard to Mr. Costa's property on

3    Kilburn Street, did he have to file a request for the city to

4    cover the bill?

5    A.    No.  I paid the bill.

6    Q.    And at the time that the mayor asked you to pay for it,

7    what did you think about the request?

8    A.    I thought it was odd, but the mayor was asking me to take

9    care of it, so I did.

10   Q.    And are you aware, sir, that not too long ago the city

11   did, in fact, investigate that job to determine whether or not

12   the city would have or should have paid for it?  Do you

13   understand that that took place?

14   A.    I did.

15   Q.    And what was the determination that was made ever so

16   recently?

17   A.    The city had taken a mill across the street from the

18   Kilburn Street property in question.  We had cut off the water

19   line due to a leak and inadvertently cut off the fire lines to

20   the Kilburn Street property.

21   Q.    And if Mr. Costa had followed normal procedure and paid

22   for it himself, he could have been reimbursed; isn't that true?

23   A.    That is true.

24   Q.    After the investigation?

25   A.    Correct.

1   Q.   The investigation, which in this instance, didn't have to

2   happen because the city paid for it before there was an

3   investigation; is that true?

4   A.   Correct.

5          MR. TOBIN:   Thank you.   Nothing else.

6   CROSS-EXAMINATION BY MR. REDDINGTON:

7   Q.   Sir, just a couple of questions.   You know Tony Costa,

8   right?

9   A.   I do.

10  Q.   You're actually almost like best friends with Tony Costa,

11  right?

12  A.   I wouldn't say best friends, no, sir.

13  Q.   But you socialize with him, you are friendly with him?

14  A.   I speak to him when I see him.   We've never been out

15  socially.

16  Q.   How long have you known Mr. Costa?

17  A.   Shortly after Mayor Correia was elected, I was introduced

18  to him.

19  Q.   Who introduced you to him?

20  A.   Hil Camara.

21  Q.   Now, counsel had asked you some questions about the city

22  and investigating into the history, if you will, of this fire

23  line.   And you indicated, I believe, you were aware that back

24  in 2014 the city took over the King Philip Mill buildings,

25  right?

1   A.   Correct.

2   Q.   And at some point the water line or the fire line was

3   disconnected and it was one loop for all of those buildings,

4   right?

5   A.   That is correct.

6   Q.   So when Mr. Costa purchased his building on Kilburn

7   Street, I believe in June of 2016, that's when there was a

8   determination that the water feed to the sprinkler system in

9   that building was not operable, right?

10  A.   Yes.

11  Q.   And that was an emergency.  It had to be replaced and it

12  had to be replaced fast, correct?

13  A.   I can't answer that question.  I'm not sure what the

14  inspector told Mr. Costa.

15  Q.   And you know, sir, that the fire line service was, in

16  fact, connected and reinstalled, and it was a determination

17  that the city disconnecting that fire service line determined

18  that the city is responsible to reconnect the fire service, not

19  the owner, right?

20  A.   Could you repeat that, sir.

21  Q.   That the city disconnected the fire service line so the

22  city determined that they were responsible to reconnect the

23  fire service?

24  A.   After the fact, yes, sir.

25  Q.   For payment, right?

1  A.   After the fact, yes.

2  Q.   For payment, right?

3  A.   For payment?

4       MR. REDDINGTON:  Thank you.  That's all I have, Your

5  Honor.  Thank you.

6       THE COURT:  All right.  Anything further, Mr. Tobin?

7       MR. TOBIN:  No, Your Honor.  Thank you.

8       THE COURT:  You may step down, Mr. Perry.  If you

9  could take the top off the microphone, it would be helpful.

10      THE WITNESS:  Yes, sir.

11      MR. HAFER:  Your Honor, I neglected to mention this

12 morning, with your permission, prior to the start of the next

13 witness I'd like to read the stipulation regarding Count X --

14      THE COURT:  Okay.

15      MR. HAFER:  -- with the court's permission.

16      THE COURT:  Yes, you may.  And while you're doing

17 that, perhaps we'll get the witness in here as well.

18      MR. HAFER:  Yes, Your Honor.

19      THE COURT:  So before we hear from this witness, you

20 can read to the jury the stipulation.

21      MR. HAFER:  Thank you, Your Honor.  We'll do the same

22 thing, if that's okay, just publish it on the screen while I'm

23 reading.

24      THE COURT:  Yes, that's fine.

25      MR. HAFER:  This is titled "Stipulation Regarding

1    Count X.  The parties hereby stipulate and agree as follows:

2    Defendant Jasiel F. Correia, II, was an agent of an

3    organization or of a state, local or Indian tribal government

4    or agency thereof, namely the City of Fall River, as referenced

5    in Title 18, United States Code, Section 666(a)(1) and (a)(2)

6    and defined in 18 U.S.C. Section 666(d)(1).

7           "The City of Fall River, Massachusetts, Fall River,

8    was a local government as referenced in 18 U.S.C. Section

9    666(a)(1) and (2) and defined in 18 U.S.C. Section of

10   666(d)(3).

11          "The City of Fall River, Massachusetts received in

12   excess of $1 million in federal assistance from the United

13   States Department of Housing and Urban Development, HUD, in the

14   one-year period between July 1, 2017 and June 30, 2018, and in

15   excess of $1 million in the one-year period between July 1,

16   2018 and June 30, 2019.  These funds constituted benefits under

17   a federal program involving a grant, contract, subsidy, loan,

18   guarantee, insurance or other form of federal assistance as

19   required by 18 U.S.C. Section 666(b)."

20          THE COURT:  All right.

21          Ms. Beatty, you can swear the next witness.

22          JOSEPH I. MACY, Sworn

23          COURTROOM CLERK:  Please state your full name, and

24   please spell your last name.

25          THE COURT:  If you could give us your last name, spell

```
 1    the last name.  And if you could put the cap on top of the
 2    microphone, and you can take your own mask off.
 3              THE WITNESS:  Is this it, Your Honor?
 4              THE COURT:  Yes.  And you can take your mask off at
 5    this point.
 6              THE WITNESS:  If everybody could speak up, I'd
 7    appreciate it.
 8              THE COURT:  I'm sorry.  If you would take your mask
 9    off at this point.
10              THE WITNESS:  Okay.  That's a relief.  Thank you.
11              THE COURT:  And Mr. Hafer is going to be examining
12    you.  Keep the microphone between you and Mr. Hafer so it can
13    pick up your voice as well.  All right?
14              THE WITNESS:  Yeah.  Thank you, Your Honor.
15              THE COURT:  Mr. Hafer.
16    DIRECT EXAMINATION BY MR. HAFER:
17    Q.   Good morning, sir.
18    A.   Good morning.
19    Q.   How old are you?
20    A.   How old am I?
21    Q.   Yes.
22    A.   I'll be 78 in a month.
23    Q.   What town do you live in?
24    A.   Excuse me?
25    Q.   What town do you live in?  Where do you live?
```

```
 1   A.   I live in Fall River.

 2   Q.   Are you are currently working or are you retired?

 3        THE COURT:  If I may --

 4   A.   I would say I'm semi-retired.  I have a couple of cases

 5   I'm working on but --

 6        THE COURT:  If I may interrupt, I don't think that we

 7   have on the record the witness's name.

 8        MR. HAFER:  Oh, I'm sorry, Your Honor.

 9   Q.   Sir, could you state your name and spell your last name

10   for the record.

11   A.   Joseph I. Macy, M-a-c-y.

12   Q.   What was the last job you held before your semi-retirement

13   status, sir?

14   A.   I was corporation counsel in Fall River until January 6,

15   2020.  That was my last day of work.

16   Q.   Approximately how long, how many years, did you hold the

17   corporation counsel job in the City of Fall River?

18   A.   Approximately five.  I was appointed by Mayor Sutter July

19   13, 2015.

20   Q.   Were you the corporation counsel under Mayor Jasiel

21   Correia?

22   A.   Yes.

23   Q.   Prior to being the corporation counsel in the City of Fall

24   River, how were you employed?

25   A.   Working backwards, I was a judge in the Commonwealth of
```

1    Massachusetts from 1998 to 2015.  Prior to that, I was in

2    private practice for 30 years.  Prior to that, I served in the

3    U.S. Army.  And prior to that, I was in law school.

4    Q.   You indicated you were the corporate counsel under Mayor

5    Jasiel Correia.

6    A.   Yes.

7    Q.   In addition to the professional relationship, did you have

8    a personal relationship with Mayor Correia?

9    A.   We had a social relationship, yeah.

10   Q.   And could you just describe that, what types of social

11   activities you would do together.

12   A.   Well, I suppose it's hard to separate social from

13   political.  But from time to time, we would go together to

14   political functions, both in Boston and Fall River and New

15   Bedford.  He came to my house a couple of times on Halloween

16   for trick or treat.  He was supposed to give out the candy.  He

17   didn't.  I did.  He visited with my wife.  We would go out to

18   dinner, just the two of us, maybe every two to four months.

19   During debate time, I would participate in debate prep.  After

20   the debates, we'd usually go out to eat.

21   Q.   As corporate counsel did you have regular interaction at

22   work with Jasiel Correia when he was the mayor?

23   A.   Yes.

24   Q.   Could you briefly describe just what your day-to-day

25   responsibilities were as corporate counsel for the City of Fall

1    River.

2    A.   General responsibilities of the corporation counsel, the

3    way Fall River is constituted, is the corporation counsel has

4    general charge of all the legal affairs of the city.  It's the

5    corporation counsel that brings suits, defends suits, renders

6    opinions to the mayor, the city council, the various department

7    heads, signs off on all contracts, prepares contracts, if

8    necessary, prepares deeds, if necessary, and in general

9    fulfills the obligations of what I would consider to be general

10   counsel.

11   Q.   Mr. Macy, as corporate counsel for the City of Fall River,

12   were you involved in the city's issuance of Non-Opposition

13   Letters and Host Community Agreements?

14   A.   Yes.

15   Q.   Very generally first, sir, what was your involvement in

16   that process?

17   A.   Well, from time to time I would actually meet with people

18   who were interested in doing business in Fall River.  My direct

19   responsibility as corporation counsel was, I usually drafted

20   the Letters of Non-Opposition and drafted the Host Community

21   Agreements and then interacted with usually the lawyers for the

22   vendors to get everything signed, forwarded to them, and then

23   it was up to them to deal with the Department of Public Health

24   or the conservation -- not the Conservation Commission, I'm

25   sorry -- the Cannabis Control Commission.

1   Q.   In essence, what did these Non-Opposition Letters say?

2   You said you drafted them.  What was the essence of what they

3   said?

4   A.   The Non-Opposition Letter really was pretty much dictated

5   by the requirements of the Cannabis Control Commission.  It

6   essentially said that the city, in this case the City of Fall

7   River, had no opposition to the location of a marijuana

8   dispensary, usually described at a particular location, and it

9   also certified that the zoning for that location was

10  appropriate.

11  Q.   And in your understanding, was this Non-Opposition Letter

12  and the Host Community Agreement something that was required

13  for applicants seeking to operate marijuana businesses in

14  Massachusetts?

15  A.   It was required for submission to the Cannabis Control

16  Commission.  They were the ultimate approving authority.

17  Q.   Understanding that they were the ultimate approving

18  authority, did applicants need the letter from the city to

19  submit as part of their package to the Cannabis Commission?

20  A.   They needed both the letter and the Host Community

21  Agreement before they could submit to the Cannabis Control

22  Commission.

23  Q.   Mr. Macy, as the corporate counsel for the City of Fall

24  River, did you produce documents to the government in this case

25  in response to grand jury subpoenas?

1   A.   Yes.

2   Q.   And in approximately July of 2019 in particular, did you

3   produce documents and a summary of the approval process in the

4   City of Fall River?

5   A.   Yes.

6   Q.   Sir, you have a binder in front of you.  Could I ask you

7   to take a moment and turn to tab 150, 1-5-0.

8   A.   I have it.

9   Q.   Do you recognize the document at tab 150?

10  A.   I recognize that page, yes.

11  Q.   Okay.  What is that generally?  What is that?

12  A.   That's a copy of one of the answers I gave to you in

13  response to, I guess it was the subpoena.  I thought it was a

14  request, but it could have been the subpoena.  Anyway, I wrote

15  it.

16           MR. HAFER:  I offer Exhibit 150, Your Honor.

17           THE COURT:  It's received.

18           (Exhibit 150 admitted into evidence.)

19           MR. HAFER:  Ms. DiPaolo, could you highlight the top

20  half of it.

21  Q.   Mr. Macy, this is a lengthy document.  I don't want to

22  read the entire document but just to establish the record, fair

23  to say this was a summary you provided as to how the process

24  for obtaining Non-Opposition Letters and Host Community

25  Agreements was implemented in Fall River.  Is that fair to say?

1    A.    Yes.

2    Q.    I'm going to just read in part from the document Exhibit

3    150 in evidence.  You indicate that the process is governed by

4    Mass. General Laws and the jurisdiction of the Cannabis

5    Commission, correct?

6    A.    Yes.

7    Q.    In the next paragraph, you then state that an applicant

8    must first receive the Letter of Non-Opposition and a Host

9    Community Agreement with the host community; is that correct?

10   A.    That's correct.

11   Q.    The next paragraph you indicate there's not a specified

12   process by which one may apply for a letter and that there's

13   not a standard form or checklist that needs to be filled out;

14   is that correct?

15   A.    That's correct.

16   Q.    You then go on to elaborate that the process in Fall River

17   evolved over time, right?

18   A.    That's correct.

19   Q.    You indicate that generally requests were made either

20   directly to the mayor's office, the corporation counsel's

21   office or by an inquiry to one of the city departments; is that

22   right?

23   A.    That is right.

24   Q.    And you were the corporate counsel's office, correct?

25   A.    Yes.

1              MR. HAFER:  Ms. DiPaolo, could I have the next...

2     Q.    Just going again through the document, you indicate that

3     there's a lot of telephone inquiries that come in, and people

4     who call in are told they have to submit their site, their

5     experience and their financing; is that right?

6     A.    That's right.  Most of the telephone inquiries were really

7     overly general:  How do I get a license?  What's the law?  And

8     generally I would refer those people to the Cannabis Control

9     Commission or the statute.  But I did, when I spoke to them at

10    least, asked for a letter or proposal.

11    Q.    Going to the next paragraph, you indicate the process that

12    the city followed when a written proposal was received.  You

13    said typically a meeting would be scheduled.  That would be

14    attended by Mayor Correia and yourself; is that correct?

15    A.    Usually that would be the process, yes.

16    Q.    And at that meeting, the applicant would make some formal

17    presentation.  Any followup that had to be done would be

18    discussed.  Is that fair to say?

19    A.    Right.

20    Q.    Going to the next paragraph, you indicate if, after

21    evaluating the applicant and the plan, the mayor approves, a

22    Letter of Non-Opposition is issued and a Host Community

23    Agreement is executed; is that correct?

24    A.    Yes.

25    Q.    So who had the authority in Fall River at the time to

1  approve Non-Opposition Letters?

2  A.    The mayor.

3  Q.    You indicate the letter is in statutory form and that the

4  Host Community Agreements are sort of standard boilerplate, if

5  you will, legal documents; is that fair to say?

6  A.    After the first Host Community Agreement, that was right,

7  we used the same or tried to use the same one for every vendor.

8  Q.    Then finally, sir, the last paragraph indicates that after

9  the process is complete in Fall River, the applicant then needs

10  to take the Non-Opposition Letter and the Host Community

11  Agreement and move on to the Cannabis Control Commission; is

12  that fair to say?

13  A.    That's correct.

14  Q.    Based on your time as corporation counsel for Mayor Jasiel

15  Correia, do you know approximately how many Non-Opposition

16  Letters were issued by the city?

17  A.    I'm pretty sure by the time I left there were 14 and 14

18  Host Community Agreements.

19  Q.    Did you ever have a conversation with Mayor Correia where

20  he told you that he had agreed with certain vendors that he was

21  going to limit that number to only four or five?  Did you ever

22  have that conversation with him?

23  A.    No.

24  Q.    Mr. Macy, I assume you're generally aware of the

25  allegations regarding corruption in this case.  Do you have a

1    general awareness of the allegations?

2    A.    Am I aware of the allegations?  Yeah.

3    Q.    Yes, just generally.

4    A.    Yes.

5    Q.    At any point during the time you were corporation counsel

6    for Mayor Correia, did you have a conversation with him where

7    he told you he was taking money and things of value in return

8    for Non-Opposition Letters?

9    A.    Absolutely not.

10   Q.    Did you have any idea there was anything going on with

11   respect to money in return for Non-Opposition Letters?

12   A.    No.

13   Q.    Are you familiar with a man by the name of Charles Saliby?

14   A.    Yes, I am.

15   Q.    Who is Charles Saliby?

16   A.    He is a young fellow who owns, I believe, Guimond Farms --

17   it might have a different name now -- Convenience Store in Fall

18   River.

19   Q.    And was Mr. Saliby trying to open a marijuana business in

20   Fall River during the time you were corporation counsel?

21   A.    Yes, he did.

22   Q.    Could you turn, Mr. Macy, if you wouldn't mind, to tab

23   152.

24   A.    Yes, I have it.

25   Q.    There's actually two separate documents in 152.  What are

1   those?

2   A.   The first one is an amendment to the Host Community

3   Agreement for a company called Greener Leaf, and the other is a

4   Host Community Agreement between Fall River and Charles Saliby.

5   Q.   And Greener Leaf, to be clear, was Charles Saliby's

6   marijuana business; is that right?

7   A.   Yes.

8        MR. HAFER:   Your Honor, I offer 152.

9        THE COURT:   It's received.

10       (Exhibit 152 admitted into evidence.)

11       MR. HAFER:   Can I actually have the second document

12   first, Ms. DiPaolo, next page.

13   Q.   You indicated --

14       MR. HAFER:   And could you highlight down through the

15   background section.

16   Q.   You indicate here that this is a Host Community Agreement

17   between Mr. Saliby and the City of Fall River; is that correct,

18   Mr. Macy?

19   A.   What's on my screen says "Background."  So yes, that's the

20   first page of the Host Community Agreement.

21       MR. HAFER:   Now Ms. DiPaolo, could I have the next

22   page, section 2 at the top, highlighted.  Actually, the two --

23   both paragraphs, please.

24   Q.   The Host Community Agreement, Mr. Macy, essentially said

25   that the marijuana vendor or was going to agree, had to agree

1    to pay a portion of his or her sales or proceeds to the city

2    every year for the right to operate; is that correct?

3    A.   I'm not sure I'd phrase it that way.

4    Q.   How would you phrase it?

5    A.   In order to -- under our Host Community Agreement, every

6    marijuana vendor was required to pay a $50,000 per-year fee to

7    the city, which was permitted by the statute.  And in addition,

8    eventually 3 percent of their gross to the city and 3 percent

9    went to the state, which came back to the city.  So essentially

10   they paid 50,000 plus 6 percent.

11   Q.   You indicated eventually these agreements said 3 percent?

12   A.   That's right.

13   Q.   This particular agreement, if you look at the third line

14   up from paragraph 1, indicates the company will make a payment

15   of 4 percent.  Do you see that?  From paragraph 1, the third

16   line up from the bottom of the paragraph, "The company will

17   make a payment of 4 percent of gross revenue."  Do you see

18   that?

19            THE COURT:  I think the references is to romanette i

20   in section 1.

21            MR. HAFER:  Yes.  I'm sorry.

22   Q.   Mr. Macy, on the screen --

23   A.   I've got it now.  I see it on the screen, yes.

24   Q.   I just want to ask you.  You said eventually 3 percent.

25   Did it -- at one point it was 4 percent, and then it was

1    changed to 3 percent; is that fair to say?

2    A.    For everyone, yes.

3    Q.    For everyone.  And here, there's an original Host

4    Community Agreement for Mr. Saliby and an amended Host

5    Community Agreement; is that correct?

6    A.    That's right.  The amendment --

7    Q.    Changed it from 4 percent to 3 percent, right?

8    A.    That's right.  And that was for everyone.

9    Q.    Looking at Roman Numeral ii --

10            MR. HAFER:  What was the term you used, Your Honor?

11            THE COURT:  The new term of art I think is romanette.

12   A.    I see it.

13            MR. HAFER:  Ms. DiPaolo, would you highlight the

14   language, "The company shall make one annual payment."

15            THE WITNESS:  Yes, I have it.

16   Q.    Mr. Saliby's agreement here indicates that his company

17   shall make one annual payment to the city of $25,000.  Do you

18   see that?

19   A.    I do.

20   Q.    Was that the typical amount --

21   A.    No.

22   Q.    Why, to your knowledge, was Mr. Saliby's number lower than

23   the other ones?

24   A.    Mr. Saliby was in my office a lot complaining about almost

25   everything, getting his letter, and he kept claiming that his

```
1   place was so small that he couldn't afford the $50,000 a year.

2   So I told him or I told the mayor or I told the two of them

3   that he shouldn't be in the business if he couldn't afford it.

4   Eventually, he persuaded the mayor that, because his place was

5   so small, that he should only be required to pay 25,000.  And I

6   think the mayor initially agreed, but --

7   Q.   So who told you to change --

8           MR. REDDINGTON:  Can he finish his answer?  Sorry.

9           THE COURT:  Yes.  If you can complete your answer,

10  Mr. Macy.  You said "but."  You hadn't -- it didn't appear you

11  completed your answer.

12          THE WITNESS:  Okay.

13          THE COURT:  Why don't you put another question,

14  Mr. Hafer.

15  Q.   With respect to this agreement, did anyone ask you to

16  change the amount, standard amount from 50,000 to 25,000?

17  A.   Yes.

18  Q.   Who?

19  A.   The mayor.

20  Q.   Did he tell you why he wanted you to change it from 50 to

21  25?

22  A.   Yes.

23  Q.   What did he say?

24  A.   He said that because the place, Saliby's place was so

25  small, that he should only have to pay 25.  So that's what he
```

1    agreed to.  And that's why we added the second sentence.  If

2    his square footage went over 1,500 square feet, the annual fee

3    went up to 50.

4    Q.   In any of the Host Community Agreements that you

5    participated in the process of executing, did the mayor ask you

6    to change this amount from 50 to 25?

7    A.   No.

8    Q.   And that 50 per year is money that goes to the City of

9    Fall River, correct?

10   A.   Yes.

11   Q.   Did you ever have a conversation with the mayor where he

12   told you that the reason he wanted you to change it to 25 was

13   because he had made a separate deal with Mr. Saliby where

14   Mr. Saliby was going to pay him cash in return for a

15   Non-Opposition Letter?

16   A.   No, I never had that conversation.  Never heard those

17   words.

18   Q.   I'm going to switch subjects with you now, sir, and ask

19   you to please turn to tab 153.

20   A.   Yes, I have it.

21   Q.   As part of the documents you produced to the government in

22   this case, were you asked to produce the personnel file of a

23   woman named Gen Andrade?

24   A.   Yes.

25   Q.   And did you, in fact, produce that?

1   A.   I did -- or we did.

2   Q.   I'm sorry.  Are the documents contained at tab 153

3   documents that came from Ms. Andrade's official Fall River

4   personnel file?

5   A.   Yes.

6        MR. HAFER:  Your Honor, I offer Exhibit 153.

7        THE COURT:  It's received.

8        (Exhibit 153 admitted into evidence.)

9        MR. HAFER:  Ms. DiPaolo, could I have page 3 first,

10  please.

11  Q.   Looking, if you would, at the screen in front of you,

12  Mr. Macy -- it may be easier to do it that way -- is this

13  Ms. Andrade's employment agreement with the city?

14  A.   Yes.

15  Q.   And Ms. Andrade was going to be Jasiel Correia's chief of

16  staff according to the first sentence of this agreement,

17  correct?

18  A.   That's correct.

19       MR. HAFER:  Ms. DiPaolo, could you highlight the lower

20  portion of this document.

21  Q.   And this agreement sets out a salary of $78,780; is that

22  right?

23  A.   Yes.

24  Q.   And her employment per this agreement commenced on

25  November 27 of 2017; is that right?

1    A.    That's right.

2    Q.    And this indicates, actually, it's a term appointment that

3    is good until or will continue until December 31 of 2018 under

4    this agreement; is that right?  The paragraph titled "Term."

5    A.    Yes.

6          MR. HAFER:  If I could have the second page with the

7    signatures, Ms. DiPaolo, the next page of this agreement.

8    Q.    And just turning to the second page, this document,

9    Mr. Macy, is signed by -- well, who signed this document?

10   A.    It was signed by Mayor Correia on behalf of the city,

11   signed by Genoveva Andrade herself; and as with all city

12   contracts, it was approved as to form and manner of execution

13   by me.

14   Q.    Prior to approving this by form and manner of execution,

15   did you ever have a conversation with Jasiel Correia in which

16   he told you he had a separate arrangement with Ms. Andrade by

17   which she had to give him half of her salary?

18   A.    No.

19         MR. HAFER:  Could I have page 5, please.

20   Q.    Mr. Macy, I'm putting on the screen in front of you the

21   fifth page of this exhibit.  It's titled "Policy Acknowledgment

22   Form."  Do you see that?

23   A.    I do.

24   Q.    And could you just briefly explain what this document is.

25   A.    It's a document that every employee is supposed to sign

1    acknowledging receipt of various employment policies from the

2    city, the sexual harassment, drug-free workplace, the ethics

3    commission.  They're given copies of almost all of this, and

4    they just -- this particular form acknowledges that they

5    received it.

6    Q.   Including, among other things you mentioned ethics, it

7    indicates here a conflict of interest summary, correct?

8    A.   Yes, they're acknowledging that they got each and every

9    one of these numbered documents.

10   Q.   And I don't think I asked this.  This is Ms. Andrade in

11   this case on or about November 16 of 2017 acknowledging that

12   she's receiving these documents and policies, correct?

13   A.   Yes.

14          MR. HAFER:  Ms. DiPaolo, could I have page 1 of the

15   exhibit.  Could you see if you can get all the handwriting as

16   well.

17   Q.   I'm now turning to the first page of this exhibit,

18   Mr. Macy.  This is a letter dated December 14 of 2017; is that

19   correct?

20   A.   It is.

21   Q.   And I'm just going to read this letter and ask you a few

22   questions.  The letter is addressed to a Ms. -- how do you say

23   that?  Coelho?

24   A.   Madelyn Coelho.

25   Q.   Coelho.  "Dear Ms. Coelho, This letter is confirmation to

1    pay Genoveva Andrade, chief of staff, a snow stipend in the

2    amount of $10,000.  This stipend is to be paid half in December

3    2017 and half in January 2018."  Have I read that correctly?

4    A.   Yes.

5    Q.   And who signed that letter awarding the snow stipend to

6    Ms. Andrade?

7    A.   Mayor Correia did.

8    Q.   Did you ever, in connection with this snow stipend, have a

9    conversation with Jasiel Correia in which he told you he had a

10   separate arrangement with Ms. Andrade, and she was going to

11   give him most of the money from this snow stipend?

12   A.   No, I never had that conversation.

13          MR. HAFER:  Could I have page 2.  I think it's the

14   only one I haven't published, Ms. DiPaolo.

15   Q.   I'm just showing you the final page of this exhibit,

16   Mr. Macy.  This is a January 7 of 2019 document reflecting that

17   Ms. Andrade has resigned as chief of staff.

18   A.   I see it, yes.

19   Q.   And according to this, the effective date of the

20   resignation is January 4 of 2019; is that correct?

21   A.   That's correct.

22   Q.   Mr. Macy, as part of the series of documents and

23   productions you made to the federal government in this case,

24   were you asked to produce any particular documents in your

25   possession related to ethics, waivers, and disclosures by

1    certain employees of Fall River?

2    A.   I don't recall if I was asked to produce specific

3    documents.  My memory is I was asked to produce all documents

4    pertaining to specific individuals, in this case, Ms. Andrade.

5    Q.   Thank you for the --

6    A.   Mrs. Andrade.

7    Q.   Thank you.  And did you, in fact, produce any documents in

8    your possession regarding conflict of interest waivers that

9    Ms. Andrade had filled out?

10   A.   Those documents wouldn't have been in my possession, but

11   in conformance with my agreement with you and the subpoena, I

12   collected appropriate documents from the appropriate

13   departments, particularly human resources and the city clerk.

14   Q.   And in fact, after collecting those documents, did you

15   produce to the government documents related in the first

16   instance to Ms. Andrade's conflict of interest waivers?

17   A.   I produced -- yes, I produced them.

18   Q.   Could you turn to -- and this was in approximately July of

19   2019, correct, sir?

20   A.   Yes, sir.

21   Q.   That you made a --

22   A.   I would speculate -- there are a lot of requests, and I

23   answered a lot of them.  The documents I have in front of me

24   don't contain the subpoena, but that sounds about right.

25   Q.   Could you turn to tab 154.

1    A.   Yes, I have it.

2    Q.   Okay.  What is contained at tab 154?

3    A.   It's a disclosure form.

4    Q.   By whom?

5    A.   Ms. Andrade.

6             MR. HAFER:  I offer Exhibit 154, Your Honor.

7             THE COURT:  It's received.

8             (Exhibit 154 admitted into evidence.)

9    Q.   Mr. Macy, this was the only disclosure form that you

10   obtained with respect to Ms. Andrade; is that correct?

11   A.   Yes.

12   Q.   And in general, what are these conflict of interest

13   disclosures?  What's the point of them?

14   A.   Well, they're required to be filed with the city clerk

15   under the statute just to put people on notice that there is or

16   might be a conflict of interest.  It's pretty broadly viewed.

17   In this one I note that what she disclosed was her cousin

18   worked in the Mayor's office.  Sometimes there's a more

19   elaborate filing if somebody does business with the city.  But

20   that's what this one says.

21   Q.   Was this the only one you found with respect to

22   Ms. Andrade?

23   A.   Yes.

24   Q.   Were you also asked to produce whatever you could find

25   with respect to Jasiel Correia and conflict of interest

1  disclosures?

2  A.   Yes.

3  Q.   Could you turn to tab 155, please.  Do you recognize the

4  documents at tab 155?

5  A.   I do.

6  Q.   What are those, Mr. Macy?

7  A.   These are filings by Jasiel Correia as mayor with the city

8  clerk.  Looks like there are three.

9       MR. HAFER:  I offer Exhibit 155, Your Honor.

10       THE COURT:  It's received.

11       (Exhibit 155 admitted into evidence.)

12  Q.   Mr. Macy, I'm going to go through these one at a time.  I

13  believe you said there are three in here total?

14  A.   There were three in my package, yes.

15       MR. HAFER:  Ms. DiPaolo, can you highlight the section

16  beginning a little more than halfway down, "Appearance of

17  Favoritism Or Influence."

18  Q.   This first one, Mr. Macy, indicates that it pertains to

19  the sale of Lincoln School to a man named David Hebert; is that

20  correct?

21  A.   It is.

22  Q.   Mr. Correia on this form indicates he signed the deed and

23  that Mr. Hebert is his landlord to whom he pays monthly rent;

24  is that correct?

25  A.   Yes.

1   Q.   He's essentially making that disclosure because it's a

2   potential conflict of interest?

3   A.   Yes.  The sale was approved by the city council but as

4   mayor he had to sign the deed and he made the disclosure.

5        MR. HAFER:  Could you go to the next one, please, and

6   could you highlight the same section.

7   Q.   This is the second one.  Do you see the second one here

8   related to a Mr. Hildegar Camara?

9   A.   Yes.

10  Q.   And on this one, in essence, Mr. Correia is disclosing

11  that he appointed Hildegar Camara to a position but that

12  Hildegar Camara had invested in a startup corporation that

13  Mr. Correia organized; is that correct?

14  A.   Yes.

15       MR. HAFER:  And could you turn to the final one,

16  Ms. DiPaolo.

17  Q.   This last one indicates it relates to the sale of a Silvia

18  School to that same individual, David Hebert, Mr. Macy; is that

19  right?

20  A.   Yes.

21  Q.   Mr. Correia makes the disclosure regarding the monthly

22  rent, right?

23  A.   That's correct.

24  Q.   When you searched Mr. Correia's ethics disclosures, were

25  there any disclosures related to the receipt of payments in

1    return for Non-Opposition Letters?

2    A.    No.

3    Q.    Were there any disclosures related to any agreements with

4    Gen Andrade about paying him portions of her salary?

5    A.    No.

6    Q.    Sir, could you turn to the final tab in your binder,

7    please, tab 156.

8    A.    Yes, I have it.

9    Q.    It's a two-page document.  Do you recognize that?  Maybe

10   starting with the second page is easier.

11   A.    Let me start with the first page.  Yes, I recognize it.

12   Q.    What is that, Mr. Macy?  What is tab 156?  What is

13   contained at tab 156?

14   A.    Well, the way it's presented, it's a letter from the mayor

15   to the Fall River City Council dated August 19, 2019 vetoing an

16   ordinance they passed, which is on the reverse side of the

17   document I have, attempting to limit the number of marijuana

18   licenses that could be issued by the City of Fall River.  The

19   letter speaks for itself, but essentially he's vetoing it

20   because they didn't have that authority.

21             MR. HAFER:  Your Honor, may I offer Exhibit 156.

22             THE COURT:  Yes, it's received.

23             (Exhibit 156 admitted into evidence.)

24             MR. HAFER:  Ms. DiPaolo, could I have the second page

25   first.

1    Q.   Mr. Macy, thank you for that explanation.  I'm just going

2    to walk you through these two documents.  You indicated there

3    was an ordinance that the City of Fall River had passed

4    regarding the number of marijuana licenses in the city; is that

5    right?

6    A.   They passed the proposed ordinance.  The ordinance wasn't

7    -- wouldn't be law -- it wouldn't be an ordinance until it was

8    signed by the mayor.

9    Q.   Thank you for that clarification.

10        According to this document, the proposed ordinance reads

11   that the maximum number of marijuana licenses available at any

12   one time in the City of Fall River will be limited to 20

13   percent of off-premise liquor licenses or 11, whichever number

14   is greater, correct?

15   A.   Yes, it says that.

16   Q.   And you testified previously that, as best you recall,

17   when you left or when Mayor Correia left, at least 14 had been

18   approved, correct?

19   A.   At the time I left, yes.

20        MR. HAFER:  Could I have the first page, please.

21   Could you highlight the entire letter, if you wouldn't mind.

22   Q.   Mr. Macy, you indicated that proposed ordinance from the

23   city council was vetoed by then Mayor Correia, correct?

24   A.   That's right.

25   Q.   I'm going to read portions of this letter and just ask you

1    a couple of followup questions.  You refer in the first

2    instance to the veto being because the proposed ordinance

3    exceeded the scope of the city council's authority in some

4    measure; is that right?

5    A.   The first -- well, the first full paragraph says that --

6    it says that the city council cannot -- well, it says that

7    whether or not the city council can legally limit the number of

8    marijuana licenses, it appears that that's within the executive

9    authority of the Cannabis Control Commission.  So the ordinance

10   as written would only expose the city to unnecessary

11   litigation.  In other words, in English, it says you can't do

12   that.

13   Q.   Going to the second paragraph, I'm going to read it and

14   ask you a question.  It indicates, "By unilaterally and

15   arbitrarily attempting to limit the number of licenses, the

16   ordinance eliminates competition, artificially inflates the

17   value of licenses already issued, removes the legal sale of

18   marijuana products from market forces, and eliminates a

19   valuable source of additional revenue to the city."  Correct?

20   A.   Yes.

21   Q.   The next paragraph, "In addition, a sitting councillor

22   voted inappropriately to limit the number of licenses available

23   in Fall River while serving as town administrator of Seekonk, a

24   community which itself is in the process of granting marijuana

25   permissions."  Have I read that correctly?

1    A.    That's correct.

2    Q.    Mayor Correia is saying there's a city councilman who

3    failed to disclose a conflict; is that right, or town

4    administrator?

5    A.    I don't know that he's saying he failed to disclose a

6    conflict.  He's saying that he voted against what he considers

7    to be the interest of Fall River to advantage another

8    community.

9    Q.    The next sentence says, "In limiting the number in Fall

10   River, he advantages the town by which he is employed by

11   eliminating competition and disadvantaging this city."

12   Correct?

13   A.    That's correct.

14   Q.    Does the mayor say anything in this letter about reducing

15   Mr. Saliby's annual payment from 50,000 to 25,000 for the City

16   of Fall River?

17   A.    No.  The letter answers a general question as to whether

18   the ordinance is legal, but that language is not in there, no.

19   Q.    Was the City of Fall River disadvantaged by receiving

20   $25,000 less than it was supposed to under most Host Community

21   Agreements?

22   A.    Well, it could have been if he ever got the license.  But

23   to my knowledge, even with the controversy over the number of

24   licenses, only three have been issued to date.

25   Q.    At this time?

1   A.   As a practical matter, they weren't.  They could have

2   been.

3   Q.   If Mr. Saliby had received his license, his annual payment

4   would have been 25,000?

5   A.   That's correct.

6   Q.   So ultimately Mayor Correia, then Mayor Correia, vetoes

7   this proposed ordinance; is that right?

8   A.   Yes.  Well, he vetoed the proposed ordinance, yes.

9        MR. HAFER:  Thank you, Your Honor.  I have no further

10  questions.

11       THE COURT:  All right.  Mr. Reddington.

12       MR. REDDINGTON:  Yes, Your Honor.

13  CROSS-EXAMINATION BY MR. REDDINGTON:

14  Q.   Good morning.

15  A.   Good morning.

16  Q.   Just picking up on that last question that Mr. Hafer asked

17  you and your response.  It's your understanding that at this

18  point, as you indicated, despite the controversies, three

19  licenses have been issued.  Is that your understanding?

20  A.   At the time that letter was issued, I don't know if any

21  licenses had been issued because I don't have the dates.

22  Q.   Right.

23  A.   I know that at some point, probably up until today,

24  although I haven't checked, there were only three valid

25  marijuana licenses in Fall River issued by the Cannabis Control

1    Commission.

2    Q.   Exactly.  That's the point I'm getting it.  In other

3    words, the process that you were dealing with would be that an

4    applicant has to submit the request, obtain ultimately the

5    Letter of Non-Opposition, obtain ultimately the Community Host

6    Agreement, and then it's up to the Cannabis Control Commission

7    whether that person is approved and licensed, correct?

8    A.   That's right.  That was -- they always had that exclusive

9    authority, and that's the way we operate.

10   Q.   All right.  And as it relates to -- Mr. Hafer was asking

11   you about Mr. Saliby.  Did he have a very, very tiny business

12   store?

13   A.   Excuse me?

14   Q.   Did he have a small store, Saliby?

15   A.   Yeah, it wasn't -- I mean, particularly compared to some

16   of the other stores, it was small.

17   Q.   Right.  And you indicated that Mr. Saliby was in your

18   office a lot?

19   A.   He was always running around, anxious to get his

20   agreement.  And at one point the only really time I remember is

21   he wanted it before he went on vacation.  And I don't remember

22   if I got it done in time or not.  I tried to deal with his

23   lawyer for the most part.

24   Q.   And that would be Mark Levin?

25   A.   Yes.

1    Q.   And many of the applicants, if not all, were represented
2    by attorneys when they were dealing with you and the city law
3    department in filing applications for these Letters of
4    Non-Opposition, correct?
5    A.   To my memory, almost everybody was represented by an
6    attorney, yes.
7    Q.   And is it fair to say that it was important to you and to
8    City Hall that the location be a valid, appropriate location
9    for this type of a business?
10   A.   Yes.
11   Q.   And it was important that there not have any schools or
12   dance studios or anything nearby, playgrounds, things of that
13   nature, correct?
14   A.   Well, there are two things.  One is the statute requires
15   that you can't locate within so many feet of a school, church,
16   I think a park; and the other is that certain locations were
17   simply inappropriate because they were too close to a
18   neighborhood or too close perhaps to another vendor, not a
19   commercially viable location.
20   Q.   And the person would put together, with the assistance of
21   counsel most likely, their application, including their
22   articles of organization for the corporation, correct?
23   A.   Either that or they were an LLC, or some people were
24   individuals, and I think the contract might have said "or their
25   nominee" so that they could form whatever entity they wanted

1    to.

2    Q.   Okay.  So what I'm getting at is that it's a requirement

3    that a person have the advice of a board of directors, for

4    example, which would consist of a medical or cannabis

5    specialist, perhaps a security specialist, things of that

6    nature?

7    A.   I'm not sure I understand the question, but that was all

8    to be vetted by the Cannabis Control Commission.  I mean, if

9    somebody came to us and said, "I'm General Motors.  We've got

10   their articles of incorporation," but otherwise, we took them

11   at face value.

12   Q.   So when you take them at face value, basically you would

13   agree that an investigation was done regarding the location,

14   regarding the unit that was going to house the business that

15   was investigated, correct?

16   A.   Yeah, we -- the city had to satisfy itself that these

17   people were viable.  In terms of an investigation, I wouldn't

18   call it that.  Some of these people were known entities, some

19   of them were known to the mayor.  But I don't think it's fair

20   to characterize what we did as an investigation.

21   Q.   Well, didn't people have to come in and make a

22   presentation to you, for example, Chris Parayno, for example,

23   Jasiel Correia, for example?

24   A.   Some of them did, yes.

25   Q.   And where would that take place, in City Hall?

1    A.   Well, yes.  If there were meetings, they would take place

2    in City Hall, yes.

3    Q.   And you were involved in a number of these meetings,

4    correct?

5    A.   Yes.

6    Q.   And the people would present basically what I was just

7    asking about, what type of business they have, the location, to

8    ensure that it would be a viable decent business, right?

9    A.   Well, it was up to them to make sure their business was

10   viable.  We were more concerned in the location, make sure the

11   location was appropriate.

12   Q.   Of course.

13   A.   And very often they'd bring their marijuana growing person

14   so we knew they had experience.

15   Q.   All right.  And these could be lengthy meetings, correct?

16   A.   Excuse me?

17   Q.   They could be lengthy meetings?

18   A.   I'm missing that one.

19   Q.   They could be lengthy, long, a lot of work went into these

20   meetings.  First they'd show up.  They'd have their attorney.

21   They'd have many times their representative, their supplier, as

22   it were.  It takes some time for these meetings, right?

23   A.   Well, it wasn't a very involved process, but we met with

24   them, yeah.

25   Q.   Now, you worked under the prior administration, Mayor

1    Sutter --

2    A.   Yes, I did.

3    Q.   -- correct?

4         And for how many years did you work for Mr. Sutter?

5    A.   I don't know if it was a year or it was 11 months.  I

6    started in the middle of the term.  I started in July of 2015.

7    Q.   And when Mr. Sutter lost the election to Jasiel Correia,

8    and Jasiel Correia was then sworn in as mayor, he kept you on

9    so to speak?

10   A.   He did, yes.  Yes.

11   Q.   Along with your staff, other attorneys, I think there's

12   another fellow that works for you, and your secretaries and

13   whatnot?

14   A.   There was a lot of turnover in the secretaries, but, yes,

15   basically he kept my assistant and he kept whatever office

16   staff was there.  They changed over after a while.

17   Q.   Right.  My point is that he basically kept your office the

18   way it was.  He didn't take it and do anything with it?

19   A.   That's right.

20   Q.   And who is Carla Dutra?

21   A.   She is my secretary.  She came -- she wasn't the original

22   secretary there, but she's the secretary who was there for the

23   most time, and she's there now.

24   Q.   And for how many years were you corporation counsel under

25   Jasiel Correia's administration?

```
 1   A.    I don't know how many years it was.  However long he was
 2   mayor, I was there.
 3   Q.    And you had occasion to observe his job performance, if
 4   you will, as mayor working for the city and the people,
 5   correct?
 6   A.    I didn't hear that one, Mr. --
 7   Q.    Well, did you think he did a good job as mayor?
 8   A.    Excuse me?
 9   Q.    Did you think he did a good job as mayor?
10   A.    Yeah, I thought as mayor he did a good job, yes.
11   Q.    And one of the things that you were familiar with would be
12   his philosophy, if you will, regarding the number of marijuana
13   businesses that could operate in the City of Fall River.  You
14   knew about that, right?
15   A.    I don't think he had a philosophy.  I never heard it.
16   Q.    Well, okay.  Did you ever discuss with him and, as you
17   know, according to that document that shows the veto of the
18   city council, for example, he did not want to limit to three or
19   four businesses.  He wanted free enterprise, if you will, with
20   a number of applicants and the possibility of a number of
21   marijuana businesses.
22   A.    I never heard him articulate that.  But it's clear as a
23   practical matter the City of Fall River and the mayor were
24   interested in issuing any number of viable marijuana licenses.
25   Q.    Thank you.  And to anyone who was qualified, no
```

1    discrimination, correct?

2    A.    I'm not sure about saying anyone.  I mean, there were

3    people who were qualified who came in too late.  In other

4    words, after the city council was just, you know, very, very

5    difficult.  There were other people who were qualified in one

6    way who just didn't seem to be able to locate a correct

7    location.

8    Q.    Okay.

9    A.    So I'm not sure it's fair to say anybody who wanted a

10   license could get one.

11   Q.    Would you agree, sir, that -- and I think you do -- that,

12   for example, there were about 14 Letters of Non-Opposition that

13   were issued by Jasiel Correia?

14   A.    Yes.

15   Q.    And assume that these businesses that had received their

16   Letters of Non-Opposition, for example -- if I may, I just have

17   a little chart here, if I could ask a couple of questions just

18   as a guide for myself more or less.

19        For example, Agricultural Healing Incorporated, fellow by

20   the name of Colin Geoffroy.  You're familiar with that Letter

21   of Non-Opposition being issued, correct?

22   A.    I -- these vendors came up with all sorts of names that I

23   just processed.  I knew about most of the vendors by the name

24   of the principal.

25   Q.    Okay.

1   A.   So that one doesn't -- I mean, it rings a bell.

2   Q.   Colin Geoffroy?

3   A.   Excuse me?

4   Q.   Colin Geoffroy?

5   A.   Yes, that was -- I think I used to pronounce it Colin

6   Geoffroy, but that's the one, yes.

7   Q.   Okay.  So let's just -- Robert Sabin and Sidney Adler,

8   does that ring a bell?

9   A.   Say that name again.

10  Q.   Robert Sabin and Sidney Adler.

11  A.   That does not ring a bell.

12  Q.   The business being Canna 1, LLC?

13  A.   What was the name of the corporation?

14  Q.   Canna 1, LLC.

15  A.   That name I remember, yes.

16  Q.   Okay.  Premium Chef Edibles, Ricky Granoff?

17  A.   I don't remember the person, but I remember the edible

18  production.  They were going to make candy or something.

19  Q.   Okay.  Okay.  CannaTech Medicinals Inc., Randy Maslow and

20  John Henderson?

21  A.   I remember that name.  I'm not sure if they were the

22  doctors' group that was in first or not.  But I remember that

23  name, yeah.

24  Q.   You remember the name.

25       Greener Leaf Incorporated, Charles Saliby?

1    A.    I remember him.

2    Q.    Hope Heal Health Incorporated, John Rogue, Amy Ferrie?

3    A.    Yes, I remember Mr. Rogue very well.  He came in early and

4    had an elaborate presentation and actually bought his own

5    building.

6    Q.    So each one of these Letters of Non-Opposition that were

7    issued to these individuals -- for example, there was another

8    fellow by the name of Mr. Brayton.  Do you remember

9    Mr. Brayton?

10   A.    Yes, I remember Mr. Brayton.

11   Q.    Mr. Bairos?

12   A.    What was the next one?

13   Q.    Bairos, B-a-i-r-o-s.

14   A.    That name doesn't ring a bell, no.

15   Q.    So these individuals, assuming that they were licensed,

16   would be generating revenue, $50,000 per license, to the City

17   of Fall River, correct?

18   A.    Yes, they would.

19   Q.    And they also would be paying a percentage, in accordance

20   with the Community Host Agreement, to the City of Fall River

21   once they were up and running, correct?

22   A.    Yes.

23   Q.    Now, the Community Host Agreement and the Letter of

24   Non-Opposition, who wrote that; who legally prepared that?

25   A.    Well, the Host Community Agreements were generated by my

1    office, and the original one was a combination of myself and

2    another lawyer who represented, I think maybe Cannatech.  But

3    in any event, we used the same agreement all along.

4    Q.   And then you --

5    A.   And the Letter of Non-Opposition was pretty much in

6    statutory form.

7    Q.   Okay.  And it was obviously prepared or reviewed by you.

8    You would agree with that?

9    A.   They were generated by me, yeah.

10   Q.   And then you would provide them, for example, to Jasiel as

11   the chief executive officer of the city in the event he

12   approved location, business, all the items we talked about, he

13   would then sign it and then return it to your office, correct?

14   A.   No.

15   Q.   How would that --

16   A.   He would present the approved party to me.

17   Q.   Okay.

18   A.   And then I would generate the paperwork.

19   Q.   All right.  So after you were presented the approved

20   party, you would then generate the paperwork, meaning the

21   Letter of Non-Opposition and the Community Host Agreement,

22   right?

23   A.   That's correct.

24   Q.   And what would happen to that then; would it be given to

25   Jasiel to sign?

1    A.   Well, what I used to try to do -- I don't know that it

2    always worked -- is I would send a draft Host Community

3    Agreement to the attorney.  If the terms were correct, that is,

4    the name of the entity and the address of the premises, I would

5    send two host agreements to the attorney for their client to

6    sign.

7         When I got two signed agreements back, I would have the

8    mayor sign them.  I would then have the mayor sign the letter

9    of opposition, and I would send the Letter of Non-Opposition

10   and one Host Community Agreement back to the lawyer, retaining

11   a signed Host Community Agreement for us.

12   Q.   Okay.  And that was done on a regular basis, correct?

13   A.   That was the way it worked for the most part.  I'm not

14   saying they didn't cross in the mail ever.

15   Q.   Okay.  So people would basically have kind of like a

16   heads-up that they were looking pretty good to be approved to

17   get the Community Host Agreement to sign before the letter of

18   commitment was even issued, right?

19   A.   I wouldn't send it out unless he told me they were

20   approved.

21   Q.   Right.  But then you indicated you'd send a draft

22   Community Host Agreement to the individual's lawyer, right?

23   A.   That's right.

24   Q.   So the lawyer, at least, if not the client, the business

25   person, would have a heads-up that you're looking pretty good

1    even before the Letter of Non-Opposition is signed, right?

2    A.    I think the accurate way to phrase it is the lawyer would

3    know they've been approved.  He was to look at and approve the

4    business terms for his client, and he was to look at and

5    approve the entity terms so that we knew we were dealing with

6    the correct LLC.

7    Q.    Okay.  So if someone has a business and they want to sell

8    marijuana and get a license in the City of Fall River, their

9    hope or aspiration would be they're going to make a lot of

10   money, right?

11   A.    They would do what?

12   Q.    Make a lot of money.

13   A.    They thought they would, yes.

14   Q.    Okay.  So the people many times were kind of excited and

15   anxious to get this portion of the process completed, right?

16   A.    I'm not following that.

17   Q.    Well, if somebody wants to get a license, they know they

18   have to be approved by the Cannabis Control Commission, right?

19   A.    Yes.

20   Q.    So they know that the thing that has to be done first is

21   to get a Letter of Non-Opposition from the mayor and the

22   Community Host Agreement, right?

23   A.    They knew that was the first step, that's right.

24   Q.    And many times people were anxious, they were anxious to

25   have that process complete and would inquire as to what the

1    status is of my --

2    A.   Yes, they would.

3    Q.   All right.  And all I'm asking you is, once you guys

4    determined that this business was going to be approved, you

5    would then send, as I understand it, two community host

6    agreements out to the person or their attorney to sign both,

7    right?

8    A.   That's right.

9    Q.   Then they would sign them and send them back to you or the

10   law department, correct?

11   A.   That's right.

12   Q.   And then you would have Jasiel sign that Community Host

13   Agreement, right?

14   A.   Yes.

15   Q.   Then you would have him then sign the Letter of

16   Non-Opposition, right?

17   A.   That's right.

18   Q.   But the person well before they received the Letter of

19   Non-Opposition at least had an inkling that they had been

20   approved because of the Community Host Agreement that was going

21   to be signed in duplicate, right?

22   A.   That's right.  It was a cumbersome process, but I wanted

23   their signature.

24   Q.   Absolutely.  All right.  Now --

25            THE COURT:  Mr. Reddington, is this maybe a point to

1    break here?

2              MR. REDDINGTON:  Sure, absolutely.

3              THE COURT:  Okay.  Ladies and gentlemen, we'll take

4    our morning recess.  We'll be back a little bit before 11:20.

5              (Jury exits the courtroom.)

6              THE COURT:  Anything we need to take up?

7              MR. REDDINGTON:  Not from me, Your Honor.

8              MR. HAFER:  Not from us, Your Honor.

9              THE COURT:  All right.  So we'll be in recess.

10             (Recess taken 11:06 a.m. - 11:23 a.m.)

11             THE COURT:  Ready for the jury.  Let's get the witness

12   on the stand here.

13             MR. HAFER:  Yes, Your Honor.

14             (Jury enters the courtroom.)

15             THE COURT:  You can take your mask off again,

16   Mr. Macy.

17             MR. REDDINGTON:  Thank you, Your Honor.

18             THE COURT:  Mr. Reddington, go ahead.

19             MR. REDDINGTON:  Yes.

20   Q.   Just a question, sir, regarding Mr. Saliby.  Mr. Saliby

21   was represented by Attorney Mark Levin, was he not?

22   A.   I'm not sure who represents him now.  At the time he was

23   represented by Mark Levin.

24   Q.   Okay.  And the agreement with Mr. Saliby was basically

25   negotiated by Mark Levin with the city, correct?

1    A.   Those -- no, that's not correct.   Those agreements were

2    not negotiated.   They were presented, with the exception of

3    Mr. Saliby's 25 versus 50.

4    Q.   That's what I'm asking about.

5    A.   They were approved.

6    Q.   And that was, Mr. Levin was pleading and cajoling that he

7    should pay less because of the size of his business, right?

8    A.   I didn't speak to Mr. Levin about the money.

9    Q.   You know Gen Andrade, right?

10   A.   Excuse me?

11   Q.   You knew Gen Andrade.

12   A.   Oh, yeah.

13   Q.   Tell us about Gen.   You know, how long had she been

14   working in City Hall?

15   A.   I can't give you a time because there was a time when

16   she -- she worked on the campaign, and she was in and out, but

17   she had no official position.   And I'm pretty sure that she

18   worked in the City Hall only after she signed the contract to

19   be chief of staff.

20   Q.   And you knew that she was married to a physician, correct?

21   A.   Excuse me?

22   Q.   You knew she was married to a physician, correct?

23   A.   Oh, yeah.

24   Q.   You knew that she was very close and friendly with Jasiel,

25   correct?

1    A.    Absolutely.

2    Q.    You knew that she was like a mother adviser to him, right?

3    A.    I don't know how I would characterize it, but they were

4    very close.  She drove him around.  She fed him.  They had

5    always been friends, as far as I knew.

6    Q.    And was she involved in his initial campaign when he was

7    running as city councillor against Sam Sutter?

8    A.    Yes.

9    Q.    She was, in fact, his campaign manager, was she not?

10   A.    That's what I understood, yes.

11   Q.    And then when he was elected and sworn in as mayor, he had

12   to then, as any elected official does, had to create a staff,

13   true?

14   A.    Yes.

15   Q.    And he would hire a number of people to work in various

16   departments within the city, right?

17   A.    Yes.

18   Q.    Now, when he first became mayor, he did not appoint Gen

19   Andrade as his chief of staff.  He had a guy by the name of

20   Chris Parayno, I believe.

21   A.    That's right.

22   Q.    You knew Chris Parayno.

23   A.    Sure.

24   Q.    And you knew how long he was involved as chief of staff to

25   Jasiel?

1    A.    Yes.

2    Q.    And about how long was he chief of staff?

3    A.    I couldn't tell you.

4    Q.    So in any event, after Mr. Parayno, there was another

5    gentleman, I think he was a retired or a police officer, a

6    fellow by the name of Michael Hoar, H-o-a-r.

7    A.    Yes, Sergeant Hoar.

8    Q.    And how long was Sergeant Hoar chief of staff for Jasiel?

9    A.    I couldn't tell you that.  I would estimate six months,

10   but it might have been a little more, a little less.

11   Q.    And Mr. Moore left that position, and it was at that point

12   that Jasiel then appointed Gen Andrade to be his chief of

13   staff, right?

14   A.    Yes.

15   Q.    And she then worked in that capacity in City Hall up until

16   the time of her resignation, which is around the time of the

17   indictments and the investigation in this case, right?

18   A.    I don't know what was coterminous with what, but she

19   worked there.  Ultimately she resigned.

20   Q.    You knew in reference to the snow stipend that was

21   referenced by the government -- basically a snow stipend is a

22   payment that's made to a city employee to do a particular job

23   or function, right?

24   A.    Well, a snow stipend is particularly with respect to the

25   snow removal.

1   Q.   Exactly.  But there are other stipends that are given out

2   to people in the city as employees?

3   A.   Yes.

4   Q.   So as relates to the snow stipend, that was $10,000; 5,000

5   to be one year, 5,000 to be paid the following January, right?

6   A.   That's what the contract says, yes.

7   Q.   And you knew that or you had the opportunity to observe

8   the work and the effort that Gen Andrade put into that position

9   as being in charge of snow removal in the city?

10  A.   Yes.

11  Q.   She worked very hard, didn't she?

12  A.   To my observation she did, yes.

13  Q.   And she was known on occasion actually to basically take

14  up residence in the City Hall during snow emergencies, 24 hours

15  a day?

16  A.   Well, I don't know if she was there 24 hours a day, but

17  the problem with snow removal is it doesn't always snow in the

18  daytime.  So if there were a snowstorm coming, she would plan.

19  She would -- if the snow -- if it was snowing at night, she'd

20  be in the City Hall at night.  I wasn't there.  But I know she

21  worked very hard.

22  Q.   Okay.  You knew that the Federal Bureau of Investigation

23  and various investigators for any number of federal agencies

24  were in the City of Fall River interviewing many, many, many

25  people for a long period of time before any indictments were

1    returned, correct?

2    A.   I had heard that, yes.

3    Q.   And pretty much everybody -- in City Hall, it was pretty

4    much a known fact that the federal authorities were in and out

5    and interviewing people and conducting an investigation on

6    Jasiel Correia, right?

7    A.   I would hear from time to time, yes, "The FBI is here.

8    Did you know the FBI was here?"

9    Q.   Okay.  And the Fall River Herald was actually very active

10   in printing many, many articles about the ongoing

11   investigation, correct?

12   A.   They were active.  And every time I think they heard the

13   FBI was there, they published it.  I don't really know.

14   Q.   You also knew that -- let me back up.  On occasion I think

15   you described your relationship with Jasiel that at times you'd

16   be like the 70-year-old guy giving advice to the 20-year-old

17   guy, things of that nature, right?

18   A.   I think at one point I said, you know, I was 75, he was

19   25.  We were friendly.  How friendly can you be?

20   Q.   Right, right.  But you'd also give him advice and he'd ask

21   you your opinion and advice, right?

22   A.   Yes.

23   Q.   Now, you knew he was under investigation and, of course,

24   once he was indicted about SnoOwl, you knew he was represented

25   by an attorney, correct?

1    A.   Yes.

2    Q.   And you knew the attorney was a guy by the name of Mark

3    Berthiaume, right?

4    A.   What was his last name?  I knew his first name was Mark.

5    Q.   Mark Berthiaume.

6    A.   Yes, yes.

7    Q.   You knew that Jasiel was quite vocal about the fact that

8    he had to pay Mr. Berthiaume and his firm an awful lot of money

9    for legal fees, right?

10   A.   I don't know if he used the term "awful lot of money" but

11   he was complaining about the amount and the size of the legal

12   fees, yes.

13   Q.   And at some point he set up what's called a legal defense

14   fund; is that correct?

15   A.   I found -- I knew he did, yes.  I didn't know --

16   Q.   Well, you knew he did because it was on the front page of

17   the Herald, right?

18   A.   Yes.

19   Q.   Everybody knew that.

20        And if a person was to donate to the legal defense fund,

21   their name would probably the next day be on the front page of

22   the Fall River Herald, right?

23   A.   I believe -- I didn't participate, and I didn't set it up,

24   but I believe that it's a matter of public record who

25   contributes to campaigns and defense funds.

1    Q.   And he would ask people for a donation to the legal

2    defense fund, but pretty much nobody wanted to get involved

3    with it because they didn't want their name in the paper,

4    right?

5    A.   I don't know how that operated.

6    Q.   So you knew that he had consulted with the executive

7    commission for -- I forget what they're called -- a woman by

8    the name of Sarah Hartry, she was counsel to the election

9    commission in Boston?

10   A.   I knew that he told me he had passed it by an appropriate

11   commissioner, and they said yes, you can set that up.

12   Q.   Okay.  And also he had, obviously as any politician would,

13   his campaign fund?

14   A.   Yes.

15   Q.   And he would have events.  He would run, or his staff

16   would run events to try to generate money for his campaign,

17   such as on the Battleship, I think, is one of the places where

18   they -- or also a restaurant named Barker's or Cinderella's,

19   he'd have functions, correct?

20   A.   I don't know that he had any fundraisers at Cinderella's.

21   He always had one every summer on the Battleship.

22   Q.   And people would purchase tickets for those fundraisers,

23   right?

24   A.   Yeah.

25   Q.   And they would go and maybe have a drink or two and talk

1    and socialize and listen to the person who is seeking public

2    office, right?

3    A.   Yes.

4            MR. REDDINGTON:   That's all I have, Your Honor.   Thank

5    you.

6            THE COURT:   All right.   Mr. Hafer.

7            MR. HAFER:   Just very briefly, Your Honor.

8    REDIRECT EXAMINATION BY MR. HAFER:

9    Q.   Mr. Macy, Mr. Reddington asked you some questions about

10   the authority of the Cannabis Commission to ultimately issue

11   licenses to applicants in Massachusetts.   Do you remember those

12   questions?

13   A.   Yes.

14   Q.   Between 2016 and 2018, who in Fall River had the exclusive

15   legal authority to issue Letters of Non-Opposition?

16   A.   The mayor of the City of Fall River.

17   Q.   And who was that between 2016 and 2018?

18   A.   I'm trying to remember if Sam might have been mayor for a

19   month, but the fact is whoever was the mayor, and I believe

20   Jasiel became mayor in 2016, had the exclusive power and

21   authority to issue the letters and the Host Community

22   Agreements.

23           MR. HAFER:   Thank you.   Nothing further, Your Honor.

24           MR. REDDINGTON:   Nothing, Your Honor.   Thank you.

25           THE COURT:   You may step down.   Thank you.   If you

1    could take the top off the microphone.

2           MR. TOBIN:  Your Honor, the United States next calls

3    Brian Bairos.

4           BRIAN BAIROS, Sworn

5           COURTROOM CLERK:  Please be seated and state your full

6    name and please spell your last name.

7           THE WITNESS:  Brian Bairos.  Last name spelled

8    B-a-i-r-o-s.

9           THE COURT:  You may inquire, Mr. Tobin.

10          MR. TOBIN:  Thank you, Your Honor.

11   DIRECT EXAMINATION BY MR. TOBIN:

12   Q.   Good morning, sir.

13   A.   Good morning.

14   Q.   How old are you?

15   A.   42.

16   Q.   Where did you grow up?

17   A.   East Bridgewater, Massachusetts.

18   Q.   How far did you go in school?

19   A.   I had a paralegal program at Northeastern University.

20   Q.   Where do you live?

21   A.   West Bridgewater, Mass.

22   Q.   Are you currently employed?

23   A.   I am unemployed at the moment.

24   Q.   How were you recently employed?

25   A.   I had a tobacco distribution company.

1    Q.    How long were you involved in the tobacco distribution

2    company?

3    A.    About eight or nine years.

4    Q.    And you left that company how recently?

5    A.    Very recently.

6    Q.    Sir, are you testifying today with an immunity agreement

7    from the United States?

8    A.    Yes, I am.

9    Q.    Sir, there is a binder in front of you, and I would ask

10   you to open that and look at tab 159.  Do you recognize the

11   document at tab 159?

12   A.    Yes, I do.

13   Q.    What is it?

14   A.    That's the agreement I have with the United States.

15         MR. TOBIN:  Your Honor, may Exhibit 159 be moved into

16   evidence?

17         THE COURT:  Yes, it's received.

18         (Exhibit 159 admitted into evidence.)

19   Q.    Sir, what is the date on the first page of that immunity

20   agreement?

21   A.    August 22, 2019.

22   Q.    And the address for an Attorney Michael Contant is on the

23   document.  Who is Attorney Michael Contant?

24   A.    He's my attorney.

25   Q.    This agreement was negotiated by your attorney with the

 1    U.S. Attorney's Office?

 2    A.    That's correct.

 3    Q.    If we could please go to the second page of the immunity

 4    agreement, are there signatures on that page?

 5    A.    Yes, there is.

 6    Q.    And whose signatures appear?

 7    A.    Me and Michael's.

 8    Q.    And are there dates next to your signature and your

 9    attorney's signature?

10    A.    Yes, August 22, 2019.

11    Q.    And does Zachary R. Hafer sign as chief of the criminal

12    division on behalf of the United States?

13    A.    Yes, he did.

14          MR. TOBIN:  If you could go back to the first page of

15    this agreement.

16    Q.    Sir, this is the agreement you have with the United States

17    that governs your situation currently in this matter.  Is that

18    true?

19    A.    That's correct.

20    Q.    I'm going to read ever so briefly from the second

21    paragraph which has a "1," which has a "1" in front of it.  And

22    I'd ask you to read along to yourself.

23          "Your client agrees to provide complete and truthful

24    testimony pursuant to any subpoena compelling his testimony in

25    this matter.  Your client also agrees to meet with

1    representatives of the United States Attorney to answer

2    questions and/or to prepare for such testimony.  Your client

3    must answer all questions and must not withhold any

4    information."

5         Do you understand that that is your requirement?

6    A.    Yes, I do.

7    Q.    What must you do specifically under the terms of this

8    agreement?

9    A.    Just tell the truth.

10   Q.    If you can go to the next paragraph, the one with the "2"

11   in front of it.  Sir, does the second paragraph outline what

12   the United States' obligation is under the terms of this

13   agreement?

14   A.    Yes.

15   Q.    Let me read a portion of it and ask you to read along to

16   yourself.

17        "In return for your client's full and truthful testimony

18   and statements, as well as your client's complete production of

19   responsive documents, objects, or other evidence as set forth

20   above, the United States Attorney agrees not to use any

21   statement made or other information provided by your client

22   pursuant to this agreement, or any information directly or

23   indirectly derived therefrom against your client in any

24   criminal case, except in the prosecution of," and then it talks

25   about perjury and acts of violence.  Is that accurate?

1   A.   That's correct.

2   Q.   So sir, as you understand it, if you testify truthfully,

3   what has the United States pledged to you?

4   A.   That I don't get in any trouble.

5   Q.   You don't get prosecuted?

6   A.   Correct, prosecuted.

7   Q.   You don't get prosecuted for paying a bribe to the mayor

8   of Fall River?

9   A.   That's correct.

10  Q.   Sir, at some point did you get into the legal marijuana

11  business in New England?

12  A.   Yes.

13  Q.   When was that originally?

14  A.   About eight years ago.

15  Q.   Where was that?

16  A.   In Rhode Island.

17  Q.   What kind of legal marijuana business did you have in

18  Rhode Island?

19  A.   Basically I was a caregiver and I grew for my patients,

20  and then we were allowed to sell our excess product to the

21  local dispensaries.

22  Q.   Does that mean you were a grower?

23  A.   Correct, yes, cultivator.

24  Q.   And you mentioned patients.  Explain that to us.  You

25  would grow the marijuana, and where would it go?

1    A.   So the patients would identify you as their grower or

2    caregiver.  So you would grow their medicine and then whatever

3    they purchased from you -- anything we had left over we were

4    allowed to sell to the larger dispensary where they have

5    multiple patients.

6    Q.   Sir, what was the name of this legal marijuana business in

7    Rhode Island?

8    A.   Colorado Ave., LLC.

9    Q.   Mr. Bairos, at some point did you decide to expand into

10   Massachusetts with the marijuana business?

11   A.   I did, yes.

12   Q.   When was that, approximately?

13   A.   2017, '18.

14   Q.   What was the name of your Massachusetts marijuana

15   business?

16   A.   Giving Tree Health Center.

17   Q.   Giving Tree Health Center?

18   A.   (Witness nodding head.)

19   Q.   And sir, when you decided to expand into Massachusetts,

20   where within the Commonwealth did you decide to or want to open

21   up shop?

22   A.   Fall River, Massachusetts.

23   Q.   What type of marijuana business did you want to open in

24   Fall River, Massachusetts?

25   A.   Complete seed to sale.  We were going to manufacture,

1    produce, extract, everything, make edibles, along with a retail

2    store.

3    Q.   How would that differ from what you were doing in the

4    marijuana world in Rhode Island?

5    A.   In Rhode Island, we just cultivate and we sell to the

6    local dispensaries.  So basically we wholesale the product, and

7    we didn't do any extraction.  We just grew the product.  Where,

8    in Fall River, we were going to do everything, from making

9    edibles, to extracting oil, to retailing it.

10   Q.   Sir, what did you need in order to open a marijuana

11   business, as you've described, in Fall River?

12   A.   A Letter of Non-Opposition and a Community Host Agreement,

13   which is two different letters.

14   Q.   Can you tell us what a Letter of Non-Opposition is, as you

15   understood it then?

16   A.   Basically a Letter of Non-Opposition means that the town

17   would allow you to operate there to grow medically.

18   Q.   And what about a Host Community Agreement?

19   A.   A Community Host Agreement is an agreement you make with

20   the town for recreational sales and where you negotiate a

21   percentage or a fee, or whatever the case may be, that the town

22   requires.

23   Q.   You needed both a Letter of Non-Opposition and the Host

24   Community Agreement in this instance from Fall River because

25   that's where you wanted to do business?

1  A.   Correct, yes.

2  Q.   Who ultimately gives the license to open up a marijuana

3  shop?

4  A.   The Cannabis Control Commission gives the license.

5  Q.   Do they require the Letter of Non-Opposition and Host

6  Community Agreement from the municipality, as you understood

7  it?

8  A.   Yes, you have to have that.

9  Q.   Sir, who in Fall River had the power to give you a Letter

10  of Non-Opposition and a Host Community Agreement?

11  A.   At the time it was Mayor Correia.

12  Q.   What steps did you take to open a marijuana business in

13  Fall River, focusing primarily, or at least at this point, on

14  obtaining the Non-Opposition Letter and the Host Community

15  Agreement?  What steps did you take?

16  A.   I just reached out to the town to try to set up a meeting

17  with them and see if we can just sit down and I can kind of go

18  over my plan and tell them what I wanted to do and see if it's

19  something the town would allow.

20  Q.   Were you ultimately successful in setting up a meeting

21  with town officials?

22  A.   Not really, no.

23  Q.   Well, did you ultimately have a meeting -- well, did you

24  ultimately have a meeting with the mayor of Fall River?

25  A.   Correct, yes.

1    Q.    And the mayor at the time was who?

2    A.    Mr. Correia.

3    Q.    And who else was present at the meeting?

4    A.    His chief of staff, Gen Andrade.

5    Q.    And during the meeting, what did you do?  What did you

6    tell the mayor and his chief of staff Gen Andrade?

7    A.    I told them my plan, what I wanted to do with -- I told

8    them my location, what I wanted to do there.  How I was going

9    to go about it and the timeframe.

10   Q.    And what did the mayor say to you during that meeting, or

11   perhaps at the conclusion of that meeting, about your plan?

12   A.    He seemed interested.  He liked the idea that I had, and

13   he kind of, just kind of stayed neutral.

14   Q.    I'm sorry.  I missed that last sentence.

15   A.    He did like what I had to say but, you know.

16   Q.    Sir, after the meeting -- and this meeting, where was it,

17   was it at City Hall in the mayor's office?

18   A.    Correct, yes.

19   Q.    After that meeting at City Hall in the mayor's office with

20   the mayor and Gen Andrade, did you hear anything from Mayor

21   Jasiel Correia or anything from City Hall?

22   A.    Afterwards, no, not really.

23   Q.    At some point did you become frustrated because of not

24   getting any word back from City Hall?

25   A.    Yes.

1    Q.   What happened next?

2    A.   Basically I was introduced to somebody else that could

3    help me facilitate this whole thing.

4    Q.   Who did the introduction?

5    A.   Craig.

6    Q.   Do you know Craig's last name, do you recall it?

7    A.   I don't recall, no.

8    Q.   Well, who is Craig and how did you know him?

9    A.   He owns a local, like a supply house for like grow

10   facilities where they supply lights, nutrients and that type of

11   thing, and his landlord had a good relationship with

12   Mr. Correia.

13   Q.   So you knew Craig because he owned this shop?

14   A.   Correct.

15   Q.   Did you buy things from Craig for your Rhode Island

16   business?

17   A.   We were introduced together from a mutual friend.

18   Q.   And what assistance did -- did you tell Craig about your

19   frustration that you've talked to City Hall but they haven't

20   gotten back to you?

21   A.   Correct.

22   Q.   What did Craig say to you?

23   A.   He said that he could introduce me to his landlord, who

24   had a good relationship with Mr. Correia.

25   Q.   Did he tell you, or did you learn who Craig's landlord

1   was?

2   A.   Yes, I did.

3   Q.   And your understanding from Craig was that this

4   individual, the landlord, had a good relationship with the

5   mayor?

6   A.   Yes.

7   Q.   And who was this individual?  Who was this landlord?

8   A.   Tony Costa.

9   Q.   Sir, did Craig -- by the way, did you know Tony Costa at

10  this point?

11  A.   No.

12  Q.   Had you ever heard of Tony Costa at this point?

13  A.   No, not before that.

14  Q.   Did Craig, in fact, set up a meeting for you and Tony

15  Costa?

16  A.   Yes.

17  Q.   Where was the meeting?

18  A.   At Dunkin' Donuts.

19  Q.   In which city or town?

20  A.   Fall River.

21  Q.   Who was present at the meeting?

22  A.   In the beginning it was me, Craig, John and Tony, but then

23  Craig and John left, and it was just me and Tony afterwards.

24  Q.   I think you've described who these folks are, but who is

25  John?

1    A.    Just the other individual, the mutual friend.

2    Q.    Okay.  Eventually Craig and John left, and you're at

3    Dunkin' Donuts with Tony Costa; is that true?

4    A.    Yes.

5    Q.    Tell us about the conversation you had that first time you

6    met Tony Costa.

7              MR. REDDINGTON:  Your Honor, I would object just to

8    renew, and I know I believe under *Petrozziello*, I have a

9    standing objection.

10             THE COURT:  Yes, as to this one in particular I

11   overrule the objection.  You may have the question.

12             MR. TOBIN:  Thank you.

13   Q.    I'll repeat the question, sir.

14        Tell us about the conversation you had with Tony Costa

15   that first time you met him at Dunkin' Donuts.

16   A.    He was basically saying that, you know, he had a good

17   relationship with the mayor, and that he could get me the

18   letters that I need to move forward with my license.

19   Q.    And did he mention to you if there would be a cost in

20   getting the license or getting the documents you need?

21   A.    Yes, he did.

22   Q.    What did he tell you that would be?

23   A.    The initial offer was he said he could do it for $250,000.

24   Q.    And did you understand that $250,000 was some sort of

25   legal fee, or was it something else?

1    A.    Something else.

2    Q.    What did you think it was?

3    A.    Basically a bribe.

4    Q.    What was your reaction when you were confronted with this,

5    "You need to pay a bribe of 250,000"?

6    A.    You know, surprise, but, you know, I thought he was crazy

7    for the amount.

8    Q.    Did you say something about the amount to Tony Costa?

9    A.    Yeah.  I did, yes.

10   Q.    What did you tell Tony about the amount?

11   A.    I told him he was crazy.

12         THE COURT:  Mr. Bairos, if you could get a little

13   closer to the microphone so your voice can be picked up.  Maybe

14   move the microphone closer to you as well.

15         MR. TOBIN:  Okay.  Thank you.

16   Q.    You told him he was crazy.  Was there further conversation

17   during that meeting with Tony Costa about an amount less than

18   $250,000 for a bribe?

19   A.    Yes.  The second part of the negotiation he came down to

20   150,000, along with a percentage of the company.  And then I

21   also told him he was out of his mind.  So we finally agreed on

22   $150,000 total.

23   Q.    And was there an agreement at that meeting between you and

24   Tony Costa as to how or when you would pay the 150,000?

25   A.    Yes.  I was going to pay $75,000 up front, and when we got

1   the license, the other 75 was going to be paid.

2   Q.   Did Tony Costa seem to be okay with the division of that

3   $150,000 payment into two $75,000 blocks?

4   A.   Yes.

5   Q.   Who did you understand was to get this $150,000?

6   A.   First, initially I thought it was him, but as time went

7   on, it came to light that it was not.

8   Q.   And who did it come to light would be getting this money?

9   A.   Mr. Correia.

10  Q.   And again, who and who alone in the City of Fall River had

11  the ability to provide you with the documentation, the letter

12  and the agreement you needed?

13  A.   The mayor, Mr. Correia.

14  Q.   Sir, why were you willing to pay a bribe of $150,000 in

15  order to get a Letter of Non-Opposition and a Host Community

16  Agreement?

17  A.   There's a lot of steps you take to get this license as far

18  as, you know, locking down real estate, this and that.  So we

19  had a lot of time and energy invested into it.  So, you know,

20  it's tough to give that up and move to a different location.

21  So for that type of fee, you just pay it and move forward.

22  Q.   The cost of doing business?

23  A.   Correct.

24  Q.   Sir, did you communicate with Tony Costa by text messages?

25  A.   Yes, I did.

1    Q.   I'd ask you, if you would, in the binder in front of you,

2    to open up to tab 139.  Tell me if you recognize what appears

3    at tab 139.

4    A.   Yes, I do.

5    Q.   These are already in evidence, but I will make reference

6    to them.  Sir, please direct your attention to the very first

7    text on page 1 in box 1.  What is the date of that text?

8    A.   May 25, 2018.

9    Q.   And who sent the text?

10   A.   Tony Costa to me.

11   Q.   Please read the text to the ladies and gentlemen of the

12   jury.

13   A.   "He just gave me a call and told me that the deal -- it's

14   a done deal so no worries. "

15   Q.   Who do you understand that Tony Costa was referring to

16   when he said "He just gave me a call"?

17   A.   The mayor, Mr. Correia.

18   Q.   Sir, how did you understand this short message, "He just

19   gave me a call and told me it's a done deal so no worries"?

20   How did you understand that?

21   A.   Basically all the terms were accepted that were discussed.

22   Q.   And what were the terms?

23   A.   The $150,000 split into two payments, 75 in the beginning

24   and 75 at the end when the license was issued.

25   Q.   And as you understood it, those terms were accepted by

1    whom?

2    A.    Tony and the mayor.

3    Q.    Sir, did you and Tony Costa exchange texts on June 17,

4    2018?  I'll direct your attention to the same exhibit, 139,

5    pages 11 and 12, boxes 119 and 120.  119 and 120, if we might.

6    A.    Yes.

7    Q.    Okay.  Let's start with 119, if we might.

8    A.    Sure.

9    Q.    I'm sorry.  Give me just a moment, please.

10          Okay.  And this is a text on what date?

11   A.    June 17, 2018.

12   Q.    Sent by whom?

13   A.    Tony Costa to me.

14   Q.    And what does Tony Costa write to you on June 17?

15   A.    "What are we doing?  Are you moving forward?  Are you

16   pulling out?"

17   Q.    What did you believe he was referring to, moving forward

18   with what?

19   A.    The deal, paying the fee and getting the letters.

20   Q.    Do you respond by text shortly thereafter?

21   A.    Yes, I do.

22   Q.    Directing your attention to the next box, 120, that is a

23   text in response from you to Tony Costa; is that true?

24   A.    Correct.

25   Q.    What did you write to him?

1    A.    "Definitely moving forward."

2    Q.    Sir, did you have dinner with Mayor Jasiel Correia in the

3    City of Boston on June 19, 2018?

4    A.    Yes, I did.

5    Q.    Where was the dinner?

6    A.    At Ocean Prime in Boston Seaport.

7    Q.    That's right -- not too far from this courthouse; is that

8    true?

9    A.    That's correct.

10   Q.    Had you ever gone to dinner with the mayor before?

11   A.    No.

12   Q.    Were you social friends with the mayor?

13   A.    No.

14   Q.    Had you only met him that once in the office when you gave

15   him your pitch?

16   A.    Correct.

17   Q.    Yet you went to dinner with him on June 19; is that

18   accurate?

19   A.    That's correct.

20   Q.    Who was present at the dinner at Ocean Prime?

21   A.    Just me and him.

22   Q.    How did you come to meet Mayor Jasiel Correia that day for

23   dinner?

24   A.    Just through text message.  We were communicating back and

25   forth.

1    Q.   Sir, with regard to those text messages, I'm going to ask
2    you to direct your attention to Exhibit 160 in the binder in
3    front of you.  And if you can just examine what makes up
4    Exhibit 160.  Do you recognize what makes up 160?
5    A.   Yes, I do.
6    Q.   What are these?
7    A.   Text messages between me and the mayor.
8    Q.   Some of these text messages deal with setting up the
9    dinner at Ocean Prime on June 19; is that true?
10   A.   Correct.
11   Q.   Sir, I'd ask you to please direct your attention -- excuse
12   me.
13              MR. TOBIN:  Your Honor, may Exhibit 149 [sic] be moved
14   into evidence?
15              THE COURT:  Yes, it's received.
16              MR. TOBIN:  Thank you.
17   Q.   Sir, I'd ask you to direct your attention to page 2 of
18   Exhibit 169 and specifically to boxes 29 through 54.  29
19   through 54.  Do you see those boxes?
20              THE COURT:  No, Mr. Tobin.  I think you mean Exhibit
21   160.
22              MR. TOBIN:  Yes, I do.  Oh, I'm sorry.  I gave the
23   wrong number.  I apologize.
24              THE COURT:  Okay.  So I'm receiving in evidence 160.
25              MR. TOBIN:  Thank you, Your Honor.

1          (Exhibit 160 admitted into evidence.)

2    Q.   Again, directing your attention to boxes 29 through 54,

3    what do those texts concern?

4    A.   Through me and Mr. Correia.

5    Q.   We'll notice that they say "Incoming" and "Outgoing."  Who

6    wrote the incoming texts?

7    A.   That was him to me.

8    Q.   So Jasiel Correia wrote the incoming texts?

9    A.   Mm-hmm.

10   Q.   And who wrote the outgoing texts?

11   A.   I did.

12   Q.   And on that date, June 19, the first text is at 1:16 p.m.;

13   is that true?

14   A.   Yes.

15   Q.   And if we look at 54, the last text between you and Mayor

16   Correia is at 7:06 p.m., correct?

17   A.   Correct.

18   Q.   So incoming was the mayor, outgoing was you?

19   A.   Correct.

20   Q.   So perhaps the best way for us to do this and present it

21   to the jury, I will read the incoming as Mayor Jasiel Correia.

22   I would like you then to read the outgoing as yourself.  Okay?

23   A.   Sure.

24   Q.   "Just checking in to see if the attorneys have reached

25   agreement?  Do you need anything?  Also, I am in Cambridge for

1    the rest of the week and available after 5:30 most days except

2    Thursday night."

3    A.    "Is there any chance you're going to be at the governor's

4    event today at the base at Fenway."

5    Q.    "Hey, just finished up.  Where do you want to meet?"

6    A.    "You tell me.  Not sure where you are."

7    Q.    "I'm over in Cambridge.  We could do the cigar bar or

8    Seaport area.  Have you had dinner?"

9    A.    "Sounds great."

10   Q.    "Okay.  Where do you want to meet and when?"

11   A.    "Name the location."

12   Q.    "Let's go over to the Seaport since it's a nice day.

13   Legal Seafood, something like that?"

14   A.    "7:38.  I'm at Fenway.  I just need to drive over."

15   Q.    Next box.

16   A.    "I will text you a time once I put it in my GPS."

17   Q.    "Okay.  Legal Harborside is packed.  No available

18   reservations.  You haven't had dinner, have you?"

19   A.    "No, I haven't.  I'm always down to eat.  See you there."

20   Q.    "Perfect.  See you there."

21   A.    "My ETA is 7:10 p.m."

22   Q.    "Mine is 7:03."

23   A.    "Perfect."

24   Q.    "Just got here.  I'm at the bar."

25   A.    "Two minutes away."

1   Q.   These were the text messages setting up the dinner that

2   you and Jasiel Correia would have at Ocean Prime; is that true?

3   A.   Yes.

4   Q.   Who was present for that dinner?  Was there anybody

5   present, other than you and Jasiel Correia?

6   A.   No.  Just me and him.

7   Q.   And after leaving Ocean Prime -- oh, by the way, who paid

8   the bill at Ocean Prime?

9   A.   I did.

10  Q.   Sir, I'd ask you to direct your attention to Exhibit

11  163.1.  If you open up to 163, you'll see a secondary file of 1

12  after that.  Do you see that?

13  A.   Yes.

14  Q.   Do you recognize what makes up Exhibit 163.1?

15  A.   Yeah.  That's the bill from Ocean Prime.

16  Q.   Or the credit card statement indicating what you paid?

17  A.   Correct.

18       MR. TOBIN:  Your Honor, may 163.1 be moved into

19  evidence?

20       THE COURT:  Yes, it's received.

21       MR. TOBIN:  Thank you.

22       (Exhibit 163.1 admitted into evidence.)

23  Q.   If we could look at that for a moment.  Again, this is

24  from your bank statement; is that accurate?

25  A.   Correct.

1   Q.   And the posting date of 6-21-18, are there expenses from

2   Ocean Prime Boston?

3   A.   Correct.

4   Q.   What's the top expense?

5   A.   Probably either a tip or a drink.

6   Q.   Oh, what I meant actually is how much is the amount?

7   A.   Oh.  $23.91.

8   Q.   And what is the bottom number or amount?

9   A.   $257.58.

10  Q.   And that was the bill for you and Mayor Jasiel Correia's

11  dinner at Ocean Prime?

12  A.   Correct.

13  Q.   Sir, after you and Jasiel Correia finished dinner at Ocean

14  Prime, did the two of you go someplace?

15  A.   We went to a cigar bar in the North End.

16  Q.   And again, at the cigar bar at the North End, was it just

17  the two of you?

18  A.   Yes.

19  Q.   Nobody else joined your party, if you will?

20  A.   Correct.

21  Q.   Now, while at the cigar bar in the North End with Mayor

22  Correia, what, if anything, did you and he discuss?

23  A.   We basically just got to know each other, just kind of

24  gentlemen's talk.

25  Q.   And before leaving the cigar bar, did he say anything

1  specific to you which you understood referenced the bribe you

2  were going to pay?

3  A.   He just basically asked if we were all set.  "Is

4  everything good?"

5  Q.   "Are we all set?  Is everything good?"

6  A.   Yes.

7  Q.   How did you understand the mayor's words?  What did you

8  think he was talking about?

9        MR. REDDINGTON:  Objection.

10        THE COURT:  Overruled.  You may answer.

11  A.   Basically he was referring to the deal I had with Tony

12  Costa.

13  Q.   You didn't think he was referring to the quality of the

14  cigar you were smoking?

15  A.   No.

16  Q.   You didn't think he was referring to the weather in the

17  night that evening?

18  A.   No.

19  Q.   How did you respond to the mayor asking or saying

20  essentially, "Are we all set?  Are we good?"

21  A.   I told him yes, we were.

22  Q.   You told him yes, we were.  Is that because you were

23  prepared and had pledged to pay the bribe?

24  A.   Correct.

25  Q.   Sir, jumping now, if we might, to June 29, 2018.  Did

1    Mayor Jasiel Correia visit you at your place of business?

2    A.    Yes, he did.

3    Q.    Where was that?

4    A.    In Avon.

5    Q.    What was that?

6    A.    My tobacco warehouse.

7    Q.    And did you and Jasiel Correia exchange text messages

8    setting up the June 29, 2018 meeting at your warehouse?

9    A.    Correct, yes.

10   Q.    Again, I would ask you to go back to Exhibit 160, and I

11   would ask you to look at the texts from June 29, 2018.  I will

12   direct your attention to the third page of that exhibit and

13   specifically boxes 86 through 96.

14        Do you see those series of communications between you and

15   Mayor Jasiel Correia on June 29?

16   A.    Yes.

17   Q.    And again, the incoming represents either -- who, you or

18   Jasiel's writings?

19   A.    That's him.

20   Q.    And the outgoing?

21   A.    Is me.

22   Q.    And so if we look at the first one on June 29, at 2:47

23   p.m., incoming, what does it say?

24   A.    "Send me the location, places."

25   Q.    What do you respond?

1   A.   "Target in Stoughton or my warehouse at 238 Bodwell

2   Street, Avon, Mass.

3   Q.   What does the mayor say?

4   A.   "See you there in 30 minutes or so.  Thank you again."

5   Q.   What do you respond?

6   A.   "Come to the warehouse."

7   Q.   What does he ultimately respond?

8   A.   "Okay.  I'll be there by 3:40."

9   Q.   What do you say?

10  A.   "Okay."

11  Q.   What does he then say at 3:43?

12  A.   "Just got here."  Then I put --

13  Q.   That would be the end of the June 29 messages; is that

14  true?

15  A.   Correct.

16  Q.   And, in fact, had he just gotten there at your Avon

17  warehouse?

18  A.   Yes.

19  Q.   And did he come into the warehouse?

20  A.   Yes.

21  Q.   And what did Mayor Jasiel Correia ask you during his visit

22  to your warehouse on that date?

23  A.   To donate to his legal fund.

24  Q.   Did he indicate how much he was asking for?  What did he

25  want you to donate?

1   A.   Approximately $25,000.

2   Q.   What did you say to him when he asked for 25,000?

3   A.   I just offered to him in cash.

4   Q.   Did you believe -- we'll get to that in a moment.  Did you

5   believe that this request for 25,000 was in addition to the

6   bribe you had agreed to pay?

7   A.   Yes.

8   Q.   You said to him you could give it to him in cash, meaning

9   the 25,000 to the defense fund; is that true?

10   A.   Correct.

11   Q.   Was there a specific reason why you told the mayor you

12   could only give him the cash -- give his donation to the

13   defense fund in cash?

14   A.   I didn't think it was going to be accepted.

15   Q.   And did you want to give an extra 25,000 to his defense

16   fund?

17   A.   No.

18   Q.   And when you said it was cash, what did he say?

19   A.   That he didn't think it was going to work or --

20   Q.   He couldn't take it, and you didn't --

21         MR. REDDINGTON:  Your Honor --

22         MR. TOBIN:  I'm sorry.

23         THE COURT:  Mr. Tobin, it's the witness who testifies

24   rather than you.

25         MR. TOBIN:  Of course.  Thank you.

1    Q.   Did you ever pay $25,000?

2         MR. REDDINGTON:  Could he finish his answer?

3         THE COURT:  I'm sorry?

4         MR. REDDINGTON:  I don't think he finished his answer.

5    Q.   Please, sir, finish your answer.

6    A.   I'm finished.  What was the question again?  Maybe I

7    missed it.

8         THE COURT:  Why don't you put a new question,

9    Mr. Tobin.

10        MR. TOBIN:  Thank you.

11   Q.   Did you ever donate any money to the defendant Jasiel

12   Correia's legal defense fund?

13   A.   It was offered but he couldn't use it.

14   Q.   Sir, at some point did you receive a Letter of

15   Non-Opposition?

16   A.   Yes.

17   Q.   Please open to Exhibit 162 in the binder in front of you.

18   Do you recognize what makes up 162?

19   A.   Yes.

20   Q.   What is that?

21   A.   That's a Letter of Non-Opposition.

22   Q.   Signed by whom?

23   A.   By the mayor and the City of Fall River.

24   Q.   Dated what?

25   A.   July 2, 2018.

 1          MR. TOBIN:  Your Honor, may 162 come into evidence,

 2    please?

 3          THE COURT:  Yes, it's received.

 4          (Exhibit 162 admitted into evidence.)

 5    Q.    Again, sir, now that the ladies and gentlemen of the jury

 6    can see it, what is the date on the Letter of Non-Opposition?

 7    A.    July 2, 2018.

 8    Q.    And there's a signature on this letter; is that true?

 9    A.    Correct.

10    Q.    What is the signature -- whose signature is it, I should

11    say?

12    A.    Jasiel Correia, II, the mayor.

13    Q.    And please tell me if I read this correctly.  Does this

14    letter state, "I, Jasiel F. Correia, II, Mayor of the City of

15    Fall River, do hereby provide this statement of non-opposition

16    to the Giving Tree Health Center, Inc. to operate a registered

17    marijuana dispensary in Fall River.

18          "I have verified with the appropriate local officials that

19    the proposed RMD facility is located in a zoning district that

20    allows such use by right or pursuant to local permitting.  This

21    letter is subject to withdrawal or revocation at any time."

22    Sir, did I read that correctly?

23    A.    Yes, you did.

24    Q.    What did this letter cost you?

25    A.    $150,000.

1  Q.  And the last sentence of the second paragraph, "This

2  letter is subject to withdrawal or revocation at any time,"

3  what did you understand that to mean?

4  A.  That the letter could be pulled back and not be given or I

5  would be restricted again.

6  Q.  And sir, again, the date of this letter is July 2, 2018.

7  Is that approximately when you received this letter?

8  A.  Correct.

9  Q.  Sir, did you visit Tony Costa's home on July 7, 2018?

10 A.  Yes.

11 Q.  Why did you go to Tony Costa's house on July 7, 2018?

12 A.  To give him money.

13 Q.  How much money did you give Tony Costa on July 7, 2018?

14 A.  $25,000.

15 Q.  Did you give him cash, check or some other form of

16 payment?

17 A.  Cash.

18 Q.  Why did you give Tony Costa $25,000 in cash on July 7,

19 2018?

20 A.  It was part of the first portion of the agreement.

21 Q.  And who did you believe that the $25,000 was going to?

22      MR. REDDINGTON:  Objection.

23      THE COURT:  You may answer this question.

24 Q.  Who did you believe the $25,000 was going to?

25 A.  To Tony and the mayor, Correia.

1   Q.   Did you know what division or split the mayor and Tony

2   would have made?

3   A.   No.

4   Q.   Sir, where did you get the $25,000 in cash you gave to

5   Tony Costa?

6   A.   I withdrew it out of my bank account.

7   Q.   Sir, I'm going to ask you to look at Exhibit 163.2 and

8   163.3.  Would you look at those two tabs, please.

9        Sir, do you recognize what makes up Exhibits 163.2 and

10  163.3?

11  A.   Yes, I do.

12  Q.   What is that?  What are those?

13  A.   Those are the withdrawals from the bank account.

14  Q.   Where you got ultimately the 25,000 to give to Tony?

15  A.   Correct.

16       MR. TOBIN:  Your Honor, may Exhibits 163.2 and 163.3

17  be admitted.

18       THE COURT:  They're received.

19       (Exhibit 163.2-163.3 admitted into evidence.)

20  Q.   And could we please look at 163.2.  Again, this is your

21  bank record; is that true?

22  A.   Yes.

23  Q.   And these are for three transactions on 163.2; is that

24  accurate?

25  A.   Yes.

```
 1    Q.    And were these three transactions made on the same day?
 2    A.    Yes.
 3    Q.    And according to your bank record, what day was that?
 4    A.    June 29, 2018.
 5    Q.    And the three transactions, were they deposits or
 6   withdrawals?
 7    A.    Withdrawals.
 8    Q.    How much was each of the three withdrawals for?
 9    A.    $5,000.
10    Q.    For a total of?
11    A.    15,000.
12    Q.    And that was on June 29, correct?
13    A.    Yes, sir.
14    Q.    If we go to 163.3, again, this is your bank record; is
15   that true?
16    A.    Yes.
17    Q.    And at the very bottom -- we can see it now -- is there a
18   date for this transaction?
19    A.    July 3, 2018.
20    Q.    And what kind of transaction is it?
21    A.    A cash withdrawal.
22    Q.    How much is that for?
23    A.    $10,000.
24    Q.    And, again, the math is simple, I suppose.  15 and 10
25   equals how much?
```

1  A.   25,000.

2  Q.   Did you and Tony Costa exchange text messages before you

3  went to his house on July 7, 2018?

4  A.   Yes, we did.

5  Q.   Again, I'll ask you to direct your attention to Exhibit

6  139.  I'll focus you, please, on pages 13 and 14.  And I'm

7  going to ask you to look at boxes 138 through 146.  That goes

8  into the second page.  So on page 13, if you could look at 138

9  to 141 at the bottom, okay?

10 A.   Mm-hmm.

11 Q.   The first message is July 7 at 10:50 a.m.; is that

12 correct?

13 A.   Correct.

14 Q.   Who was sending the message?

15 A.   I was.

16 Q.   To whom?

17 A.   To Tony Costa.

18 Q.   What do you write?

19 A.   "How you looking?"

20 Q.   He responds?

21 A.   "I'm home."

22 Q.   He responds further?

23 A.   "I had to break up a dog fight, twisted my ankle, at

24 animal control.  Tough morning.  So I'm home."

25 Q.   Your reply to that?

```
 1    A.    "Is that a no-go or can I come down?"
 2    Q.    Can we go to the next page, please, and look at box 142.
 3    At 142, that's a message -- box 142, excuse me.  Who is sending
 4    this message?
 5    A.    Tony to me.
 6    Q.    What does he say to you?
 7    A.    "Yes, come now.  Yes.  I'm home."
 8    Q.    And you respond?
 9    A.    "Okay."
10    Q.    He then -- then what happens, what's the next message?
11    A.    He says, "You almost here?"  And then he gave me his
12    address of 207 Sterling Street.
13    Q.    Thank you.  Do you, in fact, go to 207 Sterling Street on
14    that day?
15    A.    Yes.
16    Q.    What do you have in your possession when you go to that
17    house?
18    A.    The cash.
19    Q.    Now, sir, this is July 7, correct?
20    A.    Yes.
21    Q.    Did you already have the Letter of Non-Opposition?
22    A.    I believe so, yes.
23    Q.    If you had the Letter of Non-Opposition, then why were you
24    going to pay?  Didn't you have what you wanted?
25    A.    But it could be redacted or taken away at any time.
```

```
 1    Q.    Were you still intent on that time to pay the bribe?
 2    A.    Yes.
 3    Q.    Did you still believe that the bribe was going at least
 4    partly to the mayor?
 5    A.    Yes.
 6    Q.    What happened when you got to Tony Costa's residence?
 7    A.    I gave him the money.
 8    Q.    Presumably you then left at some point?
 9    A.    Correct, yes.
10    Q.    Did Tony Costa contact you at some point after you gave
11    him the $25,000 in cash?
12    A.    Yes, he did.
13    Q.    What did he say to you?
14    A.    That they didn't like the money and that they thought it
15    was fed money.
16    Q.    Who did you understand "they" to be?
17    A.    The mayor and, I forget, Camara.  I think it was Hil
18    Camara.
19    Q.    Do you know what happened -- at the time did you know what
20    happened to the $25,000 that the mayor and others didn't like
21    because they thought it was fed money.  What happened to that
22    money; do you know?
23    A.    Tony just switched it out for them for different cash.  He
24    resolved the issue for them.
25    Q.    Tony Costa resolved the issue; that was your
```

1   understanding?

2   A.   Correct, yes.

3   Q.   You got credit for the 25,000; is that your understanding?

4   A.   Yes.

5   Q.   You mentioned when I asked you who you believed "they"

6   were, you mentioned the mayor and another person.  Who was the

7   other person you mentioned?

8   A.   I don't know.

9   Q.   I think you said Hil or something.

10  A.   Oh, Hil Camara, yeah, but I didn't know who he was.

11  Q.   Did you know who Hil Camara was at that time?

12  A.   No, I did not.

13  Q.   You're using the word or the name Hil now.  At the time

14  did you -- when he said "they" don't like it, did you have any

15  idea who he was referring to, other than the mayor?

16  A.   No.

17  Q.   Sir, did you make any additional payments on the 150 you

18  had promised, a bribe, did you make any additional payments on

19  that after that first $25,000 in cash?

20  A.   Yes, I did.

21  Q.   And that additional, or those additional payments, who did

22  you think it was going to?

23  A.   To Tony and the mayor.

24  Q.   Sir, for these additional payments, did you pay entirely

25  in cash, or did you make a partial payment in another way?

1   A.   Part of it was in cash and part was another way.

2   Q.   And that other way was what?

3   A.   Cannabis, marijuana.

4   Q.   Who came up with the idea that you could pay part of the

5   $150,000 in cannabis or marijuana?

6   A.   Tony Costa.

7   Q.   Did Tony Costa further explain what he was going to do

8   with the cannabis that you gave him, what he was going to do

9   with it?

10  A.   He was basically just using the mayor's money to make his

11  own money and then turning it into cash to give to him.

12  Q.   When you say "turning the cannabis into cash to give to

13  him," you understand the "him" was who?

14  A.   The mayor.

15  Q.   Sir, did you and Tony Costa exchange texts on July 12,

16  2018?

17  A.   Yes.

18  Q.   Let me direct your attention again to Exhibit 139.  I'd

19  ask you to look on page 15 and boxes 160 and 161.  On box 160,

20  that date is July 12; is that correct?

21  A.   Correct.

22  Q.   And this is a text from whom to whom?

23  A.   Tony to me.

24  Q.   And what does he write to you?

25  A.   "Just got a call asking what your time schedule."

1    Q.    And then you respond later that day to that, do you not?

2    A.    Yes.

3    Q.    What do you say?

4    A.    "Couple more days, just trying to finish up this deal."

5    Q.    And when you said I was trying to -- or wrote "I'm just

6    trying to finish up the deal," what deal; what were you trying

7    to do?

8    A.    I was trying to gather the product that he asked me to

9    get.

10   Q.    Sir, again drawing your attention to Exhibit 139, this

11   time to page 21, and specifically to boxes 228 to 229, the last

12   two boxes on that page, I would suggest.  What did Tony Costa

13   text you?  Do you see --

14   A.    "I have been calling my phone looking for paper.  I told

15   him it's almost here."  And then he sent a correction saying,

16   "He has been calling."

17   Q.    How did you understand those two texts taken together?

18   A.    The second text was a correction on the first one to

19   basically say, "He has been calling my phone looking for paper.

20   Told him it's almost here."

21   Q.    Who did you understand the "he" was?  Who was looking for

22   paper, as you understood it?

23   A.    Mayor Correia.

24   Q.    And if the mayor was looking for paper, what did you

25   understand "paper" was?

1    A.    Money.

2    Q.    Sir, I'd like to ask you some questions about July 20,

3    four days after these texts.  July 20, 2018.  Did you make a

4    second payment to Tony Costa on that date?

5    A.    Yes.

6    Q.    Did you give him both marijuana, as you had discussed, and

7    cash?

8    A.    Yes.

9    Q.    Where did you get the money that you used to buy

10   marijuana, and where did you get the money that you used to

11   also give to Tony Costa at that time?

12   A.    Out of my bank account.

13   Q.    Sir, again I'd ask you to go back to Exhibit 163, this

14   time point 4.  Do you see that?

15   A.    Yes, I do.

16   Q.    And is that a cash withdrawal from July 20?

17   A.    Yes.

18   Q.    How much did you withdraw?

19   A.    50,000.

20   Q.    Where did you get the marijuana you gave Tony Costa?

21   A.    Numerous resources.

22   Q.    In and around Fall River?

23   A.    Yeah, all over, around that area.

24   Q.    How much marijuana did you give Tony Costa?

25   A.    Approximately, about 12, 13 pounds.

1   Q.   Now, if the marijuana was going to be a substitute for
2   cash --
3              MR. TOBIN:   Your Honor, may I offer 163.4, please.
4              THE COURT:   Yes, it's received.
5              (Exhibit 163.4 admitted into evidence.)
6              MR. TOBIN:   Thank you.  If that may be shown.
7   Q.   Again, this is a bank record, your bank record?
8   A.   Yes.
9   Q.   And the date of this transaction?
10  A.   July 20, 2018.
11  Q.   Is this a cash withdrawal?
12  A.   Yes.
13  Q.   For how much money?
14  A.   50,000.
15  Q.   That's the money you used to pay for the weed and to give
16  additional cash to Tony Costa for the payment?
17  A.   That's correct.
18  Q.   Thank you.  You indicated just a moment ago, sir, that it
19  was ultimately 12 or 13 pounds of marijuana that you gave to
20  Tony in partial payment; is that true?
21  A.   Correct, yes.
22  Q.   Was there a value or a worth associated with each pound?
23  A.   Yes, there was.
24  Q.   That was negotiated between whom?
25  A.   Me and Tony.

1    Q.   So originally, how much was each of these pounds of
2    marijuana going to be worth?
3    A.   Approximately about $1,400, $1,500, approximately.
4    Q.   And sir, directing your attention, do you actually go to
5    Tony Costa's house with the marijuana and the cash?
6    A.   Yes.
7    Q.   What happens at Tony Costa's residence?
8    A.   He basically takes everything, and then he calls me up
9    later or texts me later.
10   Q.   Talking about that text, could we go to Exhibit 139, page
11   27.  And directing your attention to box 294.  What's the date
12   of this text?
13   A.   July 20, 2018.
14   Q.   And what time is the text?
15   A.   6:39:54 p.m.
16   Q.   And had you already left Tony Costa's house?
17   A.   Yes.
18   Q.   Had you already given him the marijuana and the cash?
19   A.   Correct.
20   Q.   What does he text you?
21   A.   "Received 67,550."
22   Q.   Sir, what did you understand Tony Costa's text, "Received,
23   67,550" to mean?
24   A.   That's what I paid up to that point.
25   Q.   Did that include the $25,000 in cash you had previously

1    provided?

2    A.    Correct, yes.

3    Q.    And by your understanding did that also include the cash

4    you provided him on this day?

5    A.    Yes.

6    Q.    July 20?

7    A.    Yes.

8    Q.    And the value of the marijuana as determined by you and

9    Tony Costa?

10   A.    Correct.

11   Q.    Sir, ultimately would you receive text messages from Tony

12   Costa complaining about the quality or the lack of quality of

13   the weed you had provided to him?

14   A.    Yes, there was complaints.

15   Q.    Was it moldy or smelly or something like that?

16   A.    That's what he says.

17   Q.    So the value of it, was it taken down?

18   A.    Correct, yes.

19   Q.    When I say "the value," you understand that to mean the

20   credit you were receiving from each pound towards the bribe

21   amount?

22   A.    Correct, yes.

23   Q.    Sir, did you meet with Jasiel Correia again at a bar in --

24   when I say "again," did you meet with him again?  And let me

25   focus you to a bar in Providence.

```
 1    A.    Yes, I did.

 2    Q.    Where did you meet him specifically?

 3    A.    Tel Aviv.

 4    Q.    And was that on September 6, 2018?

 5    A.    Yes.

 6    Q.    Who was present at the meeting at the Tel Aviv in

 7    Providence?

 8    A.    Just me and the mayor.

 9    Q.    How was the meeting arranged between you and the mayor?

10    A.    Just through text messages back and forth.

11    Q.    Sir, again, I'm going to ask you to look at Exhibit 160,

12    the text between you and Mayor Correia.  Okay?  I'm going to

13    specifically ask you to look at page 4 of 160 and to focus on

14    boxes 120 through 122.

15    A.    Mm-hmm.

16    Q.    And, again, they're on the screen now.  These are texts

17    between you and Mayor Correia?

18    A.    Correct.

19    Q.    And outgoing is you; is that true?

20    A.    Yes.

21    Q.    What do you write?

22    A.    "Can I have five minutes of your time, please."

23    Q.    Then what do you write?

24    A.    "Here and outside."

25    Q.    And give me one moment, if you would, please.  So those
```

1    were on 9-5; is that accurate?

2    A.    Correct.

3    Q.    You ultimately meet him and talk with him at the Tel Aviv

4    on September 5, 2018; is that true?

5    A.    Yes.

6    Q.    The next day would have, of course, been September 6; is

7    that correct?

8    A.    Yes.

9    Q.    Do you send him a text message that next day, on September

10   6, about meeting him the night before?

11   A.    Yes.

12   Q.    I would direct you to box 123.  What's the date of that

13   text?

14   A.    9-6-2018, September 6, 2018.

15   Q.    And that's outgoing from you?

16   A.    Correct.

17   Q.    To whom?

18   A.    The mayor.

19   Q.    And what do you write to the mayor that morning?

20   A.    "Mr. Mayor, it was great to see you yesterday.  Just

21   wanted to follow up.  Since I'm running out of time, along with

22   sending a letter, could you please call Jen Barrow, Chief of

23   Staff at the DPH."  There was a phone number.  "And ask her to

24   expedite their approval.  Please tell her this clinic just

25   provides medical services.  It's not a place where children

1   commonly congregate for day programs.  Need their approval

2   ASAP.  Thank you so much."

3   Q.   So when you wrote originally the day after the meeting,

4   "Mr. Mayor, it was great to see you yesterday," what meeting

5   were you referring to?

6   A.   At the Tel Aviv.

7   Q.   So I'd like to go back to that meeting at the Tel Aviv.

8   Again, were you social friends with Mayor Correia?

9   A.   No.

10  Q.   What did Mayor Correia tell you at the Tel Aviv the night

11  before?

12  A.   He was just concerned that, you know, everything was still

13  going forward and everything was moving, that everything was

14  good.

15  Q.   What was good?  What was going forward, as you understood

16  it?

17  A.   The money.

18  Q.   And what did he say?  What were his words?

19  A.   He just was just wondering if everything was good.  "Are

20  we all set?"

21  Q.   Did he say, "Why isn't this done?"

22  A.   Yes.

23  Q.   Did he say, "Are we all set?"

24  A.   Yes.

25  Q.   Did he say, "Is the money good?"

1          MR. REDDINGTON:  I'm going to object, Your Honor, to

2     the leading.

3          THE COURT:  Yes, sustained.

4          Mr. Tobin, no more leading questions.  We want to hear

5     from the witness, not from you.

6     Q.   What did Jasiel Correia say to you, if anything, about

7     money during that meeting?

8     A.   He asked if we were all good.  "Is the money good?  Are we

9     all set?"

10    Q.   What did you understand he was referring to?

11    A.   Finish paying off the first portion of the bribe.

12    Q.   Which would have been how much money?

13    A.   $75,000.

14    Q.   Had you paid the full 75 yet?

15    A.   No.

16    Q.   What did you respond when the mayor made that inquiry?

17    A.   I just told him that there was a few hiccups here and

18    there.  There was some additional costs that came through, and

19    that it was just taking a little bit more time, but it would be

20    done.

21    Q.   Who paid the bill or the tab at the Tel Aviv?

22    A.   I did.

23    Q.   Sir, again directing your attention to 163.5.  Do you

24    recognize what's at 163.5?

25    A.   Yes.  That's the --

1    Q.   What is that?

2    A.   The tab that I paid.

3    Q.   Your credit card statement, if you will?

4    A.   Correct.

5           MR. TOBIN:  Your Honor, may 163.5 come into evidence?

6           THE COURT:  Yes, it's received.

7           (Exhibit 163.5 admitted into evidence.)

8    Q.   Sir, looking at that now, the posting date is September 6;

9    is that accurate?

10   A.   Yes.

11   Q.   And the charge was from the Tel Aviv Cigar Bar and G,

12   Providence; is that true?

13   A.   Yes.

14   Q.   And how much did you pay?

15   A.   $86.20.

16   Q.   Was that for the meeting with the mayor?

17   A.   Yes.

18   Q.   Sir, did you make a final payment on the bribe?

19   A.   Yes.

20   Q.   Who did you pay?

21   A.   Tony Costa.

22   Q.   Where did you meet Tony Costa?

23   A.   We met off Airport Road in Fall River at a Cumberland

24   Farms.

25   Q.   When you met Tony Costa at Cumberland Farms parking lot,

1    what did you give him?

2    A.    $10,000.

3    Q.    Cash or check?

4    A.    Cash.

5    Q.    Any marijuana or just the 10,000?

6    A.    Just the 10,000.

7    Q.    And did you exchange texts with Tony Costa setting up the

8    meeting at the Cumberland Farms?

9    A.    Yes.

10   Q.    Again, I'm going to ask you to look at Exhibit 139.  And

11   this time I'll focus you to pages 59 and 60.  And specifically

12   looking at boxes or texts 646 through 658 -- and, again, 646

13   and 647 are on one page and the remaining on the next two

14   pages; is that true?

15   A.    Yes.

16   Q.    So sir, looking at the text from March 28, 2019, who is

17   that from?

18   A.    Tony to me.

19   Q.    What does he say?  What does he write, I should say?

20   A.    "Are you on your way?"

21   Q.    And what do you respond?

22   A.    "Can you meet me off Airport Road?"

23   Q.    What does he respond?

24   A.    "Yup.  Where, at the Dunkin' Donuts."

25   Q.    And then you say?

1    A.    "Cumberland Farms at the rotary."

2    Q.    He responds?

3    A.    "Okay.  When?"

4    Q.    You reply?

5    A.    "Ten minutes, 15 minutes."

6    Q.    He replies?

7    A.    He replies, "Okay, okay."

8    Q.    And then?

9    A.    I wrote, "10, 15 minutes."

10   Q.    And he replies?

11   A.    "Okay."

12   Q.    Do you, in fact, meet him at the Cumberland Farms, as you

13   were planning during these texts?

14   A.    Yes.

15   Q.    And, again, what happens there?

16   A.    I give him the $10,000.

17   Q.    Sir, later after the meeting, at 6:32 did you send Tony

18   Costa a text message?

19   A.    Yes.

20   Q.    Is that at box 659?

21   A.    Yes.

22   Q.    It's 6:32 in the afternoon or evening; is that true?

23   A.    Correct.

24   Q.    What do you text him?

25   A.    "Please confirm 10k."

1  Q.   What does he respond?

2  A.   "Yup."

3  Q.   And the 10K you were referring to was what?

4  A.   $10,000.

5  Q.   So just by way of -- the first amount of cash was?

6  A.   25.

7  Q.   And this third amount was?

8  A.   10,000.

9  Q.   And then in between there was cash and weed; is that

10 accurate?

11 A.   Correct.

12 Q.   Sir, at some point did Mayor Jasiel Correia ever tell you

13 how many Letters of Non-Opposition he intended to sign or

14 issue?

15 A.   Yes, he did.

16 Q.   Approximately what did he say?

17 A.   About six or seven.

18 Q.   Do you know how many, in fact, he did issue?

19 A.   13 or 14.

20 Q.   Sir, do you know Charles Saliby?

21 A.   Yes, I do.

22 Q.   How do you know Charles Saliby?

23 A.   He's my best friend.

24 Q.   And at some point did you converse with Charles Saliby

25 about the arrangement you had to pay a bribe?

1    A.    Yes.

2          MR. TOBIN:  I don't have any further questions, but

3    please remain seated.

4          THE COURT:  Mr. Reddington.

5    CROSS-EXAMINATION BY MR. REDDINGTON:

6    Q.    So, sir, we've had obviously testimony regarding the

7    intent and the effect of proffer agreement letters, cooperation

8    agreement letters, and you received both, correct?

9    A.    Correct.

10   Q.    Your cooperation agreement basically indicates that you

11   will cooperate with law enforcement, that you will testify if

12   they require that you testify, and that in consideration of

13   that, you will receive certain benefits, right?

14   A.    Yeah, basically said that I have to tell the truth.

15   Q.    I understand you want to tell the truth.  But the benefit

16   is, sir, that you will not be charged with any criminal

17   offense, true?

18   A.    Yes.

19   Q.    And the proffer agreement was signed on June 17 of '19,

20   correct?

21   A.    Yes.

22   Q.    And in September of '19, that's when you signed the actual

23   cooperation agreement?

24   A.    Okay.

25   Q.    Now, you knew, and when you -- by the way, when you were

 1   represented by counsel, you had occasion to go upstairs in this

 2   building to do this proffer, right?

 3   A.   Correct.

 4   Q.   And what is a proffer?  What does that mean?

 5   A.   Say again.

 6   Q.   What is a proffer?  When you sign a proffer agreement and

 7   you go and you meet with people to proffer, do you know what

 8   that means?

 9   A.   No.

10   Q.   Do you recall meeting in the United States Attorney's

11   Office in this building?

12   A.   Yes.

13   Q.   And you recall going into a room where a number of people

14   were there, right?

15   A.   Yes.

16   Q.   Present would be your attorney, Mr. Contant, correct?  He

17   was with you?

18   A.   Correct.

19   Q.   There was an FBI special agent that was there, correct?

20   A.   Yeah.

21   Q.   There was a senior investigator, Daniel O'Neil, from the

22   State of Massachusetts that was there, correct?

23   A.   Okay.

24   Q.   There was a representative of the Office of the Inspector

25   General that was there, correct?

1    A.   Okay.

2    Q.   Sandy Lemanski from the Internal Revenue Service was

3    there, right?

4    A.   Yeah.

5    Q.   And Assistant United States Attorney Zach Hafer was

6    present, correct?

7    A.   Do you have four people or five?

8    Q.   Well, let's see.

9    A.   Besides my attorney.

10   Q.   Excluding you and your attorney, would be one, two, three,

11   four, five, six, seven people.

12   A.   No.

13   Q.   So you don't -- in any event, you recall that there were a

14   number of people that were at this meeting, correct?

15   A.   Yes.

16   Q.   And it was during this meeting that you were asked a lot

17   of questions about your activities, right?

18   A.   Correct.

19   Q.   You also at the time had fairly successful business or

20   businesses, did you not?

21   A.   Yes.

22   Q.   And how many different businesses did you have at that

23   time?

24   A.   Two or three.

25   Q.   And what were the nature of those businesses?

1   A.   One was a tobacco wholesale company, and the other one was

2   just cannabis.

3   Q.   And where was the tobacco wholesale company located?

4   A.   Avon.

5   Q.   And where was the cannabis company located?

6   A.   In Rhode Island.

7   Q.   Did you own real estate and property with or in

8   consideration of those businesses?

9   A.   No.  We leased.

10  Q.   And did you -- obviously you filed your income taxes for

11  the corporations, I would imagine, correct?

12  A.   Correct.

13  Q.   You declared all the income that you made, as far as

14  you're concerned, on those income tax returns, right?

15  A.   Correct.

16  Q.   And you were also involved in drug dealing itself, right?

17  A.   Yes.

18  Q.   Right.  And how much money -- let's just randomly say

19  2018, how much money did you make on dealing illegal marijuana,

20  not legal marijuana?

21  A.   I didn't make anything.

22  Q.   You were involved in drug dealing, sir?  When I say "drug

23  dealing," I'm not referring to selling cannabis or medicinal

24  product.  You were involved in illegal drug dealing, correct?

25  A.   Yeah, I know what you were referring to.  No.

```
 1    Q.   You were not?

 2    A.   Correct.

 3    Q.   Okay.  When you were doing your proffer, for example, the

 4    representative of the Internal Revenue Service, did she ask you

 5    to produce your tax returns or your business records?

 6    A.   They could get those themselves.

 7    Q.   I asked you about at the proffer, sir, did they ask you

 8    prior to that or at the time of to produce any records?

 9    A.   Yes.

10    Q.   Did you produce the records?

11    A.   Yes.

12    Q.   What did you produce?

13    A.   Bank statements.

14    Q.   And all of your bank statements, or just the ones we

15    looked at on the little screen here?

16    A.   All the bank statements.

17    Q.   Do you recall how long the proffer agreement was, how long

18    it took?

19    A.   How long did it take?

20    Q.   Yeah.

21    A.   I don't know.

22    Q.   Fair to say, sir, that you submitted an application of

23    intent to open a registered marijuana dispensary, and you had

24    one year to obtain a provisional certificate of registration or

25    PCR, right?
```

1    A.    Repeat your question again.

2    Q.    Do you know what a PCR is, a provisional certificate of

3    registration?

4    A.    Yes, I do.

5    Q.    What is that?

6    A.    That just basically allows you to operate -- it's like the

7    beginning licensing for marijuana.

8    Q.    And you have one year to obtain that PCR, correct?

9    A.    Correct.

10   Q.    So you were looking into opening a business in the City of

11   Fall River, and you were reaching out to Fall River, as it

12   were, elected officials, to get the process going for your

13   business, and you were pretty much running into a stone wall,

14   right?

15   A.    Correct.

16   Q.    You felt for a passage of time that you were not -- they

17   were not responsive to your inquiries and requests, correct?

18   A.    Correct.

19   Q.    And how long had you been reaching out trying to open up a

20   marijuana business in Fall River without having any response

21   from anybody?

22   A.    A few months.

23   Q.    So you were somewhat frustrated at that point, right?

24   A.    Correct.

25   Q.    So as a result of being frustrated, you spoke to this

1    fellow Craig that you've described from East Coast Hydro, a

2    marijuana retail supply company, right?

3    A.    Yes.

4    Q.    And how did you know Craig?

5    A.    Just through a mutual friend.

6    Q.    What is Craig's last name?

7    A.    I don't recall.

8    Q.    So when you spoke with Craig -- and where did that

9    conversation take place?

10   A.    At his place.

11   Q.    And you spoke with him about the fact that you wanted to

12   open your marijuana dispensary but it was really going nowhere.

13   At that point Craig told you that his landlord, Tony Costa,

14   knew the mayor of Fall River, right?

15   A.    That's correct.

16   Q.    Through Craig you were able to meet Mr. Costa, correct?

17   A.    Yes.

18   Q.    First time that you met Mr. Costa you told Mr. Costa that

19   you wanted to open this retail store and shop in Fall River,

20   Mass., and Costa told you that he had a good relationship with

21   the mayor, Jasiel Correia, right?

22   A.    Yes.

23   Q.    And Costa said that he would speak to Correia on your

24   behalf, correct?

25   A.    Yes.

1    Q.   And that after speaking with the mayor, Costa then told

2    you, reached out to you, and stated that the cost of the Letter

3    of Non-Opposition from the City of Fall River was $250,000 is

4    what you testified to, correct?

5    A.   Yes, that was the negotiation.

6    Q.   And a percentage of the business.  This is what Costa told

7    you, right?

8    A.   That was the second part of the negotiation, yes.

9    Q.   So this is what Costa told you, though, right?

10   A.   Correct.

11   Q.   And that you told Costa -- you were negotiating with

12   Costa.  You said, "I'll pay $100,000," right?

13   A.   150 was the final.

14   Q.   Oh.

15   A.   150 was the final agreement.

16   Q.   Yeah.  Do you remember telling him that you'd pay

17   $100,000?

18   A.   Yes, that was part of the negotiation.

19   Q.   And then eventually you agreed to pay $150,000, right?

20   A.   That's correct.

21   Q.   And this money would be given to Costa, but it was your

22   understanding that Costa was going to use it to bribe the mayor

23   apparently, right?

24   A.   I thought it was initially for Mr. Costa at first, but

25   then --

1    Q.    You thought it was for Costa?

2    A.    Yes.  I was not sure, but --

3    Q.    So is it fair to say that you always dealt with Costa when

4    attempting to get the Letter of Non-Opposition?

5    A.    Yes.

6    Q.    And that at one point you were able to meet with Jasiel,

7    the mayor, at his office at City Hall on one occasion, right?

8    A.    Correct.

9    Q.    And he was with some other people, one of which would be

10   Gen Andrade, right?

11   A.    Yeah.

12   Q.    And how many other people were at the meeting?

13   A.    Craig and John.

14   Q.    John?

15   A.    Craig is the mutual friend and Craig is the owner of the

16   store.

17   Q.    Okay.  And you basically kind of pitched the business?

18   A.    Correct.

19   Q.    Good location, you know, good product, good staff, things

20   of that nature, correct?

21   A.    Absolutely.

22   Q.    And that was in your effort to obtain this Letter of

23   Non-Opposition, right?

24   A.    Yes.

25   Q.    And the meeting went pretty good, didn't it?

1    A.    Yeah, pretty good.

2    Q.    Now, at this point you hadn't met up with Jasiel Correia

3    at all other than this meeting, right?

4    A.    Correct.

5    Q.    You had no dinners, no Ocean Prime, no meeting at Tel

6    Aviv, things of that nature; it was just pretty much

7    straightforward you went in, had your interview regarding

8    getting the Letter of Non-Opposition, right?

9    A.    Yes.

10   Q.    And ultimately, sir, the Letter of Non-Opposition was

11   indeed issued, was it not?

12   A.    It was.

13   Q.    And you received the Letter of Non-Opposition before any

14   payments whatsoever were made to Tony Costa, right?

15   A.    I have to check the dates.

16   Q.    You'd have to check the dates?

17   A.    Yeah, but I believe so, yeah.

18   Q.    Check the dates of what, the cash that you put in an

19   envelope?

20   A.    Yeah, the withdrawals from my bank account, yeah.

21   Q.    Okay.  So the withdrawals -- how about search your memory

22   as to when you made the withdrawal from the five, five and five

23   that we already looked at --

24          MR. REDDINGTON:  Can you pull that up for me, please,

25   Alyssa.  Thank you.

1    Q.   Now, June 29, 2018, you make a withdrawal of 5,000, right?

2    A.   Yup.

3    Q.   June 29, another five and another five, correct?

4    A.   Yup.

5    Q.   Now, do you know when you received the Letter of

6    Non-Opposition, sir?

7    A.   It's dated July 2, but I received it there a little bit

8    after.

9    Q.   And when you received the Letter of Non-Opposition, you

10   also received a Community Host Agreement?

11   A.   I believe so, yes.

12   Q.   You know what a Community Host Agreement is, right?

13   A.   Yeah, that's the recreational part of marijuana.

14   Q.   And did you receive two copies of that, if you recall, to

15   sign both of them and return them?

16   A.   I don't know if I received two copies, but I did receive a

17   copy.

18   Q.   So when you went to the bank and you withdrew the cash,

19   you put it in a manila envelope, and then you reached out to

20   Tony Costa, correct?

21   A.   Yes.

22   Q.   And that's when you ended up having the meeting with

23   Mr. Costa; you went to his house?

24   A.   Correct, afterwards, yeah.

25   Q.   When you went to his house, where did you meet him

1    actually, in the yard, driveway?

2    A.    Out front, front of his house.

3    Q.    And you had a conversation with Mr. Costa, I imagine, when

4    you handed him the envelope?

5    A.    Yes.

6    Q.    And what was the conversation you had with Costa?

7    A.    Just about the cash, just, you know, just talking

8    gentlemen's talk, just say, "How you doing?  How's everything

9    going?"  That sort of thing.

10   Q.    And it was 25,000.  It wasn't 50,000, right?

11   A.    Correct.

12   Q.    It wasn't 27,000.  It was 25, correct?

13   A.    Mm-hmm.

14   Q.    All $100 bills?

15   A.    Correct.

16   Q.    And Mr. Costa, after exchanging pleasantries with you,

17   ended up leaving and you left.  He went back in his house and

18   you left, right?

19   A.    Correct.

20   Q.    And it was in June of 2018 that you went to the Ocean

21   Prime with Jasiel Correia, right?

22   A.    Yes.

23   Q.    It was June that same evening that you went to the cigar

24   bar in the North End where you discussed or told the jury about

25   the conversation regarding "How we looking with the money" and

1   all of that, right?

2   A.   Yes.

3   Q.   Because he asked you at the Ocean Prime, "How we looking

4   with the money," right?

5   A.   No.  Just gentlemen's talk, getting to know each other.

6   Q.   Okay.  So he did not have any conversation with you at the

7   Ocean Prime about money and bribes or anything.  It was at the

8   Tel Aviv, right?

9   A.   No.  There was two cigar bars on two different dates.

10  Q.   Okay.  Ocean Prime --

11  A.   The first one was Ocean Prime.  After there --

12  Q.   Go ahead.

13  A.   -- we went to a cigar bar in the North End.  And at that

14  moment when we left, that's when he asked me those questions.

15  Q.   Right.  And this is monumental to you.  It's anchored in

16  your brain.  You remember where this conversation took place,

17  right?

18  A.   Correct.

19  Q.   You recall on July 15 of 2019 when you were involved with

20  the FBI and investigators that you were asked about going to

21  the Ocean Prime restaurant located in the Seaport District of

22  Boston, Mass.

23  A.   Okay.

24  Q.   You talked to them about it, didn't you?

25  A.   Yes.

1   Q.   And you provided receipts and everything for the cigar bar

2   and for the dinner, correct?

3   A.   It was on the bank statements, yes.

4   Q.   And you provided that to them, right?

5   A.   Correct.

6   Q.   And you indicated that Bairos, that would be you, and

7   Correia had dinner together because he was taking a class at

8   Harvard.  So you guys met up, had general conversation, right?

9   A.   Correct.

10  Q.   And it was at this point Correia was cautious but asked

11  you at the Ocean Prime if "he was good with the money."  That

12  would be you?

13  A.   That was not at Ocean Prime.

14  Q.   You told the FBI it was at Ocean Prime, didn't you?

15  A.   No.  It was afterwards.

16  Q.   Do you remember talking to the FBI, and when they asked

17  you about it, you indicated in June of 2018 that you met with

18  Jasiel Correia, you had dinner together, general conversation,

19  and Correia was cautious but asked you if you were good with

20  the money?

21  A.   Yes, at the end of the night, yes.

22  Q.   Okay.  That was at the Ocean Prime is what you told the

23  FBI?

24  A.   We went to Ocean Prime.  Then we went to a cigar bar.  And

25  at the end of the night, that's when it was asked.

1   Q.   Well, you did mention the fact that after that you went to

2   the cigar bar in the North End, right?  That's where you went

3   to the cigar bar?

4   A.   Right, after Ocean Prime.

5   Q.   I understand that.  That's what you told the FBI.  So

6   initially you indicated to the FBI, sir, that you had dinner --

7          THE COURT:  Well, Mr. Reddington, it's this witness's

8   testimony, not something that you found somewhere that you

9   think supports this.  The testimony is the witness's, not some

10  notes that you may have made.

11         MR. REDDINGTON:  This is the --

12         THE COURT:  And so using a document like that is

13  improper for that purpose, and I'll ask you to put it down.

14  You can ask him what he said.  He can respond.  And then we'll

15  deal with that as necessary.

16  Q.   Do you have a memory of telling the investigators or the

17  agents when you were being debriefed that the conversation that

18  you had with Jasiel Correia regarding money took place at the

19  Ocean Prime restaurant?

20  A.   It happened that night.

21  Q.   And do you recall further --

22         THE COURT:  As I indicated, please put the document

23  down.  It suggests to the jury that there's some documentation,

24  and there's no basis for that.

25         MR. REDDINGTON:  Okay.  I was just using it as a

1  guide.

2           THE COURT:  Yes, I understand what you were using it

3  for.  That's why I've asked you to put it down.

4           MR. REDDINGTON:  Okay.

5  Q.   Do you recall indicating to the investigators, sir, about

6  the cigar bar in the North End that, in fact, you had no

7  conversation regarding, "Is it okay."  You guys just kind of

8  socialized and smoked cigars?

9  A.   We socialized at both events, and at the end of the night

10  is when that came up.

11          THE COURT:  Are we moving now on to another topic?

12          MR. REDDINGTON:  Yes, Your Honor.

13          THE COURT:  So ladies and gentlemen, we'll take our

14  break.

15          Let me give you a little brief lesson on the use of

16  documentation and that sort of thing.  As I've told you, the

17  law is and evidence is particularly concerned that we hear

18  testimony of the witness.  You get to see the witness live and

19  hear how they respond.  That's the primary concern.  From time

20  to time it's suggested that the witness has made inconsistent

21  statements perhaps on some other occasion.  And the witness is

22  given the opportunity to respond to that suggestion, as it was

23  here.  But without something more, we don't go to the purported

24  inconsistent statements.  You ask the question about

25  inconsistent statements and the evidence is left with the

1    witness's response.

2           For that reason, the idea of using some documentation

3    or waving some documentation around or that sort of thing is

4    not proper.  And that's the basis for my instruction to

5    Mr. Reddington.

6           So you've heard what the witness has to say here in

7    court.  Unless there's some additional evidence offered

8    separately, then we have his testimony, whether you believe it

9    or not.  But that's up to you.  That's the kind of basic rules

10   of the road for dealing with suggestions of inconsistent

11   statement, as we've had here.

12       So we'll take our break.  We'll be back at around 1:30.

13   And remember, again, that we'll be breaking about 3:00 today.

14           (Jury exits the courtroom.)

15           THE COURT:  Anything else before the break?

16           MR. HAFER:  Not from us, Your Honor.

17           MR. REDDINGTON:  No.

18           THE COURT:  All right.  We'll be in recess.

19           (Recess taken 12:50 p.m.)

20           (Resumed at 1:35 p.m.)

21           THE CLERK:  All rise.

22           (Court entered the courtroom.

23           THE CLERK:  Please be seated.

24           THE COURT:  I understand that counsel wants to take up

25   some matters.  I assume that they are in camera?

```
 1              MR. REDDINGTON:  Yes, Your Honor.

 2              THE COURT:  Okay.  So I'll ask the press

 3   representative to leave the courtroom at this point.

 4              (Press representative left the courtroom.)

 5              THE COURT:  So, Mr. Reddington, I understand that

 6   there's a matter that you wanted to take up?

 7              MR. REDDINGTON:  Yes, Your Honor, thank you.  I

 8   appreciate it.

 9              I don't want to incur the ire of the Court, so I'm

10   kind of looking for a little guidance as to the confrontation

11   of cross-examination of this witness.

12              The 302 that I have received in discovery is my guide,

13   if you will, as to not only the testimony but also what this

14   gentleman indicated to Sara O'Leary, the FBI agent who prepared

15   the 302.

16              So my question to Your Honor is, I have clean copies

17   of the 302 not marked up.  Would it be acceptable for me to put

18   one copy on the witness stand, ask the gentleman, "Did you tell

19   the FBI X," for example, he can then say, "No."  I could then

20   say, "Would you please look at paragraph," whatever it may

21   be --

22              THE COURT:  Let me tell you how I believe it is

23   properly done.  That is to say, ask the witness, did he say

24   such and such, the witness answers.  He doesn't have his

25   recollection refreshed by looking at some other document.  If
```

1  he says, "I don't recall," you might be able to refresh his

2  recollection with such a document.  Although, I'll be very

3  careful about it.  I've been, perhaps, too lax in enforcing the

4  basic rule that a 302 is not evidence, it is -- it becomes a --

5  contents may become evidence if certain preconditions are met.

6  And the danger is what I observed, which is to wave a document

7  in front of the jury as if it were evidence, as if it were

8  grand jury testimony, as if it were something that has an

9  independent significance.  I'm not going to let that happen

10  anymore.

11       I've permitted a fair amount of leeway in this case.

12  I've let leading questions go forward on certain matters, but I

13  have an independent responsibility to assure that the jury has

14  brought to their attention only those things that are properly

15  admissible.

16       302s, whether under the guise of waving a document in

17  front of them or actually attempting to submit the document or

18  offering it or referencing it in a way that suggests that there

19  exists such a document that has some independent significance

20  is not proper.

21       Now, the one way of dealing with it, not to go through

22  all of them, is to call the FBI agent in.  I doubt I'll let

23  that happen because the nature of the impeachment by prior

24  inconsistent statement was so collateral to the defendant's

25  (sic.) testimony that it seems to me that we aren't going to be

1    spending time searching through and contradicting with

2    extrinsic evidence of the testimony what the witness had to

3    say.

4          So you can ask.  The witness answers however they

5    answer, "I don't recall," "No, I didn't," "No, that was in the

6    North End, not in Ocean Prime," and I'll rule on it from there,

7    but the document itself is not going to be produced in the

8    presence of the jury without some further foundation.

9          So that's my basic rule with respect to it, it's the

10   one I followed all along, I think it is consistent with the

11   Federal Rules of Evidence.

12         I have made similarly sharp comments, directed

13   comments most recently to Mr. Tobin about him testifying as

14   opposed to the witness testifying.  It's improper.  And when it

15   goes to the heart of the witness' testimony, like your name is

16   X or back on and there's a throat clearing and some leading

17   questions are offered, when it goes to the heart of the

18   witness' testimony, I want the witness' testimony, that's what

19   the jury is entitled to, not Mr. Tobin saying, "Agree?"

20   Because this is direct examination.

21         Now, I use those as two illustrations of basic

22   proposition that the Court, that is, the trial judge, exercises

23   fairly substantial control over the admission of evidence with

24   a view toward avoiding redundancy, unfair prejudice or

25   inconsequential tangential matters because we've got to get

1    right to the core of it, and that goes back to the larger

2    purpose that I've been pressing here, we've got to get through

3    this case promptly.  Not unfairly, but promptly.

4         And so the distractions of me having to instruct with

5    respect to those rules of evidence are time I will take to

6    explain to the jury what's going on here because I think I have

7    to here, but I'm going to be enforcing them very strictly at

8    this point, And I hope that explains where I'm going on it.

9         It's not a matter of incurring my ire one way or the

10   other.  As you know, I'm blunt spoken, brusque, but an equal

11   opportunity blunt spoken and brusque person.  And this applies

12   to both parties in service of getting this case fairly to the

13   jury as promptly as possible.

14        MR. REDDINGTON:  So, could I just ask, Your Honor, I

15   respectfully would disagree that it's inconsequential when I

16   have allegedly a statement that is clearly inconsistent and

17   diametrically opposed to a very, very important portion of his

18   testimony.  I would believe that I should be allowed to at

19   least confront the witness with the prior inconsistent

20   statement, not offered for the truth of the matter it --

21        THE COURT:  No, you have an opportunity -- you ask him

22   the question.  He answers the question.  He said, no, it wasn't

23   what you say, it was something else.

24        MR. REDDINGTON:  Okay.

25        THE COURT:  And now the question is:  Do we get to

1    extrinsic evidence, that is, the statement of the FBI agent,

2    because the FBI agent would have to come in and contradict it.

3            And my view of this contradiction is it's so marginal,

4    if even that, that I'm not going to permit extrinsic evidence

5    with respect to it.

6            He says it was at the bar afterwards, the 302, if -- I

7    trust you that that's what the 302 says, but, you know, this is

8    relatively modest, I guess, so modest that I wouldn't permit

9    extrinsic evidence of it.

10           I mean, you can offer it if you want, and I'll rule on

11   it, and you'll have a record with respect to my ruling on that.

12           MR. REDDINGTON:  So could I put the clean 302 without

13   referencing it on the witness stand in the event that --

14           THE COURT:  No, no, he has not indicated that he

15   doesn't recall what he said.  The only reason to have it in

16   front of him is to refresh his recollection, that's the only

17   reason to have it in front of him.

18           MR. REDDINGTON:  Or as I understand it to impeach him

19   with a prior inconsistent statement.

20           THE COURT:  You do that orally.  You don't do that

21   with a document in front because then the document before the

22   jury suggests to the jury that there is some document that

23   contradicts him which is a backdoor way of getting before the

24   jury a matter that is extrinsic evidence, and I'm not

25   permitting it.

1          MR. REDDINGTON:  I understand that.

2          But -- so, if I were to at least have -- how else

3    would I refresh his memory?  In other words, to have him --

4          THE COURT:  You'll have to wait and see when he has an

5    unrefreshed memory and whether or not I think it's worth the

6    effort to permit the request to refresh his memory.  Is there

7    something that would refresh your memory?

8          You could say, "Does my hair refresh your memory,"

9    remember, because we were talking about hair, see my hair -- I

10   mean, it's the usual stuff about refreshing recollection.

11         Is it -- does thinking about a moonshot refresh your

12   recollection about what happened on such and such a day?  It

13   doesn't have to be a document, it can be anything It, hank of

14   hair, a stone, a moonshot.  But when it becomes a document,

15   then it is a backdoor introduction of the document itself or

16   the significance of the document.  I'm not going to permit it.

17         So that's how I'm going to treat those -- those

18   matters.

19         MR. REDDINGTON:  So just so Your Honor knows what I

20   would try to do, because actually, this is kind of like the

21   only template, if you will, that I have --

22         THE COURT:  Sure.  I have been permitting it --

23         MR. REDDINGTON:  Oh, I know.

24         THE COURT:  Just a moment.

25         I'm not trying to cut you off, but I just want you to

1    be clear on this.  I've been permitting it because that's how

2    everybody does it.  You know, they make notes along the side of

3    the 302s and that provides a good way to identify those things

4    that you want to pursue and that sort of thing, that's fine; I

5    don't disagree with it.  But now it took on this life of its

6    own, not as a set of notes for you to ask questions of the

7    defendant (sic.), but something that independently itself

8    impeaches the defendant and -- sorry, the witness, and that it

9    may not do without further foundation.

10                MR. REDDINGTON:  I think I understand, Your Honor.

11                THE COURT:  Okay.

12                MR. REDDINGTON:  Could I respectfully note my

13   objection, please?

14                THE COURT:  Well, with respect to the question of

15   extrinsic evidence as to contradiction having to do with at

16   what point was there a discussion about money, Ocean Prime or

17   at the cigar bar afterwards, yes.

18                MR. REDDINGTON:  Thank you.

19                And I just want to make sure, Your Honor, that you

20   understand, because I don't want to obviously, you know,

21   question by question and have you get mad at me, so what I'd

22   like to do --

23                THE COURT:  Listen, I don't get mad.

24                MR. REDDINGTON:  Could I have an objection to the

25   fact -- the ruling that I cannot impeach the witness by prior

 1  inconsistent statement?

 2          THE COURT:  I have no made such ruling.

 3          MR. REDDINGTON:  Oh.

 4          THE COURT:  You can impeach by prior inconsistent

 5  statement, you just got to do it right, and you can't do it

 6  with extrinsic evidence until we've gotten to that point.

 7          So the short of it is you can do impeachment by prior

 8  inconsistent statement as you choose; what you can't do is

 9  introduce extrinsic evidence or have the effective equivalent

10  of introducing extrinsic evidence.

11          So there's no standing objection to my not permitting

12  impeachment by prior inconsistent statement.  I permit it, if

13  it's properly supported.

14          MR. REDDINGTON:  Okay.

15          THE COURT:  Okay.

16          So are we ready for the witness?

17          MR. TOBIN:  Yes, Your Honor.

18          THE COURT:  Okay.

19          (Pause.)

20          THE CLERK:  All rise.

21          (Jury entered the courtroom.)

22          THE CLERK:  Please be seated.

23          THE COURT:  So we'll continue with the examination of

24  Mr. Bairos, Mr. Reddington.

25          MR. REDDINGTON:  Thank you, Judge.

1    BY MR. REDDINGTON:

2    Q.   So, sir, I think you had indicated that the first payment

3    that you made was to Mr. Costa for $25,000 cash, correct?

4    A.   Yes.

5    Q.   Then the second so-called payment would have been through

6    the use of marijuana, correct?

7    A.   Correct.

8    Q.   And you purchased marijuana and paid $2,000 a pound for

9    that marijuana, correct?

10   A.   That was a guesstimate, but it was less.

11   Q.   You went to Rhode Island to purchase the marijuana,

12   correct?

13   A.   No.

14   Q.   Did you obtain the marijuana from multiple sources?

15   A.   Correct.

16   Q.   Did you obtain the marijuana from a fellow by the name of

17   Rich?

18   A.   No.

19   Q.   From Bridgewater/Raynham area?

20   A.   There was multiple people.

21   Q.   Did you go to Rhode Island and obtain the marijuana from

22   Paul?

23   A.   Everything was done in state.  I didn't go out of state.

24   Q.   Did you ever tell the FBI that you went to Rhode Island to

25   meet up with Paul to purchase the marijuana?

1    A.    That's where he's from, but I didn't go there.

2    Q.    And what's his name?

3    A.    Paul.

4    Q.    Paul what?

5    A.    I don't know his last name.

6    Q.    Well, you then dealt directly with Mr. Costa, and you gave

7    him the marijuana, correct, about 13 or 14 pounds?

8    A.    That's correct, yeah.

9    Q.    And then it was your understanding -- you knew Mr. Costa

10   was a drug dealer, correct?

11   A.    I had an idea, I didn't know.

12   Q.    And in reference to -- you knew that Jasiel Correia had a

13   legal defense fund, right?

14   A.    Yes.

15   Q.    And in fact, he had talked about the legal defense fund on

16   a number of occasions with you, correct?

17   A.    A couple of times, maybe.

18   Q.    You knew he was basically asking for a donation or money,

19   right?

20   A.    Yeah.

21   Q.    To pay the lawyer that he had representing him, right?

22   A.    Yes.

23   Q.    And in fact, one of the discussions that you had at the

24   Ocean Prime was regarding the legal defense fund, right?

25   A.    I don't recall.

1    Q.   Do you recall telling him that you were a big contributor

2    to politicians?

3    A.   I wouldn't consider myself a big contributor.

4         THE COURT:  Mr. Bairos, listen to the question.  The

5    question was being asked -- stating that, excuse me.

6         Listen very carefully to what Mr. Reddington asks you,

7    only answer that question, not answer some other -- with some

8    other thoughts.

9         THE WITNESS:  Sure.

10   BY MR. REDDINGTON:

11   Q.   Do you recall discussing the fact that you were a --

12   perhaps large is not the right word, but that you had made

13   many, many political contributions to politicians?

14   A.   Yes.

15   Q.   And in fact, sir, you file -- or the Office of Campaign

16   Finance keeps records on the amount of money that is paid by

17   citizens or an individual to politicians, correct?

18   A.   Correct.

19   Q.   And for example, Charles Baker, you donated -- well, on

20   one occasion, July 19th of 2016, $1,000, right?

21   A.   Mm-hmm.

22   Q.   Pretty much all of your donations to the politicians were

23   in increments of a thousand dollars, right?

24   A.   Correct.

25   Q.   Maura Healey, correct?

```
 1    A.    Correct.

 2    Q.    Robert DeLeo?

 3    A.    Okay.

 4    Q.    And numbers of politicians from, for example, September

 5    10th of 2002 until 2020, was a total of $101,220, does that

 6    sound about right?

 7    A.    I'm going to have to add it up, but --

 8    Q.    Fairly significant donations, though, right?

 9    A.    Yeah.

10    Q.    And that would be to hopefully foster any consideration

11    that you may need in your business, right?

12    A.    Yeah.

13    Q.    And you don't have any interest in that Fall River

14    marijuana dispensary anymore, do you?

15    A.    No, I do not.

16    Q.    Do you recall that on one occasion, I think you mentioned

17    about the Broadwell Street property in Avon, Massachusetts,

18    that Mr. Correia asked you to donate, yet again, to his legal

19    defense fund, right?

20    A.    Yes.

21    Q.    He drove there in the city vehicle, the Tahoe, right?

22    A.    Yeah.

23    Q.    And that, in fact, you told Correia that you would give

24    him cash for the legal defense fund, correct?

25    A.    Yes.
```

1    Q.   And it was about $25,000 that you were going to give him,

2    cash, right?

3    A.   Yes.

4    Q.   And in fact, Jasiel told you that he could not take and

5    would not take cash, would not accept cash, right?

6    A.   Correct.

7    Q.   And so you never, obviously, gave him the $25,000 cash?

8    A.   Correct.

9    Q.   You then, as you testified, made the weed delivery to

10   Costa, now he's out of the house that he was living in, he's

11   living with his mother now, right, at 207 Sterling Street?

12   A.   Okay.

13   Q.   Do you remember that as the location?

14   A.   Yeah, I don't know whose house it is, but --

15   Q.   Okay.  Do you recall that Mr. Costa asked you and

16   discussed the marijuana for payment and you hated to do that

17   but he asked you to do it?

18   A.   That's correct.

19   Q.   So that's when you actually handed him over the marijuana

20   that you had paid approximately $2,000 a pound for the weed,

21   right?

22   A.   Yeah, that's when I handed it to him, yes.

23   Q.   And after you dealt with Mr. Costa and made the payment of

24   cash and the payment of weed, subsequent to that is when you

25   indicated that you met up with Mr. Correia at the Tel Aviv,

```
 1   right?
 2   A.   Yes.
 3   Q.   You believed, sir, that he was apparently unaware of
 4   anything to do with the marijuana at that point, to Costa,
 5   right?
 6   A.   Yeah.
 7   Q.   Did you know that Costa was, to coin a phrase, playing
 8   both ends against the middle or playing off each other?
 9   A.   I would agree with that.
10   Q.   And the cigar bar and the Tel Aviv, you actually went
11   there, correct?
12   A.   Yes.
13   Q.   But you knew that he had already reached out again and
14   asked if you could give him a check for a donation to his legal
15   defense fund, that's why he wanted to meet with you, and he was
16   there actually with a number of people from his administration.
17        Do you remember that?
18   A.   I remember people showed up towards the end, but they were
19   not there in the beginning.
20   Q.   Okay.  But you knew that they were from his
21   administration, right?
22   A.   I had no clue who they were.
23   Q.   And then at some point you provided another $10,000
24   directly to Mr. Costa, correct?
25   A.   At the end, yes.
```

1   Q.   And you had no idea whether or not Mr. Costa was keeping

2   this money for himself, did you?

3   A.   I do not, no.

4   Q.   And in fact, you thought that Mr. Costa was actually

5   pretty much the guy that was receiving the weed and the cash

6   and it wasn't going to the mayor, right?

7   A.   The marijuana, I would say yes, but to make it liquid for

8   cash to give.

9   Q.   Well, isn't it true, sir, that it wasn't until you

10  received a text after he was indicted for the SnoOwl case and

11  you received a text from Mr. Costa saying, "just don't screw

12  the kid, he did what he had to do for you."

13       You remember that, right?

14  A.   Correct.

15  Q.   And would you agree with me, sir, that at all times you

16  assumed that the money that you were giving to Costa was for

17  Correia, was your assumption, correct?

18  A.   Correct.

19  Q.   However, it was not until after Costa sent you the text

20  message that I just read that you then knew that, in fact, it

21  was allegedly being given to Correia by Costa?

22  A.   Well, there was more than one instance, because he would

23  refer to them as "they," as far as their first --

24  Q.   My question was, sir, is in reference to that text.

25  That's what I'm asking you about.  That's when you determined

1   or found out --

2   A.   Can you repeat the question?

3   Q.   -- from Costa that the money was going to Correia.

4   A.   Repeat the question again.

5   Q.   The text that I just read to you --

6   A.   Which text?

7   Q.   Which text?  Okay.  I'll read it again.

8        The text was, "just don't screw the kid, he did what

9   he had to do for you," from Costa.  That text.

10  A.   Okay.

11  Q.   And does it refresh your memory, sir, that up to this

12  point, you had assumed that, in fact, Costa was keeping the

13  money and the weed but then you confirm after that text that

14  the money was, according to Costa, for Correia?

15  A.   Okay.

16  Q.   Okay.  Now, at some point you were asked to go to a

17  fund-raising event and purchase tickets, $125 a ticket and you

18  got 20 tickets, right?

19  A.   I believe so.

20  Q.   And you went to the fund-raising event, did you not?

21  A.   I did, yes.

22  Q.   And one of the things that you were concerned about was

23  getting approval for your building permits by the Fall River

24  building inspector by the end of August of 2019, right?

25  A.   Not sure of the dates, but, yeah, I do remember --

1    Q.   Because, obviously, you were concerned, you wanted to

2    begin to build your growth facility, correct?

3    A.   Correct.

4    Q.   And that's in reference to the issue of, you know, time is

5    running out with the DPH and that you wanted a letter.  Doesn't

6    that deal with your growth facility?

7    A.   Yes, that wasn't regarding the building permit, though.

8    Q.   Okay.

9         You know Mr. Saliby, right?

10   A.   Yes.

11   Q.   You're friends?

12   A.   Yes.

13   Q.   You've had occasion to socialize, and in fact, would meet

14   up with him and discuss any number of matters, including the

15   business, right?

16   A.   Yes.

17   Q.   Do you recall, sir, that the night before you went in to

18   see for your proffer session that we talked about, that you met

19   up with and spoke with Mr. Saliby, right?

20   A.   I don't recall exactly when.

21   Q.   Well, Mr. Saliby knew that the authorities were looking

22   into his business and money and things of that nature, right?

23   A.   Yeah.

24   Q.   And Mr. Saliby knew that you were going in to see the

25   United States Attorney and that you were going to be able to

1    negotiate immunity agreement and any crimes, tax crimes,

2    marijuana crimes, anything, you knew that, right?

3    A.   That I knew that or did he know that?

4    Q.   You knew that about yourself, right?

5    A.   No, I did not.

6    Q.   Well, you knew you were going the next day to see with

7    your attorney to discuss this.

8    A.   Right.

9    Q.   And you told that to Mr. Saliby, did you not?

10   A.   I believe so, yes.

11   Q.   And Mr. Saliby said that he wanted to come in and talk to

12   the authorities as well, right?

13   A.   He didn't want to, no.

14   Q.   Did Mr. Saliby indicate to you that, in fact, he had made

15   a payment to Mr. Correia at his store?

16   A.   We really didn't --

17   Q.   What?

18   A.   We didn't discuss his, exactly details of his part of what

19   he did.

20   Q.   Well, does it refresh your memory, sir, that Mr. Saliby

21   indicated that he provided $75,000 in cash directly to

22   Mr. Correia?

23   A.   I can't speak for him.

24   Q.   I'm just asking if you had a conversation with him about

25   that.

1    A.    Like I said, we didn't, you know, discuss it in specific

2    detail.

3    Q.    Did you know that Mr. Saliby is alleged to have paid

4    $75,000 in cash to Jasiel Correia?

5    A.    Yes.

6                MR. TOBIN:   Objection.

7                THE COURT:   Overruled.

8    BY MR. REDDINGTON:

9    Q.    The answer is yes, correct?

10   A.    Yes.

11   Q.    And he indicated -- well, let me ask you:  Does it refresh

12   your memory -- let me back myself up.

13         Do you know where he made that payment?  Did Saliby

14   tell you where he is alleged to have made that payment?

15   A.    No.

16   Q.    Does it refresh your memory, sir, that if Mr. Saliby

17   indicated that Correia came to the store and that they went for

18   a ride and that he gave Correia the cash in Correia's vehicle,

19   does that refresh your memory?

20   A.    Okay, yes.

21   Q.    And there were, according to you, five people that knew

22   about alleged bribe payments that you paid to Costa, five

23   people, correct?  That would be you, right?  Yes?

24   A.    Yes.

25   Q.    Costa, right?

1    A.    Yup.

2    Q.    Bairos -- I'm sorry, that would be you.

3    A.    Yes.

4    Q.    Right?

5          And Saliby?

6    A.    Okay.

7    Q.    Because you discussed it with Saliby, didn't you?

8    A.    Yes.

9    Q.    When you received your Letter of Non-Opposition in -- was

10   it July, is that what it was, I think?

11   A.    I think so, yes.

12   Q.    You had already known back in May that you were approved;

13   isn't that right?

14   A.    Verbally.

15   Q.    Verbally.

16         Because you knew, sir, that there were drafts of the

17   Letter of Non-Opposition and drafts of the Community Host

18   Agreement that had already been written and circulated to your

19   attorney at the end of May of 2018, right?

20   A.    I knew there was discussions back and forth regarding it.

21   Q.    Okay.  I know there were discussions back and forth, sir.

22   Does it refresh your memory, sir, that you received the letters

23   of Non-Opposition draft as well as the Community Host Agreement

24   draft to your attorney at the end of May of 2018?

25   A.    Okay.

1   Q.   And Joe Macy, retired judge, was the guy that was dealing

2   with your attorney, right?

3   A.   Correct.

4   Q.   And your attorney went over the draft Community Host

5   Agreement and the draft Letter of Non-Opposition with you,

6   right?

7   A.   Yeah.

8   Q.   Okay.  And this is well before any alleged cash payments

9   were made to Tony Costa, right?

10  A.   Correct.

11          MR. REDDINGTON:  That's all I have.

12                        DIRECT EXAMINATION

13  BY MR. TOBIN:

14  Q.   Sir, Mr. Reddington asked you a question about the timing

15  of various things in his last segment of questions.

16       Following up on that, did you agree to pay a bribe before

17  the city notified you that they would bless your endeavor?

18  A.   That they would what my endeavor?

19  Q.   Okay.

20  A.   Can you repeat --

21  Q.   Let me rephrase that question.

22  A.   Yeah.

23  Q.   You went to Tony Costa, and he told you you had to pay

24  $250,000 to get into Fall River for a marijuana business; is

25  that accurate?

1    A.    That's correct, yes.

2    Q.    You told him in that meeting you would, but you agreed to

3    how much?

4    A.    $150,000.

5    Q.    At the time you agreed to the $150,000, had the city given

6    you any sort of approval?

7    A.    No.

8    Q.    Now, you testified and you were asked various questions

9    about your belief from and who the money was going to by

10   Mr. Reddington.

11        Did the statements made by the defendant, the statements

12   made by the defendant at Ocean Prime, have any effect on

13   whether or not you believed he was going to be the recipient of

14   the money?

15   A.    At Ocean Prime?  No.

16   Q.    At the cigar bar?

17   A.    Yes.

18   Q.    Did the statements that the defendant made to you at the

19   Tel Aviv have any effect on your belief that contribute to your

20   belief that the money was going to him?

21   A.    Yes.

22   Q.    Did the various texts you got from Tony Costa referencing

23   "he," and "he's looking for money," have any effect on your

24   belief that it was going to him?

25   A.    Yes.

1    Q.   Sir, Mr. Reddington asked you about the various political

2    contributions you have made to the Governor and the Attorney

3    General and the Speaker of the Massachusetts House.

4         Do you remember that?

5    A.   Yes.

6    Q.   Sir, have you ever stuffed $25,000 in cash in an envelope

7    for Charlie Baker?

8    A.   No.

9              MR. TOBIN:  Thank you.

10             THE COURT:  Mr. Reddington, anything further?

11             MR. REDDINGTON:  No, your Honor, thank you.

12             THE COURT:  All right.  You may step down, thank you.

13             And if you could take the cap off the microphone,

14   please.

15             MR. HAFER:  Your Honor, the government calls Hildegar

16   Camara.

17             THE CLERK:  Please raise your right hand.

18             HILDEGAR CAMARA, having been duly sworn by the Clerk,

19   was examined and testified as follows:

20             THE CLERK:  Please be seated and state your full name

21   and please spell your last name.

22             THE WITNESS:  Hildegar Camara, C-a-m-a-r-a.

23             THE COURT:  Mr. Camara, if you could put a cap on the

24   top of the microphone there, and can you take your mask off at

25   this point.

1          THE WITNESS:  Thank you.

2          THE COURT:  Mr. Hafer will be examining you.

3          Mr. Hafer.

4          MR. HAFER:  Thank you, Your Honor.

5                        DIRECT EXAMINATION

6     BY MR. HAFER:

7     Q.   Mr. Camara, how old are you?

8     A.   Sixty.

9     Q.   Where do you currently live?

10    A.   260 Horizon Way.

11    Q.   What city is that in?

12    A.   Fall River, Massachusetts.

13    Q.   Where did you grow up?

14    A.   Fall River, Massachusetts.

15    Q.   How far did you go in school?

16    A.   Some college.

17    Q.   Are you currently working?

18    A.   No.

19    Q.   How are you most recently employed?

20    A.   The executive director of Bristol County Training

21    Consortium.

22    Q.   What is the Bristol County Training Consortium?

23    A.   Consortium.  It's a reemployment or unemployment, putting

24    people back to work with the MassHire logo at this point.

25    Q.   What was your title at the Bristol County Training

1   Consortium?

2   A.   Executive director.

3   Q.   Approximately from when until when were you the executive

4   director of the Bristol County Training Consortium?

5   A.   July of 2016 -- or July of 2016 to November of 2019.

6   Q.   Is that an appointed position?

7   A.   Yes, it is.

8   Q.   Who appointed you to that position?

9   A.   Mayor Jasiel Correia.

10  Q.   In addition to the executive director at the Bristol

11  County Training Consortium, did you have some previous

12  involvement with the business HITEP or something like that?

13  A.   Yes, I did.

14  Q.   What is that?

15  A.   That's a CNA training school in Rhode Island.

16  Q.   Mr. Camara, immediately prior to being appointed executive

17  director of the Bristol County Training Consortium, were you

18  employed?

19  A.   No.

20  Q.   Approximately how long had you been unemployed prior to

21  your appointment as the executive director?

22  A.   About six years.

23  Q.   When did you first meet the defendant, Jasiel Correia?

24  A.   I would say October of 2006.

25  Q.   Where did you meet him, if you recall?

1   A.    At home.

2   Q.    Could you describe the circumstances under which you first

3   met him.

4   A.    Jasiel at the time was going to Bishop Connolly High

5   School where my daughter was going, he was a sophomore, she was

6   a freshman, and they had to do some school project together, so

7   they came over to do the project.

8   Q.    Did your relationship with Mr. Correia evolve over the

9   years?

10  A.    Absolutely.

11  Q.    How would you describe it?

12  A.    He became very close to us, to both me and my wife.  My

13  wife is also a graduate of Bishop Connolly High School, she was

14  the alumni president.  We had dinner many times and tried to

15  help him and mentor him and talk and exchange -- have

16  conversations, had plenty of dinners.

17  Q.    Mr. Camara, before I get into the agreements that you have

18  with the federal government, I just want to ask you some

19  questions about your interactions with law enforcement related

20  to this matter, if that's okay.

21         Directing your attention first, sir, to August of

22  2017, did you testify in the grand jury related to SnoOwl?

23  A.    Yes.

24  Q.    At some point in about June of 2019, were you contacted by

25  federal agents in connection with your involvement in the

1  issuance of marijuana Non-Opposition Letters?

2  A.   Yes.

3  Q.   And when you were contacted in June of 2019, did you have

4  an attorney?

5  A.   Yes.

6  Q.   Could you -- Mr. Camara, there's a binder in front of you.

7  Could I ask you to turn to tab 166 first, please, and tell me

8  if you recognize the agreement at tab 166.

9  A.   Yes, I believe this is the proffer letter.

10            MR. HAFER:  Your Honor, I offer Exhibit 166, please.

11            THE COURT:  It's received.

12            (Exhibit 166 received into evidence.)

13  BY MR. HAFER:

14  Q.   Mr. Camara, I'm just going to read briefly from this

15  document.  The address block indicates, "Mr. Paul Kelly, Esq";

16  is that right?

17  A.   Yes.

18  Q.   And is he your attorney?

19  A.   Yes.

20  Q.   Reading from paragraph 1, briefly, Mr. Camara, it says no

21  statements or other information provided by you will be used by

22  the United States Attorney directly against you; is that

23  correct?

24  A.   Correct.

25  Q.   And was that your understanding of this agreement, that if

1    you came in and proffered, your statements wouldn't be used

2    directly against you?

3    A.   Correct.

4    Q.   However, there were some exceptions for -- if you didn't

5    tell the truth and other matters; is that right?

6    A.   Correct.

7    Q.   Going to paragraph 2, it indicates the government's

8    permitted to make what's called derivative use of your

9    statements, that is, the government's allowed to pursue any

10    leads that may be generated by your statements; is that

11    correct?

12    A.   Yes.

13    Q.   When you --

14         MR. HAFER:  Could I have the second page?

15    Q.   And this agreement is signed by you, Mr. Camara?

16    A.   Yes.

17    Q.   And Mr. Kelly, your attorney?

18    A.   Correct.

19    Q.   And me, right?

20    A.   Correct.

21    Q.   In this proffer session that you had after signing this

22    agreement, were you entirely truthful with the government?  Did

23    you tell the complete truth about your involvement in the

24    marijuana Non-Opposition Letters?

25    A.   No.

1    Q.    In September of 2019 --

2    A.    I'm sorry, at the --

3    Q.    At the initial proffer you were asked about your

4    involvement in the Non-Opposition Letters, correct?

5    A.    Correct.

6    Q.    Ultimately you've pled guilty to several crimes in

7    connection with this matter; is that correct?

8    A.    Correct.

9    Q.    And two of those crimes pertain to false statements --

10   A.    Correct.

11   Q.    -- from this proffer; is that fair to say?

12   A.    Correct.

13   Q.    In September of 2019, were you ultimately charged with

14   several federal crimes, including the false statements related

15   to this proffer?

16   A.    Yes.

17   Q.    And did you enter into a plea agreement with the

18   government?

19   A.    Yes.

20   Q.    Could you turn, Mr. Camara, to tab 164?

21          Do you recognize the document at tab 164?

22   A.    Yes.

23   Q.    Is that your plea agreement?

24   A.    Yes, change of plea, yes.

25          MR. HAFER:  Your Honor, I offer Exhibit 164, please.

```
 1              THE COURT:  It's received.
 2                 (Exhibit 164 received into evidence.)
 3              MR. HAFER:  Could I have through the change of plea
 4    paragraph?
 5              Thank you.
 6    BY MR. HAFER:
 7    Q.   Mr. Camara, in the interest of time, I'm going to just
 8    summarize this first paragraph and will you tell me if I have
 9    it right or wrong.
10              Did you agree, essentially, to plead guilty to six
11    different federal crimes?
12    A.   Yes.
13    Q.   The last two were the false statements we already
14    discussed, right?
15    A.   Correct.
16    Q.   The first four pertain to two different charged
17    extortions; is that fair to say?
18    A.   Yes.
19    Q.   And the first one of those involve a man named David
20    Brayton?
21    A.   Yes.
22    Q.   And the second one involved a man you came to learn whose
23    name was Brian Bairos?
24    A.   Yes.
25    Q.   And, Mr. Camara, did you agree to plead guilty with
```

1    respect to those, both to what's called a regular extortion or

2    a substantive extortion and also an extortion conspiracy?

3    A.   Yes.

4    Q.   With respect to the one involving David Brayton, who did

5    you conspire with?

6    A.   Tony Costa and Jasiel Correia.

7    Q.   With respect to the one involving Brian Bairos, who did

8    you conspire with?

9    A.   Tony Costa and Jasiel Correia.

10   Q.   Mr. Camara, why did you plead guilty to these six federal

11   crimes?

12   A.   Because it's true.

13        MR. HAFER:  Ms. DiPaolo, could I have paragraph 2,

14   penalties.

15   Q.   Mr. Camara, does the second paragraph of your agreement

16   set out the maximum penalties that you face for these crimes?

17   A.   Yes.

18   Q.   And with respect to the first four counts that you've

19   discussed, the extortions, what is the maximum term of

20   incarceration?

21   A.   Twenty years.

22   Q.   And with respect to those last two counts on the false

23   statements, what is the maximum term of incarceration?

24   A.   Five years.

25   Q.   Did you eventually agree to cooperate with the government

1    in this matter?

2    A.    Yes.

3    Q.    Would you turn, please, to tab 165.

4          Do you recognize the document at tab 165?

5    A.    Yes.

6    Q.    What is that?

7    A.    It's a cooperation agreement.

8          MR. HAFER:  I offer Exhibit 165, Your Honor.

9          THE COURT:  It's received.

10          (Exhibit 165 received into evidence.)

11          MR. HAFER:  Ms. DiPaolo, could I have paragraph 1,

12    Terms of Cooperation?

13    BY MR. HAFER:

14    Q.    Mr. Camara, I'm just going to briefly read from the

15    document and ask you if it comports with your understanding.

16          Defendant agrees to cooperate fully with law

17    enforcement agents and government attorneys.  Defendant must

18    provide complete and truthful information to all law

19    enforcement personnel.

20          Have I read that correctly?

21    A.    Yes.

22    Q.    Is that your understanding of essentially the -- what you

23    have to do under this agreement?

24    A.    Yes.

25    Q.    And what is your general understanding as to what the

1    government will do if you do that?

2    A.   You'll inform the court of my helping or testifying in

3    this case for the judge to make an accurate sentence.

4    Q.   Is it fair to say that in cooperating with the government,

5    your hope is that you'll receive a lower sentence in

6    consideration of your cooperation?

7    A.   Yes.

8    Q.   I want to turn now, Mr. Camara, to late 2014/early 2015.

9    Did you speak to the defendant at that time related to a

10   potential investment in SnoOwl?

11   A.   Yes.

12   Q.   In general, how did you become to be aware of SnoOwl?

13   A.   In one of many dinners that we used to have at my house.

14   Jasiel would come over after any college break or on a weekend

15   with Chris Parayno and we sat down and just talk about it, and

16   he mentioned the SnoOwl app.

17   Q.   We'll get into a bit more detail, but did you ultimately

18   invest in SnoOwl?

19   A.   Yes, I did.

20   Q.   How much?

21   A.   $50,000.

22   Q.   You understood SnoOwl to be an app, you said?

23   A.   Correct, a mobile app.

24   Q.   Could you turn, Mr. Camara, to tab 167, please?

25        Do you recognize the email at tab 167?

```
1    A.    Yes.
2              MR. HAFER:  Your Honor, I offer Exhibit 167.
3              THE COURT:  That's received.
4              (Exhibit 167 received into evidence.)
5    BY MR. HAFER:
6    Q.    Mr. Camara, does Exhibit 167 reflect an e-mail from
7    Jasiel@snoowl.com to you?
8    A.    Yes.
9    Q.    Dated December 19th of 2014?
10   A.    Yes.
11   Q.    And is this an email that -- well, I'll read from it, it's
12   in evidence.  The second paragraph.  "Attached you will find
13   the investment documents associated with SnoOwl."
14         Have I read that correctly?
15   A.    Yes.
16   Q.    Did you, in fact, receive SnoOwl investment documents in
17   connection with your $50,000 investment?
18   A.    Yes.
19   Q.    Could you turn to tab 167.1, please?
20         Do you recognize those documents?
21   A.    The Letter of Intent, yes.
22   Q.    And several other documents related to your SnoOwl
23   investment?
24   A.    Yes.
25              MR. HAFER:  I offer 167.1, Your Honor.
```

1          THE COURT:  It's received.

2              (Exhibit 167.1 received into evidence.)

3          MR. HAFER:  Just have the first paragraph there,

4    Ms. DiPaolo.

5    BY MR. HAFER:

6    Q.   Mr. Camara, essentially the first paragraph here just

7    indicates that you, Hildegar Camara, have agreed to invest

8    $50,000 in SnoOwl; is that right?

9    A.   Correct.

10   Q.   And in return it says, The details shall be incorporated

11   into a convertible promissory note; is that correct?

12   A.   Yes.

13   Q.   And did you, in fact, receive a convertible promissory

14   note?

15   A.   Yes.

16          MR. HAFER:  Could I have page 4, Ms. DiPaolo.

17   Q.   Showing you page 4 of Exhibit 167.1 --

18          MR. HAFER:  Could you highlight the first paragraph.

19   Q.   Is this the first page of the Promissory Note, Mr. Camara?

20   A.   Yes.

21   Q.   And again, it's indicating your name and then an

22   investment of $50,000; is that right?

23   A.   Correct.

24          MR. HAFER:  Could I have the next page or the next

25   payment, I'm sorry, and then paragraph 9 and the signature.

```
 1   Q.   Do you recognize the signature at the bottom of the note?

 2   A.   Yes.

 3   Q.   Whose signatures is that?

 4   A.   Jasiel Correia, II.

 5   Q.   I'm going to read you the last sentence right above the

 6   signature.  "In addition, the company hereby represents that it

 7   intends to use the principal of this convertible promissory

 8   note primarily for the operations of its business and not for

 9   any personal, family or household purpose."

10        Have I read that correctly?

11   A.   Correct.

12   Q.   What did you -- oh, could you turn to tab 167.2, please.

13   A.   Yes.

14   Q.   Do you recognize those documents?

15   A.   Yes.

16   Q.   What are they?

17   A.   They're checks made to SnoOwl.

18   Q.   From you?

19   A.   Yes.

20        MR. HAFER:  Your Honor, I offer 167.2.

21        THE COURT:  That's received.

22        (Exhibit 167.2 received into evidence.)

23   BY MR. HAFER:

24   Q.   Mr. Camara, for the jury's benefit, this is a check dated

25   January 5, 2015?
```

1    A.   Yes.

2    Q.   From you to SnoOwl for $10,000?

3    A.   Yes.

4         MR. HAFER:   Could I have the next page.

5    A.   Yes.

6    Q.   This is a check dated April 13, 2015 for $10,000?

7    A.   Yes.

8    Q.   From you to SnoOwl?

9    A.   Yes.

10   Q.   I'm now showing you a check dated April 14 of 2015 for

11   $5,000; is that correct?

12   A.   Yes.

13   Q.   From you to SnoOwl?

14   A.   Yes.

15        MR. HAFER:   And the last page.

16   Q.   Finally, Mr. Camara here, showing you a check dated May 28

17   of 2015 for $25,000; is that correct?

18   A.   Yes.

19   Q.   From you to SnoOwl?

20   A.   Yes.

21   Q.   Those four checks totaling $50,000?

22   A.   Correct.

23   Q.   Where did you get the $50,000 that you invested in SnoOwl?

24   A.   Some was money that I had saved up and other was a -- a

25   line of credit on a credit card, that last one was a line of

1    credit on the credit card.

2    Q.   What was your understanding, Mr. Camara, as to what you

3    were getting in return for your investment?

4    A.   I was to get about two-and-a-half percent of the SnoOwl

5    company.

6    Q.   Who told you that?

7    A.   Jasiel did.

8    Q.   Prior to investing in SnoOwl, did you have any

9    conversations with Mr. Correia about his involvement in a prior

10   app?

11   A.   Yes.

12   Q.   What did he tell you?

13   A.   That he had done this once before and he had sold it and

14   made a lot of money off of it.

15   Q.   Did he tell you how much money?

16   A.   I believe over a million.

17   Q.   Prior to your investment in SnoOwl, did you have any

18   conversations with Mr. Correia about a patent on SnoOwl?

19   A.   Yes, that he had three patents either granted or pending.

20   Q.   Prior to investing in SnoOwl, did Mr. Correia tell you he

21   intended to take a salary?

22   A.   No.

23   Q.   Did he tell you he intended to use your investment money

24   for personal expenses?

25   A.   No.

1   Q.   What was your understanding as to what your $50,000 would

2   be used for?

3   A.   It was for marketing and infrastructure of the app and

4   getting it up and running and eventually selling it.

5   Q.   If you knew before you invested, Mr. Camara, that what he

6   had told you about selling the prior app for a million dollars

7   was false, would you have still invested $50,000?

8   A.   No.

9   Q.   If you knew what he told you about the patents was false,

10  would you still have invested $50,000?

11  A.   No.

12  Q.   If you knew what he told you about personal expenses and

13  not using it for personal expenses was false, would you have

14  invested $50,000?

15  A.   No.

16  Q.   As you sit here today, did you receive any -- have you

17  received any of your $50,000 back?

18  A.   No.

19  Q.   Have you received any interest payments on the $50,000?

20  A.   No.

21  Q.   I want to turn now, Mr. Camara, to some of the offenses to

22  which you've pled guilty.  Before I do, I want to ask you, do

23  you know a man named Tony Costa?

24  A.   Yes.

25  Q.   How do you know Tony Costa?

1    A.    Tony happened to be a friend and my next door neighbor or

2    backyard neighbor.

3    Q.    Could you briefly describe the nature of your relationship

4    with Mr. Costa?

5    A.    Tony bought the house in I believe around 2007, 2008 we

6    became close in 2010 when I got laid off and became good

7    friends.  I was working on my house, he was working on his, and

8    we became really good friends.  We golfed a lot, almost every

9    day; we talked almost every day.

10   Q.    Through Mr. Costa, in the spring or summer of 2016, did

11   you come to meet a man named David Brayton?

12   A.    Yes.

13   Q.    Where did you meet David Brayton?

14   A.    In a golf outing.

15   Q.    When you met Mr. Brayton, did you come to learn at that

16   golf outing what he did for work, Mr. Brayton?

17   A.    Yes.

18   Q.    What did you learn?

19   A.    That he was a medical marijuana vendor out of Rhode

20   Island.

21   Q.    Did you learn if he was trying to open a business in Fall

22   River, for example?

23   A.    Yes.

24   Q.    During that round of golf with Mr. Brayton, did Mr. Costa

25   say anything to Mr. Brayton about you and your relationship

1    with anyone?

2    A.   Yes.

3    Q.   What was said?

4    A.   He said, This is the guy you want to know because he's

5    very close to the mayor.  He's really good friends with the

6    mayor.

7    Q.   Later, several days after the round of golf, did you make

8    arrangements to meet with Mr. Brayton?

9    A.   Much later.

10   Q.   Prior to meeting with Mr. Brayton but after the round of

11   golf, did you have a conversation with Tony Costa about some

12   arrangement he had with David Brayton?

13   A.   He asked for my help in getting David Brayton the letter

14   because it was going to even out with the SnoOwl investment.

15   Tony Costa was going to get 2 percent of the company with David

16   Brayton and this way it would washout with SnoOwl.  He wanted

17   to recoup his money from the SnoOwl investment.

18   Q.   Mr. Costa told you that?

19   A.   Yes.

20   Q.   Meaning, essentially, Mr. Costa told you he was going to

21   get 2 percent of the business from Mr. Brayton?

22   A.   Correct.

23   Q.   And Mr. Correia was going to get, essentially, forgiveness

24   of whatever he might have owed Mr. Costa from SnoOwl?

25   A.   Correct.

1    Q.   At some point before you met with Mr. Brayton, did you

2    have a conversation with the defendant, Jasiel Correia, about

3    the letter Mr. Brayton was trying to get?

4    A.   Yes.

5    Q.   Do you remember what he told you?

6    A.   That he was -- that he had -- he already had the letter

7    for Tony and his friend ready.

8    Q.   Mr. Correia told you the letter was for Tony?

9    A.   Tony and his friend.

10   Q.   At this point, Mr. Camara, does Tony Costa have any formal

11   role in the government of Fall River?

12   A.   No.

13   Q.   Did you eventually meet with Mr. Brayton at a Dunkin'

14   Donuts in Fall River?

15   A.   Yes.

16        MR. HAFER:   Could I -- is it 123, Ms. DiPaolo?   123?

17   Already in evidence, I believe.

18   Q.   Showing you what's already in evidence, Mr. Camara, is

19   Exhibit 123.   Is this the Dunkin' Donuts where you and

20   Mr. Brayton met?

21   A.   Yes.

22   Q.   And was this sometime in approximately early July of 2016?

23   A.   Yes.

24   Q.   When you were going here to meet Mr. Brayton, you weren't

25   acting in an official capacity for -- on behalf of the City of

1    Fall River?

2    A.    No.

3    Q.    When you got to the meeting with Mr. Brayton, what did you

4    say to him about your relationship with the defendant?

5    A.    That we were -- that we've been close for a long time.

6    Q.    Did you observe Mr. Brayton's demeanor during this

7    meeting?

8    A.    He was -- both of us were kind of iffy on the subject,

9    but, yes, we were kind of nervous.

10   Q.    When you mentioned your connections to the mayor to

11   Mr. Brayton, why were you doing that?

12   A.    So, Mr. Brayton at the golf course had asked me for his

13   help in getting the letter.  I had a suggestion to helping him.

14   When I became aware of -- of the letter being already up and

15   running and about to be given, Jasiel told me that it was ready

16   to go out next week, he had told me that in the middle of the

17   week, the prior week, I wanted -- I didn't want to say no to

18   Mr. Brayton and I wanted to gain his favor for somewhere down

19   the road because I figured if I said no, I wasn't helpful in

20   getting the letter; if I had said yes, somewhere down the line

21   if Mr. Correia, the mayor, got voted out or decided to go for

22   another job or move on, I would need a job because I was

23   appointed by the mayor, the most -- the new mayor would

24   probably appoint someone else.  So maybe down the line I would

25   need a job and he would remember that, that I helped him get

1    the letter.  And since I had 30 years of experience in retail,

2    I would be helpful and maybe he would give me a job.  So I was

3    planting a seed for somewhere down the line for him to help me

4    if possible.

5    Q.   At this meeting, did Mr. Brayton say anything to you about

6    his relationship with Tony Costa?

7    A.   Yeah, he goes, You know my loyalty lies with Tony, Hil.

8    Q.   Mr. Camara, at some point after this meeting, did you have

9    another conversation with Mr. Costa where you learned more

10   details about the arrangement he had with Jasiel Correia?

11   A.   Yes.

12   Q.   What did he tell you?

13   A.   So after some federal agents had approached Tony's wife,

14   Michelle, which they were separated, he mentioned to me that

15   Michelle told the federal agents --

16            MR. REDDINGTON:  Objection.

17            THE COURT:  Yes, sustained.

18   BY MR. HAFER:

19   Q.   Based on what Mr. Costa told you --

20   A.   Right.

21   Q.   -- did you -- based on what Mr. Costa told you, did you

22   learn more information about the details of Mr. Costa's

23   arrangement with Mr. Correia?  Did you learn more information

24   from Tony Costa?  Don't say what it is, did you learn more

25   information?

1    A.   Yes.

2    Q.   Based on what you learned, did you have a meeting with

3    Jasiel Correia?

4    A.   Yes.

5    Q.   Could you describe that meeting.

6    A.   The next day I went to work and I went straight to the 6th

7    floor and I said to him that if he had gone to Tony's house and

8    received any money that he was in big trouble, I actually used

9    some expletives -- I used some swear words, and said, I don't

10   want to know, but if you did, you're screwed.  He has -- he

11   tells his wife everything and he's got cameras all over the

12   place and I walked out.  I said, I really don't want to know

13   but I'm out of here.

14   Q.   Was that the end of it or did you have another

15   conversation Mr. Correia?

16   A.   The next day Mr. Correia came down and told me that he did

17   not receive any money from Tony.  He swore to me he did not

18   receive any money from Tony.

19   Q.   Was that the end of it or did you have another

20   conversation with Mr. Correia about this?

21   A.   We had several conversations throughout all this time, and

22   he was led to believe that I -- he was a little bit worried

23   that someone was going to talk and the statement was, "If

24   everyone just keeps their mouth shut, we'll be okay."

25   Q.   Mr. Correia said that to you?

1    A.    Yes.

2    Q.    Did he say anything specifically about Mr. Costa's role in

3    this?

4    A.    "Tony's the only guy who can screw me."

5    Q.    Mr. Camara, I want to turn now to your appointment, just

6    for a moment, as the executive director of the Bristol County

7    Economic Consortium.  I believe you said that was in July of

8    2016?

9    A.    Correct.

10   Q.    Could you turn to Exhibit 199 in your binder?

11   A.    Yes.

12   Q.    Do you recognize that document?

13   A.    Yes.

14   Q.    What is that?

15   A.    That's my letter of appointment.

16            MR. HAFER:  Your Honor, I offer Exhibit 199.

17            THE COURT:  It's received.

18            (Exhibit 199 received into evidence.)

19   BY MR. HAFER:

20   Q.    Mr. Camara, just a couple of questions on this appointment

21   letter.  This is the letter appointing you, Hildegar Camara,

22   the executive director of the Bristol County Training

23   Consortium; is that right?

24   A.    Correct.

25   Q.    And it indicates it's effective on July 6th of 2016?

```
 1    A.   Correct.

 2    Q.   With an annual salary of a little bit over $84,000?

 3    A.   Correct.

 4    Q.   And you mentioned that before you got this job from Jasiel

 5    Correia, you had been out of work for several years, right?

 6    A.   Correct.

 7    Q.   And is it also fair to say that this letter is effective

 8    July of 2016, that's right about the same time you're dealing

 9    with Brayton and Tony and all that other stuff?

10    A.   True.

11    Q.   Did you ever have a conversation with the defendant in

12    which the topic of your appointment was tied or connected in

13    any way to the --

14    A.   Absolutely not.

15    Q.   I want to shift gears now --

16         THE COURT:  I think the question was not completed, so

17    the answer is not comprehensible.  If you put the full question

18    and then wait until that's through, you can answer that

19    question, but it was cut off.

20         MR. HAFER:  Oh, I'm sorry, the last question about

21    conversations --

22         THE COURT:  Yes.

23    BY MR. HAFER:

24    Q.   Did you ever have a conversation with the defendant,

25    Mr. Correia, in any way in which your appointment as executive
```

1    director was connected or applied to the Brayton matter?

2    A.    No.

3            MR. HAFER:   Thank you, Your Honor.

4    Q.    Mr. Silva -- Mr. Camara, I now want to direct your

5    attention to a matter involving Mr. Silva sometime in about

6    November of 2016.

7            Do you know Ed Silva?

8    A.    Yes.

9    Q.    Who is he?  How do you know him?

10   A.    Ed Silva owns a jewelry store.  He used to be -- he

11   was the one who was in partnership with his brother with

12   Hannoush Jewelers, the franchise, but then they split up and he

13   owns the Silva Jewelers.

14   Q.    Did there come a time in late 2016 when you went to

15   Silva's jewelry store with Jasiel Correia?

16   A.    Yes.

17           MR. HAFER:   Ms. DiPaolo, could I have Exhibit 144

18   already in evidence.

19   Q.    Showing you on the screen Exhibit 144 in evidence,

20   Mr. Camara, do you recognize that?

21   A.    Yes.

22   Q.    When you went to the store with Mr. Correia in late 2016,

23   what happened?

24   A.    Mr. Correia was talking to Jen and that was a visit for

25   him.  They were looking at some watches.

1   Q.   When you say "Jen," who do you mean?

2   A.   The salesgirl that was working there and she's now

3   currently his fiancé or wife.

4   Q.   And you indicated in addition to speaking with her, he was

5   also looking at some watches?

6   A.   Correct.

7   Q.   Eventually -- we'll back up, but, eventually, did

8   Mr. Correia purchase two watches from Mr. Silva?

9   A.   Yes, he did.

10  Q.   At the time -- did you leave the store that day with

11  Mr. Correia?

12  A.   Yes, I did.

13  Q.   At the time you left the store, had the watches been

14  purchased yet?

15  A.   No.

16  Q.   What did you and Mr. Correia do after you left the store?

17  A.   We drove to his apartment and we discussed about buying --

18  on the way there, we discussed about buying the watches.  He

19  was interested in impressing Jen and buying both watches.  I

20  talked to him about credit cards or whatever that they have,

21  but, eventually, said he just wanted to buy the watches

22  outright.

23  Q.   Did he, eventually, go into his apartment?

24  A.   Yes, he did.

25  Q.   And you stayed in the car?

1    A.    Yes, I did.

2    Q.    Did he return?

3    A.    Yes, he did.

4    Q.    What happened when he returned?

5    A.    He gave me the amount of about $8,000 -- he gave me the

6    amount of $8,000.

7    Q.    In cash?

8    A.    Yes.

9    Q.    What was the $8,000 for?

10   A.    For both watches.

11   Q.    Did you have an additional conversation with him about the

12   fact that he had handed you $8,000 in cash?

13   A.    Yes, I did.  I said, "You're going to pay this in cash?"

14   You got $8,000 -- and I remember the statement was, "I make

15   $115,000 a year, I have a car payment of $300 and a rent

16   payment of $600.  I can afford these watches."

17   Q.    What did you do after you received the $8,000,

18   approximately $8,000 in cash from Mr. Correia?

19   A.    I called Ed on the spot and asked him where he was because

20   the mayor decided to buy both watches.  So Eddie said, You

21   don't have to come back to the store, meet me at my house

22   and -- I asked him to bring a receipt.

23   Q.    Did you go to Mr. Silva's home that evening?

24   A.    Yes, I did.

25   Q.    What did you do when you got to Mr. Silva's home?

```
 1   A.   I handed him over the cash.

 2   Q.   Did he give you a receipt?

 3   A.   Yes, he did.

 4   Q.   Do you remember anything about what he wrote on the

 5   receipt in terms of the value of the watches and the name?

 6   A.   Yes.

 7   Q.   What did he write?

 8   A.   I asked to put it in my name, Hil Camara, I did that.

 9   Q.   Why?

10   A.   I was trying to -- I didn't want -- Eddie was famous for

11   going around and showing receipts or checks from people who

12   bought, and I didn't want him going around showing that Mayor

13   Jasiel Correia had bought two watches for $8,000.

14   Q.   Did he eventually give you a receipt?

15   A.   Yes, he did.

16   Q.   What did do you with the receipt he gave you?

17   A.   I gave Jasiel two copies and I kept a copy for myself.

18   Q.   In connection with your cooperation with the government,

19   were you asked to provide that receipt to the government?

20   A.   Yes, I was.

21   Q.   Were you ever able to locate it?

22   A.   No, I could not.

23   Q.   Before you left Mr. Silva's house, did he give you

24   anything?

25   A.   He insisted I take $200 and buy myself dinner with my
```

```
 1   wife.
 2   Q.   I want to turn now about a month or two after late 2016
 3   into early 2017 now.
 4             In early 2017, at some point did you receive a call
 5   from Tony Costa about coming over to his house to pick
 6   something up?
 7   A.   Yes.
 8   Q.   Okay.  And did you go to Mr. Costa's house when you got
 9   that call?
10   A.   Yes.
11   Q.   When you got to his house in early 2017, what happened?
12   A.   He handed me a watch.
13   Q.   Do you remember what kind of watch?
14   A.   It was a Rolex.
15   Q.   Do you remember what kind?
16   A.   I think it was a Hulk -- no, I do not remember what kind.
17   Q.   Okay.  He handed you a watch.  And what -- did he say
18   anything to you?
19   A.   To the best of my recollection, I think somewhere along
20   the lines that, This is for -- You need to get give this to him
21   now, okay; he knows what it's for, it's for the property on
22   Kilburn Street.
23   Q.   What did do you with the watch after Tony Costa gave it to
24   you?
25   A.   I gave it to -- I drove to work and gave it to the mayor.
```

```
 1   Q.   Did you say anything when you gave him the watch -- when
 2   you gave Mr. Correia the watch?
 3   A.   I go, "This is from Tony, something about Kilburn Street,
 4   here you go."
 5   Q.   What was the mayor's reaction -- did he seem surprised
 6   when you gave him the watch?
 7   A.   No.
 8   Q.   Moving forward now, I think you previously testified you
 9   went in the grand jury related to SnoOwl in August of 2017; is
10   that correct, Mr. Camara?
11   A.   Yes.
12   Q.   And prior to going in the grand jury in August of 2017,
13   had you become aware that there was an active federal criminal
14   investigation involving SnoOwl?
15   A.   Yes.
16   Q.   Did you have any conversations with Jasiel Correia about
17   the fact that there was an active criminal investigation
18   involving SnoOwl?
19   A.   Yes.
20   Q.   And what were those conversations?
21   A.   Well, he -- we did bring up the subject of salary for the
22   first time, and he asked me -- he goes, You know I wasn't doing
23   this for free, I was going to get some kind of salary.
24   Q.   Mr. Correia said to you --
25   A.   Right.
```

1   Q.   -- sometime prior to going into the grand jury in August

2   2017, You know I was taking a salary?

3   A.   Correct.

4   Q.   Had he mentioned anything about a salary to you at SnoOwl

5   prior to that?

6   A.   No.

7   Q.   I want to turn now, Mr. Camara, to the spring of 2018 and

8   an individual named Brian Bairos.

9        Do you now know who the individual named Brian Bairos is?

10  A.   Yes.

11  Q.   Okay.  How -- who first brought Brian Bairos to your

12  attention?

13  A.   Tony Costa.

14  Q.   Okay.  What did Tony Costa tell you that Brian Bairos did

15  or what was he trying to do?

16  A.   I got a call from Tony Costa asking me to ask the mayor if

17  there was another letter available for the marijuana business.

18         I --

19  Q.   Did you -- did you then talk to the mayor?

20  A.   Yes.

21  Q.   Okay.  Could you describe that conversation.

22  A.   I said, By the way, Tony wants to know if there's another

23  letter available.  I told him -- I told Tony I thought there

24  weren't any more, they were at 10 or something like that, so I

25  had suggested to Tony there was probably no way.

1    Q.   What did the defendant say to you about whether more

2    letters were available?

3    A.   He said, Yes, he could get that done.

4    Q.   Did you relay that information back to Tony Costa?

5    A.   Yes, I did.

6    Q.   Was there some back and forth between you and Tony Costa

7    about contributions to the legal defense fund?

8    A.   Yes.  At one point, I was talking to the mayor and at the

9    end of the conversation, I went upstairs and while I was

10   leaving the office he said to me, By the way, can you please

11   have Tony and his friends donate to my defense fund.  So I went

12   downstairs and called Tony and asked that, I says, The mayor

13   wants you to donate to the legal defense fund, to help him out

14   and donate to the legal defense fund.

15   Q.   After those conversations about the legal defense fund,

16   did there come a time when you got a call from the defendant

17   when he was near your house?

18   A.   Yes.

19   Q.   Could you describe that.

20   A.   I was having dinner and Jasiel called me and said, are you

21   home?  I said, Yes, I'm having dinner.  He said, Do you mind if

22   I come over?  I said, No.  He says, I'm at the rotary, I'll be

23   right there.

24   Q.   Did he arrive at your house that evening?

25   A.   Yes.

1   Q.   What happened when he got to your house?

2   A.   He made his introductions to the family because we were

3   having dinner and he asked to go down to my basement and talk,

4   to my man cave.

5   Q.   Did you go down to your man cave and talk?

6   A.   Yes.

7   Q.   What happened?

8   A.   Jasiel said, have I heard from Tony and does he know if

9   him and his friends are going to donate to the defense fund?  I

10  said, I haven't heard, I just assume that he did, but, no, I

11  haven't heard anything.

12  Q.   Did Mr. Correia say anything to you -- well, did you

13  observe Mr. Correia's demeanor during this meeting?

14  A.   You know, he was very stressed out.  He had -- he had told

15  me he's at 460,000 in legal fees and that he would really

16  appreciate the help with his defense fund.

17  Q.   Did you then agree to make a phone call?

18  A.   Correct.

19  Q.   Who did you call?

20  A.   I called Tony.

21  Q.   What did you say to Tony?

22  A.   I said, Tony, the mayor wants to know if you and your

23  friends are going to help out with the defense fund.

24  Q.   What did Tony say?

25  A.   Tony said that he didn't -- that he had asked around about

```
 1    the defense fund and the minute you put your name on the
 2    defense fund, it goes into the paper.  The minute you donate,
 3    it goes into the paper and everyone that he's talked to told
 4    him not to do it, so --
 5    Q.   I'm sorry, I didn't mean to interrupt you.
 6    A.   So he said him and his friends weren't going to do it.
 7    The only way this gets done is with the gentleman from Boston.
 8    Q.   Who did you later learn that the gentleman from Boston
 9    was?
10    A.   Mr. Bairos.
11    Q.   And "this gets done," what did he mean by "this gets
12    done"?  What was trying to be accomplished here?
13    A.   He was trying to get -- donate to the legal defense fund.
14    Q.   Were you and Mr. Correia in each other's presence during
15    this conversation?
16    A.   Yes.
17    Q.   Did Mr. Correia say something to you at this time?
18    A.   At this time, when Tony was talking about it, he said --
19    he whispered, $100,000, tell him it's going to be a hundred
20    thousand.
21    Q.   The defendant whispered that to you?
22    A.   Right.
23    Q.   Did you --
24    A.   Tony did not know that he was there, I was telling him --
25    Q.   So what did you -- what did do after he told you --
```

1    A.    So I told him, you know, Well, the mayor is going to want,

2    like, $100,000 or something like that.  There's no way, there

3    was some back and forth.  And I said to him, All right, here's

4    what I'm going to do, I'm going to tell him that you're going

5    to try to raise him $85,000 for the defense fund.

6    Q.    At this point, Mr. Camara, do you have any formal role in

7    the issuance of marijuana and Non-Opposition Letters?

8    A.    No, I do not.

9    Q.    Are you involved in any capacity in zoning or permitting

10   or any process related to marijuana and Non-Opposition?

11   A.    No, I am not.

12   Q.    Is Mr. Costa involved in any way officially in the

13   issuance of these letters or the zoning or the permitting?

14   A.    No, I did not.

15   Q.    Who has the official authority to sign the Non-Opposition

16   Letters?

17   A.    Mayor Jasiel Correia.

18   Q.    This money that you were attempting to get from Brian

19   Bairos, was this, in your view, legitimate?

20   A.    I tried to keep it legitimate, but, no.

21   Q.    At some point after this, several days later, did you

22   receive a call from Mr. Costa?

23   A.    Yes, I did.

24   Q.    What did he tell you?

25   A.    Tony called me, he says, Hey, by the way, I left something

1    for you in your shed.

2    Q.   You mentioned earlier your house and Mr. Costa's house at

3    the time were close to each other?

4    A.   Might be another 30 feet or so out of our back doors.

5    Q.   After he called you, Mr. Costa called you and told you

6    that he had left something in your shed, what did you do?

7    A.   I called the mayor.

8    Q.   What did you say to him?

9    A.   I said, Tony just told me he left something in my shed, I

10   think we should go look at it.

11   Q.   Did the mayor come to your house?

12   A.   Yes, he did.

13   Q.   Did you look at your shed?

14   A.   We went to the basement first, from the basement, I went

15   to my shed.

16   Q.   Only you went to the shed?

17   A.   Correct.

18   Q.   Mr. Correia stayed in your basement?

19   A.   Correct.

20   Q.   When you first went into the shed, what happened?

21   A.   I -- Tony told me it was there someplace.  I looked, I

22   couldn't find it.  I had to go back and call him and asked him

23   where it was.

24   Q.   What he tell you?

25   A.   He then said, It's on the left-hand side under the --

1    under a bucket of paint or can of paint.

2    Q.   When he told you that, did you go back to your shed?

3    A.   Yes, I did.

4    Q.   What happened when you went back to your shed?

5    A.   I went to the left-hand side, saw a can of paint, picked

6    it up and there was an envelope.

7    Q.   What did you do after you found the envelope?

8    A.   I returned to my basement.  I --

9    Q.   I'm sorry, no, go ahead.

10   A.   I returned to the basement and I opened the corner of it

11   up and there were -- there was an amount of dollars in there.

12   Q.   When you opened it up, was anyone else there?

13   A.   The mayor was.

14   Q.   What was your reaction when you opened it up, Mr. Camara?

15   A.   I was spooked, I was nervous, I was worried.

16   Q.   Did you have the opportunity to observe Mr. Camara's

17   reaction?

18   A.   He was okay, nonchalant.

19   Q.   What did you do next?  Did you say anything to --

20   A.   Yes.

21   Q.   What did you say?

22   A.   I said -- I says, This isn't what I signed up for.  If you

23   take this or I take this, we're going to go to jail.  The mayor

24   says, Well, what do you want to do?  I says, Okay.  I got on

25   the phone and I called Tony and I asked him where he was.  He

1    told me he was at his house or his new residence, which was at

2    his mother's on Sterling Street.  I said, Hey, I'll be right

3    there.

4    Q.   At this point in time, what is your state of mind?  What

5    are you trying to accomplish?

6    A.   Okay.  I'm trying to get out of this.  I'm not -- I don't

7    want the cash, I don't want to deal with the cash or anything.

8    I was very, very nervous.  I was worried about fingerprints and

9    everything so I put -- I wiped down the envelope, put it in the

10   Shaw's bag, and drove to Tony's house.

11   Q.   What happened --

12   A.   I left my house and I drove to Tony's.

13   Q.   What happened when you got to Tony's house?

14   A.   When I got to Tony's, I said, Tony, this is not what I

15   want.

16        Now, on my way there I had to think of what I wanted

17   to say to Tony so the money could be returned.

18   Q.   Did you come up with something to say?

19   A.   Yeah, I said, This is all fed money.  You know there's a

20   bunch of investigations going on, there's still an ongoing

21   investigation; I want no part of this.  So you need to return

22   this to the gentleman.

23        Tony suggested that he might move it by showing it to

24   his friends in Providence or New York.  I said, You're going to

25   go to some guy saying you received a bunch of fed money and

1   they should launder it, is that what you're going to tell them?

2   Q.   What did he say?

3   A.   Well, what do you want me to do?  I says, I think you

4   should give it back to the guy.  I don't know this guy, you

5   don't know this guy, okay --

6   Q.   Did you have a conversation after that with Mayor Correia

7   about the Non-Opposition Letter for Mr. Bairos?

8   A.   Yes.  So what happened was this:  I wasn't sure Tony was

9   going to return the money.  So two or three days later, I found

10  out Tony returned the money and that he was going to do some

11  other deal with the gentleman but that he needed the letter

12  within the next five days, Tony did.

13  Q.   Okay.

14  A.   I saw an opportunity and I made the decision on my own to

15  go upstairs and tell the mayor that Tony told me everything is

16  all set, mail out the letter.

17  Q.   Why did you do that?

18  A.   My thought process was that if this was something as bad

19  as it seemed, that I would wash my hands of it.  No money had

20  exchanged hands, the man got his letter back, and I'm out of

21  this.

22  Q.   At some point, around October 12th or 13th of 2018, did

23  you learn that Mr. Correia had been arrested?

24  A.   Yes.

25  Q.   And after learning that, did you have a conversation with

1    Mr. Costa?

2    A.    Yes.

3    Q.    Do you remember what you said to him?

4          MR. REDDINGTON:  Objection.

5          THE COURT:  No, you may answer this question.

6    A.    We were talking about what was going on, and I still was

7    worried about the man, the legal defense fund and everything

8    like that.  And I told Tony not to screw him, that he did what

9    he asked him to do, he gave you a letter, so help the guy out.

10   Q.    Who did you mean by "the guy"?

11   A.    Jasiel Correia.

12   Q.    So even though he's been arrested at this point,

13   Mr. Camara, you're telling Mr. Costa not to screw him?

14   A.    Correct.

15   Q.    Why is that, sir?

16   A.    Because I knew he needed money for his defense fund.

17   Q.    Did you care about him personally?

18   A.    Absolutely, he knows I did, everyone knows I did, very,

19   very much like a son.

20         MR. HAFER:  Your Honor, I have no further questions.

21         THE COURT:  All right.  Mr. Reddington?

22         Well, we're right at the end of the day.  If you want

23   to start, Mr. Reddington, we can, or we can break at this

24   point.

25         MR. REDDINGTON:  Whatever Your Honor prefers, I mean,

1    it is five minutes.  I could start tomorrow.

2              THE COURT:  Okay.  Why don't we start tomorrow with

3    this.

4              Ladies and gentlemen, we're going to break for the

5    day, as I indicated, because I have some matters to take up

6    with counsel here in anticipation of presenting the case to

7    you.

8              We've had a few introductions to the law of evidence

9    here, I'll give you more as we go along in terms of

10   instructions that I've given counsel as to how matters should

11   be presented, that sort of thing, which you understand that

12   what we're all trying to do is make sure that this case gets to

13   you as fairly and efficiently as it possibly can.  That's

14   everything that everyone here has worked toward, and we're

15   getting close.

16             So I want to emphasize what I've said before.  Don't

17   let yourself be exposed in any way to any conversations or read

18   anything or in any way expose yourself to matters outside the

19   courtroom that the parties haven't had a chance to see.  The

20   genius of this system is that everybody knows what it is that

21   you're going to be making your decision on, they know what the

22   rules are that you're going to be making your decision on.  It

23   would be immensely unfair to everyone involved if you were to

24   permit yourself to be exposed to anything, and of course you'll

25   tell us if inadvertently you are.  But we've gotten this far

1   and we've gotten this far, I think, efficiently and fairly and

2   now it becomes especially important for you to be vigilant

3   about keeping yourself insulated from anything that might be

4   out there in the community or people who might want to offer

5   their views on things, don't let them; and certainly, of

6   course, you won't have any communications with anyone on your

7   own.

8           I'll ask my customary question tomorrow morning.

9   We'll move on to continue with Mr. Camara's examination at that

10  point, and I think by the end of the day I'll be able to tell

11  you with some greater specificity when this case is going to be

12  presented to you.

13          So enjoy the afternoon, what's remaining of it, and

14  we'll see you tomorrow morning.

15          THE CLERK:  All rise.

16          (Jury left the courtroom.)

17          THE COURT:  You may step down, Mr. Camara.

18          (Witness left the courtroom.)

19          THE COURT:  So if you want to take a break at this

20  point we can or keep going.

21          I'm sorry, we we're going to take a break at this

22  point to assure that I'm not burdening the people who really do

23  the work in the courtroom or the person who is really doing the

24  work in the courtroom, and why don't we come back in, say, 10

25  minutes to discuss this and what I think, as I've indicated, is

1    I'd like to go through the redacted indictment as a way of

2    shaping the discussion.

3              MR. HAFER:  That's fine.

4              Could we have 15 just so I can go up and grab it and

5    get organized?

6              THE COURT:  Sure.  So we'll be back at 3:15.

7              THE CLERK:  All rise.

8               (Recess taken.)

9              (Court centered the courtroom.)

10             THE CLERK:  Please be seated.

11             THE COURT:  So, as I indicated, I'd like to have us

12   walk through the redacted indictment to the degree that the

13   government now takes a position that there is evidence, not

14   necessarily that the jury will believe it, but there's evidence

15   in the record with respect to the otherwise unidentified

16   persons in various of the counts here.  If the evidence is

17   still to come, I don't want to hear about it right now, because

18   I have this as an open hearing and I am adhering to my view

19   that matters that may or may not arise as to the introduction

20   of evidence are not matters that I want to have in open session

21   right now.

22             So let's turn to Counts A through I here, and these

23   are the wire fraud counts.

24             And what I'm thinking about here is, certainly I want

25   to fill in the name of whoever the government contends is the

1    actual person involved in the various wires or mailings, but

2    I'd also like to identify, if it's different, who the investor

3    is, because I'm looking at this from the perspective of

4    traditional fraud as well, and it seems to me that there could

5    be a scheme to defraud but we have to identify who is being

6    defrauded, and that will shape what that person knew, when they

7    knew it, whole questions of materiality.  So I put that in that

8    broader context so that you've got an idea.

9            But let's go with Exhibit A.  Assuming that I will put

10   in the actual name, which I understand was communicated to the

11   defendant during the course of the discovery, what's the actual

12   name that we'll be using there?

13           MR. HAFER:  Count A would be David Cabeceiras, Your

14   Honor.

15           THE COURT:  Okay.

16           And for -- and, Mr. Reddington, if there's a dispute

17   about whether there's evidence with respect to this or this is

18   who you understood to be that, what the government was

19   contending was the victim here, you'll let me know.

20           Then Count B?

21           MR. HAFER:  Mr. Eisenberg and Martinez, Your Honor.

22           THE COURT:  Is the government -- let me put it this

23   way:  Is this, then, multiplicitous or duplicitous?

24           MR. HAFER:  I don't think so.  They're just --

25           THE COURT:  Did they both receive the same information

 1     at the same time?

 2              MR. HAFER:  Oh, I see what you're saying.

 3              I think so, Your Honor.  From memory, I think so.  If

 4     it's -- I think we can live with one or the other if I just

 5     double-check the email.

 6              THE COURT:  I think that's an issue in the case.  If

 7     it's multiplicitous, I may not let it go to the jury on both

 8     but only one, and the government would have to elect as to

 9     those ones, and of course I'll hear anything that

10     Mr. Reddington has to say about that potential issue with the

11     indictment.

12              Now, C?

13              MR. HAFER:  It's the same two, Your Honor, so --

14              THE COURT:  Okay, so you'll --

15              MR. HAFER:  Yes, I'll report back to you first thing

16     in the morning.

17              THE COURT:  Okay.  And tell Mr. Reddington when you're

18     ready.

19              MR. HAFER:  Yes.

20              THE COURT:  And if there's further action that needs

21     to be taken with respect to that, I'll deal with it.  But we're

22     dealing with both Eisenberg and Martinez as -- within the

23     contemplation of the evidence that the government submitted.

24              Then for D?

25              MR. HAFER:  That one is Mr. Eisenberg.

```
 1                THE COURT:  Okay.
 2                And for E?
 3                MR. HAFER:  Mr. Martinez.
 4                THE COURT:  Okay.
 5                And then for F?
 6                MR. HAFER:  Both Eisenberg and Martinez on F, Your
 7     Honor.
 8                THE COURT:  Okay.  So, again, you understand that --
 9                MR. HAFER:  I do.
10                THE COURT:  -- the indictment problem with that,
11     potential problem?
12                MR. HAFER:  Yes, Your Honor.
13                THE COURT:  G?
14                MR. HAFER:  G is Mr. Miller.
15                THE COURT:  Okay.
16                H?
17                MR. HAFER:  Both H and I are Dr. Cabeceiras.
18                THE COURT:  Okay.  So let's go back on this, too, for
19     me to outline my view.
20                I think that there has to be identified what the false
21     statement is; that is, it has to be argued, you have to have
22     the evidence of it.  I'm not asking that there be some further
23     specification in the indictment, but is it a false affirmative
24     statement?  Is it an admission to state a material fact?  Is it
25     a half-truth?  What is it that occurred before the date of this
```

1    wire communication with respect to this investor?  And that's

2    the way I think I'm going to be looking at it.

3            The language is, you know, false and fraudulent

4    pretenses, representations and promises, and that can include a

5    variety of different kinds of ways of communicating matters of

6    fraud or misrepresentation.  As I say, affirmatively, by

7    admission to state a material fact or some combination of both

8    of them.

9            So I think I want to know a little bit about what

10   you're going to be contending with respect to each one of these

11   counts to be sure that in the instructions that I give the

12   jury, I am addressing the several issues because I'm going to

13   be telling the jury that they have to decide these separately

14   with respect to each one of these counts.

15           And I assume, but maybe you'll try to argue otherwise,

16   that there is no duty to disclose after the disclosure is made,

17   which under other circumstances if we're dealing with the kinds

18   of affirmative duties to disclose that you find in securities

19   cases might be at issue.  But I don't think that's what you're

20   contending here.

21           So let's start with Dr. Cabeceiras.  What

22   misrepresentations prior to May 5, 2014 are you going to be

23   arguing?

24           MR. HAFER:  I'm just trying to remember the

25   testimony --

1          THE COURT:  This is not meant to be a pop quiz really,

2     but I do want to know ahead of time.  I'll give you a chance to

3     think it through to be able to get back to me, but before I

4     charge, and this week, I want to know what the government's

5     contention is going to be with respect to the

6     misrepresentation, because the timing of the misrepresentation,

7     it seems to me, is critical here.  The misrepresentations and

8     the mailings together are more or less contemporaneous but not

9     quite necessarily and so I'm of the view that I'll be charging

10    that there has to be a misrepresentation and it has to

11    remain -- I may not say this because I may not have to -- I'd

12    say this, because I may not have to but the structure is the

13    misrepresentation has to remain outstanding with respect to

14    each victim at the time that the wire communication took place

15    involving that particular victim.

16         So, I guess, you know, rather than going through this

17    in that fashion, I'm just telling you, I want to know --

18         MR. HAFER:  Okay.

19         THE COURT:  -- at some point.  But that shapes the

20    questions with respect to intent.

21         Is there a dispute about the way in which intent would

22    be presented to the jury under that rubric?

23         MR. HAFER:  Well, my general understanding from

24    reading the cases, Your Honor, and I quickly read, I reserve

25    rights, but I did quickly pull and read the instruction out of

1  page 1140 of the opinion you cited to us this morning.

2          I will just tell you my general understanding, we

3  agree that we have the burden of proving beyond a reasonable

4  doubt an intent to defraud, a specific intent to defraud.  As I

5  tried to delineate in our filing over the weekend, we don't

6  think that intent applies to each mailing, each transmission,

7  but we agree that he has to have an intent to defraud.

8          THE COURT:  Let me put it in a different way --

9          MR. HAFER:  Yup.

10          THE COURT:  -- that may move this along a little bit.

11          Let me take a hypothetical that may have been

12  foreshadowed in some of the questions that the defense is

13  asking, and I'll turn it into a hypothetical.

14          MR. HAFER:  Okay.

15          THE COURT:  My hypothetical is this:  That Mr. Correia

16  was deeply involved in SnoOwl, wanted it to work, that kind of

17  thing, was working on it full time, and at that point, apart

18  from the desire of every young man to become President of the

19  United States, he wasn't working to become President of the

20  United States in any meaningful sort of way or even mayor of

21  Fall River.  He simply recognizes there's a long life ahead of

22  him and he's got all kinds of goals.  But he represents to

23  Dr. Cabeceiras, I will work hard on this thing, I want it to

24  work and I'm going to give my best efforts on this; and then,

25  four years later, he decides that he's going to look for

1   another job.  The way I said that hypothetical, is that a

2   misrepresentation?

3          MR. HAFER:  If the case depended entirely on -- no, I

4   understand, I understand your point, let me say that.  I

5   totally understand the point.  I don't think I disagree with

6   it, I don't believe I disagree with it.  I need a little more

7   time to think about it, but I certainly understand --

8          THE COURT:  Okay.  So that's where I'm coming from on

9   this, which is, is there at the time that the offense is

10  completed, and here the offense is completed by the mailing, is

11  there still a -- not still -- is there a misrepresentation?

12         There could be, you know, someone says, I anticipate

13  that the earnings of the company are going to be $800,000 in

14  2014, and it doesn't work out, those are kind of projections.

15  At the time that projection is made, he's got a good-faith

16  basis for making that, I don't believe that would be

17  misrepresentation.  Maybe you'll argue around that to deal with

18  that, but that's really what I'm thinking about.

19         Now, if we're talking about past reporting material,

20  that is to say, I sold my previous company for, today's

21  testimony was a million dollars to Mr. Camara, then that's

22  tested against historical fact there.  Whether or not it was

23  made in good faith or whether it was $200,000 or whether it was

24  $20,000, whatever it is, those are historical facts.

25         Similarly, did they have intellectual property that

1    they sold?  Did they have patents at the time, patents in

2    process?  Those are tested in a different sort of way.

3              But I'd like to know what it is, what are the

4    misrepresentations so that we can focus more particularly on

5    this.  Because, as I say, the way in which I see myself

6    charging the jury is to say with respect to this, this arises

7    out of the investment made by Dr. Cabeceiras.  This arises out

8    of the investment made by either or most likely either, not

9    both, Mr. Eisenberg and Mr. Martinez, and down the line.

10             Now, that gets me to the next point, which is, we do

11   not have a misrepresentation here with respect to Mr. Bairos or

12   Mr. Camara, at least in the mailings.

13             I think the way I look at that is that goes to the

14   larger creation of a scheme to defraud.  The evidence is

15   admissible for those purposes, but to the degree that you have

16   to prove a mailing in furtherance of the scheme, any mailing

17   having to do with Mr. Camara or Mr. Bairos is not part of this

18   case, at least something I'm charging the jury about.  But it

19   does shape the scheme, it's evidentiary of the scheme.

20             So it's -- charging about scheme, and 1st Circuit or

21   Judge Hornby and Judge Torres in, you know, their updates and

22   so on, took artifice out.  I've always liked it, like it's the

23   King James version of some explanation of what the charge is,

24   comes, of course, directly from the statute, but who knows what

25   an artifice is?  And so I think I'll probably use language from

1    the 1st Circuit scheme to defraud, conveys the same thing I

2    think.

3         But, in any event, you understand that the -- or you

4    should understand that my present view is, in order to prove

5    its case, the Court (sic.) has to prove misrepresentations with

6    respect to the named individuals in the counts as victims and

7    that they -- those misrepresentations still remain material at

8    the time that the mailing took place.  That's the way I'm

9    thinking this through.

10        And what that means -- the reason I'm going through

11   this is so the parties can argue, you know, however they want

12   to argue about that, saying, whatever he meant at the time, you

13   know, he moved on.  Said, you know -- for a 21-year-old man,

14   two years is 10 percent of his life, so things change

15   dramatically.  Just foreshadowing on it so that you understand

16   where I'm coming from.

17        That having been said, if you want to speak to some of

18   that concept at this time, I'll, of course, hear you.

19        MR. HAFER:  The only thing I want to say -- first of

20   all, thanks, it's very helpful to have your thoughts so that we

21   can -- it's very helpful.

22        My only preliminary reaction is -- I agree on the

23   material misrepresentation has to precede the date of the

24   mailing, I agree with we haven't alleged one with respect to

25   Mr. Costa or Mr. Camara, that otherwise those go to the --

 1    overall to the scheme and the intent, and I wouldn't argue as

 2    you just suggested I shouldn't.

 3          The only thing is some of the misrepresentations to

 4    the investors are obviously all a little bit different.  You

 5    know, I think, and I'm just speaking from memory, if I'm wrong,

 6    hopefully, you won't hold it against me.

 7          My memory is Mr. Correia said nothing to

 8    Dr. Cabeceiras about whether he was taking a salary or using it

 9    for personal expenses, whereas he affirmatively told

10    Mr. Miller.  I just -- my only concern would be that it not get

11    parsed too finely it.

12          THE COURT:  It won't be parsed too finely, but I think

13    those distinctions have to be made --

14          MR. HAFER:  Okay.

15          THE COURT:  -- with respect to it.

16          Now, I suppose with respect to Dr. Cabeceiras, you

17    could say or could argue, I don't think it works here, but

18    you'll argue -- we've all got transcript now so we can deal

19    with it -- that Dr. Cabeceiras would necessarily assume that

20    that's the case.  So it's an admission to state a material

21    fact, the material fact being unlike any other startup I'm

22    going to take money out of it for various personal uses because

23    I need to keep things going.

24          I want to hear if that's the theory government has,

25    but it has to be made as to each one of these separate victims.

 1    That's why I'm saying it at the outset.

 2              MR. HAFER:  Okay.

 3              THE COURT:  And that, similarly, for purposes of

 4    Mr. Reddington, you know, that is meant to identify those areas

 5    in which you can fairly argue about various of the points

 6    because that's what I'm going to be dealing with or the way I

 7    think I'm going to be dealing with this matter.

 8              Mr. Reddington, do you have on this issue matters that

 9    you'd like me to be thinking about here?  We're going to have a

10    final, obviously, charge and discussion, but I wanted to get

11    this out before we -- so that you're thinking about it before

12    the case ends and there may be evidence that you want to put

13    in, whatever.

14              MR. REDDINGTON:  I tend to agree, Your Honor, in the

15    sense that it makes imminent good sense that you got the

16    scheme --

17              (Court reporter interrupted.)

18              MR. REDDINGTON:  Yeah, let me get the microphone.

19              THE COURT:  I think for these purposes, Mr.

20    Reddington, you can shed all pretense of wearing the mask.

21              MR. REDDINGTON:  Excellent, thank you.

22              THE COURT:  You're far enough from everyone except,

23    perhaps, Mrs. Correia.

24              MR. REDDINGTON:  I just gave Mr. Hafer a hug, so we're

25    all set.

1          Your Honor, I tend to think that the intent does have

2     to be at the time that the wire is sent, that the mail is

3     mailed, so I have nothing to add.

4          THE COURT:  Okay.

5          So I'll continue to work on this, but -- and I have

6     been, as you know, on it.  I'm not wedded to any of this stuff,

7     I just happen to mention -- you know, I keep turning up my name

8     in these cases as being reviewed by the Court of Appeals or

9     writing an opinion of my own, you're entitled to know that, but

10    the core of this thing is, as far as I'm concerned, apart from

11    the jurisdictional hook stuff, is, was there a scheme?  And as

12    part of that scheme, were there misrepresentations to

13    identifiable victims and those identifiable victims we've

14    talked about, and that scheme and the materiality and

15    misrepresentations has to be alive at the time of the mailing

16    which I consider to be the conclusion of the specific crime

17    alleged in A through I.

18         There may be other counts out there that -- or the

19    scheme may continue beyond those, that time period, but you got

20    to prove those.

21         And so I would like an identification --

22         MR. HAFER:  Yes, Your Honor.

23         THE COURT:  -- of those issues in a reasonable amount

24    of time.

25         Now, that gets me to the next question, which is, I

1    have been letting in, as you've seen, in anticipation of

2    Petrozziello findings or Ciampaglia -- I date myself by saying

3    Petrozziello, but the reason that I do is that, see that man

4    back there to the left of the door?

5             MR. HAFER:  Yes.

6             THE COURT:  That's Judge Murray.  Judge Murray was the

7    judge who charged in Petrozziello and lead to the 1st Circuit's

8    decision in Petrozziello.  I mention it because I was clerking

9    for him then when he did that, which is now 40 years, more than

10   40 years ago, 45 I guess.

11            The 1st Circuit said that the way in which he handled

12   the question of co-conspirator hearsay was perhaps a little bit

13   too prescriptive, but acceptable.  What he did, is he said

14   you've got to introduce all non-hearsay evidence of a

15   conspiracy before I rule on whether or not you've met the

16   standard.  I don't do it that way.  I think we can even

17   consider the statements seeking admission for those purposes.

18   But, in any event, I make the decision at the end of all the

19   evidence in the case, and I will here, but I don't want to

20   spend a lot of time if there are not really disputes that there

21   is sufficient evidence under these circumstances for

22   admissibility.  Sufficient evidence for admissibility for

23   co-conspirator hearsay is by a fair preponderance of the

24   evidence.  It's not coincident with proof beyond a reasonable

25   doubt.  And so, at an appropriate time, before it's put to the

1   jury, I'll probably be turning to Mr. Reddington to say, Do you

2   want me to make specific findings as to specific individuals

3   here?

4          I do those findings outside of the presence of the

5   jury and do it in camera because I don't want the jury to be

6   influenced by saying, Well, the judge has already found

7   something, if that happens.

8          But just so you're forewarned and are able to give me

9   a heads-up on the ones that you want as specific findings as I

10  can with respect to it, I'm prepared to give conclusory

11  findings.

12         The second aspect of it is, I've let some of this in

13  to show the organization and development of the conspiracy on

14  one ground, just kind of general background context, and I let

15  some of it in because it goes to the state of mind that the

16  person who is potentially the victim or could be a victim of

17  the scheme to show how it might be material as to them, but it

18  also bleeds over into the state of mind of the victim for

19  purposes of extortion.

20         So that's my way of explaining the evidentiary rulings

21  that I make that we're going to go back to at a later point.

22         So the question of -- you know, perhaps it's too much

23  to say that false filing cases are kind of garden variety fraud

24  cases, but I don't see any heavy lifting here about

25  instructions there unless there's something and specific you

1    want to know about it.

2         I then turn to the extortion.  I raised the issue

3    before with respect to extortion.  The government is proceeding

4    on, as I understand it, a *quid pro quo* extortion theory here

5    with respect to all of this, not pressing the envelope on

6    anything that might be considered to be a gratuity here.

7         Now, that being said, the observations or observation

8    of Mr. Costa that that's the way it's done in the city may be

9    read as a gratuity.  You know, you do something for us, there's

10   a gift for you at the end.  I don't understand the government

11   to be arguing that that is anything that's after the event,

12   that is, after the -- getting the either host agreement or the

13   other agreement is extortion here, but I want to be sure that

14   I'm not missing something on that, so I raise it.

15        MR. HAFER:  If I understood you correctly, which I

16   think I did, yes.

17        THE COURT:  So, again, Mr. Costa's testimony, to the

18   extent the jury believes it, and it's up to them, is larger

19   context of this kind of thing.  It also provides a basis for

20   Mr. Reddington to argue on behalf, is this is a group of people

21   who think it's a matter of honor to, you know, be thankful for

22   somebody who has done something nice for you, it's not a

23   shakedown, it's a gratuity.  That's the kind of alternative

24   argument.  That's an argument.  Whether the jury will believe

25   that this was just a house warming gift is another matter.

 1              So now let's turn to the extortion parts of this.  And
 2      we're going to Counts N, P, and R.
 3              So the government's position with respect to N is --
 4      the victim of extortion there is?
 5              MR. HAFER:  Mr. Brayton, Your Honor.
 6              THE COURT:  Okay.  And with respect to P?
 7              MR. HAFER:  Mr. Bairos.
 8              THE COURT:  Okay.  And R?
 9              MR. HAFER:  I can say the name, even though he hasn't
10      testified?
11              THE COURT:  Okay, then let's not yet until -- but the
12      government anticipates evidence to come to deal with that?
13              MR. HAFER:  Yes, Your Honor.
14              THE COURT:  Now turning to T and V.  T?
15              MR. HAFER:  A witness from whom the evidence is yet to
16      come.
17              THE COURT:  And V?
18              MR. HAFER:  V, Mr. Costa, Your Honor.
19              THE COURT:  Okay.
20              Then O, Q, and S?
21              MR. HAFER:  I'm sorry, Your Honor, I'm just making
22      sure I have it right.
23              Yes.  O, Mr. Brayton.
24              THE COURT:  All right.
25              MR. HAFER:  Q, Mr. Bairos.

1            THE COURT:  All right.

2            MR. HAFER:  S, TBA.

3            THE COURT:  Okay.  The standard I'm applying here, as

4    you, I think, understand, Mr. Reddington -- let me deal with U

5    and W, as well, as they require attention.

6            MR. HAFER:  U also is to come, Your Honor.

7            THE COURT:  All right.

8            MR. HAFER:  And W is Mr. Costa.

9            THE COURT:  Okay.

10           So if there's a dispute about sufficient evidence

11   here, you can raise it after you reflect on it, Mr. Reddington.

12   I'm not sure that -- you know, I'm asking Mr. Hafer to tell us

13   what his view is.  I've cross-checked on this as well going

14   through the record as I understand it and other materials, and

15   that seems correct for the ones who have been identified right

16   now.  And there appears to be evidence in the record with

17   respect to that, but you may say they're not enough, if that's

18   your position, Mr. Reddington.  This is not so much a question

19   of sufficiency of the evidence for purposes of judgment of

20   acquittal as it is sufficiency of they've tied it up, they've

21   put in evidence with respect to this kind of material, this

22   victim, that's what I want to focus on.

23           But it seems to me that the government's position with

24   respect to extortion, which is, we're only going on a *quid pro*

25   *quo* theory, is sails well through the safe harbor that is still

1    remaining in these kinds of cases for -- from recent

2    developments by which I include, now that I've been reminded of

3    it, McNally forward here, and that's the way I'm likely to be

4    charging with respect to it.

5         Onto the final question of bribery, which is found in

6    X, Ms. Andrade has been identified here, that's the nature of

7    it.  And of course, while I won't be charging quite this way,

8    extortion and bribery in this context are the yin and yang of

9    political corruption, but they are separately identified as

10   demanding a bribe and demanding extortion here, and I'll try to

11   make those distinctions clear as to what the government has to

12   say.

13        I will be taking off the reference to forfeiture

14   allegations here because I understand from the submissions the

15   government has made, the government's view is that this does

16   not go to the jury, it's being handled administratively or

17   otherwise or civilly, but, in any event, it's not a jury issue

18   for them.

19        MR. HAFER:  Correct, Your Honor.

20        THE COURT:  Okay.  So we're almost there for purposes

21   of the redacted indictment being an indictment that identifies

22   the victims involved or the persons whose mailings are involved

23   or who had been purportedly extorted.

24        I wanted, as I said, wanted to do this preliminarily

25   so you have some idea of where I am to make it possible for us

1   to have a meaningful final charging conference and the parties

2   to, you know, make choices about whether or not they fortify

3   some aspect or another of the kind of proof that they're going

4   to offer so that they're going to be able to argue it to the

5   jury.

6          But that then gets me to the question of how much

7   longer we realistically are going to be.

8          MR. HAFER:  We just spoke, Your Honor, and I think we

9   are -- we'll send, obviously, Ms. Beatty the update when we get

10  in and confirm everything, but I think, again, subject to the

11  cross, I really do anticipate us finishing with our witnesses

12  Thursday morning.

13         THE COURT:  Okay.  My intent is to move immediately to

14  the defense case at that time, Mr. Reddington.  The -- because

15  what I'd like to do, and I think it serves your purposes as

16  well, but you have other purposes of developing the record the

17  way you want to develop the record, but -- is to give you guys

18  the weekend to think about what you're doing and also to

19  prepare your closing arguments so that the question of charge

20  is, you know, laser directed and it also gives you a day to

21  think about the charge.  So what I would be thinking about is

22  that Monday morning we'd have a final charging conference, then

23  go to the jury on Tuesday.  That would be the way in which I

24  think we'll go.

25         MR. HAFER:  Very much appreciate that, Your Honor,

1    that's time that Mr. Reddington and I will --

2         THE COURT:  Okay.  There are some loose ends with

3    respect to the defense case that I think it's premature to take

4    up, I talked about them in camera to anticipate, but I'll make

5    any final inquiries before the final determination of who the

6    witnesses are going to be are made, and I'll do that off -- or

7    in camera, that is, there will be a record of it but it's not

8    going to be disclosed until the choices are actually made in

9    terms of evidence in the case.  Okay.

10         MR. REDDINGTON:  Very good.

11         THE COURT:  Now, is there anything else that you would

12    like to talk about at this point to address this?

13         MR. HAFER:  No, your Honor.

14         THE COURT:  Okay.  Mr. Reddington, anything else?

15         MR. REDDINGTON:  No, Judge.

16         THE COURT:  Okay.  So does that schedule work for

17    everybody?

18         MR. REDDINGTON:  Yes.

19         THE COURT:  Mr. Reddington, again, you'll develop your

20    case the way you want.  I don't mean to -- you know, if it

21    doesn't work that we don't get through on Friday, we don't get

22    through on Friday.  My intention is to give you guys a day

23    after the charging conference to think about how it works

24    through, but you'll have the weekend, obviously, to think about

25    it, too.

1              MR. REDDINGTON:  Perfect.  I feel comfortable that we

2    should be done by Friday, Judge.

3              THE COURT:  Okay.  Bearing in mind --

4              MR. REDDINGTON:  At the latest.

5              THE COURT:  -- we're going to be breaking a little bit

6    before 4:00 on Friday to afford the -- one of the jurors the

7    opportunity to get her second shot.

8              MR. REDDINGTON:  Thank you.

9              THE COURT:  But I think it's a full day there.  Okay?

10             MR. HAFER:  Thank you very much, Your Honor.

11             THE COURT:  Okay.  Then we'll be in recess, thank you.

12             MR. REDDINGTON:  Very good.

13             THE CLERK:  All rise.

14                (Court adjourned at 3:56 p.m.)

15                        -------------

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATION

2          We certify that the foregoing is a correct transcript

3     of the record of proceedings in the above-entitled matter to

4     the best of our skill and ability.

5     /s/Debra M. Joyce_____        May 4, 2021_____
      Debra M. Joyce, RMR, CRR, FCRR   Date
6     Official Court Reporter

7

8

9     /s/Kelly Mortellite___           May 4, 2021_____
      Kelly Mortellite, RMR, CRR       Date
10    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2

3    WITNESS                                              PAGE

4

     MICHAEL KHOURY
5
        Direct Examination by Mr. Tobin                      6
6       Cross-Examination by Mr. Reddington                 15
        Redirect Examination by Mr. Tobin                   18
7       Recross-Examination by Mr. Reddington               19

8    JOHN PERRY, JR.

9       Direct Examination by Mr. Tobin                     20
        Cross-Examination by Mr. Reddington                 26
10
     JOSEPH I. MACY
11
        Direct Examination by Mr. Hafer                     30
12      Cross-Examination by Mr. Reddington                 57
        Redirect Examination by Mr. Hafer                   79
13
     BRIAN BAIROS
14
        Direct Examination by Mr. Tobin                     80
15      Cross-Examination by Mr. Reddington                129
        Direct Examination                                 166
16      By Mr. Tobin

17   HILDEGAR CAMARA

18      Direct Examination                                 169
        By Mr. Hafer
19

20

21                          E X H I B I T S

22

     Exhibit No.                                        Received
23

24      146                                                  9

25      147                                                 12

| | | |
|---|---|---|
| 1 | 148 | 14 |
| 2 | 149 | 15 |
| 3 | 150 | 35 |
| 4 | 152 | 40 |
| 5 | 153 | 45 |
| 6 | 154 | 50 |
| 7 | 155 | 51 |
| 8 | 156 | 53 |
| 9 | 159 | 81 |
| 10 | 160 | 98 |
| 11 | 163.1 | 100 |
| 12 | 162 | 107 |
| 13 | 163.2-163.3 | 109 |
| 14 | 163.4 | 118 |
| 15 | 163.5 | 125 |
| 16 | 166 | 172 |
| 17 | 164 | 175 |
| 18 | 165 | 177 |
| 19 | 167 | 179 |
| 20 | 167.1 | 180 |
| 21 | 167.2 | 181 |
| 22 | 199 | 191 |
| 23 | | |
| 24 | | |
| 25 | | |