UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                               )
UNITED STATES OF AMERICA,      )
                               )          Criminal Action
          Plaintiff,           )          No. 18-10364-DPW
                               )
v.                             )
                               )
JASIEL F. CORREIA, II,         )
                               )
          Defendant.           )
                               )
```


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


JURY TRIAL DAY 11


May 5, 2021


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Debra M. Joyce, RMR, CRR, FCRR
Official Court Reporters
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Zachary R. Hafer
 3    David G. Tobin
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3106
 6    zachary.hafer@usdoj.gov
      david.tobin@usdoj.gov
 7

 8    On Behalf of the Defendant Jasiel Correia, II:
      Kevin J. Reddington
 9    Law Offices of Kevin J. Reddington
      1342 Belmont Street
10    Suite 203
      Brockton, MA 02301
11    508-583-4280
      kevinreddington@msn.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3   before the Honorable Douglas P. Woodlock, United States
 4   District Judge, United States District Court, District of
 5   Massachusetts, at the John J. Moakley United States Courthouse,
 6   One Courthouse Way, Courtroom 1, Boston, Massachusetts, on May
 7   5, 2021.)
 8              THE CLERK:  All rise.
 9              (Court entered the courtroom.)
10              THE CLERK:  The Honorable Court is now in session.
11   Please be seated.  Criminal action 18-10364, United States v.
12   Jasiel Correia.
13              THE COURT:  Well, I don't think there's anything we
14   need to take up before we bring the jury in here and get the
15   witness on the stand.  I did get -- I'm sorry, go ahead.
16              MR. HAFER:  Your Honor, just briefly.  Mr. Reddington
17   doesn't have an objection.  I was just going to read the
18   stipulation regarding retention of counsel.  I was going to do
19   that with his agreement before the cross; if Your Honor
20   prefers, I can wait until before the next witness.
21              THE COURT:  Whenever the two of you agree on is fine
22   with me.
23              MR. HAFER:  It's very short; this is one sentence.  I
24   was just going to read that, do it exactly the same way we've
25   been doing it and then --
```

1              MR. REDDINGTON:  No problem, Judge.

2              THE COURT:  Okay.

3              MR. HAFER:  You said get the witness, Your Honor?

4              THE COURT:  Please.  And I note that, Ms. DiPaolo --

5              MR. HAFER:  Okay.

6              THE COURT:  -- notified -- I'm sorry.

7              MR. HAFER:  Oh, I'm sorry, Your Honor.

8              THE COURT:  I noted that Ms. DiPaolo notified

9    Ms. Beatty about Exhibit 173, introducing only the first page

10   there.  I don't know if that's something that we need to talk

11   about.

12             (Discussion off the record.)

13             MR. HAFER:  Yes, Your Honor.  I don't think so, but

14   can I just confer?

15             THE COURT:  Yes, please.

16             (Discussion off the record.)

17             MR. HAFER:  Your Honor, I think we're all set on 173,

18   just the first page.

19             THE COURT:  Okay.  So we'll bring the jury in.

20             MR. HAFER:  And the last thing I'm going to say, just

21   to be precise, Mr. Reddington just asked me to add Mark

22   Berthiaume at Greenberg Traurig to the stipulation on retention

23   of counsel.  I'm going to do that, that's no problem.  It's not

24   on the printout, so I think what I'll do is just read this one

25   without the printout because it is so --

```
1              THE COURT:  I think you can read it and say the
2    parties do agree that Mark Berthiaume --
3              MR. HAFER:  I'll do it that way.  Thank you, Your
4    Honor.
5              MR. REDDINGTON:  Your Honor, there is, as -- in
6    reference to that exhibit with the text between witnesses
7    coming up and Ms. Andrade, I would be objecting to that.  I
8    don't think it's within the scope of a conspiracy, so I just
9    wanted to flag that issue for you.
10             THE COURT:  I'll have to take a look at it, I just
11   haven't looked at it --
12             MR. REDDINGTON:  Okay.
13             THE COURT:  -- now, but it's the first page of that
14   173.  I'll look at it.  I'll hear arguments if I think I need
15   to hear arguments.
16             MR. HAFER:  And there's another witness after
17   Mr. Camara before that, so I think we'll have time to deal with
18   it.
19             THE COURT:  Okay.  Ready for the jury?
20             THE CLERK:  All rise.
21             (Jury entered the courtroom.)
22             THE CLERK:  Please be seated.
23             THE COURT:  Good morning, ladies and gentlemen.  The
24   question you've been waiting for.
25             Has any of -- have any of you been exposed in any way
```

1    to any information outside of the courtroom concerning this

2    case, communications, media, anything like that?

3            And I see no affirmative response, so I find the jury

4    has not been so exposed since last we raised the question, and

5    we'll continue with the examination of Mr. Camara.

6            You can take your mask off, Mr. Camara.

7            MR. HAFER:  Your Honor, with your permission, I'll

8    just read a brief stipulation.

9            THE COURT:  Yes.

10           MR. HAFER:  This stipulation is titled "Stipulation

11   Regarding Defendant's Retention of Counsel."

12           "The parties stipulate and agree that on or about

13   March 21, 2017, defendant retained the law firm of Greenberg

14   Traurig to represent him in connection with the federal

15   criminal investigation involving SnoOwl."

16           While it's not in the document on the juror's screen,

17   the parties further stipulate and agree that Mark Berthiaume of

18   Greenberg Traurig was retained as the defendant's attorney at

19   this time.

20           THE COURT:  All right.  You may continue.

21           MR. REDDINGTON:  Thank you.

22           HILDEGAR CAMARA, having been previously duly sworn by

23   the Clerk, was further examined and testified as follows:

24                        CROSS-EXAMINATION

25   BY MR. REDDINGTON:

1   Q.   Mr. Camara, yesterday, I believe you indicated that you're

2   well aware that you are testifying here today pursuant to

3   what's called a cooperation agreement, correct?

4   A.   Correct.

5   Q.   And you executed what's known as a --

6           THE COURT:  Mr. Camara, if you could get that

7   microphone down so we can pick up your voice.

8           THE WITNESS:  Okay.

9           THE COURT:  Go ahead.

10  BY MR. REDDINGTON:

11  Q.   And you also, sir, executed a plea agreement with the

12  government, and you know what your exposure is after pleading

13  guilty to these offenses; isn't that true?

14  A.   Correct.

15  Q.   And what are you looking at -- or what are you hoping for

16  as a sentence?

17  A.   With my testimony, I'm hoping that the government will

18  explain to the judge what my cooperation is in this --

19  Q.   Go ahead.

20  A.   -- in this case.

21  Q.   In reference to that, what you're hoping with your

22  testimony, what type of sentence are you hoping for?

23  A.   A reduction, whatever the judge feel -- believes in.

24  Q.   So you're represented by counsel, correct?

25  A.   Correct.

1    Q.   All right.  And you've reviewed the documents with your

2    attorney, right?

3    A.   Correct.

4    Q.   And you know that there's things called the sentencing

5    guidelines, a bunch of numbers that were put in your plea

6    agreement, right?

7    A.   Yeah, I saw that.  I didn't understand it, but I saw it.

8    Q.   Well, that's what you have an attorney for.

9    A.   Who explained it to me, that's his job.

10   Q.   So you spoke to your attorney, yes?

11   A.   Yes.

12   Q.   About the plea agreement?

13   A.   Correct.

14   Q.   You know about the numbers that you're looking at in the

15   sentencing guideline?

16   A.   Correct.

17   Q.   It comes out to around 51 months to 70 months; is that

18   right?

19   A.   Correct.

20   Q.   But you also know that in the plea agreement or the

21   cooperation agreement, I should say, that one of the issues or

22   one of the things is this, what's called the 5K1.1 provision

23   from the sentencing guidelines.

24            You're familiar with that, right?

25   A.   I don't know exactly as that term, but I understand what

1   you're saying.

2   Q.   Sure.

3           Basically that means that if your testimony and if

4   you satisfy, and I believe in the agreement it indicates the

5   government will determine if your testimony was of value,

6   right?

7   A.   Correct.

8   Q.   Then they have the right that they can submit something to

9   the judge under that section that would allow the judge to go

10  below the sentencing guidelines, possibly down to probation,

11  right?

12  A.   Correct.

13  Q.   Now, you indicated that you knew Jasiel from, what, back

14  in high school?  He went to high school with your daughter?

15  A.   Yes.

16  Q.   And you indicated that you were familiar with his family.

17  You knew his family, right?

18  A.   Correct.  I got to know his family.

19  Q.   You knew his dad, his mother, his sister?

20  A.   Grandmother.

21  Q.   And he would come over to your house and have dinner?

22  A.   Correct.

23  Q.   You would socialize, obviously, I think you indicated that

24  you thought of him like he's a son?

25  A.   True.

1    Q.   And when you first heard about SnoOwl, that was from

2    Jasiel because he basically wouldn't shut up about it; he just

3    kept talking about it constantly, right?

4    A.   Yes, he'd talk about it several times.

5    Q.   And would you agree, sir, that he exhibited a significant

6    passion, if you will, for that enterprise, SnoOwl?

7    A.   Absolutely.

8    Q.   And he never asked you for any investment, did he?

9    A.   No, I offered.

10   Q.   And basically you came to him or you had a conversation

11   and you asked him whether or not you could invest in this, and

12   that conversation, he knew that you were going to be investing

13   money that, you know, was your money from savings and he told

14   you that you should be very, very aware that you could lose

15   your investment.

16        He told you that, right?

17   A.   I'm well aware of that, yes.

18   Q.   But, nevertheless, you still were interested in investing

19   in SnoOwl, right?

20   A.   Yes.

21   Q.   Now, at this time, was he even an elected official when

22   you first invested?

23   A.   No, he was not.

24   Q.   But he was running for city council, I believe, right?

25   A.   I don't think he was in city council yet at that time.

1    I'm not remembering the dates.  Maybe he was in the city

2    council.  I'm trying to figure this out.

3    Q.   So when you had your conversations with him and indicated

4    that you wanted to invest money in SnoOwl and well aware or

5    forewarned that you could lose your investment because it's a,

6    you know, high-tech business, you persisted and wanted to

7    invest the money with Jasiel and the business, right?

8    A.   Yes.

9    Q.   And at that time what was he about 21, 22?

10   A.   Yes.

11   Q.   And you did, in fact, review documents that you signed and

12   you indicated yesterday you had access to information, I

13   believe it would be a business plan?

14   A.   Correct.

15   Q.   And you reviewed that, right?  Yes?

16   A.   Yes.

17   Q.   You got to say yes, just for the record.

18   A.   I'm sorry, I took --

19   Q.   Do you recall when it was that you made your investment?

20   A.   So it started in January of 2015, I believe, was the first

21   check.  It was something like 2014 that we had the

22   conversation, December 2014 that I wanted to join, and I think

23   we started -- we had six months to give him the $50,000.

24   Q.   Right.  So you reviewed the --

25             MR. REDDINGTON:  Alyssa, could you call up the 2014

1    business plan?

2    Q.   You reviewed what was presented to you after you indicated

3    that you wanted to invest the money, Jasiel provided you with

4    this document, which is Exhibit 26.2 being the business plan,

5    correct?

6    A.   Correct.

7          MR. REDDINGTON:  All right.  Can you just kind of scan

8    through a little bit, Alyssa?

9    Q.   And you reviewed this plan, did you not?

10   A.   Yes.

11         MR. REDDINGTON:  And would you page-by-page kind of

12   just go through it.

13   Q.   So one of the things it indicated was leadership, and it

14   had little bullet points, I think it's on page 5, as to who

15   would be the principals of SnoOwl.

16         Maybe it's the next page.

17         (Pause.)

18         MR. REDDINGTON:  All right, just kind of slow down.

19   Sorry.

20         Can you go back to page 1 or 2?

21         Thank you.

22         And page 3.

23   Q.   Now, it says, "Vision," and it talks about how it's a

24   portable and catalogs content based on what consumers like or

25   would not -- what they may like, correct?

1    A.    Correct.

2    Q.    And you knew that this was a rather unique idea, and you

3    felt that you could make some pretty good money or return on

4    your investment?

5    A.    Correct.

6    Q.    And one of the things that had to be done was that the app

7    itself had to be developed and it had to be presented to Apple

8    and it had to then be accepted by Apple and placed on the app

9    store, as we refer to it, right?

10   A.    Okay, yes.

11         MR. REDDINGTON:  Can you go down, Alyssa.

12   Q.    So you see where it says Leadership.  It gives the

13   background of Jasiel Correia.  It gives the background of Alex

14   Vlahos.

15         Did you know who Alex Vlahos was?

16   A.    No.

17         MR. REDDINGTON:  Move down, Alyssa, please.

18   Q.    How about Nick Bernier?

19   A.    Yes.

20   Q.    So Nick Bernier was general counsel of SnoOwl, correct?

21   A.    Correct.

22   Q.    And you also knew Chris Parayno was working with SnoOwl,

23   right?

24   A.    Correct.

25   Q.    Had you ever met Mr. Bernier or Mr. Parayno?

1    A.    Well, Chris I've known just as long as I've known --

2    almost as long as I've known Jasiel.

3    Q.    Okay.

4    A.    And they were always together; they were like brothers.

5    Q.    Jasiel was --

6    A.    And Bernier came in after.

7    Q.    And it continues on with things like the focus and

8    implementation and then the organizational structure and

9    ownership, right?

10   A.    Correct.

11   Q.    It talks about how it's going to be an LLC or a limited

12   liability company in the state of Massachusetts located at

13   Anawan Street, right?

14   A.    Correct.

15   Q.    Now, at that time it was not a corporation, was it?

16   A.    I believe not.

17   Q.    Actually, it wasn't until 2015 when other people became

18   involved and the agreements or investor agreements were revised

19   and convertible debt notes were then prepared.

20         Do you remember those documents?

21   A.    Okay.

22   Q.    If you don't remember, just say, No, but if you do

23   remember -- do you remember?

24   A.    Yes.

25   Q.    Okay.

1              And at that point --
2              MR. REDDINGTON:  Can you go down to the next page?
3    I'm sorry, Alyssa.
4              Next page.
5              And the next page.
6              (Pause.)
7    Q.   Now, when you made the investment over that period of
8    time, some six months or so --
9    A.   Correct.
10   Q.   -- you then kind of kept your finger to the pulse of the
11   business to see how it was working?
12   A.   I had conversations with Jasiel about it.
13   Q.   Mm-hmm.
14              And at some point, the app went on the app store, it
15   was completed, right?
16   A.   True.
17   Q.   Now, at that point, a fellow by the name of Staff Sheehan
18   was involved with SnoOwl, right?
19   A.   Correct.
20   Q.   And Mr. Bernier continued on, correct?
21   A.   Correct.
22   Q.   Mr. Carreiro?  Yes?
23   A.   Yes.
24   Q.   And a law firm of Gunderson Dettmer was involved, right?
25   A.   I don't know that.

```
 1    Q.   How about Goodwin Procter, did you know that?
 2    A.   No.
 3    Q.   But you knew that the initial investor agreement that had
 4    been reviewed by you --
 5              MR. REDDINGTON:  You can take that down now.  Thank
 6    you.
 7    Q.   -- was rewritten when Staff Sheehan and the other
 8    gentlemen were involved and you had to sign those documents,
 9    right?
10    A.   I truly don't recall that, I may have.  I'm not saying
11    that I didn't but --
12    Q.   Would you agree, sir, that one of the things that was
13    contained in the new agreement that had been rewritten was what
14    was reviewed yesterday by Mr. Tobin, that money shall not be
15    spent for household, incidental or personal expenses, right?
16              MR. HAFER:  Your Honor, just to Mr. Tobin, I just
17    don't want the witness -- he said Mr. Tobin.
18              MR. REDDINGTON:  I apologize.
19              THE COURT:  Just to orient the jury of who asked the
20    question, I'll accept that.
21              MR. REDDINGTON:  Thank you, Judge.
22    BY MR. REDDINGTON:
23    Q.   So you knew that in the rewrite, if you will, or the
24    revision of the Investment Agreement, there was a paragraph
25    that indicated no personal expenses shall be expended, right?
```

1  A.    Correct.

2  Q.    That was not in the first agreement that you signed,

3  though, was it?

4  A.    To be honest with you, I didn't look at the document that

5  well, but I would assume so.

6  Q.    Did you have an attorney when you were deciding on

7  investing in SnoOwl?

8  A.    No.

9  Q.    And during the time that -- as time passed, did you have

10 occasion to see Jasiel working on the app or working in the

11 business?

12 A.    We've talked about it, yes.

13 Q.    Did you ever go to Anawan Street?

14 A.    Yes, once.

15 Q.    And at some point you determined that -- after you signed

16 all the new agreements, the rewrites, you felt comfortable with

17 that investment, you were happy with the way things were going

18 along, right?

19 A.    Yes.

20 Q.    Now, you invested the money in SnoOwl because of what

21 reason?  It was an interesting idea?  It looked as though it

22 was a business that could make a lot of money?

23 A.    Okay.  After -- after we spoke at dinner plenty of times

24 about it, about the app, I got excited about it.

25            Now, I had lost some money in the market, like

1  everybody else did, in 2008, and I figured if I could --
2  someone was making the decision for me, with my money in my
3  401(k) and stuff like that, I could take some money out and
4  invest my own money and try to make it work.  I knew Jasiel, I
5  loved Jasiel, and I was interested in the app.  He was very
6  passionate about it.  He talked about it.  He knows how I felt
7  about it and, yeah, he never asked me for money, but I said,
8  Listen, I might want to invest.  And I said -- tell my wife, I
9  said let's put some $50,000 in our control and see what
10  happens.
11  Q.   Okay.  Now, you'd agree, sir, that the fact that when he
12  was in college at the age of 20 that he had FindIt Network that
13  he was creating with another college student, that was not a
14  consideration that pushed you to write that check or checks to
15  invest.  You wanted to invest in the corporation, the business,
16  the idea?
17  A.   But he had also -- yes, but he was also -- he had also
18  promoted that he was successful doing it once.
19  Q.   So you knew that he was working at Nordstrom 's, right?
20  A.   Yes.
21  Q.   And you knew that he was living in a loft, right?
22  A.   Mm-hmm.
23  Q.   He wasn't living with his mother and father, living at
24  their home?
25  A.   Well, I don't know if -- are you talking about his address

1   on -- where he was living while he was mayor?

2   Q.   No, while he was talking to you about SnoOwl.

3   A.   He was in college.

4   Q.   And --

5   A.   I don't know where he was living.  I knew he was in

6   college.

7   Q.   And when he got out of college -- and while he was in

8   college, he was working selling shoes for Nordstrom, right?

9   A.   Absolutely.

10  Q.   And when he got out of college, he continued working

11  selling shows for Nordstrom, right?

12  A.   Correct.

13  Q.   You knew that when he finally left home where mom and dad

14  were, that he went into a loft-type apartment, right?

15  A.   Correct.

16  Q.   Now, at some point, he ends up becoming city councillor

17  for Fall River --

18  A.   Correct.

19  Q.   -- you were helpful to him, you supported him in that

20  campaign, right?

21  A.   Absolutely.

22  Q.   You then knew he was running for mayor at some point

23  obviously?

24  A.   Correct.

25  Q.   And you helped him and supported him in that campaign?

1    A.   When he made -- so he had gone back and forth of whether

2    he was going to run or not.  We had many conversations about

3    whether he wanted to run or not, and at one point he was not --

4    he considered running, at one point he considered not running,

5    and then two weeks later he considered running again.

6    Q.   Now, when he won, as it were, the election and became

7    mayor --

8    A.   Correct.

9    Q.   -- did you ask him if he could get you a job or give you a

10   position in the city?

11   A.   He knew I was unemployed and I did say, Listen, if you

12   could give me a job, that would be great.  I did ask.

13   Q.   And indeed, he did?

14   A.   Correct.

15   Q.   And what was the nature of that position?

16   A.   Executive Director of Bristol County Training Consortium.

17   Q.   What do you do in that job?

18   A.   We basically reemploy people, people who hit unemployment

19   come to us for training, and we try to find them jobs.  We have

20   job fairs, we have temp agencies that come in and recruit, we

21   are part of what is called now MassHire.

22   Q.   What is that?

23   A.   MassHire.

24   Q.   MassHire.  Okay.

25        And you still have that job?

1    A.    No, I do not.

2    Q.    What are you doing now?

3    A.    Nothing.

4    Q.    So how many years did you work for the City of Fall River

5    in that job?

6    A.    Three years.

7    Q.    Do you feel, sir, that you were qualified for that job?

8    A.    Absolutely.

9    Q.    And can you just tell us, you know, what your background

10   is briefly --

11   A.    Okay.

12   Q.    -- that you feel helps you out as a person working in that

13   position?

14   A.    Sure.

15          I worked at Radio Shack for 27 years, 24 years.  I

16   was district manager at one point in Downtown Boston.  We

17   recruit -- my job is to recruit, hire, train, retain, business

18   plans, calculate sales goals, calculate profits, calculate

19   everything that has do with general business and hiring and

20   working in retail.

21   Q.    And you worked pretty hard in the job?

22   A.    Absolutely.

23   Q.    And do you believe, sir, that the job that was obtained or

24   given to you within the City of Fall River was some kind of a

25   payoff for the investment in SnoOwl?

1    A.    Not at all, sir.

2    Q.    And in fact, you know Carol Fiola and you know her husband

3    Ken Fiola, right?

4    A.    Absolutely.

5    Q.    And who are they?

6    A.    Carol is now a state representative and Kenny is the

7    director of what used to be Fall River Office of Economic

8    Development, it now has another same, SouthCoast or South --

9    Q.    Okay.  And Ken Fiola and Carol Fiola asked Jasiel to get

10   you that job, right?

11   A.    No, they asked him to get a job.

12   Q.    They asked what?

13   A.    They asked him to help me get a job.

14   Q.    Okay.  So it was Ken and Carol Fiola that asked him to --

15   A.    They also asked -- they asked --

16   Q.    -- to get a job --

17   A.    Right.

18   Q.    -- whatever it was?

19         Now, as time went on, one of the things the mayor has

20   to do, obviously, they -- you know, they run budgets, they run

21   different departments or they supervise and they appoint people

22   that would be department heads, right?

23   A.    Correct.

24   Q.    And one of the people that a person relies on

25   significantly would be what is called a chief of staff, right?

1    A.    Correct.

2    Q.    When he was mayor initially, who was the chief of staff?

3    Do you recall Chris Parayno?

4    A.    Yes.

5    Q.    Okay.

6    A.    Chris Parayno, correct.

7    Q.    And after a period of time, Chris Parayno was no longer

8    chief of staff and then a fellow by the name of Michael Hoar, I

9    believe?

10   A.    Correct.

11   Q.    Former police officer, right?

12   A.    Correct.  Sergeant Hoar.

13   Q.    And at some point then, for any number of reasons, he left

14   that position and the substitute or the new person would be Gen

15   Andrade, right?

16   A.    Correct.

17   Q.    Now you knew Gen Andrade well?

18   A.    Correct, I got to know her over the campaign.

19   Q.    Would you agree with me, sir, that she was very, very

20   close with Jasiel?

21   A.    Absolutely.

22   Q.    And she was almost like a mother to him.  She'd feed

23   him --

24   A.    Absolutely.

25   Q.    -- you know, take care of things for him?

1    A.   Yes.

2    Q.   And they got along quite well, right?

3    A.   Yes.

4    Q.   And you knew, for example --

5    A.   As did I.

6    Q.   I'm sorry?

7    A.   As did I.

8    Q.   And you knew at some point that she was given a snow

9    stipend in the city, right?

10   A.   Correct.

11   Q.   And you had occasion to see her do that job and she did a

12   pretty good job on it?

13   A.   Yes, I did.

14   Q.   She worked very hard on it?

15   A.   Correct.

16   Q.   At some point, in 2017, the Federal Bureau of

17   Investigation and various law enforcement entities were

18   conducting an investigation of SnoOwl, right?

19   A.   Correct.

20   Q.   And that was pretty much not just known by you but by

21   anybody living in the City of Fall River, right?

22   A.   Correct.

23   Q.   And there were a number of federal agents that were

24   interviewing employees at the city hall on a weekly or daily

25   basis, right?

1  A.   Yes.

2  Q.   It was in the Fall River Herald news constantly.

3  A.   Yes.

4  Q.   And the investigation continued and you actually gave a

5  statement to the investigators about SnoOwl, what we've about

6  basically been talking about, right?

7  A.   Correct.

8  Q.   In 2019, you had, again, been reached out by the Federal

9  Bureau of Investigation and they wanted to investigate the

10 marijuana licenses, right?

11 A.   Correct.

12 Q.   Did you have an attorney at that point?

13 A.   I believe so, yes.

14 Q.   Okay.  Was that --

15 A.   I'm not sure when I hired Paul Kelly.

16 Q.   Paul Kelly, all right.  And he's your attorney here now,

17 correct?

18 A.   Correct.

19 Q.   So do you recall that you were interviewed on June 17,

20 2019 as well as June 24th of 2019?

21 A.   Correct.

22 Q.   And do you recall where the first interview occurred?

23 A.   I believe in this building.  I'm not sure.

24 Q.   All right.  So who called -- who reached out to you and

25 said they wanted to talk to you?

```
1   A.   My lawyer reached out to me and said -- that's right, so
2   that's how I know.  So my lawyer reached out to me and said, We
3   need to go and talk to the agents.
4   Q.   Okay.  So you came here?
5   A.   Correct.
6   Q.   Did you go upstairs to the 9th floor where the U.S.
7   Attorney's Office is?
8   A.   I believe so, yes.
9   Q.   You were with your attorney?
10  A.   Correct.
11  Q.   And there were a number of people that were there,
12  correct?
13  A.   Correct.
14  Q.   You'd agree that FBI Special Agent DeLair was there,
15  right?
16  A.   Mm-hmm.
17  Q.   Internal Revenue Service Special Agent Sandra Lemanski was
18  there, right?
19  A.   Correct.
20  Q.   Assistant United States Attorney Zach Hafer was there,
21  right?
22  A.   Correct.
23  Q.   Another attorney in the U.S. Attorney's Office Ibrahim
24  Salah was there, correct?
25  A.   I don't know --
```

1   Q.   You wouldn't know his name, but, I mean, there was another

2   person --

3   A.   There were people -- there were several people there.

4   Q.   Right.  And an inspector general agent was there as well,

5   right?

6   A.   Correct.

7   Q.   Was that meeting recorded, if you recall?

8   A.   I don't know.

9   Q.   Sir, where did you meet?  Was it in a room with, like, a

10  conference table?

11  A.   A conference room.  Conference room.

12  Q.   Conference room.

13          And in the course of that meeting or in the

14  subsequent meeting, would you agree, sir, that things got a

15  little tense and you were very, very nervous?

16  A.   Absolutely.

17  Q.   And quite frankly, you were being yelled at, were you not?

18  A.   I don't know remember being yelled at, but I know -- it

19  was not a good situation for me to be put in.

20  Q.   So when you were there in the conference room sitting with

21  your attorney and all these investigators, was a statement made

22  to you in either of those meetings to the effect that if you

23  cut a plea deal and cooperate that you would be able to get a

24  favorable sentence?

25  A.   I truly do not recall that, if it happened or did not

1    happen.

2    Q.   Okay.  Do you recall basically complaining to anyone that

3    would listen to you that you did nothing, that you had done

4    nothing wrong and they were making you plead guilty?

5          Do you recall that in the city hall?

6    A.   No.

7    Q.   Did you ever tell people that you did nothing wrong in

8    city hall?

9    A.   Yes, I did.

10   Q.   So when you were talking with these individuals, had you

11   already testified in the grand jury about SnoOwl?

12   A.   Yes.

13   Q.   And you didn't perjure yourself or lie in the grand jury,

14   did you?

15   A.   No, I did not.

16   Q.   So everything you testified to about SnoOwl was correct,

17   right?

18   A.   Yes.

19   Q.   Basically what you indicated here today, that you thought

20   it was a great investment, that you were excited about it, that

21   it was a good product and that he was working very hard on it,

22   right?

23   A.   Correct.

24   Q.   And by the way, pretty much everybody knew that people

25   from city hall or investors, for example, were being summonsed

```
1    to the federal grand jury, at no time did Jasiel ever tell you
2    to lie or cover anything up --
3    A.    No.
4    Q.    -- before you went into the grand jury, correct?
5    A.    Correct.
6    Q.    Now, they started asking you questions about the issuance
7    of Non-Opposition Letters, correct?
8    A.    Correct.
9    Q.    At no time in that portion of the investigation did Jasiel
10   ask you to lie or say anything untrue, correct?
11   A.    Correct.
12   Q.    Nevertheless, you went in and testified in the grand jury
13   and then you continued to talk with the investigators, and they
14   focused on the current investigation, which would include the
15   Non-Opposition Letters to certain vendors within the city,
16   correct?
17   A.    Correct.
18   Q.    Do you recall that you were asked what your role was as it
19   relates to David Brayton?
20   A.    Yes.
21   Q.    And David Brayton was -- he was the owner of what,
22   Nature's Medicines or something, right?
23   A.    I didn't know the name of the company.  I knew he had --
24   he was a vendor of medical marijuana in the State of Rhode
25   Island.
```

1   Q.   Okay.  And in Fall River, do you recall the business was

2   named Xiphias or --

3   A.   I don't know what the business is called even today.

4   Q.   All right.  But you were friends with, obviously, Tony

5   Costa, that's one of the things you indicated?

6   A.   Yes.

7   Q.   You knew Tony for a number of years, you were neighbors,

8   backyard guys?

9   A.   Correct.

10  Q.   You had your shed located right there, right?

11  A.   Yes.

12  Q.   You would socialize with Tony?

13  A.   Very much.

14  Q.   You would play golf with Tony?

15  A.   Very much.

16  Q.   On occasion you would even, you know, go on boats, fishing

17  trips with Tony, right?

18  A.   Yup.

19        MR. REDDINGTON:  Would you call up the photograph

20  of --

21  Q.   Do you see in front of you there's a photograph?

22  A.   Correct.

23  Q.   Can you identify that photograph, sir?

24  A.   In that photograph, obviously, Tony and I are on a boat.

25  Q.   Okay.  And whose boat was it?

```
 1   A.   I do not recall at this point.
 2        MR. REDDINGTON:  Your Honor, may I approach and
 3   retrieve that photograph?
 4        THE COURT:  Yes, you may.
 5        MR. REDDINGTON:  Thank you.
 6        THE WITNESS:  You're welcome.
 7        MR. REDDINGTON:  Your Honor, may I offer this and use
 8   the ELMO to illustrate it?
 9        MR. HAFER:  No objection, Your Honor.
10        THE COURT:  All right.
11        MR. REDDINGTON:  Just to show this photograph for the
12   purpose -- okay.
13   BY MR. REDDINGTON:
14   Q.   So that's Tony on the left in the blue shirt and that's
15   you on the right in the white shirt; is that correct?
16   A.   Correct.
17   Q.   Thank you.
18        THE COURT:  In this connection, I think that we should
19   mark that as 344.
20        MR. REDDINGTON:  Okay, thank you, Judge.
21        (Exhibit 344 received into evidence.)
22   BY MR. REDDINGTON:
23   Q.   You would talk with Tony, the two of you would go to your,
24   as you refer to it as a man cave, I believe, at your house or
25   you go to his house?
```

1  A.   His house, correct.

2  Q.   Socialize?

3  A.   Yes.

4  Q.   Talk about various business ventures, and things like

5  that, right?

6  A.   Yes, and sports and life.

7  Q.   As I said, you obviously golfed with him a lot as well,

8  correct?

9  A.   Correct.

10  Q.   Now, the first time that you met Mr. Brayton was at this

11  golfing outing, correct?

12  A.   Correct.

13  Q.   And you were with Tony Costa?

14  A.   Correct.

15  Q.   You were with Mr. Brayton?

16  A.   Correct.

17  Q.   And did you know who Mr. Brayton was?

18  A.   No.

19  Q.   So why did you think you were going golfing with him?  Was

20  there any reason?

21  A.   No, I was going golfing with Tony, and Tony had invited

22  two people that he had golfed with all winter long at the Sand

23  Trap in Dartmouth, Massachusetts.  Those are the guys -- he

24  asked me to join a league, every Tuesday they would golf, and I

25  says, I can't commit to that.  And these are people he would

 1  golf with in that Sand Trap virtual golf --

 2  Q.   So it's your testimony that you didn't know when you were

 3  golfing with Mr. Brayton and Tony Costa that you were supposed

 4  to talk to Mr. Brayton about getting or obtaining a marijuana

 5  license or a Letter of Non-Opposition?

 6  A.   No, I was introduced -- that was brought up at the golf

 7  course.

 8  Q.   Okay.  So that would be the first time you met

 9  Mr. Brayton, right?

10  A.   Correct.

11  Q.   That's the only time you've golfed with Mr. Brayton,

12  right?

13  A.   Correct.

14  Q.   When you saw Mr. Brayton on the golf course, you had

15  already talked to Tony about who he was, right?

16  A.   No.

17  Q.   Tony told you that he was looking for a Letter of

18  Non-Opposition and he was getting stonewalled.

19  A.   That is not true.

20  Q.   So when you met Mr. Brayton, at some point did you ask

21  him, you know, who you are or, you know --

22  A.   Those two people that we were golfing with were friends of

23  his that he had golfed with all winter long.  I'm bringing a

24  couple of buddies with me to golf --

25  Q.   At some point, sir --

1    A.    -- at that golf course, then Tony said to me -- Tony said

2    to Brayton, hollered to Brayton that Mr. Camara is really good

3    friends with Jasiel Correia and that's the guy you really need

4    to know.

5    Q.    So you're golfing with a gentleman that you don't know who

6    he is or why he's there, you assume he's just there for a good

7    time and a golf outing?

8    A.    Correct.

9    Q.    And randomly, your testimony is, Tony says to you, you

10   know, to Mr. Brayton, that this is Hil Camara, he's the guy to

11   see, or he's the guy to know?

12   A.    Right, he's very close to the mayor, he's the one --

13   Q.    But you knew he was a marijuana guy, right?

14   A.    That's when I found out that he was a marijuana guy.

15   Q.    So when you spoke with Mr. Brayton regarding being a

16   marijuana guy, did you at that time talk to him about his

17   efforts to obtain a Letter of Non-Opposition?

18   A.    He approached me and asked for help on that opposition

19   letter.

20   Q.    Okay.  And you --

21   A.    So that's when the whole subject came across, I'm with

22   Tony, we've talked about a marijuana license for the City of

23   Fall River, and could you help me with that.  That's how that

24   conversation came up.

25   Q.    Did he tell you that he felt that he was being stonewalled

1   and that nobody was getting back to him in the city?

2   A.   I don't remember that conversation.

3   Q.   Well, what efforts were you going to make from your point

4   of view to help him with his Letter of Non-Opposition?  What

5   did that mean?  What were you going to do?

6   A.   Well, he asked me for help in getting a reference letter

7   to help him get a Non-Opposition Letter.

8   Q.   So did you write a reference letter for him?

9   A.   No, I did not.

10  Q.   So you knew that one of the efforts was that you, in the

11  city hall or in your position within the city hall, that you

12  were very close to and knew the mayor, right?

13  A.   I did not have that position at that time.

14  Q.   So when you had --

15  A.   We met with him in, I would say, beginning of golf season,

16  which could have been April, May, but it was right before I had

17  my appointment to the -- to that office.

18  Q.   Do you remember telling Mr. Brayton that you were very

19  friendly with Jasiel Correia and that you had --

20  A.   Tony made that statement to him at the golf course.

21  Q.   So Tony said -- excuse me --

22  A.   I agreed with Tony --

23          THE COURT:  Just a moment.  One at a time, all right?

24  So let Mr. Camara finish his response and then, Mr. Reddington,

25  you can ask the next question.

1    A.   At the golf course, at the golf course, Tony made it very

2    clear, and I didn't deny it, that I was friends with Jasiel

3    Correia, very close to Jasiel Correia.  And that I could help

4    get them their Non-Opposition Letter.  At that time, I didn't

5    even know it was called a Non-Opposition Letter, it was just a

6    letter.

7    Q.   And after you finished that round of golf with Mr. Costa

8    and Mr. Brayton, that would be -- that would just be the three

9    of you that day?

10   A.   No, there were four, there was someone else there.

11   Q.   Who else --

12   A.   A gentleman in a white shirt, I don't remember his name;

13   he was a friend of Mr. Brayton.

14   Q.   So do you recall telling the investigators that

15   Mr. Brayton certainly was there and you were well aware that he

16   was a marijuana guy, right?

17   A.   At that point, yes.

18   Q.   And you played the round of golf, you finished the round

19   of golf, and do you recall what happened then?  Did you guys

20   just break up and leave or was there a plan or something --

21   A.   No, we sat down and I think we had a drink, just like the

22   water, just finishing from the game, and once again, he said,

23   Hil, I could use your help with getting that letter.

24   Q.   And would you agree that this would be in the summer of

25   2016?

1    A.    Summer, spring of 2016.

2    Q.    All right.

3    A.    Most likely spring.

4    Q.    And you also advised that, do you recall, that you and

5    Costa were having a conversation about the best way to assist

6    Brayton in getting a license to operate the business in Fall

7    River?

8    A.    No, once again, not the best way.  I would not say that

9    was the conversation.  The conversation was, Tony asked me for

10   help in helping him and Brayton get that letter.

11   Q.    And where did that conversation take place where you and

12   Tony --

13   A.    In the car, in the drive on the way home.

14   Q.    And what is it that you decided to do to assist Brayton?

15   What was the best way to assist him?

16   A.    Well, once again, they had asked for a reference letter,

17   and I said, well, I'll think about it.  I told Tony no -- as a

18   matter of fact, I told Tony several times, I'm not going to

19   help you.

20   Q.    Do you recall that Tony Costa told Brayton directly in

21   front of you that if somebody wanted a license in Fall River,

22   they had to talk to you?

23   A.    Absolutely not.

24   Q.    Did you ever say that to the FBI agents?

25   A.    No.

```
 1   Q.   Do you recall that -- or did Mr. Costa tell Mr. Brayton
 2   that you had connections in the city, including your brother,
 3   Joe, who at the time was city council president?
 4   A.   Once again, that statement is false.  So the statement
 5   went -- the question went this way, or Tony's statement was
 6   this:  Hil is very close to the mayor and his brother is
 7   president of the city council.
 8             My response to that question was, that is not true.
 9   My brother is no longer president of city council --
10   Q.   He was then, right?
11   A.   Excuse me?
12   Q.   He was then.
13   A.   No, he was not.
14   Q.   When was he president of city council?
15   A.   He had got off the president of city council the year
16   before that, I believe.  He was still on the city council, but
17   he was not president.
18   Q.   Do you recall that --
19   A.   And I made that clear to both Brayton and Tony.
20             And there's a reason we didn't work on a reference
21   letter because I hadn't talked to my brother since March of
22   2014.  So there's no way I was going to call somebody -- Tony
23   wanted me to call my brother to write a reference letter for
24   him, and I'm saying, So let me get this straight, you want me
25   to call my brother, who I haven't spoken with in two years, to
```

1   get a reference letter on a gentleman that I just met on a golf

2   course?

3   Q.   So you wanted nothing to do with that?

4   A.   Correct.

5   Q.   But, nevertheless, you had continued your conversation

6   with Tony Costa and you knew that Tony Costa had already worked

7   out a side deal with Brayton, the marijuana guy?

8   A.   I knew that Brayton and Tony Costa were partners in trying

9   to get this deal done.

10  Q.   They were partners?

11  A.   They were partners -- yes.

12  Q.   So Mr. Costa had an arrangement that he told you about

13  with Mr. Brayton which included that he was going to get 2

14  percent of the Brayton marijuana business if Costa was able to

15  deliver the Letter of Non-Opposition?

16  A.   Correct.

17  Q.   And Costa asked you to help him in getting Brayton the

18  letter?

19  A.   Correct, by getting the letter from my brother.  It's not

20  going to happen.

21  Q.   So you knew that this is not a letter of recommendation,

22  this is a Letter of Non-Opposition that had to be delivered by

23  Costa to Brayton --

24  A.   I was not asked --

25  Q.   Wait --

```
 1              THE COURT:  Just a moment.
 2              Mr. Camara, you anticipate questions.  You've got to
 3     wait until Mr. Reddington completes his question before your
 4     response.
 5              THE WITNESS:  I apologize.
 6              THE COURT:  It's hard for the -- just a moment.  Just
 7     by way of explanation, it's hard for the court reporter to pick
 8     it up, it's certainly hard for me to pick up, it's hard for the
 9     jury to pick it up.
10              So listen to the question.  When it's completed, you
11     answer the question.  Mr. Reddington, if he wants to follow up,
12     he will ask another question.  All right?
13              THE WITNESS:  All right.
14              THE COURT:  Go ahead, Mr. Reddington.
15              MR. REDDINGTON:  Thank you, Judge.
16     BY MR. REDDINGTON:
17     Q.   Sir, would you agree that Tony Costa indicated to you that
18     he had a deal with Mr. Brayton where if he was able, "he,"
19     meaning Tony, was able to deliver the Letter of Non-Opposition
20     from the administration that he was going to get 2 percent of
21     Brayton's marijuana business?
22     A.   Yes, I did.
23     Q.   And do you recall, sir, that he then asked you to help him
24     in getting Brayton that letter, right?
25     A.   Yes, I do.
```

1    Q.   And about two days after you guys did the golf on the

2    course, you noted that Jasiel Correia came by your home.

3              Do you remember that?

4    A.   I'm not sure if it was two days later, but Jasiel came by

5    my home often, so I'm not sure --

6    Q.   Okay.  So when you were talking to the agents and doing

7    your proffer up in the room at the conference table, do you

8    recall indicating that about two days after the golf, Jasiel

9    came by your house?

10   A.   If I said that then, yeah.

11   Q.   You raised the issue of Mr. Brayton with Jasiel, didn't

12   you?

13   A.   I don't believe I raised the issue of Mr. Brayton.

14   Q.   Well, you asked him the status of this Letter of

15   Non-Opposition, and he told you that, in fact, the Letter of

16   Non-Opposition had already been issued, right?

17   A.   And that -- so I think you've got your dates messed up.

18   It's not two days letter because my golf course adventure was

19   sometime in May --

20   Q.   When Jasiel came to your home, sir, do you recall a

21   conversation about Brayton's marijuana business, yes or no?

22   A.   Yes.

23   Q.   Do you recall in the course of that conversation asking

24   Jasiel Correia the status of the Letter of Non-Opposition for

25   Mr. Brayton --

```
 1   A.   I did not ask --
 2          THE COURT:  Mr. Camara --
 3          THE WITNESS:  I apologize.  I'm sorry.
 4          THE COURT:  All right.  So complete the question or
 5   put it again if you wish, Mr. Reddington.
 6   BY MR. REDDINGTON:
 7   Q.   Do you recall in that conversation that, in fact, Jasiel
 8   indicated that, indeed, a Letter of Non-Opposition for
 9   Mr. Brayton had been issued or would be issued very shortly,
10   you told him that.
11   A.   Right.
12   Q.   I'm sorry, he told you that.
13   A.   Oh, okay.
14   Q.   Right?
15   A.   I'm trying to tell you -- you said something that was two
16   days later after the golf.
17   Q.   Forget the two days.  You remember Jasiel came to you --
18   A.   On the day that I received my appointment letter, in that
19   week that I received my appointment letter, the middle of the
20   week, Tuesday or Wednesday, Jasiel also mentioned to me that he
21   had the letter ready for Tony and his friend.
22   Q.   He had the letter -- he had what letter ready?
23   A.   The marijuana letter.  I didn't at that time know it was
24   called an Opposition Letter or anything.  He had the letter
25   ready for Tony and his friends.
```

1   Q.   So when you were talking to the agents upstairs and you

2   made your statement, do you recall indicating that, in fact, at

3   that meeting that Jasiel said that he was going to issue a

4   Letter of Non-Opposition for Mr. Brayton.

5            Do you remember that conversation?

6   A.   Correct, that was --

7   Q.   The answer is yes?  The answer is yes?

8   A.   Yes.

9   Q.   Do you also recall indicating that it was better for you

10  to be seen as someone that could help out even if it meant that

11  you had no actual hand in getting Brayton that letter?

12  A.   Excuse me?

13  Q.   Do you recall indicating that it was better in your mind

14  for you to be seen as someone who could help out even if it

15  meant that you had no actual hand in getting Brayton the

16  letter?

17  A.   I'm not sure if those are the exact words but I can

18  explain it to you today if you --

19  Q.   You wanted to make it seem that you had some influence and

20  that you were able to get that Letter of Non-Opposition, right?

21  A.   Well, yes.  I had told Brayton, no -- I told Tony -- I

22  never told Brayton no, I told Tony that I wasn't going to get

23  him the letter.

24           Now that I knew that the mayor was going to give him a

25  letter, I tried to gain favor by saying, Okay, I'll agree to

1    helping you out and getting you the reference letter.

2    Q.   You basically acted as though you went to the mayor, that

3    you had influenced the mayor, that you were a heavy hitter and

4    you were able to get the letter, that's what you basically told

5    him, right?

6    A.   No, that is not what I told him.  I told him that I would

7    get him -- I would help him with the letter that he was asking

8    from me -- from me.  He was asking for a reference letter from

9    me.  So instead of me saying no, I was going to buy some time

10   and saying, all right, how long do you need to get that letter,

11   give me about a week or two, knowing that the letter was going

12   out the following Monday.

13   Q.   Okay.  So you basically pretended, right?

14   A.   Correct.

15   Q.   And about a week or so before Father's Day of that summer

16   of '16, do you recall speaking to Tony Costa because Tony was

17   going to Boston to speak to the investigators?

18   A.   Tony came to my house with a letter saying that he had to

19   go to speak to the investigators.

20   Q.   And then, after he spoke with the investigators, Tony came

21   to your house and the two of you talked about that, right?

22   A.   Yes.

23   Q.   And in the course of that conversation, do you recall

24   indicating that discussion of the fact that you're a good guy

25   and that you did nothing wrong?

```
 1              Do you remember that?
 2   A.   Yes.  Leave me out of it.
 3   Q.   Is there -- you then advised that you found out about
 4   Brayton giving a $100,000 check to Costa, right?
 5   A.   Correct.
 6   Q.   When did you find that out?
 7   A.   So, the federal agents had spoken to Tony's wife,
 8   separated wife, at that time they were separated.  They had
 9   talked to Tony's wife and Tony came to me and says, My wife
10   told the federal agents everything, told them about everything
11   that I had done and even told them about the mayor coming over
12   and receiving some money.
13   Q.   This is the wife, right?
14   A.   Tony's telling me that about -- after the agents spoke
15   with his wife.
16   Q.   Now, you indicated something about Costa going through a
17   divorce, right?
18   A.   Correct.
19   Q.   You also knew that Costa was a drug dealer, right?
20   A.   I learned that in about the summer of 2014.
21   Q.   You didn't know that he was a drug dealer at the time that
22   you were dealing with him?
23   A.   From 2010 to 2014, I truly believed he was a welder
24   working in New York at high rates of making $30,000, $40,000 a
25   week.
```

1    Q.   So you knew Mr. Brayton gave Tony Costa a check for
2    $100,000, yes?
3    A.   Yes.
4    Q.   And you were pretty upset about that, weren't you?
5    A.   I asked him because --
6    Q.   I'm asking you if you were upset about that fact?
7    A.   Yes.
8    Q.   Okay.  You knew that Tony deposited the check into his
9    business account, right?  Sorry, his personal account.
10   A.   I don't know what happened with the check.
11   Q.   Well, do you recall when you were asked about that and you
12   made your proffer or your statement, that, in fact, because he
13   was going through the divorce, he made a withdrawal and he gave
14   half of it to his wife?
15   A.   I'm not sure about that.  I don't recall that to be honest
16   with you.
17   Q.   So, do you recall indicating that it was during this time
18   frame, 2016, not in the years before, that you knew that
19   Mr. Costa was involved in the drug, illegal, illicit drug
20   business at that time?
21   A.   Yes.
22   Q.   Okay.  And that he also told you, as we indicated, that
23   you knew he had a 2 percent stake in Brayton's business,
24   according to what Tony said, right?
25   A.   Correct.

1    Q.   And when he made the deposit of the $100,000, do you

2    recall that he made one large withdrawal?

3    A.   No.

4              So --

5    Q.   Did he tell you that he gave half the money to his wife?

6    A.   Not to his wife, no.  So if you want me to explain.

7    Q.   Excuse me.

8              Did he tell you that he was making little dribs and

9    drabs withdrawals of cash to pay the mayor?

10   A.   No, he did not tell me that.

11             If you'll let me explain, I could tell you --

12             THE COURT:  Just a moment.  Mr. Camara, the lawyers

13   get to ask the questions.  If they think there's something

14   more, they'll tell you, but you don't get to volunteer that

15   you'd like to offer additional information, okay?

16             THE WITNESS:  Okay.

17   BY MR. REDDINGTON:

18   Q.   Yesterday, I believe you had indicated that Jasiel Correia

19   told you that Tony Costa would bury him, is what you said,

20   right?

21   A.   At one point, yes.

22   Q.   But, in fact, sir, isn't it true that your recall is a

23   little different, when you made your proffer, you indicated

24   that Correia -- you asked him if he had taken Costa's money, at

25   which point he denied taking any money from Costa and said, If

1    I did, he'd bury me, right?

2    A.    That's not accurate what you're saying.

3    Q.    So, do you remember saying that in any other proffer or

4    interview?

5    A.    My proffer was the minute I found out --

6    Q.    No, I'm not asking you.  I'm just asking:  Do you remember

7    saying that in the proffer, yes or no?

8    A.    I remember saying -- I remember saying that the man would

9    bury him, that Tony could bury the mayor, and that if he had

10   taken any money -- if Jasiel had taken any money -- had gone to

11   Tony's house and taken any money, that he was very -- he was --

12   and I swore, and left.

13   Q.    Right.  That's what you said, right?

14   A.    Correct.

15   Q.    Okay.  So you had been to Bailey's Ale House before,

16   right?

17   A.    Correct.

18   Q.    And Bailey's Ale House is like a cigar bar or something

19   like that in Providence, Rhode Island?

20   A.    Correct.

21   Q.    And you went to Bailey's on a number of occasions,

22   correct?

23   A.    Correct.

24   Q.    And you went to Bailey's with Mr. Costa on a fairly

25   regular basis, right?

1    A.    We went three or four times I would say.

2    Q.    Did you ever meet Jasiel Correia down there?

3    A.    A few times.

4    Q.    Do you recall there were conversations with you about

5    SnoOwl?

6    A.    Yes.

7    Q.    And Costa had made an investment in SnoOwl as well, right?

8    A.    Correct.

9    Q.    It was pretty common knowledge it was a $50,000

10   investment --

11   A.    Correct.

12   Q.    -- signed in the agreement, right?

13         Do you recall having dinner in Providence, Rhode

14   Island and you drove there together, you and Costa, and that

15   you never had a conversation with Costa and Correia in which

16   Correia told you that Costa was never a SnoOwl owner?  Tony

17   never told you that, did he?

18   A.    Can you repeat that, please?

19   Q.    Sure.

20         Correia never told you anything to the effect that

21   Costa was not a SnoOwl investor?

22   A.    Correct.

23   Q.    All right.

24   A.    The difference is in the amounts.

25   Q.    And it was your understanding that Costa had given Correia

1    and signed the agreement for $50,000 as an investor, right?

2    A.    Correct.

3    Q.    Later on, Costa indicated that he actually gave initial

4    $10,000 --

5    A.    Correct.

6    Q.    -- and he was going to be making payments over a period of

7    time, right?

8    A.    Correct.

9    Q.    And you asked Costa again about his testimony in the grand

10   jury regarding his role as a SnoOwl investor and the ongoing

11   investigation, you talked about that with Costa, right?

12   A.    I did not ask but that did come up.

13   Q.    Oh, okay.  And you asked him if he lied under oath and

14   things of that nature, right?

15   A.    I told him not to lie under oath.

16   Q.    Well, did he tell you that he lied under oath?

17   A.    Yes, he did.

18   Q.    And you at no time saw Correia ever ask Costa, as well as

19   you, to lie in the grand jury proceedings, correct?

20   A.    Correct.

21   Q.    You then asked again -- strike that.

22         Do you recall, sir, in reference to Mr. Brayton

23   receiving the Letter of Non-Opposition that you wanted to make

24   it appear as though you were helping Brayton because you

25   already knew Brayton was getting the letter without any

1    assistance?  Is that a fair statement?

2    A.    Correct.

3    Q.    Okay.  Do you recall that Mr. Costa went to Las Vegas with

4    Mr. Brayton and other associates?

5    A.    Correct.

6    Q.    And do you recall that -- is it true, sir, that Mr. Costa

7    told you that he split the $100,000 check he got from Brayton

8    with his wife, Michelle Costa, as part of the divorce?

9    A.    No.

10   Q.    No what?

11   A.    He did not split it with Michelle; he split it with the

12   mayor.

13   Q.    He split it with the mayor.

14          Do you recall being asked that question, sir, by

15   investigators?

16   A.    No, I do not recall, but my knowledge --

17   Q.    No, no, do you recall, sir --

18   A.    No, I do not.

19   Q.    -- indicating to the investigators that the $100,000 was

20   split --

21   A.    Yes.

22   Q.    -- with Michelle Costa?

23   A.    No, not with Michelle Costa.

24   Q.    Did you talk about Michelle Costa and Tony Costa and their

25   divorce with the investigator?

1    A.    Yes.

2    Q.    And how did that have relevance?  What did you say?

3    A.    Okay.  So, when the federal agents spoke with Michelle

4    Costa --

5    Q.    I'm asking about the divorce.

6    A.    I understand that, I'm getting to that.  Tony was already

7    separated, so came to me and says, Michelle told the federal

8    agents --

9    Q.    I know you want to talk about what Michelle --

10          THE COURT:  Now just a moment, just a moment.  You've

11   asked the question, Mr. Reddington, now the witness can answer

12   the question, and I believe that it's responsive to the

13   question that you asked.

14          So you may continue, Mr. Camara.

15   A.    So my first knowledge of the mayor going to Tony's house

16   to receive money was when the first -- when the check of

17   $100,000 came up after the federal agents had spoken with

18   Michelle Costa and asked her about what was going on.  Tony

19   came to my house, or over a phone call says, Michelle -- I know

20   it was in person -- Michelle told them everything, he told them

21   about the mayor coming to my house, getting the money, and so

22   on.  So that was the first time I ever heard of $100,000 and

23   the mayor -- and the mayor receiving money.

24          So, the next day, I went upstairs to the mayor's

25   office and said, If you went to Tony's house and received any

1    monies, you're screwed.  I may have used the "F" word.  I don't

2    want to know what the answer is, you're screwed.  Because he

3    has cameras all over the place and his wife -- and he tells his

4    wife everything.  And I left.  I said, I don't want to know,

5    and I left.

6                So the 100,000 was never split between Michelle Costa

7    and Tony Costa; it was split between the mayor and Tony Costa.

8                MR. REDDINGTON:  Your Honor, I respectfully suggest

9    that that was not responsive to my question.

10               THE COURT:  The latter part was a little bit beyond,

11   but I think I'll permit it to stand there in light of the very

12   open question that was asked about conversations.

13               MR. REDDINGTON:  I focused on the issue of divorce.  I

14   ask it be stricken.

15               THE COURT:  I understand.  I've reviewed my notes and

16   I'm not going to strike the answer with that admonishing to the

17   jury that the jury will understand that I'm permitting some of

18   this so that you get a sense of the demeanor of the witness

19   here, make your own judgments about believability in light of

20   the way in which the witness responds.  But it has to be

21   responsive to actual questions that are put to him, that's the

22   kind of line I'm drawing here.

23   BY MR. REDDINGTON:

24   Q.   And, sir, you never saw -- this is what Tony told you,

25   correct?

1   A.   Correct.

2   Q.   When you were talking with the agents and you were doing

3   your proffer, do you recall discussing the $100,000 check that

4   was delivered to Tony from Brayton?

5   A.   I recall talking about the $100,000 check.

6   Q.   Okay.

7   A.   And I pursued that with Brayton, yes.

8   Q.   Do you recall indicating that, in fact, that was split

9   with Michelle Costa because of the divorce?

10  A.   No.

11  Q.   Did you tell that to the agents?

12  A.   No.

13  Q.   You would agree with me, sir, that you were asked if you

14  had any direct knowledge that Jasiel Correia was, as they would

15  refer it, a "pay-to-play mayor," you had no knowledge of that,

16  correct?

17  A.   I've heard of that.

18  Q.   No, I'm asking you whether you had direct knowledge, sir,

19  a difference?

20  A.   No.

21  Q.   No, you did not?

22  A.   Correct.

23  Q.   And you recall that when you made the statement about this

24  investigation and allegations of taking money, that Jasiel

25  consistently denied that he ever took any money for Letters of

1    Non-Opposition in the city?

2    A.    Yes.

3    Q.    And at some point, do you recall that there was an

4    envelope that was delivered to you in your shed?

5    A.    Yes.

6    Q.    Would that be in the summer of 2018?

7    A.    I believe so.

8    Q.    And you were contacted by Tony, right?

9    A.    Correct.

10   Q.    And Tony told you that there was something in the shed,

11   correct?

12   A.    Correct.

13   Q.    So, as a result of that, you reached out to Jasiel and

14   told him to come to your house?

15   A.    Correct.

16   Q.    At that time, when he arrived at the house, you went into

17   the shed, ultimately found this envelope, opened it up a little

18   bit, and saw it was money, right?

19   A.    Correct.

20   Q.    And it was at that point that you advised that you wanted

21   nothing to do with that.  You indicated to Jasiel that it's fed

22   money, that, you know, it's dirty and you were very panicked

23   about that, right?

24   A.    Absolutely.

25   Q.    Yeah, and he was kind of nonchalant apparently, didn't

1    really didn't care?

2    A.   I said he said, What do you want to do?

3    Q.   My question was:   What his mannerism was?

4    A.   I said, Watch me, and I called -- I called Tony, and

5    said -- asked him where he was because I wanted to talk to him.

6    I didn't tell him I wanted to return the money.  I says, Where

7    are you?  He goes, I'm home.  All right, I'll be right there.

8    Q.   So, when you contacted Tony, that would be by phone

9    apparently, right?

10   A.   Correct.

11   Q.   You opened up the envelope and you counted the money,

12   right, it was $25,000, correct?

13   A.   I did not open up the envelope.

14   Q.   You touched the money, didn't you?

15   A.   I did not touch the money.

16   Q.   Well, didn't you take it into the bathroom and wash it

17   down with face cloths?

18   A.   I wiped the envelope.  I wiped the envelope.

19   Q.   So you wiped it down in the bathroom?

20   A.   That envelope was never opened; a corner of it was opened.

21   Q.   So you wiped down the envelope to remove your --

22   A.   Correct.

23   Q.   Let me just ask the question, please, sir.

24        You wiped down the envelope to remove your

25   fingerprints, correct?

1    A.    Correct.

2    Q.    You were wearing gloves, were you not?

3    A.    No.

4    Q.    Do you recall indicating to the investigators that you

5    were wearing gloves and when you saw Tony to give him the

6    money, you were wearing gloves?

7    A.    No.  I told Tony I didn't want anything to do with it;

8    that I wore gloves.  Tony was the only one I told I wore gloves

9    to.

10   Q.    And you drove to Costa's house to give him the money back,

11   that would be the same day, correct?

12   A.    Correct, right, within a half hour.

13   Q.    Now, this had always been an issue with Jasiel, this legal

14   defense fund, raising money to pay the law firm that was

15   representing him at that time, right?

16   A.    Correct.

17   Q.    And there were always requests for people to donate to the

18   legal defense fund, right?

19   A.    Correct.

20   Q.    Donate to the campaign, as well?

21   A.    Correct.

22   Q.    There would be fund-raisers that would take place?

23   A.    Correct.

24   Q.    In all of these occasions, sir, discussions would be had

25   and one of the issues with Mr. Brayton, for example, was

1    whether or not there would be a contribution to the legal
2    defense fund, right?
3    A.   The quote that the mayor gave me was, Ask Tony and his
4    friends to donate to my legal defense fund.
5    Q.   And pretty much nobody wanted to donate to the legal
6    defense fund because they'd end up in the newspaper, right?
7    A.   Correct.
8    Q.   Now, how long did you talk to Mr. Costa when you returned
9    or you gave him that envelope?
10   A.   I tried to make the point to Tony that he needed to return
11   the money back to the gentleman from Boston.
12   Q.   Okay.  And do you recall that you indicated to Mr. Costa
13   that, in your opinion, this looked like a sting, the money was
14   dirty?
15   A.   Absolutely.
16   Q.   It was fed money, right?
17   A.   Absolutely.  I wanted him to return that money.
18   Q.   Right.  So that wasn't something that Jasiel said he
19   didn't want to touch the money, he didn't want to handle the
20   money, it was fed money, it was sting money, that was you,
21   right?
22   A.   It was all me.
23   Q.   Okay.  And actually, do you recall at some point, sir,
24   making a statement to the effect that you actually thought that
25   the money may have been Costa's cash because Costa was in the

1    business of selling marijuana illegally?

2    A.   No, I never thought it was Costa's cash.

3    Q.   Did you ever say that, is what I'm asking you?

4    A.   I never said that.

5    Q.   Because you told us you didn't know Costa was selling

6    marijuana illegally, right?

7    A.   No, that's not true.

8    Q.   So, you thought, sir, that the cash came from Costa's

9    marijuana operation, right?

10   A.   That is not true.

11   Q.   Did you ever say that to the agents?

12   A.   I do not recall saying that to the agents.

13   Q.   Now, a couple of days later, after you gave Costa the

14   money back, Costa called you and was asking about the Letter of

15   Non-Opposition for the person from Boston and whether or not it

16   was ready, right?

17   A.   That statement you're making is not true.

18   Q.   Did you ever tell the investigators that Costa reached out

19   to you and asked about whether or not the Letter of

20   Non-Opposition for Brayton was ready?

21   A.   Costa called me and said, I gave the money back to the

22   gentleman from Boston and I want the letter for -- he's going

23   to go away and I need a letter in the next five days.

24           MR. HAFER:  I'm sorry.

25           THE COURT:  Mr. Hafer, if you're going to object, I

1    have to hear the word "objection."

2              MR. HAFER:  Objection, Your Honor.

3              THE COURT:  All right.

4              MR. HAFER:  Solely to the -- I think Mr. Reddington

5    said Mr. Brayton, I don't think we're talking about

6    Mr. Brayton, that's the only objection.

7              THE COURT:  All right.  Well, I note that and it's up

8    to the jury to make the determination and perhaps

9    Mr. Reddington will modify his question or perhaps not.

10   BY MR. REDDINGTON:

11   Q.   So, this is the fellow from Boston, correct?

12   A.   Correct.

13   Q.   And do you recall the conversation with Costa as to

14   whether or not the letter was ready, and that was the

15   conversation that you had with Jasiel Correia indicating that

16   the letter, in fact, was mailed out that day?

17   A.   That's not accurate.

18   Q.   Well, would you agree, sir, that you were under the

19   impression that Costa was upset that the letter was mailed out

20   because Costa would end up getting nothing?

21   A.   That's a separate conversation.

22   Q.   So, would you agree, sir, that Costa was upset that Jasiel

23   or the administration had sent out the Letter of Non-Opposition

24   before Costa or you got any money, right?

25   A.   Correct.

```
 1              THE COURT:  You see -- just a moment.  As I've said,
 2    Mr. Camara, this is question and answer and it has to be
 3    legible to the jury and me, and the court reporter has to be
 4    able to take it up, so interrupting like that is not helpful
 5    and it's beyond, frankly, what your responsibilities are here.
 6              THE WITNESS:  I apologize, your Honor.
 7    BY MR. REDDINGTON:
 8    Q.   Did you or Mr. Costa contact the gentleman from Boston and
 9    say that the letter was going to be issued, knowing it had
10    already had been issued?
11    A.   When Tony called --
12    Q.   Can you just say yes or no?
13    A.   Can you repeat your question?
14    Q.   Sure.
15              Did you or Costa at any time reach out to the man from
16    Boston and indicate that the Letter of Non-Opposition had been
17    issued or would be issued soon?
18    A.   No.
19    Q.   Was there any contact between you and Costa, to your
20    knowledge, with the person from Boston pretending that
21    influence had been brought to bear knowing that the letter was
22    in the mail?
23    A.   No.
24    Q.   You knew that Tony Costa kept the $25,000 cash, right?
25    A.   I gave Tony the $25,000 cash, yes.
```

1   Q.   And you had said something like -- strike that.

2            Did you know that he kept that money?

3   A.   No -- I know I gave it to him.  I was hoping for him to

4   return it to the gentleman from Boston.

5            If you let me explain, I can tell you how the whole

6   conversation went.

7            THE COURT:  If I can say it one more time.

8            THE WITNESS:  I'm sorry.

9            THE COURT:  And the next time I'm going to take

10   further action.  Do you understand?

11            THE WITNESS:  Yes.

12   BY MR. REDDINGTON:

13   Q.   Did you ever tell Tony that he should start selling

14   marijuana to convert it into money or maybe even take the money

15   that you wiped the envelope with and give it to the dirty

16   Mexicans so they can sell it?

17   A.   No.

18   Q.   Did you ever have any conversations with Tony Costa about

19   drug dealing and selling marijuana?

20   A.   Yes.

21   Q.   Did you know that Tony Costa received 14 pounds of

22   marijuana from Mr. -- the gentleman?

23   A.   I found out later, yes.

24   Q.   And did you talk to him about how he was going to move

25   that marijuana?

1    A.    No.

2    Q.    Did you talk to him at any time about having contact with

3    the dirty Mexicans?

4    A.    No.

5          MR. REDDINGTON:  That's all I have, Your Honor, thank

6    you.

7          THE COURT:  All right.

8          MR. HAFER:  After that, I have no redirect, thank you.

9          THE COURT:  All right.  You may step down, Mr. Camara,

10   thank you.

11         If you can take the top off the microphone, too, as

12   you leave.

13         (Witness left the courtroom.

14         MR. TOBIN:  Your Honor, the United States next calls

15   Matthew Pichette.

16         THE COURT:  All right.

17         MATTHEW PICHETTE, having been duly sworn by the Clerk,

18   was examined and testified as follows:

19         THE CLERK:  Please be seated and state your full name

20   and please spell your last name.

21         THE WITNESS:  Matthew Pichette, P-i-c-h-e-t-t-e.

22         THE COURT:  Mr. Pichette, if you can take your mask

23   off and put a cover on the microphone as well, I think the

24   covers are to your left.

25         You may proceed, Mr. Tobin.

```
 1              MR. TOBIN:  Thank you, Your Honor.
 2                        DIRECT EXAMINATION
 3   BY MR. TOBIN:
 4   Q.   Good morning, sir.
 5   A.   Good morning.
 6   Q.   Are you testifying today with an immunity agreement from
 7   the United States?
 8   A.   I am.
 9   Q.   Sir, there's a binder in front of you with various
10   exhibits in it.  If you open that up to your first tab, which
11   should be 174, can you examine that document and tell us what
12   it is?
13   A.   This is my immunity agreement from the government.
14              THE COURT:  Mr. Pichette -- I'm sorry, Mr. Pichette,
15   if you could keep your voice up and probably put the microphone
16   between you and Mr. Tobin because he's going to be asking the
17   questions.  Okay?
18              THE WITNESS:  Okay.
19              MR. TOBIN:  May 174 be introduced into evidence?
20              THE COURT:  Yes, it is.
21              (Exhibit 174 received into evidence.)
22   BY MR. TOBIN:
23   Q.   And, sir, looking at the immunity agreement, do you see
24   the date on the first page?
25              What is that?
```

1    A.   August 22, 2019.

2    Q.   Robert Fisher, Esquire, from Nixon Peabody LLP.  Who is

3    Robert Fisher?

4    A.   He's my attorney.

5            MR. TOBIN:  May we go to the second page of this

6    agreement, please.

7            Are there signatures on this page?

8            There are.

9    Q.   What is the first signature that appears?

10   A.   Zachary Hafer.

11   Q.   He's the chief of the criminal division?

12   A.   Yes.

13   Q.   You understand he represented the United States Attorney's

14   Office in this matter?

15   A.   Yes.

16   Q.   And below that are there additional signatures?

17   A.   Yes, there are.

18   Q.   Whose signatures appear on the document?

19   A.   My signature and Rob Fisher's signature.

20   Q.   Are there dates next to your signature and the signature

21   of your attorney?

22   A.   Yes, they're both 8/22/2019.

23   Q.   Thank you.

24           MR. TOBIN:  May we go back to the first page of the

25   agreement, please.

1  Q.   Sir, you understand this agreement sets out your

2  obligations and the government's obligations?

3  A.   Yes, I do.

4  Q.   I'd ask you to look at -- I suppose it's the second

5  paragraph, but it has the "1" on it.

6  A.   Mm-hmm.

7  Q.   I'm going to read a small portion of this and ask you

8  about it thereafter, okay?

9  A.   Yes.

10  Q.   "Your client agrees to provide complete and truthful

11  testimony pursuant to any subpoena compelling his testimony in

12  this matter.

13       "Your client also agrees to meet with representatives

14  of the United States Attorney to answer questions and/or to

15  prepare for such testimony.  During such meetings, your client

16  agrees to provide complete and truthful responses to all

17  questions."

18       It goes on, of course, but you understand that those

19  are your obligations?

20  A.   I do, yes.

21  Q.   And does this document also lay out then, if you meet your

22  obligations, what the United States Attorney's Office will do?

23  A.   Yes, it does.

24  Q.   I would ask you to look at the next paragraph, it has a

25  "2" in front of it.  Again, I'm going to read a small portion

1    of it and then ask you questions about it.

2              "In return for your client's full and truthful

3    testimony and statements, as well as your client's complete

4    production of responsive documents, objects, or other evidence,

5    as set forth above, the United States Attorney agrees not to

6    use any statements made, or other information provided, by your

7    client pursuant to this agreement, or any information directly

8    or indirectly derived therefrom, against your client in any

9    criminal case except for" -- and then they talk about

10   exceptions of perjury and acts of violence; is that true?

11   A.    That is true.

12   Q.    So, sir, in your own words, what is it that you must do?

13   A.    As long as I tell the truth here and don't withhold any

14   information, I will not be prosecuted for anything I say here.

15   Q.    You will not be prosecuted for any sort of paying of a

16   bribe; is that accurate?

17   A.    That is true.

18   Q.    Mr. Pichette, how old are you?

19   A.    Fifty-five.

20   Q.    Where did you grow up?

21   A.    Fall River.

22   Q.    Where did you go to high school?

23   A.    Durfee.

24   Q.    Where did you go to college?

25   A.    UMass Dartmouth.

```
1    Q.    What did you study?

2    A.    Accounting.

3    Q.    Where do you live now?

4    A.    I live in Tiverton, Rhode Island.

5    Q.    Do you own a company?

6    A.    I do.

7    Q.    What is the name of your company?

8    A.    Russco Incorporated General Contractors.

9    Q.    Do you have a partner?

10   A.    Yes, I do, my brother.

11   Q.    And how long have you and your brother been associated

12   with Russco General Contractors?

13   A.    It's a family business my farther started, it's all we've

14   ever done.

15   Q.    Sir, in 2018, did you become involved in an effort to open

16   a legal marijuana business in Fall River?

17   A.    Yes, I did.

18   Q.    Did you have various partners in this business?

19   A.    Yes, I did.

20   Q.    Was one of them your brother?

21   A.    Yes.

22   Q.    What kind of legal marijuana business did you and your

23   partners want to open in Fall River?

24   A.    We wanted to open a micro business that both grew and

25   produced edibles, so chocolates and the like infused with
```

1  marijuana.

2  Q.    And the growing operation, you actually wanted to grow

3  your own marijuana?

4  A.    Yes.

5  Q.    Did that portion of the company have a name?

6  A.    That company was Loop Cultivation.

7  Q.    And the portion of the company that would take the

8  marijuana and turn it into -- was it edibles, you said?

9  A.    Yes.

10 Q.    Things like chocolate and of that like?

11 A.    Yes.

12 Q.    Did that portion of the company have a name?

13 A.    Yes, that was called Premium Chef Edibles.

14 Q.    Did you eventually select a location where you would build

15 your grow facility and kitchen?

16 A.    Yes, we did.

17 Q.    And did you own that property?

18 A.    We did, yes.

19 Q.    Where was that property?

20 A.    It's in the back of the -- back of the land that we have

21 where our company is based in -- at the Commerce Park in Fall

22 River.

23 Q.    So it was in the City of Fall River that you wanted the

24 marijuana business?

25 A.    Yes.

1    Q.   Sir, as you understood it, what did you need to obtain

2    from the City of Fall River before you could open your

3    marijuana business, your kitchen and your edible -- your

4    kitchen and your grow facility?

5    A.   My understanding was we needed a Host Community Agreement

6    and a Letter of Non-Opposition for both companies.

7    Q.   As you understood it, sir, who had the sole authority to

8    give you a Letter of Non-Opposition and a Host Community

9    Agreement?

10   A.   The mayor of Fall River.

11   Q.   Who was the mayor of Fall River at the time?

12   A.   Jasiel Correia.

13   Q.   Who did you reach out to for assistance in getting the

14   necessary approvals from the City of Fall River?

15   A.   David Hebert, who was a friend of mine.

16   Q.   And why did you seek the assistance from David Hebert?

17   A.   I knew that Dave had a relationship with the mayor.  It

18   was common knowledge through Dave that he knew the mayor well.

19   Q.   Did David Hebert have any official position within the

20   city or the administration of Jasiel Correia?

21   A.   No, not that I know of.

22   Q.   Did he have more of a social relationship as you

23   understood it?

24   A.   Yes.

25   Q.   Sir, with regard to David Hebert, when did you first meet

1   him?

2   A.   Probably 30 years ago.

3   Q.   And did you have an ongoing professional relationship with

4   David Hebert?

5   A.   Yes, I did.

6   Q.   What was the nature of that professional relationship?

7   A.   As a family, we own apartment buildings in Fall River and

8   Dave managed the individual buildings and the apartments for

9   us.

10   Q.   And how long had David Hebert managed your rental

11   properties in Fall River?

12   A.   Probably 25 years.

13   Q.   You mentioned a professional relationship with David

14   Hebert, did you as well have a personal or a friendship with

15   David Hebert?

16   A.   Yes, he was a friend for a long time.

17   Q.   Sir, did you ever communicate with your friend, David

18   Hebert, at times by text messages?

19   A.   Yes, a number of times.

20   Q.   Sir, I would ask you to open the binder in front of you to

21   Exhibit 177, if you would examine what is at 177.

22   A.   These are text messages from -- between David and myself.

23        MR. TOBIN:  Your Honor, may Exhibit 177 be received?

24        THE COURT:  It is.

25        MR. REDDINGTON:  I object, Your Honor.

1           THE COURT:  I'm sorry?

2           MR. REDDINGTON:  I object.

3           THE COURT:  Okay.  How do we want to handle this?  I

4    understood that this was not objected to, but, again, there is

5    an objection.

6           MR. REDDINGTON:  Let me back up, Judge, hold on one

7    minute.

8           THE COURT:  Right.

9           (Discussion off the record.)

10          MR. REDDINGTON:  That's another exhibit, Your Honor.

11   I do object.

12          I do object.  It's communications with Mr. Hebert.

13          THE COURT:  Okay.  I understand the premises of it so

14   I'm going to overrule that objection and permit it to come in.

15          (Exhibit 177 received into evidence.)

16          MR. TOBIN:  Thank you, Your Honor.

17   BY MR. TOBIN:

18   Q.   Sir, with regard to the text messages that are in Exhibit

19   177, I would direct your attention to the first text on the

20   first page, and to orient you, I believe the date is July 11,

21   2018 at 10:42 a.m.

22          Do you see that first text?

23   A.   Yes, I do.

24   Q.   Who sent the text?

25   A.   I sent that to David.

1   Q.   To whom did you send the text?

2   A.   To David.

3   Q.   Would you kindly read the text to the ladies and gentlemen

4   of the jury?

5   A.   "So my guys have the application ready to submit to the

6   state but we need the Host Agreement which goes in with the

7   application.  What do I need to do to get that?"

8   Q.   Sir, when you wrote, "my guys have the application ready

9   to submit to the state," what application were you referring

10  to?

11  A.   An application to the Cannabis Commission to obtain

12  licensing.

13  Q.   And what response did you receive --

14       MR. TOBIN:  If we can go down further and highlight

15  the next couple of boxes.

16  Q.   Did you receive a response from Dave Hebert?

17  A.   Yes, I did.

18       "You need to request from city, talked to mayor

19  they're maxed out but might be able to get you one.  Retail

20  sales might be an issue though.  Best to just apply fast and

21  see where the process takes you."

22  Q.   You responded in kind or what did you then write?

23  A.   I then said, "No retail sales are needed.  Where do I

24  apply and how?"

25  Q.   What did David Hebert respond to that request?

1    A.   And he said, "Just spoke with him.  We need proposal from

2    your group.  Rules are 4 percent of gross revenue and $50,000

3    per year licensing fee.  The state law will be lowering that to

4    3 percent in the future but for now it's 4 percent.  Outline

5    the plan and location as well as projected revenues.  Get that

6    done ASAP and bring you to table with mayor to get letter."

7    Q.   And, sir, how did you understand -- when Hebert wrote

8    "just spoke with him," who did you believe "him" referred to?

9    A.   Jasiel Correia.

10        MR. TOBIN:  If we can go down further and continue to

11   show these next messages.

12   Q.   And I'm still on July 11th; is that accurate?

13   A.   We are, yes.

14   Q.   And the top one that's there, it says, "Read" "indicate

15   projected payments."

16        Who did that come from?

17   A.   That was from Dave.

18   Q.   And if you could kindly read that, please.

19   A.   "Indicate projected payments to the city based on revenues

20   in your proposal."

21   Q.   Your response was?

22   A.   "Tuesday or Wednesday next week, we can have something

23   ready.  Let me know what works for him."

24   Q.   Dave Hebert then replied what?

25   A.   "I'll get you the day.  Get the proposal ready and forward

1    me a draft as soon as possible so I can get it looked over

2    beforehand."

3    Q.   And you responded what?

4    A.   "Will do."

5         MR. TOBIN:  If I could just have a moment.

6    Q.   And that was the end of the text communications on July

7    11; is that true?

8    A.   Yes, it was.

9    Q.   However, you also had additional text communications with

10   Dave Hebert on the 17th of July which appear on this; is that

11   true?

12   A.   That is true.

13   Q.   So I'd ask you to look at the first one from July 17th.

14        This is a message to or from you?

15   A.   It was from me to Dave.

16   Q.   From you to David on July 17th.  What did you write to

17   David Hebert?

18   A.   "So if I get the presentation ready, do I have a meeting

19   with the mayor tomorrow or another day?  I just want to make

20   sure he isn't expecting us at a certain time or anything."

21   Q.   What response did you receive from David Hebert?

22   A.   "When you're ready, I'll set it up."

23   Q.   And then what's the next text?

24   A.   "Ok, we're almost there, I'll let you know."

25   Q.   And that was on July 17th of 2018; is that true?

```
 1   A.   Yes, it was.

 2   Q.   Now, sir, again, if we can go to the next set of text

 3   messages between you and David Hebert, those are from July

 4   25th; is that accurate?

 5   A.   They are -- it is.

 6   Q.   And looking at the first text message from July 25th, and

 7   to orient you, it is at 9:50 a.m.; is that true?

 8   A.   Yes.

 9   Q.   And what is it -- who sends this message, you or David

10   Hebert?

11   A.   I send it to Dave.

12   Q.   And what do you write to David?

13   A.   "Buttoning up our proposal and Host Agreement and should

14   get it to you this afternoon.  Any chance of meeting with mayor

15   tomorrow?  I'm leaving Friday and gone all next week."

16   Q.   And David's response shortly thereafter was?

17   A.   "I'll check."

18   Q.   He then sends another message a few hours later or an hour

19   or so later; is that true?

20   A.   Yes, he does.

21   Q.   What does he write to you?

22   A.   "By the way, 1:30 tomorrow at city hall, does that work?

23   We need to talk beforehand though."

24   Q.   When he texted to you 1:30 at city hall, what did you

25   think he was referring to?  What was happening at 1:30 tomorrow
```

1    at city hall?

2    A.    Our meeting with the mayor.

3    Q.    And then he writes to you:  "We need to talk beforehand

4    though"; is that accurate?

5    A.    Yes.

6    Q.    And your response to that?

7    A.    "Yes."

8    Q.    And those were the last of the messages from the 25th; is

9    that correct?

10   A.    Yes, it is.

11   Q.    Did you actually meet with Mayor Jasiel Correia the

12   following day on July 26, 2018?

13   A.    We did.

14   Q.    Did you meet and speak with David Hebert before you met

15   with the mayor, Jasiel Correia?

16   A.    I did.

17   Q.    Where did you meet with David Hebert before that meeting?

18   A.    At the Firehouse Cigar Shop in Fall River.

19   Q.    And what happened during the meeting with David Hebert at

20   the cigar shop?

21   A.    I showed Dave the proposal that we were going to present,

22   and he liked it.  He said it looked like it was something that

23   could happen, and he said -- he said, you know, this is going

24   to come with a cost.  So, I said, What is that cost?  He

25   said --

1            MR. REDDINGTON:  I'm going to object, Your Honor, to
2    this question and the line of questioning.
3            THE COURT:  No, overruled.  He may continue to answer.
4    BY MR. TOBIN:
5    Q.   Sir, just to throw a question out.
6            So when you said, "Ok, what is the cost," what was
7    David Hebert's response?
8    A.   $25,000.
9    Q.   Did he indicate where the $25,000 had to go?
10   A.   He initially said it would be to Jasiel's legal defense
11   fund.
12   Q.   When he told you you needed to pay $25,000, what did you
13   say in response?
14   A.   I said, I don't like this idea because there's somebody
15   who at that point in time was all over the papers for doing --
16   giving donation to Jasiel's legal defense fund, and ironically,
17   I didn't want to be in the paper.
18   Q.   Did you -- but did you agree on the $25,000 or did you
19   refuse to pay it?
20   A.   I agreed to pay $25,000.
21   Q.   Why did you agree to pay $25,000 to the mayor's fund?
22   A.   Because I -- I expected there was no other way to get the
23   letters.
24   Q.   Sir, after that meeting with David Hebert, did you, in
25   fact, meet with Mayor Jasiel Correia on the 26th at city hall?

1    A.    Yes, we did.

2    Q.    And just so it's clear, this is 2018?

3    A.    Yes.

4    Q.    Who attended the meeting at the mayor's office?

5    A.    Two of my partners, Andrew Shotts, who was the chef, the

6    celebrity chef that was going to be making the edibles, and

7    Brian Carney, who was more of the finance guy and put together

8    the proposals and all the financials that we presented.

9    Q.    You were there; is that accurate?

10   A.    I was, yes.

11   Q.    Brian Carney and Andrew Shotts, two of your partners,

12   correct?

13   A.    Yes.

14   Q.    Was Mayor Jasiel Correia there?

15   A.    Yes, he was.

16   Q.    Do you remember if anybody else was present for the

17   meeting?

18   A.    No.

19   Q.    Can you tell me or tell us what happened at the meeting in

20   the mayor's office?

21   A.    We presented the proposal, it was a PowerPoint

22   presentation, 15, 20 minutes long.  My partners did most of the

23   talking.  My job in the partnership was to do the real estate,

24   build the building, get everything done, and they were the

25   marijuana guys.  So they presented and finished up their

1  presentation.

2  Q.   At the end of the presentation when Brian Carney and

3  Andrew Shotts had used the PowerPoint to explain, did you have

4  a private conversation with Mayor Jasiel Correia?

5  A.   I did.

6  Q.   How did that happen?

7  A.   He was sort of standing over in the corner of the room, I

8  went over, shook his hand.

9  Q.   What did he say to you?

10  A.   He said the proposal was a great proposal, it's not like

11  anything he had seen yet.  There were a number of reasons that

12  it was different from what other people were trying to do, and

13  he acknowledged that.  And he said, you know, We're good.  I

14  said, Yeah.  He said you talked to Dave and we're good.  I

15  said, Yes, I did, and we're good.

16  Q.   What did you understand Mayor Jasiel Correia to mean when

17  he said, We're good, you've talked with Dave?

18         MR. REDDINGTON:  Objection.

19         THE COURT:  Overruled, you may answer.

20  A.   I totally understood that to mean I -- I understood from

21  Dave that there would be a $25,000 fee.

22         MR. TOBIN:  I'm sorry, Judge, there was an objection.

23         MR. REDDINGTON:  Sorry, Judge, I objected to that.

24         THE COURT:  Yes, no, I overruled the objection.

25  BY MR. TOBIN:

```
 1    Q.   I'm sorry, sir, if I may rephrase the question.
 2    A.   Sure thing.
 3    Q.   How did you understand the comments made by the mayor,
 4    "We're good, have you talked with Dave," what did you
 5    understand that to mean?
 6    A.   That I had talked to Dave, Dave had told me about the
 7    $25,000 fee, and I agreed to it.
 8    Q.   At that point, what did you think?
 9    A.   It was then -- I mean, I was always not wanting to believe
10    that Jasiel was going to do something like that, but when he
11    shook my hand and asked me the question, at that point I said
12    to myself this --
13              MR. REDDINGTON:  I'm going to object, Your Honor.
14              THE COURT:  Well, I'm going to permit the answer.
15    It's a little elliptical in response to the question.
16              Listen very carefully to the question --
17              THE WITNESS:  Sure.
18              THE COURT:  -- and respond to that question, but I'm
19    overruling the objection with that observation.
20    BY MR. TOBIN:
21    Q.   Sir, what did you think, sir?
22    A.   That Jasiel was dirty.
23    Q.   How did you respond when he had said, "Are we all set"?
24    A.   I said, "Yes, we are."
25    Q.   At that point, did that essentially end the meeting?
```

1  A.   Pretty much, yeah, yeah, we all packed up and moved out.

2  Q.   Sir, did you speak with David Hebert after your meeting

3  with Mayor Jasiel Correia?

4  A.   Yes, I did.

5  Q.   When did you speak with David next?

6  A.   The next morning.

7       THE COURT:  Just a moment, Mr. Tobin.  Before we're on

8  to the next day, maybe this is a point to take the morning

9  break.

10       MR. TOBIN:  Yes, this is a super time, yes, Judge.

11       THE COURT:  So, ladies and gentlemen, we'll take our

12  morning break, we'll be back probably around 11:20 here.  Bear

13  in mind my instructions not talking about the case in any way,

14  and we'll continue with Mr. Pichette around 11:20.

15       THE CLERK:  All rise.

16       (Jury left the courtroom.)

17       THE COURT:  Mr. Pichette, you can leave the courtroom

18  at this point.

19       (Witness left the courtroom.)

20       THE COURT:  So there are a couple of matters that I'd

21  like to take up as a virtual sidebar.  So I'm going to close

22  the courtroom, and I'd ask the press representative to leave at

23  this point.

24       (Press representative left the courtroom.)

25       THE COURT:  So, the first is that it should be

1    obvious, but I'll state it clearly, I'm quite familiar with the

2    record in this case because I took the plea with respect to

3    several of the alleged co-conspirator pleas with respect to the

4    several alleged co-conspirators, and I'm familiar more

5    generally with the theory that the government has in this case.

6    Of course, I'm obviously not making a final determination for

7    Petrozziello or Ciampaglia purposes until all of the evidence

8    is completed, but I'm sufficiently satisfied that the testimony

9    that the witness was encouraged to provide falls within the

10   co-conspirator hearsay exception, but, in addition, the

11   question of the state of mind of someone who is being extorted

12   is a matter that is properly to be brought to the attention of

13   the jury.

14          As I've said, some of these witnesses are elliptical

15   at -- perhaps that's the kindest way to refer to it, and as a

16   consequence, I will permit additional questions to get to it,

17   but the witnesses have to respond to the particular question

18   and not dance around.

19          And so I'll permit that, the jury will evaluate that,

20   I'm sure counsel will comment on that in various ways, whether

21   to show consciousness of guilt or to show discomfort that

22   they've been put in this awkward position by the government and

23   they have to satisfy the government in the case.  But that's

24   all for juries.

25          Second issue is this Exhibit 173.  Let me understand

1    what that's about.

2              MR. HAFER:  Yes, Your Honor.  With respect to Count X,

3    the government's principal evidence is the bank records showing

4    the payments from Ms. Andrade to Mr. Correia.  As we alleged,

5    actually, in the indictment, there were two statements

6    Ms. Andrade made, one to Mr. Harkins, who is identified as

7    Marijuana Vendor No. 5, and one to Mr. Hebert, who is

8    identified as Middleman No. 1.  As you know, we've indicated

9    we're not calling Mr. Hebert.  But, in essence, the statement

10   that Ms. Andrade made to Mr. Harkins was in the course of a

11   conversation, she told me him, you want to hear something

12   really fucked up, I have to give him half of my salary.  That

13   statement has been part of our allegations in this case for

14   over a year and a half.

15             THE COURT:  And it's being offered as a co-conspirator

16   statement?

17             MR. HAFER:  I have three bases of admissibility on the

18   statement, Your Honor.

19             Number one, I think Mr. Reddington agrees that

20   Ms. Andrade is unavailable.  Mr. Rankin has advised both of us

21   that, if called, she will exercise her Fifth Amendment right,

22   so I think in the first instance, subject to a finding of

23   unavailability, based on that representation, it's a statement

24   against interest by Ms. Andrade under 804(b)(3).

25             To your point, yes, I believe it's a co-conspirator

1    statement under 801(d)(2)(E).

2            THE COURT:  When do you say that Ms. Andrade was no

3    longer a member of the conspiracy, if at all?

4            MR. HAFER:  I'm sorry, can you repeat --

5            THE COURT:  When was Ms. Andrade no longer a member of

6    the conspiracy?

7            MR. HAFER:  I'm not aware of any withdrawal.

8            THE COURT:  Well, withdrawal can take a variety of

9    different forms, one of them being when she no longer had some

10   benefit to obtain from the conspiracy.  I understand the theory

11   is that the benefit that she got is she got a job, she got a

12   job at a less than what she -- of what was presented as the

13   going rate for it, but she still had the job at that point; is

14   that right?

15           MR. HAFER:  Yes, Your Honor.

16           THE COURT:  Okay.  Now, the second question is:  How

17   does this further the conspiracy?

18           MR. HAFER:  On the co-conspirator statement, the case

19   that I cited in the submission I made, the motion in limine in

20   I made, United States v. Murray, talked about -- well, I

21   think -- I guess let me back up.

22           I would say the in furtherance requirement is broad --

23           THE COURT:  You can tell me it's broad, it's narrow,

24   but how does it further it whether it's broad or narrow?  How

25   does it further it to say to a stranger, at least not someone

1    who's involved in this aspect of the conspiracy, I'm getting

2    the short end of the stick on this?  How does that advance the

3    conspiracy?

4            MR. HAFER:  Well, in the first instance, I would say

5    that's why I started with the statement against interest.

6            THE COURT:  And that's fine, I'm asking now the

7    question about this.

8            MR. HAFER:  Judge, I should have let -- again, I don't

9    want to -- I didn't realize there was a motion to exclude

10   this -- I am not criticizing Mr. Reddington -- I would have

11   looked at it a little more closely.

12           THE COURT:  I think you should on this, because a way

13   of looking at a statement against interest is not against her

14   own interest.  This is a victim saying, I've been victimized,

15   what's against interest there?  That she's paid back and

16   consequently is exposed to bribery under those circumstances?

17           MR. HAFER:  Yes, Your Honor.

18           THE COURT:  Okay.  So I understand the theory, but you

19   said you had three rounds, one of which I think you'd like to

20   do a little bit more research on before you press it, and

21   what's the third?

22           MR. HAFER:  801, Your Honor, (d)(2)(D) as in dog,

23   which is a statement made by the party's agent or employee on a

24   matter within the scope of that relationship and while it

25   existed.

1          So the text message will show, and Mr. Harkins will

2     testify, that this lunch, in which Ms. Andrade made the

3     statement to him, was on August 1st of 2018.  The evidence in

4     the record at this point is Ms. Andrade was, in fact, the chief

5     staff on August 1st of 2018; she was, in fact, the chief of

6     staff until January of 2019.  This is also about three weeks

7     after the Saliby extortion.

8          So, our position is, on August 1, 2018, she's

9     absolutely an employee.

10         THE COURT:  So let's just assume that implicit in the

11    exception is the idea it's in furtherance of her agency.  How

12    is it in furtherance of her agency?

13         MR. HAFER:  Well, Judge, I do think there's a

14    distinction between (D) and (E) there.

15         THE COURT:  There well may be.  I'm asking whether or

16    not you can contend that there is something in furtherance of

17    her agency to make a statement like that to some other person

18    or whether it can be viewed as simply a gratuitous statement or

19    the shared sense of victimhood.

20         MR. HAFER:  I think -- first, I would just say that

21    the text of (D) is within the scope of the relationship --

22         THE COURT:  I understand all of that.

23         MR. HAFER:  Okay.

24         THE COURT:  It talks about what her relationship is as

25    an agent in the government and with Mr. Correia.

1           My question is to further understand what the

2      government's contention is and to deal with it is how does that

3      further her agency for the government of Fall River or for her

4      agency in respect to her relationship to Mr. Correia.  And it

5      doesn't immediately come to mind to me.

6           Now, you may take the position that you don't have to

7      show that, just show she was an agent, and anything an agent

8      says is to be ascribed to a principal.  I'm not sure that

9      that's the law on that, and so I'm inviting further submissions

10     on your part before I rule on this issue.

11          MR. HAFER:  Okay.  Thank you for the opportunity to do

12     that.

13          I think what probably makes sense then is to slightly

14     change the order so there's time -- I mean, I'll turn to it the

15     minute we're out of court at lunch and look at it closely --

16          THE COURT:  Okay.  So we're going to push Mr. Harkins

17     off and go to Mr. Saliby, is that --

18          MR. TOBIN:  Saliby.

19          THE COURT:  Whatever you want to do, fair warning, I

20     want to be able to rule on this with a full understanding of

21     what the implications are and for Mr. Reddington to be able to

22     respond.

23          MR. HAFER:  Thank you.

24          THE COURT:  Okay.  So if you can give me a copy of

25     that after the break, but a copy of the first page, I guess, of

 1    173, I suppose I have it here, but if can you --

 2              MR. HAFER:  I can just walk up a copy of the first

 3    page now if that's helpful now, Your Honor.

 4              THE COURT:  Yeah, I think that would be helpful.

 5              Although, why don't we -- we want to take a break

 6    because we want to get back to the jury, you know, relatively

 7    promptly.  So you'll do that at the -- you know, after -- after

 8    this break.

 9              MR. HAFER:  Just to be clear, the substance of that

10    statement is not in 173.  173 is simply, "let's meet for

11    lunch."

12              THE COURT:  Right.  Okay.

13              Excuse me.

14              So, we'll take a break, it's not going to be as long

15    as before, and we'll try to be back here about 11:25.

16              (Recess taken.)

17              THE CLERK:  All rise.

18              (Court enters the courtroom.)

19              THE COURT:  Are you ready for the jury?

20              MR. HAFER:  Yes, Your Honor.

21              THE COURT:  Let's bring the witness in here.

22              THE CLERK:  All rise.

23              (Jury entered the courtroom.)

24              THE CLERK:  Please be seated.

25              THE COURT:  We'll continue with the examination of

 1   Mr. Pichette, and Mr. Tobin, you may inquire.

 2          MR. TOBIN:  Thank you, your Honor.

 3   BY MR. TOBIN:

 4   Q.   Sir, I believe right before the break you were telling us

 5   that the day after your meeting with the mayor in the mayor's

 6   office you met with David Hebert; is that correct?

 7   A.   That is correct.

 8   Q.   And where did you meet him?

 9   A.   At the cigar shop again.

10   Q.   Sir, I'd ask you, again, to look at -- not again, but I

11   would ask you to look at the binder and open up to Exhibit 179.

12   Please tell us what that is, if you can.

13   A.   This is a picture of the cigar shop.

14   Q.   Where you met David Hebert the day after the meeting with

15   the mayor?

16   A.   Yes.

17          MR. TOBIN:  Your Honor, may Exhibit 179 be received?

18          THE COURT:  Yes, it is.

19          (Exhibit 179 received into evidence.)

20   BY MR. TOBIN:

21   Q.   Sir, what happened when you got to the cigar shop the next

22   day?  What did you and David Hebert do or talk about?

23   A.   We discussed how the meeting went and the proposal that we

24   had made to the mayor.

25   Q.   I'm sorry, continue, I cut you off, I apologize.

1          THE COURT:  Just so the record is clear on this,

2     Mr. Reddington, you have a continuing objection to this.

3          MR. REDDINGTON:  Thank you, Judge.

4          THE COURT:  Go ahead, Mr. Tobin.

5     BY MR. TOBIN:

6     Q.   Let me pose a question.  Did you initially go inside the

7     cigar shop?

8     A.   Yes, I did.

9     Q.   And is that where you encountered David Hebert?

10    A.   Yes, he was inside, and there was also a customer and the

11    owner of the cigar shop were in the building.

12    Q.   And initially inside the building, what did David Hebert

13    say to you?

14    A.   He said, Let's go outside on the porch to talk, this place

15    could be bugged, you know, in a half joking manner.

16    Q.   And of course, the porch that he was referring to, is that

17    the porch that's on the front of this photograph?

18    A.   Exactly.

19    Q.   Once you and David Hebert had removed yourselves to the

20    porch, what was discussed?

21    A.   The campaign -- how we were going to pay the $25,000.

22    Q.   Did David Hebert have a suggestion how you should pay the

23    $25,000?

24    A.   We talked about campaign donation and how I could do that

25    with -- knowing that an individual could only donate $1,000, a

1   husband and wife could donate $2,000 together.  He explained to

2   me that, you know, if you can get 25 friends to write $1,000

3   checks, we're all set.

4   Q.   What did you stay to that proposal?

5   A.   I said I don't have 25 friends, so that's going to be hard

6   to do, you know, and I said, you know, this is -- we'd have to

7   figure out how to do this.

8   Q.   Did you make any suggestions as to who you could approach

9   to write checks?

10  A.   Yeah, he --

11  Q.   Who did he suggest?

12  A.   He mentioned -- I have two sons who were adults at the

13  time, so he said, you know, you can get both your boys;

14  obviously my partners; my brother and his wife; my mother; my

15  mother-in-law; you know, he just named off a bunch of people

16  that I could ask to donate so we could come up with the $25,000

17  if --

18  Q.   Was there any discussion about where the money would

19  really come from?

20  A.   Yes, he said that, you know, from my sons who were, you

21  know, they're adults, but they're young adults, they wouldn't

22  have the means to donate $1,000, I would reimburse them that

23  money.

24  Q.   And at this point, are you and he talking about the full

25  $25,000 at one shot?

1    A.   At that point we are, but then I said, Listen, you know,

2    we've got -- there's going to be a fund-raiser in the summer

3    and I'm sure there will be a Christmas party, can we just split

4    this into two $12,500 donations that we could buy tickets to

5    the fund-raisers.

6    Q.   And I'm sorry, whose suggestion was splitting it in half,

7    was that yours or David Hebert's?

8    A.   That was my -- my suggestion.

9    Q.   And when you made that suggestion, what response did you

10   receive from David Hebert?

11   A.   He said, I think that will work.

12   Q.   So during this conversation on the porch, was there any

13   talk about how David Hebert might benefit from this

14   transaction, if you will?

15   A.   Yes, there was.  After we discussed how to make the

16   donation, he said, You know, you guys are going to make a lot

17   of money doing this, how can I -- I want to get a piece of

18   this.  So --

19   Q.   Did he make a suggestion how he could get a piece of this?

20   A.   He did.  He had an agreement that he was -- I think it was

21   floated to him by another marijuana vendor previously where he

22   was a consultant charged with obtaining the Letters of

23   Non-Opposition, a Host Community Agreement, where he would get

24   paid a fee to do that.

25   Q.   And he brought up this agreement he had with another

```
 1    organization, is that what you're saying?
 2    A.   Yes.  I don't think they ever executed the agreement, but
 3    it was something that he wanted to put in front of me.
 4    Q.   And did he want you to do the same?
 5    A.   He did ask me to do the same, yes, or to look through the
 6    agreement and see what I thought.
 7    Q.   Sir, did he make any statements at all about whether or
 8    not he was getting you a good deal?
 9    A.   He did.
10    Q.   What did he say?
11    A.   He said, Listen, you know, we're friends, this is -- the
12    $25,000 is a good deal; this is going for $100,000 for anybody
13    else.
14    Q.   What did you think about his idea of this consulting
15    agreement?
16    A.   He -- he e-mailed it to me shortly after our meeting and I
17    read through it and I was not at all interested in signing an
18    agreement like that.
19    Q.   Sir, I'd ask you to open up your binder to Exhibit -- give
20    me one moment, if you would, please.
21         Exhibit 177, the messages between you and Dave Hebert.
22    And I'm going to ask you to look halfway down on the first page
23    to a text sent on July 27, 2018.
24         Do you see the one I'm referring to?
25    A.   Yes.
```

```
 1   Q.   And this was sent on July 27th; is that true?
 2   A.   It was, yes.
 3   Q.   And it was sent by whom?
 4   A.   It was sent by email from Dave to myself.
 5   Q.   And what did the email say?  If you could read that,
 6   please.
 7   A.   This is it what I spoke about.  It will need to be
 8   tweaked, and then the attachment was the agreement that he had
 9   worked out with Nature's Remedy.
10   Q.   And if we look at 178, tab 178, what is at tab 178?
11   A.   That is the actual -- a copy of the email.
12   Q.   And the attachment?
13   A.   And the attachment, yes.
14        MR. TOBIN:  Your Honor, may 178 be admitted into
15   evidence?
16        THE COURT:  Yes, it's received.
17        (Exhibit 178 received into evidence.)
18   BY MR. TOBIN:
19   Q.   Again, the first page, that's the email you had read to us
20   previously from the chart?
21   A.   Yes.
22   Q.   And then if we can go to the second page, what is that,
23   sir?
24   A.   That is his consulting services agreement that he had
25   worked on with Nature's Remedy.
```

1    Q.   And of course, he indicated to you in your email that it

2    would need to be tweaked?

3    A.   Yes.

4    Q.   What did you understand "tweaked" to mean?

5    A.   "Nature's Remedy" would be changed to "Loop Cultivation,"

6    you know, effective dates, all those kind of things would have

7    to be changed so it was an agreement between us and Dave.

8    Q.   And as you understood it, sir, how much would David Hebert

9    get from you as a consultant under the terms of this agreement?

10   A.   He would get $50,000 upon obtaining us the letters that we

11   needed, and then another $50,000 when we were an operating

12   entity, actually selling marijuana.

13   Q.   And did you ultimately agree to this agreement or did you

14   reject it?

15   A.   I rejected this.

16   Q.   Did you tell David Hebert that you were rejecting this

17   proposed consulting service agreement?

18   A.   I did, yes.

19   Q.   Did you really need David Hebert as an advisor once the

20   company was up and running?

21   A.   No.

22   Q.   The conversation that you told him and you weren't going

23   to accept this, was that by phone, by text, in person, how was

24   that done?

25   A.   That was by phone.

1   Q.   Sir, at some point, did David Hebert suggest another way
2   he could get his cut from this deal?
3   A.   He did.
4   Q.   Where did that conversation take place?
5   A.   Actually, on Martha's Vineyard.
6   Q.   And how did you and David Hebert come to be on Martha's
7   Vineyard together?
8   A.   The week after -- the week after we met at city hall,
9   we -- as a family, I had a vacation on Martha's Vineyard, and I
10  invited Dave and his wife to come over.
11  Q.   And did they, in fact, come over?
12  A.   They did, on Wednesday of that week.
13  Q.   And at some point, did you and David find yourself alone
14  and discussing what he wanted from this deal?
15  A.   Yes.
16  Q.   And can you tell us at that point what was suggested or
17  what was discussed.
18  A.   He came up with an idea where he had bought a building
19  from my brother and wasn't able to finance through a bank the
20  entire amount of the -- of the cost.  I think he -- my brother
21  sold it to him for $650,000, he was able to obtain $585,000 in
22  loans from a bank and asked my brother to hold paper on the
23  rest of the money, around $70,000.
24  Q.   Does that mean, as you understand it, David Hebert owed
25  your brother money?

1    A.    Yes, he owed -- he owed my brother $70,000.

2    Q.    And as you understand it, had David Hebert being paying

3    monthly almost like a mortgage on that note your brother --

4    A.    Yes.

5    Q.    -- held?

6    A.    Yes, he had been.

7    Q.    So, I'm sorry, just so it's clear, so what was the

8    suggestion that David Hebert made at Martha's Vineyard?

9    A.    So he had been paying roughly ten years on this note that

10   he owed my brother, and his suggestion at the time was, I've

11   paid Russ back most -- or I've paid Russ back all of the

12   principal of this note, you know, the original $70,000

13   difference, the rest of the money that I owe him is interest.

14   Do you think you could get him to forgive the rest of the note,

15   which, you know, again, he had paid principal, Russ got the 650

16   he wanted to sell the building for, so it seemed like --

17   Q.    What did you say to him?

18   A.    I said I -- I didn't think it was out of the question, and

19   I would talk to my brother about it.

20   Q.    Did you, in fact, talk your brother Russ about the plan?

21   A.    Yes, I did.

22   Q.    What did your brother think about forgiving the balance of

23   David Hebert's note?

24   A.    A little hesitant at first.  He checked with the

25   accountant in our office who had been accepting the monthly

1    payments from Dave to make sure that he was accurate in his
2    accounting, and she verified that he had paid the principal.
3    And Russ took a drive by the building because the other part of
4    Dave's reasoning was the building was hard to keep afloat the
5    way it was and by not having to pay monthly, you could put that
6    money into fixing the building.  So it was a building we had
7    owned for a long time and Russ drove by the building and agreed
8    that the building was getting -- needed a lot of work.  So,
9    after knowing Dave for 25 years, he agreed to, you know,
10   release him from the promissory note.
11   Q.   So, sir, as you understood it, how much, essentially, was
12   David Hebert saving by not paying the rest of the note even if
13   it was just interest, excuse me, I'm sorry?
14   A.   The rest of the interest I think was -- because of the
15   structure of the deal was still another $60,000 that he was
16   getting relieved from paying.
17   Q.   Sir, I'd ask you to direct your attention, again, to
18   Exhibit 177, and this time still on the first page a text sent
19   on August 8, 2018, it's pretty much smack dab right in the
20   middle of the page.
21          Do you see that 8/8/2018 at 10:32 a.m.?
22   A.   I do, yes.
23   Q.   And who was sending this text?
24   A.   I sent that to Dave.
25   Q.   And can you read it for us?

```
 1   A.    I said, "I forgot to tell you Russ agrees."
 2   Q.    You expressed or let him know that your brother agreed to
 3   that part of the deal?
 4   A.    Yes.
 5   Q.    Sir, did you and David Hebert exchange other texts about
 6   the deal where you would buy $25,000 in campaign tickets and
 7   Jasiel Correia would grant you a Letter of Non-Opposition?
 8   A.    Yes, we did.
 9   Q.    Again, going back to 177, I would ask you to look at the
10   texts from August 20, 2018, again, near the bottom of that
11   page.
12              Do you see those?
13   A.    Yes.
14   Q.    And the first one is at 10:43 a.m.; is that accurate?
15   A.    Yes, it is.
16   Q.    And who's sending it?
17   A.    Dave to me.
18   Q.    And what does he write?
19   A.    "Any news?  I'm getting your letters today."
20   Q.    Exclamation point, exclamation point?
21   A.    Yes.
22   Q.    What's the next time and who is it from?
23   A.    From me to Dave.
24   Q.    What do you write?
25   A.    "What's the deal with the tix, how many am I buying?"
```

1    Q.   What tix or tickets were you referring to?

2    A.   Fund-raising tickets.

3    Q.   Part of the deal for the letter?

4    A.   Mm-hmm.

5    Q.   And what's the response?

6    A.   The deal was 200 --

7    Q.   Okay.

8    A.   -- 25,000.

9    Q.   And then you write what?

10   A.   "Deal was half for the summer outing and half for the

11   Christmas party.  Need to spread it out."

12   Q.   And he writes what?

13   A.   Call me.

14   Q.   And then the last text, if you will, from August 20th is

15   by whom?

16   A.   It's from me to Dave.

17   Q.   And what do you write?

18   A.   "Agreements were dropped off at the 6th floor corporate

19   counsel on Friday women was expecting them and took them right

20   away."

21   Q.   And when you refer to the "agreements," what did you mean

22   by "agreements"?

23   A.   We had been sent unsigned letters that needed to be

24   executed.  We as, you know -- on our side, we executed them and

25   dropped them back off for final signatures.

1    Q.   Now, at this point, had you given David Hebert any money

2    for the mayor's fund?

3    A.   No.

4    Q.   And yet, you believed that the letters were essentially a

5    done deal at that point; is that true?

6    A.   Yes.

7    Q.   Well, sir, if you thought the letters were a done deal,

8    why did you continue or take steps to pay on the bribe?

9    A.   Because that was the deal we made.

10   Q.   Sir, did you collect checks totaling almost $12,500 made

11   out to Jasiel Correia's campaign?

12   A.   I did.

13   Q.   Who did you get the checks from?

14   A.   Some from partners, most from my family.

15   Q.   Did you reimburse any of the individuals for the checks,

16   $1,000 checks, they wrote out to the Jasiel Correia campaign?

17   A.   Yes, I did.

18   Q.   I'd like you to please look at Exhibit 176.  It's a number

19   of pages, but once you've had a chance to look at them and

20   familiarize yourself, just let me know and I'll ask you what

21   they are.

22   A.   Sure, all set.

23   Q.   What are those?

24   A.   These are the checks that I handed over to Dave for the

25   tickets, for the fund-raiser.

1        MR. TOBIN:  Your Honor, may Exhibit 176 be introduced

2   into evidence.

3        THE COURT:  Yes, they are received.

4        (Exhibit 176 received into evidence.)

5        MR. TOBIN:  Thank you.

6   BY MR. TOBIN:

7   Q.   And then we'll look at the first one.  So, sir, this first

8   check is for how much money?

9   A.   $500.

10  Q.   And it's made out to what entity?

11  A.   Friends of Mayor Jasiel Correia.

12  Q.   And at the bottom, what does it say on it?  In the "memo"

13  section, I suppose.

14  A.   "Russco Project Manager."

15  Q.   And at top, this check is from a Richard E. Meyer; is that

16  accurate?

17  A.   That is accurate.

18  Q.   Who is Richard E. Meyer?

19  A.   Rich Meyer is actually a superintendent who works for me

20  and has worked for me for 20-plus years.

21  Q.   How did you come to collect a $500 check from Rich Meyer?

22  A.   Rich was the superintendent who built the dispensary on

23  Globe Street that we were working on, and we were discussing

24  what was going on and how I was trying to figure out how to get

25  $12,500 worth of money, and he offered that.  He said, Hey, I'm

1    working here, doing this job, I'm willing to donate $500.

2    Q.    Did you not have to reimburse him?

3    A.    I did not have to reimburse Richard.

4          MR. TOBIN:  Next check, please, next page.

5    Q.    Sir, this is a check for how much?

6    A.    $2,000.

7    Q.    Made out to who?

8    A.    Friends of Mayor Jasiel Correia, II.

9    Q.    The date on the check?

10   A.    August 29, 2018.

11   Q.    And this is a check from whom?

12   A.    Myself and my wife.

13   Q.    Dina Pichette is your wife?

14   A.    Yes.

15   Q.    As you understood it, a couple could give a maximum of

16   $2,000 a calendar year to a campaign; is that true?

17   A.    Yes.

18   Q.    I won't ask you if you reimbursed yourself.

19         MR. TOBIN:  Next check, please.

20   Q.    This is a check for how much?

21   A.    $1,000.

22   Q.    Made out to whom or what organization?

23   A.    Friends of Mayor Jasiel Correia, II.

24   Q.    The date on this?

25   A.    August 29, 2018.

1    Q.   And the names on the check?

2    A.   Joshua Pichette and Dina Pichette.

3    Q.   Who is Joshua Pichette?

4    A.   Joshua is my younger son.

5    Q.   And he was an adult at the time?

6    A.   Yes, he was.

7    Q.   And who signed this check?  Whose signatures, what

8    signature, what name appears in the signature line?

9    A.   Joshua Pichette.

10   Q.   He was away at college at the time?

11   A.   He was, yes.

12   Q.   Who actually put his name down on that?

13   A.   His brother.

14   Q.   Thank you.

15        MR. TOBIN:  Can we go to the next check, please.

16   Q.   Sir, this check is for how much?

17   A.   $1,000.

18   Q.   And it's made out to whom or what organization?

19   A.   Friends of Mayor Jasiel Correia, II.

20   Q.   The date on the check?

21   A.   8/29/2018.

22   Q.   And this check is from whom?

23   A.   This is from Zachary and Dina.

24   Q.   Dina being your wife, of course.  Who's Zachary?

25   A.   Zachary is my older son.

1    Q.   So, money actually came out of the accounts of both of

2    your sons; is that accurate?

3    A.   That is accurate.

4    Q.   Did you reimburse your sons or their accounts for these

5    $1,000 each?

6    A.   I did.

7    Q.   Thank you.

8              The next check, please.

9              This is a check for how much?

10   A.   $2,000.

11   Q.   Made out to whom or what?

12   A.   Friends of Mayor Jasiel Correia, II.

13   Q.   What's the date?

14   A.   8/29/2018.

15   Q.   And whose names are printed on the check?

16   A.   Russell Pichette, Jr., Helen Mary Pichette.

17   Q.   And who are they, please?

18   A.   That's my brother and his wife.

19   Q.   Russ and his wife?

20   A.   Yes.

21   Q.   And that's for $2,000?

22   A.   Yes.

23              MR. TOBIN:  Next check, please.

24   Q.   Sir, this is a check for $1,000; is that accurate?

25   A.   It is.

1    Q.    Who's it made out to?

2    A.    Friends of Mayor Jasiel Correia, II.

3    Q.    The date on the check?

4    A.    8/29/2018.

5    Q.    And who was -- what names are printed on the check?

6    A.    Maria Sousa and Dina Pichette.

7    Q.    Who is Maria Sousa?

8    A.    My mother-in-law.

9    Q.    And this is a joint account your mother-in-law had with

10   her daughter, your wife?

11   A.    Yes.

12   Q.    And who actually signed the check?

13   A.    My wife.

14   Q.    And was your mother-in-law reimbursed or where -- where

15   did that $1,000 come from -- excuse me, let's me rephrase that,

16   where did the $1,000 come from?

17   A.    It came from her account, but she was reimbursed.

18   Q.    Thank you.

19         MR. TOBIN:  Next check.

20   Q.    This is a check for $1,000 to friends of Mayor Jasiel

21   Correia.  It also is dated 8/29, is all of that accurate?

22   A.    Yes, it is.

23   Q.    And this is from whom?

24   A.    Marie J. Pichette and Russell Pichette, Jr.

25   Q.    And who is Marie J. Pichette?

1    A.    My mother.

2    Q.    Thank you.

3          And was she reimbursed?

4    A.    No, she was not reimbursed.

5    Q.    Well, who puts money into that account?

6    A.    It's -- it comes from her rental properties.

7    Q.    Thank you.

8          MR. TOBIN:  Next check.

9    Q.    This is a $2,000 check, correct?

10   A.    Yes, it is.

11   Q.    To Friends of Jasiel Correia?

12   A.    Yes.

13   Q.    Who are Marcy and Frederick Granoff?

14   A.    Rick Granoff is -- was one of my partners in the entities,

15   and Marcy is his wife.

16   Q.    You called him Rick Granoff; is that true?

17   A.    Yes.

18   Q.    Is Rick also Frederick as in --

19   A.    Yes.

20   Q.    -- as in Fred Rick?

21   A.    Yes.

22   Q.    Thank you.

23         MR. TOBIN:  Next check, please.

24   Q.    This is a check again for $1,000.  Who is this person?

25   A.    Randy Shatz.  He was also a partner in the entities.

1   Q.   Sir, did Randy Schatz attend the meeting at the mayor's

2   office?

3   A.   No, he did not.

4   Q.   Thank you.

5          MR. TOBIN:  Next check, please.

6          (Discussion off the record.)

7          MR. TOBIN:  There are no more checks.

8   Q.   And did you reimburse Granoff and Shatz?

9   A.   No.

10  Q.   They were your partners?

11  A.   They were our partners, yes.

12  Q.   Did you tell them what you were doing and why?

13  A.   Yes, they knew.

14  Q.   Sir, I want to ask you now, if you might, to please look

15  at Exhibit 175.

16          Do you recognize Exhibit 175?

17  A.   Yes.

18  Q.   What is on 175?

19  A.   It is spreadsheet of the checks we just talked about.

20  Q.   And all of the checks we just talked about, are they

21  reflected on this spreadsheet?

22  A.   They all are, yes.

23          MR. TOBIN:  Your Honor, may Exhibit 175 be admitted

24  into evidence?

25          THE COURT:  Yes, it's received.

1           (Exhibit 175 received into evidence.)

2     BY MR. TOBIN:

3     Q.   And, sir, at the bottom of that, there's a total of all

4     these checks, is there not?  Do you see that?

5     A.   I do, yes.

6     Q.   And how much is the total?

7     A.   $11,500.

8     Q.   Now, you had agreed to pay $12,500; is that accurate?

9     A.   That is accurate.

10    Q.   What can you tell us about the remaining $1,000?

11    A.   It came from a friend of Rick Granoff's, and I don't

12    know -- I never knew the person's name.

13    Q.   At some point, did you take these checks totaling $11,500

14    and give them to David Hebert?

15    A.   I did.

16    Q.   I'm going to ask you to direct your attention again to

17    Exhibit 177.

18           I'm going to ask you to look at the -- give me one

19    moment, if you would.

20           Where did you give him the checks?

21    A.   At the cigar shop.

22    Q.   At the cigar shop.

23           And did you at some point receive a missive or a text

24    from David Hebert telling you that he had your letters, the

25    letters that you needed, the documents from city hall?

1  A.    I did get a text regarding that, yes.

2  Q.    Sir, I'm going to ask you to look then at Exhibit 177, and

3  I'm going to ask you to look at the bottom of the first page

4  where it says August 21st.

5          Do you see that?

6  A.    Yes.

7  Q.    And do you see the second from the bottom a message --

8  who's that message from?

9  A.    That's from Dave to me.

10  Q.    Actually, it's third from the bottom.

11         What does he write to you?

12  A.    "I've got the letters come by the cigar shop."

13  Q.    And in fact, what did you believe he was referring to when

14  he said, "I've got the letters come by the cigar shop"?

15  A.    The Letters of Non-Opposition and the Host Community

16  Agreements.

17  Q.    Did you go by the Cigar shop?

18  A.    I did.

19  Q.    And what did you obtain from David Hebert?

20  A.    The letters.

21  Q.    Sir, I'm going to ask you to draw your attention to

22  Exhibit 180.

23         Do you recognize what is in Exhibit 180?

24  A.    I do.

25  Q.    What is that?

```
 1    A.    A Letter of Non-Opposition.

 2    Q.    For which of your two companies?

 3    A.    For Loop Cultivation Partners.

 4    Q.    Could you go to 181 and tell us what is on 181?

 5    A.    A Letter of Non-Opposition for Premium Chef Edibles.

 6          MR. TOBIN:  Your Honor, may Exhibits 180 and 181 be

 7    received.

 8          THE COURT:  They're received.

 9          (Exhibits 180 and 181 received into evidence.)

10          MR. TOBIN:  Thank you.  If you could look now at

11    Exhibit 180.

12    BY MR. TOBIN:

13    Q.    So is this one of the two letters or one of the letters

14    that David Hebert gave you at the cigar shop?

15    A.    It is.

16    Q.    And I'm going to read it and ask you some questions about

17    it, it's brief.

18          "I, Jasiel Correia II, Mayor of the City of Fall

19    River, do hereby provide this statement of Non-Opposition to

20    Loop Cultivation Partners to operate a marijuana establishment

21    license/marijuana micro business in Fall River.

22          "I have verified with the appropriate local officials

23    that the proposed MEL/marijuana micro business facility is

24    located in a zoning district that allows such use by right or

25    pursuant to local permitting.  This letter is subject to
```

1    withdrawal or revocation at any time."
2            Did I read that correctly?
3    A.   You did.
4    Q.   And this is the letter that you got from David Hebert?
5    A.   Yes.
6    Q.   And it was to whom David Hebert you gave all of the checks
7    we just went through?
8    A.   Yes.
9    Q.   How did you understand the last line or the last sentence
10   of this letter, "This letter is subject to withdrawal or
11   revocation at any time"?
12   A.   Just that, it could be withdrawn or revoked at any time.
13   Q.   And if we could briefly go to the next exhibit, the second
14   letter.  I won't read it, but it is essentially the same thing;
15   is that true?
16   A.   It is.
17   Q.   And again, this is for which of the companies or the parts
18   of the company?
19   A.   That's for Premium Chef Edibles.
20   Q.   Now, sir, at some point after August of 2018, did your
21   wife get a call from the Office of Campaign Finance?
22   A.   Yes, she did.
23   Q.   Did she or both of you get in some trouble with the Office
24   of -- actually, did your wife get in some trouble with the
25   Office of Campaign Finance?

1  A.   She did.

2  Q.   And what was the -- what was the trouble?  What was the

3  allegation, if you will?

4  A.   Campaign finance violations regarding my reimbursing my

5  children and mother-in-law for campaign donations.

6  Q.   A couple can only give how much per year?

7  A.   $2,000.

8  Q.   And you reimbursed other people bringing -- or why was it

9  that your wife was in trouble and not you per se?

10 A.   Because her name's on everybody's checks.

11 Q.   She wrote the checks?

12 A.   Yes, and she's a joint account holder on all the checks.

13 Q.   How was that issue resolved?

14 A.   We had to hire attorneys who presented to the campaign

15 finance people and we paid a fine.

16 Q.   To the state?

17 A.   To the state, yes.

18 Q.   Was that a $5,000 fine?

19 A.   It was a $5,000 fine.

20 Q.   And just to confirm, the checks, those were given by you

21 to David Hebert?

22 A.   Yes, they were.

23 Q.   And where did you give them, the checks?

24 A.   At the cigar shop.

25 Q.   And where did you get the Letters of Non-Opposition?

1    A.    At the cigar shop.

2    Q.    Sir, I'd like to ask you about July 2019.

3          Did you and your wife, Dina, run into Jasiel Correia

4    in that month and year, July 2019?

5    A.    Yes, we did.

6    Q.    Where did that take place?

7    A.    At the SouthCoast Marketplace Shopping Center in Fall

8    River.

9    Q.    And what happened?  Explain it to us, please.

10   A.    We were just getting some stuff for a party we were going

11   to have, we were leaving the parking lot, and Jasiel was going

12   to cross in front of our Jeep, and, you know, we waved, he came

13   over and some small talk.  We had built a movie theater and a

14   couple of stores there, so he asked how business was, and then

15   he looked -- you know, looked across me to my wife --

16   Q.    When you say across you, were you and your wife still is

17   in your vehicle?

18   A.    Yeah, we were in our vehicle.  I was driving, she was in

19   the passenger's seat.  And he looked across and said, "I just

20   want to apologize for all that stuff."

21   Q.    He directed that comment to whom?

22   A.    To my wife.

23   Q.    Sir, what is the status of these two marijuana companies

24   today, the grow facility and the kitchen facility?

25   A.    They are -- no, they are not companies any longer.

```
 1    Q.   They were never actually opened.

 2    A.   They never opened, no.

 3              MR. TOBIN:  I have no further questions, but please

 4    remain seated.

 5              THE COURT:  Mr. Reddington?

 6                        CROSS-EXAMINATION

 7    BY MR. REDDINGTON:

 8    Q.   What did you do with the companies?  Did you sell them,

 9    disband them?

10    A.   No.  We disbanded them, yes.

11    Q.   And at the outset of your testimony, sir, one of the

12    questions that the prosecutor was asking is that -- that you

13    were represented by an attorney, Rob Fisher, correct?

14    A.   Yes.

15    Q.   And Mr. Fisher was representing you in your dealings and

16    negotiations with the United States Attorney's Office, right?

17    A.   Yes.

18    Q.   And as a result of that, you had indicated through

19    Mr. Fisher that you would not testify, you would -- intended to

20    exercise your rights under the Fifth Amendment to remain

21    silent, correct?

22    A.   Right.

23    Q.   And as a result of that, you were then granted immunity by

24    the U.S. Attorney's Office, right?

25    A.   Correct.
```

1   Q.   And that's what you're here today testifying under a grant

2   of immunity?

3   A.   Correct.

4   Q.   Now, first of all, you had dealings with Jasiel Correia

5   for a number of years; isn't that right?  While he was in the

6   mayor's office, he -- you came to him and requested help with

7   some movie cinema or something?

8   A.   Yes.

9   Q.   And it was a big project that you were involved in, and it

10  was kind of under the gun, you had to have it opened at a

11  certain time?

12  A.   True.

13  Q.   And did he do anything to help you out, sir, to have that

14  opened?

15  A.   Yes, he did.

16  Q.   What did he do?

17  A.   On opening night he asked the building inspector to stay

18  until we were completely done and ready to open the building.

19  Q.   All right.  You didn't make any payments or any bribe or

20  any contributions regarding that, did you?

21  A.   I did not.

22  Q.   This fella, is it Dave Hebert?

23  A.   Yes.

24  Q.   That's his name, Dave Hebert.  You've known him for an

25  awful long time, correct?

1    A.    I have.

2            MR. REDDINGTON:   One second, Your Honor, please.

3            THE COURT:   Yes.

4            (Pause.)

5            (Discussion off the record.)

6            MR. REDDINGTON:   Your Honor, we have an agreement that

7    I may take one of the documents and put it on the ELMO because

8    we can't put it up on the electric screen.   Is that okay?

9            THE COURT:   That's fine.   For purposes of the record,

10   we'll mark that at 345.

11           MR. REDDINGTON:   Thank you, Judge.

12           (Exhibit 345 received into evidence.)

13   BY MR. REDDINGTON:

14   Q.    Now, that's a picture of Dave Hebert, correct?

15   A.    It is.

16   Q.    And that's also a picture of you, right?

17   A.    It is.

18   Q.    And that's a wedding, is it not?

19   A.    It is.

20   Q.    Mr. Hebert's second wedding, right?

21   A.    Right.

22   Q.    You were the best man at the wedding, right?

23   A.    I was.

24   Q.    And would you agree with me, sir, that Mr. Hebert, in all

25   the years that you've known him, he's the type of guy that

1    always wants to be known as the guy who can get things done,

2    right?

3    A.    Accurate.

4    Q.    And you used that expression when you were talking with

5    the authorities, the agents, when you were interviewed,

6    correct?

7    A.    I did.

8    Q.    You came in here and gave a proffer, right?

9    A.    I did.

10   Q.    You've had a chance to review it, right?

11   A.    I have.

12   Q.    Now, if I understand, you had in-person meet up at the

13   city hall on one occasion with Jasiel Correia as the mayor,

14   correct?

15   A.    Yes.

16   Q.    You then saw him, apparently, in a parking lot where you

17   indicated that he said, Sorry about all that, right?

18   A.    Mm-hmm.

19   Q.    And "all that" you took to mean the flap about the

20   campaign finance?

21   A.    Yes.

22   Q.    That was in the newspaper, wasn't it?

23   A.    It was in the newspaper.

24   Q.    It had an awful lot of publicity, and it was embarrassing,

25   right?

```
 1   A.    It was embarrassing.

 2   Q.    And he apologized for what you guys ended up going through

 3   in the newspaper for that, right?

 4   A.    He did, yeah.

 5   Q.    So you went to your friend Dave and you were talking with

 6   Dave about your intention to have a business in the City of

 7   Fall River, right, about opening up a marijuana business?

 8   A.    Yes.

 9   Q.    You were approached by somebody else back in 2016 to open

10   up this particular business, right?

11   A.    2017, I think, but --

12   Q.    Okay.  You spoke to Dave Hebert about what you had to do

13   to be able to get this business open in the City of Fall River,

14   right?

15   A.    Yes.

16   Q.    He basically told you what the rules and regulations were,

17   that you had to have certain locations that were suitable, if

18   you will, for zoning laws and for the Cannabis Control

19   Commission rules, et cetera, right?

20   A.    Yes.

21   Q.    Had to have a business set up, you had to have staff, and

22   that you had to have a meeting in city hall to pitch that

23   business to see if it would be approved, correct?

24   A.    Yes.

25   Q.    Now, what you had to have is this Letter of
```

1    Non-Opposition, but that does not grant you a license, that's

2    up to the Cannabis Control Commission, right?

3    A.    True.

4    Q.    And when did they grant you a license?

5    A.    We never got a license.

6    Q.    That's right.

7          So when you were sitting with Mr. Hebert, he

8    indicated to you that he would be able to get you the Letters

9    of Non-Opposition because, basically, he was friendly with the

10   mayor, right?

11   A.    Yes.

12   Q.    So you sat with him, you put all your paperwork together,

13   and then you and your partners, I believe, went to city hall

14   and you had your presentation, correct?

15   A.    True.

16   Q.    And other than you and your partners that were with you,

17   who was there on behalf of the city?  Did you ever deal with

18   Joe Macy, the judge that was the corporation counsel?

19   A.    Yes.

20   Q.    And Mayor Correia, of course, was there?

21   A.    Yes.

22   Q.    Anybody else, if you remember, from the city side?

23   A.    I don't remember, no.

24   Q.    And took about, what, about a half hour or so or 45

25   minutes to do your PowerPoint presentation?

1    A.    I would say so, yes.

2    Q.    And when that was finished, that's the time that you

3    indicated that you saw Jasiel standing in the corner of the

4    room, and did he approach you or did you approach him?

5    A.    I probably approached him.

6    Q.    And at that point, he indicated to you that it was an

7    excellent presentation and that things looked pretty good as

8    far as your business, right?

9    A.    Yes.

10   Q.    You knew, sir, at that point that he had been requesting

11   that there be a donation to his legal defense fund, right?

12   A.    Yes.

13   Q.    At that meeting, you knew that prior to that, right?

14   A.    What do you mean "prior to that"?

15   Q.    Well, you talked about the $25,000, right?

16   A.    Yes.

17   Q.    And at the meeting, your presentation, the $25,000, if I

18   understand your testimony correctly, you took to mean as a fee,

19   if you will, to basically submit a bribe to the mayor, right?

20   A.    I did.

21   Q.    And you then indicated that when he shook your hand, you

22   thought it was for purposes of the fee, correct?

23   A.    Yes.

24   Q.    Now, would you agree with me, sir, that you had the

25   conversation in July 26, 2018 at city hall, and, as you were

1    leaving the meting, Correia approached Pichette, shook his hand
2    and said, Hey, we all good, you talk to Dave, we all good; and
3    you said, Yes.  And you understood that he was asking about the
4    contribution to the fund.
5    A.   Yes.
6    Q.   Okay.  So you knew that's what he meant when he said, Are
7    we all good, right?
8    A.   Yes.
9    Q.   All right.  And then after that, you had your meeting with
10   Mr. Hebert, and a discussion was had as to how a campaign
11   contribution could be structured with what you've described
12   through all of these different checks, correct?
13   A.   Yes.
14   Q.   And at some point after you gathered all the checks, so
15   that would be August 29th of 2018, that's when you meet Hebert
16   at the cigar bar, right?
17   A.   Mm-hmm.
18   Q.   I mean, you did not meet Jasiel at the cigar bar?
19   A.   I did not.
20   Q.   You had no next with Jasiel at all prior to that?
21   A.   No.
22   Q.   You had no telephone conversation with Jasiel prior to
23   that, right?
24   A.   Nope.
25   Q.   Your only involvement with him other than the parking lot

1   a year or two later was when you made your pitch at city hall,

2   right?

3   A.   Yes.

4   Q.   All of your dealings were with Mr. Hebert, your friend,

5   right?

6   A.   Mm-hmm.

7   Q.   That's the only person you dealt with?

8   A.   That's true.

9   Q.   And when Mr. Hebert then came up with the suggestion that

10  there would be a mortgage that would be forgiven, whose

11  property was that?

12  A.   My brother's.

13  Q.   Your brother owned it, right?

14  A.   Yes.

15  Q.   He had a mortgage on it?

16  A.   My brother had sold it to Dave, Dave owned it.

17  Q.   That's what I'm getting at.  So, in other words, Hebert

18  comes up with an idea that part of this, I guess, compensation

19  for the Letter of Non-Opposition would be that he, Hebert,

20  would have about $60,000 or $70,000 of the mortgage written

21  off, wasn't it?

22  A.   Yes.

23  Q.   And that was done, wasn't it?

24  A.   That was done.

25  Q.   But you already had received the Letter of Non-Opposition

1    as of August 21st, right?

2    A.    Yes.

3    Q.    Before any money changed hands or any mortgages were

4    written off by Hebert or anything was given to Hebert, you

5    already had the letters, right?

6    A.    Yes.

7    Q.    And you knew, sir, that the letters generally are prepared

8    by the city hall corporation counsel?

9    A.    Yes.

10   Q.    You may or may not, the letters are pretty boilerplate,

11   they come from the statute, did you know that?

12   A.    I didn't know that, no.

13   Q.    Okay.  Did you have an attorney while you were negotiating

14   this business?

15   A.    Yes, we did.

16   Q.    And who was that?

17   A.    Jeffrey Padwa.

18   Q.    And did you know, sir, the city hall, what they generally

19   do is they will send out or give the draft Letters of

20   Non-Opposition and draft agreement to the attorney representing

21   the person or the business itself, they're drafts, they're not

22   signed?

23   A.    Right.

24   Q.    And in fact, when Mr. Hebert met with you, basically he

25   gave you a signed copy or an unsigned copy?

```
 1    A.    Signed copies.
 2    Q.    Had you ever received the draft agreement?
 3    A.    Yes, we received draft agreement.
 4    Q.    You received it prior to that?
 5    A.    Yes.
 6    Q.    So how long prior to that date that you had the signed
 7    Letter of Non-Opposition that you received the draft agreements
 8    from your attorney?
 9    A.    I think it was about a week prior.
10    Q.    And you had a flurry of text messages with Mr. Hebert
11    regarding your brother forgiving the mortgage and finally said
12    you'd talk with him and he's going to go along with that, write
13    off that mortgage, correct?
14    A.    Yes.
15    Q.    That was a benefit of 60 or 70 thousand to Hebert, right?
16    A.    Yes.
17          MR. REDDINGTON:   That's all I have, Your Honor, thank
18    you.
19          MR. TOBIN:   Briefly, Your Honor.
20                         REDIRECT EXAMINATION
21    BY MR. TOBIN:
22    Q.    Did you ever pay the second half of the bribe, the second
23    12-5?
24    A.    I did not.
25    Q.    Why not?
```

```
 1    A.   Because Jasiel got arrested.

 2    Q.   Mr. Reddington asked you a series of questions about

 3    making the payment, giving the checks after you already knew

 4    you had the letter or were getting the letter.  Do you recall

 5    those questions?

 6    A.   I do, yes.

 7         MR. TOBIN:  If we could pull up one of those letters,

 8    Exhibit 180.

 9    Q.   Can you read the last sentence, please?

10    A.   "This letter is subject to withdrawal or revocation at any

11    time."

12    Q.   Sir, let me ask you again.  Dave Hebert, did he have any

13    official role in city hall that you know of?

14    A.   No.

15    Q.   Did he work in the legal department?

16    A.   No.

17    Q.   Did he work in the mayor's office?

18    A.   No.

19    Q.   Yet, it was Dave Hebert who had both of those city letters

20    with the mayor's signature that he gave to you.

21    A.   He did.

22    Q.   Not an official at city hall, no one in city hall, but he

23    had these and gave them to you.

24    A.   Correct.

25         MR. TOBIN:  Thank you.
```

1          MR. REDDINGTON:  If I may.

2                    RECROSS-EXAMINATION

3     BY MR. REDDINGTON:

4     Q.   One of the texts from Hebert indicated that the letters

5     were in, as it were, and it was picked up by a woman that

6     worked at city hall, right?

7     A.   That was when I dropped off the letters, the draft that

8     you --

9     Q.   The drafts.

10    A.   That I -- that I and my partners had signed for final

11    execution by whoever did that in city hall.  I dropped them off

12    myself to that woman at the sixth floor.

13    Q.   Could you --

14          MR. REDDINGTON:  With the Court's permission, I

15    neglected to do this.

16          Could you pull up Exhibit 176, please.  Those would be

17    the checks.

18    Q.   I'm not going to go through every one of them like

19    Mr. Tobin did, but would you agree, sir, that all of these

20    checks, if you look at the second portion or the bottom, that's

21    where the endorsement, I believe -- this is one of the checks

22    that was provided, correct?

23    A.   It is.

24          MR. REDDINGTON:  Can you go down to the endorsement,

25    in other words, the backside of the check.

1           Can you pull up check number 164 I believe is the next

2     check.  Or any one of these.

3     Q.   So, would you agree, sir, that Jasiel Correia did not

4     execute or sign these checks?  They were stamped for a direct

5     deposit or deposit to the Friends of Jasiel Correia account,

6     right?

7     A.   I would, yeah.

8           MR. REDDINGTON:  That's all I have, thank you.

9           THE COURT:  All right.  You may step down, thank you.

10          If you could take the cap off the microphone.

11          (Witness left the courtroom.)

12          MR. TOBIN:  Your Honor, if I may, I'll call our next

13    witness.

14          THE COURT:  Yes.

15          MR. TOBIN:  Charles Saliby, please.

16          CHARLES SALIBY, having been duly sworn by the Clerk,

17    was examined and testified as follows:

18          THE CLERK:  Please be seated and state your full name

19    and please spell your last name.

20          THE WITNESS:  My first name is Charles, my last name

21    is Saliby, S-a-l-i-b-y.

22          THE COURT:  Mr. Saliby, you can take your mask off at

23    this point, but also put a cover over the microphone, please.

24          THE WITNESS:  I'm sorry, Judge?

25          THE COURT:  There's a cover to your left that you can

```
 1    put over the microphone to kind of protect it from spray.  Keep

 2    the microphone between you and Mr. Tobin who is going to be

 3    asking you questions, okay?

 4              THE WITNESS:  Okay.

 5              MR. TOBIN:  May I inquire, Your Honor?

 6              THE COURT:  You may.

 7              MR. TOBIN:  Thank you.

 8                      DIRECT EXAMINATION

 9    BY MR. TOBIN:

10    Q.    Good afternoon, Mr. Saliby.

11    A.    Good afternoon.

12    Q.    Are you testifying today with an immunity agreement with

13    the United States?

14    A.    Yes.

15    Q.    Sir, there's a binder in front of you.  I would ask you to

16    open it up to tab 188.

17              Do you recognize the document at tab 188?

18    A.    Yes.

19    Q.    What is it?

20    A.    It's the immunity letter.

21              MR. TOBIN:  Your Honor, may Exhibit 188 be received

22    into evidence.

23              THE COURT:  Yes, it's received.

24              (Exhibit 188 received into evidence.)

25    BY MR. TOBIN:
```

```
 1    Q.   Sir, directing your attention to the first page of the
 2    immunity agreement, what date is on it?
 3    A.   August 8, 2019.
 4    Q.   Carmine Lepore, Esq., from Lepore & Hochman.  Do you know
 5    who Carmine Lepore is?
 6    A.   That's my attorney.
 7    Q.   Your attorney negotiated this letter or agreement with the
 8    United States Attorney's Office; is that accurate?
 9    A.   Yes.
10         MR. TOBIN:  If we could please go to the second page
11    of this agreement.
12    Q.   Are there signatures on this page?
13    A.   Yes.
14    Q.   And the top signature, the first signature that appears
15    belongs to whom?
16    A.   Zachary Hafer.
17    Q.   He's the chief of the criminal division of the U.S.
18    Attorney's Office; is that accurate?
19    A.   Yes.
20    Q.   And there are two other signatures on the page.  Who do
21    those signatures belong to?
22    A.   The first one is mine, and the second one is my attorney,
23    Carmine Lepore.
24    Q.   Are there dates next your signature and your attorney's
25    signature?
```

1    A.    August 8, 2019.

2    Q.    If we could go back to the first page of the agreement.

3          Sir, would you agree that agreement spells out or

4    specifies your requirements, what you had to do, and in turn,

5    what the United States would do in kind?

6    A.    Yes.

7    Q.    I'm going to read a bit from the second paragraph which

8    has a "1" in front of it, and I'll ask you some questions

9    thereafter, okay?

10   A.    Yes.

11   Q.    "Your client agrees to provide complete and truthful

12   testimony pursuant to any subpoena compelling his testimony in

13   this matter.  Your client also agrees to meet with

14   representatives of the United States Attorney to answer

15   questions and/or to prepare for such testimony.  During such

16   meetings, your client agrees to provide complete and truthful

17   responses to all questions."

18         Sir, in your words, what is your obligation under this

19   agreement?

20   A.    To tell the truth.

21   Q.    If we can go to the paragraph below 1, the one with a "2"

22   next to it.

23         Do you understand that this is what the United States

24   will do if you live up to your end of the bargain?

25   A.    Yes.

1   Q.   Again, I'm going to read a portion of it, and I would ask
2   you to read along by yourself.
3          "In return for your client's full and truthful
4   testimony and statements, as well as your client's complete
5   production of responsive documents, objects, or other evidence,
6   as set forth above, the United States Attorney agrees not to
7   use any statements made, or other information provided, by your
8   client pursuant to this agreement, or any information directly
9   or indirectly derived therefrom, against your client in any
10  criminal case except in a prosecution" -- and it goes on to
11  talk about perjury and crimes of violence; is that true?
12  A.   Yes.
13  Q.   So, sir, let me ask you, in your own words, what is it
14  that the United States has done or promised you if you testify
15  truthfully?
16  A.   Not to charge me for paying a bribe.
17  Q.   Sir, how old are you?
18  A.   Thirty-nine years old.
19  Q.   Where were you born?
20  A.   Beirut, Lebanon.
21  Q.   How old were you when you immigrated to the United States?
22  A.   Four years old.
23  Q.   Who immigrated to the United States with you?
24  A.   My family, my father and my mother.
25  Q.   Was another child added to the family upon your arrival or

1    sometime after your arrival?

2    A.    My sister was born in the United States.

3    Q.    And what is your sister's name?

4    A.    Nicole Custadio.

5    Q.    Sir, where were you raised?

6    A.    Fall River.

7    Q.    Where did you go to high school?

8    A.    Durfee High School.

9    Q.    Where did you go to college?

10   A.    UMass Dartmouth.

11   Q.    What did you study?

12   A.    Operations management.

13   Q.    What year did you graduate from college?

14   A.    2003.

15   Q.    Sir, where did you go to work after graduating from

16   college?

17   A.    My family business.

18   Q.    What kind of business does your family operate?

19   A.    It's a general store.

20   Q.    Does it also have a liquor license?

21   A.    It does.

22   Q.    Where is the store?

23   A.    It's in Fall River in the South End.

24   Q.    What is the name of your family store?

25   A.    Guimond Farms Convenience Store.

1  Q.   Other than yourself, do other family members work at the

2  store?

3  A.   Yes.

4  Q.   Who?

5  A.   My mother, my father and my sister and some employees.

6  Q.   But your entire -- your mom, your dad, your sister, you,

7  and then some nonfamily members; is that accurate?

8  A.   Yes.

9  Q.   Is the store your primary source of income?

10 A.   Yes.

11 Q.   Is the store your parents' source of income?

12 A.   Yes.

13 Q.   Is the store your sister's primary source of income?

14 A.   Yes.

15 Q.   Sir, in that binder in front of you, I would ask you to

16 turn to Exhibit 189 and tell me if you recognize what's

17 depicted in that photograph.

18 A.   That's our store.

19      MR. TOBIN:  Your Honor, may this be introduced into

20 evidence.

21      THE COURT:  Yes, it's received.

22      (Exhibit 189 received into evidence.)

23 BY MR. TOBIN:

24 Q.   And it may be self-explanatory, sir, but can you explain

25 specifically which building in this photograph is your store?

1    A.    It's the one with the orange roof.

2    Q.    And there's a sign seemingly above the door or near the

3    door?

4    A.    It's the larger sign, yes.

5    Q.    Next to the store, still with an orange roof, there appear

6    to be some blackened windows.  Do you see that?

7    A.    Yes.

8    Q.    Did your family also own that portion of the building?

9    A.    Yes.

10   Q.    At some point, did you have an operating business there?

11   A.    Yes, I did.

12   Q.    And what was that?

13   A.    It was a laundromat.

14   Q.    Thank you.  I'm going to ask you to flip to the next

15   exhibit, 190.

16         Do you recognize that?

17   A.    Yes.

18   Q.    Is that your store as well?

19   A.    Yes, it is.

20         MR. TOBIN:  Your Honor, may 190 come into evidence,

21   please.

22         THE COURT:  It's received.

23         (Exhibit 190 received into evidence.)

24   BY MR. TOBIN:

25   Q.    Again, what is this?

1    A.    This is our family business, that's the building.

2    Q.    It's a street view of it, if you will?

3    A.    Yes.

4    Q.    Can you flip to 191, please.

5          What is that?

6    A.    Yes.

7    Q.    That what?

8    A.    That's a side view of our building.

9    Q.    From the parking lot essentially?

10   A.    Yes.

11         MR. TOBIN:  Your Honor, may 191 come into evidence.

12         THE COURT:  Yes, it's received.

13         (Exhibit 191 received into evidence.)

14   BY MR. TOBIN:

15   Q.   Sir, perhaps one last photo at this time, could you look

16   at 192, please.

17         And what does 192 depict?

18   A.   That's a photo from inside the store of the front where

19   the registers are located.

20         MR. TOBIN:  Your Honor, may 192 be admitted into

21   evidence?

22         THE COURT:  That also will be received.

23         (Exhibit 192 received into evidence.)

24   BY MR. TOBIN:

25   Q.   Sir, that's the interior of the store as you've indicated?

1    A.    Yes.

2    Q.    Paper towels in the foreground, liquor in the background,

3    and various and sundry matters throughout?

4    A.    Yes.

5    Q.    Sir, at some point, did you become interested in opening a

6    retail marijuana store in Fall River?

7    A.    Yes.

8    Q.    When was that?

9    A.    Late 2017, beginning of 2018.

10   Q.    Where specifically did you want to open your marijuana

11   business?

12   A.    Where the laundromat was.

13   Q.    If we may, can we please go back to photograph 190.

14         And the laundromat business and where you wanted to

15   put your marijuana store, again, just specifically tell us

16   where in this photograph that's depicted.

17   A.    On the right side where the windows are tinted.

18   Q.    Thank you.

19         What name did you choose for your legal marijuana

20   business?

21   A.    Greener Leaf Incorporated.

22   Q.    Sir, who is Brian Bairos?

23   A.    Brian Bairos is a friend.

24   Q.    And did you discuss your plan to open a legal marijuana

25   business with Brian Bairos?

1    A.    I have, yes.

2    Q.    Was Brian Bairos pursuing a similar interest?

3    A.    Brian Bairos wanted to open up a seed-to-sale

4    establishment where they did manufacturing, cultivation, and

5    retail.

6    Q.    What did you want to open up?

7    A.    Just a retail operation.

8    Q.    So you would not grow your own marijuana?

9    A.    That's correct.

10   Q.    Where did you intend to obtain the marijuana you would

11   sell in the retail shop you hoped to open?

12   A.    I intended to be a customer of Brian's and to purchase

13   from other marijuana establishments.

14   Q.    Mr. Saliby, what steps did you take to get your plan to

15   open a legal marijuana business off the ground specifically

16   with regard -- I'm sure there were many steps, but specifically

17   with regard to the City of Fall River?

18   A.    I reached out to the city on several occasions from

19   February 2018 through end of May, beginning of June 2018.

20   Q.    And when you say you "reached out to the city," how

21   specifically did you do that?

22   A.    I called the city hall.

23   Q.    Did you call the mayor's office?

24   A.    Yes, I did.

25   Q.    At some point, were you able to talk to somebody in the

1    mayor's office by the telephone?

2    A.    Yes, I was.

3    Q.    By the way, who was the mayor of Fall River at the time?

4    A.    It was Jasiel Correia.

5    Q.    And with whom did you speak finally in his office?

6    A.    His chief of staff, Gen Andrade.

7    Q.    Now, why did you want to communicate with the mayor's

8    office?  Why did you want to communicate with city hall?  Was

9    there something you needed from the mayor or from city hall in

10   order to open your business?

11   A.    Yes.

12   Q.    What did you need?

13   A.    I needed a Letter of Non-Opposition and I had to enter

14   into a Host Community Agreement.

15   Q.    As you understood it, sir, who was the sole authority in

16   the City of Fall River who could give you those documents?

17   A.    The mayor.

18   Q.    Is that why you contacted the mayor's office?

19   A.    Yes.

20   Q.    You indicated, I believe, that you spoke with a Gen

21   Andrade.  Did you know what position she occupied in the

22   administration or at city hall?

23   A.    She -- she made it clear that she was the chief of staff

24   when she called me.

25   Q.    And what did she tell you about getting the documents you

1    needed?

2    A.    She said she doesn't believe that the mayor will issue any

3    more, that they hit their max.

4    Q.    Nonetheless, was Gen Andrade able to schedule an

5    appointment to speak with Jasiel Correia?

6    A.    Yes.

7    Q.    Approximately when that was meeting?

8    A.    It was toward the end of June on or around June 21st.

9    Q.    And a year?

10   A.    2018.

11   Q.    Where was the meeting?

12   A.    At the mayor's office?

13   Q.    Who was present at the meeting?

14   A.    It was the mayor, Gen, and myself.

15   Q.    Sir, what happened during that meeting at the mayor's

16   office with the mayor and Gen Andrade?

17   A.    I started off by explaining how we had been in business in

18   Fall River for over 20 years, how we have a great reputation,

19   and we run a successful business.  And then I -- I asked -- he

20   asked me:  What would you like from me?  And I asked him -- I

21   said, I would like to get into the marijuana business in the

22   city.

23   Q.    Did he mention -- when I say "he," of course, the mayor,

24   Jasiel Correia, did he mention anything about existing licenses

25   or existing letters that were outstanding?

1    A.    He said that he has none to issue, but he might rescind

2    one of the licenses because of inactivity of it, because they

3    weren't moving forward, could be a possibility of that.

4    Q.    A possibility that you could get it?

5    A.    Yes.

6    Q.    Did that -- how did that make you feel?

7    A.    Very good.

8    Q.    Did the meeting essentially end at that point or shortly

9    thereafter?

10   A.    Yes.

11   Q.    At that point, was there any commitment from the mayor,

12   city hall or Gen Andrade that you would get the Letter of

13   Non-Opposition and the Host Community Agreement?

14   A.    No.

15   Q.    But there was at least a glimmer of hope; is that

16   accurate?

17   A.    Yes.

18   Q.    Let me ask you, sir, after you left the meeting with the

19   mayor, did you shortly thereafter speak to your friend, Brian

20   Bairos?

21   A.    Yes.

22   Q.    During the conversation, what, if anything, did Brian

23   Bairos tell you about his involvement with the mayor?

24          MR. REDDINGTON:  Objection.

25   A.    That the mayor --

```
1              THE COURT:  Just a moment.

2              MR. REDDINGTON:  Objection.

3              THE COURT:  I think I understand the objection.  It's

4     related to the previous objections that we've had here, if I

5     don't have that wrong, and so I overrule it.

6              MR. REDDINGTON:  That's correct, Your Honor.

7              THE COURT:  Okay.

8              You may answer the question.

9              MR. TOBIN:  If I may just rephrase it to refresh his

10    memory.

11    BY MR. TOBIN:

12    Q.   What did Brian Bairos tell you about his dealings with the

13    mayor?

14    A.   He said that he would be getting the letter but the mayor

15    wanted $250,000 from him.

16    Q.   And did you understand that -- what did you understand

17    this $250,000 to be?

18    A.   A bribe.

19    Q.   Sir, at some point, did you hear from Mayor Jasiel

20    Correia?  I'm focusing you after the meeting you had with him

21    in city hall, after you talked to Brian Bairos, did you hear

22    from the mayor?

23    A.   I did.

24    Q.   When was that?

25    A.   I believe it was a few days after.
```

1    Q.   Explain how you learned that the mayor was looking for

2    you.

3    A.   I was at a doctor's appointment at Gillette with my

4    father, I think the Brigham & Women Hospital, and we were

5    leaving, and my sister called me and said that somebody from

6    the mayor's office is here to see you.

7    Q.   Did that excite you at some point?

8    A.   Very much.

9    Q.   What did you tell your sister?

10   A.   I said, We're leaving the appointment now, I'm going to

11   drop off dad, then I'll head right over to the store.

12   Q.   Did you, in fact, do that?

13   A.   Yes.

14   Q.   What happened when you got to the store, your store, sir?

15   A.   I walked in and I said to Nikki, I said, When they come

16   in, I'll be in the office, please go and get me.

17   Q.   Did you, in fact, go to your office?

18   A.   Yes, I did.

19   Q.   And at some point, did your sister come and get you?

20   A.   Yes.

21   Q.   And did you go out to the front of the store that was --

22   when I say "the front," the interior of the store near the

23   entrance?

24   A.   Yes.

25   Q.   Who did you see?

1    A.    I saw Gen Andrade and Jasiel Correia.

2    Q.    What did you do at that point when you saw the mayor and

3    his chief of staff at your store?

4    A.    I invited him into my office.

5    Q.    Where is your office within the building?

6    A.    It's on the second floor.

7    Q.    Sir, I'll ask you again -- not again, perhaps, but if you

8    will look at tab 193.

9          Do you recognize what's depicted in 193?

10   A.    Yes.

11   Q.    What is that?

12   A.    That's the entrance into our backroom.

13   Q.    And did you have to bring Mayor Jasiel Correia and Gen

14   Andrade through that way?

15   A.    Yes.

16         MR. TOBIN:  Judge, may 193 come into evidence, please?

17         THE COURT:  Yes, it's received been.

18         (Exhibit 193 received into evidence.)

19   BY MR. TOBIN:

20   Q.    This is sort of the non-public section of the market; is

21   that true?

22   A.    Yes.

23   Q.    And now if you could look at 194, please.

24         What's depicted in 194?

25   A.    That's the hallway to my office; it's on the first floor.

1   Q.   Again, this is out of the public area of the store; is

2   that true?

3   A.   Yes.

4   Q.   And you have gone down this hallway, at least a portion of

5   it, with the mayor and Gen Andrade?

6   A.   Yes.

7           MR. TOBIN:  Your Honor, may 194 come into evidence,

8   please.

9           THE COURT:  Yes, it's received as well.

10          (Exhibit 194 received into evidence.)

11  BY MR. TOBIN:

12  Q.   Sir, still on 194, but if you could turn the page to the

13  next photo -- in fact, there are -- there are four additional

14  photos.  Instead of moving them all in at different times,

15  could you look at the next series of photos in this exhibit and

16  just tell me if you recognize generally what they are.

17  A.   Yes, it's the door on the first floor going into my

18  office.

19  Q.   And other photographs of the private part of your store,

20  including your office; is that true?

21  A.   Yes.

22          MR. TOBIN:  Your Honor, may the other exhibits --

23  strike is that -- the other photos in 194 come into evidence,

24  please.

25          THE COURT:  They are in evidence now.

1    BY MR. TOBIN:

2    Q.    What is this photograph?

3    A.    That's the door on the first floor leading to my office.

4    Q.    And if we go to the next photograph?

5    A.    That's the stairs going up into my office.

6    Q.    Your office is on the second floor?

7    A.    Yes.

8    Q.    And the next photograph?

9    A.    That's my office.

10   Q.    And of this group, the last photograph, what is that?

11   A.    That's a different angle of my office.

12   Q.    Is that your desk?

13   A.    That's my desk, yes.

14   Q.    So, is this the office where you escorted the mayor and

15   his chief of staff, Gen Andrade?

16   A.    Yes.

17   Q.    When you all got there and settled, what did Mayor Jasiel

18   Correia and Gen Andrade tell you?

19   A.    They said that we have good news for you and we're going

20   to issue a Letter of Non-Opposition and enter into a Host

21   Community Agreement.

22   Q.    How did you feel when you heard that?

23   A.    Very excited, very happy.

24   Q.    What did you say to the mayor when you heard that?

25   A.    I said, Thank you very much.  If there's anything I can

1    do, just please let me know.

2    Q.    And what did Mayor Jasiel Correia say in response?

3    A.    "I'm looking for $250,000."

4    Q.    What did you understand that to mean?

5    A.    I was nervous; I was uncomfortable.  I knew at that point

6    that it was a bribe.

7    Q.    Did you believe the $250,000 was for some sort of official

8    cost that would go into the coffers of the city?

9    A.    No.

10   Q.    You saw it as a bribe?

11   A.    Yes.

12   Q.    Is that your testimony?

13          And who did you understand that the $250,000 would be

14   going to?

15   A.    Jasiel Correia, the mayor.

16   Q.    At that point, what did Gen Andrade do, sir?

17   A.    She asked to use the restroom.

18   Q.    What did you do?

19   A.    I walked her down the stairs and showed her where the

20   restroom was.

21   Q.    While you were doing that, where was Jasiel Correia?

22   A.    Still in my office.

23   Q.    After you showed Gen Andrade the bathroom door -- that was

24   on the first door?

25   A.    Yes.

1    Q.    -- did you return to your office on the second?

2    A.    Yes.

3    Q.    Did Gen Andrade return with you?

4    A.    No.

5    Q.    So it's just you and Jasiel Correia in your office?

6    A.    Yes.

7    Q.    What do you say to him now that it's just the two of you

8    alone?

9    A.    I asked him why $250,000?

10   Q.    What was his response?

11   A.    He said that he was only going to issue six of them in the

12   city, and he said that it would give me an opportunity to make

13   money and the value of it would be worth a lot more.

14   Q.    Did he indicate what he wanted the $250,000?

15   A.    Legal defense fund.  Legal fees.

16   Q.    And he indicated how many was he giving out?

17   A.    Six.

18   Q.    I'm sorry, what did he say -- how did that benefit you

19   that that were only six?  What did he say?

20   A.    He said it would increase in value, it would be worth a

21   lot of money.

22   Q.    What did you say in response to Mayor Jasiel Correia?

23   A.    I said to him, I said, That's too much.  I said, I'm

24   applying just for a retail -- retail business only.  I said,

25   Everybody else has the seed-to-sale, which they have the

1  cultivation, the manufacturing, and the retail.  I said,

2  They'll be able to sell their own products where I'm already at

3  disadvantage because I have to purchase from them.

4  Q.   What did he say to you?

5  A.   He said, How much are you willing to pay?

6  Q.   Your response, please?

7  A.   I told him $75,000.

8  Q.   What did he then say to you at your 75?

9  A.   Could you do 150?

10  Q.   What did you say?

11  A.   I said, Can we do $100,000?

12  Q.   What did he say?

13  A.   He said, I can't go any lower than $125.

14  Q.   Sir, did you pay a $125,000 bribe to the mayor to get his

15  support for your marijuana business?

16  A.   Yes.

17  Q.   What happened next?

18  A.   Gen Andrade had came in, came into the -- came to the

19  office.

20        Before then, I'm sorry, I had discussed in regarding

21  the fees, I asked him what the 4 percent fee was, and he said

22  that that's a fee that the city collects.

23  Q.   Perhaps you could explain to us, what do you mean by a 4

24  percent fee that the city collects?

25  A.   4 percent from the gross sales, I believe, goes to the

```
 1    city for -- part of the sales goes to the city.  It's, I
 2    think --
 3    Q.   Did you understand that to be an above-board legal fee
 4    that you would have to pay?
 5    A.   Yes.
 6    Q.   -- as a marijuana business owner?
 7    A.   Yes.
 8    Q.   Sir, at that point, did you escort the mayor out of your
 9    office?
10    A.   Yes.
11    Q.   And where do you -- where do you start to bring him?
12    A.   Downstairs.
13    Q.   Who, if anyone, do you encounter?
14    A.   Gen Andrade.
15    Q.   What happens when you run into Gen Andrade -- you and the
16    mayor run into Gen Andrade, what does she say?
17    A.   She says, "Is everything okay?"
18    Q.   What did you say?
19    A.   I said, "Yes."
20    Q.   What did she then say?
21    A.   "You're family now."
22    Q.   "You're family now"?
23    A.   Yes.
24    Q.   Sir, what did you think would happen if you did not agree
25    to pay or if, in fact, you did not pay a $125,000 bribe?
```

1    A.    I feared the mayor would retaliate.

2    Q.    Retaliate in what manner?

3    A.    Against my family and my business.

4    Q.    Did you believe that -- strike that.

5          Did you believe that you had to pay the 125 to get the

6    license?

7    A.    Yes.

8    Q.    Were you concerned about additional retaliation other than

9    that?

10   A.    Yes.

11   Q.    What sort of retaliation did you fear from the mayor?

12   A.    When I renew my license --

13         MR. REDDINGTON:  Objection, objection, objection, Your

14   Honor.

15         THE COURT:  Overruled, I'll permit him to answer.

16   BY MR. TOBIN:

17   Q.    What potential retaliation were you concerned about if you

18   didn't pay?

19   A.    My licenses needed to be renewed.  There was -- again, I

20   had my family that were running the businesses so we needed the

21   city to move forward on permits and licenses.

22   Q.    Sir, when you say my licenses needed to be renewed, were

23   you referring to the store, Guimond Farms?

24   A.    Yes.

25   Q.    Sir, after you had agreed with the mayor on the 125, I

 1    think you indicated -- did you have an attorney at that point?

 2    A.    We ended up reaching out to the family attorney, Levin &

 3    Levin.

 4    Q.    And did that firm start negotiating the nitty-gritty of

 5    the legal deal with city hall?

 6    A.    Yes.

 7              THE COURT:  Mr. Tobin, at this point perhaps we can

 8    take our lunch break?

 9              MR. TOBIN:  Yes, Your Honor.

10              THE COURT:  So, ladies and gentlemen, we'll take our

11    lunch break.  We'll come back around 1:30 here and continue

12    with examination of Mr. Saliby.

13              THE CLERK:  All rise.

14              (Jury left the courtroom.)

15              THE COURT:  You may step down, Mr. Saliby.

16              THE WITNESS:  Thank you.

17              THE COURT:  So we'll resume a little bit before --

18    let's say 12:20 or so to take up the contested matters.

19              (Discussion off the record.)

20              THE COURT:  1:20.  Back to the future.

21              And we'll take up the contested matters.  That will be

22    a closed hearing until there's a determination about the

23    admissibility of that evidence.

24              MR. TOBIN:  Thank you, Judge.

25              (Court recessed at 12:46 p.m.)

```
 1              (Resumed, 1:27 p.m.)
 2    (SEALED COURTROOM)
 3              THE COURT:  So let's go back to the question of the
 4    admissibility of Ms. Andrade's statement and the smorgasbord of
 5    alternative justifications that the government has invited me
 6    to feast on.  And I want to know whether you're still pressing
 7    all of them here and then we'll go from there.
 8              MR. HAFER:  Could I possibly do this without my mask?
 9              THE COURT:  Sure, you can take it off.
10              MR. HAFER:  Thank you.  Yes, Your Honor.
11              Briefly, we're pressing all, and I have a fourth
12    ground as well.  If it's okay, I can go one at a time or I can
13    lay them all out --
14              THE COURT:  I think we will go one at a time and I
15    will do it by framing this issue in this way:  We're concerned
16    about the declarant.  The declarant is Ms. Andrade.  That's who
17    we're talking about.  We're not talking about the witness.
18    We're talking about the declarant.
19              Second, we're dealing in an environment in which the
20    law of confrontation has taken on a new vitality, and it's not
21    settled yet.  It is probably with respect to co-conspirator
22    hearsay, but one wants to be careful.
23              Third, I have an obligation to make preliminary
24    findings.  Those preliminary findings are not final
25    determinations, but they are meant to be rigorous evaluations
```

1    of the purpose of the rule and whether or not there is another

2    way of looking at what a particular witness is doing.  So I'll

3    look at it from that way.

4         Let's start where you started before the new addition

5    came and, of course, you'll tell me the new addition.  I'll

6    look forward to learning about it at this very late state.

7         So, with respect to something being in a -- against

8    the penal interest, I do believe that there is an evaluation

9    that must be made that's fairly careful.  And it goes something

10   like this, which is would an ordinary person understand that

11   they're exposing themselves to trial or a criminal violation by

12   making that statement.  I make that determination independent

13   of co-conspirator hearsay or any other contextual -- legal

14   contextual analysis, but just with respect to Ms. Andrade.

15        I think it's fair to say that people who have been

16   extorted don't know that they're giving bribes.  That's an

17   artifact of the Hobbs Act.  It is one of those circumstances in

18   which it is possible for there to be substantial abuse in the

19   charging decisions that are made with respect to the flip side

20   of extortion being bribery.  In any event, I have considerable

21   concern about that.

22        Now I turn to the question of federal program bribery,

23   which is the exact charge that might be asserted as against her

24   penal interest.  Of course it's been around a long time.  Of

25   course it's something that from time to time prosecutors dip

1    into their kit to pull out and assert.  Of course in the past

2    18 months it's made an appearance in the Varsity Blues cases

3    because the government has not convinced most of the judges of

4    the monetization of the bribes and, of course, the universities

5    feel very uncomfortable putting a dollar figure on what a place

6    is in the university.

7         So there's been considerable thought.  I've given some

8    thought myself to what does it mean to someone to be accused of

9    federal program bribery.  And in this particular case, what

10   does it mean to Ms. Andrade?  What would it mean under those

11   circumstances?  What should she be thinking at that point.

12   Because it is a specific intent crime, although the

13   jurisdictional cloak is not specific intent.

14        So someone like Ms. Andrade commiserating, as a theory

15   of this, commiserating with a fellow victim of shakedown, would

16   she -- could she properly be said to be acting and speaking

17   adversely to her penal interest here so clearly that I would

18   let it in.  That's the way I frame the issue.

19        So go ahead.

20        MR. HAFER:  Thank you, Your Honor, for the framing.

21   My short answer to that is yes.  As you know, and I think that

22   you can consider this in determining whether the statement is

23   admissible, Ms. Andrade, in fact, pled guilty before you to

24   that charge.

25        THE COURT:  She pled guilty after she was fully

1    counseled and she had a full discussion with an attorney about

2    what 666 bribery is, and she didn't do it until she was on the

3    cusp of trial.

4         MR. HAFER:  Understood.  Then I'm going to actually

5    shift to something.  At the time that -- if the statement is

6    allowed in, the evidence will be that the statement was made on

7    August 1 of 2018.  Your Honor has now heard evidence that

8    approximately July 2, 3, 4 of '18, Ms. Andrade said to

9    Mr. Saliby, "You're family now."  That in my opinion, Your

10   Honor, shows that this is someone who knew what was going on,

11   who was not confused.

12        THE COURT:  But that's a co-conspirator hearsay

13   analysis, not an analysis about her knowledge about the

14   inculpatory character of, what I have framed as an alternative

15   way of understanding it, commiseration between victims.

16        MR. HAFER:  I hear you, I do.  I just respectfully

17   disagree.  I think that her understanding, her very clear, I

18   think the evidence shows, understanding that what she was doing

19   was illegal is relevant to her understanding -- her analysis of

20   whether there's sufficient reliability in the statement to her

21   understanding that what she was doing, and the evidence will be

22   every week, every other week when the paycheck came in cutting

23   a check right back to Mr. Correia, I agree with you that 666,

24   federal programs bribery is not something on the tip of

25   anyone's tongue other than those of us who do what we do.  But

```
1    cutting a check every two weeks, not one day, not one month,
2    every two weeks --
3            THE COURT:  Let me ask you a question.  You don't
4    really have to answer it, I suppose, but I'll put it in a
5    provacative way.  Would anybody ever prosecute someone for
6    having to pay back money to have a job in an office?
7            MR. HAFER:  We tried not to prosecute Ms. Andrade.
8    She got statutory immunity.
9            THE COURT:  I understand that.
10           So what we're talking about here is the artifacts, or
11   let's say the elaborate gavotte that is criminal prosecution in
12   which there's a thrust and a parry and there's efforts to take
13   advantage and -- take advantage because we're dealing with
14   balancing advantage.  That's what criminal trials are all
15   about, I think.  And the balancing advantage is we can frame a
16   charge against you, Ms. Andrade, directly on program bribery.
17   And you can.  I don't disagree with that.  And she pled guilty,
18   and I understand that she understands that now.
19           The question is whether or not she understood it at
20   the time that she was a declarant that this was a statement
21   against her penal interest.  And I go back to this idea that
22   I'm not thinking of it in terms of other aspects.  Being a
23   member of -- being family is, it seems to me, not necessarily
24   saying I'm a willing briber or enabler of an extortionist.  I
25   shouldn't say "enabler of an extortionist."  I think it
```

1    probably is an enabler of an extortionist, that we do things

2    for our family that we wouldn't do for other people, but I

3    don't understand that to be a statement of penal interest on

4    behalf of the declarant so clearly that I would not exercise my

5    authority if not convinced to exclude it on that ground.

6          MR. HAFER:  Let me answer that by just -- can I give a

7    little more context to the circumstances --

8          THE COURT:  Sure, yeah.

9          MR. HAFER:  -- in at which the statement was made.

10          I mentioned that it was made on or about August 1,

11    2018, about a month after the incident with Mr. Saliby.  The

12    context of the statement is that Mr. Harkins, who is not a

13    charged -- as you know, is not a charged extortion here --

14    Mr. Harkins contributed $20,000 to Mr. Correia's legal defense

15    fund.  Mr. Harkins was told by Mr. Correia, the evidence would

16    be, that he was only going to issue five or six of these

17    letters.  Mr. Harkins found out that Mr. Saliby had gotten a

18    letter.  He was angry.  He reached out to Mayor Correia.  I

19    think the evidence would be, if Mr. Harkins testifies, he

20    texted him "WTF, what the fuck, you said five or six, this guy

21    is right down the street for me.  Why is he getting a letter?"

22    Mr. Correia tells Harkins, "That was Gen.  That's Gen's friend.

23    I didn't do that one."  So Mr. Harkins says to Gen, "Can we

24    meet?  I want to talk to you about this."  He says to her,

25    "Hey, this is wrong.  This guy Saliby is right down the street

1    from me.  This isn't the deal.  This wasn't the deal."  And in

2    that context she says, "Oh, you think that's bad, what Jasiel

3    did to you.  There's a lot of sleazy stuff going on.  He makes

4    me give him half my salary."

5         So now I am going to bleed a tiny bit into the

6    co-conspirator analysis.

7         THE COURT:  Don't --

8         MR. HAFER:  Okay.

9         THE COURT:  -- because it seems to me that I, for

10   analytical purposes, I want to deal with each one as it goes

11   along.  So now we're at this point in which she acknowledges

12   that what Mr. Correia was doing was wrong both to Mr. Harkins

13   and to her.

14        MR. HAFER:  Yes, Your Honor.

15        THE COURT:  But the question is whether or not she

16   has, as a result of that, a penal exposure and understands so

17   clearly that she has a penal exposure herself.  That's the key

18   issue for me, and I'm not sure that there's more here.

19        MR. HAFER:  I don't know what --

20        THE COURT:  I understand.  So I think I want to do

21   these step by step back and forth.  Well, maybe not.  Why don't

22   we do each one of the ones that you're going to press.

23        MR. HAFER:  I just want to make one final point on

24   that, although, again, I know this isn't perfect because some

25   of it bleeds together, and I understand your point about the

1    timing.  The issue is what did she understand at the time the

2    statement was made, not what did she understand a year and a

3    half later with Charlie Rankin's sage counsel.  But I do think,

4    just in terms of you're your Honor's overall assessment of the

5    indicia of reliability of this statement, the fact that at her

6    December 14 Rule 11 in describing the charges, I put the

7    admission in my statement of facts and under oath she didn't --

8    she acknowledged it.  And I do think that is something that

9    informs your overall -- I don't know whether it just goes to

10   statement --

11        THE COURT:  But then it gets to this question of

12   confrontation, which suffuses the discussion about the hearsay

13   exceptions or the definitions of hearsay, however you frame

14   these issues.

15        Yes, that's true.  Is there any opportunity to

16   cross-examine her?  No, there's not.  And that is at the core

17   of what I will call the Crawford revolution.  Is it so clear

18   that statements against penal interest are to be thrown out

19   immediately?  No.  Not received on that basis?  I don't think

20   so.  But it does require that they be received with care and

21   examined with great caution, and that's the point that I'm

22   trying to make with respect to, yeah, she says it.  Where is

23   she?  She's not here.  She's unavailable.  And so there is, and

24   was before *Crawford*, this recognition of what was a common law

25   exception to the hearsay rule, but now we look at it more

```
 1    carefully and more rigorously.
 2              MR. HAFER:  I concede that, I agree.  I agree
 3    Crawford --
 4              THE COURT:  So let's go to the next one.
 5              MR. HAFER:  Okay.  801(d)(2)(D), Your Honor.  I did
 6    find a case -- you asked me about the in-furtherance.
 7              THE COURT:  Right.
 8              MR. HAFER:  I found a First Circuit case from 2001,
 9    Larch v. Mansfield Municipal Electric in which that exception
10    was reviewed by the First Circuit.  If you'll indulge me a
11    minute just to explain --
12              THE COURT:  Go ahead.  Arising in the context of a
13    civil case?
14              MR. HAFER:  It is a civil case, yes, Your Honor.
15              THE COURT:  Without the overlay of Crawford?
16              MR. HAFER:  Right.  But you had asked me specifically
17    about the in-furtherance.
18              THE COURT:  I understand.  But you will understand
19    that it's not altogether dispositive of the larger issues that
20    I'm raising.
21              MR. HAFER:  I understand that.  I just think it
22    informs the analysis, but I understand the point on Crawford.
23              This concerned a statement that a deceased
24    commissioner said, quote, "We are the town fathers and people
25    should do what we tell them to do."  Quote, "I will kick
```

1    Larch's ass out of town and make life miserable for the

2    department."  That statement was admitted under the (d)(2)(d)

3    exception.  On appeal, the argument was that threatening the

4    manager in that respect was not within the scope of the

5    employment in the sense that the statements were not authorized

6    by the larger department and not made for the purpose of

7    furthering the interests of the department.

8            The First Circuit started by saying to qualify as

9    non-hearsay and then just repeated the rule, which I know you

10   don't need me to read to you, but they said simply, "The

11   statement itself is not required to be within the scope of the

12   declarant's agency.  Rather, it need only be shown that the

13   statement be related to a matter within the scope of the

14   agency."  And then said, "While Mahana's job description did

15   not include making life miserable for the electric department,

16   the statements were related to a matter within the scope of his

17   employment," which was oversight of the department.

18           And so what I would say here is the statement about

19   her salary clearly is within the scope, and I think this case,

20   which was the best I could do quickly --

21           THE COURT:  Well, quickly is kind of a misnomer.  We

22   had a filing for purposes of motions in limine.

23           MR. HAFER:  There was no motion in limine on this

24   statement.

25           THE COURT:  No.  You were making the motion in limine.

1    You made a filing and said, "Here is what we're going to do.
2    We want to have this admitted" and --
3              MR. HAFER:  Well, my motion precisely was to exclude
4    Ms. Sousa.
5              THE COURT:  But, you know, it's not as if this is a
6    big surprise for anybody.
7              MR. HAFER:  No, I agree.
8              THE COURT:  You anticipated the issue.  You breached
9    it.  I took time to give Mr. Reddington an opportunity to
10   respond in writing.  I don't believe I have that writing now.
11   But in any event, it's been around for a while.  There's
12   nothing new --
13             MR. HAFER:  I agree.
14             THE COURT:  -- or surprising here.
15             MR. HAFER:  I agree with that, and we've been thinking
16   about -- obviously it's in the indictment, which is two years
17   old now -- we've been thinking about it and thought we had the
18   good faith basis.  But my point is I think this case stands
19   for -- and I do, I continue to take your point on *Crawford* in
20   the criminal context, but I think this stands for -- this
21   exception does not require in-furtherance and here --
22             THE COURT:  So what is the declarant doing under these
23   circumstances?  The declarant is engaged in -- as an
24   alternative way of thinking about it -- the declarant is
25   engaged in the commiseration of victims from activity of the

1      defendant.  And so here what your contention is is that the

2      defendant does have responsibility for manipulating salary

3      kinds of concerns, and consequently all she's reporting -- not

4      all, but what she's reporting here responsive to the rule is

5      that she also is the victim of his exercise of agency.  That's,

6      I think, the best case you make on that.  Isn't it?

7              MR. HAFER:  It is.

8              THE COURT:  In light of that.  Okay.  Anything else?

9              MR. HAFER:  Not on that one, Your Honor.

10             THE COURT:  Okay.  Let's go to the next one.

11             MR. HAFER:  You had asked me about the in-furtherance.

12             THE COURT:  Right.

13             MR. HAFER:  I did not give an articulate explanation

14     of how the statement was --

15             THE COURT:  That was pre-articulate.  Now it's

16     articulate.

17             MR. HAFER:  And this may still be deemed inarticulate,

18     but I'm going to do my best.

19             The reason I was giving some context on the

20     circumstances on which the statement was made, the background

21     in terms of the Saliby -- Harkins being upset about Saliby

22     getting a letter.  Ms. Andrade knowing, certainly on a

23     preponderance standard at this point, that the Saliby extortion

24     had occurred, being a co-conspirator in that extortion, trying

25     to fend off Mr. Harkins who is asking questions and getting

1   angry about Saliby getting a letter, the argument would be that
2   it's in furtherance of the underlying extortion in the extent
3   that they're trying to keep it from being exposed, keep Harkins
4   from kicking up more dust about anything related to Charlie
5   Saliby by saying, "Hey, look, you think that's bad.  I have
6   this.  Relax on Saliby."  So that's my argument on
7   in-furtherance.
8           THE COURT:  Okay.  What else?
9           MR. HAFER:  The final one, which is not my preference,
10  but as I thought about this more and thought about some of the
11  rulings you've made to date that we wouldn't offer the
12  statement for the truth of the matter that Mr. Correia was, in
13  fact -- that was, in fact, the arrangement, but would be
14  offered solely for Ms. Andrade's state of mind and that, as
15  Your Honor has recognized in bribery extortion cases, the state
16  of mind of the alleged victim is relevant.  I don't dispute the
17  *Crawford* point.
18          THE COURT:  Okay.  So that one is out.
19          MR. HAFER:  Okay.
20          THE COURT:  It was right for you to come to that at
21  the last possible minute because it's the least likely to be
22  successful, and so I'm not going to take it.
23          MR. HAFER:  Okay.
24          THE COURT:  I mean, not that I'm not going to take it.
25  It simply doesn't provide an adequate basis as far as I'm

```
1    concerned --

2              MR. HAFER:  Those are my arguments.

3              THE COURT:  -- for the introduction, particularly in

4    the absence of the availability of the declarant on such a

5    fundamental issue.

6              So Mr. Reddington, do you want to speak to these

7    several alternatives?

8              MR. REDDINGTON:  Yes, Your Honor.  Thank you.

9              First of all, I think Your Honor focused on that

10   obviously like a laser.  I mean, the Crawford case just really

11   trumps any 801 arguments.  That's the elephant in the room.

12             THE COURT:  It doesn't really trump.  We don't have a

13   case on point with respect to Crawford on these issues.  I

14   raise it as not an elephant in the room but a looming presence

15   in the clouds and I have to be concerned about the weather.

16             MR. REDDINGTON:  Absolutely.  I take that position,

17   Judge, that obviously she is the declarant.  Obviously she is

18   not available.

19             THE COURT:  Well, let's go to the one that I think has

20   the most legs, which is the co-conspirator hearsay thing.  What

21   Mr. Hafer is telling me is this is a lulling kind of

22   conversation.  It's to keep this guy from raising so much

23   trouble that he's going to call attention to the ongoing

24   conspiracy that they have.  And so she, you know, attempts to

25   kind of wrap her arms around him and say, it's okay, this is
```

1    the way things are done, that even I, someone as close as I am

2    to the mayor, have to cough up money for him.

3            Now, it seems to me that that's classic in furtherance

4    of the conspiracy.  If the conspiracy were over, if they were

5    sitting two years later at this cigar bar and talking about

6    past occasions, that would be different, but that's not this.

7    This is right at the core of the activities that are the

8    subject of my concern, or my concern for evidentiary purposes.

9    And, of course, I keep saying, and the parties recognize it, I

10   am not making a final determination about it.  On the other

11   hand, I wouldn't let something in that I didn't think was going

12   to stay in.  That's where I think I am on that one.  So if you

13   want to speak directly to that, go ahead.

14           MR. REDDINGTON:  I would suggest to the court that, as

15   Your Honor is aware, Mr. Harkins is not a victim as seriously

16   as far as being a victim, but nevertheless as, I think the term

17   was "commiserating," she's in a sense commiserating or

18   indicating to him, yeah, well, I'm a victim too because,

19   actually, check this out, can you f-ing believe this?  I have

20   to give half of my salary back.  I don't see how that is in

21   furtherance of a conspiracy, especially where there's no,

22   again, dovetailing into *Crawford*, opportunity to cross-examine

23   this person.

24           THE COURT:  Well, but see, with co-conspirator

25   hearsay, we're pretty clear on *Crawford*.  *Crawford* is a bridge

1   already passed.

2          MR. REDDINGTON:  I'm sorry.

3          THE COURT:  No, go on.

4          MR. REDDINGTON:  I just don't see how that statement

5   is a statement in furtherance of a conspiracy or how it could

6   be tortured to try to extract from it that she's hoping by that

7   statement that Harkins is not going to kick up dust about

8   Saliby's license.  It's more she's making the statement that

9   I'm a victim too.  I don't see that it's in furtherance of a

10  conspiracy, and I certainly don't see that it's with an effort

11  to try to dissuade, as it were, Mr. Harkins from complaining

12  about Saliby's license.

13         THE COURT:  Well, I understand the argument.  I am

14  going to let it in on that basis.  I'm less secure, and if I

15  were to have to rule on the two still viable alternatives or at

16  least the ones that I haven't cut off, it would be a harder

17  question I think.  The questions thought of seriously about is

18  it a statement against penal interest.  It's an argument.

19  Where would I end up ultimately?  I'd probably let it in.

20         But the principal reason that I'm doing it as

21  co-conspirator hearsay.  Similarly for agency.  She is in a

22  position to talk about what it is that her supervisor does in

23  connection with his office and to report with respect to that

24  in a fashion that gets her within one of the so-called

25  exceptions to the hearsay rule even in the absence of -- or

1   so-called exceptions to the hearsay rule.  I'd probably let it

2   in on that ground, too.

3        So that it's clear, the basis on which I'm letting it

4   in is co-conspirator hearsay, and I will take up at a later

5   point the final findings and conclusions with respect to

6   co-conspirator hearsay, but I think the government should

7   provide, and the defendant, any co-conspirator or alleged

8   co-conspirator hearsay matters that I'm supposed to be ruling

9   on.  I think I know most of them, but I don't want to miss

10  anyone, if that's involved.

11       So my intention, but I'll look to Ms. Mortellite

12  first, is to move forward without a break in the afternoon.

13            MR. HAFER:  Oh, you mean once we start, just go --

14            THE COURT:  Yes.

15            MR. HAFER:  I don't object.  Whatever you do on that

16  is fine.

17            THE COURT:  Mr. Reddington, any problem with that?

18            MR. REDDINGTON:  That's fine.

19            MR. HAFER:  We just need a minute to circle back and

20  make sure we have the witnesses.

21            THE COURT:  Sure.  So take 180 seconds.

22            MR. REDDINGTON:  Would Your Honor want me to note an

23  objection to that ruling now or --

24            THE COURT:  No.  I think I understand your objection.

25  You object on all of those grounds there, and I've given my

1    principal reasons and indicated it's a kind of indicative

2    ruling with respect to the two alternatives.  The alternative

3    that is most recently pressed on me was one I did not find --

4         MR. REDDINGTON:  I meant in a logistic sense.  What's

5    your preference?  Can I make an objection now or should I wait

6    until --

7         THE COURT:  That's fine.  We don't have to do that in

8    front of the jury.  That's why I'm doing this, so we don't have

9    the jury thinking about what's that about kind of thing.

10        MR. REDDINGTON:  One other brief point I wanted to

11   raise.  Right now I suppose is a good time.  I know the

12   government intends to have Mr. Saliby go through some type of a

13   demonstration with some type of fake cash or something, putting

14   it in a metal container on the witness stand, a demonstration

15   or demonstrative evidence.  I would object to that, Judge.

16        THE COURT:  Well, if it illustrates the circumstances,

17   I'd probably let it come in, and I did something over the

18   government's objection, very much like that in the *Turner* case

19   in which, I think it was Mr. McNeill was somewhat concerned

20   that the witness was going to illustrate how what Mr. Turner

21   later referred to as a preacher's handshake was effective.  And

22   I think I'll permit that here unless there's something wholly

23   outrageous about it, or it takes a lot of time.  If it takes a

24   lot of time, at some point pretty quickly you'll hear me say,

25   "Let's get on with it."

1          MR. TOBIN:  I don't think it's going to take much

2     time, Judge.  That's my belief.

3          THE COURT:  I understand that objection.  In its

4     broadest sense I'm overruling it.  If there's something

5     specific that arises, then you can make the objection then, but

6     I consider the objection to be made and me to have ruled on it

7     at this point, Mr. Reddington.

8          MR. REDDINGTON:  Thank you.

9          MR. HAFER:  I think I just need three minutes to line

10    everything up.  Maybe not even.

11         THE COURT:  I'll stay here impatiently waiting for

12    your three minutes to run out.

13         MR. HAFER:  Do you want the witness, Your Honor?

14         THE COURT:  Yes, please put the witness on the stand.

15    (PUBLIC SESSION.)

16          (Jury enters the courtroom.)

17         THE COURT:  Ladies and gentlemen, asking the question

18    that I always ask, whether any of you were exposed to or had

19    any discussions about or in any way considered anything other

20    than what was presented here in the courtroom by yourselves.

21    Was anyone exposed in any way to any such conversations or

22    communications with others?

23          And I see no response to that, so I find that the jury

24    was has not.  Now, my confession, and apologies, is this:  I

25    try very hard, as you might have noticed, to move things along

1    as swiftly as possible, but also as fairly as possible, and the

2    guiding principle for me is to take as much of your time when

3    we said you were going to be here as I can.  And we've tried to

4    do that throughout, and the parties have been very helpful to

5    me.  But a major important evidentiary issue came up about

6    evidence that might or might not be admissible before you, and

7    I wanted to be sure that I had an adequate opportunity to think

8    about it and hear argument from counsel about it.  Hence, 2:00

9    is considered the new 1:30 this afternoon, and I apologize for

10   taking your time in doing that.

11       There's a second aspect to the apology, and that is,

12   in doing so, I'm taking away your afternoon break.  I hope that

13   there's not a problem with that.  And if there is, if someone

14   has a problem with that, I know Ms. Beatty was raising it with

15   you, whenever there is some concern about a prolonged period in

16   the courtroom, then raise your hand, and we'll make the breaks.

17       But what I'd like to do is move ahead swiftly.  Now,

18   what's the governing principle that I use to justify my

19   confession and my apology?  We sometimes take time to save

20   time.  It seems to me that by dealing with these matters in

21   this way at this time we've saved some time for you.  At least

22   that's my view about it.

23       Ultimately I take as much time is necessary as to give

24   a fair trial to the parties obviously.  I think that's been

25   done, but I also think, for what it's worth, I think we've

1    managed to save a good deal more time in the case as a result

2    of this discussion.  So you may proceed, Mr. Tobin --

3              MR. TOBIN:  Thank you, Your Honor.

4              THE COURT:  -- with your examination.

5    BY MR. TOBIN:

6    Q.   Mr. Saliby, perhaps I'll just repeat my last question.

7    After you agreed to pay the $125,000 bribe, did your attorney

8    begin to negotiate the terms the official Host Community

9    Agreement with the city's attorney?

10   A.   Yes.

11   Q.   Thereafter what did you learn about another annual legal

12   fee that the operator of a marijuana business would have to

13   pay?

14   A.   There was a $50,000 community impact fee.

15   Q.   Was that on top of the percentage that you and the mayor

16   had discussed, the legal percentage that would have to go to

17   the city?

18   A.   Yes.

19   Q.   And that $50,000 additional fee of which you speak, was

20   that yearly, was that only one time?

21   A.   That was yearly.

22   Q.   Now, when you and the mayor back in your office were

23   discussing fees, was that ever brought up?

24   A.   No.

25              THE COURT:  Mr. Saliby, if you could take your mask

1    down.

2              THE WITNESS:  I'm sorry.

3              THE COURT:  No.  Frankly, it's nice to have people who

4    are attentive to the social distancing obligations that we've

5    tried to observe.

6              MR. TOBIN:  I apologize.  I should have mentioned that

7    to you.

8    Q.   So was this a bit of a surprise to you when you recognized

9    or learned that it was an extra $50,000 a year?

10   A.   Yes.

11   Q.   And why was that a concern to you?

12   A.   Because what I wanted to open was a small retail business.

13   It was approximately around 1,200 square feet.  I would be

14   retail only and, like I said earlier, I would be purchasing

15   from other marijuana establishments, so that would put me at a

16   disadvantage with the other marijuana establishments in the

17   city that were growing and selling their own products.

18   Q.   Sir, what did you do after learning about this $50,000

19   annual fee?

20   A.   I called the City Hall.

21   Q.   And with whom did you speak?

22   A.   Gen Andrade.

23   Q.   Ultimately as a result of that call, did you have another

24   meeting at City Hall?

25   A.   Yes.

1    Q.    Who was -- where was that meeting?

2    A.    In Gen Andrade's office.

3    Q.    Who was present for that meeting?

4    A.    Me, the mayor, and Gen Andrade.

5    Q.    What happened at that meeting, please?

6    A.    I asked him -- I brought up the $50,000 community impact

7    fee, and I told him, I said, "We never discussed this."  So he

8    had stated -- when I say "he," I mean the mayor had stated that

9    he cannot remove that, but would be able to drop it down to

10   $25,000 a year.

11   Q.    To go from $50,000 to $25,000?

12   A.    Yes.

13   Q.    He was able to cut it in half for you?

14   A.    Yes.

15   Q.    Were there any conditions on getting it cut in half?

16   A.    He had said that I'd have to add another $25,000 on top of

17   what we had agreed upon, bringing the new total up to $150,000.

18   Q.    The bribe went from 125 to 150?

19   A.    That's correct.

20   Q.    And this statement was made in a conversation with the

21   mayor?

22   A.    Can you please repeat that.

23   Q.    This agreement was hatched between you and the mayor?

24   A.    Yes, correct.

25   Q.    Well, did you accept the terms of the modification of your

1    original agreement?

2    A.    Yes.

3    Q.    Why?

4    A.    Because he said that I would be able to save $125,000 in

5    five years with the condition that I open up a retail space

6    less than 1,500 square feet, I believe.

7    Q.    So at some point if you got larger, it would go back to

8    50,000?

9    A.    Yes.

10   Q.    Did you have any intention of getting larger at that time?

11   A.    No.

12   Q.    Sir, at that point, at this meeting now in Gen Andrade's

13   office, was there any additional conversation with the mayor

14   about when and how you would pay the now $150,000 bribe?

15   A.    Yes.

16   Q.    Tell us about that conversation with the mayor.

17   A.    I asked him if I could pay $75,000 when I received the

18   Letter of Non-Opposition and the Host Community Agreement, and

19   then if I could pay the remaining 75 once I received the

20   provisional license from the state.

21   Q.    What did Mayor Correia say to that proposal?

22   A.    Yes.

23   Q.    You mentioned the term "provisional license."  Can you

24   explain what you understood a provisional license to be.

25   A.    After you complete your application through the Cannabis

1    Control Commission portal and they approve it, that's kind of

2    like the next step in the process toward getting your final

3    license.

4    Q.    And that provisional license actually comes from the

5    Cannabis Commission in Boston or wherever it might be?

6    A.    The Cannabis Control Commission in Boston, correct.

7    Q.    Lastly, with regard to this conversation in Gen Andrade's

8    office, was there any discussion about when Mayor Jasiel

9    Correia would get or how he would get the half, the 75,000?

10   A.    He said he would reach out to me in several days, in a few

11   days.

12   Q.    Sir, did, in fact, Mayor Jasiel Correia reach out to you?

13   A.    Yes, he did.

14   Q.    How did he do so?

15   A.    He called me.

16   Q.    What happened during that call?

17   A.    He asked me if I had the money.

18   Q.    What did you tell him?

19   A.    Yes.

20   Q.    Was there a discussion as to how he would pick it up or

21   where he would pick it up?

22   A.    He said he would come to the store.

23   Q.    Did he, in fact, come to the store?

24   A.    Yes, he did.

25   Q.    Were you at the store when he came?

```
 1   A.    Yes.

 2   Q.    Were you waiting for him, or where were you?

 3   A.    I was standing next to the window waiting for him to come.

 4   Q.    Did, in fact -- what did you observe at some point?

 5   A.    He was driving a black SUV.

 6   Q.    In your understanding, was that a personal car or a city

 7   car?

 8   A.    A city car.

 9   Q.    When Jasiel Correia arrived at your store in the city car,

10   what did you do?

11   A.    I walked out to see him.

12   Q.    Sir, what were you carrying?

13   A.    A metal clipboard.

14   Q.    Okay.  What was inside the metal clipboard?

15   A.    75,000 in cash.

16   Q.    In what denominations were the bills?

17   A.    Mostly $100 bills.  I believe --

18   Q.    I'm sorry.

19   A.    I'm sorry.  I believe there could have been maybe some

20   50s, but if I can recall, the majority of them would have been

21   hundred dollar bills.

22   Q.    Sir, where did you get the $75,000 in cash?

23   A.    From the family safe.

24   Q.    Did you tell anyone in the family that you would be taking

25   this large sum of money from the family safe?
```

```
1    A.    My father.

2    Q.    Sir, 75,000 in cash is an awful lot money; would you

3    agree?

4    A.    Yes.

5    Q.    Why did your family keep so much money in a safe and not

6    in a bank?

7    A.    When my parents were in Lebanon, there was a war going on

8    in the 1980s, and my father just got into the habit of putting

9    it into the safe because you couldn't really trust the banks

10   back then.  And then he just brought those habits here, and

11   being in business for over 20 years, he saved some cash.

12   Q.    So sir, the cash that you took, mostly hundreds you

13   indicated?

14   A.    Yes.

15   Q.    You took it out of a safe?

16   A.    Yes.

17   Q.    And can you tell us how were those bills -- how were they

18   wrapped or how were they packaged, how were they bundled, if at

19   all?

20   A.    In 10,000-dollar stacks and in elastics.

21   Q.    I think you -- let me ask you, is there a metal box in

22   front of you?

23   A.    Yes.

24   Q.    Just so it's clear, that is not the box that you had in

25   your possession when you saw the defendant arrive in his
```

1   vehicle, correct?

2   A.   That's correct.

3   Q.   Is that a replica or is it the same type of box?

4   A.   It's the same type of box.

5   Q.   You gave a description ultimately to federal agents?

6   A.   Yes.

7   Q.   They procured that box and you looked at it?

8   A.   Yes.

9   Q.   So that is essentially or is a replica of the box that you

10  had at the time?

11  A.   Yes.

12  Q.   The box you put the cash into?

13  A.   Yes.

14  Q.   I'd ask you now to look in that manila envelope.  You can

15  look what's in there, touch it if necessary.  And do you

16  recognize what's in there?

17  A.   The stacks of bills.

18  Q.   And again, just so it's clear, that is not real money,

19  correct?

20  A.   Correct.

21  Q.   In fact, on it it says something about "For motion picture

22  purposes."  Is that accurate?

23  A.   Yes.

24  Q.   Nonetheless, it's stacked in amounts of how much?  Does it

25  indicate, is there a band on each stack?

1    A.    $10,000.

2    Q.    Is that similar to what you had on that day when you took

3    it from your family's safe?

4    A.    Yes.

5    Q.    So the box is similar and the money is essentially in the

6    same manner that it was on that day?

7    A.    Yes.

8    Q.    And you took that money and you did what with it?

9    A.    I put it in the metal clipboard.

10   Q.    Okay.  Could you hold the metal clipboard up and show it

11   to the ladies and gentlemen of the jury.

12          Now, does that open?

13          And is there two compartments or is there a divider

14   inside of it?

15   A.    There's two compartments, and there is a divider in the

16   middle.

17   Q.    And I know it's awkward, but if you could just open that

18   and show us the divider, how it works.

19          MR. TOBIN:  Your Honor, at this time for demonstrative

20   purposes I'd ask that this be moved into evidence or a

21   photograph of it at 195.

22          THE COURT:  It will.  Ladies and gentlemen, this is a

23   demonstration, as the evidence indicated.  You've got to

24   remember what you saw in the demonstration because the box

25   isn't coming in and the facsimile of the currency isn't coming

1    in, but this is being offered I guess by the government to

2    illustrate how the transaction took place, and I'm going to

3    permit it, and you'll evaluate it in light of all the evidence

4    to decide whether it helps you to understand the case more

5    clearly or not.  But in any event, this is a way of

6    demonstrating what this witness contends was the transaction

7    that day.

8            MR. TOBIN:  Your Honor, if I might as well, with

9    similar limitations, I would ask -- the fake cash as Exhibit

10   196.

11           THE COURT:  All right.  They're both received, as I

12   say, for demonstrative purposes.  And when I say for

13   "demonstrative" it just means it's not going into the jury with

14   you because it's something that you've seen like a kind of

15   demonstration in the course of evidence -- course of testimony.

16           (Exhibit 195-196 admitted into evidence.)

17           MR. TOBIN:  Thank you, Judge.

18           THE COURT:  All right.

19   Q.   Sir, I'd like you now in front of the ladies and gentlemen

20   of the jury, can you take the stacks -- by the way, would you

21   hold up one of the stacks.  And there's a little band on it,

22   isn't there?  How much is that?

23   A.   $10,000.

24   Q.   Okay.  Can you load that metal clipboard, that metal box,

25   in the same manner in which you loaded it when you took real

1  money out of your family's real safe and put it into the box?

2         And as you do that, can you describe for the record

3  and for the ladies and gentlemen what you're doing.

4  A.   Sure.  I'm just positioning them in a way where they fit

5  into the metal clipboard.

6  Q.   And is that all of the cash?

7  A.   No.

8  Q.   Okay.  So for the record, you've just taken the divider

9  inside the box and you put it down; is that true?

10  A.   Yes.

11  Q.   What are you doing with the rest of the bundles of cash?

12  A.   I'm putting it on the top.

13  Q.   And you did this back in real life with real cash on the

14  day that the mayor showed up at your store?

15  A.   Yes.

16  Q.   Okay.  Please continue.

17         Is the full amount of money -- is the $75,000 in cash

18  now in the box?

19  A.   Yes.

20  Q.   Similar to the way it was on that day?

21  A.   Yes.

22  Q.   And on that day, what, if anything, did you put around the

23  box?

24  A.   An elastic band.

25  Q.   And again -- and did the box close?

1    A.    Yes.

2    Q.    Can you lift it up again and just show the ladies and

3    gentlemen of the jury.  Great.  And that is what you had in

4    your hand when the mayor arrived in his official vehicle?

5    A.    Yes.

6    Q.    So tell us now, please -- thank you -- what happened when

7    you went outside and made contact with Mayor Jasiel Correia?

8    A.    He told me to sit in the passenger side, to come into his

9    vehicle.

10   Q.    Did you, in fact, do that?

11   A.    Yes, I did.

12   Q.    What happened after you got into his passenger side?

13   A.    I handed him over the metal clipboard.

14   Q.    Did he -- was he driving at that time or was the car

15   stationary?

16   A.    It was stationary.

17   Q.    You handed him the metal clipboard?

18   A.    Yes.

19   Q.    What, if anything, did Mayor Jasiel Correia do with the

20   metal clipboard?

21   A.    He put it in the back seat.

22   Q.    At that point what, if anything, did Jasiel Correia do?

23   A.    He gave me a manila folder with a Letter of Non-Opposition

24   and I believe the Host Community Agreement.

25   Q.    Were they signed?

```
1    A.    Yes.

2    Q.    They were signed by whom?

3    A.    The mayor.

4    Q.    And did you look at them in the car while you were sitting

5    in the front seat?

6    A.    Yes.

7    Q.    Then what happened?

8    A.    He pulled out of the parking lot and we went all the way

9    up the road for a ride.

10   Q.    How long were you in the car with Mayor Jasiel Correia

11   after you gave him the clipboard?

12   A.    Approximately five, six minutes.

13   Q.    Was there any discussion?

14   A.    Yes.

15   Q.    What did you talk about?

16   A.    I told him how my father-in-law -- if he knew my

17   father-in-law.

18   Q.    And that's because your father-in-law was -- who was your

19   father-in-law?

20   A.    It's Gabriel Andrade.

21   Q.    And did he hold a position at some point in the City of

22   Fall River?

23   A.    Yes, he was on the school committee.

24   Q.    But he was not at that time?

25   A.    No.
```

1    Q.    There was just regular talk, is that true?

2    A.    Yes.

3    Q.    Sir, I'm going to ask you to now direct your attention to

4    tab 197.  Please tell me, what's at tab 197?

5    A.    That's the Letter of Non-Opposition.

6    Q.    Signed by whom?

7    A.    The mayor.

8         MR. TOBIN:  Your Honor, may 197 be admitted into

9    evidence.

10        THE COURT:  Yes, it's received.

11        (Exhibit 197 admitted into evidence.)

12   Q.    Sir, what's the date on that?

13   A.    July 5, 2018.

14   Q.    And I'm going to read a very small portion of it or a

15   portion of it and I'll ask you to read along to yourself.  "I

16   Jasiel F. Correia, II, Mayor of the City of Fall River, do

17   hereby provide this Statement of Non-Opposition to Greener

18   Leaf, Inc. to operate a registered marijuana dispensary in Fall

19   River.

20        "I have verified with the appropriate local officials

21   that the proposed RMD facility is located in a zoning district

22   that allows such use by right or pursuant to local permitting.

23   This letter is subject to withdrawal or revocation at any

24   time."  Did I read that correctly?

25   A.    Yes.

1    Q.   You understood that this letter, his approval was subject

2    to revocation at any time?

3    A.   Yes.

4    Q.   And how much time elapsed from the time you handed him

5    $75,000 in cash until the time he handed you this letter with

6    his signature?

7    A.   It could have been maybe 30 seconds to a minute.  It could

8    have been maybe a little sooner.

9    Q.   Okay.  At some point --

10   A.   It was right after --

11   Q.   I'm sorry.  I didn't mean to cut you off.

12   A.   No, I'm sorry, Dave -- Mr. Tobin.  Excuse me.

13   Q.   Where did Mayor Jasiel Correia drop you off?

14   A.   Back at the store.

15   Q.   And what did you say, if anything, to Mayor Correia as you

16   got out of the car?

17   A.   If he could please count and send me a text to verify that

18   the amount was there.

19   Q.   Did he ever send you that text?

20   A.   No.

21   Q.   Sir, at some point after that, were you contacted by chief

22   of staff Gen Andrade?

23   A.   Yes.

24   Q.   And what did she ask you when she contacted you?

25   A.   That she wanted me to sell some fundraising tickets for

1    his event at the Battleship.

2    Q.    When you say "his," you mean Mayor Jasiel Correia?

3    A.    Yes.

4    Q.    Did she specifically tell you how many tickets she wanted

5    you to sell?

6    A.    20.

7    Q.    Did she tell you how much they were for, each ticket?

8    A.    I believe they were about $125 a ticket.

9    Q.    Had you been in the practice of attending 125-dollar

10   political fundraisers?

11   A.    I'm sorry, Dave.

12   Q.    Yes.  Had you been in the practice, did you previously go

13   to 125-dollar fundraisers for politicians?

14   A.    No.

15   Q.    Did you previously purchase 20 tickets for politicians at

16   $125?

17   A.    No.

18   Q.    Did you agree to take the tickets?

19   A.    Yes.

20   Q.    Why?

21   A.    Because I -- again, I felt like that's what they wanted me

22   to do, and I was afraid that he would retaliate and affect my

23   business and my family some way.

24   Q.    Who ended up paying for the tickets?

25   A.    I did.

1   Q.   How much did you pay?

2   A.   2,500.

3   Q.   Who did you give the $2,500 to?

4   A.   The mayor.

5   Q.   Was it cash, check or in some other form of payment?

6   A.   It was cash.

7   Q.   How did you give those -- or tell us the circumstances how

8   you came to give Mayor Jasiel Correia this other 2,500 in cash.

9   A.   He had came to the store and we walked into the back room,

10  and I gave it to him on our -- in the back room.

11  Q.   Did he express any reluctance about taking cash for these

12  campaign tickets?

13  A.   No.

14  Q.   Sir, did you eventually get a provisional marijuana

15  license from the Cannabis Control Commission at the state?

16  A.   Yes.

17  Q.   Sir, did you ever make a second payment, a second $75,000

18  to Mayor Jasiel Correia?

19  A.   No.

20  Q.   Why not?

21  A.   Because I heard and found out that he was issuing other

22  Letters of Non-Oppositions and entering into Host Community

23  Agreements with many other vendors in the city, and I reached

24  out to him and I asked him about it, and he had said that it

25  was only for cultivation purposes.  And then I was waiting for

1    him to reach back out to me, and he never did.

2    Q.    Sir, do you know, have you ever met an individual by the

3    name of Tony Costa?

4    A.    No.

5    Q.    Sir, do you know or have you ever met an individual by the

6    name of Hildegar Camara?

7    A.    No.

8    Q.    Sir, do you know or have you ever met an individual by the

9    name of Dave Hebert?

10   A.    No.

11   Q.    Sir, you mentioned that the state issued you a provisional

12   license to open your marijuana retail store, correct?

13   A.    Yes.

14   Q.    That was issued when?

15   A.    I believe in April of 2019.

16   Q.    Why has your store not opened?

17   A.    Because the Cannabis Control Commission deemed me

18   unsuitable because of my involvement with Jasiel Correia.

19   Q.    Because of paying a bribe?

20   A.    Yes.

21   Q.    Which is a crime?

22   A.    Yes.

23   Q.    For you?

24   A.    Yes.  And -- yes.  And in turn they posed me as a risk.

25   Q.    Your cooperation with the United States has resulted in

1  your company not opening at this point?

2  A.   Yes.

3         MR. TOBIN:  I don't have any other questions, but

4  please remain seated.

5         THE COURT:  Mr. Reddington.

6  CROSS-EXAMINATION BY MR. REDDINGTON:

7  Q.   To follow through, sir, do you know an individual by the

8  name of Brian Bairos?

9  A.   Yes.

10  Q.   Yes, you know him quite well, don't you?

11  A.   Yes.

12  Q.   You are very good friends, are you not?

13  A.   Me and Brian were very close.

14  Q.   You know he's a drug dealer, right?

15  A.   That's incorrect.

16  Q.   It's incorrect?

17  A.   Yeah, I believe that it's incorrect.

18  Q.   Have you ever seen or have you known Mr. Bairos to, shall

19  we say, handle large amounts of marijuana?

20  A.   No.

21  Q.   Go to Rhode Island to purchase marijuana?

22  A.   No.

23  Q.   Go up in the northern part of Massachusetts to purchase

24  marijuana?

25  A.   No.

1    Q.   Did you ever smoke marijuana with him?

2    A.   No.

3    Q.   And in the course of your relationship with Mr. Bairos,

4    you knew, sir, that there had been an investigation going on

5    involving the FBI and people that were getting Letters of

6    Non-Opposition, right?

7    A.   Can you please repeat the question.

8    Q.   You knew that the FBI was in Fall River investigating

9    Letters of Non-Opposition in marijuana businesses, right?

10   A.   After I was contacted by the FBI.

11   Q.   And you knew that Jasiel Correia had been indicted by the

12   federal government, right?

13   A.   In regarding to.

14   Q.   Federal indictment regarding SnoOwl, fraud, for example?

15   A.   After the arrest.

16   Q.   After his arrest?

17   A.   After Jasiel's arrest.

18   Q.   Right.  It was in every newspaper and it was constantly in

19   the Fall River Herald, right?

20   A.   Yes.

21   Q.   It was no secret that he was under a microscope by the

22   federal government, right?

23   A.   I do not really follow the politics in the city.

24   Q.   So you knew that Mr. Bairos was actually being

25   investigated by the federal government as well, correct?

1    A.    No.

2    Q.    Well, you knew that Mr. Bairos had ultimately ended up

3    getting an attorney to deal with the United States government,

4    U.S. Attorney's Office, right?

5    A.    Yes.

6    Q.    And you knew who the attorney was, right?

7    A.    No.

8    Q.    You spoke to Mr. Bairos about the fact that he would have

9    been charged or could have been charged with some criminal

10   offenses, correct?

11   A.    I don't recall that.

12   Q.    Well, did you talk to Mr. Bairos, did he indicate that one

13   of the issues that he could have been charged with would be

14   money laundering or selling narcotics, marijuana?

15   A.    Can you please repeat that.

16   Q.    Did you talk to Mr. Bairos about the fact that one of the

17   issues that he had been contending with is that he could have

18   been charged with any number of criminal offenses, including

19   selling marijuana?

20   A.    Yes.

21   Q.    And you knew when you talked to Mr. Bairos that he was

22   aware of the fact that the Internal Revenue Service was

23   involved in this investigation, right?

24   A.    Excuse me.  It's not selling the marijuana.  It was the

25   involvement with Jasiel.  That was when he told me he hired an

1    attorney because the FBI had contacted him.

2    Q.   So when you were talking to Mr. Bairos, you knew that he

3    also was dealing with issues with the IRS, right?

4    A.   No, I didn't.

5    Q.   Were you concerned about issues with the IRS?

6    A.   Never.

7    Q.   So when you were talking to Mr. Bairos, you knew that he

8    was going into the U.S. Attorney's Office the following day.

9    You knew that, right?

10   A.   I cannot recall that.

11   Q.   Well, didn't he call you the night before he went in to

12   see all the agents and all the U.S. attorneys upstairs in this

13   building regarding an immunity agreement and talk about it with

14   you?

15   A.   He didn't talk to me about it, but he did tell me that he

16   had contacted -- the FBI had contacted him and he was being

17   questioned.   And I don't recall when that happened.

18   Q.   Well, if I suggest to you, sir, that it was the night

19   before that the two of you either met or talked, would that

20   refresh your memory?

21   A.   I do not recall.

22   Q.   So when you were speaking in some fashion to Mr. Bairos,

23   did he suggest to you that this could be a pretty good thing

24   for you to do as well, and he mentioned you by name that very

25   next day?

1    A.    He had advised me to -- advised me to see a lawyer if the

2    FBI ever contacted me.

3    Q.    So you didn't know that he mentioned you to the FBI as far

4    as being a person willing to come in and be interrogated or

5    interviewed?

6    A.    I did.

7    Q.    And that would be the next day, right?

8    A.    I don't recall when he did that.

9    Q.    So you've had occasion to meet Mr. Bairos on a number of

10   instances, even just the two of you in the nighttime parked in

11   front of your store, right?

12   A.    Mr. Bairos would come by occasionally, but in the past

13   couple of years it was very, very, very rare that Mr. Bairos

14   would come by the store.

15   Q.    Did you know that Mr. Bairos ultimately was able to obtain

16   an immunity agreement and a cooperation agreement?

17   A.    Yes.

18   Q.    Did you know that the government agreed that they were not

19   going to charge him with any narcotics offenses or any

20   financial offenses or any Internal Revenue Service offenses?

21   A.    I later found out that he just got into an immunity

22   agreement.  I didn't know the details of it.

23   Q.    And the $75,000, for example, that was in the family safe

24   as you refer to it, where is the safe located?

25              MR. TOBIN:  Objection.

```
 1              THE COURT:  Is there a need for specificity?
 2    Q.   Well, is it in a building?
 3              THE COURT:  No, you can have that.  The question is --
 4              MR. REDDINGTON:  I don't need a specific location.
 5    A.   It's in the building.
 6    Q.   And how much money was in the safe when you removed the
 7    75,000?
 8              MR. TOBIN:  Your Honor, again objection.
 9              THE COURT:  This question I'm going to permit.
10    A.   There would have been probably about, again, give and take
11    because the deposits -- we put the deposits in there and take
12    deposits all the time.  There could have been about 140 or
13    150,000.
14    Q.   When you say "deposits," that would be from the business?
15    A.   It would be daily deposits from the business, yes.
16    Q.   Excuse me.  Because actually you pretty much run a cash
17    business?
18    A.   Well, it's cash business and we do accept credit card as
19    well.
20    Q.   And you were interviewed in this investigation by an agent
21    from the IRS, a Sandy Lemanski.  Do you recall that?
22    A.   Yes.
23    Q.   And were you asked how much money was in the safe when you
24    removed the 75,000?
25    A.   I'm sorry, Mr. Reddington.
```

1    Q.   Were you asked how much money was in the safe when you

2    removed the 75,000?

3    A.   Did I ask?

4    Q.   Were -- bad with the mask.  Were you asked by Sandy

5    Lemanski, or anyone, how much money was in the safe when you

6    removed the 75,000?

7    A.   I do not remember.

8    Q.   Do you have records, do you keep records of the income,

9    like, you know, some people would keep records for bank

10   deposits and things like that.  Did you keep records for your

11   cash deposits in the family safe?

12   A.   I have a bookkeeper and I have an accountant that does

13   that for me.

14   Q.   Okay.  So the bookkeeper and the accountant would not be

15   keeping the records from the guy that comes in and buys three

16   packs of butts and gives you 20 bucks, right?  I mean --

17   A.   I submit that information monthly.

18   Q.   So where do you do that and how do you do that?

19   A.   I have a monthly financial spreadsheet that I load up and

20   I print out the detailed reports from my Cash Register Express

21   software, and then I give it to -- it's a program that I have

22   on my computer, and I hand it over to the bookkeeper.

23   Q.   Now, when you were talking on the number of occasions to

24   Mr. Bairos, one of the things that you knew is that Mr. Bairos

25   told you that in his, meaning Bairos', dealings with Jasiel

```
 1   Correia, he mentioned, meaning Mr. Bairos, your name, right?
 2   A.   He mentioned my name I think after --
 3   Q.   Is the answer yes, sir?  I'm just asking if he mentioned
 4   your name.
 5   A.   After the meeting.
 6   Q.   And after the meeting he told you that he mentioned your
 7   name, correct?
 8   A.   Yes.
 9   Q.   And then after the meeting in Boston -- because Jasiel was
10   at a Harvard class or something and they met, had dinner at the
11   Ocean Prime that night, right?
12   A.   I believe Brian said that Jasiel had brought up my name.
13   Q.   Okay.  So they had dinner at the Ocean Prime that night,
14   correct?
15           MR. TOBIN:  Objection.  Objection with this witness.
16           THE COURT:  I'm sorry.  I'm going to have to review
17   that again.  Can you put the question again.
18   Q.   In your conversations with Mr. Bairos, sir, he told you
19   that they went to dinner at the Ocean Prime, correct?
20           MR. TOBIN:  Objection.
21   A.   I found out later on --
22           THE COURT:  Just a moment.
23   A.   I knew they went to a restaurant, but I found out later on
24   that it was --
25           THE COURT:  Mr. Saliby, just a moment.
```

```
 1              THE WITNESS:  I'm sorry.
 2              THE COURT:  Is the objection pressed?
 3              MR. TOBIN:  There is an objection to that.
 4              THE COURT:  Okay.  Overruled.
 5   Q.    The answer is yes, correct?
 6   A.    The answer is I knew that they went to a restaurant and
 7   then later found out it was the Ocean Prime.
 8   Q.    Did Mr. Bairos tell you that he told Jasiel that he should
 9   issue you a license because you're a great businessman?
10   A.    I do not recall that.
11   Q.    So you remember testifying in the grand jury, right?
12   A.    Yes.
13   Q.    Page 20.  "QUESTION:  What happened -- what did Brian tell
14   you happened when he and the mayor met there?" meaning at the
15   restaurant.
16              MR. TOBIN:  Objection.
17              THE COURT:  Grounds?  Just briefly state it --
18              MR. TOBIN:  I don't think this is the proper way.
19              THE COURT:  I don't know about proper way but,
20   Mr. Reddington, the purpose of this reference to the grand
21   jury?
22              MR. REDDINGTON:  I'm seeking to impeach, Your Honor,
23   his testimony before this jury right now, and I'm about to
24   refresh his memory.
25              THE COURT:  I'll permit it on that basis.
```

1          MR. REDDINGTON:   Thank you.

2    Q.   Do you recall answering, sir -- and you were under oath at

3    the grand jury, right?

4    A.   Yes.

5    Q.   All right -- that "Brian was telling me that my name came

6    up in the conversation.  Brian told the mayor to issue one for

7    me because I was a great businessman and I would be able to run

8    the business in the city."  Did you --

9    A.   If I said it at the grand jury, then it's true.  And I'm

10   sorry, I cannot recall at this moment, but if I said it at the

11   grand jury, then it is true.

12   Q.   Now, you were represented by Attorney Mark Levin in the

13   negotiations with the city; is that correct?

14   A.   I believe it's Mark Levin, yes.

15   Q.   And Mr. Levin actually on a number of occasions negotiated

16   with a guy by the name of Joe Macy, who was the corporation

17   counsel, correct?

18   A.   Yes.

19   Q.   And this is the negotiation the back and forth that takes

20   place when you're dealing with the Community Host Agreement,

21   right?

22   A.   To my knowledge.

23   Q.   So the first thing that has to be issued is a Letter of

24   Non-Opposition, and then there's the Community Host Agreement

25   that's executed between the parties and the city, right?

1    A.   And that's required to apply for a license.

2         MR. REDDINGTON:  Can I have the pictures of the

3    business, please.  I'm sorry.  His business.

4    Q.   Now, this obviously is your business, correct?

5    A.   Yes.

6         MR. REDDINGTON:  And can you just kind of flip through

7    it slowly, Alyssa.

8    Q.   If you look closely, on the building -- obviously you'd

9    know for sure -- you have a lot of surveillance cameras on

10   there, don't you?

11   A.   Yes, I do.

12   Q.   Yeah.  And they're operable, correct?

13   A.   Yes, they are.

14   Q.   Did you have any surveillance of Jasiel Correia pulling up

15   in your parking lot and meeting with you or with Gen Andrade?

16   A.   When this happened, it happened in June of 2018, and I

17   never saved the clips.  Because they rerecord over each other

18   after ten days.

19   Q.   So did you, in your dealings with the investigators, did

20   anyone ask you if you would produce the hard frame that

21   actually stores the digital images or the actual videos that

22   are recorded over?

23   A.   I don't recall.

24   Q.   Are you aware that there's software that can extract

25   things like that from surveillance devices, even if they're

1    recorded over?

2    A.    I'm unaware.

3    Q.    You also had surveillance cameras in the inside of the

4    building.  As you go up the stairs, for example, in one of the

5    pictures it shows the little ball hanging off the ceiling.

6    That's a surveillance camera, correct?

7    A.    There's no camera in my office.

8    Q.    How about the hallway or main section of the building?

9    A.    On the first floor.

10   Q.    And it's your understanding, sir, that Mr. Correia, who

11   was under indictment by the federal government, in the

12   newspaper just about every other day, paranoid or concerned

13   about investigators being in City Hall, he accepted $75,000 in

14   cash from you?

15   A.    I did not know he was under federal involvement or

16   indictment.

17           MR. REDDINGTON:  That's all I have, Your Honor.

18           THE COURT:  All right.  Mr. Tobin.

19           MR. TOBIN:  Nothing else, Your Honor.

20           THE COURT:  Okay.  You may step down, Mr. Saliby.  If

21   you could take the top off that microphone, too.

22           MR. TOBIN:  Your Honor, the United States, if I may,

23   next calls Nikki Custadio.

24           THE COURT:  All right.

25           NICOLE CUSTADIO, Sworn

```
 1              COURTROOM CLERK:  Please be seated and state your full
 2    name, and please spell your last name.
 3              THE WITNESS:  Sure.  First name is Nicole,
 4    N-i-c-o-l-e.  Last name is Custadio, C-u-s-t-a-d-i-o.
 5              THE COURT:  And Ms. Custadio, you can take your mask
 6    off, but if you could put a cap on that microphone.  And keep
 7    the microphone between you and Mr. Tobin, who is going to be
 8    asking you questions so we can pick up your voice.  Okay?
 9              THE WITNESS:  Okay.
10              MR. TOBIN:  May I inquire?
11              THE COURT:  You may.
12    DIRECT EXAMINATION BY MR. TOBIN:
13    Q.   Good afternoon.
14    A.   Good afternoon.
15    Q.   In which city or town do you live?
16    A.   Fall River, Massachusetts.
17    Q.   What is your relationship to Charlie Saliby?
18    A.   He is my brother.
19    Q.   What is your father's name?
20    A.   Sami Saliby.
21    Q.   What is your mother's name?
22    A.   Nouhad Saliby.
23    Q.   Where do you work?
24    A.   I work at Guimond Farms.
25    Q.   How long have you worked at Guimond Farms?
```

1    A.    Since I was a teenager.

2    Q.    Who owns the store?

3    A.    My father.

4    Q.    Family business?

5    A.    I'm sorry?

6    Q.    Is it a family business?

7    A.    It is a family business, yes.

8    Q.    And who else in the family works there?

9    A.    It's me, my brother, my mother, my father, and we have a

10   few employees as well.

11   Q.    Do you recall a day -- and let me direct your attention to

12   June of 2018 -- when a city official came into your store?

13   A.    Yes.

14   Q.    And who was that?

15   A.    It was Gen Andrade.

16   Q.    And later that same day did another city official come

17   into your store?

18   A.    Yes.

19   Q.    And who was that?

20   A.    The former mayor.

21   Q.    And the former mayor's name was?

22   A.    Jasiel.

23   Q.    Had you ever met Jasiel Correia at the time?

24   A.    No.

25   Q.    When he came into the store that day, did you recognize

1    him as the mayor, Jasiel Correia?

2    A.    I did, yes.

3    Q.    How did you recognize him?

4    A.    Just from the media, knowing that he's the mayor.

5    Q.    So I think you initially told us that Gen Andrade had come

6    into the store.

7    A.    Yes.

8    Q.    Perhaps this goes without saying, but were you working at

9    the time that Gen Andrade came in?

10    A.    I was, yes.

11    Q.    Where was your father and your brother Sami, if you know?

12    A.    My brother and my father I believe were at a doctor's

13    appointment for my father.  They were together.

14    Q.    You were holding down the fort, if you will?

15    A.    I was holding down the fort.

16    Q.    Tell us what happened when this woman who you've now

17    talk -- or described as Gen Andrade came in.

18    A.    So I made a phone call to my brother and I called and I

19    told him that somebody from the mayor's office was here to talk

20    to him.

21    Q.    And what did your brother tell you?

22    A.    He said that he's going to drop off my father and that

23    he'd be there shortly.

24    Q.    In fact, did your brother come back to the store?

25    A.    He did.

1    Q.   By the way, when this woman you've described or said Gen

2    Andrade, did you tell her that your brother wasn't there?

3    A.   I did, yes.

4    Q.   And what else did you tell her?

5    A.   I later told her that he was on his way.

6    Q.   Did she leave the store?

7    A.   She did, yes.

8    Q.   You remained in the store?

9    A.   I remained.

10   Q.   At some point does your brother return to the store?

11   A.   He did.

12   Q.   What happens when your brother returns?

13   A.   So he returned and he just told me that he'd be in the

14   back if he needed me or someone came in for him.

15   Q.   At some point did somebody then come into the store?

16   A.   Yes.

17   Q.   Who came in?

18   A.   Gen, alongside Jasiel.

19   Q.   Now, just let me ask you, at that time you indicated you

20   understood, or you knew, or you recognized Jasiel?

21   A.   Yes.

22   Q.   Of course the chief of staff, did you know at that point

23   who Gen Andrade was?

24   A.   I did not.

25   Q.   Did you even know her name on this day?

```
 1   A.   I did not.

 2   Q.   You just knew she was from City Hall?

 3   A.   Yes.

 4   Q.   So when Gen Andrade and Mayor Correia came back into the

 5   store, what did you do?

 6   A.   I went to the back, and I told my brother that the woman

 7   that was here from the mayor's office earlier was here with the

 8   mayor.

 9   Q.   What did your brother do in your presence?

10   A.   He then directed them to his office.

11   Q.   And where is your brother's office?

12   A.   Upstairs on the second level.

13   Q.   And they left your view going into the back of the store;

14   is that accurate?

15   A.   Yes, mm-hmm.

16   Q.   At some point did you see the mayor and Gen Andrade leave?

17   A.   I did not.

18   Q.   Did you have the opportunity to talk to your brother again

19   during that shift, the hours that you were at the store?

20   A.   I did not.  I was still on the floor working, and then

21   when I left, I sent him a text message.

22   Q.   You sent who a text message?

23   A.   My brother.

24   Q.   There's a binder in front of you.

25   A.   Yes.
```

1    Q.   If you open that up, there is a tab, one tab that says
2    "198."  Do you see that?
3    A.   I do.
4    Q.   If you open that up and look at it, can you tell us what
5    it is?
6    A.   It is a text message I sent him that day.
7    Q.   And "him" being?
8    A.   My brother.
9            MR. TOBIN:  Your Honor, may 198 come in?
10           THE COURT:  Yes, it's received.
11           (Exhibit 198 admitted into evidence.)
12   Q.   So is this a screenshot from your phone?
13   A.   Mm-hmm.
14   Q.   And let's focus on the blue bubble.  Is there a date and
15   time above the blue bubble?
16   A.   There is, yes.
17   Q.   What's the date?
18   A.   June 25, 2018.
19   Q.   What's the time?
20   A.   6:52 p.m.
21   Q.   What did you write to your brother?
22   A.   I wrote, "When you head home and you're by yourself, call
23   me please.  Nothing important.  Just want to celebrate with
24   you.  LOL."
25   Q.   Was there a reply from your brother?

```
1    A.    Yes.

2    Q.    What was the reply?

3    A.    "Okay.  Absolutely."

4    Q.    I'd like to ask you some questions about this text.

5    A.    Sure.

6    Q.    What did you want to celebrate and why?

7    A.    So it was my assumption that seeing the mayor come in, it

8    was good news.

9    Q.    Good news regarding what?

10   A.    Moving forward in the marijuana business.

11   Q.    Did you know at that time that your brother was -- what

12   did you know your brother was trying to do at that time?

13   A.    I know that he wanted to open up a marijuana dispensary.

14   Q.    And did you believe that the mayor's visit had to do with

15   that?

16   A.    Yes, I was hoping, you know, it was good news.

17   Q.    "Nothing important.  Just want to celebrate with you."

18   A.    Mm-hmm.

19   Q.    Did you, in fact, celebrate?

20   A.    Well, he gave me a call and he just said that it was good

21   news moving forward.  Nothing, no details really given that

22   night.

23              MR. TOBIN:  Thank you.  I don't have any other

24   questions.

25              THE WITNESS:  Okay.
```

```
 1              MR. TOBIN:  Please remain seated.  I'm sorry.
 2              THE COURT:  Mr. Reddington.
 3              MR. REDDINGTON:  I have no questions.  Thank you.
 4              THE COURT:  All right.  You may step down,
 5    Ms. Custadio.
 6              THE WITNESS:  Thank you.
 7              THE COURT:  If you could take the top off of that.
 8              THE WITNESS:  Sure.
 9              MR. TOBIN:  Your Honor, if I might, excuse me, the
10    United States next calls Mr. Sami Saliby.
11              SAMI SALIBY, Sworn
12              COURTROOM CLERK:  Please state your full name and
13    please spell your last name.
14              THE WITNESS:  Okay.  My name a Sami Saliby.  Sami,
15    S-a-m-i.  Saliby, S-a-l-i-b-y.
16              THE COURT:  Mr. Saliby, you can take your mask off at
17    this point.  Mr. Saliby, you can take your mask off at this
18    point.
19              THE WITNESS:  Okay, sorry.
20              THE COURT:  And if you can take, to the left of you is
21    a little container that could be put over the -- you beat me to
22    it.  Thank you.
23              MR. TOBIN:  May I inquire, Your Honor?
24              THE COURT:  Yes.
25              MR. TOBIN:  Thank you.
```

```
 1    DIRECT EXAMINATION BY MR. TOBIN:

 2    Q.    Good afternoon, sir.

 3    A.    Good afternoon.

 4    Q.    How old are you?

 5    A.    I'm 68.

 6    Q.    Where were you born?

 7    A.    Lebanon.

 8    Q.    At some point did you immigrate to the United States?

 9    A.    Yes.

10    Q.    When was that?

11    A.    We came to the United States in 1984.

12    Q.    And when you say "we," who came with you?

13    A.    Oh, my wife and my son.

14    Q.    And where did your wife, your son -- how old was your son,

15    by the way, at that time?

16    A.    Three years old.

17    Q.    Okay.  And where did your family -- where did you live?

18    Where did you move?

19    A.    With my mother.  My mother is an American citizen.

20    Q.    In what city?

21    A.    Fall River.

22    Q.    And have you been living in Fall River or that area ever

23    since?

24    A.    Yeah, we were living in Fall River.

25    Q.    At some point, sir, did you and your wife, your family,
```

1    open a store or buy an existing store?

2    A.    When?

3    Q.    Did you get a store at some point?

4    A.    Yes.

5    Q.    And what's the name of your store?

6    A.    Guimond Farms.

7    Q.    How long have you owned Guimond Farms?

8    A.    We bought it in 1997.

9    Q.    Who works there now?

10   A.    Now?

11   Q.    Let me qualify that, sir.  Who within your family works at

12   the store?

13   A.    Me, my wife, my son, and my daughter.

14   Q.    And who is your son, what's his name?

15   A.    Charles Saliby.

16   Q.    And what is your daughter's name?

17   A.    Nicole Saliby.

18   Q.    Thank you.  Sir, from time to time do you need to go to

19   the doctor's?

20   A.    Yes.

21   Q.    Do you have any doctors at or near Gillette Stadium or in

22   Foxboro?

23   A.    Yeah, in Foxboro.

24   Q.    Okay.  And how do you get to the doctor's in Foxboro, how

25   do you get --

1    A.    Always I go with my son Charles.

2    Q.    Sir, do you and your family keep a safe to put cash and

3    other things in from the store?  Do you have a safe?

4    A.    Sorry?

5    Q.    Yes.  Do you have a safe?

6    A.    Safe, yeah.

7    Q.    A safe?

8    A.    Yes.  I'm sorry.

9    Q.    Do you keep one?

10   A.    Yes.

11   Q.    Do you keep money in there?

12   A.    Yes.

13   Q.    Was there a time when your son Sami Saliby --

14   A.    Charlie.

15   Q.    Charlie, I'm sorry.  You're Sami.  I apologize.  I am

16   sorry.

17   A.    That's all right.

18   Q.    Was there a time when your son, Charlie Saliby, came to

19   you and told you about needing to take money out of the safe?

20   A.    Yes.

21   Q.    Did he tell you why he needed to take money out of the

22   safe?

23   A.    It was for the business.

24   Q.    What business specifically, as you understood it?

25   A.    For the marijuana shop.

1           MR. TOBIN:  I have no further questions.  Thank you.

2           THE COURT:  All right.  Mr. Reddington.

3           MR. REDDINGTON:  I have no questions.  Thank you.

4           THE COURT:  All right.  You may step down, Mr. Saliby.

5    Mr. Saliby, you can step down.  But if you take that top off

6    the microphone, that would be helpful.  Thank you.

7           THE WITNESS:  That's it?  Thank you.

8           MR. HAFER:  Your Honor, the government calls

9    Christopher Harkins.

10          THE COURT:  All right.

11          Mr. Harkins, in that witness stand over there.

12          CHRISTOPHER HARKINS, Sworn

13          COURTROOM CLERK:  Please be seated and state your full

14   name, and please spell your last name.

15          THE WITNESS:  Mask off?

16          THE COURT:  Yes, please.

17          THE WITNESS:  Chris Harkins, H-a-r-k-i-n-s.

18          THE COURT:  Mr. Harkins, if you can put a top on that

19   microphone there.  It's over on your left-hand side.  There's a

20   little shroud that you can put on top of the microphone.

21          THE WITNESS:  Okay, yeah.

22          THE COURT:  I never know exactly what to describe it

23   as, but that's what it is.

24          MR. HAFER:  May I proceed, Your Honor?

25          THE COURT:  You may.

1    DIRECT EXAMINATION BY MR. HAFER:

2    Q.    How old are you, Mr. Harkins?

3    A.    45.

4    Q.    Where do you currently live?

5    A.    In Portsmouth, Rhode Island.

6    Q.    Where did you grow up?

7    A.    Concord, Mass.

8    Q.    How far did you go in school?

9    A.    College.

10   Q.    Are you currently working?

11   A.    Yes.

12   Q.    How are you employed?

13   A.    I'm the CEO of Northeast Alternatives.

14   Q.    What is Northeast Alternatives?

15   A.    We're a cannabis business located in Fall River.

16   Q.    And are you currently operating in the City of Fall River?

17   A.    Yes, we are.

18   Q.    Approximately when did your business, Northeast

19   Alternatives, become operational?

20   A.    2018 for medical.  So that was in June.  And then January

21   of 2019 for adult use.

22   Q.    Mr. Harkins, in connection with your involvement in this

23   case, were you contacted by federal agents at some point in

24   about July of 2019?

25   A.    Yes.

1   Q.   During the course of your interactions with the federal

2   government, did you eventually obtain a lawyer?

3   A.   Yes.

4   Q.   What is his name?

5   A.   Tony Fuller.

6   Q.   Could you turn to tab 168 of the binder in front of you

7   and let me know if you recognize the document at tab 168.

8   A.   Yes.

9   Q.   What is that?

10  A.   This is an immunity agreement.

11  Q.   Between you and the United States Attorney's Office?

12  A.   Correct.

13          MR. HAFER:   Your Honor, I offer 168.

14          THE COURT:   It's received.

15          (Exhibit 168 admitted into evidence.)

16          MR. HAFER:   Ms. DiPaolo, could I have the first

17  paragraph.

18  Q.   Mr. Harkins, I'm just going to read the first two

19  sentences.   "Your client agrees to provide complete and

20  truthful testimony pursuant to any subpoena compelling his

21  testimony in this matter.   Your client also agrees to meet with

22  representatives of the United States Attorney to answer

23  questions and/or to prepare for such testimony."

24          Have I read that correctly?

25  A.   Yes.

1   Q.   Is that your understanding as to what you're obligated to

2   do under this agreement?

3   A.   Yes.

4   Q.   And what is your understanding as to what the government

5   is obligated to do under this agreement?

6   A.   What the government -- oh, so, you know, I'm not liable --

7   I'm not to be prosecuted for any information that I give the

8   government.

9   Q.   I want to turn -- I'm sorry.

10           MR. HAFER:   For the record, may I have the second

11   page, Ms. DiPaolo.

12   Q.   Mr. Harkins, you see the signatures on this page?

13   A.   Yeah.

14   Q.   Do you recognize the bottom two signatures?

15   A.   I do.

16   Q.   Who are those?

17   A.   Myself and my attorney.

18   Q.   And someone from -- I signed it from the U.S. Attorney's

19   Office?

20   A.   Correct.

21   Q.   As the CEO of a cannabis business, Northeast Alternatives,

22   are you familiar with a Letter of Non-Opposition?

23   A.   I am.

24   Q.   What is that generally?

25   A.   That's the approval from the city or the -- basically

1    approval from the city to locate in the community.

2    Q.    Are you familiar with the Host Community Agreement?

3    A.    I am.

4    Q.    What is that?

5    A.    That's just the terms of the actual agreement, you know,

6    between the city and the business, you know -- you know, the

7    terms, financial terms and so forth.

8    Q.    Could you turn, Mr. Harkins, to your binder at tab 169.1,

9    please.

10   A.    169.1?

11   Q.    169.1, yes.

12   A.    Okay.

13   Q.    Do you recognize that?

14   A.    Yes.

15   Q.    What is it?

16   A.    It's a Letter of Non-Opposition.

17        MR. HAFER:  Your Honor, I offer Exhibit 169.1.

18        THE COURT:  It's received.

19        (Exhibit 169.1 admitted into evidence.)

20   Q.    Mr. Harkins, you received a Letter of Non-Opposition from

21   the City of Fall River on or about May 23 of 2017; is that

22   right?

23   A.    Correct.

24   Q.    And it's signed by then Mayor Jasiel Correia?

25   A.    Correct.

1    Q.   I'm just going to read you the last sentence.  Do you see

2    where it says, "This letter is subject to withdrawal or

3    revocation at any time"?

4    A.   Yes.

5    Q.   And do you understand that -- was that your understanding

6    of essentially the withdrawal provision of the letter?

7    A.   Yeah, that's what the letter states.

8    Q.   In connection with obtaining this Letter of Non-Opposition

9    in May of 2017, did you also obtain a Host Community Agreement

10   in approximately July of 2017?

11   A.   Yes.

12   Q.   Throughout the year 2017, Mr. Harkins, did you and your

13   business partners and members of your family make any political

14   contributions to Jasiel Correia?

15   A.   Yes, we did.

16   Q.   If you recall, what was the approximate amount of those

17   contributions in 2017?

18   A.   They were $4,000 or $5,000.  They were thousand-dollar

19   checks apiece.

20   Q.   After obtaining the first Host Community Agreement in

21   about July of 2017, throughout the rest of 2017 and into 2018,

22   were you still dealing with the City of Fall River in the

23   process of getting Northeast Alternatives up and running?

24   A.   Yes.

25   Q.   Did there come a time when you had a conversation with

1    Jasiel Correia about his legal defense fund?

2    A.    Yes.

3    Q.    Could you describe that conversation.

4    A.    He asked if I or we would be willing to donate, that he

5    was being, you know, victimized by sort of this, you know,

6    political assassination attempt against him to sort of force

7    him out of office and that he was looking for help, you know,

8    to be able to defend against that from the legal side.

9    Q.    When you had that conversation, did Mr. Correia say

10   anything about other marijuana and larger businesses in the

11   City of Fall River?

12   A.    Yeah.  He indicated, you know, the larger businesses and

13   that it was perfectly legal for businesses to donate, and a

14   large percentage of the bigger businesses were donating

15   substantially.

16   Q.    Did you decide to contribute to his legal defense fund

17   immediately, or were there people you had to talk to?

18   A.    I talked to my team about it and, you know, we were big

19   believers in Mr. Correia, and so we were happy to do it.

20   Q.    Did there come a time when you agreed to contribute to his

21   legal defense fund?

22   A.    Yes.

23   Q.    How much did you agree to contribute to his to legal

24   defense fund?

25   A.    20,000.

1   Q.   Could you turn to tab 169.3 and tell me if you recognize

2   that document.

3   A.   I do.

4   Q.   What is that, Mr. Harkins?

5   A.   That's the check that was written.

6             MR. HAFER:  I offer 169.3, Your Honor.

7             THE COURT:  It's received.

8             (Exhibit 169.3 admitted into evidence.)

9   Q.   Mr. Harkins, this is a check dated April 13 of 2018; is

10  that right?

11  A.   Correct.

12  Q.   Made out to the Friends of Jasiel Correia Defense Fund; is

13  that right?

14  A.   Correct.

15  Q.   For $20,000; is that right?

16  A.   Yes.

17  Q.   And you signed that check?

18  A.   I did.

19  Q.   What is J.H. Holdings Group, LLC?

20  A.   It's a real estate holding company.  I was also running --

21  I also run a development and had been running a development

22  company.

23  Q.   Could you turn just for a moment, Mr. Harkins, to tab

24  169.6.

25  A.   Yes.

1   Q.   Do you recognize that?

2   A.   Yes.  It's also a second check that the first one didn't

3   clear.

4            MR. HAFER:  I offer 169.6, Your Honor.

5            THE COURT:  It's received.

6            (Exhibit 169.6 admitted into evidence.)

7   Q.   Mr. Harkins, you just indicated the first check we just

8   looked at from April 13 of 2018 didn't clear.

9   A.   Correct.

10  Q.   So you wrote a second check on April 20 of 2018?

11  A.   Correct.

12  Q.   But just to be clear, you didn't give $40,000.

13  A.   No.

14  Q.   You gave $20,000.

15  A.   Correct.

16  Q.   In April of 2018, did you also negotiate an amended Host

17  Community Agreement with the City of Fall River?

18  A.   I did.

19  Q.   And why were you getting a new Host Community Agreement in

20  April of 2018?

21  A.   It was an amendment to the original Host Community

22  Agreement.  So it wasn't new.  It was an amendment that brings

23  in adult use.

24  Q.   So even though you already have a Letter of

25  Non-Opposition, you're still interacting and dealing with the

1   city for amendments and things like that?

2   A.   Correct.

3   Q.   Could you turn, Mr. Harkins, to tab 169.4.  Do you

4   recognize that?

5   A.   I do.

6   Q.   There's actually two documents in there.  Could you just

7   indicate what each one of them is, if you wouldn't mind.  The

8   first five pages of the first document and then there's a --

9   A.   Yeah.  So this is the original Host Community Agreement

10  with the amended language for adult use, and this document is

11  the -- there was an -- there was another amendment dated in

12  December of '18 bringing the -- you know, getting in line with

13  the legal requirements, state legal requirements of 3 percent.

14  The original had a 4 percent fee.

15          MR. HAFER:  Your Honor, I offer 169.4.

16          THE COURT:  It's received.

17          (Exhibit 169.4 admitted into evidence.)

18          MR. HAFER:  Could you just highlight the top half of

19  the first one, Ms. DiPaolo.

20  Q.   Just so it's clear, there's the initial July 2017 Host

21  Community Agreement, correct?

22  A.   Correct.

23  Q.   And this is essentially the first amended agreement which

24  you indicated was because you were going from medical to

25  recreational or adult use?

1   A.   Adding adult use, yes.

2   Q.   Adding, okay.  This is dated April 13 of 2018, correct?

3   A.   Correct.

4   Q.   Now, that's the same date as the $20,000 check that you

5   just testified didn't clear; is that right?

6   A.   That is correct.

7   Q.   Was there any arrangement or specific agreement between

8   you and Mr. Correia as to that --

9   A.   No.

10  Q.   -- April 13 check and this Host Community Agreement?

11  A.   No, there was not.

12       MR. HAFER:  Ms. DiPaolo, could I have page 2 of this

13  agreement.  Could you highlight the top paragraph under section

14  2.

15  Q.   About halfway through the paragraph that's highlighted on

16  your screen, Mr. Harkins, it indicates that Northeast

17  Alternatives will make a payment of 4 percent gross revenue.

18  Do you see that?

19  A.   I do.

20  Q.   Could you -- I think you said this briefly, but what is

21  that exactly?

22  A.   So that's the percentage of gross revenue that the city

23  receives for, you know, locating in the community.

24  Q.   In addition to the 4 percent, was there an annual $50,000

25  that Northeast Alternatives had to pay to Fall River?

1   A.   Yes.

2   Q.   Was it your understanding that that $50,000 annual

3   payment, was that a negotiable number, or was that something

4   that --

5   A.   None of the Host Community Agreement was negotiable.  It

6   was a set-in-stone thing.  So it was not as if you needed to

7   negotiate this.  This had been determined by corporation

8   counsel, and that's who I was working with.  As you mentioned

9   the date there, I was dealing with corporation counsel, Judge

10  Macy at that time.

11          MR. HAFER:  Could I have page 5, the signature page.

12  Q.   This first amended agreement, Mr. Harkins, is signed by

13  you on April 13, 2018, correct?

14  A.   Correct.

15  Q.   And by Mr. Correia on behalf of the City of Fall River?

16  A.   Correct.

17  Q.   At some point during the course of your interactions with

18  Jasiel Correia regarding the Non-Opposition Letter and Host

19  Community Agreement, did you have a conversation with him about

20  being a consultant for Northeast Alternatives?

21  A.   Through the time that I had spent discussing our business,

22  discussing the industry with the mayor, in various

23  conversations, he had indicated that through his relationship

24  with the U.S. mayors conferences that he had lots of

25  relationships with mayors around the country and that he would

1    be able to make introductions.  So, yes.

2    Q.   Did you ultimately enter into a consulting agreement with

3    Jasiel Correia?

4    A.   Yes.

5    Q.   Could you turn to tab 170 of your binder, please.  Do you

6    recognize that, Mr. Harkins?

7    A.   I do.

8    Q.   What is that?

9    A.   That is the consulting contract agreement.

10            MR. HAFER:  Your Honor, I offer Exhibit 170.

11            THE COURT:  It's received.

12            (Exhibit 170 admitted into evidence.)

13            MR. HAFER:  Ms. DiPaolo, could you just highlight the

14   top half of it.

15   Q.   The top here is dated April 5 of 2018; is that right, just

16   what's dated there at the top left hand corner of the document

17   on your screen?

18   A.   It is.  But that's -- that was just a, you know, it was

19   just a blank form that we had the wrong date on, but yes.

20            MR. HAFER:  In fact, could you now go to the signature

21   block, Ms. DiPaolo.

22   Q.   What is that date, Mr. Harkins?

23   A.   6-29-18.

24   Q.   And is that, in fact, when you and Jasiel Correia entered

25   into this consulting agreement?

```
 1    A.    Yes.
 2              MR. HAFER:  Could you go back to the first paragraph,
 3    please.
 4    Q.    Did you negotiate the payment that Northeast Alternatives
 5    was going to make to Mr. Correia?
 6    A.    Yeah, $4,000.
 7    Q.    Monthly?
 8    A.    Monthly.
 9    Q.    And what did you expect the company was going to get in
10    return?
11    A.    It was for business development, to do what I just -- what
12    I said before, which is to make introductions, to formulate a
13    plan, government relation plan, and to positively -- and/or,
14    you know, explain to other municipalities, other mayors, his
15    experience with Northeast Alternatives and the executive team.
16    Q.    Prior to entering into this agreement with Mr. Correia,
17    did the issue of any ethics waivers he might need come up?
18    A.    Yes.
19    Q.    What do you remember about that?
20    A.    Well, we discussed that there was going to be a
21    requirement for there to be a contract, a consulting contract,
22    that we needed to have an ethics opinion and approval from
23    Mass. State Ethics.
24    Q.    And did he ultimately provide you with documents showing
25    that he had obtained the necessary approvals?
```

1    A.    Yes, he did.

2    Q.    Could you turn to Exhibit 169.5.  Do you recognize that

3    four-page document?

4    A.    Yes, I do.

5    Q.    What is that, Mr. Harkins?

6    A.    That is an email chain that was handed -- you know, given

7    to us of the approval by -- I'm probably not going to get this

8    name right, but the lawyer for Mass. State Ethics, approving

9    the work.

10   Q.    And who gave that to you?

11   A.    Mr. Correia.

12            MR. HAFER:  Your Honor, I offer 169.5.

13            THE COURT:  It's received.

14            (Exhibit 169.5 admitted into evidence.)

15            MR. HAFER:  Could I have the top half of the first

16   page, Ms. DiPaolo.

17   Q.    This email chain is dated April 6 of 2018; is that

18   correct, Mr. Harkins?

19   A.    Yes.

20   Q.    And the first email below the top one from a

21   paulinenguyen@state.ma.us to mayorjfc@gmail.com, I'm just going

22   to read a portion to you.  "Hi Jasiel.  I am writing in

23   response to your request for advice under the conflict of

24   interest law, General Law Chapter 268A."  Have I read that

25   correctly?

1    A.    Yes.

2    Q.    It then says, "In providing this opinion, I have relied

3    upon the facts you provided in your request for advice and have

4    not made any independent investigation of those facts."  Have I

5    read that correctly?

6    A.    Yes.

7    Q.    And we'll look further at this document in a moment, but

8    what was your general understanding when Mr. Correia gave you

9    this document with respect to whether he had obtained the

10   necessary approvals from the Ethics Commission?

11   A.    I had made the assumption that the contract had been

12   provided to the ethics and the full explanation of the work, it

13   seemed to indicate that when I read through the document, and

14   so I thought it was a good ethics opinion.

15   Q.    Beyond whatever is in the content of this email, were you

16   present when Mr. Correia spoke to anyone from the Ethics

17   Commission?

18   A.    No, I was not.

19   Q.    Do you know whether he told anyone from the Ethics

20   Commission that, for example, you had put $20,000 in his legal

21   defense fund?

22   A.    I have no idea, no.

23   Q.    Do you know if he told anyone from the Ethics Commission

24   at the time he entered into this agreement with you he was

25   still involved in the process of signing Host Community

```
 1    Agreements?
 2    A.    I have no knowledge of any interactions he may have had.
 3              MR. HAFER:  Ms. DiPaolo, could you go back to 169.4,
 4    page 6.
 5    Q.    You previously testified, Mr. Harkins, there was the
 6    amended Host Community Agreement and then there was an
 7    amendment to the amendment; is that right?
 8    A.    That's correct.
 9    Q.    And this here on the screen in front of you is the
10    amendment to the amendment; is that right?
11    A.    Yes.
12    Q.    And that was what you said took that 4 percent fee down to
13    3 percent?
14    A.    Correct.
15              MR. HAFER:  Could I have the signature block of this
16    document.
17    Q.    And this amendment to the amendment is signed by you and
18    Jasiel Correia in December of 2018, correct?
19    A.    Correct.
20    Q.    So in December of '18 you're still dealing with
21    Mr. Correia, the City of Fall River in connection with your
22    business?
23    A.    That's correct.
24              MR. HAFER:  Could you go back, Ms. DiPaolo, to 169.5,
25    page 2, and highlight section 19.
```

1    Q.   Looking now again at the email that Mayor Correia provided

2    you -- then Mayor Correia -- provided you regarding the ethics

3    opinion, I want to read, "Section 19 in relevant part prohibits

4    you as mayor from participating in any matter in which you or

5    Northeast Alternatives has a financial interest."  Have I read

6    that correctly?

7    A.   Yes.

8    Q.   "There is no exemption to Section 19 available to you.

9    This means if a matter comes before you in which Northeast

10   Alternatives has a financial interest, you must recuse yourself

11   from that matter."  Have I read that correctly?

12   A.   Yes.

13   Q.   At any point when you dealt with Mayor Correia for

14   Northeast Alternatives, did he ever recuse himself from

15   anything?

16   A.   I wasn't privy to this being signed, so I have no

17   knowledge.

18   Q.   But he signed the December 2018 amendment to the

19   amendment; is that right?

20   A.   Yes, he did.  Not in my presence, but clearly he did.

21   Q.   But it's signed by him?

22   A.   Yes.

23   Q.   And he never told you he had to recuse because he was

24   consulting for you?

25   A.   I didn't speak with him about it.

1    Q.   Did you, in fact, pay Mr. Correia for a month of

2    consulting work?

3    A.   Yes.

4    Q.   Could you turn to tab 171.  Do you recognize that

5    document?

6    A.   I do.

7    Q.   What is that, Mr. Harkins?

8    A.   That is the one payment that he received for consulting.

9         MR. HAFER:  I offer Exhibit 171, Your Honor.

10        THE COURT:  It's received.

11        (Exhibit 171 admitted into evidence.)

12   Q.   This is a check, Mr. Harkins, dated July 26 of 2018; is

13   that right?

14   A.   Yeah.

15   Q.   And it's made to Jasiel Correia for $4,000; is that

16   correct?

17   A.   Correct.

18   Q.   From -- that's your group, J.H. Holdings Group?

19   A.   Yeah.

20   Q.   Did you pay Mayor Correia again after the first month?

21   A.   No.

22   Q.   Why not?

23   A.   He was unavailable to do the work, or the work wasn't

24   provided, so.

25   Q.   Mr. Harkins, I want to be clear.  When you gave Mayor

1    Correia $20,000, was that a bribe of any sort?

2    A.    No, it was not.

3    Q.    Why did you give him $20,000 for his legal defense fund?

4    A.    Because we believed in him.

5    Q.    Did $20,000 have anything to do with getting your

6    Non-Opposition Letter?

7    A.    No.

8    Q.    Did it have anything to do with getting your Host

9    Community Agreement?

10   A.    No.

11   Q.    During the course of your interactions with Jasiel

12   Correia, did you have any conversations with him about the

13   number of marijuana dispensaries that he was going to authorize

14   in Fall River?

15   A.    Yes.

16   Q.    What did he tell you?

17   A.    Five was his target.  They were going to be split up

18   geographically apart around the city.

19   Q.    And why did it matter to you as a business owner how many

20   dispensaries there were?

21   A.    Well, for obvious reasons, you don't want -- the market

22   flooded with, you know, lots of retailers.

23   Q.    Directing your attention to the summer or the late spring

24   of 2018, did you eventually come to learn that more letters

25   were being issued?

```
 1    A.    I had been hearing rumors, and then I subsequently --
 2              MR. REDDINGTON:  I object to rumors.
 3              THE COURT:  Well, no.  The jury will understand that
 4    that's the level of his knowledge.  There were some rumors out
 5    there.  Whether they were true or not is another matter, but
 6    the question is his state of mind, and so I'll permit the
 7    answer to stand.
 8    A.    Should I continue?
 9    Q.    Yes.
10    A.    And then subsequently there was newspaper reporting of
11    actual new locations that had been granted Host Community
12    Agreements.
13    Q.    When you learned that information, did you reach out to
14    Mr. Correia?
15    A.    I did.
16    Q.    Did you actually learn specific information about a
17    business that had been authorized geographically in proximity
18    to yours?
19    A.    Yes, yes.
20    Q.    What did you learn about that?
21    A.    The name of the business escapes me, but it was on the
22    same -- it was very, very close to where we were located, on
23    the same street basically.  So I was concerned about it.
24    Q.    Near like a Guimond Farms convenience store?
25    A.    Yes, it's exactly that one, yeah.
```

1   Q.   So when you reached out to Jasiel Correia about the

2   additional letters that you learned about, what did you say,

3   and what did he say?

4   A.   I asked why -- you know, that this was troubling, and that

5   I was surprised, particularly this location being as close as

6   it was to our location, and he told me that this was a location

7   that Gen Andrade was pushing for.

8   Q.   Did you know who Gen Andrade was at the time?

9   A.   I did.

10  Q.   Who was she?

11  A.   His chief of staff.

12  Q.   When he told that you this -- just to be clear, the

13  location is this Guimond Farms.  Did you learn the name of the

14  individual whose business that was?

15  A.   I didn't.  It was just from a Herald newspaper article.

16  Q.   After Mr. Correia told you that one was Gen Andrade, did

17  you follow up with Ms. Andrade?

18  A.   I did.  I asked her if we could set up a meeting to

19  discuss.

20  Q.   Could you turn to tab 173, Mr. Harkins, which I believe is

21  just a one-page document.  Do you recognize the document at tab

22  173?

23  A.   I do.

24  Q.   What is that?

25  A.   It's a text chain between myself and Gen Andrade.

```
 1              MR. HAFER:  Your Honor, I offer 173.
 2              THE COURT:  It's received.
 3              (Exhibit 173 admitted into evidence.)
 4              MR. HAFER:  Could you, actually, if it's possible,
 5    Ms. DiPaolo, just enlarge the whole thing.
 6    Q.   I'm just going to start at the top, Mr. Harkins.  Are you
 7    the blue or the gray in this?
 8    A.   I'm blue.
 9    Q.   And the chain begins on July 31 of 2018; is that correct?
10    A.   Yes.
11    Q.   Ms. Andrade, if she's the gray -- let me ask.  You said
12    this is you and Gen Andrade?
13    A.   Correct.
14    Q.   Ms. Andrade asked you if you're still meeting for lunch
15    today on July 31, 2018?
16    A.   Yeah.
17    Q.   You essentially say you have another commitment, can you
18    move it to the next day; is that right?
19    A.   Correct.
20    Q.   And then you make plans to meet the next day at 110 Grill
21    at 12:00 p.m.?
22    A.   Correct.
23    Q.   Did you, in fact, meet with Gen Andrade for lunch at 110
24    Grill on August 1 of 2018?
25    A.   Yes.
```

1    Q.   And is that what the second portion of the text chain

2    reflects where you text Ms. Andrade, "I'm here"?

3    A.   Yes.

4    Q.   When you met Ms. Andrade for lunch, did you bring up your

5    concern about the extra letters and what Jasiel Correia had

6    told you?

7    A.   I did.

8    Q.   What did she say?

9    A.   She told me that that was 100 percent false, that she was

10   not the person that was responsible for encouraging that

11   location, and that the mayor had been -- and I should say that

12   I asked her about, you know, the other rumors I was hearing

13   about, you know, other letters being signed.

14           MR. REDDINGTON:  I'm going to object to rumors.  I'm

15   sorry.

16           THE COURT:  I understand the objection.  I overrule

17   it, though.

18   A.   So I just generally asked her that question, and she said

19   you know, in addition to the "no," that that wasn't anything to

20   do with her, that he had been meeting with a lot of who she

21   called shady people in the marijuana -- you know, sort of

22   marijuana people looking to get into the city.

23   Q.   When she said "he," who did you understand her to mean by

24   "he"?

25           MR. REDDINGTON:  Your Honor, motion to strike.  May I

1   have a standing objection?

2          THE COURT:  To the degree that we've discussed a

3   standing objection, it's overruled.  Anything beyond that, of

4   course, I want to be advised of, and we'll move forward with

5   this testimony on that basis.

6   Q.   I'm sorry, Mr. Harkins.  Who did you understand her to

7   mean by "he" was meeting with --

8   A.   Mayor Correia was meeting with shady people, as she

9   described it.

10  Q.   Anything else, did she say anything else at this lunch?

11  A.   She said -- she also said --

12         THE WITNESS:  And excuse my language, Judge.  This is

13  verbatim language.

14         THE COURT:  That's what you're asked for, so.

15  A.   She said, "If you want to hear something really fucked up,

16  he's taking half of my salary."

17  Q.   Did you ask her why?

18  A.   I did.

19  Q.   What did she say?

20  A.   She said that that was the arrangement.

21         MR. HAFER:  Thank you.

22         Your Honor, I have no further questions.

23         THE COURT:  All right.  Mr. Reddington.

24  CROSS-EXAMINATION BY MR. REDDINGTON:

25  Q.   Actually, didn't she in response indicate that she did not

1   know why, is the quote, that she stated to you about the

2   salary?

3   A.   My recollection was that she said that that was the

4   arrangement.

5   Q.   So you had occasion, sir, to be interviewed by the FBI,

6   right?

7   A.   I did.

8   Q.   Various agents, agencies, correct?  And as a result of

9   which you were granted immunity?

10  A.   I was granted immunity, correct.

11  Q.   And now, you had this marijuana dispensary business

12  already open in another city, but then you wanted to get into

13  Fall River, is that --

14  A.   No, that's not correct.

15  Q.   Did you have a prior business?

16  A.   Did not.

17  Q.   Okay.  So you decided you wanted to open a marijuana

18  dispensary and you wanted to open one in a bigger city in

19  Massachusetts, correct?

20  A.   Yes.

21  Q.   So you decided that you'd settle on Fall River, because

22  you were developing property.  You had a lot of commercial and

23  residential real estate in Fall River, right?

24  A.   Some.

25  Q.   And did you make a purchase of a building so that you

1    could operate this marijuana business?

2    A.    Yes.

3    Q.    And fair to say you poured an awful lot of money into this

4    business?

5    A.    Sure.

6    Q.    Close to $10 million?

7    A.    Oh, no, not there, no.

8    Q.    About $7 million?

9    A.    No, not that much.

10   Q.    How much do you figure you invested in the business, sir,

11   the building and your startup costs?

12   A.    I'd say between three and a half, three and a half, four

13   million.

14   Q.    And how many commercial buildings did you at that time own

15   in Fall River?

16   A.    I don't think I had any other commercial buildings in Fall

17   River at that time.

18   Q.    Had you been developing commercial and residential real

19   estate for years in Fall River?

20   A.    No.  Just one subdivision that I would -- you know, just

21   single-family homes.

22   Q.    That was a fairly recent -- in reference to the timeframe

23   we're talking about, July of '19, that was a fairly recent

24   purchase.  It was 20 house lots, wasn't it?

25   A.    I was buying individual lots, but that was in 2013, '14.

1    Q.    When you were speaking with the agents, does it refresh

2    your memory they indicated -- note that you made a statement to

3    the effect that you had looked to Fall River because you had

4    been developing commercial and residential real estate for

5    years?

6    A.    I don't recall saying that, but.

7    Q.    All right.  So where was your location for your business?

8    A.    999 William S. Canning Boulevard.

9    Q.    And this is a corporation that held title to it?

10   A.    Excuse me?

11   Q.    Your marijuana business was a corporation.

12   A.    Yes.

13   Q.    And it had to be incorporated, and there's regulations and

14   rules by the State of Massachusetts, for example, that require

15   that marijuana vendors, businesses that receive licenses have

16   to have certain people on their board of directors, like former

17   law enforcement, perhaps a marijuana adviser, people like that,

18   right?

19   A.    I mean, I think that's -- broadly.

20   Q.    Okay.  So how many people were on your board of directors?

21   A.    I think -- at that time?

22   Q.    Yeah.

23   A.    At that time I think five.

24   Q.    And one of the things you had to do is you had to put

25   together a presentation, like a pitch, for your business,

1    right?

2    A.    Yes.

3    Q.    And you went to City Hall?

4    A.    Yes.

5    Q.    And you made that presentation, correct?

6    A.    Yeah.

7    Q.    And when I say "you," was it you yourself, or did you have

8    a lawyer do it or some other people?

9    A.    I did, sir.

10   Q.    And who was at the presentation when you were opening?

11   A.    When I presented our plan to the city?

12   Q.    Yeah.

13   A.    Mr. Correia.

14   Q.    And where did that take place in City Hall?

15   A.    In Mr. Correia's conference room there.

16   Q.    Conference room, office?

17   A.    Yeah.

18   Q.    And after that meeting was completed -- by the way, did

19   you ever deal with Joe Macy?

20   A.    Extensively in the, yeah, negotiating -- the word's not

21   "negotiating," but in the Host Community Agreement signing and

22   all of that, yes.

23   Q.    Sure.  And you basically felt that Joe Macy was kind of a

24   pain in the butt, right?

25   A.    Well, he was thorough, sure.

1   Q.   He was somewhat slow-moving for your standards, I guess?

2   A.   I mean somewhat, yeah.

3   Q.   Okay.  So did you have to make another pitch to get the

4   Letter of Non-Opposition from Mayor Jasiel Correia, or was that

5   issued to you?

6   A.   I'm not following.  Can you repeat that.

7   Q.   You had the meeting, you did the pitch.

8   A.   Yes.

9   Q.   Jasiel Correia was the one that listened to the pitch.

10  A.   Yes.

11  Q.   To get your Letter of Non-Opposition, did you have to do

12  anything else?  Did you have to have another pitch?

13  A.   No.  I think I made a couple of -- I mean, we had a couple

14  of meetings beyond the original pitch, but no, not an

15  official --

16  Q.   Okay.  And what did they involve, the other meetings that

17  you had?

18  A.   Just simply just talking about our business, our executive

19  team, our, you know, future plans, so forth.

20  Q.   It all seemed on the up and up?  I mean, as far as his

21  questions, he was trying to make sure it was a quality

22  corporation?

23  A.   He was vetting the company, yes.

24  Q.   And ultimately, you did get your Letter of Non-Opposition,

25  right?

1    A.    That is correct.

2    Q.    And that would be -- when did you receive that?

3    A.    The exact date is going to escape me, but it was in 2017.

4    I think it's in here, but.

5    Q.    When you received the Letter of Non-Opposition, it opened

6    the door for you to then negotiate the Community Host

7    Agreement, right?

8    A.    It really wasn't a negotiation.  The agreement was just

9    simply agreed to and signed.  It was already done by the city.

10   Q.    And that's pretty much standard, in other words, there's

11   no negotiating on that type of --

12   A.    There was no --

13   Q.    Right, for anyone.

14         Did Jasiel Correia ever ask you to, you know, give

15   him $250,000 or money or anything like that for --

16   A.    Never.

17   Q.    And the business was successful and was up and running and

18   successful?

19   A.    Yes, sir.

20   Q.    You're still there?

21   A.    Yes, sir.

22   Q.    Obviously you received the license from the city -- strike

23   that -- the license from the Cannabis Control Commission.

24   A.    Yes, sir.

25   Q.    And negotiating on the non-opposition agreements, you were

```
 1   aware, sir, that, for example, the amendment that Mr. Hafer was
 2   asking you about, is that when it went from 4 percent to 3
 3   percent.
 4   A.   He was referring to two separate amendments to the
 5   agreement.  There's one agreement, and then there was an
 6   amendment that just added in adult use.
 7   Q.   Right.
 8   A.   And then some months later there was another amendment
 9   that added in to conform with state law --
10   Q.   Right.
11   A.   -- which is the cap of 3 percent.
12   Q.   You hit it right on the head.  That's right.  There was a
13   change in the state law that required that it go from the cap
14   of 4 percent to 3 percent, and that was what that modification
15   was, right?
16   A.   Correct.
17   Q.   Okay.  You knew Gen Correia -- you knew Gen Andrade,
18   correct?
19   A.   I did.
20   Q.   And her sister worked for you, right?
21   A.   She did.
22   Q.   And you do recall making a contribution to his legal
23   defense fund, right?
24   A.   I do.
25   Q.   And the consulting contract that you were talking about
```

1   where you knew that he had reached out to the Ethics Commission

2   to get their opinion on him working for you was after the

3   Letter of Non-Opposition Community Host Agreement had all been

4   signed and negotiated, right?

5   A.   That's correct.

6   Q.   You don't know a guy by the name of Costa, do you?

7   A.   I do not.

8   Q.   Hil Camara?

9   A.   No.

10  Q.   Mr. Hebert?

11  A.   No.

12  Q.   Do you recall in the conversation with Jasiel about -- and

13  it's understandable.  You have a business and you would prefer

14  to have, as any business person would, prefer to have not so

15  much competition, or, as you said, glut the market, right.

16  A.   Correct.

17  Q.   And do you recall him indicating to you that his position

18  on these licenses or Letters of Non-Opposition was pretty much

19  free market, free enterprise, let anybody that's capable get a

20  business and see if they're approved by Cannabis Control

21  Commission?

22  A.   That's not the conversation I had with him, sir.

23  Q.   Well, he issued, in addition to your license -- strike

24  that.

25            Your Letter of Non-Opposition, he had issued

1    approximately 14 -- 11 or 14, right?

2    A.    I believe -- that's what I've heard subsequently, but at

3    the time where I was making my presentation to the city to

4    locate there, I don't believe -- I believe that we were the

5    fifth or fourth, and that there was going to be a limit.

6    Q.    You thought there would be a limit, right?

7    A.    Correct.

8    Q.    Subsequently at present, I imagine, you keep attuned to

9    the competition.  There's now about 14 -- 11 to 14 businesses

10   that have received Letters of Non-Opposition, right?

11   A.    That's what I've heard.  I have no direct knowledge of

12   that, but that's what I've heard.

13           MR. REDDINGTON:  Okay.  That's all I have, Your Honor.

14           THE COURT:  All right.

15           MR. HAFER:  Your Honor, no redirect.

16           THE COURT:  All right.  You may step down.

17           THE WITNESS:  Thank you.

18           THE COURT:  If you could take the shroud off the --

19           THE WITNESS:  Binder stays here, sir?

20           THE COURT:  Yes, please.

21           Call your next witness.

22           MR. HAFER:  Your Honor, we've made it through everyone

23   we have today.  I don't want to say more than you want me to

24   say, but we --

25           THE COURT:  Do you have any other witnesses to offer

1  today?

2          MR. HAFER:  We have the one first thing tomorrow but

3  not for right now, Your Honor.  We communicated that last

4  evening we're way faster than we --

5          THE COURT:  And I communicated throughout that there

6  should be a witness available at all times so that we don't

7  have additional downtime.  And as I understand it, you're now

8  telling me that we do have additional downtime.

9          MR. HAFER:  Your Honor, we don't have another witness.

10          THE COURT:  Okay.  So ladies and gentlemen, my further

11  apologies on behalf of the system of justice that we've taken

12  your time this afternoon and we haven't used it as effectively

13  as we should have.  But we'll keep plugging along.  We have

14  additional witnesses tomorrow, and we'll start at right around

15  9:30 tomorrow morning, and I'll have a discussion with counsel

16  about how we organize that so that we take your time most

17  effectively tomorrow.

18          Again, bear in my mind my instructions about not

19  talking to anyone, not exposing yourself in any way to evidence

20  in this case and, of course, I'll ask you that question

21  tomorrow morning.  Enjoy the rest of the afternoon that's been

22  opened up to you unexpectedly.

23          (Jury exits the courtroom.)

24          THE COURT:  You may be seated.  I think we're going to

25  be taking up evidence that's not yet been introduced, so I'm

1    going to close the hearing at this point.  I'm closing the

2    hearing from the press.  I don't mean to rush you, but I just

3    wanted you to be aware.

4    (HEARING CLOSED TO PUBLIC.)

5          So Agent Lemanski, she'll be here tomorrow, won't she?

6          MR. HAFER:  Yes.  And, Your Honor, I have no problem.

7    We just needed to see exactly how it came in.  We've been in

8    touch with Mr. Reddington.  It's going to be no more than 30

9    minutes.  It's some summary stuff.

10          THE COURT:  You know, we got the jury in.  I've made

11    this point on multiple occasions and with greater degrees of

12    specificity, and I'm astonished, astonished that there isn't

13    somebody out there.  So you go through these witnesses quickly.

14    That means we ought to have somebody on deck, particularly

15    somebody who is supposed to be the case agent who probably is

16    around here somewhere.

17          MR. HAFER:  I want to be clear, she is around here.  I

18    will be candid, the examination is not prepared because we

19    wanted to --

20          THE COURT:  Well, you know, this case has been going

21    on for quite some time.  I suspect you've had some

22    conversations with her.  She's an experienced agent, and the

23    focus of her attention is fairly clear at this stage.  So I

24    expect to see her tomorrow.

25          Now, I will take a break but not long before we move

1    on to the defendant's case.

2         But, Mr. Reddington, how long do you anticipate your

3    case is going to be?

4         MR. REDDINGTON:  Your Honor, I anticipate that after

5    my last conversation this morning with Mr. Correia, it does

6    appear as though he does intend to testify.  That being the

7    case, it would add obviously some time to the witnesses.

8         THE COURT:  Let me just -- Mr. Correia's current view

9    is he's going to testify?

10        MR. REDDINGTON:  Yes, sir.

11        THE COURT:  Okay.

12        MR. REDDINGTON:  So I have, first it would be a Zoom.

13    I did file a motion.

14        THE COURT:  Right.  That's allowed.  We've agreed to

15    that.  I've never really heard about preordained vacations,

16    particularly going to Miami.  That's not where ordination is

17    ordinarily --

18        MR. REDDINGTON:  Probably late at night when I wrote

19    that and sent it to my secretary.  I don't know.

20        THE COURT:  Okay.

21        MR. REDDINGTON:  So I would propose to do Mr. Correia

22    first by Zoom.  That would probably, I would say, take, as I

23    think I've estimated before, 15 minutes.  I don't know what

24    Mr. Hafer would have for cross.  Sarah Hartry is counsel to

25    the -- not the Ethics Commission, the Campaign Finance

1    Commission in Boston.  She'll probably be about 15 minutes.

2    Mike Dion worked in City Hall in Fall River.  I would figure

3    I'll probably be 15 minutes with him.  And if I then went to

4    the defendant, I would imagine that would occupy us probably

5    for a significant portion of the day, if not all of the day,

6    depending on Mr. Hafer's cross.

7              THE COURT:  Okay.  So the last witness will be the

8    defendant, assuming that he testifies.

9              MR. REDDINGTON:  Yes.

10             THE COURT:  I want to find that time in which I

11   inquire of the defendant, irrespective of what his ultimate --

12   where he ultimately comes to land about his full discussion

13   about this.

14             But I'll say at this point, Mr. Correia, this is the

15   most significant decision that you can make in a case.  I'm

16   sure you're aware of that.  It's also a decision on which there

17   is no certainty one way or the other.  But what I want to be

18   sure is that you've had adequate opportunity to discuss with

19   your counsel the pros and the cons that are going to inform

20   your judgment because you're the one who is making the judgment

21   in this case about whether or not it makes sense for you in

22   connection with this case to testify or not to testify.

23             I'll tell you two basic things.  Number one, you heard

24   me instruct the jury about the right of a defendant to simply

25   remain silent, that it's a very valuable Constitutional right,

1    and I charge the jury pretty hard when a witness doesn't

2    testify to make sure I do what I can to avoid having them

3    think, well, we want to know something from the defendant.  I

4    think it works.  But that's a different issue.

5           The second issue is, this is a forum as you've seen in

6    which I try to keep control of it, but it is question and

7    answer.  It's not the same as a press conference.  It's not the

8    same as a campaign rally.  It's not the same as a meet and

9    greet.  This is a pretty stylized kind of thing and you have

10   seen me turn to witnesses who have been nonresponsive and

11   telling them they've got to respond here.  So I want you to

12   understand that this is the kind of interaction which, once it

13   gets going, you don't control.  The lawyers do, your lawyer and

14   the government lawyer here.

15          I don't think I want to say anything more about that,

16   but I am going to be -- unless you want to hear something more,

17   or have some other questions of me.  But I am going to ask you

18   at the time, and it's at the end of the case, you have to make

19   the decision one way or the other.  And it's not unusual at all

20   for a defendant to think, well, maybe I will, maybe I won't.

21   But at some point you have to decide.  And that's now, or

22   tomorrow.  And I'm going to ask you at that time anything else

23   on it.  So you can ask a question or questions now, but I'm

24   going to put that same question to you at the moment at which

25   you actually have to make the choice.  Do you understand?

1          THE DEFENDANT:  I do, Your Honor.

2          THE COURT:  Do you have any questions of me now?

3          THE DEFENDANT:  Not at this time.

4          THE COURT:  Okay.  So you may be seated.

5          So I think we're going to finish this tomorrow.  That

6     is, all of the testimony.  Now, what does that mean?  Well, I

7     guess we do some form of charging conference tomorrow.  I'm not

8     quite at the final point, but we've had a discussion about it

9     enough, I think, for you to -- when I say "tomorrow," I meant

10    Friday more likely, but we'll see how far we get tomorrow.  But

11    I mean to move it along as promptly as possible, and I think

12    I'm putting the case to the jury on Monday.

13         Now, if there's some objection to that, I want to hear

14    it, but I also want to hear how long the closing arguments are

15    expected to be.  So I don't know if you're allocating or

16    reallocating closings, Mr. Hafer, Mr. Tobin.

17         MR. HAFER:  Your Honor, I think my opening was just

18    under 45 minutes.  I don't want to obviously -- I was thinking

19    about an hour and 15 for closing, in that area code, but I'm

20    obviously not composing anything yet, but that's my guess.

21         THE COURT:  All right.  So an hour 15 minutes.  You

22    understand my view with respect to rebuttal closings, that they

23    are available but only for matters that could not reasonably

24    have been anticipated in the closing argument of counsel.  And

25    if I think that it's simply a replication or a restatement of

1    the initial closing, I'll shut it down.

2           MR. HAFER:  Okay.  Thank you for that.  I did know

3    that, but I appreciate the reminder.

4           THE COURT:  Okay.  So I'll block out, lets say, an

5    hour 20 minutes for the government, both the initial closing

6    and the rebuttal closing.

7           MR. HAFER:  Thank you.

8           THE COURT:  So Mr. Reddington, what about you?

9           MR. REDDINGTON:  You know, generally on closings and

10   the like, Your Honor, I subscribe to less is more, but I just

11   don't want to end up underestimating.  So I'd say an hour.

12          THE COURT:  Okay.  So we've got an hour on that.  And

13   my charge to the jury will probably be an hour and 30 minutes,

14   something like that.  That would be my expectation afterwards.

15          MR. HAFER:  Your Honor, on the schedule, my only

16   question is if there is going to be testimony from the

17   defendant and we end up filling most of the day tomorrow, I

18   would just ask for a little bit.  I need to reengage with you

19   on intent.  I need to do that.  I'll be ready by Friday.  I

20   would just ask --

21          THE COURT:  We can do it later on Friday, or whatever.

22   The point, I guess, I had in my mind is I wanted you people to

23   at least have the weekend to be thinking about your closing

24   arguments, and that you'd have -- I was thinking that you'd

25   finish on Friday, and then we might go to Monday with charge,

```
 1   but I don't think that's necessary here because I think we're

 2   really just tweaking the charge, from my perspective just

 3   tweaking the charge.  So we can give the jury Friday and a long

 4   weekend, and then we'll be back at it at that point.  So that's

 5   the plan that I have if we -- you know, if the examination of

 6   Mr. Correia goes longer, then I still probably am going to hold

 7   to that if it spills over into Friday a little bit, but it

 8   doesn't sound to me like it should.  So the testimony should be

 9   completed well before the end of the day tomorrow.  Okay.  So

10   we've got a basic idea of what the schedule is.

11           MR. HAFER:  I have a completely miscellaneous issue to

12   raise if you have a minute.

13           THE COURT:  Sure.

14           MR. HAFER:  I don't know if you remember yesterday --

15   we're on the closed session, is that --

16           THE COURT:  Yes, we are.

17           MR. HAFER:  The witness Mr. Perry from Fall River,

18   apparently it's been brought to our attention that the current

19   mayor of Fall River somehow understood something he said about

20   how Mr. Khoury was paid to suggest some sort of impropriety.

21   My ask -- I don't want to -- he's asked me if he could have the

22   transcript of his testimony to sort of show the mayor it's not

23   what the mayor thinks.  I have it obviously, but I'm not

24   providing it because I understand the rules.  I just didn't

25   know if I can get permission just for Mr. Perry's portion, and
```

```
 1    I think Mr. Khoury, to clear this issue up to just give him the
 2    portion of the transcript, or if you prefer I just direct him
 3    to the court to order one.  I just wanted to raise it.  It just
 4    seems to me, it's my understanding, that it's confusion that
 5    can be clarified with an official record.  So that would be my
 6    request.  But I don't want to do anything I'm not supposed to
 7    do.
 8            THE COURT:  Here is how I think we can deal with it.
 9    What we have been doing is the government has asked for daily
10    transcript, and it's been provided.  It has not been filed in
11    court, on the docket in the court.  The intent was to file it
12    all when it was completed.  There hasn't been a request as I
13    understand it, for any transcript by anyone.  I think that
14    under these circumstances with some special need that the
15    government can provide to -- Mr. Khoury, is it?
16            MR. HAFER:  It's Mr. Perry.
17            THE COURT:  Mr. Perry, excuse me.  Can provide that
18    limited portion of, I guess, Mr. Khoury's testimony; is that
19    what you're --
20            MR. HAFER:  Mr. Perry asked for his and Mr. Khoury's
21    together, which aren't long, but that was the request, just to
22    be clear, it's the two witnesses.
23            THE COURT:  I'm told as well that there's been a
24    request for Mr. Costa's testimony, and that it's being paid for
25    at the ordinary rates.  What I think I would say is that
```

1      Mr. Khoury's testimony is 29 pages and Mr. Perry is -- oh,

2      that's both of them together.  30 pages.  I think that that can

3      be made available by their payment but it's available.  You can

4      tell them that's available, and I maybe should ask Ms.

5      Mortellite.

6                  (Judge Woodlock and court reporter confer.)

7                  MR. HAFER:  I can get authorization to pay the second

8      copy rate since I'm requesting this, because I'm very sensitive

9      to all the work Ms. Mortellite --

10                 THE COURT:  Okay.  Well, the rate would be what would

11     be the rate for any other party who asked for it.  And I'm

12     told, and I'm not relying on that, but I'm told that that would

13     be about $30.

14                 MR. HAFER:  Okay.  I just wanted to make sure it was

15     okay.  I will make sure Ms. Mortellite is made whole.

16                 THE COURT:  So do I.  But I also want to be sure that

17     everybody has equal access to this information according to the

18     rules that the Administrative Office has, but the formal record

19     of the court is not filed on the docket of the court until the

20     conclusion of all of the evidence in this case, all of these

21     transcripts will be filed at that point.  That starts the

22     running of the redaction period and all of that sort of thing

23     for trial transcript.  But that's the state of the record right

24     now.

25                 And, again, as I've indicated to the government, there

1     cannot be any reference to the transcript.  You can say, "You

2     may remember, ladies and gentlemen," that kind of thing.  But

3     there's to be no reference that would give an unfair advantage

4     to the deployment of resources like that.

5           As to private persons, they have a right to request

6     the transcript, and it's been prepared in the sense that it's

7     viewed as the official transcript of the court.  I'm a little

8     concerned that the request for transcript by the media is

9     something that's potentially an issue on weekend kind of

10    publicity, and I want to think about that a little bit more.

11          Ms. Mortellite.

12          (Judge Woodlock and court reporter confer.)

13          THE COURT:  So what I think I want to say about that

14    is let's talk about that tomorrow, that is, whether or not the

15    parties have a concern about the disclosure to the media of the

16    transcript that involves Mr. Costa immediately before the

17    argument, charge and the jury deliberations.

18          I think we've taken every step that we possibly can.

19    I'm not a big fan obviously of gag orders or anything like

20    that.  On the other hand, I don't want to come this far and

21    then stumble on a case.  So you think about it overnight.  It's

22    not going to be -- I don't think it's going to be disclosed,

23    but certainly Ms. Mortellite and I understand it's not to be

24    disclosed, but there are two court reporters involved in the

25    preparation of the transcript.  They've been trading off to be

1    able to do daily copy in this way.  So we'll talk about that

2    tomorrow morning if there's an issue.  If there isn't an issue,

3    I will authorize it and just charge the jury -- instruct the

4    jury -- I don't do the charging here -- to disregard anything,

5    not to look at anything.  This is an especially important time

6    not to be looking at anything, to avoid any kind of media

7    exposure.  Okay?

8              MR. REDDINGTON:  Just one logistical question.

9              THE COURT:  Sure.

10             MR. REDDINGTON:  When the government rests, I will

11   have a Rule 29 motion, but I'm not at my office.  So I'm

12   communicating by text and email.

13             THE COURT:  That's going to be fine.  And I think the

14   way I'll end up doing it, because I've obviously been thinking

15   about it, is simply reserving on it.  But I will note for the

16   record that you've made one and that given the press of time it

17   will be reduced to a formal writing appropriately, but it's

18   something that you'll raise at the end of the government's case

19   and at the end of all of the evidence in the case as well.

20             MR. REDDINGTON:  Yes, Your Honor.

21             THE COURT:  I assume, but I won't be taking time to

22   argue that issue.

23             MR. REDDINGTON:  Thank you.

24             THE COURT:  Okay.  So we'll see you tomorrow morning.

25             (Adjourned, 3:50 p.m.)

1                          CERTIFICATION

2            We certify that the foregoing is a correct transcript

3       of the record of proceedings in the above-entitled matter to

4       the best of our skill and ability.

5       /s/Debra M. Joyce              May 5, 2021
        Debra M. Joyce, RMR, CRR, FCRR   Date
6       Official Court Reporter

7

8

9       /s/Kelly Mortellite            May 5, 2021
        Kelly Mortellite, RMR, CRR      Date
10      Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3     WITNESS                                                PAGE

4

      HILDEGAR CAMARA
5
         Cross-Examination                                     6
6        By Mr. Reddington

7     MATTHEW PICHETTE

8        Direct Examination                                   64
         By Mr. Tobin
9        Cross-Examination                                   116
         By Mr. Reddington
10       Redirect Examination                                126
         By Mr. Tobin
11       Recross-Examination                                 128
         By Mr. Reddington
12
      CHARLES SALIBY
13
         Direct Examination                                  130
14       By Mr. Tobin
         Cross-Examination by Mr. Reddington                 192
15
      NICOLE CUSTADIO
16
         Direct Examination by Mr. Tobin                     204
17
      SAMI SALIBY
18
         Direct Examination by Mr. Tobin                     212
19
      CHRISTOPHER HARKINS
20
         Direct Examination by Mr. Hafer                     216
21       Cross-Examination by Mr. Reddington                 239

22

23

24

25

<pre>
1                         E X H I B I T S

2
     Exhibit No.                                        Received
3

4       344                                                  31

5       174                                                  64

6       177                                                  72

7       179                                                  90

8       178                                                  95

9       176                                                 103

10      175                                                 110

11      180 and 181                                         112

12      345                                                 118

13      188                                                 130

14      189                                                 135

15      190                                                 136

16      191                                                 137

17      192                                                 137

18      193                                                 145

19      194                                                 146

20      195-196                                             183

21      197                                                 187

22      198                                                 209

23      168                                                 217

24      169.1                                               219

25      169.3                                               222
</pre>

| | | |
|---|---|---|
| 1 | 169.6 | 223 |
| 2 | 169.4 | 224 |
| 3 | 170 | 227 |
| 4 | 169.5 | 229 |
| 5 | 171 | 233 |
| 6 | 173 | 237 |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |