*  *  *  *  *S  E  A  L  E  D  *  *  *

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                                )
                                )           Criminal Action
        Plaintiff,     )           No. 18-10364-DPW
                                )
v.                            )
                                )
JASIEL F. CORREIA, II,    )
GENOVEVA ANDRADE,       )
                                )
        Defendants.    )
                                )

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

*  *  *   S  E  A  L  E  D *  *  *

VIDEOCONFERENCE

July 16, 2020
1:49 p.m.

John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

* * * S E A L E D * * *

1    APPEARANCES:

2    On Behalf of the Government:
     Zachary R. Hafer
3    David G. Tobin
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3106
6    zachary.hafer@usdoj.gov
     david.tobin@usdoj.gov
7
     On Behalf of the Defendant Jasiel Correia, II:
8    Kevin J. Reddington
     Law Offices of Kevin J. Reddington
9    1342 Belmont Street
     Suite 203
10   Brockton, MA 02301
     508-583-4280
11   kevinreddington@msn.com

12   On Behalf of the Defendant Genoveva Andrade:
     Charles W. Rankin
13   Rankin & Sultan
     151 Merrimac Street
14   Second Floor
     Boston, MA 02114-4717
15   617-720-0011
     crankin@rankin-sultan.com

16

17

18

19

20

21

22

23

24

25

*** S E A L E D ***

```
 1                    P R O C E E D I N G S
 2           THE COURT:  Okay.  Well, I wanted to do this part in
 3    camera because there were several issues that I wanted to take
 4    up.  First, in an informal matter, the motion for an order
 5    requiring production of documents of the Massachusetts ethics
 6    Commission.  I understand that Mr. Reddington has no objection
 7    to it.
 8           MR. REDDINGTON:  That's correct.
 9           THE COURT:  I don't think I heard anything from
10    Ms. Andrade.  Ms. Rankin, is there an objection to --
11           MR. RANKIN:  Ms. Andrade doesn't have an objection.
12           THE COURT:  I'm sorry, Ms. Andrade.  I did notice in
13    it, with a sinking heart, that the critical case is In re
14    Hampers.  Probably you didn't read very carefully, but I did,
15    who the lawyers were in that case.  I was prompted to recall
16    that I wrote the brief for the United States.
17           MR. HAFER:  Oh, wow.
18           THE COURT:  Well, "oh, wow" doesn't begin to capture
19    it, Mr. Hafer.  I lost, and so it's a sore point with me.  But
20    what it does indicate is a question of age, which gets me to
21    the next point, which is that --
22           COURTROOM CLERK:  Judge, can I interrupt?  I think we
23    might have problems with Mr. Reddington.  We seem to have lost
24    him.
25           THE COURT:  Okay.
```

*  *  *  *  *  S E A L E D  *  *  *  *

1          COURTROOM CLERK:  Mr. Reddington, can you hear me

2   okay?  You are on mute, so if you could unmute your device.  I

3   think we lost him.  Give him a few minutes to see if he logs

4   back in.

5          THE COURT:  All right.  Mr. Reddington, can you hear

6   me right now?  You are on mute right now.

7          MR. REDDINGTON:  I can hear you fine.  I don't know

8   what happened.  My screen went black.  I could still hear you,

9   but it went black.

10          THE COURT:  In any event, unless there's something

11   more to say, I'm allowing the motion for disclosure here, which

12   is number 128.  But I was proceeding on a trip down memory lane

13   mentioning that the core case *Hampers* was decided 39 years ago,

14   a little more than 39 years ago, and I was involved in it.  The

15   only people who -- I look at the list of people involved.  The

16   only other people who are still around are Judge Harrington and

17   me.

18          So that brings me to this point, which is concern

19   about doing jury trials here.  I know we've got a trial date.

20   I think you probably all recognize that it's not a meaningful

21   trial date.  It has been overtaken by the pandemic.  We, the

22   court, issued a general order yesterday saying that we're

23   prepared to go back into nonjury proceedings but with some

24   significant limitations.  And those limitations are such that

25   we're discouraging even nonjury proceedings in the courthouse

*  *  *  S E A L E D  *  *  *

1    itself.

2           All of that is part of a ramp-up, however, to getting

3    to jury trials, and we're now in the process of reconstituting

4    the court, setting it up in various ways, trying out different

5    configurations in the courtrooms to see what we can do.

6           It now appears to us that a mega-trial is two

7    defendants or more, which is somewhat of a redefinement,

8    redefinition of mega-trials.  But it's also the case that what

9    will happen is we'll start with single-defendant cases maybe in

10   September, maybe in October, hard for us to say at this point.

11   And I want to get a sense of where you are on the dance card

12   that's involved and also having in mind that 39 years is a long

13   time, and it appears it's right in the heartland of the

14   concerns that the CDC has for increased exposure to COVID-19.

15          We're going to try to do everything we can to mitigate

16   all of those concerns, and I do not want to in any way make

17   anyone uncomfortable about the idea of raising those concerns

18   if they exist.  I have to say they should exist for everybody.

19   We ought to think about them.

20          COURTROOM CLERK:  I'm sorry to interrupt, Judge.  I

21   don't know if Mr. Reddington is here with us.

22          MR. REDDINGTON:  I'm here.

23          COURTROOM CLERK:  You can hear us?

24          MR. REDDINGTON:  Yes.

25          COURTROOM CLERK:  Okay.  Sorry.

*  *  *  S E A L E D  *  *  *

1          THE COURT:  Okay.  So let me put it in a different

2     form.  As we're triaging the potential trial dates, the

3     traditional approach is criminal cases before civil cases and

4     criminal cases with defendants in custody before cases in which

5     -- defendant criminal cases in which the defendant is not in

6     custody.  And then among those cases, the oldest case first.

7          That's more or less the structure that I think we will

8     be following but not entirely because each case is different,

9     and it poses different kinds of problems and challenges.  I

10    would say however that this case does not immediately leap to

11    the top of the list because we don't have defendants who are in

12    custody.  Nevertheless, there is an interest in making cases

13    like this that are older move along more promptly.

14         As a first cut on this, I think what I want to suggest

15    is that the parties talk among yourselves to try to identify a

16    time that works that you would feel comfortable trying the

17    case, you know, perhaps make it more complex or perhaps not by

18    offering a variety of alternatives.

19         One of them is this, that I've had pending for some

20    time and I haven't felt the need to act on it because of the

21    uncertainty about when trial is going to take place, but the

22    *Kastigar* motion of Ms. Andrade.

23         I've made a preliminary cut-through.  Of course I'll

24    want to have a hearing on it, but I think I have to say two

25    things about it.  Number one, I'm not persuaded that we have a

*  *  *  *  *  S E A L E D  *  *  *  *  *

1     *Kastigar* problem here.  Number two, I recognize that *Kastigar*

2     is something that has to be taken up step by step at each

3     moment as new information develops, including even at trial.

4          I think that the government in its enthusiasm to draw

5     Ms. Andrade in for a proffer and then to indict immediately

6     thereafter or press it was perhaps improvident in a sense that

7     it created an issue in the case that's a significant issue, as

8     *Kastigar* issues are when there is a circumstance in which some

9     of the information that's developed in the proffer is also

10     developed elsewhere.  And the question is was it because it was

11     developed in the proffer that it was developed elsewhere.  But

12     my initial cut on this is I don't find that at this point,

13     subject obviously to argument and that sort of thing.

14          Now, why do I raise that?  I raise it because one of

15     the configurations of this trial that I'm thinking about is

16     severing the trial in any event among the defendants.  That is,

17     a trial involving Mr. Correia and a separate trial involving

18     Ms. Andrade.  The trial involving Mr. Correia would not have to

19     be severed, I don't think -- but maybe there will be an

20     argument about this -- would not necessarily have to be severed

21     with respect to the two different alleged schemes, that is the

22     fraud scheme involving Mr. Correia's company and the corruption

23     scheme in which Ms. Andrade is a co-defendant.

24          In any event, if I were to sever, we would have at a

25     minimum two trials with two different defendants.  I'm not as a

* * * *S E A L E D* * * *

 1   general proposition a fan of trying cases on multiple

 2   occasions, the same case perhaps involving different

 3   defendants, but these are not the usual circumstances, and

 4   maybe that is something that makes sense.

 5         Then the question is who goes first, assuming that

 6   there's severance.  In the first instance, I suppose I'd look

 7   to the parties to tell me what they want.  There are, I'm sure,

 8   beyond my, quote, "powers of recognition" strategic judgments

 9   that would be involved in this on scheduling the trial -- the

10   trials.  But I'd like to have the parties' view.

11         Now, I've outlined the idea of severance.  It's also

12   possible that we would come to having mega-trials here in this

13   courthouse.  One of the initiatives that we're considering in

14   reconstitution is trials involving at least two defendants.

15         For myself, because my courtroom is one of the guinea

16   pig courtrooms, and so I've thought about it and thought my way

17   through it, is we could probably do it.  It involves some major

18   reconfiguration of the courtroom, but it may be possible.  But

19   I don't think we as a court and certainly me as a judicial

20   officer want to do that until we've got some experience with

21   single-defendant cases.

22         And we've got a list of single-defendant cases quite

23   apart from anything that is involved here that we're going to

24   be trying to set up and maintain schedules, schedules that may

25   begin as early as September, maybe later.  We'll just have to

* * * *S E A L E D* * * *

1  see.  And there are lots of moving parts as you can well

2  understand, particularly when we're dealing with juries in

3  which we need a lot of lead time to get jury summonses out, and

4  we're going to have to worry about questions of whether jurors

5  will be willing to serve, have legitimate excuses.  And we're

6  going to be making arrangements to ensure that every day, every

7  juror, everybody who is involved in the trial has to answer

8  questions having to do with their current symptoms and also be

9  subject to temperature-testing anyway here, which raises the

10  possibility that somebody is going to have a cough, whether

11  it's COVID-related or not, in which case we continue for the

12  day.  And if it turns out to be COVID-related, then I suspect

13  that everybody who has come into contact with that juror,

14  assuming it's a juror, is going to be subject to a 14-day

15  quarantine, which sounds to me like a mistrial for that case.

16        So it's a dicey proposition.  I'm not trying to make

17  things seem worse than they are.  They are pretty bad in terms

18  of trying to move forward on this.  That's the good news.

19        Now the bad news.  The bad news is what do we do about

20  trial in this case?  I think I would like to have you talk

21  amongst yourselves.  I would think that if anyone is

22  particularly concerned about health issues that are related,

23  we're going to have a lot more information after the initial

24  trials are undertaken.  I think that by January we'll have an

25  idea of whether or not we can do trials of two defendants in

* * * *S E A L E D* * * *

1    this courthouse.  If we can't, we're going to have to start

2    exploring whether or not we hold them in other spaces outside

3    of the courthouse.

4         By way of history, not that I was here when they tore

5    down the old courthouse on Courthouse Square, Post Office

6    Square, but I know about it.  In the late 1920s they tore down

7    the old post office and subtreasury building which is where the

8    federal court sat to build what became the McCormack Building.

9         During that four- or five-year period they sat in

10   Rounds Hotel.  Rounds Hotel is about where -- I date myself

11   even on this but where Boston Company is, right next to where

12   the Boston School Committee used to be but in that area.  And

13   they sat in ballrooms for that.

14        I suppose we could put our dancing shoes on and try

15   mega-trials in ballrooms, and we're going to explore that as a

16   way of dealing with this because one of the features frequently

17   of federal trials is multiple defendants, large number of

18   defendants, more than two, so we'll have at least one-defendant

19   trials, then we will have mini mega-trials, which are two

20   people, and then mega-trials, which are more than two people

21   that we have to think about.

22        So where does this go?  Well, it could be a two-person

23   trial as long as the *Kastigar* issues don't resolve that in a

24   different way.  It can be two one-person trials.  It could be

25   three one-person trials.  I don't really know how the parties

*  *  *  *  *  *  *  *  *  *  *  *

1    look at it, and I'll make my own decision about it ultimately,

2    but I want to know what the parties have in mind.  And so what

3    I'm going to ask you to do is get back to me it in a week

4    regarding that.  It should be a matter submitted under seal

5    because I want the parties to be able to feel comfortable

6    mentioning health issues that any participant in the trial

7    might experience, witnesses, anybody who is going to be

8    involved in the trial.

9         Because one further thing that I would say is, if I

10   can get a trial date on this, it's one I'm going to hold you

11   to, and it will be, because Judge Young is involved in our

12   triage committee -- I'm not, but he is -- it may be something

13   along the lines of Judge Young's running trial dates, in which

14   case you'll be expected to be ready when it's ready.

15        I tend not to do things that way.  I don't like to do

16   things that way, but it may be that we have to do things that

17   way, and I'll try to be sensitive about it.  But I really want

18   to know where you are on that and where you want to be.  The

19   government may have its own views about severance.  I want you

20   to not fight the hypothetical too much, although the

21   hypothetical has still not been crystalized sufficiently but to

22   give me some idea about your views about going forward.  And if

23   it's more -- if it's severed as to individuals, who goes first,

24   and if it's to be severed as to schemes, which one goes first,

25   that sort of thing.

**\* \* \* *S E A L E D* \* \* \***

1         From the defendant counsel, same thing, what your

2    preferences would be on this, with the assumption -- and this

3    is the kind of timing assumption I'll make, that we're really

4    not going to be getting to this until January.  The more time I

5    get, the more time I can discuss with the triage committee what

6    makes sense for a case like this with busy trial lawyers who

7    have lots and lots of other obligations that they'll be called

8    upon to respond to so that I can give you something firmer by

9    way of date.

10        If there's anything you want to say, any questions you

11   want to ask, of course you can now.  I'm not sure how much I

12   can answer, but it's a somewhat open-ended obviously assignment

13   for say by noon Thursday for the parties to submit something,

14   next Thursday, for the parties to submit something, two weeks,

15   so I can sort through it and discuss it and try to figure out

16   where I go from there.

17        Now, just by way of further thought, because there are

18   public persons who are waiting on this, to coming into this

19   hearing, what I propose to do, unless there's something else

20   that the parties want me to deal with, is to indicate that we

21   had a conference in camera because there were certain sensitive

22   matters that needed to be taken up, and we've done so.

23        This was set up principally as a status conference,

24   and as a status conference I will say that I'm continuing the

25   trial at least until January of 2020 as the court tries to

* * * S E A L E D * * *

1  reconstitute jury trials generally and leave it at that with

2  nothing more said during the public portion of this hearing.

3          So are there questions or comments that the parties

4  want to make at this point before we bring the public in?

5          MR. HAFER:  If I may, just very briefly, Your Honor.

6          THE COURT:  Sure.

7          MR. HAFER:  I think you just answered it with your

8  summary of what you're going to say to the jury.

9          THE COURT:  To the public.

10         MR. HAFER:  Pardon me, to the public, excuse me, to

11  the public.  If there were severance, not fighting the

12  hypothetical, but if there were severance, am I hearing you say

13  that even, say, for example, a one-defendant trial in December,

14  in your view, given the variables with custody and non-custody

15  and the age of the case, is not something that we should even

16  aspire to?

17         THE COURT:  No.  I never attempt to curb enthusiasm,

18  but, you know, looking at this, I think the January date makes

19  more sense.  I don't want to give some artificial one.

20         Now, on the other hand, if I'm confronted with lawyers

21  who say, "I'm available in December and then in the year 2045,"

22  I would moderate that somewhat, but I don't think that's going

23  to happen.  I just think that realistically we're talking about

24  no earlier than January.  If I'm wrong about the willingness of

25  the availability of the parties, then, you know, I'll do

* * * S E A L E D * * *

1  whatever I can.

2       I just know that there are lots of judges who are

3  anxious to get going on their trial schedule, and the longer we

4  wait, the longer the list gets and the more compelling it

5  becomes as a categorical list that says your oldest and your

6  oldest in custody, you go first.

7       Now, one of the things that happens of course is that

8  we will only have -- if we're fortunate, we'll only have three

9  or four trial courtrooms at that time.  We'll start out with

10  just two, my courtroom and probably Judge Saylor's courtroom,

11  or I should say my former courtroom and Judge Saylor's former

12  courtroom.

13       By January we should be able to have all the

14  procurement that's necessary, which includes Plexiglas and

15  various kinds of electronics that makes it possible for a

16  lawyer to communicate with the lawyer's client during the

17  course of the trial for translation to take place.  We'll have

18  lots of that worked out, and we presumably will have the

19  equipment, hardware that is necessary for the courtroom, and

20  we'll have a better understanding of how these courtrooms work.

21  We've set up a courtroom, I should just add my courtroom has

22  been used to kind of try things out for 18 jurors.  That could

23  be a very long trial.

24       Looking at this courtroom, I think we'll be lucky if

25  we can have more than 14.  That puts a cap on how long the

* * * *S E A L E D* * * *

1    trial goes, too, because that means that you run the risk of

2    having inadequate number of jurors to render a verdict,

3    particularly if you've got the possibility anyway of people

4    turning up sick during the course of the trial.

5          So that's -- again, we wait and see but that suggests

6    to me single-defendant, narrowly-focused trials for the

7    foreseeable future, which means slice and dice on trials.

8          And there will be a list and people will -- you know,

9    there's the magic of the courtroom steps that makes cases

10   resolve themselves before they actually go to trial, and that

11   means next in line.  That's why I'm saying that Judge Young in

12   a kind of running trial list has captured some of what's likely

13   to happen in this area.

14         So that's a longer answer that you I'm sure wanted but

15   maybe informs your judgment and will inform your judgment a

16   little bit more.

17         MR. HAFER:  It does, and thank you, Your Honor.

18         THE COURT:  Okay.  Anybody else?

19         MR. RANKIN:  One other question or comment.  I'm happy

20   to talk with Mr. Hafer and Mr. Reddington this week and report

21   next week.  I do -- and certainly, you know, I have an idea

22   about my schedule and my thoughts about the sequence and

23   composition of the trials.

24         I do think that there may be objections or comments

25   that will arise once the process is in motion so that if we try

* * * *S E A L E D* * * *

1    a one-defendant case in September and the feedback is in a

2    certain way or it's held in a certain way, seated at a table

3    with masks, that would certainly influence how I would view the

4    appropriateness of going to trial under those circumstances.

5    So I don't view the status report that we're going to file in a

6    week as commenting on those kinds of issues because --

7          THE COURT:  I think -- I'm interrupting you, but I

8    think I have the gist of what you're saying.  No, it doesn't.

9    This is a work in progress, and it is an iterative process in

10   which we get information and there's a continual feedback on

11   it.

12         I will say this, though, so that you understand.  A

13   major issue will be the question of masks.  I think it's fair

14   to say that we've been spending a good deal of time with

15   epidemiologists from Tufts Medical Center to get information,

16   that their recommendation, strong recommendation, is that

17   everybody wear a mask.

18         We've suggested that's a little difficult for someone

19   that's testifying in a case, and probably that would not be

20   agreeable.  There may be, among the classes of participants,

21   different views.  There may be judges who think that there

22   shouldn't be masks on.  I have to say that from my own

23   perspective I don't like the idea of masks, but I support it

24   because it seems to me important that nobody in the courtroom

25   would have a sense that someone is especially privileged unless

* * * *S E A L E D* * * *

1   there's some functional reason.  The functional reason of

2   course is to observe the facial demeanor of a witness.

3        Does that mean that the defendant should not be

4   wearing masks?  It seems to me that there are arguments of pro

5   and con and probably issues having to do with how presentable

6   the defendant is.  There are, I'm sure, having had clients

7   myself over the years, clients that I would rather have masked

8   during the courtroom proceedings for various reasons, and then

9   there are those people who I think would be wonderful as

10  artifacts in the courtroom to be observed in full.

11       All of that having been said, I think there would be a

12  constant or a uniform treatment unless the court just says,

13  "Local option to the judge," but I'll tell you where I stand

14  after absorbing some more information.

15       But enough about everybody else.  What about the

16  lawyers?  That may be your question.  And the answer to your

17  question is lawyers wear masks.  And that means speak up.  That

18  means a judge who has a soft voice has got to wear a mask and

19  speak up.  That's the way I see it.

20       Now, you might say I want to wait until the new

21  Jerusalem when everybody can be maskless, and the New Jerusalem

22  may be 2045.  I don't think that's going to work out.  So we're

23  working our way through our backlog, understanding the backlog

24  is going to be increased now because we do have grand jury

25  proceedings going on, not quite as extensive as before but

* * * *S E A L E D* * * *

1  obviously indictments are being returned now that haven't been

2  for a period of time.

3          We're going to get through it.  This is an older case,

4  actually one of the older cases on my docket, criminal cases on

5  my docket.

6          MR. RANKIN:  On that note, I would add that

7  Ms. Andrade was only added last September.

8          THE COURT:  Right.  You no doubt remember Judge

9  Aldrich's description of a conspiracy, that conspiracy is like

10 a railroad train and that you get on and you're charged with

11 the point of departure all the way to the destination is

12 reached, so I view this as a 2018 case.  But I understand that

13 and, you know, there may be good cause to say I further want to

14 severance to prevent that.

15         As I say, in almost all my activities as a judge, I

16 feel like the fellow in Plato's cave.  I see the shadows but I

17 don't really know what's going on.  I have some idea.  So I

18 have some ideas about what people's strategy may be.  I kind of

19 think maybe I really understand this case.  I'll see what their

20 strategy is, but invariably I find out that I didn't know

21 enough.  You'll provide some more shadows, and I'll see whether

22 they're meaningful for purposes of deciding what the case does.

23 But I want to start this process as soon as possible with that

24 kind of structure to it and see where it leads here.

25 Mr. Reddington, anything you wanted to add?

* * * S E A L E D * * *

1          MR. REDDINGTON:  All I'd say, Your Honor, is being the

2     oldest person in this group right now, I agree

3     wholeheartedly --

4          THE COURT:  I don't believe you are.

5          MR. REDDINGTON:  I know I am.

6          THE COURT:  This isn't a test of old manhood, but I

7     suspect I'm older than you are.

8          MR. REDDINGTON:  No, you're not.  So I'm one of those

9     vulnerable people, so I agree with what Your Honor is saying.

10          THE COURT:  Right.  Well, so there's no shame in that,

11     and as far as I'm concerned, that's going to shape the way we

12     schedule things.  Our epidemiologists say, and we're seeing it

13     now in the papers today, you know, that there's not a lot you

14     can do, but you have to be sure that you've got distancing,

15     which we think we can do, that you've got adequate ventilation,

16     which we believe we have in the courtrooms, particularly when

17     we're not concerned about people in custody where they have to

18     pass through a different circulation route.  And 80 percent of

19     it is masks, and, you know, we can do that, too.

20          So we think with sensible testing and baby steps we

21     can get to that point, but we're not there yet.  So thinking

22     about how we get there in this case is the thing that's

23     important to me.  Okay?

24          MR. REDDINGTON:  Yes.

25          THE COURT:  So are we ready to bring the spectators

**\* \* \* S E A L E D \* \* \***

1    in?  And I will simply relate generally that I thought it was

2    important to have a conference with counsel and the parties

3    alone to take up various matters that are confidential, and we

4    dealt with those, but the real issue that is of importance is

5    scheduling the trial.  And as it presently is presented, I

6    cannot see the trial starting any earlier than January.  The

7    parties and I are going to try to work to figure out how we can

8    schedule this, having in mind that there are other trials and

9    limitations in the courtroom.

10          MR. REDDINGTON:  Fine.

11          THE COURT:  Okay?  So Ms. Beatty, you can bring the

12   spectators in.

13   **PUBLIC SESSION:**

14          COURTROOM CLERK:  Criminal Action 18-10364, *United*

15   *States v. Correia and Andrade.*  Members of the public are

16   reminded of Local Rule 83.3, which states that no photography,

17   recording or broadcasting of this proceeding is allowed.

18          THE COURT:  This is Judge Woodlock.  I've had a

19   conference with counsel in what we call in camera to take up

20   certain matters that seem to me to justify confidential

21   treatment.  They have to do with health concerns about

22   participants in the trial here, and I want people to be free to

23   be able to disclose things that would otherwise be

24   confidential.

25          There are other pretrial matters that I wanted to take

* * * *S E A L E D* * * *

1    up, and we've taken them up.  We've dealt with them in a

2    provisional sort of way.  The larger issue that is of concern

3    to all of us is how we are to try this case at a time when the

4    courthouse itself is effectively not open.  That's why we're

5    having these Zoom conferences.

6            Just yesterday the court issued its public emergency

7    order, supplemental order number 20-31, which continued the

8    view that the courthouse is expected to be closed except for

9    certain nonevidentiary, nonjury proceedings and in very limited

10   circumstances.

11           That having been said, the court is in the process of

12   developing plans for what we call reconstitution, which is to

13   bring cases back into the courthouse, including jury trials.

14   And we're trying to develop the best possible way of doing that

15   that's safe for every participant in the proceeding.

16           We've engaged a team of epidemiologists from Tufts

17   Medical Center to advise us.  We've received some significant

18   advice from them.  We're still dealing with that advice.  But

19   it appears possible that we can start jury trials maybe in

20   September, maybe a little bit later, and those jury trials in

21   the courthouse would at least start out with simply one

22   defendant.  We also have what I'll call a triage, but basically

23   it's an order of battle that the court has always pursued,

24   which is that criminal cases have priority over civil cases and

25   that criminal cases with persons in custody have priority over

* * * S E A L E D * * *

1    criminal cases in which the defendants are not in custody.

2    That broad outline of order is what we'll be following,

3    although adjustments will have to be made for very specific

4    circumstances, and we're still working on the development of

5    that.

6         I've told counsel that I think this is a case that

7    they should not anticipate going to trial until, the earliest,

8    January, and maybe not then.  And it's not clear whether it

9    will go to trial as a single defendant case or with both

10   defendants together.  It's all a matter that we're going to

11   have to work out and develop and think our way through on.

12        So I've done what of course I think everybody here

13   anticipated, and I'm continuing the trial because the trial

14   date that was previously established is not one that's

15   realistic in light of the pandemic and the continuing states of

16   emergencies in the Commonwealth and in the United States

17   itself.

18        I do that or make that set of observations so that the

19   parties who are not present, the individuals who are not

20   present for the in-camera proceedings have some idea of what

21   we've been about.  I emphasize that there were matters taken up

22   in camera that deal with preparation for trial, but they're

23   matters that I think are properly kept confidential at least at

24   this point to serve countervailing interests to general public

25   knowledge of what's going on in proceedings.

* * * S E A L E D * * *

1      If it hadn't been by Zoom, it would have been done by

2   emptying the courtroom for this, so I guess we've got a

3   technological way of dealing with that sort of thing, but I

4   don't believe that there are any other matters that we need to

5   take up at this time with counsel, unless counsel have

6   something further that you'd like to raise with me at this

7   point?

8      MR. HAFER:  Nothing from the government, Your Honor.

9      MR. REDDINGTON:  Nothing from me, Judge.

10     THE COURT:  Okay.  And nothing from Mr. Rankin.  So

11   that having been said, we'll be in recess, and we'll continue

12   to work on trying to develop reasonable plans that provide for

13   a safe trial as promptly as we can reach it in these

14   challenging times.  That having been said, we'll be in recess.

15   Thank you very much.

16      (Adjourned, 2:38 p.m.)

17

18

19

20

21

22

23

24

25

*** S E A L E D ***

1                   CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                   Dated this 21st day of June, 2021.

10

11              /s/ Kelly Mortellite

12              _____

13              Kelly Mortellite, RMR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25