## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 18-10364-DPW |
| v. ) | |
| ) | |
| JASIEL F. CORREIA, II,. ) | **Leave to File Excess Pages Granted on** |
| ) | **August 30, 2021** |
| Defendant. ) | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S RENEWED MOTION  FOR JUDGMENT OF ACQUITTAL OR,
## ALTERNATIVELY, A NEW TRIAL

NATHANIEL R. MENDELL
Acting United States Attorney

ZACHARY R. HAFER
DAVID G. TOBIN
MARK T. QUINLIVAN
Assistant U.S. Attorneys
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
zachary.hafer@usdoj.gov
david.tobin@usdoj.gov
mark.quinlivan@usdoj.gov

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 2

I.     THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE JURY'S VERDICT ............ 2

     A.     Legal Standard ........................................................................................ 2

     B.     The Evidence Was Sufficient to Convict Correia of Wire Fraud .......................... 3

          1.     It was reasonably foreseeable to Correia that his crimes would involve wire transactions ................................................. 3

          2.     The jury could reasonably infer from the evidence that Correia e-mailed an investor agreement to Martinez ................................. 6

          3.     The checks from Cabeceiras and Miller were "in furtherance" of the fraudulent scheme ....................................... 9

          4.     Correia made material misrepresentations ................................ 14

     C.     The Evidence Was Sufficient to Convict Correia of Tax Fraud .......................... 17

     D.     The Evidence Was Sufficient to Convict Correia of Extortion Conspiracy ............................................................................................. 20

          1.     The jury reasonably could have found that Correia conspired with Pichette (Count R) and Saliby (Count T) ................................. 20

          2.     The jury also reasonably could have found that Correia conspired with Hebert (Count R) and Andrade (Count T) ................... 23

               a.     Correia and Hebert conspired to extort Pichette ........................... 23

               b.     Correia and Andrade conspired to extort Saliby ........................... 26

           3.     Correia extorted Pichette ...................................................... 31

          4.     *Evans* is binding precedent. ................................................. 31

II.     CORREIA'S NEW TRIAL CLAIMS BASED ASSERTIONS OF SPILLOVER PREJUDICE AND MISJOINDER FAIL ON MULTIPLE LEVELS ............................ 32

     A.     Correia's Prejudicial Spillover Claim is Waived and Lacks Merit ...................... 32

1.      Correia's prejudicial spillover claim is waived. ........................................ 32

2.      Correia's prejudicial spillover claim fails even if considered
        on the merits ............................................................................................ 34

B.      Correia's Unpreserved Misjoinder Claim is Waived and Untimely,
        and Fails Even if Considered on Plain Error Review ........................................... 36

1.      Correia's unpreserved misjoinder claim is waived and
        untimely ..................................................................................................... 37

2.      Correia's unpreserved misjoinder claim fails even if
        considered on plain error review ............................................................... 38

CONCLUSION ........................................................................................................... 43

CERTIFICATE OF SERVICE ................................................................................... 43

## PRELIMINARY STATEMENT

Following an eleven-day trial, and after four days of deliberations, the jury convicted defendant Jasiel F. Correia, II of nine counts of wire fraud, in violation of 18 U.S.C. §1343; four counts of tax fraud, in violation of 26 U.S.C. §7602(1); four counts of extortion conspiracy, in violation of 18 U.S.C. §1951; and four counts of substantive extortion, also in violation of 18 U.S.C. §1951.  Contrary to the arguments raised in Correia's memorandum in support of his Renewed Motion for Judgment of Acquittal, or Alternatively for a New Trial (hereafter "Def. Mem."), the evidence was sufficient to convict Correia on each of the counts of conviction that he now challenges on sufficiency grounds.  In arguing otherwise, Correia misstates the law, fails to set out the evidence in the light most favorable to the verdict, as required when making a sufficiency challenge under Fed. R. Crim. P. 29, and fails to account for how the Court instructed the jury regarding the counts being challenged.

Correia also has failed to show any ground that would entitle him to a new trial.  Correia's claim that he is entitled to a new trial on all surviving counts of conviction due to spillover fails because his sufficiency challenges lack merit, and because his counsel waived any claim of spillover prejudice when he agreed that the fraud and corruption counts should be tried together and never backtracked from that position.  Correia's claim that the fraud and corruption counts were misjoined likewise is waived and also is untimely because he failed to make such a motion pretrial as required by Fed. R. Civ. P. 12(b)(3)(B)(iv), and because he has not shown good cause to excuse his untimeliness.  And even assuming *arguendo* that these claims are not waived or untimely, they fail even if considered on the merits.

Accordingly, Correia's post-trial motion should be denied, and the jury's verdict should be upheld.

1

<u>**ARGUMENT**</u>

**I.    THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE JURY'S VERDICT.**

In his renewed motion for judgment of acquittal, Correia contends (Def. Mem. at 2-37) that the evidence was insufficient to convict him of wire fraud, tax fraud, or that he conspired to violate the Hobbs Act.  Those claims lack merit.

**A.    <u>Legal Standard</u>**

In assessing a challenge to the sufficiency of the evidence under Fed. R. Crim. P. 29, courts must determine "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime."  *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994).  In conducting this review, courts must review the evidence in a "prosecution-friendly light," and make "all reasonable inferences and credibility choices in the government's favor."  *United States v. George*, 761 F.3d 42, 48 (1st Cir. 2014).  Moreover, and "[i]mportantly," when courts evaluate the sufficiency of the evidence, they must "place 'no premium * * * upon direct as opposed to circumstantial evidence' since 'both types of proof can adequately ground a conviction.'"  *United States v. Owens*, 917 F.3d 26, 39 (1st Cir.), *cert. denied,* 140 S. Ct. 200 (2019) (quoting *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir. 1992)).  Thus, "as long as the guilty verdict finds support in a 'plausible rendition of the record,' it must stand."  *United States v. Moran*, 312 F.3d 480, 487 (1st Cir. 2002) (quoting *Ortiz*, 966 F.2d at 711).

The Rule 29 standard thus poses "daunting hurdles" for defendants, *United States v. Hatch*, 434 F.3d 1, 4 (1st Cir. 2006), and it is "rare" for a court to reverse a conviction under Rule 29.  *See United States v. López-Díaz*, 794 F.3d 106, 108 (1st Cir. 2015).  Indeed, the First Circuit has said

that sufficiency of evidence challenges are "a tough sell," *United States v. Polanco,* 634 F.3d 39, 45 (1st Cir. 2011), and that defendants seeking acquittal on this basis "face an uphill battle." *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010).

**B.** **The Evidence Was Sufficient to Convict Correia of Wire Fraud.**

    **1.** **It was reasonably foreseeable to Correia that his crimes would involve wire transactions.**

Correia contends (Def. Mem. at 2-9) that the evidence was insufficient to convict him on Counts A, D, E, G, H, and I because the government failed to prove that in connection with depositing or cashing SnoOwl investor checks, wire communications were reasonably foreseeable to him or that they actually occurred. That claim can be easily dispatched.

The wire fraud statute provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. §1343. The elements of a wire fraud conviction under section 1343 are: "(1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme." *United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013).

With respect to the third element – the only one that Correia challenges in pressing this claim – this Court instructed the jury as follows in topics four and five of its instructions:

>     Fourth, that for the purpose of executing the scheme and in furtherance of the scheme Mr. Correia knowingly and willfully caused an interstate wire communication to be used or that it was reasonably foreseeable to him that for the purpose of executing the scheme and in its furtherance an interstate wire communication would be used;

Fifth, that on or about the date alleged in the separate counts of the indictment a wire communication in interstate commerce was used in the execution and furtherance of the scheme.

[Tr., 5/10/21, at 123-124].

Topic five is not implicated by Correia's motion, as the parties stipulated that the interstate-nexus requirement (topic five) of the wire fraud statute was satisfied, [Tr., 5/6/21, at 9], and the jury so found by convicting Correia on Counts A, D, E, G, H, and I.  The question therefore is only whether the evidence was sufficient for the jury to conclude that for the purpose of executing and in furtherance of the scheme, Correia knowingly and willfully caused an interstate wire communication to be used or that it was reasonably foreseeable to him that one would be used.  The answer is an unqualified yes.

As courts have recognized, "[t]he content of reasonable foreseeability must inevitably keep pace with advances in technology and general awareness of such advances."  *United States v. Muni*, 668 F.2d 87, 90 (2d Cir. 1988) (quoted with approval in *United States v. Tum*, 707 F.3d 68, 74 n. 4 (1st Cir. 2013)).  It is common knowledge in the electronic age that many (if not most) banking transactions are made almost instantaneously – particularly those that occur interstate, as in this case – and that banks must use wire communications to do so.  Indeed, the First Circuit recognized in *Tum*, "no one can deny that electronic communications go on all the time today, particularly in the world of banking."  707 F.3d at 74 (internal citation omitted).  As a result, the jury, applying its common sense, could readily find that it was reasonably foreseeable to Correia that when he deposited and/or cashed the checks at issue, interstate wire communications would be used.

To be sure, the Court also instructed the jury on topic four that "at the time that Mr. Correia was involved, if you find that he was, in these interstate wire communications, it has to be shown

4

that he intended that such wire communications would be undertaken with the specific intent that they be used." [Tr., 5/10/21, at 129]. But the Court went on to instruct the jury that "where such an interstate wire communication may be reasonably foreseen, even though not precisely contemplated in some specific form, then a person can be found to have caused and specifically intended the interstate wire communications to be used." [*Ibid.*]. Inasmuch as the jury, applying its common sense, could reasonably find that it was reasonably foreseeable to Correia that wire communications would be used when he deposited and/or cashed the checks at issue, the specific intent requirement set forth in topic four also was satisfied.

Correia's contrary arguments fail to persuade. He asserts (Def. Mem. at 6) that unlike an e-mail or phone call, it is not self-evident that check processing necessarily involves wire communications because "[t]he mechanics of how banks process checks are not 'matters of common knowledge that lay jurors may bring to bear to connect the too-widely spaced dots in the government's case.'" But it *is* common knowledge that most bank transactions are made almost instantaneously in the electronic age, particularly those that are made interstate, as was the case here given the parties' stipulation that the wire fraud statute's interstate nexus requirement was satisfied. Thus, it would have been reasonably foreseeable to a person in Correia's position that wire communications would be used when he deposited or cashed the checks at issue in this case. *See Tum*, 707 F.3d at 74 ("So having asked that benefit payments be deposited electronically into his account, a sensible person in Tum's position should have anticipated that wire transmissions involving Unum and others would follow—at least a reasonable factfinder using 'common sense' could so conclude, which is all that is required."). Correia's sufficiency challenge to Counts A, D, E, G, H, and I on this ground consequently fails.

    **2.**    **The jury could reasonably infer from the evidence that Correia e-mailed an investor agreement to Martinez.**

Correia contends (Def. Mem. at 9-10) that with respect to Count F, no evidence proved that he sent an investor agreement to Victor Martinez.  This claim also lacks merit.

The evidence, taken in the light most favorable to the verdict, showed the following. Martinez and Mark Eisenberg met with Correia at a coffee shop in Fall River in November 2014, during which Correia made a presentation about SnoOwl and asked them to invest in SnoOwl, and Martinez and Eisenberg agreed to make a $50,000 investment.  [Tr., 4/27/21, at 196-200].  On November 8, 2014, Correia sent an e-mail to Martinez and Eisenberg, and addressed the e-mail to Martinez at "vmartinez@piezonis.com."  [Tr., 4/27/21, at 152; Exh.26.3].  In the e-mail,  Correia wrote, among other things:  "Per our conversation, we have agreed on 50K for 3.5% for Victor and 3.5% for Mark, a total of 7% equity stake in SnoOwl," and also referenced an investor agreement.  [Exh.26.3].  On November 9, 2014, Martinez sent Correia a check for $25,000 and wrote "SnoOwl investment" on the check.  [Tr., 4/27/21, at 198-200; Exh.36].

On November 18, 2014, Correia sent another e-mail to Martinez and Eisenberg, and again addressed the e-mail to Martinez at "vmartinez@piezonis.com."  [Tr., 4/27/21, at 154; Exh.27.1]. In the e-mail, Correia wrote:

> Gentlemen,
>
> Attached is a signed copy of the investor agreement.
> Mark please try and sign and return sometime before noon.
> Victor I will be in after noon to pick up your copy and finalize the deal.
> Looking forward to this next step,
>
> Jasiel

[Exh.27.1].  Eisenberg identified the investor agreement admitted as Exhibit 27.2 as the agreement that Correia attached to the November 18 e-mail.  [Tr., 4/27/21, at 155].

The first paragraph of the attached investor agreement included blank lines for the name of the "Investor" entering into the agreement with Correia as well as the date. [Exh.27.2, at 1]. The second page of the agreement likewise included blank lines to be filled in for the name and signature of the "Investor" entering into the agreement with Correia as well as the date. [Exh.27.2, at 2]. The agreement also contained the representation that SnoOwl would not sell, assign, transfer or otherwise convey business assets except in the ordinary course of business without the investor's consent. [Exh.27.2, at 2]. Correia had signed and dated the agreement when it was sent. [Exh.27.2, at 2].

In light of this evidence, the jury could reasonably have found that for the purpose of executing and in furtherance of the scheme, Correia knowingly and willfully caused an interstate wire communication to be used or that it was reasonably foreseeable to him that one would be used. As a threshold matter, although Correia asserts that the evidence failed to show that the investor agreement was actually e-mailed to Martinez, the government did not need to so prove to convict Correia on Count F. Rather, and as this Court instructed the jury, [Tr., 5/10/21, at 123-124, 129], Correia could be found guilty of this count if the jury found that it was reasonably foreseeable that he would use a wire communication to send the investor agreement to Martinez. *See, e.g., United States v. Tavares*, 844 F.3d 46, 59 (1st Cir. 2016) (defendant need not personally mail anything so long as it was reasonably foreseeable that mails would be used in the ordinary course of business to further the scheme).[1] The jury could so find. Inasmuch as Correia sent an

---

[1] The mail and wire fraud statutes share "common elements" and "differ only in that, to prove a violation of the wire-fraud statute, the government must establish the use of wires (rather than the use of the mails) in furtherance of the alleged scheme." *United States v. Simon*, — F.4th —, 2021 WL 3754239, at *17 (1st Cir. Aug. 25, 2021). As a result, cases construing the common elements of those statutes apply equally in both mail and wire fraud cases. *See United States v. Fermin Castillo*, 829 F.2d 1194, 1198 (1st Cir. 1987).

e-mail to both Martinez and Eisenberg on November 8 that referenced the investor agreement, [Exh.26.3], the jury readily could conclude that it was reasonably foreseeable that he also would use e-mail to send the investor agreement to both men on November 18.

In the alternative, the jury could reasonably have found from the evidence that Correia sent the November 18 e-mail to both Martinez and Eisenberg and attached the investor agreement to that e-mail for both men to separately sign and date.  Martinez and Eisenberg were close – Martinez testified that Eisenberg was a friend, mentor, and business coach, [Tr., 4/17/21, at 196] – and Eisenberg testified that Correia sent both the November 8 and November 18 e-mails to Martinez as well as to him.  [Tr., 4/17/21, at 152, 154].  Both e-mails were sent to Martinez using the address "vmartinez@piezonis.com."  [Exhs.26.3, 27.2].  The jury also had before it an e-mail that Nick Bernier sent to Eisenberg on which Martinez and Correia were copied, and it also was sent to Martinez using the address "vmartinez@piezonis.com."  [Exh.31].  Martinez testified that he owned a chain of restaurants named PieZoni's.  [Tr., 4/27/21, at 195].  The jury could readily infer from this testimony and evidence that    Martinez's e-mail address in fact was "vmartinez@piezonis.com."  The jury also could infer that that Correia attached a single investor agreement to the e-mail for both Martinez and Eisenberg to separately sign and date.

Correia thus misses the mark when he asserts (Def. Mem. at 9) that "the prosecution never introduced any 'signed investor agreement' between Martinez and SnoOwl," or proved "that he exchanged that phantom document with Mr. Correia by email, fax, or other wire communication." The wire communication at issue with respect to Count F was the November 18 e-mail that Correia sent Martinez and Eisenberg in which he attached the investor agreement that contained a material misrepresentation.  The government did not need to prove that Martinez signed the agreement or sent it back to Correia to convict him of wire fraud on Count F.

### 3.    The checks from Cabeceiras and Miller were "in furtherance" of the fraudulent scheme.

Correia contends (Def. Mem. at 10-15) that the evidence was insufficient to convict him on Counts A, H and I because the checks that David Cabeceiras gave him in May 2014 (Count A) and May 2015 (Counts H and I) were not "in furtherance" of the scheme, and was insufficient to convict him on Count G because the check Steven Miller gave him in January 2015 was not "in furtherance" of the scheme. Those claims are insubstantial.

Both the Supreme Court and the First Circuit have given the third element of the mail and wire fraud statutes – that mails or wires were used "for the purpose of executing" the scheme to defraud, otherwise known as the "in furtherance of" requirement – "a liberal construction," *United States v. Serino*, 835 F.2d 924, 928 (1st Cir. 1987), meaning that it is "broadly read and applied." *United States v. Hebshie*, 549 F.3d 30, 36 (1st Cir. 2008). To satisfy this requirement, a mailing "need not be an essential element of the scheme"; rather, it need only be "incident to an essential part of the scheme" or a "step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989). In other words, there need not be a "but for" link between the mailing and the fraudulent scheme; "a mere 'connection or relationship' is sufficient." *Hebshie*, 549 F.3d at 36 (quoting *United States v. Pimental*, 380 F.3d 575, 587 n.5 (1st Cir. 2004)). In this case, the evidence, taken in the light most favorable to the verdict, showed that Correia's material misrepresentations made to Cabeceiras in January 2013 and to Miller in July 2013 were not isolated or temporally limited, but rather were foundational lies that pervaded the scheme from the beginning to the end.

Cabeceiras testified that he agreed to invest in SnoOwl after meeting with Correia at his house and at the Ninety-Nine Restaurant in January 2013, and that Correia stated, among other things, that he had sold and done very well with a previous app. [Tr., 4/26/21, at 203-207; Tr., 4/27/21, at 66, 68-70]. Cabeceiras testified that he was "[v]ery impressed" by that representation

and that it affected his decision to invest in SnoOwl. [Tr., 4/27/21, at 66-67]. He also testified

that if he had known the truth – that Correia had not in fact sold the prior app or made any money

from such a sale – he "absolutely" would not have made the initial $50,000 investment in SnoOwl:

> **Q.** And you're suggesting that when you meet with him after that
> meeting with your son talking about this innovative idea SnoOwl and the
> expectation that you had, giving him $50,000 at the age of 21, that, if you knew that
> he didn't sell FindIt, that you would not have invested that money? Is that what
> you're telling this jury?
>
> **A.** Oh, absolutely.
>
> **Q.** So because he said that he had an enterprise in Florida, which he
> did, and because he said that he had success with it, which I would suggest he did,
> and because he then told you he sold it, without getting into any detail or any
> amount of money, you would not have invested in SnoOwl?
>
> **A.** No.

[Tr., 4/27/21, at 71].

Cabeceiras additionally testified that the investor agreement he signed in January 2013

contained the representation that SnoOwl would not sell, assign, transfer or otherwise convey

business assets except in the ordinary course of business without the investor's consent. [Tr.,

4/27/21, at 61-62; Exh.9]. Cabeceiras testified that Correia never obtained his consent to spend

the money he had invested on personal items for himself and his girlfriend. [Tr., 4/27/21, at 62].

Cabeceiras testified that if he had known the truth, he would not have entrusted Correia with *any*

of the $145,000 he invested in SnoOwl:

> **Q.** Sir, had you known that Jasiel Correia was going to use or spend a
> significant portion of your investor money on cologne, shoes, jewelry for his
> girlfriend and other personal events, would you have entrusted him with $145,000?
>
> **A.** No.

. [Tr., 4/26/21, at 211].

Miller testified similarly.   Miller testified that he met Correia at the Tipsy Seagull, a floating barge, in Fall River in July 2013, and that he was "very impressed" when Correia told him that he had sold his prior app for hundreds of thousands of dollars:

> **Q.**     What did he tell you?
>
> **A.**     He explained to me that in college him and his roommate had come up with this idea, and he explained the idea, which was, when you move into a dorm, they slide all the coupons under your door, which is like the pizza places and the Chinese restaurants and everything around the area when you move into your dorm.  He said the idea they came up with, they were able to sell it.  And I don't remember what the figure was, 250,000 they each got, or they split $250,000 from the idea that they were able to sell.
>
> **Q.**     Did he explain to you – he explained that he had sold this to you as a basis to your responding to your question about his –
>
> **A.**     Yeah, that's the money he was living on right now.  He sold this.  And I was very impressed.  I was like, this college kid did this?  He sold this and was able to make this kind of money?  Good for him.
>
> **Q.**     When he told you he had sold his previous business, Mr. Miller, did you believe him?
>
> **A.**     Yes.  Yes.

[Tr., 4/27/21, at 85-86].  Miller testified he would not have invested in SnoOwl if he had known that Correia's tale was false:

> **Q.**     Mr. Miller, if you knew that what the defendant had told you about the company with the Chinese food and pizza coupons wasn't true, would you have still invested in SnoOwl?
>
> **A.**     No.  I thought he was like boy wonder.  He had that first idea, he made a couple of hundred thousand.  Now he had this new idea.  I thought he was going to be the next greatest thing.

[Tr., 4/27/21, at 107].

Miller testified that he had a subsequent meeting with Correia at his office during which they discussed whether Correia would be taking a salary or compensation from SnoOwl:

11

> **Q.**    At that meeting at your office did you have a conversation about Jasiel Correia regarding whether he was going to take a salary or compensation from SnoOwel?
>
> **A.**    Yeah.  We had talked about how much I was going to invest in the company and so forth.  And he explained how the dentist got 5 percent.  And I said, "Well, maybe I'll put in another 50,000 and get my 5 percent of the company."  And he had – I said, "Well, Jasiel," I said, "are you going to be drawing any money out of this?  Are you going to get a salary or anything?"  He said, "Absolutely not.  I'm not taking a dime out of this.  My payday is at the end."  That's what I wanted to hear because, A, the dentist put in 50, I'm going to put in 50.  That's 100.  There's no room for salary there.  So I wanted all our money to go into the development of the app.
>
> **Q.**    Did you believe him?
>
> **A.**    Absolutely.

[Tr., 4/27/21, at 87-88; *see also id.* at 134 ("He said he was not going to take a dime.  His payday was coming at the end.").  The investor agreement that Miller signed contained the representation that SnoOwl would not sell, assign, transfer or otherwise convey business assets except in the ordinary course of business without the investor's consent.  [Exh.19, at 2].  Miller testified that Correia never sought his consent to transfer any of SnoOwl's business assets.  [Tr., 4/27/21, at 90].  He also testified that he would not have invested in SnoOwl if he had known that Correia was going to take money out of the company for his personal use:

> **Q.**    Yeah.  If you knew, when he told you he wasn't going to take a dime, if that wasn't the truth, if you knew he wasn't telling you the truth, would you still have invested in the company?
>
> **A.**    No, absolutely not.  There was no room for salary.  If the dentist had put in 50 and I put in 50, there was no money there for a salary.  Everything has to go into development.
>
> **Q.**    Mr. Miller, if you knew that within about a week of receiving your first $50,000 investment check that the defendant was going to pay down a $7,000 loan from Fall River Municipal Credit Union, would you have invested?
>
> **A.**    Absolutely not.

> **Q.**     If you knew that within two weeks of receiving your second investment check that the defendant was going to go to Foxwoods, pay off a personal credit card and buy new tires for his car, would you have invested?
>
> **A.**     Absolutely not.

[Tr., 4/27/21, at 107-108].  And on cross-examination, Miller testified that regardless of whether he thought SnoOwl was a viable business or not, he would have been very concerned if he had known that Correia was using SnoOwl money for personal expenses:

> **Q.**     What you're saying today is you would not – you would have been very concerned if you knew that he was spending money – like, if somebody's working for a business and they have money and they're spending it on personal expenses, you would have been very concerned is what you're telling this jury, right?
>
> **A.**     Yes.
>
> **Q.**     Even though you knew that this was a very good concept that could have made huge money, right?
>
> **A.**     Yes.

[Tr., 4/27/21, at 123].

Based on this evidence, the jury reasonably could have found that Correia's misrepresentations to Cabeceiras in January 2013 and Miller in July 2013 were not simply isolated lies or one-offs, but foundational misrepresentations that permeated their entire relationship with Correia.  Both men were adamant that they would not have invested in SnoOwl if they had known that Correia had not successfully sold a prior app and that he was taking monies from their investment for personal use, and the jury reasonably could have found that they also would not have made any subsequent investments in SnoOwl if they had known the truth.  At a minimum, the jury reasonably could have found that Correia's misrepresentations were "incident to an essential part of the scheme" or a "step in [the] plot," *Schmuck*, 489 U.S. at 71, which is all that is necessary to satisfy the wire fraud statute's "in furtherance of" requirement.

### 4.    Correia made material misrepresentations.

Correia contends (Def. Mem. at 15-18) that the evidence was insufficient to prove that he made material misrepresentations to the SnoOwl investors. He is wrong.

This Court instructed the jury with respect to the wire fraud counts that the three types of representations that the government proceeded on in this case were as follows:

> First, that Mr. Correia had been involved in successfully developing or selling a prior app.

> Second, that investor money for the SnoOwl project would be used to develop the SnoOwl app.

> And third, omitting to state and concealing that investor money for the SnoOwl project would be used for Mr. Correia's personal benefit and not for the development of the SnoOwl app. Those are the types of representations.

[Tr., 5/10/21, at 125-126]. There was abundant evidence that Correia made all three types of misrepresentations.

As discussed above, Cabeceiras testified that he agreed to invest in SnoOwl after meeting with Correia in January 2013, and that he was "very impressed" by Correia's representation that he had sold and done very well with a previous app. [Tr., 4/26/21, at 203-207; Tr., 4/27/21, at 66-71]. When asked if he would have invested in SnoOwl if he had known the truth that Correia had not sold the app, Cabeceiras testified: "Absolutely not." [Tr., 4/27/21, at 71]. The investor agreement that Cabeceiras signed contained the representation that SnoOwl would not sell, assign, transfer or otherwise convey business assets except in the ordinary course of business without the investor's consent. [Tr., 4/27/21, at 61-62; Exh.9]. Cabeceiras testified that Correia never mentioned that he was going to take a salary out of the investor money, and that he would not have given Correia any of the $145,00 that he invested in SnoOwl if he had known that Correia would use a significant portion of the money on personal expenses. [Tr., 4/26/21, at 211].

14

Miller testified that he was "very impressed" when Correia told him that he had sold his prior app for hundreds of thousands of dollars. [Tr., 4/27/21, at 85-86]. Miller testified that he would not have invested in SnoOwl if he had known that this was false. [Tr., 4/27/21, at 107]. Miller testified that Correia said that he would "not be taking a dime" out of SnoOwl and that "[m]y payday is at the end," and that he would not have invested in SnoOwl if he had known that Correia would use a significant part of the money he had invested in personal expenses. [Tr., 4/27/21, at 87-88, 107-108, 123, 134]. The investor agreement that Miller signed contained the representation that SnoOwl would not sell, assign, transfer or otherwise convey business assets except in the ordinary course of business without the investor's consent. [Exh.19, at 2].

Eisenberg testified that he and Martinez met with Correia in the fall of 2014, and that Correia told them that he had developed an app while he was at Providence College which he eventually sold to a group out of Cambridge and made money doing so. [Tr., 4/27/21, at 145, 152]. Martinez likewise testified that during the meeting, Correia said that he had created an app while in college that he had sold. [Tr., 4/27/21, at 197]. Eisenberg testified he would not have invested in SnoOwl if he had known that that representation was false. [Tr., 4/27/21, at 158].

Eisenberg and Martinez both testified that Correia never indicated during that meeting that he would be taking a salary or using investment money for personal expenses. [Tr., 4/27/21, at 151, 200]. The investor agreement that Correia e-mailed Eisenberg and Martinez contained the representation that SnoOwl would not sell, assign, transfer or otherwise convey business assets except in the ordinary course of business without the investor's consent. [Exh.27.2, at 2]. When asked if he would have invested in SnoOwl if he had known Correia was going to use investor money on personal expenses, Eisenberg testified: "A loud, strong no." [Tr., 4/27/21, at 158]. When asked the same question, Martinez testified: "Absolutely not." [Tr., 4/27/21, at 200].

Based on this testimony and evidence, the jury reasonably could find that Correia made one or more of each of the following misrepresentations to Cabeceiras, Miller, Eisenberg, and Martinez:  (1) he represented that he had been involved in successfully selling a prior app; (2) he represented that investor money for the SnoOwl project would be used to develop the SnoOwl app; and/or (3) he omitted to state and concealing that investor money for the SnoOwl project would be used for Mr. Correia's personal benefit and not for the development of the SnoOwl app.

In arguing otherwise, Correia erects a strawman.  He argues (Def. Mem. at 15-17) that the government needed to prove that he promised to use "all investor money" for SnoOwl, and that he truthfully said he would take no "salary."   As the Court instructed the jury, however, the representations that the government proceeded on in this case included "that investor money for the SnoOwl project would be used to develop the SnoOwl app," and "omitting to state and concealing that investor money for the SnoOwl project would be used for Mr. Correia's personal benefit and not for the development of the SnoOwl app."  [Tr., 5/10/21, at 125-`126].  They were not limited to representations that Correia would use "all investor money" on SnoOwl or that he would take no "salary."

Correia also argues (Def. Mem. at 17-18) that any claims about the prior app "were puffery, not fraud."  Cabeceiras, Miller, and Eisenberg each testified emphatically that they would not have invested in SnoOwl if they had known that Correia's representation that he had successfully sold the prior app was false.  [Tr., 4/27/21, at 71 (Cabeceiras), 107 (Miller), 158 (Eisenberg)].  The jury was entitled to credit that testimony and conclude that Correia's false representation was material to the fraudulent scheme.

For these reasons, Correia's claim that the evidence was insufficient to prove that he made materially false representations to investors is unavailing.

16

**B.**     **The Evidence Was Sufficient to Convict Correia of Tax Fraud.**

Correia contends (Def. Mem. at 18-25) that the evidence was insufficient to convict him of tax fraud because the government failed to prove that he willfully failed to disclose business income and willfully falsified his amended returns.  Those claims fail.

Correia was convicted of four counts (Counts J, K, L & M) of filing false tax returns in violation of 26 U.S.C. §7206(1), which makes it unlawful for anyone who "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter[.]"  26 U.S.C. §7206(1).  The elements of an offense under 26 U.S.C. 7206(1) thus are the following:  (1) that the defendant made, or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing it was false; and (4) that the return contained a written declaration that it was made under the penalties of perjury.  *See United States v. Boulerice*, 325 F.3d 75, 79-80 (1st Cir. 2003).  In this context, "willfully" means "'a voluntary, intentional violation of a known legal duty.'"  *Id.* at 80 (quoting *United States v. Monteiro*, 871 F.2d 204, 209 (1st Cir. 1989)).

In *Boulerice*, the First Circuit made clear that the government "need not present direct evidence of willfulness; rather, circumstantial evidence of willfulness can be sufficient to sustain a conviction."  *Ibid.*  In addition, a jury "'may permissibly infer that a taxpayer read his return and knew its contents from the bare fact that he signed it.'"  *Ibid.* (quoting *United States v. Olbres*, 61 F.3d 967, 971 (1st Cir. 1995)).  Thus, to convict a defendant of filing a false tax return, "the government need only have presented sufficient evidence for the jury to conclude that when [the defendant] signed [his or her] tax returns, those returns were not 'true and correct as to every

material matter,'" and the jury is "then permitted (though by no means required) to infer willfulness." *Id.* at 80-81 (quoting 26 U.S.C. §7206(1)); *see also Burr v. United States*, Crim. No. 12-10352-DPW, 2013 WL 6859006, at *2 (D. Mass. Dec. 27, 2013) ("Given the circumstances of this case—upon which I need not elaborate here—it was not unreasonable for Burr's counsel to advise him that, as a practical matter, his signature on a materially false return was sufficient to sustain a conviction [under section 7206(1), and accordingly, it was in his best interest to accept the government's offer of a plea bargain."). As this Court instructed the jury, the willfulness element of the statute "can be established beyond a reasonable doubt if you find that Mr. Correia chose to keep himself uninformed as to the full extent to which the return was inadequate, as to which the return was inadequate." [Tr., 5/10/21, at 132].

Applying these principles, the evidence was sufficient for the jury to convict Correia of filing false tax returns on Counts K through M. The Form 1040 Individual Tax Return for year 2013 only listed $6,630 in adjusted gross income, an amount that corresponded to what Correia was paid by Providence College that year. [Exh.61; Tr.4/30/21, at 13-16]. The Form 1040 Individual Tax Return for year 2014 only listed $16,016 in adjusted gross income, an amount that corresponded to what Correia was paid by the City of Fall River that year. [Exh.63; Tr., 4/30/21, at 29-37]. Neither of these returns included income Correia took from SnoOwl. Stacia Vieria also testified that when she went over the Return Income Verification form with Correia for tax year 2013, she would have asked him if he had any additional income beyond the $6,630 he was paid by Providence College, but Correia indicated that he did not. [Tr., 4/30/21, at 19-20]. She also testified that when she went over the Return Income Verification form with Correia for tax year 2014, he never informed her about SnoOwl or any sums of money he had received from that company. [Tr., 4/30/21, at 38]. Based on this evidence, the jury easily conclude that when Correia

signed his 2013 and 2014 tax returns, those returns were not "true and correct as to every material," and/or that he chose to keep himself uninformed as to the full extent to which the return was inadequate.  And the jury also could infer from this evidence that Correia acted willfully.  *See Boulerice*, 325 F.3d at 80; *Burr*, Crim. No. 12-10352-DPW, 2013 WL 6859006, at *2.

Likewise,  the jury could conclude from the evidence that Correia's Amended tax returns for 2013 and 2014 were materially false because:  (1) SnoOwl was improperly classified as a sole proprietorship in 2013 and 2014, saving Correia thousands in tax liability; (2) the amended returns failed to report income that Correia received from SnoKimo; and (3) the amended returns falsely claimed personal expenses as business expenses on the attached Schedule Cs.  [Exhs.118, 119].  And, once again, the jury also could infer from this evidence that Correia acted willfully.  *See Boulerice*, 325 F.3d at 80; *Burr*, Crim. No. 12-10352-DPW, 2013 WL 6859006, at *2.

Correia nonetheless asserts (Def. Mem. at 19) that "criminal tax cases typically feature evidence that defendants were told, or otherwise learned, about their tax liabilities but flouted them," and contrasts this case was the evidence adduced in *Boulerice*.  But Correia fails to acknowledge that the First Circuit expressly stated in that case, as just discussed, that to convict a defendant of filing a false tax return, "the government need only have presented sufficient evidence for the jury to conclude that when [the defendant] signed [his or her] tax returns, those returns were not 'true and correct as to every material,'" and the jury is "then permitted (though by no means required) to infer willfulness."  325 F.3d at 80-81 (quoting 26 U.S.C. §7206(1)).  To be sure, the First Circuit noted that "the government elicited significantly more evidence of willfulness than Boulerice's signature on two false returns," *id.* at 81, but that additional evidence was not necessary to support his convictions for the reasons already set forth.

The evidence thus was sufficient to convict Correia of tax fraud on Counts J  through M.

C.      **The Evidence Was Sufficient to Convict Correia of Extortion Conspiracy**.

Correia contends (Def. Mem. at 25-37) that the evidence was insufficient to convict him on Counts R and T, which charged him with extortion conspiracy in violation of the Hobbs Act, because the government failed to prove that he conspired with at least one other person to obtain money from Matt Pichette and Charles Saliby.  This claim fails.  The jury reasonably could have found that Correia conspired with Pichette and/or David Hebert as to Count R, and Saliby and/or Genoveva Andrade as to Count T.

1.      **The jury reasonably could have found that Correia conspired with Pichette (Count R) and Saliby (Count T)**.

Correia first contends (Def. Mem. at 25-28) that he could not conspire with Pichette or Saliby because the government alleged that he engaged in "shakedowns" of both men, and because the SSI distinguished between "co-conspirators" and "victims."  Neither point is well taken.

The Hobbs Act provides:

> **(a)** Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. §1951(a).  The Act further provides that "[t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. §1951(b)(2).  Hence, as the plain terms of statute make clear, the Hobbs Act "combines two categories of criminal conduct – 'coercive extortion and extortion by official right,'" *Evans v. United States*, 504 U.S. 255, 261 n.9 (1992), with the former being extortion "induced by wrongful use of actual or threatened force, violence, or fear," and the latter being extortion "under color of official right."

At issue in this case is extortion by official right.  The SSI charged in Counts R and T that Correia and others did conspire to commit extortion by obtaining property not due to him from the victims "under color of official right[.]"   [Docket Entry No. 69, at 38, 40; *see also Redacted Indictment Submitted to the Jury*, Docket Entry No. 219, at 5, 7].  This Court also instructed the jury that "[t]he term 'extortion' means the obtaining of money from another with his consent under circumstances in which that consent was obtained under color of official right.  That's what it means in this context."  [Tr., 5/10/21, at 135].  This case, in other words, was neither charged nor did it go to the jury as a coercive extortion case.  This defeats Correia's claim that Pichette and Saliby could not have conspired to commit Hobbs Act extortion with respect to Counts R and T.  That is so because Hobbs Act extortion "under color of official right" includes the "rough equivalent of what we would now describe as 'taking a bribe,'" *Evans*, 504 U.S. at 260, and although Pichette and Saliby "were incapable of committing the underlying substantive offense as principals, they could * * * conspire to commit Hobbs Act extortion by agreeing to help [Correia] commit the substantive offense."  *Ocasio v. United States*, 136 S. Ct. 1423, 1433 (2016) (internal footnote omitted).

Correia nonetheless argues (Def. Mem. at 26-28) that Pichette and Saliby could not have conspired with him because the government used the term "shakedown" during closing argument and because Saliby testified that he feared "retaliat[ion]" against his family and business.  But that is essentially an argument that these counts involved coercive extortion, and, once again, those counts were neither charged nor did they go to the jury as coercive extortion but rather went to the jury under an extortion by official right theory.  Nor did the prosecutor's colloquial use of the term "shakedown" during closing argument, or Saliby's testimony that he feared "retaliat[ion]," change the unassailable fact that Counts R and T were charged and went to the jury under an extortion by

official right theory.  As a result, the jury reasonably could have found that Correia entered into a conspiracy that had as its objective the obtaining of property from another conspirator (Pichette as to Count R; Saliby as to Count T) with their consent and under color of official right.

Correia alternatively contends (Def. Mem. at 28) that even if the evidence established an agreement between him and Pichette and Saliby, the indictment did not charge such a conspiracy because it distinguished between "his co-conspirators" and "the victims."  But an individual can be both a co-conspirator and a victim for purposes of Hobbs Act conspiracy, as *Ocasio* makes clear.  In that case, the Court rejected the argument that two owners of a local auto body shop could not have entered into a conspiracy with the defendant because they did not have the objective of obtaining money "from another" inasmuch as the money in question was their own.  136 S. Ct. at 1433-34.  That argument failed, the Court explained, because the criminal objective on which the defendant and shopowners agreed was that the defendant (and other Baltimore officers) would obtain money from "another" – the shopowners.  *Id.* at 1434.  In other words, the shopowners in *Ocasio* were both co-conspirators with the defendant and victims as well, inasmuch as the defendant obtained money from them.  And, the Court made clear in *Ocasio*, "under well-established rules of conspiracy law, [the defendant] was properly charged with and convicted of conspiring with the shopowners."  *Ibid.*  Similarly, in this case, Pichette and Saliby were both co-conspirators with Correia – as they entered into an agreement with him that he would obtain money from them with their consent and under color of official right – and "victims" of the scheme for the very same reason.

For these reasons, the jury reasonably could have found that Correia conspired with Pichette (Count R) and Saliby (Count T) to commit Hobbs Act extortion.

    **2.**       **The jury also reasonably could have found that Correia conspired with Hebert (Count R) and Andrade (Count T).**

The jury also reasonably could have found that Correia conspired with Hebert as to Count R and Andrade as to Count T.

        **a.**      **Correia and Hebert conspired to extort Pichette.**

The evidence, taken in the light most favorable to the verdict, showed that Hebert conspired with Correia to extort $25,000 from Pichette in return for two non-opposition letters.

Pichette testified that he became involved in an effort to open marijuana businesses in Fall River in 2018 – one that would grow marijuana called Loop Cultivation, and one that would use that marijuana to produce edibles called Premium Chef Edibles – and sought the assistance of Hebert, a personal friend, because it was common knowledge that Hebert knew Correia well. [Tr., 5/5/21, at 68-71]. Pichette began exchanging text messages with Hebert about finalizing his application to the Massachusetts Cannabis Commission to obtain licensing for the proposed businesses as well as setting up a meeting with Correia to obtain non-opposition letters. [Tr., 5/5/21, at 71-77; Exh.177]. In several of the text messages, Hebert indicated that he had spoken with Correia and outlined the steps that Pichette needed to take to obtain non-opposition letters, and Hebert also indicated that he would arrange a meeting with Correia on July 26, 2018. [Exh.177].

Prior to the meeting with Correia on July 26, 2018, Pichette met with Hebert at the Firehouse Cigar Shop in Fall River on July 26, 2018, and Hebert told Pichette during that meeting that "this is going to come with a cost" and Pichette would need to pay $25,000 to Correia's legal defense fund. [Tr., 5/5/21, at 77-78]. Pichette reluctantly agreed. [Tr., 5/5/21, at 78]. Pichette and his partners thereafter met with Correia and made a PowerPoint presentation. [Tr., 5/5/78-

79].  After the presentation was over, Pichette had a private conversation with Correia during which the following exchange occurred:

> Q.      What did he say to you?
>
> A.      He said the proposal was a great proposal, it's not like anything he had seen yet.  There were a number of reasons that it was different from what other people were trying to do, and he acknowledged that.  And he said, you know, We're good.  I said, Yeah.  He said you talked to Dave and we're good.  I said, Yes, I did, and we're good.
>
> *   *   *
>
> Q.  How did you respond when he said, "Are we all set"?
>
> A.  I said, "Yes, we are."

[Tr., 5/5/21, at 80, 81].  Pichette understood Correia to be referring to the fact that Pichette had spoken with Hebert earlier that day and "Dave had told me about the $25,000 fee, and I agreed to it," and that this was a bribe to Correia.  [Tr., 5/5/21, at 81, 122-123].

Pichette met with Hebert at the cigar shop the following day and they discussed how Pichette was going to pay the $25,000.  [Tr., 5/5/21, at 90-91].  Hebert said Pichette could get 25 family members or friends to write checks for $1,000, and Pichette would then reimburse them.  [Tr., 5/5/21, at 91-93].  After some further discussion, Pichette proposed splitting the $25,000 into two $12,500 payments, and Hebert agreed.  [Tr., 5/5/21, at 91-92].  Hebert told Pichette, "Listen, you know, we're friends, this is – the $25,000 is a good deal; this is going for $100,000 for anybody else."  [Tr., 5/5/21, at 94].  Pichette rejected Hebert's proposal for a consulting agreement in connection with the marijuana business, but testified that he agreed to Hebert's alternative proposal that part of a mortgage Hebert owed Pichette's brother would be written off.  [Tr., 5/5/21, at 93-100, 124].

24

On August 20, 2018, Hebert sent Pichette a text in which he wrote:  "Any news?  I'm getting your letters today!!"  [Tr., 5/5/21, at 100; Exh.177].  They also exchanged text messages over the next few days about how many fund-raising tickets Pichette would purchase in connection with the $25,000 payment, and that the checks needed to be made out to:  "Friends of Mayor Jasiel Correia II."  [Tr., 5/5/21, at 100-101; Exh.177].  Pichette collected checks from family and friends totaling $11,500 made out to Correia's campaign (an additional $1,000 was sent separately).  [Tr., 5/5/21, at 102-109; Exhs.175, 176].  On August 21, 2018, Hebert sent Pichette a text in which he wrote:  "I've got the letters come by the cigar shop."  [Tr., 5/5/21, at 111; Exh.177].  On August 29, 2018, Pichette met Hebert at the cigar shop and gave Hebert the checks to Correia's campaign, and Hebert gave Pichette the letters of non-opposition and host community agreements.  [Tr., 5/5/21, at 110-113; Exhs, 180, 181].  Pichette testified he did not make the second payment of $12,500 because Correia already had been arrested.  [Tr., 5/5/21, at 126-127].

The jury could reasonably have found from this evidence that Correia conspired with Hebert to extort $25,000 from Pichette in exchange for the non-opposition letters and host community agreements.  In particular, the jury could infer from Correia's statements to Pichette during their private conversation at City Hall that he was aware that Hebert had demanded a $25,000 payment earlier that day and that he had approved that demand.  The jury also could infer that the fact that Hebert – who was not an employee of the City of Fall River – both arranged Pichette's meeting with Correia and delivered the non-opposition letters and host community agreements to Pichette showed that he was working in concert with Correia.

Correia asserts (Def. Mem. at 30) that "there was no evidence, direct or circumstantial, that Herbert [sic] and Mr. Correia ever discussed extorting Pichette, much less that they agreed to do so," but errs in doing so.  While there may not have been direct evidence that they reached such

an agreement, it is well settled that circumstantial evidence "'can adequately ground a conviction,'" *Owens*, 917 F.3d at 39 (quoting *Ortiz*, 966 F.2d at 711, and the jury could readily infer from the circumstantial evidence in this case that Correia and Hebert acted in concert to extort the $25,000 payment for the reasons just discussed.  Correia likewise errs in asserting (Def. Mem. at 30) that "[t]he most reasonable inference from the limited evidence was that Herbert [sic] was free-lancing and looking to line his own pockets, not behalf [sic] of Mr. Correia."  This is yet another closing argument cloaked in the guise of a sufficiency challenge, and here, once again, Correia fails to present the evidence in the light most favorable to the verdict, as he must when challenging the sufficiency of the evidence.

**b.**     **Correia and Andrade conspired to extort Saliby.**

The evidence, taken in the light most favorable to the verdict, also showed that Andrade conspired with Correia to extort $150,000 from Saliby in exchange for a non-opposition letter.

Saliby testified that he became involved in an effort to open a retail marijuana business in Fall River sometime in late 2017 or early 2018, and that the business would be named Greener Leaf Incorporated.  [Tr., 5/5/21, at 138-139].  Saliby testified he placed several calls to Correia's office because he needed to obtain a letter of non-opposition and host community agreement from the Mayor's office, and spoke to Andrade, Correia's chief of staff, who said that she did not believe Correia would issue any more letters or agreements because they had "hit their max."  [Tr., 5/5/21, at 139-141].  Andrade nonetheless scheduled an appointment so that Saliby could speak with Correia in late June 2018 in Correia's office.  [Tr., 5/5/21, at 141].  Saliby met with Correia and Andrade in Correia's office, and Correia stated that he had no more letters of non-opposition to issue but that he might rescind an existing license.  [Tr., 5/5/21, at 141-142].  Following the

meeting, Brian Bairos, an acquaintance, told Saliby that he would be getting a non-opposition letter from Correia but that he had had to pay a $250,000 bribe to get it. [Tr., 5/5/21, at 142-143].

A few days later, Andrade arrived at Saliby's family store, and Nicole Custadio, Saliby's sister, called him and said that someone from the mayor's office was there to see him. [Tr., 5/5/21, at 206]. Saliby arrived back at the store and he told Custadio that he would be in his office, after which Correia and Andrade entered the store. [Tr., 5/5/21, at 207]. Custadio told Saliby that Correia and the woman from the mayor's office were there (Custadio did not know Andrade's name at the time), and Saliby escorted them upstairs to his second-floor office. [Tr., 5/5/21, at 142-143, 207-208].

Correia and Andrade said they had good news and that they were going to issue Saliby a non-opposition letter and a host community agreement; Saliby said thanks and said if there was anything he could do to please let him know. [Tr., 5/5/21, at 147-148]. Correia responded, "I'm looking for $250,000," and Saliby became nervous because he understood Correia was asking for a bribe. [Tr., 5/5/21, at 148]. After Andrade left to go to the restroom, Saliby asked why $250,000, and Correia responded that he was only going to issue six non-opposition letters and it would give him "an opportunity to make money and the value of it would be a lot more." [Tr., 5/5/21, at 149]. Correia also said that he wanted the $250,000 to be paid to his legal defense fund. [Tr., 5/5/21, at 149]. Saliby said that this was too much because he was only opening a retail marijuana store, and, after some back and forth, they agreed that he would pay Correia $125,000. [Tr., 5/5/21, at 149-150].

Saliby escorted Correia downstairs, where they encountered Andrade and the following exchange occurred:

> **Q.**     And what happens when you run into Gen Andrade – you and the mayor run into Gen Andrade, what does she say?
>
> **A.**     She says, "Is everything okay?"
>
> **Q.**     What did you say?
>
> **A.**     I said, "Yes."
>
> **Q.**     What did she then say?
>
> **A.**     "You're family now."
>
> **Q.**     "You're family now"?
>
> **A.**     Yes.

[Tr., 5/5/21, at 151].  Saliby testified that he feared Correia would retaliate against his family and business if he did not pay the $125,000 bribe.  [Tr., 5/5/21, at 151-152].

Following this meeting, Saliby learned that operators of marijuana businesses also had to pay an annual $50,000 community impact fee, and he spoke with Andrade about arranging a meeting at City Hall.  [Tr., 5/5/21, at 174-175].  Saliby met with Correia and Andrade in Andrade's office and complained that they had never discussed the annual $50,000 fee.  [Tr., 5/5/21, at 175]. Correia responded that would be able to drop the fee down to $25,000 a year, but that the agreed payment that Saliby would make would have to increase from $125,000 to $150,000, and Saliby agreed.  [Tr., 5/5/21, at 175-176].  Saliby also asked if he could make an initial payment of $75,000 when he received the letter of non-opposition and host community agreement and pay the remainder once he received a provisional license from Massachusetts, and Correia agreed.  [Tr., 5/5/21, at 176].  Correia said that he would reach out to Saliby in a few days.  [Tr., 5/5/21, at 177].

As promised, Correia called Saliby a few days later and asked if he had the money, and when Saliby responded that he did, Correia said he would come to Saliby's store to pick it up. [Tr., 5/5/21, at 178].  Correia arrived at the store in a black SUV that was a city car and told Saliby

to enter the vehicle and sit in the passenger seat, and Saliby did so and handed Correia a metal clipboard containing $75,000 in mostly $100 bills.  [Tr., 5/5/21, at 178-185].  Correia put the metal clipboard in the backseat and handed Saliby a letter of non-opposition and the host community agreement that he had signed.  [Tr., 5/5/21, at 185-188; Exh.197].  After some further discussion, Correia dropped Saliby off at his store.  [Tr., 5/5/21, at 186-188].

Sometime after this meeting, Andrade contacted Saliby and asked him to sell 20 tickets at $125 each for a fundraising event for Correia.  [Tr., 5/5/21, at 188-189].  Saliby agreed to take the tickets and paid Correia $2,500 in cash for them when Correia came once again to Saliby's store.  [Tr., 5/5/21, at 189-190].  Saliby did not make the second agreed-upon payment of $75,000 to Correia because he learned that Correia was issuing letters of non-opposition and host community agreements to several other vendors in the city.  [Tr., 5/5/21, at 190-191].

The host community agreement issued to Saliby reflected that the annual community impact fee was $25,000.  [Exh.152].  Joseph I. Macy, who served as the corporation counsel for Fall River from July 2015 to January 2020, testified that Correia asked him to change the annual fee for Saliby from $50,000 to $25,000, and that this was the only reduced annual fee of which he was aware.  [Tr., 5/4/21, at 39-44].

The jury could reasonably have found from this evidence that Correia conspired with Andrade to extort $125,000 from Saliby in exchange for the non-opposition letter and the host community agreement.  In particular, the jury could infer that Correia would not ask for a $250,000 payment from Saliby in Andrade's presence if she was not in on the scheme.  *See, e.g., United States v. Tejeda*, 974 F.2d 210, 213 (1st Cir. 1992) (a "fact finder may fairly infer * * * that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes").  The jury likewise could infer that when Andrade

29

said "You're family now" – immediately after Saliby had answered "Yes" when Andrade asked him if everything was "okay" after she met up with Correia and Saliby after leaving for the restroom – she was indicating her understanding that Saliby had agreed to pay the bribe.  And the jury could infer that when Andrade requested that Saliby sell 20 tickets at $125 each for a fundraising event for Correia, she knew she could make this request because Saliby had agreed to pay a bribe and now was part of the "family."

Correia's contrary arguments go nowhere.  Correia asserts (Def. Mem. at 35) that the fact that Andrade may have heard him demand a bribe from Saliby was insufficient to support a reasonable inference that she agreed with Correia to extort Saliby.  He further asserts (Def. Mem. at 35) that Andrade's statement "You're family now" to Saliby – which he characterizes as "spontaneous" without any record support – likewise falls short of proof of her knowing participation in the conspiracy beyond a reasonable doubt.  Not only do these arguments fail to consider the evidence in the light most favorable to the verdict, however, they constitute a classic and divide-and-conquer strategy that fails to consider the evidence in its totality.  That is impermissible, as the First Circuit has repeatedly instructed that evidence supporting a judgment of conviction must be considered in its totality, and not in isolation.  *See, e.g., United States v. Iwaula*, 789 F.3d 1, 9 (1st Cir. 2015) ("So, too, the court may not speculate as to the weight afforded to individual pieces of evidence: rather, it must recognize that the jury need not evaluate each piece of evidence in isolation but may draw conclusions from the evidence as a whole."); *United States v. Angulo-Hernández*, 565 F.3d 2, 7 (1st Cir. 2009) ("We do not atomize our analysis. We consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence.'); *United States v. Martin*, 288 F.3d 1, 10 (1st Cir. 2000) ("Furthermore, juries need not evaluate pieces of evidence in isolation, but may draw conclusions from the sum

of an evidentiary presentation."); *Ortiz*, 966 F.2d at 711("[J]uries are not required to examine the evidence in isolation, for 'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.  The sum of an evidentiary presentation may well be greater than its constituent parts.'") (quoting *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987)).  Here, the jury could reasonably find that Andrade's statement "You're family now" was not ambiguous after she had been in the room when Correia demanded a bribe from Saliby and after Saliby had just answered "Yes" after she had asked if everything was good.  Rather, the jury reasonably could infer from this and the other evidence just discussed that Andrade was acting in concert with Correia to extract a bribe from Saliby.

For these reasons, the jury reasonably could have found that Correia conspired with Hebert (Count R) and Andrade (Count T) to commit Hobbs Act extortion.

### 3.    Correia extorted Pichette.

Correia contends (Def. Mem. at 35-36) that the evidence was insufficient to prove with respect to Count S that he extorted Pichette because "the alleged scheme to extort Pichette ran through Herbert [sic]," and because Correia's statement, "You talked with Dave, and we're good" was insufficient to prove that he committed substantive extortion for the same reason he asserts it failed to prove an extortion conspiracy between Correia and Hebert.  This claim fails for all the reasons discussed above in Part I.C.2.a.

### 4.    *Evans* is binding precedent.

Correia asserts (Def. Mem. at 36-37) that judgment of acquittal should also be entered on all the Hobbs Act extortion and conspiracy counts because *Evans* was wrongly decided, an issue which he wishes to preserve for further review.  This claim merits little discussion, as Correia rightly concedes that this Court is bound by *Evans* and its progeny.  *See, e.g. ,Agostini v. Felton*,

521 U.S. 203, 238  (1997) (noting that lower courts are bound by Supreme Court decisions "unless and until this Court reinterpreted the binding precedent"); *Hutto v. Davis*, 454 U.S. 370, 375 (1985) ("But unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."); *see also see also Payne v. Tennessee*, 501 U.S. 808, 827 (1991) ("Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.").

## II.   CORREIA'S NEW TRIAL CLAIMS BASED ASSERTIONS OF SPILLOVER PREJUDICE AND MISJOINDER FAIL ON MULTIPLE LEVELS.

Correia contends (Def. Mem. at 37-50) that he is entitled to a new trial because any surviving counts were tainted by spillover prejudice from the counts for which he asserts acquittal is required, and because the fraud and corruption cases were misjoined and should have been severed.  For multiple reasons, those claims fail.

### A.    Correia's Prejudicial Spillover Claim is Waived and Lacks Merit.

Correia contends (Def. Mem. at 37-41) that he is entitled to a new trial on any surviving counts of conviction due to prejudicial evidentiary spillover.  That claim is waived and, even  if not waived, lacks merit.

#### 1.    Correia's prejudicial spillover claim is waived.

It is well settled that "[a] party who identifies an issue, and then explicitly withdraws it, has waived the issue."  *United States v. Rodriguez*, 311 F.3d 435, 437 (1st Cir. 2002); *see also United States v. Olano*, 507 U.S. 725, 733 (1993) (defining waiver as "the intentional relinquishment or abandonment of a known right") (internal quotation omitted).  That is what occurred here.  During a sealed *in camera* conference on June 25, 2019, Correia's counsel stated

that although he did not believe the corruption charges should be brought in a superseding indictment because "it's a totally unrelated set of facts," his position was that "I'd like to try it once" because "my feeling is that if you're going to take a shot at it, I'd rather do it once rather than having consecutive trials."  [Sealed Tr., 6/25/19, at 5; *see also id.* at 6 ("I would rather have it here and do it probably both at the same time.")].

Thereafter, when it responded to co-defendant Andrade's motion to sever, the government noted that because Correia's counsel had informed the Court at that hearing that he preferred one trial with respect to all of the government's allegations against him, the government was not briefing the appropriateness of the joinder of the SnoOwl counts and the corruption counts against Correia under Fed. R. Crim. P. 8(a).  [Docket Entry 97, at 1 n.1].  Correia did not challenge this assertion or otherwise backtrack from his position that he wanted both the SnoOwl and corruption counts tried together.  Nor did he object when, following Andrade's guilty plea, this Court indicated during a status/scheduling on December 15, 2020, that the case would proceed to trial against Correia "on all counts."  [Docket Entry 154].

This consequently is not a case in which Correia failed to raise the issue that joinder of the fraud and corruption counts might lead to prejudicial spillover.  Rather, his counsel expressly raised the issue that the fraud and corruption counts may have been improperly joined, but stated that he wanted those counts to be tried together for strategic reasons.  In these circumstances, any claim of spillover prejudice is waived.  *See Rodriguez*, 311 F.3d at 437.  And "[o]nce waived, a claim typically is 'dead and buried; it cannot thereafter be resurrected on appeal.'"  *United States v. Tkhilaishvili*, 926 F.2d 1, 11 (1st Cir.) (quoting *United States v. Eisom*, 585 F.3d 552, 556 (1st Cir. 2009), *cert. denied*, 140 S. Ct. 403, 140 S. Ct. 412 (2019)).  By like token, these claims cannot be raised for the first time in a post-trial motion, as Correia attempts to do here.

To be sure, Correia asserts in a footnote (Def. Mem. at 50 n.10) that to the extent his counsel "may have agreed to fight on multiple fronts, rather than challenge the misjoinder of unrelated charges and move to sever them, Mr. Correia received ineffective assistance of counsel in violation of the Sixth Amendment." To the extent this assertion is meant to apply to his prejudicial spillover claim as well, Correia offers nothing to support this bare allegation, such as an affidavit from trial counsel, nor does he develop this argument in any meaningful way. This Court should not entertain this claim in these circumstances, and instead should dismiss the claim without prejudice to being raised in a timely motion under 28 U.S.C. §2255.

### 2.    Correia's prejudicial spillover claim fails even if considered on the merits.

"To prevail on an evidentiary spillover claim, the defendant must prove prejudice so pervasive that a miscarriage of justice looms." *United States v. Paz-Alvarez*, 799 F.3d 12, 30 (1st Cir. 2015) (internal quotation omitted). The First Circuit has said that "[t]here is always some prejudice in any trial where more than one offense or offender are tried together--but such 'garden variety' prejudice, in and of itself, will not suffice." *United States v. Boylan*, 898 F.2d 230, 246 (1st Cir. 1990). Rather, to establish reversible error due to evidentiary spillover, defendants must *36 "make a particularly compelling showing of prejudice." *United States v. Casas*, 356 F.3d 104, 112 (1st Cir. 2004). In this case, Correia has failed to show prejudice from any evidentiary spillover that was so pervasive that a miscarriage of justice looms.

*First*, because Correia's sufficiency challenges fail for the reasons discussed above, his claim of prejudicial evidentiary spillover necessarily fails as well.

*Second*, and contrary to Correia's claims, there was significant overlap between the evidence on the wire fraud and corruption counts, as Antonio Costa and Hildegar Camara, both of whom pled guilty and testified pursuant to cooperation agreements, were both SnoOwl investors

and conspirators in the corruption related to the non-opposition letters. To take but a few examples, Costa testified that the reason he kept cash from marijuana vendor Brian Bairos was to recoup what he thought Correia stole from him related to SnoOwl. [Tr., 5/3/21, at 141-142, 228]. Similarly, Camara testified that his understanding of why Costa was getting a piece of the David Brayton extortion was to make him whole for his SnoOwl investment. [Tr., 5/4/21, at 186]. Camara also testified, in connection with the Bairos extortion, that Correia was desperate for money for his legal defense fund (which was for SnoOwl). [Tr., 5/4/21, at 200]. So, too, Saliby testified that, in connection with the issuance of the non-opposition letter and host community agreement, Correia demanded a bribe of $250,000 payable to his legal defense fund. [Tr., 5/5/21, at 149; *see also id. at* 221 (marijuana vendor Christopher Harkins testifies that Correia asked for a donation to his legal defense fund, and Harkins paid $20,000 to that fund)]. This testimony would have made no sense absent the SnoOwl evidence. As such, the testimony of two critical witnesses (Costa and Camara), as well as other witnesses was essential to both parts of the case, and their motives and understanding of the nature of the conspiracies.

*Third*, in order to mitigate any potential evidentiary spillover from one charge to the other, this Court repeatedly instructed the jury that it must consider each of these counts in the case "on the facts and circumstances of the evidence regarding them separately," that the jury's decision "as to any one of those counts does not necessarily mean that you will reach the same decision with respect to any other of those counts," and that each of the counts in the case "stand on their own and are evaluated on their own." [Tr., 5/10/21, at 122, 130-131, 134]. These instructions helped ensure that the jury considered each of the charged counts separately and individually. *See Simon*, — F.4th —, 2021 WL 3754239, at *26 ("As a general rule, 'instructing the jury to consider each charged offense, and any evidence relating to it, separately as to each defendant' constitutes

an 'adequate measure[] to guard against spillover prejudice.'") (quoting *United States v. Casas*, 425 F.3d 23, 50 (1st Cir. 2005)).

*Fourth*, that the jury followed the Court's instructions is demonstrated by the verdict, inasmuch as jury acquitted Correia on Counts V, W and X.  [Docket Entry 229, at 5-6]. The jury's discriminating verdict shows that the jury was able to follow this Court's instructions and differentiate between charged counts.  *See Simon*, ─ F.4th ─, 2021 WL 3754239, at *27 ("We add that Gurry's argument that patient-harm testimony likely 'incited [the jury's] ire' is severely wounded by his acquittal with respect to the CSA and honest-services predicates. That the jury's findings distinguished among defendants and differentiated among proposed predicates is strong evidence that no spillover prejudice occurred."); *United States v. Edgar*, 82 F.3d 499, 504 (1st Cir. 1996) (because jury acquitted defendant on one of several counts, "[t]he jury thus showed itself clearly capable of discriminating among the evidence applicable to each count"); *United States v. Natanel*, 938 F.2d 302, 308 (1st Cir. 1991) (in rejecting claim that joinder prejudiced defendant, who was acquitted of all but one count, noting that "[t]he appellant speculates that he was hurt by evidentiary spillover--but the jury's demonstrated selectivity affords a reasonably good assurance that no injurious spillover effect occurred").

Correia's prejudicial spillover claim thus fails even if considered on the merits.

**B.    Correia's Unpreserved Misjoinder Claim is Waived and Untimely, and Fails Even if Considered on Plain Error Review.**

Correia also contends (Def. Mem. at 41-50) that he is entitled to a new trial on any surviving counts because the fraud and corruption counts were misjoined and he was prejudiced as a result.  That claim is waived for the reasons discussed above and also is untimely and Correia has failed to show good cause to excuse his untimeliness.  Even if considered on the merits, the claim fails.

### 1.     Correia's unpreserved misjoinder claim is waived and untimely.

Correia's misjoinder claim is waived for the same reason that his claim of prejudicial spillover is waived.  Once again, his counsel expressly raised the issue that the fraud and corruption counts may have been improperly joined, but stated that he wanted those counts to be tried together for strategic reasons.  As a result, any claim of misjoinder is waived.  *See Rodriguez*, 311 F.3d at 437.

This claim also is untimely.  Under the Federal Rules of Criminal Procedure, motions that must be made before trial include a defect in the indictment or information on the ground, *inter alia*, that there has been improper joinder.  *See* Fed. R. Crim. P. 12(b)(3)(B)(iv).  "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely," although "a court may consider the defense, objection, or request if the party shows good cause."  Fed. R. Crim. P. 12(c)(3).

Correia did not move pretrial to sever the fraud and corruption counts on the ground that they were misjoined.  To the contrary, and as noted above, his counsel affirmatively abandoned any claim of misjoinder when he said that the fraud and corruption counts may have been improperly joined, but nonetheless stated that he wanted those counts to be tried together.  As a result, his attempt to resurrect this claim in a post-trial motion consequently is untimely and waived.  *See Simon*, ─ F.4th ─, 2021 WL 3754239, at *28 n.11 ("In all likelihood, the claim of misjoinder — which was available before trial but not raised by any pretrial motion — was waived.") (citing Fed. R. Crim. P. 12(b)(3)(B)(iv)).  Nor does Correia make any developed effort to establish good cause for that failure, as, once again, he merely asserts in a footnote in his memorandum (Def. Mem. at 50 n.10) that his counsel should be deemed to have provided ineffective assistance by failing to file such a motion.  This Court therefore should deem any

possible claim that good cause has been established to have been waived.  *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n.1 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived.") (quoted with approval in *United States v. Castro-Vasquez*, 802 F.3d 28, 37 n.6 (1st Cir. 2015)); *see also United States v. Santana-Dones*, 920 F.3d 70, 81 (1st Cir.) ("Good cause for allowing a defendant to file motions out of time demands more than the appearance of new counsel seeking to second-guess the decisions of prior counsel.  After all, allowing new counsel to reopen an expired deadline in order to pursue strategic options forgone by prior counsel would put a premium on changing counsel and unfairly advantage the defendant.") (internal citation omitted), *cert. denied*, 140 S. Ct. 257, 140 S. Ct. 257 (2019).  And even if not waived, this Court should not entertain this claim of ineffective assistance in these circumstances and instead should dismiss the claim without prejudice to being raised in a timely motion under 28 U.S.C. §2255.

For these reasons, Correia's misjoinder claim should be dismissed because it is untimely and he has failed to show good cause to excuse that untimeliness.

### 2.   Correia's unpreserved misjoinder claim fails even if considered on plain error review.

Even if not waived or untimely, Correia's unpreserved claim that the fraud and corruption charges were misjoined is subject only to review for plain error, which he cannot show.

As a threshold matter, because Correia raises this claim for the first time in his post-trial motion, it is reviewable only for plain error.  *See United States v. Kinsella,* 622 F.3d 75, 83 (1st Cir. 2010) ("Because Kinsella's trial lawyer failed to preserve the prosecutorial-misconduct issues through timely objections, the plain-error standard controls.  The only slight wrinkle is that defense counsel did raise the redirect-examination issue in a new-trial motion.  But that is still an unpreserved claim, so the plain-error rule applies here too."); *Aguayo v. Rodríguez*, Civil No. 14-

1059 (MEL), 2016 WL 3522259, at *8 (D.P.R. June 11, 2016) ("All the remaining arguments were not objected to prior to the jury retiring, but rather, were raised for the first time in the motion for new trial.  These objections will therefore be reviewed for plain error.").

Under the plain error standard, courts have "leeway to correct only the most egregious of unpreserved errors."  *United States v. Etienne*, 772 F.3d 907, 913 (1st Cir. 2014) (quotation omitted).  Under that standard, Correia must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001).  But Correia fails to discuss or apply the plain error standard in discussing this claim in his supporting memorandum, and that failure waives any possible claim that he can meet that standard.  *See United States v. Grullon*, 996 F.3d 21, 31 (1st Cir. 2021); *United States v. Cruz-Ramos*, 987 F.3d 27, 40 (1st Cir. 2021); *United States v. Veloz*, 948 F.3d 418, 428 (1st Cir.), *cert. denied*, 141 S. Ct. 438 (2020); *United States v. Rivera-Carrasquillo*, 933 F.3d 33, 49 n.15 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 2691 (2020); *United States v. Severino-Pacheco*, 911 F.3d 14, 20 (1st Cir. 2018); *United States v. Pabon*, 819 F.3d 26, 33 (1st Cir. 2016).

In any event, Correia cannot show plain error in this case.  Rule 8(a) of the Federal Rules of Criminal Procedure provides:

> **(a) Joinder of Offenses**.  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).  As the First Circuit has made clear, "'[s]imilar' does not mean 'identical,'" and that "joinder serves the purposes of economy of resources."  *United States v. Edgar*, 82 F.3d

39

499, 503 (1st Cir. 1996) (quoting and citing *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980) (Friendly, J.)).   In determining whether counts are properly joined, courts look to such factors as "whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred." *United States v. Taylor*, 54 F.3d 967, 973 (1st Cir. 1995) (internal citations omitted).

In this case, although the fraud and corruption counts admittedly involved different statutes, some of the witnesses and testimony regarding those counts, as just discussed, would overlap, particularly that of two critical witnesses, Costa and Camara.   As this Court informed the jury when the evidence shifted from the SnoOwl part of the case to the Fall River part of the case, "[t]here's some overlap, as you can see, and there may be some additional testimony that deals with SnoOwl specifically."   [Tr., 4/30/21, at 133].   The fraud and corruption counts also involved conduct that took place on a fairly ongoing basis over a period of a little more than five years.   *Cf. United States v. Irons,* No. 07-CR-95, 2008 WL 5136520, at *1 (E.D. Tenn. Dec. 5, 2008) (denying motion to sever arson charges occurring five years apart because they were of a same or similar character).   In these circumstances, Correia does not come close to showing that the joinder of these counts constituted an error, much less one that was clear or obvious, as is required under the plain error standard.

Correia also cannot show that his substantial rights were affected by any possible error or that any error seriously impaired the fairness, integrity, or public reputation of judicial proceedings.   As discussed above, this Court repeatedly instructed the jury that it must consider each of these counts in the case "on the facts and circumstances of the evidence regarding them separately," that the jury's decision "as to any one of those counts does not necessarily mean that you will reach the same decision with respect to any other of those counts," and that each of the

counts in the case "stand on their own and are evaluated on their own." [Tr., 5/10/21, at 122, 130-131, 134]. These instructions helped ensure that the jury considered each of the charged counts separately and individually, and the fact that Correia was acquitted on Counts V, W and X also shows that the jury was able to follow this Court's instructions and differentiate between charged counts. *See Simon*, — F.4th —, 2021 WL 3754239, at **26-27; *Edgar*, 82 F.3d at 504; *Natanel*, 938 F.2d at 308.

Nor do Correia's contrary arguments carry the day. He asserts (Def. Mem. at 46-49) that the misjoinder of the fraud and corruption counts improperly allowed the government to argue that he had a criminal disposition. But the First Circuit requires a "strong and convincing showing of prejudice" for such an argument to succeed, pointing out that "[s]ome prejudice results in almost every trial in which the court tries more than one offense together," and that "[g]arden variety prejudice * * * will not, in and of itself, warrant severance." *United States v. Richardson*, 515 F.3d 74, 81 (1st Cir. 2008) (internal citations omitted). Here, once again, the fact that this Court instructed the jury that it had to consider each group of counts individually and the jury acquitted Correia of Counts V, W and X enervates any claim that the joinder of these counts prejudiced him by allowing the government to argue that he had a criminal disposition. *See Simon*, — F.4th —, 2021 WL 3754239, at **26-27; *Edgar*, 82 F.3d at 504; *Natanel*, 938 F.2d at 308.

Correia also argues (Def. Mem. at 50) that the misjoinder of the fraud and corruption counts prevented him from denying that he had accepted any bribes. But the First Circuit requires a defendant making such a claim to make "a convincing showing that [Correia] has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Richardson*, 515 F.3d at 81 (internal quotations omitted). To make this showing, a defendant "must timely offer enough information to the court to allow it to weigh the needs of judicial

economy versus the defendant's freedom to choose whether to testify as to a particular charge."
*United States v. Jordan*, 112 F.3d 14, 17 (1st Cir. 1997) (internal quotations omitted).  Thus, in
*Jordan*, for example, the defendant "argued his need to testify in order to produce a 'good faith'
defense to the tax charges" in his objection to the government's motion to join indictments, and
"[t]o bolster this assertion, he included an offer of proof reciting the testimony that would
constitute his defense."  *Ibid.*

Correia made no comparable showing in this case.  When questioned by the Court on May
6, 2021, Correia initially indicated his intent to take the stand and testify.  [Tr., 5/6/21, at 84-86].
After further discussions with counsel, however, counsel reported that Correia had decided not to
take the stand and testify, and noted specifically that Correia was aware and satisfied that the Court
would protect his Fifth Amendment privilege not to testify and "vigorously" instruct the jury that
it could not draw any adverse inference from the fact that he had chosen not to testify:

> **MR. REDDINGTON:**  Your, Honor, may I report the status.  I
> appreciate the time the court has given me to again revisit with Mr. Correia this
> very, very serious constitutional right to this decision, which as Your Honor
> obviously is quite aware is very significant.  He's had plenty of time, literally
> weeks, we've discussed it many, many times.  He is well aware that Your Honor
> would forcefully instruct this jury they could not draw any inference against him
> for not testifying.  He's aware that Your Honor would very vigorously protect that
> constitutional right.  He also knows that he does have the right to testify in this case.
>
> Based on a review of where we are right now, his decision would be to not
> testify and that we'd rest.

[Tr., 5/6/21, at 89].  At no time did Correia or his counsel indicate that he wished to testify on the
corruption counts but was prevented from doing so due to the fraud counts, nor did he make a
proffer of what his testimony might be regarding the corruption counts.  As a result, Correia has
failed to meet his burden of showing that he had both important testimony to give concerning the
corruption counts and a strong need to refrain from testifying due to the fraud counts.

## CONCLUSION

For the foregoing reasons, Correia's post-trial motion should be denied, and the jury's

verdict should be upheld.

Date:  August 30, 2021                      Respectfully submitted,

                                            NATHANIEL R. MENDELL
                                            Acting United States Attorney

                                            ZACHARY R. HAFER
                                            DAVID G. TOBIN
                                            MARK T. QUINLIVAN
                                            Assistant U.S. Attorneys
                                            John Joseph Moakley U.S. Courthouse
                                            One Courthouse Way, Suite 9200
                                            Boston, Massachusetts 02210
                                            (617) 748-3100
                                            zachary.hafer@usdoj.gov
                                            david.tobin@usdoj.gov
                                            mark.quinlivan@usdoj.gov

## CERTIFICATE OF SERVICE

I, Mark T. Quinlivan, hereby certify that the foregoing document filed through the ECF
system will be sent electronically to counsel for the defendant.

            By:    /s/ Mark T. Quinlivan
                   MARK T. QUINLIVAN