UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )          Criminal Action
          Plaintiff,                )          No. 18-10364-DPW
                                    )
v.                                  )
                                    )
JASIEL F. CORREIA, II,              )
                                    )
          Defendant.                )
                                    )



BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


SENTENCING

September 20, 2021




John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210




Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Zachary R. Hafer
3    David G. Tobin
     Mark T. Quinlivan
4    United States Attorney's Office MA
     1 Courthouse Way
5    Suite 9200
     Boston, MA 02210
6    617-748-3106
     zachary.hafer@usdoj.gov
7    david.tobin@usdoj.gov

8    On Behalf of the Defendant Jasiel Correia, II:
     William Fick
9    Daniel Marx
     Fick & Marx
10   24 Federal Street
     Boston, MA 02110
11   857-321-8360
     dmarx@fickmarx.com
12   wfick@fickmarx.com

13   Kevin J. Reddington
     Law Offices of Kevin J. Reddington
14   1342 Belmont Street
     Suite 203
15   Brockton, MA 02301
     508-583-4280
16   kevinreddington@msn.com

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2   (Case called to order.)
 3            THE COURT:  Well, I wanted to outline some
 4   housekeeping ahead of time before we move on.  I have asked of
 5   the people who might be in the courtroom whether or not they're
 6   vaccinated.  I've received responses.  There are some people in
 7   the courtroom who are not vaccinated, and so I'm going to ask
 8   all of those who are in the spectator area and sitting at the
 9   prosecution and defense table to keep their masks on
10   throughout.  That includes government counsel as well.
11            I make the observation that we're still in a very
12   delicate position here.  You all recall the way in which we
13   conducted this trial.  We had no more than 26 people in the
14   courtroom during that proceeding.  Excluded from the courtroom
15   were my law clerks.  They're not excluded now.  They're all
16   vaccinated.  They've got masks on here.  But ensuring the
17   safety and integrity of the courtroom is a challenging matter.
18            I will only offer one very recent anecdote.  I was
19   about to start a trial that would be quite intense, something
20   like this case, in which all the participants said that they
21   were vaccinated.  I was uncomfortable with the trial schedule.
22   I continued it, and we continued with pretrial activities.  One
23   participant in the trial came down with COVID.  If that had
24   happened during the trial itself, we would have had a mistrial.
25   We would have ended up with jurors who were here who had to be
```

1    discharged, would have had to have been discharged.

2          So while it seems sometimes extreme to take these

3    steps, I think it's important.  You'll note I don't have a mask

4    on.  Ms. Beatty doesn't have a mask on.  Ms. Mortellite doesn't

5    have a mask on.  Ms. D'Addeico is about to put her mask on, but

6    she doesn't really need one, I think, so long as people are

7    likely to speak, I'm likely to speak, Ms. Beatty is likely to

8    speak, Ms. Mortellite is likely to speak.  And there is now a

9    rule in this court that all are fully vaccinated.  That is a

10   rule that the judges adopted last week for all employees.  The

11   President has his own rules with respect to executive branch

12   persons.  There's a separation of powers issue involved.

13         But I want to emphasize how important it is that all

14   of us take whatever steps we can to protect not only our own

15   safety and security but the safety and security of everyone

16   else that we encounter.  I've done what I can to do that, and

17   that shapes to some degree what we're about to undertake.

18         So back to the point that I was making earlier.  If

19   people wish to speak, then of course I'll permit them to speak

20   and take their masks off if they are fully vaccinated, and I

21   take their representations as true that they truly are, but

22   otherwise use the masks, even though people have had

23   associations during the course of the trial that may suggest

24   that they had pods.

25         I have permitted the media to have, at least as far as

1   I know, as many people as they want to have in the courtroom

2   here.  And I understand that there are five individuals here.

3   They stand as proxies for the public.  But under these

4   circumstances, I've instructed Ms. Beatty that no other members

5   of the public other than family of the defendant and people who

6   are associated with the U.S. Attorney's Office can be in the

7   courtroom and Probation as well and, as I said, the media.  The

8   media I understand may have a need to leave the courtroom from

9   time to time.  And while I'm not encouraging running in and

10  out, I do ask you not to do so in a disruptive fashion here.

11       The way in which I think this will work is the

12  following:  that there are significantly briefed issues for

13  judgment of acquittal as to various of the counts and for a new

14  trial if those judgments of acquittal aren't granted.  So I'm

15  going to take those up first, and I'll follow the outline of

16  the defendant's motion and his memorandum.

17       There are some of the arguments that I don't think I

18  need to hear argument about, but there are some that I'm fairly

19  interested in, and I will want to go to the record in the case

20  very specifically to test the propositions that are presented.

21  I think it may take a little while.  I'm not exactly sure how

22  long.

23       Then my plan would be to break for a period of time,

24  probably coinciding with lunchtime, and then proceed to the

25  sentencing, assuming that there are matters that require

1    sentencing in the case.

2         So that's the overall kind of approach that I have in

3    dealing with this.  And I think what I'd like to do then is

4    just turn directly to the several claims that the defendant is

5    making.  The first is judgment of acquittal and thereafter for

6    a new trial.

7         I want to start with the question of wire fraud here.

8    I guess to focus this I'm going to tell you that what I'm

9    interested in here is the question of evidence regarding

10   depositing or cashing or check processing of the wires.  That

11   doesn't include all of the counts of which the defendant was

12   convicted of wire fraud.  I understand that there's a challenge

13   to others of the counts.  I will say in a broad brush sort of

14   way that my focus here is on whether this case belongs in the

15   Federal Court.

16        That's the issue that's raised by the question about

17   evidence of check processing or depositing or cashing, that it

18   presented to the jury and there was evidence before the jury

19   and evidence that I would have accepted in any event before the

20   jury regarding the defendant's knowledge of material

21   misrepresentations seems to me to be fully established.

22        The defendant, I think a reasonable jury could and in

23   fact a reasonable jury did find that the defendant engaged in

24   fraud.  And that evidence that preceded the particular charges

25   of fraud, that is the earlier stages of his representations,

1    remained active all the way through.  They became foundational

2    to the omissions to state material facts and the material

3    facts.

4         So we have, from my perspective, a case that a

5    reasonable jury could find that there was fraud.  This is, to

6    put a finer point on it, the question of the payments that the

7    defendant elicited.

8         I say that this is important for purposes of federal

9    jurisdiction because otherwise virtually every federal case or

10   every fraud case becomes a federal case at least if it involves

11   a public official, and that simply isn't the case.  There is a

12   very important dimension to jurisdiction of the courts, and

13   that is the actual use of wires and can the jury find that.

14        Now, in that connection, there was a stipulation

15   entered into concerning so called interstate nexus.  I've read

16   the stipulation again carefully.  I had outlined before the

17   case was put to the jury that I wasn't going to conflate the

18   jurisdictional issues regarding interstate commerce and in

19   particular called out the question of what kind of actual use

20   of the wires was undertaken here.

21        The defendant now challenges that, and it really is a

22   challenge to what is known as Count A, the processing of the

23   Cabeceiras $6,000 check; Count D, which is the processing of

24   the Eisenberg $25,000 check; the processing in E of the

25   Eisenberg check, $25,000; the processing of the Miller $20,000

1    check; in H the processing of the $5,000 Cabeceiras check, and

2    Count I, which is the Cabeceiras $4,500 check.  And so I don't

3    know, Mr. Hafer, are you going handle this part of the matter?

4            MR. HAFER:  Mr. Quinlivan in the first instance, Your

5    Honor.

6            THE COURT:  So Mr. Quinlivan, if you could point me to

7    what I would call direct evidence in this case, not inferences

8    and so on.  I want to understand what the inferences are

9    supposed to be drawn from.

10           MR. QUINLIVAN:  Understood, Your Honor, and may it

11   please the Court.  I believe the parties' stipulation

12   established -- and Your Honor has said he has read it, but I'll

13   read it again.  The stipulation said, quote, "With respect to

14   the wire fraud counts, Counts A through I, the parties agree

15   that the interstate commerce element of the offense charged has

16   been established and is not in dispute."

17           THE COURT:  I don't find it to be sufficient.  So

18   let's go on.  It does not deal with the question of the use of

19   an instrumentality, actual use of an instrumentality.  And that

20   was called out during the discussion before the case was put to

21   the jury.  So I don't consider that that stipulation provides

22   sufficient evidence on which a jury could find that there was

23   the actual use of the interstate facilities.

24           MR. QUINLIVAN:  Okay.  I understand Your Honor's

25   point.  If I could just complete the thought just to establish

1    the record.

2         THE COURT:  Right.

3         MR. QUINLIVAN:  It's just that the stipulation did

4    refer to the offense charged.  The first superseding indictment

5    as relevant here alleged that the defendant did transmit and

6    caused to be transmitted interstate wire communications.  And

7    so it's the government's position that the jury could have

8    found from that stipulation that said that the interstate

9    commerce element of the offense charged, clearly wire fraud

10   counts, not mail fraud counts, has been established.

11        Now, putting that aside, I would also point out that

12   at least from the government's perspective, that was the

13   general understanding of the purpose of that.

14        THE COURT:  The subjective understanding of the

15   government with respect to a document that I'm supposed to read

16   as a piece of text is governing here?  And the subjective

17   understanding that the government has about something that we

18   discussed at great length because I did not use the standard

19   instruction with three parts.  I made it five.

20        MR. QUINLIVAN:  That's right.

21        THE COURT:  And one of the five was precisely the use

22   of the actual instrumentalities, and there is a great deal of

23   case law with respect to precisely that issue that populates

24   the casebooks.

25        So let me say that the subjective understanding of the

1       government is not compelling or even relevant, frankly, to me,

2       although I question whether it could have been well founded.

3               The second part is, I look at precisely the document

4       you've asked me to look at, and it conflates those five

5       elements, or really two of the five elements here without

6       calling them out at all.  So I don't find the text to be

7       compelling under these circumstances.

8               So now we'll move on to the direct evidence here other

9       than -- unless there's something else you want to say.  Excuse

10      me.  I'm sorry, I didn't mean to interrupt.

11              MR. QUINLIVAN:  I'm sorry.

12              THE COURT:  -- the direct evidence with respect to the

13      counts that are challenged here.

14              MR. QUINLIVAN:  Yes.  And I just add, Your Honor, that

15      it's not just the government's subjective understanding.  I

16      would point out that when Mr. Hafer noted that he was going to

17      read the stipulation on the morning of May 6 and that there had

18      been some discussion or exchanges with the Court about the

19      wording of that stipulation, Your Honor noted that the

20      stipulation did not cover or go to the specific intent

21      requirement, which Your Honor indicated would be topic four,

22      but that Your Honor was otherwise -- you know, that the

23      stipulation was otherwise fine.

24              THE COURT:  And I have to tell you that nothing in

25      that, objectively reviewed, suggests that I ratified the

1    stipulation as satisfying all elements of the case.  I was very

2    specific with respect to the question of specific intent but

3    otherwise simply said that I would accept it.

4           MR. QUINLIVAN:  Understood.  And I would just add one

5    final point that in his closing when Mr. Hafer did argue with

6    respect to topic five that that had been satisfied by the

7    stipulation, so it's certainly --

8           THE COURT:  So if a lawyer argues erroneously that a

9    particular legal proposition is satisfied, that constitutes --

10   and I don't interrupt, that constitutes ratification on my

11   part?

12          MR. QUINLIVAN:  I'm not suggesting that, Your Honor.

13   I'm suggesting that it does indicate what at least from the

14   government's perspective we thought was the understanding of

15   the nature of the stipulation.

16          THE COURT:  So now we're back to the subjective

17   understanding of the government.

18          MR. QUINLIVAN:  Well, no, because I would go back to

19   the wording of the stipulation.  I understand Your Honor

20   disagrees with that.

21          THE COURT:  We've dealt with this, the language in the

22   stipulation, so let's go to the direct --

23          MR. QUINLIVAN:  We have.

24          THE COURT:  -- evidence with respect to that.  And to

25   focus this a bit more, let me simply ask, assuming no

```
 1      stipulation in the case, as a way of thinking about this,
 2      rather than saying stipulation, broadly conceived, assuming no
 3      stipulation in this case, would the government have been able
 4      to satisfy with a direct evidence basis -- a direct evidence
 5      basis for the several counts that are challenged here?
 6                  MR. QUINLIVAN:  I think the government would have,
 7      based on the face of the checks that were introduced into
 8      evidence, the markings on the checks, which a jury, applying
 9      its common sense, would I think understand in the electronic
10      age as we noted.  I'm not trying to conflate the specific
11      intent requirement.  But I do think that as we've noted in this
12      age, a reasonable juror would know that when you deposit a
13      check, you don't have to do it in person.  You can do it
14      online.  You can do it at an ATM.  A reasonable juror would
15      know that --
16                  THE COURT:  And you can actually deliver it to the
17      bank itself.
18                  MR. QUINLIVAN:  Absolutely.
19                  THE COURT:  So a reasonable juror at this point would
20      know that there are a variety of ways in which a check could be
21      deposited or could be processed or it could be cashed.
22                  MR. QUINLIVAN:  That's right.
23                  THE COURT:  It could be done by wire.  That's what's
24      challenged here.  It could be done by actual delivery.  It
25      could be done by Federal Express.  It could be done by mail.
```

1          Now, I've outlined what a reasonable juror in this

2     present age, at least, we all would agree, could do or could

3     think.  How do I say that a reasonable juror under these

4     circumstances decided that it was the wire that was done, given

5     those other alternatives?

6          MR. QUINLIVAN:  Well, first off, it doesn't have to be

7     simply how the defendant transmitted the check.  It's whether a

8     wire --

9          THE COURT:  I have posited that these checks that

10    are -- I say "checks," but there's some other email

11    communications as well.  But that these matters could have been

12    deposited, processed or cashed without the use of wires.  In

13    fact, a common understanding in this current age would

14    recognize that frequently -- not frequently but people from

15    time to time use other forms of delivery of checks,

16    particularly sizable checks.  So we don't know what was being

17    done in that kind of processing.  We'll get to the particulars

18    of each of these in just a moment.

19          But I look at the record in the case, the transcript

20    of the case, the way in which the checks were introduced, and

21    you'll remember that I said at every point while I recognize

22    that the parties were not disputing the admissibility of

23    particular kinds of evidence, that I expected them to announce

24    when they were offering a particular piece of evidence so we

25    could see it in the record, so we could see whether or not

 1     there was basis for some kind of dispute about it.  And what I

 2     have is simply delivery of documents.

 3            So how do I know, how does a juror know that the

 4     document was processed or cashed or deposited using that as the

 5     classic example by the use of wire, having in mind that this is

 6     a jurisdictional element.  It means the difference between

 7     federal fraud and state common law fraud.

 8            MR. QUINLIVAN:  I think, Your Honor, I would separate

 9     out two issues.  One is how the defendant potentially delivered

10     or deposited the checks in question.

11            THE COURT:  Okay.

12            MR. QUINLIVAN:  And whether or not as part -- whether

13     or not wire transmissions were used as part of the processing

14     of those checks.

15            THE COURT:  Okay.  I did, too.

16            MR. QUINLIVAN:  And I think --

17            THE COURT:  I did, too.  And now I want to understand

18     how it is that I can say to the exclusion of alternative ways

19     for those checks to move through and ultimately show up on a

20     bank statement that they did so through the use of wires.

21            MR. QUINLIVAN:  And I would go back, Your Honor, to

22     the point that when, for example, you deposit a check, and no

23     matter how you do it, you get a receipt immediately that tells

24     you, if it's a small amount, it tells you that it's been

25     immediately credited.  If it's a larger amount, it typically

```
 1    will tell you that, you know, a certain amount might be
 2    immediately available and then in two days the larger amount
 3    will be available.
 4               THE COURT:  Do we have that evidence?
 5               MR. QUINLIVAN:  No, but I think that --
 6               THE COURT:  So that's an interesting observation
 7    dehors the record.  Now I want to focus on the record.  I've
 8    been trying to focus on the record.  I'm going to focus you
 9    directly in the record.  Show me in the record documentation
10    that will tell us that each of these challenged ones were wire
11    transfers.
12               MR. QUINLIVAN:  I can't point to evidence in the
13    record that itself shows that.  I can point Your Honor to the
14    checks with the markings on the checks that a reasonable juror
15    could infer.
16               THE COURT:  Okay.  So let's look at them.  Show in the
17    checks so that I can see what it is that you say.  You'll
18    recognize, of course, that going through the record there was
19    no explanation of these markings, none.
20               MR. QUINLIVAN:  That's correct, Your Honor.
21               THE COURT:  Okay.  So what we have is a juror, based
22    on common understanding, what you say is common understanding,
23    who is going to be able to tease out what markings, unexplained
24    in the record, show that this was a particular kind of
25    transaction, right?
```

1          MR. QUINLIVAN:  I think I would phrase it slightly

2     differently, Your Honor.  I would say that the markings would

3     confirm what a juror applying his or her common sense would

4     know about banking transactions in this day and age.

5          THE COURT:  What do we know about what jurors know

6     about banking transactions?  I mean, is there evidence about

7     that?

8          MR. QUINLIVAN:  There is not evidence about that.

9          THE COURT:  Okay.  And so now the question is how I

10    draw that kind of conclusion.  I'm prepared to say that because

11    there was some case law with respect to that, including case

12    law that I've dealt with on this, but never anything quite as

13    extreme as this that I can find in the current case law.

14         So what is it that would permit this reasonable juror

15    or us to conclude that this reasonable juror would understand

16    these markings that were unexplained during the course of the

17    trial would provide direct evidence of wire transfer?

18         MR. QUINLIVAN:  Your Honor, I go back to what I've

19    already said.  I think that a juror, based on the common

20    experience of engaging in banking transactions in this day and

21    age, would understand that these are not being sent -- when a

22    check is being processed, it's no longer being sent in the

23    mail, that it can be done almost instantaneously, that, as I

24    said, you get a receipt immediately telling you when those

25    funds will be made available.

1          A juror would understand that these checks are not

2     being sent from one bank to another through the mails to get

3     processed, but in this day and age it is being done through

4     wire communications.  And in fact, the very fact that you can

5     now do these -- you don't even have to go to the ATM.  You can

6     scan a check and deposit it.

7               THE COURT:  Is that what they did?

8               MR. QUINLIVAN:  I don't believe there's evidence to

9     that.

10              THE COURT:  No, there isn't.  So you're telling me

11    about all these various ways that you think might be possible.

12    We don't know which one it was.  We don't have a basis for

13    doing it.  We would have to speculate entirely with respect to

14    that unless there's some evidence, and I keep going back to

15    evidence.

16              MR. QUINLIVAN:  Your Honor, if I could, because I was

17    not -- because I was not the trial attorney, I'm going to defer

18    to Mr. Hafer.

19              MR. HAFER:  I may have the exhibit number wrong.  I

20    think it was 69.  If it's not 69, I'm referring to the six or

21    700-page exhibit with all the records from Citizens Bank.  You

22    asked Mr. Quinlivan if there's evidence of how the money moved,

23    there's years' worth of statements in there.

24              THE COURT:  Okay.  So where is it?

25              MR. HAFER:  I didn't bring it, Your Honor.

1          THE COURT:  You didn't bring it down?

2          MR. HAFER:  No.  I'm happy to go get my hands on it.

3          THE COURT:  We'll do it in an orderly way, if that's

4    what you want me to look at here.  And I'm going to be able to

5    find there that a juror looking at those documents,

6    uninstructed by any testimony at trial, would conclude that a

7    wire transfer was involved, and the way in which the government

8    presented it, I'm not limiting you to a question of processing,

9    although that's the way it's charged in the indictment, but to

10   include depositing or cashing, that a juror would necessarily

11   conclude that that was done by wire.

12         MR. HAFER:  Right.  There was testimony before Your

13   Honor that the bank account, the Citizens account at issue was

14   opened in Rhode Island.  There was testimony from several

15   witnesses that the account was opened in Rhode Island.

16         THE COURT:  It's not the opening of the account.  It

17   is where the money was processed or the check was received or

18   deposited.

19         MR. HAFER:  I understand, Judge.  You wouldn't let me

20   finish the point, sir.  You wouldn't let me finish the point.

21   The point is --

22         THE COURT:  Well, perhaps you'll listen to the point

23   I'm trying to make, and then you'll be able to respond more

24   responsibly to the question that I'm asking.  It is not, I

25   think, unless you're arguing otherwise, where an account was

1    created in the first place.  It has to do with what you charged

2    in the indictment, and what you've charged in the indictment is

3    the processing of the account.

4          Now, if you're going to say, Oh, well, all of these

5    Citizens Bank things have to ultimately go to Rhode Island and

6    that then in Rhode Island the money is transferred in some

7    fashion, I understand that, although I'd like to see where in

8    the record it says that.

9          What I do know is that there was referenced processing

10   and depositing and cashing, and none of that is apparent from

11   the record, so I do want to get to the particular

12   documentation, as you say I should review again, not developed

13   fully in the briefing by the government responsibly to the

14   defendant's brief.  We'll take a break -- not take a break but

15   we can do it at a later point during the course of this.  It's

16   not that I want to go by it, but I want you to understand what

17   it is that I'm asking about.

18         Now, in order to shape the question -- I interrupted

19   you.  Is there something else you want to say at this point

20   before we go -- not before we go to that, until we get to that.

21         MR. HAFER:  I'll wait until I have the benefit of, I

22   believe it's 69, Your Honor.

23         THE COURT:  All right.  So we'll move on from the

24   question of wire fraud because that's in this motion for

25   acquittal as to the wire fraud counts.  I think that that

1    however irrespective means that Counts B, C and F remain

2    undisturbed by the rulings that I have made.  I don't know if

3    Mr. Fick or Mr. Marx, you're going to be speaking to that.

4         MR. MARX:  That's correct, Your Honor.  B, C and F are

5    not challenged on that basis.  I just ask, Your Honor, if the

6    government now intends to rely on Exhibit 69 or some other

7    document which wasn't referenced in its opposition, I just ask

8    that we get a copy of that so we can look at it.

9         THE COURT:  I take it you don't have it with you

10   either?

11        MR. MARX:  It wasn't in the briefs, Your Honor, so we

12   didn't think to bring a copy with us.

13        MR. HAFER:  He knows the standard is all the evidence

14   in the light most favorable to the government.

15        THE COURT:  Please, we're going to get to -- this is

16   the time to evaluate the evidence itself.  My view, as you

17   know, is I will permit -- because I think there are asymmetries

18   in appeal, that I'll permit the government to get to the jury

19   if there's anything colorable in the case, but it's going to be

20   examined very carefully at the time of a motion for acquittal.

21   That's what's happening here.

22        In any event, we have undisturbed by the rulings that

23   I'm making here, unless, Mr. Marx, you want to plow the ground

24   some more, I'm not sure that it's going to be very fertile, but

25   if you want to plow the ground some more on these issues, I'll

1    listen to you, but I think that what's left here or what's

2    undisturbed here, and we haven't resolved the others, is B, C,

3    and F, right?

4         MR. MARX:  Yes, Your Honor, and I think the other

5    issues are significantly briefed and it sounds like we have

6    other work to do this morning.

7         THE COURT:  All right.  So let's move then to the tax

8    fraud counts.  And here again it is a question of what does the

9    evidence show in this case.  We have two different accountants

10   who, I take it, that the government contends are the people who

11   provided the knowledge that the defendant willfully

12   disregarded, intentionally disregard and knowingly disregarded.

13        And I guess I want to understand how that works for

14   Ms. Vieira, who, I read the testimony in the case to suggest

15   was asked "Anything else" a couple of times about a fairly

16   complex question of what is attributable to an individual for

17   income.  And so then I move on to Mr. Charest.  Similar kind of

18   issue, I suppose, although there is some additional income

19   quite apart from SnoOwl that the defendant received there that

20   I think may survive.

21        So I don't know, Mr. Quinlivan, are you going to be

22   speaking to this one as well?

23        MR. QUINLIVAN:  Yes, Your Honor.

24        THE COURT:  Okay.  So let's talk about it a bit.

25        MR. QUINLIVAN:  So, Your Honor, and I pointed out, we

1    pointed out in our memorandum what the First Circuit said in

2    the *Boulerice* case.  We think that a reasonable jury, from the

3    evidence, could conclude that when the defendant signed the

4    returns they were not true and correct as to every --

5          THE COURT:  But this isn't *Boulerice*.  The evidence is

6    entirely different from *Boulerice*.  We're not even dealing with

7    the same basic set of tax provisions.

8          MR. QUINLIVAN:  Absolutely, Your Honor, but the point

9    in *Boulerice* -- the challenge, as I understand it, that the

10   defendant is making as to the tax fraud counts is to the

11   willfulness requirement.  And *Boulerice* talked about the legal

12   standard for the willfulness requirement.

13         As Your Honor knows, the defendant in that case took

14   the stand and testified that the willfulness element, her

15   position on appeal was that willfulness could not have been

16   established because she took the stand and testified that she

17   was just following through the advice of her accountant, and

18   how could, in those circumstances, willfulness be established.

19   Now, the First Circuit noted that there was all kinds of

20   additional evidence.

21         THE COURT:  Right.  So --

22         MR. QUINLIVAN:  But --

23         THE COURT:  Just a moment.  People talk about

24   *Boulerice*.  This is not *Boulerice*.  So the question for me is

25   the encounters, which I understand to be the basis for the

1    government's position on the tax fraud between the defendant

2    and Ms. Vieira and then the defendant and Mr. Charest.

3              MR. QUINLIVAN:  Yes.

4              THE COURT:  Okay.  So then we look at what those

5    encounters were, what it is that was communicated to the

6    defendant under these circumstances.  These are not areas of

7    general understanding, putting to one side what is involved

8    here, which is *Cheek* kind of specific intent.

9              So with Ms. Vieira, she said "Anything else," right?

10   That's it.  Do you have any other income?  Did she give any

11   instructions with respect to what would constitute income

12   imputable to the defendant under these circumstances?

13             MR. HAFER:  May I, Mr. Quinlivan?

14             MR. QUINLIVAN:  Your Honor, I'll argue the legal

15   issues, but when it goes to specific evidence, I will defer to

16   my --

17             THE COURT:  That's fine.  That's why I wanted to have

18   everybody who was involved in the trial here, recognizing that

19   cases look different on appeal than they actually occur at

20   trial, and so the re-spinning of cases by a defendant who has

21   been convicted and by the government that is seeking to sustain

22   its convictions ought to be tested carefully.

23             MR. QUINLIVAN:  Absolutely.  But before Mr. Hafer --

24   if I could just, because I do want to note, and I don't want

25   the point to get lost, which is that, yes, this isn't *Boulerice*

1    in the sense of it's the same kind of tax information,

2    absolutely.  But *Boulerice* established a principle of law that

3    with respect to the willfulness element of the tax fraud

4    statute, that if the jury concludes from the evidence that a

5    return was not true and correct as to every material element,

6    the jury is entitled to infer willfulness.  It's not compelled

7    to find willfulness but a jury may infer willfulness.

8              THE COURT:  You mean the mere signature is enough?

9              MR. QUINLIVAN:  Your Honor --

10             THE COURT:  You take that as the principle from

11   *Boulerice*?

12             MR. QUINLIVAN:  No.  It's the --

13             THE COURT:  What do you say to *Cheek* under those

14   circumstances?

15             MR. QUINLIVAN:  *Boulerice* was decided in 2003.  *Cheek*

16   was decided in 1991.

17             THE COURT:  I understand, but in hierarchy --

18             MR. QUINLIVAN:  Absolutely, right.

19             THE COURT:  I really do have to look at *Cheek*.

20             MR. QUINLIVAN:  Understood, Your Honor.

21             THE COURT:  And you're telling me that, as I

22   understand it, *Boulerice* defines our understanding of what

23   *Cheek* means about specific intent sufficient so that the mere

24   signing of the return is enough to establish the willfulness or

25   specific intent?

1          MR. QUINLIVAN:  In combination as the First Circuit

2    said with the conclusion that --

3          THE COURT:  In combination with what?  In combination

4    with the conclusion that you've already identified as your

5    conclusion?

6          MR. QUINLIVAN:  Your Honor, I take it we're not --

7    Your Honor disagrees, so let me --

8          THE COURT:  I want to be sure.  I tend to be -- as you

9    have seen before and you will see here today -- very aggressive

10   in asking the questions because that's how I learn.

11         MR. QUINLIVAN:  Yes.

12         THE COURT:  And so while everybody likes deference, I

13   don't expect it here.  I want you to come back at me if there's

14   something here, and so if there's something I'm missing that

15   arises from your reading of *Boulerice*, then I should understand

16   it.  Because as I understand what you're saying now, it is, you

17   sign it, you're willful, or at least a jury could decide that

18   you're willful under these circumstances.

19         MR. QUINLIVAN:  Your Honor, that's our understanding

20   and reading of *Boulerice*.  And, you know, again, I just add

21   that I freely admit that the First Circuit went on to note all

22   of the additional evidence of willfulness that the jury heard

23   in that case.  But it's clear from the decision that even if

24   all of that had been put to the side, the conviction could have

25   stdanded with respect to the willfulness challenge on that

 1    basis.

 2              THE COURT:  Okay.  I think, two things.  Number one,

 3    as a principle of law, I disagree.  It's not there from *Cheek*.

 4    And number two, I don't read *Boulerice* that way.  I can't

 5    imagine that the First Circuit had that in mind.  Why would

 6    they spend all of their time talking about all of this other

 7    evidence?  Because they had all this time on their hands and

 8    wanted to talk about other evidence?  No.  Because they wanted

 9    to get to the question of whether or not there was evidence

10    that could support this basic proposition.  You sign it.

11    That's important.  That takes the government lots of the way,

12    but it doesn't get to the specific intent which *Cheek* called

13    out in very particular ways.  We're dealing in areas, as you

14    know --

15              MR. QUINLIVAN:  Absolutely.

16              THE COURT:  -- in which the Supreme Court has become

17    increasingly concerned about specific intent and polices the

18    boundaries along those lines.  So it's clear, I don't want

19    there to be any misunderstanding, I reject your reading of

20    *Boulerice*.

21              MR. QUINLIVAN:  I understand.  And just in response to

22    Your Honor's comment, if you go to the next section of

23    *Boulerice,* it's quite clear that the First Circuit is basically

24    saying "but there was more."  It was not hanging its hat on

25    that additional evidence.

1          THE COURT:  What was it doing then under your theory?

2     Just gratuitously offering but there was more like it was an

3     information commercial?

4          MR. QUINLIVAN:  Your Honor, I've had literally dozens

5     of decisions in which the First Circuit or a Court will note

6     that a principle can be established on this basis but that

7     there was additional grounds.  It could alternatively be done

8     on --

9          THE COURT:  Did they say "alternatively"?

10          MR. QUINLIVAN:  I'll take one example.

11          THE COURT:  No.  Let's go to *Boulerice*.  I'm happy to

12     look at it.  I've got it here.  I assume you do, too, right?

13          MR. QUINLIVAN:  I don't have it with me right now.

14          THE COURT:  Okay.  So based on your recollection of

15     what *Boulerice* says, *Boulerice* says that the alternative is

16     available even though it's purely established by the signature

17     on the return?

18          MR. QUINLIVAN:  I don't have -- I can't, because I

19     don't have -- I apologize, Your Honor, I don't have it, I can't

20     point you to the exact language.  But that's my recollection of

21     the immediate next paragraph which is to then say "but there

22     was other evidence of willfulness as well."

23          THE COURT:  Okay.

24          MR. QUINLIVAN:  Again, I don't want to misstate what

25     was said.  But my reading, our reading is that the Court went

1    on to then say, "Here is how the jury also could have found
2    willfulness in these circumstances."
3              THE COURT:  Okay.
4              MR. QUINLIVAN:  And going back to the broader point
5    earlier, you know, for example, on multiple occasions the First
6    Circuit might say that --
7              THE COURT:  I understand the idea of alternatives.
8    The question is whether or not this is one.
9              MR. QUINLIVAN:  And again, I don't want to misstate
10   what the exact language is, but that's how I recollect the
11   ensuing paragraph reads.
12             THE COURT:  All right.  Well, I'll look at it again.
13             MR. HAFER:  Your Honor, with respect, if I may, just
14   to the specific facts --
15             THE COURT:  I'm sorry.
16             MR. HAFER:  If I may just amplify the legal points
17   with my recollection of the evidence on the initial tax counts,
18   the first 2013 and 2014 returns, Ms. Vieira's testimony, as I
19   recall it, was considerably more substantial than just the
20   "anything else" question.  It was supplemented by the Liberty
21   Tax exhibits that included all the different places on the
22   forms that she testified were presented to Mr. Correia where
23   business income could and should have been included and he did
24   not include it.
25             There was a lot of testimony at this trial that SnoOwl

 1    was Mr. Correia's baby, that he was working on this 24 hours a

 2    day, seven days a week.

 3            THE COURT:  Just a moment.  May I -- just a moment

 4    because I've looked at the briefing on this, and I have to say

 5    I've tried to find where she instructed him about the

 6    circumstances under which something that could be characterized

 7    and in fact Mr. Charest had a hard time figuring out what it

 8    was as a partnership or as a sole proprietorship would involve

 9    income that would be imputed to the individual defendant.

10    There's none of that.

11            MR. HAFER:  There's no mention of SnoOwl whatsoever.

12            THE COURT:  No, no mention by her.

13            MR. HAFER:  By him.  Her testimony was there were

14    several opportunities in which he could have provided --

15            THE COURT:  If he had known, if he had known at that

16    time that this was within the ambit of his personal return.

17            MR. HAFER:  Right, right.  And it defies common sense

18    and the other evidence at trial that Mr. Correia at the time

19    that he walked in there in 2015 -- because it's February of

20    2015 when he files those original ones -- didn't know that he

21    had some obligation to mention this business from which he was

22    taking all of this money.  Your Honor, you could find

23    willfulness just on the fact that he amended the returns to

24    include it.

25            THE COURT:  Is there case law that says that, that

1        shows willfulness of the original return?

2                MR. HAFER:  It's common sense, Judge.

3                THE COURT:  Just a moment.  Apart from common sense,

4        which seems to be the reliance interest of the government, is

5        there case law that says that?  Because I've pressed now on a

6        couple of matters of case law.  Of course not everybody brings

7        all of the cases down to look at and point to.  I suspect that

8        when the argument is in the First Circuit that people will be

9        more prepared.

10               But in any event, apart from saying it's common sense,

11       is there case law that says that when someone files an amended

12       return that it was willfully wrong in the original return?

13               MR. HAFER:  I have no idea.  The government's evidence

14       with respect to the willfulness of the first return is Ms.

15       Vieira's testimony as to what she went through with Mr. Correia

16       at the time he came in to file the returns, all with supporting

17       documents that provide numerous places in which some business

18       income could and should have at least -- whether at that point,

19       that one is not charged as calling it a sole proprietorship

20       versus a partnership.  It's charged for the complete omission

21       of any mention whatsoever --

22               THE COURT:  If it's not imputable to him, he doesn't

23       have to mention it, does he?

24               MR. HAFER:  If it's not imputable to him?  How could

25       it not be imputable to him?  He claimed it throughout the whole

1    trial as a salary.

2              THE COURT:  You use the post --

3              MR. HAFER:  Any business income, anything that's --

4              THE COURT:  I encourage you, Mr. Hafer, to listen to

5    the questions.

6              MR. HAFER:  Okay.

7              THE COURT:  I know you have an answer, but perhaps

8    you'll want to refine your answer when you listen to the

9    question so that it is responsive to the question itself.

10             MR. HAFER:  Okay.

11             THE COURT:  So we have a communication between Ms.

12   Vieira and the defendant.  The communication is one in which

13   Ms. Vieira tells him there are things we want to know about it,

14   we'd like to hear about this and this and this and this.  Okay?

15             Now, whether something is imputable, whether something

16   is in fact his income, is something that depends upon a

17   construction of a particular statute, a series of statutes

18   having to do with sole proprietorships, limited partnerships,

19   that kind of thing, not a -- well, perhaps some people's common

20   sense, I don't think so, it's something that requires a little

21   bit of thought.

22             So the defendant does not tell her about SnoOwl, the

23   monies involved in SnoOwl.  As I understand it, your theory is

24   that his failure to identify SnoOwl as possibly within the

25   ambit of reportable income, that is what he's going to be

```
 1  signing his return on, shows willful blindness or recklessness.
 2  What is it that it shows?
 3          MR. HAFER:  That it was willfully false when filed.
 4  Can I -- I don't want to interrupt but --
 5          THE COURT:  Well, no, I think you do.  But in any
 6  event, again, try to be responsive to the questions that I'm
 7  putting to you.
 8          MR. HAFER:  It was in response to something you just
 9  said, which is, it's not just the failure to provide it.  It's
10  the failure to provide the information after being apprised of
11  the requirement that that's what they're asking for.  And also,
12  Judge, remember, there's signatures, there's initial signatures
13  on each one of those pages.
14          THE COURT:  I think you've -- maybe I have this wrong,
15  but the violation is a violation of the return.  Just a moment.
16  It's not a violation of what he responded in terms of the
17  questionnaire.
18          MR. HAFER:  That's right.  The return has to be
19  willful, but when you're told that this is the information
20  that's going to be used to file your return and we still need
21  that jurat or the willfulness declaration on the return, then
22  that's how the totality proves it up.
23          THE COURT:  So don't you have to, under those
24  circumstances, show that not only did he not provide this
25  evidence, provide the information, but that he knew the
```

 1   significance of the information because the significance of the

 2   information is precisely what provides specific intent with

 3   respect to the tax return?

 4          MR. HAFER:  Right, but we proved that the way we

 5   always prove knowledge.  You give the instruction.  You never

 6   know exactly what's in someone's head at the time.

 7          THE COURT:  But it can't be unduly speculative.

 8          MR. HAFER:  Of course not.  Agreed.

 9          THE COURT:  That's the point.  This is one of the

10   thinner cases with respect to this.  People prove it up in a

11   variety of different ways.  What you have is someone who, you

12   know, in light of Mr. Reddington's cross-examination about the

13   advertising for Liberty, suggests that this is not one of

14   the -- however many are left, I used to know them as the big

15   eight.  But this was not a major accounting firm instructing

16   someone about what the fine points are.  So what I have is

17   someone who says "Got any of this?"  He says "No."

18          MR. HAFER:  And I think you have more than that.  The

19   government rejects the characterization of this is thin when

20   the trial testimony is so uncontroverted.  The amount of time,

21   effort and energy that Mr. Correia, an intelligent, educated

22   graduate of Providence College at the time in route to becoming

23   an elected city councilor, when you have all that evidence and

24   the amount of time he put into this company, right, and you

25   have to prove knowledge, and without having a wiretap or some

1    sort of MRI that would reveal actually what was going on in his

2    head, he fails to even mention the existence of this company

3    when the forms that are in evidence provide several different

4    places for it to be disclosed and it's not disclosed in any

5    way, shape or form, the government does not view that as thin.

6    The government views that as a willful material omission.

7            THE COURT:  Okay.  So we're back to this point of he

8    was not instructed on the particulars of when the return should

9    reflect various kinds of receipts, right?

10           MR. HAFER:  I'm sorry, Your Honor, I didn't

11   understand.

12           THE COURT:  There's no evidence that he was instructed

13   on the significance of various kinds of receipts.

14           MR. HAFER:  Receipts?

15           THE COURT:  Yes, money.  What you're saying is he's

16   asked about is there any business income.

17           MR. HAFER:  Supplemental income, other income,

18   business income, anything.

19           THE COURT:  Okay.  What does "income" mean under those

20   circumstances?  Does it mean reportable income?

21           MR. HAFER:  Partnership interests -- I don't have the

22   form in front of me.  It wasn't just one throwaway --

23           THE COURT:  Again, I think it's important for you to

24   have the form in front of you and for the defendants to be able

25   to respond to it, so I'll take a break to deal with that as

1    well.

2             MR. HAFER:  That's fine.

3             THE COURT:  Because I've been over it, and I want to

4    be sure that I haven't missed something.  The parties may say,

5    "Well, we mentioned it in our brief."  Good.  That starts the

6    discussion.  It doesn't end it.  And so I want to be sure that

7    I have been fully apprised of what it is that is being relied

8    upon here.

9             So you say there's lots of stuff in the record here

10   that would support the willfulness, and we'll take a look at it

11   when you're prepared, although I'd like to do it today and

12   relatively promptly on a break.

13            MR. HAFER:  Yeah, we can do it very promptly I think.

14            THE COURT:  Now let me turn to the defendant on this

15   issue, which is one aspect that seems to me to be fairly

16   capable of knowledge, at least with respect to the amended

17   return, and here is the affiliated company Snow -- I can't

18   remember the precise name for it, Mr. Marx.

19            MR. MARX:  Snowkimo, Your Honor.

20            THE COURT:  All right.  So how could anybody not know

21   that was income?

22            MR. MARX:  Well, Your Honor, I think it's a microcosm

23   of the same issue you've been discussing with Mr. Quinlivan and

24   Mr. Hafer now for a few minutes.

25            It's certainly not common sense that if someone takes

1    a debit card that belongs to a company and goes to a store and

2    buys something for themselves personally that that's business

3    income under the federal tax code that needs to be reported on

4    a tax return.

5            THE COURT:  Is that what it has to be for Snowkimo?  I

6    mean, it's income.  I mean, you take someone's credit card, a

7    credit card that you have access to and you use it.  What does

8    that take in terms of understanding?  Not a CPA responsibility.

9            MR. MARX:  I don't know that if I took, for example,

10   Mr. Fick's credit card and went and bought myself lunch I would

11   think that I need to report that as income on my federal tax

12   returns.  So using --

13           THE COURT:  There's no immunity here, you know, Mr.

14   Marx.

15           MR. MARX:  And I'd never do that, Your Honor.  But

16   that doesn't make it income to me.  It may be money that I've

17   spent in some context.  The question is whether it's income

18   that I need to report on my federal tax returns.  And more

19   importantly, as Your Honor has identified, the question is

20   whether I know that's income that I need to report on my taxes.

21           THE COURT:  So let me leave it at this because we're

22   going to be taking more time for the parties to refute.

23   Assuming I'm leaning that way and saying, you know, with

24   respect to SnoOwl, I have to make a list, a chance to do

25   something other than the incantation of common sense that seems

1    to be the basis of the government's arguments in these areas.

2    So they'll come back and they'll have whatever they have, and

3    we'll talk about that.

4          You've got to come back and talk to me about Snowkimo

5    because it seems to me that that falls in a different category

6    here, enough at least to permit or to require that the, I guess

7    it would be Count M would be --

8          MR. MARX:  Count M, I believe, Your Honor.

9          THE COURT:  M is the one that deals with the 2014 time

10   period, and that's when Snowkimo comes in, right?

11         MR. MARX:  Yes, Your Honor.

12         THE COURT:  So that M may survive under this.

13         MR. MARX:  I'm happy to come back to that when we have

14   the documents available.  I'll just say this at this point.

15   Snowkimo is a detail in this case in the sense it's this other

16   company about which there's very little testimony.  I'm not

17   sure there's any testimony about exactly what its corporate

18   form is, who owns it, what its business structure is, who gets

19   the income from it.

20         So again, I think, writ large, this is a case where

21   someone is alleged to have taken a company credit card or taken

22   money from the company themselves that may be an embezzlement

23   case, that may be fraud case by the company.  It's not a tax

24   case, Your Honor.

25         THE COURT:  I think you've touched on something that

1   should be clear.  It might be an embezzlement case and it might

2   be a fraud case.  It is something that I'll think about in

3   terms of sentencing on the basis of the facts that are

4   presented here.

5          It's one thing for me to go through, and I will, to be

6   sure that these counts are properly to be the basis for a

7   judgment in the case.  It's another thing for me to look at the

8   totality of the circumstances about the defendant and his

9   activities.

10          MR. MARX:  Absolutely, Your Honor.  And obviously

11   we'll get to sentencing and we're not taking the position, and

12   it would be absurd to, that the jury couldn't reasonably

13   conclude that there was misuse of company money, whether you're

14   talking about SnoOwl or Snowkimo.  There's certainly evidence

15   from which a rational jury could conclude that and the jury did

16   conclude that.  The question is whether that misuse in and of

17   itself proves a willful violation of a tax code.

18          THE COURT:  Okay.  So let's move on then to the second

19   set of -- or part B, I guess, of the defendant's memorandum in

20   opposition that has to do with the Hobbs Act here.

21          As with Mr. Quinlivan's view about which has greater

22   force, *Boulerice* or *Cheek* or a variation on that, I reject the

23   defendant's argument that evidence was wrongly decided, or at

24   least that's not for me to say here.  I can offer my own

25   gratuitous observations, which is that it's been around a long

 1    time and it still hasn't been overturned.  And consequently,

 2    it's applicable.  So that puts that out.

 3            That then leaves, as far as I can see, just two counts

 4    that are being challenged here, Count R and Count T.  And those

 5    have to do with questions of conspiracy.  And I guess I have

 6    considerable difficulty not treating Mr. Pichette and

 7    Mr. Saliby as conspirators.  So tell me how I can't under these

 8    circumstances.

 9            MR. MARX:  So there's two reasons why I think you

10    can't properly do that, Your Honor.  The first is, it's not

11    what the indictment says.  The indictment is very explicit that

12    Mr. Correia was charged in those counts with conspiring with

13    others, specifically Mr. Hebert with regard to Matt Pichette

14    and Ms. Andrade with regard to Charles Saliby, to extort them

15    as victims.

16            Your Honor, just as a housekeeping matter, we do have

17    a motion for leave to file a reply in support of this.  The

18    only reason I mention that, it was assented to, docket number

19    300, I believe.

20            THE COURT:  Yes.  I'm sorry.  This was the one that

21    was filed on Friday?

22            MR. MARX:  No, Your Honor.  That relates to

23    sentencing.  This was filed on the 13th, I believe.

24            THE COURT:  I thought it had been allowed.  In any

25    event, it is, I have it before me --

1        MR. MARX:  Thank you, Your Honor.  The only reason I
2    mention that is because when I attached Exhibit A to the
3    proposed motion, it did not include Exhibit A to that proposed
4    motion.  ECF makes that level of complexity challenging, but
5    Exhibit A was the actual indictment in *Ocasio.*  And here is why
6    I mentioned this, Your Honor, and I have copies if Your Honor
7    would like to see it, and I have copies for the government as
8    well, of course.
9        THE COURT:  Pass it to Ms. Beatty.  Okay.
10       MR. MARX:  So, Your Honor, *Ocasio* is the Supreme Court
11   case I imagine we'll spend a few minutes talking about.  This
12   is the actual superseding indictment that was at issue in that
13   case that went all the way up to the Supreme Court.  And if I
14   direct the Court's attention to page 3 of the indictment, Count
15   One of the conspiracy --
16       THE COURT:  Hold on a second.  Yes, go ahead.
17       MR. MARX:  -- charges Mr. Ocasio, along with a
18   co-defendant, with conspiring, directly below their names,
19   "with other Baltimore Police Department, BPD, officers, and
20   with Mareno and Mejia to obstruct, delay and affect commerce"
21   -- I'm skipping ahead now -- "to unlawfully obtain under color
22   of official right money and other property from Mareno and
23   Mejia and Majestic, their auto body shop."
24       So in *Ocasio* we have a very clear case of a situation
25   where an indictment alleges two guys who own a body shop in

1    Baltimore are involved in a ongoing cyclical kickback referral

2    scheme with Baltimore Police Department officers, and they are

3    indicted as conspirators and victims, plainly identified in the

4    face of the indictment as such.  The superseding indictment in

5    this case, Your Honor, does not do that.  It nowhere says that

6    Mr. Correia conspired with Pichette and Saliby to extort

7    Pichette and Saliby.

8            THE COURT:  Why isn't the language "and others known

9    and unknown to the jury did conspire" and then filling in the

10   blanks as I did in the redacted version identifying as victims

11   Mr. Saliby and Mr. Costa?

12           MR. MARX:  Because I think the indictment, fairly

13   read, Your Honor, by identifying them as victims but never

14   identifying them as conspirators --

15           THE COURT:  I don't think anybody read it that way,

16   and certainly I didn't.  And I listened to the evidence, and I

17   presented the revised, redacted indictment to everybody

18   involved in the case, and frankly it doesn't make any sense to

19   use common sense in this overused context.  That's the whole

20   point about why I think you're concerned about evidence and

21   others are as well, that how can you be both a victim and a

22   conspirator or a principal or whatever.

23           Well, you can because this is to some degree a

24   hermaphroditic charge in which somebody wants something bad

25   enough so that they can be extorted by official right.  But I

1    don't think there's any question here about this, even looking

2    at the particular language that you've provided to me,

3    different language, but if someone took this indictment that

4    went to the jury as to which there was no objection, they would

5    say, "Well, the victim here is Saliby and the other victim is

6    Costa."

7            MR. MARX:  I'm sorry.  I just want to make sure I'm

8    following the interpretation.  The two victims I believe we're

9    talking about are Pichette and Saliby.

10           THE COURT:  Okay.  So let me jump over to Pichette,

11   which is R, but the same applies to him I believe.

12           MR. MARX:  I'm looking at page 5 of the redacted

13   indictment, if we're looking --

14           THE COURT:  Right.  I'm sorry.  I focused only on the

15   Saliby conspiracy and substantive count.  But the same thing

16   applies to Pichette under R.  The language of the indictment is

17   "others known and unknown to the jury did conspire" here.  It

18   fairly -- that's fairly comprehensible.  "By obtaining property

19   not due to Correia from the victims with the victims' consent."

20   So, you know, you can be both a consenting victim and someone

21   who conspires.

22           And the consenting victims here were people who wanted

23   these opportunities to engage in marijuana distribution.  And

24   under the present system or under that system at that time it

25   was discretionary.  So I think, you know, *Evans* is fairly

1    clear, I think *Ocasio* is fairly clear that you can be both.

2           MR. MARX:  Yes, Your Honor.  So I won't waste the

3    Court's time on the indictment.  Let's go right to *Ocasio*.  And

4    I want to be clear.  We made the argument about evidence to

5    preserve the arguments of evidence.  That's obviously an issue

6    that's of some interest to a number of justices on the court.

7    That's not our argument here, Your Honor, our primary argument.

8    Our primary argument here is if you read *Ocasio* --

9           THE COURT:  So let's do what I wanted to do with

10   Mr. Quinlivan and maybe we'll get a chance to, and that's look

11   at *Ocasio*.  You've got it; so do I.

12          MR. MARX:  Yes, sir.

13          THE COURT:  What am I looking at that tells me that

14   this carves out?

15          MR. MARX:  So in particular, Your Honor, I think

16   there's a lot of places in *Ocasio* you could look to, but I

17   think the clearest example is the health inspector hypothetical

18   that the Court spins out of that case.  If you give me a

19   minute.  On my printout, it's on page 8 of the PDF.  I believe

20   it's page 1436 --

21          THE COURT:  Okay.

22          MR. MARX:  -- of the Supreme Court Reporter.  What the

23   Court explains in *Ocasio*, and just to be clear, the government

24   makes an argument in the opposition about coercive extortion.

25   We're not talking about coercive extortion here.  We're talking

1    about extortion under color of official right.

2          And what the Supreme Court holds in *Ocasio* is

3    extortion under color of official right always requires the

4    consent of the victim, but they use language in the case like

5    "grudging acquiescence to a shakedown" to explain that simply

6    because someone has the consent necessary to trigger a

7    violation of the Hobbs Act does not mean that they're actually

8    a conspirator.

9          THE COURT:  Right, so it's a matter of judgment.  And

10   so the question is, applying *Ocasio*, applying *Evans,* how could

11   I not say that Saliby and Pichette were victims who were also

12   conspirators?

13         MR. MARX:  Here is how, Your Honor.

14         THE COURT:  They wanted this.  This wasn't a kind of

15   grudging consent.  This was a matter of business for them.

16   That they were not themselves charged has to do with the

17   charging decisions in these cases and the need for evidence in

18   the case, all of which I fully understand, and it is very much

19   in the bailiwick of the government.

20         MR. MARX:  Respectfully, Your Honor --

21         THE COURT:  But with respect to these people, how can

22   I not say that they are victims -- conspirators.  Where is the

23   categorical that I take out of *Ocasio?*  I understand *Ocasio*

24   talks about the range of alternatives perhaps illustrating how

25   dangerous it sometimes is to have hypotheticals, but in any

1    event, I look at this and say this is in the heartland, and now

2    you've got to tell me why it isn't.

3          MR. MARX:  Okay.  Respectfully, Your Honor, I

4    disagree, and I'll point you to the language I was just talking

5    about, which I believe is categorical.

6          The Supreme Court says imagine a health inspector

7    demands a bribe from a restaurant owner.  Pausing for a second,

8    Your Honor.  The restaurant owner in this hypothetical wants

9    his license just as bad as Mr. Saliby and Mr. Pichette want it.

10   So we're talking about a very, very similar hypothetical

11   scenario.  If somebody wants a license, they need it from the

12   government.

13         The health inspector demands a bribe from the

14   restaurant owner, threatening to close down the restaurant if

15   the owner does not pay.  Very convenient, the flip of our case.

16   I'll take away your license, and I'll give you a license.  In

17   either case you need to pay me money --

18         THE COURT:  Is this mere acquiescence; is that the

19   state of the evidence in this case?

20         MR. MARX:  Yes, Your Honor, because the government

21   made a choice in this case, because they thought it was their

22   best hope of convicting Mr. Correia to describe this case

23   repeatedly, exclusively as a shakedown campaign.

24         THE COURT:  You know, argument is argument.  The

25   question -- as far as I'm concerned, I instructed the jury with

1    respect to this.  You don't challenge the instruction as I

2    understand it.  And the instruction said fairly clearly I think

3    what was necessary under these circumstances.  This was not a

4    mere acquiescence case on evidence here.  At least a jury could

5    find that it was not mere acquiescence.

6              MR. MARX:  I don't dispute the principle that the jury

7    could find that.

8              THE COURT:  Isn't that the standard I'm using?

9              MR. MARX:  No, Your Honor, it's not.  And here is why.

10   The government always likes to repeat, and this case is no

11   different that any other, that the evidence must be viewed in

12   the light most favorable to the jury's verdict.  And of course

13   that's true.  We don't dispute that principle.  That would be

14   silly.

15             But the Supreme Court, I was looking again at the

16   language in, I believe it's *Flores-Rodriguez*, for example,

17   cited in our briefs.  The Supreme Court -- the First Circuit

18   rather always recites that language.  But the equipoise

19   principle applies to that and limits that verdict-friendly

20   approach.  So I think Your Honor's job --

21             THE COURT:  You say "equipoise," you mean if it could

22   be either one or the other?

23             MR. MARX:  Yes.

24             THE COURT:  That's the standard?  If it's either one

25   or the other?  Not that there's sufficient evidence from which

1    a finder of fact could find it but that there's equal amounts

2    of evidence?

3             MR. MARX:  No, it's not that there's equal amounts of

4    evidence, Your Honor.  But if you have a situation where the

5    evidence is ambiguous because you're making -- in here there's

6    no argument there's a direct proof of conspiracy by Saliby and

7    Pichette.  The argument is inferential that, because they

8    agreed to pay, they were engaging in a conspiracy.

9             The contrary inferences are in equipoise.  If it's

10   equally plausible for the jury to say they were the victims of

11   a shakedown or active participants in a conspiracy, and I don't

12   think there's any evidence cited in the briefs, and I don't

13   remember any from looking at the trial transcript many times,

14   that would have tipped that balance.

15            If those inferences are of equal weight, that's

16   equipoise, and that necessarily dictates reasonable doubt on

17   behalf of the jury.  That's what the First Circuit says.

18   Viewed in the light most favorable to the government --

19            THE COURT:  Where does it say that?

20            MR. MARX:  It says that, Your Honor, in

21   *Flores-Riviera*, Your Honor, a case we cited, 56 F.3d 319, 1995

22   decision from the First Circuit.  Of course there's many cases

23   that then go on to cite --

24            THE COURT:  It says when it's --

25            MR. MARX:  I'll read it, Your Honor.  It say "if the"

1    -- and now it's quoting the standard -- "If the evidence viewed

2    in the light most favorable to the verdict gives equal or

3    nearly equal circumstantial support to a theory of guilt and a

4    theory of innocence of the crimes charged, this Court must

5    reverse the conviction.  That is so because where an equal or

6    nearly equal theory of guilt or theory of innocence is

7    supported by the evidence viewed in the light most favorable to

8    the prosecution, a reasonable jury must necessarily entertain a

9    reasonable doubt."  Now, it's not possible to say --

10            THE COURT:  May I just pause on that?  That's

11   precisely the instruction I gave the jury, right?

12            MR. MARX:  Yes, Your Honor.

13            THE COURT:  Okay.  So now we're back to my assessing

14   the evidence in this case.  I've been somewhat unwilling to

15   express my own views about it, but now you're inviting it.

16   This was not an acquiescence case.  This wasn't even close.

17   These were people, businessmen who liked the idea of sumptuary

18   criminal activity being legalized and wanting to advance that

19   through a faithless employee of the City of Fall River.  So you

20   want to balance on that.  Wasn't even close.  So if that's what

21   you've asked for, you got it.

22            MR. MARX:  I think Your Honor has to make a judgment

23   call, that's your obligation under Rule 29, notwithstanding the

24   jury's verdict, to decide whether there's sufficient evidence.

25   I respectfully disagree with that reading.

1          THE COURT:  No.  I made the determination that there

2     was sufficient evidence, and now you're telling me I have to

3     make the determination about equipoise, that's categorical,

4     even though I put it to the jury in the case.  Now I've done

5     it.

6          MR. MARX:  The point, Your Honor, is, if you look at

7     the evidence and the jury could equally infer from that

8     evidence that Saliby and Pichette were the victims of

9     shakedowns -- the testimony by Saliby was, "I was afraid of

10    retaliation.  That's why I paid the bribe" -- it's hard to

11    imagine --

12         THE COURT:  I observed Saliby here, too.  The

13    government could have indicted him in this case.  He was

14    pursuing this relentlessly.  He was like the people in the

15    construction business get a contract and say, "Now is the time

16    for negotiation" whenever he was dealing with Mr. Correia.

17         This is not someone who was the subject -- who was

18    without responsibility in this case.  So this was not an

19    acquiescence case in the slightest.  I shouldn't say "in the

20    slightest."  Someone acquiesces, they're put to the test.

21    You're going to be a member of the family or not.  Are you

22    going to pay this up or not?  You want it or not?  He wanted

23    it, and he wanted it in ways that implicated him in what was a

24    violation of public trust.

25         MR. MARX:  Absolutely, Your Honor.  I'm not disputing

1    that.  I want to make sure we understand each other.  And

2    obviously, if you reject my argument, that's fine.  I just want

3    to make sure you understand.  My point is not that he didn't

4    consent.  Of course consent is a requirement of Hobbs Act

5    violation.  If he had a gun put to his head and turned over

6    money, we'd be talking about something totally different.

7         There's always consent.  He wanted the license.  He

8    agreed to pay the bribe.  But the question is whether there's a

9    gap the Supreme Court has described between that consent for

10   Hobbs Act and an act of conspiracy, the intent to join a

11   criminal conspiracy to shake yourself down.  It's possible but

12   it's unusual.  And in --

13        THE COURT:  A, it's not unusual; and B, I mean, the

14   case law that has developed over the years with respect to the

15   Hobbs Act makes clear that it's not unusual at all.  You may

16   not like the law, which is evidence, and you may say, "Well,

17   *Ocasio* indicates that some members of the Court are

18   uncomfortable with the law."  I understood that.  But it is the

19   law, and so what you're arguing for is close to saying every

20   time there's consent, we've got a categorical problem with

21   Hobbs Act extortion under color of official right.

22        MR. MARX:  That's not my argument, and I'm sorry for

23   not being clear about it.  The language at the bottom -- the

24   beginning of page 1436 is, "If the owner reluctantly pays the

25   bribe in order to keep his business open, the owner has,"

 1     quote, "'consented' to the inspector's demand, but this mere
 2     acquiescence in the demand does not form a conspiracy."  That's
 3     about as categorical as the Supreme Court can get, that
 4     evidence that you've consented --
 5          THE COURT:  No, no.  Mere acquiescence is what that is
 6     clear about categorically.  Mere acquiescence.  And this is not
 7     a mere acquiescence case.
 8          MR. MARX:  So as long as we're clear about that, our
 9     point is that there isn't evidence from which the jury could
10     distinguish the two possibilities that these guys were
11     grudgingly acquiescing to pay someone off in order to get a
12     license just like the Supreme Court says, if you did it to the
13     health inspector, it would not be a conspiracy and actively
14     engaging in some kind of symbiotic relationship with a
15     bribe-taker.
16          Those are the poles the Supreme Court is describing.
17     The way this case was tried to the jury, the way it was
18     described to the jury, it was clearly presented as a case in
19     which people were forced under the fear of retaliation to
20     consent to paying bribes, which may be a substantive Hobbs Act
21     problem.  But the Supreme Court in *Ocasio* -- and I'm not
22     talking about evidence.  You know, I'm not trying to channel
23     Justice Thomas and his critique of evidence right now.  I'm
24     just talking about *Ocasio*.
25          The majority opinion in *Ocasio* says consenting in that

1    situation is not enough to prove conspiracy.  The question is

2    what additional evidence at trial proved there was a conspiracy

3    that went beyond consent for Hobbs Act purposes.

4         THE COURT:  Well, I want to be sure -- I think I'm

5    sure about this, but I want to be absolutely sure that I

6    haven't missed this.  That is, your categorical is consent?

7         MR. MARX:  No, Your Honor.

8         THE COURT:  Your categorical -- just a moment.  Is

9    your categorical mere acquiescence?  Is it simple acquiescence?

10   Mere acquiescence?  Acquiescence in part?  What is it?

11        MR. MARX:  The categorical is that consent sufficient

12   to violate the Hobbs Act does not in and itself establish a

13   criminal conspiracy.  There needs to be additional evidence in

14   the record presented to the jury that can distinguish from a

15   situation where someone has merely acquiesced and a situation

16   where someone has intentionally joined a criminal conspiracy.

17        THE COURT:  So the substantive offense here is, of

18   course you're not challenging, or you're challenging only if

19   evidence makes you challenge it; is that right?

20        MR. MARX:  No, no, no, Your Honor.  We're getting sort

21   of into the weeds now.  We challenge it with respect to

22   Pichette because that substantive offense is covered by Hebert.

23   We don't with respect to Saliby because he took the stand and

24   said this happened to him directly.  So the jury reached the

25   verdict.  It wouldn't be possible, given the standards we're

1    dealing with now, to challenge that.

2            THE COURT:  Why is Pichette not in the same category?

3    He didn't take the stand?

4            MR. MARX:  No, because Hebert didn't take the stand,

5    Your Honor, and Hebert is the one who demanded the bribe.

6            THE COURT:  But there was evidence of Hebert's demand,

7    wasn't there?

8            MR. MARX:  Correct.

9            THE COURT:  Okay.  So the question is not who said it,

10   unless you want me to be evaluating the credibility of each of

11   these individuals who are proffered properly with this evidence

12   of substantive violation.

13           MR. MARX:  Right.  So the issue with respect to Hebert

14   and the substantive offense for Pichette, which is S, is Hebert

15   makes the demand.  We're not challenging that.  That was the

16   testimony.  The issue is whether or not Mr. Correia can be

17   convicted of the substantive offense of a Hobbs Act violation

18   because Mr. Hebert made that demand.

19           So in order to create that linkage, there needs to be

20   evidence from which someone can reasonably infer, that goes

21   beyond the equipoise principle, that Mr. Hebert is acting on

22   behalf of or in conspiracy with Mr. Correia at that time.

23           THE COURT:  How could you not find that?  The evidence

24   was wink, wink, nod, nod, but it's there.

25           MR. MARX:  I think the evidence, Your Honor, is that

1    Mr. Hebert would say and do anything to line his own pockets.

2            THE COURT:  No question about that.  I agree fully

3    with it.  I've made that comment throughout.  But that doesn't

4    exculpate the defendant.

5            MR. MARX:  But the only evidence, you know, when you

6    put aside kind of the theatrics of the government's

7    presentation, the only actual evidence that links Mr. Hebert's

8    demand either the morning or the day before the meeting at City

9    Hall and Mr. Correia is the handful of words supposedly spoken

10   in the corner, "You talked to Dave.  We're good."

11           So the question is, yes, he talked to Dave.  He talked

12   to Dave at least twice, maybe more.  And on one occasion the

13   only occasion in which the evidence actually links that

14   conversation to Mr. Correia when in a text message which the

15   government introduced Dave Hebert says, "I spoke to the mayor.

16   Here are the rules.  You have to share revenue with the City

17   and you need to pay licensing fees to the City, and otherwise

18   you're not going to get one of these Host Community Agreements,

19   and you're not going to get an agreement.  So you got to do

20   that.  If you're willing to do that, I'll get you a meeting

21   with him, and we'll get this set up."  A few days later, he

22   meets with him, he says, "You talked to Dave.  We're good."

23           Now, it's possible to infer that when Hebert is

24   meeting in the cigar bar without Mr. Correia present that he's

25   acting somehow on behalf of him or they've discussed it, but

1    Hebert doesn't testify to that.  No one else testified to that.

2         THE COURT:  So the categorical is that the person who

3    is the direct link has to testify?  That's what it comes down

4    to?

5         MR. MARX:  No.

6         THE COURT:  Because you see all of these links here,

7    which, as you've invited me to do, I find compelling.  And you

8    say that's not enough.

9         MR. MARX:  Right.  This is not the categorical

10   argument about *Ocasio*.  This is an argument about whether --

11        THE COURT:  It's the argument about the categorical

12   qualities of evidence that is necessary for purposes of finding

13   a violation.  And now I'm trying to figure out how that works.

14   And what it appears to be is, they didn't call him, so he can't

15   be a conspirator.

16        MR. MARX:  No, Your Honor.  They didn't call him, so

17   he can't be a source of evidence.

18        THE COURT:  He can't be a conspirator with respect to

19   someone who clearly had a communication with him, who said,

20   "You talked to Dave."

21        MR. MARX:  About the legal rules, Your Honor.  That's

22   the only actual connection in the evidence, Your Honor.

23        THE COURT:  I think that's -- I have to say it is an

24   arid reading of the evidence in this case.  I pressed the

25   government, as I will, to show me the direct evidence for

1    certain kinds of offenses like the tax and wire fraud because

2    those are fairly specific on that.  But this is very much the

3    realm of jurors making their commonsense determinations with

4    all of their life experience.  They did here.  It accords with

5    mine, as I've indicated, and it seems to me to be highly

6    reasonable under these circumstances.  Not displaced in any way

7    by this kind of argument.  But is there more to say about that?

8              MR. MARX:  No, Your Honor.  I think you've heard my

9    argument, Your Honor.

10             THE COURT:  All right.  So as far as I'm concerned, as

11   I've indicated, I don't see a reason -- I haven't gotten

12   obviously to the question of new trial, which I have to deal

13   with at a certain point, but none of the Hobbs Act

14   convictions -- and of course not all of this has been Hobbs Act

15   convictions, but none of the Hobbs Act convictions are going to

16   be the subject of a judgment of acquittal.

17             So what do you need to look at here?  How much time do

18   you need to look at it?  I would think that this stuff should

19   be available here for the government and for the defense.  Do

20   you want to go back and get your books, or what do you want?

21             MR. MARX:  I think it would be most efficient, Your

22   Honor, if the government can just supply copies of the two --

23             THE COURT:  Do you have extra copies?

24             MR. HAFER:  If I don't, I'll make them and bring them

25   down.  The bank records -- I'm going to go up right now and

1    work on this.  I intend to get -- I may have the number wrong

2    -- the Citizens Bank account records.  If I don't have a

3    printed copy, I know it's a lot, I'll hit print.  I'll have

4    someone hit print, and I'll bring it right down to court.

5            THE COURT:  Okay.  That deals with what you say is the

6    wire fraud.  And with respect to the tax case?

7            MR. HAFER:  I can print Ms. Vieira's testimony, a copy

8    of Ms. Vieira's testimony.

9            THE COURT:  You don't have your transcripts here?

10           MR. MARX:  I have the testimony, Your Honor.  I don't

11   need to see that.

12           MR. HAFER:  I'll print the related exhibits, and I can

13   bring those down as well.

14           THE COURT:  So as to whatever you're printing up, I

15   want to be sure that I've got the same thing that you're

16   relying on that they're relying on I have.  Of course I've read

17   them.

18           MR. HAFER:  Those aren't voluminous.  The exhibits I'm

19   thinking of associated with Ms. Vieira's testimony are not

20   voluminous.  The Citizens Bank records are.  I'll make copies

21   of those and get them down here.

22           THE COURT:  So if we come back at 1:30.

23           MR. HAFER:  That's good, I think so.  I'll ping Ms.

24   Beatty if we're running a few minutes behind.

25           THE COURT:  My intention is to look carefully and be

 1    pointed to precisely what it is that the government is relying

 2    upon here in both the transcript and in the exhibits in support

 3    of their position with respect to the mail fraud counts that

 4    are challenged and the tax counts that are challenged.  And

 5    similarly to deal with Sno -- I can never get the --

 6              MR. MARX:  Snowkimo, Your Honor.

 7              MR. HAFER:  Okay.  We'll get working on it right now.

 8              THE COURT:  So we'll be back at 1:30, reasonable time,

 9    it should be.

10              (Recess taken 12:38 p.m. - 1:52 p.m.)

11              THE COURT:  One further housekeeping question which I

12    do want to raise with counsel, which is that the Zoom

13    capability that we had didn't prove to be fully successful, and

14    a number of people were excluded here, without going into the

15    specifics of the problems that were related to it.  I want to

16    be sure that I have counsel and the parties' views about what

17    steps if any to take on this.

18              I'm prepared obviously to go forward on this.  We've

19    made additional adjustments, as I understand it from the IT

20    department, to make it possible to have this Zoom technology

21    available for other people.  And of course we have, as I said

22    earlier, the group of media people who act as proxy for people

23    being in the courtroom.  And we have obviously tried to

24    discourage people from coming to the courthouse when there are

25    problems with the resurgence of COVID.

1          But having said that, do the parties have any views

2     one way or the other about this?  What's happened is that

3     everyone was closed out of the Zoom, during the lunch break,

4     when we found out about this, and then they were brought back

5     or made available for them to come in and signed in again.

6     There were something like 600 people, a little bit more, who

7     had signed up for the Zoom.  And as I said, the capacity,

8     properly licensed, didn't permit that here.  So from the

9     government, any view one way or the other?

10         MR. HAFER:  Your Honor, I think the other measures

11    that you've talked about, we have members of the media here, it

12    was my understanding there was also an overflow room provided

13    in the building --

14         THE COURT:  Yes.

15         MR. HAFER:  -- the fact that the Court has taken, it

16    sounds like all reasonable steps to improve and amend whatever

17    issues there are with the technology, we don't see any issue.

18         THE COURT:  Okay.  And Mr. Fick?

19         MR. FICK:  We would concur with that, Your Honor.

20         THE COURT:  I want to be sure under the circumstances

21    that Mr. Correia has been properly consulted with respect to

22    that and has agreed to go forward.

23         MR. FICK:  We should probably take two minutes just to

24    be sure.

25              (Defendant conferring with counsel.)

 1          MR. FICK:  So we would concur that we have no

 2     objection.  Our understanding is that the capacity was expanded

 3     so that going forward those who want to catch can; is that

 4     correct?

 5          THE COURT:  Yes, to the amount of the available

 6     license, which could be as much as a thousand people here.  But

 7     as I said, at a point there were over 600 people signed up and

 8     there wasn't that license capacity here.  Some were getting

 9     pushed off here.

10          MR. FICK:  So we understand the Court's attentiveness

11     to this and appreciate that and have no objection to this

12     morning's proceedings or to continuing.

13          THE COURT:  So we're back to the question of the

14     evidence with respect to wire fraud first, Mr. Hafer.

15          MR. HAFER:  Yes, Your Honor.  I think I just want to

16     just go right to it.  I provided copies of what I have to the

17     defense and handed a copy up to Ms. Beatty.

18          The first one, Judge, which your copy I think just has

19     a sticky on it so you know where it comes from, is two pages

20     from Exhibit 65.  I had misspoken before the break and said 69.

21     I was thinking of Exhibit 65.  Those are the Citizens Bank

22     records.

23          And again, here, just not neglecting any of our

24     arguments with respect to the stipulation or anything else.

25     The first excerpted page shows, which ends with the last six

1    Bates number 001100, indicates under paragraph marked 2C, D,

2    "Please note that the checks provided were cashed at Fall River

3    S & S Rodman branch, located at 501 Rodman Street, Fall River

4    Massachusetts.  Electronic deposit files are then sent to our

5    operations center in East Providence, Rhode Island."

6           Behind that page, Your Honor, is something that

7    certainly goes, in terms of the scope of the technology, well

8    above and beyond my general comprehension, other than we would

9    submit it to Your Honor as additional evidence that Citizens

10   Bank, in processing the checks at issue in this case, it

11   involves electronics, the use of IP transmissions, mainframes

12   and that sort of thing.

13          THE COURT:  Okay.  So let me -- not to -- seem to be

14   cornering you, and I'm not, beyond your comprehension.  I would

15   assume that you meet the standard of the reasonable juror here.

16          MR. HAFER:  Yes.  I just -- I didn't want to try to

17   explain, other than to show it's electronic.  That was my

18   point.

19          THE COURT:  Okay.  So we have these two pieces of

20   evidence from Exhibit 65.  I have to say that the second part

21   of it was not in the copy of the exhibits that was provided to

22   me.

23          MR. HAFER:  I think, Your Honor, it's because they're

24   not in perfect order.  I think it's actually like the last page

25   of the exhibit, if you're tracing the numbers, I brought -- Mr.

1    Marx, if I could have that, just the big one, the whole -- I
2    brought the entirety of Exhibit 65.  I just printed it up, I
3    have it as literally the very, very last page of the one that
4    went in, and it's because the Bates numbers aren't in perfect
5    order because we were trying to get them in chronological
6    order.
7            THE COURT:  Where would I find what was provided to me
8    during the course of the trial?
9            MR. HAFER:  I have it as the last page of Exhibit 65
10   that went into evidence.  We printed it up.
11           THE COURT:  So what was provided to me was not the
12   complete version of 65?
13           MR. HAFER:  I can't imagine we would have given you an
14   incomplete version of 65.  I can just tell you I went up and
15   printed off --
16           THE COURT:  Okay.  Let me see that.
17           MR. HAFER:  Yes, Your Honor.
18           THE COURT:  Okay.  Any dispute that this was provided
19   to the jury in any way?
20           MR. MARX:  No, Your Honor.
21           THE COURT:  Okay.  So let me hear the defendant on
22   this issue.
23           MR. MARX:  Your Honor, having just received these
24   couple of pages a few minutes ago, you know, my view is it's
25   simply too little and too late.

1          This is a motion that was filed two months ago, and

2     none of this is referenced in the opposition, and now the

3     government over the lunch break has come up with two pieces of

4     paper buried in the back of a multipage exhibit given to the

5     jury with no testimony, other than Agent Lemanski's testimony,

6     other than these are bank records received in response to a

7     subpoena to Citizens Bank.

8          I don't know what this letter from Citizens Bank is,

9     who wrote it, what it means, what checks it refers to.  I also

10    don't know whether this other diagram that's been provided to

11    Your Honor is the map referenced in letter.  No one talked

12    about this.  No one testified what it was.  I think Your

13    Honor's question this morning about the markings on the check,

14    I expect we'll hear something about that, too, these

15    unexplicated markings on the physical checks fall in the same

16    category.

17         It's simply no way to conduct a criminal trial, Your

18    Honor, to put documents like this in the back of an exhibit of

19    years of bank records and then pull them out at this point and

20    say they satisfy the fundamental element of the crime charged.

21    I don't think they show that.  There was no testimony.  These

22    were never mentioned by a single witness or the government in

23    the closing argument.  I think that's ambiguous at this point

24    to convict Mr. Correia beyond a reasonable doubt.

25         THE COURT:  Okay.  Is there any testimony, because I

1   couldn't find any, that explains this?

2         MR. HAFER:  No, Your Honor, there's not.  Our view was

3   the stipulation satisfied the element.  You don't agree with

4   that, but that was our view.

5         THE COURT:  Well, I don't find this to be sufficient,

6   so let's move on.

7         MR. HAFER:  Could you perhaps explain why the

8   document --

9         THE COURT:  Yes, this is inexplicable.

10        MR. HAFER:  That an electronic file was sent to Rhode

11   Island --

12        THE COURT:  How?  Was it done by someone carrying --

13        MR. HAFER:  Your Honor --

14        THE COURT:  You know, we've had this discussion.  Put

15   to one side the question of whether or not this was adequately

16   responded to in the extended period of time that I gave to the

17   government to respond here, but it wasn't.

18        The short of it is, without speculation, it would be

19   very difficult, indeed impossible, for a juror to say with the

20   degree of certainty that would be necessary in this area,

21   something more than speculation, that what was involved in this

22   particular transaction involved the deposit or processing or

23   cashing of this check by execution through the mails, and I

24   can't find that there.

25        MR. HAFER:  I would just like to make a further point

1    then, Your Honor, which I think is important.  The initial

2    version of the stipulation that the government submitted to the

3    Court for its review prior to trial explicitly referred to the

4    admitted exhibits having been caused to be transmitted and in

5    fact transmitted and that email and bank servers were located

6    outside of Massachusetts.

7         Your Honor changed the verbiage of proposed

8    stipulation to what was read at trial.  So I want the record to

9    reflect that.  Your ruling is your ruling.  But we had

10   something.  It was rejected.  We went with something else that,

11   now it sounds like if we had said something about email and

12   bank servers being located outside of Massachusetts, we would

13   have been okay.  We tried to say that.  You said no.  And now

14   we're being told what we presented --

15        THE COURT:  So there's a legislative history that

16   we're going to apply here, and does that include the

17   legislative history of the instructions that I provided to

18   counsel?

19        MR. QUINLIVAN:  Your Honor, if I may answer that,

20   because I want to make clear that the government's position is

21   not the history or our understanding.  It's the plain language

22   of the stipulation.  And I want to go over it again.  Because

23   it says, "With respect to the wire fraud counts, Counts A

24   through I, the parties agree that the interstate commerce

25   element of the offense charged" -- not something abstract --

1   "of the offense charged has been established and is not in

2   dispute."

3          The counts, the offense charged, the wire fraud counts

4   allege that the defendant, as relevant here, "did transmit and

5   cause to be transmitted by means of wire communications in

6   interstate commerce," and then it sets out, "Description of

7   wire communications."  That's entirely consistent with Your

8   Honor's instruction in topic 5, which was, "and fifth, that on

9   or about the date alleged in the separate counts of the

10  indictment a wire communication and interstate commerce was

11  used in the execution and furtherance of that scheme" -- or "of

12  the scheme."  I'm sorry.

13         The plain language of that stipulation, when it says,

14  "The interstate commerce element of the offense charged," which

15  is wire fraud, it's not the government's understanding.  It's

16  that the plain language of that stipulation satisfied the wire

17  communication element.  That's the government's position.

18         THE COURT:  Well, it is, except that of course the

19  interstate element was broken out, broken into different parts,

20  what could be called the interstate element was broken into

21  different parts.  And in fact, advisedly, as Mr. Hafer's

22  reference to legislative history indicates, his statement that

23  apparently a suggestion that they somehow had been sandbagged

24  was just the opposite.

25         And I have to say that I used an instruction that was

 1    different from the standard instruction to make the point that

 2    the interstate element is the anticipated foreseeable use of

 3    interstate nexus.  Not the execution.  That's the way the

 4    instruction read.

 5         MR. QUINLIVAN:  With respect, Your Honor, you know, I

 6    understand what your intent may have been in crafting it the

 7    way you thought, but it's the plain language of what was the

 8    stipulation that went to the jury that matters.  And that

 9    stipulation says that the interstate commerce element of the

10    offense charged, not something abstract, the offense charged --

11         THE COURT:  What does the use of the singular mean?

12         MR. QUINLIVAN:  I'm sorry?

13         THE COURT:  In plain language.

14         MR. QUINLIVAN:  Of the singular?

15         THE COURT:  Yes.

16         MR. QUINLIVAN:  Of the offense charged, wire fraud.

17         THE COURT:  Element.

18         MR. QUINLIVAN:  I'm --

19         THE COURT:  "Element."  It says, "The interstate

20    commerce element," singular.  What does that mean, in light of

21    an instruction that discusses interstate dimensions to this in

22    two separate elements?

23         MR. QUINLIVAN:  I think -- well, I'm sorry, Your

24    Honor.  Maybe I'm not grasping.  I think at best it means that

25    if -- well, I would have two answers.  One, I would start with

 1    the fact that it says "element," not "nexus requirement."  But

 2    in addition --

 3              THE COURT:  So why -- I'll start with that.  I just

 4    asked a question.  It says "element."

 5              MR. QUINLIVAN:  Right.

 6              THE COURT:  There were five elements that the jury was

 7    instructed about that the parties knew they were going to be

 8    instructed about.  Not one element.  Five.

 9              And the five break down to one that has to do with

10    execution and one that has to do with foreseeability of the use

11    of the instrumentalities of interstate commerce -- I mean the

12    foreseeability of the effect on interstate commerce.

13              MR. QUINLIVAN:  I don't think you can read the

14    singular use of element as somehow divorcing that from the

15    remainder of what's in that stipulation.

16              THE COURT:  So for purposes of plain language,

17    singular, plural, doesn't make any difference?

18              MR. QUINLIVAN:  No, because at best it means that --

19    at best it means -- if it could possibly be read to suggest

20    that interstate commerce element or nexus element, et cetera,

21    but it's tied to "of the offense charged," again, which is wire

22    fraud.  It's not like it's -- again, the defendant in his reply

23    memorandum says, "If wire communications were used, then it

24    affected interstate commerce."  That's not what it says.

25              THE COURT:  And that's not what I say.  But what I do

1    say is that in order to bring this into the Federal Court,

2    there has to be first a federal interest, that is that it's not

3    just internal local kind of government fraud.  It has to be

4    affecting interstate commerce in some fashion.  And there was

5    sufficient evidence, I thought, I think there, it's not

6    challenged actually, and then there's the execution part of it.

7    The execution part of it is fairly important here.

8         I was thinking about this earlier because I had a

9    number of these cases, as you know, for a period of time, one

10   of which you've cited and the defendant has cited, *United*

11   *States v. Dray*.  I got a letter from Professor Freund after I

12   wrote that opinion talking about it.  He clerked for Justice

13   Brandeis.  He said -- it's very interesting.  I won't go into

14   the letter, but he said, you know, "Having clerked for Justice

15   Brandeis, I think he might have had a problem with that because

16   he was so concerned about the use of mail fraud and wire fraud"

17   -- mail fraud was what he was concerned about at that point --

18   "for expanding the government's jurisdiction, the federal

19   government jurisdiction."

20        That's precisely what this is about, and that's why,

21   reading it very carefully, it seems to me a responsibility that

22   I have.  So I understand your argument about the stipulation, I

23   understand it.  I think I understand what Mr. Hafer has said,

24   that anybody looking at this would say, you know, must be wires

25   involved in this of some sort.  I don't find those to be

1    sufficient here.

2           Now, is there anything else with respect to this

3    particular transaction?

4           MR. QUINLIVAN:  Just one last point, further response

5    to your question about the singular use of "element."  Because

6    the First Circuit and what we cited in our brief has described

7    that element as the use of the interstate wires in furtherance

8    of the scheme.  In Your Honor's instruction --

9           THE COURT:  What was the instruction and what was the

10   case?

11          MR. QUINLIVAN:  It was *United States v. Appolon,* 715

12   Federal Reporter 3d series 362, 346.

13          THE COURT:  Do you know -- I have to go back and look

14   at it again, but do you know whether or not this standard

15   instruction was given, the three-part instruction was given

16   there?

17          MR. QUINLIVAN:  I do not know that.  I do not know

18   that.  Just going back to Your Honor's instruction that on or

19   about the date alleged in the separate counts of the

20   indictment, a wire communication in interstate commerce was

21   used.  So in our view, when you're talking about the interstate

22   commerce element, singular, it's that, whether it be, as I

23   said, the use of interstate wires or wire communication in

24   interstate commerce is used, that's consistent with the

25   interstate commerce element being in the singular.  I know Your

1    Honor takes a different position, but that's the government's

2    view.

3              THE COURT:  Okay.  So my tentative view, as I've

4    indicated, is that -- I say "tentative" because I want to be

5    sure I have explored all of these together -- is that there was

6    not sufficient evidence from which the jury could find that in

7    the execution of the scheme the wire communications were in

8    fact used here for this transaction, and I want to be sure that

9    we tie this transaction back to the particular count.  And

10   maybe you can help me with that, Mr. Hafer.

11             MR. MARX:  Your Honor, if I may.

12             THE COURT:  Yes.

13             MR. MARX:  The counts are A --

14             THE COURT:  No.  I understand that.  I want to tie

15   this -- because this is a particular transaction, that is the

16   one that is the beginning of this lengthy, 65, that involves

17   these two account numbers, and I want to be sure whether the

18   government is just saying that it applies to all of them,

19   that's what happens all the time, or if it is saying it applies

20   to a particular check and so on.

21             MR. HAFER:  Well, our position is it applies to all of

22   them with respect to the SnoOwl checks.  It certainly

23   particularly applies to the SnoOwl checks from the Citizens

24   Bank account for which the evidence shows they were processed

25   in Massachusetts.

1          THE COURT:  Okay.  That's circular.  I want to be sure

2     that I understand what this is.  Are you saying that here we

3     have a letter that says there has been an account open, two

4     SnoOwl accounts open here, and they've got these signature

5     cards and that sort of thing, and then we look underneath to

6     see the map and that applies to all of these?

7          MR. HAFER:  Yes.

8          THE COURT:  Is that what's going on here?  I look at

9     this, and I'm told that there are two pages of 65, which as I

10    indicated was not in the collection at least that was handed up

11    to me but I'm told went to the jury, so that counts.

12         I looked through them and these seem to refer to --

13    well, Bates stamp 1100 is I guess pretty close to the end here,

14    and it says that notes, that checks provided -- and these are

15    the -- I think these two checks, but I'm not sure I know or

16    could figure it out now that I have the whole thing -- include

17    the checks that are at issue in this case, or are they some

18    other checks?

19         I mean, what we have is, buried below the extensive

20    collection of documents is a letter that someone says, I'm

21    responding to your subpoena with respect to one of the

22    accounts, the 9102 account, that it references the Citizens

23    Bank address I guess in Providence.  It says, "Please see map

24    attached," and it says, "The checks provided were cashed at

25    Fall River Savings, Rodman branch, located at 501 Rodman

1    Street, Fall River," and that "electronic deposits are then

2    sent to our operations center."

3           Now, does that include all of the checks that are

4    being disputed here?

5           MR. HAFER:  What I was just able to track down is that

6    we sent the checks that on their face did not show, from the

7    electronic copies we had, that they were -- we know, Special

8    Agent Lemanski knows from her career that everything in

9    Citizens goes through Rhode Island.  We knew the checks were

10   processed in Massachusetts.  So we were comfortable that, if

11   needed, Special Agent Lemanski could testify to the fact that

12   the checks were negotiated in Massachusetts and everything --

13   you know, we could have called the custodian.  We didn't call

14   the custodian because we had a stipulation to explain that from

15   Citizens.

16          So here what we did is, before we had the decision,

17   before we knew whether we were going to need a witness for the

18   checks that didn't facially show from the record that they were

19   negotiated in Massachusetts, which I believe was one of the

20   Miller checks, Count G, and I believe the Eisenberg check early

21   in the investigation, early-ish -- actually, you'll see the

22   date here, August 7 of 2018.  This is about two months before

23   the first part of the case was indicted, so it would have been

24   when we were trying to make sure we had evidence on the

25   interstate commerce.  So the checks that didn't facially show

1    -- because we were comfortable that we could prove up that

2    everything at Citizens goes through Rhode Island

3    electronically, we wanted representation from them with respect

4    to these checks.

5          THE COURT:  I still go back to this question.  A juror

6    gets this and they look at it, and of course, you know, a juror

7    doesn't have to believe the stipulation either.  In a criminal

8    case, the jurors as the final finders of fact are entitled to

9    believe it or not believe it.  And throughout the instructions

10   I said you have to make the determination with respect to that.

11   I didn't say that's settled here.  So I still am unclear what

12   checks this particular two pages which are found --

13         MR. HAFER:  So, Your Honor --

14         THE COURT:  -- at the end here apply to.

15         MR. HAFER:  Exhibit 10 was the David Cabeceiras

16   checks.

17         THE COURT:  Okay.  It applies to the David Cabeceiras

18   check?

19         MR. HAFER:  What I was going to tell you -- I promise

20   I'm answering your question.  The David Cabeceiras checks

21   indicate on the stamp as part of the check that they were

22   processed, they were cashed, deposited in Massachusetts.

23         We knew as we were preparing to indict the first part

24   of this case that if the face of the check showed it was

25   deposited in Massachusetts that we could prove interstate wires

1    were used because of what we know from our experience as to how

2    Citizens Bank operates.

3            So we didn't -- so here, towards the end, and again, I

4    wasn't able to get through all the subpoenas, but I believe the

5    Martinez check and Miller check -- it might be Eisenberg and

6    Miller.  It's definitely the Miller check that's charged in

7    Count G.  It wasn't clear from what we had previously obtained

8    in the records from Citizens where the check was negotiated.

9    Because it wasn't clear, we sent a subpoena and said, "Where

10   was it negotiated?"  They responded, "Fall River, Rodman Street

11   branch."

12           THE COURT:  Do we have that?

13           MR. HAFER:  Do we have what?

14           THE COURT:  The response to the subpoena.  Is that

15   this?

16           MR. HAFER:  Yes, Your Honor.  What this is, this

17   portion where the numbers are different is because this came in

18   separately in response to a follow-up inquiry to Citizens.  And

19   that's the gist of what Special Agent Lemanski testified when

20   these went into evidence.  I understand it seems disjointed and

21   unclear now.  To repeat ourselves, we believe we were --

22           THE COURT:  And we've been through that, and I've

23   expressed my reservations about it.  But before we go further,

24   I want to know what ones these are said to apply to.

25           MR. HAFER:  What applies to all of the checks, Your

1    Honor, what applies to all the checks at issue is that when

2    Citizens Bank processes a check, it sends an electronic deposit

3    file to its operation center in Rhode Island.  That applies to

4    all the SnoOwl checks.

5        So in order to establish interstate in addition to

6    wire, so I think that our view is that establishes a wire, we

7    followed up here before we charged the case and said these ones

8    that don't have facial markings of being negotiated in

9    Massachusetts, where were they negotiated?  And they responded

10   Massachusetts, and then they go to Rhode Island, and then they

11   gave us what they call the map, which is showing the various

12   ways that deposited checks in Citizens move electronically

13   through their servers and systems.

14       THE COURT:  Okay.  So I think we've probably exhausted

15   this aspect of it, but am I to look -- because I want to be

16   sure.  I've looked at all of your checks.  Here you call the

17   excerpts from Exhibit 10 as exemplary of this --

18       MR. HAFER:  Yes, Your Honor.  If you look at the

19   excerpts from Exhibit 10, for example, the one dated May 2,

20   2014, which is check number 112, if you look at the bank stamp

21   below that, you can see, "Branch name:  Fall River, Rodman."

22   So what I would argue to you applies is that came into evidence

23   showing that that check was deposited to the Fall River

24   Massachusetts Rodman branch with the backup, and that is the

25   case with the other two Cabeceiras checks, although it says

 1     "Fall River," and I think it's "S & S" for Stop & Shop on the

 2     other two checks which are Counts H and I, but showing

 3     Massachusetts.

 4          And so the three, A, H and I Cabeceiras counts, the

 5     evidence was they were physically deposited at a branch in

 6     Massachusetts, coupled in our view with the stipulation and the

 7     language in the letter that we're talking about now that

 8     everything from Citizens is sent to their operations center in

 9     East Providence, we would argue, certainly in the light most

10     favorable is sufficient to support the jury's verdict on the

11     wire fraud counts.

12          THE COURT:  What does it mean to be sent to the

13     processing center in Rhode Island?

14          MR. HAFER:  I'm sorry?

15          THE COURT:  What does it mean to be sent to the

16     processing center in Rhode Island?

17          MR. HAFER:  I mean, that's where they have their

18     mainframe and everything else.  So the electronic file goes,

19     everything gets processed the same way.  I think the Federal

20     Reserve processes most checks through either Baltimore or

21     Atlanta through their servers.  Citizens are in Rhode Island.

22     Same way we prove up email.  Google is in Mountainview,

23     California.  That's my understanding of what it means to be

24     processed.  An electronic transmission is sent from the branch

25     where the check is deposited.

1              THE COURT:  And there's no such testimony here, right?

2              MR. HAFER:  No, because the proposed language --

3              THE COURT:  I understand you believe that you had done

4      enough, but there is no such testimony here.  Now, turning to

5      the larger or secondary issue, why isn't it completed with the

6      deposit of the check?

7              MR. HAFER:  Why isn't what completed?

8              THE COURT:  The mail fraud, the particular mail fraud

9      count.

10             MR. HAFER:  Wire fraud?

11             THE COURT:  Wire fraud, excuse me.

12             MR. HAFER:  It's what's reasonably foreseeable to the

13     defendant that would happen.  So the way you've instructed, the

14     use of the wires had to be foreseeable to the defendant and

15     there had to be an actual wiring.

16             And here, in order for the money to hit the account,

17     my understanding of what the Citizens custodian would have said

18     is it has to go to Rhode Island first before it hits the

19     account.  So it's absolutely part of the transaction.  In order

20     for that check to clear, the first one, which is I think the

21     $6,000 check, in order for the $6,000 to go from

22     Dr. Cabeceiras' account into the defendant's account, there has

23     to be this electronic transmission from Massachusetts to

24     Citizens servers in Rhode Island.

25             THE COURT:  Okay.  So do you want to be heard on this,

 1    Mr. Marx?  You may also want to address the question of the

 2    completion of the crime itself as a deposit.

 3           MR. MARX:  Your Honor, I think you've probably heard

 4    enough.  If you have specific questions, I'm happy to address

 5    them.  My view remains the same, that, as Your Honor

 6    identified, the documents refer to subpoenas we don't have and

 7    the record checks that aren't identified.

 8           There may be some history here of the investigation

 9    which sheds light on what it is, but we're here to evaluate the

10    evidence that was presented to the jury, and that evidence was

11    not that everything at Citizens goes through Rhode Island, and

12    not only that but it goes through Rhode Island by wire

13    communication.

14           With respect to the completion of the crime, it's a

15    good question.  I hadn't thought much about it.  But I wonder

16    whether or not the crime is completed at the moment, for

17    example, David Cabeceiras hands the check to Jasiel Correia.

18           THE COURT:  No, it has to be -- perhaps.  The bribe is

19    given -- not bribe.  The money is exchanged.

20           MR. MARX:  The monies are obtained on the basis of an

21    alleged misstatement.  When it's walked in to the branch of

22    Fall River, it becomes a black box for the jury.  There's no

23    evidence about what happens at that point to the funds.

24           THE COURT:  Okay.  So I guess I have to say that I'm

25    where I was before, that there is not sufficient evidence with

1    respect to these checks being executed by a wire, and that the

2    evidence permits a variety of different approaches, none of

3    which is altogether clear.

4            As a consequence, my present intention is to grant a

5    judgment of acquittal with respect to -- and I want the parties

6    to be clear that I haven't neglected any other arguments about

7    this, but with respect to Count A, Count D, Count E, Count G,

8    Count H and Count I, those are the counts that are at issue, so

9    I'm preliminarily making it.

10           Now, I've heard various things said.  I'm open to

11   making sure that no party feels that they've somehow been not

12   permitted to fully develop their positions, including the

13   argument about the plain meaning and the legislative history of

14   the stipulation, and I've made reference to the development of

15   the instructions.  I want to be sure that there isn't a sandbag

16   question here.  Not as to me.  I think I knew what I was doing.

17   But if the parties think somehow they've been misled in this,

18   and this is principally the government, then I'll permit you to

19   submit whatever you want to submit about it.  If you want to

20   rely solely on the stipulation, I'll recognize that as well.

21   You'll think about that.  But I'm making this as a preliminary

22   determination because it's going to affect obviously the

23   sentencing.

24           And the way in which we're going, I think we're going

25   to have to be doing sentencing tomorrow morning itself, the

1    actual sentencing, to get through all the stuff that I want to

2    get through here.  Because we have to reach the question of new

3    trial in any event.

4          But provisionally, subject to any requests for

5    additional opportunities, I'm going to grant the judgment of

6    acquittal with respect to those counts, recognizing, as I said,

7    that the government has the right to appeal on this.  I didn't

8    grant and don't generally grant the judgment of acquittal

9    before the jury has returned its verdict.

10          So you have a verdict that you can appeal from or the

11   defendant can appeal from, and you've got provisionally a

12   determination by me that it's not sufficient here.  So it

13   preserves or at least avoids the asymmetries that I keep saying

14   about appellate rights.

15          So let's turn then -- unless there's something more

16   that you want to say about this, let's turn then to the

17   question of the tax fraud here.  And let me understand what it

18   is that you want me to look at here, Mr. Hafer.

19          MR. HAFER:  Your Honor, just a couple of things.

20   Mr. Tobin is going to speak to Ms. Vieira's testimony.  Just as

21   a background to that, on the larger issue of willfulness in

22   addition to all the evidence, much of which I've already

23   referred to about Mr. Correia's education and sophistication

24   and commitment and time and everything else on SnoOwl, I would

25   direct your attention to Exhibit 71.1, which is a loan

1    application from Autobahn from the first of the two Mercedes at

2    issue in this case.  I think I've tabbed for Your Honor Bates

3    page ending 460.  If I haven't, that's where I'm looking.

4              THE COURT:  Yes, it's tabbed here.  Thank you.

5              MR. HAFER:  This is a 2013 loan application to

6    Rockland Federal Credit Union.

7              THE COURT:  Let me just double-check against what was

8    provided to me.  Yeah.

9              MR. HAFER:  So just for the benefit of the record,

10   this is a 2013 document signed by the defendant in connection

11   with a loan he applied for from Rockland Federal Credit Union

12   for a Mercedes in which under, "Source of other income," he

13   indicates "Self-Employed" with a monthly amount of income of

14   $1,000 per month.

15             Certainly that is additional evidence that in 2013,

16   prior to the 2015 filings that are at issue in the first two

17   tax counts, the defendant was aware of at least a thousand

18   dollars a month in self-employment income.  Whether he was

19   referring to SnoOwl there or Snokimo --

20             THE COURT:  Was Snokimo even active at that point?

21             MR. HAFER:  It was, Your Honor, and that's the other

22   exhibit.  There were -- I believe that the Snokimo summary

23   chart shows $4,500 in income in 2013 and then an additional

24   $2,000 in income --

25             THE COURT:  Do you have that?

1          MR. HAFER:  I thought I had it.  Can I have one

2     moment?

3          THE COURT:  Sure.

4          MR. HAFER:  Can I walk -- can I approach, Your Honor?

5          THE COURT:  Just give me the cite.

6          MR. HAFER:  65.1.

7          THE COURT:  65.1 I've got.  That was one which we had

8     a little bit of trouble.

9          MR. HAFER:  This went in, I'm sure, through Special

10    Agent Lemanski.  I did also pull her transcript over the break

11    talking about the Snokimo income.  Again, Mr. Tobin will speak

12    to Stacia Vieira's testimony, but certainly the combination of

13    the defendant's education, background, commitment to SnoOwl,

14    the fact that he disclosed prior to the filing of those returns

15    a thousand dollars of self-employment income, which was not

16    disclosed to her, certainly in the light most favorable and I

17    would say in any light establishes willfulness there.

18         To respond to your specific questions this morning

19    mostly to Mr. Marx about Snokimo, certainly that income applies

20    to both 2013 and 2014 as 65.1 demonstrates, as supplemented by

21    Special Agent Lemanski's testimony the first time around, which

22    I believe was on April 30, that Friday, the first Friday of the

23    trial, Your Honor.

24         THE COURT:  Okay.  So Mr. Tobin, do you want to speak

25    to this?  And let me focus you even more on this because, as I

1   said, Snokimo was something that I thought might be exceptional

2   in this case.  But so we're clear, what he said on the Mercedes

3   loan application is self-employed $1,000.  It doesn't identify

4   and it doesn't appear to ask it to identify what the source is,

5   I mean, a specific source.

6        But what is it that would tell me that he knew from

7   his conversations with Ms. Vieira and then Mr. Charest that it

8   was SnoOwl, and what is it that would show that he knew it was

9   Snokimo or both?

10        MR. TOBIN:  Well, Your Honor, I think that the issue

11   is, for the federal tax returns that were filed that he swore

12   were accurate and truthful, I think the issue here is whether

13   or not he made a willful omission.

14        THE COURT:  No.  I think I understand what the issue

15   is.  I'm looking at the evidence here.

16        MR. TOBIN:  Of course.

17        THE COURT:  I want to find the evidence that shows he

18   willfully failed to disclose with respect to, which I now

19   understand to be the universe, either SnoOwl or Snokimo or

20   both.

21        MR. TOBIN:  Yes, Your Honor.  First of all, if you go

22   to -- and I believe the Court has it -- Exhibits 61 through 63,

23   these were the exhibits that were introduced in through Stacia

24   Vieira, the Liberty Tax preparer, that worked for the defendant

25   and completed his taxes based on information he provided.

1           And if you look at specifically Exhibit 62, I believe

2      it's the second page, I'll give the Court a moment to find

3      that.

4           THE COURT:  Yes.

5           MR. TOBIN:  And I believe there's a second document

6      identical to this for the second year.  But you'll recall from

7      the testimony -- and I thank you again for allowing us the

8      opportunity to review Ms. Vieira's testimony during the lunch

9      break.  But you'll recall from the testimony that when an

10     individual went in to Liberty Tax, they were provided with a

11     document, a worksheet, essentially the document that you have

12     now in front you or something similar.

13          THE COURT:  But weren't the worksheets included as

14     well, or were they provided in evidence?

15          MR. TOBIN:  I mean, this is the worksheet that has

16     typed information which I believe they then go and transfer

17     anything written by the customer into a typed form.  I don't

18     know if we have one.  Actually, we do we have those, 64.1 for

19     instance.

20          THE COURT:  64?

21          MR. TOBIN:  64.1, Liberty Client Tax Data Sheet.  If

22     you'll notice on the second page, it's signed by Jasiel

23     Correia.  And you'll notice for contributions, he writes in a

24     $500 donation to college, and he also provided his W-2.  But if

25     you look at that document which Jasiel Correia completed, there

1    are many places in this document where he could have, should

2    have, was required to, if you wanted to give a truthful and

3    honest assessment of his income to the federal government, he

4    could have answered.

5         I'm looking at the first page where it says, "Check

6    the income items that pertain to you."  The bottom of the first

7    page, "Self-Employed Income," he doesn't check the box.  He

8    doesn't report that he's self-employed.  The next paragraph it

9    says, "Partnerships, S corporations" --

10        THE COURT:  Let's just pause for a moment --

11        MR. TOBIN:  Of course.

12        THE COURT:  -- and find out what it was that Ms.

13   Vieira asked him about that.  And she testified -- where is the

14   testimony we're going to be relying on?

15        MR. TOBIN:  From the outset let me say that at no time

16   does Ms. Vieira give him a definition of what it means to have

17   income.  She does not take out the Oxford English Dictionary.

18   She doesn't take out Merriam-Webster.  She doesn't take out a

19   treatise --

20        THE COURT:  The short answer is she doesn't tell him

21   anything.  She says, "There's income, you tell me whether

22   you've got it."

23        MR. TOBIN:  Well, I wouldn't say it like that, Your

24   Honor, most respectfully.

25        THE COURT:  Well, I wouldn't say it the way you said

1      it either, but I want to find out what it is in fact she told

2      him.

3              MR. TOBIN:  Okay.  So I asked her in her testimony,

4      page 85 of the transcript --

5              THE COURT:  This is what day?

6              MR. TOBIN:  April 30, Jury Trial 8.

7              THE COURT:  And the page is?

8              MR. TOBIN:  8.5.  This is her explaining the

9      situation.

10             THE COURT:  I'm getting it out now.

11             MR. TOBIN:  Okay.  I'm sorry.  I also should point out

12     as an aside that I understand the Court made reference that she

13     didn't work for the big eight, which, I don't know if they're

14     the big three now.  But nonetheless, on page 8.5 she does

15     testify that she worked for Liberty Tax from 2006 until 2017.

16     She was an experienced tax preparer.

17             THE COURT:  I've got all of that.  What I want to

18     understand is what she was telling him.  People go to different

19     kind of tax preparers for various reasons, frankly having to do

20     with how much money it costs or whether their father pointed

21     them in that direction.  The point is what were they told and

22     what can I fairly say they knew about what their obligations

23     were in responding to them and then in responding to the tax

24     return.

25             MR. TOBIN:  Well, she explains the circumstances.  The

1    customer would come in and they would fill out a Client Data

2    Sheet.  She would also bring in all their required

3    documentation in order to file their tax returns.

4         The next page, halfway down, "Once a member of your

5    staff had the data sheet and had the supporting documents, what

6    happened next?"

7         "At this point there would be a client interview if

8    they decided to stay, and we would sit down and complete the

9    tax return in-house with the client present."

10        I asked shortly thereafter, "And once the data was

11   completed, was it reviewed in any way with the client?

12        "Yes.

13        "Explain that process to us, please.

14        "So once all the data entry is completed, I would

15   actually turn the screen over to the customer and run through

16   where all the income would go," meaning on the document, "what

17   their refund would look like and any tax liabilities just as a

18   quick summary."

19        I ask, "Now, with regard to that information, the

20   information you've input into the Liberty Tax computer that you

21   go over with a client, are they asked to initial or sign

22   anything that contains the data?"  And she explains they do,

23   and we see the defendant's initials on those forms.

24        I ask further on that page, 8.7, "And do you ask them

25   about the various kinds of income they might have or expenses?

1              "Yes.

2              "And again, at the end of these pages are they

3       initialed after you've gone over them?

4              "Yes."

5              THE COURT:  What do they ask him about the income?

6              MR. TOBIN:  I don't know, Your Honor.

7              THE COURT:  Nor did the jury, right?

8              MR. TOBIN:  Your Honor --

9              THE COURT:  Mr. Tobin, you've rightly cited,

10      dramatically, the testimony that was given, but I'm really

11      focusing on whether or not he was given some notice about the

12      -- if I may --

13             MR. TOBIN:  Most respectfully -- I'm sorry, I cut you

14      off.  I apologize.

15             THE COURT:  Simply that the income that's related to

16      the prospect of getting a refund, which of course would depend

17      on whether or not it was evidence -- it was income that he

18      should have been disclosing --

19             MR. TOBIN:  Your Honor, Mr. Hafer -- I know you're

20      going to -- I'm trying to say something that won't have you

21      stop me in mid-tracks.

22             Mr. Hafer talks about his education.  The man was

23      taught to read, to think critically by the Dominicans at

24      Providence College.  If the Court is suggesting that he doesn't

25      know what it means by business income, partnerships or other

 1   income, I just respectfully disagree with you.  I don't think

 2   he needs to be given definitions --

 3        THE COURT:  If it were a sole partnership, would it be

 4   business income to him?  Do the Dominicans provide education

 5   about that, too?

 6        MR. TOBIN:  I'm sure they do in their business school.

 7   It's brand new, from what I understand.

 8        THE COURT:  And the question is did they do it to him?

 9   This kind of glossing over is not that helpful.  So I'm looking

10   at this, and she or someone in the course of business asks

11   questions about income, and there clearly was no response with

12   respect to that income.

13        MR. TOBIN:  He was asked if there was business income,

14   and we all know there was, and we all know he spent tens of

15   thousands of dollars from the business.  I don't know what more

16   she needed to say other than "business income" --

17        THE COURT:  So the answer is this is as good as it

18   gets.

19        MR. TOBIN:  And it's good enough, I would suggest,

20   yes, Your Honor.

21        THE COURT:  So, Mr. Marx, do you want to speak to

22   this?  And what I really want you to be speaking to is Snokimo

23   under these circumstances.

24        MR. MARX:  Yes, Your Honor, absolutely.  Before I do,

25   just one moment because I can't resist the urge, and I won't do

1  a dramatic reading, but the testimony goes on for Ms. Vieira

2  who is asked in a leading fashion by Mr. Tobin, "Would you have

3  specifically asked Mr. Correia about any business income or

4  loss," to which she answers, "Specifically, no."  I think that

5  pretty much closes the book on her testimony.

6          With regard to Snokimo, Your Honor, again, this is an

7  awfully little at an awfully late hour to come up with a --

8          THE COURT:  Not really.  It was in the case.  And what

9  I do have is a statement by the defendant as of February 23, I

10  guess 28 of 2013, that he had self-employed income of a

11  thousand dollars.

12         MR. MARX:  Absolutely, Your Honor.

13         THE COURT:  What's that?

14         MR. MARX:  That's right.  And we have no testimony at

15  trial obviously about this application or what he meant or even

16  who took the paperwork from him.  Let's look at the documents

17  themselves, which I just got a few minutes ago --

18         MR. HAFER:  He keeps saying he got it a few minutes

19  ago.  It's evidence in the case.

20         THE COURT:  I understand.  I am going back to be sure

21  we're looking carefully at the particular documents and I'm

22  giving people as much as time as you need.  If you think you

23  need more time to look at all the documents in evidence, of

24  course tell me that.

25         I think we're dealing here with the chart that was

1    created that shows that there were deposits that came from

2    SnoOwl and from Snokimo, and in both cases they were over a

3    thousand dollars.  And in the case of Snokimo, there could be

4    no question about, it seems to me, or at least the jury could

5    find that there was no question that that was business income

6    that should have been reported.

7         MR. MARX:  So let me start with the documents

8    themselves, Your Honor, and then address your question about

9    Snokimo.  As you've already identified, this loan application

10   document is dated February -- it's a little hard to read the

11   actual day but sometime in February of 2013.  It identifies

12   Mr. Correia as having income from three sources, Nordstrom,

13   self-employment, which as Your Honor has already identified

14   doesn't say from where, and RA, which I take to mean being a

15   residential adviser at Providence College.

16        This document plainly refers to a period of time when

17   Mr. Correia was in school, working at Nordstroms, and the time

18   when he was operating FindIt Networks, which the testimony was

19   generated some but not much income, certainly not enough to

20   support some of the statements that were made about it.

21        So February of 2013 is referring to, in school, he's

22   working while he's a student, he's making money as an RA, and

23   he has a company on the side.  There's no indication it's

24   Snokimo or SnoOwl.  And I would say this chart, Your Honor,

25   which has been identified as the other half to the supposed

1    puzzle, Your Honor, the chart starts March of 2013.  It doesn't

2    identify a single payment predating this loan application.

3         So certainly whatever this loan application means, and

4    there's nothing in the record to tell us that the chart, 65.1,

5    Exhibit 65.1, starts with SnoOwl deposits in March and April of

6    2013, continues with Snokimo deposits starting in July of 2013,

7    nearly six months after this document.

8         So whatever he's talking about in this document, it's

9    not these deposits which happened months after he applied for

10   this loan.  So I don't think these two together can establish

11   that at this time he understood --

12        THE COURT:  But he made no explanation for what this

13   was, right?  I mean, he didn't include that in his conversation

14   with Ms. Vieira or her acolytes, to use the Dominican

15   dimension, to learning about taxes.

16        MR. MARX:  That's right, Your Honor.  I don't know

17   what this refers to.  There's no testimony about what it refers

18   to, and apparently there was no discussion with Ms. Vieira

19   about any of this income, but there's no suggestion in this

20   document --

21        THE COURT:  But as of February, he had a thousand

22   dollars worth of extra income.

23        MR. MARX:  According to this document.

24        THE COURT:  Well, according to what he wrote here.

25   Now we're talking about his 2013 tax return and its amendment.

1    And that's fully consistent with money from Snokimo, being

2    money from Snokimo that would be directly his income, not

3    income of potentially a sole proprietorship -- excuse me --

4    sole proprietorship, yeah.

5         MR. MARX:  Respectfully, Your Honor, I don't think the

6    dates match up.  The loan application is in February.

7    According to this chart, 65.1, the first Snokimo check doesn't

8    come until July.  So this loan document is not referring to

9    income he had at the time from Snokimo.

10        Now, the government claims he had income from Snokimo,

11   but let me address that issue.  The testimony at trial, the

12   only evidence at trial -- and there's very little about

13   Snokimo.  During the break I went back and found every

14   reference to Snokimo in the trial transcript.  There's not

15   much.  But what there is is testimony from Mr. Arias that he

16   hired, under the umbrella of SnoOwl, Snokimo to do web

17   development for his jewelry company.

18        Now, Mr. Correia is not a web developer.  He hires

19   other people to do that, but that was a service provided under

20   the umbrella of SnoOwl.  The money was paid either to SnoOwl or

21   Snokimo.  The testimony from Agent Lemanski is that money then

22   gets deposited into a Snokimo Citizens Bank account.  There's

23   no testimony about what happens to those funds.

24        But even if we were to speculate, there's no testimony

25   about it, but speculate he used some of those funds for

1    personal expenses as the jury found he did with regard to the

2    SnoOwl money, we're just back to where we started, Your Honor,

3    which is the question of, if a corporate employee, whether a

4    partner or a sole proprietor or a member of an LLC, misuses

5    corporate funds for personal expenses, is that imputed to them

6    as income?  And if it is under the federal tax laws, does the

7    defendant know that, and is he willfully --

8            THE COURT:  Let's just focus on 2014, which is where I

9    was earlier on it.  That is, he receives, whatever information

10   he wants, he receives from Ms. Vieira.  He does not account for

11   a thousand dollars that he knew he had received in 2013.  He

12   just doesn't account for it, doesn't tell her one way or the

13   other about it.  But tracing that to Snokimo or SnoOwl is a

14   little bit more difficult because of the reasons that you've

15   given, that is, that the chart starts after this date, but it

16   continues into 2014.

17           And now we're dealing with a later occasion in which

18   he's talking to Mr. Charest and Mr. Charest is trying to figure

19   out what's going on in this operation.  He talks to the

20   lawyers.  He talks to the defendant.  He finally sorts it out

21   at least sufficiently from his perspective to come to the

22   conclusion that in the case of Snokimo that would be monies

23   that would be under a direct imputation to him, and he's aware

24   of this going back and forth with the lawyer who is handling

25   the operations of the SnoOwl conglomerate, let's call it that,

 1  in its several forms.  Isn't that enough to get to the jury on

 2  that Snokimo as a false statement --

 3       MR. MARX:  I don't believe so, Your Honor, because we

 4  still have to wrestle with the same fundamental question, which

 5  is whether or not he understands that.  And I'll just for the

 6  purposes of this argument use the term, misuse of corporate

 7  funds for personal purposes is imputable as business income on

 8  a personal tax return.

 9       No one explained that to him.  There's no testimony

10  about that.  And Terry Charest specifically says, Your Honor,

11  "I don't know that I ever had that conversation with him."  So

12  it may have been a false tax return, but our question here and

13  the one Your Honor is wrestling is was it a willful violation

14  of the tax law, which requires knowing you have a legal duty to

15  report that business income.

16       I'm just looking quickly at this form now.  You know,

17  it's interesting that the form that --

18       THE COURT:  Which form are you talking about?

19       MR. MARX:  This is the Liberty Tax form.

20       THE COURT:  I'm beyond Liberty on this.  I really am

21  on to Mr. Charest and the testimony surrounding that.

22       MR. MARX:  With respect to Mr. Charest, Your Honor, he

23  didn't say a word about Snokimo, not a word of testimony, not a

24  single question was asked to him about whether or not

25  Mr. Correia had to report business income from Snokimo on his

1    amended returns.  His testimony broadly is Mr. Correia never

2    came to him and said anything that suggested he was trying to

3    evade his taxes or mislead Mr. Charest, and he doesn't testify

4    at all about Snokimo.

5         So I think to focus on the amended returns and

6    preserve the conviction solely on the basis of Snokimo, $6,000

7    in revenue, no testimony about whether there was actually any

8    profit, no testimony whether there was any income to the

9    owner --

10        THE COURT:  Under the circumstances there doesn't have

11   to be profit and loss, does there?

12        MR. MARX:  Well, it's not income to Mr. Correia if the

13   company is making no money.  It may have been a loss he could

14   have claimed, but it's certainly not income.

15        THE COURT:  But he's aware of income and doesn't

16   discount the income on the basis of some sort of loss.  But I

17   take the point, and maybe, Mr. Tobin, you want to point me to

18   anything that shows that Mr. Charest's communications with

19   Mr. Correia and the circumstances of Mr. Charest's work on

20   behalf of the various financial backers of SnoOwl demonstrate,

21   would demonstrate an awareness of some sort, either directly or

22   indirectly.

23        MR. HAFER:  Can you repeat the question.

24        THE COURT:  Sure.  As to the 2014, the corrected

25   returns, Charest is brought in.  He's asked to provide support

1    because people are concerned about the accuracy of the records

2    that are maintained by SnoOwl generally.  He provides

3    recommendations with respect to amended returns and in

4    particular for the amended return as to 2014 for the

5    corporation, as I understand it, for the entity SnoOwl, makes

6    reference to the different treatment that would be provided to

7    Snokimo.

8          Now, I'm trying to figure out whether I could say

9    based on the additional communications at a time when the

10   defendant is a little bit more sophisticated it would be

11   sufficient to say he had knowledge that at least the Snokimo

12   payments that he received, which are set forth in the chart,

13   are attributable to him and consequently the failure to

14   disclose them in the amended complaint was willful.

15         MR. HAFER:  I did not look at Mr. Charest's testimony

16   over the break.  My memory is he did talk -- I remember one of

17   the worksheets that had a Snokimo notation on it for follow-up.

18   I'm confident that he testified he asked about any other type

19   of income and any other types of treatment.  I don't know what

20   Mr. Marx is talking about, that one quotation he picked out.

21   Mr. Charest was on the stand for a very, very long time.

22         THE COURT:  So the answer to this -- I understand that

23   the parties are responding to very specific questions I have.

24   I want to be sure that you have an opportunity to do it.  I'm

25   leaving open this one.  I'm not -- the other three I'm not.

1    That is to say J, K and L I believe are ones that cannot be

2    maintained because the evidence with respect to willfulness

3    simply doesn't reach the level of speculation.

4            With respect to M, which is the 2014 amended return,

5    I'll permit the government to provide me with citations that

6    you want to.  I've been through it, but I want to be sure I

7    haven't missed anything that you want --

8            MR. HAFER:  I'll take that opportunity, number one.

9    But I'd like to remind the Court that the government's theory

10   of falsity on the amended returns was not just tied to the

11   corporate treatment of SnoOwl or the failure to report Snokimo

12   but also the false representations with respect to individual

13   expenses, for example, the treatment of the money for the car

14   as software development and others.

15           THE COURT:  Okay.  Then if you want to, and of course

16   you do, if you want to pursue that, then I want to see some

17   indication that there was some discussion about how it is that

18   you treat those kinds of issues from Mr. Charest.

19           MR. HAFER:  Okay.  I would like to have that

20   opportunity.

21           THE COURT:  Okay.  So I'll hold open then L and M on

22   that.  With respect to J and K, I'm going to be granting a

23   judgment of acquittal on the basis of what I now know.

24           MR. MARX:  Your Honor, just so the record is clear,

25   the citation I gave was from Volume 7 of the transcript, pages

1    180 to 181, a direct quote from Mr. Charest.

2         THE COURT:  And I've been through it myself fairly

3    recently, but I want to be sure that I haven't missed something

4    that the parties want me to take a look at here.  But as you

5    can see, I've marked it.  So I'll receive that tomorrow

6    morning, I guess.  Is that sufficient time?

7         MR. HAFER:  It is, Your Honor.

8         THE COURT:  So we've got those issues I think

9    clarified, at least what's open on this, the possibility that

10   at least some of the wire fraud counts are going to be subject

11   to judgment of acquittal and that two of the tax frauds are

12   going to be subject to judgment of acquittal.

13        Part of this is of course meaningful for purposes of

14   the financial dimension of any sentence that is imposed here,

15   whether it's imposed by forfeiture or restitution or fine.  But

16   this is money.  And I'm going to try to figure out how that

17   works in making a sentence, assuming that we go forward.

18        Now, I've also said that the Hobbs Act counts are not

19   going to be dismissed.  That's pretty much final on this.  And

20   I think that then leaves us to discuss what I'll call the

21   motion for new trial, which is both a motion for a new trial

22   but also a challenge to the verdict on the basis of ineffective

23   assistance of counsel.

24        I required the -- not "required," but I said I wanted

25   to have the lawyers who had tried the case present because it's

1    important to have their understanding.  It's very hard for

2    someone coming in from the outside to get the full texture of a

3    trial.  I was there.  Mr. Hafer was there.  Mr. Tobin was

4    there.  Mr. Reddington was there.  And of course Mr. Correia

5    was.

6         But the motion for new trial, at least as I understand

7    it here, turns on the question of joinder and whether or not

8    this case was properly joined.  It is an issue that on its face

9    I believe was waived, forfeited.  I'm not sure I have to look

10   at anything more than that.  That's the state of the record.

11        I don't have, although Mr. Reddington is still of

12   counsel, I do not have an affidavit on that.  And I observed

13   that Mr. Correia was very interested in the trial, conducted

14   conversations on multiple occasions with Mr. Reddington.

15   Mr. Reddington reported that to me.  Mr. Correia was also, as

16   one would be under these circumstances, cost-sensitive about

17   the trial.  He raised money for his legal defense fund based on

18   big firm rates from his prior counsel who he discharged and

19   brought Mr. Reddington into the case.  He had discussions here

20   at various times about what we were going to do with this trial

21   under COVID circumstances.

22        The trial was set, then reset.  I listened to the

23   government's -- shared with Mr. Reddington the government's

24   anticipation of what the charging decisions were going to be

25   made during this run-up that there was going to be a likelihood

```
 1    that Mr. Correia was going to be indicted for political
 2    corruption even before that happened.  I said that's the
 3    government's choice, but I want to make possible, because I
 4    know I had busy counsel here, I had the chief of the criminal
 5    division in the U.S. Attorney's Office and Mr. Reddington who
 6    is as busy as any trial lawyer I know and also responsive when
 7    courts ask for someone to give them a real trial date.  So it
 8    was pushed off.  Then there was a superseding indictment, and
 9    then there was a second superseding indictment.
10           In order for this case to be tried, I thought, under
11    these present circumstances, what I had to do was a severance
12    that would permit Ms. Andrade and Mr. Correia to be charged
13    together -- to be tried together.  That's the severance that
14    frankly I realize, not as to Ms. Andrade, but that's the
15    severance that now Mr. Correia says he should get and that
16    there's something wrong with what Mr. Reddington did because he
17    didn't get it.
18           But I had set it down for that kind of separate trial.
19    Then Ms. Andrade entered into a C plea negotiation, and she was
20    apparently no longer going to be part of the trial, and it was
21    important to move the trial along in an orderly fashion,
22    understanding how demanding such a trial would be.  And so I
23    raised the issue of having all of the counts tried together.
24    Are they subject to severance?  I don't have to ask whether
25    they are.  I did it.
```

1          The question is whether they continue to be subject to
2     severance, that there's no other possibility.  And the answer
3     to that is no.  That somebody cost-sensitive like Mr. Correia
4     would choose, as Mr. Reddington reported in the presence of
5     Mr. Correia, wanted to get this all wrapped up, it made sense
6     to get it all wrapped up.
7          So what are we left with?  Well, we're left with this.
8     The idea that under other circumstances without waiver or
9     forfeiture, there should be severance in cases like this, the
10    Court should do it sua sponte, and that not asking for it is a
11    prima facie disclosure of ineffective assistance of counsel.
12         This record doesn't support that.  And I want the
13    parties to be clear about this.  In making the determination
14    about it, now having been pressed on it by new counsel, this
15    means that you face the potential for res judicata on this
16    issue.  I think you've made that choice, but I don't, as I've
17    done throughout, I don't want anybody to misunderstand what the
18    larger implications are of what they've done or what they
19    propose to do here.
20         I don't know of any other reason for a new trial in
21    this case.  Those matters that have not been potentially the
22    subject of a judgment of acquittal seem to me to be on firm
23    ground.  I just don't see a problem with it.  That there are
24    some that aren't is part of the process of what the trial was
25    about, and I will give some guidance with respect to what the

1    sentencing process should be for that.  I've already talked

2    about it in terms of the financial dimensions of it.  But I

3    simply don't know of anything else involved in this new trial

4    argument that I should be entertaining.  It is the classic,

5    that is to say illustrative of why I went to such extraordinary

6    efforts to make sure that Mr. Correia considered it fully

7    whether or not he was going to testify in this case.  And I

8    think I did it with the severance as well.  The record will I

9    think reflect that.

10   Because when things turn out badly or at least not how

11   the defendant hopes they will, things do not seem to him then

12   or now as seem to have seemed to him then that this becomes a

13   kind of opportunity for a re-do of strategic judgments that

14   were made in the course of bringing this case to trial.

15   Well, the law of ineffective assistance of counsel

16   recognizes that making strategic judgments, fully informed

17   here, are the matter of choices that have to be made, and they

18   don't provide a basis for an effectiveness claim or in this

19   setting a new trial.

20   I've also considered it from the perspective of actual

21   innocence.  There isn't -- although there are obviously

22   extrajudicial statements that have been made, but there is no

23   showing undertaken of actual innocence.  I've been asked to

24   look at the record.  I looked at it very carefully.  As you

25   see, we've all gone back and looked at it.  I've flyspecked

1    this record, and I don't see actual innocence in this case on

2    the basis of the record that I now have.

3          So then I look at prejudice.  Not that I am obligated

4    to do that under these circumstances given the findings I've

5    preliminarily made with respect to other aspects of challenges

6    to a conviction like this, and I don't see actual prejudice

7    either.

8          It is, you know, certainly the case that it's too easy

9    to say, Well, the defendant was convicted on some things but

10   not other things, that means the jury is discriminating in its

11   judgment.  I'd never buy that on its face, but I buy it here.

12   This was a very careful jury, it was clear to me.  They took

13   four days to think this through.  I encouraged them, as you

14   know, in the sense of saying don't do this with a straw vote

15   immediately.

16         Someone who is standing trial under these

17   circumstances and has another defendant in the case has the

18   benefit of a distraction, particularly when the other person

19   who might be involved doesn't testify.  And the jury has to

20   think very carefully about each aspect of the charges, and I

21   believe that their judgment with respect to the charges on

22   which they acquitted are entitled to full recognition as a

23   discriminating verdict on the part of the jury.  One can

24   understand what choices they made here.

25         So we have a defendant who made some choices.  They

1    didn't turn out so well.  He wants a new trial.  And while he

2    might get a new trial with respect to a couple of tax counts or

3    might not, I don't see him getting a new trial as to the core

4    of this case, which I've always viewed as based on the

5    trajectory that he pursued in the period between the

6    conceptualization of SnoOwl and the use of his position to

7    obtain, extort in the words of the Hobbs Act, money in a system

8    of bribery in the City of Fall River.

9         So I outline all of that so that Mr. Fick or Mr. Marx,

10   whoever is going to speak to this aspect of it, you know what

11   you're dealing with here and you can speak to those issues.

12   You are fully familiar with, as I know, with the law of default

13   and waiver in the context of 2255 proceedings for which this

14   simply would be in other circumstances a sneak preview.  But on

15   the basis of the record that's now put here is, from my

16   perspective, your opportunity to make that case.

17        MR. FICK:  Thank you, Your Honor.  Might we take a

18   short break to confer with our client in light of what the

19   Court has just said and also just to use the facilities?

20        THE COURT:  Sure, absolutely.  We'll take a ten-minute

21   break.  Is that going to be enough?  As you can see, I'm not

22   rushing things, but I want to be sure that you have time, so

23   we'll take a ten-minute break.

24        (Recess taken 3:14 p.m. -  3:34 p.m.)

25        THE COURT:  So Mr. Quinlivan -- I'm sorry, Mr. Marx.

1           MR. MARX:  Thank you, Your Honor.  I'd like to address

2    your questions in three parts, and I'll try to be brief about

3    it.  The first to address head-on the issue of a 2255 argument;

4    second, the issues around waiver of forfeiture and how they

5    relate to the problem of misjoinder here; and then lastly, the

6    issue of spillover prejudice, which in some sense has only

7    become ripe today in light of Your Honor's preliminary

8    decisions about the wire fraud and tax fraud charges.

9           With respect to the 2255, whether we agree or disagree

10   about the sufficiency of the argument so far with respect to

11   res judicata and collateral estoppel, I know the First Circuit

12   would say since I only put it in a footnote it's as if I didn't

13   say it.  We're not prepared now to put a full-throated 2255

14   argument before Your Honor.  We don't think the record is

15   developed to do that.  We think there would be extra record

16   material that would be relevant to the decisionmaking before

17   trial.

18          Your Honor identified one issue, finances, about how

19   that may have implicated the decisionmaking.  So to the extent

20   that the Court receives that as having been raised by us in our

21   brief in the final footnote, we withdraw the argument that

22   there's ineffective assistance sufficient for 2255, and that's

23   what gets us past waiver of forfeiture.  I want the record to

24   be clear on that.

25          Second, so that leaves us with the situation where

1    this issue was not litigated before trial.  Your Honor used the

2    words "waiver" and "forfeiture."  I've spent some time over the

3    past few days reading through the First Circuit cases trying to

4    make sure I understand the difference between those things, and

5    I don't believe there was a waiver here.  I believe that on the

6    current record there was a forfeiture.  There was no waiver

7    because the comment that the government focuses on by Attorney

8    Reddington occurred before there was even a superseding

9    indictment, so there was no indictment to challenge under Rule

10   8 for misjoinder.  It didn't exist yet.

11        So to the extent the statement is made hypothetically,

12   in the future should this case metastasize into a corruption

13   case, we'd be inclined to try it together.  We don't think that

14   is a knowing waiver of a potential legal challenge to an

15   indictment which does not exist.  But once the indictment comes

16   back and that indictment is not made, we think there's a

17   problem of forfeiture here.

18        So what's the implication of that?  The implication is

19   that it remains reviewable but under a more demanding and

20   rigorous standard.  Now, if we were down the hall in the First

21   Circuit, we'd be talking about plain error review.  I don't

22   agree with the government that Your Honor has to apply plain

23   error review here because we're on a Rule 33.  You have broad

24   discretion.  The standard is in the interests of justice.

25        I don't think the First Circuit has ever said there

1    needs to be reversible appellate error that satisfies a plain

2    error standard for a trial judge to decide I'm not comfortable

3    with the outcome of this trial, and in the interests of

4    justice, I want to try all of it or some part of it again.

5            That being said, for the reasons we put in the reply

6    brief, which I now understand has been accepted, we think the

7    plain error standard is satisfied.  It's satisfied because if

8    you go back in time, Your Honor, to before this case was tried

9    and the time the indictment was returned, the superseding

10   indictment, and ask yourself does this indictment satisfy Rule

11   8, I think it plainly doesn't, and I don't think there's any

12   argument that it does.

13           Rule 8 identifies three criteria for joinder of

14   separate offenses, none of which are met here.  The government

15   doesn't argue any of them are met here.  Instead it argues

16   evidentiary overlap.  Now, that's an important concept here

17   because at the time and in a number of conferences -- and

18   although Mr. Fick and I weren't present at those conferences,

19   we've carefully studied the transcripts of them, including the

20   sealed conferences -- at the time there was a lot of comment by

21   the government that there would be substantial evidentiary

22   overlap between the fraud case, that includes the wire fraud

23   and the tax fraud, and the Hobbs Act corruption cases.  In

24   fact, there would be so much overlap it would be almost

25   impossible to try these cases separately.  That was a

1     representation made by the government as late as December of

2     2020.

3           What we know, Your Honor, having being through the

4     trial, and Your Honor was sitting here, I've only read it in

5     the transcript, what we know, it was almost impossible to

6     combine these two cases.  And with the exception maybe of a

7     couple pages out of about 2,000, straight testimony from Camara

8     and Costa how they invested in SnoOwl, none of which related to

9     charged conduct, none of it was significant to any element of

10    the corruption case, there was no overlap here.

11          And in fact, the government told the jury to think

12    about this as two separate cases.  Take it one part at a time.

13    Let's talk about the fraud part.  Look at the evidence with

14    regard to the fraud part.  Now look at the Hobbs Act part.

15    Look at the evidence with respect to that.  In reviewing the

16    evidence with respect to tax and SnoOwl fraud, Tony Costa and

17    Hil Camara's names were never mentioned once.

18          So quite the contrary, there wasn't significant

19    overlap here.  There was the complete absence of any important

20    overlapping evidence between these two cases.  So as a matter

21    of plain error, and it may be that's the way this has to get

22    litigated eventually, as a matter of plain error, we think

23    these cases were misjoined, and as a result, Mr. Correia

24    suffered prejudice.

25          Now, that gets into the last of the three things I

1   wanted to mention, Your Honor, which is this issue of prejudice

2   spillover.  Based on your preliminary indications today, it

3   sounds like we may be in a situation where judgment of

4   acquittal enters on six of the nine wire fraud counts, two or

5   possibly as many as four of the tax fraud counts, which would

6   be the entire tax fraud case, but not of the Hobbs Act counts.

7          Your Honor has referred to the Hobbs Act part of the

8   case, the corruption part of the case as the core of the case.

9   That case, as Your Honor knows, was built on the backs of

10  witnesses who, as Your Honor observed this morning, could have

11  been charged with criminal conduct, in many cases were charged

12  with criminal conduct, in some cases were convicted of criminal

13  conduct, witnesses who admitted they lied to the FBI, they lied

14  to the grand jury, they lied in proffer sessions, they even

15  lied to each other, witnesses who had every incentive to point

16  the finger at someone else in order to avoid substantial prison

17  sentences in this case.  You have a case built on the testimony

18  of those witnesses, testimony that was, from the defense

19  perspective, we're stuck with now.

20         They came into court.  They swore to tell the truth.

21  They gave that testimony, and the jury was entitled to credit

22  it.  However, if the jury had not heard that testimony after

23  weeks of testimony about SnoOwl and additional days of

24  testimony about tax fraud and had the government not presented

25  this as one giant portrait of greed and power hunger, they

1    might have looked more carefully at the completely

2    uncorroborated self-serving testimony of cooperating witnesses.

3           And we think, to the extent that it's incredibly

4    important, obviously not just to Mr. Correia but to the public,

5    that we have a fair judgment on those counts of conviction, we

6    think it's critical that a jury have the opportunity to

7    evaluate the credibility of those witnesses, which we believe

8    was highly dubious, without being prejudiced by other parts of

9    the case that have nothing to do with that, parts about

10   defrauding investors in a software company or lying to tax

11   preparers.  If you put those out of the case, Your Honor, we're

12   dealing with a very, very different trial here.

13          So there's really two issues.  One is from the

14   perspective of before the trial happened and whether there's

15   plain error with respect to Rule 8.  But another is, now that

16   we know the trial would have been much more focused and narrow,

17   is it fair to simply let the Hobbs Act counts stand given the

18   evidence on which they are based.

19          And our argument, Your Honor, is under Rule 33 you

20   have tremendous discretion to say that we can't have enough

21   confidence in this verdict to let things stand and that part of

22   the case should be retried, even though Your Honor has

23   indicated you're not willing to enter judgment of acquittal on

24   any of those counts.

25          THE COURT:  So let me parse through that.  Number one,

1    I don't know whether you're saying you're withdrawing your

2    effort to raise this issue now and whether that would

3    constitute forfeiture or waiver, but that's up to you.  But are

4    you going to press that issue at this point?

5         MR. MARX:  Not at this point, Your Honor, on the 2255

6    issue to the --

7         THE COURT:  Not the 2255 issue.  This is an issue of

8    whether or not there was ineffective assistance of counsel in

9    this case.

10        MR. MARX:  No, Your Honor, not at this time.

11        THE COURT:  But of course you briefed it, and you

12   sought to have me address this, but you are now waiving that

13   and you understand that that may also constitute another layer

14   of waiver.

15        This is a very delicate issue from my perspective.  An

16   attorney's reputation is thrown into question gratuitously

17   without a foundation.  Because I observed the trial.  I

18   observed the trial to be one in which Mr. Reddington on the

19   basis of what I saw played the cards he was dealt and that the

20   parties were prepared to continue to play, in particular

21   Mr. Correia, as best as they could be played.  This was not an

22   easy case for Mr. Correia, much as he may think otherwise.  And

23   so what he does is, after it's over, takes a shot at his

24   lawyer.

25        Now, if that is something that you are now having

disclosed it, raised it, want me to disregard and waive, I

understand.  You can argue whatever you want to argue on this.

What the implications are of doing that under these

circumstances is certainly something that will be taken up by

me because I have to decide the question of a new trial in any

event irrespective of what you do.  But you chose to do it, and

it comes with real significance.

The second aspect of this is more or less the same as

the other one.  There's nothing here.  Plain error, some form

of mistaken understanding by counsel?  No.  This was a choice.

It was a strategic choice.  It's the classic kind of strategic

choice as to which counsel working with his client, and I

observed him to be doing so, and I observed the client to be

communicating directly with him, undertook that kind of

representation.  That it turns out not so well isn't a grounds,

as far as I'm concerned, for ineffectiveness or plain error or

anything like that.

And that brings me to the third and larger issue,

which is, this may reconfigure the case, there's no question

about it.  But was I going to let in a lot of this evidence?

Yes, irrespective of whether it was charged.  This goes

fundamentally, to the degree that you would call it 404(b)

evidence, this goes to the predisposition of a defendant who

charged and sought to defend on the basis of lack of intent.

And the trajectory of his awareness and his, I guess greed is

1    the right word, continuing in the face of being indicted is

2    something that really does require evaluation, and I would have

3    permitted it here.

4           Now, would the government have developed its case the

5    same way it did otherwise?  I have no idea.  I've raised

6    questions about the use of mail fraud as a general proposition.

7    Clearly the case was at a particular point in light of

8    Mr. Correia's success as a politician, although the charges

9    were laid for nonpolitical corruption at least initially.

10          I listened to the witnesses.  I made judgments about

11    whether or not they should have been charged or not charged.  I

12    dealt with witnesses who did in fact testify, listened to what

13    the government had to say about what their recommendation was.

14    That is ultimately, from my perspective, a prosecutorial

15    decision, one that I think I am obligated to consider very

16    carefully under separation of powers grounds.  Sentencing is

17    another matter.

18          So if you're saying you're withdrawing it, I'll take

19    that as you're saying you're withdrawing it.  You understand my

20    view about what that might mean here.  But if you and your

21    client now are prepared to say that, I'll let you do it.

22          MR. MARX:  So I put it this way, Your Honor, to the

23    extent this record may be parsed later --

24          THE COURT:  Oh, it will be, and you can be assured

25    that I'm going to be speaking very directly to precisely these

1    issues.

2           MR. MARX:  Our view is that the issue, and I take Your

3    Honor's criticism, nothing -- certainly I would never in my

4    mind gratuitously criticize a fellow member of the bar, but I

5    take Your Honor's criticism, and that's on me, not on

6    Mr. Correia.

7           THE COURT:  No.  It's on Mr. Correia.  He went out and

8    hired you afterwards, and that is an indication of a desire to

9    have a re-do on whatever grounds might be reached for.  So

10   Mr. Correia is responsible for all of his acts.  The question

11   is what is the result of that responsibility.

12          MR. MARX:  So with respect to the status of that

13   argument, our view, Your Honor, is not that it has been raised

14   and relinquished.  It has not been properly raised.  And today

15   is not the time to do that.  Our view is you need a full-blown

16   evidentiary hearing with respect to some of those issues, and

17   that is typically done in later, post-conviction proceedings.

18          So Your Honor will make a decision.  I'm sure you'll

19   describe it as you see fit in whatever decision, if there is a

20   written decision.  Our argument is we are not waiving any

21   potential 2255 going forward, and we're not pressing that issue

22   today, is I guess how I would phrase it.

23          The only other thing I would say, Your Honor, because

24   I don't want to belabor this point, we've been at this a long

25   time today, I don't think if Your Honor had been asked before

1    this trial whether or not -- if this trial were only the

2    corruption case, if this were only the Hobbs Act case and Your

3    Honor had been presented with a motion in limine from the

4    government to introduce the SnoOwl case or tax fraud case as

5    404(b), I think that's an easy decision and the answer a no.

6            Now, it may be relevant, the government may have

7    argued, well, the defendant went out and bribed people and

8    tried to raise money because he had big legal bills, and I can

9    see them getting that in going to the motive.  But the source

10   of those legal bills, the fact that he was subject to an

11   investigation, the fact that he was charged, the fact that he

12   defrauded people, committed crimes, none that would come in as

13   404(b).  It's not certainly 404(b) and it wouldn't pass a 403

14   prejudice/probative type balancing.

15           So I think there is a real issue here that that part

16   of the case, and Your Honor since -- and it's clear that it's

17   strongly held that there's a thematic connection here of greed

18   between all three parts of the case I think alone is not

19   sufficient to join disparate criminal cases together.  And I

20   think had the government come to you before the trial and said,

21   Your Honor, we're only prosecuting Mr. Correia for Hobbs Act

22   extortion, but we'd like to put in a separate case about him

23   defrauding investors in a prior company in a prior life before

24   he was a public official because it shows he's a greedy person,

25   I think Your Honor rightly would have said no, you can't do

1    that.

2         But as a result, what happened in this case is he

3    effectively faced both of those cases at the same time.  And

4    now, given Your Honor's preliminary decisions today, I think

5    the question is raised whether or not standing alone, the

6    testimony of critical witnesses in the Hobbs Act case, without

7    corroboration and given all the warts on those witnesses,

8    whether or not the jury's evaluation of their credibility was

9    likely influenced by the existence of the SnoOwl and tax fraud

10   cases, and our position was it almost certainly was, which is

11   what requires a new trial.  But thank you for the argument.

12        THE COURT:  All right.  So I take that as the

13   defendant undertaking to withdraw the resolution at this time

14   of the matter that he raised as to, broadly conceived,

15   ineffective assistance of counsel, and it is withdrawn as far

16   as I'm concerned.

17        That doesn't mean it's forgotten.  And more than that,

18   it means, from my perspective, that I will be addressing the

19   question of a new trial independently, with the exception of,

20   at this point, the exception of the two tax counts.  I'm pretty

21   certain that the case will proceed with the dismissal of

22   certain of the mail fraud counts and the other tax fraud

23   counts, the original tax filing counts.

24        My understanding is, and Ms. D'Addeico is going to

25   help us on this, I don't think it makes a difference in the

1    guidelines in this case.  Perhaps it does, but I'd like you to

2    look at it from that perspective.  That is to say these counts

3    are out.  I've made clear on numerous occasions that I'm not

4    particularly enamored of the lack -- not particularly enamored

5    of the guidelines because of their lack of nuance, that they

6    overstate the significance by focusing on loss as a rule of

7    thumb.

8           But in any event, we will get from Probation tomorrow

9    a set of what the guidelines will be, and I'll assume that the

10   parties are ready to go forward with sentencing tomorrow on all

11   of those issues.  And you have an understanding of what's on my

12   mind in this case, which is, as I said, the trajectory from

13   someone who perhaps was a bit greedy and immature to someone

14   who is the chief executive officer of a major city in the

15   Commonwealth of Massachusetts, and he did not become more

16   humble.  He became more likely to commit fraud.  That's the

17   perception that I have of the case.  And you're entitled to

18   know where I'm coming from, so you'll argue with respect to

19   that.  Mr. Correia is entitled to know that.

20          One of the things that we have experienced here,

21   Mr. Hafer and Mr. Tobin, I want you to be prepared for this, is

22   the government under any circumstances I think is going to be

23   submitting a dismissal with respect to the first indictment and

24   the second indictment.  We have noticed over the more recent

25   time period that that's delayed.

1         Now, you know, because you see it as the chief of the
2    -- or did as the chief of the criminal division, my view is you
3    don't have to ask my leave.  That's a decision that you make
4    yourself, a separation of powers as far as I'm concerned means
5    that I don't approve or disapprove of it.  I simply note on the
6    record that a case has been dismissed.  And I have language
7    that I've used in a number of cases where I've been asked for
8    leave, but I want to have this done so that the judgment that
9    goes up, whatever the judgment is, is clear that those
10   indictments have been dismissed, the counts of those
11   indictments have been dismissed.  I don't know any reason they
12   shouldn't be as to Mr. Correia.  Of course, they're still
13   outstanding in the question of Ms. Andrade.
14       The way in which I'm looking at this, I think, is I
15   will obviously look very carefully at the record here.  I'm not
16   going to make any precipitative judgments with respect to it,
17   but I expect the judgment will enter tomorrow in the case.  And
18   I suspect that the defendant will ask for the opportunity to
19   self-surrender, and that will be afforded.
20       The way in which it's probably going to get teed up is
21   the question of whether or not there should be a stay of the
22   self-surrender here, and I will set a time period for the
23   parties to argue that.  Because as you have heard, I think, my
24   view is that whatever remains of this case will remain and
25   properly remain, that the only real reason for pursuing a stay

1    pending appeal is for purposes of delay and that there are no

2    grounds for believing that there will be a case that will

3    ultimately, after review by the Court of Appeals, will result

4    in a sentence that is less than the time that would be taken to

5    press this in the Court of Appeals.

6           Now, there are incentive structures in place.  All of

7    the transcript, everything has been prepared.  There's been

8    intensive discussion about this.  But I want you to be clear

9    that I've thought a great deal about this from that

10   perspective, trying to understand what is the proper way to

11   vindicate the public interest in this setting.

12          So I think I've touched on all of the issues that need

13   to be touched on.  11:00 tomorrow.  I have another matter that

14   I scheduled before that that I have to deal with, but 11:00

15   tomorrow for purposes of sentencing.

16          And as I've indicated, I have no reason to believe

17   that I will not stay -- permit self-surrender of the defendant

18   before that.  But that may not last, from my perspective,

19   throughout the pendency of the appeal, and we'll set a

20   schedule.  You ought to think about whatever schedule you want

21   to deal with.

22          I think Mr. Quinlivan, probably the oar has now become

23   firmly in his hand on this, but he's had some assistance and

24   discussion of the record here.  Anything else that we need to

25   take up at this point?

1           MR. FICK:  Briefly, Your Honor, I think it would be

2    helpful certainly to have any revision to the PSR in advance of

3    our talking tomorrow.  I think Your Honor is probably right

4    that the bottom-line guideline range does not change as driven

5    by the Hobbs Act, but I think just sort of, as a matter of sort

6    of good sentencing --

7           THE COURT:  I agree entirely.  I think if

8    Ms. D'Addeico can have it by 9:00 tomorrow, do you think?

9           U.S. PROBATION:  Yes, Your Honor.  I will disclose to

10   the Court and the parties a revised version by 9:00 a.m.

11   tomorrow.

12          THE COURT:  Okay.  So we'll deal with that and we'll

13   talk that through, too.  Because I think we understand the play

14   of the guidelines, but the counting on this drops out I think.

15          MR. FICK:  The other thing is, to the extent the

16   government is going to submit something else in support of the

17   two tax counts that are still sort of hanging in the balance,

18   we'd like to potentially be able to respond to that, too.

19          THE COURT:  Mr. Hafer, can you have that by 9:00

20   tomorrow?

21          MR. HAFER:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. FICK:  Thank you.

24          THE COURT:  So you'll have it.  But this is not going

25   to be who does get to have the last word on it, because I know

1    who does have the last word, at least at this stage.

2              MR. FICK:  I understand, Your Honor.

3              THE COURT:  We'll go through that specifically.  As I

4    said, I want everybody to have the chance to make the best

5    possible case.  All right.  We will be in recess.

6              (Recessed, 4:00 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 27th day of September, 2021.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25