UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Criminal Action |
| Plaintiff, ) | No. 18-10364-DPW |
| ) | |
| v. ) | |
| ) | |
| JASIEL F. CORREIA, II, ) | |
| ) | |
| Defendant. ) | |
| ) | |

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

SENTENCING

September 21, 2021

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Zachary R. Hafer
3    David G. Tobin
     Mark T. Quinlivan
4    United States Attorney's Office MA
     1 Courthouse Way
5    Suite 9200
     Boston, MA 02210
6    617-748-3106
     zachary.hafer@usdoj.gov
7    david.tobin@usdoj.gov

8    On Behalf of the Defendant Jasiel Correia, II:
     William Fick
9    Daniel Marx
     Fick & Marx
10   24 Federal Street
     Boston, MA 02110
11   857-321-8360
     dmarx@fickmarx.com
12   wfick@fickmarx.com

13   Kevin J. Reddington
     Law Offices of Kevin J. Reddington
14   1342 Belmont Street
     Suite 203
15   Brockton, MA 02301
     508-583-4280
16   kevinreddington@msn.com

17

18

19

20

21

22

23

24

25

```
 1                   P R O C E E D I N G S
 2     (Case called to order.)
 3             THE COURT:  Well, I've received a revised Presentence
 4     Report.  We'll talk about that as we go along here, but I want
 5     to get to the bottom of the potential for the acquittals on
 6     certain of the counts.
 7             The way I understand it, but I want to be sure that
 8     the parties understand it the same way, is that I have received
 9     from the government and it's docketed as number 304 this
10     morning a memorandum regarding Counts L and M.  There's no
11     further memoranda with respect to what I'll call the Vieira tax
12     return matters.  Okay.  So those counts, there will be an
13     acquittal on.
14             Now, with respect to Counts L and M, I will want to
15     hear from the defendant as well.  With respect to the mail
16     fraud, I haven't received anything, so I assume that the
17     government's position is you stand and fall on the issue of the
18     stipulation here, that there's nothing else that is going to be
19     asserted as a grounds for opposing acquittal.  Is that
20     Mr. Quinlivan or --
21             MR. HAFER:  The stipulation, the information in
22     Exhibit 65 that we discussed yesterday --
23             THE COURT:  Just -- I'm sorry.
24             MR. HAFER:  I'm sorry.  The stipulation, obviously our
25     view is the stipulation satisfied our burden of proof.  In
```

1    addition, when you expressed your view that it did not, we

2    pointed to the information in Exhibit 65 and any reasonable and

3    logical inferences drawn therefrom, so that's our position.

4          THE COURT:  I'm not sure I understand what you're

5    saying now.  I invited the opportunity to point me to

6    particular matters that we discussed.

7          MR. HAFER:  The ones we did yesterday.  I'm talking

8    about the back and forth you and I had yesterday regarding the

9    East Providence, Rhode Island electronic thing that you deemed

10   too little too late.  I'm saying our position is --

11        THE COURT:  All right.  So it's that you've got a

12   stipulation and you submitted this package of materials that

13   are supposed to be self-evident.

14        MR. HAFER:  Correct.

15        THE COURT:  Okay.  So the acquittals with respect to

16   certain of the counts under the wire fraud denomination will

17   stand as well.  So let's turn then to Counts L and M here.  And

18   Mr. Marx, are you going to be speaking to this?

19        MR. MARX:  Yes, Your Honor.  Good morning.

20        THE COURT:  Okay.  So, Mr. Tobin I guess filed this,

21   but the filings with respect to this turn on Mr. Charest's

22   testimony here and as well on the fact that the defendant

23   denied partnership before the filing of the corrected returns.

24        I know you've made arguments about the reliance by the

25   government on the debate that the defendant engaged in and its

1     relevance here.  It seems to be highly relevant.  So why isn't

2     this sufficient on both Snokimo and on SnoOwl?

3                MR. MARX:  Thank you, Your Honor.  Let me start with

4     Snokimo, which was the loose end we left from yesterday.

5                THE COURT:  Right.

6                MR. MARX:  In our view the evidence with regard to

7     Snokimo is similar to but even weaker than the evidence with

8     regard to SnoOwl and the testimony about the exchanges between

9     Mr. Correia and Stacia Vieira.

10               The Court has already indicated that those

11    interactions were insufficient to establish that he willfully

12    violated any known legal duty.  The evidence from Terry Charest

13    is that in connection with preparing the amended '13 and '14

14    returns, which was done in 2017, Mr. Correia never mentioned

15    Snokimo and didn't provide any documents about that entity, a

16    web development company that's somehow related to SnoOwl.

17    That's the sum total of his testimony with regard to Snokimo.

18               Now, you'll recall from the discussion we had

19    yesterday and because we've all studied the testimony, the

20    evidence from Stacia Vieira was at the least she provided

21    Mr. Correia with a form that listed all of these categories of

22    income, things like business income, and asked him if after he

23    provided his W-2s, "Do you have anything else," in a general

24    sense.  There was no such interaction --

25               THE COURT:  But let's understand the timing here.  The

```
 1    interaction with Ms. Vieira is at a relatively early stage in
 2    his --
 3            MR. MARX:  2015, I believe, yeah.
 4            THE COURT:  -- relatively early stage in his efforts
 5    to comply with the tax law.  Now we get to Mr. Charest, and
 6    we're talking about a more sophisticated individual who at the
 7    time held a position of public trust.  And so they are not the
 8    same grounds.  They reflect someone as to whom a greater
 9    sophistication with respect to matters, particularly when there
10    have been called in by his partners the need to regularize the
11    tax returns, not only his own but for the entity itself.  So I
12    don't think we can say that they're the same, he's the same
13    person.  I mean, you don't have to be Heraclides to say that
14    you never step into the same river twice.
15            MR. MARX:  Absolutely, Your Honor.  Two things you've
16    identified as possible differences between Mr. Correia in 2015
17    when he meets with Vieira and in 2017 when he does his amended
18    returns with Terry Charest.
19            The first thing you mentioned was now he's in public
20    office.  He's now the mayor.  That's a position of public
21    trust.  I obviously would never disagree with that, but I don't
22    think that bears on his knowledge of tax law or his own
23    obligations in terms of his personal tax returns.
24            THE COURT:  Why doesn't it alert him to the need to
25    respond fully and honestly to inquiries that are made?
```

1          MR. MARX:  Well, I think it may.  But my point before

2     was there was no inquiry made by Terry Charest -- there's no

3     testimony that they ever had a discussion, even a minimal one

4     like the one Stacia Vieira had.

5          But let me go to what I think is the bigger question

6     Your Honor is posing, which is what about all this work that

7     gets done in 2016?  It all happens between the 2015 charges and

8     2017 charges.  And I think the important thing about the

9     evidence, and I went back and I've read this a few times since

10    yesterday and looked at the documents that came in through

11    Terry Charest, and I think it's important, the government is

12    conflating two different things in its efforts to save the

13    convictions on Counts L and M.

14         One is the agreed-upon procedures project which starts

15    and finishes in 2016.  It starts in May.  There's an engagement

16    letter.  It is document Exhibit 102.  It outlines and

17    specifically says this is not an audit, but we're going to

18    conduct --

19         THE COURT:  Let me pull it out as you're referring to

20    it.

21         MR. MARX:  Absolutely.  It's Exhibit 102.

22         THE COURT:  Yeah.

23         MR. MARX:  So in May of 2016, Chris Carreiro on behalf

24    of SnoOwl engages Terry Charest and his CPA firm to do an

25    agreed-upon procedures project for SnoOwl.  This is not a tax

1  preparation engagement.

2       The project here is to go through the books and

3  records at the request of some people involved in the company

4  and to regularize them, to make sure that everything is

5  accurate, to make sure things are properly classified in the

6  correct accounts as either business or personal expenses.

7       Now, there's no evidence from Terry Charest that this

8  engagement, the 2016 engagement, which by the way is finished,

9  the testimony is, by October or November of that same year, is

10  related to the tax preparation engagement that he enters in May

11  of 2017, almost a year later.

12       THE COURT:  Isn't this evidence of his knowledge?

13       MR. MARX:  Absolutely not, Your Honor.  And here is

14  why.  The whole purpose of that project and the only evidence

15  about it is that what Terry Charest does is he creates a

16  document.  He first calls it an exchange account.  He later

17  changes the title of that account to Due From Jasiel.  And the

18  purpose of that, Your Honor, is to identify expenses that were

19  not properly classified as business expenses for which Jasiel

20  may have to reimburse the company or the company would have to

21  enter into some agreement with him to designate those as a loan

22  that he'll repay over time.

23       Critical, Your Honor, and this is the most important

24  fact, is there's never a discussion and there isn't a word of

25  testimony in this case that anyone says, Terry Charest or

1    anyone else, says to Jasiel Correia, "This Due From Jasiel

2    account, if you don't pay that amount at the bottom, that's

3    imputed income to you that needs to be reported on your

4    personal tax returns."

5           The entire project is an internal SnoOwl project to

6    properly designate for its books and records how money was

7    spent and what money Jasiel may have to repay.  Terry Charest

8    does not say a word about ever advising Jasiel that any of this

9    has any implications for his personal tax returns, and in fact

10   he says specifically that, when asked, this was on

11   cross-examination by Attorney Reddington, he says, "Do you

12   remember having a conversation with Jasiel basically where you

13   were advising him that, for example, if he were to a take the

14   debit card and purchase a diamond ring or clothing or dinners

15   or entertainment or a hotel and it's not related to that

16   business," in other words, it ends up in that Due From Jasiel

17   account, "that it's income to him."

18          And Mr. Charest responds, "It doesn't become

19   deductible, so it reflects as income to him, correct," of

20   course not answering Attorney Reddington's question.  So he

21   follows up.  "Right.  And you told him that, right?  You told

22   him that it's income?"  And Terry Charest answers, "I don't

23   know that I ever had that conversation."

24          So, Your Honor, we have two separate engagements by

25   Terry Charest, a 2016 agreed-upon procedure, which is expressly

1    not a tax preparation engagement, and a 2017, and this is

2    Exhibit 113, tax engagement to do Jasiel Correia's personal tax

3    returns.  There's no testimony about the relationship between

4    those two things, and there's explicit testimony in which Mr.

5    Charest denies that he ever explained to Mr. Correia, "If you

6    spent company money and it's due back to the company from you

7    and you don't pay it back, that's income you need to report in

8    your personal tax returns."  No testimony.  None cited in the

9    opposition, and even in the supplemental brief filed this

10   morning, no testimony on that point.

11        THE COURT:  Okay.  Let's just pause on that.  Is there

12   any disagreement about that, Mr. Tobin, that particular state

13   of the record?

14        MR. TOBIN:  The record speaks for itself.

15        THE COURT:  It does.  I'd like you to recite what you

16   understand the record to say.  I've been asking throughout for

17   identification of transcript, so a response that says "The

18   record speaks for itself" is frankly an inquiry of me looking

19   at the record and saying "Speak."

20        MR. TOBIN:  You're right, Your Honor.  I do apologize.

21   That's not an appropriate thing to say.  I respectfully --

22        THE COURT:  Is there testimony in here that there was

23   such a conversation in which Mr. Charest said, "I had a

24   specific discussion with Mr. Correia concerning whether or not

25   the business expenses were imputed income to him," yes or no?

1        MR. TOBIN:  No, I don't recall reading that.

2        THE COURT:  In fact, he said he didn't, right?

3        MR. TOBIN:  That's what my brother just read and that

4   comports with my recollection of having read it.

5        THE COURT:  Thank you.  So you can proceed further.

6   This now turns us to the 2014 return.

7        MR. MARX:  I'm sorry, I didn't follow the --

8        THE COURT:  Now we go to the 2014 amended return that

9   I called out with respect to Snokimo.

10       MR MARX:  Thank you, Your Honor.  So on that point,

11  again, to pick up where I left off a minute ago, the only

12  evidence about Snokimo from Terry Charest is that Mr. Correia

13  didn't say anything about it.  So in that sense it's similar

14  about the earlier returns.

15       And we just established there's no evidence one way or

16  the other about imputed income and how that works with respect

17  to an entity that may receive payments or generate revenues to

18  Mr. Correia.  There's no evidence at all that Mr. Correia

19  understood the admittedly confusing corporate form question,

20  which apparently confounded even lawyers and accountants who

21  looked at SnoOwl and Snokimo, that he understood the difference

22  between a sole proprietorship and a corporation.

23       THE COURT:  Apparently he did.  He announced that his

24  opponents in that debate didn't know enough about how business

25  is run to know that he had partners.  This is not someone

1    saying, "Gee, I don't know what a partner is," that kind of

2    thing.  He made that statement.  Now, that suggests a knowledge

3    with respect to significance for purposes of corporate

4    entities.

5         MR. MARX:  Yes, Your Honor.  But I think it suggests a

6    highly generalized level of knowledge.  When someone says, "I

7    have partners who I started a company with," and even Terry

8    Charest was confused and misidentified SnoOwl as a sole

9    proprietorship initially even though it was opened as a --

10        THE COURT:  Right, but now I'm focusing, as I said --

11        MR. MARX:  Just on Snokimo.

12        THE COURT:  Right.

13        MR. MARX:  There's no testimony.  When he makes the

14   partner comment in the mayoral debate, he's not talking about

15   Snokimo.  The question is, What is Snokimo?  No one knows

16   entirely.  The only testimony about that is that it's related

17   to SnoOwl somehow and there's a Citizens Bank associated with

18   it that indicates it's a sole proprietorship.

19        What the difference is between that and a partnership

20   or an LLC to Mr. Correia, there's no testimony about that.

21   There is testimony, and I direct Your Honor to the record, this

22   is at volume 7, pages 122 to 124, where the government asks Mr.

23   Charest about the tax differences between partnerships and

24   proprietorships, and he testifies at some length that there are

25   important tax implications.

1          But what he doesn't say and what he never says and
2     what no witness ever says is that anyone explained any of this
3     to Mr. Correia or told Mr. Correia that if you're getting
4     money -- put SnoOwl aside, not money that's flowing into a
5     partnership but money that's flowing into something we're going
6     to decide was a sole proprietorship that that's income to you
7     that you need to declare on your personal tax returns.
8     Everything about that testimony --
9          THE COURT:  So we look at 124, and the question is, at
10    that first meeting, in addition to telling you he had no
11    partners, something he didn't tell --
12          MR. MARX:  About SnoOwl.
13          THE COURT:  Right, but he had no partners, generally.
14    He is saying, "I have no partners."  At the debate he announces
15    that he has partners.  That's a major difference and indicates
16    some knowledge of the significance of partnership.
17          So he says, "What did he say to you about your
18    requests for other documentation so you could move forward with
19    the agreed-upon procedures?"  He says, "He told me he had a
20    gentleman that was in charge of all of that and he didn't know
21    where it was, and he said he didn't think there was anything
22    that he could find that would be helpful to me."  And he's
23    asked to look at Exhibit 105.
24          MR. MARX:  I'm sorry, Your Honor.  I misdirected you
25    on the prior page.

1          THE COURT:  No.  I'm directing you.

2          MR. MARX:  I'm sorry.

3          THE COURT:  It doesn't end at 123.

4          MR. MARX:  Correct.  I said "124" when I meant this

5     discussion starting at 123.

6          THE COURT:  Right, and now we're on 124.

7          MR. MARX:  Yes.

8          THE COURT:  And what it says, this is Mr. Charest,

9     "What we did is I indicated to him that I needed his assistance

10    in identifying the business activity from the personal, so I

11    told him that I would print out the activity from each of the

12    accounts that we were capturing, the activity, and that he, I

13    kind of gave him instructions that we would probably focus on

14    business, the business activity, if he would identify the

15    business activity by maybe highlighting it and indicating what

16    it was for so that I could -- it would help us to put the

17    proper account on the profit and loss statement," and he then

18    refers to again to Exhibit 105, which is the transactions with

19    respect to SnoOwl.

20          Then he goes on to be directed to the additional 105

21    materials, and in response to Mr. Hafer's question, he says,

22    "And he ended up, I'm assuming, passing it on to Jasiel for his

23    input on what the business expenses were.  This is that it was

24    given to Chris Correia.  And so much of that writing,

25    handwriting is, some of that handwriting is Jasiel.  I got it

1    back and there were highlighted transactions but no

2    descriptions next to them, so I ended up having to go back, and

3    we ended up having a meeting with Jasiel and trying to fill in

4    the blanks on what had been -- what had been overlooked as far

5    as the descriptions were concerned."

6           That is a fairly substantial discussion with respect

7    to Mr. Correia about the significance of partnership as opposed

8    to another form of entity and the responsibility to report

9    about it.

10          Now, is it a statement that I told him directly?  No.

11   The question is is it enough for a jury to look at this and

12   say, at least with respect to Snokimo, that the amended return

13   was inaccurate.

14          MR. MARX:  Respectfully, Your Honor --

15          THE COURT:  Knowingly inaccurate on the part of Mr.

16   Correia.

17          MR. MARX:  Respectfully, Your Honor, I don't think

18   that comes close to a willful violation of the federal tax law.

19   An extensive discussion in the context of an agreed-upon

20   procedures engagement about how to properly account for

21   expenses, and Your Honor just recited, for the purposes of the

22   profit and loss statement of SnoOwl, shows that Mr. Correia

23   understands or had any reason to know or anyone ever told him

24   that if a sole proprietorship that he's running to do web

25   development receives a 6,000-dollar check or checks totaling

1   $6,000, that's income to him.  That's what the SnoOwl charges

2   are --

3          THE COURT:  What was the thousand dollars that he put

4   on the return originally?

5          MR. MARX:  Candidly, Your Honor, I don't know.  And no

6   one knows because there's no testimony about it.

7          THE COURT:  Okay.  So he has some idea that he has

8   some income of some sort, right?

9          MR. MARX:  Well, one could infer from that document

10  that in 2013 he understood as of February he had some

11  self-employment income from some source that's not identified.

12  He's not charged with any tax violation in connection --

13         THE COURT:  No.  We're talking about inferences to be

14  drawn from various aspects of the evidence in the case.  That's

15  really what I'm looking at.  And the question is what am I

16  supposed to draw from the thousand dollars that at least he

17  knows enough to know that he's got independent income of some

18  sort?

19         MR MARX:  But not from a corporate entity that he may

20  have imputed personal income from.  I don't think you can infer

21  from the simple words "self-employment" on an otherwise

22  completely unexplicated document that he understands for

23  federal tax reporting purposes a business entity that receives

24  money means he has to report on his personal taxes that he made

25  income, even if that money never went to him.

1            And that's possibly even the more important issue

2     about Snokimo and the easier way to dispose of those counts, is

3     that there's no -- the only testimony is that a jeweler in Fall

4     River paid money to Snokimo as an entity related to SnoOwl to

5     do web development.

6            Mr. Correia is not a web developer.  He doesn't do

7     that work.  Someone else gets paid for that work.  There's

8     revenue to an entity that possibly was a sole proprietorship of

9     his.  There's no testimony, Your Honor, that that company ever

10    generated any profits, that any money flowed to him, that, like

11    with SnoOwl, he misused any of that $6,000 or used it for

12    personal expenses.

13           The only testimony is that there's this entity that

14    provided services.  It presumably had costs.  It may have

15    operated at a loss.  We don't know any of the answers to any of

16    these questions.  And at the end of the day, he didn't report

17    that he had personal income in connection with that entity.

18           We don't know that he even did have income.  There's

19    no evidence that he did, unlike in the SnoOwl context where at

20    least there was evidence that he misspent corporate money which

21    could be fairly imputed to him if he understood those rules.

22           With Snokimo, all we know is some entity received

23    checks for $6,000.  Not that they went to him, not that he

24    misused those funds and not that he had any understanding that,

25    depending on the corporate form of that entity, he'd be

1    obligated to report the taxes.  No one explained that to him.

2    He may be getting more sophisticated over time.  He's getting

3    more mature.  He's in increasing important positions in public

4    life, but this is a federal tax fraud charge.

5              THE COURT:  No.  I'm somewhat familiar with that.

6              MR. MARX:  Thank you.

7              THE COURT:  So unless you have something more that you

8    want to say, Mr. Tobin, I'll go back and look at the materials

9    one more time here.  It's very close.  And as indicated in the

10   Presentence Report, it makes no difference in terms of the

11   guidelines here.  But if there's something more that you want

12   to say to draw my attention to, but I want specific evidence,

13   not things that speak for themselves but I can't hear them.

14             MR. TOBIN:  Well, Your Honor, again, the specific

15   evidence is, as the Court has pointed out, during the testimony

16   of Mr. Charest at pages 7-122, he specifically made it clear he

17   asked the defendant, "Do you have partners?"  The defendant

18   says "No."  That is a willful and intentional misstatement that

19   has material effects on the tax return.  So I'll leave it at

20   that point.

21             THE COURT:  Okay.  So unless there's something more,

22   my intention is to look at this one final time, but I'm going

23   to move on.

24             MR. TOBIN:  No, no, I understand, and you've been very

25   patient, and I do thank you for that.  Again, if we can go back

1    just for one moment, and I'm sure the Court understands our

2    position, but with regard to the business versus SnoOwl --

3    personal versus business expenses, my brother keeps saying that

4    was during the agreed-upon procedures.

5         I mean, the reality here is his certified public

6    accountant with 40 years of experience or thereabouts or at

7    least a significant amount of experience spoke with the

8    defendant and said, "You must tell me what is business, what is

9    personal."  As he testified, Mr. Charest did, he relied upon

10   those representations when determining what business expenses

11   to take.  And quite candidly, the defendant's

12   misrepresentations caused a material problem with the tax

13   returns.  To suggest, well, that was, he asked him at a

14   different time --

15        THE COURT:  Well, see, the issue is not whether there

16   was a material misrepresentation.  It appears that there was,

17   that the tax return was wrong, it appears that there was.

18        The question is what did he know in subscribing.  And

19   that requires a specific intent that has to be founded on some

20   knowledge that is quite specific on those issues, and that's

21   what I've been focusing on here.

22        MR. TOBIN:  I understand that.

23        THE COURT:  Not that it's a bad tax return.  It is.

24        MR. TOBIN:  No, no.  I understand.  I will look, but I

25   do not think I'm going to find anywhere where his certified

1    public accountant said to him, "By the way, if you lie to me

2    and tell me that something is a business expense and it is not,

3    then you are committing tax fraud."  I don't think, with all

4    due respect, it has to be that specific.

5         THE COURT:  Well, but it has to be somewhat specific

6    with respect to that.

7         MR. TOBIN:  Okay.

8         THE COURT:  So I take your point, but I'm not sure

9    there's much more.

10        MR. MARX:  Your Honor, if I could just try your

11   patience for one more minute, because I realize I didn't

12   directly respond to the question about partnership, which

13   Attorney Tobin just raised.

14        I think it's the third and the least compelling of the

15   issues around the alleged misstatements in the amended tax

16   returns.  But here is where we land on this.  There's testimony

17   from Terry Charest that Mr. Correia told him "I don't have any

18   partners" in 2017.

19        Now, in 2017, he's the mayor.  The original partners

20   who started SnoOwl with him who were legally partners, Chris

21   Parayno and Chris Mello, are long gone and uninvolved in the

22   business.  He doesn't have them as partners anymore, so he

23   doesn't believe they're in the business.

24        Now, as a layperson, if you start an entity with a

25   couple of other people and you go to Citizens Bank and you open

1   up an account as a partnership and you enter a partnership

2   agreement and then those two people ride off into the sunset

3   because the company has never done anything or made any money,

4   and years later they're gone and you say to yourself, "I don't

5   have partners anymore," I don't think there's a knowing

6   misrepresentation about federal tax implications.

7          THE COURT:  Did he say that in the debate?

8          MR. MARX:  So in the debate --

9          THE COURT:  No.  In the debate, he didn't say, "I

10   don't have any partners."

11          MR. MARX:  No, but he's not talking about legal

12   partners.  He's talking about his investors.

13          THE COURT:  Okay.  So now we're into this process of

14   what is it that he knew under the circumstances and how can a

15   jury evaluate it.  Is it enough to permit him to be held

16   culpable on this count?

17          So that's where it is.  You say when he says

18   "partners," he means investors.  He's apparently his own

19   lexicographer for purposes of whatever context he's putting

20   things in?

21          MR. MARX:  No.  I think in context, Your Honor, he's

22   telling -- according to the prosecution, and if you just listen

23   to the words that are spoken, he's saying to the people, "You

24   can trust me, just like the people who trusted me and put faith

25   in me with regard to this company."

1          He's not talking in legal terms about people who

2    signed a partnership agreement.  He's talking about generally.

3    So whether that has a tax implication and whether he

4    understands, David Cabeceiras is not a partner for tax

5    purposes.  He may be a partner in the venture in the colloquial

6    sense, but he's not a partner for tax purposes.

7          THE COURT:  But that's not the allegation here.

8          MR. MARX:  Right.  The allegation is did he understand

9    that he still had partners.  And by the way, Terry Charest, he

10   had 40 years as a CPA.  The documents he had in his possession,

11   the Citizens Bank documents, the EIN, they said "Partnership."

12         So he's the tax expert, yet he never follows up.  He

13   apparently relies on the statement, "No, I don't have

14   partners," without explaining to him, "Well, hold on a second

15   here.  The bank accounts are opened as a partnership.  There's

16   a partnership agreement.  So are you sure?  Because there's a

17   difference between it being a legal partnership and you working

18   with these guys."

19         THE COURT:  And they submit it as a partnership.

20         MR. MARX:  Right.  But there's no discussion about

21   this with Terry Charest in 2017 about what happened in 2013.

22   That's our point, Your Honor.

23         I think to the extent there's confusion around that or

24   maybe inconsistent statements about the word "partners," I

25   don't think any of that shows anything sufficient to satisfy

1  the *Cheek* standard that Mr. Correia was willfully

2  misrepresenting a partnership or proprietorship for the purpose

3  of evading taxes.

4         And in fact, Terry Charest testified that it was never

5  his impression that Jasiel Correia came to him with the intent

6  to evade taxes.  But I think Your Honor has heard the argument.

7  Thank you, Your Honor.

8         THE COURT:  All right.  So I'm going to look at this

9  more carefully further.  As I indicated, it doesn't make a

10 difference for purposes of the guidelines.  It is evidence that

11 I would have permitted in some form regarding the development

12 of the defendant's scienter that ultimately reached fruition in

13 the Hobbs Act counts.

14         So now I do want to deal with one other open question.

15 I have not, maybe it's called taking the bait with respect to

16 matters as to which there was no evidence provided, except

17 assertions in memoranda about continued misrepresentations on

18 the part of the defendant.

19         The defendant's memorandum said that there were

20 ill-considered statements made immediately after the trial.  My

21 view, which I think the parties should be familiar with but

22 I'll restate it because it's going to pop up in connection with

23 the guidelines discussion, is that I'm highly skeptical of the

24 idea that someone gets a discount for acceptance of

25 responsibility because it is frequently a proxy for not going

1  to trial.  And the obligations are on the part of the

2  government to prove the case.  The defendant doesn't have to do

3  anything at all.  On the other hand, when the defendant does

4  something, it is something that I need to think about.

5          So it's been brought to my attention that the

6  defendant repeated that there was no plea offered here.  I

7  don't want to know about the plea, whether someone is engaged

8  in a plea or not.  But the people who are here know the answer

9  to that, and it's not going to drop in a footnote.  And because

10  it's been repeated and not just the motion after a trial, at

11  least I understand it to have been repeated, I want to

12  understand from the government's position was there ever a plea

13  offer made to the defendant?

14          MR. HAFER:  No, Your Honor.

15          THE COURT:  Okay.  Mr. Reddington, was there ever a

16  plea offer made to the defendant?

17          MR. REDDINGTON:  No, Your Honor.

18          THE COURT:  All right.  So I don't know how you want

19  to deal with that issue, Mr. Fick, but it's now in the record

20  here from the percipient witnesses on this issue, and it is

21  relevant, as far as I'm concerned, to the question of

22  sentencing.

23          MR FICK:  So Your Honor, might we take a short break

24  to discuss this issue since the importance the Court is

25  attaching to it was not previously sort of --

1     THE COURT:  To the contrary.  It was back and forth in

2   a series of footnotes between the parties.  Now, the parties I

3   understand like to back away from footnotes, that they think

4   they can throw that kind of stuff into the record and then say,

5   "Well, never mind."  Maybe that happens the first time.  It

6   doesn't happen again.

7     So this is an issue that was brought to the attention

8   of the Court as to which there was a dispute of fact that I

9   didn't think was worth pursuing because I share the view that

10  immediately after an adverse decision people say foolish

11  things.  But "ill-advised" I guess was the term that was used

12  in the defendant's memorandum, but apparently -- I say

13  "apparently" because it comes only from news reports -- this

14  was repeated yesterday.

15    MR FICK:  So forgive the preamble.  We'd like a chance

16  to talk to our client very briefly, if we may, Your Honor.

17    THE COURT:  Sure.  We'll take five minutes or so.  But

18  let me outline where I want to go with this.  I want there to

19  be no misunderstanding on the part of the defendant and the

20  parties generally that I have an independent obligation, having

21  dealt with a motion for judgment of acquittal, independently,

22  irrespective of whether the parties have raised it to deal with

23  the question of new trial.  Is there any question about that?

24    MR FICK:  That the Court has the power and obligation

25  to do that?

1          THE COURT:  Yes.

2          MR FICK:  We would agree with that.

3          THE COURT:  You don't --

4          MR FICK:  We would agree with that.

5          THE COURT:  Yes, okay.  And that's something that I

6     will be undertaking to do in thinking about it, even given the

7     11th hour withdrawal of the motion to -- I'll call it

8     withdrawal without characterizing it as forfeiture or waiver --

9     of the contention with respect to new trial.  Okay?

10         So we'll take whatever response you have.  If it has

11    to be testamentary, I asked it orally of the two people who

12    presumably would know the answer to that question, and I will

13    take evidence on it.  I'll make a judgment with respect to

14    that, and it will be part of the record in the case that I'll

15    be relying on for purposes of sentencing here.

16         So after we do that, one further point, is there any

17    dispute about the guidelines?  Because I want to get that

18    straightened away.

19         MR FICK:  We have no objection to the revised

20    guideline sentencing range calculation.  I think there's some

21    open questions about forfeiture and restitution we'll discuss.

22         THE COURT:  Right, right.  That has to go to the

23    question of financial obligations here that the defendant would

24    have, and that can't really be resolved until I finally resolve

25    the acquittal issues because part of it is tax acquittal, too.

 1    And I haven't done that.  But we'll get as far as we can get on

 2    this.

 3          MR. HAFER:  Just for the record, we, too, have no

 4    objection to the revised guideline calculation --

 5          THE COURT:  Right.

 6          MR. HAFER: -- we have no objection.

 7          THE COURT:  Right.  So that it's clear that

 8    irrespective of what happens to the tax cases or tax counts or

 9    even the mail fraud counts, it doesn't make any difference in

10    terms of the guidelines, which is a commentary on the

11    guidelines and its kind of Rube Goldberg quality in reaching a

12    characterization.

13          MR FICK:  Just to be clear, the bottom line didn't

14    change, but the subpart for the group involving the wire fraud

15    counts did.

16          THE COURT:  Right.  But grouping, as we both know,

17    under this set of guidelines means that the less significant

18    guidelines drop out of consideration, almost like no harm no

19    foul for purposes of the guidelines.

20          Now, I want to emphasize, as I have all along, that

21    that is yet another reason why I find the guidelines to be not

22    very helpful on this, because they don't properly group

23    culpability and how you deal with culpability, which is a much

24    more nuanced kind of evaluation.

25          I may end up in the same place, but I want it to be

1   clear what we're dealing with here.  I have initial

2   responsibility to decide the guidelines properly.  I'll do

3   that.  Doesn't sound like there's a dispute about that.  And

4   then we'll go to what that means in terms of calculation.

5   Okay?

6          So I'll hear what you have to say.  Then we'll

7   probably take a break, and then we'll go into sentencing,

8   understanding that there are open issues before the judgment

9   has to be entered.  Okay?

10          MR FICK:  Thank you, Your Honor.

11          (Recess taken 11:48 a.m. - 12:19 p.m.)

12          THE COURT:  So what's the defendant's view with

13   respect to the outstanding issue here?

14          MR FICK:  A couple of things, Your Honor.  First, if I

15   heard Your Honor correctly, I think Your Honor might have been

16   under the misimpression that the plea deal statement was made

17   more than once, other than the day of the verdict.

18          To be clear, Mr. Correia did not speak to any press

19   yesterday.  There was a Globe article this morning that I think

20   repeated some of the prior comments and may have, like, not

21   been clear as to when they were made, but I think that --

22          THE COURT:  Well, I guess I have to say that I've been

23   informed that there was a video recording of the conversation.

24   Whether that's true or not, I don't know.  But we get press

25   clippings as a matter of the Court library, and that was

1    referenced in it.

2         MR FICK:  Is Your Honor referring to the day of the

3    verdict or yesterday?

4         THE COURT:  Yesterday.

5         MR FICK:  Mr. Correia, as I think the press can

6    confirm here, did not speak to the press yesterday.  Any video

7    clip would have been from the day of the verdict, is my

8    understanding.

9         THE COURT:  Okay.  Well, I don't want to trench into

10   journalistic privilege here.  And so if there are members of

11   the press who will say he did not make such statements and are

12   in a position to say so, I'll listen to them, but I'm not

13   compelling them to do that at this point.  And it may be that

14   we'll have to go back and look at the state of the record as

15   reported to me.  But as reported to me, it is problematic and

16   it is from yesterday.

17        MR FICK:  I will just say that yesterday a lot of old

18   footage and old writing got regurgitated in various forms.  And

19   certainly I'm not aware of him making any statements yesterday.

20   I have plenty of reason to believe he did not, but we would

21   certainly also want to look at the record if there's something

22   to be discussed there.  That's sort of the first observation.

23        THE COURT:  Okay.

24        MR FICK:  In terms of the statement on the day of the

25   verdict, without sort of going -- I want to be very careful

1    about issues of privilege, but I think our understanding is

2    this:  that during the course of pretrial proceedings, between

3    then attorney and client, there were conversations, as would

4    always take place where counsel would say something to the

5    effect of, "It's my obligation to tell you this is how the

6    sentencing guidelines work.  In the case of a trial, you're

7    looking at this.  In the case of a plea, you're looking at

8    this," that sort of thing.

9          On the day of the verdict, Mr. Correia said something

10   to the effect of, "I wouldn't take a plea deal."  That was not,

11   I don't think, meant to suggest that there was a written formal

12   offer on paper the way we usually see in the court between the

13   government and the defense.  It was again a sort of colloquial

14   statement about "I wouldn't take a plea," what I understood to

15   be on the table in the event of a plea.

16         It doesn't change the fact that I think any comment on

17   that day, as we said in our memorandum, was ill-advised.  We

18   would always advise our client to remain silent.  We were not

19   counsel at that point.  He spoke on that day.  That's

20   unfortunate.  He has to live with that.

21         MR. REDDINGTON:  I told him --

22         MR. FICK:  I don't mean to suggest otherwise.  I'm

23   sorry.  So, you know, speaking on that day was a mistake, poor

24   judgment, ill-advised, whatever you want to use, against

25   advice, fine.  But it is not our understanding that Mr. Correia

1    has ever repeated that comment about the plea deal, certainly

2    not yesterday.  And if the record reflects otherwise, we want

3    to look at that and have a chance to look at that --

4         THE COURT:  Okay.  So I may have been misinformed.

5    That's why I raise it, to deal with it.  I'll deal with this in

6    two parts.  The first part is that comments made at the time

7    immediately after the verdict are not matters that I would

8    include in my evaluation here, advised or ill-advised, and I

9    have representations from counsel that they were not advised

10   here, that there was no plea agreement discussed in this case.

11        Now, if that's going to be in dispute and there's

12   going to be some factfinding on that, and it sounds to me like

13   there's a suggestion that it might be, once the withdrawn

14   suggestion that ineffective assistance of counsel is reasserted

15   again at a later point if that's what the defendant undertakes

16   to do, but I put that to one side.  It's not going to be part

17   of the evaluation as to the day of the sentencing.

18        The question of whether it took place yesterday, I

19   don't know how to proceed with respect to it.  I don't know

20   whether the government wishes to press the issue here or not.

21   And I'll consider it, if they do.  You do of course have press

22   relationships that make it possible for you to have access to

23   materials that are in the public record.

24        MR. HAFER:  I'm not aware of any statements that he

25   made yesterday.  I'm happy to represent that to the Court.

1          THE COURT:  Okay.  After inquiry?

2          MR. HAFER:  Yes, Your Honor.

3          THE COURT:  All right.  So I'll treat it as not part

4  of the record in the case here, so it won't be considered here.

5  I mean, I say, "It won't be," as if it actually took place, and

6  there's no evidence that it did here and no party who is

7  prepared to pursue it.

8          So let's then turn to the remaining issues as to which

9  I would like some clarification over the time period that we're

10 going to take before we go into sentencing.

11         I have had handed up to me a form of the dismissal of

12 the indictment, the first superseding indictment, which is the

13 way in which we try to bring a case to conclusion.  It is

14 customarily presented, when it is presented, as a motion for

15 leave to file or leave to file granted, that sort of thing on

16 it.

17         I have spoken at length about my view that there are

18 separation-of-powers reasons why I don't take any position

19 regarding the leave to file.  If the government does it, the

20 government does it.  That's their choice.  So I will be

21 allowing that, and I'll indicate the language that I use.  It's

22 allowed to the degree necessary and appropriate for the Court's

23 action, subject to the reservations expressed by me in *United*

24 *States v. Henderson,* 951 Fed. Supp. 3d, 228 D. Mass. 2013.

25         That was a case involving a customs and border

1    enforcement individual who was prosecuted and then the

2    prosecution was ultimately dropped for having a cleaning lady

3    who was not properly documented in this country.  So that will

4    be the way in which I'll deal with that issue.

5           Now, while we have the question of acquittal as to the

6    remaining Counts L and M still open, I have not resolved that

7    yet, but I will in the next day or so.

8           I have the order of forfeiture that is submitted here,

9    and it's I think going to be inflected by the acquittals in

10   this case, and the monies for any of the counts that are

11   subject to acquittal I think don't get included in that.  I'm

12   going to have the person I look to to tell me about forfeiture

13   issues.

14          MS. HEAD:  Sure, I'm happy to, Your Honor.  So we

15   don't believe that actually the acquittals would affect the

16   forfeiture requested.  Sorry, I'll remove my mask.  And that's

17   when the tax charges aren't factored into the forfeiture order.

18   And the second part is because all the acquittal counts are

19   part of the charge of a scheme to defraud.

20          And the First Circuit has been very clear, and I'd

21   refer Your Honor to their decision in *United States v. Cox*,

22   which is 851 F.3d 113.  It's a 2017 decision.  And I have extra

23   copies if you'd like.

24          THE COURT:  Yes, if you could pass it up.

25          MS. HEAD:  And I tabbed the page for Your Honor where

1     the forfeiture discussion begins.

2              THE COURT:  Any help I can get.

3              MS. HEAD:  So I can, if Your Honor --

4              THE COURT:  Let me just read it before I respond or

5     you go on.

6              Okay.  So treating this in the way in which it's done

7     in *Cox* appears to indicate that the scheme there at 1344,

8     scheme, comprehends all of the proceeds.

9              MS. HEAD:  Right.  And specifically, in the *Cox*

10    decision, the First Circuit joined the other circuits that had

11    held that uncharged conduct and even acquitted conduct would be

12    considered in conjunction with the forfeiture.  So that's why

13    it's our position that the dollar amount for forfeiture that

14    the government has requested wouldn't change here.

15             THE COURT:  Okay.  And that includes the acquitted

16    conduct in this case?

17             MS. HEAD:  Yes.

18             THE COURT:  So Mr. Fick, you understand what the claim

19    is.  Now, let me just be clear about this, or as clear as I can

20    be, which is that my view was that there would be a pro tanto

21    reallocation for purposes of fine of things that were not

22    forfeited under the acquittal theory, but Ms. Head has brought

23    to my attention this case suggesting a broader view on the part

24    of the Court of Appeals.

25             And of course I haven't finally decided with respect

1    to finances, but this is a case about money and someone taking

2    money improperly.  And while forfeiture is one way and money

3    judgment forfeiture is one way of recovering it or at least

4    depriving someone of ill-gotten gains, a fine is another, but

5    in any event, if you want to speak to that, you can.

6            MR FICK:  So I haven't had a chance to review *Cox* and

7    the case it relies on, but we would object to the inclusion of

8    acquitted and uncharged conduct in the forfeiture calculation.

9            The other thing I would say is that I think it's

10   improper to base forfeiture on every penny made as an

11   investment to SnoOwl as distinguished from the monies that

12   Mr. Correia improperly extracted from SnoOwl, which Probation

13   calculated in a paragraph of the PSR of as being around 64

14   percent.

15           So to the extent forfeiture is to take away ill-gotten

16   gains from the defendant, money that he never got but that

17   stayed in SnoOwl's coffers or were used for SnoOwl purposes, we

18   would suggest are not properly subject to forfeiture.  It's

19   only the money that Mr. Correia actually got himself as a

20   proceed of the offense, which we would say we agree it's 64

21   percent.

22           THE COURT:  I understand the theory.  Do you want to

23   talk to the theory of allocation?  That is to say that

24   forfeiture is meant to deal with ill-gotten gains by a

25   particular defendant?

1          MS. HEAD:  Certainly.  Forfeiture is meant to deal

2     with ill-gotten gains obtained by the defendant that the

3     defendant controls, right?  So here, we would contend that the

4     defendant controlled the funds that were received here and

5     therefore --

6          THE COURT:  But what if the -- as is alleged here and

7     seems to be the case, we're not talking about all of the funds

8     being used for ill-gotten gains.  They were used for other

9     purposes, not necessarily successful ones, and Probation has

10    done an identification, if I recall correctly here, of roughly

11    64 percent.

12         MS. HEAD:  Sure.  So, I mean, the statute specifically

13    provides for forfeiture of any property, real or personal,

14    which constitutes or is derived from proceeds traceable to a

15    violation of any offense constituting a specified unlawful

16    activity.

17         Wire fraud is a specified unlawful activity.  And

18    "proceeds" is defined in this -- I'm sorry, I'm referring to 18

19    U.S.C. 981(a)(1)(C) for what is forfeitable, and then the

20    proceeds as defined in 981(a)(2)(A) includes property of any

21    kind obtained directly or indirectly as a result of the

22    commission or offense giving rise to forfeiture and any

23    property traceable thereto and is not limited to the net gain

24    or profit realized from the offense.

25         So in this case there are other situations for other

1    offenses where it is a net gain question.  But here it's
2    property obtained, and so we look for the property that the
3    defendant controls, obtained, and then what he chose to do with
4    it is a next-level question.  That's not something that we
5    consider appropriate to factor into the forfeiture analysis.
6             THE COURT:  Okay.  So let me put it this way.  What I
7    would like is a breakdown count by count of what you say,
8    including uncharged conduct, what you say he is responsible for
9    for purposes of forfeiture in this case.
10            I also would like by tomorrow, if possible, because I
11   want to get this straightened away, any case law that deals
12   with this question of allocation at all on this issue.  And
13   that similarly goes for you, Mr. Fick, but we'll put off this
14   question of forfeiture until I've had a chance to deal with
15   that.  And I think I can deal with it on the papers once I see
16   the respective positions of the parties.
17            I want to talk about restitution as well.  The
18   Presentence Report only talks in terms of Mr. Eisenberg and --
19   the name escapes me right now, but those two defendants.
20            MR FICK:  It's Martinez and Eisenberg, Your Honor.
21   They're related to the surviving counts of conviction.
22            THE COURT:  Right.  And is there any question about
23   them being properly viewed as victims for purposes of
24   restitution?
25            MR FICK:  Those two, for the three surviving counts, I

1    think is correct.  The question then again is, and I think

2    Probation left the Court to decide how much of their total --

3              THE COURT:  No.  I understand that.

4              MR FICK:  -- identifying them, yes.

5              THE COURT:  Okay.  And those are the only victims as

6    to restitution left in the case; is that correct?

7              MS. HEAD:  So Your Honor, we would again note that the

8    wire fraud charge is a scheme to defraud under the mandatory

9    Victims' Rights Act.  And let me find --

10             THE COURT:  So if there is an acquittal with respect

11   to a particular aspect of that scheme, it doesn't get backed

12   out?

13             MS. HEAD:  No, Your Honor.

14             THE COURT:  And there's case law that said that?

15             MS. HEAD:  First I'd refer to the statute which is 18

16   U.S.C. 3663A(a)(2), which defines "victim" under the mandatory

17   Victims' Rights Act.  And victim means "a person directly and

18   proximately harmed as a result of the commission of an offense

19   which restitution may be ordered, including, in the case of an

20   offense that involves as an element a scheme, conspiracy or

21   pattern of criminal activity, any person directly harmed by the

22   defendant's criminal conduct in the course of this scheme,

23   conspiracy or pattern."

24             THE COURT:  So that includes acquitted conduct --

25             MS. HEAD:  That's our position.

1          THE COURT:  -- in your reading of it.  So any

2     authority that you have apart from the language itself would be

3     helpful.

4          MS. HEAD:  So I can refer Your Honor, and I did also

5     bring these cases -- I don't believe these cases particularly

6     deal with acquitted conduct.  They deal with uncharged conduct.

7     But they're two First Circuit cases, and I can provide copies

8     to the Court.  One is *United States v. Hensley*, which is 91

9     F.3d 274.

10         THE COURT:  I'm sorry, Hennessy?  I just want to make

11    my notes on this.  Although I would welcome your copies.  And

12    the other?

13         MS. HEAD:  The other one is *United States v. Matos*.

14         THE COURT:  M-a-t-o-s?

15         MS. HEAD:  Yes.  And may I approach, Your Honor?  I'll

16    give you copies.

17         THE COURT:  Yes, please.

18         MS. HEAD:  So I just want to -- *Matos* was 611 F.3d 31.

19    Now, *Hensley* predates the MVRA here, so it's talking about a

20    prior statute, same statutory language.

21         THE COURT:  This is refreshing my recollection since

22    it's a 1996 case that I handled.

23         MS. HEAD:  Yes.  And then *Matos* essentially is more

24    recent, I think it's a 2011 case, that applies the test under

25    the MVRA in the First Circuit.  And I think the key language

1    that I refer to is, while it deals with uncharged conduct, it

2    discusses how you assess whether a victim is part of a scheme

3    here.

4          And it talks about considering the totality of the

5    circumstances, including the nature of the scheme, identity of

6    the participants and victims and commonality in timing goals

7    and modus operandi.  So it's the government's position that,

8    you know, these victims are victims of the same scheme and

9    should be awarded restitution.

10          THE COURT:  Okay.  So irrespective of whether or not

11   there is acquitted conduct, they remain victims.  That's your

12   argument?

13          MS. HEAD:  That's our position.

14          THE COURT:  So I don't think there is and didn't think

15   there was, and now it's clear to me that there hasn't been

16   proffered to me anything dealing with acquitted conduct.  And

17   that doesn't mean that I don't consider the text of the later

18   enacted Victim and Witness Protection Act.  But let me ask

19   this.  Apart from the First Circuit, is there case law that

20   says that someone is a victim?

21          MS. HEAD:  After acquitted conduct, I haven't looked.

22   I'm happy to do had that.

23          THE COURT:  Well, it will be helpful because it's

24   material to me.  But now let's go back to each one of the

25   counts here.  We would have, under your theory, both

1    restitution and forfeiture, money judgment forfeiture for each

2    of those counts?

3              MS. HEAD:  That's correct.  We're not seeking

4    restitution for the extortion counts.

5              THE COURT:  Right.

6              MS. HEAD:  And forfeiture doesn't apply to the tax

7    counts, so we're talking about the wire fraud counts.

8              THE COURT:  Right.

9              MS. HEAD:  So yes, and both are mandatory.  There are

10   different statutory schemes.  Forfeiture is --

11             THE COURT:  No.  I understand the theory of it.  I'm

12   just trying to sort through how I would implement my own

13   judgment about applicability of these issues in a judgment

14   here.

15             So what I would like is just a breakout from each of

16   the counts that the government maintains it's entitled to

17   either forfeiture or restitution -- I say "it," but either

18   forfeiture or restitution is appropriate here, identifying

19   whether it's either or both with respect to the separate

20   counts, and I understand that we're not talking about -- well,

21   I'll look at what you have here, but as far as you're

22   concerned, I should be looking not merely at uncharged conduct

23   but also at acquitted conduct.

24             MS. HEAD:  Yes.  And Your Honor, just in terms of the

25   acquitted conduct and the restitution, you know, I think the

1    principles in *Cox* are -- they're also talking about how to view
2    conduct in a case with a scheme to defraud and that's what
3    the --
4             THE COURT:  Right, but if the scheme to defraud is not
5    proved, then it's a little bit different, it seems to me, for
6    purposes of restitution.
7             MS. HEAD:  Okay.
8             THE COURT:  And that's I guess the issue that I am
9    trying to struggle with in formulating a judgment in the case,
10   but it's the financial dimensions of this.
11            MS. HEAD:  Right.  And of course as part of
12   sentencing, our burden is only a preponderance.
13            THE COURT:  Mm-hmm, right.  Okay.  So if you can have
14   something for me, say, by noon tomorrow on that.
15            MS. HEAD:  We'll do that.
16            THE COURT:  But on the question of the individual
17   counts, I would like it -- well, I can have both at the same
18   time.  So that's fine.  And Mr. Fick, same thing, noon
19   tomorrow.
20            MR FICK:  Thank you, Your Honor, yes.
21            THE COURT:  Okay.  So we'll take until 1:15.  Or do
22   the parties want more time before we start into the question of
23   sentencing here?
24            MR. HAFER:  1:30 will be acceptable, Your Honor.
25            THE COURT:  Yes, that's fine.  I don't want people to

1    be rushing.  We haven't been rushing.  So we'll do it at 1:30.

2    And I may frame this a bit because one of the issues I think I

3    have to say is that institutional memory is about maybe ten

4    years of what sentences have been in corruption cases.

5          There have been a lot of corruption cases in the

6    District of Massachusetts.  And frankly, it was brought home to

7    me by the passing off Ed Lee, a criminal defense lawyer most

8    recently but also first assistant who prosecuted DiCarlo and

9    MacKenzie, left unstated in this list of cases that I should

10   look to for purposes of evaluation.

11         And frankly, you've got to look back farther in

12   Massachusetts to James Michael Curley, whose experience is in

13   an odd sort of way parallel to the defendant here in terms of

14   exposure to civil breach of trust, to criminal fraud and to a

15   fraud on behalf of a constituent.  It was that he campaigned on

16   the proposition that he did it for a friend.

17         In any event, there's a long history of this, and I

18   will suggest that that long history is longer still than that

19   to frame this issue, and I want to have people speak to that,

20   not necessarily the specifics of it, but in this.

21         John Noonan who was a judge of the Ninth Circuit,

22   before he was a judge of the Ninth Circuit, was a professor at

23   the University of California Law School.  And before that he

24   was a practicing lawyer in Boston and also a member of the

25   Brookline -- I think it was the Redevelopment Authority.  In

1   any event, he wrote an extended book.  It's the most

2   comprehensive book I know on bribery, starting 4,000 years

3   before.  This has been going on for a very long time.  And in

4   the end, he has a summation which was completed before he went

5   on the bench, has a kind of hopeful response that this will

6   sooner or later be dealt with.

7         Well, this case suggests that it hasn't been, and so

8   the question is how to deal with that, what's the proper way to

9   both reflect the seriousness of the offense and also deal with

10  the question of someone who has been involved in it going

11  forward.

12        Just as a way of shaping this, I think most of the

13  lawyers here have appeared before me in sentencing, but I want

14  to emphasize this.  There's a historical dimension of it.  What

15  did he do, and what's the price he has to pay for doing that.

16  What's the debt he owes society.  That's backward-looking,

17  historical.  There's another dimension that's looking forward.

18  What does this mean for the defendant rehabilitating himself

19  and going forward?

20        Those are not the same kinds of inquiries.  And right

21  in the middle is, what does it mean right now?  And what I have

22  from the defendant of course is lengthy discussion about going

23  forward and from the government a more -- a heavy weight placed

24  on the prior issues.  But I want to hear both aspects of it.  I

25  hope to hear both of aspects of it.  And in light of the kinds

1   of sentences that Massachusetts in the last, say, since the

2   20th Century, although there was lots before that, has imposed.

3           And the question I suppose is whether or not

4   continually increasing incrementally the amount of a sentence

5   is justified in this area.  That's part of the question.  But I

6   raise it so you know what I want to hear you talk about and

7   what I'm thinking about here.  Okay?  All right.  See we'll be

8   recessed until 1:30.

9           (Recess, 12:50 p.m. - 1:36 p.m.)

10          THE COURT:  So I thought that it might be useful to

11  frame this more specifically from Judge Noonan's comments at

12  the end because they raise the question of whether this is

13  simply part of the human condition and continues and what are

14  we supposed to do about it.  This is his book.  I'm reading

15  from page 706.  That's before the appendices and footnotes.

16  It's at the very end.

17          He says, "I venture a prediction.  As slavery was once

18  a way of life and now, whatever analogs in economic duress

19  remain, have become obsolete and incomprehensible."  You might

20  say, is that the current state of understanding of our society?

21          "So the practice of bribery in the central form of the

22  exchange of payment for official action will become obsolete.

23  The movement to restrict, by law, many forms for reciprocal

24  exchange with officeholders incorporates the thrust of a

25  dominant moral idea.  The conventions that give concreteness to

1    the idea of the bribe will be refined and made responsive to

2    the needs satisfied by human trust."  That's his prediction

3    over 40 years ago, almost 40 years ago.

4           What is conceded on both sides is that the evidence

5    before me here involves reprehensible corruption of a type that

6    is incomprehensibly crude and continuing.

7           And so the question is, what do you do about it?  And

8    I guess having said that, I want to touch on the guidelines as

9    recalculated so that we all understand what we're dealing with

10   and what the parties' recommendations are with respect to it.

11          First, we're dealing with a total offense level now of

12   34, Criminal History Category of I.  That generates a guideline

13   range of incarceration of 151 months to 188 months.  It leads

14   to supervised release of one to three years.  It leads to a

15   fine of $35,000 to $350,000.  The restitution, although as

16   we've discussed is likely to be subject to some tailoring, is

17   in the range of $283,843, and special assessments of perhaps

18   $2100, although I don't think the special assessments are

19   assessed on acquitted conduct.

20          U.S. PROBATION:  No, Your Honor.  The special

21   assessment should be $1300.

22          THE COURT:  $1300, okay.  So that's what is provided

23   here.  I note that the government's recommendation is well

24   below that guideline, which I think speaks to careful thought

25   on the part of the government about what they want to recommend

1    and a recognition perhaps that the guidelines really are not

2    altogether responsive to the larger needs that we have.  And

3    similarly, I know that the defendant has a different

4    recommendation.  But I'll hear from you first, Mr. Hafer.

5            MR. HAFER:  Yes, Your Honor.  I don't intend to take

6    too much time beyond the points made in the sentencing memo.  I

7    would just like to make a few points this afternoon.

8            You commented in an earlier proceeding, related

9    proceeding in this case, you've commented again today about

10   the, I think the words was it was striking to you that the

11   corruption could be conducted in the way it was conducted and

12   that it would continue to take place in this day and age.  And

13   that's amplified by the comments from Judge Noonan.

14           For the government, in thinking about that is, well,

15   why was it striking?  What makes it striking?  And I think in

16   the first instance it's what you referred to as the crudeness

17   of the corruption.  You used the phrase "redolent of an earlier

18   era."  We used the phrase I think "old-school corruption."

19           The point I think was the same, Your Honor.  The cash

20   in clipboards and in envelopes, in sheds and cigars, and this

21   was, Fall River under Jasiel Correia was like Atlantic City

22   during prohibition in terms of the crudeness of the corruption.

23           The second thing, as we thought about this and what

24   made it so striking was the pervasiveness of the corruption.

25   This wasn't, to use a case I know you're much more familiar

1   with than I am, this wasn't a one-time unsolicited preacher's

2   handshake.  This was sustained behavior.  These were solicited

3   bribes over a continued period of time.

4           So you have crudeness.  You have pervasiveness.  And

5   for us, the third point of what makes it so striking, which is

6   also something you've referred to, is that the majority of it

7   occurred at a time when the defendant knew he was under federal

8   investigation in connection with stealing from the investors

9   and for tax charges.

10          The last three marijuana vendor extortions occurred at

11  a time he knew he was under active federal investigation, Your

12  Honor.  And to do this at a time you know you're under

13  investigation, that is the height of hutzpah to commit these

14  offenses, knowing you're under federal investigation.

15          And it's for those reasons, Your Honor, the striking

16  component of this, that we are asking knowingly for a sentence

17  higher than one that's been given out at least in recent memory

18  in a corruption case in Massachusetts.

19          We think that specific deterrence requires a sentence

20  of substantial length, and we think that general deterrence

21  requires it and that the Court's sentence today must speak

22  clearly, promoting respect for the rule of law that this type

23  of behavior, this type of corruption redolent of an earlier era

24  is unacceptable.

25          I just want to make three additional points and then

1   respond to one other thing that you've raised, Your Honor.  And
2   I know you know this, but I think it's important to note, this
3   is a victim case.  You have the SnoOwl investors, two of whom
4   have attached letters here.  Striking to us that at least with
5   respect to Dr. Cabeceiras, this is someone who had deep
6   affection and love and trust for the defendant, and he took his
7   money anyway and he lied to him anyway.

8           Steven Miller talks about the lack of remorse shown to
9   his victims.  So you have this first category of victims who
10  were the SnoOwl investors.  As we alluded to in our sentencing
11  memo, there's a second category, although not legal victims for
12  all the reasons we've discussed about being both
13  co-conspirators and victims, but it is worth I think thinking
14  about the costs that have been borne and imposed on the
15  marijuana vendors who paid the bribes.

16          Willing participants, absolutely, Your Honor, but
17  there was testimony from Mr. Pichette about an adverse OCPF
18  action against his wife, testimony from Mr. Saliby about being
19  deemed unsuitable because of his involvement in this case.  And
20  I think that's another thing that needs to be considered in
21  fashioning an appropriate sentence here.

22          And then the third, although obviously more amorphous
23  category of victims, are the citizens of Fall River, frankly
24  the citizens of the entire Commonwealth.  You've noted before
25  that corruption fundamentally undermines our sense of what a

1   community is.  And I think in fashioning a sentence today,

2   considering what has happened to the trust in the citizens of

3   Fall River having their public officials at a time when there's

4   a lack of trust generally, a disturbing lack of trust in public

5   officials, what has happened to the reputation of the city,

6   there's not just -- we drew a distinction in our filing between

7   the money that Mr. Correia actually attempted to deprive the

8   City of Fall River of, referring to that Host Community

9   Agreement where the 50,000 that was supposed to go to the City

10  annually he changed for 25 in addition to Mr. Saliby in return

11  for the additional 25 for himself, that's obviously an actual

12  tangible cost.  But the intangible one, we submit, is much more

13  substantial, this continued lack of trust and the damage to the

14  reputation.

15        And therefore, my first of these final three points is

16  that the victim component here is a critical component of the

17  Court's sentence.  The second piece, second point is with

18  respect to these comparable cases.  And this is tricky, Your

19  Honor.  You just noted, we only went back so far.  We fully

20  recognize there's a much longer history here.  These cases are

21  distinguishable.  Every case is different.

22        We did, we included some cases for two reasons

23  primarily.  One is taking your point on the guidelines only

24  going so far in these types of cases.  We wanted to have some

25  other data points in assessing what an appropriate sentence is

1    here.  And when you do that, inevitably you lead to things

2    like, well, Dianne Wilkerson got 42 months for this amount of

3    money, Sal DiMasi got 96 for this amount of money.  This is a

4    lot more than that.

5         And this isn't to suggest that this is some sort of

6    formulaic exercise for Your Honor.  Obviously that's not how

7    Your Honor is going to do this.  But we wanted to provide data

8    points beyond the guidelines for some of these cases, the more

9    high profile recent ones in Massachusetts, some from other

10   districts that have also occurred recently.

11        I think there's a related point on those that's worth

12   noting, which is, in culling the ones we did, it became clear

13   to us that guideline sentences were perhaps more common than

14   usual when it came to some of these particular egregious cases.

15        But that said, you're correct, we're not asking for a

16   guideline sentence here.  We're asking for 132 months.  But in

17   looking at those cases and considering 3553(a)(6), I think it's

18   important, it's really, really difficult to find a case to

19   compare to this factually, going back to the first point, for

20   the pervasiveness, for the crudeness, for the fact that it

21   occurred while under investigation, so we include them.

22        And I would just close on this point by noting it's

23   very hard to find one where the conduct in our view is

24   comparable in terms of both of those three things, the

25   crudeness, the pervasiveness and it occurring while under

1    investigation.

2           Final point, Your Honor, which is, I hope at least in

3    part, hopefully in full, to what you said before the break,

4    which is, against this backward-looking emphasis on the conduct

5    and what's before you, what do you have here to mitigate?  What

6    cuts the other way in this case?

7           And I have to say candidly, Your Honor, I'm having a

8    very hard time coming up with anything.  Unlike so many

9    defendants sentenced in this building, Mr. Correia had, by all

10   accounts, based on the PSR and his counsel's submission, a

11   loving, supportive family raise him and a good upbringing.  So

12   that's not a mitigator.  Unlike so many defendants sentenced to

13   lengthy periods of incarceration, he had a very good education.

14   Unlike so many defendants at a young age, as the Mayor of Fall

15   River he was making 116, $118,000 a year, so he had a good

16   salary.

17          So, as we said in our closing, as we said in our

18   filing, what explains this behavior other than greed?  What

19   explains this behavior other than hubris?  You made a comment,

20   I believe it was yesterday, about how it almost -- you didn't

21   use this word, but you talked about the increasing level of

22   criminality or things seem to progress and things got worse

23   from SnoOwl, not better.  And that is concerning, very

24   concerning to us.

25          You talked yesterday with the defense counsel about

1    the fact that Mr. Correia, you know, fired Mr. Reddington after

2    this case.  I take your point earlier this morning about not

3    wanting to put much, if any, weight on comments made in the

4    aftermath of a verdict, but the reality is there is no evidence

5    from which to conclude there is any type of remorse or

6    recognition of what's occurred here.

7         There is evidence of defiance.  There is evidence of

8    continued blame-shifting.  There is evidence of not accepting

9    any responsibility.  And this isn't punishing anyone for

10   exercising their constitutional right to a trial.  This is the

11   3553 factors.

12        So looking forward and saying what is the appropriate

13   sentence here, our view is Mr. Correia needs to be deterred.

14   Society needs to be deterred.  This cannot be a situation where

15   a defendant walks out of the building and claims vindication,

16   presents himself -- I did as much research as I could at the

17   break on James Michael Curley -- as some sort of martyr.  This

18   sentence needs to be substantial, Your Honor.

19        Again, we're not asking for a guideline sentence, but

20   in assessing, trying to assess culpability relative to some of

21   these other significant cases, it's perhaps crass, but this is

22   worse than what Sal DiMasi did in our view.  This is much, much

23   worse than what Dianne Wilkerson and Chuck Turner did in our

24   view.

25        And that leaves us with a recommendation under 3553,

1    considering all of these factors, looking at the guidelines,

2    looking at other cases, considering what Your Honor has said in

3    this case, considering what Your Honor said in the Wilkerson

4    matter about the insufficiency of corruption-related sentences

5    in Massachusetts, which Judge Wolf quoted in the DiMasi

6    sentencing, considering all of that, Your Honor, the

7    government's view is, under the 3553 factors, the minimum

8    sentence sufficient to justly punish the defendant here,

9    protect society, uphold the rule of law, is 132 months of

10    incarceration followed by two years of supervised release.  And

11    then we rest on the papers and what comes further from Ms. Head

12    with respect to forfeiture and restitution.

13         THE COURT:  All right.  Thank you.  Mr. Fick.

14         MR FICK:  Thank you, Your Honor.  There's certainly no

15    sugarcoating anything about this case.  The impulse publicly

16    and perhaps even among the participants here in court to want

17    to say, "Well, you know, let's really inflict some pain here,

18    let's up the ratchet, let's impose the maximum punishment,

19    let's look with a jaundiced eye on everything Jasiel Correia

20    has ever done," that's a natural impulse and in some ways a

21    deserved impulse.  But at the same time, the role of the Court,

22    I would suggest, is to take a more measured look at both

23    Mr. Correia and the offense here and really focus on what an

24    individual sentence can accomplish and should accomplish.

25         You know, on the up-the-ratchet question, I think the

1    Court almost answered it by pointing out that corruption has

2    existed for at least 4,000 years and the fact that Noonan's

3    book is at least 40 years old.  Despite our best hopes and

4    aspirations, corruption will never disappear, and the notion

5    that simply upping the ratchet, making an example, an even more

6    strident example of one particular individual is ever going to

7    stop corruption or eliminate corruption, that I would suggest

8    is the height of hubris on participants in the criminal justice

9    system, which would be particularly ironic in a case where I

10   think we quite aptly described what happened here as a kind of

11   hubristic loss of moral campus on the part of Mr. Correia.

12        What makes corruption thrive, I would submit, and I

13   think there's research to back that up, some of which we cited,

14   it's impunity that allows corruption to thrive.  It's the

15   notion that people can do this and not get caught or rarely get

16   caught.  And it's accountability.  It's the getting caught that

17   stops it, not, you know, 36 months this time, 42 months the

18   next time, 60 months the following time.  There's really no

19   evidence that upping the ratchet makes a difference.

20        And in fact there's empirical research across lots of

21   criminal cases to say, again, it's the fact of getting caught,

22   not the measurement of punishment inflicted, particularly in a

23   kind of white-collar situation, that has meaningful deterrent

24   effect.

25        So I guess the first thing thematically I'm trying to

1    say is I think the Court should resist the urge to turn up the

2    ratchet as kind of an experiment or reflexive response to the

3    fact that corruption continued to exist.

4         And I would point out, I looked at the cases the Court

5    directed us to just before the break.  Mr. Curley got six to 18

6    months commuted after five by the President.  DiCarlo and

7    MacKenzie each got a year.  I guess we can sit back here many

8    years later, 40, 30 years later and say, "Well, that wasn't

9    enough."  But the other answer might be that, "Well, you know,

10   turning up the ratchet has proven not to work, and what are we

11   really accomplishing by doing that?"

12        In terms of the government's focus on certain what

13   they consider aggravating factors, first let's talk about the

14   crudeness.  I guess the first question I would pose to the

15   Court with that is, is crudeness really an aggravator or a

16   mitigator?  I mean, there's nothing good to say about crude

17   corruption, but I think part of what makes this case sort of on

18   some measure less egregious than, say, what was happening in

19   DiMasi is simply the lack of sophistication.  You don't have

20   these things hidden inside purportedly proper consulting

21   contracts.  You don't have this being done by somebody who is a

22   lawyer, you know, someone who has been in public office for

23   years where the fact of doing this reflects their level of

24   cynicism that I don't think anyone would suggest should be

25   applied to Mr. Correia.

1          Again, none of these things suggest that there's

2    anything good about what happened here, but again, in trying to

3    balance, to measure, to compare, you know, crudeness versus

4    sophistication is not necessarily a fulcrum on which I think it

5    would be appropriate to suggest an increase in punishment.

6          Then let's talk about the government's emphasis on

7    pervasiveness.  Well, certainly the conduct went on for quite

8    some time.  I think it's also very important to note, as the

9    Court I think framed it well yesterday, this is a situation

10   where some much older, more established criminals, con men,

11   whatever you want to them, found an outlet to engage in

12   criminal activity and enrich themselves using what I think the

13   Court described as a faithless public official.

14         Again, that's not exculpatory, but in a certain sense

15   in the big picture I would suggest it's at least mitigating.

16   You know, you have here a 23-year-old mayor, not somebody many

17   more years senior, many more years in public office with many

18   more reasons to know better than not to be cynical about it.

19         And what else does pervasiveness mean?  Well, the

20   three marijuana deals at issue were all things that happened to

21   be connected to Tony Costa.  There's no suggestion that the

22   other ten licenses issued in Fall River were subject to some

23   sort of chicanery like this.  As I think we've pointed out I

24   think in our filings, Mr. Correia genuinely did a lot of really

25   good for Fall River driven by an interest in public service

1   that was genuine and sincere beginning when he was really

2   barely a teenager.  Again, none of that excuses what happened

3   here, but I think it's required to have a fuller picture of the

4   man and to understand how somebody might get derailed but still

5   has hope to contribute in a future chapter of life, of which

6   hopefully there will be many.

7        So against that backdrop, I think that our

8   recommendation of a bottom-line sentence of 36 months but

9   incorporating a concurrent sentence, a guideline sentence on

10  the fraud counts to acknowledge that conduct, those victims,

11  and, you know, concurrent sentencing is sort of the default

12  under the law and an appropriate, I think, result here where

13  the corruption case is the driver of what's going on, we would

14  suggest that that is an appropriate sentence that accomplishes

15  the things that the statute and the Court ought to be concerned

16  with.

17       And unless the Court has questions, I think that I

18  will leave the presentation there.

19       THE COURT:  No.  I believe I understand the argument.

20       MR FICK:  I'm sorry.  One more thought, I apologize.

21  But, so in a case where I think both we and the Court have

22  recognized that at least one either cause or symptom or

23  underlying factor here is hubris, there is little that I've

24  encountered in my life that expunges or extinguishes hubris,

25  there's little more effective frankly than even a day in

1    federal prison to do that.

2           I'm not suggesting a day is the appropriate sentence

3    here, but I think we ought not lose sight that going to federal

4    prison period is a powerful, powerful hubris retardant, as will

5    the collateral consequences that follow the conviction here and

6    the financial burdens that the Court is required to impose.

7           You know, there's little that contributes to a loss of

8    hubris more powerful than continuing for many years to do

9    restaurant work to pay off a debt.  Not to belittle that work,

10   but it's hard work.  It's not the work Mr. Correia necessarily

11   aspired to do from when he was a child.  And faced with all of

12   this, that's the work he turned to.  He remained industrious

13   and productive.  And to the extent he has to do that going

14   forward to pay off his debts to society, he certainly is in a

15   position to do that and will.  So I think the sentence we're

16   proposing on every measure accomplishes what the Court needs to

17   accomplish.

18          THE COURT:  There is one question, and of course I'm

19   going to ask whether Mr. Correia has anything that he wants to

20   say here, but the issue is raised of remorse here.

21          MR FICK:  So I mean, that's a complicated question

22   because of the stage of the legal proceedings.  He has

23   appellate rights, and we've advised him, to the extent he

24   wishes to pursue those, not to speak.  I believe he will follow

25   that advice.  It's very difficult to show remorse in a way

1    that --

2         THE COURT:  Well, I'm not challenging in any way the

3    advice and so on, but what I have before me is absolute lack of

4    remorse.  Nothing.  And it's not, as I said before, the problem

5    of making choices to show acceptance of responsibility and that

6    sort of thing.  That's off the table as far as I'm concerned.

7    I look at the record as it exists and ask this fairly important

8    question that goes to future conduct and the state of the man

9    at the time he appears before me.

10        And it may be that the answer is, "Sorry, but this is

11   a complicated legal issue and we've advised him not to testify,

12   not to allocute."

13        MR FICK:  We have advised him not to allocute.  On the

14   broader remorse question, look, I've been doing this work for

15   quite some time now.  I've always been sort of challenged by

16   and troubled by what it means to show remorse, what satisfies

17   the public and/or a court in an expression of remorse sort of

18   ritualistically versus how a defendant can actually show that

19   in life.

20        And I think the reality is from the time of offense

21   conduct through the sort of adjudication and appellate process,

22   I'm sort of at a loss of what a defendant can do to show

23   remorse.  That's really a thing that a person has to show.  You

24   really can't know a human heart.  You can make some guesses,

25   not necessarily always appropriately based on what is known and

1    knowable in the record.  I think remorse is really somebody has

2    to -- well, you don't earn remorse.  But I think to convince

3    people that one is remorseful is a process that is earned and

4    requires time and requires some distance from where we are.

5            THE COURT:  Well, there's been a fair amount of time

6    here.  And without suggesting, you know, punch-the-ticket kinds

7    of items, which of course I don't buy, but where's the empathy

8    for the victims?  Where is the reaching out to the victims?

9    Where is the effort to compensate here?  Now, maybe those are

10   inconsistent with the legal position that the defendant wants

11   to take; I take that.

12           But it is something that is a matter of concern that

13   arises in the context of the nature and characteristics of the

14   defendant and the question of specific deterrence, and it's a

15   matter that I consider, and I'm inviting a response.  I have a

16   response.  I understand the response, and it's one that I think

17   raises some important issues that I'll be sensitive to I think.

18           But, you know, the trajectory here was flying higher

19   and higher.  Not to overdue the Icarus comparison, but there

20   are psychologists who have referred to an Icarus complex as

21   someone who is so narcissistic and so deaf to the concerns of

22   the others who he's affecting who are not directly supporting

23   him that it raises the question of, what's he going to be like

24   in the future?

25           Yes, work, he seems to be a worker, putting in the

1    hours in any event, but this larger question of what do we

2    expect from him in the future, what has he demonstrated over a

3    period of time, lengthy period of time here?  And it's been a

4    kind of no excuse.

5             MR FICK:  A couple of observations along the way of

6    what the Court said.  First, my understanding is, and we would

7    have to supply I think a supplement in writing, but there were

8    early in the investigation some efforts to try to make

9    arrangements to repay investors.  Now, once the criminal

10   process begins, he's prohibited from talking to them.  The fact

11   that they feel like --

12            THE COURT:  That was raised or suggested at some point

13   here.  There was nothing that vindicated that, nothing at all.

14   And, you know, to put to one side this question of whether or

15   not there was plea arrangements or not, the state of the record

16   is no, there weren't.  The government wanted the full amount, I

17   guess.  That's their position.  I understand that

18   Mr. Reddington did not communicate it.  That at least is his

19   position at this point, and it's not challenged.

20            So incompletely fulfilled obligations are not really

21   the form of remorse.  I see remorse in other cases where people

22   come forward immediately and say, "People are harmed, I'm going

23   to pay them."  And I would not let that come in as evidence of

24   consciousness of guilt or something like that, but it's

25   illustrative of a recognition, not a jailhouse-door recognition

1    but a recognition that they've done wrong and they want to do

2    better in the future.

3             Now, for some people it's easier to do than others.

4    For people with a lot of money, it's easier to do than others,

5    although a lot of money was taken here.

6             MR FICK:  I mean, you're pointing to things that are

7    not in the record that would be nice indicia of remorse, and we

8    have them.  And we have release conditions that prohibit him

9    from even talking to these people, which, talk is cheap, I

10   understand and --

11            THE COURT:  There has never been an occasion on which

12   those conditions cannot be waived for purposes like this to the

13   degree that they have to.  And the real issue for those release

14   conditions, which I did not originally impose here, is concern

15   about whether or not there was a manipulation of witnesses and

16   an effort to manipulate witnesses in the case.  It's not

17   something I'm making a determination about here, but it's an

18   issue that I raise.  You've responded to it.  I understand it,

19   but it is lacking from the record here.

20            MR FICK:  And I would concede that point and say it's

21   a function of an exercise of legal rights, and I think the

22   Court understands that.  In terms of the broader sort of Icarus

23   point, and, you know, does it suggest a kind of narcissism

24   that's incurable, I mean, it's a natural impulse to ask that

25   question and to take the most cynical, malign, whatever answer,

1     inference from what we have, but I think the answer to that

2     really is unknowable until somebody hits bottom and tries to

3     get up again, the ultimate answer.

4          THE COURT:  As you know, the sentence that has to be

5     imposed has to be imposed now, recognizing both history and

6     future.  And so I raise it to see if there's something that can

7     be said here that addresses this aspect of that issue.

8          MR FICK:  I mean, understanding that the indicia of

9     remorse the Court would hope to see are not here for various

10    and whatever reason, I think, though, you know, what we saw of

11    Mr. Correia's genuine interest in service in youth and his

12    young age, even sitting here now, you know, six years after

13    becoming mayor, roughly, is those are all reasons to be hopeful

14    that there are chapters ahead where he can show to everyone,

15    Fall River, his family, the community, the people who suffered

16    from the offense conduct here, there's opportunity ahead to

17    make that right.  Will he take it or not?  I think we have

18    reason to hope that he will, and I think it's a reason to

19    impose a less severe sentence now to give him that opportunity

20    and let that chapter begin to unfold.  If it doesn't unfold or

21    if, you know, hubris takes over again, you know, everyone, the

22    Court, this Court, some other Court is going to be less

23    forgiving if that, God forbid, were ever to come to pass.

24          But I think in the circumstances, what we know of

25    Mr. Correia suggests that there's at least hope, and so I think

1    that's a reason -- I think the Court should engage that hope or

2    give it some ground to grow in.

3         THE COURT:  All right.  Thank you.  Mr. Correia, this

4    is an opportunity for you to speak.  Your attorney has

5    indicated that for various reasons there's been advice given to

6    you not to do so at this time, but I want to be sure that

7    you've told me that and I've given you the opportunity that you

8    should have to make any statement relevant to the question of

9    sentencing.

10        THE DEFENDANT:  That's correct, Your Honor.

11        THE COURT:  I'm sorry?

12        THE DEFENDANT:  That's correct, Your Honor, that my

13   attorney has advised me not to.

14        THE COURT:  Okay.  So you have no statement to make at

15   this point?

16        THE DEFENDANT:  At this time.  Thank you.

17        THE COURT:  Okay.  All right.  So obviously there's

18   been a great deal of thought and careful thought given by all

19   of the participants in this case to what's to be done here.

20        I've made my comments on a number of occasions with

21   respect to the guidelines in white-collar areas, including in

22   corruption cases, as being not particularly nuanced.  They're

23   an effort to kind of provide an orientation about things that

24   could be thought about in connection with these cases.  They're

25   not an anchor, although some of the lumpen psychology that

1    makes its way into appellate decisions.  And even decisions of

2    the Supreme Court suggest that there's an anchor that's

3    provided by the guidelines.

4         I think for the most part most judges, particular now

5    that they are discretionary, view them as a way of ensuring

6    that you're in the general context that certain important

7    things have been thought about, that there's been outlined a

8    way of looking at them, and then you move on to the more

9    fundamental issues in the case.

10        The more fundamental issues in the case are set forth

11   in the considerations of section 3553, which are the broad

12   overarching concerns of sentencing.  They reflect what I've

13   said on a number of occasions, because I think it's right, I

14   suppose, not simply to be reflexive, is a series of

15   incommensurables, things that pull and tug in different sorts

16   of ways, because our sentencing process is an attempt to

17   provide a tolerable accommodation of those incommensurables,

18   things that lead toward no time, things that lean toward lots

19   of time.

20        And so the process of working through that, which I

21   know the parties have done as well here with their own

22   emphasis, is something that at least permits one to say, and

23   I'm the person who has to say it in the end, that this is the

24   most reasonable sentence that I can reach.

25        So let me start with the nature of the offense.  And

1    It is -- I've said it repeatedly, and I really don't like to
2    repeat myself but find myself doing it from time to time.  This
3    is the most fundamentally corrosive crime that a community
4    faces.  It undercuts and enervates the community.  If we can't
5    trust each other, if we can't trust our government, where are
6    we?
7            We can talk about embezzlement as being a crime of
8    breach of trust.  We can talk about other kinds of breach of
9    trust, but this is at the core of who we are.  It's why I
10   suppose Judge Noonan spent so much time worrying his way
11   through this, trying to understand what it really means.  But
12   it's part of the human condition.
13           This crime committed in this way is as crude as
14   anything imaginable.  This is old style, all of which has been
15   said here, and it was pervasive, and it reflected a willingness
16   to take advantage of others.  I mentioned James Michael Curley
17   as a way of talking about the various ways in which this is a
18   breach of trust.  And Curley's legal exposures, both civil and
19   criminal, were ones that reflected that violation of trust.
20           But taking the very first one that he was prosecuted
21   for shortly before the commentary by Theodore Roosevelt that
22   the government offered here reflecting the kind of good
23   government approach was one in which Curley took a civil
24   service exam for one of his constituents while he was an
25   alderman.  He was caught.  There was a sentence.  The matter

1   was stayed while there was an appeal.  Curley ran again for

2   office, was elected again while he was facing prosecution.  And

3   his campaign slogan was, "He did it for a friend."

4          One can say that he had friends and then he had the

5   rest of the community.  But put that to one side.  This is

6   different.  This is one in which the defendant did it to a

7   friend, without considering the nature of the relationship with

8   Ms. Andrade, as to which I do not have full evidence.  I've, as

9   you know, declined to take an agreed-upon plea in this area,

10  but there was a perverse codependency involved here that arises

11  in the context of bribery and extortion that is illustrative of

12  someone who is profoundly indifferent to the impact on others.

13         Was it pervasive?  Yes, it was.  City Hall was for

14  sale.  There were intermediaries who chose them, who chose to

15  deal with them.  The government came in here with

16  recommendations with respect to them.  They were, you know,

17  pretty low.  On the other hand, they're making their case, and

18  from my perspective, I was prepared to and am prepared to

19  accept the recommendation of the government with respect to

20  those people that they had to deal with to make the case.

21         But bear in mind, it wasn't the government that

22  started dealing with these people.  It was the defendant.  That

23  it took place while he was under indictment is the same as

24  Curley, this willingness to disregard the obligation that a

25  public servant has to be a servant of the public, the entire

1    public, not friends who will make sure that some money gets to

2    him.  The short of it is, as this kind of crime goes, it is as

3    if nobody learned anything.  So the short of it is this is a

4    crime which reflects the guidelines, which are quite high.

5           Now, I've gone back and looked at the guidelines that

6    were initially applied in these areas, and the guidelines have

7    grown and grown and grown.  Every time Congress or the

8    Sentencing Commission gets their hands on them, they say if six

9    months is serious, then nine is more serious, then 12 is more

10   serious, all of that.  It's meaningless from that perspective.

11   Except this, that the community wants to have vindicated its

12   view that this kind of crime involving this kind of violation

13   of public trust is something not to be countenanced and it is

14   something that people have to pay for.

15          Now, we'll turn to this in a moment, but Mr. Fick is

16   absolutely right.  We've got empirical evidence that suggests

17   it would be better if there were swift and certain punishment.

18   Well, swift punishment is not necessarily what one gets in a

19   fully reticulated due process scheme.  That's a price we pay

20   for ensuring a full range of rights to people, but we don't

21   have that really available.

22          Certainty is even less likely in something like this

23   because this is carried out, as this was, through

24   intermediaries and through winks and nods, and only

25   communications with those who the defendant thought could be

1    trusted or was insufficiently aware couldn't be trusted because
2    they were just like him, people who would sell out when they
3    had a chance.

4         The short of it is that a Court has a responsibility
5    to reflect the community understanding about this.  Mr. Fick
6    properly cautions against a Court having a reflexive response
7    and giving in to the braying of the lauder mouths in the public
8    or perhaps media.  But no one, I think, would say that this is
9    anything other than -- and to his credit, Mr. Correia in his
10   briefing doesn't say it -- anything other than the crime that
11   is before me is reprehensible.  It is, it's reprehensible.

12        So then I turn to the nature and characteristics of
13   the defendant.  In some ways one can say I really don't
14   understand Mr. Correia, don't have enough information about
15   Mr. Correia.  I can't conceive how he could have done this.

16        All of the good things that he did are worth noting,
17   but that's not what brings him here.  What brings him here is
18   this incomprehensible undertaking to sell himself out or make
19   himself available for a high bidder and negotiate over things.

20        Going back to Curley, for example, one of his
21   financial problems was the City of Boston actually sued him for
22   breach of fiduciary duty.  The Supreme Judicial Court upheld
23   that prosecution.  One may ask why the Commonwealth of
24   Massachusetts or the City itself couldn't bestir itself to take
25   similar actions.  Part of that has to do with the structure and

1    nature of city government and state government, availability of
2    resources perhaps.  But this much is clear:  that the defendant
3    was engaged in a knowing activity that undermined the trust of
4    other people who put trust in him.

5         I look at the beginning of the SnoOwl activity and
6    think this was a defendant who slowly began to realize he could
7    say anything and omit to say material things, and you could
8    still get money from close friends, people who thought of you
9    as a little bit like a son.  That attitude, that indifference
10   to the harm to others is a matter of great concern in this.

11        We've talked in a general sort of way about remorse
12   and that sort of thing, and I share again Mr. Fick's important
13   caution that, you know, you got to be careful about people who
14   have these ritual kinds of remorse statements.  I think I am.
15   On the other hand, I've observed this in various kinds of
16   settings in the white-collar area and even in the area of
17   political corruption, and there is nothing here in the record
18   that suggests that the defendant was anything other than
19   reckless, leaving it to others to clean up after him.

20        So then I look at other things involving the
21   defendant, that is, close family, being close to his family,
22   having these gifts, extraordinary gifts of being able to reach
23   out and make people believe in him.  And apparently they do,
24   until their belief becomes an opportunity for his personal
25   benefit.

1          I look at him as being a hard worker.  There's no

2     question about that as well.  I mean, you know, it's a kind of

3     rush I suppose of being a politician, of having people around

4     and supportive and that sort of thing.  Nevertheless he's out

5     there all the time, and he's trying to do things for the City.

6     Things for the City of course benefit him when it comes time

7     for voting, but that's real.  It shouldn't be ignored.  I'm not

8     ignoring it.  But I come away with this sense of someone who

9     has not demonstrated in any way, in fact the record before me

10    suggests otherwise, that he is concerned about anyone other

11    than himself in the most antisocial ways.

12         So then I turn to the question of specific deterrence.

13    What does it take to keep him from doing this again?  I have no

14    idea because I don't know him.  Would he do this again?  My

15    experience with people who are involved in political corruption

16    and perhaps the personality type that gets involved in

17    political corruption is yes, they do.  That's the story of

18    Dianne Wilkerson.  That's the story of James Michael Curley.

19    It's the story of a large number of people who were involved in

20    this sort of thing.

21         And there is nothing here, although I have seen it in

22    other cases, other political corruption cases, in which there

23    was a genuine kind of epiphany for them in which they made the

24    kind of indications that would say they weren't going to let

25    this happen again.  I can't say that for this defendant.

1          So then I go to general deterrence.  Mr. Fick makes

2     that larger question about -- commentary about general

3     deterrence.  What does that mean here, that real general

4     deterrence would have to be quick and certain punishment,

5     neither of which we have.  And we'd be giving up certain

6     fundamental values to a society like due process if we were to

7     put overemphasis on "quick."  And the nature of these offenses,

8     as I've indicated, is not something that is likely to be

9     resolved with certainty unless we turn ourselves into an

10    authoritarian state, and even then.

11         And so we're left with time as kind of a report card

12    for this sort of thing.  And, you know, the apocryphal

13    definition of mental illness is doing something a second time

14    the same way and thinking it's going to turn out differently.

15         So do you impose the same amount of time on what

16    appears to be a continuing problem?  I don't think so.  Does it

17    mean that you do what the guidelines have done in their growth,

18    metastatic growth since they were developed in 1984?  No, I

19    don't think you do that either.  But there has to be

20    recognition that there's going to be additional time served for

21    someone who has been exposed to, understands, knows what the

22    risks and returns of public service would be.  And that's this

23    defendant.

24         Curley of course in the end of his career was

25    prosecuted.  It was a highly political concern.  He attempted

1     to meet with the President to get the President to tell the

2     Attorney General not to prosecute him.  The President had been

3     vigorously supported by -- this is President Roosevelt, II --

4     by Curley, and he took the advice of his Attorney General and

5     didn't meet with him.  President Truman had a different view

6     afterwards and provided a relief to what was then a really sick

7     and broken man who nevertheless adjourned to public office

8     again to be a player.

9            But in the recapitulation of the Curley example, the

10    defendant has moved in a different direction.  There's nothing

11    here that suggests, as far as I'm concerned, that he fully

12    understands and won't be an appropriate example to younger

13    individuals who do this sort of thing.

14           Now, I said that there was a trajectory.  You could

15    say I don't like bumper stickers that much, but it's a way of

16    kind of dealing with this, the first part of this, the part

17    that involved mail fraud -- wire fraud, excuse me, and tax as

18    the kind of fake-it-until-you-make-it phase of the defendant's

19    life, which is perhaps a newfound approach to how people think

20    their commercial activities should be and one he fully embraced

21    and upped the ante on day by day.

22           I indicated that I consider it to be fraud.  The

23    question of whether or not it's properly prosecuted in the

24    Federal Courts under the kinds of limitations that our

25    constitutional allocation of responsibilities requires is a

1    separate question.  But it's fraud, and it's known to me and

2    it's something that I will and do consider.  But I don't

3    consider it so fundamental here and even wonder whether or not

4    a case like this would ever have been prosecuted in the Federal

5    Court but for the defendant's public office.

6          And it's reflected oddly enough in the guidelines

7    themselves, which don't even include consideration of this

8    because of the way in which -- that is the commercial fraud and

9    tax cheat allegations, the way in which they're treated by the

10   guidelines as being not even sufficiently significant to

11   generate some additional units in the guidelines' relentless,

12   inexorable and bloodless arithmetic or maybe geometry or

13   multiplication.  But it is certainly the case that some measure

14   of time is appropriate.

15         And then I turn to look at comparisons, and the

16   parties understand, I think they've properly said that not

17   every one of these cases is the same and they have different

18   valences and different considerations and different amounts of

19   money.  And so then it becomes a kind of question of judgment,

20   and it's at this point that this kind of

21   on-the-one-hand/on-the-other-hand.  On the one hand history, on

22   the other hand future, becomes so salient.

23         We're at what I guess I would call the liminal moment,

24   the reference to Icarus has got insight there as well, I think.

25   I call to mind an Auden poem about a Breugel painting in

1   Brussels that shows everybody going about their business while

2   Icarus falls from the sky and plunges into the water and nobody

3   notices.  So the defendant does face at this point the sense

4   that people who profess to be friends, not that he necessarily

5   would be faithful to them, but profess to be friends are

6   shunning him.  That happens with white-collar criminals all the

7   time.

8           So I look back.  There is a Victorian judge by the

9   name of James Fitz James Stevens who took a rather rigid,

10  rigorous view about sentencing.  But one of the things he said

11  is the role of the judge is to put a seal on molten wax.  The

12  molten wax is the changing views of society.  They're entitled

13  to be reflected -- not even entitled.  It is the judge's

14  responsibility to reflect them -- but to synthesize them as

15  best it can in some specific judgment not so that it spills

16  over into the rest of someone's life, but it is that that is

17  critically important for the backward look.

18          Then there's the forward look.  What's going to happen

19  in the future?  And the backward-looking and the forward-

20  looking come together in the liminal moment.  Because when does

21  the forward movement start?  One would hope that it starts as

22  soon as someone recognizes that they've done something wrong.

23          As I said, I don't think the defendant has that

24  recognition.  There's certainly nothing in the record that

25  indicates that he does.  But he's a young man.  I look at older

1    people.  I think, as I believe Mr. Fick referenced, there are

2    different attitudes toward time.  Time seems to move a lot

3    faster when people are older, and it seems to extend endlessly

4    when someone is young.

5           I don't want to take away the potential for the

6    defendant to see a light at the end of the tunnel.  I don't

7    want to apply a form of sentencing that, again, using

8    stereotypes, but there's a big difference at least in my

9    experience, and I've spent some time going to prisons and

10   talking to people that I've sentenced and talking to people who

11   deal with these larger issues, a difference when someone has

12   been sentenced to more than ten years.  The light just

13   disappears and they check out for a period of time and you lose

14   them.

15          On the other hand, it can't be so short that we don't

16   have a recognition that this is worse, and there is an

17   important period of time to be paid here.  My view with respect

18   to that is that the proper sentence, the one that I will

19   impose, is 72 months' incarceration.

20          I do so balancing all of these factors.  I've

21   indicated that I will stay the -- permit the defendant to

22   self-report but that the question of whether or not there will

23   be a stay of the reporting date is something that we're going

24   to work on in terms of scheduling here.

25          I am going to impose some form of financial

1    obligation.  Certainly there's the special assessment, which I

2    believe at this point we'll say is $1300.  The forfeiture and

3    restitution issues are ones that I'm going to have to sort my

4    way through with the help and further benefit of the parties,

5    but you can be assured that the ill-gotten gains will not be

6    ones that go unaddressed in the sentence, whether it's done by

7    restitution or money judgment forfeiture or fine here.  But I'm

8    not in a position to do that because I've got to sort through

9    that.

10           I'm going to impose three years of supervised release.

11   The defendant is going to be ordered to make his restitution

12   immediately and then only subject to a payment scheme that the

13   Probation Office will develop as it is necessary.  But payment

14   immediately means payment of interest as well.  He's had the

15   money value of this.  The money has disappeared, but he's had

16   the money value of this, and it's not going to be disregarded.

17           So long as the defendant has not paid the financial

18   responsibility that he's required to pay, he is going to be

19   subject to various obligations with respect to his financial

20   activity.  He must not engage in any additional new credit

21   charges or opening additional lines of credit without the

22   approval of the Probation Office while any of the financial

23   obligations are outstanding.  He must provide the Probation

24   Office with any requested financial information.  And that, he

25   should understand, is going to be shared with the financial

1    litigation unit of the United States Attorney's Office.

2        He's going to have to meet with the Internal Revenue

3    Service within the first 60 days of the period of his

4    supervision in order to determine whether or not he has paid

5    his prior tax liabilities fully and is paying any past or

6    future taxes here.

7        Those are special conditions.  They're very important

8    when we're dealing with a financial crime like this.  My

9    experience with the Probation Office is that they make

10   proposals after discussing fully with the defendant and his

11   counsel what is reasonable for him to pay.  I don't mean to

12   have him dispossessed, but I do mean to assure that he pays

13   back the ill-gotten gains to the degree that he can and

14   continue with his life.  That is a recollection of those things

15   that he's done improperly.  There are of course other

16   conditions of supervision that he not commit another federal,

17   state or local crime, which should go without saying but in

18   this case requires stating explicitly.

19       He must not unlawfully possess a controlled substance.

20   It doesn't appear that he has that kind of problem here, so

21   it's a consequence at least initially I'm waiving the

22   requirement that he submit to anything more than three drug

23   tests within a month of his release from prison.  But if

24   anything shows up in his supervision by the Probation Office

25   that suggests recourse to control substances, of course I'll

1  extend that and may impose as many as 104 drug tests per year.

2          He has to cooperate in the collection of a DNA sample

3  as directed by the Probation Office.

4          There are a number of standard conditions.  They were

5  alluded to obviously in the Presentence Report.  They're on the

6  judgment itself.  When he signs it, he'll be acknowledging his

7  understanding of those conditions as well.

8          I've indicated, as I said, my view that he should be

9  permitted to self-surrender.  Self-surrender is a recognition

10 that the defendant has complied with his conditions while he's

11 been released, and there's no reason to believe that he won't

12 surrender here.  But he's subject to the same conditions of

13 release that were applicable before, and I will want, as I've

14 said, to get to a schedule that will effectively deal with, and

15 fairly, the question of whether or not his sentence should be

16 stayed pending appeal.

17         I've indicated my own view that on the basis of what I

18 know I have no reason to believe that the defendant will not or

19 will be successful in any appeal that would reduce the sentence

20 below the time that he would serve on what remains of the

21 sentence here.  Of course the defendant can address that in any

22 pleadings that he has, but we've got all of the materials here.

23         There's been a transfer of materials in the transition

24 to new counsel in this case.  I am, now having assured that for

25 purposes of the sentence proceedings and the post-trial

1   proceedings, assured that there is available counsel who

2   appeared at trial of the view that I will allow

3   Mr. Reddington's request to withdraw as soon as the judgment

4   enters in this case.  He then is in a different category in

5   respect of his client here.  And I think that covers everything

6   that's involved.

7          Of course implicit in this, but I'll make it explicit,

8   is the defendant does have a right of appeal, and he may

9   execute that with consultation with his attorneys here.  The

10  actual appeal date runs from the entry of judgment itself in

11  the case.  So you'll be attentive to the timeliness

12  requirements of that.

13         Now, are there other conditions that either Probation

14  or the government or Mr. Correia would like me to consider

15  here?

16         MR. HAFER:  None from us, Your Honor.

17         THE COURT:  Mr. Fick, anything?

18         MR FICK:  No, Your Honor.  I wasn't quite sure what

19  you meant by talking about the surrender date.  I think at some

20  point we'll need to know what the date is.

21         THE COURT:  I think it will be relatively prompt that

22  judgment enters in this case.  And ordinarily there would be,

23  right now I believe the Bureau of Prisons uses something like

24  eight months -- eight weeks for self-surrender for the

25  designation of the facility that's involved.

1          MR FICK:  As a default or expectation, that's helpful,

2    Your Honor.  Thank you.

3          THE COURT:  So that's what I will expect ordinarily in

4    this, which puts it I guess in the early part of December,

5    something like that.

6          Now I want to talk about the timing of the question of

7    release pending appeal here.  I've indicated perhaps

8    instrumentally but based on what I know right now the

9    unlikelihood that I'm going to be willing to stay the execution

10   of the sentence.  And that would mean that the defendant, if

11   he's not going to go directly to prison, has to seek a stay

12   from me in the first instance and then of course to the Court

13   of Appeals.

14         I want to be sure that there's enough time for this to

15   be dealt with intelligently and on reflection in light of all

16   that we've had so far, gone on so far.  So I guess my question

17   would be when do you want to submit briefs?  And I'll say that

18   the briefs should be cross-briefs on this issue.  Mr.

19   Quinlivan, do you have a view about that?

20         MR. QUINLIVAN:  Just so I --

21         THE COURT:  Pardon me?

22         MR. QUINLIVAN:  Do you want the parties to brief it at

23   the same time?

24         THE COURT:  Yes, the initial briefing on this, and

25   then I'll see if there's going to be more.  That means the

 1  initial briefing is a little bit earlier than it might

 2  otherwise be rather than the back and forth.

 3          MR. QUINLIVAN:  Understood.

 4          THE COURT:  And I understand the demands on the

 5  appellate section of the U.S. Attorney's Office, but my view

 6  will not be the same as the Court of Appeals that we have to

 7  wait until the fifth time that someone says we'd like an

 8  extension, I'd like the realtime right now --

 9          MR. QUINLIVAN:  Could we say three weeks?

10          THE COURT:  Three weeks, okay.  Mr. Fick?

11          MR FICK:  That's acceptable, Your Honor.

12          THE COURT:  So what that means is you can be obviously

13  starting to think about this now.  That means October 12 for

14  the briefing on this, which I really do want people to focus on

15  very specifically the state of the record in this case and any

16  other outstanding issues because it's the opportunity for me to

17  be sure that I've done all I can to impose a proper judgment in

18  this case and indicate at that point whether or not I would be

19  issuing a new trial order as well.

20          So I will be doing all of that there, so that parties

21  should be aware of that.  Of course I have an independent

22  responsibility to do that.  I can do it at a later point, I

23  suppose, and that's sometimes done there by an indicative

24  ruling, but I'd rather do it this way to ensure orderly

25  presentation.

1           Now, is there anything further that we need to take up

2    today?

3           MR. HAFER:  Not from us, Your Honor.

4           THE COURT:  Okay.  Mr. Fick?

5           MR. FICK:  No, Your Honor.  Thank you.

6           THE COURT:  Nothing further from Probation?  All

7    right.  We will be in recess at this point.  Thank you.

8           (Adjourned, 2:56 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter to the best of my skill and ability.

9              Dated this 27th day of September, 2021.

10

11            /s/ Kelly Mortellite

12            _____

13            Kelly Mortellite, RMR, CRR

14            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25