# United States Court of Appeals
## For the First Circuit

No. 21-1823

UNITED STATES OF AMERICA,

Appellee,

v.

JASIEL F. CORREIA, II,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Selya, and Howard,
Circuit Judges.

Daniel N. Marx, with whom William W. Fick and Fick & Marx LLP
were on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with
whom Rachael S. Rollins, United States Attorney, was on brief, for
appellee.

November 28, 2022

**SELYA**, **Circuit Judge**.  At a youthful age, defendant-appellant Jasiel F. Correia, II, successfully persuaded investors to back his SnoOwl app.  He then parlayed his work as an innovator and entrepreneur into a stunning electoral victory, winning office (at the age of twenty-three) as mayor of the city of Fall River, Massachusetts (the City).  But the swiftness of the defendant's rise was matched by the swiftness of his fall:  a federal grand jury indicted him on charges relating to his SnoOwl promotion, and a superseding indictment added charges relating to public corruption.  The defendant did not seek a severance and, following an eighteen-day trial, he was convicted on most of the charges.  The district court set aside some convictions, but let others stand and sentenced the defendant to serve seventy-two months in prison.  The defendant now appeals.  After careful consideration of a chiaroscuro record, we affirm.

I

We start with the relevant facts, recounting them "in the light most hospitable to the verdict, consistent with record support."  <u>United States</u> v. <u>Tkhilaishvili</u>, 926 F.3d 1, 8 (1st Cir. 2019).  We divide this discussion into three parts.  First, we set out the facts supporting the defendant's convictions for wire fraud.  Second, we set out the facts supporting his convictions under the Hobbs Act.  Third, we trace the travel of the case.

- 2 -

**A**

In late 2012, while a college student, the defendant began putting together a plan to develop an app called SnoOwl. For help, he enlisted three people: his then-roommate, a friend from high school, and a software engineer. The defendant hoped that SnoOwl, when perfected, would enable consumers to find events, specials, and services being offered by businesses near them.

To realize this vision, though, seed money had to be obtained. The defendant assumed responsibility for courting potential investors. Over time, he persuaded at least five people to invest in the endeavor. All five testified at trial, but we focus the lens of our inquiry on two of them: Mark Eisenberg and Victor Martinez. Eisenberg was a business coach who had previously owned or operated firms in various industries. Martinez — a friend of Eisenberg's — ran a chain of pizza restaurants.

Eisenberg and Martinez first met the defendant on November 4, 2014. During that meeting, the defendant lauded the prospects of SnoOwl and asked them to invest $50,000 toward its development. As part of his pitch, the defendant told them about his background. Most relevant here, he described his previous experience "develop[ing] an app." That app — which the defendant had developed with a fellow student, Alec Mendes, while at Providence College — was called FindIt. Like SnoOwl, FindIt's purpose was to help consumers identify local businesses that were

- 3 -

advertising specials and accepting coupons. FindIt earned money by charging businesses for advertisements — and over the entire span of its existence, FindIt generated only a few thousand dollars in revenue.

At their initial meeting, the defendant informed Eisenberg and Martinez that FindIt was "eventually sold to a group out of Cambridge." This unidentified group — as the defendant told it — then "turned around and sold [the app] to Facebook." Eisenberg recalled being "impress[ed]" by this feat, and he remembered that the defendant had indicated that he received money from FindIt's sale.

The defendant's account of FindIt's success was at odds with the tale told by the record. In point of fact, there was no evidence that FindIt was ever purchased by an outside group from Cambridge or elsewhere. To the contrary, Mendes testified that FindIt was abandoned and went offline. Around the same time, Mendes and the defendant agreed to divide FindIt's assets amongst themselves. The defendant received a payout of approximately $2,000 — but nothing in the record suggests that those funds derived from any sale of the app or its underlying source code.

Unaware of FindIt's ignominious ending, Eisenberg and Martinez "believe[d] [the defendant's] representations." Eisenberg testified unequivocally that he would not have invested

- 4 -

in SnoOwl had he "known that there was no college app that was sold to people in Cambridge, who then sold it to Facebook."

The day after meeting with the two investors, the defendant sent them an email attaching, among other things, "an updated business plan." The business plan included information on SnoOwl's expenses — specifically, $6,750 per month for software, $179 per month for server space, and $8,000 for a legal-fee obligation. The business plan also represented that "[o]ther costs associated with running the day-to-day operation of SnoOwl are negligible," adding a caveat that "[f]uture expenses will include hiring new talent and contractors, providing livable salaries to employees, and cloud server space."

Eisenberg and Martinez each agreed to invest $25,000 in SnoOwl in exchange for a 3.5% equity stake. These details were confirmed by email and — to aid in formalizing the investments — the defendant emailed each of them an "investor agreement." Through the investor agreements, the defendant committed to (among other things) "not sell[ing], assign[ing], transfer[ring] or otherwise convey[ing] business assets . . . owned, held by or owed to the Company . . . except in the ordinary course of business, without the Investor's consent." The agreement further required SnoOwl to act responsibly "to protect the integrity of the company and the investment." Eisenberg signed the agreement, but the record is tenebrous as to whether Martinez actually signed. What

is luminously clear, though, is that each man cut a check for $25,000 and delivered it to the defendant.

The defendant did not hesitate to spend the investors' money on personal expenses. He spent thousands of dollars on (among other things) car payments, casinos, hotel stays, transportation expenses, clothing, women's shoes, cologne, and student loans. He also used company funds in service of his political ambitions.

Although these expenditures were made outside the ordinary course of the company's business, the defendant never sought the investors' consent. Eisenberg testified that had he "known that investment money . . . was going to" things like "cologne," "$700 shoes for [the defendant's] girlfriend," and "strip clubs, casinos, and other places of recreation that were not involved with the company," he would not have invested. Martinez, too, testified that he would "[a]bsolutely not" have invested had he been told that the defendant "was going to use investment money . . . on expensive shoes, cologne, and many other personal items."

The defendant also convinced other individuals to invest in SnoOwl. Three such investors testified at trial, sounding many of the same themes as Eisenberg and Martinez. This testimony was reinforced by a substantial amount of documentary evidence. Taken as a whole, the documents showed that, from 2013 through 2015, the

defendant solicited investments totaling $358,190. Of this sum, the defendant spent approximately $18,600 on "[c]lothing, health care products, jewelry, personal grooming and personal trainers"; $27,023 on "hotel expenses"; $25,121 on "dining expenses"; $31,780 on "transportation related expenses"; and $37,282 on "personal credit cards, student loans and a vehicle." He also spent thousands of company dollars on "entertainment expenses" such as movies, sightseeing, amusement parks, and golf. Few, if any, of these expenses were generated in the ordinary course of SnoOwl's business. An Internal Revenue Service (IRS) agent estimated that the defendant spent $228,654 from SnoOwl's accounts on "personal expenditures."

### B

The second cache of facts relates to the defendant's tenure as the City's mayor. After winning election in 2015, the defendant assumed office in January of 2016. As mayor, the defendant enjoyed many powers — our concern here is primarily with his role in allowing marijuana vendors to open marijuana shops in the City.

Some background helps to lend perspective. When Massachusetts legalized medical marijuana in 2012 and recreational marijuana in 2016, it gave localities a place in the application process for prospective entrants into the market. As relevant here, between July of 2016 and August of 2018, the Commonwealth's

laws and regulations required that an applicant obtain a letter of support or non-opposition (a non-opposition letter) from the municipality in which the applicant proposed to operate. See, e.g., 105 Mass. Code Regs. 725.100(B)(3)(f) (2016). In addition, an applicant needed to enter into a host community agreement with the municipality, see Mass. Gen. Laws Ann. ch. 94G, § 3 (West 2018); 935 Mass. Code Regs. 500.101(1)(a) (2018), which typically committed the business to paying up to three percent of its gross sales to the municipality. The Massachusetts Cannabis Control Commission required both a non-opposition letter and a host community agreement as preconditions to the issuance of a license to sell marijuana at retail. See 935 Mass. Code Regs. 500.101(1)(a) (2018).

As mayor, the defendant held sole responsibility and executive authority to issue non-opposition letters and approve host community agreements. See Fall River, Mass., Charter § C-3-2. Soon after he assumed office, a number of prospective vendors approached the City about opening marijuana businesses. We encapsulate below the experiences of four of those prospective vendors.

**1**

In 2016, David Brayton began trying to open a marijuana business in the City. His initial attempts failed, so he turned to his friend, Antonio Costa, for help. Costa had a close

relationship with the defendant, and he was able to arrange for Brayton to meet with the defendant.  The meeting proved to be unproductive, as the location that Brayton proposed for his shop encountered a zoning problem.

After Brayton identified another potential location, he again reached out to Costa.  When the two men met, Costa told Brayton that the defendant was "looking to get a donation or a bribe . . . in order to make this work."  Brayton inquired as to the price tag, and Costa replied that it would cost $250,000. Brayton could not afford to pay that much in a lump sum, so he proposed an "alternative arrangement" under which he would pay $100,000 up front and an additional $150,000 when his new business's "cash flow [turned] positive."  Costa said that he would need "to get back to" Brayton.

Costa then spoke with the defendant, who asked only whether Brayton was "good for it?"  Subsequently, Costa told Brayton that he had spoken with "Jasiel" and that the arrangement Brayton had described — $250,000, divided into two installments, in exchange for a non-opposition letter and host community agreement — was acceptable.

Acting on this struck bargain, Brayton delivered a $100,000 check to Costa on July 14, 2016.  Brayton's project then began to pick up speed:  he received a non-opposition letter dated

July 14.  A host community agreement was signed by the defendant less than two months thereafter.

Trying does not always pay, and Brayton's marijuana dispensary never turned a profit.  Consequently, he never forked over the remaining $150,000.  Even so, the arrangement proved profitable for both the defendant and Costa:  they divvied up the proceeds of Brayton's check, with the defendant pocketing $80,000 and Costa pocketing $20,000.

**2**

The next aspiring marijuana vendor was Brian Bairos.  In the 2017-2018 time frame, Bairos decided to expand his Rhode Island marijuana business into the City.  To this end, Bairos met with the defendant and the defendant's chief of staff, Genoveva Andrade.  After that meeting produced no immediate results, Bairos made the acquaintance of Craig Willard who, in turn, introduced him to Costa.

When Bairos met with Costa, the latter boasted that "he had a good relationship with the mayor, and that he could get [Bairos] the letters that [he] need[ed] to move forward with [his] license."  Costa also told Bairos that there would be a "cost" of $250,000, which Bairos regarded as "[b]asically a bribe."  Bairos objected to the amount, and the two men ultimately agreed to a total of $150,000, to be split into two installments — the first due "up front" and the second due when Bairos "got the license."

Bairos testified that he came to realize that the defendant "would
be getting th[e] money."

        In the weeks following the meeting, Bairos and Costa
exchanged a number of text messages.  On May 25, 2018, Costa sent
a text saying that the defendant "gave [him] a call and told [him]
it's a done deal so no worries."  Bairos took this to mean that
the defendant had "accepted" the terms he had negotiated with
Costa.  Costa testified to a similar interpretation of this text.

        On June 19, 2018, the defendant had dinner with Bairos
and asked him "[i]s everything good?"  Bairos took this to be a
reference to the arrangement he had reached with Costa, and he
assured the defendant that "we were [good]" — meaning that he was
"prepared and had pledged to pay the bribe."  The two men met again
ten days later.  During this meeting, the defendant asked Bairos
to "donate" $25,000 "to his legal fund."  Bairos understood this
to be a request for money "in addition to the bribe [he] had
[already] agreed to pay."  Bairos never made the requested
donation.

        In due season, Bairos received a non-opposition letter
dated July 2, 2018, signed by the defendant.[1]  On July 7, Bairos
says that he gave Costa $25,000 in cash as "part of the first
portion of the agreement."  Bairos believed that this payment would

---

[1] The record does not disclose when, if ever, Bairos received
a host community agreement.

be split in some way between Costa and the defendant.  Although he already had the letter, Bairos testified that he made the payment because he feared that the letter "could be redacted or taken away at any time."

Although Costa's testimony reflected a slightly different recollection of the facts — Costa testified that Bairos forked over between $30,000 and $50,000 — it also lent further color to the events surrounding the July 7 payment.  Costa recounted that he gave Bairos's cash to another co-conspirator (Camara) who, in turn, was to pass it along to the defendant.  According to Costa, the defendant refused to "touch it" for fear that it was "fed money."

On July 16, Costa texted Bairos, saying that "[he has] been calling [Costa's] phone looking for paper," which Bairos interpreted to mean that "Mayor Correia" had been calling Costa looking for "money."  And on July 18, Costa texted Bairos, reiterating that the defendant "wants his end."  Two days later, Bairos gave Costa a combination of cash and marijuana, which Costa credited as a $42,550 payment toward the bribe.

In September of 2018, Bairos and the defendant met in Providence.  The defendant wanted to confirm that "everything was still going forward and everything was moving, that everything was good."  He asked Bairos "[i]s the money good?  Are we all set?"  Bairos understood the defendant to be referring to "[f]inish[ing]

paying off the first portion of the bribe," and he told the defendant that "there was [sic] a few hiccups here and there. There was some additional costs that came through, and that it was just taking a little bit more time, but it would be done." On March 28, 2019, Bairos made another cash payment to Costa: $10,000.

As matters turned out, Costa testified that he never gave any of Bairos's bribe money to the defendant. Nor is there any evidence that Costa gave the defendant any of the marijuana that Costa received from Bairos.

### 3

The third aspiring marijuana vendor was Charles Saliby, who called city hall at several points during the first half of 2018 in search of a non-opposition letter and host community agreement. Around the beginning of June, Saliby spoke with Andrade, who expressed skepticism that the defendant would issue additional letters. She nonetheless arranged a meeting between Saliby and the defendant.

The two men met (with Andrade in attendance) on or about June 21, 2018 at the mayor's office. During this meeting, the defendant reiterated that he did not have the capacity to issue additional letters. He raised the possibility, though, of rescinding a license that was presently inactive.

A few days later, the defendant and Andrade visited
Saliby at Saliby's store.  In a backroom office, the defendant and
Andrade told Saliby that the defendant was prepared to issue the
coveted letters.  When Saliby asked whether there was "anything
[he] can do," the defendant replied that he was "looking for
$250,000."  Saliby understood this to be a request for "a bribe."[2]

After Andrade left, Saliby asked the defendant "why
$250,000?"  The defendant responded that the value of the license
would be "a lot more" and that "he was only going to issue six of
them."  The defendant then added that he wanted the money to be
paid to his legal defense fund.  Saliby balked at the price, and
the two men haggled, settling upon a figure of $125,000 — a figure
agreed to after the defendant said that he could not "go any
lower."  When asked at trial what he thought would have happened
had he refused to pay the bribe, Saliby testified that he believed
the defendant would not have issued the letter and — in the bargain
— would have retaliated against his existing business.

Once the men had agreed on the amount of the bribe,
Saliby escorted the defendant out of his office.  On the way out,
they encountered Andrade, who inquired whether "everything" was

---

[2] As context for this understanding, it is important to note
that Saliby had learned from Bairos — days earlier — that the
defendant was seeking a $250,000 bribe from him.

"okay." Saliby replied in the affirmative. Andrade assured him that "[y]ou're family now."

Saliby later learned of another "annual legal fee" — a $50,000 "community impact fee" — that he would need to pay to operate his proposed marijuana business. Upon learning of this fee, Saliby again met with the defendant and Andrade (this time in Andrade's city hall office). Saliby voiced his objection to the $50,000 community impact fee. The defendant replied that he "would be able to drop [that fee] down to $25,000 a year" on the condition that Saliby "add another $25,000 on top of" the previously agreed $125,000. Saliby consented to this arrangement, and the defendant agreed that Saliby could pay the $150,000 bribe in two equal installments. The first installment was to be paid when Saliby received the non-opposition letter and host community agreement and the second when the Commonwealth issued a provisional license.

Several days after the city hall meeting, the defendant called Saliby about coming to collect the first installment. As arranged, the defendant drove to Saliby's store; Saliby got into the defendant's car; and Saliby gave the defendant $75,000 in cash. In exchange, the defendant handed Saliby a signed non-opposition letter and host community agreement.

**4**

The fourth aspiring marijuana vendor was Matthew Pichette. In 2018, Pichette and his partners decided that they

- 15 -

wanted to open a marijuana business in the City.  On July 11, 2018, Pichette contacted David Hebert, a man who had a close relationship with the defendant.  Hebert explained the process for obtaining the necessary documents from the City.  He added that he had spoken with the defendant and that — although the City was "maxed out" — the defendant might still be able to get Pichette what he needed. Hebert told Pichette that he should put together a proposal and that — when the proposal was ready — Hebert would set up a meeting between Pichette and the defendant.

Two weeks later, Pichette notified Hebert that the proposal was ready.  Hebert arranged for Pichette to meet with the defendant the following day.  Hebert conferred with Pichette in advance of that meeting and told him that completing the process was "going to come with a cost" — a $25,000 payment to the defendant's legal defense fund.  Although Pichette "[didn't] like this idea," he agreed to make the payment, believing that "there was no other way to get" the non-opposition letter and host community agreement.

Later that day, Pichette and his partners met with the defendant at city hall and presented their proposal.  Afterwards, Pichette had a private conversation with the defendant during which the defendant confirmed that Pichette had "talked with [Hebert] and we're good."  Pichette rejoined that he had spoken to Hebert and "we're good."  Pichette took this exchange to be a confirmation

- 16 -

that the defendant knew that Pichette had dealt with Hebert and had agreed to pay the $25,000 bribe. Pichette came away believing "[t]hat [the defendant] was dirty."

The next day, Pichette met with Hebert and discussed how the $25,000 payment was to be made. Hebert suggested funneling the money through a $25,000 campaign contribution. To skirt campaign finance limits, Hebert further suggested that Pichette collect $1,000 checks from twenty-five friends and family members. Before the discussion ended, Hebert agreed that the $25,000 amount did not have to be paid all at once but, rather, could be split into two installments.

On August 20, 2018, Hebert advised Pichette that he was "getting [Pichette's] letters" that day. The two men then agreed that the bribe would be paid through Pichette's purchase of $25,000 in tickets to the defendant's fundraising events — $12,500 worth of tickets for a summer event and the rest for a Christmas party. Pichette collected $11,500 in checks from family members and colleagues (most of whom Pichette reimbursed) and used those funds to purchase tickets for the first event. The checks were dated either August 29 or September 5; they were made out to "Friends of Mayor Jasiel Correia, II" or some variation thereof. On August 21, Hebert delivered the non-opposition letter and host community agreement (both of which were dated August 17).

### C

In the midst of these maneuverings, the government convened a grand jury to investigate the defendant. On October 4, 2018, the grand jury returned an indictment charging the defendant with wire fraud and tax fraud in connection with the SnoOwl app. Almost a year later, the grand jury returned a first superseding indictment that enlarged the charges against the defendant to include Hobbs Act extortion, conspiracy to commit Hobbs Act extortion, and bribery. Most of the new charges related to his dealings, as mayor, with would-be marijuana vendors. The remainder alleged variously that the defendant, as mayor, hired and retained his chief of staff on the condition that she kick back half of her salary to him and that he extorted and conspired to extort a businessman in exchange for issuing certain permits. In a second superseding indictment, the grand jury added charges against Andrade. All told, the grand jury — as evidenced by the second superseding indictment — charged the defendant with nine counts of wire fraud, see 18 U.S.C. § 1343; four counts of tax fraud, see 26 U.S.C. § 7206(1); five counts of conspiracy to commit extortion, see 18 U.S.C. § 1951(a); five counts of extortion, see id.; and one count of bribery, see 18 U.S.C. § 666(a)(1)(B).

Andrade entered a guilty plea, and the defendant proceeded to trial alone. The government and the defendant agreed that all the charges should be tried together. Following an

eighteen-day trial, the jury convicted the defendant of all nine counts of wire fraud, all four counts of tax fraud, four counts of extortion conspiracy, and four counts of extortion. The jury acquitted the defendant on one count of extortion conspiracy, one count of extortion, and the bribery count.

The defendant moved for judgment of acquittal and/or a new trial on all of the counts of conviction. The district court consolidated the hearing on these motions with the sentencing hearing. The court acquitted the defendant on six of the nine wire-fraud counts after determining that a stipulation the parties had reached did not provide sufficient evidence from which the jury could find beyond a reasonable doubt that the "interstate wire" element of the offense had been satisfied. The court likewise acquitted the defendant on all four of the tax-fraud counts. In all other respects, the court denied the defendant's post-trial motions. It then proceeded to sentence the defendant to a seventy-two-month concurrent term of immurement on each count of conviction. This timely appeal followed.

## II

The defendant challenges his convictions on multiple fronts. First, he argues that the evidence was insufficient to sustain several of the counts of conviction. Second, he argues that the impact of spillover prejudice necessitates a new trial. Third, he argues that we should order a new trial due to

instructional error.  Finally, he argues that we should order a
new trial due to prosecutorial misconduct, that is, improper
closing argument.  We address these arguments sequentially.

### III

We start with the defendant's claim that the evidence
was insufficient to permit the jury to convict on the wire-fraud
counts and some of the Hobbs Act counts.  We subdivide our
analysis, separating the wire-fraud convictions from the Hobbs Act
convictions.

As to both classes of claims, our standard of review is
familiar.  We review an order denying a motion for judgment of
acquittal de novo.  See United States v. Simon, 12 F.4th 1, 23-24
(1st Cir. 2021), cert. denied sub nom. Kapoor v. United States,
142 S. Ct. 2811 (2022), and cert. denied sub nom. Lee v. United
States, 142 S. Ct. 2812 (2022); United States v. George, 841 F.3d
55, 61 (1st Cir. 2016).  Where, as here, the defendant challenges
"the sufficiency of the evidence, all of the proof 'must be perused
from the government's perspective.'"  United States v. Kilmartin,
944 F.3d 315, 325 (1st Cir. 2019) (quoting United States v. Gomez,
255 F.3d 31, 35 (1st Cir. 2001)).  "This lens demands that 'we
scrutinize the evidence in the light most compatible with the
verdict, resolve all credibility disputes in the verdict's favor,
and then reach a judgment about whether a rational jury could find
guilt beyond a reasonable doubt.'"  Simon, 12 F.4th at 24 (quoting

United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)); see
George, 841 F.3d at 61.

In conducting this tamisage, "we must honor the jury's
evaluative choice among plausible, albeit competing, inferences."
United States v. Rodríguez-Vélez, 597 F.3d 32, 40 (1st Cir. 2010).
We "need not be convinced that the verdict is correct" but, rather,
"need only be satisfied that the verdict is supported by the
record." Kilmartin, 944 F.3d at 325. Thus, "[t]he verdict must
stand unless the evidence is so scant that a rational factfinder
could not conclude that the government proved all the essential
elements of the charged crime beyond a reasonable doubt."
Rodríguez-Vélez, 597 F.3d at 39 (emphasis in original).

**A**

We turn first to the defendant's claim that there was
insufficient evidence to support the three wire-fraud convictions
that the district court allowed to stand. The elements of wire
fraud are "(1) a scheme or artifice to defraud using false or
fraudulent pretenses; (2) the defendant's knowing and willing
participation in the scheme or artifice with the intent to defraud;
and (3) the use of the interstate wires in furtherance of the
scheme." United States v. Arif, 897 F.3d 1, 9 (1st Cir. 2018)
(quoting United States v. Appolon, 715 F.3d 362, 367 (1st Cir.
2013)). The term "false or fraudulent pretenses" encompasses any
false statements or assertions that were either known to be untrue

when made or that were made with reckless indifference to their truth so long as those statements were made with an intent to defraud. See United States v. Blastos, 258 F.3d 25, 28 (1st Cir. 2001). The term extends to "actual, direct false statements as well as half-truths and the knowing concealment of facts." Id. at 29. But in all events, "[t]he false or fraudulent representation[s] [at issue] must be material." Appolon, 715 F.3d at 367-68.

Here, the government offered evidence to show that the defendant — using two different types of materially false representations — constructed a scheme to defraud and induced Eisenberg and Martinez to invest $25,000 apiece in SnoOwl. The first type of fraudulent misrepresentation related to the defendant's track record in developing FindIt. Specifically, a reasonable jury could have found from the proffered evidence that the defendant falsely represented his success in developing and/or selling FindIt. The second type of fraudulent misrepresentation related to the defendant's plans for the use of investor money. Specifically, a reasonable jury could have found from the proffered evidence that the defendant falsely represented that investor money would be used only to develop the SnoOwl app. Relatedly, a reasonable jury could have found that the defendant concealed the important fact that investor money for SnoOwl would be used for his personal benefit.

The defendant attempts to sidestep the force of this evidence.  Although he does not gainsay his interstate use of wire transmissions in the course of soliciting investments from Eisenberg and Martinez, he digs in his heels as to the other elements of the wire-fraud convictions.  He argues that he did not use false or fraudulent pretenses because his representations were, variously, puffery, true, or never uttered.  And even if the statements were made and were false, the defendant says, they were not material.

This rebuttal is all foam and no beer.  To begin, the defendant's claim that his statements to Eisenberg and Martinez regarding FindIt's sale to a group in Cambridge were mere puffery is baseless.  While the line between puffery and fraud is sometimes blurred, the law distinguishes "between misrepresentations that go to the essence of a bargain and those [misrepresentations] that are merely collateral."  Arif, 897 F.3d at 10.  It is clear beyond hope of contradiction that the defendant's misrepresentations about FindIt were not merely collateral.  After all, particularized factual representations that can definitely be refuted — as opposed to statements of mere opinions — can constitute fraud.  See United States v. Martinelli, 454 F.3d 1300, 1317 (11th Cir. 2006); United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002).  The defendant's statements regarding FindIt's sale fall squarely into this bucket.

- 23 -

We need not tarry. From the proffered evidence, the jury reasonably could have inferred that the defendant's story regarding FindIt's sale was a fable and that the sale never occurred. Yet, the defendant made a stream of contrary factual representations to Eisenberg and Martinez. In context, those representations could not reasonably be deemed to constitute "exaggerated opinions or hyped-up sales pitches." Martinelli, 454 F.3d at 1317. Rather, they were factual statements that were verifiably refutable.

The cases cited by the defendant do not advance his cause. A prime example is United States v. Rodriguez, 732 F.3d 1299 (11th Cir. 2013). There, the Eleventh Circuit rejected an argument similar to that made by the defendant. See id. at 1304. The court held that the accused's statements to investors "surpassed 'sellers' talk' or 'mere puffery'" when, among other things, the accused made "specific" representations to customers that "he knew . . . were completely unfounded." Id. So it is here. The defendant's statements regarding FindIt's sale were lies, not puffery.

What is more, the defendant's lies about FindIt were material. "[T]o establish materiality, 'the government need not prove that the decisionmaker actually relied on the falsehood.'" United States v. Stepanets, 989 F.3d 88, 104 (1st Cir. 2021) (internal quotation marks omitted) (quoting United States v.

- 24 -

Cadden, 965 F.3d 1, 12 (1st Cir. 2020)), cert. denied, 142 S. Ct. 290 (2021). Instead, "the government need only show that the false statement 'had a natural tendency to influence, or was capable of influencing' its target's decision." Cadden, 965 F.3d at 12 (internal alteration and quotation marks omitted) (quoting United States v. Prieto, 812 F.3d 6, 13 (1st Cir. 2016)); see Appolon, 715 F.3d at 368. The false statements about FindIt easily clear this low bar: they had a natural tendency to influence the investors' decisions as to whether to invest in SnoOwl. Indeed, the jury reasonably could have concluded that the statements were uttered for this very purpose.

The defendant demurs. He contends that Eisenberg and Martinez invested in SnoOwl because they were convinced by his overall business plan — not because he claimed to have had previously developed and sold FindIt. But Eisenberg specifically testified that he would not have invested in SnoOwl had he "known that there was no college app that was sold to people in Cambridge, who then sold it to Facebook." And more generally, past success is often seen as a herald of future success. Thus, we think that a rational jury could infer that a statement regarding a prospective app-developer's past success in creating and selling a similar app would have a natural tendency to influence a prospective investor's decision to invest in a new endeavor. The

defendant's false statements regarding FindIt's sale were, therefore, material.

This leaves the defendant's claim that there was insufficient evidence for a jury to find that he falsely represented his plans for the use of investors' money. In support, he advances two arguments. First, he argues that he truthfully told investors that he would not draw a salary for his work on SnoOwl. Second, he argues that he did not tell Eisenberg or Martinez that he would use "all" of the investor money to develop SnoOwl. Neither argument gains the defendant any traction.

The defendant's "salary" argument is a red herring. Whether the defendant represented that he would not take a salary is entirely beside the point. The government's theory of fraud encompassed two broad categories of misrepresentation — and neither category included a claim that the defendant told investors that he intended not to draw a salary.

The defendant's second claim of error is swallowed up by the district court's jury instructions. The court instructed the jury that the defendant could be found guilty if he falsely represented "that investor money for the SnoOwl project would be used to develop the SnoOwl app" or if he "omitt[ed] to state and conceal[ed] that investor money for the SnoOwl project would be used for [the defendant's] personal benefit and not for the development of the SnoOwl app." Under these instructions, the

jury did not need to find that the defendant stated an intent to put every cent of investor funds toward SnoOwl's development.

With that clarification, we think that the evidence was sufficient to support the jury's verdict. Both Eisenberg and Martinez testified that the defendant never told them that he intended to pay for personal expenses — let alone extravagant personal expenses — using company funds. And in the investor agreements, the defendant warranted that he would not "transfer or otherwise convey" SnoOwl's assets except in the ordinary course of business. Those assets included the funds invested by Eisenberg and Martinez.

The jury reasonably could have found that this assurance was honored only in the breach. Following receipt of the investment, the defendant proceeded to spend thousands of SnoOwl's dollars on personal expenses, ranging from casinos to cologne to student loans. No more was exigible to ground the jury's finding that the defendant had made materially false representations in this respect.

That ends this aspect of the matter. We conclude that the evidence was sufficient for the jury to find that the defendant had committed the various acts of wire fraud of which he stands convicted.

**B**

We turn next to the defendant's challenges to his convictions for conspiring to commit extortion in violation of the Hobbs Act. (We separately address, see infra Part III(C), his challenges to the underlying extortion convictions.) The defendant argues that the evidence was insufficient to show that he conspired with two go-betweens — Hebert and Andrade — to extort Pichette and Saliby, respectively. Both aspects of this argument lack force.

The Hobbs Act makes it a felony to "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery or extortion" or to attempt or conspire to do so. Tkhilaishvili, 926 F.3d at 10 (quoting 18 U.S.C. § 1951(a)); see United States v. Goodoak, 836 F.2d 708, 712 (1st Cir. 1988). Extortion, in turn, "is defined under the Hobbs Act as 'the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.'" Tkhilaishvili, 926 F.3d at 10 (quoting 18 U.S.C. § 1951(b)(2)). This case focuses on the "official right" strain of extortion.

Extortion under color of official right is the "rough equivalent of what we would now describe as 'taking a bribe.'" Ocasio v. United States, 578 U.S. 282, 285 (2016) (quoting Evans v. United States, 504 U.S. 255, 260 (1992)); see United States v.

Buffis, 867 F.3d 230, 235 n.5 (1st Cir. 2017). To prove this type of extortion, the government must "show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Ocasio, 578 U.S. at 285 (quoting Evans, 504 U.S. at 268); see United States v. Turner, 684 F.3d 244, 253 (1st Cir. 2012). "[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense." Turner, 684 F.3d at 253 (emphasis in original) (quoting Evans, 504 U.S. at 268).

The jury supportably could have found that the government's evidence showed that the prospective marijuana vendors (for purposes of this discussion, Pichette and Saliby) agreed to make payments to the defendant in exchange for official actions (non-opposition letters and/or host community agreements). The defendant nonetheless contends that there was insufficient evidence to support his convictions for conspiracy to commit Hobbs Act extortion. See, e.g., United States v. Echeverri, 982 F.2d 675, 679 (1st Cir. 1993) (noting that — to prove conspiracy — government must "show, inter alia, that an agreement or working relationship existed, that it had an unlawful purpose, and that the defendant was a voluntary participant in it" (emphasis in original)).

**1**

One branch of the defendant's argument centers on the extortion of Pichette (who agreed to pay $25,000 to the defendant's campaign fund and actually delivered $11,500 in partial fulfillment of that agreement). The jury convicted the defendant both of extorting Pichette directly and of conspiring to do so. As relevant here, the defendant insists that the evidence was insufficient to prove a conspiracy.

At trial, the government's theory of the case was that the defendant conspired with Hebert to extort Pichette. In this court, the defendant challenges the premise on which this theory rests: to the extent that Hebert extorted Pichette, the defendant suggests, he acted alone and out of self-interest, fueled by a desire to enrich himself and to curry favor with the defendant.

Contrary to the defendant's importunings, there was adequate evidence from which the jury reasonably could have concluded that the defendant and Hebert conspired to extort Pichette. Among other things, the jury heard testimony that, hours prior to Pichette's meeting with the defendant, Hebert (who had arranged the meeting) advised Pichette that obtaining the non-opposition letter and host community agreement from the defendant was going to "come with a [$25,000] cost." And during the meeting itself, the defendant confirmed with Pichette that Pichette had "talked to [Hebert]" and that they were "good." Juries are

permitted to draw reasonable inferences from the evidence, and the jury in this case fairly could have inferred from this evidence both that the defendant was aware that Hebert had informed Pichette of the demanded bribe and that Pichette had agreed to pay it. And after the meeting, Hebert helped Pichette work out how best to pay the bribe and agreed that it could be paid in installments. This evidence and the reasonable inferences therefrom painted a picture of a conspiracy with Pichette as the bribe-payer, Hebert as the go-between, and the defendant as the bribe-taker. On these facts, the jury was free to accept or reject that picture.

The defendant points elsewhere in the record to argue that the "equal or greater" inference is that Hebert was acting alone and solely for personal gain. Specifically, the defendant points to the fact that, while brokering the arrangement, Hebert unsuccessfully sought $100,000 in consulting fees from Pichette and arranged for tens of thousands of dollars in mortgage forgiveness on a loan that he owed to Pichette's brother. But even if we assume that these facts support a plausible inference that Hebert was acting to his own behoof — a matter on which we take no view — that assumed fact does not undercut the inference that Hebert also conspired with the defendant to extort a bribe from Pichette. See Simon, 12 F.4th at 24; Rodríguez-Vélez, 597 F.3d at 40; United States v. Arias, 238 F.3d 1, 3 (1st Cir. 2001). Wrongdoers sometimes may have mixed motives; and where, as here,

the evidence is sufficient to support more than one motive, it is for the jury — not for an appellate court — to separate wheat from chaff.  See United States v. Woodward, 149 F.3d 46, 58-59 (1st Cir. 1998) (noting that "jury was free to 'choose among the reasonable alternatives posed by the evidence,' and we will not second-guess the jury's conclusion in this regard" (internal citation omitted) (quoting United States v. Sawyer, 85 F.3d 713, 733 (1st Cir. 1996))).

The assumed fact — that the evidence may have been sufficient for the jury to have found that Hebert was acting, in part, out of self-interest — does not give rise to an equal or nearly equal inference that Hebert and the defendant were acting independently.  See Rodríguez-Vélez, 597 F.3d at 40 (rejecting defendant's argument that "the evidence, even if credited, shows him to be a freelance entrepreneur rather than a coconspirator").  Notwithstanding any benefits that Hebert may have garnered for himself, the jury reasonably could have found that he persuaded Pichette to agree to donate $25,000 to the defendant's campaign fund in exchange for the desired documents.  And the $11,500 in checks that Pichette subsequently donated were made out to "Friends of Jasiel Correia, II," not "David Hebert."

The defendant has a fallback position.  He argues that the sequence of events demonstrates that, from the defendant's perspective, there was no quid pro quo.  At its core, this argument

rests on the fact that Pichette received the documents <u>before</u> he made the campaign contributions.

This is smoke and mirrors.  In the analogous context of illegal bribery under 18 U.S.C. § 666, we have observed that "the timing of the <u>payment</u> may not provide a conclusive answer as to whether [a] payment is a bribe or a gratuity, [but] the timing of the <u>agreement to make or receive a payment</u> may." <u>United States</u> v. <u>Fernandez</u>, 722 F.3d 1, 19 (1st Cir. 2013) (emphases in original); see <u>United States</u> v. <u>Jennings</u>, 160 F.3d 1006, 1014 (4th Cir. 1998) (explaining that "the timing of the payment in relation to the official act for which it is made is (in theory) irrelevant"); <u>United States</u> v. <u>Griffin</u>, 154 F.3d 762, 764 (8th Cir. 1998) (explaining that the distinguishing characteristic of a bribe is the agreement to exchange something of value for official action), <u>as amended</u> (Sept. 8, 1998).  To be sure, "one cannot agree to perform an act in exchange for payment when that act has already been performed." <u>Fernandez</u>, 722 F.3d at 19.  But timing is critical:  as long as the agreement to exchange a thing of value for an official act is made before the act is performed, the requisite quid pro quo is established.  See <u>Griffin</u>, 154 F.3d at 764.

Those principles apply here.  To convict on this charge, the jury had to find that the defendant obtained a payment to which he was not entitled in exchange for his agreement to supply the

documents Pichette needed to open a marijuana business.  See Turner, 684 F.3d at 253.  The jury was not required to find that the payment was made before the official act occurred.  See Evans, 504 U.S. at 268.

From the evidence introduced at trial, the jury reasonably could have found that Pichette and the defendant agreed that Pichette would pay a bribe in exchange for the documents before the defendant signed them.  It is thus of no moment that the defendant proceeded to sign the documents in advance of Pichette's payment of the bribe.  By effecting the payment, Pichette was simply completing his end of the bargain.  When asked why he followed through on contributing to the defendant's campaign even after the documents were a "done deal," Pichette said "[b]ecause that was the deal we made."  We hold, therefore, that it was well within the jury's province both to infer the existence of an explicit quid pro quo between Pichette and the defendant, see Griffin, 154 F.3d at 764; see also McCormick v. United States, 500 U.S. 257, 273 (1991) (holding that where payments are structured as campaign contributions, Hobbs Act liability lies when "payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act"), and to infer that Hebert conspired with the defendant to arrange that quid pro quo.

**2**

This brings us to the defendant's relationship with Saliby. Although he refrains from challenging the underlying extortion conviction, he takes aim at whether the government proved a conspiracy to extort. Upon close perscrutation, we reject the claim that there was insufficient evidence for the jury to find that Andrade conspired with the defendant to extort Saliby.

This claim rests on the notion that Andrade was not a coconspirator. Although Andrade was present during certain meetings between the defendant and Saliby, the defendant posits that she was not actively involved in the scheme. In support, the defendant cites a number of cases holding that mere presence at the scene of a crime and close association with those involved are insufficient to show participation in a conspiracy. See, e.g., United States v. Morillo, 158 F.3d 18, 25 (1st Cir. 1998); United States v. Andujar, 49 F.3d 16, 21 (1st Cir. 1995); United States v. Ocampo, 964 F.2d 80, 82-83 (1st Cir. 1992).

That is true as far as it goes — but it does not take the defendant very far. Presence and close association, though insufficient without more, are nonetheless "relevant factors for the jury" to consider. Andujar, 49 F.3d at 22. And as we have said, a "defendant's presence during the commission of a crime can establish guilt where the surrounding circumstances imply participation." United States v. Rogers, 121 F.3d 12, 15 (1st

Cir. 1997); see Echeverri, 982 F.2d at 678 (distinguishing between "mere presence" and "culpable presence"). In the last analysis, the "question is always whether the circumstances of the particular case add up to showing both knowledge and voluntary participation in a conspiracy beyond a reasonable doubt." Morillo, 158 F.3d at 25 (emphasis in original).

We think that the circumstances here are sufficient to permit the jury to have found both knowledge and voluntary participation on Andrade's part. Consequently, the evidence was sufficient to show that Andrade conspired with the defendant to extort Saliby. For a start, "it reasonably can be assumed that 'criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences.'" United States v. Patch, 9 F.4th 43, 47 (1st Cir. 2021) (quoting United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992)); see Morillo, 158 F.3d at 24. And in other contexts in which nefarious activity is afoot, we have said that it is much less likely that a person is "an innocent bystander . . . where [that] person is brought to a neutral site by a [criminal] preliminary to the actual consummation of [the crime]." Ortiz, 966 F.2d at 712. These observations apply four-square to Andrade. She accompanied the defendant to Saliby's store and was present when the defendant solicited Saliby for a $250,000 bribe. She was also present for the duration of a later meeting

at which the defendant and Saliby negotiated an increased bribe in exchange for the lowering of an annual municipal fee. Seen in this light, this was not a case in which Andrade simply arranged meetings but lacked knowledge of what transpired at those meetings.

The defendant dismisses this logic, relying on cases such as Andujar and Ocampo. But the defendant's reliance is misplaced. In Andujar, we overturned the defendant's conspiracy conviction largely because the defendant was neither present at any of the "critical . . . meetings" nor "aware" that the subject matter of the meetings concerned a prospective crime. 49 F.3d at 22. That pattern is repeated in Ocampo, in which we reversed the defendant's conviction after determining that "there was no evidence that [the defendant] participated in any meetings" with her alleged coconspirators, even though it might have been a "fair inference" that she "knew what was going on." 964 F.2d at 82-83.

Unlike in Andujar and Ocampo, the evidence here suffices to link Andrade to the scheme. Not only was she present at two pivotal meetings at which bribes were negotiated, but she also asked Saliby if "everything [was] okay" after he and the defendant had wrapped up their negotiation. When Saliby responded in the affirmative, Andrade assured him that "[y]ou're family now." Jurors are expected to use their common sense, and a common-sense interpretation of Andrade's remark, in the context of what had

gone before, was to welcome Saliby into the "family" of those who were doing under-the-table business with the defendant.

The defendant, in effect, entreats us to examine each piece of evidence in isolation — but the jury was entitled to draw reasonable inferences from the evidence as a whole. See Olbres, 61 F.3d at 974. Taking into account Andrade's presence at the two meetings, the surrounding circumstances, her close relationship with the defendant, and her contemporaneous statement to Saliby, the jury reasonably could have inferred both her knowledge of and her culpable participation in the bribery scheme.

### 3

We summarize succinctly. The record, read favorably to the verdict, adequately supports both the jury's finding that the defendant conspired with Hebert to extort Pichette and its finding that the defendant conspired with Andrade to extort Saliby.[3]

### C

The defendant's final pair of challenges to the sufficiency of the evidence implicates two of his four extortion

---

[3] Given our validation of these verdicts on the grounds stated, we need not reach the government's alternative argument that the verdicts may be upheld because the evidence suffices to show that the defendant conspired with the marijuana vendors themselves. Consequently, we take no view of the defendant's assertion that, as a matter of law, he could not be found guilty of conspiring with a marijuana vendor to extort that vendor himself.

convictions:  those involving Pichette and Bairos.  We consider these challenges separately.

1

With respect to Pichette, the defendant argues that the evidence did not show that he himself demanded the payment of a bribe.  He also argues that — because he did not receive a personal benefit from Pichette — the evidence was insufficient to show extortion.  Neither argument moves the needle.

The defendant's argument that the evidence was insufficient to show that he extorted Pichette relies on theories that we already have rejected.  See supra Part III(B)(1).  As before, he argues that the evidence showed only that Hebert "acted independently and for his own personal benefit."  But the jury heard evidence that, in a meeting at city hall, the defendant had a side conversation with Pichette during which he confirmed that Hebert had told Pichette about the required bribe and that Pichette had agreed to pay it.  Based on that conversation and the fact that Hebert had discussed the bribe with Pichette earlier that day, the jury rationally could have concluded — as it did — that the defendant himself was extorting the bribe.

The defendant does present one new wrinkle.  He says that — in order to find him guilty of "official right" extortion — the jury needed to find that he "personally receive[d] payments" from the victims of his extortion.  In other words, he argues that

he cannot be found guilty under the Hobbs Act of extorting Pichette if the benefit of his illicit acts accrued solely to some other person or people. And because the bribe paid by Pichette was not paid directly to the defendant, his thesis runs, he could not lawfully have been found guilty of extorting Pichette.

We can swiftly dispose of this argument. Even if the defendant was right that he needed to obtain a personal benefit to be guilty of "official right" extortion, he in fact received such a benefit. Pichette's donation of $11,500 to the defendant's campaign fund surely would qualify under that rubric. And as we already have determined, see supra Part III(B)(1), the jury reasonably could have found that Pichette made this contribution in exchange for the defendant's explicit undertaking to approve a non-opposition letter and host community agreement on Pichette's behalf. That meant, in essence, that Pichette received a specific quid pro quo in return for his political contribution. No more was exigible. See Turner, 684 F.3d at 253 n.4; United States v. Cruzado-Laureano, 404 F.3d 470, 482 (1st Cir. 2005).

**2**

With respect to Bairos, the defendant reiterates his claim that — in order to find him guilty of "official right" extortion — the jury would have had to find that he personally received something of value from Bairos. This argument has a foothold in the record because the alleged middleman — Costa —

- 40 -

testified that he never turned over to the defendant the money and drugs that he received from Bairos.

We nonetheless reject the premise on which this argument rests. The Hobbs Act defines extortion in relevant part as "the obtaining of property from another, with his consent, under color of official right." Turner, 684 F.3d at 253 (internal alteration omitted) (quoting 18 U.S.C. § 1951(b)(2)). In United States v. Brissette, 919 F.3d 670, 677, 680 (1st Cir. 2019), we held that the statute's "obtaining of property" element is satisfied as long as the defendant "brings about th[e] transfer [of another's property] to a third party." In the process, we refused to credit the claim that "the defendant[] must also 'enjoy a personal benefit from' th[e] directed transfer [of another's property] in order for the 'obtaining' element to be satisfied." Id. at 676 (internal alteration omitted); see Tkhilaishvili, 926 F.3d at 10-11 (holding that "the government was not required to show that the defendants stood to benefit personally from the extortionate transfer of [victim's] property to a third party"). And with respect to the Hobbs Act's "official right" element, we noted that the Supreme Court has never held "that the 'obtaining of property' element requires proof that the defendant received a personal benefit separate and apart from having 'brought about a transfer of property to another.'" Brissette, 919 F.3d at 679 (internal

alterations omitted) (quoting <u>Scheidler</u> v. <u>Nat'l Org. for Women,</u>
<u>Inc.</u>, 537 U.S. 393, 408 n.13 (2003)).

Recognizing the force of this precedent, the defendant
tries an end run.  He directs our attention to the term "official
right" and emphasizes that the Supreme Court has held that the
"official right" strain of Hobbs Act extortion envisions proof of
either "the sale of public favors for private gain," <u>Wilkie</u> v.
<u>Robbins</u>, 551 U.S. 537, 564 (2007), or a quid pro quo, <u>see</u> <u>Evans</u>,
504 U.S. at 268; <u>McCormick</u>, 500 U.S. at 274; <u>see also</u> <u>Turner</u>, 684
F.3d at 253-54 (collecting cases).  Building on this foundation,
the defendant suggests that the quid pro quo requirement cannot be
satisfied unless the public official charged with "official right"
extortion personally benefited from the extortionate scheme.  In
the defendant's words, the crime "requires that the official
personally receive an unlawful payment for an official act."

We believe that the defendant takes too crabbed a view
of "official right" extortion.  To satisfy the quid pro quo
requirement, "the Government need only show that a public official
has obtained a payment to which he was not entitled, knowing that
the payment was made in return for official acts." <u>Evans</u>, 504
U.S. at 268.  Justice Kennedy elaborated that the requirement of
a quid pro quo means only:

> that without pretense of any entitlement to
> the payment, a public official violates § 1951
> if he intends the payor to believe that absent

> payment the official is likely to abuse his
> office and his trust to the detriment and
> injury of the prospective payor or to give the
> prospective payor less favorable treatment if
> the quid pro quo is not satisfied.

Id. at 274 (Kennedy, J., concurring) (emphasis in original).
Neither element of this definition limits the quid pro quo
requirement to situations in which a public official personally
benefits from the corrupt payment. This makes good sense,
especially when one considers that the Court has long held that
"extortion as defined in the [Hobbs Act] in no way depends upon
having a direct benefit conferred on the person who obtains the
property." United States v. Green, 350 U.S. 415, 420 (1956).

Nor are we blazing a new trail in holding — as we do —
that "official right" extortion does not require that the
extortionist receive a direct benefit. Other courts that have
considered the question have reached the same conclusion. See,
e.g., United States v. Renzi, 769 F.3d 731, 743 (9th Cir. 2014);
United States v. Hairston, 46 F.3d 361, 365 (4th Cir. 1995); United
States v. Haimowitz, 725 F.2d 1561, 1577 (11th Cir. 1984); United
States v. Margiotta, 688 F.2d 108, 133 (2d Cir. 1982) overruled on
other grounds by McNally v. United States, 483 U.S. 350 (1987).

The two Supreme Court cases on which the defendant pins
his hopes do not suggest a different result. See Evans, 504 U.S.
255; McCormick, 500 U.S. 257. In each of those cases, the Court
"simply had no reason to address" whether a public official can be

- 43 -

convicted of "official right" extortion when he does not "receive[]
a personal benefit separate and apart from having 'brought about
a transfer of property to another.'" Brissette, 919 F.3d at 679-
80 (internal alterations omitted) (quoting Scheidler, 537 U.S. at
408 n.13).

By the same token, Wilkie v. Robbins, 551 U.S. 537, does
not spring to the defendant's rescue.  There, the Court clarified
that "official right" extortion includes "the sale of public favors
for private gain," but not "efforts of Government employees to get
property for the exclusive benefit of the Government."  Id. at
564-65.  That is a far cry from saying that the public official
must personally receive an unlawful payment in order to be guilty
of extortion.

To say more on this point would be supererogatory.[4]  We
conclude that there was sufficient evidence from which a reasonable
jury could find that the defendant extorted Bairos.  The jury heard
evidence that — over the course of several months in 2018 and 2019
— Bairos paid Costa $77,550 through a combination of cash and in-

---

[4] We do not address the defendant's argument (which by his
own admission he raises solely for preservation purposes) that
Evans was wrongly decided.  Cf. Agostini v. Felton, 521 U.S. 203,
237 (1997) ("If a precedent of this Court has direct application
in a case, yet appears to rest on reasons rejected in some other
line of decisions, the Court of Appeals should follow the case
which directly controls, leaving to this Court the prerogative of
overruling its own decisions." (quoting Rodriguez de Quijas v.
Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989))).

kind payments.   It also heard evidence sufficient to ground a
conclusion that Costa — in receiving the bribes — was acting in
concert with the defendant.   That evidence, if credited by the
jury, was sufficient to satisfy the Hobbs Act's "obtaining of
property" element.   See Brissette, 919 F.3d at 680.

         Although Costa testified that he kept all the money for
himself, the jury could infer that both Bairos and the defendant
believed that the payments were made in exchange for the
defendant's issuance of a non-opposition letter and host community
agreement on Bairos's behalf.   Both text-message evidence and
Costa's testimony supported the inference that the defendant had
agreed to receive money in exchange for the letters.   To cinch the
matter, Bairos testified that the defendant had asked him about
the status of the payments on several occasions.

         All in all, the evidence was sufficient to furnish a
foundation for the extortion convictions involving the defendant's
interactions with Pichette and Bairos.

IV

         The defendant next argues that evidence admitted with
respect to the charges of which he was acquitted unfairly tainted
the jury's findings against him on the convictions that remain.
Specifically, he argues that he was prejudiced by "evidentiary
spillover" resulting from the "transference of guilt" from the ten

counts that the district court dismissed in a post-trial ruling.[5]
United States v. Wihbey, 75 F.3d 761, 774 (1st Cir. 1996) (quoting
United States v. Sutherland, 929 F.2d 765, 772-73 (1st Cir. 1991)).
Relatedly, the defendant argues that the government introduced
themes in its evidentiary presentation undergirding the dismissed
charges (such as that he "was 'the type of person' who would do
anything to enrich himself") that unfairly reinforced the
remaining counts of conviction.  Finally, he argues that seemingly
credible witness testimony and documentary evidence introduced in
connection with the dismissed counts "lent a false sense of
corroboration to the corruption case."

        The defendant first raised the issue of prejudicial
spillover in his post-trial motion for a new trial.  The district
court rejected the defendant's plaint.  The court took pains to
note that the jury had been "very careful" and had reached a
"discriminating verdict."

        "We review the district court's denial of a new trial
based on allegations of prejudicial spillover for abuse of
discretion." Simon, 12 F.4th at 44. Prejudicial spillover "occurs
when the evidence admitted to prove a charge as to which the
defendant was acquitted 'was so extensive, inflammatory, and
prejudicial that it necessarily spilled over into the jury's

---

[5] The government does not appeal this ruling, and we do not
address its merits.

consideration of his guilt on other charges.'" Id. at 43 (internal alteration omitted) (quoting United States v. Mubayyid, 658 F.3d 35, 72 (1st Cir. 2011)).  "To determine whether an unacceptable threat of prejudicial spillover materialized, we must evaluate whether the record evinces 'a serious risk that the joinder of offenses compromised a specific trial right or prevented the jury from making a reliable judgment about guilt or innocence.'" Id. (internal alterations and quotation marks omitted) (quoting Mubayyid, 658 F.3d at 72).  "The devoir of persuasion rests with the defendant to show 'prejudice so pervasive that a miscarriage of justice looms.'" Id. at 43-44 (quoting United States v. Trainor, 477 F.3d 24, 36 (1st Cir. 2007)).

Here, we discern no abuse of discretion in the district court's determination that the threat of prejudicial spillover did not require a new trial.  To begin, we address the defendant's contention that he was prejudiced by the wire- and tax-fraud evidence incidental to the dismissed counts — evidence that he claims was irrelevant to the Hobbs Act counts.  Much of this evidence, he says, would have been inadmissible in a trial limited to the remaining counts of conviction.

We consider this argument in two parts, beginning with the evidence that was admitted on the six dismissed wire-fraud counts.  The district court supportably found that much of the evidence on those counts would have been admissible in connection

with the remaining charges.  The court viewed the evidence as
admissible under Federal Rule of Evidence 404(b)(2) to prove the
defendant's intent, which the court noted was the "core relevant
issue in this case."  United States v. Correia, 2022 WL 1004200,
at *6 (D. Mass. Apr. 4, 2022).  And "[t]o the degree that the
evidence was prejudicial," the court observed, "it was not unfairly
so."  Id. at *4; see Fed. R. Evid. 403; see also United States v.
Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) ("By design,
all evidence is meant to be prejudicial; it is only unfair
prejudice which must be avoided." (emphasis in original)).

We conclude that the district court did not abuse its
discretion in finding no significant spillover prejudice from the
six dismissed wire-fraud counts.  Importantly, three other wire-
fraud counts resulted in still-standing convictions — so any trial
that included those counts would have involved much of the same
evidence regarding how the defendant misled investors and used
company funds for his personal benefit.  See United States v.
Zimny, 873 F.3d 38, 60 (1st Cir. 2017) (rejecting spillover claim
when some evidence "would still have been relevant and admissible
to [some of] the counts" of conviction); see also United States v.
Edgar, 82 F.3d 499, 504-05 (1st Cir. 1996) (finding no prejudicial
spillover from evidence on acquitted count when "[s]ome of the
[same] evidence . . . would have been admissible" with respect to
counts of conviction).  And even if some modest amount of evidence

on the six dismissed wire-fraud counts would have been inadmissible
in a case winnowed down to the Hobbs Act counts and a subset of
the wire-fraud counts, the evidence was not so "extensive,
inflammatory, and prejudicial" that it was apt to have affected
the jury's consideration of the defendant's guilt or innocence.
Simon, 12 F.4th at 43 (quoting Mubayyid, 658 F.3d at 72).

       The second part of the defendant's argument targets the
evidence admitted on the tax-fraud counts (all of which were
dismissed by the district court in its post-trial ruling). But
once again, the district court refused to grant a new trial based
on spillover prejudice, invoking Federal Rule of Evidence
404(b)(2) and noting that much of the tax-fraud evidence would
still have been admissible in the context of the remaining charges.

       We need not tarry. Even assuming, for argument's sake,
that the evidence related to the tax-fraud counts would not have
been admissible in relation to the Hobbs Act counts, we discern no
abuse of discretion in the district court's rebuff of the spillover
prejudice claim.[6]

_____

       [6] We limit our analysis to the question of whether the evidence
admitted on the dismissed tax-fraud counts led to spillover
prejudice vis-à-vis the Hobbs Act counts. The defendant has not
developed any argument that the evidence admitted on the tax-fraud
counts prejudiced him with respect to the three remaining wire-
fraud convictions. See United States v. Zannino, 895 F.2d 1, 17
(1st Cir. 1990).

For one thing, the government's tax-fraud evidence was neither inflammatory nor unfairly prejudicial. One reliable measure of whether evidence can be considered inflammatory or unfairly prejudicial is "whether the evidence on the reversed count[s] would have tended to incite or arouse the jury into convicting the defendant on the remaining counts." United States v. Rooney, 37 F.3d 847, 855 (2d Cir. 1994). The government's tax-fraud evidence consisted primarily of the defendant's tax returns, spreadsheets documenting money the defendant owed to SnoOwl, an accountant's files, and the testimony of two tax professionals. Much of this evidence was dry as dust and — at any rate — it resembled in kind parts of the evidence properly admitted to prove the still-standing wire-fraud convictions (such as bank records, credit card statements, receipts, and the testimony of an IRS agent). Given its nature, there is no realistic possibility that the tax-fraud evidence was prejudicial to such a degree that it would have improperly influenced the jury's disposition of the Hobbs Act charges. Cf. Mubayyid, 658 F.3d at 40-43, 73 (finding evidence of defendants' support of terrorist organizations and "violent jihad" did not unfairly prejudice jury against defendants on counts of, among other things, tax fraud and making false statements to federal agency).

For another thing, there were sufficient dissimilarities between the evidentiary presentations on the tax-fraud and Hobbs

Act counts to make it easy for the jury to differentiate among the discrete charges. As other courts have observed, the degree to which "charges are intertwined with each other" and the extent to which "the evidence for the remaining counts is sufficiently distinct" are factors that shed light on the likelihood that the jury was able to compartmentalize evidence relevant to different groups of charges. United States v. Wright, 665 F.3d 560, 575 (3d Cir. 2012) (quoting United States v. Murphy, 323 F.3d 102, 118 (3d Cir. 2003)); see Rooney, 37 F.3d at 856. "[W]hen the reversed and remaining counts arise from completely distinct fact patterns and the evidence can be easily compartmentalized," it is more likely that the jury was able to "evaluate[] each count on the specific evidence attributed to it." Rooney, 37 F.3d at 856; see Mubayyid, 658 F.3d at 73.

This is such a case. Here, the Hobbs Act evidence focused on the defendant's alleged bribe-taking from marijuana vendors during his tenure as mayor. The tax-fraud evidence, by contrast, focused on his private-sector handling of SnoOwl funds during an earlier period and before he was elected to office. That latter evidence was sufficiently distinct from the Hobbs Act evidence to dissipate the threat of spillover prejudice. On this record, we are confident that the jury would have been able to compartmentalize and apply the distinct bodies of evidence to the

separate groups of charges.  See United States v. Portela, 167 F.3d 687, 701 (1st Cir. 1999).

Our conclusion that there was no spillover prejudice from the reversed counts is fortified by the fact that the jury acquitted the defendant on two of the Hobbs Act counts and the lone bribery count.  Put simply, the jury returned a discriminating verdict — and a discriminating verdict is an indication that spillover prejudice did not infect the jury's decisional calculus. As we have said, the fact that the jury's findings distinguished among counts can be "evidence that no spillover prejudice occurred." Simon, 12 F.4th at 44; see Edgar, 82 F.3d at 504 (holding that jury's acquittal on one of several counts demonstrated harmlessness of spillover evidence).  In a case like this one, in which the jury rendered a judgment of conviction "on only some of the charges, we are particularly reluctant to presume that the jury was unable to compartmentalize the evidence of each offense." Mubayyid, 658 F.3d at 74.  But a caveat is in order: because the jury acquitted on only three counts — counts unrelated to the counts of conviction — we give the jury's discerning verdict less weight than we ordinarily might.

We add that the basics for believing that the jury was able to compartmentalize is strengthened by the district judge's evaluation.  After all, the district judge — a veteran presider — saw the relevant events unfold at first hand and had a unique

opportunity to assess the trial's dynamics.  When — as in this case — the trial judge assesses the possibility of spillover prejudice and finds that possibility to be chimerical, an appellate court ought to give that assessment great weight.  See United States v. Sam Goody, Inc., 675 F.2d 17, 26 n.9 (2d Cir. 1982) (recognizing that a "trial judge is better situated than" an appellate court to assess the "presence and effect" of factors leading to spillover prejudice).

It bears mentioning, too, that the district court did yeomen's work in protecting against the possibility of unfair prejudice.  We have held that the district court adequately guards "against potential spillover prejudice by instructing the jury to consider the evidence separately as to each count."  United States v. Bailey, 405 F.3d 102, 112 (1st Cir. 2005); see Trainor, 477 F.3d at 36 n.23; United States v. Tracy, 989 F.2d 1279, 1284 (1st Cir. 1993).  The court did that here by telling the jury in substance — not once, but three times — that it was required to consider each of the counts separately; that it needed to parse the facts and circumstances in evidence regarding each count individually; and that its decision on any one count did not necessarily mean that it should reach the same decision on other related counts.

The defendant tries to parry this thrust by arguing that the district court should have instructed the jury that it needed

to consider the "groups" of charges separately. The failure to do so, the defendant says, may have implied to the jurors that they could conflate the evidence underlying the different groups of charges. But no such instruction was requested, nor did the defendant object to the charge on this ground. And in all events, no such instruction was required. In Zimny, for example, we held that a jury instruction nearly identical to the one given here was sufficient to protect against spillover prejudice notwithstanding that the district court had explicitly "told the jurors that the [assertedly unrelated] offenses were related." 873 F.3d at 59-60. We conclude, therefore, that the court's instructions guarded adequately against any cognizable risk of spillover prejudice.

The defendant tries to undermine the verdict from yet another angle. In a variation on his principal argument, the defendant suggests that he suffered spillover prejudice by virtue of the government's use of elements of the wire- and tax-fraud case to introduce themes that reinforced its Hobbs Act case. Specifically, the defendant says that the government used the wire- and tax-fraud case as a vehicle for portraying him as having a criminal disposition. Moreover, he says that the government injected the theme that he led a "lavish lifestyle" and would do or say "anything to enrich himself." In support, the defendant points mainly to comments that the government made during opening and closing statements to the jury.

The record provides some grounding for these arguments. In both its opening and closing statements, the government made comments that might be construed to suggest that the defendant had a criminal propensity. In its summation, for instance, the government stated (in relation to the tax-fraud charges) that "someone who says he has partners when it makes him look good but no partners when it costs him money [in taxes] is someone who will say anything to get what he wants." But neither this comment nor the other comments identified by the defendant drew any contemporaneous objection from defense counsel. And in all events, those comments were not sufficiently egregious or inflammatory to warrant a new trial. See United States v. Fattah, 914 F.3d 112, 189 (3d Cir. 2019); United States v. Henry, 325 F.3d 93, 109-10 (2d Cir. 2003).

The same is true of the statements linking the defendant's spending habits to political corruption. The defendant's strongest example is a comment made by the government in its closing statements to the effect that the defendant "would and did say anything to anyone to get what he wanted," including by "convinc[ing] and persuad[ing] people from all walks of life, from a trusting [investor] to rough-and-tumble street guys, to do what he wanted, and what he wanted was money, and what he wanted was power. Money he was willing to steal and power he was willing to sell." This statement, too — and its cousins in the record —

drew no contemporaneous objection from defense counsel. And at any rate, this line of argument was not sufficiently egregious or inflammatory to warrant a new trial. See Fattah, 914 F.3d at 189 (declining to deem reference to defendants' "lies and deception" inflammatory).

Even so, our opinion should not be read as an endorsement of the statements made by the prosecutor. As a general matter, prosecutors would do well to refrain from using such statements in the future. Under abuse of discretion review and viewed in context of the record as a whole, however, the prosecutor's comments — though inelegant — are insufficient to warrant annulment of the jury verdict on the ground of prejudicial spillover. See Henry, 325 F.3d at 109-10.

Our conclusion that the purported thematic connections did not give rise to prejudicial spillover is reinforced by the strength of the district court's instructions. As we have said, the district court substantially lessened the risk that the jury would conflate the wire- and tax-fraud charges with the Hobbs Act charges by instructing in unmistakable terms that each count should be considered separately. See Bailey, 405 F.3d at 112. Just as those instructions minimized the risk that the jury would improperly conflate the evidence, so too did those instructions safeguard against the possibility that the jury would seize upon the prosecutor's comments to forge impermissible thematic links.

Finally, the defendant strives to persuade us that the cumulative effect of the dismissed wire- and tax-fraud counts clouded the jury's ability to assess the evidence. Specifically, the defendant claims that, absent the wire- and tax-fraud evidence, the jury would have more carefully scrutinized the government's evidence and witnesses regarding the Hobbs Act counts. In other words, the defendant exhorts us to find that the credible evidence on the dismissed counts lent a false sense of corroboration to the counts of conviction. As an example, the defendant points to Costa's testimony and says that, without the testimony of the credible wire- and tax-fraud witnesses and the volume of evidence introduced in support of those charges, the jury likely would not have "accepted Costa's testimony at face value."

We are not convinced. For a start, the defendant's assent to a joint trial meant that the jury would be presented with evidence relating to both SnoOwl and the defendant's alleged extortion of marijuana vendors as mayor. And because three of the wire-fraud convictions remain standing, the jury would have heard much of the same wire-fraud evidence in any event. Last — but far from least — we afford appreciable deference to jury determinations of witness credibility. See United States v. Carroll, 105 F.3d 740, 743 (1st Cir. 1997) (noting that "[c]redibility determinations are . . . squarely within the jury's domain"). Given these facts and given the extensive evidence undergirding

the Hobbs Act convictions, the defendant has failed to show "prejudice so pervasive that a miscarriage of justice looms." Simon, 12 F.4th at 43-44 (quoting Trainor, 477 F.3d at 36).

We add a coda. We do not gainsay that, in particular cases, spillover prejudice may be inimical to a defendant's fair-trial right. In this case, though, the record makes manifest that the district court was sensitive to this danger and carefully guarded against it. We discern no abuse of discretion in the court's refusal to order a new trial based on the claim of spillover prejudice.

V

Battling on, the defendant challenges the form and substance of the district court's jury instructions. "The scope of our review is shaped by whether [the appellant] properly raised and preserved an objection to the instructions at trial." United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009) (quoting Jones v. United States, 527 U.S. 373, 387 (1999)). We review preserved objections to the wording and form of instructions for abuse of discretion. See id. We review preserved claims of error that target the substance of the instructions — that is, whether they conveyed the essence of the applicable law — de novo. See United States v. De La Cruz, 835 F.3d 1, 12 (1st Cir. 2016); United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). So, too, preserved

objections to the omission of necessary jury instructions engender de novo review.  See De La Cruz, 835 F.3d at 12.

Unpreserved claims of error stand on a different footing.  We review all such claims, regardless of whether they go to the wording, form, or substance of the instructions, for plain error.  See United States v. Goris, 876 F.3d 40, 46 (1st Cir. 2017).  Under this standard, a conviction may only be disturbed if the defendant shoulders the heavy burden of proving "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).  The party claiming "plain error must carry the devoir of persuasion as to all four of the[] elements" embedded in this construct.  United States v. Pinkham, 896 F.3d 133, 136-37 (1st Cir. 2018).

**A**

The defendant's first claim of instructional error is that the district court abused its discretion by submitting fractional written instructions to the jury that did not include overarching instructions on concepts such as the presumption of

innocence, reasonable doubt, and witness credibility. Some background helps to set the stage.

The district court's charge, given ore sponte at the conclusion of the trial, fully covered the concepts of the presumption of innocence, reasonable doubt, and witness credibility. The defendant does not fault those instructions. But the court then proceeded to give the jury portions of its instructions, in writing, to take into the jury room. These portions included a description of the elements of the crimes charged and what the government was required to prove. They did not, however, include the court's instructions on the presumption of innocence, reasonable doubt, and witness credibility. That said, the court cautioned the jury "not to get too entranced by the written instructions" and reminded the jurors that they could not "disregard" the "foundational kinds of issues, like the idea that the government must prove each essential element beyond a reasonable doubt [and] that the defendant is presumed innocent."

The defendant contends that the court underemphasized the latter concepts and the concept of witness credibility by excluding them from the fractional portions of its charge that were reduced to writing and sent into the jury room. We assume for argument's sake that this contention was preserved.[7] As such,

---

[7] The defendant voiced this objection during the pre-charge conference, but the district court brushed it aside. The court

it engenders review for abuse of discretion. Evaluating the
contention on this basis, we find it unconvincing.

A district court enjoys "considerable discretion in how
it formulates, structures, and words its jury instructions."
United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001). That
discretion extends to decisions about whether to submit written
instructions to the jury. See United States v. Previte, 648 F.2d
73, 84 (1st Cir. 1981). The defendant argues that this discretion
is nonetheless cabined: in his view, the court may only submit
either the written version of its complete charge or nothing at
all.

Our evaluation of this all-or-nothing proposition is
guided by our decision in United States v. Parent, 954 F.2d 23
(1st Cir. 1992). There, the district court submitted a written
excerpt of its charge in response to the jury's request for a
written supplemental instruction. See id. at 24. We noted that,
by submitting only a portion of the charge, the court elevated the

---

told the defendant that he could clarify the objection after the
court had delivered the charge and sent the jurors to deliberate.
Following the court's lead, the defendant objected again at that
time. The defendant should have raised the objection before the
jury was sent to deliberate. See Fed. R. Crim. P. 30(d); see also
United States v. Serrano-Delgado, 29 F.4th 16, 25 (1st Cir. 2022)
("[W]e deem objections to jury instructions automatically
unpreserved unless made after the instructions are given and before
the jury retires."). But that failure may well be absolved because
defense counsel appears to have been acting pursuant to the
district court's explicit instructions.

risk that the jury would place undue weight on the portion of the charge committed to writing. See id. at 26. But we also noted that it was not "per se error for a judge, having charged orally, to honor a jury's request for a written supplemental instruction." Id. at 27 (emphasis in original). And we went on to admonish that "if a fractional written supplement is to be used following the entirety of an oral charge, the judge must be extremely careful to avoid the possibility of prejudicial emphasis." Id. Finally, we suggested that a district court might guard against prejudicial emphasis "by carefully reminding the jury of other aspects of the original charge and cautioning them that the segment of the charge which is amplified or explained should be considered in the light of the other instructions and is not to be given undue weight." Id. (quoting Beardshall v. Minuteman Press Int'l, Inc., 664 F.2d 23, 28 (3d Cir. 1981)). Parent leaves no doubt that the defendant's all-or-nothing proposition is not good law.

The question remains, though, whether the district court acted within the encincture of its discretion in deciding to submit these particular fractional written instructions to the jury. We approach that question with care, mindful that submitting fractional written instructions to a jury is always a risky business. A district court's employment of such a praxis always must be evaluated on a case-by-case basis. In this instance, we find that the district court stepped carefully in Parent's

footprints and successfully "avoid[ed] the possibility of prejudicial emphasis." Id.  During its initial charge to the jury, the court eloquently elaborated the concepts of the presumption of innocence, reasonable doubt, and the importance of judging witness credibility.  It referred to those concepts repeatedly throughout its instructions on the elements of the different categories of offenses.  Then — immediately before it submitted the fractional written excerpts to the jurors — the court warned them not to "get too entranced by the written instructions."  And the court wisely reminded the jurors of the "foundational . . . issues" such as "that the government must prove each essential element beyond a reasonable doubt [and] that the defendant is presumed innocent." The court then directed the jurors to "keep all of those in mind" and not "disregard them."

Viewed against this backdrop, we discern no abuse of the district court's wide discretion.  To begin, we think it important that the submission of the fractional written instructions to the jury was made as part of the charge as a whole (and not in response to a mid-deliberation jury question).  Moreover, although the fractional written instructions were incomplete, the court gave the jury suitable warnings about placing too much emphasis on them. It also explicitly reminded the jury of the reasonable-doubt standard and the presumption of innocence.  We presume that juries follow instructions given by the district court, see United States

v. Bradshaw, 281 F.3d 278, 292 (1st Cir. 2002), and the defendant has advanced no credible reason for eschewing that presumption here.

Let us be perfectly clear. Our opinion should not be read to condone the district court's approach as per se acceptable. But in the circumstances of this case, we do not think that the court abused its discretion, given the safeguards that it employed to limit the possibility that the jury would place undue weight on the fractional written instructions.

B

The defendant also challenges the substance of the jury instructions in three respects. Because none of these challenges was preserved, we review them for plain error. See Goris, 876 F.3d at 46. "[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors." United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001). It is "the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Gonzalez, 570 F.3d at 21 (quoting United States v. Weston, 960 F.2d 212, 216 (1st Cir. 1992)). This is not that rare case.

1

The defendant submits that the district court should have instructed the jury to consider the different "groups" of

crimes separately. He takes issue with the fact that, when the court instructed the jury on the elements of the various groups of crimes charged, it introduced each new group with a version of the following instruction:

> You must consider each of these counts, they're separate counts, each of these counts on the facts and circumstances of the evidence regarding them separately. Your decision as to any one of those counts does not necessarily mean that you will reach the same decision with respect to any other of those counts. They stand on their own and are evaluated on their own.

In the defendant's view, this type of instruction may have led the jurors to believe that they could draw inferences as to the defendant's guilt across groups even if they understood that they could not do the same within groups.

We think that the defendant's fears are overblown. The chief difficulty with his argument — beyond the stark fact that the defendant did not make the argument below — is that a jury instruction "must be evaluated not in isolation but in the context of the entire charge." See Gonzalez, 570 F.3d at 21 (quoting Jones, 527 U.S. at 391). Looking to the charge as a whole, we find ample reason to believe that the jury was adequately instructed about its obligation to assess each count — both across and within groups — individually.

Notably, the defendant does not suggest that the district court failed to instruct the jury on the specific elements

of each group of charges. Nor could he: the court was careful to explain that the government was required to prove each element of each offense beyond a reasonable doubt. In this way, the court highlighted that the counts were distinct. Cf. Trainor, 477 F.3d at 36 n.23 (emphasizing that district court instructed jury that each count was separate and that government had to prove each element of each count beyond a reasonable doubt); United States v. Chambers, 964 F.2d 1250, 1251 (1st Cir. 1992) (similar).

Equally as important, the verdict slip required that the jury make an individual determination of the defendant's guilt or innocence on each and all of the twenty-four charged counts. See, e.g., United States v. Saunders, 553 F.3d 81, 85 (1st Cir. 2009) (noting with approval that verdict slip differentiated between all counts). The court — in telling the jurors about the verdict slip — explained "that [the slip] w[ould] show you how each one of these counts is separate and requires a separate determination by each of you in which you're asked to answer not guilty or guilty with respect to those counts." Although this explanation was given after the court had instructed the jury on the elements of wire fraud, the court later emphasized that the verdict slip required the jurors to assess "whether or not [the government] proved beyond a reasonable doubt each essential element of the offenses that are reflected in that . . . slip" — thereby reinforcing the separate and distinct nature of all twenty-four counts.

The best evidence that the district court charge adequately conveyed the separate nature of the counts is the jury's discriminating verdict. That verdict is strong evidence that the jurors fully understood that their decision on one count was separate and distinct from their decisions on the other counts. See, e.g., United States v. Brennan, 994 F.2d 918, 925 (1st Cir. 1993) (noting that "discriminating verdict suggests to us that the jury was fully able to follow the court's instructions and differentiate between the counts"); United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990) (concluding that discriminating verdict, in and of itself, "evidenced that the jurors were able to, and did, follow the court's instructions").

To say more would be to paint the lily. There was no plain error in the district court's instructions regarding the separate nature of the counts.

### 2

The defendant's next claim of instructional error targets the district court's jury instructions with respect to the counts charging him with extortion under color of official right. The court, he says, should have instructed the jury that it had to find that he personally benefited from each extortive scheme.

This claim of error entails — albeit in different garb — a view of the law that we already have debunked. See supra Part III(C)(2). We see no reason to repastinate soil that has already

been well-plowed.  Suffice it to say that there was no plain error
in this respect.

3

In his last claim of instructional error, the defendant
asserts that the district court's instructions regarding
conspiracy to commit extortion failed adequately to explain the
applicable law.  As he envisions it, the court should have
indicated that when consent or acquiescence is inherent in the
underlying substantive offense, "something more than bare consent
or acquiescence may be needed to prove that the person was a
conspirator."  Ocasio, 578 U.S. at 292.  Absent such an
instruction, the defendant suggests, the jury could have found a
conspiratorial arrangement between the defendant and a bribe-payer
(say, Pichette or Saliby) based on the latter's mere acquiescence
in the payment of the bribe.

Even if we assume that the omission of the proposed
instruction was error — a matter on which we take no view — the
defendant stumbles at the second step of the plain error construct.
At that step, the defendant must make an incremental showing:  he
must show a "clear or obvious" error.  Duarte, 246 F.3d at 60.  A
clear or obvious error is one that "at the very least,
contradict[s] existing law."  United States v. Gonzalez, 981 F.3d
11, 22 (1st Cir. 2020), cert. denied, 141 S. Ct. 1710 (2021); see
United States v. Rabb, 5 F.4th 95, 101 (1st Cir. 2021) (describing

such an error as one that "is contrary to existing law" or "'indisputable' in light of controlling law" (quoting United States v. Jones, 748 F.3d 64, 69-70 (1st Cir. 2014))). We do not think that the court's omission of the belatedly sought instruction can fairly be said to have surmounted that high threshold.

As said, to prove that the defendant was guilty of conspiracy to commit Hobbs Act extortion, the government was required to show that he conspired to obtain property from another, with the other's consent, under color of official right — meaning, in practical terms, that he conspired to obtain a payment to which he was not entitled, knowing that the payment was made in return for an official act. See Ocasio, 578 U.S. at 285 (quoting Evans, 504 U.S. at 268); Turner, 684 F.3d at 253. And to prove the requisite conspiracy, the government had to "show, inter alia, that an agreement or working relationship existed, that it had an unlawful purpose, and that the defendant was a voluntary participant in it." Echeverri, 982 F.2d at 679 (emphasis in original).

The district court's instructions regarding conspiracy to commit extortion tracked these elements. The court told the jury that, to find the defendant guilty of conspiring to violate the Hobbs Act, it had to find that he "willfully" entered into an "agreement" with "at least one other person" to "commit extortion under color of official right." The court added that the

- 69 -

government must "prove beyond a reasonable doubt that those who
were involved [in the agreement] shared a general understanding
about the object of their agreement" and warned that "[m]ere
similarity of conduct among various people or the fact that they
may have associated together with each other or discussed common
[aims] and interests does not necessarily establish proof of the
existence of a conspiracy."   The court's partial written
instructions recapitulated these points.

It also bears mention that the court — in both its oral
and written instructions — made clear that the "agreement" which
the jury needed to find was the agreement specified in the relevant
count of the indictment and "not some other agreement with other
people involving other things."  The indictment — itself sent to
the jury — charged that Brayton, Bairos, Pichette, and Saliby were
"[v]ictim[s]" of the defendant's extortionate scheme, not co-
conspirators, and that the defendant had conspired to commit Hobbs
Act extortion by "obtaining property" from those "victims" with
their consent.[8]

---

[8] For the sake of completeness, we note that elsewhere in his
brief, the defendant concedes that, in a jury note, the jury
"distinguished between 'member of conspiracy' and 'victim.'"
According to the defendant, that distinction demonstrates that the
jury "understood the prosecution's trial theory to be that Mr.
Correia agreed with Hebert and Andrade to extort Pichette and
Saliby, respectively."  Taking the defense at its word, then, the
jury did not understand the government's theory to be that Pichette
and Saliby were simultaneously victims and the lone co-
conspirators of the respective extortion schemes, such that the

Even if the court's instructions may not have been letter-perfect, they "constitute[d] a fair statement of the applicable law concerning" conspiracy to commit extortion under the Hobbs Act. Paniagua-Ramos, 251 F.3d at 247. At the very least, the instructions were not "contrary to existing law." Rabb, 5 F.4th at 101.

We hold, therefore, that — in the absence of a contemporaneous objection — the district court did not commit clear or obvious error by failing to instruct the jury sua sponte that "something more than bare consent" was needed to prove extortion conspiracy. Plain error was plainly absent.

## VI

The defendant's final claim of error posits that alleged prosecutorial misconduct during closing argument compromised his right to a fair trial. This claim has a porous foundation: the defendant did not contemporaneously challenge the conduct of which he now complains, nor did he challenge it in his post-trial motion. Our review, therefore, is only for plain error. See United States v. Walker-Couvertier, 860 F.3d 1, 10 (1st Cir. 2017).

We first supply some context. During his closing, the prosecutor played and referred to a video clip, previously admitted into evidence, which was excerpted from a 2015 mayoral campaign

---

government would need to show that their payment of bribes amounted to more than "mere acquiescence." Ocasio, 578 U.S. at 298.

debate.  Early in the debate, the defendant had touted his entrepreneurial accomplishments and cited SnoOwl as the pièce de résistance.  In the video clip, the defendant's opponent challenged the defendant to:

> Show us the proof. It looks to me as if SnoOwl isn't doing much of anything. How much money did you borrow to get SnoOwl started? And have you paid any of your investors back? Because once again, that's something that the public deserves to know. My record over the past 10 years in public life is an absolute open book. You – yours is the opposite of that.

The defendant responded:

> [My opponent] is again showing his inexperience in the business community. An investor is a partner in your business. It's not a loan. We have taken in hundreds of thousands of dollars from investors, and our goal is to get them a return on their investment. That's exactly what I do. And that's why I am running for mayor, because I am going to take your ta[x] dollars, and I'm going to invest them in the right places. . . . I am going to take your money and spend it wisely. That's what I do in my business. You can talk to any of my investor-partners, and they'll tell you they love SnoOwl, they love their investment. It's not a loan. It's not a debt. The word "investor" means "partner."  They are partners in my company.

The prosecutor played this clip three times during his closing, all in the portion dedicated to the fraud charges.  The first time he played it he asked the jury to compare what the defendant "said to the voters of Fall River in that October 2015 mayoral debate" with the testimony of the defendant's ex-

girlfriend, who had testified to some of the defendant's
extravagant spending habits. After that display of the video clip,
the prosecutor said:

> Spend it wisely? Like he does in his business?
> $32,118 on [his ex-girlfriend], $3,000 at the
> Intercontinental, Tiffany jewelry, $18,000 in
> personal purchases, campaign literature and
> stickers. Spend it wisely? He had no problem
> looking the voters right in the eye and
> telling them he spent this money wisely,
> knowing it wasn't true. Think about that. It
> tells you a lot.

Later in his summation, the prosecutor again used the
video clip (this time when deriding the defendant's boasts about
SnoOwl). Before playing the clip, the prosecutor suggested that
the jurors should "remember again . . . when the defendant stood
before the voters and touted what he had done for SnoOwl." Then
— after the video clip had been shown — the prosecutor commented:

> "That's exactly what I do. I get them a return
> on their investment." That's what he said to
> the voters in October of 2015. But think about
> that statement in the context of what the bank
> records for SnoOwl actually showed at that
> very time. The Citizens account in October of
> 2015 had $69. Hundreds of thousands gone. $69.
> The BayCoast account, negative $709, the same
> month.

> Folks, someone who can look the voters in the
> eye and say he got his investors a return when
> he knows negative $600 is what the company has
> and that the app is dead, that is someone who
> will say anything to get what he wants.

The prosecutor's last use of the video clip occurred in
connection with the tax-fraud charges. Specifically, that use

occurred when the prosecutor was discussing the defendant's tax returns and the question of whether the defendant cheated on his taxes by claiming SnoOwl was a sole proprietorship as opposed to a partnership.  Again, the prosecutor asked the jury to remember what the defendant said when he "looked the voters in the eye . . . when he was questioned about SnoOwl and whether there were loans."  The prosecutor played the video clip for a third time and then remarked:

> Couldn't be clearer, right? October 2015, Jasiel Correia has partners. Then somehow in 2017 when he has to amend his returns and partners will cost him tens of thousands of dollars in tax liability, those partners disappear. He files a sole proprietorship return. Magically, the partners, just the way SnoOwl did in 2015, have disappeared. Now he's supposedly a sole proprietorship, one owner. Not true. And someone who says he has partners when it makes him look good but no partners when it costs him money is someone who will say anything to get what he wants. And it's the type of person who, after taking all the money he admitted he took to [an accountant], would still have the gall to ask the IRS for a refund.

The defendant did not object to the prosecutor's use of the video clip on any of these three occasions.  Nor did he object to any of the prosecutor's related statements.  And although the defendant made a passing mention of the video clip in his post-trial motion, that mention was only in connection with his contention that the charges against him should have been severed.  Thus, the district court had no occasion to comment upon the

prosecutor's use of the video clip when it denied the defendant's alternative motion for judgment of acquittal or for a new trial.[9]

In this venue, the defendant contends that the prosecutor's use of the video clip during his closing and his associated comments amounted to prejudicial misconduct for two principal reasons. First, the defendant alleges that the prosecutor's actions constituted an improper propensity argument. See, e.g., United States v. Taylor, 284 F.3d 95, 102 (1st Cir. 2002). Second, the defendant alleges that the video clip and the associated comments played too heavily to the jurors' emotions by inviting them to convict the defendant for pulling the wool over the eyes of Fall River voters. See, e.g., United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994) (explaining that "arguments urging a jury to act in any capacity other than as the

---

[9] Even so, the district court's views are not a secret. In passing upon a motion for continued release on bail, the district court canvassed the arguments made in the defendant's opening brief in this court. That brief apprised the district court — for the first time — of the defendant's contention that prosecutorial misconduct related to the use of the video clip during closing argument warranted a new trial. The court made pellucid that it did not consider "the government's use in closing argument of a videotape clip of [the defendant's] statements in a mayoral debate []as sufficiently improper to justify a new trial." Correia, 2022 WL 1004200, at *6. The court "did not then view the [prosecutor's] argument, graphically presented and underscored through the video clip, to be improper in whole or in part." Id. Rather, "it was fair argument . . . go[ing] to the core relevant issue in this case, that of scienter." Id.

impartial arbiter of the facts in the case before it are improper").

        Plain error review is not appellant-friendly. We previously have outlined the steep uphill climb that is required for an appellant to prevail under plain error review. See supra Part V (quoting Duarte, 246 F.3d at 60). As applied to closing arguments, we have given the plain error standard a practical twist. In that setting, "the plain error standard requires the court first to determine whether the challenged comment is obviously improper, that is, whether the first two prongs of the plain error standard have been satisfied." Walker-Couvertier, 860 F.3d at 10. And if that is so, "the court must proceed to consider whether the comment 'so poisoned the well that the trial's outcome was likely affected.'" Id. (quoting United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)). In conducting this appraisal, we "must weigh factors such as the severity of the misconduct, the context in which it occurred, the presence or absence of curative instructions, and the strength of the evidence." Id.; see United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011).

        The district court did not regard the deployment of the video clip and the associated comments as "improper in whole or in part." See supra note 9. But even if we assume, favorably to the defendant, that the alleged misconduct constituted clear or obvious error — a matter on which we take no view — it cannot

fairly be said that the alleged misconduct "so poisoned the well that the trial's outcome was likely affected."  See Mejia-Lozano, 829 F.2d at 274.  We explain briefly.

We start with some general observations.  Our inquiry is case-specific, see Simon, 12 F.4th at 61, and the trappings of this case are sui generis. We recognize both that the prosecutor's statements were deliberate — the government frankly admits that it used the video clip as a means of contrasting the defendant's statements with other evidence in the case — and that the deliberate nature of the statements is a factor favoring the defendant in the misconduct analysis.  See United States v. Belanger, 890 F.3d 13, 34 (1st Cir. 2018).

Here, however, the alleged misconduct was not so severe as to require reversal.  Indeed, the trial judge — who saw the three uses of the video clip and heard the associated comments in real time — found nothing amiss.  See supra note 9.

To be sure, statements made in the heat of a political campaign cannot and should not always be taken literally.  That does not mean, though, that the campaigner is entitled to a free pass.  But the same is true for the prosecution.  In that regard, we note our concern that the government's use of campaign videos in criminal prosecutions, especially on unrelated charges, may have a chilling effect on political speech — the very category of speech as to which the First Amendment affords the highest level

of protection.  See, e.g., Rideout v. Gardner, 838 F.3d 65, 75 (1st Cir. 2016).  We caution, then, that our opinion should not be read as a wholesale condonation of the tactic employed by the government in this case; and we will continue to evaluate allegations of prosecutorial misconduct that implicate free-speech concerns on a case-by-case basis.

Notwithstanding our generalized concern, we find no plain error here.  The deployment of the video clip and the comments associated with it appear to have been little more than a rhetorical device, thrice repeated.  And even though the challenged comments may have suggested that the voters of Fall River had been duped, nothing in the record suggests that invoking the plight of those voters would have clouded the jury's ability to weigh the evidence fairly.[10]

Nor was this a case in which the prosecutor introduced improper argument early in the trial and proceeded to weave that improper theme into the fabric of the case.  See, e.g., United States v. Canty, 37 F.4th 775, 792 (1st Cir. 2022).  The opposite is true:  the prosecutor's use of the video clip played only a tiny part in a long and complex trial.  The video clip itself was introduced into evidence without objection, and the challenged

---

[10] We note that there is no indication in the record that any Fall River voter was seated on the jury that decided the defendant's case.

comments — which were limited to the wire- and tax-fraud counts — take up only a few lines of a transcript that runs thousands of pages.

We also find it significant that the defendant's trial counsel did not object to what the defendant now alleges was misconduct. Where, as here, a seasoned attorney does not object to remarks made during closing argument, this silence "suggest[s] that the remarks were not seen at the time" as poisoning the well. Belanger, 890 F.3d at 35; see Kasenge, 660 F.3d at 543.

The sockdolager, of course, is the strength of the government's evidence. We consistently have held that "the well is less likely to have been poisoned where strong evidence supports the prosecutor's case." Walker-Couvertier, 860 F.3d at 10 (internal alteration omitted) (quoting Kasenge, 660 F.3d at 543). So it is here. Viewing the record as a whole, see Arrieta-Agressot v. United States, 3 F.3d 525, 528 (1st Cir. 1993), the proof of the defendant's guilt on each and every count of conviction was solid.

In this case, all roads lead to Rome. In view of the prosecutor's scattershot references in his summation to the video clip, the absence of any contemporaneous objection to those references, the government's independently powerful case against

the defendant, and the instructions given by the district court,[11]
we conclude that the defendant has not shown a likelihood that the
alleged misconduct prejudiced the jury and, thus, influenced the
outcome of the case.

The defendant resists this conclusion. He marshals some
case law in support of his resistance — but the defendant is
comparing plums with pomegranates. Two examples suffice to
illustrate this point.

In Canty — a case in which the defendants were convicted
of conspiracy to possess and distribute drugs — "the prosecutor
made four types of improper comments at different points during
the opening statement, at closing, and at rebuttal." 37 F.4th at
781. "Each built upon the others and introduced improper themes."
Id. Notably, the prosecutor improperly appealed to the jury's
emotions by casting the defendants "as cruel and greedy outsiders
who came to [the state] to distribute illegal drugs to suffering
[citizens]"; argued that the defendants were guilty by association
with others who had already been convicted; vouched for the

---

[11] The district court carefully instructed the jury that its
verdict must be based solely on the evidence. That instruction
mitigated any improper residual impact that the prosecutor's
statements may have had. See, e.g., United States v. Veloz, 948
F.3d 418, 436 (1st Cir.) (holding that similar instructions
significantly undercut any prejudice from improper statements),
cert. denied, 141 S. Ct. 438 (2020); Walker-Couvertier, 860 F.3d
at 11 (same); see also Mejia-Lozano, 829 F.2d at 274 (collecting
cases).

credibility of witnesses; and mischaracterized video evidence, thus subverting the court's instruction that the evidence was admissible only against one of the defendants. See id. at 786-90. Given these serial missteps, we held that the prosecutor's obviously improper statements were cumulatively severe and — even on plain error review — were so prejudicial as to warrant a new trial. See id. at 791.

Our decision in United States v. Carpenter, 494 F.3d 13 (1st Cir. 2007), also serves to illustrate the incongruity of the authorities on which the defendant relies. There, the defendant was convicted of defrauding investors by misrepresenting his investment strategy. See id. at 16. During closing argument, the prosecutor made extensive use of a metaphor that likened the defendant to a "gambler" and his management of his clients' money to "gambling." See id. at 17, 23. The prosecutor "used some permutation of the word 'gamble'" eighteen times, including through "provocative references to 'cashing in chips,' 'doubling down' and 'river boat gambler.'" Id. at 23. We affirmed the grant of a new trial based on "the frequency with which the gambling references were made," their persistently pejorative nature, and our conclusion that they "were intended to, and did, inflame the jury's passions against the defendant." Id. at 22-24.

The case at hand is cut from markedly different cloth. Viewed in light of the record as a whole, the alleged misconduct

simply does not support the defendant's claim that the prosecutor's deployment of the video clip during closing argument and the associated comments likely skewed the outcome of the trial. Because the well was not poisoned here, it necessarily follows that plain error lies beyond the defendant's reach.

**VII**

We need go no further. The record reveals that the defendant was fairly tried and lawfully convicted by an impartial jury in a trial presided over by an able judge and unblemished by any reversible error. For the reasons elucidated above, the judgment of the district court is

**Affirmed**.